IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EMMA C. et al.,

          Plaintiffs,

    v.

DELAINE EASTIN, et al.,

         Defendants.

NO. C96-4179 TEH

ORDER IMPOSING SANCTIONS ON DEFENDANTS CALIFORNIA DEPARTMENT OF EDUCATION

This Court issued an Order on December 20, 2007 that required Defendant CDE to perform a staffing analysis for Ravenswood City School District by January 28, 2008. Specifically, it ordered:

> Using the IEPs of students rather than the District database (as the RSIP does not currently contain an effective measure of database accuracy), CDE shall determine the appropriate staffing level for special education and related services providers (teachers, occupational therapists, speech therapists, psychologists, paraprofessionals, social workers, etc.) in the District. In calculating the number of staff needed, CDE should allow adequate time for staff attendance at IEP meetings, parent-teacher conferences, planning time, collaboration with general educators, other case management activities, travel time (for staff who serve students at more than one school site) and staff meetings. By analyzing staff absences, CDE shall also determine the number of "floater" substitutes necessary to ensure uninterrupted service delivery during staff absences and the delivery of compensatory education when staff are not absent.
>
> The results of this analysis shall be communicated to the Court Monitor and the Parties by memorandum no later than January 28, 2008.

Order at 5:7-19.

On January 28, 2008, CDE submitted what it labeled "Staffing Analysis Report" to the Court Monitor. The document was not even a tentative staffing analysis. At best, it described the steps CDE had taken to start performing a staffing analysis.

Accordingly, on January 31, 2008, the Court ordered defendant CDE to show cause why it should not be sanctioned for its failure timely to comply with the order – specifically, whether CDE had "failed to take all reasonable steps" within its power to comply. *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993).

The CDE submitted a Response and the Declarations of Christine Pittman, Ruby Smith, Dennis Kelleher, Waldon Williams, Michael Hancock, Alison Greenwood, Bill Lundquist, John Ellis, Shirley Geddes, Dennis Self, Nicki Swenson, and Penny SantaCruz. Both Plaintiffs and the District submitted Replies to the Response.

The Court held a hearing on the show cause order on February 27, 2008. CDE was given opportunity to present evidence and argument in opposition to the Order to Show Cause. Ms. Pittman, the Administrator of the Focused Monitoring & Technical Assistance Unit III of the CDE's Special Education Division, Ms. Smith, a CDE Special Education Consultant responsible for monitoring the compliance of Ravenswood with state and federal special education law, Mary Hudler, Director of the CDE's Special Education Division, and Dr. Kelleher, the retired annuitant hired by the CDE to perform the staffing analysis, were called as witnesses, sworn, and testified. The matter was submitted at the close of the hearing.

After carefully considering both the briefing and evidence submitted in advance of the hearing by all parties, and the arguments and evidence offered by CDE at the hearing, the Court makes the following findings of fact and conclusions of law, and holds that imposition of sanctions is warranted.

//
//
//

**FINDINGS OF FACT**

The relevant facts are largely undisputed.

2

The Court issued its Order setting January 28, 2008 as the deadline for the CDE to produce a staffing analysis on December 20, 2007. On Friday, December 21, 2007, Waldon Williams, a CDE special education consultant, received a copy of the Court's Order. He contacted Ms. Pittman the same day by telephone and email about the Order. Ms. Smith also received and reviewed the Order on that day.

Ms. Smith and Mr. Williams met on December 26, 2007 to discuss the Order.

Ms. Pittman did not review the Order until January 2, 2008, when she returned to her office after being home because of her husband's surgery and the holidays. She did not do so because she "knew that the District was closed from December 20th through January 4th" and so believed that there was "no way to gain access to or communicate with the District until January 7th." Declaration of Christine Pittman In Response To Order to Show Cause ("Pittman Decl.") ¶ 2.

On January 2, 2008, Ms. Pittman met with Ms. Hudler to discuss compliance with the Order. She also met with Ms. Smith and Mr. Williams. Ms. Smith agreed to begin "researching methodologies for staffing analysis that CDE staff would utilize" if she could not identify an outside contractor to perform the staffing analysis. *Id.* ¶ 4. Ms. Pittman also attempted to set up a meeting with CDE's counsel on January 2nd.

On January 3, Ms. Pittman directed her staff to begin reviewing the files of students with disabilities and their IEPs at Ravenswood City School District. She also instructed her staff to begin looking for a contractor to perform the staffing analysis and to contact SELPA and the San Mateo County Office of Education for assistance.

On Monday, January 7, Ms. Smith and Mr. Williams traveled to the District and began reviewing IEPs in order to perform the staffing analysis and service logs in preparation for the compensatory services report also required by this Court's December 20th, 2007 Order. Although Ms. Smith and Mr. Williams stated that they realized on that day that the task would be more complex than they anticipated, the problems they identified – flaws in the provider service logs (*see* Declaration of Ruby Smith In Response To Order to Show Cause ("Smith Decl.") ¶ 3, Declaration of Waldon Williams In Response To Order to Show

3

Cause ("Williams Decl.") ¶ 3*)* – were relevant only to the compensatory services report, not the staffing analysis.

The same day, Ms. Pittman met again with Ms. Hudler and other administrators. At the meeting, Ms. Hudler instructed managers in the Special Education Division that Ms. Pittman "would be coming to them with staffing needs as she determined them. And they were to give her whatever resources ... she requested. In other words, she had full power to identify, even, the people that she needed, and that it would be up to those managers to reassign people to fill in behind them, so that there would be no interruption of the work that she needed to do and oversee in Ravenswood." Reporter's Transcript of Hearing, February 27, 2008 ("RT") at 49 (Hudler).

On January 7, 2008, this Court issued an Order giving CDE one extra week to put IEP Coordinators in place in the District. The Order specifically chastised CDE for not seeking an extension: if compliance was impossible, "CDE should have sought relief immediately, rather than waiting until the business day before compliance was required." January 7, 2008 Order at 1.

On January 8, 2008, Ms. Pittman met with FMTA III staff to talk about the Court's Order. Over the next few days, various CDE staff members engaged in a range of tasks directed toward finding a contractor to perform the staffing analysis and researching how to perform such an analysis. Those tasks included calling California Services for Technical Assistance and Training for the names of possible experts, requesting a copy of the California Special Education Management Information System student data report, consulting with SELPA and the District's Director of Human Resources, and performing internet research on staffing analysis models.

On January 14, 2008, Ms. Smith requested copies of staff absence reports from Ravenswood's fiscal manager.

On January 16, 2008, Ms. Pittman held a meeting with CDE administration members, including Ms. Hudler, to discuss the requirements of the Court's December 20, 2007 Order. Pittman Decl. ¶ 11.

On January 17, 2008, one of CDE's Special Education Administrators recommended retired annuitant Dr. Dennis Kelleher as a possible contractor for the staffing analysis. The next day, Ms. Pittman called Dr. Kelleher to discuss the staffing analysis project with him. Dr. Kelleher asked to be able to think about the proposal until Tuesday, January 22. On January 22, 2008, Kelleher agreed to complete staffing analysis, but warned Ms. Pittman that he might not be able to meet the Court's deadline.

In the meantime, efforts to collect information from student IEPs began again. On January 17, Ms. Smith met with Alison Greenwood and Mike Hancock, CDE staff serving as interim IEP Coordinators for the District, and discussed "strategies for completing the file reviews" begun on January 7th. Smith Decl. ¶ 7. On January 18, Smith and Greenwood started extracting data from IEPs and entering data onto forms. Ms. Smith called Ms. Pittman, informed her that the task was "too complex and detailed" for four people to complete in the space of a few days, and requested additional staff. *Id.* ¶ 8.

On January 20, Allison Greenwood developed a spreadsheet to collect data for both the staffing analysis and the compensatory services report.

On January 22, Ms. Pittman directed five additional CDE staff members to help gather data from the IEPs in the District. CDE argues that "[o]n January 23-25, Ms. Smith, along with eight other CDE consultants, continued extracting information from the IEPs of special education students in RCSD." CDE's Response to Order to Show Cause Why Sanctions Should Not Be Imposed ("CDE Response") at 14. Although the CDE intimates (and Ms. Pittman apparently believed, *see* RT at 20 (Pittman)), that the eight staff members worked full time or close to full time on the data collection task, the declarations submitted in support of the CDE's Response by Bill Lundquist, John Ellis, Nikki Swenson, Dennis Self, and Shirley Geddes, all CDE Special Education Consultants or retired annuitants, show that that is not the case. According to those declarations, Ms. Smith coordinated efforts and reviewed IEPs of students at Green Oaks School on some unspecified date or dates. Mr. Hancock likewise assisted in extracting data from the IEP files, but did not identify when.

- On January 23rd, Mr. Williams worked on the project for some unspecified period, Mr. Lundquist worked for 5 hours, Mr. Ellis worked for 6.5 hours, and Ms. Swenson for 5.5 hours.
- On January 24, Mr. Williams and Mr. Self worked for an unspecified period, Mr. Lundquist for 5.5 hours, and Mr. Ellis for 4.
- On the last day, January 25th, Ms. Greenwood and Mr. Self worked for an unspecified period, Ms. Geddes for 5 hours, and Ms. Swenson for 3.

In other words, four people, or possibly five or six, worked for periods ranging from a minimum of three hours to some unspecified maximum number of hours a day.[1] On January 23rd through 25th, Penny Santacruz logged data from IEP summaries into Excel spreadsheets and forwarded them to Dr. Kelleher as they were completed. Ms. Greenwood continued the process of inputting data on Sunday, January 27th..

Dr. Kelleher began his substantive involvement on January 23rd. Ms. Pittman met with him on that date to provide him with the data and related documents the CDE had gathered to date, and again on January 24th to discuss his employment contract. Dr. Kelleher again reiterated that it was unlikely he could complete the study by the January 28th deadline.      Efforts to contact professionals within or connected to the District for their input on how to perform the staffing analysis did not begin in earnest until late in the process. Ms. Smith attempted to contact Blair Roger, the SAM Integration Specialist, for the first time on January 24th. On January 24th and 25th, she called Ms. Roger four times, but her phone was busy. Ms. Smith met with Nancy Elium, Linda Lee, and James Lovelace, the Human Resources Director, on January 24 to learn their thoughts on the staffing analysis, "floater" substitutes, and average caseloads. On January 28th, Ms. Smith was able to set up a meeting with Blair Roger by email, and met with her, together with Ms. Elium and Mr. Hancock, on January 31st.

---

[1] This is scarcely the "eight to five" o'clock commitment of eight individuals Ms. Pittman described at the hearing. RT at 20-21 (Pittman).

6

On Thursday, January 24th, Ms. Smith learned that the District was demanding that the CDE request staff attendance records through the Superintendent.[2]

On January 28, 2008, Ms. Smith informed Ms. Pittman of "the previous week's accomplishments and all issues that developed," Smith Decl. ¶ 15, and informed her that CDE had not yet received staff absence data.

On January 28, 2008, the date the staffing analysis was due, the CDE submitted a "Staffing Analysis Report," which merely described steps the CDE had taken to produce the report. (Docket No. 1161).

At some point on or before January 29, 2008, CDE staff completed student file reviews and data entry. Pittman Decl. ¶ 18.

CDE staff received access to staff absence records at the District on the afternoon of January 31, and provided Dr. Kelleher with staff absence data late that evening. On that day, CDE submitted to the Court Monitor a "preliminary staffing analysis," which noted that the District had provided CDE staff with personnel attendance records only that afternoon and that a final staffing analysis was expected to be ready on February 1, 2008. (Docket No. 1166).

Within hours after the preliminary report was filed, the Court Monitor indicated to CDE attorneys and staff by email that the "methodology used in the analysis does not comport with the Court's Order," and that Dr. Kelleher had improperly arrived at his conclusions "through simply calculating average District caseloads and then comparing those to either state maximum or average caseloads or to the practices of other districts." (Docket No. 1183, Exh. 1). The Monitor specified that the Court's Order called for CDE to use "the actual IEPs of students – the specific types and amounts of direct, indirect, and consultative special education and related services" to calculate "the number of staff needed." *Id.*

---

[2] Whether the District was requiring the CDE to go through the Superintendent because it mistakenly believed CDE was requesting financial records or for some other reason is irrelevant here, and the Court makes no findings on that issue.

Dr. Kelleher completed his report on the night of the 31st, and Ms. Pittman provided it to CDE attorneys on February 1st. Although the Court Monitor's email was addressed to the CDE's attorney and copied to Ms. Pittman, Ms. Pittman does not remember receiving the email. Although Ms. Pittman was responsible for communicating the requirements of the Court's Order to Dr. Kelleher, RT at 23 (Pittman), and generally forwarded any feedback she received to Dr. Kelleher, *id.* at 26, she does not remember expressing any of the substantive requirements in the email to Dr. Kelleher. She remembers only learning "from CDE's counsel that the court monitor stated that CDE could take a few extra days to make the analysis more comprehensive." Pittman Decl. ¶ 22. Dr. Kelleher also did not revise or revisit his analysis in response to the Court Monitor's substantive comments. RT at 75-76 (Kelleher).

Dr. Kelleher requested and received some further data over the next several days, and reviewed and revised his report to incorporate it. The revisions had to do with additional materials that Dr. Kelleher had requested before, such as bell schedules and instructional minutes in the day. RT at 28 (Pittman). On February 8, 2008, Ms. Pittman send the revised analysis to CDE attorneys. On February 13, 2008, five days later – and well after the Court had ordered CDE to show cause why it should not be sanctioned for the late filing – the CDE submitted the revised analysis to the Court Monitor. (Docket No. 1170).

## DISCUSSION

### A. Standard

The Court "possess[es] [the] inherent authority to initiate contempt proceedings for disobedience to [its] orders." *Young v. U.S. ex rel Vuitton et Fils S.A.A,* 481 U.S. 787, 793 (1987); *Spallone v. United States*, 493 U.S. 265, 276 (1990). "The judicial power to invoke coercive contempt sanctions is statutorily authorized by [18 U.S.C.] § 401," *Armstrong v. Guccione.* 470 F.3d 89, 108 (2nd Cir. 2006), which provides:

> A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as--
>
> (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
>
> (2) Misbehavior of any of its officers in their official transactions;
>
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

A party may be held in civil contempt where it "failed to take all reasonable steps within the party's power to comply [with a specific and definite court order]. *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993).

### B. CDE Failed to Take All Reasonable Steps To Comply With This Court's Definite and Specific Order

The standard for contempt is clearly met here. As set out above, a party may be held in civil contempt where it "failed to take all reasonable steps" to comply with a specific and definite court order. *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993). The Court's December 20, 2007 Order was precise, clear, and definite. Even if reasonable people could disagree about what the staffing analysis should have contained and how it should have been performed, there is no doubt that the Order required it to be submitted to the Court Monitor by January 28, 2008. The Court's January 8, 2008 Order provided even more warning that the deadline was firm.

CDE failed to take all reasonable steps to comply with the Order. Several failures are patent. First, despite Ms. Pittman's protests that there was nothing the CDE "could have done to speed up the process" of producing the staffing report, RT at 19-20 (Pittman), and Ms. Hudler's belief that CDE "move[d] on [the Order] as quickly as possible," RT at 56

9

(Hudler), CDE did not begin work at all until January 2, 2008, nearly two weeks after the Order was issued. Ms. Smith had reviewed the Order soon after it was issued, and felt it had "really short time frames." RT at 30 (Smith). Even if records stored at the District were unavailable until after the new year, nothing prevented the CDE from allocating staff, beginning the search for a consultant, or otherwise beginning compliance before then. "Vacation" is not a valid justification for an entire agency's failure to comply with a federal court order.

Even if the initial delay was somehow excusable because CDE personnel initially underestimated how long the staffing analysis would take (and therefore felt it appropriate to wait until January to begin), the subsequent failure to allocate sufficient staff and start crucial tasks until too late was not. By January 7th, key CDE personnel knew that developing a staffing analysis from IEP records "was going to be ... complicated, because the records were not the easiest to follow." RT at 31 (Smith). Although it was clear that the IEP data had to be collected in order for anyone – either a CDE staffer or an outside consultant – to perform the analysis, there was a *ten-day delay* between the first IEP file reviews in the District and the next time CDE staff returned to collect more data. It was only on January 18th that Ms. Smith realized that she and the other CDE staff members who were supposed to be working full-time as Ravenswood City School District IEP Coordinators would not be finished in time. RT at 36 (Smith). Ms. Smith explained that the delay occurred because staff were "doing three major jobs at once," she was overstretched and focused on placing IEP Coordinators in the District, and CDE staff had to "prioritize." RT at 43-44 (Smith).

Once the CDE finally *did* start collecting data from the IEPs, it was able to complete the task with some number of staff members (certainly fewer than the eight the Department touted) working less than full time on data collection and tabulation for eight days (January 18, 20, 23, 24, 25, 27, 28, and 29th). Had the CDE started the data collection immediately after the 7th, the data undoubtedly could have been collected and recorded in the two weeks between the first IEP file review on January 7th and the date Dr. Kelleher began his work, on January 23rd. It could have been completed even sooner had the assigned CDE staff members actually worked full time on data collection.

On January 7, 2008, Ms. Hudler gave Ms. Pittman authority to use whatever personnel she needed to comply with the Court's order, and wanted to make sure Ms. Pittman "was given all the resources that she needed to get that job done." RT at 49-50 (Hudler). Nonetheless, for whatever reason, overburdened personnel failed to assess the scope of the task and communicate their needs accurately, and CDE allocated too few resources and personnel too late in the process.

CDE staff also waited until far too late to consult individuals crucial to producing an appropriate staffing analysis. For example, even though Ms. Smith acknowledged that "because the District utilizes the SAM model," a staffing analysis would not be complete without input from Blair Roger, "one of the key players in the District's ... model," RT at 45-46 (Smith), she waited until two business days before the analysis was due to try contacting her.

The Court finds that the CDE could have finished, at the very least, the "preliminary staffing analysis" that it submitted on January 31, 2008 by the January 28th deadline had it

11

allocated enough resources to the project early enough (or used its allocated resources more efficiently). Even by January 22nd, Ms. Pittman was "optimistic" that Dr. Kelleher could complete the analysis by the deadline if CDE could get him the data. RT at 22 (Pittman). Dr. Kelleher testified that he believed a staffing analysis could not be completed even in two months' time. However, he subsequently explained that most of that time would be attributable to the cumbersome state contracting process after the data was collected. RT at 62-64 (Kelleher). Dr. Kelleher was, in fact, able to "put together a report" within a week. RT at 65 (Kelleher).

Finally, CDE's counsel George Prince has taken responsibility for not seeking an extension of time in which to comply. It is utterly elementary that 1) court will ordinarily, on a showing of good cause, and with proper notice, extend deadlines; and 2) court deadlines may not simply be ignored. It is clear to the Court that there was a clear failure of both oversight and communication both within the CDE and between the CDE and its counsel. The Court Monitor's substantive comments were not communicated to the consultant performing the staffing analysis; clear indications from both those CDE employees collecting data and Dr. Kelleher that timely compliance was increasingly unlikely did not translate, for whatever reason, into a request for additional time.

In sum, CDE failed to take all reasonable steps to comply with the Court's Order. CDE staff did not begin work promptly after receiving notice of the Court's Order. CDE did not begin collecting data from IEPs until just days before the January 28th deadline. CDE failed to allocate enough staff to timely comply with the Order, both stretching management too thin and not assigning sufficient personnel to data collection once it began. Inadequate

communication and oversight from both CDE management and counsel ensured that these errors were not corrected in time and no relief from the Order was sought before the deadline passed. CDE has failed to demonstrate that it was unable to comply with this Court's order. *See FTC v. Affordable Media, LLC*., 179 F.3d 1228, 1239 (9th Cir.1999), and is therefore in contempt of this Court's December 20, 2007 Order.

**REMEDY**

As a sanction for violation of the Court's Order and conduct in contempt of this Court, the Court hereby ORDERS the CDE to bear *all* costs associated with performing and completing the staffing analysis. Those costs include, but are not limited to, the costs of CDE staff time already expended on the analysis, as set out in the CDE's brief and declarations in response to the Court's OSC. The Court's imposition of these costs on CDE as a sanction is separate from the principles of cost allocation set out in section III.C of its December 20, 2007 Order, and will not be taken into consideration when costs relating to the remainder of the Order are allocated.

The Court has carefully considered the Plaintiffs' request that CDE be required to pay for an outside consultant as a sanction for its conduct. However, given the significantly higher cost, inefficiency, and inevitable delay that would flow from finding an external consultant, the Court has determined that the disabled students of Ravenswood City School District would be better served by having the CDE complete the staffing analysis as quickly as possible and to the satisfaction of the Court.

The CDE is hereby ORDERED to complete the staffing analysis by April 18, 2008. CDE would be well-advised to work closely with the Court Monitor, relevant Ravenswood personnel, and SAM model expert(s) and seek their input as or before the analysis is performed, rather than after the fact, to ensure that the staffing analysis conforms with the Court's requirements.

**IT IS SO ORDERED.**

Dated: 3/17/08

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT