IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EMMA C. et al.,

    Plaintiffs,

v.

DELAINE EASTIN, et al.,

    Defendants.

NO. C 96-4179 TEH

ORDER ALLOCATING COSTS RELATED TO DECEMBER 20, 2007 ORDER

In response to a staffing crisis at Ravenswood City School District and consequent failure to deliver special education services to Ravenswood students, this Court ordered Defendant CDE to undertake several relatively short-term tasks to improve delivery of services at Ravenswood. Order, filed December 20, 2007. On April 3, 2008, the Court requested briefing on how to allocate costs for six of those tasks: determining service deprivations, ensuring the delivery of compensatory education, placing three IEP Coordinators in the District, assisting the District in developing methods of supervision, oversight and recommendations related to the District's Human Resources office, and assisting the District in applying for funding. The Court also reiterated the three basic principles for allocating the costs set out in the earlier order, predicated on the theory that the Court could allocate costs by identifying the funding stream that ordinarily pays for similar tasks. Those principles provided, in short, that if the task is something ordinarily funded through the RSIP budget, Ravenswood should pay for it; if the task is something for which Ravenswood receives funding from state or federal sources, Ravenswood should pay for it; and if the task falls into neither of those categories, the parties should split the costs in the same proportion as that they split the RSIP budget (45% CDE, 55% Ravenswood).[1]

---

[1] These three "principles" were numbered 1, 3, and 2 respectively in the April 3 Order.

The Court has carefully reviewed both the detailed briefing submitted by the Defendants, and the Recommendations of the Court Monitor, submitted on May 1, 2008. The Court agrees with the Recommendations of the Court Monitor in full.

The Court acknowledges that, in light of the information Defendants submitted about how Ravenswood's special education is funded, and how difficult it is to identify a particular funding stream for particular functions, the principles that the Court set out for determining allocation of costs provide less useful guidance than anticipated. Particularly with respect to the costs of providing assistance in developing methods of supervision, applying for funding, and providing oversight and recommendations relating to human resources, the funding-stream based principles did not provide a reasoned basis for allocating costs. However, the Court finds that the Monitor's rationale for allocating costs for these tasks to CDE on the ground that they fit within CDE's general oversight role under §§ 4.1 and 4.2 of the Consent Decree and under IDEA is persuasive and appropriate.

Accordingly, the Court hereby ADOPTS the Recommendations of the Court Monitor, attached hereto as Exh. A, in full. The Defendants shall allocate the costs of implementing the Court's December 20, 2007 Order as set out in the Recommendations. The Defendants shall meet and confer about the mechanics of allocating the costs and be prepared to report to the Court about how allocation will be accomplished at the status conference set for May 28, 2008.

**IT IS SO ORDERED.**

Dated: May 14, 2008

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

# Exhibit A

## United States District Court
## Office of the Court Monitor
*Emma C., et al., v. Delaine Eastin, et al.* (No. C96-4179 TEH)

P.O. Box 51170  
Palo Alto, CA  94303-9998  
(650) 329-2800  x125  
(650) 326-3410 (fax)

Mark A. Mlawer  
Court Monitor

MEMO

TO: The Honorable Thelton E. Henderson

FROM: Mark A. Mlawer

DATE: May 1, 2008

RE: Recommendations re: Allocations of Costs of 12/20/07 *Order*

    In its 4/3/08 *Order Re: Briefing on Allocation of Costs Relating to December 20, 2007 Order*, the Court ordered a briefing schedule for Defendants Ravenswood and CDE, and directed the Court Monitor to make recommendations to the Court on the allocation of the costs of the 12/20/07 Order. The Monitor has reviewed the Defendants' briefs and response briefs; recommendations are below.

    The Court set forth three principles to guide the allocation of costs in its *Order* (pp. 8-9). The principles are:

> 1) to the extent that this Order requires CDE to provide a service for which Ravenswood is currently funded through the RSIP budget, such funds shall revert to CDE;
>
> 2) for services not covered by the RSIP budget and for which Ravenswood does not currently receive funding from other sources, additional costs shall be allocated between the Defendants in accordance with the current allocation agreement for the 2007-08 school year (45% CDE, 55% Ravenswood); and
>
> 3) for services not covered by the RSIP budget and for which Ravenswood does receive funding from state and federal sources, and for which the CDE will now be responsible, such funds shall revert to CDE.

    There are six areas of CDE responsibility for which costs must be allocated between the Defendants: determining service deprivations, ensuring the delivery of compensatory education, placing three IEPCs in the District, assisting the District in developing methods of supervision,

1

oversight and recommendations related to the District's Human Resources office, and assisting the District in applying for funding.

### I. Determining Service Deprivations

There is no dispute that this task is not funded through the RSIP budget. The Monitor is not persuaded by CDE's argument that the District receives funds that "might be" (CDE Brief, p. 6) or "could be" (CDE Reply Brief, p. 5) used for this purpose, and that therefore this task falls under the Court's third principle. Projected expenditures of anticipated funds are budgeted in advance, and school districts do not budget funds for tasks that will only be necessary if they fail to deliver IEP-mandated services to students. In addition, the District does not receive funds specifically for this purpose.

The District argues that CDE should bear the costs of analyzing service deprivations because that task falls "squarely" within CDE's responsibilities under the Consent Decree of "implementing an effective monitoring program" and "ensuring Ravenswood's performance of all its obligations" under the Decree (Ravenswood Brief, p. 5). The Monitor disagrees. Performing a one-time, labor-intensive, retroactive record review is a different kind of task entirely—in structure, purpose, and scope—from the ongoing monitoring and oversight contemplated by this portion of the Consent Decree. To the extent the District argues that CDE should be responsible for the costs because its failure to implement an effective monitoring system led to the service deprivations in the first place, that argument proves too much: Ravenswood's staffing crisis and its consequences can be traced equally well to its own failure to provide timely services.

Therefore, this task falls under the Court's second principle, and 45% of the costs of performing it should be allocated to CDE and 55% to Ravenswood.

### II. Ensuring the Delivery of Compensatory Education

CDE states that it will assume the costs of monitoring the delivery of compensatory education to students (CDE Brief, p. 7). This responsibility is in keeping with CDE's responsibilities under the Consent Decree (see § 4.1, 4.2), and in the Monitor's view should include providing oversight of the process of notifying parents of their child's entitlement to compensatory education, ensuring that compensatory education is delivered to students, and ensuring that sufficient types and amounts of qualified providers are placed under contract to provide these services.

The actual costs of providing the compensatory education are another matter, however. There is no dispute that the District is not funded specifically—through the RSIP budget or otherwise—to provide compensatory education to students deprived of IEP-mandated services. There is also no dispute that the District is funded by state and federal sources to some extent to provide special education services to students; compensatory education is only required when districts fail to provide special education services as called for by student IEPs. Thus funds for special education services are properly redirected to provide compensatory education under such circumstances.

The extent to which the District is so funded, however, does appear from the briefs filed by the Defendants to be in dispute. Excluding the RSIP budget, the District's projected special education expenses for the 2007-08 school year are $6,014,527 (Amended Singh Declaration, ¶

5). It expects $1,778,791 in special education funds which originate from local property tax revenues, and $783,960 in state and federal special education funds, for a total of $2,562,751 (Amended Singh Declaration, ¶¶ 8, 6). This leaves $3,451,776, which Singh terms an "encroachment" on the District's General Fund (¶ 9).[1]

However, as CDE points out, the District's "General Fund" includes approximately $15.6 million in "unrestricted" state funding which "is to be used to provide education services to both special education and general education students" (Second Hannan Declaration, ¶ 3). Although it is difficult to piece together the precise figures with certainty from the Defendants' briefs, it appears clear that the District's General Fund includes funds which are to some extent expected to pay for special education expenses, and are necessary to do so in this and other California school districts.

Therefore, the task of providing compensatory education to students should fall under the Court's second and third principles. Ravenswood should be responsible for all special education expenditures, including compensatory education, up to the limit of its non-RSIP projected special education expenditures, $6,014,527 (local property tax funding of $1,778,791 plus $783,960 in state and federal special education funds plus anticipated General Fund Expenditures of $3,451,776) (principle three). To the extent that these expenditures exceed this amount, 45% of these additional costs should be allocated to CDE and 55% to Ravenswood (principle two).

III. IEPCs

CDE argues that the Court's first principle applies to this task, as IEPC salaries are included in the RSIP budget (CDE Brief, p. 8). The District agrees that this principle applies, but argues that the costs should be capped at the average budgeted daily cost of salary and fringe for these positions, rather than at the budgeted amount for these positions for the school year; the additional daily costs should be allocated in accordance with the Court's second principle (Ravenswood Brief, pp. 7-8).

The Monitor agrees with CDE's position on this issue. The District is currently funded through the RSIP budget at a level of $501,300 for IEPCs for the school year, and there is no legitimate reason why an average daily rate should be used instead of the annual budgeted amount. Hence, the Monitor recommends that the Court's first principle apply here: these expenses should be funded through the RSIP budget.

The Monitor is mindful of CDE's prior commitment that the services of CDE staff who served in the IEPC role would be "at no charge" to the District (Prince to Mlawer, 3/6/08, p. 2; Ravenswood Reply Brief, Exhibit D). In addition, it also appeared clear from testimony that these individuals also performed other tasks while in the District, tasks not relevant to the IEPC role. Therefore, if CDE wishes to pursue reimbursement for its staff IEPC time, it should carefully establish the percentage of time these individuals actually performed IEPC tasks.

IV. Assistance in Developing Methods of Supervision, Applying for Funding, and Oversight/Recommendations Related to Human Resources

These three tasks will be discussed together as the same reasoning applies to all.

The District argues for two of these three tasks that CDE should be responsible for performing them under the Consent Decree (Ravenswood Brief, p. 5), and that it does not receive

---

[1] Singh estimates this "encroachment" as $3,450,222, a slight difference from the Monitor's arithmetic.

designated funds for these tasks. CDE argues that general and special education funds received by the District could be directed toward these tasks (CDE Brief, p. 8).

Although outside the guiding principles set forth in the *Order*, it is the Monitor's view and recommendation that the District's argument is persuasive and should apply to these three tasks, and by this memo wishes to advise the Court that the guiding principles from the Order were not as fully useful in the task of allocating the costs of the Order as had been hoped.

These are precisely the sorts of tasks CDE is called upon to perform by the general language of the Consent Decree (§ 4.1, 4.2). Unlike determining student-specific service deprivations, these tasks are not as labor-intensive and are geared toward the systemic reforms the District must make in order to reach compliance. The District's failure to hire sufficient numbers of staff for the 2007-08 school year and failure to have a supervisory system in place sufficient to ensure the delivery of IEP-mandated services call for the technical assistance and oversight required of SEAs by the IDEA, and of the CDE with respect to Ravenswood by the Consent Decree. Therefore, the Monitor recommends that CDE be solely responsible for the expenses associated with these three tasks.