UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EMMA C., et al.,

    Plaintiffs,

v.

DELAINE EASTIN, et al.,

    Defendants.

Case No. 96-cv-04179-TEH

**ORDER DENYING STATE DEFENDANT CALIFORNIA DEPARTMENT OF EDUCATION'S MOTION OBJECTING TO, AND SEEKING TO SET ASIDE, THE COURT MONITOR'S JANUARY 9, 2014 REPORT**

This matter came before the Court on June 23, 2014, on State Defendant's motion to set aside the Court Monitor's January 9, 2014 Report. Having considered the arguments of the parties and the papers submitted, the Court now DENIES State Defendant's motion for the reasons set forth below.

**BACKGROUND**

In July 2011, the Court ordered the parties to address issues related to State Defendant, California Department of Education's ("CDE") compliance with Section 13.0 of the First Amended Consent Decree ("FACD") in their upcoming status statements. Section 13.0 of the FACD reads in pertinent part:

> If, after considering the motion(s) of Defendants and any opposition thereto, and after conducting an Evidentiary Hearing, if necessary, the Court determines that . . . (2) the state-level system in place is capable of ensuring continued compliance with the law and the provision of [a free and appropriate public education ("FAPE")] to children with disabilities in Ravenswood, there shall be a rebuttable presumption that there exists in Ravenswood a system capable of providing FAPE to Class Members and in CDE a system to adequately monitor, supervise and ensure FAPE to Class Members . . .

FACD § 13.0. The Court specifically asked the parties to consider "how compliance with

1  this requirement should be measured, and when such measurement should begin." Docket
2  No. 1640. CDE maintained that per the routine oversight activities of the United States
3  Department of Education's Office of Special Education Programs ("OSEP"), it had
4  complied with Section 13.0.[1]  Docket No. 1670 at 5-7. Plaintiffs argued that CDE should
5  be required to demonstrate that it had satisfied Section 13.0, and that the Court Monitor
6  (the "Monitor") should be charged with periodically reviewing and reporting on CDE's
7  system as it applied to Ravenswood. Docket No. 1669 at 10.

In December 2011, the Court ordered the parties to meet and confer regarding the issue. Docket No. 1674. The parties were unable to reach a resolution, and the Monitor was tasked with making determinations regarding the parties' disputes. The Monitor offered the following "General Standard" as the standard to measure CDE compliance:

> whether CDE's statewide monitoring system, as applied to Ravenswood, has been implemented adequately; has identified both compliance and noncompliance appropriately based on adequate evidence and reasoning; and has resulted in appropriate corrective actions, the implementation of required corrective actions, and the timely correction of identified noncompliance.

Docket No. 1734 at 5-6. CDE challenged the standard, arguing once more that the Court should defer to OSEP. Docket No. 1766 at 5. The Court concluded that OSEP had not specifically determined that CDE's system was capable of ensuring compliance and FAPE in Ravenswood such that any deference was warranted. Docket No. 1793 at 8. The Court

---

[1] Section 4.1 of the FACD sets out CDE's specific obligations as follows:
> CDE is responsible under federal and state law to ensure that children with disabilities who reside in Ravenswood have a free appropriate public education provided to them in the least restrictive environment. As part of this responsibility, CDE shall implement an effective monitoring system and complaint resolution procedure. CDE shall financially support Ravenswood's effort to comply with the Revised RCAP, as agreed to by the parties or as further ordered by the Court, as set forth more fully in Paragraph 17.0 below. CDE's obligations shall continue until the Court makes the determination [dismissing the action after finding compliance] pursuant to Paragraph 18.10 below.

FACD § 4.1.

also rejected Plaintiffs' request that the Monitor be charged with periodically evaluating CDE's monitoring system as it applied to Ravenswood, finding that Plaintiffs had not demonstrated that such monitoring was necessary at that time. *Id.* at 4-5.

After the Court's ruling, the parties adopted the Fifth Joint Statement, in which they agreed to the General Standard as the applicable standard, and stipulated to the following process that the parties would employ for evaluating CDE compliance: CDE implements its state-level monitoring system; Plaintiffs may object to any aspect of the design and implementation; CDE may then respond to those objections; and the Monitor then resolves any disputes. If any party disagrees with the Monitor's determinations on the disputed issues, the party may file a motion to set aside those determinations. Fifth Joint Statement, Docket No. 1799, approved by the Court in its January 2, 2013 Order, Docket No. 1803.

Consistent with that process, on May 10, 2013, Plaintiffs submitted objections to the design of CDE's state-level monitoring system and to the implementation of the Special Education Self-Review ("SESR") component of that system. CDE responded to those objections in a letter to Plaintiffs on May 31, 2013, and in a letter directed to the Monitor on August 26, 2013. On January 9, 2014, the Monitor issued extensive determinations addressing the approximately 42 remaining disputes between the parties. For each objection, the Monitor explained Plaintiffs' objection and CDE's response, engaged in his own analysis of the objection, and determined whether or not Plaintiffs' objection was valid. Where the Monitor agreed that Plaintiffs had raised a legitimate objection as to whether CDE's plan was satisfying Section 13.0, the Monitor set forth outcomes CDE should attempt to reach, and explained the necessity of developing and implementing a corrective action plan to reach those outcomes.

On April 26, 2014, CDE moved to set aside the Monitor's January 9, 2014 determinations. Rather than disputing individual determinations made by the Monitor, CDE asserts that it has actually met Section 13.0's requirements; and in the alternative, that the Monitor's determinations exceed the scope of relief authorized in this case.

**DISCUSSION**

**A.    Evidentiary Objections**

The parties raised numerous evidentiary objections relating to this motion. The Court has reviewed the evidence in dispute and finds it unhelpful to the resolution of the issues before it. As the Court does not rely on the evidence, it declines to rule on the objections.

**B.    Satisfaction of Section 13.0**

CDE argues that the Court should find that it has met the requirements of Section 13.0, and that the Monitor's contrary determination is incorrect because he fails to examine CDE's plan under the "applicable federal law" and the "community standard for state monitoring systems." Docket No. 1911 at 13-14. At the outset, the Court notes that it is improper for the Court to determine at this stage that CDE is compliant. Section 13.0 of the FACD explicitly states that:

> If, after considering the motion(s) of Defendants and any opposition thereto, and after conducting an Evidentiary Hearing, if necessary, the Court determines that . . . the state-level system in place is capable of ensuring continued compliance with the law and the provision of FAPE to children with disabilities in Ravenswood, there shall be a rebuttable presumption that there exists in Ravenswood a system capable of providing FAPE to Class Members. To overcome this presumption, the Class Members must affirmatively demonstrate, with specific evidence, that Ravenswood does have [such] a system.

FACD §13.0.; *see also* Fifth Joint Statement, Section H, Docket No. 1799 at 10. Thus, in order for the Court to determine that Section 13.0 has been satisfied, CDE must first demonstrate that the state-level system is capable of ensuring continued compliance. That then creates a presumption, which Plaintiffs may rebut. As there has been no demonstration by CDE, and no opportunity for rebuttal yet, at this stage, the Court may only make an initial finding that the system is capable of ensuring continued compliance, and must then afford Plaintiffs the opportunity to rebut that presumption. As the Court

cannot now conclude that Section 13.0 has been satisfied, it construes CDE's arguments that it has satisfied Section 13.0 as arguments in support of an initial finding by the Court.

First, CDE argues that its monitoring system meets applicable federal law because CDE has previously been reviewed by OSEP, and OSEP has continued to fund CDE. CDE raised nearly identical arguments when it challenged the Court's adoption of the General Standard, asserting that "the federal [OSEP's] acceptance of [CDE's] statewide monitoring establishes its sufficiency to ensure FAPE in the district." Docket No. 1728 at 4. Now, as then, CDE fails to put forth any evidence that OSEP has actually considered or ruled on the question presented in this case – whether CDE's monitoring system is "capable of ensuring continued compliance with the law and provision of FAPE to children with disabilities in Ravenswood." FACD § 13.0.[2] Because there is no evidence that OSEP has considered the very matter before the Court, there is no reason to consider OSEP's conclusions dispositive on the issues in this case.

CDE next argues that the Monitor misstates the contours of OSEP's "soon-to-be" implemented Results Driven Approach ("RDA"), and applies a "one-size-fits-all compliance-focused approach" that does not align with the more holistic approach of the RDA. Docket No. 1911 at 17. Specifically, CDE argues that by even looking at components of CDE's monitoring system, the Monitor is focusing on "procedural compliance" instead of on overall outcomes, as would be mandated under the RDA once it is implemented. In fact, in his determinations, the Monitor states that the RDA will be outcome-focused. *See* Docket No. 1890 at 15-16. He describes how CDE's procedural-focused approach to monitoring is out of line with the regulations and adds as an aside, that for as much as CDE relies on OSEP guidance, it should consider OSEP's statements

---

[2] Even if it were appropriate for judicial notice – which the Court makes no ruling on here – CDE's Exhibit 11, a July 1, 2013 Letter from OSEP to CDE, states that California meets the requirements of Part B of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*, which includes the required provision of FAPE; the letter does not mention any review of CDE's monitoring system generally, much less with respect to Ravenswood. Docket No. 1916-5, Ex. 11. In fact, CDE's own Exhibit 10, a February 7, 2011 Letter from OSEP to CDE, lists several areas of noncompliance OSEP found with respect to CDE's supervision plan. Docket No. 1916-5, Ex. 10.

1  that in the future, under the RDA, OSEP intends to focus more on performance versus
2  procedural compliance. *Id.* He then concludes that CDE has not demonstrated that its
3  system complies "with the statute or Consent Decree" and requires it take steps to do so.
4  Docket No. 1890 at 16. Because the Monitor does not rely on the RDA to reach his
5  conclusion, any potential misstatement – and the Court does not think there is one – does
6  not require setting aside his determinations.[3]

7  In another effort to assert that it has satisfied Section 13.0, CDE explains that its
8  plan grew out of the factors set out in the *White Paper*, a 1997 treatise prepared in the
9  wake of a different and unrelated special education class action lawsuit and co-authored by
10  the Monitor Mark Mlawer in his capacity in that case as an expert for Plaintiffs.
11  According to CDE, the *White Paper* forms the basis of the federal laws and regulations
12  governing state-monitoring systems, and because CDE based its plan on the *White Paper* –
13  CDE argues – its plan must be in compliance with federal law as well as with the
14  "community standard for state monitoring." Docket No. 1911 at 14-15 ("Section 13.0 is to
15  be interpreted consistent with federal and state law, and nothing in Section 13.0 requires
16  CDE's monitoring system to go beyond the community standard.").

---

[3] Moreover, on the day after the hearing on this motion, the United States Department of Education ("DOE") announced the implementation of the RDA as its new system of evaluating states' special education programs. *See New Accountability Framework Raises the Bar for State Special Education Programs*, United States Department of Education, June 24, 2014, http://www.ed.gov/news/press-releases/new-accountability-framework-raises-bar-state-special-education-programs. Under the RDA, the DOE looks not just at a state's ability to meet procedural requirements, but also at the education results for students with disabilities in each state. *Id.* In implementing the RDA, the DOE sorted the states into four categories: Meets Requirements, Needs Assistance, Needs Intervention, and Needs Substantial Intervention. *Id.* No states fell into the lowest category; however, California joined just two other states, Texas and Delaware, along with the District of Columbia, the Bureau of Indian Education, and the Virgin Islands in the second-lowest category of Needs Intervention. *Id.* As the parties have not had an opportunity to brief this development, the Court does not rely on it in forming its conclusion, but highlights it simply to note that even under the guidelines CDE argues should apply, it fails to make the grade. The DOE's RDA-based ranking, if anything, reinforces the Monitor's determinations, it does not rebut them.

1   Although it may have been a historically important document in the development of
2   special education law, the *White Paper* has never been adopted by this Court as a set of
3   standards that applies in this case. The criteria for evaluating CDE's monitoring system in
4   this case are set out in the FACD, the General Standard, and more generally within the
5   IDEA. At the hearing, the Court inquired where the "community standard for state
6   monitoring" was articulated and when it had been adopted as a standard in this case.
7   CDE's counsel acknowledged that the "community standard" was not articulated in the
8   record anywhere and that it refers to what other states do and "what happened over the
9   years," and that neither it nor the *White Paper* had ever been adopted as a standard in this
10  case. While the *White Paper* may have informed the development of federal special
11  education law, CDE's alleged compliance with the broad contours set out in the *White
12  Paper* alone does not mean that it has complied with the standards in this case. As such,
13  CDE's alleged satisfaction of the *White Paper*'s terms or the vague "community standard,"
14  was rightly rejected by the Monitor as "irrelevant to this case," *see* Docket 1890 at 2, n.1,
15  and does not justify a finding that CDE has complied with Section 13.0.

16  CDE's final argument that – contrary to the Monitor's determinations – it has
17  complied with Section 13.0, is that the Monitor failed to accord adequate agency deference
18  to both CDE and OSEP, which both found CDE's system in compliance. Specifically,
19  CDE argues that it qualifies for *Chevron* deference because it is the agency charged with
20  administering state and federal IDEA laws, or at least *Skidmore* and *Mead* deference due to
21  its experience in "administering its own statute." Docket No. 1911 at 18 (quoting *United
22  States v. Mead Corp.*, 53 U.S. 218, 228 (2001)). As Plaintiffs correctly point out, *Chevron*
23  holds that when Congress delegates authority to a federal agency to interpret a statute and
24  promulgate regulations, those regulations are entitled deference. *See Chevron, U.S.A., Inc.
25  v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). Here, CDE is a state agency,
26  not a federal agency; and it has not been delegated any authority to interpret the IDEA by
27  the United States Congress. In fact, *Chevron*, *Skidmore*, and *Mead* all involve affording
28  deference to legislative rulemaking. Therefore, they have no bearing here, because even

7

assuming CDE is an "agency" within the purview of those cases, CDE's interpretation of the IDEA or any other law is not at issue here; what is at issue is CDE's compliance with the consent decree. On that matter, none of those cases justify affording CDE's conclusions any deference. Regarding agency deference to OSEP, as discussed above, OSEP has not made any actual determination regarding CDE's compliance with the specific terms of Section 13.0 and the General Standard, therefore there is no ruling to defer to even if such deference were warranted.[4]

### C. Exceeding Plaintiffs' Objections

CDE argues that the Monitor's determinations 2, 3, 5, 24, and 28[5] must be set aside because they exceed the scope of the objections actually raised by Plaintiffs. Specifically, CDE argues that the Monitor rejected Plaintiffs' objections, but then made allegedly independent adverse findings against CDE, which was not contemplated by the process set out in the Fifth Joint Statement. CDE explains that in determination 28, Plaintiffs argued that CDE's SESR educational benefit review system was "entirely subjective." The Monitor rejected Plaintiffs' argument, but then went on to recommend corrective action steps based on his own assessment. Furthermore, CDE argues, the Monitor prescribed adding an even more subjective measure to the review system – parent interviews.

In fact, in determination 28, the Monitor explained that the review was not *entirely* subjective because some worksheets showed evidence that objective, quantifiable data had been considered. The Monitor added that while some worksheets contained such evidence, "[o]thers, however, [did] not." Docket No. 1890 at 73. To address this inconsistency, the

---

[4] CDE posits – but does not develop – an argument that Plaintiffs have not previously objected to CDE's system and therefore Plaintiffs previously agreed that CDE's system was effective. Docket No. 1911 at 3. In fact, Plaintiffs did not have access to CDE's underlying policies and monitoring instruments until Section 13.0 was raised and until the Court's November 2012 ruling. Thus, Plaintiffs' previous "silence" cannot be interpreted to imply any prior support for CDE's system.

[5] *See* CDE's Ex. 19, Docket No. 1916-19, for a numbered list of the Monitor's determinations with corresponding page citations to his report.

Monitor determined that CDE would need to engage in corrective action steps to ensure that its educational benefit review was implemented consistently. *Id.* He rejected recommending that parent interviews and student "observations always be conducted," finding that that "would lead to an unproductive use of . . . resources in exchange for little gain." *Id.* Instead, he required CDE to engage in corrective action steps that would best "result in . . . consistent implementation," and a system that would include objective data, interviews, and student observations "when necessary." *Id.* Thus, the Monitor did not in any way exceed Plaintiffs' objection through his determination, but evaluated Plaintiffs' objection and found that it only had partial merit. To address only that portion, the Monitor tailored his recommendation, and prescribed that CDE take steps that would achieve results without wasting resources. Thus, there is no evidence the Monitor "improperly intruded upon plaintiffs' stated objections" to justify vacating determination 28.

CDE does not explain in its papers how the remaining determinations it cites: 2, 3, 5, and 24, exceed Plaintiffs' objections. CDE was asked to provide specifics at the hearing, but offered only that in determination 5, the Monitor reserved the right to revisit an issue after rejecting Plaintiff's objection. Upon the Court's questioning, CDE agreed that the Monitor has the right to revisit any pertinent compliance issue at any time. Accordingly, the Court sees no reason to vacate determination 5. As CDE did not explain its objections to determinations 2, 3, and 24 in its papers or at the hearing, the Court has no basis to vacate those determinations either.

### D. The Impact of Wal-Mart v. Dukes

CDE claims that under *Wal-Mart v. Dukes*, 131 S. Ct. 2541 (2011), "class certification is no longer appropriate and should be revisited before adopting the Monitor's determinations for CDE to engage" in any corrective actions. Docket No. 1911 at 21. Also, CDE claims that the Monitor failed to make "specific findings of a persistent pattern of misconduct" as allegedly required by *Wal-Mart* to support the "broad injunctive relief"

9

he recommends. *Id.* at 22.  Although CDE does not explicitly seek de-certification, in a footnote it "reserves the right to bring a motion to vacate the consent decree, pursuant to Rule 60(b), based upon the changed circumstances introduced by the *Wal-Mart* decision." Docket No. 1911 at 21 n.8.

In *Wal-Mart*, the Court made clear that what matters to class certification, is "not the raising of common 'questions' . . . but rather the capacity of a classwide proceeding to generate common answers." *Wal-Mart*, 131 S. Ct. at 2551.  There is no evidence here, nor does CDE present any, that the IDEA was violated in so "many different ways" that class-wide resolution would be impossible here. *Id.* at 2551.  Perhaps most significantly, there is no question that the questions are capable of classwide resolution because the Court has already determined a common answer and has also adopted a final remedy for resolving the case on a classwide basis – the FACD.

Even if *Wal-Mart* was applicable to the legal challenges posed in this case, there is nothing in *Wal-Mart* to suggest that once a class is certified, that the "changed circumstances" of *Wal-Mart* may limit the relief authorized.  Nowhere does *Wal-Mart* require the Court to continuously make "specific findings . . . of misconduct" throughout the remedial phase, after a class action has already been certified.  Contrary to CDE's contention, a class may be certified or de-certified under *Wal-Mart*; the case does not limit the ability of a Court to manage the application of a consent decree.

### E. Determinations are Limited to Ravenswood

CDE argues that the Monitor's determinations should be confined to Ravenswood; however, it fails to put forth an example of a determination that is not so limited.  To the extent CDE is arguing that the limitation to Ravenswood prevents the Monitor from reviewing its "state-level" system at all, such an argument contradicts the plain language of Section 13.0.  Section 13.0 states that the Court is to determine whether "*the state-level system in place* is capable of ensuring continued compliance with the law and the provision of FAPE to children with disabilities in Ravenswood" (emphasis added).  In addition, in

10

the Fifth Joint Statement, CDE agreed to a review of the design of its "state-level monitoring system." Docket No. 1799 at 1.

At the hearing, CDE explained that it was concerned that certain of the Monitor's determinations would require it to change its entire state-wide monitoring system. That the determinations may have that effect, does not justify setting them aside. The Monitor is limited to reviewing CDE's system as it is applied to Ravenswood, and CDE offers no example where the Monitor reviewed information beyond Ravenswood or made recommendations that were intended to affect other districts, not Ravenswood. Simply because the corrective action steps the Monitor recommends may require CDE – due to the nature of *its* administrative scheme, or other internal reasons – to implement changes in other districts in addition to Ravenswood, does not mean that the Monitor has exceeded his scope. His determinations and recommendations are limited to ensuring CDE's compliance in Ravenswood, they require no more.

### F. Waivers

CDE claims that the Monitor's determinations report mischaracterizes CDE as at times making "no response" to contentions raised by Plaintiffs. "In actuality," CDE argues, it did not understand Plaintiffs' contentions and therefore its lack of accurate response should not be considered a waiver. Docket No. 1911 at 24. At no point, however, did the Monitor state that CDE had waived its argument, or that his determinations were in any way based on any forfeiture by CDE. Therefore, the Court declines to set aside any determinations based on CDE's arguments regarding waiver.

### G. Expert Assessment

In 2012, Plaintiffs sought expert assessment of CDE's monitoring system as applied to Ravenswood. The Monitor found, and the Court agreed, that Plaintiffs' had not demonstrated a need for such assessments then. In his present determinations report, however, the Monitor concluded that expert assessments are now warranted.

11

1    CDE argues that the Monitor has not demonstrated that an expert is justified under
2    "Rule 706 of the Federal Rules of Civil Procedure." Docket No. 1911 at 25. As there is
3    no such rule, the Court assumes CDE is referring to Federal Rule of Evidence 706, which
4    governs the appointment of court-appointed expert witnesses. The expert described by the
5    Monitor is not an expert trial witness but a consultant hired to assist the Monitor in his
6    oversight of CDE, and thereby assist the Court in its remedial decision-making.
7    Therefore, Federal Rule of Evidence 706 has no bearing on the "expert" appointment at
8    issue. Per Sections 6.1.1 and 6.1.4 of the FACD, the Monitor is authorized to evaluate
9    CDE's continued monitoring of Ravenswood's compliance. Per Section 6.1.5, he is also
10   authorized to select qualified monitoring consultants to assist him.
11   In this particular circumstance, the Monitor recommends, and the Court agrees, that
12   the use of consultants would assist the Monitor in expeditiously developing a corrective
13   action plan development. Although, as CDE points out, the Monitor does have substantial
14   expertise in and experience with CDE's monitoring system, the Monitor also has other
15   significant and time-intensive responsibilities in this case. Given the anticipated time and
16   effort needed to structure a corrective action plan, the Court finds that limiting the
17   Monitor's ability to hire consultants to assist him would lead to undue delay in the
18   development of the plan. Rather, the Monitor's careful use of consultants would result in
19   significant time savings without any notable difference in budget.
20   Finally, to the extent CDE argues that its own expertise in administering its own
21   system is sufficient, and therefore an expert is unnecessary, the Court disagrees. The
22   Monitor's recommendation is not simply for CDE to administer the system as is, but to
23   implement a corrective action plan to be developed by the Monitor with the assistance of
24   consultants. The Monitor's detailed findings regarding CDE's deficiencies support his
25   recommendation that a consultant be appointed to specifically assist the Monitor in
26   developing a corrective action plan and in assessing CDE's compliance with that plan, if
27   necessary. CDE's own expertise may be of assistance, but is not sufficient to obviate the
28   need for external expertise.

**CONCLUSION**

For the reasons discussed above, State Defendant's motion is DENIED. The parties are to proceed with the corrective action steps as outlined in the Monitor's January 9, 2014 determinations report. The Monitor is directed to hire consultants as necessary to ensure the timely development and effective implementation of a corrective action plan in order to achieve the outcomes set forth in the determinations. As recommended by the Monitor, CDE shall be responsible for the costs associated with the development and oversight of the corrective action plan, including any consultants hired by the Monitor.

**IT IS SO ORDERED.**

Dated: 7/2/14                     _____
                                                    THELTON E. HENDERSON
                                                    United States District Judge