UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EMMA C., et al.,

    Plaintiffs,

v.

DELAINE EASTIN, et al.,

    Defendants.

Case No. 96-cv-04179-TEH

**ORDER DENYING STATE DEFENDANTS' MOTION TO SET ASIDE**

    This matter is before the Court on State Defendants' motion to set aside the Draft Corrective Action Plan ("CAP") developed by the Court's Monitor with the assistance of Court-approved consultants. (Docket No. 2056). Plaintiffs opposed the motion and Defendants timely replied. (Docket Nos. 2062, 2071). The Court heard oral argument on August 3, 2015. After carefully considering the Parties' written and oral arguments, the Court hereby DENIES Defendants' motion for the reasons set forth below.

**BACKGROUND**

    Plaintiffs filed a class action complaint in 1996 against the Ravenswood City School District ("District") for its failure to provide children with disabilities with a free and appropriate public education ("FAPE"), and against the California Department of Education ("CDE") for failing to adequately monitor the District and ensure its compliance with state and federal laws. After conducting a comprehensive investigation into the allegations raised by Plaintiffs, the CDE determined that it had not "fully implemented their Monitoring responsibility to ensure that pupils are provided a [FAPE] and that compliance is maintained." Oct. 4, 2001 Order Re: Contempt at 2 (Docket No. 409) (quoting CDE Compliance Report #S-356-96/97 at 45).

    The original Consent Decree, approved on January 18, 2000, required the CDE to implement an effective monitoring system and demonstrate that it was capable of ensuring

continued compliance with the law to children with disabilities in the District. Ex. A to Consent Decree § A, ¶ 8.0 (Docket No. 232). The Parties thereafter entered into the First Amended Consent Decree ("FACD"), which included the Ravenswood Self Improvement Plan ("RSIP") and repeated the original Consent Decree's requirement that the CDE ensure an effective monitoring system. (Docket No. 832). Specifically, the FACD provided:

> CDE is responsible under federal and state law to ensure that children with disabilities who reside in Ravenswood have a [FAPE] provided to them in the least restrictive environment. As part of this responsibility, CDE shall implement an effective monitoring system and complaint resolution procedure.

FACD § 4.1. Moreover, Section 13.0 of the FACD established the standard for determining when the State should be released from Court supervision:

> If, after considering the motion(s) of Defendants and any opposition thereto, and after conducting an Evidentiary Hearing, if necessary, the Court determines that . . . (2) the state-level system in place is capable of ensuring continued compliance with the law and the provision of FAPE to children with disabilities in Ravenswood, there shall be a rebuttable presumption that there exists in . . . CDE a system to adequately monitor, supervise and ensure FAPE to Class Members.

On July 25, 2011, the Court recognized that "[u]nder FACD section 13.0, the Court must also eventually determine whether the state-level monitoring system in place is capable of ensuring continued compliance with the law and provision of a [FAPE] to children with disabilities in Ravenswood." July 25, 2011 Order at 1 (Docket No. 1640). In order to prevent the unnecessarily protracted litigation that would have resulted from waiting to address this issue until after the RSIP was fulfilled, the Court instructed the Parties to address "the relevance of [Section 13.0], how [CDE's] compliance with this requirement should be measured, and when such measurement should begin." *Id.* The Court further clarified that the State's monitoring system must *minimally* comply with the federal Individuals with Disabilities Education Act ("IDEA"). Nov. 26, 2012 Order at 6-7 (Docket No. 1793). The same Order adopted the Monitor's proposed "General Standard"

to assist in determining the CDE's compliance with Section 13.0. *Id.* at 8-9 ("CDE's statewide monitoring system, as applied to Ravenswood, [must be] implemented **adequately**; [identify] both compliance and noncompliance **appropriately** based on **adequate** evidence and reasoning; and [result] in **appropriate** corrective actions, the implementation of require corrective actions, and the **timely** correction of identified noncompliance.") (emphasis in original).

The Parties stipulated to a process for "determining whether CDE's state-level [monitoring] system" was "adequate." Fifth Joint Statement Re: CDE Monitoring of the Provision of FAPE in Ravenswood at 1, 9-10 ("Fifth Joint Statement") (Docket No. 1799), adopted as an Order of the Court (Docket No. 1803). The agreed-upon process provided that the CDE was to produce "information necessary to understand the state-level system in place," in accordance with the language of Section 13.0 of the FACD, instead of focusing on a specially designed system for the District. *Id.* at 7. The stipulation also provided a process for resolving disputes over the design of the state-level monitoring system, any proposed changes, and its implementation in the District. *Id.* at 9-10.

The Court, its Monitor, and the Parties followed this process over the ensuing months. Plaintiffs submitted objections to the design of the state-level monitoring system, the State responded, the Parties engaged in an unsuccessful meet-and-confer, and the Monitor issued his Determinations (Docket No. 1890), which recommended the development of a CAP. Pursuant to the process adopted in the Fifth Joint Statement, State Defendants filed a motion objecting to and seeking to set aside the Determinations. (Docket No. 1911). On July 2, 2014, the Court denied the State's motion and approved the Determinations in full, ordering the following:

> The parties are to proceed with the corrective action steps as outlined in the Monitor's January 9, 2014 determinations report. The Monitor is directed to hire consultants as necessary to ensure the timely development and effective implementation of a corrective action plan in order to achieve the outcomes set forth in the determinations.

1  July 2, 2014 Order at 13 (Docket No. 1958).  State Defendants appealed the July 2, 2014
2  Order, and were denied a stay by this Court and the Ninth Circuit.  (Docket Nos. 1968,
3  1971, 1982).

4  On January 15, 2015, the Court issued an Order directing the process for developing
5  a Draft CAP that would allow the Parties ample opportunity to provide input to the
6  Monitor and be heard on any objections.  (Docket No. 2013).  However, the Court
7  specifically instructed the parties not to re-argue the "substance of the Determinations"
8  when making objections to the Draft CAP.  *Id.* at 1.

9  The Monitor submitted the Draft CAP on February 12, 2015.  To provide State
10 Defendants ample opportunity to express their concerns with the Draft CAP, the Court
11 extended the deadline for objections until April 10, on which date State Defendants
12 submitted a 28-page, single-spaced letter articulating their objections.   Meet-and-confer
13 sessions were held on April 27 and May 4, but the Parties were unable to resolve their
14 differences.  The Monitor addressed the State's objections in a May 14, 2015
15 memorandum.  (Docket No. 2043).  State Defendants thereafter filed the present motion to
16 set aside the Draft CAP.  (Docket No. 2056).

**DISCUSSION**

Despite the Court's clear instruction that Defendants not use this process as an opportunity to re-argue the "substance of the [Monitor's January 2014] Determinations," much of the present motion does just that.  As previously explained, the Court has adopted the Monitor's Determinations and rejected Defendants' objections, which were fully briefed and considered last year.  The Court's July 2, 2014 Order on this matter is currently on appeal; the Ninth Circuit is now the appropriate forum for Defendants to address their concerns.  Despite the State's apparent disregard for the Court's instruction, the Court will address the arguments presented, but will hereafter consider the matter closed, absent an adverse decision from the appellate court.

4

### I. State Defendants' request for judicial notice is granted in part and denied in part.

The Court will first address State Defendants' request for judicial notice. (Docket No. 2056-1). The State seeks judicial notice of four documents: (1) a letter from Acting Assistant Secretary Sue Swenson regarding the United States Department of Education's (USDOE) revision of California's 2014 determination from "Needs Intervention" to "Needs Assistance"; (2) another letter from Swenson regarding compliance data to be provided to the USDOE by the New York State Education Department; (3) a document regarding Indicator 17 of the State Performance Plan and Annual Performance Report for Special Education: State Systemic Improvement Plan for Program year 2013-2014; and (4) a report from California's Statewide Task Force on Special education entitled "Our System: Reforming Education to Serve *All* Students."

Under Federal Rule of Evidence 201(b), judicial notice may be taken of an adjudicative fact that is "not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." "The contents of records and reports of administrative bodies are proper subjects for judicial notice under Rule 201(2)." *Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 246 (C.D. Cal. 2006) (citing *Interstate Natural Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953)). However, while a court may take notice of matters of public record, they should not take notice "of facts that may be subject to reasonable dispute." *United States ex rel. v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011) (internal quotation marks omitted).

All the documents for which the State seeks judicial notice are official records of the USDOE or the CDE, administrative agencies of the United States and California, respectively. They are therefore potentially appropriate subjects of judicial notice. *Jiminez*, 238 F.R.D. at 246. Additionally, the CDE documents are self-authenticating and the Court finds that the contents of the USDOE letters establish their genuineness. *See United States v. Beecroft*, 608 F.2d 753, 759 (9th Cir. 1979).

5

The Court takes judicial notice of the existence of the requested documents and their submitted attachments. However, the contents of those documents are another matter. Regarding the April 30, 2015 letter from Sue Swenson to Tom Torlakson, the Court additionally notices the fact contained therein that the USDOE has revised California's determination from "Needs Intervention" to "Needs Assistance." The Court judicially notices the contents of these documents, except for determinations of adequacy or compliance, which the State has not demonstrated are beyond dispute.

Regarding the April 27, 2015 letter from Sue Swenson to Elizabeth Berlin, the Court takes notice of the letter's contents to the extent that they establish that the DOE made certain findings and set forth certain standards. However, the Court does not adopt those findings or standards, which are not beyond dispute, and further notes that the contents of the letter provide a very weak point of comparison with the Draft CAP.

The Court judicially notices the contents of Indicator 17 of the State Performance Plan and Annual Performance Report for Special Education: State Systemic Improvement Plan for Program Year 2013-2014. However, the Court does not take notice of any claim or finding that these documents are proof of the State's adherence to OSEP directives or that the Local Control Funding Formula is effective in reprioritizing state education resources. These are judgments reserved to the Court and not beyond dispute.

Finally, the Court takes judicial notice of the contents of the State report, "Our System: Reforming Education to Serve *All* Students." The Court notes that none of these documents were helpful in reaching the Court's decision on the pending motion.

## II. The Court has authority to implement a CAP under the FACD and Fifth Joint Statement.

State Defendants acknowledged in the moving papers that the Parties have previously "stipulated that CDE's monitoring system was to be evaluated." Mot. at 5. The Court therefore deems waived any argument that the Court lacks the authority to evaluate the state-wide monitoring system. *Westport Ins. Corp. v. N. California Relief*, 2014 WL

6

1  7185480, at *10 (N.D. Cal. Dec. 16, 2014) ("California courts will find waiver where a

2  party intentionally relinquishes a right, or when that party's acts are so inconsistent with an

3  intent to enforce the right as to induce a reasonable belief that such right has been

4  relinquished."). Moreover, the CDE expressly consented to the evaluation of its state-level

5  monitoring system through the Fifth Joint Statement. Accordingly, the only dispute is

6  whether the Court has the remedial authority to implement the CAP that resulted from that

7  evaluation.

### A. State Defendants consented to the Court's authority through the FACD.

The State consented to the Court's authority in this matter through its assent to the FACD and Fifth Joint Statement. That the FACD contemplates oversight of the CDE's deficient monitoring system is clear from the document's language. The FACD spells out the CDE's obligation to provide FAPE and, in no uncertain terms, requires the CDE to implement an effective monitoring system:

> CDE is responsible under federal and state law to ensure that children with disabilities who reside in Ravenswood have a [FAPE] provided to them in the least restrictive environment. As part of this responsibility, **CDE shall implement an effective monitoring system** and complaint resolution procedure.

FACD § 4.1 (emphasis added). The FACD then instructs the Monitor to ensure compliance with these obligations:

> The Monitor shall also monitor the **CDE's performance of its obligations to ensure the provision** of FAPE in the LRE to children with disabilities in Ravenswood.

FACD § 6.1.1 (emphasis added). Moreover, the Fifth Joint Statement expressly provided a process for the Court Monitor's evaluation of the state-wide monitoring system in light of any objections raised by Plaintiffs.

The Court's broad power to enforce and implement the FACD, as well as to ensure compliance, is also clear from the agreement:

7

> The Monitor or the Plaintiffs may request that the Court issue an order to **implement or effectuate** this FACD. . . . The Court shall have **continuing jurisdiction** over this action to **ensure compliance with this Decree**. . . . The Monitor or a Party may request that the Court issue **any** . . . **order at any time**.

FACD §§ 6.1.7, 7.1, 7.3 (emphasis added).  To this end, the FACD provides a process for holding Defendants in contempt where they fail to meet their obligations.  *Id.* § 7.2.

      The State acknowledges that the FACD allows the Court to observe and evaluate the CDE's monitoring system, and even that it obligates the CDE to implement an effective monitoring system, but argues that it does not allow the Court to "ensure compliance" with that obligation or otherwise impose any remedy upon finding the State's system deficient.  This reading of the FACD is untenable, and ignores the clear intent and plain language of the agreement.  Only a tortured reading of the FACD could find that it mandates the Court to merely observe a CDE monitoring system that does not ensure the provision of FAPE to students with disabilities.  Moreover, under the State's argument, it follows that the Court's passive observation must continue indefinitely - as the Court can neither impose reforms upon the State nor dismiss State Defendants until such reforms occur.  *See* FACD § 13.0 (providing that State Defendants cannot be released from case until they develop an effective monitoring system).  The Court rejects this clearly erroneous reading of the FACD.

      **B.**    **Because of the FACD, a judicial determination of liability is unnecessary.**

      State Defendants argue that the Court cannot impose a CAP because there was no evidentiary finding of liability.  Reply at 11.  This argument is unavailing for multiple reasons.  First, the Court did make evidentiary findings when it adopted the Court Monitor's Determinations, which were based on evidence submitted by the Parties and subject to the Parties' arguments and objections.  However, even assuming no evidentiary findings were made, this is without consequence.  The State voluntarily entered the FACD so as to avoid any ultimate finding of liability.  By entering into the FACD and subsequent joint stipulations (*e.g.*, the Fifth Joint Statement), State Defendants consented to the

8

Court's authority in this matter. "[I]n addition to the law that forms the basis of the claim, the parties' consent animates the legal force of a consent decree." *Local No. 93, Intern. Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525 (1986). Having consented to the Court's authority to avoid a finding of liability, State Defendants cannot now eschew the Court's authority because no finding of liability was made.

At bottom, while a judicial determination of liability *might* be necessary for a court to assert plenary authority under a court's equitable power to address constitutional wrongs, [1] *see* Reply at 2-3 (citing cases), this Court does not need to resort to such equitable powers where it has the contractual authority to ensure compliance with the provisions of the FACD. *See* FACD § 7.1 (Court "ha[s] continuing jurisdiction of this action to ensure compliance with this Decree").

### C. Whether Plaintiffs have a private right of action to challenge the CDE's monitoring system is irrelevant in light of the FACD.

State Defendants argue that "Plaintiffs lack a private cause of action to challenge CDE's monitoring system," and "[b]ecause no provision in the FACD permits the . . . imposition of a CAP . . . plaintiffs must essentially assert a new cause of action to obtain such a remedy." Reply at 4. This argument necessarily fails because its premise - that the FACD does not permit remedial action against the CDE - is incorrect. Plaintiffs have standing under the FACD to enforce its terms. FACD § 6.1.7 ("The Monitor or the Plaintiffs may request that the Court issue an order to implement or effectuate this FACD.").

Even were this not the case, the Court has already established that "disabled children and their parents [have] a private right of action to enforce their substantive and procedural rights under" the IDEA. Nov. 26, 2012 Order at 7 (Docket No. 1793); *accord Morgan Hill Concerned Parents Ass'n v. Cal. Dep't of Educ.*, 2013 WL 1326301, at *6

---

[1] The Court need not settle this legal question, and therefore reserves judgment.

9

(E.D. Cal. Mar. 29, 2013) ("Given the statutory language and structure, and the weight of judicial precedent, the court finds plaintiffs have a private right of action to challenge the CDE's alleged systematic noncompliance with its IDEA obligations.  The IDEA creates a private right of action in subsection 1415(i)(2)(A).").

The cases cited by State Defendants to the contrary are inapposite.  *Lake Washington Sch. Dist. No. 414 v. Office of Superintendent of Pub. Instruction* addressed whether school districts, not disabled students, have a private right of action under IDEA.  634 F.3d 1065, 1069 (9th Cir. 2011).  *Armstrong v. Exceptional Child Center* was a Medicaid case wherein the Court considered whether there was an implied right of action under the Supremacy Clause.  135 S.Ct. 1378 (2015).  And *C.O. v. Portland Public Schools* addressed the private right of action for nominal and compensatory damages, which are not at issue in this case.  679 F.3d 1162 (9th Cir. 2012).

Finally, State Defendants' reliance on *M.M. v. Lafayette School District*, 767 F.3d 842 (9th Cir. 2014), is misplaced.  Reply at 5.  *Lafayette* merely held that there is no express private right of action under 20 U.S.C. §§ 1412(a) and 1415(a); it did not address other sections of the IDEA.  767 F.3d at 860.  Moreover, the appellate court declined to "reach whether a private right of action can be implied in § 1412 and 1415 of the IDEA." *Id.* at 860, n. 8.  Consequently, *Lafayette* did not overrule the finding of this Court, which is in accord with *Morgan Hill*, that the IDEA allows a private right of action for disabled students.

**III.   State Defendants are not entitled to an evidentiary hearing under FACD § 13.0.**

Under FACD § 13.0, State Defendants may receive an evidentiary hearing "if necessary" for the Court to determine whether they have met their legal obligations in this case such that they are entitled to release.  However, the State "must first demonstrate that the state-level system is capable of ensuring continued compliance."  July 2, 2014 Order at 4.  The State has not made any demonstration that it is capable of ensuring compliance.  Indeed, the Court's July 2, 2014 Order determined just the opposite.  Until State

10

1   Defendants make meaningful progress toward compliance with the Court's Orders, they
2   will not receive an evidentiary hearing merely because one is demanded.  The Court finds
3   a Section 13 hearing unnecessary at this juncture, and therefore DENIES Defendants'
4   request.

### IV. The Court Monitor is fully qualified to develop and oversee the implementation of the CAP.

State Defendants continue their attack on the Court's Monitor, now arguing that he is not qualified to design and implement a CDE CAP.  Mot. at 15-18.  The Court disagrees. When the Court appointed Mr. Mlawer in 1999, it noted his "extensive and varied experience in the field of special education," and "his experience assisting in the remedial phases of other special education class action cases."  Nov. 2, 1999 Order at 4 (Docket No. 223).  Ironically, it was Mr. Mlawer that co-authored the white paper on focused monitoring that the CDE asserts provided the foundation for the CDE's current monitoring system.  Acknowledging these credentials, Mr. Mlawer was appointed "to monitor . . . the obligations of the defendants under the settlement agreement."  *Id.* at 3.  This includes "monitor[ing] the CDE's performance of its obligations to ensure the provision of FAPE in the LRE to children with disabilities in Ravenswood."  FACD § 6.1.1.  And more specifically as it relates to the present motion, the CDE's obligation to "implement an effective monitoring system."  *Id.* § 4.1.  In this capacity, the Monitor has overseen this case for fifteen years, and has developed extensive insight and institutional knowledge regarding the District and State Defendants that uniquely qualify him to draft and implement the CDE CAP.

Moreover, the State's attack on the Monitor's qualifications makes little sense given previous concessions.  In the FACD, the State agreed that the Court Monitor would "monitor the CDE's performance of its obligations to ensure the provision of FAPE in the LRE to children with disabilities in Ravenswood."  FACD § 6.1.1.  Evidently, however, the State now feels that while Mr. Mlawer is qualified to monitor and evaluate the CDE, he

is not qualified to help reform it.  Despite the State's recent protests, the Court has been presented no reason to question the Monitor's credibility or qualifications.  Furthermore, the State itself has recognized that the consultants hired by the Monitor to develop the CAP have "well-regarded expertise in state monitoring systems."  Mot. at 17.  The combination of the Monitor's unique qualifications and his consultants' "well-regard expertise" in this area is more than sufficient to render them capable of drafting and implementing a CDE CAP.

Finally, State Defendants provide no legal support for their request that this Court hold a *Daubert* hearing to determine the Monitor's qualifications as an expert before allowing him to fulfill his responsibilities under the FACD, including the development and oversight of the CAP.  *Id.* at 6.  *Daubert* generally applies to expert testimony, not court monitors or special masters.  To the extent that this Court needs to find that Mr. Mlawer is an expert, it does so now, having worked with him for nearly two decades and being fully aware of his considerable experience in the field of special education.  If State Defendants have further questions about the Monitor's qualifications, the Court attaches his curriculum vitae for reference.

## V. The CAP provides ample Due Process.

Due Process requires notice and an opportunity to be heard.  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  State Defendants have had both, which they implicitly acknowledge.  *See* Mot. at 6 (acknowledging steps taken by the Court to ensure State Defendant's due process rights, including the issuance of an order that provided a "process for CDE's objections to the Draft CAP to be heard.").  This Court has entertained State Defendants' multiple objections to the substance and process of the Monitor's Determinations that formed the basis for the Draft CAP.  Further, the CAP itself provides the State the opportunity to demonstrate compliance under FACD § 13.0 and otherwise challenge future determinations of noncompliance with the CAP's provisions.  It

1    is unclear to the Court what more could be done to secure Defendants' due process rights
2    while still exercising meaningful oversight.
3        Aside from having an opportunity to be heard, State Defendants also contend that
4    the standards established in the Draft CAP are "vague." Mot. at 18-21. However, the
5    Determinations applied court-approved standards and IDEA requirements, which the State
6    itself agrees the monitoring system must be based upon. *See* Mot. at 7. Moreover, State
7    Defendants' argument against the "standards of measurement" adopted by the Draft CAP,
8    Mot. at 19-20, fails to acknowledge that these "vague" standards are found in the
9    controlling law and regulations. *See, e.g.*, 20 U.S.C. § 1416(a)(3) (". . . the State must use
10   quantifiable indicators and such qualitative indicators as are needed to *adequately measure*
11   *performance* in the priority areas") (emphasis added); *see also* Monitor's Mem. at 4-6
12   (Docket No. 2043) (noting same). Insofar as the standards articulated in the Draft CAP are
13   vague, it is only because the governing law provides that they be so.
14       As the Monitor also notes, the State has made no effort to propose more specific
15   language to replace the language to which it objects. *See id.* at 5. Additionally, the Draft
16   CAP provides that the first step toward compliance with each provision begins with the
17   CDE proposing the development of adequate monitoring policies, procedures, training
18   documents, data validation procedures, etc., that are responsive to each requirement. The
19   CDE can also support its proposed approach with a rationale prior to any application of the
20   Draft CAP standards by the Monitor. Where the State disagrees with the Monitor's
21   findings, it can appeal to the Court. In essence, the State is given the first bite at each
22   apple in the Draft CAP, as it has the opportunity to provide substance to what it considers
23   vague standards by making its own proposals to meet them.
24       The CDE attempts to demonstrate its due process concerns by pointing to two
25   instances in which it has disagreed with the Monitor's decisions. Reply at 7-9. First, the
26   CDE complains about the Monitor's claim that the FACD vests him with the authority to
27   decide what evidence can be considered in determining compliance. *Id.* at 7-8 (referencing
28   Monitor's June 19, 2015 Mem. at 3 (Docket No. 2066)). However, the Monitor's claim

was correct: the FACD provides him "plenary authority to monitor Ravenswood's compliance," including the ability to decide what documentation is "necessary or relevant to determine" that compliance. FACD §§ 6.1.2, 6.2. The State next argues that it is denied due process by virtue of the Monitor's monitoring of Determination (Corrective Action) 5. Reply at 8-9. According to the CDE, the Monitor, "with no justification," required documentation of compliance for the 2013-14 school year even though the CDE had submitted the data for the three school years originally required by the Monitor in the Determinations. *Id.* However, the Monitor explained very clearly in his April 23, 2014 Memorandum that the CDE did *not* submit documents showing the adequacy of the process used in 2012 and 2011 for monitoring compliance with Indicators 11 and 12. Mem. at 3-4 (Docket No. 1922). Therefore, as compliance had not been demonstrated for two of the three specified years, the Monitor required information for two additional years. The Court again agrees with the Monitor's assessment and finds that the State had an adequate opportunity to raise and receive a fair adjudication of its concerns. The Court is confident that the same due process will be provided under the administration of the CAP.

## VI. The CAP is not overbroad.

State Defendants argue that the Draft CAP is overbroad because it demands statewide action. Mot. at 21. The Court disagrees. The FACD requires the State to implement a prospectively effective monitoring system in the District before this case can end. The scope of the monitoring system to which this requirement applies is clear from the language of the FACD, the Fifth Joint Statement, and previous Court Orders. First, FACD § 13.0 explicitly refers to the "state-level system in place." Second, the Fifth Joint Statement provided for a process of "determining whether CDE's state-level system" was adequate, and the State agreed to submit "information necessary to understand the state-level system in place." Fifth Joint Statement at 1, 7, 9-10. Finally, this Court's Order from July 25, 2011, stated that the Court "must also eventually determine whether the state-level monitoring system" is capable of ensuring FAPE. July 25, 2011 Order at 1. The State has

14

1   long since passed the opportunity to argue that the scope of the Court's examination should
2   be limited to the district-level system.
3       The State nonetheless raises that argument at this very late hour, quoting the Court's
4   July 2, 2014 Order, which explained that the "determinations and recommendations are
5   limited to ensuring CDE's compliance in Ravenswood, they require no more." Mot. at 21
6   (quoting July 2, 2014 Order at 11). However, the State quotes the Court out of context. In
7   fact, this quote comes from a section explicitly rejecting the notion that the Court's
8   monitoring activities should be confined to the District. *See* Order at 11 ("To the extent
9   CDE is arguing that the limitation to Ravenswood prevents the Monitor from reviewing its
10  'state-level' system at all, such an argument contradicts the plain language of Section
11  13.0."). Indeed, the Court affirmed the Monitor's determination that he needed to review
12  the state-level system in order to evaluate its application in Ravenswood. *See id.* ("Simply
13  because the corrective steps the Monitor recommends may require CDE - due to the nature
14  of its administrative scheme, or other internal reasons - to implement changes in other
15  districts in addition to Ravenswood, does not mean that the Monitor has exceeded his
16  scope."). Accordingly, the Court finds that the proposed CAP is not overbroad.

**VII. The CAP allows the State appropriate flexibility and discretion.**

19      The State's final argument is that the Draft CAP is inflexible and backwards
20  looking. Mot. at 22. However, the State willfully ignores the processes contained within
21  the CAP that allow for CDE input through its submissions on each CAP requirement.
22  Further, the Fifth Joint Statement allows the State to propose any "substantive changes in
23  the design of its state-wide monitoring system that will be applied to the District." Fifth
24  Joint Statement at 9-10. The CAP does nothing to change this. For example, the State
25  could propose the elimination of an aspect of its current monitoring system, such as
26  Verification Reviews (VRs), and its replacement with new components that the State
27  believes would be more effective in ensuring compliance with FAPE for students with
28  disabilities. If that were to happen, the Fifth Joint Statement calls for a process of

15

objections, if any, from the other Parties, a meet-and-confer between the Parties to discuss the proposal and objections, and if the dispute is not resolved, determinations by the Monitor. If, as a result of agreement between the Parties or determinations by the Monitor, the State's proposal was regarded as likely to be more effective than the current VR process, then Corrective Actions 12-15 would be modified as needed (with input from the Parties) to apply to the new components of the State's monitoring system. By allowing the State the chance to work with the Court's Monitor and the other Parties to modify the CAP as conditions necessitate, the State is provided adequate flexibility and discretion while still remaining under the Court's oversight.

More importantly, to the extent that the CAP limits the State's flexibility to any degree, the State's recalcitrance in the face of the Court's Orders shows that granting it continued discretion is unwarranted. Indeed, placing limitations on the flexibility and discretion of a defendant is the entire purpose of a corrective action plan. It is partially the State's unfettered exercise of its discretion that resulted in the original denial of FAPE to children in Ravenswood. To the extent that the State's discretion must be reined in to ensure compliance with the law, so be it.

**VIII.  The Court grants Recommendations 2-4 and denies Recommendation 5.**

At oral argument, the Court asked the Parties to submit simultaneous briefing regarding the Monitor's Recommendations Nos. 2-5 included in the Monitor's May 14, 2015 Memorandum regarding the State's CAP. The Parties submitted those supplemental briefs on August 17, 2015. (Docket Nos. 2089, 2092).

The Monitor's second recommendation provides:

> In the Determinations, the Monitor wrote that the other parties should have the opportunity to comment on CDE submissions made pursuant to these corrective actions (at 5, fn. 4). The Monitor recommends that the Court issue an Order setting a timeline of 30 days after CDE submissions for the parties to offer comments.

16

The Court GRANTS this recommendation because it will ensure the most effective implementation of the CAP, and provide all of the Parties an opportunity to be heard before the Monitor issues any findings related to CDE submissions. A similar process is used for the RSIP, and has proven helpful to the Court's Monitor. The Court is not persuaded by the State's argument against this Recommendation, as it merely reiterates the State's objection to the implementation of a CAP, generally. The Court has ample authority to institute this process under the FACD's provisions allowing the Court to issue "any order" to "implement or effectuate" the consent decree. FACD §§ 6.1.7, 7.1, 7.3.

The Monitor's third recommendation provides:

> The Monitor requests that the Court clarify whether the Monitor's authority to issue directives to either Defendant in its 12/20/07 Order re Directives and CDE technical Assistance, Oversight, and Monitoring Regarding Ravenswood's Delivery of Services and Related Issues and its 4/5/11 Order Clarifying Directive Procedure applies to Defendant CDE in the context of its implementation of the CDE CAP. If these Orders do not apply in the context of its implementation of the CDE CAP, the Monitor recommends that the Court consider issuing an Order extending the Monitor's directive authority to cover CDE CAP implementation.

The Court's December 20, 2007 Order granted the Monitor directive authority over the Defendants. (Docket No. 1151). As a basis for granting that authority, the Court explained that it was "convinced that the Court Monitor should have the same authority to issue Directives that he had under the RCAP in order to speed the process of ensuring the District can provide services to students with disabilities." *Id.* at 4. The same rationale militates in favor of granting the Monitor directive authority regarding the CDE CAP. Indeed, the CDE CAP is analogous to the RSIP, formerly the RCAP. The Monitor has rarely used his directive power, but it is an important authority that allows the Monitor to implement necessary reforms. Moreover, the Court notes that the Monitor's directive authority is not plenary, as Defendants have the right to appeal directives directly to the Court. The Court therefore GRANTS Recommendation No. 3 under FACD Sections 6.1.7, 7.1, and 7.3, and hereby grants the Monitor the same authority to issue directives in connection with CAP implementation that he has in connection with the RSIP.

1     The Monitor's fourth recommendation provides:

> Consent Decree § 6.1.5 sets forth a process to be followed when the Monitor hires consultants. Although the process is specific to potential objections to proposed consultants from Defendant Ravenswood, the Monitor has in the past treated this provision as if it also applied equally to Defendant CDE in the selection of consultants to assist in oversight of CDE's resolution of complaints concerning the District, and development of the draft CAP. The Court may wish to formalize the applicability of this provision of the Decree to Defendant CDE.

The Court's July 2, 2014 Order already instructs the Monitor "to hire consultants as necessary to ensure the timely development and effective implementation of a corrective action plan . . . ." (Docket No. 1958). Therefore, clarification is unnecessary; the Monitor has the Court's permission to hire consultants to assist in CAP implementation already. In addition to the cost savings and efficiencies that would result from the retention of consultants for this purpose, the Court notes that adoption of this recommendation provides State Defendants with the opportunity to object to the appointment of specific proposed consultants. Consequently, the Court GRANTS the Monitor's recommendation.

    The Monitor's fifth and final recommendation provides:

> Consent Decree § 6.1.9 sets forth a process to be followed when the District wishes to hire a consultant regarding special education. The Monitor recommends that the Court consider whether this provision should apply to CDE in any potential hiring of consultants in areas affecting its special education monitoring system.

By its terms, Section 6.1.9 clearly applies only to District consultants. The Court is informed that Defendants' retention of consultants has rarely been an issue in this case. Moreover, the Court sees no reason at this time to extend the Monitor's oversight to the CDE's hiring of consultants. Ultimately, the CDE's compliance with CAP requirements will speak to the competency and commitment of its staff. While the Court may need to reevaluate this recommendation in the future, it is DENIED at the present time.

**CONCLUSION**

For the foregoing reasons, the Court hereby DENIES State Defendants' motion to set aside the Draft CAP.  Additionally, the Court GRANTS IN PART AND DENIES IN PART State Defendants' request for judicial notice, GRANTS Recommendations 2-4, and DENIES Recommendation 5, as set forth above.

**IT IS SO ORDERED.**

Dated:   08/25/15                                    _____
                                                                         THELTON E. HENDERSON
                                                                         United States District Judge