| | |
|---|---|
| JOHN C. BEIERS<br>County Counsel (SBN 144282)<br>BY: AIMEE ARMSBY, DEPUTY (SBN 226967)<br>San Mateo Office of County Counsel<br>Hall of Justice and Records<br>400 County Center, 6th Floor<br>Redwood City, CA 94063<br>Telephone: (650) 363-4768<br>Facsimile: (650) 363-4034<br>Email: aarmsby@smcgov.org<br>*Attorneys for Defendant Ravenswood City School District and Related Defendants*<br><br>XAVIER BECERRA, State Bar. No.118517<br>Attorney General of California<br>ISMAEL A. CASTRO, State Bar. No. 85452<br>Supervising Deputy Attorney General<br>DARRELL SPENCE (SBN 248011)<br>KARLI EISENBERG (SBN 281923)<br>Deputy Attorneys General<br>1300 I Street, Suite 125<br>P.O. Box 944255 Sacramento, CA 94244-2550<br>Telephone: (916) 323-8549<br>Fax: (916) 324-5567<br>E-mails: Darrell.Spence@doj.ca.gov<br>        Karli.Eisenberg@doj.ca.gov<br>*Attorneys for Defendants Delaine Eastin,* | *Superintendent of Public Instruction, the State Board of Education, and the California Department of Education*<br><br>WILLIAM KOSKI, Esq. (SBN 166061)<br>STANFORD LAW SCHOOL<br>YOUTH & EDUCATION LAW PROJECT<br>MILLS LEGAL CLINIC<br>559 Nathan Abbott Way<br>Stanford, CA 94305-8610<br>Telephone: (650) 724-3718<br>Facsimile: (650) 723-4426<br>Email: bkoski@stanford.edu<br>*Attorneys for Plaintiffs*<br><br>Arlene B. Mayerson, Esq. (SBN 79310)<br>Larisa M. Cummings, Esq. (SBN131076)<br>DISABILITY RIGHTS EDUCATION<br>& DEFENSE FUND, INC.<br>3075 Adeline Street, Suite 210<br>Berkeley, CA 94703<br>Telephone: (510) 644-2555<br>Facsimile: (510) 841-8645<br>Emails: amayerson@dredf.org<br>        lcummings@dredf.org<br>*Attorneys for Plaintiffs* |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMMA C., et al.,<br><br>        Plaintiffs,<br><br>  vs.<br><br>DELAINE EASTIN, et al.<br><br>        Defendants. | Case No. C-96-4179 TEH<br><br>**JOINT STIPULATION AND [~~PROPOSED~~] ORDER RE: CONCLUSION OF REMAINING RSIP MONITORING AND RELATED ACTIVITIES, AND DISTRICT TRANSITION PLAN**<br><br>Judge: The Honorable Thelton E. Henderson |

## I. INTRODUCTION

On January 19, 2017, in accordance with a recommendation of the Court Monitor in his Concluding Report Update filed October 14, 2016 ("Update") [Dkt 2228], the parties and the Court Monitor met and conferred concerning the current status of the Ravenswood Self Improvement Plan ("RSIP") and progress toward completion of its requirements. The parties have engaged in further discussions, including a conference call on April 25, 2017, and various email exchanges and telephonic discussions since the January meeting. The meet-and-confer process has been productive and collaborative, and the parties have reached agreement concerning the matters set forth below. The parties have agreed to utilize this stipulation process as a means of resolving all remaining issues under the RSIP, such that the District and CDE will be deemed to have fulfilled all of their respective obligations with regard to the remaining items being monitored under the RSIP and the parties agree to certain tasks to be performed during a post-RSIP transition period, as set forth herein. At the close of the transition period, the District will be deemed to have complied with all obligations and responsibilities under the First Amended Consent Decree (FACD), except for the determination set forth in Section 13 of the FACD.

## II. AGREEMENTS CONCERNING RSIP COMPLIANCE

After presentation of data analysis by the District, and discussion and careful consideration by all parties, agreement was reached concerning several RSIP Items. They are addressed below in numerical order.

### A. Item 6.2.1, subpart (i)

The parties discussed the requirements of subpart 6.2.1(i) of the RSIP, which measures compliance in the area of student-centered assessments. The parties had stipulated in 2014 that the District would be compliant if it demonstrated two additional semesters of compliance. As the Court Monitor noted in his Update, beginning with Quarter 1 ("Q1") of the 2015-16 school year, the District achieved compliance levels by semester averaging 97.4% and 93.6 %, for a yearly average in 2015-16 of 95.2%. The District achieved 100% compliance for Q1 of the 2016-17 school year. In light of that data, the parties agree to stipulate that the District has discharged its obligations with regard to compliance for the applicable maintenance period under the RSIP, and hereby agree that no further monitoring is

required for Item 6.2.1, subpart (i), effective immediately. Thus, subject to the Court's approval of this Stipulation, the District will no longer be monitored on Item 6.2.1, subpart (i).

### B. Item 6.2.1, subpart (l)

Next, the parties discussed the requirements of subpart 6.2.1(l) of the RSIP, which measures compliance in the area of curriculum-based assessments. For the three semesters leading up to the parties' meet and confer on January 19, 2017, spanning Q3 of 2014-15 through Q4 of 2015-16, the District maintained a perfect 100% compliance rate. For the first semester of the 2014-15 school year, the District—along with school districts across the state and, indeed, the nation—was in the process of implementing the "common core" curriculum standards. As a direct result of that transition, compliance with this subpart dipped precipitously for Q2 of 2014-15. The District pointed to the monitoring data prior to and after this noncompliant quarter as evidence of its ability to sustain compliance with this subpart. In light of all the circumstances, the Court Monitor recommended in the Update that the parties stipulate that the maintenance period has been fulfilled. After further discussion and consideration, the parties agree to so stipulate that the District has met its obligations with regard to the maintenance period under the RSIP, and hereby agree to modify the RSIP to deem Item 6.2.1, subpart (l) fully compliant, and discontinue monitoring this subpart, effective immediately. Thus, subject to the Court's approval of this Stipulation, the District will no longer be monitored on Item 6.2.1, subpart (l).

### C. Item 7.5.1

The parties have discussed the requirements of Item 7.5.1 extensively. Item 7.5.1 measures a narrow aspect of the positive behavioral intervention and support (PBIS) program within the District. Specifically, Item 7.5.1 monitors the District's obligation to review all newly implemented behavior support plans within 60 days of their implementation. Because of the small number of new plans implemented in any given quarter—sometimes only two or three—there is no margin of error in this category. While it has usually been measured at 100% compliance over the past several monitoring periods, a missed deadline for a single student automatically renders the entire item noncompliant. More importantly, this narrow category does not provide a meaningful measure of the District's broader, comprehensive PBIS program, which has been the focus of extensive work on the part of District staff over the past two and half years. After extensive discussion among the parties, and subject to the

agreement of the parties concerning the District's Transition Plan as set forth below in Section III, the parties agree to stipulate that the District has discharged its obligations with regard to compliance for the applicable maintenance period for Item 7.5.1 under the RSIP, and hereby agree that no further monitoring is required for Item 7.5.1, effective immediately.

### D. Item 8.2.1

Item 8.2.1 imposes a requirement that the District provide notice of an IEP meeting to parents 10 days in advance of the meeting, in their primary language. The law requires "reasonable" notice; the parties acknowledge that the underlying purpose of this requirement was to ensure meaningful participation by parents in IEP meetings. The parties discussed the District's compliance history with Item 8.2.1 for the past three-and-a-half years. The District's compliance average for the 2013-14 school year was 95.4%, and the average for the 2014-15 school years was 96.5%. The parties stipulated in 2016 that the District would be deemed to have satisfied the maintenance period with a showing of 95% compliance for Q3 and Q4 of the 2015-16 school year, using the average compliance percentage based on raw data for the two quarters. The District's average for Q3 and Q4 of 2015-16 was 91.7. The District notes, however, that it has overwhelming data demonstrating that it has provided reasonable notice to parents of IEP meetings at a very high level of compliance, and that it has achieved the underlying goal of meaningful participation by parents at IEP meetings.

The parties agree to stipulate that the District has discharged its obligations under Item 8.2.1, including with regard to the required maintenance period. Accordingly, subject to the parties' agreement to all other aspects of this stipulation, the parties agree to stipulate that the maintenance period for Item 8.2.1 has been satisfied.

### E. Item 8.3.1

Similar to Item 8.2.1, this requirement has as its underlying objective furthering the meaningful participation of parents in the special education process. Item 8.3.1 measures the District's compliance in the area of student assessments. Under Item 8.3.1, the District must provide a copy of a student's assessment report, in the parent's native language, at least 5 days prior to the IEP meeting at which the

assessment is to be presented and discussed.[1]

In their meet-and-confer process, the parties discussed the importance of facilitating the meaningful participation of parents by providing them with a translation of the assessment report and an opportunity to ask questions and receive responsive answers. Under federal law, discussions concerning the assessment should take place with the full IEP team at the IEP meeting. The District states that it has done extensive data review to confirm that the level of parent participation in IEP meetings is extremely high, and that is borne out by the past several years of RSIP monitoring data.

The District has shared with the parties its observations over the years the RSIP has been in place that providing parents with a translated copy of their student's assessment 5 days before the IEP meeting does not appear to be particularly useful for parents. The District states that many arrive at IEP meetings with the translated copy of their student's assessment in an unopened envelope. The District further states that parents typically wait for the IEP meeting to review the assessment so they can do so with the assistance of the psychologist or other related services provider who authored the report.

The parties agree and acknowledge the value to parents whose primary language is not English of receiving translated assessment reports, and the District will continue to provide translated reports unless requested not to by the parent. The parties also agree and acknowledge that some parents may wish to receive a translated assessment report in advance of the IEP meeting at which it will be presented. Accordingly, the District has agreed to provide parents with an opportunity to request the translated report in advance by indicating in a designated area on the assessment referral form that initiates the assessment process.

Accordingly, the parties agree to stipulate that the District has met the maintenance period for Item 8.3.1, subject to the District's agreement that, going forward, it will continue to provide translated assessment reports for parents whose primary language is not English unless the parent opts out, and that the District's assessment referral process will include an option for parents to request and receive an assessment report in their native language 5 days prior to the IEP meeting.

---

[1] The parties previous agreed by court-approved stipulation to modify this requirement to include as compliant the provision of a translated report to a parent in their preferred language two days prior to an IEP meeting if accompanied by a meeting with

**F. Item 9.2.1(k)**

Item 9.2.1(k) relates to the sharing of curriculum-based assessment ("CBA") results with the IEP team and using such results to develop standards-referenced IEP objectives. The parties reviewed the District compliance data for the past two full years and for Q1 of the 2016-17 school year, noting that the only noncompliant quarter since Q3 of the 2014-15 school year was Q2 of 2015-16, when the District was measured at a compliance rate of 92.5%, including a 100% compliance percentage for Q1 of the 2016-17 school year. Since the meet and confer session, the District has logged yet another quarter over 95%, logging a 96.7% for Q2 of 2016-17. Thus, for the past four consecutive semesters, the District has been compliant in all but one, when it missed the 95% compliant mark by 2.5%. The parties agree to stipulate that the District has discharged its obligations under Item 9.2.1(k), including with regard to the required maintenance period. Accordingly, subject to the parties' agreement to all other aspects of this stipulation, the parties agree to stipulate that the maintenance period for Item 9.2.1(k) has been satisfied.

**G. Item 13.4.1**

This final remaining RSIP item relates to the credentialing of special education staff in the District. It was implemented at time when the District was struggling to find and retain fully credentialed staff, and had a substantial number of special education staff on "emergency" credentials and/or waivers. This item requires that the District demonstrate an increase by 10%, year over year, of special education staff with "clear" credentials.

During the meet and confer process, the parties discussed a wide range of issues relating to staffing within the District. The parties agreed that the District has substantially addressed the underlying areas of concern that gave rise to this requirement. First of all, federal law has changed since this item was put in place, first through changes implemented in the No Child Left Behind initiative, under which teachers and other direct service personnel in public schools must meet the federal "highly qualified" requirement. *Elementary and Secondary Education Act of 2001 ("No Child Left Behind"), Pub.L. 107–110, 115 Stat. 1425, enacted January 8, 2002*, amending §§602(10) and 612(a)(14)(C) of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1001, *et seq*. The requirements pertaining to staff qualifications and credentialing was further modified, effective in 2005-06, by the Every Student Succeeds Act (ESSA). ESSA, P.L. 114-328 at §9214(d)(2). To meet the applicable

requirement under federal and state standards, special education staff may hold "clear" credentials or "preliminary" credentials, and under certain circumstances, teachers may be entitled to a waiver. When this item was put in place under the RSIP, the credentials of teaching staff were the focus of concern. The District states that for the past several years, the District has consistently demonstrated that direct services staff meet applicable requirements under federal law. This does not mean all staff hold a "clear" credential, however, as a preliminary credential also meets state and federal requirements.

Second, the District states that it has found that maintaining a combination of clear credentialed staff and preliminary credentialed staff works to its benefit. At any given time, a percentage of credentialed staff within the District, typically in the range of 25 to 30%, hold a "preliminary" credential. This proportion is intentional on the part of the District, and results from relationships the District has cultivated with local teaching programs, including the teacher credentialing program at California State University, East Bay ("Cal State East Bay"), which include specialized training in a fully integrated service delivery model. As one of the requirements of the RSIP, the District has implemented the Schoolwide Applications Model (SAM), which involves delivery of services to students in a fully integrated setting. Because this service delivery model is rare in California public school districts, finding teaching staff with specialized training can be quite challenging. The District has found that by developing intern and new teacher programs in conjunction with universities like Cal State East Bay, it has been able to increase the training level and preparedness of teachers in the District. Attracting new teachers has also helped improved teacher retention within the District, although that remains a challenge.

The parties agree that, given all of these factors, the preliminary credential holders should count toward the percentage of staff with a "valid and clear credential" measured under Item 13.4.1. The parties have reviewed the Court Monitor's data under Item 13.4.1 for the past several years. The maintenance period is five years. When counting both clear and preliminary credentials, for the last five years, beginning with the 2012-13 school year, the District has consistently maintained an average of 93.7% of direct service special education staff fully credentialed. The remaining percentage consists of

the one or two out-of-state hires who are working under a waiver in any given year.[2]

This brings us to the third point concerning this item. The way in which this requirement is monitored creates a metric that—as the percentage of appropriately credentialed staff increases—becomes unachievable. Thus, once the District achieved 94.4% in 2012-13 for clear and preliminary credentialed staff and maintained a percentage above 90% for each subsequent year, it became mathematically impossible for it to increase its percentage of credentialed staff by 10% for any of those years.

Accordingly, for all of the reasons set forth herein, the parties agree that the District has substantially satisfied the underlying purpose of Item 13.4.1, and therefore the parties agree that the District has discharged its obligations under the RSIP with regard to this requirement, such that it will no longer be monitored under the RSIP.

**H. Request to Waive Concluding Report Process**

The Parties agree and stipulate that, because the agreements above address and resolve all remaining items and sub-items being monitored under the RSIP, the need for a Concluding Report as set forth in Section 6.1.3 of the First Amended Consent Decree has been rendered unnecessary. Accordingly, the parties request that as part of this Stipulation, the Court waive the requirements of Section 6.1.3, to the extent they require the Court Monitor to issue a Concluding Report.

### III. AGREEMENTS CONCERNING DISTRICT TRANSITION PLAN

As an express condition of Plaintiffs' agreement to this Stipulation, the parties have agreed that the District will implement a Transition Plan, under which it will provide to Plaintiffs, with a copy to CDE, certain periodic reports and other data, for a time period not to exceed two years from the date this

---

[2] Another potential source of qualified teachers is the pool of teachers relocating from out of state. Certain other states are far more likely to produce teachers with experience in a fully integrated setting. When teachers who are fully credentialed in another state relocate to California, the California Teacher Credentialing Commission (CTCC) imposes a sometimes lengthy bureaucratic process they must complete to obtain a clear California credential. In the meantime, relocating teachers can work under a CTCC "waiver" program. For any given year in the District, a very small number, typically no more than one or two individuals at a time, hold a temporary credential waiver. The flexibility to hire such relocating teachers, who typically are being hired because they are more qualified than others available in the marketplace, is essential to the District's ability to maintain adequate levels of staffing.

Stipulation is approved by the Court or such time as this case is dismissed as against the District, whichever occurs sooner ("Transition Period"). The data to be provided by the District will have four components: i) a twice-yearly report on the District's Multi-Tiered System of Support (MTSS), as described generally in Section III.A(1), below; ii) an annual list of the credentials of District special education staff, as described in Section III.B(1), below; and iii) a report for each semester during the Transition Period concerning parent participation in IEP meetings, as described in Section III.B(2), below; and iv) a report for each semester during the Transition Period concerning service delivery, as described in Section III.B(3), below.

### A. Multi-Tiered System of Support and Report

#### 1. The MTSS

The District has provided the other parties with an overview of its process—which began in the Fall of 2015, for implementation of the MTSS, a comprehensive program for managing behavior support based on a student-centered "response to intervention" (RTI) model. The District describes the MTSS process as a well-validated and highly research-based approach that can be described in summary, as follows:

> *[MTSS], formerly known as RTI grew from efforts to improve identification practices in special education. Simply put, it is a process of systematically documenting the performance of students as evidence of the need for additional services after making changes in classroom instruction. MTSS promises to change the way schools support students with learning and behavior problems by systematically delivering a range of interventions based on demonstrated levels of need.*
>
> *MTSS is defined as "the practice of providing high-quality instruction and interventions matched to student need, monitoring progress frequently to make decisions about changes in instruction or goals, and applying child response data to important educational decisions" (Batsche et al., 2005). Based on a problem-solving model, the MTSS approach considers environmental factors as they might apply to an individual student's difficulty, and provides services/intervention as soon as the student demonstrates a need. Focused primarily on addressing academic problems, MTSS has emerged as the*

*new way to think about both disability identification and early intervention assistance for the "most vulnerable, academically unresponsive children" in schools and school districts (Fuchs & Deshler, 2007, p. 131, emphasis added).*

*Positive Behavioral Interventions and Supports (PBIS) is based on a problem-solving model and aims to prevent inappropriate behavior through teaching and reinforcing appropriate behaviors (OSEP Technical Assistance Center on Positive Behavioral Interventions & Supports, 2007). Positive Behavioral Interventions and Supports (PBIS) is a process that is consistent with the core principles of MTSS. PBIS offers a range of interventions that are systematically applied to students based on their demonstrated level of need, and addresses the role of the environment as it applies to development and improvement of behavior problems.*

*Both MTSS and PBIS are grounded in differentiated instruction. Each approach delimits critical factors and components to be in place at the universal (Tier 1), targeted group (Tier 2), and individual (Tier 3) levels.*

OSEP Technical Assistance Center on Positive Behavioral Interventions and Supports (2017). *Positive Behavioral Interventions & Supports [Website]. Retrieved from www.pbis.org.*

The District states that, after careful consideration and planning, the District implemented the MTSS approach as a structure for ensuring the sustainability of the wide-ranging and systemic improvements it has made in the delivery of special education and related services to its students through its work under the RSIP over the past several years. From the early stages of the MTSS implementation, the District has invited the Court Monitor to participate in the process, and he has provided valuable input.

**2. The MTSS Report**

After extensive discussion among the parties, all have agreed that the District's Transition Plan will include, among other things, using its MTSS to measure the District's ability to sustain an effective approach to PBIS. The Parties agree that for a transition period not to exceed two years from the date this stipulation is approved, or until terminated by agreement of the parties or action of the Court, whichever event occurs sooner ("Transition Period"), the District shall take certain actions with regard to

its MTSS program. One such action shall be the District's preparation by the end of each semester that ends within the Transition Period, a summary report on the implementation and efficacy of the MTSS program during the subject semester ("MTSS Summary Report").

The MTSS Summary Report shall summarize the status of the MTSS implementation and operation. Such report shall include a description of the program and an analysis of its efficacy by measuring improvement, if any, of outcomes for students in the area of PBIS. The MTSS Summary Report shall also include certain categories of date pertaining to behavioral referrals, including data indicating number of various types of behavioral referral, and disaggregating data in various categories, including but not limited to race, ethnicity, and English Learner (EL) status. The parties agree that the specific details of the data to be contained in the MTSS Summary Report shall be finalized through a collaborative process that addresses the Plaintiffs' interest in monitoring aspects of the District's PBIS program while not imposing undue burden on the District.

As part of the Transition Plan, the parties agree that the Court Monitor shall provide certain services on a limited-scope basis for the purposes of providing consultation to the District on the MTSS, and to review the District's draft MTSS Summary Report and make recommendations for improving and/or maintaining the MTSS, if applicable. The Court Monitor shall be paid for such consultation at the rate approved by the Court for his work as Court Monitor. Except by agreement of all Parties, the Court Monitor shall limit his work to not more than the amounts set forth below by category:

- Meetings with District staff: 10-12 days of work per year;
- Data/Document Review: 4-5 days of work per year;
- MTSS Summary Reports: 1.5-2 days of work per year;
- Office expenses: 5 hours per week of administrative assistant time in support of the above-referenced work.

The Court Monitor shall prepare a proposed budget for the above The District and CDE shall establish procedures and timelines for deposit of the Court Registry to deposit payments for the consulting services of the Office of Court Monitor as described above. The District and CDE agree to share equally the costs of the Court Monitor's services mandated by this stipulation.

### B. Additional Data Reporting

The parties have also agreed that for the duration of the Transition Period, in addition to the MTSS Biannual Reports, the District will provide the Plaintiffs, with a copy to CDE, with certain information and data in accordance with the schedules set forth herein.

#### 1. Special Education Staff Credential List - Annual

By September 1 during the Transition Period, the District shall provide to Plaintiffs, with a copy to CDE, a list of special education staff by position, excluding paraprofessionals and other positions for which there is no relevant credential, then employed by the District,[3] indicating the type of credential held ("Credential List"). Specifically, the Credential List shall indicate for each special education teaching position whether the individual holding the position holds a clear or preliminary credential, or an emergency waiver has been issued. Electronic mail shall be sufficient for the transmission of the Credential List to the parties.

#### 2. Parent IEP Participation File Review and Data Report – Each Semester

By the third Wednesday in January (for the first semester of the school year) and the first Wednesday in June (for the second semester of the school year) during the Transition Period, the District shall conduct a review of at least 25 files randomly selected from the files of all students for whom initial or annual IEPs were convened during the corresponding semester to determine whether a parent or legal guardian was present for the IEP. The District shall report to Plaintiffs, with a copy to CDE, indicating the number of files reviewed/IEP meetings held, the number of such IEP meetings at which parents/legal guardians were present, and the number of such IEP meetings at which no parent or legal guardian was present ("Parent Participation Report"). The District may, at its discretion, provide any such additional information concerning specific circumstances relevant to its report as it may deem useful in understanding the Parent Participation Report data.

#### 3. Service Delivery Data Report – Each Semester

By the third Wednesday in January (for the first semester of the school year) and the first

---

[3] The list shall include all special education positions that would have been subject to the reporting requirements of Item 13.4.1 of the RSIP if it was still being monitored.

Wednesday in June (for the second semester of the school year) during the Transition Period, the District shall provide Plaintiffs, with a copy to CDE with a report concerning service delivery to District students ("Service Delivery Report"). The Service Delivery Report shall indicate, for a randomly selected sample of no less than 15% of all special education students then enrolled, whether the services have been provided in accordance with IEPs.

### C. Completion of Transition Period

Two years from the date of the entry of the order approving this Joint Stipulation, if the District is still a party to this litigation, the Transition Period shall terminate. Effective immediately upon the termination of the Transition Period, the District will be deemed—by agreement of the parties and approval of the Court pursuant to this Joint Stipulation and Order—to have satisfied all of its obligations and responsibilities pursuant to the FACD, such that no further action by the District is required, with the sole exception of the provisions set forth in Paragraph 13. Thus, upon the termination of the Transition Period, although the District shall remain a party in this case, it shall be relieved of any responsibility to report, contribute funds, be subject to monitoring, or participate in any action or activity required under the FACD, other than the provisions set forth in Paragraph 13. The effect of termination of the Transition Period shall include, but not be limited to, to immediately terminate any contract with Parent Advocates pursuant to Paragraph 11 of the FACD.

Nothing in this Joint Stipulation precludes the District from seeking dismissal from the Court through a noticed motion at any time before or after the Transition Period terminates, or the dismissal of the District pursuant to the provisions set forth in Paragraph 13 of the FACD, or from seeking termination of the contract with Parent Advocates pursuant to Paragraph 11 of the FACD at any time.

### IV. AGREEMENTS CONCERNING MODIFICATIONS TO THE FACD

The Parties agree that certain modifications to the FACD are appropriate in light of the Parties' agreements to the resolution of the RSIP in this case and implementation of the Transition Plan.

### A. Section 3.3

Section 3.3 of the FACD requires the District to provide to all Parties a yearly accounting of the expenditure of RSIP funds pursuant to the District's annual RSIP budget. As the RSIP budget and corresponding expenditures will cease with the approval of this Stipulation, this provision is no longer

necessary.

### B. Sections 6.1.8, 6.1.9

Section 6.1.8 provides that the Court Monitor "may participate in" and provide recommendations regarding Ravenswood's personnel hiring and reassignment decisions affecting the provision of special education services. Section 6.1.9 contains similar requirements pertaining the District's retention of consultants. The parties agree that regular continued involvement in the District's hiring and contracting decisions shall not be part of the Transition Plan. However, the District may seek the input of the Court Monitor concerning personnel matters and the retention of consultants during the Transition Period as it deems appropriate, within the scope of the "Meetings with staff" category of the Transition Plan budget set forth herein.

### C. Section 6.2

Section 6.2 of the FACD provides, in part, "Except as set forth herein, the Monitor shall not directly provide services to the District." The Parties agree that nothing in Section 6.2 shall prohibit the Court Monitor from serving in a consulting role as part of the Transition Plan set forth herein.

## V. CONCLUSION

The parties hereby submit this joint stipulation and respectfully request that this Court approve it in all aspects set forth herein. The parties also request that the Court make a finding that no additional Concluding Report Update pursuant to FACD Section 6.1.3 is necessary, nor is it necessary in light of the Parties' agreements herein to hold an evidentiary hearing pursuant to FACD Section 8.1(b), and that pursuant to the terms of this Stipulation, the District has discharged all of its obligations under the RSIP and shall no longer be subject to monitoring thereunder.

Dated: July 24, 2017  JOHN C. BEIERS, COUNTY COUNSEL
COUNTY OF SAN MATEO

By: _____/s/_____
Aimee B. Armsby
Deputy County Counsel
*Attorneys for Ravenswood City School District and Related Defendants.*

| | | |
|---|---|---|
| Dated: July 24, 2017 | | YOUTH & EDUCATION LAW PROJECT |

By: _____/s/_____
William S. Koski
*Attorneys for Plaintiffs*

Dated: July 24, 2017                OFFICE OF THE ATTORNEY GENERAL

By: _____/s/_____
Karli Eisenberg
*Attorneys for Defendants Delaine Eastin, Superintendent of Public Instruction, State Board of Education and the California Department of Education*

# [PROPOSED] ORDER

The Court has reviewed the parties' Joint Stipulation regarding the conclusion of remaining Ravenswood Self-Improvement Plan (RSIP) monitoring and certain related modifications to the First Amended Consent Decree (FACD).

For good cause shown, the parties' request to approve the agreements contained herein and order the parties' Joint Stipulation concerning conclusion of RSIP monitoring, FACD modifications and implementation of the District Transition Plan as set forth herein is GRANTED.

The Court further finds that a Concluding Report pursuant to FACD Section 6.1.3 is not necessary, nor is it necessary in light of the Parties agreements herein to hold an evidentiary hearing pursuant to FACD Section 8.1(b). Pursuant to the terms of this Stipulation, the District has discharged all of its obligations under the RSIP and shall no longer be subject to monitoring thereunder.

IT IS SO ORDERED.

Dated: 7/31/2017

THE HON. THELTON E. HENDERSON
UNITED STATES DISTRICT COURT JUDGE