**United States District Court**
**Office of the Court Monitor**
*Emma C., et al., v. Tony Thurmond, et al.* **(No. C96-4179 VC)**

**P.O. Box 51170**
**Palo Alto, CA  94303-9998**
**(650) 329-2800 x60125**
**(650) 326-3410 (fax***)*

**Mark A. Mlawer**
**Court Monitor**

# Review of the California Department of Education's Phase 2 Submission: Data Analysis

January 28, 2019

## I.  Background/Introduction

The Court's May 18, 2018 *Order re State's Obligations Under Consent Decree* adopted a four-phase process for determining whether the California Department of Education (CDE) has demonstrated that its monitoring and enforcement system complies with the Individuals with Disabilities Education Act (IDEA) (Dkt. No. 2387 at 1-2).  The Court's Order determining Phase 1 compliance was issued on August 17, 2018 (Dkt. No. 2428).

On September 11, 2018 the Court issued an *Order Clarifying Scope of Phase 2 Proceedings* (Dkt. No. 2439).  The Order states:

> Phase 2 will require the state to demonstrate that its data analysis activities are sufficient to allow it to effectively fulfill its monitoring and enforcement duties under the IDEA. This will include an examination of whether the state's decision to issue annual compliance determinations for certain school districts based on data analysis alone, without further targeted monitoring activity, is sufficient to fulfill its obligations under the IDEA. It will not include an examination of the state's further targeted monitoring and enforcement activities, or whether those further targeted monitoring and enforcement activities are sufficient to make adequate annual compliance determinations or to otherwise fulfill its monitoring and enforcement obligations under the IDEA. Those issues will be the subject of Phase 3.  (Dkt. No. 2439[1])

The IDEA requires state educational agencies to monitor implementation of the statute, and to enforce statutory implementation when necessary.  The required "primary focus" of state monitoring activities is on:

- improving student results and outcomes, and
- ensuring that the program requirements of the statute are met, with a "particular emphasis" on the requirements "most closely related" to improving student results and outcomes.

The statute also establishes priority areas for monitoring:  free appropriate public education (FAPE), least restrictive environment, state exercise of general supervision (including child find, effective monitoring, use of resolution meetings, and mediation), and disproportionate representation of racial and ethnic groups in special education and related services, to the extent the representation is the result of inappropriate identification (20 U.S.C. §1416(a)(1-3)).

Thus, Phase 2 requires CDE to demonstrate that its data analysis activities are sufficient to enable it to ensure compliance with the requirements of the IDEA, particularly those most related to the results students achieve, and to improve those

---

[1] See also 9/6/18 Case Management Conference Transcript at 25 (ll. 21-25) and 26 (ll. 1-4).

student results.  What this means practically was explained by the Court in its Phase 1 ruling.  After collecting statewide data,

> [t]hen the state analyzes these data to identify school districts that raise red flags – that is, districts that might be falling short on their obligation to provide an appropriate education to students with disabilities.  (Dkt. No. 2428 at 3)

Phase 2, then, concerns whether CDE has demonstrated the sufficiency of its data analyses to raise these red flags regarding districts.  It also concerns how these data analyses are used to select districts for further scrutiny through its monitoring processes, in addition to the sufficiency of the analyses to give some districts "meets requirements" annual determinations without further monitoring scrutiny.

Accordingly, this Phase 2 report will examine whether CDE has demonstrated the sufficiency of its:

- data analyses regarding the monitoring priority areas and program requirements (Section III),
- use of data for selection for CDE's monitoring processes (Section IV), and
- issuance of "meets requirements" annual determinations based only on data without additional monitoring (Section V).[2,3]

Several implications of Phase 2 should be noted.  First, any additional data analysis that takes place after selection for monitoring in order to prepare for a monitoring event[4] will not be considered as part of Phase 2, and instead will be discussed at Phase 3.  Second, the same is the case regarding CDE's process for making annual determinations, with the exception of "meets requirements" determinations; CDE's process for making annual determinations will be part of Phase 3, as it will require consideration of the treatment in annual determinations of the results of monitoring.

## II.  Narrative Summary and Table of Conclusions

### A.  Narrative Summary

Conclusions of noncompliance are reached in this report regarding the majority of CDE's data analyses for the monitoring priority areas and IDEA program requirements.  Conclusions of compliance are reached for some, and others have been deferred (typically because the issues are not yet ripe based on the Phase 1 order).

---

[2] A narrative summary and table of conclusions are also provided (Section II below).
[3] Unless otherwise noted, all parenthetical or footnoted references to CDE attachments will be to the page numbers on the document rather than on the pdf.
[4] For example, to determine issues to be probed or the composition of student samples.

Many of the conclusions of noncompliance are due in part or whole to failure to disaggregate and analyze data for subgroups of students—those who are members of racial or ethnic minorities, students in foster care, homeless students, migrant students, those who are English-language learners, and students eligible for free or reduced lunch. Many are also due to measuring data against unambitious targets.  Further, analyses based on the use of CDE's Dashboard indicate that poor performance is not flagged if modest improvements are made from the prior year.

Additional problems affect specific areas of data analysis.  For example, CDE's approach to overall discipline does not consider multiple suspensions of individual students or the cumulative length of time of suspensions, and no analyses of school district referrals to law enforcement are set forth.  For child find, no analysis regarding preschool students is included in the submission; the standard used for selection is inadequate; no consideration is given to the performance of students who do not currently have IEPs; and attention is not paid to the migrant and other highly mobile students singled out for special attention in the regulations.  For two areas of disproportionality the formulas in CDE's submission do not measure what they purport to measure.  The treatment of noncompliance found through complaint investigations and due process hearings is not clear due to differences between two sections of CDE's submission, and no information is provided by CDE showing data analyses related to the effectiveness of its monitoring.

Turning to CDE's process for selecting districts for monitoring, selection for performance indicator review is based on insufficient data analyses and some inadequate targets as briefly discussed above.  Further it is not clear that performance and placements of preschool children are included in this monitoring process.  If not, since formulas are used for preschool review and comprehensive review, districts with poor, even very poor, performance in these areas may not be selected for a monitoring process at all.

No concerns are expressed regarding selection for the data identified noncompliance monitoring process.  For disproportionality review, the only issue standing in the way of a conclusion of compliance concerns the two areas of disproportionality that appear to use inadequate formulas.  For significant disproportionality review, CDE has not specified whether it uses a definition of reasonable progress and , if so, what that definition is.  The conclusion for that monitoring review is therefore deferred in this report.

The selection process for preschool review and comprehensive review are flawed in many respects.  For preschool review, CDE's preschool matrix cut score is not adequate to ensure that preschool children are receiving FAPE or are placed in the least restrictive environment.  Reasons include the use of an all-or-nothing approach to scoring, which does not account for the extent to which a target was missed, or the size of the district for some selection elements.  The matrix obscures important red flags suggested by very poor performance, since districts can miss up to five targets, including by wide margins, and still not be selected.  In addition, data are not disaggregated and analyzed for subgroups of children with disabilities, the matrix does

not include a selection element related to child find, and the matrix treats all selection elements as if they were equally important.

For comprehensive review, in addition to the above data analysis concerns, the scoring criteria for most of the selection elements can result in better-performing districts receiving fewer selection points than districts that performed worse, making selection more likely. Egregious performance in the current year can be mitigated by small improvements from the prior year. For many selection elements, the extent to which targets were missed in either year does not affect the scoring. Some scoring criteria are unclear, others are confusing, and one is impossible to determine. Some districts are not judged at all on important selection elements. There is no selection element related to child find. Due to the cut score of below 62%, many districts that appear to need intensive monitoring are not selected because they have slightly higher scores than the cut-off. Some districts that scored below the cut score were not selected. First-year charter districts are not selected even if their performance in the current year merits intensive monitoring. The formula treats all selection elements as equally important. Very few districts in the state are selected for comprehensive review.

With respect to CDE's determinations that some districts meet the requirements of the IDEA without further monitoring, CDE's current approach to annual determinations allows districts that may have a significant number, and significant types, of potential compliance concerns to be considered to have met the requirements of the IDEA without additional monitoring.

B. Table of Conclusions

| Section | Topic | Compliance Conclusion |
|---|---|---|
| **III** | **Analyses Regarding Priority Areas/Program Requirements** | |
| A | FAPE | |
| A 1 | School -Age Achievement | Noncompliant |
| A 2 | Preschool Outcomes | Noncompliant |
| A 3 | Discipline/Disproportionality in Discipline | |
| A 3 a | Discipline Overall | Noncompliant |
| A 3 b | Disproportionality in Discipline | Noncompliant |
| A 4 a-e | Timeliness of IEP development (initial, C to B transition, annual, and triennial) | Noncompliant |
| A 5 | IEP Implementation | Deferred |
| B | Least Restrictive Environment | |
| B 1 | School-Age Placements | Noncompliant |
| B 2 | Preschool Placements | Noncompliant |
| B 3 | Disproportionality in Placement | Noncompliant |
| C | General Supervision | |
| C 1 | Child Find | Noncompliant |
| C 2 | Effectiveness of Monitoring | Noncompliant |
| C 3 | Resolution Sessions | Compliant |

| Section | Topic | Compliance Conclusion |
|---|---|---|
| C 4 | Mediation | Noncompliant |
| D | Disproportionate Representation | |
| D 1 | Disproportionality in Identification Overall | Compliant |
| D 2 | Disproportionality in Identification in Disability Categories | Compliant |
| E | Significant Disproportionality | Deferred |
| F | Restraint and Seclusion | Deferred |
| G | Parent Input | Noncompliant |
| H | Complaint Resolutions | Noncompliant |
| I | Due Process | Noncompliant |
| IV | **Selection for Monitoring Processes** | |
| A | Performance Indicator Review | Noncompliant |
| B | Data Identified Noncompliance | Compliant |
| C | Preschool Review | Noncompliant |
| D | Disproportionality Review | Noncompliant |
| E | Significant Disproportionality Review | Deferred |
| F | Comprehensive Review | Noncompliant |
| G | Non-Public School Monitoring | Noncompliant |
| V | **"Meets Requirements" Determinations without Additional Monitoring** | Noncompliant |

## III.  Data Analyses Regarding Monitoring Priority Areas and Program Requirements: Discussion and Conclusions

This section of this report is organized by topic, beginning with the priority areas for monitoring.  Some topics can be related to more than one priority area (for example, parent input and state complaints) and are treated separately.

CDE correctly points out that, for purposes of federal state performance plan reporting (the annual performance report submitted to the U.S. Department of Education), it does not have "discretion to change or alter" either the indicators or the calculation methodologies (Dkt. No. 2455-1 at 3-4.  For that reason, this report will include little discussion of the federally mandated data analyses unless those are used by CDE to guide its current (2018-19 school year) approach to fulfilling its monitoring and enforcement duties in addition to state performance plan reporting.

### A.  FAPE

CDE puts forth data for analysis related to FAPE:  school discipline, participation and performance on state assessments for school-age students, preschool assessment proficiency, timeliness of IEPs and triennial reevaluations, IEP implementation, parent input, restraint and seclusion, and child find (Dkt. No. 2455-1 at 9).  These are each

5

discussed below (some in other sections).  All timeliness indicators, including two not listed by CDE in this part of its submission, are discussed in this section.

1. Academic Achievement:  K-8th Grade Students

Participation:  For students in grades 3-8, CDE analyzes the participation levels of students with disabilities (students who have IEPs at the time of the test) in both the English/Language Arts and Mathematics portions of the regular assessment (the California Assessment of Student Performance and Progress) and the alternate assessment (the California Alternate Assessment).  Students who took the assessments but were medically exempt, or English-language learners enrolled in a school for fewer than twelve months, are excluded.  Any district that falls below a 95% participation rate on either English/Language Arts or Mathematics is selected for either the performance indicator review or comprehensive review monitoring process.

CDE does not explain why a 95% participation rate is used for selection for its monitoring processes.  It refers to its Attachment K for its "preliminary identification" of districts that did not meet these targets; however, this attachment only identifies the number of such districts (891 for Mathematics and 836 for English/Language Arts[5]), not the districts themselves or their participation rates (Dkt. Nos. 2455-1 at 19-21; 2455-12).

It will be seen in the discussion of performance below that CDE calculates a participation rate reduction in districts' performance levels in both Math and English/Language Arts for those districts that fell below a 95% participation rate.  Since the performance levels of such districts are affected negatively as a result of failure to meet the participation standard, it is difficult to understand why failure to meet the participation rate target is treated as a separate target for purposes of selection for monitoring processes.[6]  This is not explained in CDE's submission.

Moreover, CDE does not set forth any analyses of the demographic characteristics of the students who did not participate in state assessments.  Such analyses could reveal important differences in the participation rates of students of different races or ethnicities, disability categories, those in foster care, homeless students, English-language learners, and those who live in poverty.

Performance:  For students in grades 3-8, the assessments can have four possible results, expressed as Levels 1-4 (standards not met, standards nearly met, standards met, standards exceeded).  For the 2017-18 school year CDE calculated the percentage of students with disabilities who met or exceeded standards, and compared the results to state targets of 14.9% in English/Language Arts and 12.6% in Mathematics.  Districts

---

[5] However, CDE's Attachment M identifies 833 districts for performance indicator review for Mathematics participation and 778 districts for English/Language Arts participation (Dkt. No. 2455-14). The discrepancy between the exhibits is not explained.
[6] One result of this was the selection of one district for comprehensive review solely on this basis, according to data provided by CDE.

6

falling below the targets were selected for either the performance indicator review or[7] comprehensive review monitoring process (Dkt. No. 2455-1 at 21-22).

However, CDE is using a different methodology for the 2018-19 school year based on its Dashboard.  CDE describes the Dashboard as an "on-line tool" to display performance on indicators.  CDE explains:

> The Dashboard is comprised of reports that show LEA performance on six state indicators and four local indicators (six for county offices of education). Users can search to see the reports for any local educational agency or school. The State measures performance on two factors: current year results (Status) and whether results improved from the prior year (Change). Performance on state measures, using comparable statewide data, is represented by one of five colors. From highest to lowest the performance levels are: Blue, Green, Yellow, Orange, and Red. The five color-coded performance levels are calculated using percentiles to create a five-by-five colored table (giving 25 results) that combine Status and Change.  (Dkt. No. 2455-1 at 5)

In order to determine Status, CDE uses a concept called Distance from Standard. Distance from Standard is the distance between a student's score and the third level, "standard met," and will show how far above or below the standard the student scored. This is calculated for each student, and then the scores are averaged for each district, school, and student group.  The average scores are compared to a range of scores for each level of achievement (standards not met, standards nearly met, standards met, standards exceeded) that are different for each grade level for English/Language Arts and for Mathematics.  Students with a record in the assessment file but no scale score are automatically assigned the minimum score.

For each district (and presumably school and student subgroup) the Distance from Standard is summed for all students and divided by the total number of test takers.  A participation rate reduction is also calculated for districts that fell below the 95% participation target (95% minus the participation rate, multiplied by 0.25), and this is subtracted from the cumulative Distance from Standard to yield the Status.  To calculate Change, the prior year's Status is subtracted from the current year's Status.

To illustrate how this calculation results in a performance level, a table provided in CDE's submission is reproduced below:

---

[7] The word "or" is an assumption made by the Monitor despite CDE's use of the word "and" in its relevant sentence, as only 29 districts were selected for comprehensive review in the 2017-18 school year (see 8/1/18 Transcript at 23, ll. 4-8).

| Performance Level | Declined Significantly from Prior Year (by more than 15 points) | Declined from Prior Year (by 3 to 15 points) | Maintained from Prior Year (declined by less than 3 points or increased by less than 3 points) | Increased from Prior Year (by 3 to less than 15 points) | Increased Significantly from Prior Year (by 15 points or more) |
|---|---|---|---|---|---|
| Very High +45 points or higher in Current Year | Green | Green | Blue | Blue | Blue |
| High +10 to +44.9 points in Current Year | Green | Green | Green | Green | Blue |
| Medium -5 points to +9.9 points in Current Year | Yellow | Yellow | Yellow | Green | Green |
| Low -5.1 to -70 points in Current Year | Orange | Orange | Orange | Yellow | Yellow |
| Very Low -70.1 points or lower in Current Year | Red | Red | Red | Orange | Orange |

All districts assigned red or orange performance levels on the Dashboard for students with disabilities are selected for performance indicator review, and this is also one of the elements used for comprehensive review selection (Dkt. No. 2455-1 at 22-24).

As the graphic above shows, CDE's Dashboard-based approach allows a district whose students with disabilities scored on average as much as seventy points below the standard to not be selected for performance indicator review if the students increased their aggregate performance by as little as three points on average from the prior year (one of the yellow boxes on the above Dashboard).  These districts are also less likely to be chosen for comprehensive review.  Yet, for some of the students performing poorly, not receiving FAPE may be a reason why they are not performing at higher levels. Thus, whether students performing poorly in such districts are receiving FAPE is not likely to be monitored and corrected through CDE's approach to analyzing these achievement data and selecting districts for monitoring.  In addition, depending on performance on other elements, such districts can also be labeled "meets requirements."

This approach also does not examine and analyze the performance of subgroups of students with disabilities, such as those who are members of racial or ethnic minorities, students in foster care, homeless students, those who are English-language learners, or students eligible for free or reduced lunch.  In some districts, there may not be enough students in one or more of these categories to affect the Dashboard results and tip a district into red or orange, although the students in these categories may be performing extremely poorly.  This has significant implications both for districts excused from further monitoring by virtue of receiving a "meets requirements" annual determination, and for selection for monitoring processes.

CDE provided an example in the past of the results of an analysis of disaggregated data.  In CDE's FFY '13 state performance plan/annual performance report, CDE stated that the state-identified measurable result it hoped to achieve

through the state systemic improvement plan was to increase the number of students with disabilities who are "also English Learners, eligible for free and reduced-price meals, and/or foster youth who score proficient or above on California's statewide assessments."[8]  CDE explained its choice of that result:

> These selected subgroups include approximately 60 percent of the special education population in California. Also, the data analysis conducted by the CDE demonstrated that poverty seemed to be the strongest negative correlate with assessment scores. Similarly, assessment results for ELs and foster youth tend to fall below assessment outcomes for other students.[9]

Thus, through analysis of disaggregated data, CDE uncovered three subgroups of students with disabilities with inferior performance on state assessments.  But its approach to the use of state assessment data to select districts for monitoring does not allow for such analyses to affect selection and, if a district is not selected for a monitoring process, it will receive a determination of "meets requirements."  But students with disabilities who are poor, for example, may be performing in the red or orange level of the Dashboard in some of those districts.

*Conclusion:  Noncompliant.*
*Reasons for Conclusion:  For participation CDE does not disaggregate data for subgroups.  This is also the case for performance.  Thus, the participation and performance of subgroups are unknown and do not affect selection for monitoring.  In addition, CDE's analysis of performance allows some low-performing districts to not be selected for monitoring based on small improvements from the prior year.*

### 2. Achievement:  Preschool Children

CDE states that it uses the methodology set forth by the federal state performance plan to analyze preschool achievement data.  The data are collected using the Desired Results Developmental Profile twice a year.  Teachers collect the data through observations of children, and then complete the instrument based on these observations.

Preschool entry and exit data are compared for each child to determine the extent to which each child's skills and behavior are comparable to a sample of typically developing same-age peers in three outcome areas:

- positive social relationships (with children and adults);

---

[8] https://osep.grads360.org/services/PDCService.svc/GetPDCDocumentFile?fileId=10483 at 255.  CDE has since changed its state-identified measurable result to the performance of all students with disabilities on state assessments (see Dkt. No. 2390-1 at 41).
[9] https://osep.grads360.org/services/PDCService.svc/GetPDCDocumentFile?fileId=10483 at 257.

- acquisition and use of knowledge and skills (including problem-solving, reasoning, early literacy and math skills); and
- use of appropriate behaviors/action to meet needs (including health, safety, feeding, self-care, etc.).

For each of these three outcome areas, the child's progress as measured by the Desired Results Developmental Profile is assigned to one of five progress categories:

(a) did not improve,
(b) improved but not sufficient to move "nearer" to same-aged peers,
(c) improved "nearer" to same-aged peers but did not reach that level,
(d) improved to level comparable to same-aged peers, or
(e) maintained functioning at level comparable to same-aged peers.[10]

CDE develops cut scores for the progress categories, but does not explain how these are developed.

CDE then aggregates the data for each district in each of the three outcome areas via two summary statements. The table below displays the summary statements, CDE's explanation of the children included, and the formulas used; the letters in the formulas refer to the above progress categories:

| Summary Statement | CDE Explanation | Progress Category Formula |
|---|---|---|
| 1) Of those children who entered the program below age expectations in each outcome, the percentage who substantially increased their rate of growth by the time they turned 6 years of age or exited the program. | "This data analysis examines the proportion of children who changed growth trajectories during their time in preschool special education. It is the percentage of children that narrowed or closed the gap relative to age expectations." | $((c+d)/(a+b+c+d)) \times 100$ |
| 2) The percentage of children who were functioning within age expectations in each outcome by the time they turned 6 years of age or exited the program. | "This data analysis examines the proportion of children functioning at age expectations by the time they exited out of preschool special education. It is the percentage of children functioning at or near age expectations." | $((d+e)/(a+b+c+d+e)) \times 100$ |

---

[10] CDE includes a table that aids understanding the characteristics of the children in each of these progress categories (Dkt. No. 2455-1 at 27).

The results are then compared to the 2017-18 state targets, which are shown in the table below:

| Outcome Area | Target Summary Statement 1 | Target Summary Statement 2 |
|---|---|---|
| Positive social relationships | 83.2% | 79.5% |
| Acquisition/use of knowledge and skills | 80.7% | 78.57% |
| Use of appropriate behaviors | 74.7% | 77.45% |

These targets are reasonable based on past performance of California children.[11]

Turning to selection for monitoring, CDE states in the section of its submission devoted to preschool assessment results: "CDE selects LEAs whose total rate is the (sic) below the target for *any* of the measurements for monitoring in the following review" and names the preschool review (emphasis added). These results are also a factor in the selection formula for comprehensive review (Dkt. No. 2455-1 at 25-28). But later in its submission CDE states that it uses a matrix to select districts for preschool review, a matrix in which failure to meet all six of these state targets is only one of a number of constituent elements (Dkt. No. 2455-1 at 52-54). The Monitor assumes the latter is correct, at least for the 2018-19 school year.

As performance on the preschool assessment is a federal performance indicator (Dkt. No. 2455-6 at 7 on pdf), it is unclear why this indicator is not a part of the performance indicator review process. This is a consequential omission due to CDE's employment of formulas to select districts for both preschool review and comprehensive review: due to the use of a formula, districts with poor performance on this indicator are not very likely to be selected for either review (Dkt. No. 2455-14 shows 28 districts selected for preschool review and 35 selected for comprehensive review, but the number of districts not meeting each of the six preschool outcome targets was 115, 149, 112, 156, 71, and 143). A district not selected for any monitoring review receives a determination of "meets requirements."

In addition, as was the case for school-age achievement data, CDE's analysis is limited to aggregate data about preschool children with disabilities. This approach does not examine and analyze the performance of subgroups, such as those who are members of racial or ethnic minorities, those in foster care, homeless children, those who are English-language learners, or children who live in or near poverty. A district can meet the targets in the aggregate while children from some of these groups are performing very poorly. Without analyzing such disaggregated data, poor performance by any of these subgroups will not be discovered, and will therefore not influence selection for monitoring processes.

---

[11] Performance from 2016 is found at
https://osep.grads360.org/#report/apr/2016B/publicView?state=CA&ispublic=true, "CA-datadisplay-2018b" download at 12. For national data, see
https://osep.grads360.org/services/PDCService.svc/GetPDCDocumentFile?fileId=33061 at 60-64.
States use different methods to collect these data, so CDE's data may not be fully comparable.

*Conclusion:  Noncompliant.*

*Reasons for Conclusion:  CDE does not disaggregate data for subgroups.  Thus, the performance of subgroups is unknown and does not affect selection for monitoring.  In addition, preschool outcome performance is only one element in selection for preschool review and comprehensive review.  It does not appear to be a part of any other monitoring process and, therefore, even very poor preschool outcomes (unless combined with poor performance on other selection elements) will not affect selection for monitoring.*

3. <u>Discipline and Disproportionality in Discipline</u>

    a. <u>Discipline</u>

CDE first describes the federal reporting methodology for state performance plan Indicators 4a and 4b, which was also used to select districts for monitoring in the 2017-18 school year.  Both indicators are limited to suspensions of greater than ten days.  Briefly, districts that had a suspension rate greater than 10%, or a significant discrepancy by race or ethnicity in suspensions that exceeded 0%, were selected for either the performance indicator review or comprehensive review monitoring processes (Dkt. No. 2455-1 at 15-17).

For the 2018-19 school year, CDE is using a methodology based on its Dashboard.  The methodology is based on suspension data from the 2017-18 school year.  The Dashboard includes all districts with a cumulative enrollment[12] of thirty students or more.  CDE's submission does not state whether, and if so how, it engages in oversight of discipline of students with disabilities in districts that do not meet the cumulative enrollment standard for inclusion in the Dashboard.

To calculate Status, CDE takes the number of students suspended and divides by the cumulative enrollment.  To calculate Change, CDE subtracts the 2016-17 suspension rate from the 2017-18 rate.  But these suspension rates count students who are suspended for more than one event in a school year only once; in other words, a student suspended once for one event is counted once, and a student suspended four times for four events during a year is also counted once (Dkt. No. 2455-1 at 17, fn. 29).  In addition, the cumulative length of time for which students are suspended is not included in this approach.  Thus, CDE's approach will yield a rate of individual students suspended, but does not have the nuance necessary to capture what may be very different suspension practices on the part of districts.

CDE points out that suspension rates "vary widely" based on the type of district (elementary, high, or unified).  Therefore, different cut scores are developed for each type of district.  Given the variation in suspension rates between types of districts, the development of different cut scores is wise.

All districts that receive a red or orange performance level on the Dashboard are selected for the performance indicator review monitoring process, and this is also a

---

[12] Cumulative enrollment is the total number of students enrolled at any time during the school year (Dkt. No. 2455-1 at 17, fn. 29).  It is not clear if, in the context of suspensions of students with disabilities, this refers to a minimum of thirty students with disabilities or thirty total students.

factor in selection for comprehensive review (Dkt. No. 2455-1 at 17-19).  CDE's
Attachment M shows 661 districts chosen for performance indicator review for overall
discipline based on this methodology (Dkt. No. 2455-14).

For an elementary school district, CDE's Attachment L[13] indicates that the
following combinations of Status and Change result in a red or orange performance
level:

- A <u>very high</u> suspension rate (greater than 6%) AND a significant increase (more
  than 2%) from the prior year, an increase of 0.3% to 2%, a decline or increase of
  less than 0.3%, or a decline of 0.3% to less than 2%.
- A <u>high</u> suspension rate (greater than 3% to 6%) AND a significant increase (more
  than 2%) from the prior year, an increase of 0.3% to 2%, or a decline or increase
  of less than 0.3%.
- A <u>medium</u> suspension rate (greater than 1.5% to 3%) AND a significant increase
  (more than 2%) from the prior year, or an increase of 0.3% to 2% (Dkt. No. 2455-
  13 at 185).

This approach would not result in the selection of an elementary district with a
very high suspension rate, defined as greater than 6%, if it declined significantly from
the prior year.  But a significant decline is defined by CDE as a decline of as little as 2%.
Thus, a district with a suspension rate of 10% in the prior year and 8% in the current
year would not be selected for monitoring.  But a district with a suspension rate of 1.3%
in the prior year and 1.6% in the current year would apparently be selected, as its
Dashboard result would be orange.[14]  Such an outcome is perplexing at best, and
inconsistent with CDE's obligation under the IDEA to ensure that students with
behavior problems are receiving FAPE.

In addition, CDE's Dashboard-based approach does not analyze suspension data
for subgroups of students with disabilities such as those in foster care, homeless
students, those who are English-language learners, or students eligible for free or
reduced lunch.[15]  There are districts that do not contain enough students in one or more
of these categories to affect the Dashboard results such that a red or orange Dashboard

---

[13] The graphic included in CDE's narrative document (Dkt. No. 2455-1 at 19) appears to be the suspension
Dashboard for an elementary *school* rather than an elementary school *district* (see Dkt. No. 2455-13 at 185,
188).

[14] This district's suspension rate of 1.6% in the current year would be classified as "medium" (greater than
1.5% to 3%); it increased its rate by 0.3% from the prior year's rate of 1.3%.  This qualifies for a Dashboard
designation of orange according to Attachment L (Dkt. No. 2455-13 at 185).

[15] A recent analysis of CDE's suspension data showed a correlation between higher suspension rates and
schools in rural (versus urban and suburban) parts of the state and poverty:

> The EdSource analysis found suspension rates for all student groups were highest at
> schools in rural towns and lowest at those in cities. The farther a town from a city,
> and the higher the poverty rate, the higher the suspension rates.
> (https://edsource.org/2019/californias-student-suspension-rates-by-far-the-highest-
> in-rural-schools/607297)

designation would occur, although the students in these categories may be suspended much more often than other students with disabilities in the district.

Further, as will be seen in the next subsection, CDE analyzes data related to disproportionate suspensions of students from different racial and ethnic groups. But that analysis, and hence the selection for monitoring based upon it, is limited to racial or ethnic subgroups whose risk ratios exceed "3." Suspensions of students from a particular racial or ethnic group may not exceed this threshold but be disproportionate at a level of 2.5. Some of these students with behavior problems may not be receiving FAPE. For example, if the non-Hispanic/Latino suspension rate in a district is 2.3%, and the Hispanic/Latino rate is 5.75%, the resulting risk ratio of 2.5 does not exceed the threshold of "3." CDE's approach to analysis of discipline data will not uncover this in a manner that affects selection for monitoring unless there are a sufficient number of such students in a district to affect the overall Dashboard results.

Finally, students with disabilities are sometimes reported to law enforcement agencies for incidents which take place at school, or during school-related events or transportation.[16] The court's Phase 1 order cites federal data showing that students with disabilities are disproportionately referred to law enforcement nationally, and in California are approximately three times more likely to be referred to law enforcement than students who do not have IEPs. The federal data are collected every other year and can be disaggregated by district. These data "can help the state flag school districts that may be out of compliance with federal law and require more intensive monitoring" (Dkt. No. 2428 at 22-23) Due to both the federal collection of data and the behavioral data collected by CDE, that section of the order concludes:

> All of this is to say that, although it's possible that the state does not do enough *analysis* of data about police referrals when it decides which districts to monitor more closely (which would be relevant in Phase 2 of this court oversight process), it has access to enough data, which precludes the Court from finding the state out of compliance on this issue. (Dkt. No. 2428 at 24; emphasis in original)

CDE's submission does not put forth any analysis of data concerning referrals to law enforcement.

These problems with CDE's current approach have significant implications both for districts excused from further monitoring by virtue of receiving "meets requirements" annual determinations, and for selection for CDE's monitoring processes.

---

[16] For a recent settlement agreement between the California Department of Justice and one school district regarding referrals to law enforcement see https://edsource.org/2019/stockton-unified-settles-state-complaint-over-discriminatory-policing-practices/607559. The investigation found that students with disabilities were subjected to "interrogation, use of force, and/or arrests for conduct resulting from their disabilities." The investigation also found that law enforcement referrals had an "adverse disparate impact" on Black and Hispanic students (https://edsource.org/wp-content/uploads/2019/01/Stocktoncomplaint-01.18.19.pdf at 5-6).

*Conclusion:  Noncompliant.*

*Reasons for Conclusion:  CDE's calculation of the suspension rate does not consider multiple suspensions or the cumulative length of time students are suspended. Districts with very high suspension rates will not be selected for monitoring (unless combined with poor performance on other comprehensive review selection elements) if the rate declined by a small amount from the prior year, while districts with lower suspension rates can be selected.  Data related to referrals to law enforcement are not analyzed.  Data related to subgroups of students with disabilities are not analyzed (except race/ethnicity in the disproportionality analysis below, but that is limited to districts that exceed the risk ratio threshold).  CDE does not provide information regarding if, and if so how, suspension data for districts that do not meet the cumulative enrollment standard are analyzed.*

### b. Disproportionality in Discipline

All states must collect and examine data to determine whether significant disproportionality based on race or ethnicity is occurring with respect to the "incidence, duration, and type of disciplinary removals from placement, including suspensions and expulsions" (34 C.F.R. §300.646(a)(3)).  Five areas of inquiry related to discipline are specified by the regulations:

> For children with disabilities ages 3 through 21, out-of-school suspensions and expulsions of 10 days or fewer;
> For children with disabilities ages 3 through 21, out-of-school suspensions and expulsions of more than 10 days;
> For children with disabilities ages 3 through 21, in-school suspensions of 10 days or fewer;
> For children with disabilities ages 3 through 21, in-school suspensions of more than 10 days; and
> For children with disabilities ages 3 through 21, disciplinary removals in total, including in-school and out-of-school suspensions, expulsions, removals by school personnel to an interim alternative education setting, and removals by a hearing officer.  (34 C.F.R. §300.647(b)(4)(iii-vii)

These categories match those set forth by CDE in its submission.

CDE states that it calculates the risk ratio or alternate risk ratio for each of these categories.  These concepts are defined by the regulations:

> *Risk* is the likelihood of a particular outcome (identification, placement, or disciplinary removal) for a specified racial or ethnic group (or groups), calculated by dividing the number of children from a specified racial or ethnic group (or groups) experiencing that outcome

by the total number of children from that racial or ethnic group or groups enrolled in the LEA.  (34 C.F.R. §300.647(a)(5))

*Risk ratio* is a calculation performed by dividing the risk of a particular outcome for children in one racial or ethnic group within an LEA by the risk for children in all other racial and ethnic groups within the LEA.  (34 C.F.R. §300.647(a)(6))

*Alternate risk ratio* is a calculation performed by dividing the risk of a particular outcome for children in one racial or ethnic group within an LEA by the risk of that outcome for children in all other racial or ethnic groups in the State.  (34 C.F.R. §300.647(a)(1))

Alternate risk ratios are calculated when either the numerator or denominator for the comparison group does not meet the minimum size.

In its description of these calculations for disproportionality in discipline, CDE's submission displays the calculation methodology for disproportionality in identification rather than disproportionality in discipline (Dkt. No. 2455-1 at 47).  For that reason, this report will use the formula set forth by CDE in the past for calculating the risk ratio for disproportionality in discipline[17]:

---

((Students with disabilities in a specific race/ethnicity group for each suspension category
Divided by
Students in the same race/ethnicity group in general education) x100)

Divided by

((Students with disabilities **NOT** in a specific race/ethnicity group for each suspension category
Divided by
Students **NOT** in the same race/ethnicity group in general education) x100)

---

However, this formula is problematic.  As will be seen in section III B 3 below, it has the same problem as CDE's formula for disproportionality in placement.  The problem is the denominator for each of the two calculations:  in order to calculate the risk of a specific suspension category for students with disabilities of a particular race or ethnicity, one must compare it to the risk of that suspension category for students *with disabilities* of all other races and ethnicities.[18]  As explained in 2017 by the U.S. Department of Education:

---

[17] CDE 6/30/17 CAP submission at 7.
[18] The monitor missed this problem in past monitoring (see Dkt. No. 2334 at 8-12).

A risk ratio is a numerical comparison, expressed as a ratio or decimal, between the risk of a specific outcome for a specific racial or ethnic group in an LEA and the risk of that same outcome for all other children in the LEA. The comparison is made -- the risk ratio is calculated -- by dividing the risk of a particular outcome for children in one racial or ethnic group within an LEA by the risk of that same outcome for children in all other racial or ethnic groups within the LEA (the comparison group). Note that for risk ratios involving identification, the comparison group is children in all other racial or ethnic groups enrolled in an LEA. *For risk ratios involving placement or discipline, the comparison group is children with disabilities in all other racial or ethnic groups enrolled in an LEA.*[19]

Thus, the formula would need to be revised in the following manner:

> ((Students with disabilities in a specific race/ethnicity group for each suspension category
> Divided by
> Students with disabilities in the same race/ethnicity group) x100)
>
> Divided by
>
> ((Students with disabilities **NOT** in a specific race/ethnicity group for each suspension category
> Divided by
> Students with disabilities **NOT** in the same race/ethnicity group) x100)

It is unknown to the monitor whether this is the formula in use. This should be clarified by CDE.[20]

CDE states that it uses a threshold of "3" to determine when disproportionality is significant. This threshold was set in consultation with stakeholders (Dkt. No. 2455-1 at 48). This threshold is reasonable.

With respect to selection for monitoring CDE appears to have made a mistake in its submission. In the section devoted to disproportionality CDE states that districts that receive a red or orange designation on the Dashboard are selected for performance indicator review, and that this is a factor in selection for comprehensive review. However, CDE has not set forth a Dashboard-based approach to disproportionality in discipline (see CDE's Attachment L, Dkt. No. 2455-13 at 120-127). In addition, although disproportionality in discipline is listed as a factor in selection for comprehensive review, it is not listed by CDE among the indicators involved in performance indicator

---

[19] https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/significant-disproportionality-qa-03-08-17.pdf at 4; emphasis added.
[20] It is expected that CDE will clarify this satisfactorily.

review; but it is included as expected in the disproportionality review monitoring process (Dkt. No. 2455-1 at 49-50, 54, 58-59). This is confirmed by CDE's Attachment M, which shows 301 districts selected for disproportionality review for disproportionality in discipline (Dkt. No. 2455-14).

> *Conclusion: Noncompliant.*
> *Reasons for Conclusion: CDE's submission sets forth the formula for disproportionality in identification, rather than the formula for disproportionality in discipline. Reconsideration of a formula CDE put forth in the past shows that CDE did not use the proper comparison group, i.e., students with disabilities.*

4. Timeliness

Each of the topics in this section is related to the timely development of IEPs for students and thus to the monitoring priority area of FAPE.[21] As each topic raises the same two concerns, those will be discussed in a separate subsection below (e).

a. Sixty-Day Initial Evaluation

Districts must conduct a "full and individual" initial evaluation within sixty days of receiving parent consent (34 C.F.R. §300.301(a), (c)(1)(i)).

CDE uses the same methodology to analyze these data as that prescribed for the federal state performance plan. It calculates timeliness of initial evaluations by subtracting the initial evaluation date from the parent consent date. Initial IEPs that exceeded sixty days and do not have a code indicating a valid reason for the delay (such as the parent not making the child available for the evaluation), result in the district's identification as noncompliant (because the target for timely initial evaluations is 100%). Districts with any amount of noncompliance are selected for the data identified noncompliance monitoring process. Although not mentioned in this section of its submission, timeliness of initial IEPs is also a factor in selection for comprehensive review (Dkt. No. 2455-1 at 32, 36, 57).

b. Transition from Part C of the IDEA to Part B

States are required to ensure that children served under Part C of the IDEA have a "smooth and effective transition" to preschool programs, and that an IEP "has been developed and is being implemented" by a child's third birthday (34 C.F.R. §300.124).

CDE uses the same methodology to analyze these data as that prescribed for the federal state performance plan. First CDE determines the number of students who turned three during the prior school year by subtracting the birthdate from initial evaluation date. Because some of those children were not served by Part C, CDE then uses two methods to remove those children from the analysis. First CDE looks for those

---

[21] Sixty-day initial evaluations are also related to child find; that topic is placed in the child find section of CDE's submission.

children who had an infant evaluation date, indicating that the child was served by an infant program at the district[22]; CDE then matches the remaining children who turned three with data provided by the Department of Developmental Services showing children served by Part C programs at regional centers.

CDE then subtracts from the remaining three-year-old children served by Part C a) the children found ineligible for Part B, b) the children for whom delays in parent consent caused delays, and c) the children referred to Part C ninety days before the third birthday.  Districts that do not meet the target of 100% of children with IEPs in place by their third birthday are chosen for the data identified noncompliance monitoring process, 134 districts according to CDE's Attachment M (Dkt. No. 2455-14).  This is also a factor in selection for comprehensive review (Dkt. No. 2455-1 at 39-41, 57).

### c.  Annual Review of IEPs

Districts must ensure that IEPs are reviewed by IEP teams not less than annually (34 C.F.R. §300.324(b)(1)(i)).

CDE calculates compliance with this requirement by subtracting the date the data were reported (see Dkt. No. 2390-2 at 9) from the last IEP date.  If the number of days between the two is greater than 365 (or 366 in a leap year), and there is not a "valid delay code,"[23] then the district is regarded as noncompliant as the target for this indicator is 100%.  Noncompliant districts are selected for either the data identified noncompliance or comprehensive review monitoring processes (Dkt. No. 2455-1 at 28-29, 60-61).

### d.  Triennial Assessment

Unless a parent and district agree otherwise, the student must be reevaluated at least once every three years (34 C.F.R. §300.303(b)(2)).

CDE calculates compliance with this requirement by subtracting the date the data were reported from the last determination of Part B eligibility.  If the number of

---

[22] It is not clear why all children with an infant evaluation date would be regarded as served by an infant program at the district, since a child may have been evaluated but found not eligible for Part C services. This is not explained in CDE's submission.

[23] One of the delay codes listed for this field (CASEMIS A-66) is code 20, "Parent contacted-did not attend" (Dkt. No. 2455-1 at 28; see also Dkt. No. 2390-2 at 47-48).  CDE's submission does not state whether that is regarded as a valid delay code.  If so, it should be pointed out that such a circumstance is not regarded in the regulations as a valid reason why an IEP meeting was not timely.  The regulations in fact state clearly that districts can hold IEP meetings without a parent present.  In that circumstance districts "must keep a record of its attempts to arrange a mutually agreed on time and place" such as "detailed records" of phone calls made or attempted and the results, correspondence sent to the parents and responses, and "detailed records of visits made to the parent's home or place of employment and the results of those visits" (34 C.F.R. §300.322(d)).  CDE should respond to this point.

days between the two is greater than 1,095, and there is not a "valid delay code,"[24] then the district is regarded as noncompliant; the target for this indicator is 100%.

With respect to selection for monitoring CDE again appears to have made a mistake in its submission.  In the timely triennial assessments section of its submission CDE states that districts that receive a red or orange designation on the Dashboard are selected for performance indicator review, and that this is a factor in selection for comprehensive review.  However, timely triennial assessment is not listed by CDE among the indicators involved in performance indicator review, but is included in the data identified noncompliance monitoring process and is a factor in the comprehensive review selection process (Dkt. No. 2455-1 at 29-30, 50-51, 61-62).  In addition, CDE has not set forth a Dashboard-based approach to selection for monitoring for timely triennial assessments, nor could any information related to this indicator be located in CDE's Attachment L (Dkt. No. 2455-13).  CDE refers to its Attachment K for the number of districts that did not meet this target, but that document does not address timely triennial assessments (Dkt. No. 2455-12).  CDE's Attachment M confirms that the eighty districts found noncompliant with timely triennial assessments were selected for the data identified noncompliance monitoring process (Dkt. No. 2455-14).

e. Discussion

CDE's approach to data analysis for these four IEP timeliness requirements is insufficient in one respect.

Districts that fail to comply with any of these requirements may exceed the timeline by very different numbers of days.  A district that is over the timeline by an average of two days is very different from one that exceeds the timeline by an average of thirty days.  Yet these districts are treated in the same manner in CDE's analysis.[25]

*Conclusion:  Noncompliant.*

*Reason for Conclusion:  CDE does not analyze the average number of days that districts exceed the mandated timelines.  This is of no consequence for selection for data identified noncompliance, as any district below the 100% targets will be selected, but the lack of analysis results in CDE's failure to consider this potentially important information in selection for comprehensive review.*

---

[24] As was the case with annual review of IEPs, one of the delay codes listed for this field (CASEMIS A-67) is code 20, "Parent contacted–did not attend" (Dkt. No. 2455-1 at 29; see also Dkt. No. 2390-2 at 48).  See the prior footnote.

[25] There is another problem here as well.  CDE's analysis of these data concerns whether or not a district met the target of 100% compliant for each requirement.  Thus, a district with a 99.5% compliance rate is treated the same in the analysis as one with an 80% rate:  both are noncompliant regardless of their very different levels of success.  However, CDE's analysis reveals the actual rate, although it does not treat this information reasonably in selection for comprehensive review (Dkt. No. 2455-1 at 57, 60-62).  See section IV F below.  For present purposes, it is clear that the analysis produces the actual rate.

5. <u>IEP Implementation</u>

The importance of IEP implementation to students' receipt of FAPE is clear from the court's Phase 1 order, which requires a return to the issue of collection of these data at Phase 4 (Dkt. No. 2428 at 13-18). CDE states that it will begin collection of these data and will provide details regarding analysis and use in monitoring and enforcement in the future as directed by the court (Dkt. No. 2455-1 at 3).

Therefore, the analysis and use of IEP implementation data in monitoring and enforcement will be deferred for the present.

*Conclusion: Deferred.*

B. <u>Least Restrictive Environment</u>

States are required to ensure that public agencies meet the least restrictive environment requirements. States must ensure that:

- to the maximum extent appropriate, children with disabilities are educated with children who are nondisabled;
- removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily;
- a continuum of potential placements is available to meet the needs of children with disabilities, including alternative placements (regular classes, special classes, special schools, etc.), and supplementary services (resource room, itinerant instruction, etc.) provided in conjunction with regular class placements;
- placement decisions conform with the least restrictive environment requirements, and are as close as possible to the child's home;
- unless the IEP requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled; and
- children with disabilities participate in nonacademic and extracurricular services and activities (including meals, recess periods, etc.) with nondisabled children to the maximum extent appropriate to the needs of that child, with appropriate and necessary supplementary aids and services, as determined by the child's IEP team (34 C.F.R. §§300.114-300.117).

The discussion below of data analysis related to least restrictive environment is divided by school-age students and preschoolers. For both populations CDE states that it uses the same data and calculation methodologies as those mandated for the federal state performance plan. In addition, in order to consider a complete picture of data analyses related to least restrictive environment, which CDE describes as "the cornerstone" of FAPE (Dkt. No. 2455-1 at 10), disproportionality in placement will also be discussed in this section.

1. <u>School-Age</u>

CDE bases its analysis on two data fields.  One concerns the type of student placement (for example, separate school or residential facility); the other concerns the percent of time students spend in regular classrooms.  With respect to the latter CDE calculates two rates:  the percentage of students in regular classes for greater than 80% of the school day, and the percentage of students in regular classes less than 40% of the day.  Each is calculated by dividing the number of students in the placement category by the number of students with disabilities in the district.

Turning to type of school placement, CDE calculates the percentage of students in separate placements.  This includes separate schools, residential facilities, and homebound/hospital placements.  This is calculated by dividing the number of students in any of these three placement categories by the number of students with disabilities in the district.

The three rates of placement are then compared to the statewide targets for these indicators.  The targets are shown in the table below:

| Indicator | 2017-18 Target | # Districts Not Meeting Target[26] |
|---|---|---|
| Percentage of students in regular classes for greater than 80% of the school day | Equal to or greater than 51.2% | 252 |
| Percentage of students in regular classes less than 40% of the day | Equal to or lower than 22.6% | 236 |
| Percentage of students in separate placements | Equal to or lower than 4% | 168 |

Districts that do not meet the targets for any of these three indicators[27] are chosen for either the performance indicator review or comprehensive review monitoring processes (Dkt. No. 2455-1 at 10-12).

This approach raises three concerns:  the modesty of the targets compared with California and national performance on these indicators, the failure to analyze disaggregated data, and the failure to analyze data that would show patterns of placement in particular schools.

Turning first to the targets, for each of these indicators the table below shows the California 2017-18 target, the state's actual performance in 2016, and national performance in 2016[28]:

---

[26] From CDE's Attachment K (Dkt. No. 2455-12).

[27] CDE states that it selects districts "whose total rate is *below* the target" for any of the three indicators (Dkt. No. 2455-1 at 12; emphasis added), but a district must be *above* the target for the last two indicators in the table (percentage of students in regular classes less than 40% of the day and percentage of students in separate placements) to be selected.  But its intentions are reasonably clear from the table.

[28] https://osep.grads360.org/#report/apr/2016B/publicView?state=CA&ispublic=true, "CA-datadisplay-2018b" download at 6.

| Indicator | 2016 California Performance | 2016 National Performance (includes California) | 2017-18 California Target |
|---|---|---|---|
| Percentage of students in regular classes for greater than 80% of the school day | 54.9% | 63.1% | Equal to or greater than 51.2% |
| Percentage of students in regular classes less than 40% of the day | 20.7% | 13.4% | Equal to or lower than 22.6% |
| Percentage of students in separate placements | 3.2% | 3.2% | Equal to or lower than 4% |

For each of these three school-age least restrictive environment indicators, the state as a whole has already met its targets.  Moreover, for the first two indicators in the above table, the nation as a whole is having greater success in placing students in less restrictive settings than is California.[29]  Seen in this light, the lack of ambitiousness in the state's targets is even more striking.

Setting modest targets for the purpose of federal state performance plan reporting may be strategically wise in CDE's view.  But applying those same targets to select districts for monitoring results in fewer districts selected compared with, for example, using the state averages or national averages as targets.

Turning to disaggregation, CDE's analysis is limited to aggregate data about students with disabilities.  This type of approach does not examine and analyze the placements of subgroups of students with disabilities, such as those in foster care, homeless students, English-language learners, or students who live in or near poverty. The placements of these students may be quite different from the aggregate placement patterns.

CDE also does not analyze disaggregated placement data for students with different disabilities.  A comparison of the 2016 federal and state data cited above shows significant gaps between the state and the nation in the placement patterns of students with emotional disturbances, intellectual disabilities, orthopedic impairments, and specific learning disabilities:  the nation as a whole is having more success educating these students in less restrictive settings than is California.[30]

For example, for students with orthopedic impairments, the table below shows the comparison for three placement settings:

---

[29] Due to the size of the population of students with disabilities in the state, if the state were removed from the national numbers the gap between California and the nation would be even wider.
[30] https://osep.grads360.org/#report/apr/2016B/publicView?state=CA&ispublic=true, "CA-datadisplay-2018b" download at 6.

| Indicator | 2016 California Performance | 2016 National Performance |
|---|---|---|
| Percentage of students in regular classes for greater than 80% of the school day | 30% | 52.6% |
| Percentage of students in regular classes less than 40% of the day | 40.3% | 23.5% |
| Percentage of students in separate placements/residential facilities | 10.5% | 4.5% |

For students with emotional disturbances, the table below shows the comparison:

| Indicator | 2016 California Performance | 2016 National Performance |
|---|---|---|
| Percentage of students in regular classes for greater than 80% of the school day | 30.9% | 47.2% |
| Percentage of students in regular classes less than 40% of the day | 28.3% | 18.2% |
| Percentage of students in separate placements/residential facilities | 20.8% | 14.4% |

For students with specific learning disabilities, the table below shows the comparison:

| Indicator | 2016 California Performance | 2016 National Performance |
|---|---|---|
| Percentage of students in regular classes for greater than 80% of the school day | 58.7% | 70.8% |
| Percentage of students in regular classes less than 40% of the day | 12.9% | 5.2% |
| Percentage of students in separate placements/residential facilities | 0.5% | 0.5% |

In addition, as will be seen in the subsection II B 3 below, CDE analyzes data related to disproportionality in the placements of students from different racial and ethnic groups. However, that analysis and the selection for monitoring based upon it is limited to racial or ethnic subgroups whose risk ratios exceed "3." Placements of students from a racial or ethnic group may not exceed this threshold but may be disproportionate at a lower level, although some of these students may not be placed in the least restrictive environment.

Thus, CDE's analysis of placement data will not reveal patterns of placement for subgroups that may be suggestive of least restrictive environment violations unless there are a sufficient number of such students in a district to affect meeting the aggregate targets. Districts that meet the aggregate targets will not be selected for monitoring related to least restrictive environment, and are more likely to receive a

"meets requirements" annual determination, regardless of whether students in some of these subgroups are placed in settings more restrictive than necessary to implement their IEPs satisfactorily.

Finally, with respect to the requirements concerning placing students as close to home as possible, and in the school students would attend if they did not have disabilities unless the IEP requires some other arrangement, testimony from CDE staff at the Phase 1 hearing indicated that CDE collects the specific schools attended by students.  Thus, data can be disaggregated by school to reveal patterns of placement in different schools.  The testimony also indicated that this type of analysis is not currently conducted by CDE.[31]  Therefore it is not surprising that CDE's Phase 2 submission does not set forth this type of data analysis.  If this type of analysis were a part of Phase 3 rather than Phase 2, then such data would not be analyzed for districts that meet the least restrictive environment targets, because such districts are not selected for monitoring.  But districts that meet the aggregate targets but place a large number of students in one school site because necessary staff are currently located there, should be monitored to ensure that the IEPs of those students could not be implemented in sites closer to home with the use of supplementary aids and services.

*Conclusion:  Noncompliant.*
*Reasons for Conclusion:  The targets used by CDE are not ambitious compared to current California and national placement data.  CDE does not disaggregate placement data for subgroups of students with disabilities, and does not analyze patterns of placement in particular schools to determine the extent to which districts are congregating students in certain sites.*

2.  Preschool

Four of the nine regular-early-childhood-program options in the data field relied upon by CDE to perform calculations related to preschool least restrictive environment include information about hours per week in the program (ten or more hours or fewer than ten), and also concern whether the student is receiving his or her special education services in that setting or in some other location.  For these four options the information relevant to CDE's calculations only concerns the child's placement in a regular early childhood program.  CDE calculates two rates for preschool least restrictive environment.

The first calculates the rate of children placed in regular early childhood programs (number of children in these programs divided by the total number of preschool children with disabilities in the district).  The second calculates the rate of children in separate classes, separate schools, and residential facilities[32] (number of

---

[31] 8/7/18 transcript at 186, ll. 3-7, 18-23.  See also the comments from counsel for the District at 183-184 ("…some districts funnel students to a particular school because that's where they have a particular set of staff. And so that can lead to a disproportionate number of students with special needs at a particular school within a district…").

[32] CDE's description of the second calculation misstates it ("Take the total number of students with disabilities ages 3 through 5 in a regular programs (sic)"), but it is clear from the header and the codes used what CDE intends here (Dkt. No. 2455-1 at 13).

children in these settings divided by the total number of preschool children with disabilities in the district).

These rates are then compared with the targets:

| Indicator | 2017-18 Target | # Districts Not Meeting Target[33] |
|---|---|---|
| Percentage of children in regular early childhood program | Greater than 33.9% | 97 |
| Percentage of children in separate classes, separate schools, and residential facilities | Lower than 32.4% | 191 |

However, one of these targets from CDE's submission may not be the target in use. CDE's revised table for its preschool matrix, received via email on 1/14/18 from counsel for CDE, stated that the target for the percentage of children in regular early childhood program is 34.9% rather than the 33.9% from its submission.  Although it is not clear which one of these percentages is incorrect, the table below will display CDE's apparently revised target.

Districts that do not meet either of these targets[34] are selected for performance indicator review, preschool review, or comprehensive review (Dkt. No. 2455-1 at 12-14). Although this is consistent with other sections of CDE's narrative document (Dkt. No. 2455-1), CDE's Attachment M does not include these two preschool least restrictive environment indicators under the performance indicator review process, and therefore does not show any districts selected for it due to failure to meet these targets (Dkt. No. 2455-14).  It is therefore unclear whether these indicators are actually included in performance indicator review.  CDE should clarify this and, if these indicators are included, set forth the number of districts monitored in the performance indicator review process for failing to meet the targets.

For each of these indicators the table below shows the California 2017-18 target, the state's actual performance in 2016, and national performance in 2016[35]:

| Indicator | 2016 California Performance | 2016 National Performance (includes California) | 2017-18 California Target |
|---|---|---|---|
| Percentage of children in regular early childhood program | 45.2% | 45.2% | Greater than 34.9% |

---

[33] From CDE's Attachment K (Dkt. No. 2455-12).

[34] CDE again states that it selects districts "whose total rate is *below* the target" for either of these indicators (Dkt. No. 2455-1 at 14; emphasis added), but a district must be *above* the target for the second indicator in the table (percentage of children in separate classes, separate schools, and residential facilities) to be selected.  But CDE's intentions are again reasonably clear from the table.

[35] https://osep.grads360.org/#report/apr/2016B/publicView?state=CA&ispublic=true, "CA-datadisplay-2018b" download at 5.

| Indicator | 2016 California Performance | 2016 National Performance (includes California) | 2017-18 California Target |
|---|---|---|---|
| Percentage of children in separate classes, separate schools, and residential facilities | 29.9% | 25.2% | Lower than 32.4% |

As was the case for school-age placements, CDE's targets on preschool placements have already been met.  The setting of more ambitious targets would result in the monitoring of more districts for compliance with the least restrictive environment requirements for preschool children.

Moreover, the analysis is limited to aggregate data about preschool children with disabilities.  Thus, the placements of subgroups of this population—such as those who are members of racial or ethnic minorities, children in foster care, homeless children, those who are English-language learners, or children who live in or near poverty—are not analyzed.  An exclusive focus on meeting aggregate targets can mask high percentages of self-contained placements for subgroups, and any conclusions that could be derived from the analysis of subgroups will not influence selection for CDE's monitoring processes.

*Conclusion:  Noncompliant.*
*Reasons for Conclusion:  CDE does not analyze the placements of subgroups of children with disabilities.  The targets used by CDE are not ambitious compared with current California data.*

3.  Disproportionality in Placement

All states must collect and examine data to determine whether significant disproportionality based on race or ethnicity is occurring with respect to placement into particular settings (34 C.F.R. §300.646(a)(2)).  Two areas of inquiry related to least restrictive environment are specified by the regulations:

> For children with disabilities ages 6 through 21, inside a regular class less than 40 percent of the day; [and]
> For children with disabilities ages 6 through 21, inside separate schools and residential facilities, *not including* homebound or hospital settings, correctional facilities, or private schools.  (34 C.F.R. §300.647(b)(4)(i-ii); emphasis added)

In addition to the required placements, it appears from CDE's submission that it also calculates disproportionality in placement in regular classes between 40-79% of the day,

and for greater than 80% of the day, although it does not show these calculations.[36]  It also appears from the submission that CDE includes students in homebound/hospital settings (CASEMIS field A-44, code 470) in the category of separate placements, although these students are specifically excluded in the federal requirements (Dkt. No. 2455-1 at 42, 45).

CDE first aggregates the placement data and then applies this formula to calculate the risk ratio (Dkt. No. 2455-1 at 46):

---

((Students with disabilities in a specific race/ethnicity group for each least restrictive environment category
Divided by
Students in the same race/ethnicity group in general education) x100)

Divided by

((Students with disabilities **NOT** in a specific race/ethnicity group for each least restrictive environment category
Divided by
Students **NOT** in the same race/ethnicity group in general education) x100)

---

However, as was the case for CDE's formula for disproportionality in discipline, the formula set forth by CDE is inaccurate.[37]  The denominator in each of the two CDE calculations is students in the same racial or ethnic group in general education, but to calculate the risk of a specific placement for students with disabilities of a particular race or ethnicity, one must compare it to the risk of that placement category for students *with disabilities* of all other races and ethnicities.  As explained in 2017 by the U.S. Department of Education:

> For risk ratios involving placement or discipline, the comparison group is children with disabilities in all other racial or ethnic groups enrolled in an LEA.[38]

Thus, the formula would need to be revised in the following manner:

---

[36] However, these two categories of placement are not listed in the section of CDE's submission that discusses the disproportionality review monitoring process (Dkt. No. 2455-1 at 54-55).
[37] The monitor missed this problem in past monitoring (see Dkt. No. 2334 at 8).
[38] https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/significant-disproportionality-qa-03-08-17.pdf at 4; emphasis added.

((Students with disabilities in a specific race/ethnicity group for each least restrictive environment category
Divided by
Students with disabilities in the same race/ethnicity group) x100)

Divided by

((Students with disabilities **NOT** in a specific race/ethnicity group for each least restrictive environment category
Divided by
Students with disabilities **NOT** in the same race/ethnicity group) x100)

It is unknown whether this is the formula in use by CDE. This should be clarified.[39]

Alternate risk ratios are calculated when either the numerator or denominator for the comparison group does not meet the minimum size. CDE states that it uses a threshold of "3" to determine when disproportionality is significant. This threshold was set in consultation with stakeholders (Dkt. No. 2455-1 at 48). This threshold is reasonable.

With respect to selection for monitoring CDE appears to have made a mistake in its submission. In the section of the submission concerning disproportionality CDE states that districts that receive a red or orange designation on the Dashboard are selected for performance indicator review, and that this is a factor in selection for comprehensive review. However, disproportionality in placement is not listed by CDE among the indicators involved in performance indicator review or comprehensive review, but is included in the disproportionality review monitoring process (Dkt. No. 2455-1 at 49-50, 54-55, 60-62). This is confirmed by CDE's Attachment M, which shows 73 districts selected for disproportionality review for disproportionality in placement (Dkt. No. 2455-14).

*Conclusion: Noncompliant.*
*Reasons for Conclusion: Reconsideration of CDE's formula shows that CDE did not use the proper comparison group, i.e., students with disabilities.*

C.  State Exercise of General Supervisory Authority

1.  Child Find

Child find is included under the monitoring priority area of state exercise of general supervision. States are required to have in effect policies and procedures to ensure that all children with disabilities, including homeless children, wards of the state, those attending private schools, highly mobile children including migrants, and those advancing from grade to grade if suspected of having a disability and in need of

---

[39] It is expected that CDE will clarify this satisfactorily.

special education, are "identified, located, and evaluated" (34 C.F.R. §§300.600(c), (d)(2), 300.111, 300.131, 300.149).

CDE discusses two data analyses relevant to child find in its submission. One concerns the sixty-day initial evaluation timeline. This indicator was discussed in section III A 4 a above.

The other analysis concerns the rate of students identified with disabilities in each district. This rate is calculated by dividing the number of students with IEPs by the number of all students in the district.

CDE highlights that this analysis concerns only students ages 6-21. Because California does not have universal preschool, CDE states that there is no group to serve as a denominator for this calculation (Dkt. No. 2455-1 at 34). It should be noted that, according to the federal data display for California, in the 2016-17 school year the state identified 5.4% of children ages three to five with IDEA disabilities, while the national identification rate for this age group was 6.3%.[40] Moreover, CDE's obligation to ensure that all children suspected of having disabilities and in need of special education are identified, located, and evaluated includes preschool-age children. For that reason, a method of ensuring compliance with the child find requirements for preschool children should be developed and implemented.

Options that can be considered to serve as a denominator for preschool children include the use of census data, California estimates of county populations by age,[41] or district kindergarten through third grade enrollment data.

For school-age students, CDE advances an approach to data analysis that it believes accounts for "geographic and regional differences." It offers only one example of such differences, San Diego. Because that district is a compassionate reassignment location for the military, CDE writes, "there may be" a higher rate of students with IEPs there.[42] But this example is relevant to potential overidentification of students, not child

---

[40] https://osep.grads360.org/#report/apr/2016B/publicView?state=CA&ispublic=true, "CA-datadisplay-2018b" download at 1. While not entirely clear, it appears that federal census data may have served as the denominator for these calculations. The explanatory note reads:

> The percent of the population who are children with disabilities (IDEA) in the state and nation as of the state designated special education child count date, for the ages 3 through 5 and 6 through 21. Data reported for IDEA Child Count and Educational Environments and Census. National IDEA Child Count and Educational Environments data represent the US, Outlying Areas, and Freely Associated States and national Census data represent the 50 states and DC (including BIE).

[41] See the internal link for "County Population by Age" at http://www.dof.ca.gov/Forecasting/Demographics/Projections/ for the estimates and projections prepared by the Demographic Research Unit of the California Department of Finance.

[42] CDE does not show in its submission that San Diego does in fact have a higher rate of students with IEPs than other districts of similar size and demographic make-up. In 2016 it appears that San Diego County's identification rate was higher than the state as a whole by only 0.2%, and was also lower than the identification rates of a number of other counties, including Los Angeles County and Sacramento County (see data at https://www.kidsdata.org/topic/95/special-needs-education-enrollment/table#fmt=1146&tf=88&sortColumnId=0&sortType=asc).

find; the submission does not contain additional discussion or examples of "geographic and regional differences" that might be relevant to child find.

CDE expresses its view that a methodology that will account adequately for geographic and regional differences is a normative model using two standard deviations from the mean.  CDE states that it will identify districts that fall outside of two standard deviations from the mean for monitoring.  For 2017-18 the statewide identification rate of students with disabilities, CDE states, was 10%, and the standard deviation was 3.21.  Two standard deviations below the mean is an identification rate of 3.6%.

Based on this methodology only 38 districts were selected for monitoring of potential child find violations.  These districts were selected for the performance indicator review monitoring process (Dkt. No. 2455-1 at 31-36; Dkt. No. 2455-14).

To establish a context for this discussion, it should be noted first that the federal data display for California shows that in the 2016-17 school year, 8.2% of the population ages six through twenty-one were identified with IDEA disabilities versus 9.1% nationally.   When basing the identification rate on enrollment, California identifies 11.7% with IDEA disabilities versus 13.2% nationally.[43]  According to CDE's submission, its identification rate in 2017-18 was 10%.  Considered in the context of these data, the use of a standard of below 3.6%—a standard that red-flags only 38 districts in the state for monitoring—is not adequate to ensure compliance with the child find requirements for school-age students.

Moreover, two of the populations singled out for special attention under the child find regulations, homeless students and those who are highly mobile including migrants, are not mentioned by CDE and not included in any manner in its data analysis methodology.  The same is true for another vulnerable population, students in foster care.  CDE's submission does not offer any reasons to believe that such students will be attended to adequately through CDE's methodology for selecting districts for monitoring to ensure compliance with the child find requirements.

Further, CDE's methodology does not disaggregate identification data to determine whether particular racial or ethnic groups appear to be under-identified in districts that are, for example, one standard deviation below the state identification rate. CDE's disproportionality in identification analyses is limited at best in its approach to potential under-identification, as will be seen in subsection D below, and those analyses do not consider districts' overall identification rates as part of the analysis.  With respect to disproportionality in identification, if the conclusions reached in subsection D are correct, then additional emphasis must be placed on potential racial/ethnic disparities in identification through effective data analysis for the purpose of monitoring compliance with the child find requirements.

Finally, CDE's approach does not have the nuance necessary for effective monitoring of child find.  Students without IEPs who are more likely than others to have disabilities and need special education are those who are not performing well academically and/or behaviorally.  But CDE does not use general education

---

[43] https://osep.grads360.org/#report/apr/2016B/publicView?state=CA&ispublic=true, "CA-datadisplay-2018b" download at 1.

achievement and suspension data in conjunction with identification rates to flag districts that have both low identification rates *and* significant numbers of students without identified disabilities who are performing poorly academically and/or behaviorally.

> *Conclusion:  Noncompliant.*
> *Reasons for Conclusion:  CDE does not analyze potential failures to identify preschool-age children.  For school-age students, CDE's standard of only selecting districts with identification rates below 3.6% is inadequate to ensure compliance with the child find requirements.  Data are not analyzed for vulnerable sub-populations, including those singled out for attention in the regulations (homeless, migrant, and those in foster care) and by race/ethnicity.  CDE's analysis does not factor in the academic or behavioral performance of students without IEPs.*

### 2.  Effectiveness of Monitoring

Effective monitoring is another aspect of state exercise of general supervision, which is a priority area for monitoring.  The "primary focus" of CDE's monitoring activities must be on improving "educational results and functional outcomes for all children with disabilities," and ensuring that public agencies meet the program requirements "with a particular emphasis on those requirements that are most closely related to improving educational results for children with disabilities" (34 C.F.R. §§300.600(b), (d)(2)).

In its Phase 1 order the court wrote:

> …each of the different areas listed by the court monitor in his report as important ways of evaluating the state's monitoring system[44] appear to involve some degree of data analysis (a subject for later phases) rather than data collection (the subject of the current phase).  (Dkt. No. 2428 at 33)

Phase 2 concerns data analysis.  However, CDE's submission does not set forth any analyses related to evaluating the effectiveness of its monitoring.

> *Conclusion:  Noncompliant.*
> *Reason:  No information provided.*

---

[44] Monitor's note:  These areas included whether student results and outcomes improved as a result of monitoring; whether monitoring focused on those requirements most closely associated with student results and outcomes; the use of monitoring standards that embody the IDEA's substantive, rather than procedural, requirements; and whether corrective actions succeeded in resolving noncompliance systemically (Dkt. No. 2397 at 37).

3.  <u>Use of Resolution Sessions</u>

The use of resolution meetings is included under state exercise of general supervision as a priority area for monitoring.

Within fifteen days of the filing of a due process complaint by parents, districts are required to convene a resolution meeting with the parent, relevant members of the IEP Team, and a representative of the agency with decision-making authority.  The meeting's purpose is to provide the district an opportunity to resolve the dispute.  If the complaint is not resolved to the satisfaction of the parent within thirty days, a hearing may take place.  If a resolution is reached, an enforceable legally binding agreement must be executed (34 C.F.R. §300.510).

CDE's analysis of data related to resolution sessions concerns the fifteen-day timeline.  The target for this requirement is 100% compliance.  Districts that do not meet this target are selected for the data identified noncompliance monitoring process.

The section of CDE's Attachment M devoted to this monitoring process does not list this indicator, and therefore does not show any districts that failed to meet this target and were selected for monitoring as a result; however, this indicator is listed in the data identified noncompliance section of CDE's submission, and a footnote earlier in the submission indicates that CDE "will enhance" that monitoring process to include timely resolution sessions (Dkt. No. 2455-1 at 8 (fn. 17), 37-38, 51; Dkt. No. 2455-14).  It is therefore unclear whether resolution sessions are included in data identified noncompliance for the current school year.  This should be clarified by CDE.

*Compliance Conclusion:  Compliant.*
*Reason:  CDE's data analysis is adequate to select districts for monitoring.*

4.  <u>Mediation</u>

Mediation is included under the monitoring priority area of state exercise of general supervision.

Mediation is available to assist in the resolution of disputes between parents and districts.  The process is voluntary for both parties, cannot delay or deny any rights under the IDEA, and must be conducted by a qualified, impartial person trained in mediation techniques and knowledgeable about legal requirements in special education.  Mediation sessions must be timely and held in a convenient location for both parties.  If mediation resolves the dispute, an enforceable agreement must be executed (34 C.F.R. §300.506).

CDE writes with respect to mediation that, due to its "voluntary nature," mediation data are not used to select districts for monitoring (Dkt. No. 2455-1 at 37).  Setting aside selection for monitoring, CDE does not put forth any analyses of the mediation data it collects for any purpose.  According to CDE's Phase 1 submission, the data collected include the "total numbers" of mediation requests received through all dispute resolution processes, mediations held, mediations held related to due process complaints, mediation agreements related to due process complaints, mediations held

not related to due process complaints, mediation agreements not related to due process complaints, mediations pending, and mediations withdrawn or not held (Dkt. No. 2390-1 at 65, 40-41; Dkt. No. 2390-11).

Regardless of its voluntary nature, Congress explicitly included mediation in the statute under a monitoring priority area, and did so in a manner that requires monitoring of it using indicators adequate to measure performance in this area (20 U.S.C. §1416(a)(3)).  Some districts may be quite open to reaching mediated agreements with parents and thereby resolving disputes, and others may not be.  Data should be analyzed to reveal any potential patterns.  Such patterns could connect with other data, such as noncompliance found through due process hearings, state complaints, and/or CDE's monitoring processes, to reveal issues that merit further probing.

*Conclusion:  Noncompliant.*
*Reason:  No analysis performed.*

D.  Racial/Ethnic Disproportionate Representation in Special Education and Related Services

The monitoring priority area of disproportionality requires states to use quantifiable indicators and qualitative indicators as are needed to adequately measure performance in:

> Disproportionate representation of racial and ethnic groups in special education and related services, to the extent the representation is the result of inappropriate identification.  (34 C.F.R. §300.600(d)(3))

In addition, states

> must have in effect…policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in §300.8.  (34 C.F.R. §300.173; §300.646(a)(1) and §300.647(b)(3)(i-ii))

1.  Disproportionality in Identification Overall

CDE uses the same methodology to analyze these data as that prescribed for the federal state performance plan's Indicator 9.  This indicator calls for the measurement of the percentage of districts with disproportionate representation of racial and ethnic groups in special education and related services that results from inappropriate identification of children as having disabilities.

The formula used by CDE to calculate risk ratios for disproportionality in identification is:

| ((Students with disabilities in a specific race/ethnicity group<br>Divided by<br>Students in the same race/ethnicity group in general education) x100)<br><br>Divided by<br><br>((Students with disabilities **NOT** in a specific race/ethnicity group<br>Divided by<br>Students **NOT** in the same race/ethnicity group in general education) x100) |
| --- |

Alternate risk ratios are calculated when either the numerator or denominator for the comparison group does not meet the minimum size. CDE uses a threshold of "3" to determine when disproportionality is significant. This threshold was set in consultation with stakeholders (Dkt. No. 2455-1 at 43-44, 48). This threshold is reasonable to select districts for potential overidentification.

Turning to potential under-identification, it is clear from the regulations that a "failure to identify" a racial or ethnic group or groups is also a disproportionality concern (34 C.F.R. §300.646(d)(1)(iii)). However, the use of a risk ratio threshold of "3" only does so indirectly, according to the U.S. Department of Education:

> Question A-4:  Do these regulations address significant disproportionality caused by the under-identification of children of color with disabilities?

> Answer A-4:  Yes. While these regulations only establish a system for identifying significant disproportionality based on overrepresentation, the regulations acknowledge that overrepresentation may be caused by under-identification of one or more racial or ethnic groups. We understand that overrepresentation of one racial or ethnic group that rises to the level of significant disproportionality may occur for a variety of reasons, including over-identification of that racial or ethnic group, under-identification of another racial or ethnic group or groups, or appropriate identification, with higher prevalence of a disability, in a particular racial or ethnic group.[45]

After providing an example relevant to disproportionality in identification in the disability categories (see next subsection below), the Department offers the following advice. The Department encourages states

---

[45] https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/significant-disproportionality-qa-03-08-17.pdf at 2.

> … to consider multiple sources of data when attempting to determine
> the factors contributing to significant disproportionality, including
> school level data, academic achievement data, relevant environmental
> data that may be correlated with the prevalence of a disability, or other
> data relevant to the educational needs and circumstances of the
> specific group of students identified.  (*Id.*)

As a result of considering such data, states may conclude that the under-identification of another group or groups of students contributes to the overidentification of the specific group identified in the disproportionality analysis.

Thus, as this federal advice concerns steps taken when determining the factors contributing to the identified significant disproportionality, it appears that determining whether under-identification of another group is in fact a factor contributing to the overidentification concerns the monitoring, rather than data analysis, process.  That reading of the policy guidance would make under-identification related to disproportionality a Phase 3, rather than Phase 2, issue.[46]

Turning to selection for monitoring, as noted above, CDE appears to have made a mistake in its submission.  In the section of the submission concerning disproportionality CDE states that districts that receive a red or orange designation on the Dashboard are selected for performance indicator review, and that this is a factor in selection for comprehensive review.  But disproportionality in identification overall is not listed by CDE among the indicators involved in performance indicator review, nor has it advanced a Dashboard-based methodology for this indicator.  However, disproportionality in identification overall is a factor in selection for comprehensive review.

Disproportionality in identification overall is included in the disproportionality review monitoring process (Dkt. No. 2455-1 at 49-50, 54, 59-60).  This is confirmed by CDE's Attachment M, which shows 74 districts selected for disproportionality review for disproportionality in identification overall (Dkt. No. 2455-14).  Attachment K, however, shows 69 districts identified as not meeting the target (Dkt. No. 2455-12).

*Conclusion:  Compliant.*

*Reason for Conclusion:  The formula measures disproportionality in identification overall for potential overidentification, and the risk ratio threshold is reasonable to do so.*

---

[46] It should be stressed that this reading of the policy guidance may be incorrect.  Further, even if it is correct, this reading also treats the guidance as if it were as authoritative as the statute or regulations.  Finally, it is also the case that some amount of preliminary data analysis would be necessary to determine which groups are potentially under-identified in order to guide the monitoring effort.  CDE's submission does not indicate that it engages in such analyses, although it may do so in preparation for monitoring events.

2. Disproportionality in Identification in Disability Categories

CDE uses the same methodology to analyze these data as that prescribed for the federal state performance plan's Indicator 10.  This indicator measures the percentage of districts with disproportionate representation of racial and ethnic groups in specific disability categories that results from inappropriate identification.

The formula used by CDE to calculate risk ratios for disproportionality in identification in disability categories is:

<div style="border:1px solid black;padding:10px;text-align:center">

((Students with disabilities in a specific race/ethnicity group for each disability category
Divided by
Students in the same race/ethnicity group in general education) x100)

Divided by

((Students with disabilities **NOT** in a specific race/ethnicity group for each disability category
Divided by
Students **NOT** in the same race/ethnicity group in general education) x100)

</div>

Alternate risk ratios are calculated when either the numerator or denominator for the comparison group does not meet the minimum size.  CDE again uses the threshold of "3" to determine when disproportionality is significant (Dkt. No. 2455-1 at 44-45, 48).  This threshold is reasonable to select districts for potential overidentification.

With respect to potential under-identification in disability categories, the U.S. Department of Education offers a specific example:

> For example, consider an LEA in which the risk ratio for African-American students with an emotional disturbance exceeds the State's risk ratio threshold and is identified as having significant disproportionality. The overrepresentation of African-American students could be due to:

> (1) the LEA inappropriately identifying African-American students as having an emotional disturbance and needing special education and related services even though they do not (over-identification);
>
> (2) the LEA failing to appropriately identify students in other racial or ethnic groups as having an emotional disturbance and needing special education and related services even though they do (under-identification); or
>
> (3) the LEA appropriately identifying all students in the LEA who have an emotional disturbance, but underlying variations in the prevalence of those disabilities across racial and ethnic groups

result in an overrepresentation of African-American students in
that LEA.  (*Id.*)

This is a clear explanation of the possibilities when a particular group is identified as
overrepresented in a disability category.

Again, without repeating the analysis in the prior subsection, it appears (to the
court monitor, at least) that reaching such conclusions should be a part of the
disproportionality monitoring process, making it a Phase 3 issue.

To select for monitoring, as noted above, CDE states in the section of its
submission concerning disproportionality that districts that receive a red or orange
designation on the Dashboard are selected for performance indicator review, and that
this is a factor in selection for comprehensive review.  However, disproportionality
in identification in the disability categories is not listed by CDE among the indicators
involved in performance indicator review, although it is a factor in selection for
comprehensive review.   In addition, CDE has not set forth a Dashboard-based
methodology for this indicator.

Disproportionality in identification in the disability categories is included in the
disproportionality review monitoring process (Dkt. No. 2455-1 at 49-50, 54, 59).  This is
confirmed by CDE's Attachment M, which shows 537 districts selected for
disproportionality review for disproportionality in identification in the disability
categories (Dkt. No. 2455-14).

*Conclusion:  Compliant.*
*Reason for Conclusion:  The formula measures disproportionality in identification overall
for potential overidentification, and the risk ratio threshold is reasonable to do so.*

E.   Significant Disproportionality

States are granted some flexibility by the federal regulations regarding
determinations of significant disproportionality.  States are not required to identify
districts as significantly disproportionate until they have exceeded the risk ratio
threshold for up to three consecutive prior years, and have failed to show reasonable
progress (as that is defined by the state) in each of the two prior consecutive years (34
C.F.R. §300.647(d)).

CDE states that it uses this flexibility to identify districts as significantly
disproportionate if it exceeds the risk ratio threshold of "3" for a race or ethnicity for
three years.  CDE's submission does not say whether it also uses a definition of
reasonable progress to exclude some districts in this status from identification as
significantly disproportionate.  CDE should respond to this issue.

Districts identified as significantly disproportionate are selected for significant
disproportionality review (Dkt. No. 2455-1 at 48, 55-56).  CDE's Attachment M shows 36
districts identified for this monitoring process (Dkt. No. 2455-14).

*Conclusion:  Deferred.*

38

*Reason for Conclusion:  CDE does not provide information regarding whether a definition of reasonable progress is used and, if so, what that definition is.  For placement and discipline, the formulas are problematic as mentioned previously.*

## F.  Restraint/Seclusion

Inappropriate or unnecessary restraint and seclusion of students with disabilities is an important issue.[47]  As the court pointed out in its Phase 1 order,

> …there is significant evidence that schools misuse restraint and seclusion to control the behavior of children with disabilities, often leading to grave consequences. The state has conducted school district-level investigations resulting in factual findings that school staff inappropriately physically restrained children with serious disabilities. According to one analysis, data collected before the 2013 repeal of a state law that had required the state to track the number of "behavioral emergency reports" statewide showed that the number of behavioral emergencies had doubled between 2005 and 2012 and that the majority of these emergencies had involved the use of restraint and seclusion. The most recent data collected by the federal Department of Education Office for Civil Rights showed that disabled students comprised 71% of all students restrained and 66% of all students secluded during the 2015-16 year, even though students with disabilities comprised only 12% of all enrolled students in the same survey.  (Dkt. No. 2428 at 26-27, footnotes omitted)

The order discusses a bill that was pending at that time, a bill requiring the state to collect data regarding this issue in a manner similar to the federal Office for Civil Rights data collection.  That bill, which requires annual collection of these data, has now passed.

CDE's submission states that it will begin collection of these data for the 2019-20 school year, and will provide details regarding the analysis and use of those data in monitoring and enforcement in the future as directed by the court.  Restraint and seclusion will be added to the performance indicator review monitoring process for the 2020-21 school year[48] (Dkt. No. 2455-1 at 3, 31, 50).  Therefore, the analysis and use of the collected restraint and seclusion data in monitoring and enforcement will be deferred for the present.

---

[47] For a recent incident that lead to a student's death, see
https://www.sacbee.com/news/local/education/article222733345.html.  For a recent federal initiative see https://www.ed.gov/news/press-releases/us-department-education-announces-initiative-address-inappropriate-use-restraint-and-seclusion-protect-children-disabilities-ensure-compliance-federal-laws.
[48] It is not clear that a non-intensive monitoring process such as performance indicator review will be adequate to discover and correct violations, but that is a Phase 3 issue.

There is another related issue that may merit discussion. The court's Phase 1 order did not direct CDE to collect behavioral emergency reports statewide.[49] Testimony from CDE staff during the Phase 1 hearing established CDE's ability to request additional information from districts.[50] Thus, CDE could request from districts those behavioral emergency reports that concern non-public schools and use the data as a factor in selection for the aspect of CDE's monitoring system that monitors non-public schools (see Section IV. G. below). There is no indication in its submission that it requests behavioral emergency reports for this limited purpose.

*Conclusion: Deferred.*

## G.  Parent Input

For parent input CDE collects the parental responses to the question, "Did the school district facilitate parent involvement as a means of improving services and results for your child?"[51] Rates of parents responding "yes" to this question are divided by the total number of parents who responded "yes" or "no." The target for this indicator is 92% of parents responding "yes." This is the same methodology CDE's uses for the federal state performance plan's Indicator 8 (Dkt. No. 2455-1 at 30-31).

This target is quite modest, as the state percentage for FFY 2016 was 99.4% of parents responding "yes."[52] It is therefore not surprising that only six districts in the state were identified as failing to meet this target (Dkt. No. 2455-12).

CDE's submission does not indicate that it disaggregates these data by anything other than school district. But parents from different racial or ethnic groups, parents of students with different disabilities, and parents with different income levels may have different experiences regarding whether the district facilitates their involvement. Without disaggregation of these data that will not be known.

With respect to selection for monitoring, CDE writes:

> CDE selects LEAs that receive either a Red or Orange performance level on the Dashboard for monitoring for Performance Indicator Review. Additionally, the Dashboard indicators are a factor in CDE's selection of LEAs for Comprehensive Review. (Dkt. No. 2455-1 at 31)

---

[49] Cal. Ed. Code §56521.1 contains several requirements related to the filing of behavioral emergency reports. CDE is required to "monitor and supervise" the implementation of these requirements (Cal. Ed. Code §56521(b)). It was established during the Phase 1 hearing that CDE does not routinely collect these reports.

[50] 8/1/18 Transcript at 122, ll. 17-19 ("…with our authority under the IDEA, we can ask for pretty much anything and require whatever it takes at the -- yeah, at the second level"). Testimony also indicated that behavioral emergency reports could be looked at as a "qualitative element" at tiers 2 and 3 (8/1/18 Transcript at 145, ll. 6-7).

[51] Although the adequacy of this question as a measure of parent input is questionable (Dkt. No. 2428 at 18), those are the data currently available to CDE for monitoring purposes.

[52] https://osep.grads360.org/#report/apr/2016B/publicView?state=CA&ispublic=true, "CA-datadisplay-2018b" download at 12.

However, other documents submitted by CDE show that the Dashboard has nothing to do with selection for monitoring based on this parent input indicator, which is not included in the Dashboard (see CDE's Attachment L, Dkt. No. 2455-13 at 128-130). Six districts are identified in Attachment K as not meeting the target, and this matches the six districts said to be selected for performance indicator review for parent input in CDE's Attachment M (Dkt. No. 2455-14). This is confirmed in the performance indicator review section of CDE's submission (Dkt. No. 2455-1 at 49-50).

In addition, performance on the target for this indicator in the current and prior year is a factor in selection for comprehensive review, but not based upon the Dashboard (Dkt. No. 2455-1 at 57).[53]

*Conclusion:  Noncompliant.*
*Reasons for Conclusion:  The data are not disaggregated and analyzed for subgroups. The target is unambitious compared with current California data.*

## H.  State Complaints

The IDEA creates a mechanism to allow parents and advocates to file complaints. States must resolve any and all complaints that allege violations of Part B of the IDEA, and are allowed sixty days[54] to  conduct an independent, on-site investigation of the complaint if the state determines that an on-site investigation is necessary.  Written decisions are required that address each allegation in the complaint, and contain findings of fact, conclusions, and the reasons for the state's decision.

When findings of noncompliance are made, states must address the remediation of the noncompliance, including monetary reimbursement if appropriate or other corrective actions such as compensatory services.  States must also address systemic implications of the complaint, the "[a]ppropriate future provision of services for all children with disabilities" (34 C.F.R. §§300.151-300.153).

CDE states that it issues letters of findings when noncompliance is found through complaint investigations, and these letters also set forth any required corrective actions.  Implementation of corrective actions is tracked by CDE.  Districts can be subject to sanctions if any corrective actions are not completed.[55]

CDE collects the number of "complaint noncompliance."  While it is unclear if this refers to the number of complaints for which CDE found a district noncompliant

---

[53] CDE is currently piloting a parent survey (Dkt. No. 2455-1 at 30, fn. 43).  Analysis of the data from this survey is outside the scope of this Phase 2 report:  "…the question of how to assess the results of the pilot survey, and the question of whether to expand on it in the future, will be something for the policymakers to decide" (Dkt. No. 2428 at 20).

[54] Extension of the sixty-day timeline is permitted "only if exceptional circumstances exist with respect to a particular complaint," or if the complainant and public agency agree to extend the time in order to pursue alternative means of dispute resolution, such as mediation.

[55] CDE's Attachment N is an example of a sanction letter to a district regarding the failure to submit documentation of a completed corrective action.  The threatened sanction in that case was the withholding of special education funds from the district (see Dkt. No. 2455-15).

with any allegation, or the total number of allegations found noncompliant across all complaints concerning a district, CDE uses the phrase "number of complaint … noncompliances" later in its submission, indicating that the number of allegations found noncompliant is collected.  This number is then divided by the number of special education students in the district.

The resulting rate is compared to the district's rate in the prior year.  This is a factor in selection for the comprehensive review monitoring process.  However, the comprehensive review section of CDE's submission states that selection is based on a comparison of the number, rather than rate, of instances of noncompliance (Dkt. No. 2455-1 at 36-37, 60).

Complaints can be filed about individual students or about groups of students.  It will be assumed that in resolving systemic complaints CDE makes multiple findings of noncompliance, but that may not be the case.  CDE should clarify the type of findings it makes in resolving systemic complaints.

*Conclusion:  Noncompliant.*
*Reason for Conclusion:  Disagreement between two sections of CDE's submission regarding the analysis of these data and selection based upon it.*

I. <u>Due Process Hearings</u>

Due process complaints can be filed by either a parent or a district regarding FAPE, placement, evaluation, or eligibility.  Such complaints are subject to time limitations.  A due process complaint must describe the nature of the issue and a proposed resolution.  Hearings must be conducted by impartial heating officers, and parties have the right to counsel, present evidence, cross-examine, and compel the attendance of witnesses.  Hearing decisions are required within 45 days of the expiration of the thirty-day resolution period.  Findings and decisions can be appealed to the state educational agency and/or to state or federal court (34 C.F.R. §§300.507-508, 300.511-518).

CDE collects the number of instances of noncompliance found through due process hearings.  This number is divided by the number of special education students in the district to yield a rate.  However, the comprehensive review section of CDE's submission states that selection is based on a comparison of the number, rather than rate, of instances of noncompliance (Dkt. No. 2455-1 at 37-39, 60).

*Conclusion:  Noncompliant.*
*Reason for Conclusion:  Disagreement between two sections of CDE's submission regarding the analysis of these data, and selection based upon it.*

## IV.  Use of Data for Selection for Monitoring Processes:
### Discussion and Conclusions

CDE's submission provides information about the selection process for six of its monitoring reviews.  A seventh monitoring review, concerning non-public schools, was also mentioned by CDE staff during the Phase 1 hearings.  That review will be discussed briefly below, although information about selection for it was not provided by CDE in its submission.

Each of the six monitoring reviews discussed in CDE's submission is regarded by the State Defendant as either targeted or intensive.  If CDE's analysis of data indicates that a district did not meet a target or targets, then the district is chosen for either a targeted or intensive monitoring review.  Intensive reviews are said by CDE to be "limited to those LEAs with the most significant compliance and performance issues." CDE explains:

> If an LEA's annual data collection and CDE's analyses indicate that the LEA did not meet the compliance and/or performance targets for multiple indicators or did not meet a specific target for more than three consecutive years, the LEA is selected for an intensive monitoring activity.

The intensive reviews are comprehensive review, preschool review, and significant disproportionality review.  Targeted reviews are performance indicator review, disproportionality review, and data identified noncompliance (Dkt. No. 2455-1 at 8-9). It is not clear whether the non-public school review process fits into either of these categories.  Selection for each monitoring process is discussed below.

A.  <u>Performance Indicator Review (Targeted)</u>

The districts selected for the performance indicator review process are largely, but not exclusively, those that failed to meet the targets specified in the state performance plan.  The indicators involved in this process that are relevant to elementary school districts are statewide assessment, suspension and expulsion, least restrictive environment, preschool least restrictive environment, parent involvement, and child find.[56]  In addition, CDE states that restraint and seclusion will be included in the process for the 2020-21 school year (Dkt. No. 2455-1 at 50).  As seen above, districts are selected for:

- achievement on state assessments and suspension and expulsion based on receiving a red or orange designation on CDE's Dashboard;
- child find based on falling below two standard deviations from the mean on the identification rate of students as having disabilities; and

---

[56] Graduation rate, dropout rate, and post-school outcomes are also included in the performance indicator review process, but are not directly relevant to elementary districts.

- the other indicators based on failure to meet the targets set in the state performance plan (Dkt. No. 2455-1 at 49-50).

According to CDE's Attachment M, a total of 1,522 districts were selected for the performance indicator review process (Dkt. No. 2455-14).  The indicators included in performance indicator review, and the numbers of districts selected for each indicator according to Attachment M, are shown in the table below:

| Indicator | Number Selected |
|---|---|
| Participation: ELA assessment | 778 |
| Participation: Math assessment | 833 |
| Achievement: ELA assessment | 769 |
| Achievement: Math assessment | 760 |
| Discipline | 661 |
| LRE: regular class greater than 80% | 249 |
| LRE:  regular class less than 40% | 235 |
| LRE: separate school | 165 |
| LRE: preschool regular class | none specified |
| LRE: preschool separate class | none specified |
| Parent input | 6 |
| Child find | 38 |

It is very puzzling that no districts were selected for the two preschool least restrictive environment indicators, at least according to Attachment M.  CDE's submission states clearly that failure to meet the targets for these indicators results in selection for performance indicator review, preschool review, or comprehensive review; and preschool least restrictive environment is listed as an indicator for performance indicator review in that section of the submission (Dkt. No. 2455-1 at 14, 50).  But CDE's Attachment K shows that 97 districts did not meet the target for preschool regular class, and 191 did not meet the target for preschool separate class (Dkt. No. 2455-12).  Given that Attachment M shows that only 28 districts were selected for preschool review and 35 for comprehensive review, it cannot be the case that all of the districts that did not meet the preschool least restrictive environment targets were selected for those two reviews rather than performance indicator review.  CDE should clarify whether the preschool least restrictive environment indicators, which are federal performance indicators, are indeed included in performance indicator review and, if so, state how many districts were selected for this review based on failure to meet the targets for those indicators.

In addition, as noted in section III A 2 above, performance on the preschool assessment is also a federal performance indicator.  It is not clear why this indicator is not a part of the performance indicator review process.  The table below shows the number of districts that did not meet the state targets for its six constituent elements from CDE's Attachment K (Dkt. No. 2355-12):

44

| Outcome Area | Summary Statement 1 | Summary Statement 2 |
|---|---|---|
| Positive social relationships | 115 | 149 |
| Acquisition/use of knowledge and skills | 112 | 156 |
| Use of appropriate behaviors | 71 | 143 |

Given the few districts selected for preschool review and comprehensive review, omitting preschool achievement from performance indicator review is significant: many of the districts that did not meet these targets were not selected for a monitoring process.

Section III above discussed a number of areas in which data are not analyzed by CDE for the purpose of raising red flags about districts, flags that would be potentially quite important information about districts' compliance with the IDEA, and also raised issues related to the adequacy of the targets used by CDE to select districts. The table below displays the indicators said to be included in performance indicator review, and for each indicator the areas in which data are not analyzed or targets are inadequate for the purpose of performance indicator review selection:

| Indicator Area | Selection Approach Does Not Flag Some Districts With: |
|---|---|
| Participation in assessment | • low participation rates of subgroups of students with disabilities (due to no analysis) |
| Achievement on assessment | • poor performance (if small improvements are made from prior year)<br>• poor performance of subgroups of students with disabilities (due to no analysis) |
| Discipline | • very high suspension rates (if small improvements are made from prior year)<br>• high suspension rates for subgroups of students with disabilities (due to no analysis)<br>• high rates of referrals to law enforcement (due to no analysis) |
| LRE: school-age | • relatively low rates of students in regular classes/relatively high rates in self-contained settings (due to lack of ambitiousness of targets)<br>• high self-containment rates/low rates in regular classes for subgroups of students with disabilities (due to no analysis) |
| LRE: preschool | • relatively low rates of students in regular preschools/relatively high rates in separate settings (due to lack of ambitiousness of targets)<br>• low rates of students in regular preschools/high rates in separate settings for subgroups of children with disabilities (due to no analysis) |

| Indicator Area | Selection Approach Does Not Flag Some Districts With: |
|---|---|
| Parent input | • low rates of parents of students in subgroups stating that district facilitated involvement (due to no analysis)<br>• some parents stating that district did not facilitate involvement (target is high but below state average) |
| Child find | • low numbers of preschool children with disabilities (due to no analysis of child find for preschool children)<br>• low identification rates of school-age students with disabilities (due to lack of ambitiousness of target, i.e., two standard deviations below mean)<br>• low identification rates of students in subgroups (due to no analysis)<br>• poor performance and/or high suspension rates of students without IEPs combined with low identification rates of students with disabilities (due to no analysis) |

Due to these significant areas in which data are not analyzed, inadequate standards set, or changes in scores from the prior year can offset current year performance, it cannot be concluded that selection for performance indicator review is based on data analyses that adequately flag districts for this monitoring process.

*Conclusion:  Noncompliant.*

*Reasons for Conclusion:  Selection is based on insufficient data analyses and some inadequate targets.  It is unclear whether performance and placements of preschool children are included in performance indicator review.  If not, given that formulas based on multiple selection elements are used for the two other relevant monitoring processes, districts with poor, even very poor, performance in these two areas (preschool performance and placement) may not be selected for a monitoring process at all and may therefore be labeled "meets requirements."*

B.  Data Identified Noncompliance (Targeted)

Five indicators relevant to an elementary school district are included in the data identified noncompliance process; all concern timeliness.  The indicators are timely initial evaluation (federal state performance plan indicator), timely transition from Part C to Part B of the IDEA (federal state performance plan indicator), timely annual IEP meeting, timely triennial reevaluation, and timely resolution sessions.[57]  Because the targets for these five indicators are 100% compliance, any district with any amount of noncompliance is selected for the data identified noncompliance monitoring process (Dkt. No. 2455-1 at 51-52).

---

[57] For purposes of federal oversight of the two federal state performance plan indicators, the monitoring and correction of noncompliance is governed by OSEP Memo 09-02 (https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/osep09-02timelycorrectionmemo.pdf). The requirements of this memo concerning correction of noncompliance may be relevant to Phase 3.

According to CDE's Attachment M, a total of 367 districts were selected for this monitoring process (Dkt. No. 2455-14).  The relevant indicators, and the numbers of districts selected for each according to Attachment M, are shown in the table below:

| Indicator | Number Selected |
|---|---|
| Timely initial evaluation | 243 |
| Timely C to B transition | 134 |
| Timely annual IEP meeting | 94 |
| Timely triennial reevaluation | 80 |
| Timely resolution sessions | none specified |

The discussion in section III A 4 e above raised a concern related to CDE's analysis of data for these indicators:  districts are handled in the same way regardless of their average number of days over the timeline.  Nevertheless, all districts that fail to meet the 100% target will be selected for data identified noncompliance, including districts with large numbers of average days over the timelines.[58]

*Conclusion:  Compliant.*
*Reason for Conclusion:  All districts with noncompliance are selected.*

C. <u>Preschool Review (Intensive)</u>

1. <u>CDE's 12/7/18 Submission</u>

CDE states that it uses a preschool matrix to select districts for preschool review.  The submission asserts that this approach identifies districts with the "greatest need for monitoring and corrective action" due to noncompliance or poor performance.  A table included in CDE's submission purports to show the elements of this matrix.[59]

CDE's table contains nine rows for these elements.  However, the table is incorrect, as it includes the same three elements twice.[60]  Removal of these repetitions indicates that the preschool matrix contains six elements.  The table below shows these six elements and their scoring, taken from CDE's table:

| Matrix Element | Scoring |
|---|---|
| Preschool Suspension | If any child ages 3 or 4 with a disability has a suspension or expulsion event greater than one day in the LEA, the LEA will receive a 1. |

---

[58] This issue may be relevant to the Phase 3 inquiry regarding this monitoring process, and is relevant to selection for comprehensive review.

[59] See Dkt. No. 2455-1 at 53 for the table.

[60] Percentage of children in regular early childhood program appears as both rows 1 and 7; percentage of children in separate classes, separate schools, and residential facilities appears in both rows 2 and 8; and timely transition from Part C to Part B appears in both rows 3 and 9.

| Matrix Element | Scoring |
|---|---|
| Students aged 5 year olds and suspended (these students are often in TK and have higher rates of suspension than 3 and 4 year olds). | If the 5 year old suspension rate in the LEA is greater than the total statewide suspension rate for 5 year olds, the LEA will receive a 1. |
| The LEA meets all required targets for the Desired Results Developmental Profile | If the LEA fails to meet all targets in the assessment indicator, the LEA will receive a 1. |
| Students ages 3 through 5 with an IEP with the majority of services offered in a preschool program | If the percentage for these students in the LEA is not equal or greater than the target for the state of 34.90%, the LEA will receive a 1. |
| Students ages 3 through 5 with an IEP served in a separate program or classroom | If the percentage for these students in the LEA is not equal or less than the target for the state of 32.40%, the LEA will receive a 1. |
| Students transition from the Part C to the Part B program timely | If LEAs do not have all IEPs in the place for students transitioning from Part C to Part B of the IDEA by the child's 3rd birthday, the LEA will receive a 1. |

Districts that score six or more are selected for preschool review. In addition to these elements, CDE adds that districts that "report more than one NPS [non-public school] for a child" will also be selected, regardless of such districts' total scores on the matrix (Dkt. No. 2455-1 at 52-54).

But it is not clear that "more than one" preschool child in a non-public school is the actual standard used by CDE. CDE's Attachment O is described as a "sample of the Preschool Matrix" (Dkt. No. 2455-1 at 53). The relevant column header on this attachment reads, "*Any* 3-5 Yr Old in nonpublic School"; a "yes" response is coded as one point (Dkt. No. 2455-16, column 7; emphasis added). But this element is not included in the table in CDE's submission. Thus, it is not clear from CDE's submission document and attachment how placements in non-public schools are treated for purposes of selection for preschool review.

Unfortunately, the confusion does not end there. Attachment O contains two matrix elements not included in CDE's table:

- whether the district's participation rate on the preschool assessment is less than the statewide rate (Dkt. No. 2455-16, column 9), and
- whether there are any three- to five-year-old children in the district in a residential facility (Dkt. No. 2455-16, column 6).

In addition, Attachment O contains three elements related to suspension, while the table in CDE's submission contains only two.[61]

Due to this level of confusion in CDE's submitted documents, via email CDE was requested to send: "1) a definitive and precise statement and/or table of the selection elements in CDE's preschool matrix, along with the number of points that result in selection; and 2) a clear statement of any factor(s) that are used by CDE to select districts for preschool review regardless of their scores on the matrix." The actual data relied upon by CDE for scoring matrix elements was also requested.[62]

### 2. CDE's 1/14/19 Response

CDE responded via email to the request, sending a Word attachment containing a table with the matrix elements and scoring.[63] Based on that document CDE's preschool matrix is displayed in the table below:

| Matrix Element | Scoring |
| --- | --- |
| 3-4 Year Old Students Suspended | Preschool Suspension. Any child ages 3 or 4 with a disability who has a suspension or expulsion event in the LEA. If the LEA has any child ages 3 or 4 with a suspension or expulsion event, then the LEA will receive a 1. |

---

[61] The table claims that a district receives one point if "any child ages 3 or 4 with a disability has a suspension or expulsion event greater than one day," and also receives one point if the "5 year old suspension rate in the LEA is greater than the total statewide suspension rate for 5 year olds" (Dkt. No. 2455-1 at 53). But Attachment O shows that a district receives one point if any three- or four-year-old children are suspended (column 1), receives one point if its suspension rate for five-year-old children exceeds the statewide suspension rate for this age group (column 2), and receives one point if any three- to five-year-old children were suspended for more than one day (column 3) (Dkt. No. 2455-16). The point of agreement between the two approaches in CDE's documents is districts' receipt of one point if their suspension rate for five-year-old children exceeds the statewide rate for that age group.

[62] Mlawer email to Spence and Gill, 1/1/19. The preschool data part of the request was:

> Please send me an electronic file that is in a format capable of manipulation (e.g., Excel spreadsheet, csv file, SAS dataset) that consists of all districts and their scores on the various data elements in the matrix used to select districts for preschool review in the 2018-19 school year. Please ensure that 1) each row/record represents a district, 2) each district is identified by its name and corresponding ID number, 3) there are columns/variables that represent the actual scores each district received on each element in the selection format, 3) there are columns/variables that represent the 0-1 score each district received on each element in the selection matrix, 5) the total score received by each district is included, and 6) districts selected for preschool review are identified.

CDE did not produce the actual data that resulted in the scores of "0" or "1" on the matrix. See below.

[63] Spence email to Mlawer, 1/14/19.

| Matrix Element | Scoring |
|---|---|
| LEA Suspension Rate > 5 Year Old Suspension Rate Statewide | If the 5 year old suspension rate in the LEA is greater than the total statewide 5 year old suspension rate, then the LEA will receive a 1. |
| Any 3-5 Year Old Students Suspended More Than 1 Day | Children ages 3 and 4 suspended from the preschool program. If the LEA has any 3 and 4 year old students with disabilities suspended, then the LEA will receive a 1. |
| Indicator 6A Met Target | Students ages 3 through 5 with an IEP and majority of whose services are offered in a preschool program. If the percentage for these students in the LEA is not equal to or greater than the target for the state of 34.90%, then the LEA will receive a 1. |
| Indicator 6B Met Target | Students ages 3 through 5 with an IEP but served in a separate program or classroom. If the percentage for these students in the LEA is not equal to or less than the target for the state of 32.40%, then the LEA will receive a 1. |
| Any 3-5 Year Old in Residential Facility | Students ages 3 through 5 with an IEP but served in a residential facility. If the LEA has any 3 through 5 year old served in a residential facility, then the LEA will receive a 1. |
| Any 3-5 Year Old in Nonpublic School | Students ages 3 through 5 who are in a Nonpublic School ("NPS"). LEAs with 1 student will receive a 1; LEAs with more than 1 student will be selected for an automatic review. |
| Indicator 7 Met Target | The LEA meets all required targets for the Desired Results Developmental Profile. If the LEA fails to meet all targets in this assessment indicator, then the LEA will receive a 1. |
| DRDP Participation Rate < Statewide Rate | Desired Results Developmental Profile participation. If the Desired Results Developmental Profile participation rate is less than the statewide rate, then the LEA will receive a 1. |
| Indicator 12 Met Target | The LEA ensures that all students transition from the Part C to the Part B program timely. LEAs that do not have all IEPs in place by the child's 3rd birthday will receive a 1. |

Districts that report more than one child in a non-public school are automatically selected regardless of the total score, and those with total scores of six or more are selected.

CDE's submission does not explain how the standard of scoring at least six on the matrix was developed, or why it is adequate in CDE's view to select districts for this intensive monitoring review.  Further, CDE does not explain the reasoning behind its standard for automatic selection of districts with more than one child in a non-public school.

With respect to the corrected table received from CDE via email, it unfortunately must first be noted that the CDE's stated measurement of the element listed in the third row of the table is incorrect. The matrix element states "Any 3-5 Year Old Students Suspended More Than 1 Day," but the scoring states "Children ages 3 and 4 suspended from the preschool program." The scoring statement has nothing to do with the length of the suspension, only concerns three- and four-year-olds, and is also the scoring for the first element of the matrix. It will be assumed that this element is scored a "1" for districts with any three- to five-year-old who was suspended for more than one day since that matches the spreadsheet received from CDE via email.

CDE's emailed response did not comply fully with the monitor's request for data, as it did not include the actual data that resulted in the "0" or "1" scores. In addition, there were other problems with the data in CDE's preschool spreadsheet.[64] For those reasons, the conclusions that can be drawn from the matrix, in conjunction with the submitted spreadsheet, are quite limited.

Nevertheless, some problems with this approach are clear. These include the all-or-nothing approach to scoring each selection element, the important red flags that the use of a matrix can obscure (egregious performance on one through five selection elements), and the failure to analyze disaggregated data for some selection elements.

First, for each selection element a district receives a "0" if it met the target and a "1" if it did not. Thus, the *extent to which* a target is not met has no effect on scoring. Because CDE did not produce the data underlying the scoring, the actual extent to which districts did not meet targets cannot be determined from CDE's preschool spreadsheet. Nevertheless, the effect of CDE's scoring approach is that the following types of districts would each receive a "1":

---

[64] The spreadsheet included 1,541 records with each record representing a district. However, 21 records had duplicate district IDs. These 21 records represented five unique district IDs (two district IDs were each listed in the spreadsheet six times; one was listed twice; one was listed three times; and one was listed four times. Each row representing a given district was identical. The records with duplicate district IDs had different Special Education Local Plan Area codes, so they may not be duplicate records. The analyses performed by the monitor's office were based on the original 1,541 records in the spreadsheet and did not eliminate any presumably duplicate records.

To ascertain the data that resulted in "0" or "1" scores on some of the preschool indicators, those that overlap with comprehensive review selection elements, the preschool spreadsheet was merged with the comprehensive review spreadsheet provided by CDE. But 133 of the districts in the preschool spreadsheet did not match to a district in the comprehensive review spreadsheet. In addition, data for some selection elements matched up as expected, but did not for others. For preschool separate class or program, for example, every district except one that received a matrix selection score of "1" had a score higher than the target, as expected. For timely transition from Part C to Part B, every district that had a score below 100%, with one exception, received a point for not meeting this target (this includes only those districts for which the actual performance was provided in the comprehensive review spreadsheet).

But other selection elements did not match up as expected. For preschool regular class, for example, there are 132 districts that performed better than the target but received a point for not meeting it; and there are 90 districts that did not meet the target but did not receive a point, as one would expect, on this selection element. There may be a logical reason why the two spreadsheets did not merge as expected on some of the indicators; however, given the inconsistencies, analyzing the actual data that resulted in matrix scores was not pursued.

- those that suspended multiple three- and four-year-olds, and those that suspended one;
- those that exceeded the statewide suspension rate for five-year-olds by 20%, and those that exceeded it by 0.1%,[65]
- those that suspended multiple preschool children for more than one day, and those that suspended one child for more than one day;
- those that had 15% of children placed in regular preschools, and those that had 34.8% so placed;
- those that had 60% of children in separate placements, and those that had 32.5%[66];
- those that had multiple children placed in residential facilities, and those that had one such child;
- those that complied with the timeline for transition from Part C to Part B of the IDEA for 60% of its children, and those that complied for 99.5%;
- those that fell just below the state rate for participation on the assessment and those that were far below that rate[67]; and
- those that met none of the six achievement targets in the Desired Results Developmental Profile, and those that met five of the six.

With respect to the last item, the extent to which targets were missed plays no role in scoring this selection element.  Further, CDE does not explain why these six aspects of the preschool assessment, each of which has a discrete target, are treated collectively as one selection element, or why participation on the assessments is given equal weight to achievement in this formula.

In addition, four of the selection elements concern whether at least one child was suspended or in a particular type of placement.  But there is great deal of difference in one child suspended, for example, in a very large district versus a very small school district.  The scoring of these elements does not consider the size of the district. Moreover, CDE does not explain the reasoning behind its all-or-nothing approach to scoring.

Second, setting aside the standard for automatic selection regardless of the total score, the use of this matrix fails to select districts that appear to have a significant need to be monitored.  Consider, for example, districts that fail to meet the three suspension targets but score a "0" on all other selection elements; such a district would not be selected for preschool review.  Another example of a district that would not be selected for monitoring is one that fails to meet the two targets for least restrictive environment in addition to placing a child in a residential facility and another in a non-public school. There are a number of combinations that will result in a district that should be monitored not being selected, including some that show a very significant need to be

---

[65] The submission does not set forth the statewide suspension rate for five-year-olds.

[66] This report pointed out in section III B 2 above the lack of ambitiousness in the state's two preschool least restrictive environment targets.

[67] The submission does not set forth the state participation rate.

monitored (such as failure to meet all three suspension targets *and* the two least restrictive environment targets).

Excluding the 36 districts automatically selected, the table below shows the number that received between zero and seven points, based on the data in CDE's preschool spreadsheet:

| # of Points | # of Districts | % of Districts |
|:-----------:|:--------------:|:--------------:|
| 0 | 737 | 48.97% |
| 1 | 433 | 28.77% |
| 2 | 178 | 11.83% |
| 3 | 86[68] | 5.71% |
| 4 | 50 | 3.32% |
| 5 | 16 | 1.06% |
| 6 | 4 | 0.27% |
| 7 | 1 | 0.07% |
| Total | 1505 | 100.00% |

The five shaded districts were selected for preschool review.  The 152 districts that received three, four, or five points were not.  Without access to the underlying data, the extent to which these districts did not meet the targets cannot be determined, but one can conclude at minimum that those 152 districts presented the state with reasons they should have been monitored depending upon the extent to which the targets were not met and which selection elements were not met.

The table below is based on the data in CDE's spreadsheet, and shows the number and percentages of districts that received a point for each selection element (out of 1,541 total districts), and the number and percentage that were selected for preschool review:

| Selection Element | # (%) Districts that Received a Point | # (%) Districts in Previous Column Selected for Monitoring |
|---|:---:|:---:|
| 3-4 Year Old Students Suspended | 11 (0.71%) | 3 (27.27%) |
| LEA Suspension Rate > 5 Year Old Suspension Rate Statewide | 83 (5.39%) | 3 (3.61%) |
| Any 3-5 Year Old Students Suspended More Than 1 Day | 168 (10.9%) | 22 (13.1%) |
| Regular Class/Program | 135 (8.76%) | 7 (5.19%) |
| Separate Class/Program | 183 (11.88%) | 24 (13.11%) |

[68] One of these districts had a total score of two on the matrix according to the spreadsheet, but actually had three elements with scores of "1."

| Selection Element | # (%) Districts that Received a Point | # (%) Districts in Previous Column Selected for Monitoring |
|---|---|---|
| Any 3-5 Year Old in Residential Facility | 18 (1.17%) | 2 (11.11%) |
| Any 3-5 Year Old in Nonpublic School | 47 (3.05%) — received one point And an additional 36 (2.34%) – flagged for automatic review | 38 (45.78%) |
| All 6 Assessment Targets Met | 229 (14.86%) | 24 (10.48%) |
| Assessment Participation Rate < Statewide Rate | 494 (32.06%) | 16 (3.24%) |
| Timely Transition from C to B | 85 (5.52%) | 23 (27.06%) |

Excluding the selection element that has an automatic selection trigger, districts that fail to meet a target are not very likely to be selected for preschool review. It must also be noted that Attachment M claims that 28 districts were selected for preschool review (Dkt. No. 2455-14), but the analysis of the data in CDE's spreadsheet indicates that 41 districts should have been selected (36 automatically selected plus the five selected based on total score).

One group of districts that may have a significant need but are not selected for preschool review are those that have a suspension rate for their five-year-olds that is higher than the state rate. There are 83 such districts, according to the spreadsheet received from CDE. Two of these 83 were automatically selected due to placing more than one child in a non-public school, and one district was selected because it had a total score of six points. Of the remaining 80 districts that are suspending five-year-olds at a higher rate than the state, two have a total score of five on the matrix, 14 have a score of four, and 22 have a score of three. One of the districts with a score of five did not meet the targets for either of the least restrictive environment elements, did not meet all of the achievement targets on the assessment, and did not meet the assessment participation rate target, in addition to having a high suspension rate relative to the state. This appears to be a district in need of monitoring, but it was not selected due to not meeting the cut-off of six points for selection.

This problem of the cut-off score for selection is compounded by the first issue. A district that fails to meet the selection targets by large margins for four or even five of the selection elements will not be selected. Hence, a district that had very few preschool children with disabilities placed in regular preschools, a majority in separate placements, exceeded the statewide suspension rate for five-year-olds, suspended ten children for more than one day, and met none of the six achievement targets in the Desired Results Developmental Profile would not be selected if its other scores were "0." Crucial red flags are missed as a result of this type of approach to selection.

Turning to the automatic selection standard, to study the 36 districts that were automatically selected due to placement of more than one child in a non-public school,

each of those districts was assigned one point by the monitor for the non-public schools selection element.  Their scores on the other selection elements were added to this point to arrive at the total number of points in the table below:

| # of Points | # of Districts | % of Districts |
|---|---|---|
| 1 | 2 | 5.56% |
| 2 | 6 | 16.67% |
| 3 | 11 | 30.56% |
| 4 | 6 | 16.67% |
| 5 | 6 | 16.67% |
| 6 | 5 | 13.89% |
| Total | 36 | 100.00% |

The automatic selection policy is predictive of districts that have a number of other concerns.  If awarded one point on the relevant selection element, almost 78% of those districts would have received at least three points.  Of course, in CDE's current approach to selection, a district would have had to receive six points in order to be selected.

In addition, CDE's preschool matrix does not include a selection element related to child find.  Timely transition from Part C to Part B of the IDEA is included, but that only measures whether children receiving Part C services and found eligible for Part B have IEPs in place by their third birthdays.

Finally, CDE does not analyze disaggregated data, including by race and ethnicity, foster care status, English-language learner status, homelessness, or eligibility for reduced price meals.  Districts may meet aggregate targets while a particular subgroup of children with disabilities are self-contained to a far greater extent, suspended to a greater extent, and/or failing to meet assessment targets to a greater extent than children not in this subgroup.

*Conclusion:  Noncompliant.*

*Reasons for Conclusion:  CDE does not offer reasons to believe that its matrix and its cut score of six or more points are adequate to ensure that preschool children are receiving FAPE or are placed in the least restrictive environment.  Reasons why the matrix and its cut score are not adequate to do so include the all-or-nothing approach to scoring, which does not take into account the extent to which a target was missed or the size of the district (for those elements that concern one child); the masking of important red flags that very poor performance suggests, since districts can miss up to five targets, and miss them by wide margins, and still not be selected; and the treatment of the selection elements as if they were equally important.  In addition, data are not disaggregated and analyzed for subgroups of children with disabilities, and the matrix does not include a selection element related to child find.*

D.  Disproportionality Review (Targeted)

CDE selects districts for disproportionality review based on the risk ratio or alternate risk ratio exceeding "3" for any of the racial and ethnic groups specified in the regulations (34 C.F.R. §300.647(b)(2)).  As set forth above, disproportionality is judged in four areas:  identification overall; identification in disability categories; discipline (in-school suspensions of fewer than ten days, in-school suspensions of more than ten days, out-of-school suspensions of fewer than ten days, out-of-school suspensions of more than ten days, and total removals); and placement (in regular classes for less than 40% of the day, and separate schools) (Dkt. No. 2455-1 at 54-55).

CDE's Attachment M shows a total of 676 districts selected for disproportionality review (Dkt. No. 2455-14).  The table below displays the number of districts identified for each area of disproportionality on Attachment M:

| Indicator | Number Selected |
|---|---|
| Disproportionality in discipline | 301 |
| Disproportionality in placement | 73 |
| Disproportionality in identification overall | 74 |
| Disproportionality in identification by disability | 537 |

For the three areas that are also federal state performance plan indicators, the numbers of districts selected do not match the number said to have not met the targets on CDE's Attachment K (Dkt. No. 2455-12).  This is easy to understand for disproportionality in discipline, as the federal indicator is limited to suspensions of greater than ten days,[69] but not for disproportionality in identification.  For disproportionality in identification overall 69 districts were said to not meet the target, but 74 were selected for disproportionality review; for disproportionality in identification by disability category 545 were said to not meet the target, but 537 were selected for review.  The discrepancy is not explained in CDE's submission.

As set forth earlier in this report, for disproportionality in discipline and in placement, the formulas included in CDE's submission do not use as the denominator other students with disabilities.  It is hoped that CDE will clarify the formulas currently in use.  For the other two areas of disproportionality the current conclusion would be compliant.

*Conclusion:  Noncompliant.*
*Reason for Conclusion:  For disproportionality in placement and discipline, the formulas are problematic.*

---

[69] https://osep.grads360.org/#report/apr/2016B/Indicator4B/HistoricalData?state=CA&ispublic=true.

E.  Significant Disproportionality Review (Intensive)

CDE selects districts for significant disproportionality review based on the risk ratio or alternate risk ratio exceeding "3" for a racial or ethnic group for three consecutive years.  Due to this standard, it can be assumed that districts identified with significant disproportionality were monitored for disproportionality during the more recent of those prior years.[70]  Significant disproportionality reviews occur in the same four areas as the disproportionality reviews (identification overall, identification in disability categories, discipline, and placement) (Dkt. No. 2455-1 at 55-56).

CDE's Attachment M shows a total of 36 districts selected for significant disproportionality review (Dkt. No. 2455-14).  The table below displays the number of districts identified for each area of significant disproportionality on Attachment M:

| Indicator | Number Selected |
|---|---|
| Significant disproportionality-disability | 3 |
| Significant disproportionality-disability and discipline | 3 |
| Significant disproportionality-disability, discipline, and separate schools | 1 |
| Significant disproportionality-discipline | 27 |
| Significant disproportionality-discipline and separate schools | 1 |
| Significant disproportionality-separate schools | 1 |

It is striking that significant disproportionality in discipline for three consecutive years is the most common reason, or part of the reason, for selection for significant disproportionality review, accounting for 32 of the 36 districts selected.  CDE's submission does not include information about the races or ethnicities for which districts were found to be disproportionate in discipline.

*Conclusion:  Deferred.*
*Reason for Conclusion:  CDE has not provided information regarding whether a definition of reasonable progress is used to excuse districts from this monitoring process and, if so, what that definition is.  For placement and discipline, the formulas are problematic.*

F.  Comprehensive Review (Intensive)

CDE's submission shows that it uses multiple elements to select districts for comprehensive review.  Twenty-two elements are scored for an elementary school district (see CDE's Attachment H, Dkt. No. 2455-9).  According to the submission, the elements are scored from one to four, and then added to calculate a total score; lower total scores increase the chances of selection for comprehensive review (Dkt. No. 2455-1 at 56-63).

---

[70] CDE states that its use of risk ratios and alternate risk ratios began in FFY 2016 (Dkt. No. 2455-1 at 47).

In order to analyze selection for comprehensive review, data underlying the scoring of each selection element were requested from CDE.[71]  The requested data were received on 1/14/19.  However, many of the performance values were not included in CDE's spreadsheet.  Instead of 2018 values, the spreadsheet contains entries of NA or NC for many districts.  In addition, many of the 2017 performance values were listed as NA.  The NC entries were presumably due to CDE's concerns regarding potential violations of the Family Educational Rights and Privacy Act.[72]  These NA and NC entries limited the monitor's ability to analyze the data received from CDE.

Further, the spreadsheet did not contain actual performance on state assessments or preschool assessments.  In addition, there are districts that have a selection score for participation on assessments, indicating that these districts have performance values for the prior and current year, but do not have a Dashboard score for assessment performance.  It is not clear why that would be the case.  For those reasons, results from monitor's analysis of these data should be interpreted with some caution.

A related issue concerns scores of "0" on selection elements.  To calculate the total score, CDE states that all selection elements with a "non-zero score" are counted, and the result multiplied by four to determine the maximum score available for each district.  But the scales for each selection element do not show zero as a possible score, and CDE does not explain how districts receive a score of zero on an element.

Although not entirely clear, the data received from CDE may indicate that a district receives a "0" either if no data are available or if it does not meet an unstated minimum N size.[73]  If the latter, then a very small district that did not meet the N size

---

[71] Mlawer email to Spence and Gill, 1/1/19.  The comprehensive review data request was:

> Please send me an electronic file that is in a format capable of manipulation (e.g., Excel spreadsheet, csv file, SAS dataset) that consists of all districts and their scores on the various data elements in the formula used to select districts for comprehensive review in the 2018-19 school year.  Please ensure that 1) each row/record represents a district, 2) each district is identified by its name and corresponding ID number, 3) there are columns/variables that represent the actual scores each district received on each element in the selection formula, 3) there are columns/variables that represent the 1-4 score each district received on each element in the selection formula, 5) the "summary scores," i.e., the sum of the selection scores, the count of non-zero scores, the available total score, and the percent of available total score are included, and 6) districts selected for comprehensive review are identified.  In other words, the variables in this file would include the variables in Attachment H (Dkt. No. 2455-9) and, for each of these indicator and other variables, their corresponding 16-17 score, 17-18 score, whether the target was met, and the summary scores.

[72] There was not enough time to seek adjudication of this issue.

[73] If a zero score indicates that an element was not "available" to a district, it is reasonable to assume that a zero indicates a selection element that was not applicable to a district.  On CDE's Attachment H, CDE's example of comprehensive review selection scoring, that is the case for four of the five zero scores for that district:  those four elements with scores of zero also have the notation "NA" in the column labeled "Target Met."  However, the other element (complaint and due process noncompliance) shows "YES" under "Target Met," and shows no noncompliance for the current year and "NA" for the prior year.  This element also received a score of zero (Dkt. No. 2455-9).  The fact that data are included for other elements for the prior year indicate that this district existed during that year; thus, it is hard to understand why

and placed all of its students with disabilities in separate classrooms would have a "0" score on this selection element.  In such circumstances this pattern of placement would not be held against the district for comprehensive review selection, an outcome that would be difficult to defend.  The data received from CDE show that 499 districts had a value of NA or NC in 2018 on each of three school-age least restrictive environment selection elements and thus received a score of "0" on each of these elements.

Due to CDE's standards for scoring selection elements, there are other reasons that districts would receive a "0" score.  For school-age placements in regular classes, for example, in addition to the above 499 districts with scores of "0," 589 districts also had a score of "0" because they did not have a percentage for the prior year (34 of these districts did not meet the target in the current year, and 555 districts met the target).  Thus, a total of 1,088 districts were not judged for performance on this important selection element.

1. <u>Standards for Scoring Each Selection Element</u>

This report now turns to the scoring process for each element included in the comprehensive review selection formula that is applicable to an elementary school district.

<u>Placement, parent input, two timeliness indicators</u>:  The first set of eight selection formula elements are all included in the federal state performance plan.  These elements are:

- placement in regular classes greater than 80% of the day (school-age),
- placement in regular classes less than 40% of the day (school-age),
- placement in separate schools (school-age),
- placement in regular class (preschool),
- placement in separate class (preschool),
- parent input,
- timely initial evaluations, and
- timely transition from Part C to Part B of the IDEA.[74]

The table below shows the scoring of each of these elements (Dkt. No. 2455-1 at 57):

| Score | Criteria |
|---|---|
| 1 | Did not meet target in current year, and did not improve from prior year |

---

complaint and due process noncompliance would be regarded as not applicable in the prior year.  But, as will be discussed below, there is an inconsistency between CDE's scoring table, explanatory text, and earlier statements in its submission regarding the scoring of this selection element.

[74] It is likely that this scoring approach also applies to participation in English/Language Arts and Math assessments.  See below.

| Score | Criteria |
|---|---|
| 2 | Did not meet target in current year, but "improved or maintained" from prior year |
| 3 | Met target in current year, and failed to improve from prior year |
| 4 | Met target in current year, and "improved or maintained" from prior year |

One aspect of this approach is not straightforward due to CDE's choice of terminology. One way of not improving or failing to improve from the prior year is to maintain the same percentage of compliance. Thus, for districts that did not meet the target in the current year and had the same percentage of compliance as the prior year, would such districts receive a "1" or a "2"? Similarly, for districts that met the target in the current year and had the same percentage of compliance as the prior year, would such districts receive a "3" or a "4"? CDE's stated criteria do not shed light on such circumstances. It will be assumed that districts that had the same percentage of compliance in both years would receive a "2" or a "4," depending on whether the target was met.

There are two major problems with this approach to scoring: marginal improvements or regressions, and the extent to which targets were missed or exceeded. First, according to CDE's stated criteria, any improvement or decline—no matter how small—will result in a different comprehensive review selection score on the indicator. For timely initial evaluations, CDE's spreadsheet shows that one district declined from 100% compliant in the prior year to 99.9% in the current year and received a "1." Another improved from 73.9% to 76.6% and received a "2." It is difficult to understand the rationale behind scoring results that make it more likely that a better-performing district will be selected for comprehensive review than one that performs far worse.

For the percentage of students in regular classes for greater than 80% of the school day the target is equal to or greater than 51.2%. The data received from CDE show a district that had a prior year performance of 62.7% and a current year performance of 62.8%; that district received a "4." Another district had 92.1% for the prior year and 92% in the current year; that district received a "3." It is difficult to defend that outcome.

Second, even the most egregious performance in the state on an indicator in the current year can be mitigated by a very small improvement from the prior year. Thus, the worst performing districts in the state can lower their chances of selection for comprehensive review by improving from the prior year. The data received from CDE show three districts with performance between 25-29% on regular class placements that received a score of "2" because they improved from the prior year, even though they remained far below the target. An additional four districts with even worse performance on this selection element received scores of "0" because they did not have a performance value for the prior year.[75]

---

[75] It is possible that these four districts were first-year charter school districts, but the rationale for excluding districts with such low performance from judgment on this selection element is not clear.

In addition, a number of concerns were raised in section III above regarding the data analysis for these comprehensive review selection elements. Excluding the two concerns raised thus far in the discussion of these selection elements, for the five school-age and preschool least restrictive environment elements and parent input, the concerns included the lack of ambitiousness of the targets and the failure to disaggregate the data for subgroups of students with disabilities. Thus, restrictive placements of subgroups will not be discovered through CDE's data analyses. For the two timeliness indicators, the concern had to do with the failure to make distinctions between districts based on the average number of days timelines were exceeded. This issue is not included in comprehensive review selection regardless of the average number of days the timelines were exceeded.

Achievement on state assessments, overall discipline: The next set of selection elements are also included in the federal state performance plan. CDE's submission states that the criteria below apply to federal indicators 3 (assessment participation and performance) and 4a (overall discipline). But CDE's approach to scoring assessment performance and overall discipline, as presented in its submission, is based on its Dashboard; unlike assessment performance and overall discipline, CDE has not set forth a Dashboard-based approach to *participation* on state assessments. In addition, CDE's Attachment H shows that the Dashboard is not used for assessment participation in order to select for comprehensive review (Dkt. No. 2455-9). Therefore, it is likely that the criteria above for placements, parent input, and the two timeliness selection elements are applied to participation in state assessments. CDE should confirm that this is the case.

But it is not clear why participation would be included as an element separate from performance. As shown in section III A 1 above, for districts that fell below the 95% participation rate target, CDE reduces the performance results (actual participation rate minus 95% multiplied by 0.25; Dkt. No. 2455-1 at 23). Hence, falling below the participation target is factored into the performance level.

The criteria below apply to performance on Math assessment, performance on English/Language Arts assessment, and overall discipline. The table below shows the scoring for each of these elements (Dkt. No. 2455-1 at 57):

| Score | Criteria |
|---|---|
| 1 | Scores Red on Dashboard for students with disabilities subgroup |
| 2 | Scores Orange on Dashboard for students with disabilities subgroup |
| 3 | Scores Yellow on Dashboard for students with disabilities subgroup |
| 4 | Scores Green or Blue on Dashboard for students with disabilities subgroup |

As shown in section III above, the Dashboard builds in a comparison with the prior year. But as also shown in the discussions in that section, poor performance on these selection elements will earn a district a yellow designation if small improvements are made from the prior year. For discipline, that also has the paradoxical result of yellow designations for some districts with very high suspension rates, while districts

with lower suspension rates can be designated red or orange and receive fewer points for comprehensive review selection, making selection more likely.

Further, the discipline data analysis does not include multiple suspensions of a student, cumulative days of suspension, or referrals to law enforcement.  In addition, the data analyses for discipline and for achievement on state assessment do not disaggregate data for subgroups of students with disabilities.  For those reasons, significant differences between aggregate data and data concerning subgroups will not impact selection for comprehensive review, nor will multiple suspensions, high numbers of days of suspension, or excessive referrals to law enforcement.

Performance on preschool assessments:  The next selection element is performance on the preschool assessment (federal Indicator 7).  Recall that there are six targets for preschool performance:  three outcome areas (positive social relationships, acquisition and use of knowledge and skills, and use of appropriate behaviors/action to meet needs) with two summary statements for each outcome area.[76]  CDE's approach looks at the number of these six targets met in the current year and compares that with the prior year.  The table below shows the scoring of this selection element (Dkt. No. 2455-1 at 58):

| Score | Criteria |
|-------|----------|
| 1 | Did not meet all six targets in current year, and decreased the number of targets met from prior year |
| 2 | Did not meet all six targets in current year, but increased or maintained the number of targets met from prior year |
| 3 | Met all six targets in current year, and decreased the number of targets met from prior year |
| 4 | Met all six targets in current year, and increased or maintained the number of areas from prior year |

The first problem with this approach concerns a score of "3."  If a district met all six targets in the current year, then it is not possible that it decreased the number of targets met in the prior year; there are only six targets.  CDE should explain how a score of "3" is possible on this element.  The CDE data show that four districts received this score, but the reason for the score is not clear.

Similarly, if a district met none of the targets in year one and again in year two, it maintained its performance.  One would expect such a district to receive a "1" because it performed poorly in both years, but CDE's stated criteria would result in a score of "2" because it maintained its performance from the prior year.  But it does not make sense that such a district would receive any score other than a "1."

---

[76] The summary statements are:  1) of those children who entered program below age expectations, the percentage who substantially increased their rate of growth by the time they turned 6 years of age or exited the program; and 2) percentage of children who were functioning within age expectations by the time they turned six years of age or exited the program.

The second concern has to do with the application of these scoring criteria to a district as presented in CDE's Attachment H (Dkt. No. 2455-9).  That document shows that the district met one area in the prior year and three in the current year, but also shows a selection score of "4."  This district did not meet all six areas in the current year, and increased the number of areas met from the prior year from one to three.  According to CDE's submission, this district should have received a score of "2" rather than the "4" it apparently was awarded.  Data in CDE's spreadsheet reinforce the validity of this concern.  For example, according to the spreadsheet 28 districts met three targets in both years, yet received a "4" instead of a "2."

Third, because this selection element is apparently scored based on meeting or not meeting all six of its constituent elements, the scoring criteria can have the puzzling effect of awarding more points to a district with lower performance in both years than to one that performed better in both years.  The table below shows two districts:

| District | # Met Prior Year | # Met Current Year | Points Awarded |
|---|---|---|---|
| District A | 6 | 5 | 1 |
| District B | 0 | 1 | 2 |

In this example CDE's scoring standards make it more likely that District A will be selected for comprehensive review than District B, although the former performed much better than the latter in both years.  According to CDE's spreadsheet, three districts met all six targets in the prior year and four in the current year, and received a "1" as expected based on CDE's criteria.  But fourteen districts met none of the targets in either year and received scores of "2."  Such outcomes are not sensible, but are a result of CDE's scoring standards.

Fourth, the extent to which any of the six targets were missed plays no role in scoring this selection element.  Districts that barely missed a target and those that missed a target by a wide margin are treated the same.  Because CDE's spreadsheet does not include the actual performance in the six areas, this could not be analyzed.

Finally, as set forth in section III A 2 above, CDE's data analysis does not disaggregate the performance of subgroups of children with disabilities.

<u>Disproportionality in discipline</u>:  The next selection element is federal state performance plan indicator 4b.  Performance in the prior year is not considered by CDE for this selection element.  The table below shows the scoring of this element (Dkt. No. 2455-1 at 58-59):

| Score | Criteria |
|---|---|
| 1 | Significantly disproportionate |
| 2 | Disproportionate for four or more race/ethnicities |
| 3 | Disproportionate for one to three race/ethnicities |
| 4 | Not disproportionate for any race or ethnicity |

While this may be a mistake in CDE's submission, unlike disproportionality in identification overall (see below), for this selection element CDE does not include whether noncompliance was found through the review of a district's policies, procedures, and practices.  However, CDE's Attachment H shows a column and row to capture the number of instances of noncompliance (Dkt. No. 2455-9).  In addition, the spreadsheet received from CDE appears to include a column to capture this information (column CQ).  CDE should explain whether this is a factor in the scoring of this selection element and, if so, how it is factored in.

Disproportionality in identification in disability categories:  For this selection element, federal state performance plan Indicator 10, performance in the prior year is also not considered by CDE.  Many combinations of disability categories and race/ethnicity are possible.  The table below displays the scoring of this element (Dkt. No. 2455-1 at 59):

| Score | Criteria |
|---|---|
| 1 | Significantly disproportionate |
| 2 | Disproportionate in eleven or more areas[77] |
| 3 | Disproportionate in one to ten areas |
| 4 | Not disproportionate |

Again, while this may be a mistake in CDE's submission, CDE does not include whether noncompliance was found through the review of a district's policies, procedures, and practices.  But Attachment H shows a column and row to capture this information (Dkt. No. 2455-9), and the CDE spreadsheet includes a column to capture this information (column CS).  CDE should explain whether this is a factor in the scoring of this selection element and, if so, how it is factored in.

Disproportionality in identification overall:  For this selection element, state performance plan Indicator 9, performance in the prior year is also not considered by CDE.  Scoring for this element includes both the number of race/ethnicities for which the district is disproportionate and the number of instances of noncompliance uncovered through the review of the district's policies, procedures, and practices (column CR in CDE's spreadsheet).  The table below displays the scoring of this element (Dkt. No. 2455-1 at 59-60):

| Score | Criteria |
|---|---|
| 1 | Significantly disproportionate |
| 2 | Disproportionate for more than one race/ethnicity and any noncompliance |

---

[77] CDE's bulleted narrative states that a score of "2" results from being disproportionate in "more than ten areas," while its table claims that a score of "2" applies when the district is disproportionate in "more than 11 areas" (Dkt. No. 2455-1 at 59).  It is likely that CDE means eleven or more areas, due to consistency between the table and the narrative regarding a score of "3" resulting from disproportionality in one to ten areas.

| Score | Criteria |
|-------|----------|
| 3 | Disproportionate for one race/ethnicity and any noncompliance |
| 4 | Not disproportionate **or** no instances of noncompliance |

Since CDE has a significant disproportionality monitoring process that it regards as an intensive process, it is not clear why such districts would also receive a "1" for comprehensive review selection.

Before proceeding it should be noted that one element, disproportionality in placement, appears on CDE's Attachment H as a selection element (Dkt. No. 2455-9) but a scoring methodology for it is not set forth in CDE's submission (Dkt. No. 2455-1 at 60-62). This element is also included in the spreadsheet received from CDE. Assuming that disproportionality in placement is indeed an element in CDE's selection for comprehensive review, CDE should set forth its approach to scoring this selection element.

Turning now to comprehensive review selection elements that are not part of the federal state performance plan, the additional elements set forth by CDE are complaint and due process noncompliance, timely annual IEPs, timely triennial IEPs, and timely submission of "required items."

Complaint and due process noncompliance:  CDE states that it compares the number of instances of noncompliance found through complaint resolutions and due process hearings in the current year with the number from the prior year. The table below displays the scoring for this element (Dkt. No. 2455-1 at 60):

| Score | Criteria |
|-------|----------|
| 1 | One or more instances of noncompliance in current year and increase in number of instances from prior year |
| 2 | One or more instances of noncompliance in current year and decrease in number of instances from prior year |
| 3 | Not a possible score, as zero noncompliance in current year could not be increase from prior year |
| 4 | CDE text from its bulleted list:  "If the LEA has zero noncompliances in the current year and decreased the number of noncompliances from the prior year, the Selection Score is 4"<br>CDE text from its table:  "0 noncompliances in CY"; Decreased (or stayed the same?) count of noncompliances from PY" |

A district with no noncompliance in the current year or prior year would not qualify for a "4" if the text from CDE's narrative is correct, because it did not decrease the number from the prior year. But such a district should certainly be awarded a score of "4" in this type of approach to selection:  it is not possible to perform any better. For that reason, the only sensible way to read CDE's criterion for that score is to remove the question mark from CDE's text in its table. Thus, it is assumed that the criteria for a

score of "4" is:  no instances of noncompliance in current year, and no instances of noncompliance in prior year or decrease from prior year.  This assumption is supported by the data received from CDE:  the 29 districts that received a "4" either had no noncompliance in either year, or none in the current year and a decrease from the prior year.

This approach to scoring a "1" or a "2," which concerns districts that have already been found noncompliant through complaint resolutions and/or due process proceedings, can lead to bizarre results.  The table below shows an example:

| District | # NC Prior Year | # NC Current Year | Points Awarded |
|----------|-----------------|-------------------|----------------|
| District A | 55 | 54 | 2 |
| District B | 0 | 1 | 1 |

It makes little sense to award more points to a district with 54 instances of noncompliance in the current year than to another with only one instance.  But this type of outcome appears to be a consequence of CDE's scoring criteria, at least as the criteria are set forth in the comprehensive review section of its submission (but see below).

The data received from CDE show that this is indeed an implication of CDE's scoring standards.  One district with 90 instances of noncompliance in the current year and 101 in the prior year received a "2" due to the decrease from the prior year.  Seventeen other districts received a "1" because they had two instances of noncompliance in the current year and either one or none in the prior year.  It is difficult to defend these strange scoring results.

But it is not clear that this is CDE's approach to scoring this selection element.  As shown in sections III H and I above, earlier in its submission CDE states very clearly that it calculates a *rate* of noncompliance by dividing the number of instances of noncompliance found by the number of special education students in the district (Dkt. No. 2455-1 at 36-37, 38).  These rates are compared to the prior year's rate.  On the other hand, the comprehensive review selection spreadsheet received from CDE does not show rates in the two relevant columns; it shows numbers, presumably of instances of noncompliance.  The same is true of CDE's Attachment H (Dkt. No. 2455-9).

Due to this level of confusion, it is not possible to fully determine how CDE treats complaint and due process noncompliance for the purposes of comprehensive review selection.  This should be clarified by CDE.

Timeliness of annual IEPs:  For this selection element, CDE compares the percentage of IEPs completed timely in the current year with the percentage from the prior year.[78]  The table below displays the scoring for this element (Dkt. No. 2455-1 at 60-61):

---

[78] It is unclear from CDE's submission whether untimely IEPs with valid excusal codes are excluded from the analysis, or are treated as if they were timely.  CDE should clarify this because these two options would affect the percentage considered timely.

| Score | Criteria |
|---|---|
| 1 | CDE text from its bulleted list:  "If the LEA developed *all* annual IEPs untimely in the current year, and *failed to improve* the percentage of timely annual IEPs developed" (emphases added)<br>CDE text from its table:  "Had *any* non-excused IEPs completed after one year"; "*Decrease* the percentage of compliant IEPs from PY" (emphases added) |
| 2 | Any untimely IEPs in current year and improved or maintained percentage from prior year |
| 3 | CDE text from its bulleted list:  "If the LEA developed all annual IEPs timely in the current year…, but failed to improve the percentage of timely annual IEPs developed"<br>CDE text from its table:  "This score is not possible given the methodology" |
| 4 | All annual IEPs timely in current year and improved or maintained percentage from prior year |

For a score of "1," CDE's submission disagrees with itself on two issues:  whether all or any annual IEPs must be untimely, and whether the district must fail to improve or decrease compared with the prior year.  For the first issue, it is reasonable to assume that *any* untimely IEPs in the current year is the standard; for the second issue, it will be assumed that decreasing is the standard because maintaining from the prior year is part of the criteria for a score of "2."

For a score of "3," the text from CDE's table must be correct (score not possible).  A district that was 100% compliant in the current year either maintained that level of compliance from the prior year or improved; it could not have failed to improve.  As the criteria for a score of "4" are 100% compliant in the current year and improved or maintained from the prior year, a score of "3" is not possible given this methodology.

As set forth above in section III A 4 e, the data analysis approach used by CDE is based on the target of 100% compliant.  This approach ignores the extent to which the timeline was exceeded by districts on average.  This issue is not programmed for at all in CDE's use of this element for comprehensive review selection.

CDE includes the extent of noncompliance in its analysis through a comparison to the prior year.  But that can have the following odd result:

| District | % Compliant Prior Year | % Compliant Current Year | Points Awarded |
|---|---|---|---|
| District A | 99.8 | 99.6 | 1 |
| District B | 75 | 76 | 2 |

Although not as dramatic as the hypothetical above, according to CDE's spreadsheet eleven districts went from 100% compliant in the prior year to 99.9% in the current year and received a "1."  Another district improved from 99% compliant in the prior year to 99.2% and received a "2."  Hence, a result of CDE's scoring methodology for this

element is awarding one more point to a district with a lower percentage of compliance in both years than to one that performed better.  It is difficult to understand the rationale behind these sorts of results.[79]

Timeliness of triennial IEPs:  Here CDE again compares the percentage completed timely in the current year with the percentage from the prior year.  The table below displays the scoring for this element (Dkt. No. 2455-1 at 61-62):

| Score | Criteria |
|---|---|
| 1 | CDE text from its bulleted list:  "If the LEA developed *all* triennial IEPs untimely in the current year, and *failed to improve* the percentage of timely triennials developed" (emphases added)<br>CDE text from its table:  "Had *any* non- excused Triennials completed after one year"; "*Decrease* the percentage of compliant Triennials from PY" (emphases added) |
| 2 | Any untimely triennial IEPs in current year and improved or maintained percentage from prior year |
| 3 | CDE text from its bulleted list:  "If the LEA developed all triennial IEPs timely in the current year, taking into account those for whom a valid delay code was provided, but failed to improve the percentage of timely triennials developed"<br>CDE text from its table:  "This score is not possible given the methodology" |
| 4 | All triennial IEPs timely in current year and improved or maintained percentage from prior year |

For scores of "1" and "3," CDE's criteria suffer from the same internal inconsistencies as did its timely annual IEPs selection criteria.  For the same reasons as stated in the prior sub-section, these criteria will be reconstructed as follows:

- Score of "1":  Any untimely IEPs in the current year and decrease from the prior year.
- Score of "3":  Score not possible given the methodology.

CDE's spreadsheet shows that 3.15% of districts received a "1" or "2" on this selection element, while the other 96.84% received a "4" or a "0."

As was the case for timely annual IEPs, CDE's approach does not consider the average number of days the timeline was exceeded.  In addition, the application of the scoring criteria can have the same strange results as described for annual IEP timeliness.

Timely and complete submission of "required items":  CDE's submission does not explain what these required items are, but it is reasonable to assume that CDE

---

[79] The spreadsheet also shows two districts that were 100% compliant in both years that received scores of "1."  It is assumed that this is an error in CDE's spreadsheet.

means the timely and complete submission of data.  The table below displays the scoring of this selection element (Dkt. No. 2455-1 at 62):

| Score | Criteria |
|-------|----------|
| 1 | Less than 50% of required items timely and complete |
| 2 | Between 50% and 69% of required items timely and complete |
| 3 | Between 70% and 89% of required items timely and complete |
| 4 | At least 90% of required items timely and complete |

CDE did not discuss its data analysis for this selection element elsewhere in its submission, so it is difficult to know how these standards were chosen.  However, assuming CDE intends here the timely and complete submission of data, it should be noted that the federal regulations expect submitted data to be "valid and reliable" rather than timely and complete (34 C.F.R. §300.601(b)(1)).  The accuracy of data is at least as important as whether it was submitted completely or on time.

    2. <u>Standard for Selection/Implications</u>

The last step in CDE's selection process is the determination of a cut score.  For the 2017-18 selection year that cut score was 65% of the total possible points for that particular district:  all districts scoring below 65% were selected, according to CDE's submission (Dkt. No. 2455-1 at 63).  The submission does not explain how this standard for selection was developed, or why this cut score is adequate in CDE's view for selecting districts for this intensive monitoring review in order to ensure that students are receiving FAPE and are placed in the least restrictive environment.

But in CDE's email to the monitor it states:

> …CDE used its discretion after the data calculations to finalize the selection of districts for participation in the comprehensive review monitoring activity.  The cutoff score is now 62%.  (Spence email to Mlawer, 1/14/19)

In addition, CDE writes with respect to first-year charter school districts:

> New charter schools (for the purposes of providing special education) were automatically deselected for monitoring if their score fell below the cutoff. These schools are new in the sense that SY 2017-18 is the first year where the school acted as its own LEA for the purposes of providing special education services.  Calculations and selection for comprehensive review relies on both current-year data (SY 2017-18) and prior-year data (SY 2016-17).  (Spence email to Mlawer, 1/14/19)

However, if the school itself existed in the prior year CDE could have disaggregated the data by that school and included such new charter districts in the selection process.

Further, CDE does not explain why first-year charter districts would be excluded from selection even if the data indicate very poor performance in the current year. The CDE email does not state how many fewer districts were selected as a result of the change in the cut score or why this change was made.

The table below was developed based on CDE's spreadsheet. The number of 35 districts selected for comprehensive review is based on the column in the spreadsheet headed "Selected for CR Monitoring" that contains yes/no responses and on Attachment M (Dkt. No. 2455-14).[80]

| Range of Scores | # Districts | # (%) Selected for Comprehensive Review |
|---|---|---|
| No score | 215 | 0 (0%) |
| 0-61.99% | 103 | 34 (33%) |
| 62.0-64.99% | 94 | 0 (0%) |
| 65.0-67.99% | 46 | 1 (2.2%) |
| 68.0-100% | 1637 | 0 (0%) |
| Total | 2095 | 35 (1.7%) |

It is clear from the table that 94 additional districts, those with total scores between 62.0-64.99%, would have been chosen for comprehensive review had CDE not lowered its cut score, assuming they were not first-year charter districts. But it is likely that the majority of these 94 districts are not first-year charter districts because they have Dashboard results. Recall that the Dashboard calculations are based both on current year and prior year performance.

Moreover, the performance of many of these districts suggests the necessity of an intensive monitoring process. Seventy of these 94 districts had a score on the Dashboard for the English/Language Arts assessment. Of these 70, 43 had a score of red, 25 had a score of orange, and two had a score of yellow. In addition, all 94 had a score for overall discipline: 34 were red and 20 were orange. Forty of these 94 districts received at least two red scores on the three Dashboard elements. In addition, 21 of these districts have a rate of school-age placement in regular classes below 50%; twelve received a selection score of "1" for this selection element.

In addition, 69 districts that scored below the cut score of 62% were not selected. This is unexplained by CDE. The spreadsheet shows that, of these 69 districts, 46 received a red score on the Dashboard for performance on the English/Language Arts assessment, fourteen received an orange score, and the other nine had a missing score. All 69 of these districts had Dashboard scores for overall discipline: 29 had a score of red and 31 were scored orange. CDE should explain why these districts were not selected despite scoring below the cut score.

---

[80] CDE's Attachment M, submitted on 12/7/18, and CDE's spreadsheet, emailed on 1/14/18, agree that 35 districts were selected for comprehensive review. But the December submission stated that the cut score was under 65%, and the email five weeks later said the cut score had been changed to below 62%. That would appear to point toward the change to the new cut score being made prior to CDE's submission on 12/7/18, rendering the submission inaccurate as of the date it was filed.

In order to focus just on those that may be presumed to be elementary districts, districts with scores on graduation, dropout, secondary transition, and post-secondary outcomes were removed from the analysis.  Sixty of the districts presumed to be elementary districts scored below the 62% cut score, and another 55 scored between 62% and 64.99%.  Only six of the 60 districts that scored below 62% were selected for comprehensive review.  Of the 54 districts that scored below 62% and were not selected, 33 scored red on the English/Language Arts Dashboard, twelve scored orange, and scores for nine were missing.  On the Math Dashboard, 27 scored red and 18 orange.  On the discipline Dashboard all of these districts received scores: 24 red, 23 orange, and seven yellow.  Seven of the 54 received red on all three Dashboards, and thirteen received two reds and one orange.  It is unknown why these districts were not selected for monitoring despite scoring below the cut score of 62%.

Of the six presumably elementary districts scoring below the 62% cut score that were selected for comprehensive review, three were judged on very few selection elements:  one on only two elements, one on three elements, and one on four.  For the one district that was judged only on two selection elements, those two elements were participation on the Math and English/Language Arts assessments.  Devoting intensive monitoring resources to a district for this reason is hard to understand.

Of the 55 presumably elementary districts scoring between 62% and 64.99%, districts that would have been selected based on CDE's original cut score of below 65%, 24 scored red on the English/Language Arts Dashboard and 16 orange; on the Math Dashboard, 27 scored red and 13 orange; on the discipline Dashboard, 16 scored red and 13 orange.  One district scored red on all three dashboards, and two districts scored red on two dashboards and orange on one.

Further, for at least one district CDE apparently does not believe that its stated selection approach was adequate:  the email from counsel for CDE states that an additional district, "despite scoring 67.11%, has been included in the FY18-19 CR monitoring."  The selection of this district is also shown on CDE's spreadsheet.  But CDE has not put forth any additional standards through which it overrules its stated selection methodology for other reasons, and the email does not state what those other reasons were for this district.  CDE should set forth any additional standards it uses to select districts for comprehensive review, and state why this district was selected.

Moreover, the table shows that only 1.7% of districts included in the spreadsheet were selected for comprehensive review.  Even if one were to set aside the concerns related to the scoring of the selection elements as discussed in the prior subsection, and the areas in which data are not fully analyzed or are measured against unambitious targets as discussed in section III above, the formula itself and the current cut score of 62% are not adequate to select districts for comprehensive review in order to ensure FAPE in the least restrictive environment.

First, the only selection elements included in CDE's formula related to child find concern the timeliness of initial evaluations and the timeliness of transition from Part C to Part B of the IDEA.  But neither of these selection elements get at the extent to which preschool children and school-age students who may have disabilities have been identified, located, and evaluated.  For that reason, the comprehensive review selection

formula does not include a meaningful measure of child find.  Child find is currently included only in a targeted monitoring process, performance indicator review, which is not an intensive monitoring process.  But getting to the bottom of significant potential child find noncompliance requires an intensive monitoring process.

Second, the comprehensive review selection formula treats each of the 22 selection elements applicable to an elementary school district as equally important.  But timeliness of IEP development (four elements), participation on assessments (two elements), and timely submission of (presumably) data (one element) are not as important as whether students are actually learning and gaining skills (three elements, two for school-age proficiency and one for all six preschool outcomes) or not being suspended (one element plus one disproportionality element); nor are those seven timeliness/participation selection elements as important as the five selection elements that concern whether preschool children and school-age students are placed in the least restrictive environment.

For example, receiving a red or orange Dashboard performance level on assessment performance and overall discipline does not make it very likely that such districts will be selected for comprehensive review.  The data received from CDE show that even receiving three red designations does not make selection likely.  The spreadsheet shows 75 districts that were labeled red on the Dashboards for all three elements; only seven of these districts were selected for comprehensive review (9.3%), according to the spreadsheet.  Further, of the 119 districts labeled red for two of the selection elements and orange for the other, only ten were selected (8.4%).

The same is true for least restrictive environment.  For the two school-age selection elements concerning regular classroom placements (greater than 80%, and less than 40%, of the day in regular classes), 31 districts had selection scores of "1" on these elements, but only six of these districts (19.4%) were selected for comprehensive review.[81]  For the two preschool least restrictive environment selection elements, 42 districts received selection scores of "1" on these two elements, but only three of these districts (7.1%) were selected for comprehensive review.[82]

Deepening the concern regarding CDE's decision to weight all selection elements equally, three districts had selection scores of "1" on the two school-age regular classroom selection elements, the two preschool least restrictive environment selection elements, and scored red on the discipline Dashboard.  One of these districts also scored red on the Dashboards for Math and English/Language Arts assessment performance.  None of these three districts were selected for comprehensive review.  The comprehensive review selection scores of these districts ranged from 64.6%-67%.

*Conclusion:  Noncompliant.*

---

[81] It is worth noting that some of the other 25 of these districts had 2017-18 school year performance levels that were far from the targets, a result of CDE's scoring process mitigating performance in the current year based on changes from the prior year in the scoring of these selection elements.
[82] As was the case for the school-age placement elements, some of the 39 districts not chosen for monitoring had 2017-18 school year performance levels that were far from the targets.

*Reasons for Conclusion:  In addition to the data analysis concerns set forth in section III above, the scoring criteria for most of the selection elements can result in better-performing districts receiving fewer selection points than districts that performed worse.  Even egregious performance in the current year can be mitigated by small improvements from the prior year.  For preschool performance, the extent to which targets were missed does not affect the scoring.  Some scoring criteria are unclear, others are confusing, and one is impossible to determine due to contradictions between sections of CDE's submission.  It is unclear how scores of "0" are awarded, and the effect of this can be that some districts are not judged at all on important selection elements.  There is no selection element related to child find.*

*Turning to the standards for selection, due to the cut score of below 62%, many districts that appear to need intensive monitoring are not selected.  Some districts that scored below the cut score were not selected for reasons that are not clear.  First-year charter districts are not selected even if their performance in the current year merits intensive monitoring.  The formula treats all selection elements as equally important.  Finally, very few districts in the state are selected for comprehensive review.*

## G.  Non-Public School Monitoring

Testimony by CDE staff during the Phase 1 hearings indicated that non-public schools educate students with disabilities who are placed in such facilities by districts pursuant to the IDEA.  These schools are certified by CDE's special education division and are monitored regularly by a unit within CDE that has a large staff.  Such monitoring is guided by its own monitoring instrument.[83]  The monitoring instrument shows that there are three types of monitoring reviews of non-public schools (validation review, on-site review, and follow-up review); there is also a check box labeled "other," presumably indicating the possibility of other types of monitoring reviews (Dkt. No. 2411-4 at 2).

It was clear from Phase 1 documents submitted by CDE that data are collected to capture the school attended by each student, including non-public schools (CASEMIS field A-6; Dkt. No. 2390-2 at 11-12).  The collection of these data was verified by testimony at the Phase 1 hearing.[84]  Thus, all other data collected by CDE concerning students with disabilities can be disaggregated by specific non-public school, and could be used to select non-public schools for this monitoring process.

CDE's submission does not include any information about selection for these reviews—whether data are used for selection and, if so, which data; and if data are not used, the reasons why data are not used for selection.

*Conclusion:  Noncompliant.*
*Reason for Conclusion:  No information is provided by CDE.*

---

[83] 8/1/18 Transcript at 161 (ll. 1-5), 172 (ll. 17-18), 173 (ll. 3-4), and 174 (ll. 21-23).
[84] 8/7/18 Transcript at 184, l. 24 ("We collect the school the student attends").

## V.  "Meets Requirements" Annual Determinations Based only on Data Without Additional Monitoring:  Discussion and Conclusions

This section of this report will examine the extent to which CDE has demonstrated

> whether the state's decision to issue annual compliance determinations for certain school districts based on data analysis alone, without further targeted monitoring activity, is sufficient to fulfill its obligations under the IDEA.  (Dkt. No. 2439)

In order to assess this issue, it will be necessary first to consider what CDE examines, and therefore knows, through data analysis about the districts that it preliminarily[85] deems to be meeting the requirements of the IDEA, and thereby excuses from further monitoring.  Second, the reasons CDE believes this approach to be sufficient to fulfill its obligations under the statute will be considered.  Finally, because CDE labels those districts not selected for a monitoring process as "meets requirements," what is unexamined, and therefore unknown, about these districts based on the limitations of CDE's a) data analyses, and b) approach to selection for its monitoring processes, as discussed in sections III and IV of this report, will be considered and a conclusion will be reached.

### A.  What is Examined and Known about "Meets Requirements" Districts

CDE's submission contains a graphic illustration of the relation between selection for CDE's monitoring processes, based on its data analyses, and annual determinations (Dkt. No. 2455-1 at 7-8).  Selection for any of CDE's monitoring processes results in an annual determination of "needs assistance" or "needs intervention" (in year one).  Conversely, if a district is not selected for a monitoring process based on data analyses it is provisionally given a determination of "meets requirements."[86]

The table below shows each aspect of CDE's data analysis included in CDE's graphic that is both relevant to an elementary school district and to selection for monitoring, and what is known to CDE about the districts labeled "meets requirements" through CDE's analysis of data as set forth in its submission:

| Area of Data Analysis | What is Known |
|---|---|
| Timeliness of IEP development (initial evaluation, C to B transition, annual IEP, triennial IEP) | 100% compliant for each |

---

[85] For the preliminary nature of this annual determination, see subsection B below.
[86] CDE does not state how many districts were given preliminary determinations of "meets requirements."

| Area of Data Analysis | What is Known |
| --- | --- |
| Suspension overall | For districts with cumulative enrollment of 30 or more, yellow, green, or blue performance level on Dashboard |
| Percent regular class > 80%(school-age) | Equal to or > 51.2% |
| Percent regular class < 40% (school-age) | Equal to or < 22.6% |
| Percent separate settings (school-age) | Equal to or < 4% |
| Parent involvement | Over 92% of parents responded "yes" to one question in IEP meeting |
| Assessment participation | 95% or higher participation rate in both English/language arts and math assessments |
| Assessment performance | Yellow, green, or blue performance level on Dashboard |
| Child Find (enrollment) | Identification rate of 3.6% or above |
| Disproportionality in discipline | Below risk ratio threshold of "3" for each racial/ethnic group in each of five categories of discipline |
| Disproportionality in identification overall | Below risk ratio threshold of "3" for each race/ethnic group |
| Disproportionality in identification by disability | Below risk ratio threshold of "3" for each race/ethnic group in each disability category |
| Disproportionality in placement | Below risk ratio threshold of "3" for each race/ethnic group in each placement category |
| Preschool Review matrix selection elements | Scored below six on matrix, and one or fewer children in a non-public school |
| Comprehensive Review selection elements | Scored 62% or above on selection elements (with the exception of 69 districts) |
| Significant disproportionality in identification overall | Below risk ratio threshold of "3" for each race/ethnic group for at least one of three consecutive years |
| Significant disproportionality in identification by disability | Below risk ratio threshold of "3" for each race/ethnic group in each disability category for at least one of three consecutive years |
| Significant disproportionality in placement | Below risk ratio threshold of "3" for each race/ethnic group in two placement categories for at least one of three consecutive years |
| Significant disproportionality in discipline | Below risk ratio threshold of "3" for each of five categories of discipline for at least one of three consecutive years |
| Resolution sessions | All timely |
| Timely correction of noncompliance | All noncompliance corrected within one year |

B.  Sufficiency of this Approach:  CDE's Reasoning

As set forth in this report, CDE's process of selection for monitoring and, through the selection process, of making annual determinations, is based on the federal state performance plan indicators, Dashboard elements, and several other indicators. CDE may in fact believe that the state performance plan indicators, when considered collectively, are themselves sufficient to fulfill its obligations under the IDEA:

> When used collectively, the SPP federal indicators and the accompanying calculation methodologies are sufficient to measure the performance and compliance of LEAs implementing the provisions of IDEA and provides an adequate, reasonable basis to screen all LEAs. (Dkt. No. 2455-1 at 6)

But CDE then argues that, when these federal indicators and its Dashboard overlap, the Dashboard is more "rigorous."  CDE offers two reasons for this view:  first, the Dashboard includes the current year's results but also considers the results from the prior year; second, the Dashboard results are timelier than some state performance plan indicators "which may lag one or two years behind, depending on the indicator" (Dkt. No. 2455-1 at 6).  However, CDE does not demonstrate with concrete examples the Dashboard's alleged rigor by showing that its use results in the selection of districts that would not have been selected through the use of state performance plan indicator targets in the two areas of overlap (achievement on state assessments and overall discipline),[87] or by showing that the Dashboard results are in fact timelier than the indicator data in those two specific areas of overlap.  In addition, as has been shown above, it is sometimes the case that the Dashboard—and many of the comprehensive review selection scoring criteria that do not involve the Dashboard—weaken the effect of even extremely poor performance in the current year by also considering small positive changes from the prior year.

After displaying its graphic illustration of the relation between selection for monitoring and annual determinations, CDE points to the final section of its submission for additional discussion of why its "extensive data analyses" provide a "sufficient and adequate measure of performance and compliance" for each district, specifically those determined to meet the requirements of the IDEA (Dkt. No. 2455-1 at 8).

Turning to that section (Dkt. No. 2455-1 at 63-64), CDE begins with another assertion of the sufficiency and adequacy of its data analyses to measure performance and compliance, and expresses its belief that it has explained throughout its report why its analyses meet this standard.  CDE then lists the many areas in which it analyzes data, states that its selection of districts for monitoring is based on these analyses, and points out that districts that fail to meet any targets in these many areas do not receive a "meets requirements" determination.

---

[87] It is also possible that the use of the indicators would select districts for monitoring that were *not* selected through the Dashboard.

CDE stresses the preliminary nature of such determinations.  Districts are notified of selection for monitoring in December, and those not selected can "infer" a preliminary determination of "meets requirements."  The official determination is issued one year later.  During that year CDE may receive additional information about the district in the form of:

- complaints,
- litigation, and
- critical incidents.[88]

As a result of such additional information, the preliminary "meets requirements" determination "may be affected accordingly."  The submission does not put forth any standards or criteria to guide such decisions, nor does it state whether this has ever taken place.

CDE concludes:

> Thus, for those LEAs that receive a "Meets Requirements" compliance determination, the rich data yielded from analyses outlined in this report, coupled with the opportunity for other information to be considered even after CDE has completed its data analyses, serves as a sufficient basis under federal law for CDE to officially issue the "Meets Requirements" determination.  (Dkt. No. 2455-1 at 64)

It must first be noted that CDE's repeated assertions of its desired conclusion of the sufficiency and adequacy of its data analyses to make preliminary "meets requirements" determinations do not amount to a *demonstration* that that is the case.  In addition, CDE's view that it has explained why its analyses meet this standard throughout its report is not what its report has accomplished:  the report explains, not always successfully, *how* CDE calculates and analyzes the data it collects, but frequently does not explain *why* its analyses are sufficient to fulfill its obligations under the statute.  Statutory or regulatory language is often quoted or cited by CDE at the beginning of its sections and is followed by its calculation methodologies, but the submission does not then circle back to explain why those calculation methodologies are sufficient to raise red flags about a district's compliance with those requirements.[89]

Finally, CDE's discussion of additional information that may come to it through complaints or litigation before finalization of "meets requirements" determinations

---

[88] The submission does not explain what a "critical incident" is.

[89] Quoted requirements are also not always fully related to the calculation methodologies.  For example, CDE quotes the requirements from 34 C.F.R. §300.303 that districts must ensure that a reevaluation takes place if it determines that the child's needs (including for improved academic achievement and functional performance) warrant a reevaluation, or if the child's parent or teacher requests a reevaluation; absent an agreement between the district and parent, reevaluations should not occur more than once a year and must occur at least once every three years.  The calculation methodology only concerns the last requirement, timely triennial reevaluations (Dkt. No. 2455-1 at 29-30).

does not acknowledge that complaints and litigation concern alleged violations of the IDEA; such violations would also be discoverable through additional monitoring.  But whether additional monitoring may be necessary for at least some of these districts is precisely what is at issue.  The responsibility to ensure compliance with the requirements of the IDEA falls to state educational agencies, not to those who may—or may not—file complaints and lawsuits (20 U.S.C. §1416(a)(2)(B)).

C.  <u>What is Not Fully Examined or Unexamined and Therefore Unknown through Data Analysis about "Meets Requirements" Districts/What is Missed through Selection Approach</u>

The table below collects the missing pieces from CDE's stated data analyses in each area:

| Area of Data Analysis | What is not Fully Examined, or Unexamined, and Unknown |
|---|---|
| Timeliness of IEP development (initial evaluation, C to B transition, annual IEP, triennial IEP) | • Nothing (because 100% compliant) |
| Suspension overall | • Multiple suspensions for students<br>• Cumulative length of time of suspensions<br>• Referrals to law enforcement<br>• Data related to subgroups of students with disabilities[90]<br>• No information regarding districts that do not meet cumulative enrollment standard |
| School-age least restrictive environment | • Data judged against unambitious targets<br>• Placements of subgroups of students with disabilities<br>• Potential patterns of congregating students in particular sites |
| Preschool least restrictive environment | • Placements of subgroups of children with disabilities<br>• Data judged against unambitious targets |
| Resolution sessions | • Nothing (because 100% compliant) |
| Mediation | • No analysis performed |
| Parent involvement | • Data judged against unambitious target<br>• No analysis for subgroups of parents |

---

[90] "Subgroups" in this table generally refers to students with disabilities of different races or ethnicities, in different disability categories, those in foster care, homeless students, English-language learners, and those who live in poverty.

| Area of Data Analysis | What is not Fully Examined, or Unexamined, and Unknown |
|---|---|
| Preschool performance | • Performance of subgroups of children with disabilities |
| Assessment participation (school-age) | • Participation of subgroups of students with disabilities |
| Assessment performance (school-age) | • Performance of subgroups of students with disabilities |
| Child Find (enrollment) | • Identification of preschool-age children<br>• Selection standard of identification rates below 3.6% inadequate<br>• Identification of sub-populations (homeless, migrant, those in foster care, and by race/ethnicity).<br>• Academic and behavioral performance of students without IEPs |
| Disproportionality in discipline | • CDE formula inadequate (does not use the appropriate denominator of students with disabilities) |
| Disproportionality in placement | • CDE formula inadequate (does not use the appropriate denominator of students with disabilities) |
| Disproportionality in identification overall | • Potential under-identification (although this likely complies with requirements) |
| Disproportionality in identification by disability | • Potential under-identification (although this likely complies with requirements) |
| Significant disproportionality in identification overall | • No information provided regarding reasonable progress |
| Significant disproportionality in identification by disability | • No information provided regarding reasonable progress |
| Significant disproportionality in placement | • No information provided regarding reasonable progress (in addition to problematic formula) |
| Significant disproportionality in discipline | • No information provided regarding reasonable progress (in addition to problematic formula) |
| Timely correction of noncompliance | • Whether noncompliance was corrected as soon as possible, as required by the regulations |

In addition, conclusions cannot yet be reached regarding the implementation of IEPs and restraint/seclusion.  It is clear from section III and the table above that there are many important areas in which data are not analyzed or are judged against inadequate targets.

In addition to those issues, the table below shows the types of red flags that are missed through the selection process for each of CDE's monitoring processes:

| Monitoring Process | Selection Approach Does Not Flag Some Districts With: |
|---|---|
| Performance indicator review | • Poor outcomes for preschool children<br>• High suspensions of preschool children<br>• Unclear if preschool least restrictive environment included |
| Data identified noncompliance | • N/A (all districts with any noncompliance selected) |
| Preschool review | • Poor performance or egregious performance (missed targets or missed by large margins) on one through five selection elements (due to all-or-nothing approach to scoring and treatment of selection elements as equally important), resulting in selection of only five districts through scoring six points or more<br>• Poor or egregious performance by subgroups of children with disabilities  (due to no analysis)<br>• High suspensions of subgroups of children with disabilities (due to no analysis)<br>• Restrictive placements for subgroups of children with disabilities (due to no analysis)<br>• Children who have disabilities and need special education but have not been identified (due to no child find selection element) |
| Disproportionality review | • Unclear for disproportionality in placement and discipline (due to problematic formulas)<br>• Under-identification of students with disabilities (although this likely complies with requirements) |
| Significant disproportionality review | • Unclear (due to lack of information regarding reasonable progress)<br>• Unclear for disproportionality in placement and discipline (due to problematic formulas)<br>• Under-identification of students with disabilities (although this likely complies with requirements) |

| Monitoring Process | Selection Approach Does Not Flag Some Districts With: |
|---|---|
| Comprehensive review | • Poor performance on majority of selection elements (due to small improvements from prior year)<br>• Egregious performance in the current year on one or many selection elements (due to small improvements from prior year or scores of "0")<br>• Poor performance, while some better-performing districts more likely to be selected (due to scoring criteria)<br>• Students who have disabilities and need special education but have not been identified (due to no child find selection element)<br>• First-year charter district status and poor performance in current year (due to scoring criteria's need for two years of data)<br>• Apparent need for intensive monitoring although scored above 62% (due to cut score and selection of very few districts)<br>• Scores below 62% but not selected (unclear why)<br>• Poor performance on multiple important selection elements (due to formula's treatment of all selection elements as equally important)<br>• Very poor performance on preschool outcomes (due to failure to consider extent to which targets missed and formula's treatment of all selection elements as equally important)<br>• Unknown (due to unclear, confusing, or contradictory scoring criteria, and lack of clarity regarding scores of "0") |
| Non-public school monitoring | • Unknown (due to no information provided) |

Thus, in addition to the inadequate data analyses and targets from the first table, the second table shows a number of ways districts can escape monitoring scrutiny, particularly through selection for preschool review and comprehensive review.

However, failure to select districts for the latter reviews is not of consequence to the inquiry related to "meets requirements" districts *if* the districts that are not selected for those two reviews *are* selected for other monitoring processes, as that would prevent a "meets requirements" determination.  Unfortunately, that is not the case.

First, setting aside the adequacy of the targets and insufficiency of the analyses for the moment, failure to meet some targets results in selection for performance indicator review.  But that is not true for the outcomes achieved by preschool children, the suspensions of preschool children, and perhaps for the placements of preschool children.  Unless the overall performance of a district meets or exceeds the cut score, districts in which these children are not achieving or are suspended frequently will not be selected for preschool review, can be labeled "meets requirements," and will not be

monitored further.  The same may be true of districts in which the placements of preschool children are more restrictive than necessary to implement their IEPs.  But only monitoring can uncover whether these children are receiving FAPE or are placed in the least restrictive environment.  Preschool achievement—but not preschool suspension or placements—is also included in comprehensive review, but there a district must fall below the inadequate overall cut score in order to be selected.

Second, even if CDE's current targets are regarded as adequate enough for the purpose of selection, in CDE's current approach to selection for monitoring, and thereby to annual determinations, can allow the following types of districts (depending upon performance in other areas) to be determined to be meeting the requirements of the IDEA:

- for school-age performance, students with disabilities in the districts scoring yellow on the Dashboard may have scored as much as seventy points below the standard if their aggregate performance increased by as little as three points from the prior year;
- for school-age performance, students with disabilities from some racial or ethnic groups, students living in poverty, those who are English-language learners, those in foster care, and/or those who are homeless may have performed far worse than the aggregate in those districts labeled yellow, green, or blue;
- for school-age suspension, students with disabilities in the districts scoring yellow on the Dashboard may have a very high suspension rate (greater than 6%) if it declined by as little as 2% from the prior year;
- for school-age suspension, students with disabilities from some racial or ethnic groups, students living in poverty, those who are English-language learners, those in foster care, and/or those who are homeless may have been suspended far more frequently than the aggregate suspension rate in those districts labeled yellow, green, or blue;
- for school-age suspension, students with disabilities may have been suspended multiple times, for long periods of time, and/or have been referred to law enforcement in those districts labeled yellow, green, or blue;
- for placement, districts that are congregating students in certain sites, and/or whose students with disabilities from some racial or ethnic groups, students living in poverty, those who are English-language learners, those in foster care, and/or those who are homeless spend less time in regular classes in those districts that meet the aggregate targets;
- for child find, districts that are not identifying, locating, and evaluating all preschool children with disabilities;
- for child find, districts with low identification rates whose students without IEPs are performing poorly academically and/or behaviorally and may have disabilities, if the district's identification rate is above 3.6%; and
- for child find, districts with low identification rates whose students without IEPs from some racial or ethnic groups, students living in poverty, those who are English-language learners, those in foster care, those who are migrants, and/or

those who are homeless and may have disabilities, if the district's identification rate is above 3.6%.

Districts with these features can be labeled "meets requirements" without further monitoring.  But monitoring is the activity that, if performed adequately, reveals the extent to which violations of the IDEA are responsible for the above circumstances.

Finally, districts labeled "meets requirements" have met a number of aggregate targets.  But meeting targets and meeting the requirements of the IDEA are two different things.  The first may be a necessary condition for the second, but it is not a sufficient condition.  And that is the heart of the problem with CDE's current approach to considering some districts to have met the requirements of the IDEA without additional monitoring.

*Conclusion:  Noncompliant.*

*Reasons for Conclusion:  CDE's current approach to annual determinations allows districts that may have a significant number and significant types of potential compliance concerns to be considered to have met the requirements of the IDEA without additional monitoring.*