# EXHIBIT 1

Response to the Monitor's Review of
CDE's Phase 2 Submission: Data
Analysis

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

I. Overview ............................................................................................................... 3

    A.    California's Approach Toward LEA Accountability ............................................. 3

        1.    An Integrated Approach .................................................................................. 4

        2.    Holding LEAs Accountable While Recognizing Improvement ......................... 5

        3.    CDE Uses Stakeholder-Established Targets to Select LEAs for Differentiated Monitoring ........................................................................................................... 5

        4.    CDE Analyzes Data from Every LEA in the State to Determine Which LEAs Require Differentiated Monitoring ........................................................................ 8

II. Analyses Regarding Priority Areas/Program Requirements ...................................... 10

    A.    Free and Appropriate Education ("FAPE") ..................................................... 10

        1.    School-Age Achievement ............................................................................. 10

        2.    Preschool Outcomes ................................................................................... 11

        3.    Discipline/Disproportionality in Discipline ..................................................... 12

        4.    Timeliness of IEP Development (Initial, C to B Transition, Annual Review, and Triennial Review) .............................................................................................. 15

        5.    IEP Implementation ..................................................................................... 15

    B.    Least Restrictive Environment ........................................................................ 16

        1.    School-Age Placements ............................................................................... 16

        2.    Preschool Placements ................................................................................. 17

        3.    Disproportionality in Placement .................................................................... 18

    C.    General Supervision ....................................................................................... 20

        1.    Child Find ................................................................................................... 20

        2.    Effectiveness of Monitoring .......................................................................... 20

        3.    Mediation ................................................................................................... 21

    D.    Significant Disproportionality ......................................................................... 21

    E.    Restraint and Seclusion ................................................................................. 22

    F.    Parent Input ................................................................................................... 22

    G.    Complaint Resolutions and Due Process ........................................................ 22

III. Selection for Further Monitoring Activities .............................................................. 22

    A.    Performance Indicator Review ........................................................................ 22

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

| | | |
|---|---|---|
| B. | Preschool Review | 23 |
| C. | Disproportionality Review | 24 |
| D. | Significant Disproportionality Review | 25 |
| E. | Comprehensive Review | 25 |
| 1. | Performance Values | 25 |
| 2. | Clarification of '0', 'NA' and 'NC' | 26 |
| 3. | N-size | 26 |
| 4. | Standards for Scoring Each Selection Element | 27 |
| 5. | Use of Dashboard Method for Selection | 28 |
| 6. | Performance of Preschool Assessments | 28 |
| 7. | Disproportionality Criteria | 29 |
| 8. | Timeliness | 29 |
| 9. | Timely IEPs and Triennials | 29 |
| 10. | Selection of LEAs for Comprehensive Review | 30 |
| F. | Nonpublic School Monitoring | 30 |
| IV. "Meets Requirements" Determinations without Additional Monitoring | | 30 |
| V. Attachments | | 33 |

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

# I. OVERVIEW

In this document, the California Department of Education ("CDE") addresses the Monitor's January 28, 2019 Review of CDE's initial Phase 2 Submission (the "Monitor's Review"). CDE notes that many of the opinions expressed in the Monitor's Review lack citations to the specific requirements of the Individuals with Disabilities Education Act ("IDEA") or the relevant federal regulations. As such, CDE is unable to assess whether the opinions expressed are merely the Monitor's personal views regarding best practices for statewide special education monitoring, or are instead based on the actual requirements of the IDEA. Regardless, it appears that many of the Monitor's observations reflect a policy disagreement as to how CDE can be effective at improving educational outcomes for students with disabilities.

## A. California's Approach Toward LEA Accountability

California's policymakers have determined that focusing on an accountability system that recognizes that improvement by LEAs is important; and the State should therefore provide a system of support to help LEAs along a path of continuous improvement. This is in contrast to—and a shift away from—a methodology that uses unattainable targets that would only result in putting more LEAs into a status of "Needs Improvement," without actually improving outcomes for students with disabilities.

California's revised education accountability system is based on three things:

- Measures based on more than one number;
- A belief in improving equity; and,
- A focus on local control.

Improving educational outcomes is the goal of California's accountability system. The focus of change is no longer a top-down approach with strict improvement directives from state and federal policymakers, but instead the focus is with those in the field: superintendents, administrators and teachers. It has been CDE's experience that consistently identifying what is wrong in and with LEAs—without being part of the solution—only serves to demoralize and sow distrust among those upon whom the State relies upon to champion positive change for students with disabilities. Recognizing improvement and growth, even if incremental, helps to increase the likelihood of buy-in from those that need to implement changes. CDE has observed that sometimes the biggest changes happen with the smallest steps.

CDE has determined that providing the most intensive support to LEAs that are not improving outcomes is a more efficient use of state resources than providing equal (but perhaps superficial) support to all LEAs regardless of individual performance or change in performance. As the larger accountability system has been implemented, CDE has worked to align its special education monitoring system to this paradigm, representing a

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

shift away from punitive, all-or-nothing compliance sanctions and toward a tiered system of support based on identified areas of need.

### 1. An Integrated Approach

In the past, CDE targeted the special education departments of LEAs for purposes of ensuring that LEAs were complying with the laws relating to special education. But more recently, CDE and the California State Board of Education ("SBE")[1] have been working to implement a system of support focused on coherence that avoids multiple and inconsistent targets for an LEA to meet as well as siloed special education plans that are not aligned with general education plans. In the first years of the State's Local Control Funding Formula ("LCFF"), CDE helped stakeholders and the public understand that students with disabilities are included in each of the state LCFF student groups. This ensured that special education staff and parents were involved in the local improvement planning process (known as the local control and accountability plan).

The Dashboard release in Fall 2017 highlighted that of the 223 LEAs identified for Level 2 Differentiated Assistance, 163 were selected based on their outcomes for their students with disabilities. [2] The fact that 75% of the LEAS identified for Differentiated Assistance for the outcomes of the students with disabilities student group spurred a renewed call for systems coherence and alignment for all students. In March 2018, CDE presented a plan to align special education monitoring activities to the system of support,[3] and this plan was subsequently approved by SBE.[4] Through the guidance of the LCFF principles, and using the Dashboard indicators, the goal of the system of support is to assist LEAs and schools to meet the needs of each student served, with a focus on building capacity to sustain improvement and effectively address inequities in student opportunities and outcomes.

The plan CDE formulated to create system coherence included two key features: (1) overlapping LEA performance areas (Assessment and Suspension[5]) would use the Dashboard indicators to reduce confusion and ensure coherence; and, (2) the timeline for the release of the special education monitoring activities would occur in conjunction with the release of the Dashboard and the system of support assistance. Additionally,

[1] SBE is the State's K-12 policymaking body for academic standards, curriculum, instructional materials, assessments, and accountability.
[2] A pilot release of the Dashboard in Spring 2017 was a field test and was used for the purposes of information and stakeholder engagement.
[3] See https://www.cde.ca.gov/be/ag/ag/yr18/agenda201803.asp, Agenda Item 03.
[4] See https://www.cde.ca.gov/be/mt/ms/index.asp, Final Minutes for March 14-15, 2018, download at 5.
[5] Graduation rate is also an area of overlap, but because this case is focused on students in grades kindergarten through eighth grade, graduation rates—which apply to high school students—are outside the scope of this case.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

CDE aligned its special education monitoring activities to the system of support, including incorporating tiered levels of monitoring.[6]

CDE released the 2018 Dashboard on December 6, 2018.[7]  Subsequently, CDE sent its 2017-18 annual determinations and its 2018-19 special education monitoring activities to LEAs on December 18, 2018.  Included herewith as **Attachment P** is CDE's 2017-18 annual determination and its 2018-19 special education monitoring activities for Ravenswood City Elementary.

## 2.  Holding LEAs Accountable While Recognizing Improvement

CDE emphasizes a model of continuous improvement to support LEAs to create sustainable change.  In the past, LEAs have made reactionary choices with the hope of quickly improving their numbers, but without the infrastructure, support or training necessary for long-term change in the climate and culture of the school sites.  Although these choices may create a one or two year change in the data, they ultimately fail due to the lack of long-term support.  When CDE is seen as a partner to an LEA instead of its adversary, sustainability in implementing change within an LEA is more likely.

This "partner approach" does not mean that CDE fails to hold LEAs accountable.  In fact, the Dashboard has been a very public means of showcasing LEA accountability because it illustrates how LEAs are currently performing while highlighting the areas in need of improvement.  In the new system of support, CDE holds LEAs accountable while simultaneously fostering improvement and honoring local control.  In contrast, the Monitor's theoretical system focuses on setting unattainable, rigid targets with the goal of identifying and punishing more LEAs, and issuing unduly punitive sanctions for LEAs, administrators and teachers.  CDE disagrees with the Monitor's approach, and believes that using a tiered model that analyzes both status *and* change will improve LEA performance and ultimately result in improved educational outcomes for students with disabilities.

## 3.  CDE Uses Stakeholder-Established Targets to Select LEAs for Differentiated Monitoring

The purpose of the data analysis presented in CDE's Phase 2 Submission is to show how CDE selects LEAs for differentiated monitoring activities; some of which are intensive, and some of which are targeted.  Because the IDEA does not establish the required data elements, analysis methodology, or selection cutoffs for how a state determines which LEAs require differentiated monitoring activities, it is within CDE's

---

[6] *See* https://www.cde.ca.gov/be/ag/ag/yr18/agenda201803.asp, Agenda Item 03, Attachment 1 at 6-7; *see also*
https://www.cde.ca.gov/be/ag/ag/yr18/agenda201803.asp.
[7] *See* https://www.cde.ca.gov/nr/ne/yr18/yr18rel81.asp

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

discretion to set these targets.  Some of the targets that CDE uses are based on: (1) an LEA's status in terms of performance; and (2) changes in the LEA's status over time. California's policymakers and stakeholders support the use of this methodology.  CDE analyzes the data for all LEAs in the state after applying acceptable N-size criteria.[8] After performing this analysis, CDE identified 1,650 LEAS, or 73.7% of LEAs in the state, to participate in either targeted or intensive monitoring for the 2018-19 school year.

The Monitor repeatedly states that CDE's targets are not "ambitious" (*see, e.g.*, Dkt. 2469 at 3), but fails to cite any legal authority that would support an argument that CDE's setting of these targets does not comply with federal law.  As described in its initial Phase 2 Submission,[9] in 2012, CDE used a stakeholder process to set targets for the State Performance Plan ("SPP"), which was approved during a public meeting with public input by the Advisory Commission on Special Education ("ACSE") and SBE. Moreover, this approach toward setting targets aligns with the U.S. Department of Education's expectation that SPP indicators and targets should be developed with broad stakeholder input.[10]  The process required CDE to start with a baseline and build targets based on that baseline.[11]  As mentioned previously, CDE's policymakers do not find unattainable targets to be a productive method of fostering a culture of improvement in LEAs.  And, notwithstanding the Monitor's claim that the targets set by the State are "unambitious," CDE again notes that, through the use of these targets, CDE has selected 73.7% of the LEAs in the State for differentiated monitoring activities based on a failure to meet targets in specific areas.  If the vast majority of the LEAs were meeting the stakeholder-approved targets, then the Monitor's assertion that the targets are "unambitious" might be valid.  But given that most LEAs in the State are selected for differentiated monitoring activities, it is clear that the targets accurately reflect the current state of need in California.

It is important to hold LEAs to clearly defined and consistent standards, so that they can see their own data and know where they need to improve.  Under 34 C.F.R. § 300.302 (b)(1)(i)(A), the State must "[r]eport annually to the public on the performance of each LEA located in the State on the targets in the State's performance plan as soon as

---

[8] CDE utilizes a minimum N-size criteria for each of its indicators so that the effect of a small number of students does not unduly change the outcome.  **Attachment Q**, included herewith, is a table showing the N-size criteria used for Comprehensive Review.

[9] *See* Dkt. 2455-1 at 4.

[10] *See* C-8 on page 11: https://sites.ed.gov/idea/files/08-0101_Monitoring_FINAL_June_2009.pdf

[11] *See* https://www.regulations.gov/docket?D=ED-2013-ICCD-0047, Supporting Statements, Comments and Analysis, download at 2.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

practicable but no later than 120 days following the State's submission of its annual performance report to the Secretary under paragraph (b)(2) of this section.  Publishing one standard publicly (for purposes of making annual determinations under 34 C.F.R. § 300.600) but using different standards in monitoring has, in the past, only caused confusion amongst LEAs.  CDE's policymakers do not see the utility of setting additional or different targets for purposes of selecting LEAs for further monitoring activities when the State is already required to publicly publish the performance of each LEA on the targets established in the State Performance Plan ("SPP").  The only instance that CDE has deviated from the SPP is when the statewide accountability system uses data that overlaps with SPP Indicators. As such, CDE has aligned its selection of LEAs for further monitoring activities to the Dashboard indicators to ensure that there is one consistent published data standard for each measure for every LEA to use for improvement.

CDE uses SPP targets for its selection of LEAs for Performance Indicator Review,[12] Data Identified Noncompliance and, in part, Disproportionality Review.[13]  The SPP targets serve as the cutoffs for CDE's selection of LEAs for these targeted monitoring activities.  In other words, if the LEA did not meet the SPP target, they are selected for one or more of the aforementioned targeted monitoring activities.  In addition, CDE uses the SPP targets as part of a cumulative calculation for CDE's selection of LEAs for more intensive monitoring activities, Comprehensive Review and Preschool Review.  The cutoffs for CDE's selection of LEAs to participate in the aforementioned intensive monitoring activities are set by CDE's policymakers and based on CDE's available resources.

For years, CDE has stated that it intends to use the SPP indicators and targets as the cutoffs for CDE's selection of LEAs for further monitoring activities.  CDE will follow a similar stakeholder process in setting targets for the FFY 2019 through FFY 2025 State Performance Plan/Annual Performance Report.  Once set, CDE generally cannot change targets, unless there is a change in how the data is collected.  Outside of its submissions to this Court, Plaintiffs' attorneys have not objected to the targets at any of the previously mentioned public meetings conducted for purposes of establishing SPP targets.

---

[12] The Performance Indicator Review also uses Dashboard data where there is overlap.
[13] CDE uses SPP indicators for selection of LEAs for Significant Disproportionality Review, but CDE bases its selection in part on the length of time an LEA is disproportionate.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

### 4. CDE Analyzes Data from Every LEA in the State to Determine Which LEAs Require Differentiated Monitoring

For purposes of clarification, CDE provides the following explanation of the number and of types of LEAs monitored under 34 C.F.R. § 300.600(d). To begin, CDE monitors 945 traditional school districts. Based on the data analyzed from 2017-18, those traditional school districts include 344 Kindergarten through Twelfth-grade school districts (unified school districts), 525 Kindergarten through Eighth-grade school districts (elementary school districts), and 76 Ninth-grade through Twelfth-grade school districts (high school districts). Additionally, CDE monitors 58 county offices of education. And finally, CDE monitors charter schools.

Prior to 2018-19 school year, CDE only monitored independent charter schools acting as their own LEAs for students with disabilities, as non-independent charter schools were treated as schools within other LEAs. However, with the passage of LCFF and the implementation of California's new accountability system, all charter schools, regardless of their authorizing structure (i.e., regardless of whether they operate independently or within an LEA), are treated as the responsible entity for student educational outcomes and for purposes of the State's monitoring.[14] As such, all charter schools now have their own Dashboard. To ensure system-wide consistency, the State's special education monitoring has also begun to treat all charter schools as their own LEAs and incorporated them into the calculations CDE uses to select LEAs for further monitoring activities, using a minimum N-size limitation where applicable. There are 1,235 charter schools in California.[15] Therefore, based on school year 2017-18 data, CDE reviewed and analyzed data from 2,238 LEAs to determine which LEAs required differentiated monitoring activities.

The Monitor suggests that CDE does not monitor a sufficient number of LEAs because 67 LEAs were selected for the most intensive level of review.[16] Given California's size and its number of LEAs, CDE's policymakers have determined that intensive levels of monitoring should be reserved for those LEAs deemed to be in the most need of intervention and support. The State cannot, as a practical matter, provide the most intensive level of support to all 2,238 LEAs. Hence, better performing LEAs will undergo less intensive levels of monitoring. Nevertheless, and consistent with federal

---

[14] *See* Cal. Educ. Code, § 47612(c).

[15] For charter schools that opened in 2017-18 or made significant structural changes, there was no previous year data that could be included in CDE's analysis.

[16] CDE identified 35 LEAs for Comprehensive Review and 39 LEAs for Preschool Review. Seven LEAs were identified for both Comprehensive Review and Preschool Review.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

law, the State reviews and analyzes data for all LEAs to determine whether an LEA should be selected for a further monitoring activity.

For example, in the 2017-18 monitoring year, CDE selected 1,185 LEAs for some type of further monitoring activity. There were 581 LEAs selected for the Data Identified Noncompliance Review. As part of that review process, CDE required that the LEAs bring 20,425 untimely submitted IEPs into compliance and 9,797 untimely submitted triennials into compliance, and that the LEAs correct 1,028 post-secondary transition plans to include all required elements. Additionally, CDE required 301 LEAs to submit corrective action plans to address timeliness for the sixty-day timeline. Also, during the 2017-18 monitoring year, CDE found 945 LEAs disproportionate, resulting in CDE reviewing 5,787 student files for disproportionality noncompliance. In the 2017-18 monitoring year, CDE reviewed 5,786 student files for placement noncompliance; 5,782 student files for discipline noncompliance; and 5,782 student files for identification noncompliance. Finally, CDE required 938 LEAs to participate in Performance Indicator Review, and each such LEA was required to send an improvement plan to CDE for approval.

As for CDE's most intensive level of review, in the 2017-18 monitoring year, CDE conducted 29 Comprehensive Reviews, which included the development of an equal number of monitoring plans, reviewing 878 student files, and requiring 1,781 student-level corrective actions and 1,665 LEA-level corrective actions. In addition to developing and implementing monitoring plans for the LEAs selected for Comprehensive Review, CDE conducted 42 follow-ups on previous year Comprehensive Reviews, resulting in 791 student file reviews.[17]

CDE remains open to suggestions for refining its methodologies for data analysis, and for improving its procedures. But, while the Monitor identifies areas where he believes CDE's analysis is not sufficient, the Monitor does not provide specific, realistic suggestions for improving CDE's processes for selection of LEAs for further monitoring activities to meet—in his view—the requirements of federal law. What is clear, however, is that federal law does not require CDE to identify a certain number of LEAs in the State for intensive monitoring, or require CDE to implement rigid, unrealistic targets that do not account for improvement. More importantly, these actions would not necessarily lead to improved educational outcomes for students with disabilities.

---

[17] Under federal law, CDE is required to follow up with LEAs identified as noncompliant by reviewing the files of those LEAs to ensure that the areas of noncompliance have been corrected throughout the entire LEA. *See* https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/osep09-02timelycorrectionmemo.pdf.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

CDE disputes the Monitor's suggestion that it is necessary to perform multiple calculations on the same outcome in order to determine whether an LEA is failing. An in-depth analysis of subgroups is more productive during a more detailed examination of data after selection for monitoring to determine root causes. Additionally, if an LEA is not seeing gains in a specific subgroup overall, that data is reflected in the Dashboard and can be used to address issues of access and equity. CDE does not believe that failure of a specific student group (i.e., African American Students or Students Eligible for Free and Reduced Priced Meal Eligibility) is unique to those students in special education. As such, the Dashboard already disaggregates and publishes this data for these student groups by the Monitor. Addressing the root causes of these gaps should not be directed solely to the special education departments within LEAs, but solutions developed district-wide affecting all children in those student groups.

## II. ANALYSES REGARDING PRIORITY AREAS/PROGRAM REQUIREMENTS

### A. Free and Appropriate Education ("FAPE")

#### 1. School-Age Achievement

##### a. Participation

The Monitor questions why CDE uses a 95% participation rate for selection for its monitoring processes, and why participation rate is now a separate factor in the calculation of the LEA's performance levels in Dashboard.[18] Because California did not meet the statewide participation rate for both English Language Arts and Mathematics in 2017-18, it is important for CDE to include participation rate as a factor independent from academic achievement.[19] One of the cornerstones of CDE's accountability system is performance on academic assessments. If an LEA is not meeting the participation rate for students with disabilities, then academic achievement cannot be fully measured for that group. CDE selected 850 LEAs for Performance Indicator Review based on the participation rate indicator, and those LEAs will be required to develop improvement plans to improve assessment participation in the 2018-19 monitoring year.[20]

##### b. Achievement

The Monitor expresses concerns about the State's decision to use the Dashboard. Federal courts recognize the traditionally strong state and local interest in education, and have allowed for the exercise of broad discretion and educational expertise by state agencies. (*N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dep't of Educ.*, 600 F.3d 1104, 1110 (9th Cir. 2010).) Federal law provides the State with broad

---

[18] *See* Dkt. 2469 at 7.
[19] Additionally, this is required by law. (*See* 20 U.S.C. § 6311(c)(4)(E).)
[20] 88 of those 850 LEAs were not identified on the Dashboard as Orange or Red for academic achievement.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

discretion to develop and implement a statewide accountability system for its schools. (*See generally* 20 U.S.C. § 6311 [permitting states to develop their own state education plans]; 34 C.F.R. § 300.601 [states develop their own special education performance plan].)

The State exercised its discretion to use the Dashboard because it aligns with CDE's, SBE's, and California stakeholders' rationale for continuous improvement. The Dashboard is the accountability system that the State has developed and vetted, and which was approved by SBE and U.S. Department of Education.[21] The Monitor's concern regarding the State's use of the Dashboard indicators to assess a free and public education ("FAPE") under the IDEA has no basis in statute or regulation. The State adopted the Dashboard and the use of its indicators for both statewide accountability and the provision of FAPE to ensure coherence, i.e., to ensure that an LEA should be held to one standard. Two accountability systems—one for all students and one for students with disabilities—would further exclude students with disabilities from improvement activities in the LEA and would promote a siloed approach that can make it more difficult to encourage inclusion and minimize disproportionality.

CDE's use of the Dashboard indicators for selection of LEAs for Performance Indicator Review and Comprehensive Review will red flag those LEAs that have a low assessment performance, which are the majority of LEAs in California. The Dashboard's methodology does not allow low performing LEAs to avoid being selected by CDE for further monitoring activities. Indeed, using the Dashboard indicators, CDE will require 811 LEAs to develop and implement improvement plans for the 2018-19 monitoring year. Preschool Outcomes

### 2. Preschool Outcomes

#### a. *Rationale for Cut Scores*

The Monitor requested the cut scores for Desired Results Development Profile ("DRDP") areas.[22] Early childhood outcomes summary reporting requires that children's DRDP ratings be compared to a sample of same-aged peers. The peer reference sample includes over 15,000 children enrolled in programs administered by CDE, birth through 60 months of age, in the spring of 2015. The sample is comprised of children with and without disabilities and includes children across all federal disability categories.

---

[21] *See* https://www.cde.ca.gov/be/ag/ag/yr18/agenda201803.asp; *see also* https://www.cde.ca.gov/re/es/eseasoeltr071218.asp.
[22] *See* Dkt. 2469 at 10.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

Each child's ratings on the outcome areas[23] are then categorized as "within," "close," or "not at age expectations." Within each age range, the range of ratings for the sample of children who demonstrated skills within age expectations is defined as a rating ±1.2 standard deviations above and below the mean of the peer reference sample. The range of ratings for the children who were close to age expectations is defined as a rating between 1 and 2 standard deviations below the mean of the peer reference sample. A rating located 2 standard deviations below the mean indicates that the child is not at age expectations for this outcome area. Further discussion of CDE's use of DRDP as part of its further monitoring activities is examined in Section III.B, below.

### 3. Discipline/Disproportionality in Discipline

#### a. Discipline Overall

The Monitor again expresses concerns about the use of Dashboard. As explained above, the Monitor's concerns regarding the State's use of the Dashboard indicators to assess FAPE under the IDEA has no basis in statute or regulation.[24]

### 1) Dashboard Calculation Method

The Monitor argues that, under the Dashboard-based approach, an LEA with a suspension rate of 10% in the prior year and 8% in the current year would not be selected for monitoring, implying that an LEA's reduction of suspension rates by 2% is unremarkable.[25] But a 2% reduction would be based on the statewide distribution, which shows that only 10% of LEAs had a change level of 2% or higher in reducing their suspension rate. Empirically, that is a significant reduction in suspension rate. As described above, the State has determined that although an LEA's overall Status is important, an LEA's improvement from one year to another is also important. Take the example of a moderately sized elementary school district with 2,500 students with disabilities (25,000 total student enrollment), which has a 2016-2017 suspension rate of 10% for students with disabilities (250 of the district's students with disabilities suspended at least once during that year). In the subsequent year, the LEA had a reduction of 2%, so that its suspension rate is now 8% (200 of the district's students with disabilities suspended at least once during the year). This represents a significant decline—20%—in the number of children suspended from one year to the next.

Another complaint that the Monitor raises regarding CDE's Dashboard-based approach is the fact that it "does not analyze suspension data for subgroups of students with disabilities such as those in foster care, homeless students, those who are English-

---

[23] *See* Dkt 2455-1 at 25.
[24] *See* Section III A 1 above.
[25] *See* Dkt. 2649 at 13.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

language learners, or students eligible for free or reduced lunch."[26]  But there is no legal requirement that CDE analyze suspension data for the subgroups listed above. Moreover, an in-depth analysis of subgroups would be more productive after an LEA's selection for further monitoring activities to determine root causes.

### 2) N-size

The Monitor was unclear regarding the calculation of the Suspension Rate indicator in the Dashboard.[27]  To clarify, an LEA needs a minimum of 30 or more students with disabilities cumulatively enrolled in the LEA within the academic year for purposes of calculating a performance level color on the Dashboard.

However, CDE notes that a distinction needs to be made in terms of N-size.  The Monitor assumes that LEAs that do not have total enough students may not be assigned a performance level color.  This is true only in the smallest instances, i.e., where there is total enrollment below 30.

In addition to the five-by-five grid, the Dashboard Suspension Rate Indicator uses a three-by-five methodology for student groups totaling less than 150 students who are cumulatively enrolled.  This methodology is applied to limit extreme changes in small student populations.

The Monitor cites to a specific article to suggest that rural schools are neither assigned nor captured by CDE's monitoring selection process in this area.[28]  That is not true. Indeed, the small middle school noted in the article was assigned a performance level for their students with disabilities subgroup.[29]  This middle school's district was also assigned a performance level for the Suspension Rate Indicator and has been identified for selection in the Performance Indicator Review for the current monitoring year based on the Dashboard methodology.  Attached hereto as **Attachments R and S**, respectively, are the school's and the district's Dashboard Report.

### 3) Referrals to Law Enforcement

The Monitor argues that CDE is noncompliant with federal law because CDE does not analyze data concerning referrals to law enforcement.[30]  Federal law requires CDE to

---

[26] *Id.*
[27] *See* Dkt. 2469 at 12 n.12.
[28] *See* Dkt. 2469 at 13.
[29] *See* Dkt. 2469 at 13.
[30] See Dkt. 2469 at 16.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

*report*, in connection with the state performance plan, the incidence and duration of "disciplinary actions" that are imposed upon children with disabilities. (20 U.S.C. § 1418(a)(1)(D).) These "disciplinary actions" are limited to suspensions of one or more day, expulsions, and removals to alternative educational settings. (20 U.S.C. § 1418(a)(1)(D)-(E).) But federal law does not require CDE or any other State Educational Agency to *analyze* data relating to referrals to law enforcement for purposes of monitoring.

In any event, the use of referrals to law enforcement is a data point that, while collected through the Office of Civil Rights, is not necessary for CDE's selection of LEAs for further monitoring activities. As a practical matter, LEAs with disciplinary events leading to referrals to law enforcement based on a violation of California Education Code Section 48900 will already be included in the analysis for suspension, because the events leading to the referral will ordinarily result in a suspension.[31] During Performance Indicator Review, if the LEA had a Red or Orange performance level in the Dashboard for suspension, CDE requires the LEA to analyze suspension data and provide the results of this analysis and root cause in their improvement plan.

In the 2018-19 monitoring year, CDE will require 656 LEAs to develop improvement plans to address high suspension for their students with disabilities.

### b. Disproportionality in Discipline

### 1) Disproportionality Formula

In the 2017–18 data analysis, CDE used "all students" in an LEA as the reference category rather than "all students with disabilities." Based on further clarification from the U.S. Department of Education as referenced by the Monitor in his Review, CDE will begin to use all students with disabilities as the reference category.

### 2) Selection for Further Monitoring Activities

CDE incorrectly noted that it selects LEAs for monitoring based on whether that LEA receive either a Red or Orange performance level on the Dashboard. The Monitor is correct that CDE does not use the Dashboard for selection in monitoring disproportionality in discipline, and instead, uses the calculation described in the Phase 2 Submission.[32] Additionally, the LEAs identified for disproportionality in discipline are required to complete the Disproportionality Review. CDE also uses disproportionality in discipline is a factor to determine whether to select an LEA for Comprehensive Review.

---

[31] *See, e.g.*, 8/1/2018 Hearing Tr. 68:1-18 [Testimony of Shiyloh Duncan-Becerril].
[32] *See* Dkt. 2455-1 at 47.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

Using the data from the 2018-19 school year, CDE preliminarily identified 314 LEAs for discipline disproportionality over one year based on the corrected methodology using data submitted February 2019. This change results in identifying 13 more LEAs from the previous year. This method will be implemented for the 2019-20 monitoring year.

### 4. Timeliness of IEP Development (Initial, C to B Transition, Annual Review, and Triennial Review)

#### a. *Response to Monitor's Compliance Conclusion*

CDE does not agree with the Monitor that an analysis of the average number of days that LEAs exceed the mandated timelines relating to IEPs should be used as a means of selecting LEAs for further monitoring activities. All LEAs that are not 100% timely with respect to an IEP, i.e., LEAs that are late by one or more days are selected for Data Identified Noncompliance Review and is a factor in CDE's selection of LEAs for Comprehensive Review.

### 1) Selection for Further Monitoring Activities

In its Phase 2 Submission, CDE incorrectly noted that it selects LEAs for monitoring based on whether that LEA received either a Red or Orange performance level on the Dashboard.[33] The Monitor is correct that CDE does not use the Dashboard for selection in monitoring Triennial timelines, but instead uses the calculation described in the Phase 2 Submission.[34]

LEAs not meeting the timeliness targets are selected for Data Identified Noncompliance Review. The LEA's performance in the four timeliness areas relating to IEPs (timeliness in initial IEP development, C to B transition, annual review and triennial review) is also a factor in CDE's selection of LEAs for Comprehensive Review.

### 5. IEP Implementation

CDE is currently working to implement the requirements from the August 17, 2018 Court Order with respect to IEP implementation.[35]

---

[33] *See* Dkt. 2455-1 at 29 and 30.
[34] *See* Dkt. 2455-1 at 30.
[35] *See* Dkt. 2428 at 2.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

## B. Least Restrictive Environment

### 1. School-Age Placements

#### a. Selection for Further Monitoring Activities

The Monitor states that LEAs "that do not meet the target for any of these three indicators are chosen for Performance Indicator Review *or* Comprehensive Review monitoring processes."[36]  To clarify, for Performance Indicator Review, CDE selects those LEAs that do not meet performance targets.[37]  Additionally, the failure to meet the performance target is a factor in in CDE's selection of LEAs for Comprehensive Review. For example, if an LEA is selected for Comprehensive Review because of poor performance on school-age placements, then the LEA is also selected for a Performance Indicator Review.  Therefore, some LEAs will be selected for Performance Indicator Review *and* Comprehensive Review.  **Attachment T**, included herewith, contains a revised summary table that shows the number of LEAs that CDE selected for either of these reviews.[38]

#### b. Analysis of Student Placement

The Monitor determined that CDE was not compliant with requirements relating to school-age placement in the Least Restrictive Environment ("LRE") because CDE does not conduct analyses on the "requirements concerning placing students as close to home as possible, and in the school students would attend if they did not have disabilities unless the IEP requires some other arrangements.[39]  34 C.F.R. section 300.116 does indicates that the educational placement of a child with a disability should be as "close as possible to the child's home," and that the child should be educated in the school that he or she would attend if nondisabled, unless the IEP of the child requires some other arrangement.  But courts do not strictly interpret this regulation, and instead permit broad discretion on the part of an educational agency to make placement decisions.  "State agencies are afforded much discretion in determining which school a student is to attend."  (*Flour Bluff Indep. Sch. Dist. v. Katherine M. by Lesa T.*, 91 F.3d 689, 693 (5th Cir. 1996).)  The regulation provides "only that the child be educated 'as close as possible to the child's home.'"  (*Id.*)  "However, this is merely

---

[36] *See* Dkt. 2469 at 22 (emphasis added).  The three indicators are (1) percentage of students in regular classes for greater than 80% of the school day; (2) percentage of students in regular classes less than 40% of the day; percentage of students in separate placements.

[37] Note there are three exceptions: Math and English Language Arts Assessment Performance and Suspension Rate, which use Dashboard calculations.

[38] **Attachment S** is a revision of the information CDE provided in Attachment M (Dkt. 2455-14) as part its Phase 2 Submission.

[39] Dkt. 2469 at 25.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

one of many factors for the district to take into account in determining the student's proper placement." (*Id.*) "It must be emphasized that the proximity preference or factor is not a presumption that a disabled student attend his or her neighborhood school. (*Id.* at 693-694.; *see also Cheltenham Sch. Dist. v. Joel P.*, 949 F.Supp. 346, 351-52 (E.D.Pa.1996) ["Although the regulations do signal a preference that the child be located in the school he would attend if nondisabled . . . the regulations and commentary identify geographical proximity as a consideration, but not a mandatory requirement, in placing a disabled child."].)

In any event, CDE does not make assumptions about the assignment of a student to a local district school because California is a "school choice" state. As such, CDE does not agree that the location of the school of attendance is a reliable factor in its selection of LEAs for intensive monitoring activities or a reliable factor to assess whether an LEA is providing FAPE in the LRE.[40]

Further, the Monitor deems CDE out of compliance because it does not conduct analyses of patterns of placement which the Monitor believes would suggest that LEAs are congregating students with disabilities into a particular site. There is no legal requirement that a state analyze "patterns of placement," and the Monitor cites no statute or regulation that would require CDE to do so. Regardless, CDE does not believe that analysis of "patterns of placement" data is a reliable factor in its selection of LEAs for intensive monitoring activities or a reliable (or material) factor to assess whether an LEA is providing FAPE in the LRE.

### 2. Preschool Placements

#### a. *Performance Targets*

CDE clarifies that the targets for preschool placement for placing students in the LRE for the 2017–18 data year are as follows[41]:

| SPP Indicator 6 | 2017 |
|---|---|
| SPP Indicator 6A Target – Preschool Regular Setting | >34.9% |
| SPP Indicator 6B Target – Preschool Separate Class, School, or Facility | <32.4% |

These preschool placement targets are used for selection of the Performance Indicator Review. LEAs that do not meet both targets are selected for review. For the 2018–

---

[40] See, e.g., 8/7/2018 Hearing Tr. 179:115-25 & 180:1-2 [Testimony of Kristin Wright].
[41] Targets are found in the Annual Performance Report 2016, https://osep.grads360.org/#report/apr/2016B/publicView?state=CA&ispublic=true, Indicator 6. *See also* Dkt. 2455-1 at 14.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

2019 monitoring year, CDE selected 97 LEAs for Performance Indicator Review based upon preschool regular setting (SPP Indicator 6A) and CDE selected 191 LEAs for Performance Indicator Review based upon preschool separate class, school, or facility (SPP Indicator 6B).

An LEA's performance on these indicators are factors in CDE's selection for Preschool Review and Comprehensive Review. With respect to the Monitor's concerns regarding **Attachment M** provided with CDE's Phase 2 Submission, **Attachment T**, included herewith, contains a revised summary table that show the number of LEAs that CDE selected for the Performance Indicator Review based on preschool placements.[42]

### 3. Disproportionality in Placement

Here, the Monitor deems CDE out of compliance due to the use of the wrong comparison group for calculation for disproportionality. The Monitor cites the regulation for significant disproportionality, 34 C.F.R. § 300.646(a)(2).[43] Unlike discipline and identification, however, a one-year analysis of disproportionality is not required for federal reporting in the State Performance Plan.[44] Nevertheless, CDE resolved to implement an annual review of placement disproportionality as an early-warning indicator to help LEAs recognize and address the causes of disproportionality in years one and two, prior to being identified as significantly disproportionate by the State. See **Figure 1,** below. The use of the risk ratio of 3 is the same as in significant disproportionality. The methodology described in CDE's Phase 2 Submission is used for both the one-year disproportionality and the three-year significant disproportionality identification.[45]

For example, in year one, assume an LEA has a risk ratio of 4 for African American students with disabilities in separate placements. Here, CDE would conduct a disproportionality review and requires corrective actions where noncompliance is identified. The LEA should then conduct a root cause analysis and implement changes that will address the cause of the disproportionality. In year two, assume the LEA has a risk ratio of 3.4 for African American students with disabilities in separate placements. Again, CDE would conduct a disproportionality review and require actions where noncompliance is identified. The LEA should then continue to implement changes to

---

[42] See Dkt. 2455-14.
[43] See Dkt. 2469 at 27.
[44] Disproportionality in discipline requires the reporting for significant discrepancy described in the State Performance Plan/Annual Performance Report, but the same methodology is used for the disproportionality in placement calculation as required for significant disproportionality calculation. See the SPP/APR Measurement Table: https://osep.grads360.org/#program/spp-apr-resources.
[45] See Dkt. 2455-1 at 45.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

address the causes of the disproportionality. By year three, assume the LEA has an improvement, with a risk ratio of 2.9 for African American students with disabilities in separate placements, and therefore would not be significantly disproportionate. In subsequent years, if the LEA saw an increase in the number of African American students with disabilities in separate placements and the risk ratio was above 3, the LEA would again be identified for the disproportionality review.

**Figure 1**



### a. *Disproportionality Formula*

In the 2017–18 data analysis, CDE used "all students in an LEA" as the reference category rather than "all students with disabilities." Based on further clarification from the U.S. Department of Education as referenced by the Monitor in his Review, CDE will begin to use "all students with disabilities" as the reference category.

### b. *Selection for Further Monitoring Activities*

Based on the corrected methodology (see Section II.B.3.b., above), CDE preliminarily identified 198 LEAs for placement disproportionality over one year, using data submitted February 2019. This change results in identifying an additional 125 LEAs compared to the previous year. CDE will implement the corrected methodology beginning in the 2019-20 monitoring year.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

## C. General Supervision

### 1. Child Find

The Monitor takes issue with the manner in which CDE uses and calculates data to select LEAs for further monitoring activities.

CDE's current child find calculations with the use of a statistical model that accounts for variance are sufficient to meet the State's monitoring and enforcement obligations under the IDEA. The use of a standard deviation is a "practical method . . . to determine which children are currently receiving needed special education and related services".[46] CDE requires LEAs selected for the Performance Indicator Review to address its policies and procedures for the identification of children with disabilities who are homeless, wards of the state, highly mobile and migrant.

### a. Child Find for Preschool, Ages 3 Through 5

CDE is willing to explore the use of data that can be disaggregated at the LEA level for use in child find for preschool students. However, CDE's policymakers have determined that the use of data in high stakes methodologies which may lead to sanctions of an LEA should not be based on estimates based on proxy data.

### b. Rate of Identification

CDE disagrees with the Monitor that the State is far below the national rate of identification of students with disabilities. As an initial matter, CDE is unable to validate the data display cited by the Monitor in his Review.[47] Further, in the 2017-18 school year, there were 6,220,413 public education students in California on the state's census date based on the date closest to October 1, 2017, including 683,709 students with disabilities, ages 6 through 21. This equals a statewide identification rate of 11.0%, which is not significantly below the 13.2% national identification rate used by the Monitor.[48]

### 2. Effectiveness of Monitoring

CDE does not use an analysis of the effectiveness of its monitoring for selection of LEAs for monitoring under 34 C.F.R. § 300.600(d). The evaluation of CDE's monitoring system and its effectiveness should be reviewed in the context of the monitoring activities, which CDE discuss in later phases.

---

[46] See 34 C.F.R. § 300.111(1)(ii).
[47] See Dkt. 2469 at 31.
[48] See Dkt. 2469 at 31.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

### 3. Mediation

In response to the Monitor's concerns, CDE reiterates that it collects various data on mediations, including the number of mediation requests received, the number of mediation sessions held, and the number of mediation sessions that resulted in written agreements.[49]  CDE analyzes this data to calculate SPP Indicator 16, which measures the percentage of mediations held that resulted in mediation agreements.

In fiscal year 2017-18, 2,463 mediation sessions were held (including those related to due process hearings and those not related to due process hearings).  Of the 2,463 mediation sessions held, 1,426 resulted in written agreements.  Thus, in 2017-18, the State had a 57.9 percent success rate in resolving disputes through the mediation process.  The rate of success in mediations provides information that CDE uses to ensure the efficacy of the mediation process and the trained mediators facilitating the mediation sessions across the State.  CDE uses this information to work with the Office of Administrative Hearings to adequately train contracted mediators and continuously improve the mediation process in order to provide students, families, and LEAs the opportunity to resolve disputes prior to an administrative hearing.

Due to its informal, voluntary, and individualized nature, the mediation process does not provide data that could reliably serve as an appropriate measure of an LEA's performance for selection for further monitoring activities.  Rather, CDE uses this data to inform statewide policy and practices around the mediation process, as described above.  CDE does not collect data that would accurately reflect whether a district may be open to reaching mediated agreements with parents and thereby resolving disputes, as the Monitor suggests.[50]  The mediation process is voluntary and the reasons for a party declining to participate are varied and unique to the student-specific case and circumstances leading up to the dispute.  When a dispute reaches the point of mediation, it is possible that the relationship between the parent and LEA has deteriorated to the point where one or both parties may feel that mediation would be fruitless.  Attempting to establish patterns and speculate on the motivations of an LEA when it comes to participation in a mediation session is not a reliable method for CDE to establish or infer an LEA's compliance or performance.

### D. Significant Disproportionality

The Monitor deferred his determination here, requesting additional information as to whether CDE "uses a definition of reasonable progress that would exclude some LEAs in this status from identification as significantly disproportionate."[51]

---

[49] *See* Dkt. 2390-1 at 41.
[50] *See* Dkt. 2469 at 34.
[51] *See* Dkt. 2469 at 38.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

In response, CDE states that it held a stakeholder meeting on January 18, 2019. Attached herewith as **Attachment U** is a copy of an agenda for the January 18, 2019 Meeting. At the meeting, CDE and stakeholders discussed different options for reasonable progress, and the stakeholders asked CDE to model those approaches for further discussions. CDE intends to hold a follow-up meeting to present those models to the stakeholder group for feedback prior to finalizing the methodology for presentation.

### E. Restraint and Seclusion

CDE will provide specifics on the calculation methodologies and use in monitoring and enforcement activities in later phases as directed by the Court.

### F. Parent Input

In its Phase 2 Submission, CDE incorrectly noted that it selects LEAs for monitoring based on whether that LEA receives either a Red or Orange performance level on the Dashboard. The Monitor is correct that CDE does not use the Dashboard for selection in monitoring parent input, and instead, uses the calculation described in the Phase 2 Submission.[52]

### G. Complaint Resolutions and Due Process

CDE recognizes that its Phase 2 Submission included inconsistent information for both complaints and due process noncompliance.[53] During CDE's selection of LEAs for Comprehensive Review for 2018-19, CDE intended to use a per capita rate for selection. However, CDE determined that using the number of noncompliances provided a clearer methodology, as complaints and due process filings occur throughout the year. The Monitor is correct that the number of noncompliances for both complaints and due process is what was used for 2018-19 Comprehensive Review selection.[54]

## III. SELECTION FOR FURTHER MONITORING ACTIVITIES

### A. Performance Indicator Review

As set forth in Section II.B.2.a, above, the target for SPP Indicator 6A - Preschool Regular Setting is >34.9 percent and the target for SPP Indicator 6B - Preschool Separate Class, School, or Facility is <32.4 percent. CDE used these targets in its selection of LEAs for the Performance Indicator Review. While CDE selected 1,525 LEAs for Performance Indicator Review, five LEAs were selected solely due to outcomes for preschool LRE.

---

[52] *See* Dkt. 2455-1 at 31.
[53] *See* Dkt. 2469 at 42 and Dkt. 2455-1 at 36-38.
[54] *See* Dkt. 2469 at 42.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

The preschool placement is a factor in the Preschool Review, the Performance Indicator Review and the Comprehensive Review, while preschool outcomes are only analyzed within the Preschool Review and Comprehensive Review.  CDE's policymakers have prioritized which indicators it used for selection of further monitoring activities to address what it has determined are barriers to improving outcomes for students with disabilities. In 2017-18, California saw a 7% decrease in the number of preschools students with access to a regular early childhood program, and the data also indicates a high number of suspensions of children aged 5-years old.[55]  CDE has determined that preschool access to early regular childhood programs and suspensions of 5-year old children are key barriers to positive preschool outcomes and elementary school readiness.  As such, CDE has prioritized addressing those LEAs that do not meet targets for preschool placement in its selection for further monitoring activities.  As opposed to preschool assessment, preschool placement is a factor that CDE uses to select LEAs for Performance Indicator Review to encourage LEAs to offer more inclusive preschool settings that would lead to higher outcomes on preschool assessment and increased kindergarten readiness.  In addition, as discussed in more detail below, preschool placement and suspension are factors in CDE's selection of LEAs for Preschool Review and Comprehensive Review.

## B. Preschool Review

The Monitor has a number of concerns with CDE's selection criteria for Preschool Review.  To clarify, in California, there are 86,169 students with disabilities ages 3 to 5 years old, and 1,315 LEAs that serve preschool children with disabilities.  In the development of the Preschool Matrix, CDE's policymakers reviewed a number of data points, such as suspension data, nonpublic school enrollment, and preschool placement, before determining that a review of preschool programs should include a number of variables.  Because the total population is small and there would be a wide variance in outcomes due to small N-sizes, CDE's methodology ensures that one indicator is not weighted such that it unduly influences the other indicators.  This is further evidenced in the preschool assessment indicator, Desired Results Developmental Profile ("DRDP"). There are six sub-variables in the DRDP assessment for preschool, and including each element separately would unduly weight each assessment sub-variable in CDE's selection of LEAs for Preschool Review.  CDE's methodology reflects its view that there are other intervening factors that inhibit preschool assessment outcomes that need to be addressed first.

As described above, CDE prioritized the selection of variables based on its determination of the current needs of the State: Preschool LRE (4 indicators) and

---

[55] In 2017-2018, five year olds with disabilities missed 2,226 days of instruction due to suspension.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

Preschool Suspension (3 Indicators).  To select LEAs for Preschool Review, CDE determined that it would select those LEAs with a score of six or more, based on the need to deploy resources to those LEAs most in need of support.  CDE would also select LEAs for Performance Indicator Review and Disproportionality Review based on Preschool LRE and Suspension, respectively.  Additionally, CDE selected LEAs that have students in nonpublic schools because they are considered a highly restrictive setting with little to no interaction with peers in regular education settings.  CDE has determined that preschool is the "onramp" for inclusion and equity, and if students are placed in highly restrictive settings at a young age, it sets expectations that those children will also be in segregated settings as they move onto elementary school and beyond.  CDE thus determined that it is critical to monitor LEAs that have those placements early to stem the tide of such placements later on.

Attached hereto as **Attachments V and W** are a document and spreadsheet, respectively, which provide a clearer description of the Preschool Matrix that aligns with CDE's Comprehensive Review selection methodology.[56] The elements CDE described in its Phase 2 Submission have not changed.[57]

At this time, 202 LEAs are selected for targeted review in the Performance Indicator Review based on preschool placement and 39 LEAs are selected for intensive review in the Preschool Review.  By following a tiered approach to monitoring, CDE uses targeted monitoring some Leas and intensive monitoring for those LEAs with the most need.

### C. Disproportionality Review

The Monitor deems CDE noncompliant here based on his views of disproportionality in placement and discipline.  In response, CDE incorporates by reference its discussion as set forth in Section II.B.3., above.  CDE will begin to use students with disabilities as the appropriate comparison group for both placement and discipline.

---

[56] **Attachment V** is a revised version of the table included pages 52-53 of the Phase 2 Submission, and contains further revisions to the Preschool Matrix (entitled "20190108_Preschool_Matrix_Tbl_REVISED.docx") provided to the Monitor on January 14, 2019.  See **Attachment X**, included herewith.  In addition, **Attachment W** is an updated version of **Attachment O** (Dkt. 2455-16) as well as the spreadsheet entitled "FY1819PreschoolRvw_Full_List.xlsx" provided to the Monitor on January 14, 2019.  The updates in **Attachment W** were made to ensure consistency with the data in the spreadsheet entitled "FY1819CR_Full_List.xlsx" that was provided to the Monitor on January 14, 2019 at his request.  See **Attachment X**, included herewith.
[57] Dkt. 2455-1 at 52-54.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

### D. Significant Disproportionality Review

The Monitor deferred his determination here, requesting additional information from CDE as to whether it "uses a definition of reasonable progress that would exclude some LEAs in this status from identification as significantly disproportionate."[58]

In response, CDE states that it held a stakeholder meeting on January 18, 2019.  See **Attachment U**, included herewith.  At the meeting, CDE and stakeholders discussed different options for reasonable progress, and the stakeholders asked CDE to model those approaches for further discussions.  CDE intends to hold a follow-up meeting to present those models to the stakeholder group for feedback prior to finalizing the methodology for presentation and approval by SBE.

### E. Comprehensive Review

As set forth in page 3 above, many of the Monitor's concerns appear to be the result of a fundamental disagreement about how CDE interacts with LEAs.  Comprehensive Review is the most intensive type of monitoring activity implemented by CDE, and as such, CDE's goal is to identify those LEAs with the highest level of need.  As stated, those LEAs that are not making progress are a higher priority for this intensive monitoring activity than those LEAs making progress.

#### 1. Performance Values

At the Monitor's request, CDE provided a spreadsheet with data used to select LEAs for Comprehensive Reviews on January 14, 2019.  See **Attachment X.**  The Monitor raised concerns that the following actual student data or LEA performance scores were not provided on the spreadsheet.  Using the criteria outlined in its Phase 2 Submission,[59] CDE provided the data (included in **Attachment X**) necessary to determine a score for purposes of selecting LEAs for Comprehensive Review:

- Indicator 1 – The LEA's Graduation Rate.  The Dashboard color was provided.
- Indicator 3c – The LEA's Math and English Language Arts Proficiency scores (Distance from Standard).  The Dashboard color was provided.
- Indicator 4a – The LEA's Discipline Rate.  The Dashboard color was provided.
- Indicator 7 – The LEA's six individual Preschool Outcome "scores" not provided, nor which area the LEA met.  The number of Total Areas met was provided.

---

[58] *See* Dkt. 2469 at 57.
[59] *See* Dkt. 2455-9.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

## 2. Clarification of '0', 'NA' and 'NC'

With regard to the other performance scores the Monitor believes were "missing" from the information provided to him on January 14, 2019, CDE provides the following clarification:

Because each LEA is unique, some indicators or areas of monitoring under the Comprehensive Review activity may not apply to every LEA under review.  For example, a charter school serving middle grades (grades 6-8) is different from a mid-size LEA serving grades Kindergarten through grade 12.  Not all indicators (such as post-school outcomes) are applicable to every LEA.

Instances of "NA" (not applicable) indicate that data were either not available for calculation (for example, a charter school was not open or operating in the prior year and therefore no data is available to conduct a prior to current year comparison) or indicate that the indicator is not applicable, such as Preschool Outcomes for LEAs not serving preschool-aged students.

Instances of "NC" (not calculated) indicate the calculation was not made due to small N-size.

## 3. N-size

It is appropriate to clarify the N-sizes used in selection.  The table set forth in **Attachment Q** clarifies the minimum N-size for each Comprehensive Review indicator necessary to perform calculations.

The Monitor identified 1,088 LEAs that "were not judged for performance on" school-age placement.[60]  Specifically, 499 LEAs scored a Selection Score of "0" for the three school-age placement indicators because the LEA had a value of NA or NC in the current year, and 589 LEAs had a value of NA or NC in the prior year.

To align with the larger accountability system, beginning the 2018-19 monitoring year, all charter schools will be treated as LEAs.  Even if the LEA was not selected for Comprehensive Review for these indicators, LEAs that do not meet the target are selected for Performance Indicator Review.  CDE did not select LEAs that are new charter schools with no prior year data or those LEAs that did not meet the minimum N-size for the current year, the prior year, or both, for participation in Comprehensive Review.

---

[60] *See* Dkt. 2469 at 59.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

### 4. Standards for Scoring Each Selection Element

The Monitor criticizes CDE's scoring process of LEAs in various areas.  CDE will address these issues individually.

First, the Monitor takes issue with CDE's choice in terminology.  As described in the Phase 2 Submission, CDE uses a 1, 2, 3, 4 scoring method.[61]  See **Figure 2,** below.

**Figure 2**

| Selection Score | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Selection Score Criteria | • Did not meet Indicator Target in Current Year (CY)<br><br>• Did not Improve or maintain in Indicator Target from Prior Year (PY) | • Did not meet Indicator Target in CY<br><br>• Improved or maintained in Indicator Target from PY | • Met Indicator Target in CY<br><br>• Did not Improve or maintain in Indicator Target from PY | • Met Indicator Target in CY<br><br>• Improved or maintained in Indicator Target from PY |

The Monitor stated that, "[i]t will be assumed that districts that had the same percentage of compliance in both years would receive a "2" or a "4," depending on whether the target was met."[62]  The Monitor is correct—LEAs with the same percentage of compliance as the prior year would receive a score of 2 or 4, depending on whether the target was met.  CDE intended that the plain meaning of the term "maintained" be applied in its Phase 2 Submission.

Selection for Comprehensive Review is based on poor performance, which is based on the sum of a number of applicable indicators.  Notwithstanding the Monitor's suggestion that CDE does not monitor those LEAs with low performance in regular class placement, CDE does monitor such LEAs, which are selected for Performance Indicator Review.[63]

---

[61] *See* Dkt. 2455-1 at 57.
[62] *See* Dkt. 2469 at 60.
[63] *See* Dkt. 2469 at 60.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

### 5.  Use of Dashboard Method for Selection

The Monitor requests that CDE clarify how it uses Dashboard criteria in the areas of academic achievement (for age 6 through 21) and overall discipline.  As stated in CDE's Phase 2 submission, CDE uses Dashboard criteria for "academic achievement" and "suspension rate."[64]  With respect to academic participation, CDE uses the same criteria as dropout rate, school-age placement, preschool placement, parent input, and the four timeliness State Performance Plan indicators (initial, C to B transition, annual review, and triennial review).[65]

### 6.  Performance of Preschool Assessments

The Monitor expresses concerns regarding CDE's calculation of the Comprehensive Review selection score for preschool assessment.[66]  **Figure 3**, below, provides an explanation of CDE's calculation.  For clarity, preschool assessment has six areas, each with its own denominator, subject to N-size minimums and target.  "Preschool Areas Valid" refers to the number of areas which met the minimum N size.  "Preschool Areas Met" refers to the number of areas which met the minimum N size and also met the target for that area.  "Target Met" can be a "Yes" only when the Preschool Areas Valid and the Preschool Areas Met are the same.

**Figure 3**

| LEA | Preschool Areas Met | Preschool Areas Valid | Target Met |
|-----|---------------------|-----------------------|------------|
| A   | 3                   | 3                     | Yes        |
| B   | 5                   | 6                     | No         |

As shown in **Figure 3**, above, even though "LEA B" met 5 of the 6 areas for Preschool Assessment, it did not meet the target because it must meet all 6 valid areas (meeting the minimum N-size).  "LEA A," on the other hand, met the target because even though it met only 3 areas, there are only 3 areas that are valid with respect to that LEA.

After CDE has determined whether the LEA has met the target, CDE uses the selection score methodology. See **Figure 4**, below, which provides an updated explanation of the scoring methodology:

**Figure 4**

---

[64] *See* Dkt. 2455-1 at 57 (SPP Indicators 3 and 4).  Note that CDE uses the Dashboard methodology for graduation rate (SPP Indicator 1) for Comprehensive Review scoring. However, that indicator is outside the scope of this case.
[65] *See* SPP Indicators 2, 5, 6, 8 and 11-14, respectively.
[66] *See* Dkt. 2469 at 62.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

| Score | Criteria |
|-------|----------|
| 1 | Did not meet the·target, and decreased in the number of areas from prior year |
| 2 | Did not meet the target, and increased or maintained the number of areas from the prior year |
| 3 | Met the target, and decreased in the number of areas from prior year |
| 4 | Met the target, and increased or maintained the number of areas from the prior year |

### 7. Disproportionality Criteria

With respect to the Monitor's question regarding CDE's scoring criteria for disproportionality in discipline and placements, CDE confirms that the table in the Monitor's Review represents the methodology used for all the disproportionality indicators.[67]

### 8. Timeliness

CDE calculates the timely and complete submission of required data, reports, and plans. An LEA will receive a score of 1 if each submission was timely and complete, and a score of 0 if each submission was not timely and complete, and will receive an "NA" if the report was not required for that LEA. For example, a high school district would not be required to submit a preschool assessment file. See **Attachment Y**.

### 9. Timely IEPs and Triennials

With respect to the Monitor's question, CDE responds that a score of 3 is not possible for the timeliness of IEPs and Triennials.[68]

| Score | Criteria |
|-------|----------|
| 1 | One or more instances of noncompliance in current year and increase in number of instances from prior year |
| 2 | One or more instances of noncompliance in current year and decrease *or maintained* in number of instances from prior year |
| 3 | Not a possible score, as zero noncompliance in current year could not be increased from prior year |
| 4 | Zero noncompliance in current year and score available from prior year |

---

[67] *See* Dkt. 2469 at 64-65.
[68] *See* Dkt. 2469 at 67.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

### 10. Selection of LEAs for Comprehensive Review

CDE notes that the 69 LEAs referenced by the Monitor that were not selected for Comprehensive Review were first-year charter schools without prior year data.[69]

Because the Comprehensive Review is the most intensive type of monitoring activity, CDE's goal is to select those LEAs with the highest level of need. As stated, those LEAs that are not making progress are a higher priority for this intensive monitoring activity than those LEAs making progress. CDE identifies the LEAs with the most overall need and matches them with the State's available resources to conduct reviews.

CDE selected one additional LEA for Comprehensive Review based on extenuating circumstances, as opposed to data analysis alone. This LEA had significant problems with their data submissions in the 2017-18 school year, which CDE ultimately rejected due to the LEA's validity and reliability concerns with the data submitted via California Special Education Management Information System ("CASEMIS") and California Longitudinal Pupil Achievement Data System ("CALPADS"). CDE selected this LEA for Comprehensive Review because valid and reliable data was not available for CDE to perform data analysis.

### F. Nonpublic School Monitoring

With respect to the Monitor's concerns regarding nonpublic school ("NPS") monitoring, CDE responds that it selects NPS for monitoring pursuant to California Education Code section 56366.1(e)(1), and that each certified NPS is placed on a three-year monitoring cycle.[70] CDE provided information relating to NPS monitoring on August 3, 2018 upon the Court's request.[71]

## IV. "MEETS REQUIREMENTS" DETERMINATIONS WITHOUT ADDITIONAL MONITORING

CDE disagrees with the Monitor's assertion that CDE's data analysis and CDE's selection of LEAs for further monitoring activities is somehow designed to allow LEAs to "escape" monitoring.[72] By way of example, CDE identified an elementary school district that was given a preliminary annual determination of "Meets Requirements" for the 2018-19 monitoring year. During the 2017-18 data year, this school district had an unduplicated count of 327 of student with disabilities. During the 2017-18 school year, that LEA exceeded its assessment participation rate of 95%, and students with disabilities were on average 8.6 points above standard for English Language Arts, and

---

[69] See Dkt. 2469 at 70.
[70] See Dkt. 2469 at 73.
[71] See Dkt. 2411-4.
[72] See Dkt. 2469 at 81.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

maintained this performance from the previous year. Students with disabilities were on average 2.7 points below standard for Mathematics, but improved their performance by 6.3 points from the previous year. Additionally, only 1.7% of students with disabilities were suspended once during the year, and no children experienced a suspension or expulsion greater than 10 days. Sixty-nine percent of students with disabilities were in the regular classroom greater than 80% of the day, 10% were in a regular classroom less than 40% of the day, and only 0.74% were in a separate placement, exceeding all three Least Restrictive Environment targets for school age children. Forty-seven percent of preschool-age children with disabilities were provided services in a regular early childhood program, while 21% of preschool-age children with disabilities were provided services in a separate early childhood program, exceeding two Least Restrictive Environment targets for preschool school children. One-hundred percent of parents reported that the LEA facilitated parent involvement. All IEPs in the LEA were implemented within the 60-day timeline, and were reviewed and re-assessed within the required timeline.[73] All children in early intervention that were eligible for IDEA Part B services had an IEP in place by their third birthday. Finally, the LEA was not disproportionate and has no complaints or due process filings in 2017-18 (and has not had any complaints in 2018-2019 thus far). Given this positive performance in both outcomes and performance that has been maintained from the previous year, CDE does not see the necessity of monitoring this LEA in a targeted or intensive review.

| Data and Measurement | Outcome |
| --- | --- |
| **Assessment Participation** | Exceeded 95% |
| **Assessment Achievement** | Exceeded targets<br>Dashboard Color: Yellow |
| **Suspension** | Current Dashboard Color: Yellow |
| **Suspension greater than 10 days** | None |
| **Least Restrictive Environment** | Exceeded targets |
| **Preschool Least Restrictive Environment** | Exceeded targets |
| **Parent Input** | 100% Report involvement |
| **Initial Evaluation Timeline** | 100% Compliant |
| **Timely IEPs** | 100% Compliant |
| **Timely Triennials** | 100% Compliant |
| **Complaints** | No Complaints |
| **Disproportionality** | No Disproportionality |
| **C to B Transition** | 100% Compliant |
| **Due Process Cases** | No Due Process Filings |

---

[73] IEPs must be reviewed within one year (34 C.F.R. § 300.324(b)(1)(i)) and re-assessments must occur within 3 years (34 C.F.R. § 300.303).

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

The Monitor assumes that the lack of further monitoring activities allows an LEA to have significant numbers and types of potential compliance concerns to exist without review for years.[74] If one assumes that the annual determination process was designed to allow LEAs to evade monitoring, then once an LEA has achieved "Meets Requirements," CDE would be less likely to designate the LEA as "Needs Assistance" in 2017-18. But the data does not support this assumption. For example, during the 2018-2019 monitoring year, one elementary school district was identified for both Performance Indicator Review (assessment participation) and Disproportionality Review even though the LEA achieved "Meets Requirements" the previous year. This means that, that when CDE monitored the LEA's data, the LEA showed that it was not meeting targets, even though it had met targets previous year, and it was subsequently identified for further monitoring activities (Performance Indicator Review and Disproportionality Review). Accordingly, that LEA's 2018-19 annual determination will be "Needs Assistance."

Furthermore, CDE's approach toward making annual determinations—in which it considers the totality of data for an LEA as well an LEA's improvement—is consistent with the Office of Special Education Programs ("OSEP's") approach to determining when a State 'meets requirements' in implementing the IDEA. In a June 2009 document issued by OSEP to "address some of the most important issues raised by requests for clarification on a variety of high-interest topics," OSEP provided the following guidance:[75]

> **Question C-7:** States and LEAs may be in or out of compliance on specific compliance indicators throughout the year. How will this process ensure that the determinations reflect the actual compliance status of LEAs within a State?
>
> **Answer:** The Secretary's determinations are based on the totality of the State's data in its APR and other publicly available information, including any compliance issues. The Department considers a variety of factors, including whether the State has provided valid and reliable data, and for compliance indicators, whether the State demonstrated compliance or timely correction of noncompliance. In instances where the State did not demonstrate compliance, the Department considers whether the State had nonetheless made progress in ensuring compliance over prior performance in that area[.]

Finally, with 72.8% of LEAs in the state in the category of "Needs Assistance" or "Needs Intervention," it is clear that CDE's overall system for analyzing LEA data statewide is adequate and within the requirements of law.

---

[74] *See* Dkt. 2469 at 83.

[75] *See* C-7 in https://sites.ed.gov/idea/files/08-0101_Monitoring_FINAL_June_2009.pdf.

Emma C. v. Thurmond, et al., Case No. 96-cv-04179-VC
**Report in Response to Monitor's Review of CDE's Phase 2 Submission**
Case 3:96-cv-04179-VC

## V. ATTACHMENTS

**Attachment P**: 12/18/18 E-mail to Ravenswood City Elementary
**Attachment Q**: N-size criteria for Comprehensive Review
**Attachment R**: Ishi Hills Middle Dashboard Report
**Attachment S**: Oroville City Elementary Dashboard Report
**Attachment T**: Revised Identification of LEAs and Monitoring Activities for 2018-19
**Attachment U**: 1/18/19 Significant Disproportionality Statewide Stakeholder Meeting
Agenda
**Attachment V**: Updated Preschool Matrix
**Attachment W**: W_REVISED_Preschool_Review_v_FERPA.xlsx (Spreadsheet will be
provided in Native form)
**Attachment X**: 1/14/19 E-mail to Monitor from Darrell Spence attaching
FY1819CR_Full_List.xlsx (Spreadsheet will be provided in Native form)
**Attachment Y**: Timely Reporting