William S. Koski, Esq., SBN 166061
STANFORD LAW SCHOOL
YOUTH & EDUCATION LAW PROJECT
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone: (650) 724-3718
Fax: (650) 723-4426
Email: bkoski@stanford.edu

Leecia Welch, Esq., SBN 208741
Freya Pitts, Esq., SBN 295878
NATIONAL CENTER FOR YOUTH LAW
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Fax: (510) 835-8099
Email: lwelch@youthlaw.org
fpitts@youthlaw.org

*Attorneys for Plaintiffs Emma C., et al.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| EMMA C., et al.,<br><br>            *Plaintiffs*,<br><br>    v.<br><br>TONY THURMOND, et al.,<br><br>            *Defendants*. | Case No.: 3:96-cv-4179 (VC)<br><br>**PLAINTIFFS' RESPONSE TO THE STATE DEFENDANTS' DECEMBER 7, 2018 PHASE 2 COMPLIANCE SUBMISSION, THE COURT MONITOR'S JANUARY 28, 2019 REPORT, AND THE STATE DEFENDANTS' RESPONSE TO MONITOR'S REVIEW OF THE PHASE 2 SUBMISSION**<br><br>Hon. Vince Chhabria |

Pursuant to the Court's Order Re State's Obligations Under Consent Decree ("Court Order"), ECF No. 2387, and the Court's Order Clarifying Scope of Phase 2 Proceedings, ECF No. 2439, Plaintiffs submit this Response to the State Defendants' December 7, 2018 Phase 2

1

Submission, ECF No. 2455 (the "State's Submission"), the Court Monitor's Review of the California Department of Education's Phase 2 Submission, ECF No. 2469 (the "Court Monitor's Report"), and the State Defendants' Response to Monitor's Review of Phase 2 Submission, ECF No. 2478 (the "State's Response"). In this Phase 2 of the evaluation of the State's compliance with its obligations under the Court Order and Consent Decree, the focus is on whether the State's annual data analysis activities allow it to effectively fulfill its monitoring and enforcement duties under Section 13.0 of the Consent Decree and the Individuals with Disabilities Education Act.

In this phase, the State bears the following burden:

A. The state must demonstrate that it is effectively analyzing and using the data it is obliged to collect under Phase 1.

B. The state must demonstrate that it is adequately using the data to select school districts for monitoring activities.

C. The state must demonstrate that it is adequately and timely making annual compliance determinations as required by federal law.

D. The state must demonstrate that it is taking adequate and timely enforcement action in response to its annual compliance determinations.[1]

ECF No. 2387 at 6.

The State timely submitted its initial Phase 2 Submission on December 7, 2018, the Court Monitor timely submitted his Phase 2 Report on January 28, 2019, and the State timely submitted its Response on February 25, 2019.

At bottom, the State's Submission fails to demonstrate compliance with the Court Order and Section 13 of the First Amended Consent Decree's requirement that the "the state-level

---

[1]  The Court clarified in its September 11, 2018 Order that the Phase 2 examination "will not include an examination of the state's further targeted monitoring and enforcement activities, or whether those further targeted monitoring and enforcement activities are sufficient to make adequate annual compliance determinations or to otherwise fulfill its monitoring and enforcement obligations under the IDEA." ECF No. 2439.

system in place is capable of ensuring continued compliance with the law and the provision of [a free appropriate public education] to children with disabilities in Ravenswood." Rather, the State's Submission reflects, with very limited exception, a data analysis system that is deeply flawed and reliant on data collected for only one aspect of the State's monitoring obligation—the federal reporting requirements in the state performance plan. *See* 20 U.S.C. § 1416(b). While the State claims to have an "integrated" approach to monitoring that combines special education monitoring with its statewide system for monitoring school districts under the Local Control Funding Formula, *see* ECF No. 2478-1 at 4-5, any integration is superficial, at best. The State has merely substituted a couple of dashboard indicators for state performance plan indicators (specifically, assessment and suspension indicators) and coordinated the annual release of its special education monitoring and general education monitoring data. Nowhere does the State demonstrate that its analysis of the "dashboard" data results in either better outcomes for students with disabilities or the assurance that students with disabilities are receiving a free appropriate public education ("FAPE") in the least restrictive environment ("LRE").

More specifically, the State's Submission and Response fail to demonstrate, as is required by the Court Order, that it annually analyzes and uses its data effectively and that it effectively uses the data to select school districts for monitoring activities. First, the State does not adequately measure school districts' performance in the priority areas for monitoring: provision of FAPE in the LRE, state exercise of general supervision, and disproportionate representation of racial and ethnic groups. *See* 20 U.S.C. § 1416(a)(1)-(3). Second, because the State uses insufficient data, ineffectively analyzes those data, and sets unambitiously low targets for success, the State's selection of school districts for further monitoring activities, especially comprehensive review, is fatally flawed. And, third, the State's practice of giving a pass to districts that are not selected for further monitoring by its faulty analysis inevitably will result in many "false negatives"—exclusion from further monitoring of districts that are not providing FAPE in the LRE to children and are not complying with the law.

3

PLAINTIFFS' RESPONSE TO STATE'S RESPONSE TO MONITOR'S PHASE 2 REVIEW
*Emma C., et al. v. Thurmond, et al.*; No. 3:96-cv-04179-VC

Bluntly stated, the State has actually "demonstrated" nothing in its Phase 2 submission. To demonstrate that it is effectively analyzing data and adequately using the data to select districts for further monitoring activities, the State should have explained, conceptually, why its analyses are adequate to fulfill its obligations under the IDEA.[2] Then it should have demonstrated that its methodology actually works. It should have provided historical data and specific examples of how those districts that have been selected for monitoring activities were appropriately selected and, conversely, how those districts that were not selected and were deemed to have met requirements were appropriately designated as such. The Court Order does not merely require the State to provide a description of how it conducts its analyses. The Order requires a demonstration of why the State's approach is effective, which should include an actual, on-the-ground demonstration of its effectiveness in practice.

The remainder of Plaintiffs' Response proceeds as follows. In Section I, Plaintiffs show how the State fails to demonstrate, with any evidence, that its monitoring system guarantees FAPE in the LRE and improved outcomes for children. Section II of the Response directly addresses and unpacks the State's rhetorical claims and efforts to obscure its failure to provide evidence and argument that demonstrates its compliance with the Consent Decree and the Court's Order. Sections III through V then analyze each area of (non)compliance addressed by the Monitor. In the interest of economy, Plaintiffs' Response does not reiterate the analyses of

---

[2]  The Monitor makes this point as well:

> CDE's repeated assertions of its desired conclusion of the sufficiency and adequacy of its data analyses to make preliminary "meets requirements" determinations do not amount to a *demonstration* that that is the case. In addition, CDE's view that it has explained why its analyses meet this standard throughout its report is not what its report has accomplished: the report explains, not always successfully, *how* CDE calculates and analyzes the data it collects, but frequently does not explain *why* its analyses are sufficient to fulfill its obligations under the statute. Statutory or regulatory language is often quoted or cited by CDE at the beginning of its sections and is followed by its calculation methodologies, but the submission does not then circle back to explain why those calculation methodologies are sufficient to raise red flags about a district's compliance with those requirements.

ECF No. 2469 at 77.

the Court Monitor. Rather, for each of the requirements in the Court Order for which the Court Monitor has made a compliance determination, this Response first sets forth whether Plaintiffs agree or disagree with the Court Monitor's compliance determination. If the Plaintiffs agree with the Court Monitor's determination, the Plaintiffs may offer additional analysis regarding the requirement. If the Plaintiffs disagree with the determination, the Plaintiffs will describe the extent to which they disagree and the basis for that disagreement. In addition, to the extent that the State provided any response to any of the Court Monitor's determinations, each such response will be addressed in connection with each of the Monitor's compliance determinations.

## I.

### THE STATE HAS NOT DEMONSTRATED THAT IT ADEQUATELY ANALYZES DATA TO ENSURE THE PROVISION OF A FREE APPROPRIATE PUBLIC EDUCATION IN THE LEAST RESTRICTIVE ENVIRONMENT AND TO IMPROVE EDUCATIONAL RESULTS AND FUNCTIONAL OUTCOMES FOR STUDENTS WITH DISABILITIES.

Under the Consent Decree, the State bears the burden of demonstrating that its state-level monitoring system ensures compliance with the law and FAPE in the District, while the Court's Order—citing to 20 U.S.C. §§ 1412(a), 1416(a)-(b), and 1418(d); and 34 C.F.R. §§ 300.600, 300.601, 300.602, and 300.604—requires the State to adequately and effectively analyze data to fulfill its obligations under the IDEA.

Under the IDEA, the priority areas for monitoring are:

(3) Monitoring priorities

The Secretary shall monitor the States, and shall require each State to monitor the local educational agencies located in the State (except the State exercise of general supervisory responsibility), using quantifiable indicators in each of the following priority areas, and using such qualitative indicators as are needed to adequately measure performance in the following priority areas:

(A) Provision of a free appropriate public education in the least restrictive environment.

(B) State exercise of general supervisory authority, including child find, effective monitoring, the use of resolution sessions, mediation, voluntary

5

binding arbitration, and a system of transition services as defined in sections 1401(34) and 1437(a)(9) of this title.

(C) Disproportionate representation of racial and ethnic groups in special education and related services, to the extent the representation is the result of inappropriate identification.

20 U.S.C. § 1416(a)(3). Relatedly, the focus of State monitoring activities shall be on:

(A) improving educational results and functional outcomes for all children with disabilities; and

(B) ensuring that States meet the program requirements under this subchapter, with a particular emphasis on those requirements that are most closely related to improving educational results for children with disabilities.

20 U.S.C. § 1416(a)(2). Those priority areas for monitoring are also described in the IDEA's implementing regulations. 34 C.F.R. § 300.600(b) & (d). Put simply, the State's Submission and Response do not provide any coherent argument and supporting evidence that its data analysis ensures FAPE in the LRE and improved outcomes for students with disabilities.

### A. The State fails to demonstrate how its data analyses ensure the provision of a FAPE.

20 U.S.C. § 1412 (a)(1)(A) provides:

(a)  In general
A State is eligible for assistance under this subchapter for a fiscal year if the State submits a plan that provides assurances to the Secretary that the State has in effect policies and procedures to ensure that the State meets each of the following conditions:

(1) Free appropriate public education

(A) In general

A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school.

The Supreme Court recently explained:

6

PLAINTIFFS' RESPONSE TO STATE'S RESPONSE TO MONITOR'S PHASE 2 REVIEW
*Emma C., et al. v. Thurmond, et al.*; No. 3:96-cv-04179-VC

A FAPE, as the Act defines it, includes both "special education" and "related services." § 1401(9). "Special education" is "specially designed instruction ... to meet the unique needs of a child with a disability"; "related services" are the support services "required to assist a child ... to benefit from" that instruction. §§ 1401(26), (29). A State covered by the IDEA must provide a disabled child with such special education and related services "in conformity with the [child's] individualized education program," or IEP. § 1401(9)(D).

The IEP is "the centerpiece of the statute's education delivery system for disabled children." *Honig v. Doe,* 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). A comprehensive plan prepared by a child's "IEP Team" (which includes teachers, school officials, and the child's parents), an IEP must be drafted in compliance with a detailed set of procedures. § 1414(d)(1)(B) (internal quotation marks omitted). These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances. § 1414. The IEP is the means by which special education and related services are "tailored to the unique needs of a particular child. *Rowley,* 458 U.S. at 181, 102 S.Ct. 3034.

The IDEA requires that every IEP include "a statement of the child's present levels of academic achievement and functional performance," describe "how the child's disability affects the child's involvement and progress in the general education curriculum," and set out "measurable annual goals, including academic and functional goals," along with a "description of how the child's progress toward meeting" those goals will be gauged. §§ 1414(d)(1)(A)(i)(I)-(III). The IEP must also describe the "special education and related services ... that will be provided" so that the child may "advance appropriately toward attaining the annual goals" and, when possible, "be involved in and make progress in the general education curriculum." § 1414(d)(1)(A)(i)(IV).

*Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994, 197 L. Ed. 2d 335 (2017).

The State's submission does not even attempt to demonstrate how its data analyses adequately ensure that school districts are providing FAPE to children. Nowhere does the State detail what it believes to be the components of FAPE. Nowhere does the State conceptually describe how its data analyses ensure that districts selected/not selected for monitoring activities are not/are providing FAPE. Nowhere does the State explain why it includes certain data

7

PLAINTIFFS' RESPONSE TO STATE'S RESPONSE TO MONITOR'S PHASE 2 REVIEW
*Emma C., et al. v. Thurmond, et al.*; No. 3:96-cv-04179-VC

elements, excludes others, and sets cut scores and improvement rates that ensure districts are providing FAPE. Nowhere does the State provide any empirical research, scholarly support, or evidence base that its data analyses will result in FAPE. Finally, and perhaps most telling, nowhere does the State provide any evidence that its data analysis in any district is adequate to determine whether students in that district are, in fact, receiving a FAPE.

Perhaps equally disturbing, several of the data elements that this Court has recognized ought to be included in determining district compliance and the need for further monitoring are not even yet collected or are not included in the analysis. The State has deferred data collection and analysis regarding IEP implementation for an unspecified length of time without even offering a plan for such monitoring. Although it claims that it will, at some point in the future, collect certain data on restraint and seclusion, it provides no details on the data collection methods and analysis.

Plaintiffs continue to believe that the State does not collect adequate qualitative and quantitative data to determine whether districts are providing FAPE to students. Now the State fails to demonstrate and explain how its analyses of the limited data it does collect will ensure students in Ravenswood or any district are receiving a FAPE.

### B.  The State fails to demonstrate how its data analyses ensure improved outcomes for children with disabilities.

Under the IDEA, the focus of state monitoring must be on "improving educational results and functional outcomes for all children with disabilities." 20 U.S.C. § 1416(a)(2)(A). While the State does collect data on school district performance on state assessments for school-age students and preschool assessment proficiency, the State: (1) fails to collect and analyze any data on the "functional outcomes" of school-age students with disabilities; (2) fails to collect and analyze data regarding students' achievement of goals and objectives on individualized education plans; (3) gives a "pass" to districts that make minimal improvements in student test scores, even if those students are not receiving a FAPE and/or are failing to achieve proficiency, *see* ECF No. 2469 at 8-9; and (4) fails to disaggregate subgroups of students with disabilities,

such as racial or ethnic minorities, students in foster care, homeless students, English learners, and economically disadvantaged students. *See id.* Setting aside for now the methodological problems with how the State measures preschool outcomes, the State's reliance on only one, narrow outcome (test scores), the intolerably low bar for district success on that narrow outcome, and the refusal to probe that one outcome for variation among student subgroups does not ensure that the focus of monitoring is on improving educational results and functional outcomes.

## II.

## UNPACKING THE STATE'S RHETORIC

In addition to the State Submission's overall failure to demonstrate how the State's data analyses ensure FAPE and improved student outcomes, the State's Response is also problematic because it relies on rhetorical ploys without supporting argument and evidence. Plaintiffs are compelled to offer a rejoinder to the State's rhetorical smokescreens.

1. <u>Deflecting from its own shortcomings by critiquing the Monitor</u>. The State begins its response with a critique of the Monitor: "CDE notes that many of the opinions expressed in the Monitor's Review lack citations to specific requirements of the [IDEA]. As such, CDE is unable to assess whether the opinions expressed are merely the Monitor's personal views regarding best practices for statewide special education monitoring, or are instead based on the actual requirements of the IDEA." ECF No. 2478-1 at 3. Apart from the not-so-subtle effort to undermine the Court Monitor's Report as mere "opinion," it should be noted that the State's critique of the Monitor is equally applicable to its own Submission. Except for those analyses that are mandated by federal regulations, *e.g.,* disproportionality review, the State does not meaningfully support any of its analyses with cites to federal law. Indeed, *it is the State's* burden to demonstrate how its analyses comply with federal law—ensuring FAPE in the LRE

and improving outcomes—*not the Monitor's* burden to prove noncompliance with federal law (though the Monitor has done so).

2. <u>Recharacterizing the Monitor's findings as mere "policy disagreements."</u> The State correctly observed that the Court aims to analyze the State's Submission for compliance with the IDEA and the Consent Decree, not for what is best monitoring practice and policy. But that does not give the State license to characterize the Monitor's determinations as "policy disagreements," ECF No. 2478-1, without bearing its burden of demonstrating its own compliance with the law. This entire four-phase exercise requires the State to demonstrate and the Court to determine what is the legal threshold for compliance with the IDEA's monitoring requirements. The Monitor has offered his findings that the State has not carried that burden and the State cannot minimize those findings as mere policy disagreements.

3. <u>Creating a false dichotomy.</u> Time and again, the Monitor forcefully shows that the State's analyses are flawed because they permit districts to escape further monitoring and oversight when districts make minimal improvements, but are still performing very poorly. *See, e.g.,* ECF No. 2469 at 9 ("CDE's analysis of performance allows some low-performing districts to not be selected for monitoring based on small performance improvements from the prior year"). The State attempts to obscure this flaw by stating that "California's policymakers have determined that focusing on an accountability system that recognizes that improvement by LEAs is important; and the State should therefore provide a system of support to help LEAs along a path of continuous improvement. This is in contrast to—and a shift away from—a methodology that uses unattainable targets . . . ." ECF No. 2478-1. This is a false dichotomy. Nowhere does the Monitor state that "continuous improvement" should not be recognized and rewarded nor does he call for "unattainable targets." Rather, the Monitor is making the simple and obvious point that the State has set the bar so

low for a number of its analyses that it is not ensuring that children are receiving FAPE. The State can and must do both—set a bar high enough to ensure FAPE *and* reward improvement. The IDEA requires as much.

4. <u>Setting up implicit straw arguments.</u> The State variously asserts that it has "shift(ed) away from punitive, all or nothing compliance sanctions," ECF No. 2478-1 at 4, that it aims to "reduce confusion and ensure coherence," *id*., and that the "Monitor's theoretical system focuses on setting unattainable, rigid targets with the goal of identifying and punishing more LEAs." *Id.* at 5. The problem is that no one—not the Monitor, nor the Plaintiffs—has argued in favor of "punitive" or "all or nothing" sanctions based on "unattainable" and "rigid" targets. The State creates false arguments just to knock them down and distract from its failure to offer a system that ensures FAPE.

5. <u>Deflecting, again.</u> The State chides first the Plaintiffs' attorneys for "not object[ing] to the targets" established for state performance plan compliance and then the Monitor for failing to "provide specific, realistic suggestions for improving CDE's processes for selection of LEAs for further monitoring activities to meet—in his view—the requirements of federal law." *Id.* at 8-9. Again, the State is distracting from its own failures to establish a compliant monitoring system. First, the State never invited the Plaintiffs to participate in the "stakeholder" process to establish the targets, it is not the Plaintiffs' job to attend meetings to object to the State's targets, and it is likely the State would have objected to Plaintiffs' participation in such meetings outside of this on-going litigation. Second, it is not the Monitor's job to tell the State how to comply with the law; rather, it's his job to determine when the State has failed to do so.

6. <u>Stating bald assertions without argument or evidence.</u> For instance, throughout his findings, the Monitor questions why the State does not disaggregate data and analyze

subgroups of students based on their demographic characteristics such as race, ethnicity, English learner status, homeless or foster youth status, etc. ECF No. 2469 at 9 ("For participation [in statewide assessments] the CDE does not disaggregate data for subgroups. This is also the case for performance. Thus, the participation and performance of subgroups are unknown and do not affect selection for monitoring."). The State brushes off this concern with the bald assertion that "[a]n in-depth analysis of subgroups is more productive during a more detailed examination of data after selection for monitoring to determine root causes" and goes on to say that "failure of a specific group (African American Students or Students Eligible for Free and Reduced Priced Meal Eligibility) is unique to those students in special education." ECF No. 2478-1 at 10. The State's "belief" is not evidence that it need not disaggregate and analyze data for subgroups of children in special education. Nor does the State explain why such disaggregation is only appropriate for one of the more intensive monitoring reviews. To the contrary, failure to disaggregate at the identification stage runs the risk of missing districts' failure to serve certain subgroups of children with disabilities. Moreover, there is no reason to believe that subgroups of children with disabilities are treated exactly the same as those same subgroups of children without disabilities. The State must provide evidence and an explanation for its bald assertions.

### III.

### ANALYSES REGARDING PRIORITY AREAS AND PROGRAM REQUIREMENTS

For each of the requirements in the Court Order for which the Court Monitor has made a compliance determination, this section of Plaintiffs' Response first sets forth whether Plaintiffs agree or disagree with the Court Monitor's compliance determination. If the Plaintiffs agree with the Court Monitor's determination, the Plaintiffs may offer additional analysis regarding the requirement. If the Plaintiffs disagree with the determination, the Plaintiffs will describe the

extent to which they disagree and the basis for that disagreement. In addition, to the extent that the State provided any response to any of the Court Monitor's determinations, each such response will be addressed in connection with each of the Monitor's compliance determinations.

A.    **Free Appropriate Public Education**

1.    School-Age Achievement

Plaintiffs agree with the Court Monitor's noncompliance determination. Plaintiffs note that the State failed to address the Monitor's concern that the State does not analyze the demographic characteristics of students who do not participate in assessments. This is of particular concern for highly mobile populations such as homeless and foster youth.

The State suggests that the Court Monitor is concerned generally about the State's use of the "Dashboard." ECF No. 2478-1 at 10. That is not the Monitor's concern. Rather, he is concerned about the *methodology* the Dashboard employs and he points out the shortcomings of that methodology for special education monitoring. Specifically, the Monitor is concerned about allowing Districts with low performance rates to escape further monitoring merely because they make minimal year-over-year improvements. He is also concerned about the failure to disaggregate data by subgroups of children with disabilities. The State's lengthy response, invoking local control and administrative discretion, fails to show how its Dashboard methodology avoids those problems.

2.    Preschool Outcomes

Plaintiffs agree with the Monitor's noncompliance determination. The Monitor notes that "CDE develops cut scores for the progress categories [on the Desired Results Developmental Profile], but does not explain how these are developed." ECF No. 2469 at 10. The State responds by *describing* its methodology for establishing the cut scores, but does not *explain* why it uses its methodology or *explain* how the methodology ensures FAPE. Moreover, the methodology itself appears flawed because those "within" range are those scoring ±1.2 standard deviations above and below the mean, while those scoring between 1 and 2 standard deviations below mean are

deemed "close to" age expectations. ECF No. 2478-1 at 12. If both of these are true, how is a student between 1 and 1.2 standard deviations below the mean rated? The Court should not approve of a methodology with such logical flaws. Finally, the State fails to address the Monitor's concerns about (1) certain poorly performing districts on this preschool indicator not being identified for further monitoring (unless combined with poor performance on other selection elements) and (2) the failure of the State to disaggregate data for subgroups. *See* ECF 2469 at 12.

### 3.   Discipline Overall

Plaintiffs agree with the Monitor's noncompliance determination. The Monitor specifically found that the State's analysis is noncompliant because (1) the State's calculation of suspension rates does not consider multiple suspensions or cumulative length of time suspended; (2) the State's methodology would give a pass to Districts with high suspension rates who make minimal year-over-year improvements; (3) data related to referrals to law enforcement are not analyzed; (4) data for subgroups of students are not analyzed; and (5) determinations regarding discipline in districts that don't meet the enrollment threshold are not made. ECF No. 2469 at 15.

First, the State does not address the Monitor's finding regarding multiple suspensions and cumulative length of suspensions.

Second, the State implies that it has the unfettered discretion to allow districts to maintain high rates of suspension, so long as small improvements are made, while at the same time arguing—using a hypothetical, very large elementary school district—that even small improvements translate into big numbers of reduced suspensions. ECF No. 2478-1 at 12. The State's logic (and math) is flawed because smaller districts with high suspension rates that have small improvements in suspension rates that translate into a modest number of reduced suspensions can escape further monitoring. More important, the State doesn't even attempt to argue that districts with high rates of suspension—even with small improvements—are somehow providing FAPE to their students.

Third, the State again argues that no specific legal provision *requires* analysis of the data it collects on law enforcement referrals and, in any event, analysis of such data would be useless because such referrals would somehow be captured in the discipline data. *Id.* at 14. The first argument is easily disposed. The test is not whether there is specific language in the IDEA that requires specific components in a state monitoring system. Indeed, the Court has already demonstrated that the State's monitoring system must ensure FAPE and the specifics of such a system need not be dictated by specific language in the IDEA (see, e.g., the Court's requirement that data on individualized education plan implementation must be collected to ensure that the State has an IDEA-compliant monitoring system). ECF No. 2428 at 13-18. At this stage of the process, this tread-worn argument should be uniformly rejected. Regarding the second argument, the State fails to recognize that the severity of the effects of referrals to law enforcement and the extreme risk of denial of FAPE caused by such referrals make their separate analysis necessary to determine whether students are being denied FAPE. Moreover, high rates of law enforcement referrals are not necessarily correlated with high rates of overall disciplinary events. Indeed, school districts may well use law enforcement referrals to skirt their obligations to provide due process to students alleged to have violated school rules. A law enforcement referral may never even be recorded as a disciplinary event. That is exactly the type of conduct that should be picked up by the State's analysis.

Fourth, the State simply brushes off the Monitor's finding that its analyses fail to consider subgroups of students by arguing there is no legal requirement that it do so. *Id.* at 13. This argument should be rejected as noted in the preceding paragraph.

Fifth, it is not clear that the State has addressed the Monitor's concern regarding the threshold student enrollment required for discipline analysis. This issue should be discussed at the hearing.

4.   Disproportionality in Discipline

Plaintiffs agree with the Monitor's noncompliance determination. The Monitor found the State noncompliant because it was using an incorrect formula for its risk ratios. ECF No. 2469 at 16-18. The State apparently agrees and has promised to change its formula to comply with federal law. ECF No. 2478-1 at 14. The Monitor also points out that the State provided inconsistent and confusing statements about whether it uses Dashboard indicators to determine disproportionality in discipline for performance indicator reviews and whether it uses disproportionality at all for performance indicator reviews. ECF No. 2469 at 17-18. The State admits its mistake and notes that it does not use the Dashboard for disproportionality and that it does not use disproportionality for performance indicator reviews. ECF No. 2478-1 at 14-15. The State's Submission is rife with these mistakes and they should not be dismissed as innocent. Rather, they are indicative of the confusion and carelessness that may well pervade the entire monitoring system.

5.   Timeliness of IEP Development (Initial, C to B Transition, Annual Review, and Triennial Review)

Plaintiffs agree with the Monitor's noncompliance determination. Plaintiffs also note that the State again makes and admits the mistake regarding whether the Dashboard is used for timeliness determinations and in which reviews the timeliness analysis is used.

6.   IEP Implementation

Plaintiffs agree with the Monitor's determination that this item should be deferred, but request that the Court set a timeline and deadline for the State's implementation of the Court's August 17, 2018, Court Order regarding IEP implementation. *See* ECF No. 2428 at 13-18.

**B.   Least Restrictive Environment**

1.   School-Age

Plaintiffs agree with the Monitor's noncompliance determination. The Monitor found the State noncompliant for three reasons: (1) the State's compliance targets are not ambitious

compared to current California performance and national placement data; (2) the State does not disaggregate data for subgroups of students with disabilities; and (3) the State does not analyze student placement patterns to determine whether there may be patterns of segregation of students with (certain) disabilities. ECF 2469 at 25.

The State does not address the Monitor's logic- and evidence-based determination that the LRE targets are unambitious and it should be deemed noncompliant for that reason alone. The State also does not address the Monitor's determination regarding its failure to analyze subgroups of students with disabilities (such as those in foster care, homeless students, English learners, or students in poverty), despite the fact that these students may be disproportionality placed in restrictive settings.

Finally, the State dismisses the Monitor's determination that student placement patterns should be monitored to determine patterns of segregation by arguing that its failure to do so is a matter of administrative discretion and not required by law, that California is a "choice" state (without citing any policy or statutory provision), and that "CDE does not believe that the analysis of 'patterns of placement' data is a reliable factor in its selection . . . or a reliable (or material) factor to assess whether an LEA is providing FAPE in the LRE." ECF No. 2478-1 at 17. Whether the "law" requires such analysis and whether it's discretionary is precisely what this Court must determine. While it is true that "proximity to home" is only one factor an IEP team considers in determining FAPE in the LRE, the State must analyze whether a district's weighing of the factors that go into student placement result, in the aggregate, in inappropriate and disproportionate placement in certain schools. Whether Districts tend to "cluster" (read: "segregate") certain students with certain disabilities in specific schools is precisely the type of analysis the State should undertake to determine whether districts are placing students in the LRE. This could be a problem in a district whether or not families have reasonable "school choice" in the district; and the State's "belief" regarding the reliability or materiality of this analysis is not a substitute for evidence and logic.

2.   Preschool

Plaintiffs agree with the Monitor's noncompliance determination. The Monitor found noncompliance due to the State's failure to disaggregate subgroups of children with disabilities and the unambitiously low target rates set by the State. ECF No. 2469 at 27.

The State starts by "clarifying" its targets for the 2017-18 school year and provides different targets from its original submission. *Compare* ECF No. 2478-1 at 17 *with* ECF No. 2455-1 at 14. The State does not explain why it originally provided incorrect targets and such mistakes should be cause for concern. The State also submitted a new table that lists the number of districts selected for monitoring reviews and the indicators that led to such selection, where appropriate, for the 2018-19 monitoring year, ECF No. 2478-6, to substitute for an apparently incorrect table that it originally submitted. ECF No. 2455-14. One relevant difference between the two tables is that the State did not include preschool disproportionality in its list of indicators for Performance Indicator Review in the original submission, but did so in the second, resulting in the addition of what appears to be 288 more (potentially duplicative) districts. No explanation is provided for this apparent error other than "the application of final selection analyses." ECF No. 2478-6 at n.1. The State does not address the Monitor's determinations regarding the unambitiously low targets and the failure to disaggregate subgroups.

3.   Disproportionality in Placement

The Monitor determined the State to be noncompliant in its analysis of this indicator on the grounds that the State did not use the proper comparison group for calculating the risk ratio. ECF No. 2469 at 29. The State responded by saying that "CDE will begin to use 'all students with disabilities' as the reference category. ECF No. 2478-1 at 19. Plaintiffs would like the State to clarify this response as the proper reference groups are specifically "Students with disabilities in the same race/ethnicity group" for the first part of the calculation and "Students with disabilities **NOT** in the same race/ethnicity group." ECF No. 2469 at 29. Plaintiffs also note that the State again made a mistake in its initial Submission by stating that it uses a Dashboard

analysis for disproportionality in placement for performance indicator review selection. It apparently does not do so.

C. **State Exercise of General Supervisory Authority**

1. Child Find

Plaintiffs agree with the Monitor's determination of noncompliance. This is for a number of reasons: (1) the State does not analyze data for potential failure to identify *preschool-age* children; (2) the State's standard for selecting school-age students (identification rates below 3.6%) is inadequate to ensure compliance with districts' child find obligation; (3) data for vulnerable sub-populations, *i.e.,* highly mobile populations such as homeless, migrant, and foster children, are not analyzed nor are data for racial and ethnic subgroups; and (4) the State's analysis does not consider academic or behavioral performance of students without IEPs. ECF No. 2469 at 32.

The State's response to the Monitor's finding regarding preschool-age children is meritless. Without any argument or evidence, the State simply asserts that "CDE's policymakers have determined that the use of data in high stakes methodologies which may lead to sanctions of an LEA should not be based on estimates based on proxy data." ECF No. 2478-1 at 20. The State does not explain what it means by "proxy data" or why monitoring decisions should not use such data. Moreover, the use of census statistics to compare one district to another or one district to the statewide average, as the Monitor suggests, is a sound methodology because the same type of data are used in the denominator. Colloquially stated, making such apples-to-apples comparisons is sound and makes sense. Indeed, the Monitor suggests that the United States Department of Education's Office for Special Education Programs has used such data. *See* ECF No. 2469 at n.40.

Second, the State does not even attempt to justify its use of a 2-standard-deviation variance from the mean as an appropriate cut point for monitoring. Indeed, it cannot. Allowing some districts to have identification rates as low as 3.6% when the mean identification rate is

10% does not account for variation; rather, it allows districts to skirt their child find obligations. Moreover, the State's justification that it accounts for "geographic and regional differences" rings hollow as the Monitor demonstrates.

The State doesn't address the Monitor's third and fourth reasons for determining noncompliance.

### 2. Effectiveness of Monitoring

Plaintiffs agree with the Monitor's noncompliance determination and the State admits that it does not monitor the effectiveness of its own monitoring system. ECF No. 2469 at 32; ECF 2478-1 at 20.

### 3. Use of Resolution Sessions

Plaintiffs disagree with the Monitor's compliance determination. The Monitor noted that the State does not indicate whether it uses timeliness of resolution sessions in its data identified noncompliance analysis and asked the State to clarify the matter. ECF No. 2469. It appears that the State did not provide such clarification and should be found noncompliant. Plaintiffs recognize that this is not a data analysis concern; rather, it is a concern for monitoring selection. Plaintiffs address this matter here because this is where the Monitor flagged it.

### 4. Mediation

Plaintiffs agree with the Monitor's noncompliance determination. The Monitor found the State noncompliant because it does not analyze the mediation data it collects for purposes of monitoring school districts (even though it does analyze data at the statewide level). ECF No. 2469 at 33. The State responds that, due to the "informal, voluntary, and individualized nature" of mediation, analyzing district-level data on mediations would not be appropriate. ECF No. 2478-1 at 21. This response misses the mark. By analyzing district-level mediation data and comparing districts to each other, the State could identify patterns in mediation and resolution rates. The State could then use those indicators to dig deeper to determine the "motivations" of school districts to see whether mediation rates are low because district officials refuse to mediate

and whether mediation resolution rates are low because district officials refuse to settle in mediation. This is not a "speculative" exercise; it's exactly the type of data analysis that can flag anomalies for further investigation.

### D.    Racial/Ethnic Disproportionality

#### 1.   Disproportionality in Identification Overall

Plaintiffs agree with the Monitor's compliance determination.

#### 2.   Disproportionality in Identification in Disability Categories

Plaintiffs agree with the Monitor's compliance determination.

### E.    Significant Disproportionality

The Monitor deferred his determination on this item. ECF No. 2469 at 38. The State responded by stating it is in the process of working with a stakeholder group to determine whether the State will use a definition of "reasonable progress" to exclude districts from a "significant disproportionality" finding. ECF No. 2478-1 at 22. Plaintiffs request that the Court set a timeline and deadline for the State's response to the Monitor's concern.

### F.    Restraint and Seclusion

The Monitor deferred his determination on this item. ECF No. 2469 at 38. The State said it would "provide specifics on the calculation methodologies and use in monitoring and enforcement activities in later phases as directed by the Court." ECF No. 2478-1 at 22. Plaintiffs request that the Court set a timeline and deadline for the State to establish and implement its data collection and analyses methodologies for this item. Plaintiffs also request the State to respond to the Monitor's observation regarding collection and analyses of behavioral emergency reports data. *See* ECF No. 2469 at 40.

### G.    Parent Input

Plaintiffs agree with the Monitor's noncompliance determination. The Monitor found the State noncompliant because it does not disaggregate and analyze subgroup data and its compliance targets are unambitiously low. The State didn't provide a response and should be

found noncompliant. Moreover, Plaintiffs continue to assert that the data collected to determine whether parents have a meaningful opportunity to participate in their children's education—one single question that is asked at an individualized education plan team meeting—is woefully inadequate to determine whether or not districts ensure meaningful parent input.

## H.     State Complaints

Plaintiffs agree with the Monitor's noncompliance determination. The Monitor found the State noncompliant due to its inconsistent statements on the methodology it uses in analyzing state complaint data. ECF No. 2469 at 42. The State responded by saying that it now uses a simple count of "noncompliances," rather than a compliance rate. ECF No. 2478-1 at 22. A simple count, however, is inadequate because it doesn't consider the size of the districts—we would expect larger districts to have more due process filings. Moreover, the State does not provide any statement of how it analyzes the noncompliance count and what standard it uses to determine district noncompliance.

## I.     Due Process Hearings

Plaintiffs agree with the Monitor's noncompliance determination. The Monitor found the State noncompliant due to its inconsistent statements of the methodology it uses in analyzing state due process hearing data. ECF No. 2469 at 42. The State responded by saying that it now uses a simple count of "noncompliances," rather than a compliance rate. ECF No. 2478-1 at 22. A simple count, however, is inadequate because it doesn't consider the size of the districts—we would expect larger districts to have more complaints. Moreover, the State does not provide any statement of how it analyzes the due process hearing count and what standard it uses to determine district noncompliance.

## IV.

## USE OF DATA FOR SELECTION FOR MONITORING PROCESSES

## A.  Performance Indicator Review

Plaintiffs agree with the Monitor's noncompliance determination. The determination is based on: (1) the State's selection methods that are based on insufficient data analyses and some

inadequate targets; (2) lack of clarity regarding whether preschool placement and performance data are used to select for this review; and (3) if those data are not used in this selection process, it is possible that districts that perform very poorly in these areas may escape further monitoring. As detailed in the Monitor's report and above,[3] because the State's data analyses are inadequate and its standards are unambitiously low in many instances, the selection process for Performance Indicator Review—a targeted monitoring activity—is by necessity fatally flawed.

In response, the State confirms that it uses preschool placement/LRE as an indicator for Performance Indicator Review, but it does not use preschool performance as an indicator (preschool performance is used for Preschool Review and Comprehensive Review). ECF No. 2478-1 at 22-23. Accordingly, the State should be deemed out of compliance because it does not use preschool performance to trigger Performance Indicator Review, as the Monitor determined.

### B.  Data Identified Noncompliance

Plaintiffs agree with the Monitor's compliance determination.

### C.  Preschool Review

Plaintiffs agree with the Monitor's noncompliance determination. The Monitor finds the State noncompliant for the following reasons: (1) the State does not provide any explanation/argument that its selection matrix and cut score of six or more points is adequate to ensure preschool FAPE in the LRE; (2) the selection methodology is inadequate because of (a) the all-or-nothing approach to scoring, (b) the masking of certain indicators that demonstrate poor district performance because districts can be given a pass even if they miss up to five targets and miss them by wide margins, and (c) the improper treatment of all selection elements as if they were equally important; (3) the State does not disaggregate data for subgroups; and (4) the State does not include a selection element related to child find. ECF No. 2469 at 55.

---

[3]   The Monitor provides a helpful summary table of the flaws in the State's data analyses and targets for each of the indicators used in the Performance Indicator Review selection process. ECF No. 2469 at 45-46.

Setting aside the fact that the State's submission regarding Preschool Review was replete with errors and inconsistencies, as the Monitor pointed out, the State's Response fails to meaningfully address the Monitor's finding that the State does not provide an explanation for its selection matrix and cut scores that demonstrates its data analysis can ensure FAPE in the LRE. Rather, the State expects the Court and California's children to rely on deference to the State's administrators. The State does not address the Monitor's concerns about the all-or-nothing approach to scoring, the masking of certain indicators that demonstrate poor performance, and the improper treatment of all selection elements as if they were equally important.

Instead, the State says that "[b]ecause the total population is small and there would be a wide variance in outcomes due to small N-sizes, CDE's methodology ensures that one indicator is not weighted such that it unduly influences the other indicators." ECF 2478-1 at 22. This makes no sense. First, to what "total population" is the State referring? The total number of preschoolers served by districts? The total number of districts that serve preschoolers?  Second, some large, urban districts have very large populations of preschoolers they serve, while some small rural districts would have small populations of such students. Third, the precise problem with the State's methodology is that its assignment of weights to each variable—weighing each variable equally—is arbitrary and results in less important variables having an undue influence on selection, while masking the effects of more important variables. This problem is exacerbated with the all-or-nothing approach to scoring each of the variables that may result in the exclusion from monitoring of Districts that are poor performers, but don't quite trigger the unsupported target of "6" the State has set.

The State then baldly states that "CDE prioritized the selection of variables based on its determination of the current needs of the State: Preschool LRE (4 indicators) and Preschool Suspension (3 indicators). To select LEAs for Preschool Review, CDE determined that it would select those LEAs with a score of six or more, based on the need to deploy resources to those LEAs most in need of support." *Id.* at 22-23. While preschool LRE and suspension are important

areas of concern, the State's methodology of requiring a score of six actually results in serious problems with one or more of the LRE and suspension indicators being ignored, so long as a district doesn't hit the magic number of six.  The State also inexplicably reduces all of the data collected in connection with the Desired Results Developmental Profile to one indicator, virtually ignoring the more nuanced performance data that this assessment yields. Finally, while Plaintiffs agree that the State should deploy its resources in an efficient fashion, it doesn't explain why its score of six results in such efficiency, given the flaws in its methodology and the likelihood that many needy districts are given a pass. This result is further exacerbated by the automatic inclusion of those districts that have even one student placed in a non-public (pre)school. For a small district, such a low trigger might be warranted, but, for larger districts, this could result in an inefficient placement into Preschool Review.

The State does not address the Monitor's concerns regarding disaggregation by subgroup and child find.

### D.  Disproportionality Review

Plaintiffs agree with the Monitor's noncompliance determination. The Monitor finds the State noncompliant due to the fact that "the formulas included in CDE's submission do not use as the denominator other students with disabilities." ECF No. 2469 at 56. CDE states that it will use "all students with disabilities" in the denominators for the relevant formulas. ECF No. 2478-1 at 14, 19. The Monitor also found that there is a discrepancy in the State's submission regarding the number of districts selected for monitoring under the "disproportionality in identification" indicator. ECF No. 2469 at 56. The State does not explain this discrepancy.

### E.  Significant Disproportionality Review

The Monitor deferred his determination on this item, asking the State for information regarding "whether a definition of reasonable progress is used to excuse districts from this process" and stating that the "formulas are problematic" for placement and discipline. ECF No. 2469 at 57. The State responded by stating that it has held a stakeholder meeting in which the

stakeholders asked the State to model different approaches to "reasonable progress." ECF No.
2478-1 at 25. The State, accordingly, is currently out of compliance on this item.

### F.  Comprehensive Review

Plaintiffs agree with the Monitor's noncompliance determination.

As a preliminary matter, the data analyses and selection for comprehensive review is a
critical component of the State's special education monitoring system because, as will be seen in
Phase 3, it is the only monitoring review that even attempts to go into districts to
comprehensively analyze the districts' service delivery system and provide appropriate support
to districts that are not providing FAPE to their children and complying with the law. Thus, the
State's argument that it need only conduct comprehensive review of some arbitrary number of
districts based on its own resource allocation decisions cannot be the standard for compliance
with the law. *See* ECF No. 2478-1 at 30 ("CDE identifies the LEAs with the most overall need
and matches them with the State's available resources to conduct reviews"). The State effectively
admits that it doesn't actually monitor for compliance with the law or assurance of FAPE; rather,
it monitors districts based on its own resource allocation decisions. Indeed, the State started with
an already arbitrary and unexplained cut score for comprehensive review of 65% and changed it
to 62% in 2017-18 to dramatically lower the number of districts it had to review, ECF No. 2469
at 70, due to its own resource allocation decisions. *See* ECF No. 2478-10. Put differently, the
number of districts failing to comply with the law and deliver FAPE, *i.e.,* those with "the most
overall need," doesn't change based on the State's bureaucratic decisions to allocate resources
differently.

Perhaps equally troubling, the State's alteration of cut scores does not give school
districts any reliable understanding of the compliance targets they must meet and may well create
the impression among school district administrators and teachers that the State's comprehensive
monitoring process is arbitrary and unfair. This is not a system that inspires confidence.

The State also attempts to dismiss the Monitor's concern that very poor performing districts can escape comprehensive review based on minimal gains by saying that "LEAs that are not making progress are a higher priority for this intensive monitoring activity." ECF No. 2478-1. Again, this makes no sense because a relatively higher performing district that did not make year-over-year progress might be selected for comprehensive review, while a very poor performer could escape that review by merely making minimal progress for one academic year. The State must pay attention to *both* absolute performance *and* performance gains.

In the remainder of this section, Plaintiffs identify each of the Monitor's remaining findings regarding the State's method for comprehensive review selection and address the State's response to each such finding.

### 1. Concerns Regarding the State's Data

The Monitor identifies several problems with and questions about the comprehensive review data submitted by the State. First, the Monitor notes that "the spreadsheet [containing the data] did not contain actual performance on state assessments or preschool assessments." ECF No. 2469 at 58. The State responded by saying that it provided the "Dashboard color" for the LEA's Graduation Rate, the LEA's Math and English Language Arts Proficiency Scores, and the LEA's Discipline Rate. ECF No. 2478-1. This is insufficient. In order to demonstrate that its method for selecting districts for comprehensive review (and thereby ensuring FAPE and student progress) is effective, the State must provide the underlying performance data so that its analyses may be replicated and examined.

Second, the State's initial Submission did not provide any explanation for its use of "0," "NA," or "NC" as values in some of the spreadsheet's data cells. In response to the Monitor's request, the State provided an explanation for the use of "NA" and "NC." ECF 2478-1. The State says that it assigns an "NA" value where either the data are not available for calculation or the indicator is not applicable. 2478-1 at 26. While the State provides examples of such unavailability and inapplicability, the State should provide an explanation for *all* "NA" values.

The State also says it assigns an "NC" (not calculated) where the value was not calculated due to small N-size. *Id.* The State provides a table showing the N-size required for each of the indicators, ECF No. 2478-3, but does not explain why those minimum N-sizes were selected.

### 2.   Standards for Scoring Each Selection Element

#### a.   Placement, Parent Input, Two Timeliness Indicators

The Monitor again points out that under the State's scoring and selection system, districts that are performing quite poorly on indicators related to student placement, parent input, and timeliness, may not be selected for comprehensive review because they have made minimal, one-year progress (not sustained progress). ECF No. 2469 at 60. Relatedly, Districts that perform quite well may receive a poor score simply because of a minor one-year regression. *Id.* The State doesn't try to defend these illogical outcomes, but merely says that it selects districts with low performance for performance indicator review. ECF No. 2478-1 at 27. The Court should not accept that justification where a better scoring system—one that requires meaningful absolute performance and recognizes performance gains—would ensure that districts are appropriately selected for comprehensive review. Recall, also, that the Monitor identified in Section III of his Report myriad problems with the underlying analysis of each of these indicators that are used in selecting districts for comprehensive review. *See* ECF 2469 at 61.

#### b.   Achievement on State Assessments, Overall Discipline

The Monitor reminds us that the State's use of the Dashboard for scoring these elements in comprehensive review selection is flawed due to the underlying problems with the Dashboard analysis for these indicators. *See* 2469 at 61-62. The State does not respond to this concern in this section.

#### c.   Performance on Preschool Assessments

The Monitor identifies a number of problems with the State's scoring of its preschool assessments indicator for purposes of selection for comprehensive review, including the impossibility of achieving a score of "3," the illogic of  certain scores, and the fact that well-

performing districts could (and do) receive lower scores than poor-performing districts that make a minimal gain. ECF No. 2469 at 62-63. Rather than responding directly to any of these concerns and explaining why its flawed scoring methodology is appropriate and ensures FAPE, the State "updates" its description of its scoring methodology, ECF No. 2478-1 at 28-29, which appears to be a change to the methodology it offered in its Submission. Specifically, for each of the scores (1-4), the State changed the requirement from "Did not meet all six targets in current year" to "Did not meet the target." *Id.* at 30. How this change addresses any of the Monitor's concerns is not explained.

### d.   Disproportionality in Discipline

For this selection element, the Monitor points out that there is a potential mistake in the State's submission—there is a contradiction between the scoring criteria provided by the State and the data collected and recorded in the Submission's Attachment H and the spreadsheet provided by the State. ECF No. 2469 at 65. The Monitor asks the State to "explain whether [noncompliance] is a factor in the scoring of this selection element and, if so, how it is factored in." *Id.* The State responds by "confirm[ing] that the table in the Monitor's Review represents the methodology used for all the disproportionality indicators." ECF No. 2478-1 at 29. While this statement answers the Monitor's question, it does raise two other problems: (1) Why did the State's original Submission include the confusing and potentially conflicting information in the first place?  And (2) While the State purports to be concerned about performance growth/gains, how come this element does not consider growth/gain?

### e.   Disproportionality in Identification in Disability Categories

The Monitor's concerns, the State's response, and the remaining problems are the same for this element as the "disproportionality in discipline" element above.

### f.   Disproportionality in Identification Overall

In addition to the same concerns as those for "disproportionality in discipline," the Monitor notes that Attachment H to the State's Submission identifies "disproportionality in

placement" as a selection element, but no scoring methodology is provided for this element in the Submission. ECF No. 2469 at 65. Presumably, the State uses the same scoring methodology for this added element as it does for the other disproportionality elements. If so, the scoring suffers from the same problems as the "disproportionality in discipline" element.

g.   Complaint and Due Process Noncompliance

The Court Monitor identifies in the State's submission several confusing and contradictory aspects of the State's treatment of complaint and due process noncompliance for purposes of comprehensive review. ECF No. 2469 at 65-66. The Monitor concludes by saying that "[d]ue to this level of confusion, it is not possible to fully determine how CDE treats complaint and due process noncompliance for the purposes of comprehensive review selection. This should be clarified by CDE." *Id.* at 66. The State did not respond.

h.   Timeliness of Annual IEPs and Triennials

For these two elements, the Monitor identifies a number of problems including contradictory statements regarding the scoring method, disregard of the extent to which timelines were exceeded on average, and strange results that may penalize districts that perform well. ECF No. 2469 at 66-68. In response, the State only clarifies that a score of "3" is not possible for "timely IEPs" and "timely triennials." ECF No. 2478-1 at 29. It does not address the other concerns.

i.   Timely and Complete Submission of "Required Items"

The Monitor observed that State's Submission did not explain what are the required items nor did it discuss its data analysis of this item nor did it even consider the validity and reliability of districts' data submissions (which the IDEA requires, 34 C.F.R. § 300.601(b)(1)). ECF 2469 at 69. In response, the State appears to change its scoring and analysis of this "timeliness" item and does not explain how this changed scoring and analysis is used for comprehensive review.

j.   Standard for Selection/Implications

The method and ultimate standard used for selecting districts for this most important and potentially impactful monitoring review, comprehensive review, is among the most critical components of the State's monitoring system, as this method and standard determine whether poor performing school districts will receive the necessary scrutiny and support of the comprehensive review process. Unfortunately, the Monitor found this component woefully lacking. The Monitor first finds that the "submission does not explain how this [65%] standard for selection was developed, or why this cut score is adequate in CDE's view for selecting districts for this intensive monitoring review in order to ensure that students are receiving FAPE and are placed in the least restrictive environment." ECF No. 2469 at 69. In practice, the State actually lowered its cut score to 62%. The Monitor then demonstrated how that modified cut score created several troubling and insupportable results when used in selecting districts. As Plaintiffs have already noted, the State simply responds by saying that it selects the districts "with the highest level of need" and "identifies the LEAs with the most overall need and matches them with the State's available resources to conduct reviews." ECF No. 2478-1 at 30. This is not acceptable. As Plaintiffs have argued, the State's resource allocation choices cannot be the standard for whether a monitoring system is compliant with the law.

The Monitor then notes that the State's comprehensive review selection method is flawed because it does not adequately consider child find data, it improperly treats all 22 elements in the method as equally important, and when the method is applied, a very small number of districts are selected for review. The State did not respond to these concerns.

### G.  Non-Public School Monitoring

Plaintiffs agree with the Monitor's noncompliance determination. The Monitor notes that, during the Phase 1 hearing, the State administrators indicated that the State monitors and certifies nonpublic schools and that such monitoring includes validation review, on-site review, and follow-up review, according to its own monitoring instrument. ECF No. 2469 at 73. Yet the

State's Submission provides no information about analysis and selection for such reviews. The State's Response neither describes its selection process nor explains why it is appropriate and effective. Instead, the State merely: (1) states that it "provided information relating to NPS monitoring on August 3, 2018 upon the Court's request," but does not explain how that information—which is a sample NPS monitoring protocol—is analyzed or the method for further monitoring selection, and (2) cites California Education Code § 56366.1(e)(1)—the Statute that mandates that the Superintendent of Public Instruction conduct nonpublic school monitoring—but does not describe the monitoring process at all. [4]

## V.

## "MEETS REQUIREMENTS" DETERMINATIONS WITHOUT ADDITIONAL MONITORING

Plaintiffs agree with the Monitor's noncompliance determination.  Following an extensive and thoughtful analysis, the Monitor concludes that "the CDE's current approach to annual determinations allows districts that may have a significant number and significant types of potential compliance concerns to be considered to have met the requirements of the IDEA without additional monitoring." ECF No. 2469. In other words, the State's flawed analysis of each of its data elements coupled with the State's flawed methods of selection for further monitoring reviews may well result in "false negatives"—districts with significant noncompliance issues that are not flagged for further scrutiny. Plaintiffs, however, are also

---

[4]   California Education Code § 56366.1(e)(1) provides:

> Before certification, the Superintendent shall conduct an onsite review of the facility and program for which the applicant seeks certification. The Superintendent may be assisted by representatives of the special education local plan area in which the applicant is located and a nonpublic, nonsectarian school or agency representative who does not have a conflict of interest with the applicant. The Superintendent shall conduct an additional onsite review of the facility and program within three years of the effective date of the certification, unless the Superintendent conditionally certifies the nonpublic, nonsectarian school or agency, or unless the Superintendent receives a formal complaint against the nonpublic, nonsectarian school or agency. In the latter two cases, the Superintendent shall conduct an onsite review at least annually.

concerned about the risk of "false positives"—districts that are relatively, if not very, high performing that are subjected to further monitoring reviews, resulting in squandered state and local resources.

The State's Response does not directly address the Monitor's analysis. Rather, it first provides the example of two (unnamed) school districts, one that performed well on all of the indicators and was deemed "meets requirements" and another that had met requirements in one year, but then was deemed "needs assistance" because it had been flagged by two of the indicators. ECF No. 2478-1 at 31-32. Apart from being mere anecdotes among the thousand-plus school districts in the State, these examples don't actually demonstrate that those districts are or are not providing FAPE because the data analysis and selection methodology are so flawed.

Second, the State quotes a June 2009 response to a question by the United States Department of Education, Office for Special Education Programs that appears to permit a state to be out of compliance on one or more indicators, so long as the totality of a state's data and other information indicate overall compliance. *Id.* at 32. Such an approach is not objectionable. Indeed, a thoughtful, theory-driven approach to data analysis would allow wiggle room, particularly for districts that are demonstrating strong performance on the most important indicators. The problem is that the State has not explained why its data analysis and selection methodology results in effective and appropriate determinations.

Finally, the State says that "it is  clear that CDE's overall system for analyzing LEA data statewide is adequate and within the requirements of the law" because 72.8% of LEAs in the state land in the category of "Needs Assistance." *Id.* Not only is this bald assertion unsupported, it is illogical because it's entirely possible that many of these districts were selected for the wrong monitoring reviews, were not selected for enough scrutiny, or should not have been selected at all due to the State's flawed data analysis and selection methods.

# VI.

## CONCLUSION

The Court ordered the State to "demonstrate" that its data analyses and monitoring selection methodologies were compliant with the IDEA, that is, that they ensure California school districts are providing children a FAPE in the LRE and improving student outcomes. In response, the State merely described a system of data analysis that purports to be sufficient for compliance with its federal reporting requirements, but it did not explain why that system is compliant with the law, ensures FAPE in the LRE, and improves student outcomes. Nor does it provide any evidence that the monitoring system actually works in practice. Instead, it submitted a data analysis system with internal mistakes and contradictions, a system that can result in illogical and unfair determinations, and a system that will result in children being denied FAPE and taxpayer dollars being squandered in inefficient monitoring activities.

Dated: March 25, 2019

Respectfully submitted,

YOUTH AND EDUCATION LAW PROJECT
STANFORD LAW SCHOOL
MILLS LEGAL CLINIC

By:    _____/s/_____
William S. Koski
*Attorneys for Plaintiffs Emma C., et al.*

NATIONAL CENTER FOR YOUTH LAW

By:    _____/s/_____
Leecia Welch
*Attorneys for Plaintiffs Emma C., et al.*