Pages 1 - 216

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before the Honorable Vince Chhabria, Judge

EMMA C., et al.,            )
                            )
          Plaintiffs,       )
                            )
  vs.                       )  **No. C 96-4179 VC**
                            )
TOM TORLAKSON, et al.,      )
                            )
          Defendants.       )
_____    )

                        San Francisco, California
                        Monday, April 29, 2019

                 **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**Court Monitor:**        **MARK MLAWER**
                          Office of the Court Monitor
                          PO Box 51170
                          Palo Alto, California 94303

**For Plaintiffs:**
                          STANFORD LAW SCHOOL
                          Youth & Education Law Project
                          559 Nathan Abbott Way
                          Crown Quadrangle
                          Stanford, California 94305-8602
                    BY:   **WILLIAM S. KOSKI, ESQ.**



           **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana M. Dub, CSR 7445, RDR, CRR, CCRR, CRG, CCG
              Official Reporter, U.S. District Court

```
 1    APPEARANCES:   (CONTINUED)

 2    For Plaintiffs:
                             NATIONAL CENTER FOR YOUTH LAW
 3                           405 14th Street, 15th Floor
                             Oakland, California 94612
 4                       BY: LEECIA JO WELCH, ESQ.
                             FREYA E.K. PITTS, ESQ.
 5

 6    For State Defendants:  CALIFORNIA DEPARTMENT OF JUSTICE
                             OFFICE OF THE ATTORNEY GENERAL
 7                           Civil, Health, Education and
                                Welfare Section
 8                           1300 I Street, Suite 125
                             Sacramento, California 95814
 9                       BY: DARRELL WARREN SPENCE
                             KIRIN K. GILL
10                           DEPUTY ATTORNEYS GENERAL

11    For Defendant          OFFICE OF THE SAN MATEO COUNTY COUNSEL
      Ravenswood U.S.D.:     Hall of Justice and Records
12                           400 County Center, Sixth Floor
                             Redwood City, California 94063
13                       BY: AIMEE B. ARMSBY
                             DEPUTY COUNTY COUNSEL
14

15

16    Also Present:          SHIYLOH DUNCAN-BECERRIL

17                           KRISTIN WRIGHT

18                           ALISON GREENWOOD

19

20

21

22

23

24

25
```

 1   <u>**Monday - April 29, 2019**</u>                    <u>**9:37 a.m.**</u>

 2                    <u>**P R O C E E D I N G S**</u>

 3                        ---o0o---

 4        **THE CLERK:**  Calling Case Number 96-cv-4179,

 5   Emma C., et al. versus Thurmond, et al.

 6      Counsel, please state your appearances for the record.

 7        **MR. KOSKI:**  Good morning, Your Honor.  William Koski,

 8   Youth and Education Law Project, on behalf of plaintiffs.

 9        **THE COURT:**  Good morning.  And I think we have some

10   new guests at the party.  Is that right?

11        **MS. WELCH:**  We do.  We do.  Good morning, Your Honor.

12   I'm Leecia Welch from the National Center for Youth Law

13   representing plaintiffs.

14        **THE COURT:**  Good morning.

15        **MS. PITTS:**  Good morning.  Freya Pitts from the

16   National Center for Youth Law for plaintiffs.

17        **THE COURT:**  Good morning.

18        **MS. ARMSBY:**  Good morning.  Aimee Armsby, Lead Deputy

19   County Counsel, representing the Ravenswood defendants.

20        **THE COURT:**  Hello again.

21        **MR. SPENCE:**  Good morning, Your Honor.  Darrell Spence

22   on behalf of the California Department of Education, the State

23   Board of Education, and the Superintendent of Public

24   Instruction.

25        **THE COURT:**  Hello.

**PROCEEDINGS**

1          **MS. GILL:**  Good morning, Your Honor.  Deputy Attorney

2     General Kirin Gill for State defendants.

3          **THE COURT:**  Hello.

4     And hello to the policymakers.

5     Okay.  You all got my -- by the way, I think that we

6     basically should proceed in more or less the same way that we

7     proceeded last time, which is that you all will be providing

8     testimony to us and it'll be under oath.  And you received an

9     order from me on Friday or Thursday, or something like that,

10    telling you how I wanted to start.

11         And after I hear from you on the different types of review

12    and what they entail or what they are supposed to entail, maybe

13    we'll turn to Mark and we'll ask him to sort of focus on --

14    we'll ask him to make a presentation about some of his

15    findings, and then we'll go from there.

16         So why don't we start with Kristen administering the oath

17    to the three of you.

18                    (Policymakers sworn in.)

19         **THE COURT:**  Okay.  So I thought -- it's hard to figure

20    out what's the best way to start on all of this, but I thought

21    that since, at the end of the day, this is about how to select

22    school districts or LEAs for different types of review, it's

23    important to get a refresher course on the different types of

24    review and what they aspire to accomplish.  Right?

25         And obviously, next time, we will get into -- we'll

PROCEEDINGS

1  have -- in Phase 3 we'll have more of an examination of whether

2  they are accomplishing what they're supposed to accomplish and

3  whether that is enough, whether that's adequate.

4       But now, at a minimum, I want to understand what those

5  different levels of review are supposed to accomplish, what the

6  goal is for them, so that we can put into context the data

7  analysis part.

8       So if you all could start with that, I think that would be

9  helpful.

10          **MS. GREENWOOD:**  Your Honor, I brought a PowerPoint,

11  so --

12          **THE COURT:**  Great.

13          **MS. GREENWOOD:**  -- we can proceed; and I have

14  handouts, if that's helpful.

15          **THE COURT:**  Great.

16          **MS. GREENWOOD:**  Thank you.

17       Good morning.  I'm Alison Greenwood.  I'm the quality

18  assurance administrator for the California Department of

19  Education, Special Education Division.

20       I'm here to talk and give us a little bit of a refresher

21  about our monitoring activities, and they include the following

22  activities that you see on your screen:  the performance

23  indicator review, data identified non-compliance reviews,

24  disproportionality reviews, comprehensive review, preschool

25  review, non-public school review, and other reviews, such as

**PROCEEDINGS**

1   the critical incident review and the data validation.  So I'm

2   going to go into all of those just a little bit.

3       The performance indicator review looks at those elements

4   closely related to outcomes for students.  So we're looking at

5   things like graduation rate, dropout, statewide assessments,

6   suspension, school-age least restrictive environment, preschool

7   least restrictive environment, parent involvement, post school

8   outcomes, and Child Find.

9       Some of the activities associated with that review are

10  development of an improvement plan.  That improvement plan

11  includes drill-down activities, root-cause analysis.  It

12  requires the participation of general education and special

13  education personnel and local educational agency

14  administrators.

15      THE COURT:  So what level of involvement does

16  the State have in performance indicator review?  I mean, the

17  sense that I got from reading the papers, although I may be

18  wrong and I may have missed something, but the sense I got is

19  that from the State's perspective, if a target is not met on

20  one of these indicators, the State informs the LEA or the

21  district that the target has not been met and tells the

22  district:  You need to put together a self-improvement plan and

23  submit it to us.

24      MS. GREENWOOD:  That is correct.

25      THE COURT:  And so the State is not, kind of, on the

**PROCEEDINGS**

 1   ground working with the district to make whatever improvements

 2   need to be made with respect to that indicator.

 3       Is that accurate?

 4       **MS. GREENWOOD:**  It's accurate to a certain extent.

 5   There are certainly -- we have consultants assigned to that

 6   particular activity, and they are there to serve as a resource

 7   for LEAs engaged in that activity.

 8       **THE COURT:**  You have --

 9       **MS. GREENWOOD:**  Typically --

10       **THE COURT:**  You mean the State has consultants?

11       **MS. GREENWOOD:**  Yeah.  And when I say -- that's one of

12   our, yeah, consultant staff.  So they're employed by the

13   Special Education Division.

14       **THE COURT:**  Okay.

15       **MS. GREENWOOD:**  In addition to other resources that we

16   have available for folks to use.

17       But the consultant staff develop the materials used in the

18   performance indicator review, and they review those plans once

19   submitted.

20       **THE COURT:**  Okay.  And then how often -- so there's an

21   improvement plan that is submitted by the district or by the

22   LEA --

23       **MS. GREENWOOD:**  Yes.

24       **THE COURT:**  -- to the State.

25       **MS. GREENWOOD:**  Yes.

**PROCEEDINGS**

1       THE COURT:  And how common is it to reject the

2   improvement plan?

3       MS. GREENWOOD:  I don't have a percentage, but it

4   certainly happens.  It just depends on the quality of the plan

5   that's provided to us.

6       THE COURT:  Um-hmm.

7       MS. GREENWOOD:  So there is back and forth between

8   those consultants and the LEAs in terms of missing elements of

9   the plan.

10      THE COURT:  Okay.  And then is there anything done --

11  I take it the answer is "no," but I just want to make sure.

12      Is there anything done -- so I assume these improvement

13  plans kind of lay out a list of things that the district has to

14  do, sort of ways the district needs to change its systems, or

15  whatever, to make sure that it does better on this indicator

16  going forward.  Right?

17      MS. GREENWOOD:  Developed by the LEA, yes.  So it's

18  not as though we're saying, "These are the things you have to

19  do."  We're saying, "You need to improve."

20      THE COURT:  Right.

21      MS. GREENWOOD:  You need to come up with the

22  strategies for that.

23      THE COURT:  For how to do that.

24      So might it involve dedicating more staff resources to

25  this particular function?

**PROCEEDINGS**

1          **MS. GREENWOOD:**  That's certainly possible.  It might

2  involve more professional learning opportunities.  It might

3  involve looking at the data systems and how things interact

4  with each other.  There's a myriad of possibilities.

5          **THE COURT:**  And then that plan gets submitted.  It

6  gets approved.  It might get rejected.

7      But assuming it gets approved by your staff, then does

8  your staff do anything going forward to make sure that the LEA

9  does the things that the improvement plan says it must do, such

10  as directing more staff resources to this particular area or

11  getting the data analysis cleaned up or whatever it is; or is

12  the State merely looking at whether the target is met the

13  following year?

14          **MS. GREENWOOD:**  It's the latter.

15          **THE COURT:**  Okay.  Okay.

16          **MS. DUNCAN-BECERRIL:**  And, Your Honor, the plans are

17  based on the root-cause analysis.  So each plan will be

18  different based on how the LEA looks at their own data and

19  works with our staff to drill down in some of the information.

20  But the plan will be unique to each LEA's circumstances, based

21  on their own data analysis, looking at more timely data, more

22  current data that they might have, such as current school year

23  data, that information that may not have been submitted yet to

24  the CDE.

25          **THE COURT:**  And then what sort of information do you

1    have about whether -- and I know this is kind of outside the

2    scope of Phase 2.  This is more of a Phase 3 question.  But

3    I think it's helpful for understanding the data analysis part

4    of it.

5         What kind of information, if any, do you have about how

6    effective this type of review is?  Like, is this type of

7    review, this performance indicator review and these improvement

8    plans, are they helping?  Are they helping districts really

9    make progress in these areas?

10        **MS. GREENWOOD:**  I don't know that we have that type of

11   information yet, just because it's been a phase-in process, and

12   we've had changes over the years.  So it's hard.  We're

13   comparing apples to oranges, sort of, at this point.

14        In terms of the larger picture, if you're asking about,

15   you know, sort of improvement science and those sorts of

16   things, there's a lot of evidence about improvement science and

17   improvement theory, that sort of work.

18        **MS. WRIGHT:**  It might be --

19        **THE COURT:**  I was just asking specifically about

20   whether this type of review is something that works.

21        **MS. WRIGHT:**  So the feedback we've received so far --

22   and this is anecdotal because we don't have, like, every search

23   project on it yet but -- is that it's provided the impetus for

24   local educational agencies to have a reason to take all the

25   special ed data and bring it to the forefront to work with

**PROCEEDINGS**

1    their Local Control Accountability Plans in the larger system.

2    So it's been, like, an important vehicle.  On top of the fact

3    that we're working on the individual indicators, it has been

4    something that now is being brought forward.

5         We're hearing all kinds of feedback about how -- the ways

6    that districts and schools are looking at their special

7    education data in relation to their whole systems improvement,

8    which is really what we want to see.  We don't want it all to

9    be treated in a vacuum.  We want it to be part of a whole

10   school-wide, district-wide improvement.  And we're seeing a lot

11   of new and interesting ways they're doing that through

12   cross-walking the special ed data with the activities that

13   they're doing in the whole school.  And so I would say at this

14   point, we're getting good feedback.

15        And we're also getting feedback that it's hard.  So, to

16   us, that means that people are digging in and trying to really

17   work on it and unpack the data, and that's kind of what we want

18   to see.

19        And Shiyloh's been going across the state, really trying

20   to help them understand the special ed data so that they can

21   use it as a foundation for this improvement science that

22   Alison's talking about.

23        **THE COURT:**  So this performance indicator review, when

24   did it start?  When did it start happening?

25        **MS. DUNCAN-BECERRIL:**  So we did a pilot in 2014-'15

1  where we phased in, I think, 200 LEAs; and then we phased in an

2  additional 250 for two additional years.  And so I believe

3  '16-'17 was the first year that we had all the LEAs and then

4  this upcoming year.

5      And the reason, I think, Alison says it's been sort of an

6  ongoing process change is because people have been including

7  their Local Control Accountability Plans with their performance

8  indicator because there's quite a bit of overlap.

9      And on top of that, we have also been pulling out the

10  charter school data.  And so now, you know, if you look at our

11  numbers right now, it looks like we have a lot more LEAs in

12  performance indicator review.  A lot of that is because we

13  pulled out every single charter from the LEA, and that adds an

14  additional 1100 LEAs to monitor for performance indicator

15  review.

16          THE COURT:  Each charter is its own LEA --

17          MS. DUNCAN-BECERRIL:  Yes.

18          THE COURT:  -- for special ed purposes now?

19          MS. DUNCAN-BECERRIL:  Yeah, for all purposes.  Under

20  the LCFF law, that was what was determined.

21          THE COURT:  Okay.  So performance indicator review

22  might just be about -- I suppose theoretically, an LEA could

23  meet its targets for all but one indicator.  That would subject

24  it to performance indicator review.

25          MS. GREENWOOD:  That's correct.

1      **THE COURT:**  And so take suspension.  Maybe that's the

2  one area where the LEA doesn't meet its target.  And so it's

3  subjected to performance indicator review on suspensions.  And

4  they have to come up with a self- -- they have to create an

5  improvement plan.

6      This is sort of an abstract question.  I don't know how

7  well you can answer it.  But when the LEA is putting together

8  an improvement plan for the suspension indicator, how much of

9  an opportunity does that give the LEA to take sort of a more

10  comprehensive look at the other indicators, even if they might

11  have met the target?

12      I'm just trying to get a sense of how narrow the focus is

13  of the review in a situation where an LEA might have only

14  missed the target for one or two indicators.  Does that mean

15  they're not going to take any meaningful look at the other

16  aspects of their provision of services to special ed kids?

17      I don't know if that's an answerable question.

18      **MS. GREENWOOD:**  Well, there are other reviews.  So

19  we're definitely not limited to the performance indicator

20  review.  And some of those other indicators are dealt with in

21  those other types of review.

22      **MS. DUNCAN-BECERRIL:**  And, Your Honor, I would also

23  say, when they're going through the root-cause process -- and

24  our staff also do this -- let's look at all of your indicators

25  just to see how you're doing, to make sure that you're checking

1    up on that.  But in addition to that, some of these indicators

2    are related.  For example, you have a district who's not

3    meeting its targets in achievement.  They might drill down and

4    realize, Jeez, we have a lot of suspension issues.  It may not

5    reach the point of not meeting the target, but it seems like

6    our suspension is causing students to miss school, and that's

7    what's causing our achievement.

8        So I think that there's an overlap, in part, because a lot

9    of the indicators are related.

10           MS. WRIGHT:  And in your example of you just have --

11   you're just out in suspension, the root cause may determine

12   that you need more -- you have maybe one school that is very

13   high.  So it could lead to specific issues of specific school

14   sites.  Or it could lend to a direct correlation between

15   achievement, or kids are not reading, and so you're seeing more

16   kids at certain grade levels, for certain reasons, not be

17   engaged and having behaviors.  Or it could also mean that you

18   need to work on a positive behavioral, sort of, support system

19   for your district because you don't have good foundational

20   Tier 1 behavior standards in place.

21           THE COURT:  Okay.

22           MS. WRIGHT:  But the root cause could determine that.

23           THE COURT:  Okay.  That's helpful.  You can resume on

24   your slide show.

25           MS. GREENWOOD:  Thank you.

**PROCEEDINGS**

1       So we also have the data identified non-compliance review.

2   And because we're terribly creative in our naming structures,

3   it's non-compliance that is identified based on the data that

4   comes to us.

5       So we look at evaluation within 60 days; that Part C to B

6   transition completed timely and an IEP in place by the child's

7   third birthday, implemented by the child's third birthday.  We

8   look at all eight elements of secondary transition.  We also

9   look at timely IEPs, annual and triennial, and we're adding the

10  timely resolution sessions to that process.

11          THE COURT:  How -- well, I'll let you continue, and

12  then I'll ask -- I'll hold off on my question.

13          MS. GREENWOOD:  Okay.  So if an LEA is chosen to

14  participate in the data identified non-compliance review, they

15  have to correct the identified non-compliance --

16          THE COURT:  Wait a minute.  Hold on.

17          MS. GREENWOOD:  Yes.

18          THE COURT:  You said if an LEA has chosen to

19  participate?

20          MS. GREENWOOD:  Is chosen.

21          THE COURT:  Is chosen.

22          MS. GREENWOOD:  Is chosen.

23          THE COURT:  Sorry.  Okay.

24          MS. GREENWOOD:  Yeah, based on their data submitted to

25  us.

1          There's an analysis of the root cause of missed timelines,

2    and then there are follow-up data submissions referred to

3    sometimes as Prong 2 submissions, in which once they've

4    submitted the data to us, we do an additional determination of

5    non-compliance and issue additional corrective actions.

6          **THE COURT:** So is -- I'm trying to -- conceptually,

7    I'm trying to understand why there are these two different

8    categories:  performance indicator review and data identified

9    non-compliance review.  I mean, it seems like in both

10   instances, you're looking at indicators, and you're deciding

11   whether to do a type of review that will focus on that

12   particular indicator.

13         How am I to understand the difference between the two?

14         **MS. DUNCAN-BECERRIL:** So, Your Honor, the correction

15   activities are different.  So for the data identified

16   non-compliance, it's the IEP is late.  So what we require in

17   order to fix that problem is to go in and hold the IEP for that

18   child so it is timely.

19         Performance indicator review is different in that these

20   issues are based on outcomes and sometimes more complicated to

21   fix.  And so you have to, you know, get people together,

22   provide professional development, implement a brand-new process

23   or a brand-new program, like a positive behavior support

24   system.  And so that can be an ongoing process that takes time,

25   whereas going in and holding an IEP for one child or a number

PROCEEDINGS

1    of children --

2            **THE COURT:**  Going in and what-ing an IEP?

3            **MS. DUNCAN-BECERRIL:**  Holding an IEP.  Like if you

4    have a student who has not had an IEP in, say, more than a

5    year, then the correction for that is to go in and hold that

6    IEP.

7            **THE COURT:**  What does it mean to hold an IEP?

8            **MS. GREENWOOD:**  To have an IEP meeting.

9            **MS. DUNCAN-BECERRIL:**  To have an IEP meeting.  I'm

10   sorry.

11           **THE COURT:**  Okay.  So let's take evaluation within 60

12   days of parent consent.  So an LEA is not in compliance on that

13   issue somehow.  It doesn't meet the -- the target for that is

14   100 percent; right?

15           **MS. DUNCAN-BECERRIL:**  Yes.

16           **THE COURT:**  And so it comes in at 95 percent or

17   something like that.  And what happens?  What does the State

18   do?

19           **MS. GREENWOOD:**  The district -- we provide that

20   information back to the LEA, and they have to correct the

21   non-compliance.

22           **THE COURT:**  Okay.  And how do they do that?  And what

23   is the State's role in correcting that non-compliance?

24           **MS. DUNCAN-BECERRIL:**  So typically, with a 60-day

25   timeline, that means what happened is, for an individual

1    student, it was greater than 60 days from the time of parent

2    consent until the IEP meeting was held to determine eligibility

3    for -- under IDEA.

4         And so we can't ask districts to get inside a time machine

5    and go back and make it within the timeline.

6         What we do is we say:  Look at what happened with that

7    individual child, and determine if there's something you can

8    fix in your systems, like a flag in your data system that says

9    "The 60-day timeline is coming," or working with parents in a

10   way to make sure that they get their child to the IEP meetings;

11   those kinds of things, to make sure that you're not missing the

12   timeline in the future.

13        MS. GREENWOOD:  Making sure that you have enough staff

14   to complete those evaluations timely is also another reason

15   that comes up.

16        THE COURT:  So the corrective action in that scenario

17   is, one, looking at ways you can avoid this happening in the

18   future; but, two, also just making sure we get on top of those

19   children who haven't had their IEP meeting yet.  Okay.

20        MS. GREENWOOD:  Okay?

21        THE COURT:  Is there an improvement plan in connection

22   with this type of review as well?

23        MS. GREENWOOD:  There is not an improvement plan.

24   They have to submit a root-cause analysis for issues of missed

25   timelines.

1        **MS. DUNCAN-BECERRIL:**  So for the 60-day timeline and

2   the transition from the C to B, obviously, like I said, you

3   can't get in a time machine and go back and hold it within that

4   time.  What we say is, instead, go back, sort of develop what

5   is the systematic problems that caused that to be late, and fix

6   them.  There's no improvement plan.

7        **MS. GREENWOOD:**  It's not an improvement plan.

8        **THE COURT:**  And this root-cause analysis, that's a

9   document that they also have to submit to the State?

10       **MS. GREENWOOD:**  They submit the reason, the root cause

11  of the non-compliance to the CDE.

12       **THE COURT:**  And what does that look like?  I mean, is

13  that a data entry thing, or is it a report?  What does it look

14  like?

15       **MS. GREENWOOD:**  It's typically just a data entry field

16  on some software that was developed.

17       **MS. DUNCAN-BECERRIL:**  We built a Web application that

18  allows LEAs to log on and look at both the individual students

19  that missed the timeline or who had late IEPs.

20       For students who have late IEPs, they go in; they identify

21  what the cause of the late IEP was; and they identify the date

22  in which they corrected that.  So either they held the IEP or

23  the student may have exited; that kind of information.

24       For instances like the missed 60-day timeline or the

25  missed C to B transition, we list the students that missed the

**PROCEEDINGS**

1    timeline; and then they're required to put, inside either a

2    text box or through a PDF upload, what the cause of the

3    non-compliance was, why they were late, and what they're doing

4    to fix it.

5              **THE COURT:**  Okay.  And then you said there's a

6    follow-up data submission which you called "Prong 2."

7              **MS. GREENWOOD:**  Right.

8              **THE COURT:**  Tell me more about that.

9              **MS. GREENWOOD:**  Do you want to start?

10             **MS. DUNCAN-BECERRIL:**  This is a really data-heavy

11   activity.

12        So we receive data twice a year, in June and in December.

13   Remember us talking about that almost eight months ago?

14        We do the data identified non-compliance based on the June

15   data.  So it's all the IEPs that occurred between July 1 and

16   June 30th of that school year.  We look to see which ones are

17   late or missed the timeline, and then we report that back to

18   the district.  They're required to correct that in the fall.

19        And then we receive data again in December.  And we look

20   again and say, number one, did you correct those individual

21   students that we reported to you?  And, number two, do you have

22   additional students that have missed timelines again?

23        And then they go back through that process, correcting the

24   student level or identifying the root cause, and we look at the

25   data again.

**PROCEEDINGS**

1          Districts who fail the December data submission are

2     required to do an additional data submission to show that they

3     are, in fact -- are timely with all the student -- individual

4     students we've reported to them and that they've corrected the

5     non-compliance or the root cause of the non-compliance.  So

6     we -- our intent is that every district be at zero by that

7     time.

8          **THE COURT:**  And if a district hits its targets as a

9     result of the June submission, then it doesn't have to submit

10    data in December?

11         **MS. DUNCAN-BECERRIL:**  It does.  So we use the data

12    that's already required to be submitted as that Prong 2.  We

13    just look at districts who were in the June -- the June data

14    identified non-compliance review and determine if they have

15    additional non-compliance.

16         **THE COURT:**  Okay.  And then tell me, again, what

17    happens -- so let's say we have additional non-compliance or

18    continued non-compliance in December, then what's --

19         **MS. DUNCAN-BECERRIL:**  So then we report back to them

20    again.  "Here's your list of students that are late or have

21    missed timelines.  You have to go in and either correct

22    individual students by holding IEP meetings, or you have to

23    submit the root cause of the problem and whether or not you

24    fixed it."  So sort of doing that process again.

25         And then in April, the districts who failed, who have

**PROCEEDINGS**

1   continued non-compliance in December, are required to submit

2   another set of data to show us that they've corrected the

3   problem.

4         THE COURT:  So in those districts -- and, by the way,

5   how common is this?  Like, how common is it for there to be

6   non-compliance on the creation of an IEP, the timely creation

7   of an IEP?

8         MS. DUNCAN-BECERRIL:  So I believe in our report, we

9   identified that there was -- and I'd have to look back at the

10  data, but I know that there's about 20,000 late IEPs in the

11  last June submission.  By the time --

12        THE COURT:  20,000 out of?

13        MS. DUNCAN-BECERRIL:  800,000, roughly.

14        THE COURT:  Okay.

15        MS. DUNCAN-BECERRIL:  And then by the time we get the

16  December, those districts have -- probably down to half or a

17  quarter.  You know, like, between 7- and 10,000.

18     And then by the time we have the April submission, the

19  districts who have continued non-compliance, I think we're down

20  to about 1,500 to 3,000, give or take.

21     And I mean, I don't have the exact numbers, and I can get

22  them for you.

23        THE COURT:  But what it does mean is that -- so let's

24  say June 2019 there's the initial data submission.  So there

25  are going to be -- the June 2019 submission is going to reflect

1  some kids who should have gotten IEPs by now but didn't.

2          **MS. DUNCAN-BECERRIL:**  Yes.

3          **THE COURT:**  And then so sometime during the 2018-2019

4  school year, they should have gotten an IEP and they didn't?

5          **MS. DUNCAN-BECERRIL:**  Yes.

6          **THE COURT:**  And then the June submission reflects that

7  they didn't.

8          **MS. DUNCAN-BECERRIL:**  Um-hmm.

9          **THE COURT:**  The district has to go back and sort of

10 redouble its efforts to make sure that those kids get IEPs.

11 That needs to be reflected in the December data submission.

12         **MS. DUNCAN-BECERRIL:**  And that there's no new kids.

13         **THE COURT:**  And that there's no new kids.

14    So there could be kids who were supposed to get IEPs in

15 the prior school year who, by December of the next year, the

16 data reflects that they still haven't gotten it.

17         **MS. DUNCAN-BECERRIL:**  There has been that instance,

18 yes.

19         **THE COURT:**  Okay.  So my question is:  If a district

20 is doing really badly on that, that not only have they

21 identified -- not only is there an inability to meet the

22 target, but an inability to correct the failure to meet the

23 target, does that go into the decision whether to subject that

24 district to comprehensive review?

25         **MS. DUNCAN-BECERRIL:**  It could be a factor.  In the

1   past, when we've had instances with a district who has what we

2   call "still continued" -- like, we call it "still still out."

3   I think we talked about this in a previous session.  I think we

4   submitted a letter, and we can find it.

5       If we notify a district:  Hey, you submitted this child.

6   Say, Johnny submitted his IEP late.  We told you.  We required

7   you to correct it.  We looked at your December data.  Johnny

8   still has a late IEP, and you haven't corrected it.

9       And then we look again at the April, and we see that

10  Johnny still isn't corrected.  We follow up with that LEA and

11  let them know, we put them on notice they have to correct that.

12  If they have not corrected that -- so we've now notified them

13  three times and required correction -- we can go through a

14  process where we can notify the LEA that we're going to

15  withhold funds.  And we have done that in the past.  It usually

16  gets them to hold the IEP very quickly.  But, yes.

17      **MS. GREENWOOD:**  Or to correct their data system,

18  because often what we've found is --

19      **MS. DUNCAN-BECERRIL:**  Yeah, it's a data issue

20  sometimes.

21      **MS. GREENWOOD:**  -- that it's a data issue and their

22  attendance system isn't necessarily communicating with the

23  special education information systems and that, in fact, the

24  child has not been enrolled in that district.

25      So that's some of what we also find.

1           **THE COURT:**  Okay.  Do you want to continue?

2           **MS. GREENWOOD:**  Sure.

3      Okay.  So we also complete disproportionality reviews to

4  identify disproportionate representation by race, ethnicity,

5  disability, and in placement of students with disabilities, and

6  we complete correction related to that.

7      So we're looking at the elements that you see on the

8  screen:  suspension/expulsion with significant discrepancy by

9  disability and ethnicity, disproportionate representation in

10  special education by ethnicity, disproportionate representation

11  in specific disability categories by ethnicity, and

12  disproportionality by placement.

13      That review requires --

14          **THE COURT:**  "Disproportionality by placement."  What

15  does that mean?

16          **MS. GREENWOOD:**  So students may be disproportionately

17  placed in a particular setting.

18          **MS. DUNCAN-BECERRIL:**  Based on race and ethnicity.

19          **THE COURT:**  Okay.  You mean not in the regular

20  classroom or in a particular school?  No?

21          **MS. DUNCAN-BECERRIL:**  It doesn't look at the school

22  level.  It looks at:  Are they in a restrictive setting?  Are

23  they having -- are they less than 40 percent of the day in

24  regular class?

25          **THE COURT:**  Okay.

1          MS. GREENWOOD:  So there's a required annual review of

2     policies, procedures, and practices.  Any non-compliance that's

3     identified through that review has to be corrected.  And,

4     again, there's follow-up data submissions to determine

5     non-compliance.

6          THE COURT:  So what does correction of identified

7     non-compliance involve?

8          MS. GREENWOOD:  So if it's a policy and procedure that

9     is not compliant, the district needs to correct that.  There's

10    also some public reporting requirements that have to be met for

11    those issues.  If it's a student-related issue, a lot of

12    times -- I think one of the most frequent items that we saw

13    non-compliant last year was that a general education teacher

14    was not in attendance at meetings, and so the IEP team would

15    have to be reconvened with the --

16         THE COURT:  That was a common finding with respect to

17    disproportionality?

18         MS. GREENWOOD:  Um-hmm.

19         MS. DUNCAN-BECERRIL:  So part of the

20    disproportionality review is that our staff go and look at IEPs

21    at the district -- the students' IEPs and the procedures and

22    policies of those districts identified for disproportionality.

23    And so we have --

24         THE COURT:  So disproportionality review --

25         MS. DUNCAN-BECERRIL:  -- a number of items.

PROCEEDINGS

```
1          THE COURT:  Oh, sorry to interrupt.

2       So just to be clear, in contrast to these other -- the

3   first type of review, performance indicator review, this

4   actually does involve State staff going and looking at why a

5   target wasn't met with respect to disproportionality?

6          MS. GREENWOOD:  We're looking at IEPs remotely,

7   though; so we're doing that from the office.

8          THE COURT:  Okay.  But you're looking at what --

9   the State is getting involved in examining what happened --

10         MS. GREENWOOD:  Yes.

11         THE COURT:  -- as opposed to just telling the district

12  to put together an improvement plan?

13         MS. GREENWOOD:  That's correct.

14         THE COURT:  Okay.  So, Ms. Becerril, I kind of

15  interrupted you.  I'm sorry.

16         MS. DUNCAN-BECERRIL:  Oh.  I think I was done.  I just

17  wanted to let you know that it's our staff who are looking at

18  IEPs.  That's what the review -- or policies and procedures of

19  that district.

20         THE COURT:  Okay.  And then is there -- so how do we

21  make sure -- in the context of this review, how do we make sure

22  that whatever systemic problem is identified is getting fixed?

23         MS. GREENWOOD:  So it might be that we're ordering

24  training to the LEA on whatever policies and procedures were

25  not completed or were not compliant with regulation.  As I
```

1    said, for the student-level corrective action, it might be that

2    the LEA has to reconvene the IEP team.

3            **MS. DUNCAN-BECERRIL:**  So each non-compliance

4    associated with the policies, procedures, and practices will

5    have an associated corrective action.

6            **MS. GREENWOOD:**  That's true for policies and

7    procedures and for student-level non-compliance.

8            **THE COURT:**  Okay.

9            **MS. GREENWOOD:**  And then for significant

10   disproportionality, there's also the annual review of policies,

11   procedures, and practices and correction of identified

12   non-compliance and the follow-up data submissions.

13       Those LEAs identified with significant disproportionality

14   must complete a coordinated, early intervening services plan

15   and report on the progress of that plan.  That plan is reviewed

16   by CDE staff.  And the LEA has to set aside 15 percent of the

17   IDEA grant for implementation of the coordinated, early

18   intervening services plan.

19           **THE COURT:**  How is significant disproportionality

20   identified again?

21           **MS. GREENWOOD:**  So it --

22       (Discussion held off the record amongst the policymakers.)

23           **MS. DUNCAN-BECERRIL:**  Sure.

24       So we -- if the district is disproportionate in the same

25   area for three years, that third year they become significantly

1     disproportionate.

2          So the disproportionality review is a targeted review, and

3     then the significant disproportionality review is an intensive

4     review.

5          THE COURT:   Intensive, but kind of limited to focusing

6     on the issue of disproportionality?   Tell me -- explain to me

7     the way -- give me a little more explanation of the ways in

8     which significant disproportionality review is more intensive

9     than disproportionality review.

10         MS. DUNCAN-BECERRIL:   So for the -- first, you know,

11    we have a requirement in their grant that they set aside

12    15 percent of their IDEA funds for use and development and

13    implementation of a coordinated, early intervening services

14    plan.

15         THE COURT:   And a coordinated, early intervening

16    services plan is what?

17         MS. DUNCAN-BECERRIL:   So, basically, they go -- it's a

18    little bit similar to a performance indicator review, but we

19    usually require them to go to a facilitator to develop that

20    plan.

21         We have identified a set of contractor -- a contractor

22    through Napa County Office of Education that has trained a set

23    of facilitators to help walk districts through the development

24    of that plan to make sure they're looking at the root causes.

25         And then that plan might address a number of areas.   For

1    example, if the district has a suspension, they might look at

2    positive behavior supports or other kinds of programs that they

3    would implement to address that.  And then they would use that

4    15 percent in order to implement that plan.  We also --

5         Do you want to talk about, like, what we do with the plan

6    and how that works?

7              MS. GREENWOOD:  Yeah.

8         As I mentioned, CDE staff reviews that plan and approves

9    that plan and collects information about progress on that plan.

10        It is very similar to the performance indicator review.

11   Some of the same elements are in both.

12        We also have an extensive system of technical assistance

13   activities and providers; so there's a community of practice

14   around significant disproportionality.  I'm sorry.  There are

15   regional meetings where our staff get together with technical

16   assistance providers, some of those that are involved with Napa

17   County Office of Education, who is one of our contractors, to

18   provide technical assistance regarding disproportionality.

19   There are symposiums.  There are e-learning modules.

20        So there's a pretty extensive support system for folks to

21   sort of move the needle in terms of disproportionality and

22   develop that plan.

23              THE COURT:  Okay.

24              MS. GREENWOOD:  Okay.  Comprehensive review.  So I

25   won't bother to read all of these, but there are a number of

1   selection elements involved in the comprehensive review.   And

2   I think we've talked about most of these before.

3       In terms of the activity itself, it's one of our most --

4   probably our most intensive activity.   Districts are selected

5   for the comprehensive review.   And from that, we send a

6   notification letter to the local educational agency, the

7   special education director, and the SELPA director.   We

8   schedule that.   And from there, we develop the monitoring plan.

9       The monitoring plan is really the instrument that sort of

10  drives that comprehensive review.   It's individualized to that

11  LEA.   It's based on parent concerns.   A good deal of data is

12  analyzed in the process of developing that plan.   And we also

13  look at the LEA's compliance history, both State complaints and

14  due process.

15      The monitoring plan is written.   It is -- the elements of

16  the monitoring plan are input into our comprehensive review

17  software, and that generates unique record review protocols for

18  that particular LEA.

19      So if that LEA has an issue with least restrictive

20  environment, we put that information into the system, and there

21  are items generated for review based on that information.

22      We are now doing our record reviews in-house.   So for that

23  portion of the review, we're still at CDE.   We're accessing

24  those IEPs remotely.   We also look at the other reviews that

25  are part of that review, the policy and procedure review, SELPA

1    governance review, in-house.

2         From there, we have another meeting to talk about what we

3    found just as a result of those record reviews, how that

4    triangulates with the information that we've gathered from the

5    other data that we've examined prior to doing the record

6    review.

7         We determine what activities we're going to do next in the

8    district.  That usually involves IEP implementation reviews,

9    interviews with district staff, parent staff -- parents, excuse

10   me, not parent staff -- parents and administrators.  We also do

11   an educational benefit review, and we do that with district

12   staff.

13        So that review looks at three years' worth of information

14   for a set of children from the time of their initial or

15   triennial assessment and then two subsequent years, to see how

16   those IEPs hang together in terms of identification of the

17   child's needs, the planning of goals and services, and the

18   progress the student makes.

19        After that, folks come back and we have another meeting

20   and discuss what they've learned and how best we can help the

21   district make improvements.

22        That's sort of the Reader's Digest version.

23             **THE COURT:**  In terms of timing, how does this happen?

24   When do you select?  When do you start conducting the review?

25   And when is the review over?  And what sort of verification

```
 1   process, if any, is there for making sure that the improvements
 2   are being implemented?
 3           MS. GREENWOOD:  So as with some of our other reviews,
 4   there's that Prong 2 review that happens, and that deals with
 5   the procedural non-compliance.  But we want to see that LEAs
 6   are improving in outcomes for students.  So before they exit
 7   CR, we're looking to see that scores have gone up, that they no
 8   longer meet the requirements for CR selection, and that we can
 9   confidently say that they're making improvements for students
10   and --
11           THE COURT:  So if they're in --
12           MS. GREENWOOD:  -- getting better results.
13           THE COURT:  If they're in comprehensive review, might
14   they be in for multiple years?
15           MS. GREENWOOD:  Yes.
16           THE COURT:  So it's not until you all are satisfied
17   that they have -- they're sort of -- do you have to wait until
18   the indicators would no longer put them in comprehensive
19   review, or how --
20           MS. GREENWOOD:  Yes.
21           THE COURT:  Is that what it is?
22           MS. GREENWOOD:  Yes.
23           THE COURT:  So they might be in there for multiple
24   years until they get over 62 or whatever --
25           MS. GREENWOOD:  Yes.
```

1          **THE COURT:**  -- whatever the case may be?

2          **MS. GREENWOOD:**  Yes.

3          **MS. DUNCAN-BECERRIL:**  Or they've corrected all the

4    non-compliance.  It's both.  They have to correct the

5    non-compliance and show improvement over time.

6          And so you could -- so in terms of timeline, we do the

7    selection for monitoring.  We do the data analysis in November

8    and December, and then we notify districts in January of their

9    selection, and then we -- sort of, our staff begin to do this

10   process through the spring up until districts are closed,

11   usually, in the summer.  And then in the fall, we're working

12   and doing follow-up reviews to see if they've corrected the

13   non-compliance.

14         And typically, what happens is the district will have lots

15   of non-compliance, and then we go and do follow-up reviews, and

16   then it gets fewer and fewer.  You know, we're pulling new sets

17   of records and seeing that we're not seeing the same

18   non-compliance again.

19         So only when all the non-compliance has been corrected and

20   we're not seeing any more new records and they're showing

21   improvement in their subsequent data pulls, then they're out of

22   CR.

23         So, yes, we do have districts that are in it multiple

24   years.

25         **THE COURT:**  Okay.  So there was a reference in the

1   materials to 35 LEAs being selected for comprehensive review.

2   Is that this past January, 35 LEAs were selected?

3           **MS. DUNCAN-BECERRIL:**  That meet the -- yes.

4           **THE COURT:**  And does that mean that there are more

5   LEAs currently in comprehensive review than 35 because LEAs

6   from past years were selected and they're still in

7   comprehensive?

8           **MS. GREENWOOD:**  Those included some of those from past

9   years.

10          **THE COURT:**  Okay.  So currently, there are 35 LEAs in

11  comprehensive review?

12          **MS. GREENWOOD:**  It included those, but it also -- we

13  still have some districts that have been included in past years

14  and are still in, that haven't --

15          **THE COURT:**  So fewer than 35 were selected in

16  January --

17          **MS. GREENWOOD:**  That's correct.

18          **THE COURT:**  -- for comprehensive review?

19          **MS. DUNCAN-BECERRIL:**  Brand-new.  Like they've never

20  been selected before.  They never went -- had not gone through

21  the process.

22          **THE COURT:**  Right.  And do we know what's the

23  breakdown between LEAs that were already in comprehensive

24  review and ones that are new to the party this January?

25          **MS. GREENWOOD:**  I think we identified 21 that went

1  through this process this year.

2         **MS. DUNCAN-BECERRIL:**  That are new.  21 that are new.

3  And the additional -- is it 14? -- had already been through the

4  process in a previous year and had not closed.  So they still

5  had an open CR.

6         **THE COURT:**  Okay.  Okay.

7         **MS. GREENWOOD:**  Okay.  Preschool review, the selection

8  elements -- oh, I'm sorry.

9     Preschool review, the selection elements are noted.  The

10  preschool review is pending approval of the selection

11  methodologies.  So we are not certain exactly what we will be

12  doing in preschool review, but I anticipate that it's going to

13  be somewhat similar to the comprehensive review.

14         **MR. SPENCE:**  May I ask a question?

15         **THE COURT:**  Of course.  Any time.

16         **MR. SPENCE:**  Is it your expectation, then, that --

17  we're now in April, almost May.  The number of districts that

18  you stated in your December submission were selected for

19  preschool review, do you expect that those reviews will take

20  place during the current school year?

21         **MS. GREENWOOD:**  I don't think that we will do any

22  reviews until we've agreed on what the selection methodology

23  is.

24         **MR. SPENCE:**  So you did not proceed based on what you

25  submitted in December?  Nothing has taken place --

PROCEEDINGS

```
1              MS. GREENWOOD:  We have not.

2              MR. SPENCE:  -- beyond the identification of that set

3    of districts?

4              MS. GREENWOOD:  That's correct.

5              MR. SPENCE:  Thank you.

6              THE COURT:  And why is that?

7              MS. GREENWOOD:  If we're not -- I don't -- it's

8    difficult to build a structure for the reviews if we don't know

9    what the selection methodology is and the criteria for that

10   methodology.  So once we have that established, then we feel

11   comfortable moving forward.

12             MS. DUNCAN-BECERRIL:  One of the things that we found

13   with districts is that if we are consistently changing the

14   methodology, it becomes very frustrating with them.  So we

15   developed a methodology.  We identified and submitted, "This is

16   the methodology we think is solid."

17        The plaintiffs and the Monitor were highly opposed to it.

18   So we felt uncomfortable to go forward, thinking we might go

19   through a court process that might identify something else; and

20   if we do that and then change it, it becomes very frustrating

21   for both our staff and districts to be able to understand the

22   process for selection.

23             THE COURT:  Yeah.  I mean, I understand what you're

24   saying.  On the other hand, I mean, what would be wrong with

25   using a sort of oversimplified rough selection process that is
```

1    designed to at least, like, get at the worst of the worst on

2    the preschool level?

3        **MS. GREENWOOD:**  Well, it does have consequences to the

4    LEA if they're selected.  This is an intensive review, and if

5    they're selected for an intensive review such as this, it has a

6    bearing on their annual determination.  Those annual

7    determinations at some point may have fiscal consequences to

8    the LEA.  So there are repercussions.

9        **MR. MLAWER:**  May I ask?  Did I miss, in either your

10   December submission or your February submission, a statement to

11   this effect?  This is news to me.  Maybe I missed it, but is it

12   in there?

13       **MS. GREENWOOD:**  I don't believe so.

14       **MR. MLAWER:**  I see.

15       **THE COURT:**  I mean, if I could push back on that a

16   little bit, I mean, I understand the notion that if an LEA gets

17   selected for review, that could eventually -- that could set

18   off a chain reaction that could eventually have fiscal

19   consequences for them or whatever.

20       But if an LEA just leaps off the page as having a major

21   performance problem, I guess I don't understand -- I mean, even

22   if you're not establishing some set criteria for deciding in

23   the future when which districts are going to be subject to

24   preschool review, what's the problem with, like, getting after

25   some number of districts who jump off the page as really

**PROCEEDINGS**

1    problematic from a preschool standpoint?

2         MS. GREENWOOD:  So it's not as though we're ignoring

3    preschool issues.  There are preschool elements that are part

4    of the CR selection, and --

5         THE COURT:  Sorry.  Preschool elements that what?

6         MS. GREENWOOD:  Are part of the comprehensive review

7    selection.

8         THE COURT:  Okay.

9         MS. GREENWOOD:  And for the LEAs participating in

10   comprehensive review, if they have preschool-aged children,

11   we're completing reviews for those students.

12        MS. DUNCAN-BECERRIL:  And preschool placement is also

13   a factor within the performance indicator review.  We also look

14   at preschool children for disproportionality and for data

15   identified non-compliance.  So if there are cases, we do look

16   at that.  It's part of a larger context.

17        THE COURT:  Okay.

18        MS. GREENWOOD:  So we also have non-public school

19   reviews, and those -- that is a cyclical monitoring activity.

20   So in one year, the non-public school will be in self-review.

21        THE COURT:  So, in other words, when you say "cyclical

22   monitoring," that's not based on any data analysis?

23        MS. GREENWOOD:  There is data analysis for the --

24   within the activity, but there's not data analysis for

25   selection.

**PROCEEDINGS**

1          **THE COURT:**  Selection of non-public schools.

2      What's the universe of private schools here that we're

3   talking about?

4          **MS. GREENWOOD:**  I want to say -- can I get you that

5   information?  I don't want to put out misinformation.

6          **THE COURT:**  Ballpark?

7          **MS. GREENWOOD:**  Ballpark.

8          **MS. WRIGHT:**  It's 14,000 students.

9          **THE COURT:**  14,000 students are in private schools --

10         **MS. WRIGHT:**  In non-public schools.

11         **THE COURT:**  -- receiving special education services?

12         **MS. WRIGHT:**  Correct.

13         **THE COURT:**  14,000 students with IEPs?

14         **MS. WRIGHT:**  Correct.

15         **THE COURT:**  Okay.  And so you're saying it's not --

16  currently, there's no effort, through data analysis, on the

17  part of the State to root out the problematic private schools

18  on a year-to-year basis.  It's just that they're subject to

19  cyclical monitoring.

20         **MS. GREENWOOD:**  That's correct.  But we also reserve

21  the right to go in if we find that we're getting information

22  regarding health and safety issues.

23         **THE COURT:**  Okay.  All right.  And so how does the

24  cyclical monitoring work?

25         **MS. GREENWOOD:**  So, again, the first year, there's a

1    self-review; next year, there's an on-site review; and the

2    following year, there's the follow-up review.

3        So the CDE staff are involved in both the on-site review

4    and the follow-up review.

5            THE COURT:  So you're saying that for every private

6    school, or what you guys call "non-public school," in Year 1

7    they do it themselves; in Year 2, no matter what happens as a

8    result of that do-it-yourself review, in Year 2 there's an

9    on-site review by CDE staff?

10           MS. GREENWOOD:  Correct.

11           THE COURT:  And then in Year 3, no matter what happens

12   with Year 1 and Year 2, in Year 3 there's a follow-up review by

13   CDE staff?

14           MS. GREENWOOD:  That's correct.

15           THE COURT:  What's the difference between on-site

16   review and follow-up review?

17           MS. GREENWOOD:  They also go on site for that, but

18   they're looking at fewer areas, basically.  So they're looking

19   at -- there are some areas that are set, that are standard for

20   that review.  But in addition to those standard areas, there

21   are -- they're looking at the issues that were non-compliant

22   from the previous year.

23           THE COURT:  The previous year.  Okay.

24           MS. DUNCAN-BECERRIL:  And, Your Honor, there are

25   approximately 300 non-public schools in and out of the state.

1        **THE COURT:**  You said "in and out of the state"?

2        **MS. DUNCAN-BECERRIL:**  Yes.

3        **THE COURT:**  How is it that there are private schools

4    out of the state that are --

5        **MS. DUNCAN-BECERRIL:**  So it's part of the continuum of

6    offerings; that an LEA may identify that they cannot offer a

7    placement for a child and the needs of the child are outside of

8    what is available within the state.  And so they identify a

9    placement out of the state that can serve the child.

10        **MS. WRIGHT:**  I think it's also important to note that

11   all the children who are served by non-public schools are a

12   part of the accountability of that school district.  And so

13   there's not a separate accountability system for non-public

14   schools.  These are kids that are part of the school system

15   still.  And basically, those non-public schools are contracted

16   to provide education for the students.  So it's also -- you

17   know, there's high accountability on the local educational

18   agency to ensure.

19        So we are also going out to look.  We're ensuring these

20   non-public schools are getting certified on a regular basis.

21   We have criteria that we follow that follows State statute to

22   the letter.  And so we're constantly looking, checking.

23        And then, like Alison said, if there are -- if we do come

24   upon some knowledge that something is -- we're worried about

25   something, we send staff out to the schools, whether they're in

1   state or out of state, in addition to the cyclical monitoring.

2          MR. SPENCE:  Your Honor, may we have a brief 10-second

3   moment?

4          THE COURT:  Sure.

5     (Discussion held off the record amongst the policymakers.)

6          MR. SPENCE:  We think we may have a witness who can

7   speak and add more detail to this non-public school issue, to

8   kind of get some clarity.

9          MS. WRIGHT:  We have the administrator of our

10  non-public schools and agencies unit here today --

11         THE COURT:  Great.

12         MS. WRIGHT:  -- if you'd like to talk with her.

13         THE COURT:  The only question is, do we want to go

14  down that rabbit hole now or do we want to sort of --

15         MS. WRIGHT:  Whatever you want.

16         THE COURT:  Why don't we kind of stick at the overview

17  level right now.

18         MS. GREENWOOD:  Great.

19         THE COURT:  But I think that will be helpful.

20         MR. SPENCE:  Because some of the numbers that were

21  thrown out, you know, we may have some more accurate numbers

22  perhaps.

23         THE COURT:  Yeah.

24         MR. SPENCE:  But, again, if we want to just stick a

25  pin in it and come back to it, that's fine.

1    **THE COURT:**  Yeah.  The numbers, I'm not -- I'm less

2   worried about the numbers than I am about the process, how is

3   it that these schools get monitored and is it okay that there's

4   not any -- that these schools are not part of this data

5   analysis process that we're talking about.

6    **MS. DUNCAN-BECERRIL:**  The students are part of the

7   data analysis.  They are included.  The district is responsible

8   for them, and they are included in the district analysis.

9    And when they're selected for comprehensive review, they

10  will look at IEPs associated with students in NPS.  So it is

11  part of the reviews.

12   **MS. WRIGHT:**  And if the district is -- if it comes up

13  through the data that the district has, like, a lot of kids in

14  separate schools, or something like that, then as they do their

15  root-cause analysis, that is something that comes up is:  Why

16  do you have all these students in non-public schools?

17   **THE COURT:**  Yeah.  Although I would assume -- I mean,

18  again, I think this is the kind of thing we may want to put a

19  pin in.  It may be partially a Phase 2 issue.  It may be

20  partially a Phase 3 issue.

21   But it would seem to me that there is at least a potential

22  for special problems in non- -- I mean, this came up in Phase 1

23  a little bit.  Right?  On the surface, it does not strike me as

24  enough to say that we're analyzing data about LEAs and some

25  small subset of the students from that LEA are in a non-public

1  school and so, if there are any problems at the non-public

2  school, that might be captured in the analysis that we do of

3  the LEA.  I mean, it might not because it's not a

4  school-by-school analysis.

5       But anyway, we can circle back to that perhaps.

6       Okay.  You want to continue?

7            **MS. GREENWOOD:**  Just a little bit more information

8  about the self-review.  There's 44 items in the protocol that's

9  used for non-public schools completing that review.  And the

10  on-site and follow-up review both contain elements of a

11  pre-review where consultants meet with the administrator of the

12  non-public school unit to talk about the data, to talk about

13  the documentation that they already have, to determine the

14  events at the on-site review.

15       There is the on-site review, and there's a post-review as

16  well.

17            **THE CLERK:**  Can you please speak into the microphone?

18            **MS. GREENWOOD:**  I'm sorry.  Yes.

19            **THE COURT:**  You can feel free to pull it closer to

20  you, if you like.

21            **THE CLERK:**  Thank you.

22            **MS. WRIGHT:**  And, Your Honor, can I just clarify?  And

23  this may not be needing clarification.  But the non-public

24  schools we're talking about are not like St. Francis High

25  School.  They're like non-public schools that are designed to

1    just serve students with disabilities.

2         THE COURT:  Well, I was actually -- I'm glad you

3    clarified that because I was going to ask, either for now or

4    later.  I was curious.  I mean, I remember from when I was

5    doing work for San Francisco that often SFUSD would fight with

6    the parents about whether a kid should be sent to St. Francis

7    High School, or something like that, as opposed to staying in

8    the public school.  And I was going to ask --

9         MS. WRIGHT:  That's not that.  These are the

10   contracted schools that we certify as a State to serve students

11   with disabilities.  And many of them are put there on

12   settlement agreement.

13        THE COURT:  Many of them what?

14        MS. WRIGHT:  They're on settlement agreement.  So if a

15   district and a parent decide, work together, whether it's

16   through a hearing or whatever, to settle on where that

17   placement is going to be, that also might be.

18      And sometimes that happens through Social Services and

19   other things too.  But we won't get in the weeds on that right

20   now.  I just wanted to let you know that.

21        THE COURT:  Right.  And that's kind of why I'm asking

22   these questions about the non-public schools, because I assume

23   that in the cases where there's a fight about whether the kid

24   should go to St. Francis or not, there's not a tremendous

25   amount of concern about how St. Francis is doing --

1          MS. WRIGHT:  Correct.

2          THE COURT:  -- with that child.

3      But in the non-public schools that are designed

4  primarily --

5          MS. WRIGHT:  That's an IEP placement.  St. Francis

6  would not be an IEP placement.

7          THE COURT:  Got it.  Okay.

8          MS. GREENWOOD:  Okay.  So some other reviews.  We have

9  a critical incident review, and we complete this review when we

10  have a concern regarding the practices or performance of an LEA

11  that warrants an on-site investigation.  So it's typically

12  something's that's so egregious that we feel like we can't rely

13  on data selection.  We need to go out and take a look at what

14  is happening at a particular LEA.

15          THE COURT:  Okay.

16          MS. GREENWOOD:  We also have -- and those requirements

17  and the activities are similar to that of the comprehensive

18  review.

19          THE COURT:  So it's not based on what -- will that

20  happen based on one incident?  Or --

21          MS. GREENWOOD:  It could.

22          THE COURT:  Okay.  So how many of those were done?  Or

23  how many of those are typically done?

24          MS. GREENWOOD:  I believe that we are doing two

25  currently, are in process.

1          **THE COURT:**  And those are not on -- I take it those

2    are probably not cyclical.  Those are in response to events?

3          **MS. GREENWOOD:**  Correct.

4          **MS. WRIGHT:**  And those allow us to be nimble so that

5    we're not just saying, "Oh, we only do those reviews."  If

6    something's going on and we have concerns -- it's a gut check

7    sometimes -- we want to make sure the kids are all right.  So

8    we're sending teams out to ensure that.  It may be a systemic

9    issue.  It may be from an individual issue that was fairly

10   egregious, like a child's death or something like that.

11         **THE COURT:**  Okay.  All right.

12         **MS. GREENWOOD:**  Okay.  And then, finally, the data

13   validation review.

14      Do you want to talk to that?

15         **MS. DUNCAN-BECERRIL:**  So the selection is based on a

16   couple of things.  There's issues with the LEA's data or data

17   reporting; so either they have consistently late or incomplete

18   reports or they didn't submit any data at all.  Or we identify

19   instances where the LEA has inconsistent data either between

20   their general education data and their special education data,

21   and it's clear the folks who are running the data systems

22   aren't communicating and do not have a data governance

23   structure in place.

24         **THE COURT:**  Okay.  So, I mean, maybe now is the time

25   to turn to Mark.

1    And I think it's difficult to decide where to start.  And

2    so what I floated with Mark this morning was, I'm not sure this

3    is the right way to think about it, but we have a number of

4    areas where Mark is concerned with something regarding a

5    particular indicator or a particular area, FAPE or whatever.

6    And we need to get into all of those things.

7    But I was wondering if it might be worth taking a shot

8    initially and saying -- asking:  All right.  Let's assume there

9    are no major problems with respect to any one indicator.  Okay?

10   Are there systemic problems that nonetheless exist in

11   the State's analysis of this data for purposes of deciding

12   which LEAs get monitored?

13   And my sense is that the answer is yes.  Right?  And you

14   would say -- I mean, you've raised concerns in your report

15   about the number of districts that have been selected for

16   comprehensive monitoring.  You've raised your concern about

17   possibly an outsized role played by improvement, incremental

18   improvement, or regression in the decision whether a particular

19   LEA should be subject to comprehensive monitoring, for example.

20   You've also raised concerns about certain targets being

21   unambitious.

22   I wonder if it would be -- if that would be a good place

23   to start.  Without respect to any particular individual

24   problems on particular indicators, is there something sort of

25   systemically problematic with the way the State is doing its

**PROCEEDINGS**

1  data analysis, and how big of a problem is it?

2      MR. MLAWER:  Your Honor, you're referring to selection

3  for preschool review and comprehensive review, or more

4  globally?

5      THE COURT:  I don't know.  I mean, we need to talk

6  about all of it.  And the question is:  What should we talk

7  about now?

8    Why don't we start with comprehensive review and preschool

9  review and see where that takes us.

10      MR. MLAWER:  Okay.  So I will do my best to set aside

11  some of the issues with selection that concern the analysis of

12  the data in individual areas.

13      THE COURT:  You won't be penalized if you bring them

14  up by way of example or whatever.

15      MR. MLAWER:  Okay.  Judge, this discussion appears in

16  my report -- I'm giving this information because you prompted

17  me to do it at Phase 1 -- between pages 47 to 55.  Preschool

18  review is where I'm going to start.

19      THE COURT:  You said 47 to 55?

20      MR. MLAWER:  Yes.  And I always refer to the

21  pagination at the bottom of the pages of these documents rather

22  than the PDF, except where a document's not paginated.

23      THE COURT:  Great.

24      MR. MLAWER:  Okay.  So looking at page 49 of my

25  report, a table begins that has the elements of the preschool

1  matrix that CDE uses to select districts for preschool review

2  or that I understood to be used for selection.  We just found

3  out that a set of districts were selected, but there was no

4  preschool review monitoring in the current school year, at

5  least to date.  Okay.

6       **THE COURT:**  Were they even selected?  Or is the right

7  way to say it that a methodology was created and the State is

8  sharing with us the districts that would have been selected had

9  this methodology been implemented?

10      Is that correct?

11      **MS. DUNCAN-BECERRIL:**  That's correct.

12      **THE COURT:**  Okay.

13      **MR. MLAWER:**  So one of the more major conclusions I

14  reached was that there was no demonstration in CDE's December

15  submission that the matrix and the cut score of six points or

16  above were adequate to ensure FAPE in the least restrictive

17  environment to preschool students with disabilities.

18      In addition, I found that there were reasons to believe --

19  setting aside the lack of an effective demonstration -- there

20  were reasons to believe that it was -- the matrix and the cut

21  score were not adequate.

22      So I'm going to set forth what my reasons were, with some

23  examples, and then we can discuss.

24      First, the matrix uses an all-or-nothing approach to

25  scoring each element.  You get a "0" or you get a "1."  So the

1    extent to which a target was missed is not relevant.

2        Because all the underlying data was not produced to us in

3    January, we could not fully analyze this, but we were able to

4    tease out some conclusions.

5        In addition, four elements -- four of these matrix

6    elements concern whether at least one child -- something

7    happened to one child, suspension -- at least one child -- or

8    placed in a particular setting.  But that is not calibrated to

9    the size of the district.  So at least one student in a

10   particular placement or suspended means something quite

11   different in a district the size of Ravenswood versus a

12   district the size of San Francisco Unified or San Jose Unified.

13       Second, matrix -- the use of a matrix does not select

14   districts that appear to need to be monitored intensively.  And

15   this is an intensive monitoring process.  So, for example, we

16   found districts that didn't meet all three of the suspension

17   elements, didn't meet the two placement elements, least

18   restrictive environment elements, had one child in residential

19   and another in a non-public school.

20       There are different kinds of combinations that will

21   result -- will not result in selection.  So one is -- excuse

22   me.  I misread my notes.  One is that a district doesn't meet

23   all three suspension elements.  Another would be not meeting

24   both LRE elements, having one child in residential and having

25   another child in a non-public school.  Another would be not

1   meeting the three suspension targets and both of the least

2   restrictive environment targets.

3        We're setting aside now the extent to which a target was

4   not met.

5        In addition, missing a target does not make selection very

6   likely.

7        So if you will flip to my page 53, the table that begins

8   at the bottom of that page, we looked at the districts for each

9   selection element that received at least one point and the

10  number and percent of districts in each row that were selected.

11       So, for example, if the district suspension rate exceeded

12  the five-year-old suspension rate for the entire state, there

13  were 83 such districts.  Three of those 83 were selected for

14  preschool review; so 3.6 percent.

15       If we look at placement in regular class and program --

16           THE COURT:  Wait.  Let me make sure I understand that.

17  So using that example, LEA suspension rate of students --

18           MR. MLAWER:  Five-year-olds.

19           THE COURT:  Five-year-olds?

20           MR. MLAWER:  Um-hmm.

21           THE COURT:  Okay.  So if the suspension rate of

22  five-year-olds is greater than the statewide suspension rate of

23  five-year-olds?

24           MR. MLAWER:  Yes.

25           THE COURT:  And 83 percent of districts received a

1   point --

2              **MS. DUNCAN-BECERRIL:**  83 districts.

3              **MR. MLAWER:**  83 districts.

4              **THE COURT:**  Oh, 83 districts.

5              **MR. MLAWER:**  Yeah.

6              **THE COURT:**  Okay.  So 5.3 percent of districts

7   received a point for having a suspension rate that was higher

8   than the statewide suspension rate?

9              **MR. MLAWER:**  Yes.  And three of those 83 ultimately

10  were selected for preschool review.

11             **THE COURT:**  3 percent of them.

12       I guess one initial question I have is:  How is it that

13  only 5 percent of the LEAs are greater than the statewide rate

14  for suspension of five-year-olds?  How could that be?

15             **MS. DUNCAN-BECERRIL:**  Well --

16             **THE COURT:**  Just as a matter of arithmetic.

17             **MS. DUNCAN-BECERRIL:**  How come?  Well, the other LEAs

18  who had five-year-olds were not above the statewide rate.  So

19  their statewide rate -- let's say the statewide rate -- I'd

20  have to look it up.  I'm sorry -- is 5 percent.  We had 83 LEAs

21  whose five-year-old suspension rate was greater than 5 percent,

22  and so the rest of the LEAs were less than 5 percent.

23             **THE COURT:**  But, I mean, mathematically, how possible

24  is that, that 95 percent of LEAs would have a suspension rate

25  that is lower than the statewide average and only 5 percent of

**PROCEEDINGS**

1  the LEAs would have a suspension rate that's higher than the

2  statewide average?

3       **MS. DUNCAN-BECERRIL:**  So this is just students with

4  disabilities, and it's only five-year-olds.  So it's not all

5  students.  And we don't see a lot of suspension that occurs

6  at --

7       **THE COURT:**  So it's a comparison of the suspension

8  rate of students with disabilities in the LEA who are five --

9       **MS. DUNCAN-BECERRIL:**  Yeah.  And so what --

10      **THE COURT:**  -- with suspension of all five-year-olds

11  in the LEA, regardless of whether they're disabled or not?

12      **MS. DUNCAN-BECERRIL:**  Um-hmm.

13      **THE COURT:**  Okay.  Okay.  I get it.

14      **MR. MLAWER:**  Let me just clarify.  When you use the

15  phrase "the statewide suspension rate," aren't you referring

16  to, statewide, kids with disabilities?

17      **MS. DUNCAN-BECERRIL:**  Yes.  Students with disabilities

18  ages five who were suspended over all students ages five.

19      **MR. MLAWER:**  Okay.  I had assumed that the answer to

20  the judge's question was that you had a really big chunk of

21  districts who suspended no five-year-olds, and then you have

22  this handful of -- you have some that are somewhere between

23  zero and the state average, and then you have these 83 that are

24  above the state average, but perhaps not by much, so that the

25  average is down; it's low.

1        **MS. DUNCAN-BECERRIL:**  Yeah.  So, actually, the

2   majority of districts have not suspended any five-year-olds.

3        **MR. MLAWER:**  Okay.

4      Okay.  So another example from this table is the regular

5   class and program.  Now, 135 districts received one point for

6   exceeding the target on this.  Seven of those districts were

7   selected for preschool review.  Similarly, on the separate

8   class and program, 183 districts.  24 of those selected,

9   ultimately, for preschool review.

10      Having at least one three- to five-year-old in

11   residential, 18 districts received a point for that, and two of

12   those 18 were selected for preschool review.

13      All six -- meeting all six assessment targets, there were

14   229 districts that received a point, and only 24 of those were

15   selected.

16      And the participation rate, of 494, only 16 were selected.

17      So this table stands simply for the proposition that

18   receiving a point -- which in preschool review is bad;

19   receiving zero points is good -- does not often result in

20   selection for any of these individual elements.

21        **THE COURT:**  Okay.

22        **MS. DUNCAN-BECERRIL:**  Combined altogether.

23        **MR. MLAWER:**  I'm sorry?

24        **MS. DUNCAN-BECERRIL:**  Combined altogether, if a

25   district did poorly on all of these elements --

1          **MR. MLAWER:**  Correct.

2          **MS. DUNCAN-BECERRIL:**  -- they would be selected.

3          **MR. MLAWER:**  Right.  Right.  I was looking at the

4   effect of failing to meet a target, setting aside how far off

5   you were, on the likelihood that you were selected for

6   preschool review.

7          **THE COURT:**  Okay.

8          **MR. MLAWER:**  So of the three -- let's just focus on

9   the 83 for a moment.  Of those three that were selected, two

10  were selected automatically due to the NPS --

11         **THE COURT:**  You said let's focus on the 83?

12         **MR. MLAWER:**  Yes.  Those 83 districts with a

13  suspension rate that exceeded the statewide rate.

14         **THE COURT:**  Okay.

15         **MR. MLAWER:**  So two of the three that were selected

16  were selected automatically due to placements in non-public

17  schools.  One was selected because it scored at least six

18  points.  The rest had between -- scored between two and five

19  points; in other words, not enough for selection.

20      One of those districts didn't meet both LRE targets, in

21  addition to this; all six achievement targets, the assessment

22  achievement targets; meet the assessment participation target

23  in addition to this five-year-old suspension.  That district

24  was not selected for preschool review, even though it had that

25  bunch of problems.

**PROCEEDINGS**

1    In addition, a district can miss four or even five targets

2    by very wide margins and not be selected.  And this misses --

3    going back to the language in the Phase 1 order -- red flags

4    that can be quite important information about a district.

5        We also studied the automatic selection standard.  We

6    wanted to see how predictive -- I'm using the plural pronoun on

7    some of these aspects of this report I worked on with

8    Dr. Wagner.

9        So here, we discovered that 78 percent of the districts

10   would have at least three points if we went back and awarded

11   one point rather than the automatic selection element.

12       So this is an aspect -- the automatic selection standard

13   could be regarded as a positive aspect of this approach to

14   selection in that it is predictive of having a number of other

15   problems.  Scoring at least three points indicates that you

16   have some other problems.  However, it remains the case that

17   you have to score at least six points for selection here if not

18   for the automatic selection standards.

19       The next point is that there is no selection element

20   related to Child Find.  And that is particularly important in

21   light of the absence of a Child Find methodology -- and we will

22   get to that -- for preschool students.  Current absence.

23       Finally, the data are not disaggregated by race,

24   ethnicity, the foster care status, English language learner

25   status, homelessness, migrant, being a migrant, or poverty.

**PROCEEDINGS**

 1   And aggregate targets -- and this is an issue I'm going to come

 2   back to when we move back chronologically into Roman III of my

 3   report.  A district can meet targets in the aggregate, but not

 4   be delivering FAPE in the LRE to subpopulations.

 5       We may want to not tarry on that point and go back to it

 6   later on.

 7       So those were -- that was the bases of my conclusion of

 8   non-compliance here.

 9           **THE COURT:**  And I guess now my question to you all is:

10   Do you think it's worth -- there are kind of parallel

11   criticisms of the way -- sort of global criticisms of the way

12   schools are selected for comprehensive monitoring, the data is

13   analyzed for comprehensive monitoring.

14       Does it make sense for him to go through that now, or does

15   it make more sense for you to respond on the preschool review?

16           **MR. KOSKI:**  Your Honor --

17    (Court reporter interrupts for clarification of the record.)

18           **THE COURT:**  I think what we'll do is we will hear from

19   them -- and I think, if I recall correctly, this is kind of how

20   we did it last time -- that we'll hear from them; and then if

21   you all want to jump in after they have had a chance to respond

22   to the Monitor's concerns, you can do that.

23           **MR. KOSKI:**  Right.  I thought it might be helpful to

24   add a little bit of emphasis and an additional point to the

25   Monitor's concerns so they can respond globally to both of

PROCEEDINGS

1   them.

2          THE COURT:  That's fine.

3          MR. KOSKI:  Okay.  Thank you.

4      The first is relatively small, but the Monitor also

5   pointed it out and I want to make sure it's also part of the

6   conversation, is that one of the issues with regard to the

7   selection elements is that the preschool achievement indicator,

8   which actually consists of a lot of rich data that shows how

9   children are performing in preschool, is basically boiled down

10  to one data point or one number in here, rather than taking

11  advantage of all the rich data that are there, especially given

12  that preschool achievement is a pretty important thing.

13      And the Monitor pointed this out, but I wanted to make

14  sure that that is part of the conversation as well.

15      And then also --

16         THE COURT:  And also, that indicator -- do I remember

17  correctly that that indicator is also not part of the sort of

18  less intensive isolated review process?  I can't --

19         MR. KOSKI:  Yes.  Performance indicator review.

20         THE COURT:  Performance indicator review.

21         MR. KOSKI:  That's correct, Your Honor.

22         THE COURT:  Okay.

23         MR. KOSKI:  Thank you for letting me add that.

24      And the other piece is, the State, in its response, raises

25  concerns about efficiency, and we definitely are concerned

1    about the State efficiently deploying its resources as well.

2    And the difficulty, when you look at efficiency as a

3    justification here, it's both problematic in being -- deploying

4    resources to districts that may not need a more intensive

5    review, specifically those districts that simply have the

6    automatic triggers to get into preschool, the preschool review.

7         So, on the one hand, we may be looking at districts that

8    have just a placement of a child in an NPS, and that alone is

9    enough to trigger review, but that might be the only problem

10   that they have.  So that's not necessarily efficient.

11        On the flip side, as the Monitor has pointed out, there

12   are a number of districts who have potentially very serious

13   problems that don't hit the magic number of "6" and aren't

14   identified.  So that wouldn't be efficient either.

15        And that's all I wanted to add from the plaintiffs'

16   perspective.

17             **THE COURT:**  Okay.

18             **MS. DUNCAN-BECERRIL:**  So we responded to the Monitor

19   on a couple of areas that he identified.

20        I think it's important to note that when we go through

21   this process, one of the things we look at is, what do we see

22   as current issues.

23        So in the 2017-'18 school year, we identified that we saw

24   a drop of about 7 percent of children ages three to five who

25   had access to a regular early childhood program.  That's quite

**PROCEEDINGS**

 1  big for a state our size, and so we were concerned, and we

 2  determined that that is something that we felt should be the

 3  focus of our current monitoring, which is looking at placement.

 4      If students are in their placements, they're going to do

 5  better, and so that was the impetus for the reason for

 6  selection.

 7      The other piece, I think, speaking to --

 8          THE COURT:  Can you give me a little more on that?

 9  It's a drop-off by 7 percent --

10          MS. DUNCAN-BECERRIL:  Yeah.

11          THE COURT:  -- of what?

12          MS. DUNCAN-BECERRIL:  Statewide.  So last year, we --

13  and I -- and I'm happy -- this is the executive summary that

14  shows you our annual performance report.  I brought copies for

15  everyone if you'd like to look at it.

16      But our Indicator 6 showed from this year to -- so we saw

17  a reduction from 45 percent of children ages three to five

18  having access to a regular early childhood program down to 37.

19  So actually, it's almost 8 percent.

20          THE COURT:  Children with disabilities or all

21  children?

22          MS. DUNCAN-BECERRIL:  Children with disabilities

23  having access to a regular early childhood program.

24      So for us, we identified that as a clear problem within

25  the state, and we wanted that to be the focus of our preschool

1    monitoring.

2        Our belief is that if we can improve the access to early

3    childhood programs and access to -- there's a lot of reasons

4    that having students who are ages three to five having more

5    access to their regular early childhood peers is better for

6    them and will sort of elicit better outcomes, and so that was

7    our view on that.

8        There's research to support that students who have access

9    to -- preschool students who have access to regular early

10   childhood peers and preschool programs will do better on their

11   assessments.

12       So our focus was to look specifically at that area and try

13   to get districts to improve in that.  And so if we identified

14   instances that that was a problem, that's what we looked at.

15       That's why that element is part of the PIR and not part of

16   the -- and not the assessment piece.  That is also the reason

17   it is --

18           THE COURT:  What's PIR?

19           MS. DUNCAN-BECERRIL:  I'm sorry.  Performance

20   indicator review.

21           THE COURT:  Okay.

22           MS. DUNCAN-BECERRIL:  And so for the purposes of the

23   preschool monitoring, we also wanted to ensure that -- we felt

24   that students who are in a non-public school, that's concerning

25   to us.  A three- or four- or five-year-old in that setting,

**PROCEEDINGS**

1    that's a concern for us.  And so we wanted that to be the

2    automatic trigger.  Because if you're an LEA and that is one of

3    your go-to places for students who are that age, then what does

4    that -- what -- how are you looking -- I mean, it sort of

5    raises so many questions about how you're, sort of, looking at

6    appropriate placements for children.

7         One of the final reasons, in response to the Monitor's

8    concern, was this sort of all-or-nothing criteria.  And so

9    when -- and I have a table that I can give out here that

10   shows -- you know, the majority of LEAs in California have

11   between one and five children with disabilities who are ages

12   three to five.  And so when you start to use --

13            THE COURT:  You said you had a chart that --

14            MS. DUNCAN-BECERRIL:  I do have a chart.

15            THE COURT:  -- you wanted to pass out?

16            MS. DUNCAN-BECERRIL:  Absolutely.

17            THE COURT:  Go ahead.

18            MS. DUNCAN-BECERRIL:  And so a lot of these are rates;

19   they're percentages.  So you look at how many students were

20   suspended ages three to five out of all children three to five;

21   how many -- how many students are in a placement who are ages

22   three to five.

23        When the majority of your students, if you only have 10 or

24   20, then -- or even 30, one student, two students, that really

25   can skew the data.

1        What we wanted to see was a pattern, a systematic pattern

2   of problems across the LEA and select that district for a more

3   intensive level of review.  And so because we intend this

4   review to be more intensive, like a comprehensive review, we

5   wanted to identify patterns of problems across the LEA for a

6   number of areas, not just a single area.

7        **MR. MLAWER:**  Can we go back to your first point, the

8   7 percent decline --

9        **MS. DUNCAN-BECERRIL:**  Absolutely.

10       **MR. MLAWER:**   -- in placements in regular programs?

11       If that issue was a concern -- and it certainly sounds

12  like it ought to have been a concern or ought to be a

13  concern -- why wasn't this formula weighted in that direction?

14  Why wasn't, for example, a two-point scale used?

15       **MS. DUNCAN-BECERRIL:**  So one of the things that

16  I believe when developing a monitoring calculation is to make

17  it clear and simple.  And so I didn't want to weight things, in

18  part because that complicates the methodology.  And one of the

19  things that's important to me when I'm going out and explaining

20  how LEAs are selected for a specific type of review is to be

21  able to show them this is the calculation, to show them how

22  they can look at themselves and improve.

23       I want districts to be able to be looking at their data

24  daily, weekly, monthly to determine are they making

25  improvements over time.  We only get the data twice a year, but

1  they have the data every day.  And if they know what standard

2  we're using to measure them, then they can begin to measure

3  themselves, and they can begin to see improvements in

4  themselves.

5      But if we make the data weighted, honestly, many districts

6  do not have statisticians available to be able to do those

7  levels of calculations.  And we, as a state, have not developed

8  a data calculation system that districts can log on to to do

9  their data analysis for them.  It's really up to the LEA to do

10 that.

11     And so I wanted to create systems that were clear.  You

12 hit the target; you didn't.  You get a point; you don't get a

13 point.

14         THE COURT:  Can I ask you a follow-up question about

15 that?

16     So I understand the desire to have transparency and the

17 need for LEAs to understand how things are being evaluated.

18 But on the other hand, the fact that an LEA doesn't have a

19 statistician is not a justification, I would think, for having

20 a bad matrix.  Right?  I'm not saying that this is a bad

21 matrix.  That's what I'm here to examine.  Right?

22         MS. DUNCAN-BECERRIL:  Um-hmm.

23         THE COURT:  But, in other words, I understand the idea

24 of keeping it simple, keeping it predictable.  But if it's not

25 going to do a good job of identifying the LEAs that are not

1   doing right by preschool kids, then that's not a value that

2   should drive the matrix, I would think.  Right?

3           **MS. DUNCAN-BECERRIL:**  Yeah.  And --

4           **MS. WRIGHT:**  I think we do -- we do think the matrix

5   is valid.  And I think it's also important to point out that

6   just like the comprehensive review, this isn't the only place

7   we're looking at preschool.  And, in fact, the State, as a

8   whole, has put hundreds of millions of dollars -- and we have

9   another $150 million going out in the next few weeks -- to be

10  able to assist districts in creating more inclusive

11  environments.

12      So many of our activities across all the reviews that

13  Alison talked about, when they look at root cause, will develop

14  root causes based on what's happening starting in preschool,

15  whether that's cultural bias that's leading to more

16  suspensions, whether that's placement that's starting off too

17  restrictive, or any of those things.

18      So I think it's important to assure the Court and everyone

19  that this is actually a huge area of focus, and this particular

20  piece should not be the single piece that determines whether or

21  not we care about preschool LRE, to the extent we do.

22          **MR. MLAWER:**  My conclusions have nothing to do with

23  whether you care about something.

24          **MS. WRIGHT:**  Well, or that --

25          **MR. MLAWER:**  My conclusions were simply that you can

1   have -- a district can have a variety of extremely serious

2   problems and not be selected.  That's it.  That's my

3   conclusion.

4       And had you given me the actual data, I feel quite

5   confident I would have been able to demonstrate that.

6       You can get up to five points, having missed targets by

7   very, very big margins, and not be selected for this intensive

8   review.  Is that not correct?

9           **MS. DUNCAN-BECERRIL:**  That is correct.

10      Is that your suggestion, that we should weight the review?

11  Or -- because for me, I mean, I want to be able to design a

12  system that's going to be effective.  Obviously, that's really

13  important.  So I just want to know which way to go.

14      So we developed this.  We looked at the ways that we

15  think -- and Mr. Koski brings up, I think, a point that's also

16  important.  You know, we have -- we include the six elements of

17  assessment into one indicator, in part because there are six

18  elements; and they can, I think, cause -- one of the things

19  that we've seen in the past modeling is that the assessment

20  indicators become this place where it becomes very heavy on

21  that selection and then other things that are more egregious

22  don't come up.

23      So is it weighting?  Is it identifying other?  Is it

24  looking at distance from target?  I'm not sure.

25      We think it's valid.  We think it identifies the districts

1    that need to be -- that are the most egregious that need to be

2    identified for preschool review.

3         We believe preschool LRE, suspension, preschool missed

4    timelines are identified in our other monitoring activities.

5         **MR. MLAWER:**  Was there a question for me in there?

6    I'm sorry.  No?

7         **THE COURT:**  I think there kind of was, which is:  How

8    would you improve this?

9         **MR. MLAWER:**  I think I would want to consider several

10   different possibilities.

11        If a matrix with this number of elements were retained, I

12   would consider weighting.  However, I would also consider an

13   entirely different approach where matrix elements were grouped

14   by topic and the worst performers on that topic -- LRE,

15   discipline, for example -- were selected; something like that.

16        However, whether that would be capable of ensuring FAPE in

17   the LRE to preschool kids would depend on the number of

18   districts you were willing or able to select.

19        That's an issue that I do not address in here, the

20   resource issue, but you do address in your response, in which

21   it seemed pretty plain to me that you were saying that to some

22   extent -- maybe to a very large extent -- the number of

23   districts you can monitor within preschool review and also

24   within comprehensive review is determined by the resources

25   the State has devoted to this.

1    So it would depend -- before I could answer that question

2  fully, I would have to have a better understanding and probably

3  the Court's ruling on those kinds of questions.

4       MR. SPENCE:  Could your criticisms of the matrix be

5  boiled down to simply more LEAs need to be selected for this

6  review?

7       MR. MLAWER:  Boiled down to?  No.  But that's one

8  element.  I think more districts do need to be selected for

9  this review.  But whether it would be -- I would be quite

10  interested, for example, if the State said, "Okay.  We're going

11  to double the amount of districts selected for preschool

12  review," to then analyze the districts that are selected versus

13  those not selected and see to what extent these same problems

14  appear; problems being egregious performance resulting in not

15  being selected.  That would -- you know, doing that little

16  project would be of interest to me, but I can't predict what

17  the result would be.

18    So I would say not boiled down to, but I think it's a

19  factor.

20       THE COURT:  I'll ask a question of the policymakers,

21  I guess, which is:  So far, primarily, what I've heard -- I

22  don't know about "primarily" -- but I've heard a lot about the

23  need to make this sort of consistent for the LEAs and perhaps

24  understandable to the LEAs, and I haven't heard yet much about

25  the issue of resources.

1    And I guess one thing I'm curious about -- again, I don't

2    know if this is a discussion for now or towards the end of our

3    two-day hearing process but -- how much of this is driven by

4    resources?

5        For example, as it relates to preschool review, Mark seems

6    to have identified a number of scenarios where a school could

7    be performing very badly and not get selected for preschool

8    review or an LEA could be performing very badly and not get

9    selected for preschool review.  I mean, how much of that --

10   when you design this, how much were you thinking about just the

11   lack of resources to do more review, to do more comprehensive

12   review of preschools or intensive review of preschools?

13        **MS. DUNCAN-BECERRIL:**  So I can talk about the design.

14       In the design of the automatic cut score, we realized that

15   that would be automatically.  So that wasn't necessarily a

16   resource concern.  But when it came to the cutoff score, it

17   was.

18        **THE COURT:**  You mean six points instead of five?

19        **MS. DUNCAN-BECERRIL:**  Yes.

20        **THE COURT:**  And, Mark, when you all analyzed this, I

21   mean, I don't know if you were able to do it at this level of

22   granularity; but did you -- were you able to run an analysis of

23   what it would have looked like if it were five points instead

24   of six points or what it would have looked like if it were

25   weighted, if one of the factors were weighted more, or if

1    student assessment was included --

2              MR. MLAWER:  We did not --

3              THE COURT:  -- was weighted more or something like

4    that?

5              MR. MLAWER:  We did not run it based on changing the

6    values associated with each element.  We did run the number of

7    points, and if you look at the top table on my page 53.

8              THE COURT:  Okay.

9              MR. MLAWER:  This analysis excluded the 36 districts

10   that were automatically identified based on non-public school

11   placements and simply looked at the other districts.

12       So there were five districts scoring six points or seven

13   points that were selected.  So there were 16 districts with

14   five, 50 districts with four.

15       So that would have added -- you know, lowering that point

16   score would have added that number of districts.  If we lowered

17   it to three, then we would have added about another 150

18   districts into the mix here.

19             THE COURT:  So one of the things you've done is you've

20   said, well, if six points is the cutoff, look at all these

21   schools with five points who have major problems almost all the

22   way across the board that would not be selected.

23       I mean, have you done an analysis of how many schools

24   would meet that description that had only four points as

25   opposed to five?

1      **MR. MLAWER:**  Well, because we didn't have the

2  underlying data, the entire egregiousness issue, in terms of

3  performance on an individual matrix element, we couldn't

4  analyze.  So some of what we've said there is hypothetical.

5      What we could analyze were, based on this system, the

6  number of points that were awarded -- and that's as far as we

7  took that -- and what the hypothetical effect might be.  And we

8  looked at some of those districts that got five points and got

9  four points, and some of the examples in here concern those

10  districts.

11      **THE COURT:**  What's your view, Mark, on whether it

12  makes more sense to wait until sort of a methodology is

13  hammered out as part of this process before conducting any sort

14  of targeted intensive review of LEAs for preschool versus

15  plowing ahead with something and then kind of assessing whether

16  it's working along the way?

17      **MR. MLAWER:**  Well, I would say plowing ahead.  And had

18  the December submission said, "We're not going to do any

19  preschool reviews this year until the Court rules on this," I

20  would have brought that to the Court's attention with the

21  suggestion that CDE go ahead and perform these reviews.  That

22  would give us -- especially as we're moving into Phase 3, that

23  would give us some live data to work with come the fall or

24  whenever Phase 3 --

25      **THE COURT:**  And putting aside the automatic review --

1  what did you say?  There were 36 LEAs that were --

2      **MR. MLAWER:**  Yes.

3      **THE COURT:**  -- subject to automatic review?

4      **MR. MLAWER:**  By our count in the data.  That may not

5  match what actually happened, but that's how we counted it.

6      **THE COURT:**  Putting aside those, did you identify any

7  schools that seemed like they really ought not be subject to

8  intensive -- sorry.  Did you identify any LEAs that seemed like

9  they really ought not be subject to intensive review, intensive

10  preschool review?

11      **MR. MLAWER:**  No.  We did for comprehensive review, but

12  not for preschool review.

13      **THE COURT:**  Okay.  We've been going for about an hour

14  and 45 minutes.  Do the plaintiffs want to add anything at this

15  point before we take a break?

16      **MR. KOSKI:**  No, not at this point, Your Honor.

17  Thank you.

18      **THE COURT:**  Okay.  All right.  Why don't we take a

19  break.

20      If there's anything else you all want to say on this

21  topic, you can present it to us after the break.  And then

22  we'll move on, I think, to the -- I think this is kind of a

23  helpful way to start before diving into the weeds on some of

24  these indicators.  So I think what we'll turn to next,

25  probably, is the same kind of inquiry about LEAs being selected

1   for comprehensive review.  Okay?

2       All right.  Why don't we come back at 11:30.  And then

3   we'll plan on breaking for lunch at around 12:30.

4           **THE CLERK:**  Court is in recess.

5               (Recess taken at 11:21 a.m.)

6           (Proceedings resumed at 11:36 a.m.)

7           **THE COURT:**  Okay.  So I have a couple other questions

8   on the preschool review, but was there anything that you all

9   wanted to add or anything additional you wanted to respond to?

10          **MS. WRIGHT:**  No, thank you.

11          **THE COURT:**  One thing that you didn't respond to yet

12  was Mark's comment about the variance in sizes of the LEAs.  So

13  you're sort of applying the same standard to an LEA that is a

14  small LEA and might just have a few kids with disabilities as

15  the larger LEAs.

16      And I noticed on this chart that you gave to us, you noted

17  that 597 LEAs have only between one and five kids with

18  disabilities ages three to five.  And then it goes down, down,

19  down progressively and sharply.  But then, all of a sudden,

20  when you get to between 101 and 200 kids with disabilities

21  between ages three and five, or over 201 kids with disabilities

22  between ages three and five, you have this sharp increase.

23  Right?  So you have 112 LEAs -- you have 216 LEAs with more

24  than 101 kids with disabilities between the ages of three and

25  five.

**PROCEEDINGS**

1    So how do you answer Mark's point about that variance and

2    how your system apparently doesn't account for it?

3         **MS. DUNCAN-BECERRIL:**  Well, the purpose of having the

4    matrix was to have multiple areas where, so if there is a

5    sizing issue where you have one percentage that is higher than

6    the other, it would need to show a pattern of problems across

7    an LEA in order to be selected.

8         And so that's the idea of sort of holding -- you know,

9    Mark, I think, describes it as, like, the all or nothing or

10   like -- but the point is, is that it sort of equates all of

11   those things into a single score.

12        But, yes --

13        **THE COURT:**  Let me just make sure I understand.

14        So I'm looking at the chart, Mark's chart that we were

15   looking at before, or page 53, 54.

16        **MS. DUNCAN-BECERRIL:**  Yes.

17        **THE COURT:**  Okay.  So the first selection element is

18   three- to four-year-old students suspended.

19        What's the number of students that needs to be suspended

20   to get a point?

21        **MS. DUNCAN-BECERRIL:**  Any.

22        **THE COURT:**  Any?

23        **MS. DUNCAN-BECERRIL:**  Any.

24        **THE COURT:**  Okay.  So looking back at your chart --

25        **MS. DUNCAN-BECERRIL:**  So --

1          THE COURT:  -- if a district has between one and five

2     students that meet this description or if a district has over

3     201 students that meet this description, one suspension is

4     going to get them a point on that?

5          MS. DUNCAN-BECERRIL:  Yes, if they're three or four

6     years old.

7          THE COURT:  Right.

8          MS. DUNCAN-BECERRIL:  Because if your -- if your

9     behavior system is to suspend a three- or four-year-old

10     for what probably is likely to be normal age-based behavior,

11     then that's problematic to us so that we would add a point to

12     that.  But they'd also need to have other issues as well.  It

13     couldn't be just the one thing.

14       I will also say, there are very few three- and

15     four-year-old suspensions in the state.  I think --

16          THE COURT:  Sorry.  Say again.

17          MS. DUNCAN-BECERRIL:  There's very few three- and

18     four-year-old suspensions in the state.

19          THE COURT:  I would think so, yeah.

20          MS. DUNCAN-BECERRIL:  Probably fewer than 30.

21       Where we see suspension is in the five-year-old age range,

22     and that is typically students who are in TK and kindergarten.

23     That's why we separate it out as its own element, because we

24     see a large increase there, and we want to be able to compare

25     that at a rate level as opposed to an individualized level.

1          THE COURT:  So the size of the district is effectively

2    taken into account for that second indicator, that second

3    element?

4          MR. MLAWER:  The suspension rate.

5          MS. DUNCAN-BECERRIL:  Yes.

6          MR. MLAWER:  Five-year-olds.

7          MS. DUNCAN-BECERRIL:  For five-year-olds.

8       And just to sort of answer, sort of, the thing that you

9    pointed out, one of the things that we will see with your 101

10   to your 201 --

11         MR. SPENCE:  She's looking at her chart.

12         MS. DUNCAN-BECERRIL:  The chart, that I notice that

13   116 LEAs, those are typically your large --

14     (Court reporter interrupts for clarification of the record.)

15         MS. DUNCAN-BECERRIL:  Those 116 LEAs on the chart --

16         THE COURT:  216 --

17         MS. DUNCAN-BECERRIL:  216.

18         THE COURT:  -- have more than a hundred kids age three

19   to five with disabilities.

20         MS. DUNCAN-BECERRIL:  I promise, I'm good at math.

21      -- are your large unified school districts and who also

22   have probably a transitional kindergarten program; so you'll

23   see more students identified there.

24      There is probably 200 or so large unified school districts

25   in the state of California.

1      **THE COURT:**  Okay.  And then regular class/program,

2  what's the trigger to get you a point there?

3      **MS. DUNCAN-BECERRIL:**  So we have a target for that.

4  And so for all students ages three to five, the target is

5  34 percent.  So 34 percent or more of your students should be

6  in a regular preschool setting.  And if you are -- if you did

7  not meet that target, you were given a point.

8      **THE COURT:**  Okay.  And should be in a regular

9  preschool setting a certain percentage of the time?

10     **MS. DUNCAN-BECERRIL:**  It is whether they receive the

11  majority of their services in that regular preschool setting.

12     **THE COURT:**  Okay.  And then separate class/program,

13  what's the trigger there?

14     **MS. DUNCAN-BECERRIL:**  So if they received the majority

15  of their services in a separate school or class.  And the

16  target is 32.4 percent or less.

17     **THE COURT:**  So that will, again, take -- that will --

18  so there's a natural adjustment?  It doesn't matter whether

19  it's a big district or a small district for that element?

20     **MS. DUNCAN-BECERRIL:**  Well, it could, because what

21  happens is, if you have ten students, every student counts for

22  a tenth of the percentage.  If you have 100 students, then it

23  counts for a hundred.  But it does negate the fact that, if you

24  had 100 kids in a specific school or ten kids in a specific

25  school, it takes into account some of your size.

**PROCEEDINGS**

1        **THE COURT:**  You're more likely to have an error with a

2    smaller district?

3        **MS. DUNCAN-BECERRIL:**  Yeah.

4        **THE COURT:**  Okay.  And then any three- to

5    five-year-old in a residential facility, we talked about.

6        Any three- to five-year-old in a non-public school.  So if

7    there's even one?  Is that what the trigger is there?

8        **MS. DUNCAN-BECERRIL:**  Yeah, if there's even one.  And

9    then the automatic trigger is if they have more than one.

10       **THE COURT:**  Okay.

11       Okay.  I want to give you one more chance to explain why

12   the concern about LEAs having the formula changed on them is a

13   reason to not have gone forward now on implementing preschool

14   review.

15       **MS. DUNCAN-BECERRIL:**  It isn't just the LEAs that we

16   were concerned about.  Obviously, we want to have a consistent,

17   measurable system that says:  This is how things are measured.

18   This is your target.

19       But I think it's also, when you're developing a new

20   monitoring system -- and Alison and Kristin can speak to

21   this -- it is resource-intensive to develop the materials we

22   would use, the protocols, all of those pieces; and

23   the monitoring plan takes into account the elements that were

24   used for selection.

25       So that's the starting point when we develop a monitoring

**PROCEEDINGS**

1  plan, is we start with why they were selected, and then we

2  drill down into the data to look more at root causes.  And so

3  having that as a starting point is important.

4       And then the development of all of the resources, the

5  materials that we would use for the review and then train our

6  staff to do the review and then go select districts, it's an

7  intensive process.  So using a methodology that's not going to

8  change is important.

9            **THE COURT:**  So how much of the -- to what extent does

10  the methodology for selection dictate the kind of review that

11  is conducted?  Because I would think that whether -- for

12  example, whether you had the kind of weighted system that Mark

13  seems to think would be more beneficial or kind of a simple

14  six-point system that you've got here, I mean, aren't you going

15  to go in and conduct the same kind of intensive review

16  regardless?

17            **MS. DUNCAN-BECERRIL:**  We will do a review, but the way

18  the review is done, the monitoring elements, there's hundreds

19  of procedure and policy review elements that we would select to

20  go into a protocol, that we would go and look at files and does

21  this have this?  Yes or no?  Is there these?  What dates was

22  these?  Those elements we have to select based on how we

23  selected the LEA.

24       If we use a different selection methodology or if we -- if

25  we came here today and everyone hated it and we did something

PROCEEDINGS

1    totally different, then I think that's kind of where we stood,

2    was, like, do we -- do we put a lot of resources in developing

3    an entire protocol that's based on these elements or do we

4    wait?

5         **THE COURT:**  Okay.  And then let me ask you again.

6    I mean, this is something -- Ms. Wright, you started to speak

7    to this a little bit, but I want to hear more about it from any

8    of you.

9         You reminded us that this is not the only kind of

10   preschool-related review that occurs -- right? -- or that would

11   occur.  This isn't occurring at all, but there are other types

12   of preschool-related review that are occurring.  And I know

13   it's in all the papers, but can you just, to put it all in

14   context for us, sort of lay out what type of indicators are

15   being responded to now on the preschool level.

16        **MS. GREENWOOD:**  So in both the performance indicator

17   review and the comprehensive review, we are looking at various

18   indicators, such as preschool LRE and preschool assessment.

19        **THE COURT:**  Well --

20        **MS. GREENWOOD:**  Or preschool assessment.

21        **THE COURT:**  Comprehensive review, that happens --

22   there are only 35 districts in comprehensive review --

23        **MS. GREENWOOD:**  Yes.

24        **THE COURT:**  -- right now; and I assume that you're

25   looking at everything as part of comprehensive review,

1    including preschool.

2        But for the other districts that are not in comprehensive

3    review, how should we feel about the degree to which LEAs'

4    performance with respect to preschool kids is being monitored

5    now by the State?

6        **MS. DUNCAN-BECERRIL:**  So we do look at -- so 288

7    districts, I believe, were selected for performance indicator

8    review based on not meeting the target for preschool least

9    restrictive environment.

10       So those districts have to go through a process, a root

11   cause, develop a plan to address that issue.

12       Students ages -- who are not transitioning timely from the

13   Part C program, which is our early intervention program, to the

14   Part B program and do not have an IEP in place by their third

15   birthday are included in the data identified non-compliance.

16       We are also --

17       **THE COURT:**  And how many districts -- how many LEAs

18   meet that description, roughly?

19       **MS. DUNCAN-BECERRIL:**  133.

20       **THE COURT:**  Okay.  Go on.

21       **MS. DUNCAN-BECERRIL:**  And then I don't have the exact

22   numbers, but we can get them for you.

23       We do have, as part of the disproportionality review and

24   other -- the DINC review.  For example, if you have a student

25   who has an IEP --

**PROCEEDINGS**

1          **THE COURT:**  The what review?

2          **MS. DUNCAN-BECERRIL:**  I'm sorry.  The data identified

3     non-compliance.

4          **MS. WRIGHT:**  We call it DINC.

5          **MS. DUNCAN-BECERRIL:**  I'm getting out of my acronym

6     life.

7          So if they have a late IEP or a late triennial, we do

8     require them, even if they're three to five, to hold the IEP

9     and make it timely.

10         And students with disabilities ages three to five are part

11    of the discipline and placement -- I'm sorry -- the discipline

12    disproportionality analysis.  So their suspensions and

13    expulsions are included inside of the disproportionality

14    analysis.

15         **MR. MLAWER:**  And for placement, that's because you're

16    working from that one field having to do with three- to

17    21-year-olds?

18         **MS. DUNCAN-BECERRIL:**  Yes.

19         And also, the identification does not include three- to

20    five-year-olds at this time.

21         **THE COURT:**  Identification does not include three- to

22    five-year-olds?

23         **MS. DUNCAN-BECERRIL:**  For disproportionality.

24    Disproportionality identification is not included at this time.

25         **THE COURT:**  But for discipline, it is?

1          MS. DUNCAN-BECERRIL:  Yes.

2          THE COURT:  Okay.  So to the extent that preschool

3     monitoring is happening, that is how -- you've kind of

4     described to me the breadth of it?

5          MS. DUNCAN-BECERRIL:  Yes.

6          THE COURT:  Okay.  Does anybody have anything they

7     want to add on that or any questions they want to raise

8     additionally on that?  No?

9        Okay.  Why don't we --

10         MR. KOSKI:  No, Your Honor.  I'm sorry.

11         THE COURT:  Oh, sorry.

12         MR. KOSKI:  With all of preschool?  Are we moving on

13    to comprehensive review?

14         THE COURT:  That's what I was planning on doing.

15         MR. KOSKI:  Then I do have, like --

16         THE COURT:  Go ahead.

17         MR. KOSKI:  -- two points to make.

18       One is, you know, in talking about, from the district's

19    perspective, what they want to see and what they want to know

20    if they're going to be subjected to monitoring, in my mind, I'm

21    thinking about consistency, you know, having it be the same

22    from year to year; clarity and transparency, knowing what it is

23    that they're going to be monitored on; and then I would

24    separate out simplicity because simplicity is different from

25    clarity and transparency.  You can be clear and transparent,

1   but you don't have to be easy in terms of being able to figure

2   it out.

3       If I understood what you said, your biggest concern was

4   simplicity because they don't have statisticians to try to

5   figure out the formula and that sort of thing, or at least that

6   was a concern of yours.

7           MS. DUNCAN-BECERRIL:  It was a concern.

8           MR. KOSKI:  Yeah.

9           MS. DUNCAN-BECERRIL:  We identified that as an issue

10  when we do disproportionality because disproportionality uses

11  an alternate risk ratio, and oftentimes districts have a hard

12  time understanding how they got in and out.  And so that was

13  something we discovered over time, that process.

14          MR. KOSKI:  Understood.  And I guess, then, that I

15  would wonder, you know -- well, let's take disproportionality.

16  All they need to know is to not disproportionately assign kids

17  of race and ethnicity to certain places.  That's all they

18  really need to know.  Right?  It doesn't matter what the

19  specific --

20    (Court reporter interrupts for clarification of the record.)

21          MR. KOSKI:  I'm sorry.  That they ought not be

22  disproportionately assigning children of different races and

23  ethnicities to either restrictive settings or school discipline

24  or something like that.  The specific formula matters less.

25          MS. DUNCAN-BECERRIL:  I agree with your first point; I

1    disagree with the second, because we want districts to be able

2    to, number one, identify the root causes.

3        So sometimes the root causes can be delineating that data

4    by school site, by area and location if it's a large LEA, to be

5    able to identify where do you see the problem that you can

6    address in terms of -- or you have a specific school site where

7    identification is happening more.

8        So do you have -- so those kinds of root causes, we want

9    the district to be able to do that process.

10       **MR. KOSKI:**  I'm not sure I follow why that's related

11   to how sophisticated the methodology is, because no matter

12   what, they have to dive down and figure out root causes once

13   they've been identified.  But I'll leave that there for now.

14       **THE COURT:**  No.  But I actually would like to hear an

15   answer to that question, because I had a similar question which

16   is, I don't -- I think it's a slightly different way of asking

17   the same question, which is, I haven't yet wrapped my mind

18   around why it's important for a district to know precisely the

19   formula by which they've been selected for review as opposed to

20   just knowing the issue it is that they need to be concerned

21   with.

22       **MS. WRIGHT:**  I need to say one thing about the

23   high-stakes nature of any of the times that you're identified

24   for anything.  So it is -- people know when you're identified.

25   It's public when you're identified for things.  And so it is

1    important for them to be able to understand.  And we actually

2    get challenged by districts who want to understand the

3    methodology very specifically to even determine whether they

4    believe that it's a problem for them or not.

5        So even as of late, we have had districts come to us,

6    particularly even around the disproportionality stuff, saying,

7    "We really need to understand."

8        **MS. DUNCAN-BECERRIL:**  I would also say, I think it's

9    important because we only collect data once or twice a year.

10   We only look at the data once a year.  But if you're having a

11   district go through a process, I encourage them to look at

12   district data all the time.

13       So let's take suspension as a really good example.  So

14   suspension happens throughout the entire year.  So folks ask

15   me, from time to time, "How often" -- or "When should I look at

16   suspension?"  And my answer is, the very first day of school

17   and every day after that.

18       But if you don't know how you're being measured, what are

19   you looking for?  I mean, I can tell you very simply, like, for

20   me, I get on the scale every day and look at my weight, not

21   because I think that there's an issue or, if there was an

22   issue, I need to look at it, but because I can monitor on a

23   daily basis how I'm doing.

24       That's what we want districts to do.  But if they don't

25   know the measure or cutoff for which we use to determine how

**PROCEEDINGS**

1    they're doing, we don't give them that, then they don't know

2    how to measure themselves on a more frequent basis to measure

3    their progress or measure if they're actually -- what they're

4    doing is having an effect.

5              **THE COURT:**  But, I mean, to push back on that a little

6    bit, to use the example of suspensions -- right? -- we don't

7    want to be overusing suspensions and we don't want to be

8    suspending people disproportionally.  Right?  So as a

9    layperson, it strikes me as less important that they know the

10   actual number of suspensions that is going to trigger a

11   comprehensive review for them than that they know that they

12   should not be overusing suspensions and should not be

13   suspending children disproportionately based on race.

14        And so if the benchmark changes from one year to another

15   on what's going to trigger a performance index review or a data

16   whatever it's called, one of these types of review, I guess

17   the -- the primary goal is not to avoid, like, annoying them;

18   right?  I mean, I understand that that is a goal.  That is an

19   appropriate goal, and you want to have a good relationship

20   between the State and the districts.  But the primary goal is

21   to make sure that we're doing a good job monitoring the

22   districts for compliance with the statute; right?

23             **MS. DUNCAN-BECERRIL:**  I would say it's -- our goal is

24   not nec- -- I mean, I'm not concerned whether or not we annoy

25   districts or not.  My concern is are we able to partner with

1    districts to get the ball moving for them.

2        So they're not changing -- it's not like a switch that

3    they turn on and off.  They have to train their staff.  If they

4    have some sort of inherent bias within disproportionality,

5    they're training their staff and monitoring their staff to make

6    sure that that's not coming up.  And so --

7            THE COURT:  And my only question is, to use that

8    example, if you change the benchmark from one year to another,

9    are you saying they're going to have to, like, undo the

10   training that they've given?

11           MS. DUNCAN-BECERRIL:  What I've found is when we

12   change the benchmarks, people who feel like they were doing

13   really well or they were making progress, they feel like:

14   Wait.  You changed it?  We were marching towards this thing,

15   and now it's a different thing, and now we're held to a

16   different standard.  We want to know what the measure is.

17           THE COURT:  But if you discover, through your own

18   work, that the standard you were applying was inadequate, you

19   should change it; right?

20           MS. DUNCAN-BECERRIL:  Yes.

21           THE COURT:  And the desire to avoid making them mad

22   because you've changed the standard and they thought they were

23   doing well and, all of a sudden, they're not -- you're

24   targeting them for intensive review, that's not a reason not to

25   do it; right?

1      **MS. DUNCAN-BECERRIL:**  No.  I wouldn't want you to

2    believe that that is the process.

3      What I think -- if we need to change it, we change it.  I

4    just don't want to -- I think in our design, we try and make it

5    so it doesn't change all the time.  But if it has to be

6    changed, we go with that process as well.  It's just, in our

7    design of it, our hope is to make it clear, transparent, in

8    some cases simple.

9      **THE COURT:**  Okay.  Did you want to ask anything else?

10      **MR. KOSKI:**  So I'll just add one more piece on the

11    simplicity point.  And, again, this is a hypothetical

12    situation, but if it's too simple, I could imagine scenarios

13    where there would be gamesmanship.  So if we take the actual

14    criteria you have here, if you just eliminate the two automatic

15    indicators, that's two of the seven that are gone, and they're

16    never going to hit the magic "6."  So if they just don't

17    suspend any kids who are less than five years old and they

18    don't place any kids into NPSs, they're not going to hit the

19    magic "6."  So I worry about the flip side of making it too

20    simple.

21      **MS. DUNCAN-BECERRIL:**  Well, I mean, they would have to

22    be out on all the other elements as well.  So if they don't

23    suspend kids, then that's actually three elements that would

24    not apply anymore because you wouldn't have three- to

25    five-year-old -- you wouldn't have three- and four-year-old

**PROCEEDINGS**

 1   suspensions --

 2          **MR. KOSKI:**  Okay.  That makes my point stronger.

 3          **MS. DUNCAN-BECERRIL:**  No.  I mean, of course --

 4          **THE COURT:**  In other words, all you have to do is

 5   avoid suspending a three- to four-year-old; right?

 6          **MS. DUNCAN-BECERRIL:**  Well, you'd have to stop

 7   suspending your three- through five-year-olds.  But isn't that

 8   the purpose of what we want?

 9          **THE COURT:**  Well, yes.  But the problem is that they

10   could be doing -- performing miserably in other areas; but if

11   they can just refrain from suspending a three- to four-year-old

12   and then maybe not more than one five-year-old, or something

13   like that, then they know they're going to avoid the

14   comprehensive review.  There will still be a performance

15   indicator review, I --

16          **MS. DUNCAN-BECERRIL:**  That's what I was just going to

17   say is, it's not that they're avoiding everything if they're

18   not rolled up into this intensive preschool review.

19          **THE COURT:**  But I assume it's a much bigger deal to be

20   subject to the intensive review than it would be to have to put

21   together a performance plan on one indicator; right?

22          **MS. DUNCAN-BECERRIL:**  Yeah.  But if we could get them

23   to stop suspending all three- to five-years-olds, we would

24   definitely be moving in a really good direction for a district.

25   Even if their placements are not great, we could hold them

 1    accountable in that area.

 2          MS. WRIGHT:  I think what we're looking at is for

 3    those larger systemic issues that are being, you know, birthed

 4    in preschool.  We're looking for districts that will probably

 5    be the districts that end up in our comprehensive review later

 6    because they're starting off with a lot of issues with their

 7    students with disabilities.

 8          MS. DUNCAN-BECERRIL:  A pattern of systematic

 9    problems.

10          MS. WRIGHT:  And that's really the purpose of the

11    intensive review, is to go all in, you know, to swarm in on

12    that.  And in the meantime, we have all these other individual

13    metrics that are saying:  Hey, you know, you really need to

14    focus on this.

15       Preschool LRE, we would agree, is an important one.

16          THE COURT:  Great.  But does everybody in the room

17    agree that it is important to have a comprehensive preschool

18    review along the lines of what you're describing, or is that a

19    source of disagreement?

20          MS. DUNCAN-BECERRIL:  Are you talking about, like,

21    everybody in the room or just --

22          THE COURT:  Well, you all.

23          MS. DUNCAN-BECERRIL:  Yes, we all agree that we should

24    have an intensive preschool review, because it's different.

25    And Alison might can speak to this.  But I think it's important

1   to separate, it's a smaller population.  I think it's important

2   to separate, there's different things happening there than have

3   it as a comprehensive review.  That's why you want to have it

4   as a separate review.

5       And you can talk a little bit more.

6           MS. GREENWOOD:  Well, I think, too, it's not that the

7   elements would always necessarily be the same.  We're trying to

8   be responsive to the slippage that we've seen in LREs.  So some

9   of that is included here.

10      If we could get districts to stop suspending and to

11  improve LRE, we might change -- we likely would change the

12  criteria, because it's about improvement.  So it's a continuous

13  process of improvement.  It's not going to be static moving

14  forward.  I mean, I want to see these districts make changes.

15  Once they do, we can find something else to target them for,

16  frankly.

17          THE COURT:  But then it'll be changing the formula on

18  them and they're going to get mad.

19          MS. DUNCAN-BECERRIL:  But we, you know --

20          MS. GREENWOOD:  We'll have other priorities.

21          THE COURT:  So I take it that you agree that it's not

22  acceptable to not have this kind of comprehensive review in

23  some form, comprehensive preschool review in some form.  It's

24  just a question of what form it should take and how --

25          MS. GREENWOOD:  Yeah.  And I think it's important, you

1  know, we're trying to be responsive to the data that we've seen

2  and that slippage and some of the other issues that we see.

3          THE COURT:  And that is a major -- you view that as a

4  major problem?

5          MS. GREENWOOD:  Yes.

6          THE COURT:  That 7 percent?

7          MS. GREENWOOD:  I think because it sets the tone for

8  the school-age years in some ways.  But also, I think it's

9  really concerning to have young children placed in a non-public

10 school when we should be looking at, you know, the general

11 education environment first to see how they're doing there.

12         MS. WRIGHT:  And I can't overemphasize the commitment

13 on the State's behalf -- not the Special Ed Division only, so

14 by ourselves, but the entire State's commitment to this

15 initiative well beyond just students with disabilities.  This

16 is a massive statewide initiative to create inclusive

17 environments for all children in preschool.  It's become sort

18 of -- it's got a huge set of momentum behind it.  So I don't

19 feel like we're doing this alone.

20         While this whole statewide effort is going on, we're doing

21 this monitoring and can do this kind of intensive monitoring

22 for the folks who need more assistance.  But in general, we're

23 providing a ton of assistance and resources.  The State is

24 providing resources for districts who have chronically or

25 classically not had general education environments to their --

1    this is what they claim -- enough of them to be able to ensure

2    that students with disabilities all have access to inclusive

3    environments.  That is a major initiative that we're working on

4    as a state.

5         THE COURT:  Do you have any data on kids who are being

6    sent to -- preschool-age kids who are being sent to non-public

7    schools, do you have any information on how often it's at the

8    behest of a parent versus at the behest of the district?  Is it

9    usually the parents who want this, want it this way, or is it

10   usually the district wants it this way?

11        MS. DUNCAN-BECERRIL:  So our data doesn't typically

12   get at the "why."  It doesn't say why a child is placed in a

13   specific setting.  It just says that they were placed there.

14   So I don't have the data that shows that.

15        THE COURT:  And you have this presumption that that's

16   likely not to be a good thing if it happens?

17        MS. DUNCAN-BECERRIL:  Well, yeah.  Having a student in

18   a really restrictive setting is never a good thing.  But having

19   a child, a three- or four-year-old or a five-year-old, in a

20   really restrictive setting is concerning.

21        MS. WRIGHT:  And that goes back to our rationale for

22   anywhere that has that -- a student in that setting, to be

23   looking at that situation.  So that's part of our rationale

24   with what we used for the criteria for selection.

25        MR. MLAWER:  You mean has at least two students;

PROCEEDINGS

1    right?

2              MS. WRIGHT:  More than one.

3              MS. DUNCAN-BECERRIL:  More than one.

4              MR. MLAWER:  More than one.

5              MS. DUNCAN-BECERRIL:  Yeah.

6              THE COURT:  But it does seem to be that underlying all

7    of this is kind of this policy view that it's not good to have

8    these kids in separate schools.  The assumption is that

9    that's --

10             MS. WRIGHT:  The research supports that.  I would say,

11   is that in every single case all the time?  I'm sure there are

12   outliers to that rationale.  But overall, there's overwhelming

13   evidence that children who are in preschool should be included

14   with their general ed peers in a general ed preschool.

15             THE COURT:  I guess that's why I was curious about how

16   often is this at the behest of parents and how often is it --

17             MS. WRIGHT:  That's a good question.

18             THE COURT:  Because I guess the further assumption you

19   might draw is that districts are sending these kids to

20   non-public schools maybe over the objection of their parents,

21   because the district doesn't want to deal with them or

22   something like that.  But you could also imagine parents

23   saying, "I believe this child needs to be in a" --

24             MR. MLAWER:  I think in practice, both take place.  It

25   would be great if these sorts of data were collected; but

**PROCEEDINGS**

1   ultimately, unless there's a hearing that has this result, an

2   IEP team will come to this determination, which may or may

3   not -- but typically does -- involve general agreement around

4   that table that X, whatever it is, is what the student needs --

5   a child needs to receive FAPE.

6   　　　　THE COURT:  But is there sort of general agreement in

7   the policy world that as a general matter, separate school is

8   to be avoided?

9   　　　　MR. MLAWER:  Yes, absolutely.  Except when it's

10  required to implement an IEP satisfactorily, which is the

11  standard in the statute.

12  　　　　THE COURT:  Okay.  Mark, do you want to turn to -- we

13  probably won't get through it all before lunch, but do you want

14  to turn to selection for comprehensive monitoring?

15  　　　　MR. MLAWER:  Sure.

16  　　Okay.  Judge, this is found -- this discussion is found on

17  pages 57 to 73 of my report.

18  　　　　THE COURT:  57 to 73?

19  　　　　MR. MLAWER:  Yes.

20  　　　　THE COURT:  Okay.

21  　　　　MR. MLAWER:  Fairly lengthy discussion.  I have tried

22  to boil it down to what I think are the key elements here.

23  　　There were two areas of concern that I found here.  Worded

24  generally, one concerned the selection elements and the scoring

25  of those elements, and the second concerned the standard for

**PROCEEDINGS**

1    selection and the implications of that standard.  So for each,

2    I have reasons why my conclusion regarding selection for

3    comprehensive review was non-compliant.

4         And, again, as I stated in the report and will state again

5    now, there were limitations to the data analysis we could do

6    due to not all of the information being present.  CDE has

7    explained some of those reasons.

8         So they concern scores of zero, values like NA and NC.

9         In general, as I understand it, "NA" means that either

10   it's an indicator that was not applicable to a particular

11   district -- so, for example, high school graduation to an

12   elementary district -- or there were no data from the prior

13   year to make the comparison that is necessary based on the

14   standard CDE sets for selection for each element -- for scoring

15   of each element.

16        And "C" seems to refer to an n-size that is too small for

17   CDE to make a determination with confidence.

18        Did I explain that right, Shiyloh?

19             **MS. DUNCAN-BECERRIL:**  Yeah.

20             **MR. MLAWER:**  The NC?

21             **MS. DUNCAN-BECERRIL:**  Also, if the district did not

22   receive a Dashboard, an NA would be -- if they did not receive

23   a color for their Dashboard and if they did not have any

24   complaints from either years, then they would --

25             **MR. MLAWER:**  They would receive an NC?

1          **MS. DUNCAN-BECERRIL:**  Yeah.  An NA.

2          **MR. MLAWER:**  NA.

3          **MS. DUNCAN-BECERRIL:**  NC is mostly around size.

4          **MR. MLAWER:**  Okay.  So the net effect, just to state

5    this, largely without comment, is that we found -- and when we

6    looked at placement, school-age placement in regular classes,

7    we found 1,088 districts that essentially weren't judged on

8    that element.  499 of those districts had an NA or an NC in the

9    current year and 589 in the prior year.

10      So because both years are necessary in this approach to

11   scoring that element, over a thousand districts, which is

12   roughly half the districts in the state --

13         **MS. DUNCAN-BECERRIL:**  That's correct.

14         **MR. MLAWER:**  Counting charters as districts; correct?

15         **MS. DUNCAN-BECERRIL:**  Yes.

16         **MR. MLAWER:**  -- were not judged on that particular

17   element.

18      So let me start with the selection elements and the

19   scoring of those elements.

20      So, first, one of the more distressing aspects of this

21   approach to scoring is that better-performing districts can

22   receive fewer points than worse-performing districts, even if

23   the performance was egregious.

24         **THE COURT:**  And so, just to make sure we're all on the

25   same page here, you said better-scoring districts can receive

**PROCEEDINGS**

1    fewer points than worse-scoring districts, which is a bad thing

2    in this context, even while it would have been a good thing in

3    the preschool review process.

4         **MR. MLAWER:**  Yes.  It's important to say that in this

5    process, selection for comprehensive review, the fewer points

6    you receive of the available points to your district, the more

7    the chance is you will be selected for comprehensive review.

8         I expressed that correctly, Shiyloh?

9         **MS. DUNCAN-BECERRIL:**  Um-hmm.

10        **MR. MLAWER:**  So, in other words, any improvement or

11   regression, no matter how small --

12        **THE COURT:**  You know what I would do?  Sorry.  Just

13   one brief aside.  It's not the subject of this -- it's outside

14   the scope of this case.

15        But, Ms. Wright, if I were you, at some point in the next

16   few years, I would establish a simplification -- a language

17   simplification committee, and I would require them to review

18   all the language that is being used, require them to identify

19   weird things like this, where in the preschool context, more

20   points is good and -- or is more points bad?  Sorry.

21        In the preschool context, more points are bad.

22        **MR. MLAWER:**  Right.

23        **THE COURT:**  And in this context, more points are good.

24   Is that right?

25        **MR. MLAWER:**  Yes, that's correct.

1          THE COURT:  You know, just like a comprehensive review

2     of that and sort of simplify all your language and your

3     terminology and your jargon into a way that sophisticated

4     members of the general public who are not special education

5     experts can understand.  Because I have to say -- and this is

6     obviously nobody's fault here or maybe it's partially your

7     fault but -- this is an area, more than maybe any area I've

8     ever seen, where the jargon and the language has just gotten

9     totally out of control.  And there are a lot of, sort of,

10     irrationalities built into the way you communicate about what

11     is being provided, even if what is being provided is good.

12          MS. WRIGHT:  As a parent, I don't disagree with that,

13     yes.

14          MR. MLAWER:  I actually think it's worse.  The

15     situation is worse than we can express it in the California

16     context.

17          I recall with clarity, when I first moved from

18     Massachusetts to Maryland in 1988, having worked already

19     four-plus years in this field, after the first few months of

20     trying to get used to what was going on in Maryland, I thought

21     my head was about to explode.  The acronyms were all different;

22     practices were different; the state regulations were different.

23     Every time I have worked in a new state, it takes a period of

24     adjustment precisely because of these differences.

25          THE COURT:  Even these names -- I mean, "performance

1    indicator review," "data identified non-compliance" -- you

2    could come up with much better names for these things.  I know

3    you've inherited a lot of them.

4          **MS. DUNCAN-BECERRIL:**  Yeah.  Some of them predate us,

5    unfortunately, and they've just become standard in the field.

6          **THE COURT:**  Yeah.  Anyway, sorry.  Go ahead.

7          **MR. MLAWER:**  That's okay.

8      So this first point concerned the awarding of points to

9    better-performing districts versus worse-performing districts.

10   And I think I said, although perhaps I didn't, that any amount

11   of improvement or regression, no matter the size of it, results

12   in different scores.

13     So, some examples.  I provided a number of examples

14   throughout this section of the report, but I will provide a few

15   now just to illustrate this point.  And these are districts --

16   these are not hypotheticals.  These are districts we found in

17   CDE's data spreadsheet.

18     So, for example, we had -- for timely initial evaluation,

19   we had a district that, in the --

20         **THE COURT:**  Is there a place in your report where you

21   discuss this example that you're giving?

22         **MR. MLAWER:**  Yes.  It is in there somewhere.

23         **MS. DUNCAN-BECERRIL:**  It's page 60 --

24         **MS. WRIGHT:**  Second paragraph.

25         **MS. DUNCAN-BECERRIL:**  -- middle of the page.

1          **MR. MLAWER:**  I'm sorry?

2          **MS. DUNCAN-BECERRIL:**  Page 60, middle of the

3    paragraph.  Is that where you're at?

4          **MR. MLAWER:**  Yes.  Thank you.

5       So there was a district that had 100 percent compliance in

6    the prior year, declined to 99.9 percent in the current year

7    and received a "1."

8       Another district improved from 73.9 percent to

9    76.6 percent -- in other words, the performance was

10   significantly worse than the first district -- and that

11   received a "2," a better score.

12      For placement in regular class, there was a district that

13   went -- now, this depends on meeting the target, plus

14   improvement or regression.  A district that went from

15   62.7 percent of kids placed in regular classes to 62.8 percent,

16   an improvement of 0.1 percent, that district received a "4"

17   based on that improvement.

18      Another district declined from 92.1 percent to 92 percent

19   and received a "3."  I think we would all want to say that

20   placing 92 percent of your students in regular class is

21   something to be applauded, assuming each of those students is

22   getting -- receiving FAPE.  But that district received one

23   fewer point than the first district.

24      We found three districts that, on this measure of

25   placement in regular class, scored between 25 to 29 percent of

1  their students in regular classes, which is low; but because

2  the score had improved from the prior year, received a "2."

3      With respect to the achievement and discipline Dashboards,

4  as I had thought when I originally conceptualized how I would

5  approach this, that we would have already discussed those --

6  this particular problem; so I'll just mention it in passing

7  now.  That districts that score red or orange are more likely

8  to be selected for comprehensive review than those who score --

9  that score yellow.  But some of the yellow scores on those

10 Dashboards have to do with still very poor performance and

11 minimal improvements.  And I hope we'll get into that

12 discussion when we go back to the beginning.

13     Okay.  Preschool performance, we found three districts

14 that went from meeting six of six of the outcome standards

15 declined to four and received a "1" due to the decline; but we

16 found 14 districts that, in the prior year, met none of those,

17 none of the six, and in the current year, met none of the six

18 and received a "2" due to having maintained the performance of

19 kids not meeting these outcomes.  These results I would

20 describe as silly.

21     Okay.  Turning to non-compliance found through complaint

22 investigations or due process hearings.  Now, there was some

23 confusion here in CDE's December submission that it has now

24 clarified, and there is another problem here that we will get

25 to, but not in this context.

**PROCEEDINGS**

1    But just sticking to this point, we found a district that

2  had 101 non-compliances in the prior year and declined to 90

3  non-compliances.  These were instances of non-compliance

4  discovered by CDE through complaint investigations or by

5  hearing officers through due process hearings.  So that

6  district went from 101 to 90 and received a "2."

7    We found 17 districts that went from one non-compliance in

8  the prior year to two non-compliances in the current year, and

9  those districts received a "1."

10    So a district with 90 non-compliances in the current year

11  got a better score than a district -- 17 districts with just

12  two.

13    Timely annual reviews of --

14    **THE COURT:**  Just to clarify, does that score take into

15  account the overall size of the district?

16    **MR. MLAWER:**  No.  And that is the problem that we will

17  get to.  That's precisely the problem.

18    One part of CDE's December submission said it was per

19  capita, considering the total population of students with

20  disabilities.  Another portion of the December submission said

21  it was the number.  I could not reconcile that, and I wrote it

22  that way in the section of the report.

23    CDE has now clarified that it is the number, not the

24  percentage.  So that is a significant problem, it seems to me,

25  but this is not the proper context for it, I think.

PROCEEDINGS

1          THE COURT:  Okay.

2          MR. MLAWER:  Okay.  To continue, for timely annual

3   reviews, we found 11 districts that declined from 100 percent

4   to 99 percent and received a "1."  We found one district that

5   improved from 99 to 99.2 and received a "2."  So, again, we

6   have districts with better performance receiving fewer points.

7          And this is another issue concerning those indicators with

8   a hundred percent targets, which could be considered

9   problematic on its own for this very reason, but we'll set that

10  aside.

11         Okay.  Additionally, for preschool performance, the extent

12  to which targets are missed does not matter in this approach to

13  scoring that element.  So, in other words, you've either met

14  all six targets or you haven't.  If you haven't, the extent to

15  which you didn't doesn't count.

16         So we might say, "All right.  Here's a district that met

17  zero" --

18         THE COURT:  You're saying this is only for preschool?

19         MR. MLAWER:  This is the selection element for

20  comprehensive review that concerns preschool outcomes, what

21  kids have learned by the time they leave preschool.  Okay?

22         THE COURT:  Okay.

23         MR. MLAWER:  And finally, on this --

24         MS. DUNCAN-BECERRIL:  It's not necessarily what kids

25  have learned by the time -- there's three elements that are

**PROCEEDINGS**

1   associated with preschool outcomes.  It's their

2   social/emotional behavior; it's their knowledge of skills; and

3   it is -- sorry I'm not off the top of my head.

4           **MR. MLAWER:**  I have a table in there --

5           **MS. DUNCAN-BECERRIL:**  Yeah.

6           **MR. MLAWER:**  -- that lays it all out.

7           **MS. DUNCAN-BECERRIL:**  So there's three elements.  But

8   it doesn't look at whether or not they know their ABCs.

9           **THE COURT:**  Right.  And that's one of the issues that

10  I assume we'll talk about later, is that there's much more of a

11  subjective element to the assessment of preschool --

12          **MS. DUNCAN-BECERRIL:**  Yes.

13          **THE COURT:**  -- kids than --

14      I understand.

15          **MR. MLAWER:**  Okay.  And finally, on this first point,

16  the comprehensive review selection formula does not have an

17  element that concerns Child Find, which, you know, considering

18  the context of CDE's, I take it to be, proposal that it's not

19  being implemented yet -- if I understood that correctly -- is

20  on Child Find, I think is very, very problematic.  So that's

21  all the -- the whole first point.

22      The second point concerns the standard for selection and

23  the implications of it.  So, first, as I said earlier in the

24  context of preschool review, CDE's December submission did not

25  contain anything that could be regarded, in my view at least,

**PROCEEDINGS**

1    as a demonstration of the adequacy of the cut score that it has

2    chosen.  At that time, the December 7th submission, the cut

3    score was 65 percent.  I was informed in mid-January that the

4    cut score had been lowered to 62 percent.  The change in

5    that -- I'm referring to an e-mail from counsel.  The change

6    was not explained.  The number reduced -- number of districts

7    reduced was not set forth in that e-mail.

8        According to our calculation, based on the spreadsheet

9    that was sent to us, that reduced 94 districts from the total.

10   We found 94 districts that scored between 62 percent and

11   64.9 percent.  So due to the cut score, currently 62 percent,

12   as I understand it, one major problem is that districts that

13   appear to need intensive monitoring are not selected.

14       So sticking with those 94 districts, for the moment, that

15   scored between 62 and 64.9 percent, 70 of those districts we

16   found Dashboard results, meaning that they had scores for the

17   prior year and the current year.

18       So of those 70, in English language arts performance, 43

19   of those districts scored red, 25 scored orange, keeping in

20   mind that those are the two worst performance levels on the

21   Dashboard.  For discipline, we found 34 of those 70 scored red

22   and 20 scored orange.  For placement in a regular class, 21 of

23   those districts were below 50 percent rate of placing kids in a

24   regular class.

25       Second, despite the cut score of 62 percent, 69 districts

**PROCEEDINGS**

1  that scored below 62 percent were not selected.

2      Now, CDE said, in its February response, that those

3  districts were first-year charter schools.  However, we found

4  Dashboard results for many of them indicating that there were

5  scores available from the prior year.  So I'm quite mystified

6  by this.

7      So, for example, in English language arts, 46 of those

8  districts scored red, 14 scored orange, and nine had a missing

9  score.  For discipline, all of the districts had scores, had

10 Dashboard colors, 29 red, 31 orange.  So, leaving me with the

11 question of:  Why were they not selected?

12      Okay.  We also have some results for those districts we

13 were able to determine not with a hundred percent certainty,

14 but with some certainty, were elementary districts, keeping in

15 mind the Ravenswood context for this discussion.

16      We found that there were 60 districts, presumably

17 elementary districts, that scored below 62 percent.  Of those

18 60, six were -- setting aside the ones that were not selected

19 now.  Now we're looking at the whole universe of those

20 districts.  Six of the 60 were selected for comprehensive

21 review.

22      Of the remaining 54 districts that were not selected,

23 presumably elementary districts, seven scored red on all three

24 Dashboards:  English language arts, mathematics, and

25 discipline.

1          13 of the districts scored two reds and one orange.

2          Of the six, three were judged on very few selection

3    elements.  And this, Your Honor, refers -- answers the question

4    you had raised earlier on.  One of these districts that was

5    selected appeared to only have been judged on two selection

6    elements, both of which were participation:  participation in

7    the math state assessment, participation in the English

8    language arts assessment.  So for falling below the target

9    there, as this is structured, they were chosen for an intensive

10   monitoring process for, as far as we could determine, just that

11   reason.

12         One of those three districts were -- was judged on three

13   selection elements and one on four.

14         In total, of all the districts in the spreadsheet, only --

15   that was provided by CDE, 1.7 percent of the districts in the

16   state were selected for comprehensive review.  So very few

17   districts are selected for this review.

18         In addition, first-year charters, in theory at least, are

19   excluded regardless of their performance due to the necessity

20   of two years of scores.  But that raises a significant

21   question.  If performance in the one year of data that we have

22   for a first-year charter is so egregious, they are relieved of

23   the possibility that they will be selected for this intensive

24   monitoring process.

25         In addition, the formula does not contain a selection

1   element concerning Child Find.

2        In addition, all elements in this formula are treated

3   equally.  They're of equal importance to the ultimate scoring.

4   But it seems to me that issues like timeliness and

5   participation on assessment are not as important as whether

6   students are learning, not being suspended, and placed in the

7   least restrictive environment.

8        So some examples.  75 districts, total, were found on the

9   spreadsheet to score red on all three of the Dashboards.

10  That's the worst performance level.  Of those 75, only seven

11  were selected for comprehensive review, about a little over

12  9 percent.  We found 119 districts that scored two reds and one

13  orange, and only ten of those districts were selected for

14  comprehensive review.

15       For school-age LRE, the two elements concerning regular

16  class placement, we found 31 that had scored -- 31 districts

17  that had scores of "1," the worst score, on both of those

18  elements, and only six of those 31 were selected for

19  comprehensive review.

20       For preschool LRE, we found 42 districts that received a

21  "1" on both elements, and only three of the 42, about

22  7 percent, were selected for comprehensive review.

23       Finally, we found three districts that scored a "1" on

24  both school-age LRE, both preschool LRE, and a red on the

25  discipline Dashboard.  One of the three also had a red on the

 1   math Dashboard and the English language arts Dashboard.  None

 2   of those three districts were selected for comprehensive

 3   review.  Their scores ranged between -- from 64.6 percent to

 4   67 percent.  So it would take -- to select districts like that,

 5   it would take raising that cut score.

 6            **THE COURT:**  So, Mark, it seems like your presentation

 7   on this creates two different questions.  I mean, a lot of

 8   different questions, but I think maybe it can be put into a

 9   couple of different categories.

10       The first question that I ask when I listen to your

11   presentation is:  What about the schools that have been

12   selected for comprehensive review, for comprehensive

13   monitoring?  Are we in a situation where the selection criteria

14   is selecting the wrong schools for comprehensive monitoring;

15   that there are other schools out there where comprehensive

16   monitoring is more urgently needed than the 35 who are

17   currently in -- sorry.  I keep saying "schools," but, of

18   course, I mean districts.  Are there districts out there that

19   are in more urgent need of comprehensive monitoring than the 35

20   that are in comprehensive monitoring right now?

21       If the answer is "yes," then it seems to me there's a

22   major problem with the selection criteria, and we ought to

23   look -- and we need to conduct a closer examination of some of

24   these examples that you've pointed out of one school going down

25   from 100 percent to 99.1 percent on -- what was it?  Timeliness

PROCEEDINGS

 1  of initial assessment?

 2          MR. MLAWER:  Initial, I think, yes.

 3          THE COURT:  And then the other school going from

 4  64 percent to 66 percent or whatever it was.

 5      So another way of putting this first question, I guess,

 6  is:  Are these examples that you've rattled off, are they

 7  anomalies or do they so pervade the selection process that they

 8  are resulting in the wrong schools being selected for

 9  comprehensive review?  So that's Question 1.

10      And I think what we'll do is we'll break for lunch after I

11  articulate this, and we can think about it and come back.

12      That's Question 1.

13      And then Question 2 is:  If the answer is "no," that is to

14  say, if the 35 schools selected for comprehensive monitoring

15  should have been selected for comprehensive monitoring because

16  they also are performing terribly, then maybe the primary

17  question is:  Are we doing enough?

18      Does it make sense to frame it that way, to kind of put it

19  into two categories of inquiry?

20          MR. MLAWER:  When you say "doing enough," you mean

21  selecting enough districts?

22          THE COURT:  Selecting enough districts.  Because it

23  seems at least possible that the examples that you rattled off,

24  like the 99 percent and 64 percent and the other examples, they

25  might just be anomalies on one performance indicator which did

**PROCEEDINGS**

1    not result in the wrong schools getting selected for

2    comprehensive monitoring.  And if so, I would think that we

3    wouldn't worry about that as much, as long as the overall

4    formula results in the right schools getting selected for

5    comprehensive monitoring.

6        So did you -- I mean, one question I'll ask you before

7    lunch is:  Were you in a position, were you able to conduct

8    kind of a comparison of the 35 districts that were selected for

9    comprehensive monitoring to some of these other districts that

10   you found to be in desperate need of comprehensive monitoring,

11   to see if the first group was in better shape than the second

12   group?

13       MR. MLAWER:  Well, only to the extent that I shared

14   the results, Judge.  But the --

15       THE COURT:  But those were individual -- you gave me

16   examples of individual indicators where there was this --

17   seemingly, if you viewed it in isolation, the result seems

18   irrational.  Right?  But the question is:  Did it result in an

19   irrational selection of a particular school for comprehensive

20   monitoring where some other schools should have been selected?

21       MR. MLAWER:  Yes.

22       THE COURT:  Did you conduct that sort of analysis?

23       MR. MLAWER:  But not in the way, I think, that you

24   have in mind.  We conducted it in a limited way.

25       So I identified, if I remember correctly, three districts

**PROCEEDINGS**

1   that should not reasonably have been selected for comprehensive

2   review but appear to have been selected on very few elements,

3   some of which are not that important comparatively.  And we

4   identified others that, thinking about what merits an intensive

5   monitoring review, appeared to have merited, as far as we could

6   tell from the data we were given.

7        However, one of the problems we encountered was that we

8   received the data on the 14th of January, the report was due on

9   the 28th, and we just at that point did not have enough time to

10  go much further than we went with the data.  So I tried to

11  identify the questions to answer that appeared to be most

12  important.

13       So my answers to the questions are somewhat limited.

14            THE COURT:  Because, I mean, it seems to me that if --

15  if it's merely the second problem, that not enough schools are

16  being selected -- right? -- at least from a conceptual

17  standpoint, that's an easier problem to solve.  Right?  If

18  we're not in a situation where the wrong schools are being

19  selected and the schools -- sorry -- districts, the wrong

20  districts are being selected and the right districts are not

21  being selected, if we're not in that situation, then it's just

22  a question of how do we sort of expand the monitoring.  Right?

23       But if the wrong districts are being selected in the first

24  place, then we have to ask whether the State is out of

25  compliance because of the formula that it uses to select

1  districts for comprehensive monitoring in the first place.

2        MR. MLAWER:  You mean for the second question?  The

3  second -- it may not be the form of it; it may be the cut score

4  that is --

5        THE COURT:  For the second question, maybe it's just

6  the cut score.

7       For the first question, I mean, if, in fact, the wrong

8  districts are being selected, then the formula -- the reason

9  that the State is out of compliance, in your view, is because

10  the formula is flawed.

11        MR. MLAWER:  Yes.  I think the reason it's out of

12  compliance, in my view, is on both scores.  I think the cut

13  score is too low, and I think -- as I indicated, we found some

14  evidence that districts that appear to need intensive

15  monitoring weren't selected, and some that did not appear to

16  need intensive monitoring, as far as we could tell from the

17  data -- because, remember, the business of NA and NC, we could

18  not peer behind that to see what the actual performance was.

19        THE COURT:  And so tell me -- you said the districts

20  that you identified that appeared not to need intensive

21  monitoring.

22        MR. MLAWER:  Yes.

23        THE COURT:  Where is the discussion of that in your

24  report?  And can you walk me through that a little bit more.

25        MR. MLAWER:  Yes.  Let me find it.

1      **THE COURT:**  And after that, I promise we'll break for

2   lunch.

3      **MR. MLAWER:**  Okay.  That -- those -- page 71, the

4   second full paragraph.

5      So there were six districts that scored below 62, and

6   three of those six that were selected -- and these are

7   presumably elementary districts -- three were judged on very

8   few selection elements.  One on two, one on three, one on four.

9      **THE COURT:**  So I think this is a very important part

10  of the report that needs to be discussed by the policymakers

11  and fleshed out by all of us for the reasons that I stated,

12  because I think having a better understanding of this gives us

13  a better understanding of the nature of the problem that we are

14  discussing.

15     Is it that the formula is resulting in the wrong schools

16  being selected, or is it just that not enough schools are being

17  selected?

18     Are these examples that you've provided in your report as

19  they relate to one particular indicator -- apparently

20  irrational result with respect to one particular indicator, is

21  that causing districts to be selected when they shouldn't be

22  selected, or are they just anomalies that wash out in the

23  overall application of the formula?

24     And so that, I think we should make sure we spend -- I

25  want to -- this is something that the State needs to provide a

1  good explanation for and a detailed explanation for.  So why

2  don't we start with that after lunch, and we'll plan on

3  resuming at 1:30.

4      How long do you all want to go today?  At what point

5  does -- because you all are driving back to Sacramento?

6          MS. WRIGHT:  Some are.

7          THE COURT:  At what point does it become just an

8  absolute nightmare, or is it a reverse commute?

9          MS. DUNCAN-BECERRIL:  I think it's probably now.

10          THE COURT:  It's already a nightmare?  Okay.

11  All right.  Thank you.

12          THE CLERK:  Court's in recess.

13          (Luncheon recess was taken at 12:42 p.m.)

14  **AFTERNOON SESSION**                                    **1:33 p.m.**

15          THE COURT:  Okay.  You all heard Mark's comments and

16  my comments in response.  Do you want to -- what do you want to

17  say about this piece?

18          MS. DUNCAN-BECERRIL:  Sure.  So do you want us to

19  address each of your two questions?

20          THE COURT:  I would say that if you understand the

21  questions the way I'm framing it --

22          MS. DUNCAN-BECERRIL:  Yes.

23          THE COURT:  -- but you should try to address, as much

24  as you can, from what Mark said and what I've said.

25      However you want to address it is fine.

1          **MS. DUNCAN-BECERRIL:**  Sure.  So just to be clear --

2     was that me?  Sorry.

3          Just to be clear, the purpose of CR is to identify

4     districts over a series of indicators, not just one single

5     indicator.  And so districts who are doing poorly on an

6     indicator will be selected for some level of monitoring

7     activity.  So some of the districts that Mark identified who

8     were red in all of the Dashboard indicators, those districts

9     are actually going through a differentiated assistance process

10    with our larger accountability system.

11         **THE COURT:**  This is the first time I've seen the term

12    "differentiated assistance process."  What does that mean?

13         **MS. DUNCAN-BECERRIL:**  So under the Every Student

14    Succeeds Act, which is the replacement for No Child Left

15    Behind -- there was one in between too.  It was ESEA, the

16    Elementary and Secondary Education Act -- it requires each

17    state to develop an accountability system and to work with

18    districts who don't meet the accountability system.

19         We developed an accountability system, the Dashboard,

20    which we describe in our submission.  Districts who are not

21    meeting -- who are red in more than one area for the same

22    student group are selected for something called differentiated

23    assistance, and they work with their county office.  This is

24    not like the CDE's doing the work.  It's -- they work with

25    their county office to develop plans to address the red on the

PROCEEDINGS

1    Dashboard and try to improve.

2         And so districts who are red in multiple areas, they're

3    going through a process with their county office to improve

4    those areas.   Districts who are red on the Dashboard are also

5    going through the performance indicator review process.

6         So just because a district isn't doing well on one

7    particular indicator doesn't mean they should or should not

8    have been chosen for CR.   CR looks at a pattern of things, both

9    in performance and in compliance.

10        So speaking to, I think, your initial question, which was:

11   Does the process select districts correctly?   We believe it

12   does.

13        And so Mark identifies three LEAs that he believes should

14   not have been selected.   Those three LEAs are actually charter

15   schools.

16             THE COURT:  Are what?

17        MS. DUNCAN-BECERRIL:  They're charter schools.

18             THE COURT:  Individual charter schools?

19        MS. DUNCAN-BECERRIL:  Um-hmm.  So when we pulled all

20   charter schools out of our processes and made their own data,

21   there were three charter schools for whom they had indicators

22   that fell into the minimum selection criteria.  For example,

23   participation is one where there's no minimum n-size in order

24   to be calculated.  And so their scores -- there's 28 possible

25   elements for which a district is scored upon in the

**PROCEEDINGS**

 1    comprehensive review selection.  These three districts only had

 2    valid scores, one for two of them, one for four items, and one

 3    for three items.

 4        We consider this an anomaly.  This was a product of

 5    bringing all the charters into our system.  We had talked

 6    about, when they were selected, well, do we exclude them

 7    because they're small?  We didn't seem like that was the

 8    appropriate methodology.  So we left them in our accountability

 9    system.

10        They still had pretty low, like, participation scores.

11    They didn't meet the requirements under participation.  And so

12    we wanted to -- one of them was orange on the Dashboard for

13    discipline.  So it felt like -- based on the numbers, they met

14    the criteria.  We didn't think it was appropriate to excuse

15    them based on that.  So we went ahead with the process.  And

16    Alison can talk about the process that they're going through.

17        But one of the things it highlighted for us was the need

18    to look at small school districts and charter schools, now that

19    we have so many of them.

20        So -- and I will give you the example of one district that

21    was select- -- or charter school that was selected who only had

22    two scores.  And they had low scores in the participation for

23    their ELA and mathematics assessments.  So those -- what

24    happened was, I believe there's only 20 or 30 students in that

25    charter school.

1      **THE COURT:**  Are you talking about a couple of the

2  charter schools that were among the three that Mark identified,

3  or are you talking about --

4      **MS. DUNCAN-BECERRIL:**  So the three that Mark

5  identified are charter schools.

6      **THE COURT:**  Okay.

7      **MS. DUNCAN-BECERRIL:**  And so one of them only had two

8  scores.

9      **THE COURT:**  Right.  Those were the ones that you were

10  about to talk about right now?

11      **MS. DUNCAN-BECERRIL:**  Um-hmm.

12      **THE COURT:**  Okay.  I just wanted to make sure I

13  understood that.  Okay.

14  (Discussion held off the record amongst the policymakers.)

15      **MS. DUNCAN-BECERRIL:**  So I'm just going to give an

16  example of, the smallest charter school that we selected for

17  comprehensive review only had two areas -- two valid areas to

18  do the calculations on.  And it was participation in math

19  assessments and participation in ELA assessments.

20      When we looked at the data, it was just a few kids.  And

21  this is one of the problems that sort of highlighted for us the

22  issues around small charter schools and LEAs, is that if you're

23  in -- I always use Los Angeles Unified, use something.  If

24  you're in San Francisco Unified, there's 7,000 students with

25  disabilities in San Francisco Unified.  So one percentage is a

1   lot of kids.  If you're in a district where there's only 20

2   kids, one percentage is two kids.

3       So it's sort of highlighting for us -- I'm sorry.

4   10 percent.  I'm sorry.  I really am good at math, I promise.

5           THE COURT:  You got it past me.  I didn't notice.

6           MS. DUNCAN-BECERRIL:  My lawyer picked up on it.

7   There you go.

8       So it highlighted for us sort of this issue around small

9   districts and charter LEAs.  It's not a problem, I think, with

10  the methodology in the selection of comprehensive reviews.

11  It's how we sort of implement that selection on small LEAs and

12  charters.  And I think that's something that we're addressing

13  this year.

14          THE COURT:  How you implement the selection, meaning

15  how you do the monitoring or how --

16          MS. DUNCAN-BECERRIL:  No.  How you do the calculation.

17          THE COURT:  Okay.

18          MS. DUNCAN-BECERRIL:  Right.  So, again, if you

19  have -- do we -- for example, one idea that we had was to take

20  all charter schools within a county office or a Special

21  Education Local Plan Area and pull all those students together

22  and then do the calculations there to see if it makes sense.

23      All this is to say, those three LEAs are anomalies due to

24  size and due to the fact that we included charter schools in

25  the selection this year for the first time.

1   So there's 28 elements in the comprehensive review

2   selection.  There's three LEAs that have two, three, and four

3   elements.  After that, the next smallest LEA has 16 elements

4   used for selection.  And that's a high school; so obviously

5   they wouldn't have, like, preschool elements.  That's why

6   they're not included.

7   And I also have copies of some of the selection criteria

8   applied to a district.  So if you wanted to see how it --

9        **THE COURT:**  Sure.  Great.

10       **MS. DUNCAN-BECERRIL:**  So I think one of the questions

11  you asked was, Mark feels like there's additional districts

12  that would warrant monitoring, but are there other districts

13  that are worse?  And the answer is yes.  So there are districts

14  who are scoring worse, not because of this calculation

15  methodology, but because they just performed worse on their

16  calculations.

17  What you're seeing in front of you is the selection

18  criteria for Oakland Unified.

19       **THE COURT:**  Okay.

20       **MS. DUNCAN-BECERRIL:**  So as you can see, the district,

21  while it has improved in some areas, is still not meeting the

22  target in many areas.  And when you take all of these scores

23  together, it gives you a selection score of 49 percent.

24       **THE COURT:**  Okay.

25       **MS. DUNCAN-BECERRIL:**  So they were selected for review

PROCEEDINGS

1   because many of their scores are far below the target and they

2   were getting worse.

3        So compare that to other districts who may be above the

4   62 percent.  Those districts did better on these scores than

5   Oakland.

6            THE COURT:  Okay.  But what does this -- I mean,

7   I guess it seems to me that one of the things that needs to

8   happen -- let me take a step back.

9        These examples that Mark gave in his report -- right? --

10  focusing on one selection criteria -- right? -- where he says,

11  look, here's an example of a school that went down from 100 to

12  99.9 percent and got more points -- or wait.

13       Is it got fewer points?  Fewer points?

14           MR. MLAWER:  Fewer points, yes.

15           THE COURT:  -- fewer points from that than a school

16  that went up from 64 percent to 66 percent on timely initial

17  assessment.  And he rattled off a series of examples that

18  relate to one particular indicator.

19       Are those of concern to you?  Are you concerned about

20  that?

21           MS. DUNCAN-BECERRIL:  So I --

22           THE COURT:  Does that make you worried that your

23  selection criteria or your selection formula is not adequate?

24           MS. DUNCAN-BECERRIL:  No.  I do not -- I am not

25  concerned.

1          **THE COURT:**  Why not?

2          **MS. DUNCAN-BECERRIL:**  Because for a couple things.

3     Number one, again, if a district's not doing well, they're

4     selected for another monitoring activity.

5          And then second, one of the things that we, as an agency,

6     have decided to look at throughout the entirety of our

7     accountability system is improvement.  So if a district is

8     improving, we think that counts for something.  And so we want

9     to focus our resources on districts that are getting worse, not

10    ones who are getting better.  Sometimes progress happens

11    incrementally.

12         Now, if that district gets better the next year or gets

13    worse the next year, their scores will change, and they could

14    be caught up in the comprehensive monitoring selection or they

15    could be --

16         **THE COURT:**  But you're not focusing solely on

17    districts because they're getting better or because they're

18    getting worse.  Right?  A significant portion of the formula is

19    what is their -- whether they've met a target or not.

20         **MS. DUNCAN-BECERRIL:**  Yeah.  So that's where we start,

21    whether or not they met a target and then whether or not they

22    got better or worse.  So it's typically a 1, 2, 3, 4 scale.

23         **THE COURT:**  Right.  And so, but the concern that Mark

24    raises is that it's possible that a school could be pulled in

25    to comprehensive monitoring that's doing okay but just happens

1  to have gotten worse on a few things last year.  And then you

2  might have a school that's doing really badly that's not

3  getting pulled into comprehensive monitoring just because it

4  happened to do a little better on some things last year than

5  the year before.

6         MS. DUNCAN-BECERRIL:  Well, it would have to be

7  systematically over many elements.  Right?

8         THE COURT:  But only for one year; right?

9         MS. DUNCAN-BECERRIL:  And if they got worse the next

10  year, we would catch them again.

11       So if a district is making improvements, that's what we

12  want to see; that's what we want to encourage.  But if they get

13  worse the next year, then they would have a lower score.

14         THE COURT:  Right.  But there may be some district

15  that's doing very poorly and they do a little bit better on

16  many of the indicators, and then there's a district that's

17  doing pretty well but did a little bit worse on many of the

18  indicators.  And the concern is, we wouldn't want that second

19  district to be pulled into comprehensive monitoring at the

20  expense of the first district being pulled into comprehensive

21  monitoring.  Right?

22         MS. DUNCAN-BECERRIL:  And I do not believe that is

23  happening.  And we --

24         THE COURT:  But has there been a study to assess

25  whether that is happening?  I mean, for example, it seems to me

1    that you can say:  All right.  Let's do a comparison of the

2    districts that fall in the 65 to 70 percent range with the

3    districts that fall in the 70 to 75 percent range.  I mean, I'm

4    making that range up.  And let's look and test and make sure

5    that -- the first group is, as a whole, pretty obviously more

6    in need of monitoring than the second group.  And let's make

7    sure that there are not a significant number of districts in

8    the second group that are in much worse shape than the

9    districts in the first group.

10       **MS. DUNCAN-BECERRIL:**  But -- we have not done such a

11   study.  But I would say the percentages that we do that, show

12   that.  The percentage is on here.  Even though there might be

13   some improvement, when I look at the districts that are listed

14   for CR this year, I see districts who have -- who are red,

15   orange, yellow.  I don't see a single blue or green in terms of

16   their assessment performance, their discipline.  I see

17   districts -- no districts who are meeting the target -- there's

18   one -- two districts that are meeting the target in LRE, but no

19   districts necessarily meeting the targets in separate schools.

20       So when I look at the data, I see districts that are

21   performing very poorly.  I do not see a set of -- districts

22   within this list of districts that are performing well.

23       **THE COURT:**  And that could be -- it strikes me that

24   that could be that the cutoff is so low that anybody who gets

25   pulled in is going to be doing very poorly.  Right?  And it may

1    not answer the question of whether your formula gets at the

2    right districts.  Right?

3        So that's why I was asking, if the cutoff were higher,

4    would it reach a point where it's pulling in districts that

5    don't need monitoring and not pulling in districts that are in

6    greater need of monitoring?

7        There should be a way to figure that out; right?  Couldn't

8    you do an analysis along the lines of what I just proposed?

9        MS. DUNCAN-BECERRIL:  Comparing the districts who

10   weren't selected for monitoring?

11       THE COURT:  Yeah.  Or comparing the ones that are in

12   the 65 to 70 range with the ones that are in the 70 to 75

13   range, or something like that, and testing the -- so really

14   testing your formula, your selection formula, to see if the

15   population -- if it's pretty clear that the 60 to 65 group is,

16   as a whole at least, much more in need of monitoring.

17       MS. DUNCAN-BECERRIL:  Yes.  Absolutely.  That is an

18   analysis --

19       THE COURT:  And it sounds like nobody's really done

20   that analysis.

21       MS. DUNCAN-BECERRIL:  We have not done that analysis.

22       THE COURT:  Okay.  And, I mean, I'm in a situation

23   now -- right? -- where the Monitor is saying the selection

24   formula is problematic because there are indications that it's

25   pulling in districts for comprehensive monitoring that are much

1  less in need of comprehensive monitoring than districts that

2  are not getting monitored.

3      How am I supposed to address that concern?  Is there a way

4  that I can address that concern without this kind of study

5  being done?

6          MS. DUNCAN-BECERRIL:  Would it be helpful for us to at

7  least compare the scores for the districts between -- that we

8  selected and the ones that we didn't select?  We can provide

9  that to you.

10         THE COURT:  Compare the scores or compare --

11         MS. DUNCAN-BECERRIL:  Not the scores.  Like, we could

12 look at, like, how many were red on the Dashboard versus -- you

13 know, how many were red on the Dashboard in our selected sample

14 versus ones that were not; what is the change -- what was the

15 average LRE placement in the ones we selected versus the ones

16 we did not.

17     We could submit that to you probably before our next

18 hearing.

19         THE COURT:  Before our next hearing?  Oh, you mean on

20 Wednesday?

21         MS. DUNCAN-BECERRIL:  Yes.  So we could look at the 35

22 districts that were selected and compare them to the 35

23 districts -- the next 35 in percentages.

24         THE COURT:  Or to the 94, let's say; right?  There

25 were -- am I remembering correctly that there were 94 districts

1  that were pulled out of comprehensive monitoring because you

2  went down from 65 to 62?

3       **MS. DUNCAN-BECERRIL:**  Yes.

4       **THE COURT:**  That would at least be -- that would be a

5  start, I would think.  Like, whatever you think are the most

6  important metrics by which you would measure a district's

7  performance on special education, how do those 94 look compared

8  to the 35 that are in monitoring?

9       I don't know if that will give us -- I don't know if that

10  will give us meaningful information, but it certainly seems

11  worth looking at.

12       **MS. DUNCAN-BECERRIL:**  So we could look at something

13  like assessment, suspension/expulsion, least restrictive

14  environment.  Would that be -- would you also want to look at

15  60-day timeline?

16       I'm just trying to think about indicators that would be --

17  because there's elementary school districts and there's high

18  school districts in them, and I'd want to make sure that we

19  have, like, elements that would be across all of those.

20       **THE COURT:**  I mean, I would defer to you all and Mark

21  on what's the best way to -- what are the best things to look

22  at to assess whether there are real meaningful problems at

23  these districts.

24       **MS. DUNCAN-BECERRIL:**  So I would look at --

25       **THE COURT:**  Or whether there are not real meaningful

1    problems at some of the districts that have been selected.

2        **MS. DUNCAN-BECERRIL:**  So we can look at assessment,

3    ELA and math; suspension; least restrictive environment --

4    those three categories -- for school-age least restrictive

5    environment and 60-day timeline.  Those would be in all

6    districts, regardless of type.

7        The only difference would be in high school districts, we

8    only have the -- it's only based on the 11th grade assessment.

9        **MR. MLAWER:**  What if we're limited to elementary

10   districts, so we limit -- excuse me.  So the high school

11   problem doesn't appear there; so we're comparing the same

12   things.

13       And what if we don't include 60-day timeline, or

14   timeliness in general, and we focus on the more substantive, as

15   you suggested:  performance, discipline, placement, preschool

16   placement, preschool outcomes.

17       **MS. DUNCAN-BECERRIL:**  So preschool outcomes would be

18   the only one I would be a little -- I mean, we can include that

19   one; but, again, it's one indicator that is pulled together in

20   one because there's six subindicators in them.  We could do the

21   comparisons, but it's --

22       **MR. MLAWER:**  Well --

23       **MS. DUNCAN-BECERRIL:**  Most districts don't meet all

24   six.

25       **MR. MLAWER:**  Right.  But the issue of the extent to

1    which they don't could be interesting.

2              MS. DUNCAN-BECERRIL:  It could.

3              MR. MLAWER:  And if you can peer behind, for example,

4    the Dashboard and give us the actual numbers, that would make

5    it more useful.

6              MS. DUNCAN-BECERRIL:  So timing is going to be tough

7    on that, because you're looking at, now, a different -- because

8    the way the Dashboard is done, it's going into a different set

9    of data.  I can look at how many of the districts scored red.

10       It can all be done.  It's about timing.  So I can have --

11   we can do the analysis based on the selection criteria that we

12   use, which is whether or not they were red or yellow, what

13   their color was on the Dashboard; and then we can do it by the

14   average percent of LRE; and we can do it by suspension, their

15   suspension color.

16       When we get into those pieces of data, again, what is the

17   cutoff between it's too far, it's too less?  That, I would

18   think we would need to discuss in terms of -- because I think

19   one of the concerns that you raise is, well, they could be

20   really far from it.  So what is "really far"?  How do we notify

21   that?  What is the cutoff for "really far" or "really

22   egregious"?

23       I mean, I know --

24              MR. MLAWER:  I understand.

25              MS. DUNCAN-BECERRIL:  -- in a general sense, but from

**PROCEEDINGS**

1  a statistician's point of view, what is the cutoff for those

2  things?

3          MR. MLAWER:  Yeah.  I can't answer that now.

4          MS. DUNCAN-BECERRIL:  Yeah.

5          MR. MLAWER:  If we were performing the analysis,

6  Dr. Wagner and I would spend some time discussing --

7          MS. DUNCAN-BECERRIL:  Yeah.

8          MR. MLAWER:  -- how to set the cuts.

9      But the reason I'm asking to look behind the Dashboard is

10  this whole issue of performance in -- the effect of performance

11  in the prior year versus the current year could be teased out

12  at least a little bit.

13      That, of course, doesn't get at the other issue that has

14  been raised by the Morgan Hill plaintiff group about whether,

15  essentially, two years of data is -- looking at improvement or

16  regression with so few years is a sensible thing to do.  I

17  assume you read the declarations and their brief, and that

18  point is made quite strongly by Morgan Hill.  So that's a

19  separate issue that we can't get at in this analysis.

20      But this may be useful in some respects.  I don't know.

21          THE COURT:  I don't know.  I mean, the other question

22  I have in my mind is:  Is it enough to compare the below 62 to

23  the group in 62 to 65?  Or should we also have a group -- the

24  group that falls in the 65 to 70?  I don't know the answer.

25          MR. MLAWER:  Some of the results that we got, which I

1    shared, would indicate that it may be -- if we look at 62 to

2    65, it might also be worthwhile -- you know, compare that group

3    to 59 to 62 and compare both those groups to 65 to 68, because

4    I shared some information about those three districts where

5    performance looked pretty bad, and they scored between 64.6 and

6    67, I think.

7            MS. DUNCAN-BECERRIL:  I also just want to go on the

8    record that it is a culmination of variables.  So I think we

9    will see in this analysis that there is a -- that the districts

10   we chose for comprehensive review are the ones most in need of

11   that review.  I'm confident of that.

12           THE COURT:  Well, and I think -- sorry.  Go ahead.

13           MS. DUNCAN-BECERRIL:  But it's not just a single

14   indicator that should push a district into --

15           THE COURT:  Right.

16           MS. DUNCAN-BECERRIL:  -- comprehensive review.

17           THE COURT:  But I guess where I think we should leave

18   this is, you need to present more --

19           MS. DUNCAN-BECERRIL:  Okay.

20           THE COURT:  -- to show that these districts are the

21   ones most in need of comprehensive review.

22           MS. DUNCAN-BECERRIL:  Okay.

23           THE COURT:  And you should probably be the ones to

24   figure out how to establish that these districts are the ones

25   most in need of comprehensive review and that there are not

**PROCEEDINGS**

```
 1   other districts hanging out there that are in greater need of
 2   comprehensive review that are not getting pulled in.
 3            MS. DUNCAN-BECERRIL:  Okay.
 4   (Discussion held off the record amongst the policymakers.)
 5            THE COURT:  And so I think you should take -- sorry.
 6   Go ahead.  If you need to, go ahead.
 7            MS. DUNCAN-BECERRIL:  I'm just going to put my staff
 8   to work to start that.
 9        Oh, she's got it.
10            THE COURT:  And I think you should try to submit
11   something tomorrow, if you can.
12            MS. DUNCAN-BECERRIL:  Yeah.  So that's why I wanted
13   her to communicate with the staff at the office.
14            THE COURT:  And let us know, we would have done X if
15   we had more time, or whatever.  That's obviously totally fine.
16        So then what about the fact that such a low -- the other
17   concern that Mark has identified is, just generally, there's a
18   very low percentage of districts that have been selected for --
19   that is in comprehensive review right now.  There are a lot of
20   districts that look like they have significant problems that
21   are not in comprehensive review.  Even if those other districts
22   that have significant problems are not significantly worse off
23   than the ones that are in comprehensive review, are we putting
24   enough districts into comprehensive review?
25            MS. WRIGHT:  I think it just comes down to resource
```

1   deployment.  And so we have chosen to utilize a large number of

2   our staff for the current comprehensive reviews that we're

3   doing.

4       Those staff also work to help -- as we have individual

5   things that come up in districts and questions and many other

6   things, those staff are highly skilled at working with our

7   districts on all kinds of improvement.

8       The staff that's deployed to all the other monitoring

9   activities we feel is a good investment because, as we see

10  districts start to have issues in a particular area, we want to

11  help them address that area before it becomes so systemic that

12  it's harder to go back and correct.

13      So that was part of the reason that we started the

14  performance indicator review, frankly.  And the majority of our

15  LEAs in California are somewhere in that review because we want

16  them to be looking at their data, especially as they're working

17  through all these improvement activities on the larger

18  statewide level with their accountability system.

19      We know, through research and experience, that you can't

20  solve the special education problems in a vacuum.  They take a

21  whole systems approach.  And usually, a lot of it comes back to

22  good Tier 1 instruction, access to universal design for

23  learning, all kinds of other research-based curriculum,

24  instruction, and behavioral systemic things that have to be

25  addressed in the whole system as opposed to us just going in

1    and telling special ed only what they need to do.

2        So we're working crossways with all these different other

3    activities.  So Shiyloh mentioned the differentiated

4    assistance, you know, that districts -- we have almost 300

5    districts in that process in our larger statewide system.

6    Two-thirds of them are for their students with disabilities

7    student group that they're working on.

8        And what happens in those processes is --

9            **THE COURT:**  Say that again.  Two-thirds of them?

10           **MS. WRIGHT:**  Two-thirds of those LEAs, those local

11   educational agencies, that are in that status is due to the

12   performance and outcomes for their students with disabilities

13   student group.  And so those -- all those districts are working

14   with their county offices in collaboration with the Department

15   of Education.  And what's worked out really nicely is, they've

16   all been able to use what they're learning through performance

17   indicator review to marry with this process they're having with

18   the larger system.

19       And so the idea is, again, that we're not treating special

20   ed in a silo.  We're treating special ed as part of one

21   coherent system of education that strives to serve all students

22   well, as close to the general ed environment as possible

23   starting in preschool.  That's the goal.  And so all the

24   activities we're doing are trying to head towards that goal.

25       Do we think that every district needs to be in a

**PROCEEDINGS**

 1   comprehensive review where we're sending teams of people to

 2   spend weeks out there?  Not necessarily, because they are,

 3   themselves, also working through their own improvement

 4   processes.  And like Shiyloh said, as a state, that's what

 5   we've put a lot of bandwidth into.

 6        The rest of this, we are checking and balancing so many

 7   both individual entitlements, as you heard, as well as systemic

 8   issues in districts.  So we want them to correct all this

 9   individual student timeline issues and data non-compliance.

10        And then we're also looking at how we assist the system in

11   better outcomes.  We've put a huge amount of time and money

12   with new special education leads across the state and many

13   other things to treat this.

14        So I just want to, for the record, say that we're not

15   doing this in a vacuum, and I think in previous years we were.

16   It's a very different world in terms of a system improvement,

17   like hypotheses, if you will.

18        **THE COURT:**  Well, I think, with some of these things,

19   it's not just important to say it for the record but to show

20   it.

21        So, for example, I think it would be helpful to me to

22   learn more about the differentiated assistance.  And your

23   comment that you just made, that a significant percentage of

24   districts who are in this differentiated assistance program are

25   there because of their numbers regarding special ed students

**PROCEEDINGS**

1    and what the process looks like to help them get their houses

2    in order, I mean, obviously, that is -- it's one thing to say

3    it for the record, but we need to have the full record.   Right?

4    We need to have the full picture to put what we're discussing

5    in context.

6              **MS. WRIGHT:**  Understood.

7              **THE COURT:**  So what can you give me that will allow me

8    to further educate myself on that and what's happening there?

9              **MS. DUNCAN-BECERRIL:**  So in our February 25th

10   submission --

11             **THE COURT:**  February 25th.  Was that your response --

12   that was your response?

13             **MS. DUNCAN-BECERRIL:**  The response to the Monitor.

14             **THE COURT:**  Okay.

15             **MS. DUNCAN-BECERRIL:**  Yeah.  On page 5, we kind of go

16   into -- we kind of start the discussion around -- I'm sorry.

17        Page 4 of the pagination at the bottom of the page --

18             **MR. MLAWER:**  This is your Exhibit 1, that document?

19             **MR. SPENCE:**  Yes.  Document 2478-1.

20             **MR. MLAWER:**  Got it.

21             **MS. DUNCAN-BECERRIL:**  And it starts "An Integrated

22   Approach."

23             **THE COURT:**  Sorry.  Page what?

24             **MS. DUNCAN-BECERRIL:**  4 of 33 at the bottom of the

25   page.

PROCEEDINGS

```
 1              THE COURT:  Okay.  Hold on.
 2         Okay.
 3              MS. DUNCAN-BECERRIL:  And so it says:
 4               "The Dashboard release in Fall 2017 highlighted
 5         that of the 223 LEAs identified" --
 6              THE COURT:  Slow down a little bit so the court
 7    reporter can get you.
 8              MS. DUNCAN-BECERRIL:  I'm working on it.
 9         -- "for Level 2 Differentiated Assistance, 163 were
10         selected based on their outcomes for their students
11         with disabilities."
12         We also identify a couple of other footnotes there,
13    Footnote 2 and 3, that are presentations that we've made to the
14    board around this issue and the system of support, including
15    differentiated assistance.
16              THE COURT:  So this is where I can go to further
17    educate myself on what that looks like?
18              MS. DUNCAN-BECERRIL:  Yes.  And we can also send you
19    those.
20              THE COURT:  Give me one second.
21         Well, I'll just tell you, if there's -- you don't need to
22    send us these links.  We can look at them.  But if there's
23    anything else you want to put in front of us to give us a
24    fulsome picture of what is happening with these districts that
25    have been selected in this system.
```

**PROCEEDINGS**

 1          Is there anything else similar to that that -- I mean,

 2     we've talked, of course, about performance indicator review;

 3     and I understand that when that review process is conducted,

 4     it's not necessarily going to strictly limit the district to

 5     looking at one indicator without -- without looking at it in

 6     context.

 7          Is there anything else that you want to highlight that

 8     kind of puts this in context, in terms of different ways that

 9     districts might be flagged for review, either by themselves or

10     by the State, in areas that relate to special education?

11          **MS. DUNCAN-BECERRIL:**  So disproportionality, we talked

12     a little bit about that review process.

13          **THE COURT:**  Right.

14          **MS. DUNCAN-BECERRIL:**  And then, also, the data

15     identified non-compliance are also --

16          **THE COURT:**  Right.

17          **MS. DUNCAN-BECERRIL:**  -- ways that districts are

18     flagged.

19          So all of those elements are included in the selection for

20     comprehensive review.  But, again, it's -- we want to see a

21     pattern of consistently poor scores.  That's what we would --

22     that's how we identify the selection.

23          **THE COURT:**  You know what might be helpful, also, is

24     when you're -- we talked about you submitting something to us

25     tomorrow comparing the districts that are in comprehensive

1    monitoring to the 94 that escaped it, and perhaps comparing

2    those --

3              MS. DUNCAN-BECERRIL:  They didn't escape.

4    Comprehensive review isn't our only monitoring review.  They

5    didn't escape.

6              THE COURT:  I understand.  But that was going to be

7    the point I was going to make.  Right?  And then maybe you will

8    also compare those to the people -- the districts in the 65 to

9    70 percent range, if you think that would be helpful.

10             But it might also be helpful to indicate:  Okay.  Since

11   these districts have escaped comprehensive monitoring,

12   precisely what kind of monitoring are they experiencing right

13   now?  Those districts that we're particularly concerned are

14   problematic and have escaped comprehensive monitoring, what

15   does the monitoring situation for those districts look like?

16             MS. DUNCAN-BECERRIL:  Okay.

17             THE COURT:  Are they part of this -- are they getting

18   differentiated assistance?  Which performance indicators are

19   they being reviewed for?  What are the other -- data identified

20   compliance?  What are they in?  That may be helpful.

21             MR. MLAWER:  Now, do I remember correctly that

22   somewhere in your response, I think you said something like 73

23   or 74 percent of the districts in the state are in something?

24   Is that correct?  In at least one monitoring process?

25             MS. DUNCAN-BECERRIL:  That is correct.

1          **MR. MLAWER:**  Okay.  Thank you.

2          **THE COURT:**  But I was thinking that for these ones

3     that we're concerned are escaping comprehensive monitoring, are

4     they in just one, or are they in a bunch?  What's happening

5     with them?

6          Is there anything else that you want to say, either in

7     response to my questions or in response to Mark's various

8     comments, about selection for comprehensive monitoring?

9          **MS. DUNCAN-BECERRIL:**  I don't think I have anything

10    else.

11         **MS. WRIGHT:**  I think we'll just also want to

12    exclamation mark the attention we'll be paying over the next

13    year to the small -- or the ones that are small, like the

14    charters and the small school districts, to ensure that we are

15    looking at them from, like, a mathematical perspective

16    appropriately.

17         **MR. MLAWER:**  You're referring both to comprehensive

18    review selection and preschool review?  We discussed that issue

19    in the context of preschool review as well.

20         **MS. DUNCAN-BECERRIL:**  Yes.  So our intention is to

21    address this for all small LEAs.  I mean, there just is a need

22    to look at how we select districts for monitoring who are small

23    so that they don't in any way -- their numbers alone don't

24    either select them or allow them to not be selected.

25         **MR. MLAWER:**  I imagine you're aware that there are

PROCEEDINGS

1   some states that divide districts into population groups.  I've

2   worked with some that had three or four population groups.  And

3   on the theory that you're comparing --

4           THE COURT:  Define "population group."  What does that

5   mean?

6           MR. MLAWER:  The overall student population in the

7   district is what these states use.

8           THE COURT:  So, in other words, you group districts --

9           MR. MLAWER:  Yes.

10          THE COURT:  -- based on their population.

11      So there are high-population districts, low-population

12  districts, and then maybe a couple in between?

13          MR. MLAWER:  Yes.

14          THE COURT:  You group those districts that way?

15          MR. MLAWER:  The state that does --

16          MS. DUNCAN-BECERRIL:  Oklahoma is a prime example of

17  that.  Oklahoma City has a very large school district, and so

18  they include that separately than they would include many of

19  their rural school districts.

20          MR. MLAWER:  Right.  And when I was working with

21  Wyoming, they did something similar.  They had four population

22  groups.  This was going back to the late '90s.  This was part

23  of the original design of the first conceptualization of

24  focused monitoring, was to do this so that you're comparing

25  something reasonably.

1        That would help with some of the problems we pointed to

2   with respect to preschool review about the "at least one

3   child."

4        **THE COURT:**  I would think -- I mean, I'm not the

5   expert, but in a state like California, wouldn't it be almost

6   essential to do that, given how many small districts we have

7   and how many large districts we have?

8        **MS. DUNCAN-BECERRIL:**  We haven't done that in the

9   past, but, yes, it is something we need to be doing; we will be

10  doing.

11       Our intention is, this year, to identify what the criteria

12  is.  It's not always based on location or even size sometimes.

13  I mean, we wanted to be able to -- how do we group them?  Do we

14  group them -- because there is an argument that sometimes our

15  rural districts make, that their needs and issues are very

16  different from a small set of charter schools.  And so there is

17  an argument not to do it just based on size alone, but just

18  also maybe doing it on some location and size combination.

19       **THE COURT:**  And I suppose there could be arguments for

20  having a separate category for single schools or a separate --

21  putting them --

22       **MS. DUNCAN-BECERRIL:**  Yeah.  Single schools --

23       **THE COURT:**  -- in a separate category.

24       **MS. DUNCAN-BECERRIL:**  -- like charter schools.

25       **THE COURT:**  Yeah.

1          **MS. DUNCAN-BECERRIL:**  But also, there's a number of

2    single-school school districts.  And, you know, districts have,

3    you know, kind of split up a little bit, from time to time, and

4    we see that as well.

5          **MS. WRIGHT:**  The other thing that we look at is, you

6    know, we want to make sure to identify the appropriate folks,

7    but we also want to make sure that the people that we're

8    identifying, the districts or schools that we're identifying,

9    are -- it's a situation that they can make improvement.  We

10   don't want someone spending all this time doing a giant

11   improvement plan for something that hasn't been identified as a

12   huge systemic issue.

13      So we're trying to be not easy on districts, but we're

14   trying to ensure that what we're asking them is something that

15   is appropriate.

16         **THE COURT:**  Anything more from the plaintiffs on this

17   topic?

18         **MR. KOSKI:**  Yes, Your Honor.  I'm not -- I'm going to

19   do my best not to repeat or regurgitate any of the conversation

20   that's been had already, but there is one issue out there that

21   plaintiffs are concerned about and hasn't really come up front

22   and center yet.

23      And that is, this conversation seems a bit unmoored in one

24   sense, and that is, what is the monitoring supposed to be for?

25   And I want to remind us that at least one of those things that

1    we're supposed to monitor for is the assurance that districts

2    are providing FAPE to students.  And during this conversation,

3    I still haven't heard why this formula, the selection formula,

4    the elements and the way that they're analyzed ensures that

5    school districts are actually providing FAPE to students.

6        We've heard a lot of comparative things, this district

7    compared to that district.  Why was that one selected?  Why is

8    that one not selected?  We're going to get some more analysis

9    on that point.  That's kind of a nice normative or comparative

10   way to look at who's the worst off based on these numbers that

11   we have.

12       But when you ask the question, "How do we know we're

13   selecting the right districts?" part of that has to be some

14   analysis of why the -- how it is that the criteria they've

15   chosen established FAPE in a school district; so more of a

16   criterion reference thing.  And this really has the most bite

17   when we start to talk about the final cut score here, because

18   on some level --

19           **THE COURT:**  Could I maybe propose to reword a little

20   bit what you've said?

21           **MR. KOSKI:**  Sure, please.

22           **THE COURT:**  I think part of what you're saying is:

23   How do we know that the criteria being used are identifying the

24   districts that are least likely to be providing FAPE?  Right?

25   Is that the point you're trying to make?

1          **MR. KOSKI:**  So least likely, that's part of it.  But

2     that's, again, a comparative thing, meaning that there has to

3     be, you know, some threshold of providing FAPE that all

4     districts meet.

5          And I don't know where that threshold is, and I've heard

6     no argument from the defendants as to where that threshold

7     should lie at this point.  And I've tried to make this point in

8     our briefs as well.

9          And so I'm still not sure how it is that the system is

10    going to ensure that we provide FAPE on the ground.  They might

11    have a good argument for that.  I just haven't heard it yet at

12    this point.  And so --

13         **THE COURT:**  Well, except "ensure that a district

14    provides FAPE on the ground," that's a little -- a lot of that

15    is about Phase 3, I would think.  Right?  I mean, a lot of it

16    is about, once we've selected these districts for monitoring,

17    what kind of job do we do in monitoring them and getting them

18    back on track to the extent they're not?  Right?

19         **MR. KOSKI:**  No doubt for Phase 3 I agree with that.

20    My concern right now is the districts that are not selected for

21    a meaningful monitoring activity, like comprehensive review or

22    preschool review.  I appreciate that there are these other

23    reviews out there, data indicated non-compliance and

24    performance indicator review, and the like.  But the truth is,

25    the real teeth of these monitoring activities comes out in

**PROCEEDINGS**

1  comprehensive review.  That's the place where we start to look

2  deeply into whether or not kids might be getting FAPE on the

3  ground.

4     So I'm worried about the districts that are not selected

5  for comprehensive review or preschool review, once that gets up

6  and running, basically.  So the --

7        THE COURT:  By the way, I mean, I think that goes to,

8  so, yes, there is this issue of:  Are we selecting the right

9  ones?  But then there's also this issue of:  Are we selecting

10 enough?

11       MR. KOSKI:  Right.

12       THE COURT:  I mean, I think we probably would all

13 agree that you can't select all of them for comprehensive

14 monitoring.

15       MR. KOSKI:  Sure.

16       THE COURT:  But are we selecting enough?  Even if our

17 selection criteria is adequate, is the bar too low?

18       MR. KOSKI:  Right.  And I would say that that analysis

19 should be moored in FAPE, whether or not they're providing a

20 free and appropriate public education, not based on resource

21 constraints alone.

22     And so I also want to look at it from the district's side.

23 Right?  If all of a sudden the cut score is bouncing from 62 to

24 65 to 69 back down to 60 based on resource constraints, that's

25 going to feel a bit arbitrary or unfair.  It's not going to

1   feel connected to anything that I'm doing as a superintendent

2   or a special education director to ensure that I'm educating my

3   kids.

4       So there has to be some rationale, some principled reason

5   why we're selecting the formula that we select and why we're

6   selecting the cut score that we select, and FAPE ought to be

7   that principled reason.

8       And so I look forward to seeing comparisons among those

9   districts that were selected and not selected and seeing

10  whether or not they actually got the ones that were performing

11  better or worse.  But it's not just a comparative exercise.

12  There has to be some criteria out there as well, and FAPE is

13  the place.

14      **THE COURT:**  I agree with that, and that's part of why

15  I started off this hearing the way I did, with trying to get a

16  better understanding of, if somebody is not selected for

17  comprehensive monitoring, what kind of monitoring is happening,

18  what kinds of efforts are being made to help that district

19  improve in particular areas.

20      **MR. KOSKI:**  Right.  And I will say, from the

21  plaintiffs' perspective, it's a little hard to respond and be

22  prepared to basically examine the State when all of a sudden we

23  have a new monitoring system to worry about.

24      It's called differentiated --

25      **THE COURT:**  Differentiated assistance.

1          **MS. WRIGHT:**  It's not a monitoring system.

2          **MR. KOSKI:**  Differentiated assistance.  I don't know

3     what that is, and I'm not sure what that has to do with special

4     education when we're talking about a special education

5     monitoring system.

6          I appreciate that districts were selected from the

7     Dashboard based on the fact that they were performing poorly

8     with kids who have disabilities, but does that review actually

9     address some of the issues that are unique to kids with

10    disabilities, or is it something more generic?  An integrated

11    approach is fine, but it has to mean something.  And that's --

12    you know, and for me, it has to mean that the kids are getting

13    FAPE, ultimately.

14         And so that's why I'd be curious to hear, you know, how it

15    is that the formula and the cut scores add up to FAPE.  So

16    that's the issue that we raised in our papers, and I just want

17    to make sure it doesn't get lost during this conversation as

18    well.

19         **THE COURT:**  I agree with all of that.  And I just want

20    to -- like, I think Mark speculated about why the cutoff was

21    reduced from 65 to 62.  I'm not sure if you had a chance to

22    address that.  I mean, was that a resource issue, that you just

23    didn't have the resources to do those extra 94 districts?

24         **MS. WRIGHT:**  Yes.

25         But also, can I just clarify that the differentiated

**PROCEEDINGS**

```
 1   assistance and that activity is not a monitoring activity.

 2   That's part of our statewide accountability system.

 3        And I think all the activities, all the monitoring

 4   activities that we do in the Special Ed Division that are

 5   solely focused on students with disabilities are in the

 6   interest of FAPE and are meaningful and have FAPE.

 7        And so I don't think you could find one district that

 8   wouldn't say that those don't have teeth and that we are not

 9   requiring them to do a lot of activities related to those more

10   specific and targeted things that come up in the data and --

11   but --

12        THE COURT:  Well, on the one hand, you're saying that

13   the differentiated assistance, those are not -- that's not

14   monitoring.  On the other hand, you seem to be saying that it's

15   highly relevant --

16        MS. WRIGHT:  It is.

17        THE COURT:  -- to whether your monitoring activities

18   are adequate overall because you have to consider it in the

19   context of the assistance that these other districts are

20   getting through this program.  Right?

21        MS. WRIGHT:  I was just --

22        THE COURT:  So --

23        MS. WRIGHT:  Sorry.

24        THE COURT:  -- whether you label it "monitoring" or

25   something else, the question is, substantively, what is
```

**PROCEEDINGS**

1   happening and how is it helping deliver on the IDEA promise for

2   kids and school districts?

3          **MS. WRIGHT:**  I just think it's another piece to the

4   puzzle.  That's all I was trying to say.

5          **THE COURT:**  Yeah.

6          **MR. MLAWER:**  It sounds, from what you're saying -- and

7   this also sounds to be an accurate description -- not

8   "description," but something that would capture performance

9   indicator review as well -- is that both of these projects or

10  approaches to school improvement are designed to improve

11  student results and outcomes, which is one of the purposes of

12  monitoring.  Right?

13         But there's another purpose to monitoring, and that is to

14  ensure compliance with the requirements most closely associated

15  with student results and outcomes.  That part is pure

16  monitoring.  That's determining whether students are receiving

17  FAPE, determining whether students are placed in the LRE,

18  determining whether there have been students who should have

19  been evaluated but have not been.

20         So I think that is one distinction -- based on what you've

21  shared so far, if we were to compare this differentiated

22  assistance and performance indicator review with comprehensive

23  review, that would appear to be one dimension on which they

24  differ.

25         **MS. WRIGHT:**  I'd like to make just one more statement

 1    in clarification around this.  And that's that -- so we have

 2    responsibilities under ESSA, the Every Student Succeeds Act,

 3    which is the one that took No Child Left Behind's place, and

 4    IDEA.  So we're charged with implementing a system of general

 5    supervision under the IDEA, and that system is the subject of

 6    this case.  But ESSA imposes other requirements, and our --

 7    that differentiated assistance system is how we approach

 8    districts who are struggling under those measures.

 9         And so we're working to align the two, which is why the

10    reference and sort of why I was talking about them, is because

11    they overlap.  And we're trying to align them because we are

12    realizing that in terms of improvement, we do want to work with

13    the whole system.  We don't want to just treat special ed and

14    have the rest of the system still not understanding the dynamic

15    between the two.

16         We know disproportionality is a good example of that; that

17    issues around bias and other things that happen in the general

18    system of our schools have a major impact on disproportionality

19    for our students with disabilities.  And so we don't want to

20    treat that in a silo.

21         MS. DUNCAN-BECERRIL:  And I would also just want to

22    say that the performance indicator review is not an activity or

23    something we do for fun.  It is part of our monitoring.  Part

24    of our monitoring of outcomes and improvement and FAPE, it is

25    part of that process.  So it is -- it is monitoring.  We look

**PROCEEDINGS**

1    at the data every year.  We require districts to improve.  We

2    set targets.  We want them to get better.  That is the process

3    of -- as part of that.

4            MR. MLAWER:  Are findings made in performance

5    indicator review that certain students are not receiving FAPE?

6            MS. DUNCAN-BECERRIL:  Is that the requirement under

7    the monitoring?

8            MR. MLAWER:  I'm sorry?

9            MS. DUNCAN-BECERRIL:  Is that what's required?

10           MR. MLAWER:  I'm asking a factual question.  As part

11    of the performance indicator review process, if a district is

12    chosen because of poor outcomes for students with disabilities,

13    is there a process to determine the extent to which those

14    students are receiving FAPE?

15     (Discussion held off the record amongst the policymakers.)

16           MR. SPENCE:  You mean on an individual student level?

17           MR. MLAWER:  Well, we look at sets of students in

18    monitoring, typically.

19           MS. DUNCAN-BECERRIL:  We look at LEAs.

20           MR. MLAWER:  Right.  And within LEAs, we look at

21    specific students who are chosen for different kinds of reasons

22    in different monitoring systems, and we try to determine

23    whether those students -- or the extent to which those students

24    are receiving FAPE.

25      Comprehensive review, the last time I looked at it, had

PROCEEDINGS

1   portions that purport to do that.

2       My question is:  Does performance indicator review reach

3   such determinations about FAPE? about LRE? about Child Find?

4           **MS. DUNCAN-BECERRIL:**  Well --

5           **MR. MLAWER:**  In other words, are you ascertaining

6   compliance with the requirements most closely associated with

7   results and outcomes, in the language of the statute?

8           **MS. GREENWOOD:**  Well, there are compliance aspects of

9   the performance indicator review.

10          **MR. MLAWER:**  What does that mean?

11          **MS. GREENWOOD:**  Well, for those LEAs that have been in

12  performance indicator review for a certain length of time,

13  they've had to do record reviews as well.

14          **THE COURT:**  Do what reviews?

15          **MS. GREENWOOD:**  Record.  Individual student record

16  reviews.

17          **MS. DUNCAN-BECERRIL:**  So if they're in performance

18  indicator review for --

19          **MS. GREENWOOD:**  LRE, for example.

20          **MS. DUNCAN-BECERRIL:**  -- for multiple years, we

21  require them to do a record review because they're not

22  improving; they're not meeting the target; they're not getting

23  to where we want them to be.  So --

24          **MR. MLAWER:**  And the goal of the record review would

25  be -- this is for districts that have been in for multiple

1    years?

2              MS. GREENWOOD:  Yes.

3              MR. MLAWER:  Okay.

4              MS. GREENWOOD:  I just think that all of these things

5    have, you know, ties to FAPE for students.

6              MR. MLAWER:  That's my point.

7              MS. GREENWOOD:  Okay.

8              MR. MLAWER:  There's no question that any kind of

9    performance improvement process, whether it's the

10   differentiated assistance or performance indicator review, has

11   ties to FAPE.  Its goal is to improve performance.  That has

12   clear ties to FAPE.

13        But I'm asking whether it has a monitoring process, as we

14   think about it within special education.  Do you determine

15   whether specific requirements have been complied with for

16   specific students?  That's my question.

17             MS. DUNCAN-BECERRIL:  The performance indicator review

18   was not designed to do that.  It looks at aggregate

19   student-level data to determine if a district, an LEA, is

20   improving, if it's meeting targets --

21             MR. MLAWER:  Right.

22             MS. DUNCAN-BECERRIL:  -- under that monitoring.

23             MR. MLAWER:  Thank you.

24             THE COURT:  So, but I was curious about something you

25   said when you were discussing performance indicator review for

**PROCEEDINGS**

1   least restrictive environment.  You said if they are not

2   improving --

3            **MS. DUNCAN-BECERRIL:**  Yeah.  Sorry.

4            **THE COURT:**  No, that's okay.

5       If they're not improving, if they are not meeting their

6   targets multiple years in a row and, I guess, not -- if their

7   numbers aren't improving, you make them do something more as

8   part of that performance indicator review than you would make

9   them do on the first go-around, the first time they didn't meet

10  the target.

11           **MS. GREENWOOD:**  That's correct.

12           **THE COURT:**  So tell me a little more about that.

13           **MS. GREENWOOD:**  So it's been additive and a little bit

14  more punitive for them.  If they're not making progress and

15  getting themselves out, they've had to then take a deeper dive.

16           **THE COURT:**  So give me an example, like, using

17  hypothetical numbers and targets and stuff.

18           **MS. GREENWOOD:**  Okay.  So you have a district that in

19  Year 1 did not meet the targets for LRE, say.

20           **THE COURT:**  Okay.

21           **MS. GREENWOOD:**  So they've had to come up with a plan.

22           **THE COURT:**  Okay.

23           **MS. GREENWOOD:**  In Year 2, they are still not meeting

24  the target.  They might have improved somewhat, but they're

25  still not meeting the target; so they're still in performance

PROCEEDINGS

1   indicator review.

2          THE COURT:  Okay.

3          MS. GREENWOOD:  They may refine their plan.  They may

4   decide to stick with their plan and give it some additional

5   time, because it takes -- change takes time.

6       In Year 3, if they're still in, there's additional things

7   that they've had to do, and one of those is a record review

8   that deals with compliance elements.

9          THE COURT:  And what does the record review look like?

10         MS. GREENWOOD:  It's --

11         THE COURT:  Does that mean going through the records

12  of every student with a disability?

13         MS. GREENWOOD:  No.

14         THE COURT:  Okay.

15         MS. GREENWOOD:  So it's -- I think they've had to do

16  ten records in the past for each indicator.  So there's

17  questions designed to get at:  What are the potential -- what

18  are the practices that might be contributing to poor

19  performance in LRE?  So looking at the records, what are you

20  seeing?

21         THE COURT:  And how are the records chosen?  You said

22  they have to review ten records?

23         MS. GREENWOOD:  Yes.  So in the past, the district has

24  chosen their own records to look at.  So it might be records of

25  students that are in separate settings, if that's the

**PROCEEDINGS**

1   particular issue that's causing them to be in the performance

2   indicator review.  It might be students -- whatever the

3   issue -- the particular issue is in LRE, they need to look at

4   records for those students.  And then, you know --

5          **THE COURT:**  And so however many students with

6   disabilities that the district has, the district picks ten

7   individual records --

8          **MS. GREENWOOD:**  Yes.

9          **THE COURT:**  -- student records, to review to try to

10  identify some sort of trend.  Where does that --

11         **MS. GREENWOOD:**  A practice --

12         **THE COURT:**  What?

13         **MS. GREENWOOD:**  A practice that may be contributing.

14         **THE COURT:**  Where does that ten come from?  How did

15  that -- is that just kind of a matter of policy, that --

16         **MS. GREENWOOD:**  Yes.

17         **THE COURT:**  -- that's what CDE -- CDE requires --

18         **MS. GREENWOOD:**  Yes.

19         **THE COURT:**  -- in the third year of non-compliance,

20  that the district pick ten student records?

21         **MS. GREENWOOD:**  Yes.

22         **MR. MLAWER:**  And that's ten, regardless of size of

23  district?

24         **MS. GREENWOOD:**  Yes.

25         **MR. MLAWER:**  I know this is -- we're pretty deeply

1    into a Phase 3 issue with this, but it seemed worth exploring.

2          THE COURT:  Again, it's important to understand how

3    effective or not effective the other types of monitoring are

4    when assessing whether we're doing enough comprehensive

5    monitoring, I think.  Right?  So it's worth asking the

6    questions.

7          MS. WRIGHT:  Your Honor, I think it's fair to say that

8    everything that we do, we do in the interest of FAPE for our

9    students.

10         And I think what you're hearing is filter upon filter upon

11   filter to try to find every which way that a district may be

12   needing to improve and needing assistance.  We're looking at it

13   from so many dimensions, and then we're looking at levels, and

14   then we're looking at over time.

15         So it's all in the interest of FAPE for those -- for each

16   and every student in our state.  But we don't start there, not

17   starting at every single individual IEP.  But we're looking at

18   all the information that we can gather under a general

19   supervision, sort of, overview to ensure FAPE for all of our

20   students.  That's why we're here.

21         THE COURT:  Why would you -- I mean, if in the third

22   year, you decide that you want states to do -- excuse me --

23   districts to do more to sort of get at the problem that's

24   flagged by the performance indicator, why would you just say

25   pick ten?  I mean, why wouldn't you say pick X percent of your

PROCEEDINGS

1  files and review them so that a district that has 500 disabled

2  kids might pick a larger number?

3       **MS. GREENWOOD:**  From a practical standpoint, I think

4  you can tell what the issues are, even with a small sample of

5  students.  However, we are doing some intensive work around our

6  monitoring practices this summer.  So that's, I think, one of

7  the things we're going to look at, as well as the years where

8  we start the record review process.  So it might not continue

9  to be Year 3; it might be earlier.

10       **THE COURT:**  And so you -- so you described this

11  example in one type -- in performance indicator review for one

12  particular indicator, least restrictive environment.  You

13  talked about how you require the states -- or the districts to

14  do kind of a deeper look --

15       **MS. GREENWOOD:**  Um-hmm, yes.

16       **THE COURT:**  -- in Year 3.

17     You don't look at them yourselves, but you just make the

18  district look at ten student files?

19       **MS. GREENWOOD:**  That's correct.

20       **THE COURT:**  Okay.  And then what about other types of

21  performance indicator review?  Is it the same thing where you

22  make the district do something more in Year 2 or Year 3?

23       **MS. GREENWOOD:**  It's consistent for each indicator.

24       **THE COURT:**  For each performance indicator?

25       **MS. GREENWOOD:**  Yes.

PROCEEDINGS

1          THE COURT:  Can you give me a couple other examples?

2          MS. GREENWOOD:  So we might do the same thing around

3     graduation rate or around dropout rate.  For example, did the

4     student have a course of study during the secondary transition

5     years, or were there measurable postsecondary goals for that

6     student?

7          THE COURT:  And so is it -- but is it, again, the same

8     thing?  Like, in Year 3, you have to grab ten student files?

9          MS. GREENWOOD:  It's the same process, yes.

10         THE COURT:  And see if you can discern a pattern from

11    those ten files?

12         MS. GREENWOOD:  Yes.

13         THE COURT:  Is there anything else that changes at

14    Year 3 about the performance indicator review, other than

15    looking at a few student records?

16         MS. GREENWOOD:  Not that I can think of.

17         Yes.  Their annual determination would change from "Needs

18    Assistance" to "Needs Intervention."

19         MS. DUNCAN-BECERRIL:  Yeah.  So when a district

20    changes from when they're "Needs Assistance" to "Needs

21    Intervention," beyond just putting special conditions on their

22    grant, we can require them to do -- we can withhold funds until

23    we see improvement; we can direct funds.  So we can also --

24    it's sort of heightened, I think, with teeth in terms of what's

25    available to us.

PROCEEDINGS

 1          **THE COURT:**  Okay.  Anybody else have anything to say

 2     on this topic before we move on?  Okay.

 3          Mark, I will just let you decide how you want to proceed

 4     at this point.  What's the next topic that you want to raise?

 5          Why don't we plan on going till about 3:30, and then we'll

 6     call it a day because, at that point, my brain will be

 7     completely fried.

 8          **MR. MLAWER:**  Okay.  I'm going to move back to the

 9     section Roman III, the data analysis section in my report.  The

10     first topic there -- I'm going to try to be as brief as

11     possible in the interest of time since we only have, you know,

12     the rest of today and Wednesday and a lot of material to cover.

13          **THE COURT:**  Unless we schedule another day.

14          **MR. MLAWER:**  Unless we schedule another day.

15          **MR. SPENCE:**  Mark, what page is that on?  I'm sorry.

16          **MR. MLAWER:**  Yes.  That is page 6 in my report.

17          So this is academic achievement for kindergarten through

18     eighth graders.  The first subtopic is participation in state

19     assessment.  My conclusion here was non-compliant.

20          The reason for my conclusion was that there were no --

21     there was no analysis of the participation of subgroups of

22     students with disabilities.  By that, I mean by race,

23     ethnicity, disability categories, whether a child is in foster

24     care, is homeless, is an English language learner, or is living

25     in or near poverty.

**PROCEEDINGS**

1    Did I get that right?  Am I correct that there is no

2   analysis of participation for this purpose?

3        **MS. DUNCAN-BECERRIL:**  No, we did not do analysis for

4   this purpose.  It's typically something that's done in a later

5   level of review.

6        Typically, what we would look at is the students with

7   disabilities student group; and then, once a district is

8   identified for a number of performance elements, starting with

9   that larger group which is what is identified in IDEA, then

10   during the review, the district might go through a root-cause

11   analysis that will disaggregate by those --

12        **MR. MLAWER:**  Did you say "might go through"?

13        **MS. DUNCAN-BECERRIL:**  Well, depending on what -- it

14   might not -- in terms of -- they have a root-cause analysis.

15   If they're in DINC, they may not go through that level of

16   analysis; but if they're in -- if you're talking about

17   participation, if they're selected for PIR --

18        **MR. MLAWER:**  Just participation in state assessment.

19   That's it.

20        **MS. DUNCAN-BECERRIL:**  They would go through a

21   root-cause analysis that would identify those subgroups.

22        **MR. MLAWER:**  Now, for the purposes of identifying a

23   district for a monitoring process, plaintiffs point out that a

24   particular concern of the plaintiff group here is highly mobile

25   children and homeless children, kids in foster care, for

1   example.  Do you have a response to that point?

2          **MS. DUNCAN-BECERRIL:**  We do not include them in the

3   selection for monitoring.

4          **MR. SPENCE:**  Mark, is it your position that this

5   disaggregation by subgroup is required by the law?

6          **MR. MLAWER:**  My position is that ensuring that each of

7   these students receives FAPE is required by the law.  In order

8   to do so, the districts that contain those students would have

9   to be selected for monitoring if data gives us a reason to

10  believe that might be a concern.

11         **THE COURT:**  And so is it your view that every state

12  has to do this or would have to do this to ensure compliance

13  with the law?  Or is there something particular about

14  California, that it requires it here where it may not be

15  required elsewhere?

16         **MR. MLAWER:**  Nothing is occurring to me that would

17  make this different in another state.

18         **THE COURT:**  Okay.  So your view is that as a matter of

19  law, no state can ensure that it's adequately assessing

20  districts for monitoring without doing a breakdown based on

21  these categories:  homelessness, migrant population.

22         **MR. MLAWER:**  Yes.  Unless, of course, there were a

23  state in which there were no such kids.  Under that

24  circumstance, if you have an entirely homogeneous population,

25  then there'd be no reason to look at subgroups.

1      **MR. SPENCE:**  For the record, in the State's view,

2   that's not required.  And also, I think that would go more into

3   the category of social science experiment.

4      But, again, obviously, the Court may view it differently.

5   But for the record, that's our position, that it's just not

6   required.

7      **THE COURT:**  I understand.  But part of the process of

8   figuring out whether it falls in that bucket, this sort of

9   social science bucket or the legal bucket, is:  How important

10  is it to ensuring that districts are complying with the IDEA

11  and delivering --

12     **MS. DUNCAN-BECERRIL:**  Your Honor, I would also pose

13  the question to the Monitor:  What states are using this in the

14  selection of their monitoring for -- not in cyclical

15  monitoring, but -- I just -- I don't know of any states, and I

16  work with quite a number of states who are implementing

17  results-based accountability.  And I don't know of many that --

18  I don't know of any that are implementing this process in the

19  selection of their monitoring, outside if they're changing from

20  cyclical monitoring to results-based accountability.

21     **MR. MLAWER:**  At this point in time, my understanding

22  is that very few states are doing anything beyond what they're

23  required to do by the State Performance Plan of the U.S.

24  Department of Education.  I do not know of any states right now

25  who are analyzing subgroup data specifically for this purpose.

1    It's something I can look into and let you know if I -- if

2    there are some.

3              **MS. DUNCAN-BECERRIL:**  That would be great.

4              **THE COURT:**  So can you put a little more meat on the

5    bones, Mark, of why you think this prevents the State from

6    doing an adequate job of flagging school districts that have

7    serious problems?

8              **MR. MLAWER:**  Well, it's a little bit difficult to do

9    that without knowing what the data would be saying to us.

10        So, for example, if -- let's suppose the subgroups were

11   analyzed statewide and there were no significant differences

12   between the participation rates of different subgroups.  I

13   would be less worried about this.  But in the absence of what

14   the data would say to me about this, it's difficult for me to

15   answer.

16        But I do think that there -- common sense might suggest

17   that, as plaintiffs suggested, children who are very mobile

18   might be less likely to be participating in assessments.

19        It is also true, at least based on analyses CDE performed

20   three to four years ago, that there was a correlation between

21   traits like living in or near poverty and performance on state

22   assessment.

23        So if we are ensuring that fewer of kids who are in foster

24   care or are homeless or are migrants are participating in state

25   assessments, we are not measuring their achievement.

1       **THE COURT:**   Is there any reason to believe that those

2  measures would be different depending on whether a child is

3  disabled or not?   I mean, I would assume that the participation

4  rates are a lot lower for homeless children across the board,

5  not just homeless children who are also disabled.   Right?

6     English learners, I would think probably the same thing,

7  or migrant populations.

8     Is there any reason to think that the numbers would be

9  different?   I don't know whether this question matters, but I'm

10  just curious.   I assume the numbers are a lot lower for those

11  populations, regardless of whether they're disabled or not.

12       **MR. MLAWER:**   I would probably assume the same thing,

13  Judge.

14       **MS. WRIGHT:**   Your Honor?

15       **THE COURT:**   Yes.

16       **MS. WRIGHT:**   The State does look at those student

17  populations as an overall group and does calculate; and that is

18  part of the overall statewide accountability system, is

19  specifically looking at foster, homeless, students who are

20  socioeconomically disadvantaged, and English learners.

21     We know that there's a 70 percent overlap in students with

22  disabilities who are in one or more of those other categories.

23       **THE COURT:**   There's a 70 percent overlap, meaning that

24  70 percent of students with disabilities are in one or more of

25  those other categories?   Is that what you're saying?

1          **MS. WRIGHT:** Yes. And I just mean to say that we are,

2     as a state, addressing them also. We're not not addressing it,

3     is my point.

4          **THE COURT:** Right.

5          **MS. WRIGHT:** We are addressing it also from the larger

6     system.

7          So as we're going into our root-cause analysis and looking

8     at our overall -- in our special ed data as well -- it is our

9     recommendation that they go deeper and look into those issues

10    in specific districts. We don't believe that we need to do

11    that at a statewide level.

12         **THE COURT:** I guess the question is -- the State is

13    tracking data like that for disabled and non-disabled students,

14    and so I guess the question is: Is there something more you

15    would learn by tracking that information -- not tracking that

16    information, but putting that information into the analysis for

17    deciding which districts to monitor?

18         I guess what you would do -- I suppose what Mark would say

19    is that you would look at -- let's say homeless children. You

20    would look at -- you would analyze how the disabled homeless

21    children are doing in District A compared to how disabled

22    homeless children are doing in districts statewide. And if

23    homeless children are doing significantly worse in District

24    A -- homeless children with disabilities are doing

25    significantly worse in District A than homeless children with

**PROCEEDINGS**

1  disabilities statewide, there may be some particular

2  intervention that is required.  Is that --

3         **MR. MLAWER:**  Right.  That branches us into

4  achievement, which is the next subject, but, yes, in terms of

5  how they're doing.

6         **MS. DUNCAN-BECERRIL:**  So just --

7         **THE COURT:**  And what we do know, just to follow up on

8  my example, we would already know, through existing state

9  monitoring, that this particular school district might be doing

10  worse with homeless children generally than other school

11  districts throughout the state might be doing with homeless

12  children.

13        **MR. MLAWER:**  Right.

14        **THE COURT:**  The only thing we don't know is if that's

15  also true with respect to homeless children who are disabled.

16        **MR. MLAWER:**  Right.

17        **THE COURT:**  Is that correct?  You look -- I'm getting

18  a --

19        **MS. DUNCAN-BECERRIL:**  So I'm just trying to --

20        **THE COURT:**  -- crinkled-forehead look from you.

21        **MS. DUNCAN-BECERRIL:**  No.

22        **THE COURT:**  It's perfectly fine to give me that look.

23        **MS. DUNCAN-BECERRIL:**  No, never.  I just want to make

24  sure I understand.

25        So our contention is that when you look at that statewide

1    data for that population -- and keep in mind, students who are

2    homeless or who are in foster care are small numbers.  When you

3    start beginning to cut that up, you do get down to small

4    numbers which can be problematic, as we've talked about

5    previously.  That, you know, the State is already looking at

6    that group as a whole.

7              **THE COURT:**  Right.

8              **MS. DUNCAN-BECERRIL:**  And so when a district has

9    identified it's in the red for that student group, they're

10   already looking at the totality of that student group,

11   including the students with disabilities that are represented

12   within.

13        So I think that there -- that when we look at our

14   subgroup, which is the students with disabilities, we start

15   with the largest with the students with disabilities.  We

16   identify the districts who are not serving that student group

17   well, where we don't see performance or there's compliance

18   issues.  And then the district can drill down to see if it's an

19   issue with their homeless population, if it's an issue with

20   their EL population, that kind of -- that's how we look at it.

21   That's the way that --

22             **MR. MLAWER:**  But the concern, it seems to me -- and I

23   agreed with what you said so far.  But the concern also has to

24   be that if a district with participation has made its

25   95 percent participation rate without analyzing the subgroup

**PROCEEDINGS**

1   data, for all we know, every single homeless kid, every kid in

2   foster care with a disability, every migrant kid might not have

3   participated.  And we don't -- we don't know that because we're

4   only looking in the aggregate.

5       **MS. DUNCAN-BECERRIL:**  Well, that's how our system is

6   designed.  Our system is designed to identify LEAs who are not

7   serving students with disabilities well, using aggregate-level

8   data.  It is not designed to have an individual -- I mean, we

9   look at individual performance of students, but we aggregate it

10  by the LEA level.  That's the way it's designed.  It's designed

11  to identify LEAs who are not serving students with disabilities

12  well.

13      **MR. MLAWER:**  Right, including subgroups of students

14  with disabilities who may not be served well.  And in order to

15  know the answer to that question, you have to look at the data.

16  And that's my point here.

17      **MS. DUNCAN-BECERRIL:**  I don't -- I believe when we

18  look at the larger group, we start with a larger group, and

19  then the LEAs can drill -- will drill down and look more

20  closely at that.  But our system is not designed to identify

21  every single student and identify their performance at the

22  student level.  It is not designed for that.

23      **MR. MLAWER:**  That's not the other alternative here.

24  I'm simply saying that in a district that has made the

25  95 percent participation rate, you look at the other variables

**PROCEEDINGS**

1  too, because you may have a 0 percent participation rate

2  amongst homeless students with disabilities, so forth.  You

3  don't know unless you look.

4        **THE COURT:**  You could look at it.

5        **MS. WRIGHT:**  There's a lot of student groups we could

6  look at.  I guess the question is, is:  To what end?

7        So we're looking at a statewide level, and we do expect

8  districts to walk through our process to look at their own.

9  Every district does have different student groups that are

10  represented within that district, more or less of those student

11  groups.  So, you know, I think we are essentially doing our job

12  of general supervision.

13        Could we cut it a million ways, and is it super

14  interesting, and could we research it?  Sure.  I mean, there's

15  a lot of interesting pieces to the students with disabilities

16  puzzle.  But it's about how we're working as a state, in

17  concert with the rest of our accountability system, to try to

18  make something that helps our students improve.

19        **THE COURT:**  What more can you tell me about -- or

20  where can you point me to learn about sort of what the State is

21  doing with respect to these different subgroups, generally?

22  Right?  So, for example, let's say the State identifies a

23  really low participation rate by homeless students in a

24  particular district compared to the statewide average or

25  whatever.  What does the State then go in and do about it?

PROCEEDINGS

 1  What do we know about that?

 2          **MR. SPENCE:**  Can we have a moment?

 3          **THE COURT:**  Sure.

 4    (Discussion held off the record amongst the policymakers.)

 5          **MS. WRIGHT:**  So the questions you're asking is under

 6  our local control accountability -- our local control funding

 7  formula, and our whole accountability system under ESSA.  So

 8  that would be on the general ed side of the house, if you will.

 9      So, you know, we can provide you some information from

10  that aspect, but I wouldn't want to speak to that directly.

11          **THE COURT:**  Okay.

12          **MR. SPENCE:**  We have some resources we could forward

13  to you.

14          **THE COURT:**  I was going to ask you if you could try to

15  send us --

16          **MS. WRIGHT:**  Literally some links right now.

17          **THE COURT:**  Yeah.  Just so that we can educate

18  ourselves a little bit on that.  That would be good.

19      Does anybody else have anything to add on the aggregation

20  or disaggregation part of it?

21          **MR. MLAWER:**  On participation, Your Honor?

22          **THE COURT:**  Oh, yeah.  There was something more you

23  wanted to say specifically on --

24          **MR. MLAWER:**  Well, it is an issue for other areas of

25  data analysis that I was going to hit each time.

1        **THE COURT:**  Right.  But isn't it basically the same --

2   I mean, isn't it more or less the same debate that we would

3   have with respect to each area?

4        **MR. MLAWER:**  Yes, with different levels of importance,

5   depending on the area.  Yes.

6        **MR. KOSKI:**  I guess plaintiffs would just add that we

7   think it's very important, actually, to disaggregate the data

8   by subgroups, especially because we know some of the greatest

9   rates of failure are among foster youth, homeless youth.  We

10  would add kids in the juvenile justice system.  Just the highly

11  mobile kids who do get lost in the system.

12       And to not focus in on them and seeing how they are

13  differentially served or not served, I think, would be pretty

14  important.  So disaggregation does matter.  I think we will see

15  big differences in participation rates, to use the current

16  variable that we're looking at here.

17       **THE COURT:**  I don't think there's any doubt we'll see

18  differences in things like participation rates.  But I guess

19  the question is:  Aren't those differences going to exist for

20  the homeless students who are not disabled also?  Right?  I

21  doubt there -- I don't think there's any reason to believe --

22  maybe I'm wrong, but I assume there's no reason to believe

23  that -- or let me put it in the affirmative.

24       I assume there's every reason to believe that there are

25  much lower participation rates for disabled homeless kids as

1  well as much lower participation rates for non-disabled

2  homeless kids.

3       **MR. KOSKI:**  I agree with that.  I think the one

4  difference is we would see that probably among homeless youth

5  or kids in the foster care system, that they have higher rates

6  of being identified with disabilities, but that doesn't speak

7  to your assertion.  I agree we're probably going to see

8  participation rates be similar whether or not the child has

9  disabilities.  To me, though, the question is:  What are we

10 doing to monitor that through a special education monitoring

11 system?  I understand that other things might be going on, and

12 we're learning more about that every day.

13      **THE COURT:**  Well, to me, the question is whether --

14 I think I'm largely agreeing with you, but maybe not entirely.

15 Right?  If, based on a review of this data in the aggregate and

16 an analysis of this data in the aggregate, you are

17 identifying -- you're determining that some districts don't

18 need further monitoring and some districts do need further

19 monitoring, how much of a risk is there that the aggregate

20 determination that a particular district does not need further

21 monitoring allows to fall through the cracks a particular

22 problem -- a particular failing on a district's part with a

23 particular subgroup?

24      And then, if there is a chance that it would fall through

25 the cracks, does that get addressed through the State's larger

1  school district monitoring process for these subgroups,

2  regardless of whether they're disabled or not?

3      And I guess my gut reaction to all of this is, absent -- I

4  mean, none of the other states -- apparently, none of the other

5  states do this -- right? -- when they're analyzing data about

6  disabled kids.  And it's not obvious -- it's far from obvious

7  to me that something would be slipping through the cracks by

8  just doing it on an aggregated basis and not doing the analysis

9  for each subgroup.

10      And so I would want, like, a more fulsome explanation of

11  why there's reason to believe -- right? -- that the aggregate

12  analysis is not enough.

13          MR. KOSKI:  When you say "aggregate analysis," are you

14  saying the aggregate of children who are homeless with and

15  without disabilities in the aggregate?

16          THE COURT:  No, no.  Sorry.  What I meant was analysis

17  of the data about LEAs in the aggregate.

18          MR. KOSKI:  Right.  Well, that's where we might

19  disagree.  I do think we will miss kids who are highly mobile.

20          THE COURT:  Why?  Can you give me an example of how --

21          MR. KOSKI:  So participation --

22          THE COURT:  -- that would play out?

23          MR. KOSKI:  This is a great one.  Right?  A kid who

24  just comes into a school district.  Records haven't even --

25  just comes into a school district because she was just placed

1  there through foster care.  Records haven't even come yet.

2  They may not know what grade she is.  They may not have her IEP

3  yet.  They certainly might not have her ready to go for the

4  statewide assessments that are there.

5      So I think there's a much greater risk for a highly mobile

6  kid like a homeless child, child in the foster care system,

7  child in the juvenile justice system to not participant in the

8  assessments much more --

9          THE COURT:  Well, I'm sure that's true.

10         MR. KOSKI:  So then why --

11         THE COURT:  But that's not the issue.  The issue is:

12  A district that otherwise appears to be performing well, is

13  there a reason to be concerned that they might be having a

14  particular problem with homeless youth, disabled homeless

15  youth, that they aren't having with other disabled kids;

16  whereas some other district that is doing worse with disabled

17  kids generally is doing much better, say, with homeless

18  disabled kids.

19      Ms. Armsby, you --

20         MS. ARMSBY:  Well, I just wanted to observe,

21  Your Honor, that we can't, of course, assume that there's a

22  consistent level of homelessness across all districts.  And

23  I think one issue is the identification of that as a

24  significant factor for a particular district.

25      In other words, if it's a significant element of the

**PROCEEDINGS**

1   population of students, then I think it's fair to assume it's

2   having a disproportionate impact on students with disabilities

3   who are also home insecure.

4       So I do think it needs to be a factor that's considered.

5   And I'm speaking as an attorney for a district that has a

6   hugely significant population of home insecure students.

7           **THE COURT:**  Okay.  But, so the question is -- it seems

8   to me that the primary question is -- and obviously, that

9   matters.  Right?  And part of the reason that you have a higher

10  population of disabled kids is because you have a higher

11  population of homeless kids than a lot of other districts.

12          **MS. ARMSBY:**  I'm sure there's a correlation.

13          **THE COURT:**  There's a correlation.  Right?

14      But the question here is:  How realistic of a scenario is

15  it that you might -- by analyzing this data in the aggregate --

16  right? -- you're going to determine that a district is doing

17  pretty well with respect to disabled kids and you're going to

18  miss that, even though they're doing pretty well with respect

19  to disabled kids, they're doing especially badly with homeless

20  disabled kids?  I think that's the question.

21          **MS. ARMSBY:**  Yes.

22          **THE COURT:**  Do you think there's a -- are there

23  districts out there that are doing pretty well with disabled

24  kids in the aggregate but doing especially badly with homeless

25  disabled kids, worse than other districts -- significantly

1   worse than other districts are doing with homeless disabled

2   kids?

3        MS. ARMSBY:  I believe that there are districts where

4   it is very much not consistent.  In other words, if you look

5   only at students who are participating -- disabled students who

6   are participating in the statewide assessments and not at

7   students who may not be participating because they are home

8   insecure, because they're children of migrants and they are

9   gone for part of the school year, or they're children who just

10  are not participating in the assessments because they don't

11  come to school consistently so we can't get a statistic- -- a

12  meaningful participation level in the statewide assessment in

13  order to count them, to count their assessment.

14       THE COURT:  Well, I assume that's true.  But the

15  question is on the issue of participation rates; right?

16       MS. ARMSBY:  Right.

17       THE COURT:  Are you going to get a school district

18  that -- how likely is it that you're going to get a school

19  district that, in the aggregate, has good participation rates

20  but is doing much worse than your average district on homeless

21  kid participation rates?

22       MS. ARMSBY:  I think if there is a large percentage of

23  homeless students, that is quite possible.  I do think that's

24  quite possible.

25       MR. KOSKI:  I would actually add, if there were a

1   relatively small percentage of homeless children, because the

2   homeless problem might be a little bit more hidden in a

3   district that's somewhat more affluent and they don't even know

4   they have a problem with participation rates among the homeless

5   children, I'd almost be more worried about that situation,

6   because they may look good in the aggregate, but they might be

7   missing it with that group of children.

8        We just don't know, as the Monitor has said.

9        **MR. MLAWER:**  Yeah.

10        **THE COURT:**  Well, we just don't know, but the question

11   is how -- there are a lot of things we don't know that we'd

12   like to know.  And the question is:  How big a risk is it?  In

13   the grand scheme of things, by conducting the analysis at the

14   level of generality that we're conducting it, how significant

15   of a risk is there that we are dropping the ball, we're missing

16   a district that is blowing it with respect to some subset of

17   the population?

18        **MR. KOSKI:**  So I have two thoughts on that.

19        One is I'm very mindful of your admonition that we're not

20   doing this for social science fun and we're not doing this

21   because we're interested in it.  We want to know if there's a

22   risk here.  Right?

23        And the feeling that we have, as plaintiffs, is that this

24   is a particularly vulnerable population where there is a risk

25   for a number of detrimental outcomes; and if we don't treat

1   them separately and if we don't look at them separately,

2   there's a much greater risk of their falling through the

3   cracks, whether it's looking at them in LRE situations, whether

4   it's looking at them in participation rates, whatever it might

5   be, because they do not necessarily have parents who are there

6   to advocate for them and to make sure that they're

7   participating in tests, being in the least restrictive

8   environment, and that sort of thing.

9          So this is a pretty at-risk population that we want to

10  take a look at.

11         **THE COURT:**  And maybe that goes back to, well, what is

12  the State doing, more generally, in terms of monitoring school

13  districts' responsiveness to the needs of the homeless

14  population?

15         **MR. KOSKI:**  Right.  And I don't know the answer to

16  that.  I mean, we'll probably learn a little bit more about

17  that.  It does concern me a little bit that when we are here in

18  this courtroom looking at the special education monitoring

19  system, that that's what we're looking at.

20         **THE COURT:**  Well, no, I don't agree with that.  I

21  mean, I think we have to look at it in context.  I think it's

22  very important.

23         **MR. KOSKI:**  And if the cases --

24         **THE COURT:**  I think that's one of the biggest mistakes

25  that courts make -- right? -- is they don't look at the whole

1    picture.  You don't order relief just for the sake of ordering

2    relief because the State happens to deal with the problem over

3    here instead of here.

4         **MR. KOSKI:**  That's fine.  Like I said, if there's a

5    showing that they do a good job with kids with disabilities

6    through whatever general education system that they have, I'm

7    open to hearing that.

8         It wasn't presented to us in the first submission --

9         **THE COURT:**  Right.

10        **MR. KOSKI:**  -- so that does, again, give me a little

11   bit of reason to be concerned.

12        So I guess that's --

13        **THE COURT:**  I understand.  And it's sort of

14   unsatisfying for them to just intone --

15        **MR. KOSKI:**  Right.

16        **THE COURT:**  -- "The law doesn't require us to do it."

17   I agree with that.  That's why we're having this

18   discussion.

19        **MR. KOSKI:**  So I guess that's the point, the only

20   point that we'd make.  There is a particular reason why this

21   is, again, not just because we're interested in the question or

22   interested in that group of kids.  It's because we actually

23   think they are at pretty great risk.

24        **THE COURT:**  Anything else anybody wants to say about

25   that?

PROCEEDINGS

1          **MR. SPENCE:**  Your Honor, at the risk of incurring your

2    wrath, given what you just said about intoning that the law

3    doesn't require us to do this, just for the purpose of the

4    record -- I understand your position -- it's our position that

5    the IDEA spells out very clearly when disaggregation must be

6    done.

7          **THE COURT:**  Right.

8          **MR. SPENCE:**  It's in Section 1412(22).  It says --

9          **THE COURT:**  Race and ethnicity.  I get that point.

10         **MR. SPENCE:**  Okay.

11         **THE COURT:**  And that's in your submission.

12         **MR. SPENCE:**  Okay.  I'll leave it at that.

13         **THE COURT:**  Anything else on that?

14         **MR. MLAWER:**  No, Your Honor.

15         **THE COURT:**  Okay.  So with respect to participation,

16   aggregation is your only --

17         **MR. MLAWER:**  Correct.

18         **THE COURT:**  -- issue?

19      Okay.  Go ahead.

20         **MR. MLAWER:**  Okay.  School-age performance on state

21   assessment.  My judgment here was non-compliant, and there were

22   two reasons.

23      The first is the subgroup disaggregation again.  Kids can

24   be performing well in the aggregate while certain groups are

25   far behind.

1    And second was this implication of CDE's use of the

2    Dashboard in this context.  Some low-performing schools --

3    districts cannot be selected due to small improvements from the

4    prior year.

5    I included in my report at page 8 -- this table is not

6    mine.  This is taken directly from CDE's submission.

7    **THE COURT:**  Page 8, you said?

8    **MR. MLAWER:**  Yes.  The top of the page.

9    **THE COURT:**  Okay.

10   **MR. MLAWER:**  So as we know, districts that are labeled

11   red or orange on this Dashboard are minimally selected for

12   performance indicator review.  Districts labeled yellow are

13   not.  But if you look at -- let me just see here -- the yellow

14   box under "Performance Level," if we look at "Low" and go

15   across to "Increased from Prior Year (by 3 to less than 15

16   points)," such a district is designated yellow.  A yellow

17   district will not be selected for this monitoring process.

18   And this is --

19   **THE COURT:**  For performance indicator review?

20   **MR. MLAWER:**  Correct.

21   **THE COURT:**  Okay.

22   **MR. MLAWER:**  And it is made less likely that this

23   district will be selected for comprehensive review because it

24   gets an additional point.

25   **THE COURT:**  And this is just a one-year increase;

1    right?

2         MR. MLAWER:  That is correct.

3       Now, that's the issue that was pointed to by the Morgan

4    Hill plaintiffs, that looking at one year versus the prior year

5    is not sufficient to make judgments about whether a district is

6    improving.

7         THE COURT:  And that is what, for the Dashboard -- the

8    Dashboard concept comes from elsewhere, but it's being applied

9    here in the disability context.  And so I gather it's entirely

10   up to the policymakers to decide whether that box should be

11   yellow or orange.

12        MR. MLAWER:  Well, that's my understanding.  It's a

13   CDE document, and what color designations are selected for

14   certain things is a CDE decision.  So, yes, my assumption would

15   be yes.

16        THE COURT:  Okay.  So the upshot is that this

17   indicator, through the use of this Dashboard, allows districts

18   to escape performance indicator review, even when they should

19   be subject to performance indicator review, because too great

20   an emphasis is placed on improvement and insufficient emphasis

21   is placed on actual performance.

22      Is that how you would put it?

23        MR. MLAWER:  That is the way I looked at it in

24   crafting this report.  I think the Morgan Hill plaintiffs have

25   added another dimension that I think is quite important.

PROCEEDINGS

1          THE COURT:  Right.

2          MR. MLAWER:  But my answer to your question is yes.

3          THE COURT:  Well, and those two things may be

4    related --

5          MR. MLAWER:  Yes.

6          THE COURT:  -- right?

7       It may be okay to place more emphasis on improvement or

8    regression if that measure were more reliable because it used

9    more than just one -- two years.

10         MR. MLAWER:  Yes, absolutely.  I should note, CDE, in

11   its response, appeared to be indicating that they thought I had

12   concerns about the Dashboard.  I don't have general concerns

13   about the Dashboard.  I have this specific type of concern that

14   will reappear in the context of discipline.

15         THE COURT:  Response?  I mean, your general response

16   is that we want to focus on -- we think it's good to focus on

17   improvement.

18         MS. DUNCAN-BECERRIL:  Yes.

19         THE COURT:  And we think it's appropriate to

20   prioritize the school districts that are not improving over the

21   school districts that are improving.

22         MS. DUNCAN-BECERRIL:  That is correct.

23         THE COURT:  I'm not sure anybody would dispute that.

24   But I guess the question is:  If a district is doing really

25   badly and only has improved incrementally from one year to the

**PROCEEDINGS**

 1   next, should that really allow it to escape performance

 2   indicator review?

 3            **MS. DUNCAN-BECERRIL:**  So in the past, we used a direct

 4   percentage -- percent proficient and we had a target associated

 5   with that.  We moved away from that because this is what the

 6   Dashboard, our larger accountability system, was using and we

 7   wanted to align it to make it consistent.

 8        And so we went through the State Board; we went through

 9   our Advisory Commission On Special Education; we talked with

10   stakeholders.  And their response was:  Use a single measure.

11   Don't hold us to two standards, because there's this larger

12   accountability system under ESSA, E-S-S-A, Every Student

13   Succeeds Act, that is requiring us this, and then you have

14   something under IDEA which is different.

15        And so we pushed to align those.  This went through a

16   stakeholder process.

17            **THE COURT:**  So "align them," meaning we're going to

18   use this Dashboard concept --

19            **MS. DUNCAN-BECERRIL:**  Yes.

20            **THE COURT:**  -- right?

21            **MS. DUNCAN-BECERRIL:**  Um-hmm.

22            **THE COURT:**  I get that.  We're going to use the

23   Dashboard concept.

24        But merely using the Dashboard concept does not dictate

25   what the numbers are in the left -- in the left column and the

 1 | top row; right?

 2 | **MS. DUNCAN-BECERRIL:**  Yes.  So 83 percent of

 3 | districts -- I'm sorry -- LEAs are identified in either red or

 4 | orange.  So when we examined that, it seemed like a natural

 5 | cutoff for us, that the majority of districts we identified

 6 | were not doing well in both math and ELA using orange and red.

 7 | **THE COURT:**  So wait.  Sorry.  You said 80 percent of

 8 | the LEAs statewide are, in this Dashboard, orange or red?

 9 | **MS. DUNCAN-BECERRIL:**  Yeah.

10 | **MR. MLAWER:**  On both English language arts --

11 | **MS. DUNCAN-BECERRIL:**  83 percent.

12 | **MR. MLAWER:**  -- and math?

13 | **MS. DUNCAN-BECERRIL:**  So 83 percent for ELA and --

14 | doing quick -- another 85 percent for math.

15 | **MR. MLAWER:**  And that's students with disabilities --

16 | **MS. DUNCAN-BECERRIL:**  Yes.

17 | **MR. MLAWER:**  -- not overall?

18 | **MS. DUNCAN-BECERRIL:**  That's the students with

19 | disabilities student group.

20 | **MR. MLAWER:**  Got it.

21 | **MS. DUNCAN-BECERRIL:**  Would you like to see the data?

22 | No?  Okay.

23 | **THE COURT:**  That's okay.

24 | So, in other words, even though visually it looks like

25 | there's not a whole lot of performance indicator review going

1    on, in actuality, looking at this chart, over 80 percent of the

2    LEAs are subject to performance indicator review?

3        **MS. DUNCAN-BECERRIL:**  That's correct.

4        **THE COURT:**  For performance?

5        **MS. DUNCAN-BECERRIL:**  Yes.  And I can actually give

6    you the number as soon as I find the document.

7        So for ELA achievement, that's 766 LEAs.

8        Keep in mind, that there is an n-size criteria; so there

9    would be some districts who would not be included in the

10    analysis.

11        But 766 districts are undergoing PI- -- or performance

12    indicator review for ELA achievement, and 757 are undergoing

13    performance indicator review for math achievement.

14        **THE COURT:**  And those numbers are very similar to one

15    another.  How much overlap is there between those two groups?

16    Do you know?

17        **MS. DUNCAN-BECERRIL:**  I don't know how much overlap

18    there is.  There probably is quite a bit.

19        **THE COURT:**  Okay.  And --

20        **MS. DUNCAN-BECERRIL:**  So it's not like 1,400 separate

21    districts.  It's probably much closer to 800.

22        **THE COURT:**  And do you know, out of -- so how many

23    districts are there total again, roughly?

24        **MS. DUNCAN-BECERRIL:**  So there's 2,100 local education

25    agencies and charter schools, but there is a minimum n-size

**PROCEEDINGS**

1    criteria that is put on, and I believe that minimum n-size

2    criteria is 30.

3         THE COURT:  So there are 2,100 LEAs which could either

4    be districts or single charter schools?

5         MS. DUNCAN-BECERRIL:  Um-hmm.

6         THE COURT:  Okay.  And you're not going to get

7    performance indicator review on performance unless you have

8    more than 30?

9         MS. DUNCAN-BECERRIL:  30 cumulative enrollment.  30

10   students with --

11        THE COURT:  Not 30 kids with disabilities, but 30 kids

12   total?

13        MS. DUNCAN-BECERRIL:  No.  30 cumulative enrollment

14   for students with disabilities.

15        THE COURT:  For students with disabilities?

16        MS. DUNCAN-BECERRIL:  Yeah.

17        THE COURT:  So that's probably going to eliminate most

18   every charter school, I would think.

19        MS. DUNCAN-BECERRIL:  It eliminates a number of them,

20   yes.  So when we talked about that small n-size issue --

21        THE COURT:  Yeah.

22        MS. DUNCAN-BECERRIL:  -- that is something --

23        THE COURT:  And so do you know how many are not

24   subject to the performance indicator review because of their

25   size?

1          MS. DUNCAN-BECERRIL:  I would have to look it up.  I

2     don't have the number right off the top of my head, but I can

3     get that information.

4          MR. MLAWER:  But in order to understand the

5     percentages you just shared, I'm now looking at your

6     Attachment T, which is the revised version of -- I can't

7     remember what attachment it was in December.  This shows for

8     ELA achievement, 766 districts selected for performance

9     indicator review; for math achievement, 757.

10          MS. DUNCAN-BECERRIL:  Yes.

11          MR. MLAWER:  So those numbers are roughly 80 percent

12     of the total districts that were subject that were not excluded

13     due to the n-size; is that correct?

14          MS. DUNCAN-BECERRIL:  That's correct.

15          MR. MLAWER:  Okay.

16          THE COURT:  So meaning, there are less than a thousand

17     total districts or total LEAs subject to this review and

18     roughly --

19          MS. DUNCAN-BECERRIL:  Based on the n-size.

20          THE COURT:  -- and roughly 1,100 who are excluded from

21     it?

22          MS. DUNCAN-BECERRIL:  I would have to get the exact

23     numbers, but --

24          THE COURT:  Okay.

25          MS. DUNCAN-BECERRIL:  There is a -- yeah, many of our

PROCEEDINGS

```
1    small charter schools and LEAs would be excluded.
2            THE COURT:  And with the charter schools, you said the
3    decision has recently been made to treat each individual
4    charter school as an LEA.  Do I have that right?
5            MS. DUNCAN-BECERRIL:  Yes.  So under LCFF, it named
6    charter --
7            THE COURT:  LC?
8            MS. DUNCAN-BECERRIL:  Local control funding formula.
9            THE COURT:  Okay.
10           MR. SPENCE:  They didn't create that acronym.
11           MS. DUNCAN-BECERRIL:  I didn't create that one.  I'll
12   take responsibility for DINC, or data identified
13   non-compliance.  I did create that one, and I'm sorry every
14   day.
15           THE COURT:  Not just when you come here?
16           MS. DUNCAN-BECERRIL:  Not just when I come here.
17       We did identify in our submission -- I'm trying to find
18   it -- where -- the exact citation.  But, yes, in the local
19   control funding formula, it did identify charter schools, not
20   charter schools as LEAs.
21       So now, when you look at the Dashboard and you look at the
22   colors in the Dashboard, every -- like, if you look at my son's
23   school district, all the charter schools in that school
24   district are pulled out of that data.  And so the charter
25   schools aren't represented.  They have their own Dashboard.
```

**PROCEEDINGS**

1          **THE COURT:**  Where were the charter schools before?

2    Were they just in the school district that gave them the

3    charter?

4          **MS. DUNCAN-BECERRIL:**  Yes.

5          **THE COURT:**  So they were part of the district's LEA?

6          **MS. DUNCAN-BECERRIL:**  Yes.

7          **MR. MLAWER:**  To make sure I understand this, there are

8    some charters that are not considered to be their own LEAs

9    formerly but are treated as such.  Did I understand that

10   correctly from your submission?

11         **MS. DUNCAN-BECERRIL:**  Yes.

12         **MR. MLAWER:**  There are some that are their own LEAs

13   and some that are not.  But regardless, your accountability

14   system treats them all as if they were LEAs; correct?

15         **MS. DUNCAN-BECERRIL:**  That is correct.  And it's

16   Education Code 47612(c).

17         **THE COURT:**  And that Education Code provision creates

18   this LCFF?

19         **MS. DUNCAN-BECERRIL:**  Yeah.

20         **THE COURT:**  Which prompted you to treat each charter

21   school as a separate LEA?

22         **MS. DUNCAN-BECERRIL:**  Yes.  And part of that was the

23   alignment that we've been talking about where we had -- we had

24   our monitoring system, which identified local education

25   agencies, but then the Dashboard was identifying a different

PROCEEDINGS

1    number.

2         So we would say, "Oh, District, your least restrictive

3    environment data looks like this."

4         And they would say, "Wait a second.  This isn't the number

5    that's on the Dashboard.  It's not the same data.  Is there a

6    problem with your data or the Dashboard data?"

7         And so for consistency purposes, it just was really clear

8    for us that we should do it the same way.

9              THE COURT:  So as a result -- so I assume -- it looks

10   like there are about somewhere between 1,000 and 1,100 LEAs

11   that are not subject to this performance indicator review.

12   Does that mean they're not subject to any performance indicator

13   review?

14             MS. DUNCAN-BECERRIL:  No.  They would be -- they would

15   be subject to participation.  They could also be subject to

16   least restrictive environment.  They may be subjected to

17   suspension.  There's a minimum n-size criteria --

18             THE COURT:  Why are they not subject to this one?

19             MS. DUNCAN-BECERRIL:  So in the development of the

20   Dashboard, when they went through that process, they

21   identified -- and I don't have the -- I'm not -- my shop was

22   not the one that developed the Dashboard in terms of the data

23   analysis.  But my understanding is when they went through the

24   process, it was important to implement a standard n-size.

25   I think Every Student Succeeds Act identifies 30 as the

**PROCEEDINGS**

1    threshold, and so that's what they used.

2         **THE COURT:**  I see.  Okay.

3         **MS. DUNCAN-BECERRIL:**  And also, when we report to the

4    U.S. Department of Education, 30 is also a threshold that we

5    use.  I think they wanted to make that standardized.

6         **THE COURT:**  Okay.  And then, so you've mentioned a

7    couple of times:  We know that we need to look at the smaller

8    districts and the charter schools and figure out a way to

9    analyze data for them to determine if they should be subject to

10   monitoring.

11        I mean, what's the timeline for that?  What else, if

12   anything, can you say about that at this point?

13        **MS. DUNCAN-BECERRIL:**  So I -- this was obviously

14   something that came up this year when we added all the charter

15   schools in.  We did the analysis, and it was like, Oh, okay.

16   This is something that's really important that we have to

17   address.

18        I would like to set the criteria this summer so that we

19   can implement it into our monitoring selection for the next set

20   of selection for '19-'20.

21        **THE COURT:**  And then it appears that it's about 1,000

22   or 1,100 LEAs that are not subject to this indicator review.

23   How many of those are charter schools, and how many of those

24   are just small school districts?  Do you have a sense?

25        **MS. DUNCAN-BECERRIL:**  The majority are charter

1  schools.

2          THE COURT:  So even looking at the charter school

3  issue, you've still got at least a semi-sizable chunk of small

4  school districts --

5          MS. DUNCAN-BECERRIL:  Yes.

6          THE COURT:  -- who aren't subject to this performance

7  indicator?

8          MS. DUNCAN-BECERRIL:  That is true.

9          THE COURT:  And are there other performance indicators

10  that they're not subject to?

11          MS. DUNCAN-BECERRIL:  So it would depend on their --

12  so I don't know if you remember when we had talked about a year

13  ago, about the transition from our data systems.  So --

14          THE COURT:  Vaguely.  And I remember some really

15  interesting acronyms with those.

16          MS. DUNCAN-BECERRIL:  CALPADS was probably one of

17  them.

18      So we have two data systems that collect data for

19  students.  We have our data system that collects data for all

20  students, and that is CALPADS, C-A-L-P-A-D-S.  And it collects

21  data for the achievement, for suspension/expulsion, and for

22  graduation, along with a lot of other data.  I think we

23  submitted it in our submissions last fall.

24      And then we have our CASEMIS submission, which is

25  C-A-S-M-I -- C-S-E-M-I-S [sic], which is just for students with

1    disabilities.  And it collects all the timeline information,

2    the disability designation, all of that data.

3         And so in terms of when we look at the data for, like,

4    least restrictive environment, preschool LRE, that kind of

5    information, it's a different point in time because we collect

6    that data as of December 1st, and we put in an n-size criteria

7    there.  It's usually 20 or 30.  So, for disproportionality,

8    it's 20.  For some other indicators, it may be 30.

9         But for the CALPADS data, the general education data --

10   that includes suspension, graduation, and assessment -- that

11   data is collected at the end of the year.  So it's kind of a

12   different point in time.  But we are working to --

13        **THE COURT:**  And that's all 30?

14        **MS. DUNCAN-BECERRIL:**  Yes.

15        **THE COURT:**  The cutoff is 30 for all of that.  Okay.

16        **MS. DUNCAN-BECERRIL:**  And so starting in 2019-'20,

17   it's all going to be collected in one system.  The data

18   elements will all stay the same.  None of the data elements are

19   changing.  But they're going to be collected in one system with

20   the same timelines.

21        **THE COURT:**  Okay.

22        **MS. DUNCAN-BECERRIL:**  And even though the n-size

23   criteria may still apply, one of the things that we have talked

24   about doing is aggregating groups -- similar to what Mark had

25   talked about a little bit -- sort of aggregating potentially by

1    size or by county is one or by Special Education Local Plan

2    Area is another grouping.  So we can group all the charters and

3    small LEAs under one umbrella, do the analysis for them, and

4    then sort of suss out from there which districts are

5    contributing to the poor performance, and select them for

6    monitoring.

7              THE COURT:  And you said you wanted to set criteria

8    for this summer.  Were you talking about the charter schools

9    or --

10             MS. DUNCAN-BECERRIL:  Charter schools -- what the

11   cri- --

12             THE COURT:  Charter schools and the small districts?

13             MS. DUNCAN-BECERRIL:  Yeah.  How we would do this sort

14   of small -- I mean, we need to run the models to see what it

15   would look like, to see if it would be appropriate.

16        There's a really good reason why there's a minimum n-size

17   criteria.  I mean, if I'm in L.A., one student is

18   0.0001 percent of everything.  If I'm in a very small -- in

19   Eureka, then one student accounts for 1 percent or 2 percent.

20        So there's a good reason to do it, but I think we can

21   identify a way to aggregate the students differently.

22             THE COURT:  Okay.  Anything else on the performance?

23   No?  Okay.

24        You want to continue, Mark?

25             MR. MLAWER:  Yeah.  I'm just noticing it's 3:25.  You

1   had mentioned 3:30.  Should I plow ahead?

2              **THE COURT:**  Let's do one more.

3              **MR. MLAWER:**  Okay.  The next one is preschool

4   achievement.  This is on pages 9 to 12 of my report.  I

5   concluded non-compliant for this for two reasons.

6        The first reason, again, is no analysis of the performance

7   of subgroups.

8        And the second reason concerned the fact that, as far as I

9   could determine -- and I believe CDE has confirmed this now --

10  preschool achievement is only one element in preschool review

11  and in comprehensive review.  Therefore, since it's not

12  included in performance indicator review, a district, unless

13  it's selected for one of those two reviews, will not be

14  selected for poor performance, and therefore --

15             **THE COURT:**  Wait.  Can you say that -- sorry.  Can you

16  say that one more time?  It's only one element in preschool

17  review?

18             **MR. MLAWER:**  In the preschool matrix, it's one

19  element.  In the -- in comprehensive review, it is one

20  selection element.

21       In this system, as you remember, Judge, if you're not

22  selected for a monitoring process, then you are labeled "Meets

23  Requirements" unless additional information comes to light over

24  the subsequent year.  So, therefore, a district with very poor

25  performance among preschoolers can be labeled "Meets

1    Requirements."  That's the second reason.

2         THE COURT:  And preschool review has six elements.

3    Comprehensive monitoring has, like, 28 elements, we've learned.

4    Right?

5         MR. MLAWER:  Six elements, yes.

6         You will see on page 10 the two summary statements that

7    apply to the three domains; on the top of page 11, the three

8    domains or outcome areas.

9         THE COURT:  Okay.  And remind me.  What is CDE's

10   rationale for not including this -- not having performance

11   indicator review for this?

12        MS. DUNCAN-BECERRIL:  Where we talked about the

13   preschool least restrictive environment, we made a policy

14   determination that we wanted to focus our efforts on that

15   instead of on this.  We believe if we can improve the placement

16   of students in a regular early childhood program, have more

17   students having access to regular early childhood programs, it

18   will improve the outcomes on this.  And then we can review

19   this, I think, later.

20        THE COURT:  So you're not arguing that this is not

21   something -- there's something about preschool assessment that

22   makes it not worthy of performance indicator review per se?

23   You're saying right now, as a matter of resources, it's not the

24   thing we want to be focusing on?

25        MS. DUNCAN-BECERRIL:  That's correct.

PROCEEDINGS

1          **THE COURT:**  Whose resources are you concerned about in

2   connection with this decision?

3          **MS. WRIGHT:**  I think it's fair to say that we are --

4   we've put quite a bit of resources both towards training the

5   field and getting everyone up to speed, both across the general

6   ed preschool providers and special ed, around quality; doing,

7   like, a lot of train-the-trainer models about how do we get

8   quality across preschool.

9          As you know, California does not have a universal

10  preschool program across the state.  And I think we've

11  struggled as a state around including preschoolers with

12  disabilities.

13         Shiyloh shared the data with you earlier about the fact

14  that we went down in terms of access to preschool.

15         And so we just believe that the indicator we should be

16  focused on right now is getting kids access to those inclusive

17  high-quality preschool environments, which is where we've put a

18  lot of State time and effort.  And so we're not saying it's not

19  important.  We're just saying that we believe that the most

20  important thing currently is that we focus on getting kids into

21  those inclusive environments with their general ed peers,

22  particularly since what we're measuring here is

23  social/emotional development and developmental milestones,

24  which research has shown is significantly increased when you're

25  with your general education peers and have higher expectations.

1        **MR. MLAWER:**  I take it that the implication of this is

2   something that you're comfortable with?  After all, we have,

3   you know, six areas.  A district cannot meet any of those areas

4   and failed to do so by a very wide margin.  And unless it's

5   selected for preschool review or comprehensive review or one of

6   the other forms of review, it can be labeled "Meets

7   Requirements," despite that very, very poor performance.

8        You're comfortable with that implication?

9        **MS. WRIGHT:**  I'm not sure I would agree with your

10  whole assertion.  That was kind of long.  So do you want to

11  repeat that?

12       **MR. MLAWER:**  I don't want to, but I will.

13       In this system of making annual determinations, as I

14  understand it, the only way you're eligible to be labeled

15  "Meets Requirements" is if you're not selected for a monitoring

16  process.

17       Given, then, that preschool outcomes are one element in a

18  matrix for preschool review and one selection element among

19  many for comprehensive review, if a district is not selected

20  for either of those and is not selected for your other reviews,

21  that district can be labeled "Meets Requirements" --

22  correct? -- despite the fact that it might have very poor

23  performance on all six of these areas?

24       **THE COURT:**  All six of these areas?

25       **MR. MLAWER:**  Yes.

1        **THE COURT:**  I thought it was three areas.

2        **MR. MLAWER:**  Three areas, but two summary statements.

3        **THE COURT:**  Okay.  All right.

4        **MR. MLAWER:**  So we don't usually think about meeting

5   requirements in terms of very, very poor performance, which is

6   what this example indicates.

7        **MS. DUNCAN-BECERRIL:**  So in terms of how we've decided

8   to identify what we do for monitoring for preschool, we have

9   decided in -- for the performance indicator review, we are

10  looking right now at preschool least restrictive environment.

11       **MR. MLAWER:**  I understood that, and I don't think

12  anyone really disputes the reasoning that led you to emphasize

13  the LRE aspect of this.  I'm asking a different question.

14      There is an implication, in the hypothetical I just

15  offered you, that the district I described can be labeled

16  "Meets Requirements," and that was the last piece of the

17  judge's Phase 2 order.  So I'm asking you if you recognize that

18  and are comfortable with it.

19       **MS. DUNCAN-BECERRIL:**  I recognize that that is the

20  outcome of this -- the way that we are doing things.

21      I think you can speak to the rest of it.

22       **MS. WRIGHT:**  In an ideal world, no.

23       **THE COURT:**  So I guess maybe one of the questions is:

24  Are there districts out there that are doing really poorly on

25  preschool achievement that are not getting any kind of

**PROCEEDINGS**

```
1   monitoring because we don't have performance indicator review

2   for this indicator?  There must be a way to analyze that,

3   figure that out.

4        MS. DUNCAN-BECERRIL:  Yeah.  I can identify those

5   instances.  Are you talking about not meeting any of the

6   targets or being very, very low?  And is it -- I mean, so the

7   target right now is -- you're talking about just the numbers

8   who are below the target?  Are you talking about one or two

9   standard deviations below the target?

10       THE COURT:  The answer for me is, I don't know.  I

11  mean, I'm thinking of it in more general terms, which is, if a

12  district is doing really badly on preschool performance,

13  whatever is a reasonable way to measure "really badly,"

14  preschool assessment -- preschool achievement -- sorry.

15  I guess that's the term; right?  "Preschool achievement" -- the

16  absence of performance indicator review, does that create a

17  real risk that it might not be undergoing any preschool review?

18  I mean, I would think that you would be able to look at your

19  districts and figure that out.  Right?

20       MR. MLAWER:  I have the --

21       THE COURT:  Rank them in terms of preschool

22  achievement and see what other kind of review they're getting.

23       MS. DUNCAN-BECERRIL:  So what we can provide you --

24  and we're running a whole 'nother set of analysis for

25  tomorrow -- is to determine -- we can see if there are
```

1   districts that are not in another monitoring activity but are

2   not meeting their targets.

3       We may want to take into, of course, account size.  We

4   don't apply necessarily a minimum n-size criteria here.  So

5   something to consider as well, considering we do have many,

6   many LEAs that have very few children with disabilities.  But

7   it's something we can look at.

8       **MR. MLAWER:**  Judge, I'll call your attention to the

9   second-to-last paragraph on page 11 of my report where I have

10  the overall numbers of districts not meeting the targets in

11  these six areas.  And they range from a low of 71 to a high of

12  156.

13      This is according to your December submission, one of the

14  attachments to your December --

15      **MS. DUNCAN-BECERRIL:**  156 -- I'm sorry.  I didn't

16  understand what the range was.  I thought you said it was a

17  percentage.

18      **MR. MLAWER:**  No.  The -- are you looking at that

19  particular page?  You can look at it along with me.  Page 11.

20      **MS. DUNCAN-BECERRIL:**  11.  Yes.

21      **MR. MLAWER:**  Okay.  The last -- second-to-last

22  sentence of the second-to-last paragraph.

23      ". . . the number of districts not meeting each of

24      the six preschool outcomes targets was . . . ."

25      **MS. DUNCAN-BECERRIL:**  Uh-huh.

1        **MR. MLAWER:**  And then the list.

2        **THE COURT:**  Is that a typo?  Does it mean to say not

3   meeting one of the six?

4        **MR. MLAWER:**  No.  Each of the six.  So "respectively"

5   is the word I should have added here.  This is from -- for some

6   reason, the cita- -- it looks like it's Document Number -- no,

7   that's incorrect.

8      I don't seem to have the citation in the text here to that

9   particular exhibit of yours.  But you had one exhibit in

10  December that set forth --

11       **THE COURT:**  Yeah, I think you do.  It says "Docket

12  Number 2455-14" there in the parenthetical.

13       **MR. MLAWER:**  No.  That's setting forth the number of

14  districts selected for each review.

15       **THE COURT:**  Oh, okay.

16       **MR. MLAWER:**  This was a different document.  I think

17  it was Attachment K perhaps.  I don't know.

18       **THE COURT:**  But just from a standpoint of

19  understanding the sentence, why would there be six different

20  numbers for the number of districts not meeting each of the six

21  preschool outcomes?

22       **MR. MLAWER:**  In other words, for the first one of the

23  six, it's the first number; the second one of the six, it's the

24  second number.

25     I would have been better served here with a table to set

**PROCEEDINGS**

1    this forth, but that's not what I did.

2          **THE COURT:**  So, in other words, 115 districts didn't

3    meet the first preschool outcome target?

4          **MR. MLAWER:**  It's, frankly, whatever was first listed

5    in that particular exhibit.

6          **THE COURT:**  Right.  And 149 didn't meet the second.

7       But it is not -- so we don't know how many failed to meet

8    all six?

9          **MR. MLAWER:**  No.  That information was not included.

10      Oh, here it is.  It's Attachment K, Document 2455-12.

11         **THE COURT:**  The one thing that would be interesting to

12   know is how many of those targets are they missing.  I assume a

13   lot of those districts are missing multiple targets.  They're

14   not just missing one of the six.

15         **MR. MLAWER:**  The work we did on comprehensive review

16   suggests that that's the case.

17         **THE COURT:**  That there's going to be a lot of overlap

18   among these six numbers.  And then the question is:  These

19   districts who are meeting multiple targets, like, are they

20   escaping monitoring entirely?  Are they escaping review

21   entirely?  Or is there something else happening?

22         **MR. MLAWER:**  But the hypothetical that I offered is of

23   no moment whatsoever if each one of those districts was

24   selected for something else.  If it was selected for something

25   else, it cannot be "Meets Requirements."  So that would meet

1   this potential problem I'm pointing to, if that's the case.

2          **THE COURT:**  Yeah.  But, so that's one -- it can't be

3   labeled "Meets Requirements."  But then there's an additional

4   question of:  Whatever monitoring that it's undergoing, does

5   that get at the problem that emanates from the low preschool

6   achievement numbers?

7          **MR. MLAWER:**  Yes, that's a different question.  And to

8   the extent these districts were not selected for either

9   preschool review or comprehensive review, it would appear to be

10  the case the answer is "no."

11         **THE COURT:**  Well, except some other performance

12  indicator review might indirectly get at it.

13         **MR. MLAWER:**  Yes.  School-age achievement, for

14  example.  If the strategies that were adopted by a district

15  also affected preschoolers, then, yes, it could.

16         **THE COURT:**  So why don't we see what you can come up

17  with to explain that.

18         **MS. DUNCAN-BECERRIL:**  There's 224 LEAs that did not

19  meet one or more of the targets for Indicator 7.  I can

20  identify how many of those are involved in monitoring

21  activities and for what activity.

22         **THE COURT:**  Okay.  Yeah, that might be helpful.

23      Okay.  I would suggest that we call it a day now.

24         **MR. KOSKI:**  Judge, I do have one question on this,

25  just to make the record, and then we can wrap this up.

1          THE COURT:  Go ahead, yeah.

2          MR. KOSKI:  It's a question that I'll ask a couple of

3  times.

4      But I'm just curious how you set the targets for each of

5  the summary statements.

6          MS. DUNCAN-BECERRIL:  Oh, okay.  Yes.  This has a

7  handout.  So --

8          THE COURT:  You say "how you set the targets for each

9  of the summary statements."

10         MS. DUNCAN-BECERRIL:  So you're asking --

11         THE COURT:  You're talking about for preschool

12  achievement?

13         MR. KOSKI:  Correct.

14         THE COURT:  Okay.

15         MS. DUNCAN-BECERRIL:  So how the targets are set or

16  how we identify the cutoffs?

17         MR. KOSKI:  The cutoffs.

18         MS. DUNCAN-BECERRIL:  Because the question I think you

19  had in the --

20         MR. KOSKI:  The cutoff.

21         MS. DUNCAN-BECERRIL:  -- submission was around the

22  cutoffs --

23         MR. KOSKI:  Correct.  Yeah.

24         MS. DUNCAN-BECERRIL:  -- the standard deviation.

25      So we used a mean.  When we normed the Desired Results

1    Developmental Profile 2015 -- that's the assessment we use --

2    we identified a sample of 15,000 children that we used to norm

3    the assessment.  And so for each age group, we identified what

4    the mean was for all children, so what we -- for all children,

5    and then children without disabilities.  And then we identified

6    the standard deviation.

7         And so one of the things to clarify is, when you have

8    between the -- if a student falls between the mean and 1.2

9    standard deviations, we consider them within expectations.  If

10   they're between 1.2 -- or if they're greater than 1.2 and two,

11   the student is meets -- is near expectations.  And beyond two

12   standard deviations, they are considered not meeting

13   expectations.

14        So what happens when we do the indicator is that we

15   identify the children who fall into one of the five categories.

16   Students -- so what happens is, the student, when they enter

17   the preschool program, they receive an assessment; and then

18   whenever they leave the preschool program -- either they age

19   out or they no longer are eligible under IDEA so they're not in

20   the preschool program or they leave -- they are given another

21   assessment.  And so what happens is they compare the two

22   assessments.

23        Our contractor who administers the Desired Results

24   Developmental Profile identifies if the student did not improve

25   functioning; whether the student improved functioning but not

**PROCEEDINGS**

1   sufficient to move into a different category; if they moved --

2   improved functioning to a level near meeting requirements; and

3   then who improved functioning comparable to their same-age

4   peers; or if they just maintained functioning.

5        And so we look at how that's calculated.  I believe that's

6   also in the Monitor's report.  It identifies those two

7   calculations that are done.

8        But the cutoffs are made based on our norming of the

9   assessment in 2015 that looked at students who were between the

10  mean and 1.2 standard deviations as meeting expectations,

11  greater than 1.2 standard deviations and two standard

12  deviations as near expectations, and greater than two standard

13  deviations as not meeting expectations.

14       And those vary by age as well.  So there's a different

15  cutoff score for those two standard deviations based on age.

16            **THE COURT:**  If there are further questions about that,

17  I think we should really hold them off until next time because

18  the court reporter has been going --

19            **MS. DUNCAN-BECERRIL:**  It's getting very statistic-y.

20            **THE COURT:**  -- two hours and 15 minutes now.

21            **MR. KOSKI:**  That's fine.  There will be further

22  questions.

23            **THE COURT:**  So we can pick up right where we left off

24  on Wednesday morning.  And 9:30?  Does that work for everybody?

25  Is that the plan, 9:30?

**PROCEEDINGS**

1    Okay.  Good.  We'll see you at 9:30 on Wednesday morning.

2   Thank you.

3          **THE CLERK:**  Court is adjourned.

4              (Proceedings adjourned at 3:45 p.m.)

5                       ---o0o---

6

7              <u>CERTIFICATE OF REPORTER</u>

8        I certify that the foregoing is a correct transcript

9   from the record of proceedings in the above-entitled matter.

10

11  DATE:   Thursday, May 16, 2019

12

13

14

15

16   _____

17

18        Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
              Official Reporter, U.S. District Court

19

20

21

22

23

24

25