UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA

EMMA C., et al,                    )
                                   )
                                   )
          Plaintiffs,              )
                                   )
  vs.                              ) No. C 96-4179 VC
                                   )
TOM TORLAKSON, et al,              )
                                   ) San Francisco, California
          Defendants.             ) Friday
                                   ) May 31, 2019
_____   ) 9:30 a.m.

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**Court Monitor:**          **MARK MLAWER**
                           Office of the Court Monitor
                           PO Box 51170
                           Palo Alto, California 94303


**For Plaintiffs:**         STANFORD LAW SCHOOL
                           Youth & Education Law Project
                           559 Nathan Abbott Way
                           Stanford, California 94305
                    **BY:  WILLIAM KOSKI, ESQ.**


**For Plaintiffs:**         NATIONAL CENTER FOR YOUTH LAW
                           405 14th Street
                           15th Floor
                           Oakland, California 94612
                    **BY:  FREYA E.K. PITTS, ESQ.**
                           **LEECIA JO WELCH, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
          *Official Reporter - US District Court*
          *Computerized Transcription By Eclipse*

```
 1   APPEARANCES:   (CONTINUED)

 2

 3   For State Defendants:    OFFICE OF THE ATTORNEY GENERAL
                              Civil, Health, Education and
                                 Welfare Section
 4                            1300 I Street
                              Suite 125
 5                            Sacramento, California 95814
                      BY:    DARRELL WARREN SPENCE, ESQ.
 6                           KIRIN KAUER GILL, ESQ.

 7

 8   For Defendant           OFFICE OF THE SAN MATEO COUNTY COUNSEL
     Ravenswood U.S.D.:       Hall of Justice and Records
 9                            400 County Center
                              Sixth Floor
10                            Redwood City, California 94063
                      BY:    AIMEE B. ARMSBY, ESQ.
11

12

13   Also Present:           SHIYLOH DUNCAN-BECERRIL

14                           KRISTIN WRIGHT

15                           STACEY WEDIN

16                           SUSAN WAGNER

17                             _   _   _

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **FRIDAY - MAY 31, 2019**                    **9:41 A.M.** |
| 2 | P R O C E E D I N G S |
| 3 | **THE CLERK:**  Now calling Case 96 CV 4179, |
| 4 | Emma C. et al versus Thurmond, et al. |
| 5 | **THE COURT:**  Does somebody want to make their |
| 6 | appearances? |
| 7 | **MR. SPENCE:**  Good morning, Your Honor. |
| 8 | Darrell Spence on behalf of the California Department of |
| 9 | Education, the State Board of Education, and the Superintendent |
| 10 | of Public Instruction. |
| 11 | **THE COURT:**  All right. |
| 12 | **MS. GILL:**  Good morning, Your Honor.  Deputy Attorney |
| 13 | General Kirin Gill for the State defendants. |
| 14 | **THE COURT:**  Good morning. |
| 15 | **MS. ARMSBY:**  Good morning, Your Honor.  Aimee Armsby, |
| 16 | Deputy County Counsel, for the Ravenswood School District and |
| 17 | for related defendants. |
| 18 | **THE COURT:**  All right. |
| 19 | **MR. KOSKI:**  Good morning, Your Honor.  Youth and |
| 20 | Education Law Project, my name is Bill Koski and we're with the |
| 21 | plaintiffs. |
| 22 | **THE COURT:**  All right. |
| 23 | **MS. WELCH:**  Good morning, Your Honor.  Leecia Welch |
| 24 | for the plaintiffs. |
| 25 | **MS. PITTS:**  Good morning, Your Honor.  Freya Pitts |

1   also for the plaintiffs.

2          THE COURT:  Good morning.

3      And good morning to the policymakers.

4          MR. SPENCE:  And, your Honor?

5          THE COURT:  Yes.

6          MR. SPENCE:  May I be heard?

7          THE COURT:  Oh, yes.

8          MR. SPENCE:  Ms. Greenwood is not here.  You might be

9   able to tell.  We have Stacey Wedin in her place.  And

10  Ms. Wright can explain a little bit of the background,

11  foundation about what that is and who she is.

12         THE COURT:  Go ahead.

13         MS. WRIGHT:  Good morning.  So Allison Greenwood will

14  not be working on this particular case anymore.  She will still

15  be working for the department, but for health reasons she is

16  stepping away from the case.

17     And we have Stacey Wedin, who is a policy consultant in

18  the director's office in the Special Ed Division, who has a

19  deep history and knowledge of not only this case but of special

20  education and our processes in general, so I think she will be

21  an added bonus to this case.

22         THE COURT:  Okay.  Great.

23         MR. SPENCE:  And Ms. Wright, to be clear,

24  Ms. Greenwood is not just stepping from the case; is that

25  correct?

1           **MS. WRIGHT:**  Yes.  She's actually stepping down

2    from -- she's currently in an ed admin position with the

3    department.  She's going to be working in a consultant position

4    so that she can take more time for her own personal health.

5           **THE COURT:**  Please give her my best.

6           **MS. WRIGHT:**  Thank you.

7           **THE COURT:**  Is it "Wedin"?

8           **MS. WEDIN:**  Wedin, yes.

9           **THE COURT:**  Welcome to the party.

10       Okay.  Well, I think we should probably proceed more or

11   less in the format that we've proceeded in past hearings with

12   Mark presenting his findings and me likely peppering you with

13   questions while you're presenting your findings, and then we

14   can hear any response from the policymakers that you want to

15   give.

16       So go ahead, Mark.

17          **MR. MLAWER:**  Good morning, everyone.  Let me

18   introduce Dr. Susan Wagner, who is sitting at this desk over

19   here, to everyone.

20       Okay.  Starting with comprehensive review selection.  We

21   approach this, and the first table on my Page 2 shows the

22   distribution of these districts based on CDE's comprehensive

23   review selection formula.  So we broke it out into brackets.

24   You have scoring below 62 percent and selected.  Scoring below

25   that level and not selected.  62 to 64.99.  65 to 69.99.

1    70 plus.  And those districts that were not scored by CDE.

2           THE COURT:  I'm sorry to interrupt so quickly, but

3    the question that jumped out at me when I read this was I

4    couldn't remember there being a category of districts that fell

5    below 62 percent on the score for comprehensive review

6    monitoring that didn't actually get -- weren't actually

7    selected for comprehensive review monitoring.  So I was

8    confused by that grouping to begin with.

9           So what do we know and what do we not know about that

10   grouping?  Where does that come from?

11          MR. MLAWER:  CDE has stated in its February response

12   that those 69 districts were first year charter schools.

13   However, some of them have dashboard scores, which -- and to

14   get a dashboard score you need to score the prior year.

15          So that doesn't make full sense to me, so if I can turn to

16   the CDE staff and hear your response to that.

17          MS. DUNCAN-BECERRIL:  Sure.

18          So the way that we calculate data based on information for

19   charter schools is based on what's called a County District

20   School code.  That County District School code is assigned to

21   districts and charter schools when they apply to be a school.

22          Now, one of the things that happen is districts will get a

23   new CDS code when there is a change --

24          THE COURT:  A new what code?

25          MS. DUNCAN-BECERRIL:  County District School code.

1       **THE COURT:**  Got it.

2       **MS. DUNCAN-BECERRIL:**  So, for example, there are

3   seven Washington Unified School Districts in California.  So we

4   can't use the name Washington Unified to differentiate them.

5   What we use instead is the -- is a code that's assigned to

6   them.  It's a seven-digit code.

7           Now, that code can change from year to year if there are

8   significant changes to the school itself.

9           For example, they add additional grades or they split

10  apart or they combine.  So if it was two schools and they

11  combine into one, then they get a new school code.

12          So the way that we look at it for students with

13  disabilities is they report to us what the school code is and

14  we match it to that data for that school code, and if it

15  changes, then we don't have data for the previous year for

16  them.

17          So that's why you would have districts who would be first

18  year charter schools who may have had data on the dashboard

19  that was based on a different population the previous year.

20          So, for example, an elementary school charter would become

21  a K-8 charter or a K-12 charter, but the previous year's

22  dashboard would have been based on K-6.

23      **THE COURT:**  Okay.  So these 69 districts that are

24  listed here as below 62 percent, 62 percent is the score --

25  that's the cutoff for the score that gets you into

comprehensive monitoring.

    **MS. DUNCAN-BECERRIL:**  That is correct.

    **THE COURT:**  And it was 65, and then you -- when you ran it at 65, that gave you too many districts and you didn't have the resources to subject all those districts to comprehensive monitoring, so you lowered the score to 62.

    **MS. DUNCAN-BECERRIL:**  That is correct.

    **THE COURT:**  Okay.  But then there are still these 69 districts that got a score below 62 that didn't get put into comprehensive monitoring.  And that was the part that confused me.  I didn't remember that.  It may be that I have been doing too much other stuff between the last time we met and now, but when I saw that, I said, wait a minute.

    I didn't know that there were school -- that there were districts that got a score of below 62 percent and didn't get put into comprehensive monitoring.  So who are those districts?

    **MS. DUNCAN-BECERRIL:**  They are all charter schools. And they would have not been charter schools that were acting as a district last year.  So one thing to keep in mind --

    **THE COURT:**  But then how did they get a score of below 62 percent?

    **MS. DUNCAN-BECERRIL:**  Because they had dashboard data.  So every school and district -- so my son's school, Natomas Park Elementary, it gets a dashboard.  But it's part of a district, Natomas Unified.  And so the district gets a

dashboard that includes Natomas Park Elementary, but Natomas
Park Elementary also gets a dashboard.

When we moved to -- when we moved to breaking out all
charters, which happened in 2019, '20 -- I believe we spoke
about this. I don't know if you want me to repeat it.

THE COURT: I remember that you -- I remember the
whole concept of breaking them out.

MS. DUNCAN-BECERRIL: So we broke out all these
charters, and in special education data the previous year, they
were all included with their authorizer. So we didn't break
out and recalculate. That's why they didn't have enough data
in the previous year's data.

THE COURT: So is the upshot, then, that in your --
in your system, those 69 schools are classified as having a
score below 62 percent, but that's actually meaningless because
it involves a comparison to a dashboard from the prior year
that reflects the entire district rather than the charter
school?

MS. WRIGHT: Well, the special education data would
have been included inside of the district data the previous
year and not broken out for that charter school. They didn't
have previous year charter school special education data for
least restrictive environment, least restrictive environment
for preschoolers, assessment for preschoolers.

THE COURT: The only thing I'm -- the thing I'm

trying to figure out is why, then, do they have a score of

below 62 percent?

        **MS. DUNCAN-BECERRIL:**  Because the score was based

solely on the three charter school elements, the three -- I'm

sorry -- dashboard elements.  Because as a school, they had a

dashboard last year.

        **THE COURT:**  As a school, they had a dashboard last

year?

        **MS. DUNCAN-BECERRIL:**  So next year -- so if we just

sort of, like, play this out a little bit.

    Next year they will have two years of scoring, and if they

do not improve, if they continue to struggle, they would be

caught up in the scoring for comprehensive review.  It's just

last year their data was inside of their authorizer's data, and

to break that out is very complicated.  And so we treated them

as this is the first year we're measuring them as a charter

school by themself.

        **THE COURT:**  But if you're measuring them -- if so

much of the analysis for whether a district goes into

comprehensive review is based on a comparison between how they

did this year and how they did last year, and if you don't have

the ability to run that comparison for these broken-off charter

schools, then how did they get -- how did they end up with

scores of less than 62 percent?

        **MS. DUNCAN-BECERRIL:**  So there is 28 elements within

the comprehensive scoring methodology that we use. Not every
single one of them uses the previous score from the previous
year.

    And on top of that, there are -- they did have a
dashboard. So they had those three dashboard elements. So
they likely were -- they based -- their scoring was based on
very few elements.

    **THE COURT:** Okay. And then -- so then -- I know this
came up last time, but in light of the fact that they had
scores that were below 62 percent, what was the reason for not
putting them into comprehensive review?

    **MS. DUNCAN-BECERRIL:** Because they were first year
charter schools. Because they were -- it was the first year we
have ever monitored them as -- as their own entity. We have
never ever monitored them as their own entity. We've only ever
monitored them as part of their school -- their authorizing
school district.

    **THE COURT:** So the score that was -- the score of
below 62 percent that was attached to that charter school
doesn't -- essentially doesn't mean anything, it sounds like
what you're saying.

    **MS. DUNCAN-BECERRIL:** Currently yes. Or it's based
on very few elements. So obviously those districts are in PIR.
And if they continue to have poor performance, they would be in
CR next year.

1    This happens, like, if you open -- if you open a charter

2    school today, then you wouldn't have data in the previous year.

3         **THE COURT:**  Right.

4         **MS. DUNCAN-BECERRIL:**  So you would -- we wouldn't be

5    able to measure you this year.  It's the same --

6         **THE COURT:**  I get all -- I get all that.  The part

7    that threw me off is I guess I would have expected all of those

8    schools to have, instead of to have -- expect -- instead of

9    them having a percentage score based on the comprehensive

10   review criteria, I would have expected there to be a "not

11   applicable" in that box.

12        **MS. DUNCAN-BECERRIL:**  So for the majority of the

13   elements that they were chosen for, they have a "not

14   applicable" in those elements.

15        So of the 28 elements that are used, for the majority of

16   them they have a score of "not applicable."  And then when, in

17   the CR data analysis we provided that to the Monitor as well,

18   there is a flag that says "Selected for CR:  Yes, no."  And

19   that is -- so we get the scores and then we look at the

20   charter -- we look at all the districts and we determine what

21   the cutoff is going to be and then also are there first year

22   charters.  And that's what flags that "Selected for CR:  Yes,

23   no."

24        **THE COURT:**  Okay.  Which -- and the -- and what

25   that -- what that essentially means -- correct me if I'm wrong,

1   but I think what that essentially means is that for those

2   schools, for those charter schools, whatever percentage they

3   were assigned, 62 percent, 50 percent, 20 percent, it's a

4   meaningless number because the -- the true analysis for the --

5   the true analysis for eligibility for comprehensive review

6   isn't actually being conducted.

7           **MS. DUNCAN-BECERRIL:**  Not yet.  That is correct.

8       And so it should also be clear when we start with the data

9   analysis, we don't start at the district level.  We start by

10  aggregating at the student level.

11      So we don't necessarily know, you know, this

12  Student 52471689 goes to this school and we do it that way.

13  That all comes afterwards.  We sort of pull all the district

14  data together, then we run the analysis, and then we identify

15  the factors that may exclude a district or a charter school

16  from CR monitoring.

17          **THE COURT:**  Okay.  Do you have any other questions

18  about that?

19          **MR. MLAWER:**  Well, the 215 districts that did not get

20  a score in CDE's methodology, what kind of districts are those?

21          **MS. DUNCAN-BECERRIL:**  The majority of them are going

22  to be charter schools that did not meet the minimum in size

23  criteria for the calculation.

24          **THE COURT:**  And the minimum end size criteria for the

25  calculation, was it the same across criteria?

1          **MS. DUNCAN-BECERRIL:**  No.  For assessments and

2    suspension, it is 30; and for most of the other elements, it's

3    20.  We filed on the docket, and I can find it, the minimum end

4    size criteria for all the elements that were used.

5          **THE COURT:**  Okay.  But it was -- you said for

6    suspension and a couple others it was --

7          **MS. DUNCAN-BECERRIL:**  And assessment, it is 30.

8          **THE COURT:**  It is 30.  And for most of the others,

9    you said it was 20?

10         **MS. DUNCAN-BECERRIL:**  20, yeah.

11         **THE COURT:**  Okay.

12         **MR. MLAWER:**  Now, is that cumulative enrollment?  Or

13   end of year?

14         **MS. DUNCAN-BECERRIL:**  Well, it depends on the

15   indicator.  So the indicator uses different types of

16   enrollment.

17        For example, for the -- for assessment we use concurrent

18   enrollment, which means they had to have been enrolled between,

19   I believe it was December 1st and the start of the testing

20   period in order to be included.  And then -- the suspension

21   uses cumulative enrollment.  And then for least restrictive

22   environment, we use census enrollment.  Because you have to

23   ensure that the students that you have in the numerator are

24   also students that you would have in the denominator.

25         **THE COURT:**  So the -- the -- was it 215 districts,

1   did you say?  So those, those are going to be charter schools

2   and potentially also just really small school districts.

3           **MS. DUNCAN-BECERRIL:**  Yes.  And I hope that we will

4   be able to talk about that later.  I have a whole thing.

5           **THE COURT:**  Okay.  Go ahead.

6           **MR. MLAWER:**  Okay.  So we applied several different

7   methodologies to these districts.

8       The first concerned four selection indicators, and we

9   tried to focus both on the four indicator methodology and the

10  seven indicator methodology on those indicators that are

11  arguably more important than issues like timeliness, for

12  example.

13      So here on the table on my Page 3, you will see how this

14  worked out for -- including all districts, including those with

15  small end sizes.

16      So this methodology, if applied to the same data, would

17  not select any of the districts that CDE selected and the --

18  the vast majority of the districts that would be selected were

19  those that either scored 70 and above -- 70 percent and above

20  in CDE's methodology or had no score in CDE's methodology.

21      When we took the small ends out, and this is the top table

22  on the next page, the results are fairly similar, although this

23  method --

24          **THE COURT:**  Could I just ask a clarification question

25  about that?

1          **MR. MLAWER:**  Yes.

2          **THE COURT:**  You say, "When we took the small ends

3     out."  Your definition of taking -- your version of taking the

4     small ends out is different from their version of taking the

5     small ends out.

6          **MR. MLAWER:**  That sounds right.  Yes.

7          **THE COURT:**  You took out districts with fewer than

8     ten test takers.

9          **MR. MLAWER:**  Ten test takers on the ELA.

10          **THE COURT:**  Okay.

11          **MR. MLAWER:**  So here we picked up eight of the

12     districts that were selected by CDE.  Seven that were below

13     62 and not selected.  But the majority of these districts fell

14     elsewhere, 70 plus or no score would -- would be a majority of

15     the 101 districts that would be selected by this methodology.

16          We then moved to seven selection indicators by adding in

17     three additional least restrictive environment indicators, two

18     school age and one preschool.

19          The table below that on my Page 4 shows how that would

20     work out, which again did not pick up any of the districts

21     picked up by -- selected by CDE and the majority of the

22     districts picked up here again, the overwhelming majority were

23     either 70 plus or had no score.

24          Then again, taking out those with fewer than ten test

25     takers, here we picked up four of CDE's districts, but again

1    the majority were elsewhere, 70 plus and no score.

2         And then finally we developed a methodology that would use

3    all of the indicators that were in CDE's formula as we

4    understood it but did not count any improvement or regression

5    from the prior year.  So same indicators and a more static way

6    of looking at it.

7         Here we came closer to the districts that were selected by

8    CDE, picking up 21 of the districts that CDE selected.

9         But the majority of districts, the 100 districts that

10   would be selected by this methodology, were not selected by

11   CDE.

12        We then again took out those with fewer than ten test

13   takers and here came a little bit closer to CDE.  Picked up

14   23 of its districts, but the majority of the 92 districts that

15   would be selected with this methodology were not selected by

16   CDE.

17        So our conclusion here is basically what I just said.  And

18   considered in this -- in this -- these approaches, there are

19   significant number of districts that appear to perform worse

20   than those that were selected by CDE.

21        And that conclusion comes from first using formulas that

22   did two things:  Focused on the indicators that are arguably

23   most important and not include improvement or regression at

24   all.

25        The second focused on the same indicators and did not

1  include improvement or regression.

2      **THE COURT:**  So on that -- I have a number of

3  questions.  On -- so looking at the table at the bottom of your

4  Page 5.

5      CDE selected 34 total districts for comprehensive

6  monitoring, and you've got 100 districts in your low score

7  group, so that's a little bit apples and oranges; right?

8      And I guess my question -- I guess I would say this is a

9  question I have for this chart and for all of the charts, is --

10  it seems to me what happened -- what CDE did is they -- they

11  identified a universe of districts that were going to be

12  selected for -- that were going to be considered for

13  comprehensive monitoring.  And that universe did not include --

14  if I'm understanding all of this correctly, that universe did

15  not include the second group on your charts, the below

16  62 percent not selected for CR because those were all the

17  charter schools; right?

18      And the universe also did not include -- I'm less sure

19  about this, so I'm looking for confirmation.  The universe also

20  did not include districts that fell below a certain end size.

21  And the end size was -- was it one end size for purposes of

22  establishing the universe of districts that could be assessed

23  for possible comprehensive review?

24      **MS. DUNCAN-BECERRIL:**  No.

25      **THE COURT:**  It's the combination of all those end

1   sizes within your --

2           **MS. DUNCAN-BECERRIL:**  That is correct.

3           **THE COURT:**  Okay.

4           **MS. DUNCAN-BECERRIL:**  Again, because if you do a

5   numerator and denominator, you want to ensure that when you're

6   looking at the student -- so each individual indicator will

7   have a minimum end size because you want to ensure that the

8   numerator and the denominator are -- encapsulate the same

9   students.

10          **THE COURT:**  And so I -- I guess what I would -- I

11  mean, I think this analysis is helpful and it raises some --

12  you know, potentially raises some further red flags.  But I

13  would like -- the chart that I would like to see is a chart

14  identifying the same universe of districts that CDE considered

15  for -- as candidates for comprehensive review, comprehensive

16  monitoring; right?  So I think that -- what that would mean is

17  you would get rid that second group below 62 percent not

18  selected for CR.

19      We already know that it's -- you know it's a problem that

20  those -- those districts, those schools are outside the

21  universe.  We already know that; right?

22      And so the next question is, you know, what about CDE's

23  methodology for selecting the districts for comprehensive

24  monitoring that are within the universe of candidates for

25  comprehensive monitoring?

1          And the universe that they -- and it's also a problem, by

2     the way, that I think that districts that didn't meet the end

3     size, right, not the charter schools but other districts that

4     didn't meet the end size are automatically not candidates for

5     comprehensive monitoring.  That's another problem.  I think we

6     already know that that's a problem.  I think that they agree

7     that that's a problem; right?

8          So -- so it seems to me that to get a better assessment of

9     CDE's methodology for selecting schools for -- districts for

10    comprehensive monitoring, we should conduct an analysis using

11    your preferred criteria on -- and perform that analysis on the

12    same universe of districts that CDE was considering and then

13    say, okay, what's the comparison there?

14         Of the 34, you know, districts that CDE selected from that

15    universe, how many from that same universe would your

16    methodology have captured?  And how many -- you know, and which

17    other districts from that universe would your methodology have

18    captured?

19         And it seems to me that that's not in here.  I don't know

20    if it's from a lack of data or, you know, more data needs to be

21    turned over or what.  But I -- I think that's the analysis that

22    needs to be conducted if we want to get a better sense of

23    whether CDE's current methodology for flagging districts for

24    comprehensive monitoring is arbitrary or something close to

25    arbitrary.

1    **MR. MLAWER:**  So we would want to remove the

2    categories -- remove the 69 districts that were below 62 and

3    not selected and also remove the no score districts?

4    **THE COURT:**  I guess so.  The no score districts are

5    the ones that are either charter schools or school districts

6    that are very small.

7    **MS. DUNCAN-BECERRIL:**  Your Honor, if I may, I think

8    there is also concerns about end size, too, that we should

9    consider in the Monitor's analysis.  Because the worse

10   performing districts in the Monitor's analysis are very, very

11   small and were selected on very few items.

12   **THE COURT:**  That's why I want to do an apples and

13   oranges -- put the same --

14   **MS. DUNCAN-BECERRIL:**  I have a chart if you would

15   like to see the comparison.

16   **THE COURT:**  Sure.  But what I want -- what I want to

17   know is whether that comparison can be done.

18      So, you know, apples to apples in terms of -- do you have

19   the data now to do an apples to apples comparison in terms of

20   end size and in terms of eliminating these charter schools.

21   **MS. WAGNER:**  If I may speak?

22   **THE COURT:**  Of course.

23   **MS. WAGNER:**  So in order to eliminate -- so we know

24   those 69 were eliminated because they were first year charters.

25      None of the other groups, the other almost 2,000 districts

1   is --

2        (Court reporter clarification.)

3            **MS. WAGNER:**  So I would need to know for every

4   district in the dataset I was given which were first year

5   charters so I could just eliminate them entirely.

6            **THE COURT:**  Well, it seems --

7            **MS. WAGNER:**  Because in the other score groups that

8   we have, I'm assuming there would be first year charters in

9   those as well, that they are not just the 69.

10           **MS. DUNCAN-BECERRIL:**  We definitely have the

11  information.  I have to see -- I thought it was part of the

12  information that was requested.

13           **MS. WAGNER:**  And maybe I missed that column.  But in

14  looking at the data, we can figure out which were first year

15  charters because as we said earlier, they had scores on -- on

16  the dashboards.

17           **MS. DUNCAN-BECERRIL:**  We definitely have that data.

18  I can look back through it.  I don't have the exact dataset.

19  I'm trying to pull it up.

20           **THE COURT:**  But basically what -- what we would need

21  to take out is all the first year charters and all of the

22  districts, whether charters or school districts, that are below

23  the end size that the -- that the CDE used in eliminating

24  districts that were potential candidates for comprehensive

25  monitoring.

1      MS. DUNCAN-BECERRIL:  And that is in that data that

2  was provided to the Monitor.  Those districts are identified as

3  "NA," not applicable.

4      MR. MLAWER:  In which column?

5      MS. DUNCAN-BECERRIL:  Any of the "Target Met"

6  columns.

7      There is also -- yeah, any of the NA columns would be

8  there.  So anytime a district has in the targets where it says

9  "Target Met" or "Not Met," anytime there is an "NA," that would

10  identify them as being too small.

11      MS. WAGNER:  Yes, and so we took that into account

12  for our met indicator analysis.

13      THE COURT:  So what's the answer in terms of whether

14  we have the data now to run the kind of analysis that I would

15  like to see run?  Do we have that?

16      MS. WAGNER:  I -- I believe I still need a field

17  indicating first year charters.

18      MS. DUNCAN-BECERRIL:  We can give you that today.

19      MS. WAGNER:  Or I need to know which field you sent

20  me that would indicate that.

21      MS. DUNCAN-BECERRIL:  We can give that to you.  We

22  can provide that today.  I could find it on the break.

23      THE COURT:  Okay.

24      Mark, did you have -- I have been interrupting you a lot.

25  Did you have anything else that you wanted to say about this

1  piece of it?

2            **MR. MLAWER:**  No, Your Honor.

3            **THE COURT:**  Let me -- okay.  So you have a response,

4  and part of your response is in this chart.

5      I have a couple questions for you, but why don't you go

6  ahead and tell us.  Tell us what you want to tell us about this

7  chart.

8            **MS. DUNCAN-BECERRIL:**  Certainly.

9      So when we looked at the worst performing districts in

10  both of the seven method greater than -- or equal -- or greater

11  than 10 and the 22 method employed by the Monitor on greater or

12  equal than 10, we found -- when we compare the three worst

13  performing districts, we see something I find to be striking

14  because I think the end size is limited to 10.

15      And it is that our worst performing districts are Antioch,

16  Stockton, and Oakland with scores, I believe, in the 50's.  And

17  they have students with disabilities, populations 2300, 3500,

18  5100.  Whereas, the three worst performing districts in the

19  seven methodology have 12, 9, and 17 students and in -- the

20  22 factors has 34, 15, and 13.

21      In all but --

22            **THE COURT:**  Could I ask just one quick clarification

23  question about that?

24            **MS. DUNCAN-BECERRIL:**  Absolutely.

25            **THE COURT:**  For Shenandoah Valley, I thought that the

1  idea -- I thought that Mark was using the number 10 so that if

2  10 or more disabled students took the performance exam; is that

3  what it was?

4        **MR. MLAWER:**  We did it both ways.

5        **MS. DUNCAN-BECERRIL:**  So that's the census date.  So

6  when you look at the ELA test takers, that's why using a single

7  bar to select districts is kind of inappropriate.  So on

8  December 1st, they had nine students enrolled.  Their

9  cumulative enrollment throughout the year for that district --

10 give me one moment.

11     (Brief pause.)

12       **MS. DUNCAN-BECERRIL:**  So for Shenandoah Valley, their

13 cumulative enrollment was 10.

14       **THE COURT:**  Okay.

15       **MS. DUNCAN-BECERRIL:**  So they had a student that

16 wasn't either in -- in the school on December 1 or had left.

17       **THE COURT:**  Okay.

18       **MS. DUNCAN-BECERRIL:**  So sort of when we do the

19 comparison when I look at the students who were proficient in

20 ELA and math, only two districts on the Monitor's selection

21 criteria who are considered the worst are selected -- have a

22 lower proficiency rate than Oakland, Stockton, and Antioch.

23 And that's because they had zero students proficient.

24       **THE COURT:**  What about the four factors?  Did you run

25 it for the four factors?

1          MS. DUNCAN-BECERRIL:  So the four factors -- yes, I

2    have that data.

3          THE COURT:  What does that look like?

4          MS. DUNCAN-BECERRIL:  So again using the four

5    factors, the three districts, Edward B. Cole, Shenandoah

6    Valley, and PACE Academic -- Academy charter are the three

7    lowest performing districts.

8          THE COURT:  So the same for the seven factors?

9          MS. DUNCAN-BECERRIL:  Yes.  In part because I think

10   the three additional factors were not applicable to -- to

11   the -- to those three charters because they didn't have scores

12   in the previous -- they -- they didn't have scores.  They were

13   too small.

14         THE COURT:  Okay.  Well, I think this probably

15   highlights why -- I mean, again, we have the separate problem

16   about not, you know, considering smaller districts for

17   comprehensive review, and you said you wanted -- there is

18   something you wanted to say about that, and that's fine.  But I

19   think we already kind of established last time that that's a

20   separate problem.

21         But I think that the -- you know, we do need an apples to

22   apples comparison.  The universes need to be apples to apples

23   when we conduct the analysis for it to be helpful.  And so I

24   think we need to conduct that analysis.

25         Let me ask, though.

1          **MS. DUNCAN-BECERRIL:**  So, Your Honor, if it would be

2    helpful, our staff recreated the analysis done by the Monitor,

3    and I have staff currently now at my office awaiting any kind

4    of analysis that they want -- that you would like to be done.

5    They could be doing that analysis now if you prefer and we

6    could file it relatively soon.

7          **THE COURT:**  Yeah, but I would, also like you to

8    provide the data to Susie so that Susie can run it herself.  So

9    both of those things are fine.

10        But let me ask you:  The factors that Mark selected, the

11   four factors, the seven factors, do you agree that from a

12   standpoint of being concerned about whether a district is

13   providing an appropriate education to disabled kids that those

14   are probably the best four or seven factors to zero in on?

15        **MS. DUNCAN-BECERRIL:**  Those -- yes.  Those are

16   arguably the most important factors in terms of, you know,

17   gauging FAPE, or Free Appropriate Public Education.

18        You know, when we select districts for comprehensive

19   review, we look at a variety of elements, not simply one

20   element.  That is gauged in another monitoring activity, but --

21   because we look at districts who are most egregious in both

22   performance and compliance.

23        However, one of the things I had been thinking about

24   reviewing the data that we have and the concerns that have been

25   brought up here is one better method to doing this analysis, if

the Court feels like these are really important elements, and
we agreed, is to weight those elements. So still use the --
all 28 elements, but weight the assessment factors, the
suspension factors, and the -- the least restrictive
environment factors heavier. So that districts who are doing
very poorly there would be selected -- would be more likely to
be selected.

Another thought that I have had -- obviously I have been
spending an awful lot of nights reading these documents -- is,
you know, we really believe in improvement. And if -- if a
district is getting worse, that's the district we really want
to focus our resources on and not districts that are getting
better.

But one thing we could do that would, I think, help this
discussion that we have had move along is to instead of using
the targets, because I think there is some discussion about
what the targets are and how ambitious there are and that they
are going to change soon, is to look at sort of a quartile
scoring. Right? So we look at the lowest -- we look -- very
similar to the Monitor's approach, where he looked at the
most -- the poorest performing districts in those elements.

            THE COURT: Not just whether you met the target, but
how badly you missed it.

            MS. DUNCAN-BECERRIL: Yes. And whether or not you're
improving. So we could weight those elements. We could look

1    at their scores.  I think we could do that for comprehensive

2    review selection.

3         I think there still is value in looking at the targets

4    because we have to publish them.  For Performance Indicator

5    Review for districts who are not meeting those targets, we will

6    re-bench the targets.  We have talked about this before, but I

7    think that there is still value in that for Performance

8    Indicator Review.

9         But if we're talking about the most egregious districts in

10   the State, there is value to looking at maybe a quartile

11   approach and looking at improvement and weighting those

12   variables to ensure that we are identifying the most serious at

13   need districts.

14        **THE COURT:**  In terms of the targets, can you remind

15   me -- I know you told me this last time, but can you remind me

16   when the targets are going to be revisited?  Was it this fall?

17        **MS. DUNCAN-BECERRIL:**  Yes.

18        **THE COURT:**  Okay.

19        **MS. DUNCAN-BECERRIL:**  This fall we are going to start

20   to convene a stakeholder group to set the targets.

21        **THE COURT:**  And when will you expect new targets to

22   be set?

23        **MS. DUNCAN-BECERRIL:**  We will need to have them set

24   probably by the spring so that we can submit them to the

25   U.S. Department of Education so they can be used starting 2021

1   through 2026.

2          MR. MLAWER:  That's the February 1st submission -- is

3   it February 1st of the APR?

4          MS. DUNCAN-BECERRIL:  Yeah, for February 1st, 2020.

5          THE COURT:  When you say you have to submit them to

6   the Department of Education, U.S. Department of Education, they

7   have to sign off on the targets?

8          MS. DUNCAN-BECERRIL:  Yeah.  So they don't -- they

9   don't give us a stamp of approval.  They just say, you're

10  within compliance or they don't say anything.

11         THE COURT:  They don't object.

12         MS. DUNCAN-BECERRIL:  Only if they object if -- when

13  we make the changes, yes.

14         MR. MLAWER:  Did I also understand correctly from the

15  first two days of hearing that you -- hearings that you're

16  having another activity this summer concerning the small

17  districts?  Did I understand that right?

18         MS. DUNCAN-BECERRIL:  Yes.  Do we have time now to

19  talk about that?

20         THE COURT:  Yes.

21         MS. DUNCAN-BECERRIL:  I do have a handout.  And this

22  handout, I think, talks -- goes into some of the issues around

23  Inquiry 2 as well, because the majority of districts in

24  Inquiry 2 are very small.

25       So the National Center on Education Statistics recently

1    published a guidance document in 2017 that -- to help states --

2    to guide states on developing minimum end size criteria.  And

3    in ESSA, there is a requirement that states come together and

4    determine what a -- a minimum end size criteria is, submit it

5    to the U.S. Department of Education.

6         The Office of Special Education Programs has recognized

7    this as a concern, especially around disproportionality and has

8    actually set minimum end size criteria for states to be at and

9    has required an approval if they want to be -- have a lower

10   minimum end size or a greater minimum end size.  There are lots

11   of reasons why end size is an issue; right?  You get lots of

12   variability.

13        So this is a document we are preparing to work with

14   stakeholders on, but I added some information in here for this

15   case so you could see.

16        Remember, when you have an LEA with a thousand students

17   with disability, each student is .1 percent of the outcome.

18   So 40 students with disability with an academic performance of

19   one, that's the lowest academic performance, would be

20   400 students.  Whereas, if they have 10 students, then

21   40 students would be -- 40 percent would be four students,

22   right?  So do we select districts based on the outcomes of four

23   students or 400?  And that is kind of the concern.

24        And we can see this within the Monitor's selection

25   methodology.  When you -- even when you begin to apply -- when

1   you're not applying a minimum end size criteria, the number of

2   students served by those LEAs that were selected, the

3   101 selected is very small.  Even using the seven and four,

4   it's smaller.  But once you start adding 22 elements or adding

5   the minimum end size criteria that we applied for our current

6   method, the LEAs we selected covered 180,000 students.

7           So in effect, we could be working with districts to

8   improve the outcomes for 180,000 students versus 867.

9           One of the things that we were thinking about -- and this

10  is on the next page.  And I will file on the docket that

11  National Center on Education Statistics report so that you can

12  review it if you would like.

13          **THE COURT:**  Great.

14          **MS. DUNCAN-BECERRIL:**  But, you know, they say that --

15  you know, they talk about something called "meaningful

16  difference," which in statistics is when you're looking at a

17  difference between one district and another.  Is the difference

18  real or is it based on some sort of statistical anomaly?  Like

19  the student came to school that day and started the test and

20  then got sick and left or didn't want to take the test.  Does

21  that score weight more than -- is it equivalent to three or 400

22  students not doing well in LEA?

23          So we have been sort of playing around with this idea of

24  what it would look like in the beginning to do some models

25  about what it might look like.

So one option I had briefly discussed the last time we were here was around grouping districts that are small together by county and then running all the analytics by that county and determining is the county, all the small districts in that county doing poorly and then identifying whether it's a school-based issue. So are there a lots of students at one school doing poorly, or is it a county-wide issue? And then selecting either counties or districts based on those elements.

I honestly believe in my professional opinion that even a minimum end size in terms of doing all the calculations, grouping districts together who have a student with disability population of 100 or less is a good practice. Because, really, that -- at that point then each student counts for 1 percent of the outcomes. And it's not sort of a weighted percentage for each student.

So we did model this for a couple of indicators by county --

**THE COURT:** So just to make sure I understand that, that last point. You're saying that any -- you want -- when you're analyzing a group of students, you want it to be a group of students that is at least 100.

**MS. DUNCAN-BECERRIL:** Yes.

**THE COURT:** So if there is a district that has fewer than 100 disabled students, you're going to want to combine that with somebody -- your view is that that should be combined

```
1    with some other district or something --
2              MS. DUNCAN-BECERRIL:  Yes.
3              THE COURT:  Okay.
4              MS. DUNCAN-BECERRIL:  Because then they are not
5    overly weighting the percentage -- the totality of the
6    percentage.  You get less variability.
7         And we modeled this for a couple of counties, Humboldt
8    County and Tulare County.  Each of them have 17 LEAs, fewer
9    than 100 -- Humboldt has 17, and Tulare has 22.  Their
10   proficiency rate is 34 versus 5.78 for ELA.  20 percent versus
11   5.2 for math.  A suspension rate of 2.89 or 4.95, so it's
12   greater than the State target.  Still, students with
13   disabilities combined, greater than 100.  And a total
14   enrollment, typically greater than a thousand.
15        So as you can see here, this shows -- like, Humboldt,
16   there seems to be some good progress here.  Whereas, Tulare
17   should be looked at more closely.
18             THE COURT:  And this is -- the proficiency rates are
19   proficiency rates among disabled students?
20             MS. DUNCAN-BECERRIL:  Yes.  And students who had
21   concurrent enrollment.
22             MR. MLAWER:  The students with disabilities column
23   for Humboldt, that is across the 17 constituent district.
24             MS. DUNCAN-BECERRIL:  Yes.  Uh-huh.  And that's a --
25   that's a census count.
```

1          Another option would be to look at this same kind of data

2    by SELPA, which is Special Education Local Plan Area.  I will

3    tell you that one concern I have is we have charter local plan

4    areas, and we have one charter SELPA that has 500 charters.

5          So it kind of grouped them all together.  I don't know if

6    that would be -- and they are all over the State.  So I don't

7    know if you would take into account regional differences and

8    things like that.

9              MR. MLAWER:  Is it your expectation, then, that the

10   department will have an approach designed by the end of the

11   summer?  Is that correct?

12             MS. DUNCAN-BECERRIL:  Absolutely.  I believe we have

13   to have something by the end of the summer so that we can apply

14   it for the 2019, '20 monitoring year.

15             MR. MLAWER:  Okay.

16             THE COURT:  So you'll have an approach -- this sort

17   of gets into a question that I wanted to ask you all.

18         So you'll have an approach on end size by the end of the

19   summer.

20             MS. DUNCAN-BECERRIL:  Uh-huh.  Yes, sir.

21             THE COURT:  And you'll have new targets by next

22   spring.

23             MS. DUNCAN-BECERRIL:  Yes, sir.

24             THE COURT:  Is that right?

25             MS. DUNCAN-BECERRIL:  Target setting tends to take a

little bit longer because each indicator will have its own

target.  And so what typically happens is we bring some models

to stakeholders and then they say, "Well, we would like to see

this" or "We would like to know this" or "What about this kind

of thing?"  We do it again.  And we sort of whittle it down.

So it's over several meetings.  And I think we have agreed

that we want the stakeholder group to be broad, to include

parents, school administrators, teachers, advocates, to be part

of that process.  And so that takes time to schedule the

meetings.

**THE COURT:**  I gather if the plaintiffs want to be

folded into that process, they can be?

**MS. DUNCAN-BECERRIL:**  Absolutely.  Absolutely.  We

would welcome that.

**THE COURT:**  And so the -- the question I have, and

you may want to give this a little bit of thought over the

break.  You know, for Phase 1, what I essentially concluded was

that the State passes, quote/unquote; right?  There are some

problems that need to be cleaned up, but we can move on to

Phase 2.  The State passes.  And with respect to the problems

that were identified, we can kind of circle back at the --

towards the tail end to -- for the State to establish how it's

cleaned up those problems.

It seems to me that for Phase 2, the State is going to

fail, and the problems with respect to data analysis are much

1    more fundamental and kind of widespread than at Phase 1.

2         And so it seems to me that we probably are not in a

3    position to say, okay, here are some aspects of it that are

4    okay.  Here are some aspects of it that are problematic.  We'll

5    move on to Phase 3 now, and you'll circle back to us to tell us

6    how you dealt with the problems on Phase 2.

7         I don't think that -- I don't think that's going to work;

8    right?  I think -- we're going to need to figure out a time for

9    you all to come back to us and explain how all of these

10   problems have been fixed.

11        And so, you know, one question is:  What is the ideal time

12   to do that?  And the next question -- and maybe you need to see

13   my ruling before you can answer that question, but the -- you

14   know, the other question is:  Should I be doing anything with

15   respect to Phase 3 before we have sort of -- before the State

16   has taken another shot at establishing compliance or before the

17   State has taken another shot at passing Phase 2.

18        And I guess I have -- my tentative inclination would be

19   that even though I'm very sensitive to how long this Consent

20   Decree has been in place and how long this Court monitoring

21   process has been in place, the -- it may not make sense for us

22   as part of this case to move on to Phase 3 until we've gone

23   back to the drawing board on Phase 2 and sort of tried again.

24        So that is my -- you don't have to say anything about that

25   now.  You can chat about that in -- you know, in the break or,

1   you know, you can even tell me that you don't want to sort of
2   offer a view on that today.

3        But, you know, the question that we're all going to have
4   to think about is, you know, if I issue a ruling which says no,
5   we can't -- no, you need to come back and show me how -- you
6   know, there needs -- to establish compliance with federal law,
7   there need to be dramatic changes with respect to data analysis
8   and you have to come back and establish that you've made those
9   changes or that you're well down the road of making those
10  changes before you can pass Phase 2, you know, how does that
11  implicate the timing of all of this?  That's the reason for the
12  question.

13       So that -- anything else that -- is there anything else
14  that anybody wants to discuss on the first point of Mark's
15  report before we go to the second point?

16       (No response.)

17            **THE COURT:**  Go ahead.

18            **MR. MLAWER:**  Okay.  Turning to the meets requirements
19  districts.

20       We started with 499 districts that met requirements,
21  preliminarily were labeled meets requirements by CDE.  We took
22  three of those districts out because they appeared to have
23  dashboard results that were red or orange, which doesn't make
24  sense.  We think, as I indicated in a footnote, that that's
25  probably a coding area, so we simply removed them from the

1   analysis so we can move on.

2       The first thing we noticed about these districts is that

3   they are very small.  Only seven of these districts had more

4   than 100 students with disabilities based on the end of year

5   information.  And 113 had between one and ten.  So the first

6   table that you see on my Page 7 shows the distribution, the

7   size distribution of these districts.

8       Now, the data that we had showed some concerns in many of

9   these districts.  So we started with districts that had a

10  zero percent proficiency rate in English language arts, math

11  and in both assessments.

12      So the first table does not exclude any districts.  So

13  you'll see that 61 of the districts had no proficiency rates at

14  all.  About half of the districts did not have zero percent in

15  either ELA or math.  But about 3-and-a-half percent had zero

16  percent proficient in ELA, almost 14 percent in math --

17          THE COURT:  I want to make sure you stated that

18  correctly.  So more than 50 percent of the districts had zero

19  percent proficiency in both --

20          MR. MLAWER:  No.

21          THE COURT:  -- English and math?

22          MR. MLAWER:  Had in neither English or math.  They

23  were above zero percent proficient in both.

24          THE COURT:  All right.

25          MR. MLAWER:  And about 18-and-a-half percent of the

1  districts had zero percent proficiency in both English language

2  arts and math.

3      We then excluded those districts where the proficiency

4  rates were based on fewer than ten test takers.  And that table

5  at the bottom of my Page 7 shows how those distributed.

6      So here about three-quarters of these districts did not

7  have a zero proficiency rate in either one of them, in either

8  English language arts or math.

9      About 7.3 percent of these districts had zero percent

10  proficiency in both ELA and math.  Almost 13 percent in math

11  only.  And almost 3 percent in English language arts only.

12      We next noticed that many of these districts were rated on

13  very few indicators for comprehensive review selection

14  purposes.  So you can see the distribution there on the chart,

15  the table on the top of Page 8.  So 143 of these districts were

16  rated on no indicators for -- for this particular purpose, for

17  CR selection purposes.  And you can see how it distributes

18  through the various options there.  But about 68 percent of

19  these districts were rated on five or fewer indicators for

20  purposes of comprehensive review selection.

21      Then we turn to suspension rates.  And a little bit under

22  30 percent of these districts had no suspension rate listed,

23  which puzzled us.  So I wanted to see if I could just interrupt

24  myself briefly and ask the policymakers why that would be the

25  case; that a district had a zero percent suspension rate.  We

1  can come back to this.

2          **MS. DUNCAN-BECERRIL:**  I'd have to look at the data.

3  I'm not sure.  I'd have to look at it.  I'm sorry.

4          **MR. MLAWER:**  Okay.  So the first set of results are

5  positive, that 221 of these districts had a zero percent

6  suspension rate --

7          **THE COURT:**  Are you asking why there would be no

8  suspension rate or why there would be a zero?

9          **MR. MLAWER:**  It was missing.  We just didn't have a

10  rate.

11          **THE COURT:**  You're asking why would there be

12  districts where it was missing.

13          **MR. MLAWER:**  Right.  If the district had students and

14  none were suspended, you would expect the rate to be zero

15  percent.  So just puzzled by that.

16      And about 55 percent of these districts had suspension

17  rates of less than 4-and-a-half percent.  So that is all quite

18  positive.

19      On the other hand, a little over 15 percent of these

20  districts that were labeled meets requirements had suspension

21  rates above 4-and-a-half percent, and about 7 percent had

22  suspension rates 10 percent or higher.

23      So the first table shows that, and the second table on

24  Page 8 redoes it based -- removing those districts that had

25  fewer than ten students in the census count.

1    One of these districts had a suspension rate of over

2  58 percent, and five districts had suspension rates between

3  20 percent and 36-and-a-half percent roughly.

4    Now, in the CDE's comprehensive review selection process,

5  each of these districts scored at least 75 percent of the

6  available points, the points available to that district.

7    So we then on the next page, on Page 9, we applied the

8  formulas, the -- what we call the top four, the top seven, and

9  the 22 indicator formulas to these districts, and here these

10  first two tables we show you the distribution of the

11  percentages.

12    Then starting at the bottom of Page 9, we show you the

13  numbers of districts that would have been selected using each

14  of those methodologies.

15    So the four method -- this is including all these

16  districts, including the small ends, would have selected 78 of

17  these meets requirements districts.  The top seven methodology

18  would have also selected 78.  The 22 indicator methodology

19  would not have selected any.

20    Turning to Page 10, we then remove the small ends.  And we

21  see the results, that 21 of the meets requirements districts

22  would be selected using the top four, 44 for the top seven, and

23  four using the 22 indicators.

24    So this, as I say in the paragraph that immediately

25  followed, was surprising to us.  If, you know, using any

1 methodology that's defensible, you would not expect any

2 districts labeled meets requirements to be selected for an

3 intensive monitoring process.

4 And at the end we simply noted that 32 of these districts

5 were among the districts whose -- thinking about Child Find for

6 a second -- were between one-and-a-half and two standard

7 deviations below the mean.

8 So if CDE's standard for selection there had been one and

9 a half rather than two standard deviations, then those 32

10 districts could not have been named meets requirements because

11 they would have been selected for Performance Indicator Review

12 for Child Find.

13   **THE COURT:** A couple questions about this. I'm

14 looking back at the suspension rates. What was the -- what was

15 the target -- what was the cutoff that -- on suspension rates

16 that would put you into Performance Indicator Review?

17   **MR. MLAWER:** There is no target. There is a

18 dashboard target. So if you got red or orange on the dashboard

19 for suspension rate -- this is my understanding of CDE's

20 process -- you are selected for Performance Indicator Review

21 for suspension. But here we were working with one year of data

22 and not the dashboard data. So instead we just showed the

23 distribution of the -- the one year suspension rates across

24 these districts.

25   **THE COURT:** Okay. Now, on Performance Indicator

Review, do we have this same kind of universe problem that we were talking about in the last section? In other words, are you looking at a different universe of districts that were subject to Performance Indicator Review?

**MR. MLAWER:** Well, we were not looking at it that way. We were looking -- CDE sent us information showing the districts that it preliminarily labeled meets requirements, and that's all we were working from. So --

**THE COURT:** But by definition, that is -- that is all districts that were not selected for performance indicator review or Data Identified Noncompliance Review on any category.

**MR. MLAWER:** That's correct, in addition to disproportionality review, comprehensive review, preschool review, yes. The way to get meets -- meets requirements is to not be -- in CDE's system is not to -- to be not selected for any monitoring process.

**THE COURT:** So my question is: Were there -- and this is probably just a product of my bad memory, but were there -- of those 496 districts, did any of -- were any of them -- did any of them not qualify for Performance Indicator Review for some reason? Like because they were too small or something like that? Like as was the case with the -- when we were discussing comprehensive review monitoring?

**MR. MLAWER:** That is possible. I don't --

**MS. DUNCAN-BECERRIL:** That is correct, Your Honor.

```
 1          THE COURT:  Okay.  So explain that to me.

 2          MS. DUNCAN-BECERRIL:  So 74 percent of those 499 -- I

 3   have a chart.  Sorry.  I'm a picture person.  Are -- have less

 4   than 30 students in them.

 5          THE COURT:  Disabled students?

 6          MS. DUNCAN-BECERRIL:  Students with disabilities.

 7          THE COURT:  Okay.

 8          MS. DUNCAN-BECERRIL:  So the students with

 9   disabilities, the majority of them are charters.  Some of them

10   are very small schools or single school school districts.

11   There are a number of them as well.

12      And so they are -- for example, the Monitor states that

13   there are 57 LEAs who had a zero percent proficient.  The

14   average number of students with disabilities in those LEAs is

15   16.  Meaning a change in two students would put them above the

16   State-wide rate for proficiency.  So --

17          THE COURT:  What's the State-wide rate?

18          MS. DUNCAN-BECERRIL:  I believe it's 15 percent.

19          THE COURT:  Okay.

20          MS. DUNCAN-BECERRIL:  So in terms of they would be at

21   the average, in the middle of all districts in the State for

22   two students.  And so, again, this goes back to a lot of those

23   issues around small districts.

24      For example, when the Monitor states that they calculated

25   a number of districts who were selected, 78 LEAs who would be
```

1 selected for comprehensive review using his seven method, the

2 majority of those are based off of four elements. And not

3 taking into account the idea that there are very small --

4 16 students. So I'm not saying that there isn't work to be

5 done here. I'm saying the issue of smallest is a thing that

6 sort of permeates this as well. And so until we address that,

7 it's harder to look at the other.

8       **THE COURT:** So you said that 74 percent of the --

9 these 499 districts had fewer than 30 students with

10 disabilities in them.

11       **MS. DUNCAN-BECERRIL:** Yes.

12       **THE COURT:** And what I can't remember is does that

13 mean that they -- they were not going to be put into

14 Performance Indicator Review or Data Identified Noncompliance

15 Review regardless of what their numbers were?

16       **MS. DUNCAN-BECERRIL:** So they weren't put in this

17 year. This year was the year that we identified this as a

18 large problem because --

19       **THE COURT:** Sorry. They were or were not put --

20       **MS. DUNCAN-BECERRIL:** They were not --

21       **THE COURT:** -- in this here?

22       **MS. DUNCAN-BECERRIL:** They were not put into the

23 Performance Indicator Review. The reason for that is we always

24 had a minimum end size criteria. And the part of -- the big

25 part of that is because one or two students makes such a big

1   difference.  And so that's why an end size of ten applied here,

2   it -- it doesn't capture that because when you're looking even

3   at 20 or 30 students, there is -- it makes a big difference.

4         **THE COURT:**  So for the different performance

5   indicators, again there was a different end size?

6         **MS. DUNCAN-BECERRIL:**  Yes.

7         **THE COURT:**  All right.

8         **MS. DUNCAN-BECERRIL:**  But we didn't -- this wasn't

9   a -- I think, a large problem until we added a thousand charter

10  schools into the mix.  You know, and typically there is very

11  few small, small, small districts.  But now there is a lot.

12  And so this is what is accounting for this.  The majority of

13  these are charter schools.  I want to say, like, 80 percent are

14  single charter schools that are now being put into our

15  criteria.  And so --

16        **THE COURT:**  So I guess the question is:  How many of

17  these 499 -- it sounds like -- scratch that.  Let me ask it a

18  different way.

19     It sounds like of these 499, a certain percentage of them,

20  perhaps a high percentage of them, were going to be labeled

21  meets requirements regardless of what their numbers were.  Is

22  that --

23        **MS. DUNCAN-BECERRIL:**  Yeah, that is correct.  Unless

24  they had a complaint, you know, noncompliance associated with

25  complaints.  If they had late IEPs, late triennials.  Missed

1  60 new timelines.

2      **THE COURT:**  So some of the data, what you refer to as

3  Data Identified Noncompliance?

4      **MS. DUNCAN-BECERRIL:**  Yes.

5      **THE COURT:**  Did I remember that right?

6    So --

7      **THE COURT:**  So they may not have met the targets on

8  those things, and a lot of those targets were zero; right?

9      **MS. DUNCAN-BECERRIL:**  They're zero.

10     **THE COURT:**  And if they didn't meet targets on those

11  issues, they would not have been labeled "meets requirements"?

12     **MS. DUNCAN-BECERRIL:**  That is correct.

13     **THE COURT:**  But on Performance Indicator Review, no

14  matter what their -- no matter what the number was, they were

15  going to be labeled "meets requirements" --

16     **MS. DUNCAN-BECERRIL:**  Yes.

17     **THE COURT:**  -- on the theory that the -- whatever

18  number came out was not going to be worth anything because the

19  size was too small.

20     **MS. DUNCAN-BECERRIL:**  Yeah.  There is not a

21  meaningful difference.  There is not -- you know, in terms of

22  statistically are we identifying a district because a student

23  got to the test that day and didn't feel good and went home, so

24  now the district should take more time and more energy from the

25  CDE as opposed to a district that has 400 students who are not

1    performing.

2           THE COURT:  So all of that makes sense, and so it

3    seems like it's the same issue here in the second -- you know,

4    in the second section of Mark's supplemental report as with the

5    first section.  That is, we need an apples to apples

6    comparison.

7           The fact that so many of these small districts were

8    labeled meets requirements when we didn't know if they met

9    requirements is already a problem and that's an obvious problem

10   and I don't think we need to conduct any further analysis to

11   know that's a problem, and I think nobody disagrees that that's

12   a problem; right?

13          MS. DUNCAN-BECERRIL:  That is correct.

14          THE COURT:  But so -- so the question is, you know,

15   for the -- for the -- I think the question is, to conduct a

16   further analysis, is for the districts that were identified as

17   meeting requirements that were not too small to have a

18   meaningful number, break those out; right?

19          So I'm making up the numbers, but there are 499 districts.

20   Let's say 100 of them were big enough to conduct a meaningful

21   analysis.

22          MS. DUNCAN-BECERRIL:  132.

23          THE COURT:  132.  Okay.  Let's look at those

24   132 districts and let's say, should -- you know, using CDE's

25   methodology, those were -- those were deemed to meet -- to meet

1  requirements.  They were reported to the Department of

2  Education as meeting requirements.  Should they have been

3  labeled as meeting requirements?  What did things look like in

4  those 133 districts?

5       That would be the only way we could, I think, meaningfully

6  assess the CDE's current methodology for -- and CDE's current

7  methodology is if you meet all the targets, right, then you're

8  meets requirements.  If you don't get put into Performance

9  Indicator Review or Data Identified Noncompliance Review or any

10 of these other type of reviews in any category, then you're

11 deemed to meet requirements.  And one -- one hypothesis as I

12 recall was, well, part of the problem is these targets are

13 really low.  And so it's too easy to meet all the requirements.

14      The response to that might be, well, there are only 133 in

15 the entire universe that were deemed to meet requirements that,

16 from CDE's perspective, had meaningful numbers to analyze.

17      On the other hand, maybe that doesn't matter.  Maybe --

18 you know, maybe there are some real problems in those schools

19 with suspension rates or something else.  But to have a

20 meaningful analysis, I think we need to look at those

21 133 schools.  So the question again -- or 133 districts.  So

22 the question again is:  Do we have the data we would need to

23 conduct that analysis now or is something more needed?

24      **MS. WAGNER:**  So of those 496, there were just four

25 that had a census enrollment of students with disabilities

1   above 100, so based on what you were talking about earlier, all

2   but four would fall under this new small count.

3          So in terms of, you said, 132 --

4              THE COURT:  Well, let me interrupt.

5          Is that right?  I mean, we're not cutting off anybody who

6   had -- any district that had fewer than 100 students.

7              MS. DUNCAN-BECERRIL:  So if they had 30 or more, they

8   would have a dashboard color.  They would have a -- for -- and

9   if they had cumulative enrollment greater than 30, which is

10  likely.  If they had concurrent enrollment greater than 30,

11  they would have assessment scores.  And if they have a census

12  enrollment of greater than 30, they will have scores for all

13  the other indicators.  A preschool would be the only exception

14  because you may have 30 students in the whole school but maybe

15  only five in preschool.

16             THE COURT:  So if we use that cutoff, we're getting

17  much closer to the 133?

18             MS. DUNCAN-BECERRIL:  Uh-huh.  So the -- the census

19  enrollment is a hundred -- is greater than 30.  So on

20  December 1st, they had 30 or more students, which is really the

21  lowest number that we would get all year.  Concurrent

22  enrollment and cumulative enrollment is typically larger --

23  would be 132.

24             MS. WAGNER:  So then is your cutoff the census

25  enrollment of 30 or higher to get to that 132?

1    **MS. DUNCAN-BECERRIL:** That's how I got to the 132.

2    That's the -- that is what we applied this year. The hundred

3    that I spoke of earlier is what I think, going forward, if

4    we're going to sort of combine districts together would be the

5    cutoff.

6         And -- and just for clarification, Your Honor, we did not

7    submit yet those districts. We have not completed the 2019,

8    '20 monitoring year. I mean, it's getting there. It's getting

9    super close. But we will -- if they do not have any complaint

10   noncompliance or other kinds of elements, a critical incident

11   review or something that happens, then they wouldn't be

12   reported, but they have not yet been reported.

13        **MR. MLAWER:** Yeah. I think your December submission

14   was very clear. You said that districts could infer a

15   preliminary determination of meets requirements and then if

16   certain things happen, that could change by the time you put it

17   out in the fall.

18        **MS. DUNCAN-BECERRIL:** That is correct.

19        **MR. MLAWER:** Okay. So the 132 -- Susie, can you get

20   to those?

21        **MS. WAGNER:** I get 130 districts that have a census

22   count of higher than 30. And I get 140 of those that have

23   30 or above. So maybe we need to just make sure I'm looking at

24   the right 132.

25        **MS. DUNCAN-BECERRIL:** Certainly.

1          THE COURT:  So that -- that analysis would be helpful

2     too, that apples to apples analysis.

3          Am I remembering correctly that the issue of improvement

4     from one year to the next does not come into play on the

5     Performance Indicator Review and the Data Identified

6     Noncompliance?

7          MS. DUNCAN-BECERRIL:  That is correct.

8          THE COURT:  So I did want to ask -- and we're

9     bouncing around a little bit, but I did want to ask another

10    question about the comprehensive monitoring where -- and the

11    dashboard where year over year does come into play.

12         It seems to me -- so -- so Mark's supplemental report kind

13    of removed the concept of improvement -- getting better or

14    getting worse, removed that concept entirely.

15         MS. DUNCAN-BECERRIL:  That is correct.

16         THE COURT:  You've got -- you've got the concept

17    built into your current system.  And it's just based on what --

18    a change from one year to the next, and it doesn't matter how

19    big or small the change is, as I recall.

20         MS. DUNCAN-BECERRIL:  That is correct.

21         THE COURT:  Okay.  It seems to me that as

22    policymakers, you have the leeway to make a decision to

23    include, you know, getting better or getting worse as a factor

24    in identifying which districts to monitor.  And I didn't take

25    the supplemental report as suggesting that it wasn't

1    appropriate to take that concept into account in some fashion.

2    It's just for comparative purposes you didn't do it.

3              MR. MLAWER:  Yes.

4              THE COURT:  And -- but -- I guess I still -- what I

5    still scratch my head a little bit about is the idea of just

6    doing it one year -- just comparing one year to the next as

7    opposed to potentially multiple years and, also, the idea of

8    not taking into account how much or how little improvement, or

9    how much or little regression took place.

10             MS. DUNCAN-BECERRIL:  So in the dashboard there is a

11   level of improvement.  So you have to improve so many points.

12   I think we talked about this.  For suspension you have to go up

13   2 percent in order to change the color.

14             THE COURT:  Oh, okay.  That's right.

15             MS. DUNCAN-BECERRIL:  If you remember, 2 percent

16   could be, like, 50 kids.  So it does take into account that.

17   And that's another something that we can talk about further

18   with other kinds of target.  Obviously, we've stated before

19   sometimes one or two students makes a big difference, even at

20   100.  So I think there is value in that part of it.

21             In -- in a way, the way that we look at it is building

22   year after year.  So you have to continue to improve in order

23   to get the higher score.

24             So if you -- like, you know, you're at 10 year one year

25   and you go to 12, then you get a higher score.  And the next

1     time -- the next year, where you start at is 12.  You don't

2     start at 10.  But if you go back down from 12 to 11, you get a

3     lower score.  So in a way it does build off year after year.

4     **MR. MLAWER:**  Well, that's true for the dashboard

5     indicators, but the other selection elements in the

6     comprehensive review formula were structured differently, those

7     that included improvement or regression.  And some of those led

8     to highly absurd outcomes, which I detail in my January report.

9     So there are two kinds of issues here.  One is -- I don't

10     think there is any dispute that improvement and regression --

11     that discretion exists to count improvement or regression.  The

12     problem is how to do so.

13     In my January report, I focused on -- that the current

14     approach, both within the dashboard to some extent but

15     certainly outside it, has some absurd consequences.

16     The Morgan Hill plaintiffs focus elsewhere in their

17     amicus, and they focused on the issue of whether a year over

18     year is adequate as opposed to multiple years to judge

19     improvement.

20     So that's how I see these issues.

21     **MS. DUNCAN-BECERRIL:**  But in our own indicators,

22     while you may find a district who would get a higher score if

23     they had 30 percent and going from 30 to 32, but would get --

24     another district would get a lower score if they were at 90

25     percent and went from 92 to 90.  It's still improvement and

1   getting -- or getting worse.  So I think -- and every year it

2   resets to that new place you were last year.

3           **MR. MLAWER:**  Right.  But the fact remains that when

4   you're awarding either one point or two points or three points

5   or four points, you're inside a process that you're going to

6   judge these districts against each other.  You're either above

7   62 or you're not; right?  And you get above 62 or below 62 by

8   based on how many points you get.

9       So there is -- there is a competitive thing going on here,

10  and it matters that if you tell a district that has

11  99.1 percent compliant and decline from 99.2 percent that it's

12  going to get one point, and another district that improved from

13  58 to 59 is going to get more points, that just doesn't make

14  sense.

15          **MR. SPENCE:**  But the LEA that's in the 90s --

16      (Court reporter clarification.)

17          **MR. SPENCE:**  I'm sorry.

18      That LEA that's performing highly that has a slight

19  decrease, are they really in danger of a CR?

20          **MR. MLAWER:**  Well, it depends what their other data

21  are.  There are multiple elements.

22          **MR. SPENCE:**  I guess.

23          **MS. DUNCAN-BECERRIL:**  I think when you look at the

24  totality of elements, the districts who are doing very poorly,

25  our three worst performing districts, are districts who are

*Official Reporter - U.S. District Court - San Francisco*
*(415) 431-1477*

1    doing poorly for many students across the board year after

2    year, and they are getting worse.  So that's where we should be

3    focusing.

4         If you have a district who on their Data Identified

5    Noncompliance goes from 99.1 to 99.2 -- or 99 and they get a

6    one that year versus another district who might get a two, in

7    order to be selected for comprehensive review, they also have

8    to be doing really bad with all of their students, like, across

9    the board.

10        Now, can we implement something similar to the dashboard

11   where you sort of give everyone a color and you go up and down

12   on color?  Yes, absolutely.  That's something we could do.  I

13   don't think it will change necessarily the outcome.  Districts

14   are still selected if they do or do not meet the target for

15   Performance Indicator Review.  Both districts who did not meet

16   100 percent for Data Identified Noncompliance are selected for

17   review.  The question comes into play around -- around

18   comprehensive review selection.

19        And on top of that, doing something similar to what the

20   Monitor describes or putting into quartiles something very

21   similar to what the U.S. Department of Education does when it

22   assigns determinations to the states is that it puts state --

23   it sort of lines up the performance of all states and says:

24   Here is one-third, you get the lowest points.  This middle

25   third gets the second lowest.  And then this top third gets the

highest sets of points.  Well, that alone puts states against each other and would put districts against each other. Because, oh, well, you're going to get more points because you're one step above me.

It's helpful to look at where they are today, where they were last year, and regardless of where they are in terms of a linear progression compared to other districts.

**MR. MLAWER:**  Does the U.S. Department of Education approach consider improvement regression in their formula?

**MS. DUNCAN-BECERRIL:**  I do not believe it does for the purposes of assigning, but there is lots and lots of concerns around the U.S. Department of Education determination.

**THE COURT:**  Could I ask one more question?  I think we should take a break in a minute, but let me just ask one more question about, again, now jumping back to Section 2, the districts that have been deemed to meet requirements.

The idea that you have to meet all of your targets, how many targets are there?  Like, 24 or something like that?

**MS. DUNCAN-BECERRIL:**  So there are 16 targets within the annual performance report.  There is an additional two for IEPs and triennials.  So I -- we could start there.

**THE COURT:**  And you're only labeled "meets requirements" if you hit the targets on every indicator.  Where does that come from?  I mean, is that a -- is that a federal law thing?  Is that a Department of Education thing?  Is

1  that -- or is that just part of your methodology for deciding

2  who -- who fits into what category?

3     **MS. DUNCAN-BECERRIL:** So I -- IDEA says the districts

4  or states consider the size and the methodology.  And lots of

5  states -- we have been working through this with some other

6  states in a -- in a process.  A lot of states have used only

7  compliance factors for determining, like, whether or not they

8  have on-time IEPs for determining meets requirements.  So they

9  found 50 or 60 percent of their LEAs are meets requirements

10 because they don't include performance in their annual

11 determinations.

12    The -- I believe it was in 2013 the U.S. Department of

13 Education encouraged states to begin to implement a process of

14 including performance inside the annual determinations.

15    So we did do that.  And we've talked about the annual

16 determinations.  I don't know if we want to, like, dig that out

17 of the graveyard, but we started to model that.  And the thing

18 that we found concerning is how complicated it became.  Because

19 when we talked with special education local plan area directors

20 and school administrators, they felt like, okay, well, if the

21 moon was in Virgo and the tide was high and the temperature was

22 below 73 percent, then we were meets requirements.

23    But -- so we wanted to look at a way to make it really

24 simple.  And the way that we looked at it was if you're in an

25 improvement process with us, if you are in a monitoring

1    activity, you're not meeting requirements.  And so we started

2    that as the basis for our selection into meets requirements.

3         Now, I think when we start to look at some of these issues

4    around small end sizes, we may find that none of our districts

5    in the State meets requirements.  And that's okay, but --

6         **THE COURT:**  That's kind of why I asked the question,

7    because we have been focused up till now on -- with respect to

8    this issue on how, you know, the targets may not be

9    sufficiently ambitious, and it sounds like everybody here

10   agrees on that.  And so perhaps there is this concern that

11   districts are being labeled as meeting requirements even if

12   they are not doing well at all.

13        On the other hand, though, I mean, with all these

14   different indicators, you know, if there is a blip one year on

15   one of the indicators, does it really make sense from a -- you

16   know, from a qualitative standpoint to label a district as not

17   meeting requirements?

18        I mean, it's not -- I mean, it's sort of simpler and

19   cleaner to have a system like that, but it's not obvious to me

20   that if -- you know, if I'm the superintendent and, you know,

21   there is one little blip on one little indicator of all these

22   indicators, but I'm doing really well on -- you know, on

23   everything else and I'm doing really well overall, that I

24   should be labeled to -- as not meeting requirements.

25        **MS. DUNCAN-BECERRIL:**  And that is an ongoing concern

1   that we have had.

2       But I should tell you that a lot of the things that we

3   hear from the Monitor, the plaintiffs, some of the other -- the

4   U.S. Department of Education, is they are not meets

5   requirements, they are not meets requirements.

6       What you can look around -- what I tend to look at in

7   terms of the annual determination is that it's an improvement

8   process.  We have the ability to sanction districts, to

9   withhold funds, put special conditions on their grant.  If a

10  district is struggling, usually that's not the best option.

11  But what it does is it signals to us the districts that need

12  help and maybe need a higher level of help.

13      So there might be districts who are needs assistance, and

14  it's for one student or for one non-compliant IEP or one

15  instance where a student didn't meet the 60-day timeline.  Do

16  we go and then take them out to the, you know --

17          **THE COURT:**  Woodshed.

18          **MS. DUNCAN-BECERRIL:**  -- the woodshed?

19      No.  We go:  Can you fix it and make sure it doesn't

20  happen anymore, and next year you won't be there.

21      The sanctions and the -- the heightened levels of, like,

22  fiscal things that happen to districts happen after several

23  years and needs assistance or needs intervention.

24          **THE COURT:**  Okay.  Why don't we -- why don't we take

25  a break.  As I said, I -- we should all plan on this -- this

1  hearing ending at about 1:00 o'clock.  And so why don't we take

2  a 15-minute break.

3      We'll resume at 25 minutes after the hour and we'll go

4  until 1:00 o'clock or no later than 1:00 o'clock and then we'll

5  wrap up.

6      (Whereupon there was a recess in the proceedings

7          from 11:08 a.m. until 11:28 a.m.)

8          **THE COURT:**  Okay.  Before we move on, is there

9  anything that anybody else wants to say, the plaintiffs,

10  anybody, about Section 2 of the report and the meets

11  requirements issue?

12         **MR. KOSKI:**  No, Your Honor.

13         **THE COURT:**  Okay.  So I propose in the interest of

14  time we skip over Section 3 for now and circle back to it if

15  there is time, if anybody feels the need to.  And we go to

16  Section 4, which is -- as I recall is Child Find; right?

17         **MR. MLAWER:**  Yes.  Okay.  For Child Find, recall that

18  CDE selected -- I think it was about 38 districts that fell

19  below two standard deviations below -- below the mean.

20      So we looked at the next 70 districts.  These are the

21  districts that were between one and a half and two standard

22  deviations below the State identification rate.  Those

23  districts contained about 55,000 students who didn't have IEPs.

24  We restricted our analysis to about 30,500 of those kids, kids

25  for whom we had three years of data.  And that also knocked out

1    nine other districts.  So we have -- we analyzed data about

2    30,000 -- a little over 30,000 kids from 61 districts.

3         So first we looked at academic performance as measured by

4    State assessment.  So -- and we focused most -- although we

5    gave you all the data, we focused mostly in our own thinking

6    about three years.  Kids below proficient in ELA.  This is the

7    first -- the first table on Page 13, or at -- and at level one

8    of below proficient.  So we had about 43 percent of these kids

9    in these districts scored below proficient for three years in

10   ELA and about 2,000 below -- at level one in ELA for all three

11   years.

12        On the next page you see a similar table for math.  And

13   here the numbers were a little bit higher.  Over 6,000 kids

14   below proficient for all three years, and at level one about

15   2600 kids.  The 6,000 represented more than half of the kids

16   in -- test takers in these districts for whom we had data for

17   three years.

18        And for both ELA and math, here we had about 4300 kids who

19   were below proficient, both in English Language Arts and in

20   math for three years.  At level one, about 12-and-a-half

21   percent of these kids were at level one for three years in

22   both.  Okay.  So what that said to us is that there are a

23   significant number of kids in these districts with -- who

24   struggle -- who are struggling academically.

25        We then turn to suspension rates, and that table towards

1    the bottom of Page 14 basically shows that suspension of these

2    kids is not really problematic.  Not many of these kids seem to

3    be challenged behaviorally.

4         Now, there is a subset of these kids -- we found about

5    15 percent of them, of the 620 kids who are suspended at least

6    a day for all three years or for two of the three years, about

7    15 percent of those kids scored at level one on State

8    assessment, on both State assessments for all three years.  So

9    that group of kids may have both academic -- do have some

10   academic struggles and may have academic and behavioral

11   struggles.

12        We then went to the district level and we established --

13   we developed cut scores that are somewhat arbitrary.  We used

14   23 percent for ELA and 31 percent for math.

15        Now, we dropped a footnote there to raise questions or to

16   give a statement about what the ideal way would be to do this,

17   which we couldn't do.  We only had one year's data, but we

18   worked with what we had.  We applied a cut score of

19   4-and-a-half percent for suspension, for the reasons we

20   indicated in -- in the -- in the footnote.  That's also rough.

21   It could be because it doesn't -- that was for a -- the low

22   part of the high end of the dashboard for a unified school

23   district.  The reason for that is the spreadsheet contained

24   different types of districts.  So we wanted one number that

25   would be theoretically at least applicable.

          A better way to deal with it of course would be to use the
suspension rates for the different kinds of districts if we
knew exactly what type of district each one of these were.

          Regardless, we showed in the table that you see towards
the -- on the top half of Page 15 how many districts had a
percentage of kids scoring at level one for all three years in
ELA.  Then in math.  And percentage suspended for all three
years.  Based on those targets or cut scores, that would result
at these cut scores in the selection of an additional nine
districts for ELA, for Child Find monitoring, nine for math,
six for both, and one for suspension.

          If we lowered those cut scores a little bit from 23 to
20 percent, from 31 to 28 percent for math, then those numbers
would go up a bit.  It would be 13 for ELA, 13 for math, and
10 for both.

          So our basic conclusion here is that the data show some
amount of academic struggle.  The data do not show many of
these students having behavioral concerns.  And applying these
cut scores would result in the selection of additional
districts from this bucket of these 70 districts for Child Find
monitoring.

          THE COURT:  So the primary question I had in my mind
when asking you to -- to examine this, and I may not have
articulated it very well at the last hearing, but the -- the
primary question I had in my mind is, okay, the districts that

1    are -- that are being flagged currently are the districts that

2    are more than two standard deviations below the mean.  So there

3    is that universe of districts, and they're -- they're more than

4    two standard deviations below the mean in terms of the

5    percentage of kids who are identified as disabled; right?

6         And then there is the universe of districts between 1.5 --

7    and I sort of pick this arbitrarily, but between 1.5 and two

8    standard deviations.

9         And the question I had was:  Are we looking at the right

10   universe?  And is the -- is CDE looking at the right universe?

11   And if -- and my hypothesis was -- an unproven hypothesis was

12   that perhaps a lot of those districts who are more than two

13   standard deviations below the mean in terms of the percentage

14   of kids identified as disabled, may be districts that are more

15   affluent or more high performing, and/or high performing, say

16   Marin County or whatever, and the reason they are more than two

17   standard deviations below the mean in terms of identifying

18   students with disabilities is -- is because they have a lot

19   fewer students with disabilities than, you know, a more low

20   income, you know, poorly performing school district.

21        That's a hypothesis.  Again, I don't know if -- if it's

22   correct.  And so what I wanted to see is a comparison of the

23   universe of districts that are two standard deviations below

24   the mean and the universe of districts, say, one point --

25   between 1.5 and 2.0 and sort of cross-checked against academic

1  performance and/or affluence to see if that hypothesis might

2  hold true to help us perhaps get at whether the wrong districts

3  are being flagged through the methodology of flagging districts

4  that simply go more than two standard deviations below the

5  mean.

6       So the answer to this question -- so my question is:  Can

7  we do that comparison?  And the answer may be:  Your hypothesis

8  is wrong, or that wouldn't be a useful thing to analyze.

9       But that was -- that was what I had in mind when I -- when

10  I asked you all -- when I flagged this issue for further

11  research, and I'm just wondering if the data you collected

12  gives you the ability to analyze that question.

13            MR. MLAWER:  My understanding is we do not have free

14  and reduced meal data for all the districts; is that correct?

15            MS. WAGNER:  Right.  So I don't have it for any

16  district.

17            MR. MLAWER:  For any district?

18            MS. WAGNER:  Yes.

19            MR. MLAWER:  So we would need those data to answer --

20            THE COURT:  But academic performance -- performance

21  data you do have.

22            MR. MLAWER:  Yes, Your Honor.

23            MS. WAGNER:  For each district, yes.

24            THE COURT:  And I assume there is -- there is a

25  correlation -- pretty good correlation between performance and

```
 1   affluence in school district.
 2             MS. DUNCAN-BECERRIL:  Typically there is.
 3             MS. WAGNER:  I also don't have the identification
 4   rate of each district.  I would need that.  So I know who those
 5   70 are that fall between the 1.5 and 2.0, but I don't have --
 6             THE COURT:  So I don't know -- I don't know if it's
 7   necessary to have free and reduced lunch or not.  Maybe it
 8   would be helpful.
 9        But the main thing is just, you know, sort of -- some sort
10   of comparison between the universe of people that they are --
11   universe of districts that they are flagging and, you know, the
12   universe -- a universe of districts that they are not flagging
13   with an examination of performance or -- or affluence or both
14   to test my hypothesis.
15        Now, if you tell me -- if everybody tells me my hypothesis
16   is not worth testing, that there's -- that there's -- there's
17   something really flawed in that, that's perfectly fine, too.
18        But that -- but I'm just -- I'm just telling you what --
19   what I was hoping to look at in this area.
20             MS. DUNCAN-BECERRIL:  So, your Honor, if you're just
21   looking at the district level, obviously, or were you looking
22   at percent proficient for students without disabilities and
23   percent free and reduced price meal for students without
24   disabilities in those 36 and then also in those 70; is that
25   correct?
```

1          **THE COURT:**  Thirty-six is what?

2          **MS. DUNCAN-BECERRIL:**  Greater than two standard

3    deviations.

4          **THE COURT:**  Greater than two.  Yeah.  I mean, I don't

5    know if it was -- it would be all students or students without

6    disabilities.  I don't know what the -- I don't know what the

7    right number to look at would be.

8          **MS. DUNCAN-BECERRIL:**  So the analysis that the

9    Monitor performed was solely students without disabilities.

10         So one of the things to keep in mind is the Monitor looked

11   at three years of data, is to look -- obviously, we have been

12   talking a little bit about improvement.  Are districts

13   improving?  This comes to a question also of good quality

14   general education, you know.

15         So there is -- there is a number of reasons why students

16   aren't performing well that may have very little to do with

17   their disability.  And so it's hard to kind of -- whether or

18   not they have a disability.  So sometimes it's harder to

19   control for that.

20         But if you're just looking at those percentages, I mean,

21   that is possible to do.  But when we look at the 70 districts

22   that were included in the analysis, we find that for students

23   without disabilities, the percent not proficient and the

24   percent proficient is -- so there's fewer students not

25   proficient and more students proficient.

1    So the districts are actually getting better year over

2  year in the number of students who are proficient, which

3  indicates to us that there is better, good quality education.

4        **THE COURT:**  You mean, there's -- there's greater

5  proficiency in the -- in the group of 70.  Proficiency is

6  higher in the group of 70 than It is in the group of 36?

7        **MS. DUNCAN-BECERRIL:**  I haven't done that analysis.

8  We only looked at the 70.  That was only what was requested

9  from the Monitor.  We tried to replicate some of that

10  information.  What we found in the 70 is that those districts

11  are getting better year over year for every -- so on their

12  assessment rates.  So for students without disabilities.  I'm

13  handing you a chart so you can actually see that.

14        (Whereupon document was tendered to the Court.)

15        **THE COURT:**  Can we -- before we look at this chart,

16  can we just take a step back and let me ask you:  What about my

17  hypothesis?  What about -- what about the theory that, you

18  know, some of these districts that are being flagged because

19  they are greater than two standard deviations below the mean

20  are -- simply have a low identification rate because they --

21  there are a lot fewer disabled children in those districts.

22        Because -- you know, and then one way to identify a

23  district that has a lot fewer disabled children is to look at

24  the affluence of the district or the -- or the performance of

25  the district.

1          **MS. DUNCAN-BECERRIL:**  Performance might be one way.

2       I mean, I would caution against the affluence because the

3  measurement that we use is free and reduced price meal

4  eligibility.  Most affluent parents won't even fill out the

5  form.  So -- and -- because they don't think their child will

6  be eligible.  So eligibility rates are kind of different for

7  that.

8       And in addition to that, if you have a child -- if you

9  looked at high school districts, they have lower, sometimes,

10  percentages of free and reduced price meal eligibility.

11  Because they are, you know, high school students, they don't

12  want to be on the free lunch program.

13          **THE COURT:**  Right.  Right.

14          **MS. DUNCAN-BECERRIL:**  So it is -- it's the measure --

15  the measure we use is typically the number of students eligible

16  for a free and reduced price meal.  But there are some.  It's

17  not a perfect measure.

18          **THE COURT:**  But isn't -- okay, so -- but is it

19  generally true that the higher performing school districts are

20  more affluent?

21          **MS. WRIGHT:**  Yes, they have a lower amount of free

22  and reduced price meals, yes.

23          **MS. DUNCAN-BECERRIL:**  Yes.  So the better performing

24  districts have fewer students who are eligible for free and

25  reduced price meals.

1          THE COURT:  And I'm sure if you ran the numbers in

2    those districts based on, you know, income levels, based on

3    census data or something like that, you probably would see also

4    that the higher performing districts are higher income

5    districts.

6          MS. DUNCAN-BECERRIL:  That is likely.  But I don't

7    know if that is necessarily tied to identification rates.  You

8    know, a lot --

9          THE COURT:  Well, that's what I -- yeah, that was

10   going to be my next question.

11         MS. DUNCAN-BECERRIL:  A lot of -- a lot of, for

12   example, parents in more affluent districts are more likely to

13   refer their own children because they believe that's how their

14   children can get services or supports.  There is greater

15   advocacy in terms of like -- I know one affluent district,

16   every IEP has a lawyer at it.  And that's just how they

17   function.  Like, the parents bring their lawyer.

18         And so -- so I don't know if it's necessarily tied to

19   identification rates.  I mean, we wouldn't want to make the

20   assumption that people who are more affluent don't have

21   children with disabilities.  That's not necessarily the case.

22   I think -- I would have to look at the districts, those

23   70 districts, but they do also tend to be small.  So I'm

24   guessing -- well, we're seeing charters, the average enrollment

25   rate is about 76, so...

1      **THE COURT:**  I guess -- I guess my concern, to sort of

2 boil it down to its essence, was if you look at the

3 38 districts that are more than two standard deviations below

4 the mean, are we going to find that a lot of those districts

5 are the high performing more affluent districts?  And if so,

6 does that raise questions about whether we have the right

7 selection criteria with respect to Child Find?

8      And that's the -- if you -- if I told you that, you know,

9 the 36 school districts flagged through that selection criteria

10 are all the high performing -- or most of them are the high

11 performing affluent school districts, wouldn't you be concerned

12 that it might not be the right criteria for -- for identifying

13 districts with Child Find problems?

14      **MS. DUNCAN-BECERRIL:**  I'd have to look at the data.

15 I wouldn't want to say that -- I -- I don't believe that that's

16 the case, and I can look at the data and we can provide some

17 information about those 36 in terms of the percentage of free

18 and reduced price meal eligible.

19      We tend to sometimes see lower rates within rural

20 districts because there is just less access to quality medical

21 care.  There's less access to quality preschool.  So that's

22 where we might see lower identification rates.  I'd have to

23 look at that 36.  But my guess is it's highly tied to where you

24 live and not necessarily the percentage of free and reduced

25 price meal eligibility.

1          **MR. MLAWER:**  Do you happen to have a list of the

2    36 with you?

3          **MS. DUNCAN-BECERRIL:**  I'm trying to find that right

4    this second.

5          **THE COURT:**  Maybe it's as simple as taking a look at

6    the 36 and sort of seeing where they fall on performance and

7    where -- you know, where they fall on affluence.  And maybe

8    that doesn't tell -- you know, maybe -- maybe that will tell us

9    nothing, but it was a concern that I have.

10        Mr. Koski, do you have any thoughts on this?

11         **MR. KOSKI:**  Yes, Your Honor.  There's two things that

12   I would think about in trying to decide whether or not -- or

13   two methodologies I would consider in thinking about whether or

14   not we're using the right Child Find measure here and using the

15   standard deviation cutoff method that we're using right now.

16   So it raises two questions for me.

17        One, is there a meaningful difference between the group

18   that falls -- the question you're asking essentially, whether

19   it's in terms of performance, affluence, whatever measure we're

20   using, is there a meaningful difference between those that are

21   above two standard deviations and those between 1.5 and 2.

22        But I don't want to lose track of what the Monitor did

23   find here, and that is that there is very low performance among

24   those students in the 1.5 to 2 standard deviation range and

25   those -- that may be due to disability, it may be due to

something else, as Ms. Becerril says, but we don't know, and that's part of the problem.

So that is at least one indication that we might be missing kids who have disabilities.  They might not be identified.  Performance is a pretty good way to do it --

**THE COURT:**  So that second point you're making is, that goes to whether they are flagging enough districts.

**MR. KOSKI:**  Correct.

**THE COURT:**  The first point goes to whether they are flagging the right districts; right?

**MR. KOSKI:**  Right.  Exactly.  So right ones, are we getting enough.  And I don't want to lose track of are we getting enough because I think the Monitor does provide some evidence that we might not be getting enough.

**THE COURT:**  I get that.

**MS. DUNCAN-BECERRIL:**  I'm looking at the list of 25 -- or 36 LEAs that were selected for Child Find, and what I'm finding are rural -- rural districts.  Farmersville Unified is a very small district.  Modoc Joint Unified is a small district.  Magnolia Union is a small district, a rural area.  Bitterwater-Tully Elementary is a small district in a rural area.

The other ones are also charter schools.  So Connecting Waters Charter in East Bay is a charter school.  They may have a low percentage of students with disabilities, because their

1  authorizing charter does the Child Find for them.

2      So what I -- what I'm seeing is small districts in rural

3  areas, those 36, or charter schools.

4         **THE COURT:**  What about the Dixie school district?  Is

5  that in there?  It may not be called the Dixie school district

6  anymore.  There is a controversy about that.

7         **MS. DUNCAN-BECERRIL:**  I did not see the Dixie school

8  district.

9         **MR. MLAWER:**  Are there any that fit the profile of --

10  based on what you can tell from a name, of a more affluent

11  district among the 36?

12         **THE COURT:**  Like anything from Marin -- does it have

13  the county where they are located?

14         **MS. DUNCAN-BECERRIL:**  No.  I'm looking at them.  I

15  don't see any.  What I can do, though is -- what we can do is

16  we can identify the county they come from and look at their

17  total population and we can file that on the docket so you can

18  see that.

19         **THE COURT:**  Okay.  That would be good.

20         **MR. MLAWER:**  Are any from San Mateo County?  I'm

21  asking because I think Ms. Armsby has --

22         **MS. DUNCAN-BECERRIL:**  I don't have the county.  Let

23  me look it up real quick and see if there are.

24      (Brief pause.)

25         **THE COURT:**  I forgot Ms. Armsby was here.  Do you

1    have -- is there anything you want -- anything you want to add

2    to this discussion?

3            **MS. ARMSBY:**  Not at the moment.  I don't really think

4    that I -- I don't really have anything much to add.

5            **THE COURT:**  Okay.

6            **MS. DUNCAN-BECERRIL:**  If we could circle back around.

7    I just have to find the county codes, and that's what I'm

8    struggling with.  I'm so sorry.

9            **THE COURT:**  Why don't you just -- why don't you just

10   file something on that?

11           **MS. DUNCAN-BECERRIL:**  Huh?

12           **THE COURT:**  Why don't you file something on that.

13           **MS. DUNCAN-BECERRIL:**  We can do that.  I'm sorry.

14           **THE COURT:**  And that way we can move on.  Unless --

15   does anybody -- anybody have anything else on that topic?

16   Child Find?

17       (No response.)

18           **THE COURT:**  No?  Okay.

19       Do you want to move on to aggregation?

20           **MR. MLAWER:**  Sure.  We'll turn to disaggregation of

21   data.

22       So we analyzed this issue for three indicators, to LRE

23   indicators, placement in regular classes for less than 40

24   percent of the day, placement in separate programs, and

25   suspension.  And we only focused on districts that were --

1    would not have been selected for Performance Indicator Review.

2        For the LRE elements, that means that they met the State

3    target.  For the suspension, that means that they were labeled

4    yellow, green, or blue on the suspension dashboard.  Because we

5    wanted to try to answer the question as it was posed by the

6    Court about significantly hindering the State's ability to

7    effectively flag districts, so we looked at districts that were

8    not flagged.  Okay.

9        So starting with placement for less than -- in regular

10   classes for less than 40 percent.  We analyzed this for three

11   different risk ratios, which I believe we explained in a

12   footnote.  We went through this a bit at -- earlier on in this

13   case.  Compares a target group to a comparison group.

14       So here on -- at a risk ratio of 2-and-a-half, that means

15   two-and-a-half times more likely, we flagged 12 districts, one

16   of which had more than one flag at a risk ratio of two and a

17   half.

18       We also point out that at a risk ratio of 3.0, which is

19   the risk ratio used by CDE for flagging districts for

20   disproportionality review, for the groups that are included in

21   that, the racial and ethnic groups, we found that six districts

22   were flagged here for English language learners at 3.0.  Which

23   had English language learners been included, if they were

24   included in disproportionality monitoring, would have resulted

25   in -- in the selection of those six districts.  But they are

1    not.

2        So we also then looked at -- and this is the last table in

3    each section -- the extent to which districts flagged at

4    two and a half, 2.5, were selected for comprehensive review,

5    because if you're selected for comprehensive review, then in

6    theory at least this type of issue can be probed for students.

7    And for this -- for this particular indicator, none of these

8    12 districts were selected for comprehensive review.

9        We then moved on to placement in separate programs.  Here

10   at 2.5, we flagged 18 districts, two of which had more than one

11   flag, two of those districts.

12       So at that, we then also turned again to 3.0, a risk ratio

13   of three.  And there three districts were flagged for -- for

14   kids in foster care.  Again, kids who are in foster care are

15   not included in disproportionality monitoring.  So if that were

16   not the case, then these districts would have been selected for

17   disproportionality review.

18       Here we turned again to comprehensive review selection and

19   determined that three of the districts that we flagged at

20   2.5 were, in fact, selected by CDE for comprehensive review.

21   And one additional district that was flagged at 2.5 was

22   selected despite scoring above 62 percent by CDE, and you may

23   recall some discussion of that particular district at the last

24   set of hearings.  That was a district that scored a little bit

25   above 67, but was selected for -- by CDE for other reasons.

1        Okay.  Finally, suspensions.  Here -- and we've included

2   tables that show you the flags for the different populations.

3   Here we flagged at 2.5 33 districts, seven of which had more

4   than one -- one flag.

5        At 3.0 eight districts were flagged for kids in foster

6   care, five districts were flagged for kids in poverty or -- in

7   or near poverty, and two for homeless students.  The extent to

8   which these 33 districts were selected for comprehensive

9   review, of the 33 at 2.5, four were selected by CDE by its

10  typical means, and an additional -- that additional district

11  was also selected.  So that brings the total for five out of

12  the 33 were under -- would be under -- would have, I guess by

13  this point in the school year, undergone comprehensive review.

14       So our overall conclusion is that if this sort of analysis

15  were engaged in, an additional 59 districts would be selected

16  for Performance Indicator Review in these three areas.  Eight

17  of these 59 in total were selected by CDE for comprehensive

18  review.

19       So our conclusion is basically that the failure to

20  disaggregate the data hinders the State's ability to flag

21  districts for monitoring.

22            THE COURT:  Reaction?

23            MS. DUNCAN-BECERRIL:  So we disagree with the

24  Monitor's analysis.  In fact, his analysis for student --

25  districts who are in -- whose (inaudible) students are in a

regular classroom, less than 30 percent identified 12 out of

13 -- 1,360 LEAs, and 15 --

        **THE COURT:** Oh, sorry. I -- can you repeat that?

        **MS. DUNCAN-BECERRIL:** Sure. And I have a -- of

course a chart.

        **THE COURT:** A chart. Are you going to hand out the

chart?

        **MS. DUNCAN-BECERRIL:** Sure.

    (Whereupon document was tendered to the Court.)

        **MS. DUNCAN-BECERRIL:** So 12 out of the 1,360 LEAs

that were not selected for Performance Indicator Review for

students who are in a regular classroom less than 40 percent of

the day, 12 of them were flagged. So less than 1 percent,

.88 percent.

        **MR. MLAWER:** Excuse me. Less than 1 percent of what?

Of the overall districts --

        **MS. DUNCAN-BECERRIL:** Students who were not selected

for that indicator. So 1,360 LEAs were not selected for PIR

for students in a regular classroom less than 40 percent of the

day. So the analysis -- my assumption is, and I could be

wrong, is that the Monitor states we didn't flag those

districts and we should have if we had done this analysis.

    So of the 1,360 that were not flagged for Performance

Indicator Review, he's stating 12 of them should have been.

So that's .88 percent, less than 1 percent.

1    Additionally, for students in separate schools, 1 percent

2  of the LEAs.  So 15 out of 1,435 should have been flagged.  And

3  for suspension, 3.6 percent of the LEAs not flagged, that's

4  27 out of 738.

5    Now, all of these LEAs are participating in some level of

6  monitoring activity.  Not necessarily in that area, but in a

7  monitoring activity.  So 50 out of 59 of them are

8  disproportionate.  And all of them are participating in

9  Performance Indicator Review except one.  So, and that one

10  district that's not in Performance Indicator Review is in -- is

11  disproportionate.

12    Now, it is a small number, far below what we would even

13  consider normal error.  But I did also look -- I think when we

14  had this initial discussion, the statement was said, "Well,

15  what if they are just not doing very well with that

16  population?"

17    So I went on the dashboard and I found that -- it's harder

18  with least restrictive environment, but of the 12 LEAs that

19  were identified for students in regular class less than 40

20  percent of the day, four of them are in differentiated

21  assistance for students with disabilities, which means they are

22  failing more than two areas for students with disabilities.  So

23  they are going through with their county office an intensive

24  root cause analysis to ensure that they are looking at all the

25  areas of special education.

1          And two of the LEAs were flagged for different genus.

2     Those would mean they are doing poorly for EL.  And that was

3     the area the Monitor identified them for.

4          Going to separate schools, five of the students in

5     differentiated assistance were in that because of poor outcomes

6     for students with disabilities, meaning they are going through

7     with their county office and a root cause analysis process that

8     includes looking at LRE.  And five were in the -- in

9     differentiated assistance for their outcomes for foster

10    children, which was the area the Monitor identified for those

11    five LEAs.

12         It becomes even more apparent when you look at suspension,

13    which does have a comparable -- ability to compare.  So of the

14    27 districts the Monitor flags for subgroup suspension, 17 are

15    either red or orange on the dashboard for that subgroup, which

16    indicates to me that it's not an issue of disability that's

17    causing these poor outcomes.  It's an issue that -- with that

18    subgroup.  So, for example, the Monitor identified 11 LEAs who

19    are more likely to be suspended, who are also foster.  However,

20    nine of them, or 81 percent, are read on the dashboard for

21    suspending foster students.

22         THE COURT:  Regardless of disability?

23         MS. DUNCAN-BECERRIL:  Regardless of disability.  So

24    to me, even though there is -- to me it's a very small number

25    of districts identified.  Those -- the issues, it seems to me,

1   is not that they are doing poorly with students with

2   disabilities.  It's that that subgroup is struggling within

3   that LEA.  And we have methods within our larger accountability

4   system to address that.

5           MR. MLAWER:  Did those methods include an

6   individualized determination of the extent to which the kids

7   suspended, for example, are receiving FAPE for LRE?

8           MS. DUNCAN-BECERRIL:  I can't speak -- I can't speak

9   to how foster --

10          MR. MLAWER:  Is it a special education monitoring

11  process, this differentiating --

12          MS. DUNCAN-BECERRIL:  Assistance?

13          MR. MLAWER:  -- assistance?

14          MS. DUNCAN-BECERRIL:  It is not.

15          THE COURT:  Thank you.

16          MS. DUNCAN-BECERRIL:  But the issue may very well not

17  be special education.  It may be that the district itself is

18  struggling with this greater population.

19          MR. MLAWER:  Well, both may be true, but one process

20  has the ability to find a kid who is not receiving FAPE and

21  correct that, find a kid who is not placed in the LRE and

22  correct that, and the other one does not, if I understand you

23  correctly.

24          MS. DUNCAN-BECERRIL:  That is not how we -- we could

25  separate the two within the analysis.

1    This is simply a risk that one is more likely to be

2 identified or placed in a separate school versus another -- or

3 be suspended.  The cause of that risk at this point is unknown,

4 and I don't know how we could know it using the data here.

5        **MR. MLAWER:**  Well, no.  The point is that if these

6 districts were, in fact, selected for Performance Indicator

7 Review in these particular area, presumably that process would

8 include a special education process that would make such

9 determinations and fix them.

10       **THE COURT:**  Okay.  I think I understand the issues.

11    Mr. Koski, do you have anything you want to add on this

12 point?

13       **MR. KOSKI:**  No, Your Honor.

14       **THE COURT:**  Okay.  Do you want to circle back briefly

15 to -- I wanted to make sure we had enough time to discuss the

16 other stuff before we got to Section 3.  But do you want to

17 briefly circle back to Section 3 of your report?

18       **MS. DUNCAN-BECERRIL:**  Your Honor, I was able to look

19 at those 30 districts.  The majority of them --

20       **THE COURT:**  On Child Find now?

21       **MS. DUNCAN-BECERRIL:**  On Child Find, yes.

22    About 17 of them are charter schools, so a little over

23 half.  And the rest of them are located in what we could

24 consider very small counties, rural counties.  So Imperial,

25 Modoc, San Benito, Siskiyou, Stanislaus, and Tulare.

1           **THE COURT:**  Are those the kinds of districts that you

2  would expect to have the biggest Child Find problems?

3           **MS. DUNCAN-BECERRIL:**  Those areas?  Yes.  Because,

4  again, sometimes the rural, the -- makes it more complicated to

5  do Child Find.

6           **MR. MLAWER:**  I'm not sure.  Do you have a list of the

7  70?  Do you think that the 70, between one and a half and two

8  would look similar or would there be differences?

9           **MS. DUNCAN-BECERRIL:**  I mean, we could definitely --

10  I mean, obviously I will be filing this information on the

11  docket and we can file that information as well.

12           **MR. MLAWER:**  Okay.  So just to review, there are

13  three different factors that you pointed to; right?  One is

14  being a charter school, one is being rural, and the other is

15  small; is that correct?

16           **MS. DUNCAN-BECERRIL:**  Uh-huh.

17           **MR. MLAWER:**  Okay.  So the interest would be to take

18  a look at the 70 and to see do they also fit a similar pattern?

19           **MS. DUNCAN-BECERRIL:**  Uh-huh.

20           **MR. MLAWER:**  Great.

21           **THE COURT:**  And then does it make you wonder that if

22  you're, you know -- I guess one would assume that like some

23  urban school districts, there -- I guess I'm mildly surprised

24  to see that some urban school district is not on the list of

25  districts that fall more than two standard deviations below the

1   mean.  Does that surprise you?

2           **MS. DUNCAN-BECERRIL:**  No, actually, it doesn't.

3   Because a lot of times there is a little bit more of a safety

4   net in terms of their -- there's more individuals around the

5   child.  So you have access like medical care.

6           Even if it -- let's say -- let's say -- and I don't want

7   to paint with too broad a brush here obviously, but if you have

8   a very urban district that has a very high percentage of free

9   and reduced price meal eligibility, you might find that a

10  number of those children are also on MediCal or Medicaid and so

11  that they are also accessing a set of services that could

12  identify them.  They also might be eligible for state

13  preschool, which also could identify them at an earlier age.

14          So there is a little bit more -- I'm not saying it's a one

15  to one match.  I'm saying that is what we might see versus in a

16  rural area sometimes you have students who show up for

17  kindergarten on the first day and nobody has really reviewed

18  their -- how their progress is or what their needs are.

19          **THE COURT:**  Okay.

20          **MR. MLAWER:**  Do you think -- is that because the

21  families may be somewhat disconnected from the services that

22  exist and/or services don't exist?  That kind of thing?

23          **MS. WRIGHT:**  So I just returned from Del Norte -- a

24  three-day tour of Del Norte County as of last night, and this

25  is actually something that we discussed.  And the bottom line

1   is, is that a lot of times it's parental choice and because

2   folks are -- we're talking really rural; that the -- the

3   district and the county and SELPA were doing a really nice job

4   of trying to go out and outreach and some of the children, the

5   preschoolers -- and they have -- they are trying to increase a

6   robust early intervention.  Zero to three with the regional

7   centers.

8        The children zero to three are being on a bus two to three

9   hours a day to even get to a location.  And so that's really

10  what we're dealing with.  It's like a five-hour difference

11  between some of the locations within that one county.  And I

12  think some of the same situations occur here.

13       So I don't think it's for lack of trying.  I think there

14  are just some situations that come up that are out of the norm.

15  And I think Shiyloh is right in terms of you just have so many

16  more points of contact.

17       And one of the things they talked about in Del Norte was

18  that medical care, the pediatricians -- access to

19  pediatricians, even, is really scant.  So they haven't been --

20  even been able to -- the parents are saying that it's really

21  difficult to get medical care for themselves and their kids

22  because of just -- just services in general are really --

23  there's not many.

24            **MR. MLAWER:**  Thank you.

25       Okay.  Turning to number three, the correlation between

1    suspension and rates of referral to law enforcement.  This may

2    be the most straightforward of these five issues, at least in

3    terms of what we discovered.

4         We had ultimately 800 -- data from 896 districts here for

5    analysis.  We spent some time describing some of the problems

6    in the data and concluded there that these results should be

7    interpreted with caution.  In other words, we're not sure this

8    is correct based -- for the reasons that we stated.

9         Nevertheless, we proceeded with analysis for 817 of these

10   districts that had at least 15 students with disabilities in

11   the OCR, the Office of Civil Rights dataset.

12        We determined that there was a moderate correlation, a

13   correlation of .56 between suspension and referral rates across

14   those 817 districts.

15        So what that means in terms of the issues as we've

16   discussed them in -- in this Court in the past is that CDE's

17   contention that you can use incident and suspensions as a

18   predictor for referrals for law enforcement is -- is correct at

19   this moderate level, the level of moderate correlation.

20        So in other words, if a district is selected for a

21   monitoring process based on suspension rate, assuming what

22   happens next includes looking at these issues, then you would

23   pick up most of these districts.

24        However, there are some outliers, and we tried to -- to

25   lay that out.  First, you know, we gave you a table of the

1  correlations of all students with disabilities and certain

2  subpopulations.

3        We then looked at districts that had referral rates above

4  4-and-a-half percent and suspension rates lower than

5  4-and-a-half percent.  Again, for all students with

6  disabilities and for these subgroups.  That second table on

7  Page 11 shows you those results, that continues on to Page 12.

8        So there is a relatively small number of such districts.

9  We have it at 26 such districts.

10        Then we calculated the average percent of students with

11  law enforcement referrals in those districts, and you see that

12  in the very next table.  And we expressed the full range of

13  those 26 districts.

14        However, when you get down to the district level and you

15  look at some of the gaps, nine -- there are nine gaps that are

16  at least 9 percent between suspension and referral.  And it's

17  only by analyzing these data that you can get to that sort of

18  conclusion.

19        So in other words, for these particular -- let's take

20  District A in the table at the very bottom of Page 12.  For

21  students with disabilities in District A, the referral rate was

22  14 and three quarters, the suspension rate was 1.7.  So that's

23  a fairly sizeable difference of a little bit over 13 percent.

24        So it would be only through such a data analysis that you

25  could get to these conclusions and then base monitoring on this

1   sort of data.

2       However, overall there is this moderate level of

3   correlation, so although it would not pick up this sort of

4   thing, in general, suspension rates are predictive of referral

5   rates.

6       Did I express that correctly?

7           **MS. WAGNER:**  Yes.

8           **MR. MLAWER:**  Okay.  Thank you.

9           **THE COURT:**  Okay.  It sounds like we might be able to

10  wrap up a little early.

11      But, Mark, I wanted to ask you, are there any particularly

12  important issues that you didn't get to address the last time

13  we were here?  I have a vague recollection that we may have cut

14  off before we got through the entire list, and I don't think

15  it's necessary to go through everything, but is there any -- is

16  there anything particularly important that you want to address

17  that you didn't get a chance to address last time?

18          **MR. MLAWER:**  Yeah.  There are a couple of things.

19  I'll just -- on the meets requirements districts, that was the

20  very last section of my January report.  And I included a

21  number of tables in there that the Court may want to look at

22  again, although we have -- in this additional analysis, we've

23  unpacked that somewhat for at least a couple of issues.  I

24  don't think it's worth our time now me going through it.

25      I do think that what we did not do -- with the exception

1    of preschool review and comprehensive review, we did not go

2    through the selection process for any of the monitoring -- the

3    specific monitoring processes.  I think, though, we have

4    covered a lot of the issues.  So maybe I can just do this in

5    the briefest possible way.

6          Performance Indicator Review.  My conclusion was

7    non-compliant.  This is, by the way, on Pages 43 to 46 of my

8    report.  Based on insufficient data analysis and some

9    inadequate targets.  And I include a table that starts on

10   Page 45 that captures that.

11         One aspect -- I said it was unclear whether preschool

12   placements and preschool performance were included.  We have

13   clarified that, that preschool LRE is included in Performance

14   Indicator Review.  CDE responded, and we had a bit of a

15   discussion about that issue last time.  Preschool performance,

16   preschool outcomes is not included in Performance Indicator

17   Review.

18         So some of these issues concerning data analysis and

19   targets, we have covered in other ways and CDE has told us that

20   it will be engaging in a process beginning in the fall to look

21   again at its targets and determine their adequacy and set new

22   targets, if I understood it correctly.

23         So I don't think much discussion is necessary there, and

24   we've dealt with the disaggregation issue as specifically

25   applicable here.

1          Data Identified Noncompliance.  I concluded compliance.

2     Plaintiffs stated in their response their agreement with that.

3     CDE did not address it, but I'm going to be quite surprised,

4     Mr. Spence, if you tell me you disagree with that finding.

5          **MR. SPENCE:**  We agree with it a hundred percent.

6          **MR. MLAWER:**  All right.  Now, disproportionality

7     review, I concluded non-compliant here, but that was only

8     because of the two faulty formulas.  CDE has stated, and we

9     discussed, I think, at the April 29th hearing that those

10    formulas would be corrected and applied next school year.  So

11    I think that will take care of that one.

12         Significant disproportionality review.  I deferred that

13    for two reasons.  One was the formulas; that's taken care of.

14    The second is the reasonable progress definition, which is

15    outstanding and is referred to a stakeholder group.  So I think

16    we're simply waiting for more information from CDE about what

17    that definition will be.  And I think, although I didn't

18    capture it in my notes, plaintiffs may have asked here for a

19    deadline for this.  I don't recall.  It's been a while since I

20    read your March submission.

21         **MS. DUNCAN-BECERRIL:**  I can actually chime in on that

22    if it's helpful for us to put it on the record.

23         We have to do this.  So the change in the regulation

24    requires us to do a -- for this upcoming year to use the new

25    method for significant disproportionality, including reasonable

1   progress.  So we will have to work with our stakeholder group

2   to finalize that this summer.  Because in order for us to do

3   significant disproportionality on the data this fall, we have

4   to have that set.  So it will be set.

5          MR. MLAWER:  I see.  So your intention would be to

6   file something on the docket after it is set and tell us what

7   that is?

8          MS. DUNCAN-BECERRIL:  Absolutely.

9          MR. MLAWER:  Okay.  That, I guess would --

10         THE COURT:  That sort of begs the question of what

11  sort of process we're going to have going forward.  It may not

12  be necessary to file something on the docket when they have it.

13  It may make more sense to just address it when we come back,

14  you know, to take another crack at getting us past Phase 2.

15  But we can talk about that a little bit.

16         MR. MLAWER:  Okay.  And, finally, non-public school

17  monitoring.  Now, there was a document that was filed by CDE

18  that was an instrument that governed non-public monitoring, and

19  it called -- this is the monitoring of NPSs, non-public

20  schools.  It had four different types of reviews, as check

21  boxes on the first page.  "Validation," "On Site," "Follow-up,"

22  and a box that was called "Other."  It was established at

23  Phase 1 that the school the student attends is -- are data

24  collected by CDE.  CDE's December submission did not provide

25  any information about this.  So I raised the question of are

data being used for the selection of non-public schools for
monitoring, and if not, why not.

The response that was offered by CDE was that these are on
a three-year cycle. That monitoring is on a three-year. So
each of these facilities, if I understood that correctly, is
monitored every three years regardless of what data may say
about what's going on in those schools; is that correct?

MS. DUNCAN-BECERRIL: I believe that they are
monitored annually, but the monitoring may be different. So
they have an on-site monitoring review every three years.

MR. MLAWER: But something else happens?

MS. DUNCAN-BECERRIL: They are recertified every
year.

MR. MLAWER: And what is involved in recertification?

MS. DUNCAN-BECERRIL: So I am -- I am not in charge
of that, but we do have the -- the person in charge of our
non-public schools unit here today who can come and speak to
what involves -- I mean, obviously, the selection is cyclical.
So if we're talking about selection, that is how it is done.
Every year a district -- a set of districts comes up for an
on-site review.

When they are not in on-site review, they are either doing
follow-ups or I believe there is a desk audit. But the actual
activities, I think that is a Phase 3 thing, but we can
speak -- we have the director -- or the manager of the

1    non-public schools unit here.

2          **MR. MLAWER:**  Yeah, we were -- I was thinking only of

3    selection for Phase 2.

4          **MS. DUNCAN-BECERRIL:**  So selection is cyclical.

5          **MR. MLAWER:**  So every three years, regardless of what

6    data may say about the particular facilities; is that correct?

7          **MS. DUNCAN-BECERRIL:**  I think the only exception

8    would be is if there was another -- a critical incident that

9    occurred at that site.

10         **MR. MLAWER:**  And a critical incident is what?  A

11   Behavior Emergency Report being filed about a student in a

12   facility, would that be a critical incident?

13         **MS. DUNCAN-BECERRIL:**  No.  So a critical incident --

14   do you want to speak?

15         **MS. WEDIN:**  Yeah.  So a critical incident can come to

16   our attention in a couple different ways.  Somebody can file a

17   complaint, and if we feel it's warranted, we could do an

18   on-site investigation, which would constitute basically a

19   review.

20        Other incidents have -- have arised in the media.  So if

21   we learn something through the media that something awful has

22   happened with a student in an non-public school, we can send

23   out a team and do a review that way.

24        So as things come to your attention outside of the

25   cyclical review, if we feel that it warrants our attention, we

1   will send out a team and do a review at that point.

2          **MR. MLAWER:**  So does that mean that if a complaint is

3   filed on behalf of a student or a group of students at one of

4   these facilities, that automatically results in what you're

5   describing or only sometimes that happens?

6          **MS. WEDIN:**  I believe it's only sometimes that it

7   actually warrants an on-site review.

8          **MR. MLAWER:**  Okay.  And are there a set of standards

9   that would govern when you do on-site versus when you do not?

10         **MS. DUNCAN-BECERRIL:**  Can we have a moment?

11      (Discussion held off the record amongst the

12         Policymakers.)

13         **MS. DUNCAN-BECERRIL:**  So I think we need to bring

14  up -- we keep looking back --

15         **THE COURT:**  I mean, I was actually going to cast a

16  vote for sort of circling back to this next time.

17         **MS. WRIGHT:**  We can get in the weeds on this easily.

18         **THE COURT:**  Yeah.  Why don't we do that?  Why don't

19  we move to sort of the process?

20         **MS. DUNCAN-BECERRIL:**  Your Honor?

21         **THE COURT:**  Yes.

22         **MS. DUNCAN-BECERRIL:**  Can I just circle back around

23  to the Office of Civil Rights data?

24      I just -- I'm not sure -- sometimes it's -- this sometimes

25  feels like a poker game.  I'm never sure how -- like,

```
 1   everyone's hands and stuff, but I just --
 2           THE COURT:  I don't think you need to worry about
 3   that.
 4           MS. DUNCAN-BECERRIL:  Okay.  I just want to make sure
 5   because there are a lot of concerns with that data, and if
 6   ordered to use it, then we should bring it up.
 7           THE COURT:  I don't think you need to worry about
 8   that.
 9           MS. DUNCAN-BECERRIL:  Okay.
10           THE COURT:  So what -- have you all given some
11   thought to what I said about, you know, I think that where this
12   is going is there will be a ruling from me saying, you know, we
13   need to sort of press the reset button on data analysis and
14   there is just too much that needs to be done to get past this
15   phase.
16       I'm actually not sure anybody in the room would disagree
17   with that point, but what -- assuming I do that, when -- A,
18   when is the right time to come back on Phase 2?  And I assume
19   what it would involve is maybe the State initially making a
20   filing that says, okay, here is what we're doing now.  You
21   know, you said we were not in compliance on data analysis in a
22   variety of ways.  Here is what -- here is what we are -- either
23   have changed or are in the process of changing.  Right?  And
24   then we would maybe get a response from the Monitor and the
25   plaintiffs and we would come back here again and go through it.
```

1      And so the question is:  When is the right time to do

2  that?

3      And then what -- you know, should we be doing anything on

4  the Phase 3 issues in the -- in the meantime?  On that last

5  point, I think the answer is probably no, but I'm open to

6  suggestions or thoughts.

7      **MR. SPENCE:**  Your Honor, obviously we would like to

8  move the process along as fast as possible.  I think you're in

9  agreement with that.  But I think we're going to need to see

10  your order to know the extent of the problems that you have

11  identified or will potentially identify.  So we can't really

12  give you an intelligent answer about that until we see that.

13      **THE COURT:**  Okay.

14      **MR. SPENCE:**  But it's been -- Shiyloh has mentioned

15  to me, and I'll let her speak.

16      **MS. DUNCAN-BECERRIL:**  I think one of the concerns

17  that we had in the previous period was the desire to have

18  evidence; right?  The lists of districts, which ones were

19  picked for what things.  And that was really difficult for us

20  to do with a December deadline last time.  Because I think that

21  our filing was due on the 9th, and the dashboard data didn't

22  publish until the 7th.  And so we were -- I mean, I had staff

23  late working on that to try.  And we still had some errors that

24  we had to clean up and refile and things like that that the

25  Monitor identified.

1          So I think if at all possible, my suggestion would be the

2    earliest would be late January, early February so that we could

3    do a filing based on how the order and what you see as the

4    needs of the Court to make changes to our data analysis,

5    implement them, see if there is anything that comes from this,

6    like the small charter school thing.  I think that -- you know,

7    that thing came up this year once we ran the data.  And then

8    file.

9          **THE COURT:**  So the idea would be to file something in

10   January?

11         **MS. DUNCAN-BECERRIL:**  Late January.

12         **THE COURT:**  Okay.  So that's -- that's fine with me.

13   What I want to emphasize, though, is that, and I'm guessing you

14   probably already know this based on my Phase 1 ruling and my

15   general comments in -- throughout these proceedings.  But, you

16   know, what you will not get from me and what I think would be

17   inappropriate for a federal judge to give to you is, you know,

18   specific prescriptions on how you should do X, Y and Z; right?

19   My job is to identify the areas where you're not meeting

20   some -- where you're not meeting a floor and how to meet -- how

21   to get -- how to meet the floor.  You know, what to implement

22   to get past the floor is sort of up to you.  And so I just want

23   to make that very clear.

24         **MS. DUNCAN-BECERRIL:**  I completely understand that.

25         **THE COURT:**  Yeah.  Okay.  So -- and then what

1  about -- what about the issue of whether we need to be

2  looking -- I mean, I assume that the changes that are going to

3  be -- that we all know are going to be made in the coming

4  months on data analysis may well affect, you know, sort of the

5  way monitoring is actually conducted.

6       And so that's why I keep saying that I -- I doubt it makes

7  sense for this proceeding to move on to Phase 3 in any way at

8  this point; that we ought to -- really ought to nail down

9  Phase 2.  And maybe we can figure out a way to accelerate the

10 process on Phase 3, you know, depending on where we are after

11 Phase 2.

12          MR. SPENCE:  We agree -- sorry to interrupt.

13          THE COURT:  No, that's okay.

14          MR. SPENCE:  We agree it makes sense to get Phase 2

15 nailed down before we move to Phase 3 because, as you

16 mentioned, that affects what we do.

17          THE COURT:  Okay.

18          MS. DUNCAN-BECERRIL:  Oh.

19          MR. SPENCE:  Do you disagree?

20          MS. DUNCAN-BECERRIL:  No, I agree completely with

21 that.

22       One thing we may want to -- and I sort of have been

23 prodding lawyers about this, is we could circle back around to

24 the issue of IEP implementation.  I think that we are -- there

25 are some places where we're struggling and would -- not

necessarily where we're saying should we do it this way.  We

are asking ourselves:  Should we do it this way?  Should we do

it that way?

     But helping us understand what some of the expectations or

what is good practice or ideas that -- and thoughts that people

have because we don't want to bring something forward that

would be dead on arrival.

     So I think that would be really important.  And if we

could do that --

          THE COURT:  As part of this same, on the same

timeline?

          MS. DUNCAN-BECERRIL:  We could do it, or potentially

before.  We need to be able -- if we're going to start

collecting that in 2021, we need to start getting the

specifications set really soon.

          THE COURT:  Okay.  So in other words, you would like

to seek -- you would like to kind of get a clean bill of health

on -- clean bill of legal health on IEP implementation much

sooner than the tail end of the process.  Like this year or

something like that?

          MS. DUNCAN-BECERRIL:  Yeah.  I think we would need --

this summer would be awesome.  I mean, and it doesn't have to

be a huge formal setting.

     I mean, I don't understand the process.  I'm sorry.  But

maybe, I think, like a case conference.  Is that what that is?

1           THE COURT:  Case management conference, status

2     conference.

3           MS. DUNCAN-BECERRIL:  Yes.  In a place where we could

4     have more discussion about, like, here are some things that

5     we're thinking, just to move forward.

6           THE COURT:  Yes.  And my suggestion -- I mean, I

7     would be happy to be involved, but, you know, my suggestion is

8     maybe you have a meeting or two with the plaintiffs and perhaps

9     the Monitor kind of on your own and start the process of

10    working through those issues and then, you know, kind of -- and

11    then we can -- and then you can bring me in at the tail end of

12    that.  That's what I would suggest.

13          MR. SPENCE:  It may make more sense to have it off

14    the record so that there could be more frank discussion and

15    more -- so I think that would be consistent with what you're

16    suggesting.

17          MR. MLAWER:  Can I just ask one clarification?

18    The -- you're referring to -- and, Shiyloh, I guess this

19    question is for you.

20         Were you referring to the Phase 1 aspects, collecting the

21    data, or were you also including in Phase 2 aspects the

22    analysis of the data and the use of those data for selection

23    for monitoring purposes?  How far were you going?

24          MS. DUNCAN-BECERRIL:  I think -- I think there needs

25    to be a little bit of both, because here is where we struggle.

1    So we have the indicators, and the U.S. Department of Education

2    says this is how you calculate least restrictive environment.

3    So we can then backtrack from that a way to collect the data.

4    Right now we don't have what that would look like.  And there's

5    a lot of questions that are coming up.

6         Like, a student misses a service because they are sick or

7    a parent thinks they don't like the services and those

8    services -- so there are so many things that we're sort of

9    like, okay, do we ding a district?  Do we not?  What does it

10   look like?  What does that calculation look like?

11        I have a lot of statistical ways that I'm looking at it,

12   but I want to make sure that we are going to be able to collect

13   what we can analyze and that we analyze the right thing to get

14   at the right place.

15        And we -- you know, CDE doesn't often have that

16   opportunity.  Sometimes we are just like, do it this way and

17   quickly.

18        **MR. MLAWER:**  I can make one preliminary suggestion.

19   The parties at one time when they agreed on the RSIP, the

20   corrective action plan for the district included several

21   requirements in there for measuring service delivery, which I

22   monitored for many, many years, so some of these issues like

23   the student absence issue we resolved a long time ago by simply

24   saying if the student is absent, the student is not available

25   for services that day.  We tried to keep it as simple as

possible.

There were other issues around frequency of service, where CDE made clear to me in the midst of the RSIP monitoring at least a decade ago, that in CDE's view -- and they were correct, you folks were correct about this -- I was monitoring it incorrectly, because I was not looking for frequency.  In other words, if an IEP said student gets speech therapy three times a week for 20 minutes each time, that's -- that's how CDE monitored it at that time.  I assume when you're in comprehensive review, for example, you're doing it the same way now, which is the proper way to do it.

However, what I was confronted with when I began this in 2003 were just such awful numbers in Ravenswood that it wold have been -- nothing would have been accomplished by me monitoring that way.

So instead with that example, if I saw that the student received the 60 minutes during the course of that week, which could have been in two 30-minute increments, I marked it compliant because my reasoning was the kid got the service.  If I mark it non-compliant when the kid got the service, then all of a sudden Ms. Armsby's client is overwhelmed by comp ed, and it's not easy to determine what -- is comp ed appropriate in such a circumstance.

So there are dilemmas like that come up when you're looking at --

1          **MS. DUNCAN-BECERRIL:**  Those are some of the things

2    that we are struggling with.  And Ravenswood has 300

3    students --

4          **MR. MLAWER:**  That's right.

5          **MS. DUNCAN-BECERRIL:**  -- with services.  We are

6    looking at 800,000-plus students, and last year we collected a

7    potential of 3 million services.  So it doesn't just become an

8    issue of checking the box or entering the data.

9         Now, if -- you know, we ran into some concerns about

10   labor.  So if a -- if you're now requesting that a teacher

11   enter data in this manner, then that becomes a labor issue.

12   And so these are some of the things that we're struggling with.

13         **THE COURT:**  So the upshot, it sounds like, is that

14   you want to -- before you make a submission in which you

15   attempt to establish compliance on this issue that I held you

16   out of compliance on last time, you would like to have a status

17   conference, off-the-record status conference where we can kind

18   of bounce ideas around.  No guarantees, no -- you know, no

19   stamp of approval, before at least sort of make sure everybody

20   is on the same page on the issues that you're tackling.

21   That -- I'm perfectly fine to do that as long as it's clear

22   that, you know, you're not getting any formal green light from

23   me on anything.  It's just me facilitating discussions among

24   you all to make sure that you're focused on the right issues as

25   you go forward.

1      **MR. SPENCE:**  Yes, Your Honor.

2           Also it's our understanding that we're not advocating or

3      delegating our responsibilities to come up with policy to

4      either the Monitor or the plaintiffs, but we do appreciate

5      hearing their -- their concerns, because there have been other

6      times where they have raised valid concerns that have provoked

7      discussion amongst ourselves.

8           **THE COURT:**  So working -- let's work backwards.

9           First of all, when would you like to get together with me

10     and the plaintiffs and the Monitor on that issue?  And then you

11     can maybe have some meetings before that amongst yourselves.

12          What are you laughing about, Mr. Koski?

13          **MS. DUNCAN-BECERRIL:**  He's looking at me like --

14          **MR. KOSKI:**  Nothing, Your Honor.  Sometimes we have

15     some decent ideas over here.

16          **MS. DUNCAN-BECERRIL:**  Well, I mean, I think one of

17     the things that's happened in this case, and that may

18     contribute to some of the sort of Frankenstein nature, is,

19     like, how about this?  How about this?  And we want to sort of

20     really be proactive and thoughtful.  Because it wasn't under

21     our watch that that occurred.  And so now it's like, okay,

22     let's -- there maybe needs to be a set of resetting.

23          If we could meet within June and July with the Monitor and

24     plaintiffs and then perhaps in August schedule some time with

25     you for an informal case conference?

1          **THE COURT:**  Sure.  Sure.  And you can decide, I

2    think, for these formal things all of you all, you know, come

3    here and you bring lots of people with you and stuff.  I mean,

4    this can be -- you know, you don't all have to be here for

5    that.  You can decide who should be there -- who should be here

6    for that.

7          My calendar is a little bit sketchy in August.  A couple

8    of dates that are jumping out.  One is August 7th, and another

9    is August 21st.  And then --

10          **MS. DUNCAN-BECERRIL:**  The 21st is best for us.

11          **THE COURT:**  And also the last week of August, the

12    week of August 26th probably do like, you know, the 28th or the

13    30th.

14          **MS. DUNCAN-BECERRIL:**  Just the 21st would be best for

15    us.

16          **THE COURT:**  Okay.

17          **MS. DUNCAN-BECERRIL:**  The 28th is probably okay as

18    well.  The 30th is -- that's the weekend before Labor Day.

19          **THE COURT:**  Oh, yeah.  Right.  Right.

20          If we're deciding between the 21st and the 28th and if it

21    doesn't matter too much for you, my preference would be the

22    28th.

23          **MS. DUNCAN-BECERRIL:**  Okay.

24          **THE COURT:**  I think I will have -- because I will

25    just be -- on the 21st I will just be coming back from

vacation, and I will probably not have had time to drill down

too much on it yet.

     **MS. DUNCAN-BECERRIL:**  Okay.

     **THE COURT:**  So the 28th, why don't we say -- I mean,

I have stuff in the morning.  So we could schedule it for the

afternoon or I could -- if it's easier for you, since you all

are coming down from Sacramento, I can move my stuff that's

currently scheduled in the morning to the afternoon and have

you come in the morning.

     **MS. DUNCAN-BECERRIL:**  I mean, that's kind of better

for us just for traffic-wise.

     **THE COURT:**  That's what I figured, yeah.  So why

don't we do 9:30 a.m. on the 28th.  And I'll ask Kristen to

move -- Kristen Melen to move the morning stuff to the

afternoon.

     **MS. DUNCAN-BECERRIL:**  Thank you.

   We can schedule meetings with the Monitor and the

plaintiff virtually, if that's okay, or --

     **THE COURT:**  Yeah.  Why don't you -- that sounds

great.  Why don't you do that and --

     **MR. MLAWER:**  We can do conference calls, you mean?

     **MS. DUNCAN-BECERRIL:**  Yeah.  Like Zoom calls, video

conferencing.

     **THE COURT:**  I would suggest you schedule, like, two

calls before we have this August thing, at least, you know,

1    have two meetings where you start hashing out the stuff.  And

2    no written submissions before -- well, I mean, it may be useful

3    to submit something, you know, a week in advance just for me to

4    absorb in advance.  But I'm not going to require it.  If you

5    all just want to meet, that's fine too.

6          **MR. MLAWER:**  It's possible, you know, if I think

7    optimistically, that the parties will reach some sort of

8    consensus around a couple of good options and the document

9    that's filed could conceivably be filed by both parties and be

10   a consensus statement of what the options are.  That's the most

11   optimistic possibility, I think.  And maybe it's realistic.  I

12   think that's a look of skepticism coming from Mr. Koski.

13         **MR. KOSKI:**  That's optimistic.

14         **THE COURT:**  All right.  Sounds good.  So we'll -- so

15   you all work on that.  I will work on a Phase 2 ruling.  We can

16   sort of -- we will kind of tentatively plan on coming back on

17   Phase 2 with a written submission from the State sometime in

18   late January and which I assume means that we will all get

19   together, you know, in the spring of 2020 on Phase 2 again.

20         But yeah.  It will be nice to at least get a little bit of

21   work done in the interim on this remaining -- this leftover

22   Phase 1 issue.

23         Okay.  Thank you very much.

24         (Proceedings adjourned.)

25

<u>**CERTIFICATE OF OFFICIAL REPORTER**</u>

 

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Friday, June 21, 2019

*Debra L. Pas, CSR, RPR, RMR, CRR*
*Official Reporter - U.S. District Court - San Francisco*
*(415) 431-1477*