**United States District Court**
**Office of the Court Monitor**
*Emma C., et al., v. Tony Thurmond, et al.* **(No. C96-4179 VC)**

**mmlawer@rcn.com**

**Mark A. Mlawer**
**Court Monitor**

# Review of the California Department of Education's Phase 2 (Continued) Submission: Data Analysis

March 9, 2020

## I.  Background/Introduction

The Court's May 18, 2018 *Order re State's Obligations Under Consent Decree* adopted a four-phase process for determining whether the California Department of Education (CDE) has demonstrated that its monitoring and enforcement system complies with the Individuals with Disabilities Education Act (IDEA) (Dkt. No. 2387 at 1-2).  The Court's Order determining Phase 1 compliance was issued on August 17, 2018 (Dkt. No. 2428); the Court's Phase 2 Order was issued on July 5, 2019 (Dkt. No. 2520).

The Court found in the Phase 2 Order that CDE's method of selecting school districts for monitoring was "riddled with serious defects," defects "so serious, and so numerous," that they impair the state's ability to monitor districts' compliance with special education requirements effectively.  For that reason, the Court determined that Phase 3 of this inquiry would not begin until the State Defendants address, or are on their way to addressing, these defects (Dkt. No. 2520 at 1, 2).

Accordingly, this report will examine the extent to which CDE has demonstrated that it has addressed, or is on its way to addressing, the defects identified in the Phase 2 Order.  CDE timely submitted its document responding to the Court's Phase 2 Order on January 31, 2020 (Dkt. No. 2545).

In order to perform necessary analyses of CDE's submission, data were requested from CDE on 2/10.[1]  The bulk of the requested data was received on 2/14.  Additional data were received on 2/28.[2]  CDE filed its explanation of the application of its small district selection methodology to targeted monitoring of performance on 3/2 (Dkt. No. 2553).

## II.  Narrative Summary and Table of Conclusions

A.  <u>Narrative Summary</u>

A reader of the table of conclusions in the next subsection of this report might assume that this report had concluded that CDE's submission was inadequate in all respects.  But the conclusions of this report are much more nuanced than can be captured by the binary categories "compliant" or "noncompliant."  It is clear from its submission that CDE took the findings of the Phase 2 Order very seriously.

The indicators used by CDE to select districts for both intensive monitoring processes under consideration (four indicators for preschool and six for school age) have a clear relation to the FAPE and least restrictive environment requirements of the IDEA.  The formulas and the lowest-decile approach to selection are strong, and reliably select the lowest-performing large districts across all the indicators in its formulas for both monitoring processes.  For the selection of large districts CDE's new approaches are clear improvements over its prior processes.

---

[1] Mlawer email to Gill and Spence, 2/10/20.
[2] The data were provided by CDE on seven different tabs in an Excel file.  There were some inconsistencies in the data across the tabs.  These were reconciled, but it is possible that this was not done perfectly.

It should also be noted that, for school age intensive monitoring, CDE's formula does not select the majority of the lowest-performing large districts on five of the six indicators; for preschool a majority of the lowest-performing large districts on each of the four indicators are not selected, including the least restrictive environment indicators.  This is due to the nature of selection formulas with multiple indicators: very poor performance on one indicator can be overcome by better performance on the other indicators.  This report sets forth some possible modifications to CDE's processes that would make the selection processes more compatible with the effective monitoring of large districts.  It should also be noted that a child find indicator is not included in the selection formulas for either of the intensive monitoring processes.

For the selection of small districts for intensive monitoring, although it is challenging to create an effective selection approach, the application of CDE's small district grouping methodology does not result in the selection of the lowest-performing districts and, for school age, also does not select enough small districts for intensive monitoring.  Several alternative methods that can select a higher percentage of low-performing small districts are explored.

Turning to targets, CDE's new child find target is adequate to select large districts for targeted monitoring.  While a high percentage of large districts are selected for targeted monitoring of least restrictive environment, the current targets are still not ambitious enough in light of state and national data.

With respect to selection of small districts for targeted monitoring, CDE's use of its small local educational agency (LEA) grouping and selection methodology does not result in the selection of the lowest-performing small districts for targeted monitoring of child find or least restrictive environment.  For child find, CDE's definition of a small district is also problematic because it is based on the circumstance in question in child find monitoring:  the number of students currently identified as having disabilities.  For other indicators, CDE sets forth secondary standards to select districts from a selected small district group.  These are not concerning for three of the indicators, but are not adequate for selection for two.

For small districts that would be preliminarily designated as meeting the requirements of the IDEA without further monitoring, some of these small districts show performance problems related to important indicators.

With respect to mediation, CDE's proposed proxy methodology is a reasonable approach to identifying districts reluctant to engage in mediation with parents.  However, districts selected by CDE's methodology are not selected for a monitoring process.

B.  Table of Conclusions

| Section | Topic | Compliance Conclusion |
|---------|-------|----------------------|
| III | Mediation | Noncompliant |
| IV | Small School Districts | Noncompliant |
| V | Targets | Noncompliant |
| VI | Intensive Monitoring-Preschool | Noncompliant |

| Section | Topic | Compliance Conclusion |
|---------|-------|----------------------|
| VII | Intensive Monitoring-School Age | Noncompliant |

In addition to these topics, Section VIII includes brief updates regarding two other issues—restraint and seclusion and IEP implementation.  Conclusions cannot yet be reached on these two issues.

## III.  Mediation

The Court ruled that CDE did not assess districts' use of mediation although mediation is a priority area for states' monitoring activities.  While mediation is voluntary, the Court did not regard it as obvious that the state could not take some form of action if a district routinely refused to engage in mediation.  In addition, the Court wrote:

> As the drafters of the IDEA have signaled, mediation is a useful alternative for parents who lack the resources to hire a lawyer to assist with a due process complaint, or who prefer more informal and nonadversarial methods for resolving disputes. Analyzing mediation data could therefore reveal trends not separately captured by an analysis of formal due process complaints or complaints made to the state. The state could also combine mediation data with other data – for example, districts' suspension rates or assessment outcomes – to form a more complete picture of district performance.  (Dkt. No. 2520 at 14-15; quote at 14)

CDE's proposed approach is less ambitious.

It is worth noting at the outset that California has more mediation requests per capita than almost all other states.  The most recent available federal data for the 2016-17 school year show a national average of 17 mediation requests per 10,000 children and students ages 3-21 served under the IDEA; California had 62 mediation requests per 10,000 children and students.  Only two other states exceeded 60 per 10,000.[3]

After noting that parties can request mediation after filing for a due process hearing, or can request "mediation only" without filing for a hearing, CDE points out that data regarding the reason(s) mediation did not take place are not currently collected.  For that reason, CDE proposes a proxy methodology that uses four filters.

The table below displays the components of each filter and the number of districts identified by each filter using 2018-19 data:

---

[3] U.S. Department of Education (DOE), *41st Annual Report to Congress on the Implementation of the Individuals with Disabilities Education Act*, 2019 (https://www2.ed.gov/about/reports/annual/osep/2019/parts-b-c/41st-arc-for-idea.pdf), at 195-197. California also exceeded the national average for signed, written complaints per 10,000 (13 versus 8), and for due process complaints (60 versus 27).

| Filter # | Filter | # LEAs |
|:---:|:---|:---:|
| 1 | Identify LEAs that filed for due process only without mediation | 4 |
| 2 | Identify LEAs in cases:<br>• resolved by hearing/decision<br><u>and</u><br>• no data showing mediation held<br><u>and</u><br>• no data showing willingness to mediate (mediation scheduled but not held)[4] | 37 |
| 3 | Identify LEAs in cases:<br>• in which parents filed for "mediation only"<br><u>and</u><br>• no data showing mediation held<br><u>and</u><br>• data showing one party "declined to participate" | 16 |
| 4 | Identify and remove LEAs that filed for "mediation only" in same year[5] | 56 |

Based on the 2018-19 data, this methodology would select 42 LEAs.

However, these LEAs would not be selected for a monitoring process, but instead for "targeted technical assistance." This assistance would begin in the 2020-21 school year, with selection presumably based on 2019-20 data (Dkt. No. 2545, Ex. 1 at 12-15).

As the foregoing makes clear, CDE's proposed methodology does not seek to connect mediation data with data concerning complaints filed against districts, or to data about student performance, placements, or suspensions. The failure to do so is a missed opportunity to form a more complete picture of a district at the point in time of selection.

But the question for this report is whether making such connections through data at the point of selection is *necessary* in order to monitor mediation effectively. In the absence of data that speak directly to the issue, CDE's proxy methodology is a reasonable approach to identifying districts that may not be willing to mediate. If Phase 2 of this inquiry only concerned the identification of such districts, without regard for the intervention those districts are identified for, the conclusion of the court monitor regarding mediation at Phase 2 would be "compliant."

However, the statute makes clear that mediation is a priority area for *monitoring* (20 U.S.C § 1416(a)(3)). Technical assistance is not monitoring, and the monitoring of a

---

[4] The assumption here is that the scheduling of a mediation indicates a district's willingness to mediate in that particular case. This approach would not capture districts that schedule a mediation but then cancel it.

[5] The assumption here is that requesting "mediation only" at any point in the year shows that the LEA has a general willingness to mediate. Of course, a district could request "mediation only" in a circumstance in which it felt its due process case would be weak, but refuse mediation in a situation in which it believed its case was strong.

monitoring priority area is not optional.[6]  The state offers no reason to believe that when the statute speaks of monitoring it means technical assistance.[7]  Congress could have made mediation a priority for technical assistance rather than monitoring, but did not do so.[8]

In the Phase 2 Order the Court also found that mediation is a priority area for monitoring, writing:

> But in contrast to some of the other areas discussed in this ruling, the monitoring obligation in the statute is specific rather than general. Federal regulations require states to prioritize mediation in their monitoring activities. *See* 34 C.F.R. § 300.600(d)(2). Because the state does not do this, it is out of compliance with federal law.  (Dkt. No. 2520 at 15)

*Conclusion:  Noncompliant.*
*Reasons for Conclusion:  CDE's proposed proxy methodology is a reasonable approach to identifying districts.  However, the districts selected through CDE's methodology are not selected for a monitoring process.*

## IV.  Small School Districts

The Phase 2 Order found that, due to the state's use of minimum n-sizes to measure performance (with the exception of the timeliness requirements), small districts were "functionally exempt" from many monitoring activities, and were therefore more likely to be classified by CDE as meeting the requirements of the IDEA (Dkt. No. 2520 at 11-12).

CDE's submission puts forth a new approach to the general supervision of small school districts.  It defines a small LEA as one with 100 or fewer students with disabilities.  It considered two methodologies for the analysis of small LEAs:  grouping by Special Education Local Plan Area (SELPA) or grouping by county.  But each methodology had disadvantages.  In short, the SELPA method, due to some LEAs' status as single-district SELPAs, results in some groupings having very few students with disabilities.  The county approach results in the attribution of performance

---

[6] Monitoring is a *required* activity for the expenditure of the IDEA funds reserved for state-level activities; in contrast, technical assistance is an *authorized* activity for such funds (compare the use of "shall" at 20 U.S.C. § 1411(e)(2)(B) with the use of "may" at (C)).

[7] Because mediation is voluntary on the part of both parties to a dispute, a potential objection to this line of reasoning is that there are no requirements to monitor here.  But an unwillingness to mediate may result in due process hearings or complaints.  Analysis of the substance of those disputes may connect with other data, data that could reveal that a district unwilling to mediate may have problems delivering FAPE to students, placing them in the least restrictive environment, and/or may be suspending students rather than providing them with effective positive behavior supports.  Analysis of such data regarding the districts selected can provide a guide to issues that may merit probing through monitoring.

[8] As CDE's system of making annual determinations of districts designates those not selected for any monitoring process as meeting the requirements of the IDEA, districts selected for targeted technical assistance for mediation would presumably be eligible for a "meets requirements" determination.

problems for accountability purposes to charter authorizers that are in the same county but may not be in the same SELPA.

Due to these concerns CDE ultimately created a hybrid of both methodologies: all small LEAs are grouped by county, unless the LEA is a charter LEA and belongs to a charter SELPA (Dkt. No. 2545, Ex. 1 at 10-12).

In the subsections below, this report examines selection of small districts for targeted monitoring, intensive monitoring of preschools, intensive monitoring of school age students, and the effect of CDE's selection methods for small districts on "meets requirements" annual determinations.

A.  Targeted Monitoring of Performance

For targeted monitoring, both of timeliness and disproportionality, CDE's submission indicates that selection for these processes has not changed since its last Phase 2 submission.  But for targeted monitoring of performance CDE states that it is using the small LEA aggregation method for the 2019-20 monitoring year (Dkt. No. 2545, Ex. 1 at 17-18; see also Attachment 1 at 1, Dkt. No. 2545 at 41).  However, unlike its discussions of intensive monitoring,[9] CDE's submission does not explain, illustrate, or set forth standards to govern the process of selecting small districts for targeted performance monitoring.

For that reason, CDE was asked to explain and illustrate the application of the small LEA methodology to selection for targeted monitoring of performance.[10]  CDE filed its response to the inquiry on 3/2 (Dkt. No. 2553).

CDE writes in this supplemental submission that there were 2,255 LEAs in the state in the 2018-19 school year.  The small LEA aggregation methodology results in 684 LEAs and 63 small LEA groups, for a total of 747 LEAs and groups.  For selection for targeted monitoring of performance, CDE does not analyze the LEAs and small LEA groups using the decile approach it uses for intensive monitoring of preschools and school-age populations; instead, it uses the standard it has set for each of the relevant indicators.  These standards are failing to meet federal SPP targets, Dashboard scores of Red or Orange, or the special education identification rate, depending on the indicator.

If a small LEA group's collective performance fails to meet the relevant standard for any indicator, that small group is selected for that indicator.  Based on the 2018-19 data, CDE states that 62 of the 63 small LEA groups were initially selected for at least one indicator.  These 62 small groups included all but one of the small LEAs in the state (1,570 of 1,571 small LEAs).  CDE's supplemental submission does not set forth the number of small LEA groups selected for each relevant indicator.

If a small LEA group is not selected for a particular indicator, then none of the small LEAs in that group can be selected for targeted monitoring of performance of that indicator.  But if a small group is selected for an indicator, then CDE proceeds to what it terms a "secondary analysis" of that indicator for each small LEA in that group.  The

---

[9] See Dkt. No. 2545 at 25-26, 31 for the standards for selection of the LEAs in a poorly performing small LEA group for intensive monitoring.
[10] Mlawer email to Gill and Spence, 2/10/20.

secondary analysis uses as a guiding principle whether or not the small LEA "contributed negatively" to its small LEA group's performance on that indicator. This principle, as operationalized by CDE, amounts to a set of standards different from the standards used to select the small group, with the exception of child find. These standards are stated clearly in CDE's supplemental submission (Dkt. No. 2553, Ex. 1 at 3-10; the secondary standards are found at 7).

Review of the data provided by CDE showed that for the indicators relevant to the *Emma C.* litigation, 705 of the 1,571 small districts (44.88%) were selected for targeted monitoring in at least one indicator.[11]  The table below shows the number of small districts selected for one through four indicators:

| # Indicators | # Selected |
|:---:|:---:|
| 1 | 340 |
| 2 | 314 |
| 3 | 46 |
| 4 | 5 |

The data also showed that four of the small LEA groups created by CDE had only one LEA member. These four LEAs had child counts ages 3-21 of 18, 64, 14, and 56 students.

The application of CDE's small district selection methodologies and secondary standards are analyzed below in the Targets, Intensive Monitoring-Preschool, and Intensive Monitoring-School Age sections of this report. The conclusions of those sections with respect to the selection of small districts are briefly summarized below.

Selection of Small Districts for Child Find:  As noted above, CDE's definition of a small district is based on the number of students with disabilities. For child find, this definition is problematic because it defines a small district based on the very circumstance in question in child find monitoring:  whether the district has identified all students who have disabilities. Moreover, CDE's method does not select the small districts with the lowest identification rates due to CDE's process of grouping small districts. Alternative approaches select small districts with much lower mean identification rates than those selected by CDE.

Selection of Small Districts for Intensive Monitoring-Preschool:  The overwhelming majority of the lowest-performing small districts on each of the four indicators in CDE's formula were not selected for intensive monitoring by CDE. This is due to the effect of CDE's small LEA grouping methodology. Several alternative methods that can select a higher percentage of low-performing small districts are explored in the Intensive Monitoring-Preschool section below.

---

[11] This includes 14 districts that it appeared CDE miscoded as not selected. These were coded as "ES" rather than 'YES' in the cell for selection for targeted monitoring for federal indicator 5C (school-age separate placements).

Selection of Small Districts for Intensive Monitoring-School Age:  The application of CDE's small LEA grouping methodology does not result in the selection of the lowest-performing districts, and does not select enough small districts for intensive monitoring.  It is challenging to create an effective selection approach for small districts, but alternative methods that can select a higher percentage of low-performing small districts are explored in the Intensive Monitoring-School Age section below.

Although other targets were not found to be problematic by the Phase 2 Order, the secondary standards for some of these are sufficiently different from the primary targets that they merit brief discussion.  If a small LEA group is selected for any of these indicators, the standards below are used to select individual small districts for targeted monitoring.  CDE's supplemental submission does not offer a rationale for these secondary standards (Dkt. No. 2553, Ex. 1 at 7).

1.  Participation on State Assessments

A small LEA group is selected if it has a collective participation rate below 95%.  A small district from a selected small group is selected for targeted monitoring of participation in assessments if it has no students participating in either of the assessments, a 0.00% participation rate.  The secondary standard is quite far from the primary standard.  For that reason, even a small district in a selected small LEA group with a participation rate of 10% would not be selected by this secondary standard.

CDE's data shows that 12 small districts were selected for participation in Math and 12 for participation in English/Language Arts (0.76% of the 1,571 small districts).

2.  Performance on State Assessments and Suspension (Dashboard Indicators)

A small LEA group is selected if it has a collective Dashboard designation of Red or Orange on these indicators.  A small district from a selected small group is selected for targeted monitoring of these indicators if it has a designation of Red or Orange or a change in the wrong direction from the prior year.  Assuming CDE's standard for selection of a large district (Red or Orange on any of these indicators) has not changed, the secondary standard is higher, as it also captures any district in a selected small group with a negative change from the prior year.

The table below shows the number and percentage of the small districts selected by CDE for these indicators:

|  | # Selected by CDE | % Selected by CDE (of 1,571) |
|---|---|---|
| ELA Proficiency | 365 | 23.23% |
| Math Proficiency | 383 | 24.38% |
| Suspension | 165 | 10.50% |

This is a sound number of districts to select for targeted monitoring of these important indicators.

> 3. Parent Involvement

A small LEA group is selected if it has a collective rate of below 93% of parents reporting that their district facilitated parental involvement. A small district from a selected small group is selected for targeted monitoring if it has "0 positive parent involvement," which presumably means a rate of 0.00%. CDE's data shows that no small districts were selected using this secondary standard. Given how far the secondary standard is from the primary, this is not surprising. Moreover, CDE data indicate that there are no small districts in the state that would be selected using this standard if it were applied to all.

B. "Meets Requirements"

In order to ascertain which of the 1,571 small districts would be preliminarily determined to meet the requirements of the IDEA without further monitoring, those that were selected for any intensive or targeted monitoring process were removed. Of the 1,571, 532 small districts were not selected for any monitoring process.

The table below shows the number of students with disabilities in these districts:

| # SWD Ages 6-21 at Census | # Districts | Percent of Total |
|---|---|---|
| Missing | 3 | 0.56% |
| 1-10 | 158 | 29.70% |
| 11-20 | 137 | 25.75% |
| 21-50 | 184 | 34.59% |
| 51-70 | 38 | 7.14% |
| 71-100 | 12 | 2.26% |
| Total | 532 | 100.00% |

The majority of these districts have at least 11 students with disabilities.

The table below shows the extent to which these districts had 0.00% proficiency rates on assessments:

| Assessment | # Districts | % Districts |
|---|---|---|
| No ELA or Math Scores | 55 | 10.34% |
| 0% Proficiency Rate for ELA and 0% Proficiency Rate for Math | 94 | 17.67% |
| 0% Proficiency Rate for ELA but Greater than 0% Proficiency Rate for Math | 15 | 2.82% |
| 0% Proficiency Rate for Math but Greater than 0% proficiency rate for ELA | 78 | 14.66% |

| Assessment | # Districts | % Districts |
|---|---|---|
| Greater than 0% Proficiency Rate for ELA and Math | 290 | 54.51% |

Over one-third of these districts (35.15%) had 0.00% proficiency rates on both assessments or on one assessment.  Over half of these districts had greater than 0.00% proficiency rates on both assessments.

The table below shows the suspension rates for these districts:

| Suspension Rate | # Districts | % Districts |
|---|---|---|
| No suspension rate | 14 | 2.63% |
| 0.00% | 350 | 65.79% |
| .01-2.49% | 36 | 6.77% |
| 2.50-4.49% | 34 | 6.39% |
| 4.50%-9.99% | 58 | 10.90% |
| 10.00%+ | 40 | 7.52% |
| Total | 532 | 100.00% |

The majority of these districts had a suspension rate of 0.00%.  But 18.42% of them had suspension rates of at least 4.50%.

Finally, turning to the performance of the small districts that would preliminarily be designated "meets requirements" on the five least restrictive environment indicators, the table below shows the extent to which these districts did not meet the targets for those indicators:

| Indicator | FFY 2018 Target | # Small Districts not Meeting Target |
|---|---|---|
| 5A. Percent students in regular classes for greater than 80% of the school day | 52.20% | 40 |
| 5B. Percent students in regular classes less than 40% of the day | 21.60% | 35 |
| 5C. Percent students in separate placements | 3.80% | 28 |
| 6A. Percent children in regular early childhood program | 35.90% | 39 |
| 6B. Percent children in separate classes, separate schools, and residential facilities | 31.40% | 24 |

A small number of these "meets requirements" districts did not meet the targets of a given indicator, although for each indicator these represent a small percentage of the 532 small districts under consideration for this issue.

The table below shows the number of these districts that missed one through five of these targets:

| # Targets Missed | # Districts | % Districts |
|---|---|---|
| None | 410 | 77.07% |
| One | 84 | 15.79% |
| Two | 33 | 6.20% |
| Three | 4 | 00.75% |
| Four | 1 | 00.19% |
| Five | 0 | 0.00% |

A large majority of these districts did not miss any of the least restrictive environment indicators. However, a little under 23% of them missed one through four targets.

In conclusion, with respect to the districts that would be preliminarily designated as meeting the requirements of the IDEA, some of these districts show performance problems related to achievement, suspension, and/or least restrictive environment. While the number of such districts is not large, it is difficult to understand why districts whose data show, for example, a suspension rate of over 10% would be designated "meet requirements" without further monitoring.

*Conclusion: Noncompliant.*

*Reasons for Conclusion: CDE does not select the lowest-performing small districts for either of the intensive monitoring processes under consideration due to its small district grouping and selection process. For targeted monitoring of child find, CDE's definition of a small district is problematic and, again due to its grouping process, CDE does not select the districts with the lowest identification rates. For other indicators, CDE's secondary standards are not concerning for three of the indicators, but are not adequate for selection for two, and, its grouping process prevents some very low-scoring small districts from being identified for targeted monitoring. Some of the small districts that would be preliminarily designated as "meets requirements" show performance problems related to important indicators.*

## V. Targets

The Phase 2 Order points out that the federal regulations require "measurable and rigorous" targets. The Order explains the importance of adequate targets for a monitoring system:

> An adequate monitoring system requires adequate targets. If targets are too modest, states may fail to identify districts that are falling short on their obligation to provide an adequate education to disabled children. (Dkt. No. 2520 at 15)

Hence, "legally deficient" targets are those that "prevent the state from adequately monitoring school districts" (Dkt. No. 2520 at 17). For example, CDE's least restrictive environment and child find targets were set below statewide performance, and the performance of the state as a whole in these areas was below national levels. Targets of these sorts will not select some districts that merit monitoring.

The Order does not analyze all of the targets as CDE intended to revise them presently.  But, with some exceptions (see below), the Order requires:

> The state's new targets must be crafted with its monitoring obligations in mind, and it must do a far better job of explaining and justifying its targets during the renewed Phase 2.  (Dkt. No. 2520 at 18, fn. omitted).

One implication of the Phase 2 Order is apparent:  because legally deficient targets are those that prevent the state from adequately monitoring districts, the only targets relevant to the continuation of Phase 2 of this inquiry are those that are used to select districts for a monitoring process.

Because some of the relevant targets come from the federal State Performance Plan (SPP), CDE's submission explains that DOE informed states in October 2019 that it was delaying by one year the required submission of new SPP targets for the next six-year cycle.  At that time CDE was in the midst of a stakeholder process to adopt the new SPP targets.  In light of the delay in the adoption of new six-year targets, DOE directed states to create and submit SPP "extension targets"[12] that cover one year.  CDE then reconvened its stakeholder group, received feedback on its proposed one-year extension targets,[13] and submitted those to the State Board for approval.

A case management conference was held on 2/19/20 to discuss the effect of this federal delay on the Phase 2 schedule.  The Court left it to the parties to decide whether they wished to discuss the extension targets and draft six-year targets at the upcoming Phase 2 hearings in June 2020.  The parties met and conferred on 2/20 and agreed that CDE would decide whether to submit the draft targets by the time of its responsive report (4/7).  If so, the monitor would produce a supplemental report.  As to the extension targets, because much of the monitor's work on these had already been completed, the parties decided that those data should be included in the report.

---

[12] With respect to the extension targets, CDE writes:

> Extension targets require LEAs to continue to make improvements in outcomes for students with disabilities along the same trajectory of the current State Performance Plan.  (Dkt. No. 2545, Ex. 1 at 16)

This assertion is not supported by a footnote.  Thus, it is unclear if CDE is asserting that DOE required that extension targets continue on the same trajectory as prior targets or if this was a decision made by CDE.

Relevant federal documents were reviewed, and do not indicate a DOE directive that these extension targets should aim at improvements along the same trajectory as the current SPP.  The documents reviewed were an audio recording of the October 2019 DOE technical assistance call and its accompanying presentation slides, the instructions for the submission of the SPP/Annual Performance Report (APR), the template for the SPP/APR, and the federal SPP/APR memo (OSEP 19-012489):
https://www.youtube.com/watch?v=2NPIuCzSozc&feature=youtu.be
https://osep.grads360.org/#communities/pdc/documents/18297
https://osep.grads360.org/#communities/pdc/documents/18274
https://osep.grads360.org/#communities/pdc/documents/18300.
[13] The stakeholders were "generally supportive," CDE writes (Dkt. No. 2545, Ex. 1 at 16).

As noted above, many of the SPP targets are not currently used by CDE for the purpose of selecting districts for monitoring or are no longer applicable to Phase 2. Specifically:

- The Court's findings regarding the inadequacy of targets specifically do not include those for the timeliness, disproportionality, or parent input indicators.
- CDE's new approaches to selection for intensive monitoring of preschools and of school-age populations do not use targets to guide selection.
- CDE does not use SPP indicator targets for selection for assessment performance and suspension; for these indicators CDE's Dashboard is used.[14]
- The SPP indicator for preschool outcomes is not included in CDE's targeted monitoring of performance.

But targeted monitoring of performance still relies on some targets for selection (Dkt. No. 2545, Ex. 1 at 17). One of these (child find) is not an SPP indicator. The targets for each of the indicators relevant to targeted monitoring of performance is discussed below.

A. Child Find

CDE refers to this target as a "cutoff," perhaps to distinguish it from SPP targets. CDE's submission states that two changes have been made to its prior methodology. First, the cutoff for selection was changed from 2.0 standard deviations below the mean to 1.5 standard deviations. This new cutoff means that non-small districts with identification rates below 7.23% would be selected for targeted monitoring.

The other change is grouping small LEAs using the small LEA definition and methodology set forth above. But the definition advanced by CDE for a small LEA for the purposes of other monitoring processes (100 or fewer students with disabilities) defines "small" using the very circumstance that is in question in child find monitoring: the number of students with disabilities (Dkt. No. 2545, Ex. 1 at 18, 10). In other words, a district may have 100 or fewer students with disabilities, and therefore be considered "small" by CDE, because its identification rate is low; and its identification rate may be low because it is not identifying, locating, and evaluating all children and youth with disabilities.

This can have significant implications for selection because the 7.23% cutoff is not applied to all "small" districts for selection; it is only applied to those sorted into a small LEA group whose collective identification rate is below the cutoff. CDE's spreadsheet showed 2,242 LEAs that had identification rates.[15] Of these, 1,581 had 100 or fewer students with disabilities ages 6-21. Of these 1,581 small districts, 421 (27.02%) had

---

[14] CDE's use of the Dashboard for the purpose of selection for monitoring is a reminder that, except for the compliance indicators, state educational agencies are free to use targets other than the SPP targets to select districts for monitoring.

[15] Five LEAs showed identification rates between 216% and 600%. Even though these are impossible rates, these LEAs were left in the analyses.

identification rates below 7.23%. Of these 421, 105 small districts were selected by CDE for targeted monitoring of child find. Two additional districts with missing identification rates were also selected. Thus, 107 of the 421 small districts with identification rates below the cutoff (or with missing rates) were selected by CDE (25.42%).

If CDE did not group and select small districts, but instead applied its cutoff identification rate to all districts, then 444 districts of the 2,242 (19.80%) would be selected for monitoring of child find using CDE's cutoff of 7.23%. Under its current approach, based on the data in CDE's spreadsheets, 130 districts (5.80%) were selected (23 non-small and 107 small).

The data provided by CDE shows 62 small LEA groups with identification rates calculated. Of these 62, ten small LEA groups had collective identification rates below 7.23%. These ten groups include 211 LEAs. Of these 211 LEAs, 107 (50.71%) had identification rates below 7.23% or missing rates and were therefore selected. The small LEA groups not flagged for child find monitoring contain 1,370 small LEAs that were not selected for child find monitoring. Of these 1,370, 317 (23.19%) had identification rates below the cutoff. Thus, a higher percentage of the LEAs in the selected small LEA groups had identification rates below CDE's cutoff than those in the non-selected groups, an unsurprising result.

However, that does not mean that CDE has selected the small districts with the lowest identification rates. The selected districts were selected because they a) were in a selected small group, and b) because they had identification rates below 7.23%, which is CDE's secondary standard when a small group is selected. But 316 small districts that were not selected also have identification rates below the cutoff, and 104 of these districts have identification rates below 4%.

The two groups of small LEAs below the CDE cutoff were compared (two of the 107 had missing identification rates). The results are shown in the table below:

|  | Districts Selected | Districts Not Selected |
|---|---|---|
| # Districts | 105 | 316 |
| Mean ID Rate | 3.64% | 4.74% |
| Range of Rates | .04%-6.99% | .05% - 7.21% |
| Average Census Count 6-21 | 17.95 | 19.06 |
| # (%) Districts Below 2.50% Identification Rate | 30 (28.57%) | 48 (15.19%) |

These data show that the districts selected by CDE have a lower mean identification rate and slightly fewer students with disabilities on average. The range of identification rates in both groups are roughly comparable. A total of 78 districts across both groups have identification rates below 2.50%. A set of districts whose identification rates range from 0.00% to 2.50% are more in need of child find monitoring than the group selected by CDE, a group whose rates range all the way up to 6.99%. Fourteen of these 78 districts have total enrollments greater than 1,000 students and 63 have an enrollment

greater than 100.  This suggests that the very low identification rate is not a small numbers issue.

This result suggests that the most important factor determining selection of a small district in CDE's current approach is not the district's identification rate; it is the collective identification rate of the districts in that district's small LEA group.  A district will only have CDE's cutoff applied to it if its small group's collective rate is below CDE's cutoff.

In order to analyze whether alternative approaches to the selection of small districts would result in the selection of different, worse-performing districts, two other methodologies were tested:  1) the retention of CDE's definition of a small district but not its grouping process, and the application of a different cutoff identification rate for small districts than that used for non-small districts; and 2) the use of a different definition of a small district, one based on overall enrollment rather than the number of students identified as having disabilities.  Both alternative approaches aim to select the same number of small districts selected by CDE in order to make a fair comparison of the methods.

The first alternative approach starts from the assumption that larger LEAs would be more likely to have identification rates similar to the state as a whole due to the higher numbers of students in such districts compared with small LEAs.  CDE's data shows that there is a difference in the mean identification rates of the large and small districts, although it is small (12.39% for the 666 large districts and 11.46% for the 1,576 small districts).  Thus, the current cutoff of 7.23% for non-small districts would remain.  However, in this alternative approach, a lower identification rate cutoff would be used for small districts so that 107 districts would still be selected, and small LEA groups would not be used for selection.

The use of this approach results in the selection of 108 small districts (the 107th and 108th districts had identical identification rates).  All of these districts have identification rates of 2.98% or below.  The mean identification rate of this group is 1.65%, compared with the mean of 3.60% for the group selected by CDE.  Thus, this alternative approach—one that does away with CDE's grouping methodology—results in the selection of those small districts with the lowest identification rates and, hence, higher chances of child find problems.

Of the 108 selected by this alternative method, 67 have fewer than five students with disabilities (62.04%), compared with 25 of CDE's 107 selected districts (23.36%).  CDE's method selects a higher percentage of the larger small districts than this alternative, although the alternative selects districts with lower identification rates.  The alternative method is problematic because it selects too many very small districts.

The second approach uses overall enrollment rather than the number of students identified as having disabilities to define a small district for the reason set forth above (i.e., a district could be considered "small" by CDE because its identification rate is low).  Defining a small district for child find selection purposes instead as an overall

enrollment of fewer than 1,000 students, there are 1,578 small districts and 663 non-small districts.[16]

Of the 662 that have an enrollment of at least 1,000 students, 56 districts have an identification rate below CDE's cutoff of 7.23%. Thirty-seven (37) of these districts were selected by CDE (24 as non-small districts and 13 as small districts) Nineteen (19) of these districts were not selected by CDE. If these 56 non-small districts (as defined by enrollment) are selected, that leaves 74 small districts to select in order to arrive at the number selected by CDE. If the 74 with the lowest identification rates are selected from the group of 1,578 small districts, all of the selected small districts would have identification rates of 2.75% or below. It should be noted that only 18 of these selected districts have enrollments of fewer than 100 students. The mean identification rate of these small districts is 1.53% compared with the mean of 3.60% for those small districts selected by CDE.

As noted above, these alternative approaches were created in order to compare the results to CDE's, and therefore sought to select the same number of districts as selected by CDE. The results indicate that the alternative approaches select small districts with lower mean identification rates than those selected by CDE, although the first alternative selects more of the smallest of the small districts. CDE's process of grouping small districts prevents the identification of those districts with the lowest rates; and, more importantly, compared to the enrollment-based alternative, CDE's approach prevents the selection of some relatively large districts with low identification rates—districts CDE considered to be small based on special education child count. These districts had a much smaller chance of being selected by CDE because they were in a small group with a collective identification rate above the cutoff.

The table below shows the identification rate for 2017-18 for California, the nation as a whole, and the nation excluding California, for students ages 6-21:

|  | CA | Nation[17] | Nation Excluding CA |
|---|---|---|---|
| Enrollment | 5,692,856 | 45,908,893 | 40,216,037 |
| Students with Disabilities | 683,709 | 6,130,637 | 5,446,928 |
| Identification Rate | 12.01% | 13.35% | 13.54% |

When the state is removed from the national data, California's identification rate of students 6-21 is 1.53 percentage points lower than the rest of the nation.

---

[16] It is worth noting here an illustration of the importance of dividing districts based on size in some fashion. Using CDE's current approach of categorizing districts as small and non-small based on the number of students with disabilities and its use of small groups, CDE selected a total of 130 districts for child find monitoring. If instead CDE used overall enrollment without categorizing small and non-small districts and selected the 130 districts with the lowest identification rates, all of these districts have identification rates below 3.47%. However, 129 of these districts have fewer than 100 students with disabilities age 6-21 (i.e., are "small" in CDE's definition) and the other has 109 students with disabilities. Of the 129 small districts, 48 have overall enrollments of 200 students or fewer. It is difficult to imagine this scenario as an efficient use of monitoring resources.

[17] 2019 Data Display

https://osep.grads360.org/#report/apr/2017B/publicView?state=CA&ispublic=tru at 1.

For children ages 3-5, the state's identification rate as a percentage of the population of that age group (based on the census rather than enrollment) is 5.6%, versus 6.4% for the whole nation including California. Thus, the available data suggest that the state is not identifying as many children and youth with disabilities as are identified in the nation. Given the sheer number of children and students nationwide, it is possible that the gap between California and the nation is not due to learning and behavioral differences in the children themselves, but instead to different identification practices. Only child find monitoring can establish whether these gaps are the result of faulty implementation of the child find requirements.

But it is also important to note that child find trends in the state are starting to close the gap with the nation. The table below is based on the census for three school years:

|  | SY 2015-16 | SY 2016-17 | SY2017-18 |
|---|---|---|---|
| **California** |  |  |  |
| Age 3-5 | 5.2% | 5.4% | 5.6% |
| Age 6-21 | 7.9% | 8.2% | 8.4% |
| **Nation (including CA)** |  |  |  |
| Age 3-5 | 6.4% | 6.3% | 6.4% |
| Age 6-21 | 9.1% | 9.1% | 9.2% |

The table below shows the last three years for school-age students based on enrollment rather than the census:

|  | SY 2015-16 | SY 2016-17 | SY2017-18 |
|---|---|---|---|
| California | 11.34% | 11.70% | 12.01% |
| Nation | 13.27% | 13.23% | 13.35% |
| Nation (excluding CA) | 13.55% | 13.45% | 13.54% |

These tables show the gap slowly narrowing over this period of time, for both preschool children and for school-age students. This slow narrowing of the gap is due to increases in the state's identification rate, not decreases in the national rate.

Due to the narrowing gap between the state and the nation and the use of a higher identification rate cutoff compared to CDE's first Phase 2 submission, the new cutoff is a reasonable target to use to select large districts for targeted monitoring of child find.

B. Least Restrictive Environment (school age)

CDE's submission includes the FFY 2019 extension targets and the prior year's performance in an attachment (Dkt. No. 2545 at 200). The table below shows these data and national performance for the most recent year available:

| Indicator | FFY 2018 California Performance | FFY 2017 Mean Rate Across 60 States, Territories, Commonwealths, BIE) (includes California)[18] | FFY 2019 California Target |
|---|---|---|---|
| A. Percent students in regular classes for greater than 80% of the school day | 56.88% | 65.71% | Equal to or greater than 53.2% |
| B. Percent students in regular classes less than 40% of the day | 19.53% | 10.68% | Equal to or lower than 20.6% |
| C. Percent students in separate placements | 3.1% | 2.83% | Equal to or lower than 3.6% |

As the table shows, California has already met each of the FFY 2019 extension targets. Compared to the nation as a whole California places a lower percentage of students in regular classes, a higher percentage in self-contained classes, and a higher percentage in separate placements.  The state's targets are still set below statewide performance, and the performance of the state as a whole remains below national levels, significantly so in the case of A and B in the table above.

The table below shows the trends for the last five years:

| Indicator | FFY 2014 | FFY 2015 | FFY 2016 | FFY 2017 | FFY 2018 |
|---|---|---|---|---|---|
| A. Percent students in regular classes for greater than 80% of the school day | 53.38% | 54.07% | 54.92% | 56.10% | 56.88% |
| B. Percent students in regular classes less than 40% of the day | 22.01% | 21.54% | 20.70% | 19.82% | 19.53% |
| C. Percent students in separate placements | 3.31% | 3.63% | 3.56% | 3.40% | 3.10% |

The trends here are in the right direction, although separate placements were above the 2014 levels for three years before declining in 2018.

Turning to selection for targeted monitoring, as a result of the targets chosen by CDE, fewer districts will be selected for monitoring than would be using more rigorous targets.

When a small LEA group is selected by CDE for any of these indicators, the following secondary standards are used to select small districts from that small LEA group:

---

[18] 2019 Data Display at
https://osep.grads360.org/#report/apr/2017B/publicView?state=CA&ispublic=tru at 1.

- Students in regular classes for greater than 80% of the school day:  No students in this placement.
- Students in regular classes less than 40% of the day:  One or more students in this placement.
- Students in separate placements:  One or more students in this placement.

Because 2018 results were used by CDE to select districts for monitoring for the current school year, the table below shows the number of non-small and small districts selected by CDE for each of these three indicators based on the data provided by CDE:

| Indicator | Non-Small | | Small | |
|---|---|---|---|---|
| | # Below Target | # Selected | # Below Target | # Selected |
| A. Percent students in regular classes for greater than 80% of the school day | 204 | 204 | 131 | 1 |
| B. Percent students in regular classes less than 40% of the day | 194[19] | 194 | 121 | 3 |
| C. Percent students in separate placements | 112 | 112 | 104 | 15 |

As shown in the table, an overwhelming majority of the small districts that missed CDE's targets were not selected by CDE.  This is the result of its small LEA grouping methodology, which only looks deeply at a small district if it is in a selected small group.

C.  Least Restrictive Environment (preschool)

CDE's submission includes the FFY 2019 extension targets and the prior year's performance in an attachment (Dkt. No. 2545 at 200).  The table below shows these data and national performance for the most recent year available:

| Indicator | FFY 2018 California Performance | FFY 2017 Mean Rate Across 60 States, Territories, Commonwealths, BIE) (includes California) | FFY 2019 California Target |
|---|---|---|---|
| A. Percent children in regular early childhood program | 36.58% | 51% | Greater than 36.9% |

---

[19] This number is an assumption.  The data provided by CDE did not include these scores for the large districts.

| Indicator | FFY 2018 California Performance | FFY 2017 Mean Rate Across 60 States, Territories, Commonwealths, BIE) (includes California) | FFY 2019 California Target |
|---|---|---|---|
| B. Percent children in separate classes, separate schools, and residential facilities | 33.84% | 20% | Lower than 30.4% |

Neither of these FFY 2019 targets has been met, although one is close (and could be met in FFY 2019).  However, California lags far behind the nation:  other states are having more success placing children in regular programs, and are placing fewer children in self-contained classes, separate school, and residential settings.

The table below shows the trends for the last five years:

| Indicator | FFY 2014 | FFY 2015 | FFY 2016 | FFY 2017 | FFY 2018 |
|---|---|---|---|---|---|
| A. Percent children in regular early childhood program | 32.91% | 44.13% | 45.19% | 37.32% | 36.58% |
| B. Percent children in separate classes, separate schools, and residential facilities | 34.41% | 31.45% | 29.86% | 33.81% | 33.84% |

The data suggest that 2015 and 2016 could have been the beginning of a positive trend in the placements of preschool children.  Unfortunately, the last two years for which data are available show the placement patterns moving in the wrong direction.[20]

When a small LEA group is selected by CDE for either of these indicators, the following secondary standards are used to select small districts from that small LEA group:

- Children in regular early childhood program:  No students in this placement.
- Children in separate classes, separate schools, and residential facilities:  One or more students in these placements.

The table below shows the number of non-small and small districts selected by CDE for both of these indicators based on the data provided by CDE:

---

[20] CDE made the Court aware of this during the Phase 2 hearings.  See the 4/29/19 transcript at 61-62.

| Indicator | Non-Small | | Small | |
|---|---|---|---|---|
| | # Below Target | # Selected | # Below Target | # Selected |
| A. Percent children in regular early childhood program | 69 | 69 | 195 | 2 |
| B. Percent children in separate classes, separate schools, and residential facilities | 128 | 128 | 211 | 23 |

As was the case for selection for targeted monitoring for school-age least restrictive environment, a large majority of the small districts below CDE's targets were not selected.  This the result of CDE's small district grouping and selection process.

> *Conclusion:  Noncompliant.*
> *Reasons for Conclusion:  The new child find target is adequate to select large districts for targeted monitoring.  The current least restrictive environment targets are not ambitious enough in light of state and national data.  CDE's use of its small LEA grouping and selection methodology does not result in the selection of the lowest-performing small districts for targeted monitoring of child find or least restrictive environment, and also results in an extremely small number of districts selected for the least restrictive environment indicators.*

## VI.  Intensive Monitoring-Preschool

Although districts performing poorly with respect to preschool children could be selected for some CDE targeted monitoring processes, the Court found that a separate preschool monitoring activity was necessary.  The Order also notes similarities between CDE's proposed (at that time) preschool review approach and its comprehensive review selection methodology, and points out that neither approach appeared tied to a "clear theory of statutory compliance" (Dkt. No. 2520 at 12-14; 23, fn. 10).

CDE's prior approach to selection for intensive monitoring of preschools used an all-or-nothing method of scoring indicators—based on whether a particular standard was or was not met—but did not consider the extent to which a standard was missed or exceeded.  CDE's new methodology does not use absolute targets or standards;  instead, its new process uses actual scores via deciles in an attempt to identify the worst performing districts.

CDE's new selection process uses four indicators, each of which is related to one of three categories.  The three categories are child outcomes (as measured by pre and post assessment results), discipline, and placement.  The three categories have a clear relation with the FAPE and least restrictive environment requirements of the statute. No category is related to child find.

The table below shows each category, the indicators related to each category in CDE's current method, and the related indicators in CDE's former approach:

| Category | Indicators:  Current CDE Method | Indicators:  Prior CDE Method |
|---|---|---|
| Outcomes | • average rate of child outcomes | • targets on all assessments<br>• target for assessment participation rate |
| Discipline | • rates of suspension and expulsion | • three- or four-year-olds suspended<br>• suspension rate for five-year-olds<br>• preschool suspensions more than one day |
| Placement | • rate of children who receive a majority of special education/related services in a regular classroom<br>• rate of children who receive a majority of special education/related services in separate schools and placements | • target for regular classroom placement<br>• target for separate classroom or program<br>• preschool child in residential placement<br>• preschool child in nonpublic school (more than one such child resulted in automatic selection) |

Although it does not fit neatly into CDE's current categories, the prior method also included as an indicator the timeliness of transition for Part C to Part B of the IDEA.

Two of the four indicators in CDE's current methodology are related to placement.  This reflects CDE's view that placement in regular preschool classrooms leads to better outcomes later in life, and therefore should be weighted more heavily in selection.

The scoring of each indicator is structured by deciles.  The worst-performing 10% of LEAs/small groups on each indicator are given a "1" the next-worst a "2," etc.  Each LEA/group's scores on each indicator are summed and then divided by the total possible score.

There were 279 LEAs/groups that educated preschool children.  In keeping with its decile approach to each indicator, CDE selected approximately 10% of LEAs/groups for intensive preschool monitoring.  Because two LEAs had identical scores (32.5%), CDE selected 29 LEAs/groups (one small LEA group, eleven elementary districts, and seventeen unified districts).

CDE then explains how a selected small LEA group's data are further analyzed to determine which of the districts in that group should be monitored.  The submission sets three criteria for selection; a district is selected if it meets any of the following conditions:

- any preschool discipline (suspensions or expulsions)
- no children in regular classroom placements
- any children in separate placements

The category of assessment outcomes, used by CDE to rank districts and groups by deciles, is not included among the small LEA selection criteria.  The submission does

not explain why outcomes are excluded, but this may be explained by the large number of small districts that lacked outcome data (see below).

There were 39 districts in the selected small LEA group.  CDE selected 25 of these 39 districts through application of its criteria.  Thus, 53 districts total were selected for intensive preschool monitoring (25 small, 11 elementary, and 17 unified). With respect to the small districts, the submission includes two tables showing data for each of the three criteria for one selected district and one that was not selected.  CDE mentions that the selected district also was one of the worst performers on preschool outcomes.  (Dkt. No. 2545, Ex. 1 at 28-33).

The preschool data provided by CDE were analyzed.  A striking fact emerged from the initial analysis:  the data showed that many districts did not have child outcome data.  Six of the 217 large districts (2.76%), ten of the 62 small LEA groups (16.13%), and 793 of the 1,132 small districts (70.14%) did not have outcome data.  One of the six large districts that lacked outcome data was selected for monitoring by CDE, and three of the 794 small districts without outcome data were selected by CDE.

The lack of data on one indicator for the majority of small districts provokes the question of whether outcome data should be used for selection for these districts.  In order to probe this issue, outcomes were excluded from the formula.  The cut score was adjusted so that approximately the same number of LEAs and small LEA groups selected by CDE (29) would be selected.  Using a cut score of 27%, 37 large LEAs and one small LEA group were selected.  (Fourteen of the LEAs/small groups had an identical score, which is why more districts were selected by this method than by CDE.)  Both methods selected 21 of the same districts, but a different small group was selected.  Eliminating outcomes from the formula, an indicator that a non-trivial number of districts lack, may produce a more accurate view of the districts and groups in need of monitoring than when outcomes are included.

The four indicators used by CDE were separated in order to determine the extent to which CDE's approach selects the worst-performing large LEAs on each indicator.  The worst performers of the large districts on each of the four indicators were identified, and the results are shown in the table below:

**Large Districts Only**

| Indicator | # Districts With a Score | Definition of "Lowest-Scoring" | # of Lowest-Scoring Districts | # of Lowest-Scoring Selected by CDE | % of Lowest-Scoring Selected by CDE |
|---|---|---|---|---|---|
| Average rate of child outcomes | 211 | Average Score below 2.40 | 20 | 7 | 35.00% |
| Suspension and expulsion | 217 | Decile Score of 1 | 20 | 7 | 35.00% |

23

| Indicator | # Districts With a Score | Definition of "Lowest-Scoring" | # of Lowest-Scoring Districts | # of Lowest-Scoring Selected by CDE | % of Lowest-Scoring Selected by CDE |
|---|---|---|---|---|---|
| A. Children who receive a majority of special education/related services in a regular classroom | 217 | Decile Score of 1 | 26 | 8 | 30.77% |
| B. Children who receive a majority of special education/related services in separate schools and placements | 217 | Decile Score of 1 | 25 | 11 | 44.00% |

As shown in the table, the majority of the lowest-performing large districts on each indicator were not selected by CDE.

The table below compares the large districts selected by CDE with those not selected and shows the extent to which the large districts were among the lowest performers on these four indicators:

| | Large LEAs Selected by CDE | | Large LEAs Not Selected by CDE | |
|---|---|---|---|---|
| | # | % | # | % |
| *Total # Districts* | 28 | | 189 | |
| None of the four | 7 | 25.00% | 140 | 74.07% |
| One of the four | 11 | 39.29% | 40 | 21.16% |
| Two of the four | 8 | 28.57% | 9 | 4.76% |
| Three of the four | 2 | 7.14% | 0 | 0.00% |
| All four | 0 | 0.00% | 0 | 0.00% |
| Total | 28 | 100.00% | 189 | 100.00% |

The table shows that of the 28 large districts selected by CDE, 75.00% had a decile score of "1" on one, two, or three of the indicators, compared to 25.93% of the districts not selected. The 40 districts not selected by CDE that were among the lowest performers on one indicator were not selected because their other scores pulled them above the bottom 10% overall. Similarly, the seven selected districts that were not among the lowest in any indicator scored low enough on all indicators taken together that they were selected.

The table below shows the effect on the selection of large districts of removing outcomes from the formula:

| Indicator | # Districts With a Score | Definition of "Lowest-Scoring" | # of Lowest-Scoring Districts | # of Lowest-Scoring Selected | % of Lowest-Scoring Selected |
|---|---|---|---|---|---|
| Suspension and expulsion | 217 | Decile Score of 1 | 20 | 4 | 20.00% |
| A. Children who receive a majority of special education/related services in a regular classroom | 217 | Decile Score of 1 | 26 | 12 | 46.15% |
| B. Children who receive a majority of special education/related services in separate schools and placements | 217 | Decile Score of 1 | 25 | 14 | 56.00% |

Removing outcomes from the formula selects a significantly higher percentage of lower performing districts on the least restrictive environment indicators, but fewer low-scoring districts on suspension.

As noted above, CDE has chosen to emphasize the least restrictive environment indicators in its formula. And, as was seen above in the Targets section of this report, California's actual performance on these two indicators has declined in the last two school years. For those reasons, it would be sensible to ensure that the lowest-performing large districts in the state on these two indicators are selected for intensive monitoring. The formula without outcomes achieves that goal. But there are other ways to achieve that as well.

There are five large districts that were not selected for monitoring but had a decile score of "1" on both least restrictive environment indicators; there are an additional 11 districts that were not selected that had a decile score of "1" on either of the least restrictive environment indicators and a decile score of "2" on the other. The selection of at least the five additional large districts scoring in the lowest decile on both least restrictive environment indicators would also achieve the goal of increased emphasis on least restrictive environment.

In conclusion with respect to the selection of large districts, CDE's current approach is strong: it selects those large districts whose data over the four indicators taken together merits monitoring. However, CDE does not select the majority of the large lowest-performing districts on least restrictive environment, a key monitoring priority of the IDEA and an important priority of the state.

Turning to CDE's selection process for small LEAs in a selected small group, as noted above CDE selects a district if any of three criteria are met (any preschool discipline, no children in regular classroom placements, or any children in separate placements). The table below compares the 25 small districts selected by CDE to all other small districts in the state:

|  | LEAs Selected | | LEAs Not Selected | |
|---|---|---|---|---|
|  | # | % | # | % |
| *Total # Districts* | 25 | | 1,107 | |
| No children in regular classroom placements | 2 | 8.00% | 90 | 8.13% |
| Any children in separate placements | 23 | 92.00% | 449 | 40.56% |
| Any preschool discipline | 6 | 24.00% | 49 | 4.43% |

The districts not selected by CDE meet any of the three criteria to a far lesser extent than the selected districts, with the exception of one—having no children in regular classrooms; approximately the same percentage of the districts not selected meet this standard.

In order to determine whether CDE selected those districts that perform worse on the three standards taken together, the table below shows the extent to which the small districts selected and those not selected met CDE's three criteria:

|  | Small LEAs Selected | | Small LEAs Not Selected | |
|---|---|---|---|---|
|  | # | % | # | % |
| *Total # Districts* | 25 | | 1,107 | |
| None of the three | 0 | 0.00% | 592 | 53.48% |
| One of the three | 19 | 76.00% | 442 | 39.93% |
| Two of the three | 6 | 24.00% | 73 | 6.59% |
| All three | 0 | 0.00% | 0 | 0.00% |

No districts from either group met all three criteria. Over half of the LEAs not selected met none of the criteria. Seen in this way, the selected districts have a much higher chance of meeting any of the criteria. This is to be expected as those districts were in the selected small group (although 14 of the districts not selected were also in that same small group).

CDE has set meeting any of these criteria as its method of selection for small LEAs within a selected small group. Because no districts in either group met all three criteria, an argument can be made that meeting two of the three criteria should be the guide for selection, rather than only applying the criteria to small LEAs if they are in a selected small group. But this approach would select 79 districts which is more than three times the 25 small districts selected by CDE and may be beyond its available monitoring resources.

The table below looks at all the small districts with scores on any of the four indicators in order to determine the extent to which CDE has chosen the lowest performers on each indicator:

**Small Districts Only**

| Indicator | # of Districts With a Score | Definition of "Lowest-Scoring" | # of Lowest-Scoring Districts | # of Lowest-Scoring Selected by CDE | % of Lowest-Scoring Selected by CDE |
|---|---|---|---|---|---|
| Average rate of child outcomes | 338 | Average Score below 50.00% | 32 | 4 | 12.50% |
| Suspension and expulsion | 1,020 | Rate > 2.00% | 38 | 2 | 5.26% |
| Children who receive a majority of special education/related services in a regular classroom | 1,132 | 0% | 92 | 2 | 2.17% |
| Children who receive a majority of special education/related services in separate schools and placements | 1,132 | 100% | 30 | 1 | 3.33% |

As seen in the above table, the overwhelming majority of the lowest-performing small districts on each indicator were not selected by CDE.  This is due to the effect of CDE's small LEA grouping method which only looks deeply at a small district if a particular small group of which it is a member is selected.

The table below compares the small districts selected by CDE with those not selected, and shows the extent to which the small districts were among the lowest performers on these four indicators:

| | Small LEAs Selected | | Small LEAs Not Selected | |
|---|---|---|---|---|
| | # | % | # | % |
| *Total # Districts* | 25 | | 1,107 | |
| None of the four | 17 | 68.00% | 953 | 86.09% |
| One of the four | 7 | 28.00% | 125 | 11.29% |
| Two of the four | 1 | 3.33% | 29 | 2.62% |
| Three of the four | 0 | 0.00% | 0 | 0.00% |
| All four | 0 | 0.00% | 0 | 0.00% |

Seventeen of the districts selected by CDE were not among the lowest performers on any indicators.

These data suggest that an alternative methodology to select small districts for intensive review of preschools would be to select the 30 districts that were among the lowest performers on two of the four indicators.  However, all 30 of these small districts had only one, two, or three children with disabilities.  Two of the 25 small districts selected by CDE had fewer than five children; the other 23 had preschool populations

between eight and 94 children, which is a good size range of districts.  Although the districts chosen by this alternative are lower performing on the indicators, monitoring the small districts selected by CDE will affect more children.

CDE's data shows that 574 of the 1,132  small districts (50.71%) had four or fewer preschool children with disabilities.  However, there are 558 small districts that have at least five preschool children.  The implications of this for selecting small districts for monitoring could also be considered.

An alternative approach for the selection of small LEAs is the use of the same formula for small LEAs as is used for large LEAs.  Due to the relative paucity of outcome data for these districts, outcomes were excluded from the formula.  Decile scores were created based only on the small LEA scores for each of the three indicators.  Each district's score was then summed and divided by the appropriate total to get a percent score (similar to how this process was done for large LEAs).  Using this method, the lowest-performing small districts could be selected for intensive monitoring.[21]

In this scenario, the 26 lowest-scoring districts were selected.  This selection was not disaggregated by district size but, given the number of very small LEAs that serve preschoolers, that could be considered.  The districts, for example, could be differentiated into those with fewer than five children with disabilities and those with at least five; a given number of districts could then be selected from each group.  Of the 26 lowest-scoring districts, seven have fewer than five children with disabilities.

The table below shows the extent to which the 26 districts fell into the lowest decile on each indicator:

**Small Districts Only**

| Indicator | # of Districts With a Score | Definition of "Lowest-Scoring" | # of Lowest-Scoring Districts | # of Lowest-Scoring Selected by New Approach | % of Lowest-Scoring Selected by New Approach |
|---|---|---|---|---|---|
| Suspension and expulsion | 1,020 | Decile 1 | 55 | 2 | 3.64% |
| Children who receive a majority of special education/related services in a regular classroom | 1,132 | Decile 1 | 113 | 8 | 7.08% |

---

[21] Note that in creating decile scores for the small LEAs, there is a restriction of variability problem.  For example, for suspensions, there are only two decile scores created, 1 and 6.  This is an area that would need to be discussed and explored further.

28

| Indicator | # of Districts With a Score | Definition of "Lowest-Scoring" | # of Lowest-Scoring Districts | # of Lowest-Scoring Selected by New Approach | % of Lowest-Scoring Selected by New Approach |
|---|---|---|---|---|---|
| Children who receive a majority of special education/related services in separate schools and placements | 1,132 | Decile 1 | 121 | 20 | 16.53% |

Compared to CDE's method, the new approach selects fewer of the lowest-performing districts on suspension, but six more for the first least restrictive environment indicator and 19 more for the second.  Overall, this method selects more of the lowest-performing districts than does CDE's method.

The table below does not use deciles but defines lowest-scoring using absolute values:

| Indicator | # of Districts With a Score | Definition of "Lowest-Scoring" | # of Lowest-Scoring Districts | # of Lowest-Scoring Selected by New Approach | % of Lowest-Scoring Selected by New Approach |
|---|---|---|---|---|---|
| Suspension and expulsion | 1,020 | Rate > 2.00% | 38 | 10 | 26.32% |
| Children who receive a majority of special education/related services in a regular classroom | 1,132 | 0.00% | 92 | 6 | 6.52% |
| Children who receive a majority of special education/related services in separate schools and placements | 1,132 | 100% | 30 | 5 | 16.67% |

The table above illustrates the difference between using absolute values versus decile values.  For example, the first decile for the regular classroom indicator includes districts with scores ranging from 0.00%-18.75%.  The absolute approach looks only at districts that have a score of 0.00%.   The approach that uses absolute values selects

more, and a higher percentage, of the lowest-performing districts than the approach that uses deciles, but there are advantages to using a decile approach (e.g., each variable in the formula is given equal weight by flattening the distributions).

The above analyses suggest that CDE's method does not select the lowest-performing small districts for intensive preschool monitoring. This is a direct result of its small group methodology.

*Conclusion: Noncompliant.*

*Reasons for Conclusion: The indicators used in CDE's formula have a clear relation to the FAPE and least restrictive environment requirements of the statute. Because many districts lack outcomes data, particularly small districts, consideration can be given to removing outcomes from the formula. Although a majority of the lowest-performing large districts on each indicator are not selected by CDE, the formula selects those large districts whose data over the four indicators merits intensive monitoring. This is an important accomplishment by CDE.*

*Because least restrictive environment is a statutory priority, and a priority for CDE due to recent data trends, a higher percentage of the lowest-performing large districts on least restrictive environment would be selected if outcomes were removed from the formula, or through selecting additional districts that scored in the first decile, or the first and the second decile, on both least restrictive environment indicators.*

*For small districts, the overwhelming majority of the lowest-performing small districts on each of the four indicators were not selected by CDE. This is due to the effect of CDE's small LEA grouping methodology.*

## VII. Intensive Monitoring-School Age

The Court determined that CDE's system of selecting school districts for comprehensive review was "legally inadequate" (Dkt. No. 2520 at 24) due to two major flaws: CDE's approach did not select enough districts, and the state selected the wrong districts because some better-performing districts were selected while some worse-performing districts were not. The Phase 2 Order found a number of reasons for this:

- the scoring system for indicators included in the selection formula measured only whether a target was met or missed, but did not measure the extent to which it was met or missed;
- the scoring system placed a clear priority on one-year improvements or regressions, even minor ones;
- the selection formula was unweighted, and thus treated all indicators as equally important regardless of how strongly an indicator was related to FAPE;
- child find was not included as an indicator although it is a priority area for monitoring; and
- the cut score used for selection was somewhat arbitrary, not tied to a theory of compliance, and based in part on resource constraints (Dkt. No. 2520 at 18-24).

As was the case for intensive monitoring of preschools, it is clear from CDE's submission that it endeavored to take much of the Phase 2 Order to heart as it set about redesigning its approach to selection for this monitoring process. As will be discussed in detail below, key features of CDE's new process include the use of fewer indicators, the use of indicators more closely associated with FAPE in the least restrictive environment, no consideration of improvement and regression on indicators, and no use of targets, in order to select the lowest-performing districts in the state. These are very positive changes.

However, CDE's new selection process does not include an indicator related to the monitoring priority area of child find. Currently CDE's child find monitoring is a targeted, rather than intensive, monitoring process. The substance of targeted monitoring of child find is a Phase 3 issue.

The final model adopted by CDE[22] uses six indicators in three categories as shown in the table below (Dkt. No. 2545, Ex. 1 at 22-23):

| Category | Indicators |
|---|---|
| Academic Achievement | • Proficiency Rate in English/Language Arts<br>• Proficiency Rate in Math |
| Educational Climate | • Rate of Suspension<br>• Rate of Chronic Absenteeism |
| Least Restrictive Environment | • Rate of Students in Regular Class Greater than 80% of the day<br>• Rate of Students in Separate Schools and Placements |

The indicators in CDE's formula have a clear relation to the FAPE and least restrictive environment requirements of the statute.

The submission includes details about the models considered by CDE before it arrived at this final model. While the models and variations considered will not be discussed in this report, three decisions made by CDE during its consideration process merit mention before proceeding.

First, CDE decided to exclude from its approach to selection indicators that only applied to high schools and to former students after the end of secondary schooling (graduation, dropout, and post-school outcomes) because these indicators do not apply to elementary schools (Dkt. No. 2545, Ex. 1 at 21). CDE's view is that the indicators used should be stable across all districts in order to identify the worst-performing districts. As the *Emma C.* litigation does not include students after eighth grade, analysis of the effect of this decision is beyond the scope of this report.

Second, CDE elected not to use the indicator regarding students placed in regular classes less than 40% of the day. Two reasons are advanced for this decision: 1) CDE did not wish to overweight placement by including three related indicators (although CDE could have included all three least restrictive environment indicators

---

[22] CDE introduces the model with the phrase "CDE proposes" (Dkt. No. 2545, Ex. 1 at 22). It is therefore not clear that this model is in use during the current school year.

and weighted them so that the least restrictive environment category received one-third of the weight in the final formula as it currently does with the two indicators); and 2) it wanted to encourage increased access to general education classrooms, rather than focusing on lowering the number of students in self-contained classrooms (Dkt. No. 2545, Ex. 1 at 21-22).  The effect of this decision will be studied below, as its supporting reasoning is questionable in light of state and national data.

    Third, initially CDE considered having only one school climate indicator, suspension rate, and double weighing it so that all three categories had equal weight.  Instead, CDE ultimately decided to include the rate of chronic absenteeism—absences of at least 10% of the instructional days the student was enrolled in a school—to capture students who are not engaged in school or are not feeling adequately supported (Dkt. No. 2545, Ex. 1 at 22).  The decision by CDE to use chronic absenteeism in this fashion is a useful and important component of its formula.

    Turning to CDE's process of scoring and ranking districts, scoring of each indicator uses deciles.  The worst-performing 10% of LEAs/small groups on each indicator are given a "1'" the next-worst a "2," etc.  Each LEA/small group's scores on each indicator are added and then divided by the total possible score to yield the LEA's or small LEA group's score.

    For students ages 6-21 there were 728 LEAs and small LEA groups.  CDE determined that at least 10% of LEAs in the state should be selected for this intensive monitoring process.  Because eleven LEAs/groups were tied at the lowest end of the lowest 10% (score of 30%), CDE included all of them.  This resulted in the selection of 83 LEAs and small groups (one small group, one county office of education, ten elementary districts, 23 high school districts, and 48 unified districts).

    CDE then analyzes the small LEA group's data.  The group selected consisted of two LEAs.  CDE analyzes each of the small LEAs and selects those that meet any of these criteria:

- no students proficient in English/Language Arts assessments
- no students proficient in Math assessments
- no students in regular classes 80% or more
- any students in separate schools and placements
- any students suspended
- any students chronically absent

Both of the small districts met these criteria and were selected.

    The submission includes tables showing the data for each of these two districts.  The first district met three of the criteria, and the other met only one.  CDE writes that this latter district did not contribute to the small group's poor performance in two of the three categories.  But the district did not have any students proficient in English/Language Arts and was therefore selected.

    Thus, 84 LEAs were ultimately selected for intensive school-age monitoring (two small LEAs, one county office of education, ten elementary districts, 23 high school

32

districts, and 48 unified districts).  These LEAs serve about 16% of the school-age students with disabilities in the state (Dkt. No. 2545, Ex. 1 at 23-27).

The table below shows the extent to which the 666 large districts in the state performed in the lowest decile for each indicator in CDE's formula, and the number and percentage of those districts selected by CDE:

**Large Districts Only**

| Indicator | # of Districts With a Score | Definition of "Lowest-Scoring" | # of Lowest-Scoring Districts | # of Lowest-Scoring Selected by CDE | % of Lowest-Scoring Selected by CDE |
|---|---|---|---|---|---|
| ELA Proficiency | 664 | Decile Score of 1 | 70 | 28 | 40.00% |
| Math Proficiency | 664 | Decile Score of 1 | 69 | 23 | 33.33% |
| A. Percent students in regular classes for greater than 80% of the school day | 666 | Decile Score of 1 | 71 | 33 | 46.48% |
| C. Percent students in separate placements | 666 | Decile Score of 1 | 69 | 26 | 37.68% |
| Suspension | 665 | Decile Score of 1 | 68 | 37 | 54.41% |
| Absent | 662 | Decile Score of 1 | 55 | 24 | 43.64% |

CDE selected a majority of the large districts in the lowest decile for suspensions.  For the other indicators in its formula, it did not select a majority of the lowest performers, although some were close.

As noted above, CDE elected not to include in its selection approach the least restrictive environment indicator that concerns placements in regular classes less than 40% of the day.  The table below shows the extent to which the large districts in the lowest decile for that indicator were nevertheless selected:

**Large Districts Only**

| Indicator | # of Districts With a Score | Definition of "Lowest-Scoring" | # of Lowest-Scoring Districts | # of Lowest-Scoring Selected by CDE | % of Lowest-Scoring Selected by CDE |
|---|---|---|---|---|---|
| B. Percent students in regular classes less than 40% of the day | 666 | Decile Score of 1 | 66 | 21 | 31.82% |

CDE's formula picked up fewer than one-third of the lowest-performing large districts on this indicator.  The decision not to include this indicator is striking when one considers the extent to which California lags behind the nation in the extent to which students are educated in regular classes less than 40% of the day compared with separate placements:

| Indicator | FFY 2018 California Performance | FFY 2017 Mean Rate Across 60 States, Territories, Commonwealths, BIE) (includes California)[23] |
|---|---|---|
| B. Percent students in regular classes less than 40% of the day | 19.53% | 10.68% |
| C. Percent students in separate placements | 3.1% | 2.83% |

The state is far closer to the nation in its use of separate placements than in its use of separate classrooms.

      The choice to emphasize that indicator (C. above) over the one that measures students who spend little time in regular classes (B. above), in light of the state and national data, is difficult to understand.  In addition, statistically there is not much variability in C.  The difference between a district in the first decile and a district in the tenth is as little as 4.6%.  In contrast, the variability in B. between the first and tenth decile (the smallest difference between a district in the first and one in the tenth) is 26.2%.  The state has wider variability in LEA performance and more need for improvement in its use of separate classrooms than in its use of separate schools.  Therefore, selecting districts for monitoring based in part on separate classroom usage is more compatible with the effective monitoring of districts.

      For that reason, two alternatives to CDE's formula were analyzed.  First, B. above was substituted for C. in CDE's formula.  Of the 82 lowest-scoring large districts selected by this alternative, 64 were also selected by CDE with its formula.  Next, all

---

[23] 2019 Data Display at
https://osep.grads360.org/#report/apr/2017B/publicView?state=CA&ispublic=tru at 1.

three of the least restrictive environment indicators were included and collectively given one-third weight (with the two proficiency indicators getting another third, and the climate variables getting the other third).  Of the 82 lowest-scoring large districts selected by this alternative, 71 were also selected by CDE.  CDE's formula and the two alternatives selected 64 of the same districts.

The following two tables show the extent to which the 82 selected large districts scored in the first decile on the six indicators using CDE's formula and the alternative formula substituting B. for C.

**CDE's Formula**

| # Indicators at or Below Decile 1 | Not Selected | | Selected | |
|---|---|---|---|---|
| | # | % | # | % |
| 0 | 416 | 71.2% | 10 | 12.2% |
| 1 | 120 | 20.5% | 16 | 19.5% |
| 2 | 36 | 6.2% | 29 | 35.4% |
| 3 | 9 | 1.5% | 14 | 17.1% |
| 4 | 3 | 0.5% | 10 | 12.2% |
| 5 | 0 | 0.0% | 3 | 3.7% |
| 6 | 0 | 0.0% | 0 | 0.0% |
| Total | 584 | 100.00% | 82 | 100.00% |

**Alternative Formula Substituting B. for C.**

| # Indicators at or Below Decile 1 | Not Selected | | Selected | |
|---|---|---|---|---|
| | # | % | # | % |
| 0 | 421 | 72.1% | 5 | 6.1% |
| 1 | 121 | 20.7% | 22 | 26.8% |
| 2 | 33 | 5.7% | 22 | 26.8% |
| 3 | 9 | 1.5% | 16 | 19.5% |
| 4 | 0 | 0.0% | 15 | 18.3% |
| 5 | 0 | 0.0% | 1 | 1.2% |
| 6 | 0 | 0.0% | 1 | 1.2% |
| Total | 584 | 100.00% | 82 | 100.00% |

In CDE's formula, 32.9% (n=20) of the selected 82 districts score in the first decile on three or more indicators.  In the alternative formula, 40.2% (n=33) of the selected 82 districts score in the first decile on three or more indicators.  Thus, use of the alternative formula selects a higher number of the lowest-performing districts.

The table below shows the extent to which the large districts in the state performed in the lowest decile for each indicator in the alternative formula, and the number and percentage of those districts selected by this formula:

### Alternative Formula Substituting B. for C.

| Indicator | # of Districts With a Score | Definition of "Lowest-Scoring" | # of Lowest-Scoring Districts | # of Lowest-Scoring Selected | % of Lowest-Scoring Selected |
|---|---|---|---|---|---|
| ELA Proficiency | 664 | Decile Score of 1 | 70 | 32 | 45.71% |
| Math Proficiency | 664 | Decile Score of 1 | 69 | 29 | 42.03% |
| A. Percent students in regular classes for greater than 80% of the school day | 666 | Decile Score of 1 | 71 | 35 | 49.30% |
| B. Percent students in regular classes less than 40% of the day | 666 | Decile Score of 1 | 66 | 28 | 42.42% |
| Suspension | 665 | Decile Score of 1 | 68 | 38 | 55.88% |
| Absent | 662 | Decile Score of 1 | 55 | 23 | 41.82% |

The alternative approach selects a few more of the lowest-scoring large districts on each of the six indicators with the exception of the chronic absence indicator; for that indicator the alternative formula selects one fewer district.

The differences between the two formulas in the large districts selected are not big but do make a difference. Given the small gap between the state and the nation on C. compared with the large gap on B., the alternative formula is more likely to select districts in need of monitoring of their use of self-contained classrooms and slightly more likely to select the lowest-performing districts on all but one of the other indicators. That said, CDE's formula is strong; it does a reliable job selecting districts in need of intensive monitoring.

Turning to the selection of small LEAs, as noted above CDE selected only two small LEAs for intensive school age monitoring. One of these districts had one student with a disability, and the other had 43 (numbers based on census count for ages 6-21). This is the result of CDE's small grouping method, which only looks deeply at small LEAs if they are in a selected small group. There is little point in attempting to develop alternative approaches that would result in the selection of only two small districts for intensive monitoring. Instead, alternatives were analyzed that would result in the selection of a reasonable number of districts.

There are 1,571 small districts; six of these had no scores for any of the six indicators.  Using the alternative formula, the one that uses B. rather than C., the table below shows the number and percentages of the 1,565 remaining small districts performing in the lowest decile on each indicator; these decile scores were created based only on the small districts[24]:

| Indicator | # of Districts With a Score | Definition of "Lowest-Scoring" | # (%) of Lowest-Scoring Districts | # (%) of Lowest-Scoring Districts that have Fewer than 10 SWD |
|---|---|---|---|---|
| ELA Proficiency | 1,472 | Decile Score of 1 | 253 (17%) | 101 (39.92%) |
| Math Proficiency | 1,470 | Decile Score of 1 | 399 (27%) | 122 (30.58%) |
| A. Percent students in regular classes for greater than 80% of the school day | 1,565 | Decile Score of 1 | 156 (10%) | 57 (36.54%) |
| B. Percent students in regular classes less than 40% of the day | 1,565 | Decile Score of 1 | 157 (10%) | 55 (35.03%) |
| Suspension | 1,547 | Decile Score of 1 | 154 (10%) | 15 (9.74%) |
| Absent | 1,525 | Decile Score of 1 | 153 (10%) | 68 (44.44%) |

There are many more low-performing small districts than the two selected by CDE. One of the two selected by CDE scored in the lowest decile on the two least restrictive environment indicators, and the other on the proficiency in English/Language Arts indicator.

The table also illustrates the difficulty in selecting small districts.  It is not unusual for very small districts to have "extreme" scores on both ends of an indicator, i.e., scoring at 0% or 100%.  Of the 1,565 small districts, 18% have fewer than ten students with disabilities.

An alternative approach to selecting small LEAs would be to use the same formula for small LEAs as is used for large LEAs.  The districts' scores on each indicator were summed, and divided by the appropriate total to get a percent score (similar to how this process was done for large LEAs).  Using this method, CDE could then select the lowest-performing small districts for intensive monitoring.

---

[24] By definition, for each indicator, 10% of districts should perform in the lowest decile.  For ELA and Math proficiency, the higher percentage of districts in the first decile is indicative of the percentage of districts that had 0.00% proficient on these indicators.

For example, if CDE selected the 11 lowest-scoring districts or the 24 lowest-scoring districts, the table below shows the results:

| Indicator | # of Districts With a Score | Definition of "Lowest-Scoring" | # (%) of Lowest-Scoring Districts | Select 11 | Select 24 |
|---|---|---|---|---|---|
| ELA Proficiency | 1,472 | Decile Score of 1 | 253 (17%) | 5 | 9 |
| Math Proficiency | 1,470 | Decile Score of 1 | 399 (27%) | 5 | 11 |
| A. Percent students in regular classes for greater than 80% of the school day | 1,565 | Decile Score of 1 | 156 (10%) | 10 | 20 |
| B. Percent students in regular classes less than 40% of the day | 1,565 | Decile Score of 1 | 157 (10%) | 9 | 17 |
| Suspension | 1,547 | Decile Score of 1 | 154 (10%) | 7 | 15 |
| Absent | 1,525 | Decile Score of 1 | 153 (10%) | 5 | 12 |

In the group of the eleven lowest-scoring districts, five have fewer than ten students with disabilities.  In the group of the 24 lowest-scoring districts, nine have fewer than ten students with disabilities.  Modifications could be made to the formula to restrict to a census count of ten students or above, or some other minimum n, in order to ensure that a reasonable number of districts are selected for each small size group.

Compared with the method currently used by CDE, this alternative approach to the selection of small districts selects a higher number of lower-performing districts for intensive monitoring.  It also does not depend upon the use of small groups.

*Conclusion:  Noncompliant.*

*Reasons for Conclusion:  The indicators used by CDE to select districts have a clear relation to important requirements of the IDEA, with the exception of child find.  Although CDE's formula does not select the majority of the lowest-performing large districts on five of the six indicators, CDE's formula is strong and does a reliable job of selecting large districts for intensive monitoring.  The formula could be made more compatible with the effective monitoring of districts by substituting the indicator measuring placements in separate classrooms for the indicator measuring placements in separate schools.*

*For small districts, although it is challenging to create an effective selection approach, the application of CDE's small LEA grouping methodology does not result in the selection of the lowest-performing districts and does not select enough small districts for intensive monitoring.*

## VIII.  Status Updates on Outstanding Issues

A.  <u>Restraint and Seclusion (Phase 2 Status)</u>

The Phase 1 Order found the state compliant on data collection regarding restraint and seclusion (Dkt. No. 2428 at 26-28).  With respect to the Phase 2 issues, analysis of these data, CDE states that it is collecting data from LEAs during the current school year (2019-20), and will use the data for monitoring in the 2020-21 school year. Its calculations and selection approach will be submitted, it anticipates, in future phases of this inquiry (Dkt. No. 2545, Ex. 1 at 18).

Thus, a conclusion on the Phase 2 aspect of this issue cannot yet be reached.

B.  <u>IEP Implementation (Phases 1 and 2 Status)</u>

The Phase 1 Order found the state noncompliant on the collection of IEP implementation data.  The Order states that this inquiry will return to this issue during Phase 4 (Dkt. No. 2428 at 13-18).

CDE provides an update in its submission, stating that the approach under consideration includes the collection of IEP implementation data from each LEA using a statistically significant sample of students.  Districts and students will be randomly selected in order to determine the validity and reliability of the data.  CDE anticipates working with experts in sampling, and designing a data collection form, during the current school year.  It expects to pilot its data collection methodology with a sample of LEAs in the 2020-21 school year, collect the data from all LEAs in the 2021-22 school year, and use the data in monitoring during the 2022-23 school year (Dkt. No. 2545, Ex. 1 at 34-35).

Thus, conclusions on the Phase 1 and Phase 2 aspects of this issue cannot yet be reached.