1   XAVIER BECERRA
    Attorney General of California
2   DARRELL W. SPENCE
    Supervising Deputy Attorney General
3   KIRIN K. GILL, State Bar No. 259968
    CHRISTINE M. MURPHY, State Bar No. 183835
4   Deputy Attorneys General
      1300 I Street, Suite 125
5     P.O. Box 944255
      Sacramento, CA 94244-2550
6     Telephone:  (916) 210-6172
      Fax:  (916) 324-5567
7     E-mail:  Kirin.Gill@doj.ca.gov
      E-mail:  Christine.Murphy@doj.ca.gov
8   *Attorneys for Defendants
    California Department of Education, Tony
9   Thurmond, in his official capacity as the State
    Superintendent of Public Instruction, and State
10  Board of Education*

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14

15

| | |
|---|---|
| **EMMA C., et al.,** | 3:96-cv-04179-VC |
| Plaintiffs, | **STATE DEFENDANTS' RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION** |
| v. | |
| **THURMOND, et al.,** | Judge:  The Honorable Vince Chhabria |
| Defendants. | |

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to the Court's July 5, 2019 Order re State's Compliance at Phase 2 (Dkt. 2520) ("the "7/5/19 Order"), the September 3, 2019 Scheduling Order (Dkt. 2531), and the March 24, 2020 Order Granting Motion for Extension of Time (Dkt. 2561), Defendants California Department of Education ("CDE"), Tony Thurmond, in his official capacity as the State Superintendent of Public Instruction, and State Board of Education ("SBE") (collectively, "State Defendants" or the "State") hereby submit their Response to the March 7, 2020 Monitor's Review of CDE's Phase 2 (Continued) Submission: Data Analysis (Dkt. 2555) (the "Response to Monitor's Review of the Further Phase 2 Submission"), attached hereto as **Exhibit 1**, to further show that the State's data analysis activities are sufficient to allow the State to effectively fulfill its monitoring and enforcement duties under the Individuals with Disabilities Act (the "IDEA"), to address the Court's concerns as set forth in the 7/5/19 Order, and to address and respond to points raised in the Monitor's Review of the Further Phase 2 Submission.  The Response to Monitor's Review of the Further State Phase 2 Submission also addresses some of the anticipated challenges presented by COVID-19 on the State's ability to implement its data analysis activities for the next monitoring year.

Dated:  April 21, 2020

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
DARRELL W. SPENCE
Supervising Deputy Attorney General

/s/ Kirin K. Gill
/s/ Christine M. Murphy
KIRIN K. GILL
CHRISTINE M. MURPHY
Deputy Attorneys General
*Attorneys for Defendants
California Department of Education, Tony
Thurmond, in his official capacity as the
State Superintendent of Public Instruction,
and State Board of Education*

SA2005104070
34006013.docx

1

1   XAVIER BECERRA
    Attorney General of California
2   DARRELL W. SPENCE
    Supervising Deputy Attorney General
3   KIRIN K. GILL, State Bar No. 259968
    CHRISTINE M. MURPHY, State Bar No. 183835
4   Deputy Attorneys General
     1300 I Street, Suite 125
5    P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone: (916) 210-6172
     Fax: (916) 324-5567
7    E-mail: Kirin.Gill@doj.ca.gov
     E-mail: Christine.Murphy@doj.ca.gov
8   *Attorneys for Defendants*
    *California Department of Education, Tony*
9   *Thurmond, in his official capacity as the State*
    *Superintendent of Public Instruction, and State*
10  *Board of Education*

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14

15

| | |
|---|---|
| 16  **EMMA C., et al.,** | 3:96-cv-04179-VC |
| 17                        Plaintiffs, | **EXHIBIT 1** |
| 18        **v.** | Judge: The Honorable Vince Chhabria |
| 19  **THURMOND, et al.,** | |
| 20                        Defendants. | |

21

22

23

24

25

26

27

28

EXHIBIT 1 (3:96-cv-04179-VC)

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
## RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

Introduction ................................................................................................................. 2

Least Restrictive Environment .................................................................................... 4

    Small School Districts ............................................................................................. 6

    Meets Requirements .............................................................................................. 8

    Child Find .............................................................................................................. 22

    Intensive Monitoring ............................................................................................. 25

        Preschool Age .................................................................................................. 25

    Mediation .............................................................................................................. 30

COVID-19 Impact ..................................................................................................... 34

Attachments ............................................................................................................. 37

  Toc38016170

*Emma C. v. Thurmond et al.*; Case No. 96-cv-04179-VC
## RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

## Introduction

In the Further Phase 2 submission dated January 31, 2020 (Dkt. 2545) (Further Phase 2 Submission), State Defendants addressed the following concerns in the Court's July 5, 2019 Order re State's Compliance at Phase 2 (Dkt. 2520) (the 7/5/19 Order): (1) California Department of Education (CDE) was not sufficiently analyzing data regarding small local educational agencies (LEAs), preschool, and mediation; (2) CDE's selection methodology for its most intensive monitoring activity resulted in CDE selecting incorrect and insufficient LEAs; and (3) the targets CDE uses to select LEAs for further monitoring activities were not sufficiently rigorous.[1] As to the third item, as previously discussed, while CDE undertook an extensive process to set new rigorous targets, based on recent U.S. Department of Education action there is an unavoidable delay in CDE's ability to publicly release new targets.

The Monitor's March 9, 2020 Review of CDE's Further Phase 2 Submission (Dkt. 2555) (the Monitor's Review), while acknowledging the propriety of some of CDE's approaches and the seriousness with which CDE took to address each of the Court's concerns in the 7/5/19 Order, and recognizing the inherent challenges in addressing certain items, nevertheless recommends a finding that CDE is noncompliant with the Individuals with Disabilities in Education Act (IDEA) in all areas. As explained in more

---

[1] As discussed in the Further Phase 2 Submission and at the February 19, 2020 Case Management Conference (2/19/20 CMC), the Office of Special Education Programs (OSEP) announced this past fall that it would be delaying implementation of a new six-year cycle by at least one year, and directed States to create extension targets for the current six-year cycle and submit them to OSEP by February 1, 2020, the date OSEP previous set for States to submit targets for the new six-year cycle. (See, e.g., Dkts. 2545 at pp. 2-3, 6 & 20-21; 2546; 2550.) Accordingly, because of OSEP's revised timeline for the next six-year cycle, the State cannot adopt new State Performance Plan (SPP) targets for the next six-year cycle until at least the 2021-2022 monitoring year, and the State anticipates that the State Board of Education (SBE) will not be in a position to approve the new targets for the next six-year cycle prior to the end of 2020. (Id.) Additionally, the ongoing effects of COVID-19 may further delay timelines relating to federal and State approval of targets for the next six-year cycle. Since the 2/19/20 CMC, there have been no further developments between CDE and stakeholders with respect to target-setting activities for the next six-year cycle. Given the changes CDE has made to the State's data analysis activities in response to the Court's 7/5/19 Order as set forth in the Further Phase 2 Submission, CDE will address any additional issues regarding SPP targets as part of a separate hearing, or in connection with a later phase, depending on the Court's preference.

*Emma C. v. Thurmond et al.*; Case No. 96-cv-04179-VC
## RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

detail below, each of the proposals CDE has set forth in response to the Court's concerns is compliant with federal law. In general, CDE's approaches emphasize an LEA's overall performance, as revealed by a systematic, repeatable, and fair evaluation of data to identify LEAs in need of monitoring, whereas the Monitor's approaches emphasize the number of individual students. But CDE's proposed approaches comply with federal law and align with IDEA's emphasis on improving outcomes for students. For example, in proposing methodology for selecting small LEAs for monitoring, CDE and the Monitor simply place different weight on competing concerns relating to over-identifying small LEAs based on size alone versus under-identifying low-performing LEAs. These differing approaches simply reflect a difference in policy. That CDE and the Monitor disagree on policy does not render CDE's approaches noncompliant with federal law.

CDE carefully considered and analyzed the Monitor's alternative approaches. Indeed, in one instance, where the Monitor proposes placing reliance on federal least restrictive environment (LRE) indicator 5b over Indicator 5c, which CDE's proposed methodology emphasizes, CDE has decided to adjust its approach to adopt the Monitor's recommendation. In all other areas, notwithstanding the Monitor's assertions to the contrary, the State's proposals set forth in the Further Phase 2 Submission appropriately and adequately address the Court's concerns and should be deemed compliant with federal law.

### Standard of Review for State Monitoring Selection Process

CDE implements the selection process for monitoring in accordance with the requirements in 34 CFR § 300.600(d). According to guidance from OSEP,[2] integrated monitoring as part of a system of general supervision should include:

- Stakeholder involvement

- Focus on a specific hypothesis

- Include families

- Investigate both noncompliance and program improvement

- Multiple methods and data sources to monitor every program, every year

- Activities include examination of performance for compliance and results

- Written reporting specify evidence of correction

---

[2] See **Attachment 11**, also available at
https://sites.ed.gov/idea/files/General_Supervision_Breakout_3-29-07.pdf.

*Emma C. v. Thurmond et al.*; Case No. 96-cv-04179-VC
**RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2
SUBMISSION**

- Internal and external technical assistance and professional development to
  support improvement and correction

CDE's integrated monitoring system includes each of the eight components required by
OSEP. Neither the IDEA nor OSEP impose a specific monitoring framework on states.
Further, OSEP does not require states to automatically select every LEA that has a
single low-performing student for further monitoring activities under an effective system
of general supervision. In fact, OSEP has provided guidance and technical assistance
on developing a system of general supervision that directs states to develop their own
models of general supervision based on what is required and desired.[3] OSEP does not
place prescriptive requirements or limits on what types of monitoring must or can be
conducted. OSEP does not limit "monitoring" to those activities that occur "onsite."
Thus, federal law permits and anticipates States may use a wide range of different
types of monitoring activities under the IDEA. Details on the different types of monitoring
activities CDE employs will be discussed in Phase 3.

Given the size of California and the sheer number of LEAs and students, the State—in
accordance with its broad authority under federal law—implements the IDEA in a
manner that necessarily differentiates LEA monitoring and enforcement activities based
on an LEA's demonstrated need and the scope of an LEA's apparent deficiencies. For
example, in CDE's proposed selection process for monitoring small LEAs, CDE
monitors all students under the first step of CDE's selection methodology. As discussed
in more detail below, once CDE identifies an LEA or an LEA group, CDE conducts a
secondary evaluation of the available data, and then analyzes which LEAs appear to
have practices or procedures in place that contribute to the poor performance of the
LEA group. Given the vast sources of data, variables, circumstances, and calculation
variations to consider, CDE has created an effective method of selecting those LEAs
most in need of monitoring. This selection methodology meets the general supervision
requirements of federal law and promotes the goal of improving outcomes for students
with disabilities (SWD).

The Monitor's concerns focus largely on the implementation aspect of the selection
methodology to address small LEAs. Accordingly, CDE will address the criticisms
relating to its proposed selection methodology with respect to small LEAs as a group
rather than in the order set forth in the Monitor's Review.

## Least Restrictive Environment

The Monitor proposes an alternative measure for selecting LEAs for monitoring of
compliance with least restrictive environment (LRE). (See Dkt. 2555 at p. 34.) Although
the Monitor does not raise a concern with CDE's selection methodology, he proposes

---

[3] See **Attachment 12**, also available at
https://sites.ed.gov/idea/files/General_Supervision_3-29-07.pdf.

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
# RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

that using Indicator 5b—"Percent of Students in a Regular Class Less than 40% of the Day"—would be a better measure of LRE than CDE's methodology, which proposed using Indicator 5c—"Percent of Students in a Separate School or Placement." (Id.) Both indicators measure the percentage of students who are excluded from the general education program, and CDE's methodology emphasizes Indicator 5c because placement of children in separate settings is highly restrictive, and should, consistent with the State's policy, be considered only in extreme cases. Having too many students identified in Indicator 5c may indicate a systemic problem of excluding students from inclusive environments with their general education peers. The curve of variance for separate schools and placements (Indicator 5c) is far narrower than the variance for the percent of students with disabilities in a regular class less than 40% of the day (Indicator 5b), indicating less variance[4] in the former group than the latter. **Figures 1 and 2** below display this result.

## Figure 1



---

[4] Variance refers to how many distinct or different measures exist during an observation and how far apart each measure is from another one. For example, the daily temperature in a given year in Kansas City, Missouri has more variance, or more distinct measures that are further apart from each other, than the daily temperature in San Diego, California, which has fewer distinct measures that are closer together.

Emma C. v. Thurmond et al.; Case No. 96-cv-04179-VC
**RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2
SUBMISSION**

<u>**Figure 2**</u>



As reflected in Figures 1 and 2 above, the data indicates a lack of variance or range of possible scores when using Indicator 5c (CDE's proposal) rather than Indicator 5b (the Monitor's proposal) in CDE's selection methodology for LRE. Greater variance impacts the way LEAs fall into deciles, and greater variance allows for the poorest performing LEAs to be identified in the bottom 10% of LEAs. Accordingly, while the methodology to select LEAs for monitoring an LEA's compliance with LRE will remain as described in the Further Phase 2 Submission, CDE will adjust its methodology to adopt the Monitor's approach to use Indicator 5b rather than Indicator 5c in Intensive Review – School Age.

## Small School Districts

As acknowledged by the Monitor, creating a selection methodology to address the small LEAs is a complicated matter. (See, e.g., Dkt. 2555 at pp. 2, 8, 38.) There are difficulties or challenges with any selection methodology for LEAs with small population sizes, because the effect of one student can disproportionately impact the calculated rates. Using a simple rate calculation would be the least effective method, because most LEAs selected will be smaller in size due to one or two students accounting for a larger proportion of the rate. For example, a poor performance by one or two students could drastically affect the overall rate of the smaller LEA, yet not be indicative of systemic, LEA-wide poor performance. Selecting LEAs with very small populations for further monitoring activities based on the performance of one or two students, would inappropriately emphasize small student size, rather than an LEA's poor effort or other noncompliance issues. As such, CDE's methodology is focused on selecting the lowest

performing LEAs based on indicators that suggest a systemic problem, rather than merely on the size of the student population. This allows the State to appropriately target its further monitoring activities, corrective actions, and technical assistance to improve outcomes for students.

To address the concern that size would be a complicating factor in selection, CDE developed its proposal by reviewing best practices used in the health, science, and social science fields for analyzing small populations. Using small population size to make inferences lacks precision and can lead to misinterpretation of need.[5] The same assumptions that can be made for LEAs with large populations—where the effect of one student's performance does not overly affect the inferences that can be drawn from the data because the variance is controlled by the overall number of students—cannot be applied to LEAs with small populations.

Most scientists and statisticians will select one of several methods when faced with small sizes.[6] One of the most common methods is to exclude small populations from analysis because experts in the field have concluded that including them in the analysis and the final calculation does not change the ultimate findings. Federal and State education authorities have implemented this methodology within the guidance for Significant Disproportionality and California's statewide accountability system: the California School Dashboard (See Dkts. 2455-1 at p. 48 and 2478-1 at pp. 6 & 13) CDE employed this method of exclusionary analysis in previous years, which led to a number of LEAs not being included in the State's initial analysis for selection for monitoring.

Another common method that scientists and statisticians use to stabilize the variance of small populations and to ensure that the inferences—or conclusions—drawn are more precise, is to aggregate or run multivariate models that borrow information from neighboring sources to enhance the population size and reduce the effect of single cases on the final calculation. In other words, grouping similar small populations (e.g., by geography or demographics) stabilizes the influence—or impact—of a single case. In practice, the purpose of these kinds of aggregations is to reduce error and ensure that the data indicate that outcomes in the small population are attributable to systemic issues within the LEA and not the variance of a few students in a small population. These advanced models are typically known as Bayesian Models, and can vary in levels of complexity.

---

[5] See Louis, T. (2018) Bayesian Methods for Small Population Analysis.

[6] National Academy of Science, Engineering and Medicine (2018) *Improving Health Research on Small Populations (Chapter 7)*.

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
## RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

Accordingly, CDE selected a simplified version of either a multivariate model or hierarchical model for its small LEA selection methodology; however, because no regression analysis was required, no linear model was performed. When constructing this model, CDE used research that examined similar problems,[7] and considered a number of questions:

> How would small LEAs be aggregated?

> What is the appropriate number to use to aggregate students?

> Are there other considerations from the stakeholders?

Ultimately, CDE applied the concepts of Bayesian models and used input from stakeholders to build the final model.[8]

Realizing that every model will have deficiencies and that no perfect model exists for addressing this complicated issue, CDE weighed and analyzed different types of models with stakeholders and considered current research and guidance that exists in other fields to ensure that LEAs are equitably and appropriately identified. As described, CDE's proposed methodology for analyzing small LEAs is sufficient to meet the State's obligations under federal law.

In the alternative methods proposed by the Monitor, he also identified many of the same issues identified by CDE with respect to small LEAs; however, he reached a different conclusion. These differing conclusions, however, do not render the State out of compliance with federal law. In the following sections, CDE identifies a number of concerns with the Monitor's assumptions and observations that further highlight the problems with making inferences on small populations using standard rates or percentages. These concerns show that the methodology proposed by CDE is more appropriate to identify small LEAs.

### Meets Requirements

CDE is required to make annual determinations under 34 CFR § 300.603(b):

 (1) General. Based on the information provided by the State in the State's annual performance report, information obtained through monitoring visits, and any other public information made available, the Secretary determines if the State -

---

[7] Korngiebel, D. (2015) Addressing the challenges of research with Small Populations *American Journal of Public Health.*

[8] The Further Phase 2 Submission describes the State's policymaking process that led to its proposed selection methodology with respect to small LEAs. (See, e.g., Dkt. 2545 at pp. 14-16.)

Emma C. v. Thurmond et al.; Case No. 96-cv-04179-VC
# RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

(i) Meets the requirements and purposes of Part B of the Act;

(ii) Needs assistance in implementing the requirements of Part B of the Act;

(iii) Needs intervention in implementing the requirements of Part B of the Act; or

(iv) Needs substantial intervention in implementing the requirements of Part B of the Act.

(2) Notice and opportunity for a hearing.

(i) For determinations made under paragraphs (b)(1)(iii) and (b)(1)(iv) of this section, the Secretary provides reasonable notice and an opportunity for a hearing on those determinations.

(ii) The hearing described in paragraph (b)(2) of this section consists of an opportunity to meet with the Assistant Secretary for Special Education and Rehabilitative Services to demonstrate why the Department should not make the determination described in paragraph (b)(1) of this section.

(See 20 U.S.C. § 1416(d).)

LEAs that participate in any of monitoring activities are automatically identified as either "Needs Assistance" or "Needs Intervention." (See, e.g., Dkt. 2455-1 at 8-10 & 64-65.) LEAs not selected for review are preliminarily assigned "Meets Requirements." (Id.) During the 2019-2020 Monitoring Year, CDE preliminarily selected over 1,700 LEAs for a monitoring activity; accordingly, CDE would assign these LEAs either a "Needs Assistance" or "Needs Intervention" annual determination. LEAs that were not selected for review may still be identified as "Needs Assistance" and "Needs Intervention" if there was a critical incident or the LEA was found noncompliant and received corrective actions pursuant to a complaint process. (See id. at 64-65.)

The Monitor asserts that CDE's proposed methodology for small LEAs would lead to a number of small LEAs being deemed "Meets Requirements" under the IDEA without further monitoring, despite performance problems related to achievement, suspension, and/or LRE. (Dkt. 2555 at p. 11.) CDE reviewed the Monitor's analysis using the data provided by CDE, but unfortunately, CDE could not recreate the total count of small LEAs the Monitor identified that would be preliminarily designated "meets requirements," and was therefore unable to verify the analyses exactly as presented by the Monitor. (See id. at pp. 9-10.) However, operating under the same premise as the Monitor, CDE identified 529 small LEAs (compared to 532 small LEAs identified by the Monitor) that would be preliminarily designated "Meets Requirements" because these

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
## RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

LEAs were not identified for a monitoring activity for the 2019-2020 monitoring year.[9] While the difference in total count of LEAs identified is negligible, the distribution of student count varies. A comparison of the student breakdown in the small LEAs identified by the Monitor (see Dkt. 2555 at p. 9) to those identified by CDE is in **Figure 3,** which shows that CDE identifies 24 additional LEAs with 10 or fewer SWD that would be deemed "Meets Requirements."

### Figure 3

| # SWD in the census count, age 6-21 | Monitor's Analysis | | CDE's Analysis | |
|---|---|---|---|---|
| | # LEAs | Percentage of Total | # LEAs | Percentage of Total |
| Missing | 3 | 0.56% | 3 | 0.57% |
| 1-10 | 158 | 29.70% | 182 | 34.40% |
| 11-20 | 137 | 25.75% | 129 | 24.39% |
| 21-50 | 184 | 34.59% | 170 | 32.14% |
| 51-70 | 38 | 7.14% | 35 | 6.62% |
| 71-100 | 12 | 2.26% | 10 | 1.89% |
| Total | 532 | 100.00% | 529 | 100.00% |

For the 529 small LEAs CDE identified, CDE has reviewed the information presented in the Monitor's analyses and recreated the tables provided for the three performance areas: assessment, suspension, and least restrictive environment. (See Dkt. 2555 at pp. 9-10.) As described below, CDE's review of the Monitor's analysis demonstrate the great impact small counts have on the calculation of rates.

### Assessment

The Monitor showed the number and percent of LEAs having a 0.00% proficiency rate on Math and English Language Arts (ELA) assessments. (Dkt. 2555 at pp. 9-10.) A comparison table in **Figure 4** shows the 532 small LEAs identified by the Monitor compared to the 529 small LEAs identified by CDE. The breakdowns are nearly identical.

---

[9] Under CDE's methodology, LEAs that participate in only targeted monitoring are assigned a determination of "Needs Assistance." LEAs that participate in Intensive Monitoring are assigned a determination of "Needs Intervention." If an LEA does not participate in a monitoring activity and does not otherwise have complaint noncompliance during the monitoring year, they are assigned a "Meets Requirements" determination.

*Emma C. v. Thurmond et al.;* Case No. 96-cv-04179-VC
**RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2
SUBMISSION**

**Figure 4**

| Assessments | Monitor's Analysis | | CDE's Analysis | |
|---|---|---|---|---|
| | # LEAs | % LEAs | # LEAs | % LEAs |
| No ELA or Math Scores | 55 | 10.34% | 55 | 10.40% |
| 0% Proficiency Rate for ELA and 0% Proficiency Rate for Math | 94 | 17.67% | 95 | 17.96% |
| 0% Proficiency Rate for ELA but Greater than 0% Proficiency Rate for Math | 15 | 2.82% | 15 | 2.84% |
| 0% Proficiency Rate for Math but Greater than 0% Proficiency Rate for ELA | 78 | 14.66% | 75 | 14.18% |
| Greater than 0% Proficiency Rate for ELA and Math | 290 | 54.51% | 289 | 54.63% |
| **Total** | **532** | **100.00%** | **529** | **100.00%** |

The Monitor notes that the majority (371 of 532) of the small LEAs he identified as preliminarily designated "Meets Requirements" has at least 11 total SWD in the age 6-21 census count. (Dkt. 2555 at p. 9.) However, only grades 3-8 and 11 are tested in California. (Cal. Ed. Code §§ 60600 et seq.) Analyzing the students assessed in the 529 small LEAs, and not those in the census count, shows that 64% of these LEAs have 11 or fewer students, highlighting the challenges of using a single rate calculation for selection. Sixty-eight percent of LEAs have fewer than 20 students, meaning that each student accounts for 5% of the rate calculation performed for the LEA. Additionally, none of the LEAs have more than 70 students tested. See **Figures 5 and 6** below.

**Figure 5**

| # ELA Participants | # LEAs | Percent of Total |
|---|---|---|
| Missing | 54 | 10.21% |
| 1-10 | 244 | 46.12% |
| 11-20 | 117 | 22.12% |
| 21-50 | 103 | 19.47% |
| 51-70 | 11 | 2.08% |

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
**RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2
SUBMISSION**

| # ELA Participants | # LEAs | Percent of Total |
|---|---|---|
| 71-100 | 0 | 0.00% |
| **Total** | **529** | **100.00%** |

**Figure 6**

| # Math Participants | # LEAs | Percent of Total |
|---|---|---|
| Missing | 55 | 10.40% |
| 1-10 | 245 | 46.31% |
| 11-20 | 115 | 21.74% |
| 21-50 | 103 | 19.47% |
| 51-70 | 11 | 2.08% |
| 71-100 | 0 | 0.00% |
| **Total** | **529** | **100.00%** |

The Monitor states that of the 532 small LEAs he identified, "over one-third of these districts (35.15%) had 0.00% proficiency rates on both assessments or on one assessment." (Dkt. 2555 at p. 10.) But the Monitor's analysis does not include student counts, and therefore doesn't reflect the impact a few students have on an LEA's overall proficiency rate. As shown in **Figure 7**, on average, the number of SWD tested is 14, and more specifically, the average number of SWD assessed in the LEAs that the Monitor identified as having performance issues is only approximately eight.

**Figure 7**

| Assessments | CDE Additional Analysis on Participants (Denominator of Proficiency Rate) | |
|---|---|---|
| | Average # ELA Participants | Average # Math Participants |
| No ELA or Math Scores | .02 | 0 |
| 0% Proficiency Rate for ELA and 0% Proficiency Rate for Math | 5.72 | 5.64 |
| 0% Proficiency Rate for ELA but Greater than 0% Proficiency Rate for Math | 8.8 | 8.8 |

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
# RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

| Assessments | CDE Additional Analysis on Participants (Denominator of Proficiency Rate) | |
| --- | --- | --- |
| | Average # ELA Participants | Average # Math Participants |
| 0% Proficiency Rate for Math but Greater than 0% Proficiency Rate for ELA | 8.95 | 8.88 |
| Greater than 0% Proficiency Rate for ELA and Math | 18.99 | 18.95 |
| **Total** | **14.39** | **14.37** |

Lastly, CDE conducted further analysis of the count of SWD participating in assessments in the small LEAs with a 0.00% proficiency rate for ELA. Using the Monitor's N-size of at least 11 students, only 18.02% (or 20 of 111 small LEAs) have at least 11 SWD participating, and an overwhelming majority (almost 82%) had 10 or fewer SWD participating the ELA assessment. As shown in **Figures 8 and 9**, there are similar percentages of participation when analyzing small LEAs with a 0.00% proficiency rate for Math.

## Figure 8

| ELA Proficiency Rate = 0% | | |
| --- | --- | --- |
| # SWD Participating in ELA | # LEAs | % of Total |
| 1-5 | 64 | 57.66% |
| 6-10 | 27 | 24.32% |
| 11-26 | 20 | 18.02% |
| **Total** | **111** | **100.00%** |

## Figure 9

| Math Proficiency Rate = 0% | | |
| --- | --- | --- |
| # SWD Participating in Math | # LEAs | % of Total |
| 1-5 | 85 | 50.00% |
| 6-10 | 49 | 28.82% |
| 11-35 | 36 | 21.18% |
| **Total** | **170** | **100.00%** |

Upon further analysis of the LEAs with a 0.00% proficiency rate for ELA, CDE identified six LEAs as having a Math proficiency rate of greater than 20% (much higher than the statewide proficiency rate of 12.4%), and CDE identified one LEA with a 100% Math

proficiency rate. The average number of SWD assessed in these LEAs is four. **Figure 10** displays the proficiency rates for these six LEAs.

### Figure 10

| LEA | ELA | | | Math | | |
|---|---|---|---|---|---|---|
| | # of SWD Proficient | # SWD Assessed | % SWD Proficient | # of SWD Proficient | # SWD Assessed | % SWD Proficient |
| 1 | 0 | 2 | 0% | 1 | 2 | 50% |
| 2 | 0 | 2 | 0% | 2 | 2 | 100% |
| 3 | 0 | 3 | 0% | 1 | 3 | 33% |
| 4 | 0 | 4 | 0% | 2 | 4 | 50% |
| 5 | 0 | 5 | 0% | 1 | 4 | 25% |
| 6 | 0 | 8 | 0% | 2 | 9 | 22% |

For the small LEAs with a 0.00% Math proficiency rate, CDE identified 42 LEAs as having an ELA proficiency rate of greater than 20% higher than the statewide proficiency rate of 16.2%. As shown in **Figure 11**, the average number of SWD participating in assessments is about five, and only four of the 42 small LEAs have greater than ten SWD participating in the assessments. Again, these simple rate calculations exemplify the effect the performance of one or two SWD can have in a small LEA otherwise showing successful outcomes.

### Figure 11

| LEA | ELA | | | Math | | |
|---|---|---|---|---|---|---|
| | # of SWD Proficient | # SWD Assessed | % SWD Proficient | # of SWD Proficient | # SWD Assessed | % SWD Proficient |
| 1 | 1 | 1 | 100% | 0 | 1 | 0% |
| 2 | 1 | 1 | 100% | 0 | 1 | 0% |
| 3 | 2 | 2 | 100% | 0 | 2 | 0% |
| 4 | 1 | 1 | 100% | 0 | 1 | 0% |
| 5 | 1 | 2 | 50% | 0 | 2 | 0% |
| 6 | 1 | 3 | 33% | 0 | 3 | 0% |
| 7 | 2 | 5 | 40% | 0 | 5 | 0% |
| 8 | 1 | 4 | 25% | 0 | 4 | 0% |

*Emma C. v. Thurmond et al.*; Case No. 96-cv-04179-VC
## RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

| LEA | ELA | | | Math | | |
|---|---|---|---|---|---|---|
| | # of SWD Proficient | # SWD Assessed | % SWD Proficient | # of SWD Proficient | # SWD Assessed | % SWD Proficient |
| 9 | 2 | 3 | 67% | 0 | 3 | 0% |
| 10 | 2 | 5 | 40% | 0 | 5 | 0% |
| 11 | 2 | 6 | 33% | 0 | 6 | 0% |
| 12 | 2 | 3 | 67% | 0 | 3 | 0% |
| 13 | 1 | 3 | 33% | 0 | 3 | 0% |
| 14 | 4 | 5 | 80% | 0 | 5 | 0% |
| 15 | 1 | 3 | 33% | 0 | 3 | 0% |
| 16 | 1 | 4 | 25% | 0 | 4 | 0% |
| 17 | 2 | 7 | 29% | 0 | 7 | 0% |
| 18 | 1 | 1 | 100% | 0 | 1 | 0% |
| 19 | 1 | 3 | 33% | 0 | 3 | 0% |
| 20 | 2 | 7 | 29% | 0 | 7 | 0% |
| 21 | 2 | 7 | 29% | 0 | 7 | 0% |
| 22 | 2 | 7 | 29% | 0 | 7 | 0% |
| 23 | 1 | 4 | 25% | 0 | 4 | 0% |
| 24 | 1 | 3 | 33% | 0 | 3 | 0% |
| 25 | 1 | 4 | 25% | 0 | 4 | 0% |
| 26 | 2 | 6 | 33% | 0 | 6 | 0% |
| 27 | 2 | 6 | 33% | 0 | 6 | 0% |
| 28 | 5 | 16 | 31% | 0 | 16 | 0% |
| 29 | 4 | 7 | 57% | 0 | 7 | 0% |
| 30 | 4 | 16 | 25% | 0 | 16 | 0% |
| 31 | 2 | 5 | 40% | 0 | 4 | 0% |
| 32 | 1 | 3 | 33% | 0 | 3 | 0% |
| 33 | 2 | 8 | 25% | 0 | 8 | 0% |
| 34 | 3 | 11 | 27% | 0 | 11 | 0% |
| 35 | 2 | 6 | 33% | 0 | 6 | 0% |
| 36 | 3 | 11 | 27% | 0 | 11 | 0% |
| 37 | 1 | 1 | 100% | 0 | 1 | 0% |
| 38 | 4 | 8 | 50% | 0 | 7 | 0% |
| 39 | 2 | 5 | 40% | 0 | 5 | 0% |
| 40 | 2 | 6 | 33% | 0 | 6 | 0% |
| 41 | 2 | 7 | 29% | 0 | 7 | 0% |
| 42 | 3 | 8 | 38% | 0 | 8 | 0% |

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
## RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

### Suspension

The Monitor also displayed the frequency and percentage of the 532 small LEAs that would be labeled as "Meets Requirements" by suspension rate alone. (Dkt. 2555 at p. 10.) Similar to the analysis for assessment, **Figure 12** shows the distribution by suspension rate for the 529 small LEAs CDE identified.

### Figure 12

| Suspension Rate | Monitor's Analysis | | CDE's Analysis | |
|---|---|---|---|---|
| | # LEAs | % LEAs | # LEAs | % LEAs |
| No suspension rate | 14 | 2.63% | 15 | 2.84% |
| 0.00% | 350 | 65.79% | 346 | 65.41% |
| .01-2.49% | 36 | 6.77% | 37 | 6.99% |
| 2.50-4.49% | 34 | 6.39% | 34 | 6.43% |
| 4.50-9.99% | 58 | 10.90% | 58 | 10.96% |
| 10.00% + | 40 | 7.52% | 39 | 7.37% |
| Total | 532 | 100.00% | 529 | 100.00% |

CDE and the Monitor propose different analyses for this indicator. Specifically, CDE proposes that the analysis focus on the average number of SWDs, while the Monitor focused on those LEAs with a suspension rate of 4.5% or greater. However, in the small LEAs, the rate can be dramatically impacted by one or two students. In the LEAs the Monitor focused on (LEAs with a suspension rate of 4.5% or more), each SWD accounted for a total of 3.69 to 4.47% of the LEA's total suspension rate for all students. In other words, each of those small LEAs would only need, on average, one to two students suspended one time to be identified under the Monitor's selection methodology. As noted, such approach can paint a misleading picture of an LEA's overall performance, and would lead to the State redirecting resources away from those LEAs who may have a systemic problem in this area. **Figure 13** illustrates this point using the 529 small LEAs CDE preliminarily identified as "Meets Requirements."

### Figure 13

| Suspension Rate | Avg # Suspensions | Avg % Suspended | Avg # SWD ages 6-21 | Impact of 1 student |
|---|---|---|---|---|
| No suspension rate | n/a | n/a | 10.67 | 9.37% |
| 0.00% | 0 | 0.00% | 16.58 | 6.03% |

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
## RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

| Suspension Rate | Avg # Suspensions | Avg % Suspended | Avg # SWD ages 6-21 | Impact of 1 student |
|---|---|---|---|---|
| .01-2.49% | 1.08 | 1.67% | 50.05 | 2.00% |
| 2.50-4.49% | 1.26 | 3.34% | 32.85 | 3.04% |
| 4.50-9.99% | 2.31 | 6.63% | 27.1 | 3.69% |
| 10.00% + | 4.18 | 15.92% | 22.38 | 4.47% |
| **Total** | **0.74** | **2.60%** | **21.44** | **4.66%** |

CDE's calculation of the suspension rate for purposes of selecting LEAs for Intensive Review - School Age does not employ the same methodology and cutoffs used in CDE's selection of LEAs for Targeted Monitoring - Performance as the Monitor describes in his Review (Dkt. 2555 at p. 10). CDE's selection of LEAs for Targeted Monitoring – Performance uses the Dashboard to measure performance in suspension, identifying small LEAs scoring Red or Orange (the worst performance colors) or showing a positive (i.e., higher) suspension rate than the previous year.

As a reminder, Intensive Review – School Age ranks large LEAs and small LEA groups' performance in suspension by deciles. In reviewing the decile breakdown of suspension, it is unclear how the Monitor arrived at a 4.50% suspension rate to flag an LEA as not "Meets Requirements" under the IDEA. As the breakdown by decile in **Figure 14** below shows, for the large LEAs and small LEA groups, a 4.5% suspension rate is decile rank 7.

### Figure 14

| Dashboard Suspension | | | |
|---|---|---|---|
| **Decile** | **Rank** | **Min** | **Max** |
| ≤ 10 | 1 | 11.36449% | 35.20000% |
| 11-20 | 2 | 9.44882% | 11.33603% |
| 21-30 | 3 | 7.97101% | 9.40171% |
| 31-40 | 4 | 6.57895% | 7.96460% |
| 41-50 | 5 | 5.42927% | 6.57277% |
| 51-60 | 6 | 4.66926% | 5.42888% |
| 61-70 | 7 | 3.73134% | 4.64602% |
| 71-80 | 8 | 2.53353% | 3.70370% |
| 81-90 | 9 | 1.16959% | 2.52101% |
| 91-100 | 10 | 0.00000% | 1.16279% |

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
# RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

Further, based on the breakdown by decile ranking, using a suspension rate of 10.00% or more as the cutoff would result in 39 of the 529 LEAs (or 7%) being preliminarily identified as "Meets Requirements." Additional analysis of these 39 LEAs reveals that the average number of SWD suspended is about four, and the average total number of students enrolled is 26.

**Figure 15** displays the impact of a single student suspension in a small LEA serving 26 SWD. Indeed, as illustrated in **Figure 15**, assuming that the suspension event at this LEA is based on a single fight during the school year involving three SWD, and each such student is suspended for one day, the resulting suspension rate for that LEA would be 11.54%.

### Figure 15

| # SWD Suspended | # SWD Enrolled | Suspension Rate |
|:---:|:---:|:---:|
| 1 | 26 | 3.85% |
| 2 | 26 | 7.69% |
| 3 | 26 | 11.54% |

When CDE translates the impact small student counts have on an LEA's suspension rate, each student represents nearly 4% of the rate. If a small LEA with only 26 SWD suspends two SWD, its suspension rate is over the 4.50% rate proposed by the Monitor using his approach. (Dkt. 2555 at p. 11.) But omitting the student count leads to false red flags suggesting that an LEA is in need of targeted monitoring for performance when it is not.

## Least Restrictive Environment

Lastly, the Monitor identifies performance issues in the five areas of LRE for the small LEAs he identified as "Meets Requirements." (Dkt. 2555 at p. 11.) Specifically, the Monitor takes issue with the fact that a low number of the 532 small LEAs he identified did not meet the statewide State Performance Plan (SPP) targets for Federal Fiscal Year 2018 (FFY 2018) targets. (Id.)

**Figure 16** illustrates CDE's analysis of the 529 small LEAs it identified preliminarily as "Meets Requirements" compared to the 532 LEAs identified by the Monitor, with additional data in **Figure 17** below.

### Figure 16

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
**RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2
SUBMISSION**

| Indicator | FFY 2018 Target | Monitor's Analysis<br># Small LEAs not meeting Target | CDE's Analysis<br># Small LEA not meeting Target |
|---|---|---|---|
| 5a. Percent students in regular class for greater than 80% of the school day | ≥52.20% | 40 | 41 |
| 5b. Percent students in regular class less than 40% of the day | ≤21.60% | 35 | 37 |
| 5c. Percent students in separate placements | ≤3.80% | 28 | 31 |
| 6a. Percent children in regular early childhood program | ≥35.90% | 39 | 41 |
| 6b. Percent children in separate classes, separate schools and residential facilities | ≤31.40% | 24 | 27 |

The Monitor is correct that CDE's methodology would mean that there are some small LEAs that would not be been identified for Targeted Monitoring – Performance even though the LEA did not meet the SPP target for an applicable LRE indicator. But CDE's methodology does not use SPP targets for LRE indicators when analyzing small LEAs because the indicator uses rates and percentages, which, as described above, can lead to inappropriate selection outcomes with respect to small LEAs. Applying rates or percentages to a small population creates the outcomes of disproportionate influence of one data point on the score, which is what CDE's methodology attempts to avoid. As shown in **Figure 17**, when analyzing the number of SWD for each of these LRE indicators (which were not included in the Monitor's analysis), CDE found that a large proportion of these LEAs have fewer than ten SWD. This is especially true in relation to the two preschool LRE indicators, where over 97% and 88% of LEAs have fewer than 10 children with disabilities (CWD)[10] in Indicator 6a—"Percent Children in Regular Early Childhood Program," and Indicator 6b—"Percent Children in Separate Classes, Separate Schools and Residential Facilities," respectively.

---

[10] Children with IEPs ages 3-5 are referred to as "children with disabilities" (CWD) rather than "students with disabilities" (SWD).

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
**RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2
SUBMISSION**

**Figure 17**

| Indicator | Average # of SWD Census age 6-21 or 3-5 | # Small LEA with less than 10 SWD | # Small LEA | Percent of Small LEA with less than 10 SWD |
|---|---|---|---|---|
| 5a. Percent students in regular class for greater than 80% of the school day | 17.27 | 24 | 41 | 58.54% |
| 5b. Percent students in regular class less than 40% of the day | 17.7 | 21 | 37 | 56.76% |
| 5c. Percent students in separate placements | 19.84 | 12 | 31 | 38.71% |
| 6a. Percent children in regular early childhood program | 2.54 | 40 | 41 | 97.56% |
| 6b. Percent children in separate classes, separate schools and residential facilities | 4.59 | 24 | 27 | 88.89% |

**Figure 18** compares the small LEAs CDE identified to the small LEAs the Monitor identified with respect to the number of targets missed.

**Figure 18**

| # Targets Missed | Monitor's Analysis | | CDE's Analysis | |
|---|---|---|---|---|
| | # LEAs | % of LEAs | # LEAs | % of LEAs |
| None | 410 | 77.07% | 403 | 76.18% |
| One | 84 | 15.79% | 85 | 16.07% |
| Two | 33 | 6.20% | 34 | 6.43% |
| Three | 4 | 0.75% | 4 | 0.76% |
| Four | 1 | 0.19% | 3 | 0.57% |
| Five | 0 | 0.00% | 0 | 0.00% |
| **Total** | **532** | **100.00%** | **529** | **100.00%** |

CDE analyzed the school-age LRE indicators (Indicators 5a, 5b, and 5c) separate from the preschool-age LRE indicators (Indicators 6a and 6b). As seen in the previous two areas in which the Monitor expressed concerns, the average number of SWD is very small. To put this into perspective, **Figures 19 and 20** includes an additional column

Page 20 of 37

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
## RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

that shows the percentage change that one SWD or CWD makes to a small LEA's placement rates under LRE indicators. The FFY 2018 SPP Target for Indicator 5b— "Percent Students in Regular Class Less Than 40% of the Day," is ≤21.60%. **Figure 19** shows the impact one student can make to a small LEA's placement rate in this indicator ranges between over 4% to nearly 8%.

**Figure 19**

| LRE School-Age # Targets Missed | # LEAs | % of LEAs | Avg # of SWD 6-21 | Impact of 1 student |
|---|---|---|---|---|
| None | 446 | 84.31% | 21.8 | 4.59% |
| One | 59 | 11.15% | 22.1 | 4.52% |
| Two | 22 | 4.16% | 12.59 | 7.94% |
| Three | 2 | 0.38% | 20 | 5.00% |
| Total | 529 | 100.00% | | |

One CWD has an even greater impact in the two preschool age LRE indicators. **Figure 20** shows that each child accounts for over 26% of the LEA's total placement rate in these indicators.

**Figure 20**

| LRE Preschool-Age # Targets Missed | # LEAs | % of LEAs | Avg # of CWD 3-5 | Impact of 1 child |
|---|---|---|---|---|
| None | 477 | 90.17% | 3.51 | 28.49% |
| One | 36 | 6.81% | 3 | 33.33% |
| Two | 16 | 3.02% | 3.75 | 26.67% |
| Total | 529 | 100.00% | | |

Thus, the Monitor's concern that small LEAs would avoid monitoring under CDE's methodology for small LEAs is unfounded, because each student in the LEA is monitored as part of a group. Additionally, LEAs are measured on a number of metrics prior to CDE assigning the LEA an annual determination. In general, LEAs that are deemed "Meets Requirements" have these common characteristics:

1. They are not the lowest 10% of LEAs and LEA groups across the six (6) indicators most closely associated with FAPE, combined.

2. The LEA or LEA groups have met the all the targets for Dropout, School Age Least Restrictive Environment (3 indicators), Assessment Participation, Preschool Least Restrictive Environment (2 indicators), Parent Participation, and Post-school outcomes (3 indicators).

3. The LEA has met the 60-day timeline and the Part C to Part B transition timeline for all students referred and assessed in the academic year.

4. The LEA has zero (0) late IEPs or triennials.

5. The LEA was not selected for Targeted Monitoring - Disproportionality or Intensive Monitoring - Significant Disproportionality.

6. The LEA or LEA group Child Find was above 1.5 standard deviations from the mean.

7. The LEA did not have any qualitative factors that indicate further need for monitoring (e.g., critical incidents, complaints).

CDE previously highlighted that the effect of small populations should be considered when making annual determinations.[11] As demonstrated above, CDE's methodology for selecting LEAs for further monitoring activities and the subsequent annual determination is based on LEA performance, and not the impact one or two students could have on an LEA based on the LEA's size. CDE developed a simplified Bayesian methodology regularly employed in related fields to address challenges with small populations. CDE's analysis of a single-rate percentage methodology employed by the Monitor shows that it can result in artificially inflated scores that paint a false narrative about a small LEA's overall performance. Using a rate for a small population would equate one student in a small LEA to a hundred or more students in larger LEAs.[12] CDE's methodology strikes the appropriate balance of analyzing each LEA's performance and identifying those small LEAs with systemic issues for further monitoring activities.

### Child Find

In the area of Child Find for students ages 6 through 21, the Monitor concludes CDE is noncompliant, stating that the grouping of small LEAs prevents identifying "worse-performing districts" and that the methodology CDE employs to identify a small LEA is

---

[11] See, e.g., Testimony of Shiyloh Duncan-Becerril at 4/29/19 Hearing (Tr. at 199:13-20 & 201:22-202:21).

[12] Korngiebel, D. et al. (2015). Addressing the challenges of Research with Small Populations. American Journal of Public Health.

problematic.[13] (Dkt. 2555 at p. 15.) However, the Monitor did not take issue with CDE's methodology used for selecting large LEAs in this area, including the cutoff CDE used for selection and the CDE's count of large LEAs. As discussed below, CDE has addressed the Court's concerns set forth in the 7/5/19 Order with respect to Child Find, and the Monitor's criticisms do not render CDE out of compliance in this area.

CDE's performance metric[14] to identify LEAs for targeted monitoring in the area of Child Find is the rate of SWD in the LEA. To identify LEAs in need of further monitoring in this area, CDE uses the same definition as in other processes to identify and group small LEAs (i.e., LEAs with 100 or fewer SWD). CDE applies a calculation to small LEA groups and large LEAs to obtain the Child Find rate by dividing the number of SWD by the total students enrolled in the LEA. CDE determines a mean rate of the small LEA groups and large LEAs and then calculates standard deviation and then identifies those small LEA groups and large LEAs below 1.5 standard deviations from the mean rate. For the 2018-2019 school year, 744 small LEA groups and large LEAs generated a mean identification rate of 11.58%, and 1.5 standard deviations from the mean is 7.23%.

It is important to understand how CDE identified 7.23% as the cutoff for selection. The result of 1.5 standard deviations from the mean is relative to the group of LEAs it measures. Altering the group of LEAs alters the mean identification rate as well as the percentage that corresponds to 1.5 standard deviations from that mean. The significance of 7.23% as a cutoff for selection is only appropriately understood relative to the group that it measures. And in this case, that group is the small LEA groups and large LEAs. The rate of 7.23% is not an arbitrary percentage; it is a direct result of a statistically sound method of interpreting data. **Figure 21** displays the specifics for the small LEA groups and large LEAs.[15] The percentage used as a cutoff for selection is 1.5 standard deviations from the mean percentage.

---

[13] Child Find with respect to children ages 3-5 is addressed further below.

[14] CDE clarifies this as a "performance" metric as opposed to a "compliance" metric to emphasize that this analysis is in addition to the analysis CDE already conducts to ensure that all students, ages 3 through 21, are evaluated for a disability in a timely manner. CDE uses SPP Indicator 11 to measure and monitor for compliance in this area. Timely evaluation is included in Targeted Monitoring – Compliance, and LEAs must meet the 100% target to avoid being selected for further monitoring in this area.

[15] In response to the data set received on February 14, 2020, the Monitor identifies LEAs with missing Child Find rates as well as LEAs with a rate above 100%. (See Dkt. 2555 at p. 13. n.15 and p. 14.) CDE recognizes these area anomalies and has taken the

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
# RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

### Figure 21

| | # of LEAs | Mean Percentage | 1 Std. Dev. | 1.5 Std. Dev. | Cutoff % for Selection |
|---|---|---|---|---|---|
| Grouped Small LEAs and Large LEAs | 744 | 11.58% | 2.90% | 4.35% | 7.23% |

The Monitor explores two options, both of which use 7.23% as a cutoff for selection for some LEAs. (Dkt. 2555 at p. 15.) In his first option, the Monitor suggests retaining the CDE definition of small LEA (i.e., an LEA 100 or fewer SWD ), but his methodology does not group small LEAs, and it applies a different methodology to selecting small LEAs for further monitoring by identifying 108 of the small LEAs with lowest Child Find rate to match to the total count selected by CDE. (Dkt. 2555 at p. 14.) But the Monitor concludes this methodology is problematic because it selects too many very small districts. In the second option, the Monitor changes the definition of a "small LEA" to an LEA with fewer than 1,000 students enrolled, again uses 7.23% as a cutoff selecting LEAs with 1,000 or more students, and then identifies and selects the 74 of the small LEAs with the lowest Child Find rate.

These two methods are problematic. First, as noted above, the significance of 7.23% as the cutoff exists only as a measure of the small LEA groups and large LEAs grouped using CDE's methodology.

Second, of particular concern, is the Monitor's identification of small LEAs, in which he merely selects a number of LEAs with the lowest rate to match to the total count of LEAs that CDE identified. While this may have been for comparative purposes, merely selecting the bottom 108 LEAs (as in the Monitor's option 1 approach) or bottom 74 (as in the Monitor's option 2 approach) does not seem to be tied to a specific theory of selection or calculation. Nor does it account for the LEAs whose rate is above that for the small LEAs identified (2.78% used in the Monitor's option 1 approach and 2.75% in the Monitor's option 2 approach) but below that (7.23%) used for large LEAs.

It is not necessary to adopt the Monitor's definition of small LEA to adequately and appropriately identify those small LEAs in need of targeted monitoring in the area of Child Find. CDE's definition of small LEAs as those with 100 or fewer SWD is adequate, and it not necessary to use a definition of small LEAs as those with fewer than 1,000 students enrolled, as the Monitor proposes. CDE's grouping of small LEAs reduces the

---

steps to address an error in the coding to prevent future issues. All figures as a result of additional analyses contained herein exclude these LEAs.

variability, reduces the standard deviation, and mitigates the Monitor's concern with potential overidentification of very small LEAs in this area.

Additionally, CDE's methodology was driven by using methods that are repeatable, transparent, and easily understood. If CDE were to employ the Monitor's grouping and selection method for small LEAs in his option 2 approach, it would differ from how small LEAs are treated for all other calculations used to identify them for selection in targeted monitoring . Further, unlike CDE's approach, the Monitor's selection of small LEAs does not seem to have a clear method, nor does it seem to employ a clear definition of "poor performing" (e.g., a static percentage).

## Intensive Monitoring

### Preschool Age

The Monitor concludes CDE is not compliant in its method and process used to identify and select LEAs for intensive monitoring in the area of preschool for several reasons. As explained below, CDE's approach as set forth in the Further Phase 2 Submission adequately addresses the Court's concerns related to preschool and complies with federal law. (Dkt. 2545 at pp. 28-33.)

Before addressing the substance of the Monitor's criticism, there is one point in need of clarification at the outset. The Monitor states there is no Child Find indicator included in the analyses for Intensive Review - Preschool, but provides no further discussion on the matter, no alternatives to incorporate into the analyses, and no reasoning as to why this indicator should be required in the State's selection of LEAs for Intensive Review. As noted in 7/5/19 Order, although the State is interested in developing a measure for Child Find for children ages 3 through 5, there is no appropriate method for doing so as there is no universal preschool, an explanation which the Court found adequate for purposes of the assessing the State's compliance in this area.[16] (Dkt. 2520 at 17 n.5.) Further, CDE does not agree that Child Find should be an indicator for Intensive Monitoring-Preschool. CDE has explained that it will use Child Find to select LEAs for Targeted Monitoring – Performance, and the cutoff used to identify LEAs in this area has already been altered in direct response to the Monitor's concerns.

### Analysis and Selection of Small LEAs

One of the Monitor's main concerns is CDE's methodology for grouping small LEAs. In the alternatives provided, the Monitor separates out LEAs by size, offering different

---

[16] Note that Indicator 11–"Timely Evaluation for Special Education Eligibility," includes all students ages 3 through 21, and is included in CDE's methodology for selecting LEAs for Targeted Monitoring – Compliance. Any LEA with less than a 100% compliance rate in this area will be selected for further monitoring activities.

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
## RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

approaches for large and small LEAs in an attempt to identify "lower performing" LEAs. The Monitor's initial approach to analyzing LEAs is fundamentally different from the approach employed by CDE, and seemingly stems from the Monitor's belief that grouping small LEAs would inadvertently lead to LEAs escaping monitoring.

The issue can be analyzed by treating small and large LEAs as two separate groups. Using 100 or fewer CWD to define a small LEA, **Figure 22** shows the comparison of the two groups. There were 1,349 LEAs serving CWD ages 3 through 5 in the 2018-2019 school year.

### Figure 22

| | Small LEAs<br>≤100 CWD age 3-5 | Large LEAs<br>>100 CWD age 3-5 |
|---|---|---|
| # LEAs | 1,132 | 217 |
| Average CWD Count (Census) | 15 | 322 |
| Total CWD Enrolled (Census) | 16,564 | 69,892 |

As shown in **Figure 22**, 84% of LEAs serving CWD ages 3 through 5 are small LEAs. Second, on average, large LEAs serve 307 more CWD than small LEAs do.

**Figure 23** shows the breakdown for the 1,132 small LEAs by range of child count. About 67% of small LEAs (756) serve fewer than ten CWD and just over half, 51%, or 574 small LEAs, serve only one to four CWD.

### Figure 23



*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
## RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

The Monitor recognizes that small student populations can have certain impacts, but has a different view than CDE on how to effectively address the implications.[17] In grouping small LEAs, CDE's methodology minimizes the impact one child has and avoids the likelihood that a small student count will be the ultimate determining factor in an LEA's selection for further monitoring activities, rather than a systemic performance issue. Grouping the LEAs as CDE proposes levels the playing field, and minimizes the impact of one or two, or even five children creating a misleading "red flag" and leading to an inappropriate designation of "Needs Intervention." Further, CDE's methodology is more likely to identify small LEAs in need of further monitoring and technical assistance as required by the IDEA.

The Monitor includes a comparison table exhibiting the extent to which "low performing" small LEAs were identified for monitoring. (Dkt. 2555 at p. 27.) The Monitor goes on to provide an alternative methodology for selecting small LEAs. Removing CDE's process of grouping small LEAs, the Monitor appears to have simply reviewed small LEAs and employed a mixed approach to determine definitions of "lowest scoring," using CDE's methodology of 0% of children placed in the regular classroom and 100% of children in separate schools and placements, and the Monitor's own definitions for average rate of child outcomes, average score below 50%, and suspension and expulsion rate >2.00%. This proposal results in the identification of 30 small LEAs, only 5 more than would be identified under the CDE's proposal, but each LEA only served 1, 2 or 3 children, which is less than the number of children served by the LEA's CDE identified using its methodology.

The Monitor proposes a second alternative for selecting small LEAs. Employing the same methodology of ranking LEAs scores by decile, scoring, summing up and dividing to calculate a percentage, the Monitor identifies 26 small LEAs he believes are in more need of monitoring than the 25 small LEAs CDE identified.[18] But five of the same small

---

[17] (See Dkt. 2555 at p. 28.) The Monitor identifies 558 out of 1,132 small LEAs have "at least five preschool children." (Id.) It's unclear why the Monitor uses this N-size of five in this area, whereas in a previous section of his Review of the Further Phase 2 Submission, the Monitor identifies the significance of an LEA having at least "11 students with disabilities." (Dkt. 2555 at p. 9.)

[18] Again, the Monitor notes the impact of LEA size, but instead of proposing an alternative that addresses the impact small student count on assessing small LEA performance, he notes that "disaggregation by district size…could be considered." (Dkt. 2555 at p. 28.) The Monitor does not provide any support as to why one "poor performing" LEA would be more in need of monitoring over another "poor performing" LEA. (Id.)

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
## RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

LEAs the Monitor identified were also identified by the CDE using the CDE's methodology.

Looking more closely at the 26 LEAs the Monitor identified, CDE recreated the Monitor's use of the decile method, removed preschool outcomes, and was able to identify the exact number of LEAs identified as lowest scoring. However, CDE also identified that there is a large difference between the Monitor's counts and CDE's counts of small LEAs selected for suspension/expulsion, as shown in **Figure 24**. CDE expects the issue is related to the "variability" issue noted by the Monitor, but is uncertain how the Monitor only selected two small LEAs for suspension/expulsion, when CDE identified 20 small LEAs. This discrepancy is important because the Monitor explains that his methodology identifies more small LEAs based on placement alone, but this is not supported by the review of the LEAs selected by the Monitor. CDE finds that when applying the decile methodology, there are in fact 18 more LEAs selected for suspension than were identified by the Monitor. CDE cannot find the source of the discrepancy, which may be an error on the part of the Monitor.

### Figure 24

| Indicator | Monitor's Analysis | | | CDE's Analysis | | |
|---|---|---|---|---|---|---|
| | # of Lowest Scoring LEA | # of Lowest-Scoring Selected | % of Lowest Scoring Selected | # of Lowest Scoring LEA | # of Lowest-Scoring Selected | % of Lowest Scoring Selected |
| Suspension /Expulsion | 55 | 2 | 3.64% | 55 | 20 | 36.36% |
| Preschool Regular | 113 | 8 | 7.08% | 113 | 8 | 7.08% |
| Preschool Separate Schools | 121 | 20 | 16.53% | 121 | 13 | 10.74% |

**Figure 25** provides more information regarding these small LEAs, by including the count of these small LEAs that serve very small populations of CWD.

### Figure 25

| # of CWD (Census) | # LEAs | % of Total |
|---|---|---|
| < 5 | 7 | 26.92% |
| 6-25 | 3 | 11.54% |
| 26-50 | 4 | 15.38% |
| 51 + | 12 | 46.15% |
| Total | 26 | 100.00% |

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
# RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

### Preschool Outcome Data and "Lowest Performing" Districts with Multiple Indicators

Preschool outcome data is an appropriate indicator, and CDE does not agree with the Monitor that preschool outcome data should be removed as an indicator to assess an LEA's need for Intensive Monitoring. Indeed, it appears that there was an agreement on this point between CDE and the Monitor at the April 29, 2019 hearing.[19] This is especially true for large LEAs, since the majority of large LEAs (and the small LEA groups, for that matter) had adequate data to analyze. Specifically, 97% of large LEAs and about 84% of small LEA groups have preschool outcome data. It is also unclear why removing an area key to ensuring effective monitoring in FAPE on the LRE is appropriate when it appeared CDE and the Monitor previously agreed on this point.[20] The Monitor's proposal would also reduce the factors used for selection of LEAs to only two areas: suspension and placement. Again, this appears to be at odds with the Monitor's prior criticisms of CDE's selection methodology, in which he argued CDE based selection on too few elements. (See, e.g., 4/29/19 Hearing Tr. at 111:2-11; see also generally Dkt. 2469 at p. 71.) The Monitor reasons that CDE stressed the importance of monitoring placement due to a statewide slip in performance, but placement already accounts for two of the four indicators included in the selection formula, and this proposal would impose even more importance on placement over outcomes, especially for LEAs with adequate outcome data for CDE to analyze. CDE's view is that both placement and outcomes should play a role in identifying LEAs for Intensive Monitoring - Preschool.

The Monitor includes tables to show how many LEAs are decile 1 (ranked as the poorest performing) for each indicator, for both small and large LEAs, and compares the LEAs CDE identified for monitoring to those LEAs that were not identified. (See Dkt. 2555 at pp. 23-25) The Monitor also identifies that the majority of lowest performing LEAs by each indicator area are not selected due to the nature of selection with formulas with multiple indicators.

But the Monitor simultaneously indicates the reason "better performing" LEAs may be identified for monitoring over "poorer performing" LEAs is due to the nature of formulas with multiple indicators. (Dkt. 2555 at p. 2) CDE's methodology takes into account that an LEA may be poorly performing in one area, but performing adequately overall across

---

[19] See 4/29/19 Hearing Tr. at pp. 203-207. The Monitor discussed the importance of including preschool outcome data in monitoring and the implications of performance in preschool outcomes has with respect to an LEA's annual determination.

[20] At the April 29, 2019 Hearing, the Monitor highlighted student learning, suspension, and placement in the least restrictive environment as important elements in measuring LEA performance. (See 4/29/19 Hearing Tr. at p. 112.)

all indicators. It is unclear if whether the Monitor believes CDE's methodology of analyzing selection for Intensive Monitoring – Preschool across multiple indicators is legally compliant, as the Monitors appears to both criticize and employ this approach in his own proposals.

Assessing an LEAs performance over several areas to determine whether it should be selected for Intensive Monitoring is a direct result of CDE policy. Intensive Monitoring is just that – intensive. CDE's policymakers believe identifying LEAs for Intensive Monitoring based on a single area[21] is not an appropriate way to select LEAs for this intensive level of intervention. CDE's policymakers also believe that an LEA's annual determination of "Needs Intervention" should not be based on performance in one area. Indeed, CDE identified 285 LEAs for Targeted Monitoring – Performance based on for preschool placements (Indicators 6a and 6b) and 161 in Targeted Monitoring – Compliance based on Part C to Part B transition. As described previously, CDE's selection methodology ensures that LEAs struggling in one performance area are selected for further monitoring. That CDE's methodology may lead to not selecting an LEA struggling in a single area for Intensive Monitoring does not render CDE's methodology legally deficient or flawed.

CDE's selection methodology for Intensive Monitoring – Preschool addresses the Court's concerns that small LEAs are adequately incorporated into its data analyses. CDE reduced the metrics for selecting LEAs for this review to those that both CDE and the Monitor agree are the most closely linked to FAPE in the LRE. CDE's approach is an appropriate reaction to a statewide decline in preschool placement by bolstering additional analysis and focus on placement of California's preschool-aged children in the LRE – a core belief of the policymakers and a priority for monitoring – and establishes a repeatable, fair, and adequate process for identifying and selecting LEAs in need of intensive support.

### Mediation

The Court deemed the state out of compliance with federal law because the State did not address an LEA's mediation practices as part of its data analysis. (Dkt. 2520 at p. 14.) Specifically, the Court stated that it was "far from obvious that the state couldn't take action against districts that refuse to use mediation as a blanket matter (or, for that matter, seriously neglect this tool)." (Id.)

---

[21] See Dkt. 2555 at p. 25. The Monitor describes an alternative approach to selecting LEAs scoring "1" on both least restrictive environment indicators, or selecting LEAs scoring "1" on either of the least restrictive environment indicators and a decile "2" on the other. However, this approach would emphasize LRE indicators over other indicators, and make it more likely that an LEA would be selected for Intensive Monitoring based on its performance in only one area.

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
## RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

In the Further Phase 2 Submission, CDE proposed a data analysis methodology to select LEAs for targeted technical assistance in the area of mediation. In his Review of the Further Phase 2 Submission, the Monitor states that "CDE's proxy methodology is a reasonable approach to identifying districts that may not be willing to mediate." (Dkt. 2555 at p. 4.)

Nevertheless, the Monitor asserted that CDE is noncompliant in this area because "the districts selected through CDE's methodology are not selected for a monitoring process." (Id. at pp. 4-5) The Monitor argues that "Technical assistance is not monitoring, and the monitoring of a monitoring priority area is not optional. The state offers no reason to believe that when the statute speaks of monitoring it means technical assistance." (Id.)

To be clear, CDE has never suggested that monitoring is optional. Further, CDE has never suggested that the monitoring under federal law refers to technical assistance alone. Instead, CDE recognizes the symbiotic relationship between monitoring and technical assistance under the IDEA. Though not necessarily interchangeable, monitoring and technical assistance are critical, complementary components of an effective system of general supervision.

As explained previously, CDE's approach to universal monitoring includes the annual collection and analysis of LEA data to identify concerns in various areas of performance and compliance. By developing a methodology to select LEAs that may need to improve the use of mediation, and by analyzing available, relevant data in the proposed manner, CDE will be routinely monitoring in the priority area of mediation. The analysis of the data fulfills the State's obligation to measure performance in the use of mediation required by 34 C.F.R. § 300.600(d)(2).

Additionally, 34 CFR § 300.600(a) requires "The State must— (1) **Monitor** the implementation of this part; . . . (3) **Enforce** this part, consistent with § 300.604, using appropriate enforcement mechanisms, **which must include, if applicable**, the enforcement mechanisms identified in §300.604(a)(1) (**technical assistance**) . . . [emphasis added]". (See 34 CFR § 300.600(a).)

In providing targeted technical assistance to LEAs identified in the mediation area, CDE satisfies its obligations under the IDEA, despite not identifying such LEAs for some other monitoring activity. Analyzing data to gauge LEAs' use of mediation will be a new monitoring process added to the annual data analyses that CDE conducts for all LEAs. As such, CDE, in its policymaking capacity, not only considered the appropriate approach to monitoring (i.e., analyzing pertinent data), but also the appropriate mechanism for enforcement (i.e., targeted technical assistance), as required by 34 CFR § 300.600. CDE's proposal does not intend to provide targeted technical assistance in lieu of monitoring; rather, CDE's proposal describes the different components of its

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
**RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2
SUBMISSION**

monitoring proposal, <u>which includes</u> technical assistance as an enforcement mechanism.

CDE's approach is consistent with OSEP's system for providing Differentiated Monitoring and Support (DMS) for states. OSEP "began providing [DMS] to states as part of its Results Driven Accountability (RDA) system."[22] OSEP designed DMS to mitigate potential risks and to help OSEP use its resources wisely by determining the levels of engagement states need in each focus area. OSEP uses DMS to fulfill its responsibility to monitor grantees. OSEP's "Targeted" level of engagement for states includes offering "technical assistance and/or monitoring focused on a discrete issue". CDE's proposal mirrors OSEP's system for DMS.[23]

Furthermore, identifying LEAs for existing targeted or intensive monitoring processes based on available mediation data is not appropriate given the scope and types of activities LEAs are required to complete as participants in those processes.[24] Mediation is voluntary and identifying LEAs for more stringent monitoring when there is no evidence of wrongdoing would be punitive rather than remedial. CDE's monitoring of mediation is focused on encouraging the use of mediation in the hopes of increasing informal resolution of disputes, which helps preserve the relationship between LEAs and families. Targeted technical assistance is an integral part of an effective system of general supervision and serves multiple functions to assist LEAs in improving results.[25] In CDE's view, naming or coining another, separate "monitoring process" to provide targeted technical assistance in this area is unnecessary.

The Monitor points out that under "CDE's system of making annual determinations of districts designates those not selected for any monitoring process as meeting the requirements of the IDEA, districts selected for targeted technical assistance for mediation would presumably be eligible for a "meets requirements" determination." (See Dkt. 2555 at p. 5 n.8). Setting aside the inaccuracies with respect to CDE's proposal for monitoring in the area of monitoring, as a matter of policy, it is CDE's view that an LEA's

---

[22] See OSEP's DMS Reports, available at
https://www2.ed.gov/fund/data/report/idea/dmsrpts/index.html

[23] See OSEP's DMS System Overview, available at
https://osep.grads360.org/#communities/pdc/documents/14982.

[24] Targeted and Intensive Monitoring activities will be further discussed in Phase 3.

[25] See the National Center for Special Education Accountability Monitoring, Developing and Implementing and Effective System of General Supervision: Part B, available at
https://www.hdc.lsuhsc.edu/docs/TIERS/resources/Effective%20General%20Supervisio
n%20Paper_Part%20B.pdf

annual determination should not be affected solely by CDE's decision to provide an LEA targeted technical assistance in this area.

As discussed in the Further Phase 2 Submission, the available data does not necessarily show an LEA's unwillingness to participate in mediation and, further, may not be an accurate reflection of the LEA's use of mediation or, more generally, success in informally resolving disputes as the IDEA encourages.[26] The proposed proxy methodology for selection in the area of mediation is necessarily built on assumptions due to the absence of more germane, descriptive data. For example, although LEAs are selected with the proposed methodology (in some cases) where the data shows a mediation session was not held, there are several possible explanations for why that session was not held. Those explanations include the possibility that the student/parent was the party unwilling to mediate, rather than the LEA. In that sense, there is significant variability in the conclusions that can be drawn from the data alone. Thus, in CDE's view, it is not appropriate for an LEA's annual determinations to be adversely impacted solely based on CDE's decision to provide an LEA targeted technical assistance in the area of mediation.

Another factor that CDE considered when weighing the impact on annual determinations was that, in many cases, the number of filings (or opportunities to mediate) for each LEA in a given year is small. For example, referring to the data set forth in the Further Phase 2 Submission, of the forty-two LEAs that would have been selected for targeted technical assistance in 2018-2019 using the proposed methodology, only two LEAs were not selected for other monitoring activities and, thus, would be eligible to receive a "meets requirements" determination. One of those two LEAs had two filings (i.e., opportunities to mediate) in 2018-2019, and the other LEA had one filing. In a scenario where targeted technical assistance in mediation directly impacts an LEA's annual determination, LEAs could theoretically be negatively impacted by a single case where mediation was not pursued for undetermined reasons. Thus, it is inappropriate to attribute to an LEA a negative reason for not mediating, when the reasons could include the matter resolving itself or a student/parent cancelling a mediation session. Again, the data analyzed by CDE for selection purposes does not indicate why a given mediation session was not held. As such, the data tells an incomplete story about the progression of a dispute and the potential neglect of mediation by the LEA. It is CDE's view, in its policymaking capacity, that given the limitations of the data and the fact that participation in mediation is ultimately voluntary,

---

[26] For example, an LEA may have four (4) due process filing with mediation and participated in mediation in two (2) of the four (4) cases. That data would factor into CDE's selection methodology for mediation. However, that same LEA may have successfully resolved ten (10) other disputes or filings informally (i.e. outside of the resolution session or mediation processes), which is not captured in the data collected and thus not included or weighed in CDE's analysis and selection methodology.

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
**RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2
SUBMISSION**

directly tying CDE's decision to provide targeted technical assistance in the area of mediation to high-stakes annual determinations for LEAs is inappropriate.

Given the limitations of available mediation data, it is also the State's view that attempting to "connect mediation data with data concerning complaints filed against districts, or to data about student performance, placements, or suspension" would be a futile effort and ultimately an unwise use of limited state resources. (See Dkt. 2555 at p. 4.) Further, the basis for suggesting that an interactive or causal relationship exists between an LEA's use of mediation, specifically, and other LEA performance measures (such as suspension rates or assessment outcomes) is unclear. It does not appear that there is a significant, meaningful relationship between an LEA's willingness to participate in mediation and an LEA's suspension rate or assessment results that can be demonstrated or probed with existing data. If data existed that could reliably identify apparent patterns or trends indicating that an LEA routinely neglected monitoring as a dispute resolution tool, perhaps that would generally serve to paint a more complete picture of the LEA's success implementing all provisions of the IDEA. However, there is no data that would reliably flag an LEA's indisputable failure or neglect of mediation. As such, attempting to connect unreliable data to other performance measures would result in the State drawing variable, likely erroneous conclusions. The State is unable to devote limited staff time and resources to conducting extensive exploratory data analyses attempting to prove or disprove correlation when it is far from clear that the results would be of legitimate purpose and value in driving decisions about monitoring.

Instead, existing data serves as a means or prompt for further engagement between CDE and an LEA on the issue of mediation. Should CDE become aware of unfavorable patterns or trends, such as an LEA refusing to mediate as a blanket matter, through the provision of targeted technical assistance and related engagement with LEAs on mediation practices, CDE may consider further enforcement measures as necessary for individual LEAs, including impact on annual determinations.

The 7/5/19 Order noted that "To be fair, the state's failure to assess districts for their use of mediation is less significant than some of the other problems discussed in this section. There is even an argument that the failure to analyze mediation data does not, on its own, significantly interfere with the state's ability to fulfill its monitoring obligations under the IDEA. Federal regulations require states to prioritize mediation in their monitoring activities. See 34 C.F.R. § 300.600(d)(2)." (Dkt. 2520 at pp. 14-15.) CDE's proposal for data analyses and decision to provide LEAs targeted technical assistance in the priority area of mediation, given the discrete focus and attention on mediation practices, meets the basic threshold of prioritizing mediation in monitoring for the purpose of compliance with federal regulations.

## COVID-19 Impact

CDE is currently reacting and responding the effects of COVID-19 in California. On March 4, 2020, California Governor Gavin Newsom declared a State of Emergency to

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
## RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

prepare for the spread of infection. During March 2020, LEAs began to close physical school sites in an attempt to reduce the spread of the coronavirus. In response, the Governor issued an Executive Order on March 13, 2020,[27] ensuring that funding for schools would continue and requiring schools to:

- Continue to deliver high quality educational opportunities through other options, distance learning, or independent study;

- Ensure that students have access to meals; and,

- Continue to pay employees.

Following that Executive Order, the Governor issued an additional Executive Order on March 18, 2020 suspending standardized testing for the 2019-2020 school year.[28] In response, on March 26, 2020, the State requested a waiver from the statewide assessment, accountability and reporting requirements of the Elementary and Secondary Education Act (ESEA) Section 8401(b) for the 2019–2020 school year from the U.S. Department of Education, which it granted the following day.[29]

On March 19, 2020, the Governor issued an Executive Order requiring all citizens statewide stay at their homes or places of residence, except as needed with respect to continuity of essential industries.[30] On March 31, 2020, the State Superintendent of Public Instruction stated that physical school sites were unlikely to reopen for this school year.[31]

During this period, the U.S. Department of Education also issued guidance for SWD[32] and CDE also provided FAQs and webinars to address the programmatic questions

---

[27] See https://www.gov.ca.gov/wp-content/uploads/2020/03/3.13.20-EO-N-26-20-Schools.pdf

[28] See https://www.gov.ca.gov/wp-content/uploads/2020/03/3.17.18-N-30-20-Schools.pdf

[29] See https://www.cde.ca.gov/re/es/documents/covid19waiverresponse.pdf.

[30] See https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf

[31] See CDE Communications release #20-16, available at https://www.cde.ca.gov/nr/ne/yr20/yr20rel16.asp.

[32] See U.S. Department of Education, Office of Special Programs, available at https://www.ed.gov/coronavirus.

being posed by teacher and families of SWD.[33] CDE also issued two "CALPADS flashes" stating that LEAs should continue to update enrollment and Individual Education Programs as changes are made.[34] However, CDE also acknowledged that data collection for the 2019-2020 school would be affected by school site closures in response to the COVID-19 Executive Orders.

CDE currently anticipates that the following data points will be affected by COVID-19 school site closures:

- Assessment data (no assessment data for 2019-2020 school year)

- Graduation data (data uncertain at this time)

- Dropout data (data uncertain at this time)

- Suspension Data (truncated data for 2019-2020)

- Least Restrictive Environment (data already collected but could be impacted now based on student needs)

- Preschool Assessment Data (Truncated data for 2019-2020)

- Timely IEPs and Assessments (Truncated or impacted by LEAs unable to hold IEPs meetings and Assessments)

- Post-School Transitions Plans (Truncated or impacted by LEAs unable to hold IEP meetings prior to the end of the school Year)

- Post-School Outcomes (Impacted if LEAs are unable to locate and survey individuals)

- Restraint and Seclusion (Truncated for 2019-2020)

- Chronic Absenteeism (Will not be calculated for 2019-2020)

- Dashboard (Will not be calculated for 2019-2020)

While these data challenges do not affect the design of CDE's monitoring selection, they will likely impact the State's implementation of its revised selection methodology for the 2020-2021 monitoring year as set forth throughout this document and in its Further

---

[33] See https://www.cde.ca.gov/ls/he/hn/coronavirus.asp.

[34] See CALPADS Flash 173, available at https://www.cde.ca.gov/ds/sp/cl/documents/calpadsupdflash173.pdf and CALPADS Flash 175, available at https://www.cde.ca.gov/ds/sp/cl/documents/calpadsupdflash175.pdf.

*Emma C. v. Thurmond et* al.; Case No. 96-cv-04179-VC
## RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

Phase 2 Submission. CDE currently anticipates that the data used for selection in many of the monitoring activities will be either unavailable or truncated. Additionally, given the need to monitor LEAs as they are anticipated to resume normal operations in the next school year, CDE may alter is monitoring processes to support LEAs as they identify and provide any missed services or compensatory education as a result of COVID-19 school site closures. CDE does not have enough information at this time to determine whether changes may be required to account for this need, and, if so, what changes.

In light of the current expectation that LEAs will resume normal operations in the next school year, CDE anticipates that the aforementioned data issues will be a one-year anomaly, and anticipates returning to its selection methodology and monitoring activities in the 2021-2022 monitoring year as previously outlined in these Court proceedings.

## Attachments

- **Attachment 11**: OSEP 2007 PowerPoint – General Supervision: Developing an Effective System (Implications for States)
- **Attachment 12**: OSEP 2007 PowerPoint– General Supervision

1   XAVIER BECERRA
    Attorney General of California
2   DARRELL W. SPENCE
    Supervising Deputy Attorney General
3   KIRIN K. GILL, State Bar No. 259968
    CHRISTINE M. MURPHY, State Bar No. 183835
4   Deputy Attorneys General
        1300 I Street, Suite 125
5       P.O. Box 944255
        Sacramento, CA 94244-2550
6       Telephone: (916) 210-6172
        Fax: (916) 324-5567
7       E-mail: Kirin.Gill@doj.ca.gov
        E-mail: Christine.Murphy@doj.ca.gov
8   *Attorneys for Defendants*
    *California Department of Education, Tony*
9   *Thurmond, in his official capacity as the State*
    *Superintendent of Public Instruction, and State*
10  *Board of Education*

11              IN THE UNITED STATES DISTRICT COURT

12             FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14

| 15 | **EMMA C., et al.,** | 3:96-cv-04179-VC |
|----|----|----|
| 16 | Plaintiffs, | **ATTACHMENT 11** |
| 17 | | |
| 18 | **v.** | Judge: The Honorable Vince Chhabria |
| 19 | **THURMOND, et al.,** | |
| 20 | Defendants. | |

21

22

23

24

25

26

27

28



OSEP Part B Regulations
Regional Implementation Meetings

Building the Legacy: IDEA 2004

# General Supervision:
# Developing an Effective System
## *Implications for States*



*U.S. Department of Education*
*Office of Special*
*Education Programs*



# Components of General Supervision



State Performance Plan

Policies, Procedures, and Effective Implementation

Integrated Monitoring Activities

Fiscal Management

Data on Processes and Results

Improvement, Correction, Incentives & Sanctions

Effective Dispute Resolution

Targeted Technical Assistance & Professional Development

*U.S. Department of Education Office of Special Education Programs*

*Building the Legacy, 2004*

2

# Integrated System of General Supervision

- OSEP first presented concept at 2004 National Accountability Conference; Revisited at NAC 2006
- OSEP/RRC/NECTAC Planning Meeting November 2006
- NCSEAM draft "Developing and Implementing an Effective System of General Supervision", Fall 2006
- Kansas City meeting, December 2006

# The components

- Each of the Big 8 is required by IDEA, GEPA, etc.
- Most states have established independent components
- States typically develop their own models for meeting general supervision requirements

# Why an "Integrated System"?

- General Supervision system must be accountable for:
  - improving educational results and functional outcomes
  - ensuring that public agencies meet program requirements

# Why an "Integrated System"?

- To be effective, components must
  - connect
  - interact
  - articulate
  - inform each other

# How can a state use the General Supervision paper?

- What are the "Big 8"?
- What is the "evidence" to demonstrate a component is part of General Supervision system?

# Integration of Big 8 Components

1. State Performance Plan (SPP)
2. Policies, Procedures, and Effective Implementation
3. Data on Processes and Results
4. Targeted Technical Assistance and Professional Development
5. Effective Dispute Resolution
6. Integrated Monitoring Activities
7. Improvement, Correction, Incentives and Sanctions
8. Fiscal Management

# This Session

- State Performance Plan (SPP)
- Policies, Procedures and Effective Implementation
- Data on Processes and Results
- Integrated Monitoring Activities

# Discussion

- Successes? Remaining challenges?
- Questions, issues?
- Other evidences?
- Further suggestions?



# State Performance Plan

- Blueprint for systems change
- All other components must be integrated with SPP



*U.S. Department of Education
Office of Special
Education Programs*

*Building the Legacy 2004*

11

# Policies, Procedures and Effective Implementation

- Aligned with IDEA
- Include descriptions of
  - activities to identify noncompliance
  - methods for requiring correction of noncompliance
  - range of sanctions to enforce correction
- establish and maintain specifications for highly qualified personnel

# Policies, Procedures and Effective Implementation

- Local educational agency (LEA) policies and procedures aligned with those of state
- LEA policies and procedures designed and implement to improve results
- LEA policies and procedures personnel adequately prepared
- State and LEAs have written policies and procedures in place, including assurances
- Required memoranda of understanding (MOUs) in place and current

# Discussion

- Successes? Remaining challenges?
- Questions, issues?
- Other evidences?
- Further suggestions?



# Data on Processes and Results

- Collection and verification
  - 618
  - Dispute resolution
  - Previous monitoring reports
  - Other
- Examination and analyses
  - Areas of state concern
  - Clusters of related indicators

# Data on Processes and Results

- Reporting
  - Annual Performance Report (APR) (state)
  - LEA performance against state targets
- Status determination
- Improvement
  - Data are used to plan and revise activities

# Discussion

- Successes? Remaining challenges?
- Questions, issues?
- Other evidences?
- Further suggestions?



# Integrated Monitoring Activities

- Stakeholders involved
- Focus on specific hypotheses for areas
- Teams include family members
- Investigation related to compliance and program improvement
- Multiple methods and data sources to monitor every program, every year

# Integrated Monitoring Activities

- Activities include continuous examination of performance for compliance and results
- Written reports specify evidence of correction and improvement
- Internal and external TA and professional development support improvement and correction

# Discussion

- Successes? Remaining challenges?
- Questions, issues?
- Other evidences?
- Further suggestions?



# Putting the Puzzle Together

- Use the General Supervision paper to:
    - Self-evaluate your state's Big 8 components
    - Improve connections among components to strengthen your General Supervision system.

# Benefits

- More efficient and effective state system
- **Improved outcomes for children with disabilities and their families!**

# Web Resources

- ■ National Center for Special Education Accountability Monitoring

    http://www.monitoringcenter.lsuhsc.edu/

- ■ Regional Resource and Federal Center Network http://www.rrfcnetwork.org

    • SPP/APR guidance materials

- ■ OSEP Technical Assistance Network

# Contact Information

- Ruth Ryder

   ruth.ryder@ed.gov

- Gregg Corr

   gregg.corr@ed.gov

1   XAVIER BECERRA
    Attorney General of California
2   DARRELL W. SPENCE
    Supervising Deputy Attorney General
3   KIRIN K. GILL, State Bar No. 259968
    CHRISTINE M. MURPHY, State Bar No. 183835
4   Deputy Attorneys General
     1300 I Street, Suite 125
5    P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone: (916) 210-6172
     Fax: (916) 324-5567
7    E-mail: Kirin.Gill@doj.ca.gov
     E-mail: Christine.Murphy@doj.ca.gov
8   *Attorneys for Defendants*
    *California Department of Education, Tony*
9   *Thurmond, in his official capacity as the State*
    *Superintendent of Public Instruction, and State*
10  *Board of Education*

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14

15

16  **EMMA C., et al.,**                    3:96-cv-04179-VC

                            Plaintiffs,    **ATTACHMENT 12**
17
                                           Judge: The Honorable Vince Chhabria
18              **v.**

19  **THURMOND, et al.,**

20                          Defendants.

21

22

23

24

25

26

27

28




OSEP Part B Regulations
Regional Implementation Meetings

Building the Legacy: IDEA 2004

# General Supervision





# Concepts of General Supervision

## Accountability for Implementation & Improved Results



U.S. Department of
Education Office of
Special Education
Programs

# The BIG 8 of General Supervision (and Continuous Improvement)



1. What are the minimum **components** for General Supervision ?

2. How do the components form a state **system** ?

3. What are the annual **processes** operating within the system ?



U.S. Department of Education Office of
Special Education Programs

# Difference between **Concepts** & a **Model**

Each state develops
Its Own Model
of General
Supervision
based on what's
required and desired



Components of General Supervision

Ask Yourself How Each Piece Operates and Fits Into the Whole

State Performance Plan

Policies, Procedures, and Effective Implementation

Integrated Monitoring Activities

Fiscal Management

Data on Processes and Results

Improvement, Correction, Incentives & Sanctions

Effective Dispute Resolution

Targeted Technical Assistance & Professional Development

U.S. Department of Education, Office of Special Education Programs

Building the Legacy: IDEA 2004

5

# Accountability's Big View



**How Do the Big 8 Fit Into a State System?**



**What accountability requirements for other programs have?**

# Requirements:
# State Performance Plan (SPP)



- 34 CFR §§76.720 and 80.40 Annual performance reports (APRs)

- 34 CFR §300.157 Performance goals and indicators

- 34 CFR §300.601 SPP

- 34 CFR §300.600 (c) and (d) Monitoring and enforcement

- 34 CFR §300.602 Targets and reporting



**State Performance Plan**

U.S. Department of Education Office of Special Education Programs

# State Performance Plan



- Stakeholders should be actively involved in all aspects of the SPP.

- The development and implementation of the SPP leads to improved results.

- Reporting is critical to ensuring accountability to the public.

- The SPP is the blueprint for systems change.

**State Performance Plan**

U.S. Department of Education Office of Special Education Programs

Building the Legacy: IDEA 2004

8

# Requirements:
# Policies, Procedures & Effective Implementation



- 20 U.S.C. §1232d(b)(1) Program administered in accordance with rules

- 20 U.S.C. §1232e(b)(1) local educational agency (LEA) administers program in accordance with rules

- 34 CFR §76.700 Compliance with statutes

- 34 CFR §300.100 State policies and procedures (state plan)

- 34 CFR §300.154 Methods of ensuring services

- 34 CFR §§300.200-300.201 LEA policies and procedures

**Policies, Procedures & Effective Implementation**

U.S. Department of Education Office of Special Education Programs

Building the Legacy: IDEA 2004

9



# Policies, Procedures & Effective Implementation



**Policies, Procedures & Effective Implementation**

- Aligned with IDEA

- Implemented by local programs

- Methods to detect noncompliance and ensure correction of noncompliance

- Program improvement through improvement planning and incentives

- Current interagency agreements and memoranda of understanding (MOU) when required to ensure IDEA implementation

- Mechanisms to determine effectiveness of agreements and MOU

U.S. Department of Education, Office of Special Education Programs

# Requirements:
# Effective Dispute Resolution



- 34 CFR §300.150 Procedural safeguards

- 34 CFR §§300.151-300.153 Complaint procedures

- 34 CFR §300.500 Procedural safeguards

- 34 CFR §300.504 Procedural safeguards notice



**Effective Dispute Resolution**

U.S. Department of
Education Office of
Special Education
Programs

# Effective Dispute Resolutions



**Effective Dispute Resolution**

- Are timely

- Track issues

- Inform onsite and offsite monitoring activities

- Periodically evaluate effectiveness of resolutions

- Determine that parents and families and students understand their rights, especially in cases where there are few or no complaints, hearings, or other resolutions

# Requirements:
# Data on Processes & Results



- 20 U.S.C. §1232d(b)(4) Evaluate effectiveness

- 20 U.S.C. §1232e(b) LEAs report to the state educational agency (SEA), board, Secretary



**Data on Processes & Results**

- 34 CFR §300.601(b) Data collection

- 34 CFR §300.602 Targets and reporting

- 34 CFR §300.640 Annual report of children served

U.S. Department of Education Office of Special Education Programs

# Data on Processes & Results





**Data on Processes & Results**

- Collection and verification
  - 618
  - Dispute resolution
  - Previous monitoring reports
  - other
- Examination and analyses
  - Areas of state concern
  - Clusters of related indicators
- Reporting
  - APR (state)
  - LEA Performance compare to state targets
- Status determination
- Improvement
  - Data are used to plan and revise activities

# Requirements:
# Integrated Monitoring Activities



- 20 U.S.C. §1232d(b)(3)(A) Proper methods of monitoring

- 34 CFR §300.120 Monitoring least restrictive environment (LRE)

- 34 CFR §300.149 SEA responsibility for general supervision

- 34 CFR §300.600 State monitoring

**Integrated Monitoring Activities**

U.S. Department of Education Office of Special Education Programs

# Integrated Monitoring Activities



- Stakeholders involved

- Focus on specific hypotheses for area

- Teams include family members

- Investigation related to noncompliance and program improvement

- Multiple methods and data sources to monitor every program, every year

- Activities include continuous examination of performance for compliance and results

- Written reports specify evidence of correction and of improvement

- Internal and external technical assistance and professional development support improvement and correction



**Integrated Monitoring Activities**

U.S. Department of Education Office of Special Education Programs

# Requirements:
# Targeted TA and Professional Development



- 20 U.S.C. §1232d(b)(3)(B), (C), (D) Provide TA, promising practices and disseminate information

- 20 U.S.C. §1232e(b)(8) LEA has effective dissemination to teachers and administrators

- 34 CFR §300.119 TA on LRE

- 34 CFR §300.156 Personnel qualifications



**Targeted T/A & Prof Dev**

U.S. Department of Education Office of Special Education Programs

# Targeted Technical Assistance & Professional Development



- Directly connected to the SPP and improvement activities

- Provided to correct noncompliance and improve results

- Principles of adult learning

- Measure effectiveness of implementation

- Incorporate various agencies in development and dissemination

- Distribute promising practices and evidence based practices to local programs



**Targeted T/A & Prof Dev**

U.S. Department of Education Office of Special Education Programs

# Requirements: Improvement, Correction, Incentives, & Sanctions



- ❑ 20 U.S.C. §1232d(b)(3(A) and (E) Proper methods—correction and enforcement
- ❑ 34 CFR §80.12 Special conditions
- ❑ 34 CFR §80.43 Enforcement
- ❑ 34 CFR §300.222 LEA compliance
- ❑ 34 CFR §300.600 State monitoring and enforcement
- ❑ 34 CFR §§300.603-300.604 Determinations and enforcement actions
- ❑ 34 CFR §300.608 Enforcement



**Improvement & Correction, Incentives & Sanctions**

U.S. Department of Education Office of Special Education Programs

# Improvement, Correction, Incentives & Sanctions



**Improvement & Correction, Incentives & Sanctions**

U.S. Department of Education Office of Special Education Programs

- Explicit state authority to enforce regulations, policies, and procedures

- TA to ensure correction of noncompliance

- Improvement planning to meet targets

- Corrective action planning and follow-up tracking of correction and improvement

- Range of formalized strategies and/or sanctions for enforcement with written timelines

- Determines the status of local programs annually

# Requirements: Fiscal Management



**Fiscal Management**

U.S. Department of Education Office of Special Education Programs

- 34 CFR §§300.704 and 300.705 Distribution of funds

- 34 CFR §300.209 Treatment of charter schools

- 34 CFR §300.133 Private schools proportionate share

- 34 CFR §§300.163 and 300.203-300.205 Maintenance of effort

- 34 CFR §§300.162 and 300.202 Excess cost/supplement not supplant

- 34 CFR §300.226 Early intervening services 15%

- OMB Circular A-133 – Single Audits

# Fiscal Management



- States distribute funds in accordance with federal requirements.

- Funds are used in accordance with federal and state requirements.

- States provide oversight on the use of funds.

- Funds are aligned to problem areas in the SPP/APR



**Fiscal Management**

U.S. Department of Education Office of Special Education Programs

# Describing a 'System' of General Supervision



Problems in Description (beginning list)

✓ Equating general supervision as only onsite monitoring

✓ Viewing administration as a collection of separate and isolated functions

✓ Defining accountability as an event rather than a 'state' and process

✓ Others?



What is 'System ?'

**State Performance Plan**

**Policies, Procedures, and Effective Implementation**

**Integrated Monitoring Activities**

**Fiscal Management**

**Data on Processes and Results**

**Improvement Correction, Incentives & Sanctions**

**Effective Dispute Resolution**

**Targeted T/A & Professional Development**

U.S. Department of Education
Office of Special Education Programs

Building the Legacy: IDEA 2004

24



It's about Better Results

U.S. Department of Education
Office of Special Education
Programs

Building the Legacy: IDEA 2004

25



# General Supervision Big 8

**State Performance Plan**

**Policies, Procedures, and Effective Implementation**

**Integrated Monitoring Activities**

**Fiscal Management**

**Data on Processes and Results**

**Improvement, Correction, Incentives & Sanctions**

**Effective Dispute Resolution**

**Targeted Technical Assistance & Professional Development**

# For More Information



- http://sites.ed.gov/idea
- http://www.ed.gov
- http://www.monitoringcenter.lsuhsc.edu
- http://www.rrfcnetwork.org

# CERTIFICATE OF SERVICE

Case Name:  **Emma C., et al. v. Thurmond,**          No.   **3:96-cv-04179-VC**
 **et al.**

I hereby certify that on <u>April 21, 2020</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

STATE DEFENDANTS' RESPONSE TO MINITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>April 21, 2020</u>, at Sacramento, California.

|                       |                        |
|:---------------------:|:----------------------:|
| J. Hutcherson         | /s/ J. Hutcherson      |
| Declarant             | Signature              |

SA2005104070
COS.docx