William S. Koski, Esq., SBN 166061
STANFORD LAW SCHOOL
YOUTH & EDUCATION LAW PROJECT
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone: (650) 724-3718
Fax: (650) 723-4426
Email: bkoski@stanford.edu

Leecia Welch, Esq., SBN 208741
Freya Pitts, Esq., SBN 295878
NATIONAL CENTER FOR YOUTH LAW
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Fax: (510) 835-8099
Email: lwelch@youthlaw.org
fpitts@youthlaw.org

*Attorneys for Plaintiffs Emma C., et al.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| EMMA C., et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>TONY THURMOND, et al.,<br><br>*Defendants*. | Case No.: 3:96-cv-4179 (VC)<br><br>**PLAINTIFFS' RESPONSE TO THE STATE DEFENDANTS' JANUARY 31, 2010 FURTHER PHASE 2 SUBMISSION, THE COURT MONITOR'S MARCH 9, 2020 REPORT, AND THE STATE DEFENDANTS' APRIL 21, 2020 RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION**<br><br>Judge: Hon. Vince Chhabria |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND PROCEDURAL BACKGROUND ................................... 1

    A. Procedural Background ........................................................................... 1

    B. Summary of Plaintiffs' Response ......................................................... 3

II.   MEDIATION ............................................................................................... 5

III.  SMALL SCHOOL DISTRICTS ................................................................. 8

    A. Alternative Methodologies for Monitoring Small School Districts .................... 10

    B. Monitoring Child Find in Small School Districts ................................. 12

    C. Selection of Small School Districts for Intensive Monitoring ........................... 13

    D. Selection of Small School Districts for Targeted Monitoring ............................ 14

IV.   TARGETS .................................................................................................. 15

    A. The State Performance Plan Target Development and the Extension"

        Targets ................................................................................................ 14

    B. Child Find .......................................................................................... 16

    C. Least Restrictive Environment (School Age) ....................................... 17

    D. Least Restrictive Environment (Preschool) ......................................... 17

V.    INTENSIVE MONITORING—PRESCHOOL ........................................ 17

VI.   INTENSIVE MONITORING—SCHOOL AGE ...................................... 19

VII.  IMPACT OF COVID-19 .......................................................................... 21

VIII. CONCLUSION .......................................................................................... 22

i

Plaintiffs' Response to State's Response to Monitor's Further Phase 2 Review
*Emma C., et al. v. Thurmond, et al.*; No. 3:96-cv-04179-VC

Pursuant to the Court's July 5, 2019 Order re State's Compliance at Phase 2 ("Phase 2 Order"), ECF No. 2520, the Court's September 3, 2019 Scheduling Order, ECF No. 2531, and the Court's March 24, 2020 Order Granting Motion for Extension of Time, ECF No. 2561, Plaintiffs submit this Response to the State Defendants' January 31, 2020 Further Phase 2 Submission (the "State's Further Phase 2 Submission"), ECF No. 2545, the Court Monitor's Review of the California Department of Education's Phase 2 (Continued) Submission (the "Court Monitor's Report") ECF No. 2555, and the State Defendants' Response to Monitor's Review of Further Phase 2 Submission (the "State's Response") ECF No. 2563.

## I.

## INTRODUCTION AND PROCEDURAL BACKGROUND

### A.  Procedural Background

This Phase 2 of the evaluation of the State's compliance with its obligations under the Court's May 18, 2018 Order re State's Obligations Under Consent Decree, ECF 2387, focuses on whether the State's annual data analysis activities allow it to effectively fulfill its monitoring and enforcement duties under Section 13.0 of the Consent Decree and the Individuals with Disabilities Education Act (the "IDEA").

In this phase, the State bears the following burden:

A.  The State must demonstrate that it is effectively analyzing and using the data it is obliged to collect under Phase 1.

B.  The State must demonstrate that it is adequately using the data to select school districts for monitoring activities.

C.  The State must demonstrate that it is adequately and timely making annual compliance determinations as required by federal law.

    D.  The State must demonstrate that it is taking adequate and timely enforcement action in response to its annual compliance determinations.[1]

ECF No. 2387 at 6.

The State timely submitted its initial Phase 2 Submission on December 7, 2018, the Court Monitor timely submitted his Phase 2 Report on January 28, 2019, and the State timely submitted its Response on February 25, 2019. Following a hearing on Phase 2 compliance, the Court issued its Phase 2 Order. ECF No. 2520. The Court found in the Phase 2 Order that the California Department of Education's ("CDE") "system for flagging school districts for intervention is riddled with serious defects." *Id.* at 1. The Court further found that "the defects in the current system are so serious, and so numerous, that they significantly interfere with [the State's] ability to monitor how school districts are serving disabled children." *Id.* at 2. Generally speaking, the Court found the CDE's data analysis and selection methods deficient in the following ways:

1.  The CDE was not sufficiently analyzing data regarding small local education agencies ("LEAs"), preschool-aged children, and mediations.

2.  The CDE's selection methodology for "comprehensive review"—its most intensive monitoring activity—resulted in the selection of too few and the incorrect LEAs.

3.  The targets that the CDE uses to select LEAs for monitoring activities were insufficiently rigorous.

---

[1] The Court clarified in its September 11, 2018 Order that the Phase 2 examination "will not include an examination of the state's further targeted monitoring and enforcement activities, or whether those further targeted monitoring and enforcement activities are sufficient to make adequate annual compliance determinations or to otherwise fulfill its monitoring and enforcement obligations under the IDEA." ECF No. 2439.

In response to the Court's Phase 2 Order, the State timely submitted its Further Phase 2 Submission on January 31, 2020, ECF No. 2545, the Court Monitor timely submitted his Report on March 9, 2020, ECF No. 2555, and the State timely submitted its Response to the Court Monitor's Report on April 21, 2020. ECF No. 2563.

## B.  Summary of Plaintiffs' Response

While Plaintiffs acknowledge and commend certain significant reforms to the State's data analysis and monitoring selection system—such as its addition of intensive monitoring for preschool children and an improved methodology for selecting districts for school-aged intensive monitoring—the State's Submission continues to fail to demonstrate compliance with the Court's May 18, 2018 and Phase 2 Order and Section 13 of the First Amended Consent Decree, which requires that the "the state-level system in place is capable of ensuring continued compliance with the law and the provision of [a free appropriate public education] to children with disabilities in Ravenswood." Specifically, the State's Submission and Response fail to demonstrate compliance with the Court's Phase 2 Order in the following ways:

1.  The CDE's method for selecting Districts for intervention due to an LEA's failure to meaningfully participate in mediation continues to be flawed.

2.  The CDE's method for selecting small LEAs for targeted monitoring and intensive monitoring is deeply flawed and will result in hundreds of poor-performing small LEAs being deemed to "meet requirements" and escape further monitoring activities.

3.  The CDE's "extension targets" continue to lack rigor and there does not appear to be a date certain for when the CDE will propose meaningful targets for its State Performance Plan indicators.

4.  The CDE's selection method for preschool intensive monitoring, while a welcome addition to the CDE's monitoring regime, will allow many poor-performing LEAs, particularly small LEAs, to escape further monitoring.

5.  Finally, the CDE's selection methodology, despite proposing a much more thoughtful approach to selection for school-aged intensive review, still does not pick the right LEAs for intensive review.

The remainder of Plaintiffs' Response proceeds as follows. Section II considers the CDE's proposal for monitoring mediations. Section III discusses the fatal flaws in the CDE's proposal regarding monitoring of small school districts. Section IV analyzes the CDE's targets for its performance indicators and targeted monitoring. Sections V and VI analyze the CDE's selection of LEAs for intensive monitoring of preschool and school-aged children, respectively. Finally, Section VII provides Plaintiffs' thoughts regarding the impact of the COVID-19 pandemic on the implementation of and further proceedings pursuant to the Court's May 18, 2018 Order re State's Obligations Under the Consent Decree. ECF No. 2387.

In Sections II through VI, Plaintiffs analyze each area of (non)compliance addressed by the Monitor. In the interest of economy, Plaintiffs' Response does not reiterate the analyses of the Court Monitor. Rather, for each of the requirements in the Court's Phase 2 Order for which the Court Monitor has made a compliance determination, this Response first sets forth whether Plaintiffs agree or disagree with the Court Monitor's compliance determination. If the Plaintiffs agree with the Court Monitor's determination, the Plaintiffs may offer additional analysis regarding the requirement. If the Plaintiffs disagree with the determination, the Plaintiffs will describe the extent to which they disagree and the basis for that disagreement. In addition, to the

extent that the State provided a response to the Court Monitor's determinations, each such response will be addressed in connection with the Monitor's compliance determinations.[2]

## II.

## MEDIATION

Plaintiffs agree with the Court Monitor's noncompliance determination. The Court Monitor found CDE noncompliant because "the districts selected through CDE's methodology are not selected for a monitoring process." ECF No. 2555 at 5. Though Plaintiffs agree with that finding (and discuss it further below), Plaintiffs disagree with the Monitor's determination that the CDE's methodology is "a reasonable approach to identifying districts that may not be willing to mediate." *Id.* at 4. The CDE's methodology both provides an "escape hatch" for any district that wants to avoid monitoring by the CDE and fails to identify districts that do not meaningfully engage in mediation.

The CDE proposes the use of four "proxy" filters that it contends will identify those districts that demonstrate an unwillingness to mediate: (1) Identify LEAs that filed a request for due process hearing only without mediation; (2) Identify LEAs involved in cases in which a due process complaint was resolved by a due process hearing and written decision and there is no data indicating either that mediation was held or a willingness to mediate, unless the LEA can demonstrate that it had been willing to mediate; (3) Identify LEAs that were named in a student-filed "mediation only" request where there is no data confirming mediation was held; and (4) Identify LEAs that filed a request for "mediation only" with the [Office for Administrative Hearings]. ECF No. 2545 at 13-14. If an LEA is flagged by any of Filters 1, 2, or 3, CDE states

---

[2] Plaintiffs note that the Court Monitor's Report and the State's Response are not organized in the same fashion, making it difficult to map the State's specific responses onto the Court Monitor's findings. Plaintiffs have adopted the Court Monitor's organizational structure.

that it will provide targeted technical assistance to the LEA. *Id.* However, if an LEA is identified as having filed a request for "mediation only" (Filter 4), the "CDE will not select that LEA for targeted technical assistance in the area of mediation," *id.* at 15, even if it has been flagged by any of the other three filters.

Using Filter 4 as a "mitigating factor" is highly problematic. An LEA can completely immunize itself from mediation monitoring if each year it perfunctorily files a "mediation only" request in just one case. This is arbitrary, overbroad, and ripe for abuse. Indeed, one can predict that school district attorneys might counsel their clients to file such a request each year to avoid being flagged for mediation difficulties.

Moreover, although Filters 1-3 might identify those school districts that have a practice of refusing to mediate, they will not identify the worst offenders, *i.e.,* any districts that participate in mediation, but do so only perfunctorily without any intention of settling. To capture those districts, the CDE should replace its current fourth filter with a filter that measures the ratio of hearing decisions in cases to failed mediations in those very same cases. The CDE could then flag those districts that have the highest ratio of decisions to failed mediations and select the top ten percent of the worst offenders. Such a high ratio is an indicator that a district has a practice of attending mediations without any intent to settle. Of course, it's possible that there are good explanations for certain failed mediations (*e.g.,* a parent that did not mediate in good faith or both parties mediated in good faith, but couldn't reach agreement). The CDE can provide districts flagged by this indicator an opportunity to offer such explanations, just as the CDE provides districts an opportunity to explain when they are flagged by Filter 2. Absent a good explanation for high rates of mediation failure, the CDE should conclude that the district was not properly using mediation as a method to resolve disputes.

6

Finally, the Monitor found the CDE out of compliance because it proposes to provide "targeted intervention," rather than "targeted monitoring" to those districts flagged for mediation deficiencies. While Plaintiffs acknowledge that technical assistance and related intervention can be (indeed, should be) part of any effective system of general supervision, the CDE does not provide a good reason for allowing LEAs that are identified as having mediation problems to not be identified for targeted monitoring (which could include technical assistance) and potentially be deemed to "meet requirements." The CDE is concerned that their proxy measures are inappropriate for selection for monitoring activities. While Plaintiffs agree that the CDE's first three filters are insufficient alone, the addition of Plaintiffs' fourth filter would strengthen the measure to give the Court confidence that districts are appropriately selected for mediation-related monitoring activities, a priority monitoring area under the IDEA.

The CDE baldly asserts that providing technical assistance is the "appropriate approach to monitoring" and the "appropriate mechanism for enforcement," but doesn't explain why it shouldn't deem a district that does not meet mediation criteria as "needing assistance." Plaintiffs recognize that being flagged under the four filters (particularly Filter 2 and Plaintiffs' proposed fourth filter) may not be due to the district's "wrongdoing," but that is why districts have an opportunity to explain any failure to mediate prior to being deemed noncompliant. The CDE also worries that those districts that have very few mediation and/or due process filings would be unfairly selected for monitoring (the "n-size" problem). While that may indeed be a problem, the solution is not to give a blanket pass from monitoring and a "meets requirements" to all districts. The CDE should propose a solution that accounts for small n-sizes, while ensuring that those districts that eschew mediation are appropriately identified and monitored.

7

## III.

## SMALL SCHOOL DISTRICTS

Plaintiffs agree with the Monitor's noncompliance determination.

For many monitoring analyses and activities, the CDE's initial Phase 2 Submission required that school districts have a minimum number of students with disabilities before assessing those school districts. Small school districts were excluded because a very small number of students could have an outsized influence on a small school district's performance and unfairly subject the district to further scrutiny. This is the "n-size" problem, and it is a legitimate concern. In its Phase 2 Order, the Court acknowledged that concern, but found that "[b]ecause . . . small districts are not being assessed on many metrics, they are functionally exempt from many targeted and intensive monitoring activities," ECF No. 2520 at 11, and that the "state attached the classification of 'meets requirements' to hundreds of small school districts despite conducting virtually no analysis of those districts." *Id.* at 1.

To address the Court's concerns, the CDE, in its Further Phase 2 Submission, proposes a "grouping" methodology for all LEAs with fewer than 100 students with disabilities to allow them to be assessed for targeted and intensive intervention. The CDE groups all such small LEAs with other small LEAs in the county in which the LEA is located, unless the LEA is a charter school LEA and belongs to a charter school special education local plan area (SELPA). In that case, the charter LEA is grouped with the other small LEAs in the SELPA. The CDE then considers those aggregated groups as a single LEA for initial selection purposes, looking at data specific to a small LEA only if its group is selected for review.

The difficulty with the CDE's approach, as the Monitor discusses at length, is that, if a small LEA *group* is not selected for targeted monitoring on any specific indicator or is not

selected for intensive monitoring, then all the small LEAs within the group are given a pass, *irrespective of how poorly those individual districts may be performing.* Indeed, the Monitor's analysis demonstrates that, using the grouping methodology, many of the lowest-performing small districts are not selected for intensive monitoring and some districts that have performance problems in specific areas are deemed "meets requirements" and do not receive either intensive or targeted monitoring. ECF No. 2555 at 7 and 11. This problem is compounded by the fact that the CDE raised its minimum size requirement from 30 students with disabilities to 100 students with disabilities, effectively allowing many more "small" school districts and charter schools to escape further scrutiny, the very problem that the Court identified in its Phase 2 Order. Finally, this problem is even further compounded because the CDE uses secondary filters to select specific small LEAs for targeted and intensive monitoring from the LEA groups that are flagged as low performers. As discussed below, these secondary filters are problematic and result in very few small districts being selected for monitoring activities.

The Monitor, in turn, proposes different methodologies to deal with the n-size problem that, for the most part, subject all LEAs, regardless of size, to the same metrics. The CDE, in response, dismisses the Monitor's proposed alternatives as mere "policy choice" differences that do not render the CDE's grouping methodology out of compliance with the IDEA.

The CDE and the Monitor each have a point. The n-size problem needs to be addressed, but the grouping methodology proposed by the CDE ineffectively addresses this concern by allowing many poor-performing school districts to escape targeted and/or intensive monitoring merely because they were lucky enough to be grouped with higher performing peers. Giving a pass to many poor performers is not a "policy choice;" it's a violation of the IDEA. *See* Court's Phase 2 Order at 11 (finding that  where small school districts "are functionally exempt from

many targeted and intensive monitoring activities" the State's monitoring system is noncompliant). There are alternative methodologies that can address both the CDE's n-size concern and the Monitor's concern about allowing small districts to deny FAPE to children.

The following subsections provide: (1) a discussion of alternative methodologies that address both the CDE's n-size concern and the Monitor's concern about allowing poor-performing small school districts to escape monitoring; (2) a specific methodology for the unique problem posed by child find; and (3) a discussion of problems with the CDE's small school selection methodology for both intensive and targeted monitoring.

### A. Alternative Methodologies for Monitoring Small School Districts

The CDE could avail itself of alternative methodologies for monitoring small school districts that would both account for the n-size problem and ensure that poor-performing small districts are flagged for monitoring. For instance, rather than grouping small districts, the CDE could smooth out variability due to small n-sizes by aggregating three or more years of data for each small school district and applying its analyses to those aggregate numbers. With such a method, the n-size problem might be ameliorated (Plaintiffs don't have the data to test this approach) due to the greater "n" created by aggregating data from multiple years *and* no small school district could hide behind its better performing neighbors. Even if this approach did not prove workable for school districts with the smallest populations, at the very least, it could reduce the number of school districts presenting this monitoring challenge.

Alternatively, Plaintiffs offer a three-tiered methodology for monitoring small districts that accounts for small n-sizes and ensures that all districts can be subjected to monitoring scrutiny. The point here is not to prescribe this specific methodology or even guarantee that the methodology would be effective and compliant (the CDE would have to test the method on its

data). Rather, the point is to demonstrate that a workable methodology can respond to both the Court's concern about ensuring that small districts are monitored and the CDE's concern about small n-sizes. In this system, the CDE would monitor LEAs as follows:

Large LEAs (more than 100 students with disabilities). Large LEAs could be monitored using the same methods that the CDE currently proposes.

Small LEAs (11-100 students with disabilities). Small LEAs of this size could be monitored using the same method as large LEAs, except that for Level 2 monitoring (Targeted Monitoring) the performance indicator targets should be set at a different (more lenient) level from the target for LEAs with over 100 students with disabilities. These different targets would account for the n-size problem for these small LEAs. They represent a compromise that keeps small districts accountable without their compliance determination being unduly impacted by the influence of a small number of students, a concern the CDE discussed at length in the State's Further Phase 2 Submission. ECF No. 2545 at 6. Alternatively, the CDE could simply select the districts in the lowest performing decile for each indicator.

Very Small LEAs (1-10 students with disabilities). The CDE could select for intensive monitoring a certain percentage (*e.g.,* ten percent) of these districts through a random selection process. Such a system would provide an incentive for all very small LEAs to maintain compliance, as any one of them could be selected for intensive monitoring, and would allow the CDE to use intensive monitoring as an opportunity to gather data from and provide support to these districts.

No doubt there are modest drawbacks to this system, but among those drawbacks is not the problem of giving small school districts a pass due to their small n-size. Plaintiffs look

forward to the Parties' and Court's consideration of such alternatives to the CDE's deeply flawed "grouping" method for monitoring small school districts.

**B.  Monitoring Child Find in Small School Districts**

Monitoring child find in small school districts presents a unique challenge. As the Monitor notes, the CDE's method that aggregates districts with fewer than 100 students with disabilities into groups, "is problematic because it defines a small district based on the very circumstance in question in child find monitoring: whether the district has identified all students who have disabilities." ECF No. 2555 at 7. As a result a district could be improperly identifying too few children for IDEA eligibility yet escape child find scrutiny by being grouped into a small district group with better performing districts. The Monitor offers alternative approaches—including selecting small school districts based on overall student count (those LEAs with fewer than 1,000 students)—that would address this challenge. ECF 2555 at 15.

While the CDE criticizes the Monitor's alternative approach for monitoring small school districts for child find, the CDE fails to address the central concern that a district could be deemed a "small school district" and grouped with higher performers to escape monitoring precisely because it under-identifies students with disabilities, the very problem that child find monitoring is aimed to address. To avoid this problem, Plaintiffs propose the three-tiered monitoring system discussed above, but instead of placing students into tiers based on the number of students with disabilities, the CDE should place students into tiers based on the overall student count in the district. Specifically, "large school districts" could be those with greater than 1000 students, "small school districts" could be those with between 100 and 1000 students, while "very small" school districts could be those with fewer than 100 students. The large school districts would be monitored with the most stringent criteria because they are not

affected by the n-size problem; the small school districts would have slightly more lenient criteria so that they are less apt to be affected by the n-size problem; and the very small school districts would be subjected to randomized monitoring as discussed above.

The CDE bemoans the use of a different small school district selection methodology for child find than that used for other forms of targeted monitoring, claiming that its methods are repeatable, transparent and easily understood. *Id.* at 25. This criticism, too, is misplaced because there is nothing non-repeatable, non-transparent, or difficult to understand about using a small district selection method based on overall student counts and there is nothing wrong with using a demonstrably better method just because it is different.

The CDE finally criticizes the use of a 7.23% cutoff rate for flagging small school districts for child find because that figure was calculated using a different population of schools and could not be applied to the Monitor's different population of small school districts. ECF No. 2563 at 24. But that criticism rings hollow because the CDE need only calculate the appropriate cutoff percentage (based on 1.5 standard deviations from the mean small school district population) for the different population of small districts proposed by the Monitor.

### C. Selection of Small School Districts for Intensive Monitoring

1.  Selection of Small School Districts for Intensive Monitoring-Preschool.

The Monitor concludes that the CDE's grouping methodology for small school district monitoring is flawed because the "overwhelming majority of the lowest-performing small districts on each of the four indicators in CDE's [preschool intensive monitoring] formula were not selected for intensive monitoring by the CDE." ECF No. 2555 at 7; *see also id.* at 27. The Monitor then proposes an alternative methodology that would select more of the poorest performing small school districts for preschool intensive monitoring. *Id.* at 27-30. The CDE

again criticizes the Monitor's approach because it selects too many small school districts with very low n-sizes (allowing one or a few students to have a disproportionate impact on performance), ECF No. 2563 at 25-28, but the CDE again fails to address the fact that its method allows too many low-performing small school districts to escape scrutiny. As discussed above, there are alternative small district selection methods that could be used to address both the Court's concern that small districts escape monitoring and the CDE's concern that small districts should not be penalized for small n-sizes.

> 2.   Selection of Small School Districts for Intensive Monitoring-School Age.

Out of the 1,571 small school districts, only two were selected for school-age intensive monitoring using the CDE's small district grouping methodology. ECF 2555 at 37. As the Monitor concludes "[t]here are many more low-performing small districts than the two selected by CDE." *Id.* Again, the CDE should jettison its grouping methodology because it does not select enough or the worst performing small school districts. Alternative methods can be devised that account for small n-size and ensure small district monitoring.

### D.  Selection of Small School Districts for Targeted Monitoring

Using its small district grouping methodology, the CDE first identifies groups of small LEAs using the same primary standards as those for larger LEAs and then applies secondary standards (or filters) to identify specific small districts within groups. ECF No. 2553 at 7. As the Monitor notes, the CDE does not provide an explanation or rationale for these secondary standards and it is not clear why they were chosen. ECF No. 2555 at 8. The Monitor takes specific notice of two secondary standards that Plaintiffs agree appear problematic:

> 1.   Participation on State Assessments. The State's secondary standard is quite far from the primary standard and is too generous to districts with very low rates of participation on

14

PLAINTIFFS' RESPONSE TO STATE'S RESPONSE TO MONITOR'S FURTHER PHASE 2 REVIEW
*Emma C., et al. v. Thurmond, et al.*; No. 3:96-cv-04179-VC

state assessments, resulting in too few districts being selected for targeted monitoring on this indicator.

2.    Parent Involvement. Again the Monitor notes that the secondary standard is quite a bit lower than the primary standard, resulting in no small districts being selected for targeted monitoring for parent involvement. Apart from the fact that the measure used for parent involvement is virtually meaningless (a single question asked at an IEP team meeting), the CDE should be required to use a more stringent secondary standard if it continues to use its flawed small district grouping methodology.

## IV.

## TARGETS

In its Phase 2 Order, the Court stated that:

> Another flaw in the state's monitoring system relates to the performance targets it has set for school districts. An adequate monitoring system requires adequate targets. If targets are too modest, states may fail to identify districts that are falling short on their obligation to provide an adequate education to disabled children.

ECF No. 2520 at 15. The Court further noted that "targets must be 'measurable and rigorous' across all priority areas." *Id.* (citing 34 C.F.R. § 300.601(a)(3)). The Court then went on to identify several targets as being insufficiently ambitious, resulting in too few districts being identified for what the State now calls targeted monitoring, its second tier of monitoring review.

In response, the State has proposed to discontinue the use of several of the indicators and targets it previously used for performance. In this section, Plaintiffs only analyze the targets that the State proposes to use for selecting districts for targeted monitoring.

### A.  The State Performance Plan Target Development and the "Extension" Targets

As the State describes in its Further Phase 2 Submission, ECF No. 2545 at 15-17, some

of the indicators upon which the CDE relied for targeted monitoring are among those the federal Office for Special Education Programs ("OSEP") requires the State to include in its State Performance Plan ("SPP"). The State notes that the CDE had begun a stakeholder process to develop new, more ambitious, and more appropriate targets for all of the indicators in the SPP. Plaintiffs' counsel, William Koski and Freya Pitts, were invited to participate and participated in that stakeholder process. Unfortunately, OSEP has delayed the development process for the new SPP targets for the next six-year cycle and instead instructed the CDE to submit "extension targets" for the current monitoring cycle.

 The CDE developed those extension targets. To put it simply, the extension targets are essentially the same as the prior, unambitious targets that the Court found wanting. In some instances, the targets are actually set below current performance levels. The CDE then submitted extension targets to the stakeholder group for review. ECF No. 2545 at 16. The State says that the "[s]takeholders were generally supportive of the proposed extension targets and did not express any concerns with the extension targets." *Id.* To be clear, Plaintiffs' counsel do not believe that the extension targets are in any way adequate. Plaintiffs' counsel participated in the stakeholder process in good faith and, like most of the stakeholders, proposed much more ambitious targets for the upcoming six-year cycle. Moreover, as discussed at the February 19, 2020, telephonic case management conference, Plaintiffs reserve the right to challenge as insufficient any of the SPP targets that are established for the upcoming six-year cycle and are relevant to these proceedings.

### B. Child Find

 As the Court Monitor notes, in response to the Court's Phase 2 Order, the CDE made two changes to its methodology for selecting districts for child find targeted monitoring: (1) the

cutoff for selection was raised from 2.0 standard deviations below the mean on this indicator and (2) small school districts with fewer than 100 students with disabilities are grouped for analysis to avoid the n-size problem. Plaintiffs have already discussed the CDE's flawed grouping method generally and specifically with regard to child find and will not repeat that discussion here.

The Monitor found that the "new child find target is adequate to select large districts for targeted monitoring." ECF No. 2555 at 21. Plaintiffs agree with that finding.

### C.  Least Restrictive Environment (School Age)

On this indicator, the CDE uses its extension target. As the Court Monitor notes, "California has already met each of the FFY 2019 extension targets. California as a whole places a lower percentage of students in regular classes, a higher percentage in self-contained classes, and higher percentage in separate placements. The state's targets are still set below statewide performance and the performance of the state as a whole remains below national levels . . . ." ECF No. 2555. The school-age least restrictive environment target is unambitious and patently unacceptable.

### D.  Least Restrictive Environment (Preschool)

As is the case with school-age least restrictive environment, the preschool least restrictive environment extension targets are unambitious. California also lags far behind the nation in integrating its preschool children with disabilities into classrooms with their non-disabled peers. The CDE should be found noncompliant on this target.

### V.

### INTENSIVE MONITORING-PRESCHOOL

Plaintiffs agree with the Monitor's noncompliance determination.

As an initial matter, Plaintiffs commend the CDE for its decision to monitor districts' provision of FAPE to preschoolers through its intensive monitoring process (rather than the targeted monitoring process it had employed before). Moreover, although the CDE does not include child find among its indicators used for intensive monitoring selection (as the Monitor notes, ECF No. 2555 at 21), the three indicators the CDE uses—preschool outcomes, discipline, and placement—all have a direct relationship to FAPE. Nonetheless, the methodology that the CDE uses to select preschools for intensive monitoring does not ensure FAPE and fails to comply with the IDEA in three specific ways.

First, the Monitor notes and as discussed above, the CDE's grouping methodology for selecting small school districts allows too many poor-performing districts to escape intensive monitoring because poor-performing small districts can hide behind their better performing neighbors and because the CDE further filters out poor performers with its secondary filters.

Second, as the Monitor notes, many school districts did not report preschool outcomes data. *See* ECF No. 2555 at 23-25. While the Monitor suggests that outcomes could be excluded from the selection methodology, the CDE believes that outcomes data must be maintained due to their relationship to FAPE. Plaintiffs contend that outcomes data can be maintained as an indicator if the CDE ensures that all districts report preschool outcomes. The CDE could penalize districts for failure to report outcomes data through its data verification processes. Or it could automatically select those who don't report such data either for targeted monitoring on preschool outcomes or for intensive monitoring. (One could also devise an intensive monitoring methodology that "assumes" poor performance on preschool outcomes when no such outcomes data are reported.)

Third, the CDE does not include an indicator for child find in its methodology for selecting districts for preschool intensive monitoring. The Monitor mentions this fact, ECF No. 2555 at 21, but does not pursue the matter. The CDE notes that it is "interested in developing a measure for Child Find for children ages 3 through 5," but "there is no appropriate method for doing so as there is no universal preschool, an explanation which the Court found adequate for purposes of assessing the State's compliance in this area." ECF No. 2563 at 25.[3] School districts have an obligation to locate and assess children ages 3-5 who are suspected of having a disability. This is an essential component of preschool FAPE and should be included in the selection process for intensive monitoring. *Plaintiffs request that the Court and the Parties discuss this issue to devise thoughtful ways to assess preschool child find and develop an indicator that could be used for both targeted and intensive monitoring.* An IDEA compliant monitoring system requires it.

## VI.

## INTENSIVE MONITORING-SCHOOL AGE

Plaintiffs agree with the Monitor's noncompliance determination.

Plaintiffs again commend the CDE for its proposed methodology for selecting districts for school-age intensive monitoring. The CDE has abandoned its deeply flawed method that placed undue emphasis on one-year improvement or regression, employed too many variables

---

[3] In footnote 16 of its Response to the Court Monitor's Report, ECF No. 2563 at n.16, the CDE notes that "Indicator 11—'Timely Evaluation for Special Education Eligibility,' includes all students ages 3 through 21, and is included in CDE's methodology for selecting LEAs for Targeted Monitoring—Compliance." Timeliness of assessments is a wholly inadequate measure of performance on preschool child find. LEAs have a responsibility to actually locate all children with disabilities. Mere timely assessments of those who have been located says nothing about whether the LEA is doing an adequate job of locating children with disabilities in the first instance. A better measure must be devised.

and did not emphasize those variables most connected to FAPE, and used a cut score that was based on administrative convenience and the CDE's available resources, not district performance. The CDE's proposed methodology uses fewer variables and chooses those with a direct relationship to FAPE, does not consider minor, one-year improvement or regression, and employs a selection method that selects more districts and stands a better chance of selecting the lowest performing districts.[4] Yet the CDE's selection method still suffers from two significant problems.

First, as the Monitor notes and as discussed above, the CDE's grouping methodology for selecting small school districts allows too many poor-performing districts to escape intensive monitoring because poor-performing small districts can hide behind their better performing neighbors and because the CDE further filters out poor performers with its secondary filters.

Second, the CDE initially did not include the least restrictive environment ("LRE") indicator for students placed in general education classes less than 40% of the day and instead included the indicator for students placed in separate schools. The Monitor found, for several reasons, that the CDE should include in its selection formula the indicator for placement in general education classes for less than 40% of the day. ECF No. 2555 at 33-37. Plaintiffs similarly contend that CDE should focus on students who are placed in general education classes less than 40% of the day, often spending the rest of the school day in self-contained special day

---

[4] As the Monitor notes, ECF No. 2555, the CDE's school-age intensive monitoring methodology excludes indicators that solely apply to high schools and former students such as graduation and dropout rates, and post-school outcomes, because it wants a single system for identifying school districts for intensive monitoring. While it is beyond the scope of this litigation, Plaintiffs suggest that the CDE should consider separate selection methodologies for unified school districts, elementary school districts, and high school districts. This would allow the CDE to employ all relevant variables tied to FAPE for each type of district and provide better apples-to-apples comparisons.

classes, because (1) the students in those restrictive placements dramatically outnumber those in separate schools; (2) special day classes are nearly, if not identically, as restrictive as separate schools; and (3) the relatively few students who are placed in separate schools are often placed in those schools by mutual agreement of the families and schools due to the significant needs of the students. The CDE appears to agree with the Monitor's suggestion and states that it will not use the indicator for placement in separate schools, but will instead use the indicator for placement in general education classrooms for less than 40% of the day. ECF No. 2555 at 6. Assuming that the CDE maintains this position, this issue does not appear to be in dispute.

## VII.

## IMPACT OF COVID-19

The CDE's Response provides a discussion of the impact of COVID-19 on its data collection and monitoring activities. ECF No. 34-37. Plaintiffs acknowledge the significant impact on the CDE's operations, children with disabilities, and schools and education in California. Indeed, many Plaintiff children are not receiving the services required by their individualized education plans and are struggling to cope with "virtual learning."

The CDE specifically identifies many data collection activities that will be affected by the current school closures but contends that, while "these data challenges do not affect the design of CDE's monitoring selection," they will "likely impact the State's implementation of its revised selection methodology . . . ." *Id.* at 36. Plaintiffs are concerned that, if the CDE is unable to implement its revamped systems, the current response to COVID-19 will affect monitoring implementation in ways that might compromise the Court's current review of the monitoring design. Moreover, the delay in data collection may well have impacts on Phase 3 activities regarding the design and implementation of monitoring activities.

PLAINTIFFS' RESPONSE TO STATE'S RESPONSE TO MONITOR'S FURTHER PHASE 2 REVIEW
*Emma C., et al. v. Thurmond, et al.*; No. 3:96-cv-04179-VC

At bottom, CDE seems to suggest that COVID-19 will diminish the CDE's monitoring capabilities. This is troubling because now is precisely the time that the CDE should appropriately modify and redouble its efforts to ensure that school districts are providing FAPE to children and complying with the IDEA. Due to school closures and the challenges of "virtual learning," children with disabilities throughout California are right now being denied the services that they are entitled to receive pursuant to their IEPs. As the Court recognized in its Phase 1 Order, ECF No. 2428 at 13-18, failure to implement IEPs is a violation of the IDEA and the CDE's monitoring system should be capable of determining whether districts are providing children the services delineated in their IEPs. While the CDE states that it is in the process of developing a data collection method for IEP implementation, *see* ECF No. 2545, Ex. 1 at 34-35, the current crisis demands that CDE act to ensure that districts are properly serving their children with disabilities, particularly if school closures linger into the fall or re-occur during the next school year. *Plaintiffs request that the Court and the Parties discuss how the CDE intends to modify and amplify its monitoring capabilities to ensure that districts provide special education services and FAPE to their children.*

## VIII.

## CONCLUSION

Plaintiffs acknowledge and commend the CDE for its improved approach to data analysis and selection for monitoring activities. Yet the CDE's analysis and selection process is still seriously lacking in certain respects, particularly its method for assessing small school districts. Plaintiffs look forward to addressing these matters with the Court and the Parties.

///

///

Dated: May 15, 2020                Respectfully submitted,

                                   YOUTH AND EDUCATION LAW PROJECT
                                   STANFORD LAW SCHOOL
                                   MILLS LEGAL CLINIC

                         By:    _____/s/_____
                                   William S. Koski
                                   *Attorneys for Plaintiffs Emma C., et al.*

                                   NATIONAL CENTER FOR YOUTH LAW

                         By:    _____/s/_____
                                   Leecia Welch
                                   *Attorneys for Plaintiffs Emma C., et al.*

# ECF ATTESTATION

I hereby certify that on May 15, 2020, I electronically filed the following document(s) with the Clerk of the Court by using the CM/ECF system:

**PLAINTIFFS' RESPONSE TO THE STATE DEFENDANTS' JANUARY 31, 2010 FURTHER PHASE 2 SUBMISSION, THE COURT MONITOR'S MARCH 9, 2020 REPORT, AND THE STATE DEFENDANTS' APRIL 21, 2020 RESPONSE TO MONITOR'S REVIEW OF FURTHER PHASE 2 SUBMISSION**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on May 15, 2020, at Stanford, California.

DATED:      May 15, 2020

By:      /s/ William S. Koski
WILLIAM S. KOSKI