Rob Bonta
Attorney General of California
Darrell W. Spence
Supervising Deputy Attorney General
Kirin K. Gill, State Bar No. 259968
Deputy Attorney General
State Bar No. 259968
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-6172
  Fax: (916) 324-5567
  E-mail: Kirin.Gill@doj.ca.gov
*Attorneys for Defendants*
*California Department of Education, Tony*
*Thurmond, in his official capacity as the State*
*Superintendent of Public Instruction, and State*
*Board of Education*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **EMMA C., et al.,** | 3:96-cv-04179-VC |
| Plaintiffs, | **STATE DEFENDANTS' PHASE 3 DESIGN SUB-PHASE SUBMISSION** |
| v. | Judge: The Honorable Vince Chhabria |
| **THURMOND, et al.,** | |
| Defendants. | |

Pursuant to the Court's August 11, 2021 Order Regarding Evidentiary Hearings on Phase 3 Design Sub-Phase (Dkt. 2658) (8/11/21 Order), Defendants California Department of Education (CDE), Tony Thurmond, in his official capacity as the State Superintendent of Public Instruction, and State Board of Education (SBE) (collectively, State Defendants or the State) hereby submit State Defendants' Compliance Report – Phase 3 Design of Monitoring and Enforcement Activities, attached hereto as **Exhibit 1**, to demonstrate that the State's design (and proposed design) of its monitoring and enforcement activities is in compliance with federal law.  Further, in accordance with the 8/11/21 Order, the Report includes updates regarding the State's recently adopted State Performance Plan (SPP) targets submitted to the Office of Special Education Programs (OSEP) and the State's proposed use of restraint and seclusion data.  The Report also includes updates regarding the State's activities with respect to IEP Implementation data collection.

Dated:  April 15, 2022                              Respectfully Submitted,

ROB BONTA
Attorney General of California
DARRELL W. SPENCE
Supervising Deputy Attorney General


/s/ Kirin K. Gill
KIRIN K. GILL
Deputy Attorney General
*Attorneys for Defendants*
*California Department of Education, Tony*
*Thurmond, in his official capacity as the*
*State Superintendent of Public Instruction,*
*and State Board of Education*

SA2005104070
36088791.docx

1

# EXHIBIT 1

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

Introduction ........................................................................................................ 2

   CDE's Approach Toward Special Education Monitoring to Meet Federal Monitoring
Requirements ................................................................................................... 2

   Special Education Monitoring and Alignment with Statewide Accountability System .. 4

Monitoring LEAs in the Tiered System for SWD ............................................... 5

   Universal Monitoring and Support ..................................................................... 7

   Targeted Monitoring and Support ..................................................................... 8

      Differentiation in Targeted Monitoring ........................................................... 8

   Intensive Monitoring and Support ................................................................... 11

      Differentiation in Intensive Monitoring ......................................................... 11

Monitoring Activities ...................................................................................... 13

   Universal Monitoring Activities ....................................................................... 13

      Timely and Complete Data ........................................................................ 13

   Targeted Compliance-Only Monitoring Activities ............................................ 14

      Identification and Correction of Noncompliance ......................................... 14

   CIM Process Monitoring Activities .................................................................. 15

      CIM Step 1 – Gather and Inquire ............................................................... 17

      CIM Step 2 – Investigation ........................................................................ 23

      CIM Step 3 – Planning .............................................................................. 25

      CIM Step 4 – Implementation and Ongoing Monitoring ............................... 25

Enforcement Activities ................................................................................... 26

Small LEA Cyclical Monitoring ....................................................................... 27

Nonpublic Schools Monitoring ........................................................................ 28

Phase 2 – SPP Targets, Restraint and Seclusion and IEP Implementation Updates.... 32

   SPP Targets ................................................................................................. 32

   Restraint and Seclusion ................................................................................ 33

   IEP Implementation ...................................................................................... 34

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

# Introduction

The Court is examining the State's compliance with its monitoring and enforcement obligations under the Individuals with Disabilities Education Act ("IDEA") in four phases. The Court has bifurcated Phase 3 to examine first, the State's design of monitoring and enforcement activities and then the implementation of these activities with fidelity. (Dkt. 2658). This Compliance Report ("Report") provides descriptions of the monitoring activities associated with both targeted and intensive monitoring to demonstrate the applied activities are reasonably designed to improve educational results and functional outcomes. This Report further demonstrates that California Department of Education (CDE) applies appropriate enforcement mechanisms based on each local educational agency's ("LEA's") Annual Determination under IDEA, and effective identification and correction of noncompliance in the priority areas. (Dkt. 2651).

The remaining data analysis and use issues for Phase 2 that have yet to receive a ruling are also included in this Report. The Report includes the newly-adopted State Performance Plan ("SPP") targets currently under the review by the Office of Special Education Programs ("OSEP"). The Report also provides an update regarding state level activities with respect to restraint and seclusion and the individualized education program ("IEP") implementation data collection pilot.

The majority of the State's monitoring and enforcement obligations and provision of technical assistance to LEAs arise from 20 U.S.C. § 1416. Pursuant to 20 U.S.C. § 1416 and implementing regulations, 34 C.F.R. § 300.600 et seq., states are required to monitor the LEAs within the state for compliance with program requirements under IDEA Part B, with the aim of improving the educational results and functional outcomes for students with disabilities ("SWD"). In this Report, the State will demonstrate that its monitoring and enforcement activities are reasonably designed to achieve this federal directive. Further, the State will also demonstrate that its monitoring and enforcement activities are designed to be effective; essentially, that the activities support LEAs in their efforts to improve the educational results and functional outcomes of their SWDs.

## CDE's Approach Toward Special Education Monitoring to Meet Federal Monitoring Requirements

The majority of the State's monitoring and enforcement obligations and provision of technical assistance to LEAs arise from 20 U.S.C. § 1416 and implementing regulations, 34 C.F.R. § 300.600 et seq. Congress's stated intent in the IDEA is that the education of students with disabilities ("SWD") can be made more effective if educators have high expectations for SWD and ensure their access to the general education curriculum in the regular classroom to the maximum extent possible. (20 U.S.C. § 1400(c)(5)(A)). The relationship between increased participation in a general education

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

setting and academic growth for SWDs has been established in the national literature (Barrocas and Cramer 2014[1]; Cramer 2015[2]; Hoppey and Mickelsen 2017[3]).

Consistent with these requirements and objectives, CDE's monitoring is designed to address fundamental, systemic concerns within LEAs and to support their improvement in meeting the program requirements under IDEA Part B, primarily emphasizing those requirements most closely aligned with improving educational results and functional outcomes for SWD. (See 34 C.F.R. § 300.600(b)). Better functioning LEAs means that the SWD served by those LEAs will receive greater access to general education and supports.

CDE believes improved student outcomes are based on four major pillars:

1) Identifying the right placement for the student that will ensure that they are able to access general education curriculum and instruction to the greatest extent possible;
2) Providing the right supports to allow each student to fully engage in learning;
3) Maintaining classrooms with high quality instruction to ensure that all students fully benefit; and,
4) Ensuring equity and that the education offered is free of racial and ethnic bias so all students are provided every opportunity to succeed.

If CDE focuses its monitoring efforts on these fundamental pillars, it expects that there will be a measurable reduction in negative behaviors that result in SWD removals from the educational environment and that SWD learning will be evidenced in higher outcomes on achievement assessments. Further, CDE expects that SWD will graduate with a regular high school diploma and achieve independence through college and career success. Therefore, CDE has designed a monitoring system that is focused on addressing the systemic issues within LEAs that weaken these pillars and hinder SWDs in achieving success. (See **Figure 1**).

---

[1] Barrocas, Lisa, and Elizabeth D. Cramer. 2014. "Placement and Achievement of Urban Hispanic middle schoolers with Specific Learning Disabilities." *Journal of Urban Learning, Teaching, and Research*, *10*: 3-13.
[2] Cramer, Elizabeth. 2015. "Shifting Least Restrictive Environments in a Large Urban School District." *Journal of Urban Learning, Teaching, and Research*, *11*: 40-49.
[33] Hoppey, David, and Ann M. Mickelson. 2017. "Partnership and Coteaching: Preparing Preservice Teachers to Improve Outcomes for Students with Disabilities." *Action in Teacher Education, 39*(2): 187-202.

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

**Figure 1**



# Special Education Monitoring and Alignment with Statewide Accountability System

As explained in previous submissions, the State has an integrated student accountability system based on federal and state legislation. The federal Every Student Succeeds Act ("ESSA") required all states to have a new multiple measures accountability system in effect by the 2017-2018 school year.[4] Similarly, California's Local Control Funding Formula ("LCFF") legislation made a shift from a complex school finance system to one focused on equity, transparency, and performance. Under the LCFF, LEAs receive funding based on the demographic profile of the students they serve and are expected to meet enhanced accountability requirements and improve student performance. A core component of LCFF is the Local Control and Accountability Plan ("LCAP"). The State requires each LEA to submit an LCAP which serves as a tool for LEAs to set goals, plan actions, and use existing resources to meet those goals to improve student outcomes.[5]

Rather than developing separate state and federal accountability systems, the State has developed an integrated local, state, and federal accountability and continuous improvement system founded on the LCFF priority areas that also aligns with ESSA requirements, known as the California School Dashboard ("Dashboard"). The Dashboard is an online tool that shows how LEAs and schools are performing on state

---

[4] See, e.g., 20 U.S.C. § 6301 et seq.
[5] See CDE's LCAP website, available at: https://www.cde.ca.gov/re/lc/.

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

and local indicators. All LEAs receive accountability results within the Dashboard. CDE uses LEAs' performance on the Dashboard for those performance areas overlapping with related SPP targets.[6]

Additionally, the State's required LCAPs from each LEA as well as the State's required improvement plan from each LEA under the Compliance and Improvement Monitoring ("CIM") process (as described further herein) align to support the LEA in continued improvement. Specifically, the State's CIM process requires an LEA to submit an improvement plan similar to the LCAP but with one key distinction: the CIM improvement plan is the mechanism CDE uses to monitor and provide support to LEAs that is designed to improve the outcomes for SWD and meet the federal monitoring requirements under IDEA Part B. The State's CIM process is designed to monitor and support LEAs through a set of monitoring activities, specifically aimed at discovering the root causes of poor performance for SWD within the selected LEAs so that those root causes can be addressed.

# Monitoring LEAs in the Tiered System for SWD

CDE's SWD monitoring framework uses a tiered system that differentiates the level of monitoring and technical assistance supports for each LEA based on data analyses and that LEA's need. CDE's approach is consistent with OSEP's Differentiated Monitoring and Support ("DMS") system for providing monitoring and supports to States as part of its Results Driven Accountability ("RDA") system.[7] OSEP's RDA system shifted its approach from monitoring States based solely on their compliance with IDEA Part B requirements, to providing monitoring and support focused on both compliance and improving results for SWDs. Given the number and diversity among the states, OSEP differentiates its approach for each state based on the state's specific needs.[8] In California, CDE determined that a monitoring framework also based on a differentiated model would be the most effective given the sheer number and variation of LEAs that the State monitors.

CDE's tiered monitoring model includes three tiers: universal monitoring, targeted monitoring, and intensive monitoring. CDE's selection processes, as described in Phase

---

[6] CDE uses an LEA's performance on the Dashboard for Graduation Rate, Statewide Assessment Proficiency and Suspension Rate as the method to identify LEAs for further monitoring. CDE previously discussed this in its December 7, 2018 Phase 2 Compliance Report (Dkt. 2455-1 p. 6) and its January 31, 2020 Further Phase 2 Compliance Report (Dkt. 2545 p. 8).

[7] See the U.S. Department of Education's Office of Special Education and Rehabilitative Services Results Driven Accountability website, available at:
https://www2.ed.gov/about/offices/list/osers/osep/rda/index.html.

[8] See OSEP's DMS System Overview, available at
https://osep.grads360.org/#communities/pdc/documents/14982.

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

2, are designed to ensure that LEAs are identified for the appropriate monitoring tier.[9] LEAs that remain in universal monitoring have access to resources from the State to support their continued compliance and performance. Within the targeted and intensive monitoring tiers, CDE further differentiates the level of engagement and activities that LEAs participate in so as to best support LEAs to implement improvement activities that support improved outcomes for SWD. In other words, the higher the LEA's need, the greater level of CDE's engagement. **Figure 2** displays the level of engagement that CDE allocates to LEAs based on its monitoring tier.



**Figure 2**



Targeted and intensive monitoring for LEAs begins each year upon the publication of the annual determination letter to each LEA. CDE sends each LEA a letter that notifies the LEA of: (1) its annual determination of whether the LEA has met IDEA Part B requirements, the data used to make that determination, and any required actions or sanctions required under 34 C.F.R. §§ 300.600(a) and 300.603; (2) its monitoring tier for the upcoming monitoring year; and, if applicable, (3) if it has been identified as significantly disproportionate[10] and the resulting required actions. Once an LEA is identified for the appropriate monitoring tier, CDE begins its engagement with the LEA, and directs the LEA to begin the CIM process.

The core of CDE's monitoring framework is the CIM process, described in greater detail below. LEAs in targeted or intensive monitoring for performance are required to

---

[9] The State provided a full description of the monitoring model in Dkt. 2545 pp. 2-10.
[10] LEAs are identified as significantly disproportionate when data demonstrates an overrepresentation in one or more of the four areas of disproportionality (disability, race/ethnicity and disability, discipline and placement) in the same area and within the same population for three consecutive years.

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

participate in and complete the CIM process as part of their ongoing, annual monitoring activity. The CIM process is a series of steps and activities by which CDE identifies and assists LEAs to identify areas for correction and improvement, and developing an integrated plan to address those areas. CDE designed this process to ensure that LEAs, with differentiated levels of involvement and review, examine a wide-range of both compliance and performance data and identify the root causes of areas of concern to develop and implement an effective improvement plan. LEAs identified for each level of both targeted[11] and intensive monitoring tiers are required to participate in the CIM process. The CIM is a multi-year process that recognizes that meaningful improvement likely does not occur in a short period of time. Therefore, it requires an LEA's sustained focus on the areas in need of improvement to support positive outcomes for SWDs.

With respect to small LEAs—those serving 100 or fewer SWD—CDE intends to monitor those LEAs cyclically. Under cyclical monitoring, each small LEA will be selected for monitoring once every three years. Small LEAs may also be identified for higher levels of monitoring such as targeted or intensive, as reflected in their annual determination. All small LEAs will continue to be monitored annually for timeline and complaint noncompliance, regardless of whether they have been selected for cyclical monitoring in a given year. The small LEA cyclical monitoring design is described further herein.

# Universal Monitoring and Support

CDE provides universal monitoring and support to each LEA in the State annually, regardless of the LEA's performance. Universal monitoring includes collection and analysis of both compliance and performance data, review of fiscal information including Maintenance of Effort,[12] and review of the local Special Education Local Plan Area ("SELPA") assurances.[13]

For those LEAs that have no procedural noncompliance, are not disproportionate, have met all performance targets, have no corrective actions to perform, and for whom CDE did not identify areas of concern in nonpublic schools ("NPS") reviews, CDE does not require them to participate in the targeted or intensive monitoring CIM processes.[14] Nor do those LEAs receive direct technical assistance from CDE or CDE-funded technical

---

[11] LEAs identified for targeted, compliance-only monitoring are not required to participate in the CIM process.

[12] The Maintenance of Effort requirement mandates that LEAs spend at least the same amount of state and local funds to provide services to SWD spent in the previous fiscal year. (34 C.F.R. § 300.203.)

[13] CDE requires several components for SELPA Local Plans, including annual budget plans. More information, including CDE-adopted templates, are available at https://www.cde.ca.gov/sp/se/ds/lclpln.asp.

[14] Some LEAs may choose to participate in the CIM process, as CDE does not prohibit LEAs from voluntarily and independently participating in the CIM process.

assistance ("TA") providers. However, CDE makes available resources and tools for those LEAs to address improvement voluntarily.

LEAs that are not identified for targeted or intensive monitoring are determined to "Meet Requirements" in their Part B Annual Determination. While LEAs in this tier will have the same access to CDE's training and supports to complete self-guided activities as those LEAs identified for targeted monitoring, CDE will not require the "Meets Requirements" LEAs to participate in those self-guided activities, nor will CDE monitor those LEAs' participation in those activities unless the LEA is found not to meet requirements in a subsequent year.

**Attachment 1** displays the criteria CDE will use to assess and sort LEAs into the appropriate monitoring tier and differentiated monitoring level, and the LEA's resulting Annual Determination under IDEA Part B.

# Targeted Monitoring and Support

CDE provides targeted monitoring and support to LEAs whose data indicate areas of concern related to performance, compliance, and/or disproportionality that may impact SWD performance. For LEAs that CDE identifies for targeted monitoring, their data does not indicate ongoing, systemic noncompliance or a need for intensive support. The data for LEAs in this tier indicates that the LEA can engage in correction and improvement with less CDE support and oversight than those LEAs identified for intensive monitoring. CDE requires that LEAs with concerns related to performance and identified for targeted monitoring must participate in the CIM process and complete various activities within that process. The areas of focus for CDE's monitoring of these LEAs are based on the areas of concern that identified the LEA for targeted monitoring.

LEAs selected for targeted monitoring are required to complete the activities in the CIM process with CDE and TA provider guidance and support, and CDE monitors the LEA's implementation of the CIM plan. CDE differentiates the level of intervention and the LEA's required activities depending on the areas of concern within that LEA. CDE monitors every LEA that is identified for targeted monitoring to determine if the LEA corrects noncompliance and improves outcomes.

## *Differentiation in Targeted Monitoring*

LEAs are identified for compliance-only or differentiated targeted monitoring when facing barriers with procedural compliance or improving special education outcomes. LEAs identified for compliance-only targeted monitoring are those whose data show that SWD are meeting performance targets for improved outcomes, but have not demonstrated compliance with IDEA requirements. LEAs identified for targeted monitoring for issues other than compliance are provided a differentiated level of monitoring in one of three levels.

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

**Compliance-only Targeted Monitoring and Support**

CDE identifies LEAs for compliance-only targeted monitoring in a number of ways.
Primarily, CDE identifies LEAs for compliance-only targeted monitoring based on data
analysis with respect to timelines in six areas.[15] Secondarily, CDE may identify LEAs for
compliance-only targeted monitoring if they had noncompliance identified in a special
education compliance complaint investigation report, an Office of Administrative
Hearings special education due process hearing decision, data, fiscal or Nonpublic
School (NPS) areas of concerns, or any other review of LEA data and student files.
CDE only requires correction of noncompliance from these LEAs so that CDE can
allocate resources and apply graduated engagement to those LEAs with both
performance and compliance concerns. For those LEAs identified for compliance-only
targeted monitoring, CDE continues to monitor compliance and makes available
resources to allow these LEAs to proactively address any individually identified
performance concerns.

CDE requires that any LEA identified for compliance-only targeted monitoring must
satisfy the corresponding corrective action and provide data demonstrating correction of
the noncompliance, including subsequent data demonstrating 100 percent compliance.
These LEAs are required to take these actions as soon as possible, but in any event, in
not longer than one year after CDE's identification of the noncompliance, consistent with
federal law. (34 C.F.R. § 300.600(e)). Once the LEA has satisfied the corrective action,
CDE verifies that the LEA corrected any noncompliance per guidance from OSEP
Memo 09-02.[16]

LEAs identified for this type of monitoring are not required to participate in the CIM
process nor complete and submit an improvement plan.

**Level 1 Targeted Monitoring and Support**

CDE identifies LEAs for level 1 targeted monitoring where those LEAs: (1) do not meet
one or two performance targets, and/or (2) are not making progress in addressing the
systemic causes of low performance or have not corrected noncompliance. CDE directs
LEAs identified for level 1 targeted monitoring to conduct most of the required activities
independently, or with the assistance of the LEA's SELPA, as needed. Using templates
providing by CDE, the LEA is required to conduct an independent data-drill-down and
review of the procedural compliance elements associated with the targets or areas in
need of review. If the LEA's data shows noncompliance, or the LEA identifies potential
noncompliance through the CIM activities, CDE will assign corrective actions and
require the LEA to submit evidence of correction and ongoing compliance to CDE within

---

[15] See January 31, 2020 State Defendants' Further Phase 2 Compliance Report, Dkt. 2545, p. 6.
[16] See the OSEP site, MEMO: OSEP Memo 09-02 to Chief State School Officers Reporting on Correction
of Noncompliance (October 17, 2008) available at: https://sites.ed.gov/idea/idea-files/osep-memo-09-02-
reporting-on-correction-of-noncompliance/.

one year. CDE verifies that the LEA corrected any noncompliance per guidance from OSEP Memo 09-02.

The SELPA will support the LEA's progress through CIM activities and the development of the LEA's improvement plan. CDE will provide support to the LEA upon the LEA's request. CDE will further monitor the LEA's implementation of its improvement plan through existing data analysis processes of annual data collection.

## Level 2 Targeted Monitoring and Support

CDE identifies LEAs for level 2 targeted monitoring where those LEAs: (1) do not meet three or more performance targets, and/or (2) are in year one of Disproportionality. CDE directs LEAs identified for level 2 targeted monitoring to conduct some of the required activities independently, or with the assistance of CDE-funded TA providers, as needed. Using templates providing by CDE, the LEA is required to conduct an independent data-drill-down and review of the procedural compliance elements associated with the targets or areas in need of review. CDE will assign corrective actions and require the LEA to submit evidence of correction and ongoing compliance to CDE within one year. CDE verifies that the LEA corrected any noncompliance per guidance from OSEP Memo 09-02.

Under CDE's design of this monitoring tier, CDE will require the LEA's SELPA or COE to support the LEA's progress of the CIM process and completion of required activities with support from TA providers, as needed, and approve the LEA's improvement plan. Similar to LEAs identified for level 1 targeted monitoring and support, CDE will further monitor the LEA's implementation of its improvement plan through existing annual data collection and analysis processes.

## Level 3 Targeted Monitoring and Support

CDE identifies LEAs for level 3 targeted monitoring where those LEAs: (1) are performing in the bottom 11-20 percent of LEAs in those performance indicators most closely associated with the provision of a free, appropriate public education (FAPE) in the least restrictive environment (LRE) and data do not demonstrate improvement, such that the LEA is at risk for moving into the intensive monitoring tier; and/or 2) are identified as Disproportionate for the second consecutive year and data do not demonstrate improvement, such that the LEA is at risk of being identified as Significantly Disproportionate in the following year.

LEAs identified for level 3 targeted monitoring and support will conduct some of the required activities independently, but CDE requires these LEAs to complete other activities with the assistance and guidance of a TA provider assigned by CDE. Similar to other targeted monitoring levels, the LEA will conduct an independent review of the procedural compliance elements associated with the targets or areas in need of review. CDE will assign corrective actions and require the LEA to submit evidence of correction

and ongoing compliance to CDE within one year. CDE verifies that the LEA corrected any noncompliance per guidance from OSEP Memo 09-02.

Under CDE's design of this monitoring tier, both CDE and the LEA's SELPA or COE will review, approve and support the LEA's implementation of the improvement plan. CDE will further monitor the implementation of activities and the LEA's progress based on timelines and milestones that the LEA identified in its improvement plan. CDE will also require the LEA's SELPA or COE to work closely with the LEA to ensure that the LEA meets those implementation timeline milestones.

# Intensive Monitoring and Support

CDE provides intensive monitoring and support to those LEAs whose data on outcomes for SWD indicate systemic issues. CDE will require that these LEAs participate in the CIM process, and CDE will require these LEAs to complete required activities, with close oversight and direction from CDE. Similar to targeted monitoring, CDE's design of intensive monitoring is differentiated, so that the types of activities CDE will require and level of intervention CDE will provide is based on the LEA's need. CDE will further monitor every LEA identified for intensive monitoring to determine if the LEA improves outcomes and provides support, including through CDE's TA providers and the statewide system of support.

## *Differentiation in Intensive Monitoring*

Similar to targeted monitoring, CDE provides further monitoring and supports to LEAs identified for intensive monitoring in three levels.

**Level 1 Intensive Monitoring and Support**

CDE identifies LEAs for level 1 intensive monitoring and support where those LEAs: (1) are in the bottom 8-10 percent of LEAs in the intensive selection criteria,[17] based on the examination of both school-age and preschool data; (2) have outstanding corrective actions assigned more than one year prior; and/or (3) are in year one of Significant Disproportionality.

CDE will require that those LEAs identified for level 1 intensive monitoring and support conduct (1) some of the CIM process independently, (2) some with the assistance and guidance of a TA provider, and (2) some under CDE's close supervision. For intensive

---

[17] CDE uses the following selection criteria for school-age intensive monitoring: English proficiency, math proficiency, suspension rate, chronic absenteeism rate, rate of students in regular classes 80% or more of the day, and rate of students inside the regular class less than 40% of the day. CDE uses the following selection criteria for preschool intensive monitoring: average rate of child outcomes (based on assessments of social skills, knowledge, etc.), rates of suspension and expulsion, rate of students in regular classes most of the time, and rate of students in separate schools or placements most of the time.

monitoring, CDE, not the LEA, conducts a review of the procedural compliance elements associated with FAPE in the LRE or Significant Disproportionality. Upon completion of the review, CDE notifies the LEA of any noncompliance and assigns corrective actions. The LEA must provide evidence of satisfactory correction of the noncompliance, including data demonstrating ongoing compliance to CDE as soon as possible, but in any event, in not more than one year. CDE verifies correction of the noncompliance in accordance with OSEP Memo 09-02.

Under CDE's design of this monitoring tier, CDE reviews, approves and further monitors implementation of the LEA's improvement plan. CDE will further monitor the implementation timeline milestones that the LEA identified in its improvement plan, and will work closely with the LEA to ensure that the LEA meets those implementation timeline and milestones.

**Level 2 Intensive Monitoring and Support**

CDE identifies LEAs for level 2 intensive monitoring and supports where those LEAs: (1) are in the bottom 4-7.99 percent of LEAs in the intensive selection criteria based on the examination of both school-age and preschool data, and/or (2) in year two of Significant Disproportionality.

Under CDE's design of this monitoring tier, LEAs identified for level 2 intensive monitoring and support do not conduct any of the activities in the CIM process independently. CDE requires that these LEAs complete some activities with the assistance and guidance of a TA provider provided by CDE, and must complete most activities under CDE's close supervision. CDE, not the LEA, conducts a review of the procedural compliance elements associated with FAPE in the LRE or Significant Disproportionality. Upon completion of the review, CDE notifies the LEA of any noncompliance and assigns corrective actions. The LEA must provide evidence of satisfactory correction of the noncompliance, including data demonstrating ongoing compliance to CDE as soon as possible, but in any event, in not more than one year. CDE verifies correction of the noncompliance in accordance with OSEP Memo 09-02.

Under CDE's design of this monitoring tier, CDE will review, approve, and further monitor the LEA's implementation of the improvement plan. CDE will further monitor the implementation timeline milestones that the LEA identified in its improvement plan, and will work closely with the LEA to ensure that the LEA meets those implementation timeline and milestones.

**Level 3 Intensive Monitoring and Support**

CDE identifies LEAs for level 3 intensive monitoring where those LEAs: (1) are in the bottom 0-3.99 percent of LEAs in the intensive selection criteria, based on examination of both school-age and preschool data; (2) have outstanding corrective actions

assigned more than two years prior; and/or, (3) have been Significant Disproportionate for three or more years.

Under CDE's design of this monitoring tier, CDE will require LEAs identified for level 3 monitoring and support to complete all activities in the CIM process under and alongside CDE's direct supervision. These LEAs will not conduct any of the activities in the CIM process independently or with the assistance and guidance of a TA provider; however, CDE will assign relevant TA providers to participate in the monitoring and support as needed. Under CDE's design of this monitoring tier, CDE will review, approve, and further monitor the LEA's implementation of the improvement plan. CDE will further monitor the implementation timeline milestones that the LEA identified in its improvement plan, and will work closely with the LEA to ensure that the LEA meets those implementation timeline and milestones.

CDE will conduct a review of the procedural compliance elements associated with FAPE in the LRE or Significant Disproportionality. Upon completion of the review, CDE notifies the LEA of any noncompliance and assigns corrective actions. The LEA must provide evidence of satisfactory correction of the noncompliance, including data demonstrating ongoing compliance to CDE as soon as possible, but in any event, in not more than one year. CDE verifies correction of the noncompliance in accordance with OSEP Memo 09-02.

# Monitoring Activities

**Attachment 2** displays the monitoring tier, differentiated monitoring levels and required CIM process steps and activities.

## Universal Monitoring Activities

### *Timely and Complete Data*

As described in Phase 2, CDE requires LEAs to submit timely and complete data to CDE to meet both state monitoring and federal reporting requirements. CDE deems those LEAs that fail to submit timely data as noncompliant with 34 C.F.R. § 300.601(b), and CDE requires those LEAs to determine the cause of the noncompliance and perform data system improvements that will ensure compliance. CDE further monitors and verifies correction of noncompliance related to timely and complete data through subsequent data collections. CDE makes available technical assistance for LEAs as needed from CDE and from state-funded TA providers.

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

# Targeted Compliance-Only Monitoring Activities

## *Identification and Correction of Noncompliance*

As part of CDE's general supervision responsibilities, CDE completes a number of activities to review LEAs' compliance in certain areas. These compliance activities may result in CDE identifying LEAs as noncompliant in one or more areas, at which time, CDE will notify the LEA of the noncompliance, and assign the LEA associated corrective actions.

CDE's compliance monitoring activities occur in all levels of CDE's monitoring, and are part of other types of monitoring represented within the CIM process. CDE requires that those LEAs that required to complete the CIM process to complete compliance review activities, and CDE verifies the correction of any noncompliance as explained previously.

CDE reviews compliance in all LEAs both annually and during the course of other parts of the general supervision. While CDE does not require some LEAs to participate in the CIM process under CDE's differentiated monitoring system, CDE requires those LEAs to correct any identified noncompliance, complete mandated follow-up activities, and submit data to CDE demonstrating correction of the noncompliance. CDE reviews each item of noncompliance, and verifies correction of the noncompliance in accordance with OSEP Memo 09-02. CDE verifies that the LEA has successfully corrected any individual instances of noncompliance by reviewing data or records, such as data from subsequent on-site monitoring or data collected through the State's data collection systems.

**Timeline Noncompliance**

CDE annually reviews and analyzes LEAs' data submitted to CDE to determine if they have met required timelines set forth in federal and state statutes. CDE's review of LEA's compliance in these areas include:

- SPP Indicator 11: One hundred percent of children were evaluated within 60 days of receiving parental consent for initial evaluation.
- SPP Indicator 12: One hundred percent of children referred by Part C prior to age three, who are found eligible for Part B, have an IEP developed and implemented by their third birthday.
- SPP Indicator 13: One hundred percent of youth aged 16 and above have an IEP that includes the eight required elements of transition.
- Whether the LEA held an IEP meeting at least once per year.
- Whether the LEA conducted a "triennial" re-evaluation to determine the student's continued eligibility for special education every three years.

- Whether the LEA held an informal resolution session with the parent within fifteen days of the parent's filing a request for a special education due process hearing with the Office of Administrative Hearings.

When CDE identifies an LEA's noncompliance in one of the aforementioned areas, it notifies the LEA of all individual instances of noncompliance, including, for example, the student record or case in which the noncompliance was identified, and sets forth the appropriate corrective action. There are instances in which CDE will require the LEA to correct the student-level noncompliance (late IEPs, late initial evaluations that are still not held by the data collection period, and incomplete transition plans). There are other instances where CDE will require the LEA to make system-level changes to ensure that there are not future instances of noncompliance. For any finding of noncompliance, CDE requires the LEA to demonstrate ongoing compliance with the requirements through submission of data to CDE showing compliance.

**Complaint Corrective Actions**

In exercising its monitoring and enforcement responsibilities pertaining to complaints and due process decisions, CDE ensures that when it identifies an LEA's noncompliance, it requires LEAs to complete corrective actions as soon as possible, and in no case later than one year after the State identifies noncompliance. (See 34 C.F.R. § 300.600). CDE identifies deadlines for an LEA's compliance in investigation reports or due process notification letters with the expectation that the LEA will resolve each corrective action within the required timeline identified in the investigation report or due process notification. CDE further monitors an LEA's progress on these corrective actions and communicates with the LEA until CDE has determined that all corrective actions are completed, by either verifying that the LEA corrected individual instances of noncompliance, and that the LEA has submitted data demonstrating compliance.

# CIM Process Monitoring Activities

CDE has designed the CIM process to help LEAs (1) identify systemic issues in the LEA that lead to poor student outcomes, (2) create a plan that prioritizes those activities that will have the greatest impact on improving outcomes for SWD, and (3) implement that plan with fidelity. The CIM process includes a Policies, Practices and Procedures review to assess an LEA's procedural compliance, as well as targeted activities such as a review of data, solicitation of parent input, initiative inventories, plan development, plan approval, and further monitoring of the implementation timeline.

The CIM process is a four-step process to leads the LEA to develop a cohesive and comprehensive plan. CDE will provide templates and guidance to LEAs for activities in each step.

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

- Step 1: Gather and Inquire. The LEA gathers, reviews and synthesizes data and information to determine the current issues that exist in the LEA.
- Step 2: Investigation. The LEA examines the issues identified in order to determine the causes of the issues, prioritize, and develop a theory of action to address the root cause.
- The Step 3: Planning. The LEA identifies those activities that will have the greatest impact on improving outcomes for SWD and develops a detailed plan for implementation using parts of other improvement plans, including the LCAP, developed by the LEA.
- Step 4: Implementation. LEAs, TA Providers and CDE monitor the implementation of the plan over time to determine if the LEA is meeting its plan's timelines or milestones and to ensure the LEA is provided with the appropriate support. If the LEA is not meeting timelines or milestones, CDE will provide the LEA further support to get back on track. CDE will also determine whether, at any time, the LEA needs to revise its plan and will provide appropriate feedback and support.

**Requirements and CDE Engagement to Complete CIM Process Activities**

All LEAs identified for targeted and intensive monitoring are required to complete the CIM process; however, depending on the monitoring level of the LEA, they will be required to complete different activities under the CIM process with different levels of engagement from CDE, COEs, SELPAs and TA providers. CDE will annually notify each LEA as to which activities of the process LEAs are required to complete, as well as what level of engagement they can expect from CDE and TA providers.

In the first year, for those LEAs required to go through the CIM process, the LEA will complete Steps 1 through 3 to develop an improvement plan. In subsequent years, the LEA and CDE will work through Step 4, implementation of the improvement plan. Each year, CDE and the LEA review annual data and local level data, where appropriate, to determine whether the LEA is making progress on timelines and milestones. If the LEA is not making progress, CDE may refer the LEA to a TA provider for support or require the LEA to revisit the process and revise the plan. After three years, if the LEA is not making progress evidenced in local data and outcome data, CDE will require the LEA to restart the process and complete Steps 1 through 4.

CDE believes that employing this monitoring and support strategy provides clear and transparent expectations to the LEA about improvement, but also allows flexibility. For example, an LEA provided a lower level of support may warrant a higher level of engagement from CDE if they do not improve, and CDE will require these LEAs revisit certain steps of the CIM process. This strategy is also designed to provide those LEAs at a higher monitoring level time to make systemic changes and demonstrate improvement.

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

**Levels of Engagement**

CDE's CIM process is designed so that LEAs receive differentiated levels of engagement from CDE depending on the level of identified monitoring for that LEA.

*Optional*

For those activities that CDE identifies as optional, CDE does not require the LEA to the LEA to complete the activity. An LEA may choose to complete an optional activity if the LEA believes it would support its improvement planning.

*Required, Independent*

CDE requires an LEA to complete certain activities independently. The LEA may request the support of their SELPA, COE, or other TA providers. CDE will provide the training and tools to complete the CIM activities but will only provide individualized assistance to the LEA upon request.

*Required, with Assistance*

CDE requires an LEA to complete certain activities with the assistance of a TA provider. CDE assigns LEAs a TA provider or directs LEAs to select a provider to assist with the completion of the CIM process or a specific CIM activity. The TA provider may support LEAs through webinars, trainings and one-on-one support depending on the LEAs' needs.

*Required, Directed by CDE*

LEAs whose data indicate they are at the highest level of monitoring require the greatest level of CDE engagement. CDE requires the LEAs to complete the CIM process and activities under the direct supervision of CDE. LEAs receive trainings, tools and assistance to complete the CIM process and are provided support through convening small regional cohorts and one-on-one support from CDE and TA providers. The LEA works closely with CDE in advancing through each step of the CIM process.

## *CIM Step 1 – Gather and Inquire*

To develop an effective improvement plan, CDE will require the LEA to examine qualitative and quantitative data to better understand the challenges and factors contributing to the issues the LEA is experiencing. Under step 1 of the CIM process, the LEA will identify and thoroughly analyze data from a variety of sources to better understand systemic issues and how they are impacting specific subgroups of SWD with respect to placement, participation in general education, and equity, consistent with CDE special education theory of action. This step is designed to help the LEA answer the following questions:

- What is the issue we (the LEA) are trying to address?
- What does our existing data tell us about this issue, and why it might be happening?
- What additional data do we need to collect?

Step 1 culminates in the identification of the issue(s) most connected to an LEA's poor performance and areas of focus for further investigation and planning.

**Creation of a Team**

CDE will also require the LEA to identify a team of people committed to participating in the CIM process who can provide a variety of perspectives. CDE believes that the success of the process depends on the varied perspectives and roles of team members, including decision-makers, leaders, specialists, and generalists. CDE suggests that LEAs use the following participants to form a quality CIM Team:

- An administrator in a leadership role who is familiar with past and present improvement initiatives, the policies and procedures of the LEA, as well as the LEA's LCAP, such as a superintendent or deputy superintendent.
- A special education administrator in a leadership role who is familiar with the legal requirements, LEA policies pertaining to special education, and district-wide challenges relating to special education, such as a special education director.
- A special education teacher who works directly with SWD and who uses the LEA's policies, practices and procedures in their daily work.
- A general education teacher who serves a variety of learners and is a content expert for the teacher's grade level.
- Optional participants may include a local site leader such as principal, an LEA school psychologist, or members of the Differentiated Assistance team.

CDE may require additional CIM team members as necessary.

**Data Drill Down**

Each LEA identified for targeted or intensive monitoring and supports is required to do an analysis of its data to determine the issues that exist in the LEA and the areas that will require further analysis. The LEA will use its current data to conduct the analysis. The LEA will use data analysis tools and guides from CDE to disaggregate the data by disability, location, age, and race/ethnicity. The LEA will also walk through a set of guided questions that will help it arrive at conclusions based on the synthesis of this data disaggregation.

For both independent and required engagement level, CDE will provide the LEA a set of tools and instructions to complete the data analysis, and the LEA will be required to provide CDE a description of the outcome of its analysis. At the required assistance engagement level, CDE provides and expands access to the tools and instructions to

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

the LEA, TA provider, and SELPA and/or COE, to support the LEA to complete the data analysis. CDE expects that the TA provider will hold support sessions with the LEA, or a cohort of LEAs, to help with the LEAs' data analysis process. CDE requires the LEA to submit a description of the analysis and the support from the TA provider. At the appropriate engagement level, CDE works one-on-one or in cohorts with the LEA to conduct the data analysis and synthesize the results to identify issues that require further investigation via other required processes.

**Assessment of Infrastructure**

In 2020, CDE collaborated with stakeholders to help develop an LEA self-assessment to examine the strength of their infrastructure.[18] The infrastructure self-assessment is based on six key components needed to operate a well-functioning special education program.[19] While this activity is optional for LEAs identified for targeted monitoring, CDE will require LEAs identified for intensive monitoring to complete this activity. The results of this assessment will support LEAs to determine the needs that require attention to start system improvement efforts.

The Six Basic Components are:

- Collaboration and Communication. Norms and processes that allow for meaningful and productive interaction between special education programs and other programs, as well as between schools and families.
- Staffing. Processes to monitor and address personnel needs, and strategic allocation of staff with defined roles and responsibilities.
- Policy and Procedures. The existence of up-to-date, documented, and accessible procedures that are compliant with the IDEA, along with a robust pre-referral system, such as a multi-tiered system of support.
- Data Systems. Accurate and consistent data sources that are accessible and monitored at the student, classroom, and school levels.
- Resource Management. Budget planning and monitoring processes that ensure that resources for special education are strategically allocated and managed to meet state and federal guidelines and to serve SWD.
- Instructional Practices. Professional learning opportunities, systems, and processes for general and special education teachers and other personnel, to support high-quality IEPs and all students' access to the general education curriculum.

---

[18] See Serving Students With Disabilities: A Resource for Assessing the Basic Components of Your Special Education Infrastructure at: https://www.wested.org/wp-content/uploads/2020/03/CCEE-SWD-Basic-Levers-Tool.pdf. Associate Director Shiyloh Duncan-Becerril and former Special Education Director Kristin Wright participated in preparing the publication.
[19] Id.

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN**
**OF MONITORING AND ENFORCEMENT ACTIVITIES**

**Policies, Practices and Procedures Review**

Based on an LEA's data, CDE requires LEAs in targeted monitoring to conduct a differentiated level of Policies, Practices and Procedures review using templates provided by CDE. CDE conducts the same review required for LEAs in the intensive monitoring tier. This review will examine the LEA's ability to adhere to the procedural requirements in IDEA. This review will also provide important information to the LEA about potential systemic issues in the LEA that prevent the LEA from ensuring that all IEPs meet legal requirements. To support LEAs in this review, CDE created a set of compliance items most closely aligned to policies, practices or procedures that support improved student outcomes and FAPE in the LRE. CDE requires the LEA to use this set of compliance items in its review of policies, practices, procedures, and the student file review.

CDE also measures procedural compliance under the Compliance-only targeted review, specific to procedural compliance around timelines in six key areas, as discussed above.[20]

CDE designed its compliance review activity to focus on the LEA's procedural compliance with the requirements of the IDEA that are most closely linked to improving student outcomes and equity, specifically those items CDE believes are indicators of potential barriers that are preventing the LEA from effectively improving the outcomes of SWD. The compliance portion of this monitoring activity is designed within the context of the State's and LEA's review of comprehensive quantitative data to provide one view into the LEA's practices.

CDE designed this required activity to have the LEA—individually or with the direct support of a TA provider or CDE staff—identify and uncover policies, practices and procedures that impede the LEA from improving student outcomes. LEAs use results of the file review—in addition to correcting noncompliance within one year —during Step 2 of the CIM process. In conjunction with other Step 1 activities, the LEA determines the root causes of procedural noncompliance in order to determine effective activities to address the systemic issues related to improving outcomes for SWD.

CDE will require LEAs in targeted monitoring to complete an independent self-review of their compliance as well as policies, practices, and procedures review. CDE will provide training to LEAs on the process for conducting a review, and the LEA will be required report the outcomes of the review to CDE. CDE will conduct a random verification of reviewed files to ensure that the review was conducted consistently and accurately. For LEAs in intensive monitoring, CDE staff will conduct the review by accessing the files remotely and identifying noncompliance in the student files and in the LEA's policies, practices and procedures.

---

[20] See Timeline Noncompliance, supra.

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

For each finding of noncompliance within an LEA, CDE will provide a required corrective action. CDE will further monitor each item of noncompliance and subsequent corrective action for completion and verify correction, including by reviewing subsequent data provided to CDE, per guidance from the OSEP Memo 09-02.

**Educational Benefit Review**

CDE will require that LEAs conduct an Educational Benefit Review to assess the provision of FAPE in the LRE by sampling a subset of student records over three years. The purpose of the Educational Benefit Review is to determine whether a student's program has been reasonably planned to result in educational benefit. At the targeted level, CDE will make the Educational Benefit Review optional for LEAs. For LEAs identified for intensive monitoring, CDE will require the Educational Benefit Review. This review can identify areas for improvement as well as areas for correction of noncompliance related to the content of student IEPs.

To conduct the review, CDE will require the reviewer to examine the last three years of information about the student's program - the IEPs, assessments, triennial review, and progress information. The review will chart how the program was planned for each year - assessed needs, present levels of performance, goals, services, and progress. Subsequently, the review will analyze whether the assessment was comprehensive. The review will examine the relationship between the needs identified and the goals, and whether sufficient supportive services are identified in the IEP to assist the student to reach the goals. The final part of the review will compare the student's program in year one to the program in years two and three to determine how the team adjusted the student's program in relation to changes in the student's performance and progress.

At the independent level of engagement, the Educational Benefit Review training is self-paced and accessible online. The LEA completes the Educational Benefit Review with their special education staff using the tools made available by CDE. At this level, an Educational Benefit Review provides the LEA an opportunity for self-reflection and growth. Although CDE does not verify or review IEPs at this level, CDE requires the LEA to submit assurances to CDE that it completed the trainings and the review, and to discuss the results of the review in its summary of CIM process Step 1. CDE and TA provider staff will be available to answer questions and provide the LEA support upon request.

At the assisted level of engagement, CDE will require the LEA to participate in a live training. CDE will require LEA staff to conduct a review of a stratified sample of student files, and report the results to CDE on a Summary of Concerns worksheet. If the LEA reports noncompliance, CDE verifies the noncompliance, and issues a finding of noncompliance with required corrective actions. CDE monitors the completion of corrective actions and the subsequent reviews to ensure systemic correction in accordance with OSEP Memo 09-02. The results of the review must be included in the description of process and outcomes in CIM process Step 1.

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

At the directed level of engagement, CDE will require the LEA to participate in the review with a CDE staff member as the lead reviewer with ten student files. CDE will require that the review files start with either an initial or triennial assessment, and the LEA is required to complete the Summary of Concerns worksheet with CDE staff oversight. CDE will issue findings of noncompliance with corrective actions, and verify the LEA's correction of the noncompliance through subsequent reviews that ensure systemic correction in accordance with OSEP Memo 09-02. CDE will require the LEA to include the results of the review in the description of process and outcomes in CIM process Step 1.

**Parent Input**

CDE will require LEAs in both targeted and intensive monitoring to solicit parent input to gain a greater understanding of the parent perspective on issues that might exist in an LEA. CDE developed and published a parent survey that allows parents to provide input on several elements.[21]

CDE's requirements for the LEA's completion of the survey and CDE's engagement with the LEA will vary depending on the LEA's monitoring level. LEAs who are not required to conduct a parent input survey will have the option to do so, and CDE will make available the necessary tools to conduct the survey at their discretion.

For those LEAs that are required to collect parent input independent from CDE oversight, CDE will require those LEAs to participate in a webinar training on how to complete this activity. In addition to the survey, those LEAs may also use other means of collecting parent input, including the means the LEA uses to gather input from parents on improvement planning. CDE will provide these LEAs with access to a reflective activity so that the LEA can provide its conclusions in the summary of CIM process Step 1.

For those LEAs at the assisted level of engagement, CDE will require the LEA to work with a TA provider to conduct the training and conduct the analysis of the parent input that will be included in CIM process Step 1.

For those LEAs at the directed level of engagement, with CDE's oversight and training, CDE will require those LEAs send a link to the survey to every parent of a SWD. CDE will conduct analysis meetings to assist the LEA in drawing the conclusions from the parent survey data that the LEA must include in its summary of CIM process Step 1.

---

[21] See the Parent Survey, accessible at Seeds of Partnership site at https://www.seedsofpartnership.org/monitoringsurvey/

## CIM Step 2 – Investigation

The focus of the next step in the CIM process is investigatory. After the LEA has identified the issues that exist, the LEA can further examine the causes of the issues. CDE designed this step to help the LEA to answer the following questions:

- Why is the issue happening (root cause)?
- Which 1-3 root causes should we focus on, and why?

**Root Cause Analysis**

The first activity in CIM process Step 2 is the Root Cause Analysis ("RCA"). CDE designed the RCA to give the LEA insight into the main cause(s) of the issues that the LEA identified in CIM process Step 1, and to help the LEA identify where to allocate its resources to implement a single activity that will have the greatest impact on improving outcomes for SWD.

Root causes are typically few in number, often three or less. Additional root causes would likely indicate that deeper analysis is required. Root causes are also not a person or group of people. They often point to a process, a set of assumptions or beliefs behind a process, or a break in the system that might need some level of support. A root cause should reveal where to focus the LEA's attention, not where to assign blame. Addressing this process with a growth mindset is essential to finding real solutions. Points of resistance may reveal additional information and a place for needed support.

Step 2 begins with the RCA. The RCA uses the observations from the CIM Step 1 to help the LEA develop an activity that aims to provide insight into why the issue is happening. CDE will require an LEA to complete the RCA activity before the Initiative Inventory activity (discussed below) to help the LEA consider the true root cause of an issue, and to discourage an LEA from inadvertently assigning a current LEA initiative as the root cause of the issue.

CDE believes that a true data-based, vetted root cause will be the beginning of the LEA's positive change needed to truly improve outcomes for SWD. There are many exercises that can help a team analyze an issue in greater detail, for example, "5 Whys," a fishbone diagram, or any other tool that will help the team look behind the obvious. Sometimes an LEA needs a change in perspective and additional information to get the full picture of what is behind a symptom or initial cause.

For those LEAs that are required to conduct the RCA independently, CDE will provide those LEAs the necessary tools and invite them to participate in a webinar training to conduct the RCA. Once the RCA is completed, CDE will require the LEA to describe its resulting analysis in its summary of CIM process Step 2.

For those LEAs at the assisted level of engagement, CDE will require the LEA to work with a TA provider to conduct the RCA and the TA provider will assist the LEA in the analysis that the LEA will include in its summary for CIM process Step 2.

For those LEAs at the directed level of engagement, CDE will require the LEA to conduct the RCA with CDE's oversight and training. CDE will conduct meetings that will assist the LEA in the RCA analysis, and that the LEA will include in its summary of CIM process Step 2.

**Prioritization**

Upon the completion of the RCA activity, CDE believes that it is important for LEAs to examine all of the potential root causes of their current issues and concerns revealed during RCA. CDE will require the LEA to review all of the root causes and determines the priority in which they should be addressed. The purpose of this activity is to help the LEA focus efforts on improvement activities that can be scaled up and widely implemented in the LEA with fidelity. In this activity, CDE will also require the LEA to consider the overlap of needs and RCAs within the LEA across both general and special education.

**Initiative Inventory**

Once the LEA completes both the RCA and the prioritization activities, CDE will require the LEA to review all its current initiatives, including those existing in special education and the general education, and to determine which activities address identified root causes and align to the highest priority need.

Often LEAs will engage in several "improvement initiatives" simultaneously without considering the resources needed to implement them fully and completely. When this occurs, an LEA's staff are unable to adequately identify which initiative has impact, and cannot devote energy or resources appropriately. As a result, an LEA is not able to improve outcomes because an LEA fails to fully and completely implement any initiative. As part of this activity, CDE may require the LEA to conduct a "KEEP, STOP, START" inventory to determine what current initiatives should be kept, started, or stopped, based on what is revealed through the data and root cause analysis.

Another reason CDE designed this activity is to determine what initiatives are already in place in an LEA, and what initiatives have already been implemented. There might be existing initiatives that align well with the priority root causes and that the LEA could expand or scale up to address poor performance. Alternatively, there might be initiatives that the LEA is implementing that are not aligned with their priority root cause, and that the LEA should consider pausing or delaying. This activity is designed to support appropriate resource allocation so that the LEA may focus on the highest priority activity aimed at improving outcomes by reducing or eliminating the root cause of the issue.

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

During this initiative inventory, CDE will require those LEAs required to complete this activity to have focus groups or parent input sessions to decide what is and is not working in the current LEA initiatives. The outcomes of parent input should also be considered in the "KEEP, STOP, START" inventory.

**Theory of Action/Improvement Framework**

The final activity of CIM process Step 2 is the Theory of Action ("TOA"). Creating a TOA will help LEAs narrow in on core beliefs, generate a rationale behind selecting certain activities that will have greater impacts on improving outcomes for SWD over others, and clearly articulate their journey toward creating sustainable improvement over time.

CDE expects the LEA to clearly state a logical chain of reasoning to describe how the change the LEA will employ will lead to improved practices and how, in turn those practices, if sustained, will lead to improved outcomes for SWD.

## CIM Step 3 – Planning

**Improvement Plan**

Upon the completion of Steps 1 and 2 of the CIM process, CDE will require the LEA to develop an improvement plan regarding the activity that will have the greatest impact on improving outcomes that the LEA intends to deploy. CDE will require the LEA's plan to include timelines and milestones that CDE will use to further monitor the LEAs and guide CDE's ongoing monitoring of the LEA.

**Approval Process**

The final output of the CIM process is the required assurances and documentation about Steps 1 and 2, and the final plan. Depending on the monitoring level, CDE may require the LEA to submit the assurances, documentation, summaries and plan for review and approval. For Level 1 Targeted, LEAs will submit only their compliance information to CDE for corrective action and follow-up. For Level 2 Targeted, LEAs will submit their plan to their SELPA for review and approval, and the compliance review output will be sent to CDE for action and follow-up. Finally, LEAs in all differentiated monitoring levels of intensive monitoring will be required to submit all of the outputs of their CIM process to CDE for approval and follow-up.

## CIM Step 4 – Implementation and Ongoing Monitoring

Once the CIM process Steps 1-3 are complete, including the approved improvement plan, CDE monitors the LEA's implementation of that plan. CDE monitors that LEAs are meeting the milestones and timelines outline in the improvement plan and through either direct monitoring or communities of practice. CDE will require those LEAs that are not meeting their timelines and milestones to work directly with CDE to address the

barriers to implementation and get back on track to full implementation of their activities and practices that will have the greatest impact on improving outcomes for SWD. CDE will also review the LEA's data annually to determine if it is making progress, and in the event that the LEA continues to demonstrate poor performance, CDE may require the LEA to revisit CIM Steps 1-2 and update their plan.

# Enforcement Activities

Consistent with IDEA, CDE has a series of enforcement activities it can use when it determines that an LEA is not meeting the requirements of Part B of the IDEA, meaning a determination level other than "Meets Requirements" and when an LEA does not correct noncompliance within required timelines. Consistent with the enforcement mechanisms identified in 34 C.F.R. §300.604 for when an LEA receives a determination level other than "Meets Requirements," CDE uses the following enforcement actions as needed:

- Make available technical assistance
- Direct technical assistance
- Place special conditions on LEA's funding
- Create a corrective action or improvement plan through the CIM process
- Withhold funds

Longstanding noncompliance extending beyond the one-year correction period will result in additional enforcement actions by CDE and will affect the LEA's annual determination. Likewise, an LEA's timely correction of noncompliance will also be considered in the LEA's annual determination.

CDE's enforcement actions due to an LEA's failure to correct noncompliance are taken immediately, and involve the imposition of graduated sanctions. CDE may use the following range of sanctions:

- More frequent reporting on progress toward correction (e.g., monthly or quarterly)
- Notification to the LEA superintendent of uncorrected noncompliance
- Negotiate a compliance agreement requiring corrective action within three years
- Consideration of failure to correct in annual local determinations
- Special conditions on LEA funding
- Ineligibility for IDEA funding
- Withhold a portion of funds until noncompliance is corrected
- Redirect funds (e.g., earmark funds for specific activities)
- Remove the LEA's ability to apply for any discretionary funds from CDE
- Request an audit be conducted of the LEAs financial records
- Direct the administration of the LEA's special education programs

# Small LEA Cyclical Monitoring

The Court found that CDE had identified two alternative, valid options for addressing challenges in attempting to identify small LEAs[22] for further monitoring. CDE has decided to use the "cyclical monitoring" option. Thus, each year, CDE will randomly select one-third of small LEAs to complete three activities: 1) a procedural compliance review; 2) a timeline compliance review; and, 3) an educational benefit review. LEAs selected in a given year cannot have participated in the review in the prior two years.

**Compliance Review**

Each small LEA selected for review is required to complete an independent self-review of its compliance elements of up to 25 student files of compliance elements and a policies and procedures review. The attached items are those most closely aligned with FAPE in the LRE. CDE will provide a training to LEAs about the process for conducting the review and the LEA will report the outcomes of the review to CDE. CDE will conduct a random audit of the LEA's reviewed files to ensure consistency with the expectations, and that the LEA conducted the review accurately.

CDE will require the LEA to report the results of the compliance review to CDE. CDE will assign corrective actions and will further monitor the LEA to ensure that the LEA completes and systemically corrects the noncompliance in accordance with OSEP Memo 09-02.

**Timeline Noncompliance**

This type of compliance occurs annually through the review and analysis of student level data submitted to CDE for compliance with state and federal requirements. Specifically, CDE examines the data submissions of each LEA to determine if it has met required timelines set forth in federal and state statutes. CDE will conduct timeline noncompliance activities for small LEAs in the manner described above with respect to non-small LEAs.

**Educational Benefit Review**

CDE will require each small LEA selected for review to conduct an Educational Benefit Review to assess the provision of FAPE in the LRE by sampling a subset of student files. CDE will require the Small LEA to participate in a live training and to review student files with their staff, reporting the results on a Summary of Concerns worksheet. If the LEA reports noncompliance, CDE verifies the noncompliance, and issues a finding of noncompliance with required corrective actions. CDE monitors the completion of

---

[22]For the purpose of determining an LEA size, CDE defines a "small LEA" as serving fewer than or equal to 100 SWD using the census day count.

corrective actions and the subsequent reviews to ensure systemic correction in accordance with OSEP Memo 09-02.

**Incorporation into the CIM Process**

CDE will examine the results of the three activities conducted as part of the small LEAs monitoring activities, along with any dispute resolution data, and determine which LEAs may need a higher level of monitoring, including participation in a modified CIM process. CDE will only select those small LEAs with systemic concerns of noncompliance to complete a modified CIM process.

# Nonpublic Schools Monitoring

The Court requested that CDE provide a description of the State's requirements and processes to certify and monitor Nonpublic, nonsectarian public schools ("NPS") and Nonpublic, nonsectarian agencies ("NPA") ("NPS/A").[23] In accordance with federal law regarding the placement of SWD in private schools, (see 20 U.S.C. §1412(a)(10)(B)). state requirements for the certification and monitoring of NPS/A are explicitly outlined in California Education Code and California Code of Regulations. (See Cal. Educ. Code §§ 56365 through 56366.12, and the Cal. Code of Regulations, Title 5, § 3060 et seq.).

As demonstrated below, the State meets these statutory requirements. To be clear, however, students served by NPS are included in CDE's special education monitoring framework. For the purposes of CDE's special education monitoring framework, CDE considers an NPS as any other school under the auspices of the contracting LEA. As such, NPS are required to submit the data required by CALPADS to their contracting LEA for reporting to the State. Compliance in meeting Part B requirements and the performance for students placed in NPS are incorporated when CDE analyzes the contracting LEA's performance and compliance. CDE evaluates the data for students served by NPS alongside all other SWD served by the LEA to determine an LEA's selection for further monitoring.

NPS/A are part of the continuum of program options that a SELPA makes available to meet the needs of SWD under IDEA. (See Cal. Educ. Code 56361(f)). It is the intent of the Legislature that NPS/A are made available and provided pursuant to clear statutory directives and requirements and in accordance with federal law. (See Cal. Educ. Code § 56366). Enrollment and service provided to students placed in an NPS/A are made possible through a master contract with an LEA. The certification by CDE permits an

---

[23] NPS and NPA are defined in California Education Code §§ 56034 and 56035, respectively. An NPS refers to a private, nonsectarian school that enrolls individuals with exceptional needs pursuant to an individualized education program (IEP). An NPA is a private, nonsectarian establishment or individual that provides related services necessary for a pupil with exceptional needs to benefit educationally from the pupils' IEP. CDE certifies and monitors both NPS/A.

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

NPS/A to contract with LEAs and receive public special education funding to meet the needs of the SWD. Students enrolled in the NPS are deemed to be enrolled in public schools, and tuition is paid with public funds by the LEA through the master contract between the LEA and the NPS/A.

**State's Responsibilities for Certification and Monitoring of NPS/A**

CDE directly certifies, monitors, and evaluates NPS/A compliance with federal and state laws and regulations in addition to the indirect monitoring of NPS under the special education monitoring framework previously described. CDE considers SWD placements in NPS part of the continuum of services that LEAs must have available for students with disabilities. LEAs may place students in an NPS only if there is no appropriate public program available.

Pursuant to California Education Code, an entity that seeks initial or renewed certification as an NPS/A is directed to file an application with CDE using CDE's application forms. (See Cal. Educ. Code §56366.1(a) and Title 5 of the Cal. Code of Regulations §3060.) CDE provides guidance to completing NPS and NPA applications on its website.[24]

CDE uses a Validation Review to assess the applicant's operational standards, instructional materials, and school facility. If the applicant's operational standards do not meet current requirements, CDE may deny certification or issue a conditional certification with required corrective actions. Following the Validation Review, if the applicant meets all application requirements, CDE will issue the applicant a 90 day conditional certification, authorizing the new NPS to begin contracting with LEAs to provide appropriate special education and related services for students. If, after following the NPS's conditional certification, an IEP-placed student is enrolled in the NPS, the NPS obtains a master contract, and the NPS enters into an individual service agreement with the student's LEA, CDE will then schedule an Onsite Review with the conditionally certified NPS to determine whether to certify the NPS. If an NPS fails to obtain an IEP-placed student, master contract, and individual service agreement within the 90-day conditional certification window, the conditional certification will expire.

CDE makes a determination of any new NPS/A application within 120 days of an application submission. Applicants will either be certified, conditionally certified, or denied. If CDE fails to take one of these actions within 120 days, the applicant is automatically granted conditional certification for a period terminating on August 31 of

---

[24] See the New or Renewal NPS Application site at https://www.cde.ca.gov/sp/se/ds/npsgeninfo.asp for NPS application guidance and New or Renewal NPA Application at https://www.cde.ca.gov/sp/se/ds/npageninfo.asp for NPA guidance. A certified NPS that is relocating must undergo the same process as a new NPS applicant.

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

the current school year. If CDE denies certification, CDE will provide the applicant reasons for the denial. (Cal. Educ. Code § 56366.1(f).)

CDE annually reviews existing NPS/A certifications and requires certified NPS/A to annually update their applications between August 1 and October 31.

**Monitoring of NPS**

In addition to certifying new NPS and conducting an initial Validation Review and Onsite Review of an NPS, CDE monitors existing NPS as required by statute. Each certified NPS is placed on a three-year monitoring cycle and is monitored under one of the reviews outlined below. (See Cal. Ed Code § 56366.1(j)). Unlike CDE's selection for LEAs for review, CDE's identification of NPS for one of the three monitoring reviews is not based on annual data collection and analysis. However, CDE has the right to conduct unscheduled monitoring in the event the State has a substantial reason to believe there are concerns regarding health and safety of students. (Cal. Educ. Code § 56366.1(i)(1)).

In the first year of the three-year monitoring cycle, CDE requires the NPS complete a Self-Review. In the second year, the NPS participates in an Onsite Review and in year three, the NPS participates in a Follow-up Visit. (See Cal. Educ. Code § 56366.1(j)(1-3)).

**Self-Review**

CDE selects approximately one third of the NPS for a Self-Review each year. The purpose of Self-Review is for the NPS to monitor its facilities, educational environment, and the quality of its educational and behavioral program. This includes the teaching staff, the credentials authorizing service, the standards-based core curriculum being employed, and the standards-focused instructional materials used by the NPS.

**Onsite Review**

CDE selects approximately one third of the NPS for an Onsite Review each year. The purpose of the Onsite Review is for CDE to review the NPS's facilities, the educational environment, and the quality of the educational program, including the teaching staff, the credentials authorizing service, the standards-based core curriculum being used, and the standards-focused instructional materials used by the NPS. More specifically, the Onsite Review allows CDE:

- To determine whether an NPS is compliant with certification requirements, program quality, and IEP implementation, and to provide CDE with information regarding key compliance questions related to certification and IEP implementation.

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

- To determine whether the LEAs and SELPAs are providing appropriate supervision and monitoring of the special education programs and services.

- To provide general supervision to LEAs in accordance with the obligations imposed on the State under the IDEA.

CDE begins the Onsite Review with an entrance meeting with NPS staff and a tour of the NPS facilities. CDE reviews NPS documentation, NPS procedures and programs, and a sampling of student IEPs and records. CDE observes whether NPS students have access to the same standards-based core curriculum used by any school district with which the NPS contracts. Upon conclusion of the review, CDE holds an exit meeting with NPS staff to review preliminary findings and develop plans to remedy any issues of noncompliance. Within 60 days of the review, CDE issues a written report to the NPS and the contracting LEAs that contains any required corrective actions. CDE continues to monitor the NPS and ensure that the NPS resolves findings of noncompliance within the required timelines.

**Follow up Visit**

CDE selects approximately one third of NPS for a Follow up Visit each year. CDE returns to the site to monitor the NPS facilities, the educational environment, and the quality of the educational program at an existing NPS. CDE verifies staff credentials, licenses, and educational documentation, and reviews the NPS's behavioral programs. This process addresses areas of concern, follows up on areas in which the NPS was found noncompliant during the previous year's Onsite Review, and provides the NPS technical assistance as needed.

At any given time, all NPS certified by CDE (as part of the application/certification process) will be somewhere in the three-year cycle of monitoring. Because an Onsite Review and a Follow up Visit both include an onsite visit, in any given year, CDE will be conducting onsite visits of two-thirds of the certified NPS. CDE's NPS onsite visits typically take place between October and June of each year.

**Investigations Process Overview**

In addition to the cyclical three-year monitoring cycle, CDE completes certification compliance investigations according to the following legal requirements:

1) If there is substantial reason to believe there is an immediate danger to the health, safety, or welfare of a child. (Cal. Educ. Code § 56366.1(i)(1));

2) If evidence is received related to a significant deficiency in the quality of educational services provided. (Cal. Educ. Code § 56366.1(i)(2)); and,

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

3) If evidence is received related to noncompliance with the Health and Safety Code Section 1501(b). (Cal. Educ. Code § 56366.1(i)(3)).

# Phase 2 – SPP Targets, Restraint and Seclusion and IEP Implementation Updates

## SPP Targets

In its 7/5/19 Order, the Court identified concerns with the SPP targets that the State uses in connection with its data analysis activities and identification of LEAs for further monitoring. The Court found that the SPP indicators the State used to measure LEA performance to identify for further monitoring were not sufficiently rigorous.

States are required to develop and implement an SPP, a multi-year, statewide improvement plan. OSEP defines the instructions and indicators a State must use to develop the SPP, which includes five compliance indicators, eleven performance indicators, and one indicator with both compliance and performance components. Every state is required to submit a new SPP to OSEP at least once every six years.

CDE anticipated that the next six-year cycle would commence with program year 2019. Accordingly, CDE convened a stakeholder group comprised of individuals from various backgrounds: educators, parents, school administrators, policy advisors, school psychologists, Family Empowerment Centers, early education, advocacy groups, state advisory board members, and Plaintiffs' counsel in this case. CDE held a series of in-person and virtual meetings in late summer 2019 that oriented stakeholders with the performance indicators. The meetings were partnered with detailed presentations to inform the community members of the history and data trends, and assist them in making informed recommendations. The presentations included an explanation of how each indicator is defined, measured, and calculated; an in-depth history of statewide performance trends over the last five years; and a comparison of how California's results compare to other states of similar size and demographics, along with data forecasting. These meetings provided time for community members to discuss statewide data, target setting, and how CDE can provide supports for LEAs to meet more rigorous targets.[25]

However, OSEP announced in fall 2019 that it would not be implementing a new six-year cycle, and directed states to create extension targets and to submit to OSEP by February 1, 2020. CDE submitted extension targets to both OSEP and to this Court in its January 31, 2020 State Defendants' Further Phase 2 Submission (Dkt. 2545).

---

[25] CDE previously provided the Court the Stakeholder Member List, and example of materials presented to Stakeholders during the late summer 2019 meetings. (Dkt. 2545, Attachment 3 and Attachment 4, respectively).

Further, OSEP announced in February 2020 that it would be revising the calculation methodologies for SPP indicators, beginning with the 2020–21 program year. These revisions would inform the development of states' next six-year SPP. In accordance with federal directives, CDE reconvened its stakeholder group to discuss the changes to key SPP indicators and provide community partners the opportunity to refine their recommendations for these targets in light of the revisions. [26]

CDE presented proposed targets for the performance indicators for program years 2020–21 through 2025–26 for the State Board of Education's ("SBE") consideration at the September 2021[27] meeting, and consideration for approval at the November 2021[28] meeting. SBE approved the proposed indicator targets at its November 2021[29] meeting and CDE submitted the approved indicator targets to OSEP on February 1, 2022.

The proposed SPP targets CDE will use as the metrics to assess and determine LEA performance and identification for targeted monitoring are included as **Attachment 3**. For comparison, **Attachment 3** includes the previous six-year targets, the extension year target as well as the new proposed targets.[30] As a reminder, in instances of overlap, CDE utilizes the Dashboard to identify LEAs for targeted monitoring in the areas of Graduation Rate (Indicator 1), Statewide Assessment Proficiency (Indicator 3) and Suspension Rate (Indicators 4a and 4b).

# Restraint and Seclusion

Pending Court review is the remaining Phase 2 issue regarding the State's analysis and use of restraint and seclusion data is adequate to determine which LEAs need monitoring intervention in that area. Due to the continued disruption to data collection efforts posed by the ongoing COVID-19 pandemic, CDE's has postponed its

---

[26] As original members of CDE Stakeholder Group, Plaintiffs' counsel was invited again to participate to review OSEP's revised calculation methodologies and provide feedback to proposed SPP targets. Stakeholder engagement was held virtually, and CDE requested participants review and submit final recommendations prior to the State presenting recommended targets at the public September and November 2022 SBE meetings.

[27] See the California SBE September 2021, Agenda Item 04, New Targets for State Performance Plan Indicators in the Annual Performance Report for Part B of the Individuals with Disabilities Education Act of 2004, covering program years 2020–21 through 2025–26, available at

https://www.cde.ca.gov/be/ag/ag/yr21/agenda202109.asp.

[28] See the California SBE November 2021, Agenda Item 18, available at
https://www.cde.ca.gov/be/ag/ag/yr21/agenda202111.asp.

[29] See the California SBE November 3-4, 2021 Final Minutes, Agenda Item 18:
https://www.cde.ca.gov/be/ag/ms/index.asp.

[30] OSEP required extension year targets for the 2019 program year. These targets were previously provided to the Court. See State Defendants' Further Phase 2 Submission, 1/31/2020 (Dkt. 2545, Attachment 7, p.200).

development of a data analysis model to identify LEAs in need of monitoring in the area of restraint and seclusion.

Effective January 1, 2019, Assembly Bill (AB) 2657 (Statutes of 2018, Chapter 998) added sections 49005–49006.4 to California's Education Code regarding the use of restraint and seclusion with students receiving both general education and special education. Section 49006 requires CDE to collect and report the data outlined in statute. In preparation for this data collection, CDE directed LEAs to start collecting this data locally beginning in fall 2019 for submission to the California Longitudinal Pupil Achievement Data System (CALPADS). CDE collected restraint and seclusion data for the first time from LEAs as part of the 2019–20 CALPADS "End-of-Year (EOY) 3" annual data submission from May to September 2020.

The Governor's Executive Order issued March 2020 and subsequent school site closures, affected the SY 19-20 data collection, resulting in a truncated restraint and seclusion data set. Likewise, because LEAs offered distance learning during SY 20-21, that year's restraint and seclusion data was also affected. While CDE still required LEAs to collect and report restraint and seclusion data to CALPADS in SY 20-21, CDE has determined that the data set is so affected as to prevent CDE from making adequate conclusions to determine an effective data analysis model to select LEAs in need of monitoring in this area.

CDE anticipates that once a data analysis model and designed intervention activities have been reviewed and approved by the Court, CDE's monitoring activities in this area will be folded into the monitoring framework and require identified LEAs to complete the same CIM process used for all other LEAs in targeted or intensive monitoring. CDE intends to consider performance in this area when determining an LEA's Annual Determination under IDEA Part B.

# IEP Implementation

In its June 18, 2021 Order Re Stipulation and Order Regarding State's Compliance at Phase 1 – IEP Implementation Data Collection (Dkt. 2644), the Court found that the State's data collection methodology was in compliance with federal law because it allows the state to assess LEAs' performance in providing the services promised to SWDs in their annual IEPs. Further, this methodology allows CDE to identify and determine systemic LEA performance issues to use alongside other data points to identify LEAs for an appropriate monitoring tier. Given continued challenges posed by the COVID-19 pandemic, CDE does not yet have sufficient information to determine and propose an effective data analysis.

As stated during the August 2021 Case Management Conference, CDE will conduct a pilot prior to the release of the annual data collection.

*Emma C., et al. v. Thurmond, et al.; Case No. 96-cv-04179-VC*
**STATE DEFENDANTS' COMPLIANCE REPORT – PHASE 3 DESIGN
OF MONITORING AND ENFORCEMENT ACTIVITIES**

The primary goals of the pilot are to test the data collection method and internal validation measures and determine an appropriate percentage rate the State will use to measure an LEA's implementation of IEP services. CDE will collect data from LEAs in the pilot at the following three percent ranges: 100 to 95 percent of IEP services implemented, 94.9 to 90 percent of IEP services implemented, and fewer than 90 percent of IEP services implemented.

As of April 2022, the pilot is currently underway. CDE has identified twelve LEAs to participate, which range in size from approximately 180 SWD to over 76,000 SWD (Los Angeles Unified School District). In total, the LEAs that CDE identified to participate serve about 95,000 SWD, approximately 11 percent of the State's SWD population.[31] Each LEA serves SWD from varying race/ethnicities, grades preschool-twelve, varying disabilities, settings and SWD also identified under key LCFF subgroups: English learner, homeless, foster and socioeconomically disadvantaged. CDE will generate samples based on previously discussed samples sizes (Dkt. 2632, Figure 2, p. 11). In total, CDE anticipates around 2,500 SWD will be included in this pilot.

CDE has contacted the participating LEAs, notifying them of the timeline, the purpose of the pilot and general expectations of local analysis and data reporting. CDE is currently developing a technical assistance guide, complete with data review and reporting supports, as well as guidance to appropriately use the reporting software to provide to the participating LEAs in late April. CDE has notified these LEAs that this pilot will review the period of April 1 to May 31, with the reporting window beginning June 1 to June 27. CDE will provide these LEAs a random sample of students on June 1.

Beginning in July 2022, CDE will extract the reported data set to continue testing the reporting system and conduct audits to validate the reported data. As the pilot progresses, CDE expects to make adjustments to the method of reporting, the technical assistance provided as well as the audit protocols.

---

[31] All data sourced from CALPADS EOY, school year 2020-2021, the most current school year available. For SY 2020-2021, the total SWD is 891,355. Source figures provided to demonstrate approximate size of LEAs in the pilot and the anticipated sample size of files reviewed for IEP implementation in pilot. Exact count of students in sample will differ.

# ATTACHMENT 1

## Attachment 1

**Criteria Sort into Monitoring Tier, Differentiated Monitoring Level and IDEA Part B Annual Determination**

| MONITORING TIER | UNIVERSAL | TARGETED | | | | INTENSIVE | | |
|---|---|---|---|---|---|---|---|---|
| DIFFERENTIATED MONITORING LEVEL | Universal Supports | Compliance Only | Level 1 | Level 2 | Level 3 | Level 1 | Level 2 | Level 3 |
| ANNUAL DETERMINATION | Meets Requirements | Needs Assistance | | | | Needs Intervention | | |
| Timely/Complete Data Submissions | None | Untimely/Incomplete Data | | | | | | |
| Fiscal (MOE/SELPA Assurance) | None | MOE/SELPA Assurance Concerns | | | | | | |
| Procedural Compliance | No Procedural Noncompliance | Procedural Noncompliance | | | | | | |
| Disproportionality | Not Disproportionate | | | Disproportionate Year 1 | Disproportionate Year 2 | Significantly Disproportionate Year 1 | Significantly Disproportionate Year 2 | Significantly Disproportionate Year 3+ |
| Performance | Targets Met/Not Lowest Performing | | Not Meeting 1-2 Targets | Not meeting 3+ Targets | Bottom 11-20% | Bottom 8-10% | Bottom 4-7% | Bottom 0-3% |
| Corrective Actions (CA) | No Corrective Actions | Corrective Actions | Not Making Progress on Corrective Actions | | | Overdue CA 1 year | | Overdue CA 2+ years |
| NPS Areas of concern | No areas of concern in NPS Reviews | Areas of Concern | | | | | | |

*(Row group label, rotated: MONITORING IDENTIFICATION CRITERIA)*

# ATTACHMENT 2

**Attachment 2**

**Monitoring Tier, Differentiated Monitoring Level and Required Activities**

| CIM PROCESS STEPS > ACTIVITIES | MONITORING TIER | UNIVERSAL | TARGETED | | | | INTENSIVE | | |
|---|---|---|---|---|---|---|---|---|---|
| | DIFFERENTIATED MONITORING LEVEL | N/A | Compliance Only | Targeted Level 1 | Targeted Level 2 | Targeted Level 3 | Intensive Level 1 | Intensive Level 2 | Intensive Level 3 |
| | ANNUAL DETERMINATION | Meets Requirements | Needs Assistance | Needs Assistance | Needs Assistance | Needs Assistance | Needs Intervention | Needs Intervention | Needs Intervention |
| | CIM PROCESS PARTICIPATION AND ENGAGEMENT LEVEL | N/A | Not Required; Corrective Actions Only | Required Independent | Required Independent | Required Assisted | Required Assisted | Required Directed | Required Directed |
| | **STEP 1: Gather and Inquire** | | | | | | | | |
| | Data Drill Down | Optional | Optional | Required Independent | Required Independent | Required Assisted | Required Assisted | Required Directed | Required Directed |
| | Assessment of Infrastructure | Optional | Optional; CAs | Optional | Optional | Optional | Required Assisted | Required Directed | Required Directed |
| | Policies, Practices, Procedures Review | N | Prong II | Required Independent | Required Independent | Required Independent | Required Directed | Required Directed | Required Directed |
| | Educational Benefit Review | N | N | Optional | Optional | Optional | Required Independent | Required Assisted | Required Directed |
| | Parent Input | Optional | Optional | Optional | Optional | Required Independent | Required Independent | Required Assisted | Required Directed |
| | **STEP 2: Investigate** | | | | | | | | |
| | Root Cause Analysis | Optional | Optional | Required Independent | Required Independent | Required Assisted | Required Assisted | Required Directed | Required Directed |
| | Prioritization | Optional | Optional | Optional | Optional | Required Independent | Required Assisted | Required Directed | Required Directed |
| | Initiative Inventory | Optional | Optional | Optional | Optional | Optional | Required Independent | Required Assisted | Required Directed |
| | Theory of Action/Improvement Framework | Optional | Optional | Optional | Optional | Optional | Required Independent | Required Assisted | Required Directed |
| | **STEP 3: Planning** | | | | | | | | |
| | Plan | Optional | Optional | Required Independent+ | Required Independent+ | Required Assisted | Required Directed | Required Directed | Required Directed |
| | Approval | N | N | N | SELPA | SELPA+CDE | CDE | CDE | CDE |
| | **Step 4: Monitoring Implementation Plan** | N | N | N | SELPA | SELPA+CDE | CDE | CDE | CDE |

**ATTACHMENT 3**

**Attachment 3**

**State Performance Plan (SPP) Targets Used to Identify LEAs for Further Monitoring**

| SPP Indicator | SPP Indicator Name | Previous SPP Targets, FFY 2013-18 | | | | | | Extension Year 2019-20 | Proposed Targets, FFY 2020-21 through 2025-26 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2013-14 | 2014-15 | 2015-16 | 2016-17 | 2017-18 | 2018-19 | 2019-20 | 2020-21 | 2021-22 | 2022-23 | 2023-24 | 2024-25 | 2025-26 |
| 2 | Dropout | 15.72% | 14.72% | 13.72% | 12.72% | 11.72% | 10.72% | 9.72% | 11% | 10% | 9% | 8% | 7% | 6% |
| 3a | Assessment Participation | 95% | 95% | 95% | 95% | 95% | 95% | 95% | 95% | 95% | 95% | 95% | 95% | 95% |
| 5a | LRE: ≥ 80% in the Regular Class | 49.2% | 49.2% | 49.2% | 50.2% | 51.2% | 52.2% | 53.2% | 58% | 60% | 62% | 64% | 67% | 70% |
| 5b | LRE: ≤ 40% in the Regular Class | 24.6% | 24.6% | 24.6% | 23.6% | 22.6% | 21.6% | 20.6% | 19.5% | 18% | 16.5% | 15% | 13.5% | 12% |
| 5c | LRE: Separate Setting | 4.4% | 4.4% | 4.4% | 4.2% | 4% | 3.8% | 3.6% | 3.4% | 3.2% | 3% | 2.8% | 2.6% | 2.4% |
| 6a | Preschool LRE: Regular Early Childhood Programs | 32.9% | 32.9% | 32.9% | 33.9% | 34.9% | 35.9% | 36.9% | 39% | 41% | 43% | 45% | 47% | 49% |
| 6b | Preschool LRE: Separate Setting | 34.4% | 34.4% | 34.4% | 33.4% | 32.4% | 31.4% | 30.4% | 33% | 31% | 29% | 27% | 25% | 23% |
| 8 | Parent Involvement | 90% | 90% | 90% | 91% | 92% | 93% | 94% | 95% | 95.5% | 96% | 96.5% | 97% | 97.5% |
| 11 | Child Find | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 12 | Early Childhood Transition | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 13 | Secondary Transition | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 14a | Post School Outcomes: Higher Education | 52.3% | 52.3% | 52.3% | 52.3% | 53.3% | 54.3% | 55.3% | 55% | 56% | 57% | 58% | 59% | 60% |
| 14b | Post School Outcomes: Higher Education or Competitively Employed | 72.4% | 72.4% | 72.4% | 72.4% | 73.4% | 74.4% | 75.4% | 75% | 76.5% | 78% | 79.5% | 81% | 82.5% |
| 14c | Post School Outcomes: Postsecondary Education or Training | 81% | 81% | 81% | 81% | 82% | 83% | 84% | 87% | 87.5% | 88% | 88.5% | 89% | 89.5% |

# CERTIFICATE OF SERVICE

Case Name:  **Emma C., et al. v. Thurmond,**    No.   **3:96-cv-04179-VC**
                    **et al.**

I hereby certify that on <u>April 15, 2022</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**STATE DEFENDANTS' PHASE 3 DESIGN SUB-PHASE SUBMISSION**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>April 15, 2022</u>, at Sacramento, California.

<table>
<tr><td>Natalie Y. Quinonez</td><td>*/s/Natalie Y. Quinonez*</td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

SA2005104070
36092993.docx