**United States District Court**
**Office of the Court Monitor**
*Emma C., et al., v. Tony Thurmond, et al.* **(No. C96-4179 VC)**

**mmlawer@rcn.com**

**Mark A. Mlawer**
**Court Monitor**

# Review of the California Department of Education's Submission Regarding the Design of Its Monitoring Activities (Phase 3 Design Sub-Phase)

June 17, 2022

# Table of Contents

I. Background ....................................................................................................................3

II. Introduction ................................................................................................................3

III. Summary and Conclusions ........................................................................................5

IV. Outstanding Phase 2 Issues ......................................................................................16

   A. Targets ....................................................................................................................16
      1. School-Age LRE ..............................................................................................16
      2. Preschool LRE ................................................................................................17

   B. Restraint and Seclusion..........................................................................................18

   C. IEP Implementation ...............................................................................................19

V. Framework of CDE's Monitoring and Support System for Non-Small LEAs ...........19

   A. Philosophical Underpinnings.................................................................................19

   B. CIM Process ...........................................................................................................20

   C. Monitoring and Support Tiers................................................................................21
      1. Universal Monitoring and Support..................................................................22
      2. Targeted Monitoring and Support...................................................................22
      3. Intensive Monitoring and Support...................................................................28

VI. Substance of CDE's Monitoring and Support System for Non-Small LEAs.............32

   A. CIM Process Step 1:  Gather and Inquire.............................................................32
      1. Team Creation..................................................................................................32
      2. Data Drill Down ..............................................................................................33
         a. Data Drill Down:  Targeted ......................................................................33
         b. Data Drill Down:  Intensive .....................................................................34
      3. Assessment of Infrastructure ..........................................................................36
      4. Policies, Practices and Procedures Review.....................................................37
         a. Policies, Practices and Procedures Review:  Targeted .............................38
         b. Policies, Practices and Procedures Review:  Intensive ............................45
      5. Educational Benefit Review ............................................................................53
         a. Educational Benefit Review:  Targeted ....................................................54
         b. Educational Benefit Review:  Intensive ...................................................55
      6. Parent Input .....................................................................................................65
         a. Parent Input:  Parent Survey Instrument ..................................................65
         b. Parent Input:  Targeted .............................................................................66
         c. Parent Input:  Intensive ............................................................................67

   B. CIM Process Step 2:  Investigation.......................................................................68
      1. Root Cause Analysis........................................................................................68
         a. Root Cause Analysis:  Targeted ...............................................................69
         b. Root Cause Analysis:  Intensive ..............................................................70
      2. Prioritization ...................................................................................................74
         a. Prioritization:  Targeted ...........................................................................74
         b. Prioritization:  Intensive ..........................................................................75

       3. Initiative Inventory......................................................................................75
       4. Theory of Action/Improvement Framework...............................................77

   C. CIM Process Step 3:  Planning ...........................................................................77
     1. Improvement Plan .......................................................................................77
       a. Improvement Plan:  Targeted .................................................................78
       b. Improvement Plan:  Intensive ................................................................78
     2. Approval Process...........................................................................................79
       a. Approval Process:  Targeted ..................................................................79
       b. Approval Process:  Intensive .................................................................80

   D. CIM Process Step 4:  Implementation and Ongoing Monitoring....................80
     1. Implementation and Ongoing Monitoring:  Targeted...............................81
     2. Implementation and Ongoing Monitoring:  Intensive...............................81

VII. Cyclical Monitoring of Small LEAs ....................................................................82

VIII. Monitoring of Nonpublic Schools .......................................................................84

  A. Self-Review ...........................................................................................................84

  B. CDE Onsite Review ..............................................................................................85

  C. CDE Follow-Up Review .......................................................................................88

IX. Annual Determinations ..........................................................................................89

X. Enforcement .............................................................................................................89

## I. Background

The Court's May 18, 2018 *Order re State's Obligations Under Consent Decree* adopted a four-phase process for determining whether the California Department of Education (CDE) has demonstrated that its monitoring and enforcement system complies with the Individuals with Disabilities Education Act (IDEA) (Dkt. No. 2387 at 1-2). The Court's Order determining Phase 1 compliance was issued on August 17, 2018 (Dkt. No. 2428); the Court's first Phase 2 Order was issued on July 5, 2019 (Dkt. No. 2520), and its second Phase 2 Order on July 16, 2020 (Dkt. No. 2598); and its Stipulation/Order regarding the collection of individualized education program (IEP) implementation data on June 18, 2021 (Dkt. No. 2644).

The current sub-phase, the subject of this report, concerns the design of CDE's monitoring activities. This report will also discuss three outstanding issues from Phase 2 and reach a compliance conclusion about one of these issues.

CDE timely filed its submission on April 15, 2022 (Dkt. No. 2676). The submission included three one-page attachments and no other supporting documents.

## II. Introduction

State educational agencies (SEAs) are responsible for ensuring that the statutory requirements for special education are met—including a free appropriate public education (FAPE), placements in the least restrictive environment (LRE), and child find—and that all educational programs for students with disabilities (SWD) are under its "general supervision" and meet its educational standards (20 U.S.C. § 1412(a)(1), (3), (5) and (11)). SEAs are also required to monitor implementation of the statute by local educational agencies (LEAs) and to enforce statutory requirements when necessary.

The "primary focus" of monitoring activities should be:

- improving the educational results and outcomes of SWD; and
- ensuring that the program requirements are met for SWD, particularly those requirements that are "most closely related" to improving results and outcomes.

Further, the IDEA establishes monitoring priority areas, which include the provision of FAPE in the LRE, child find, effective monitoring, and disproportionate representation of racial and ethnic groups in special education to the extent that the disproportionate representation is the result of inappropriate identification (20 U.S.C. § 1416(a)).

Past monitoring reports during the Court-adopted four-phase process have reached conclusions of compliant or noncompliant with the relevant governing standards. But the majority of the design sub-phase is different in an important respect.

Setting aside CDE's cyclical monitoring of small LEAs and cyclical monitoring of nonpublic schools, most of CDE's monitoring activities are said to be either "targeted" or "intensive" as will be seen below. But the statute does not mention targeted or intensive monitoring and, for that reason, does not set any standards for what such

monitoring processes should accomplish. As the Court has also not adopted such standards for the *Emma C.* case, it is not possible for this report to reach conclusions of compliant or noncompliant for targeted and intensive monitoring activities.

Instead, this design sub-phase report will endeavor to describe and analyze, based on the documents submitted by CDE, the adequacy of the design of each CDE monitoring process: what each process can do, and cannot do, if implemented effectively.

Unfortunately, many of the documents necessary to understand the design of each monitoring process, requested from CDE on 4/21/22,[1] were not provided. Counsel for CDE writes in response to this request:

> As an initial matter, we note that, in compliance with the Court's August 11, 2021 Order (Dkt. 2658) (8/11/21 Order), the State's Phase 3 Design Sub-Phase Submission included an explanation of the design—and *proposed design*—of its monitoring and enforcement activities. In connection with these proposed activities, the State is continuing to develop many of the requested supporting materials that are the subject of your April 21, 2022 request, including procedures, guidance, tools, and trainings. The April 21, 2022 request also appears to seek materials that are the subject of the second sub-phase of the Phase 3, such as root cause analyses, that the State cannot provide until it has implemented the proposed activities. Finally, the April 21, 2022 request also appears to seek materials that the State does not possess at this time. (Gill letter to Mlawer, 5/6/22 at 1; emphasis in original)

However, the 8/11/21 Order makes no mention of the *proposed* design of CDE's monitoring activities; it simply adopts a schedule for "the Court's evaluation of *the design* of the State's monitoring activities (Design Sub-Phase) at Phase 3" (Dkt. No. 2658 at 2; emphasis added). The transcript of the August 2021 case management conference also does not mention the proposed design of monitoring activities (Dkt. No. 2662).

In addition, the letter's reference to CDE monitoring activities such as root cause analysis as part of the second sub-phase of Phase 3 rather than the first is incorrect: the *design* of the root cause analysis process is part of the design sub-phase; the actual *implementation* of root cause analyses is part of the second sub-phase.[2]

Nevertheless, this report can only work with the documents CDE did submit. Due to 1) a lack of all relevant documents, and 2) the apparently inchoate state of the design of most of its monitoring processes, this report is limited in its ability to describe

---

[1] Mlawer email to Gill.

[2] See the Court's remarks on the two sub-phases at the August 2021 case management conference, Dkt. No. 2662 at 5-6: "As it relates to Phase 3, I'm deeply concerned about a possible disconnect between what the state says it does and what it actually does in terms of monitoring and enforcement…." Phase 3A will be about "…examining what the state says it does, with an eye towards deciding whether what the state says it does is sufficient…."

what the design of each CDE monitoring process can do, and cannot do, if implemented effectively, as will be seen below.

Some of the sections of this report will identify issues needing CDE responses based on ambiguities in, or disagreements between, the documents it did submit; these will be in italics in the body of the report.  Where applicable, each section will also mention the types of documents necessary to describe fully what that process can and cannot do; these will appear in bold in each section's conclusion.

### III.  Summary and Conclusions

The overall framework of CDE's monitoring process consists of the following elements:

- the compliance and improvement monitoring (CIM) process, and
- CDE's use of monitoring and support tiers and levels for LEAs.

CIM is a four-step process for LEAs to develop and implement plans to improve compliance and SWD results and outcomes.[3]  The use of monitoring and support tiers allows CDE to assign specific CIM activities to LEAs based on their designated tier and level of monitoring.  Depending on the tier and level, a specific CIM activity may be optional, required to be completed independently, with assistance, or with direction from CDE.[4]

The essence of this approach is the targeting of CIM steps and CDE monitoring and improvement resources to those LEAs most in need of compliance and performance improvement.  At the most general level of analysis, this framework of CIM and monitoring and support tiers is well designed.

But much as the design of a human being requires more than an impressive skeleton, the design of a state special education monitoring system requires more than a thoughtful and well-designed general framework.  The design of the details of its constituent monitoring processes must reasonably enable the improvement of SWD results and outcomes and compliance with IDEA requirements, particularly those requirements most closely related to improving results.  It is here, in the design of the details, that the current state of the design of CDE's monitoring processes falls well short, as far as that can be determined based on the submitted documents.  It is difficult to reach conclusions about the adequacy of CDE's monitoring processes when details are missing, documents are not available due to being "still in development," and

---

[3] The four steps are:  determine the current problems through gathering data and information and inquiring further about them; investigate the causes of the problems, prioritize them, and develop a theory of action to address the causes; develop an implementation plan to improve SWD outcomes; and implement the plan and monitor implementation.

[4] Specific CIM activities are:  the creation of a team; data drill down; infrastructure assessment, policies, practices and procedures review; educational benefit review; parent input; root cause analysis; prioritization; initiative inventory; theory of action/improvement framework; improvement plan; approval process; LEA plan implementation; and monitoring plan implementation.

inconsistencies are present across documents.  It is clear that CDE has not yet fully designed all of the elements of each of its monitoring processes.

Given those limitations, the following conclusions were reached.

Outstanding Phase 2 Issues

- Prior to this report, three Phase 2 issues were outstanding: restraint and seclusion data analysis and selection, IEP implementation data analysis and selection, and preschool and school-age LRE targets.  Due to the Covid-19 pandemic, compliance conclusions for the first two issues are deferred in this report.
- This report concludes that CDE's ambitious LRE targets are compliant with this Court's standards.

Universal Monitoring

- CDE's universal monitoring and support tier is well designed:  it conserves CDE's resources in order to devote them to LEAs in need of additional monitoring, support, and oversight.

Targeted Monitoring:  Sorting LEAs

- Although its general framework for sorting LEAs into targeted monitoring is sound, due to important contradictions between some of its documents, lack of clarity regarding the indicators used to sort LEAs into level 3, and the failure to include standards for key concepts such as "not making progress," firm conclusions cannot be reached about aspects of its targeted monitoring LEA sorting process.
- Some LEAs that miss few targets but by wide margins are sorted into a largely self-monitoring process with little meaningful oversight.

 Targeted Monitoring:  General

- The information submitted by CDE for each activity in targeted monitoring concerned only disproportionality.  None had to do with the other possible targeted monitoring review areas:  child find, statewide assessment participation, statewide assessment proficiency, suspension rate, LRE, preschool LRE, and parent involvement.  Thus, what each activity is designed to accomplish in the other areas of review cannot currently be determined.

Targeted Monitoring:  Timeline Noncompliance

- The documents submitted do not call for the provision of compensatory education when SWD suffer lengthy delays in the adoption and implementation of IEPs.

- CDE currently lacks standards for distinguishing timeline noncompliance that requires student-level correction from that requiring system-level changes.

Targeted Monitoring:  Data Drill Down

- Targeted monitoring LEAs likely have access to much of the data necessary to perform an effective drill down.  However, these LEAs will need assistance to perform an effective drill down, and the documents provided by CDE do not show that assistance for all potential areas of review.  Hence, this report cannot conclude that targeted monitoring data drill down is likely to be performed effectively.

Targeted Monitoring:  Policies, Practices and Procedures Review

- Due to a lack of responsive documents and different information in different CDE documents, conclusions regarding some aspects of this review cannot be reached.  For example, the size of the student sample is not completely clear,[5] nor is it clear how the student sample is chosen.  Whether student samples are focused on the issues that resulted in an LEA's selection cannot therefore be currently determined.
- The methodology CDE uses to verify whether findings of compliance and noncompliance were made appropriately by LEA self-monitors is unclear (random verification of students or whether each student is verified).  If a random verification is used, the size of the samples is not clear.  Thus, whether this verification is designed to be effective cannot be determined at this time.
- It is also unclear whether LEA self-monitors or CDE monitors are given enough information to conduct the student review effectively and whether interviews are conducted.
- For the disproportionality issue that is a priority area for monitoring—whether the racial or ethnic disproportionality in identification as a SWD is the result of "inappropriate" identification—the student review is not designed to determine whether the identification of the student was or was not appropriate.
- On the positive side, CDE's documents show that it has a method of tracking findings of noncompliance and corrective actions that is likely to be valuable, assuming it is implemented effectively.

---

[5] Assuming the sample is ten students per indicator, that sample size is adequate for issues involving small numbers of students at an LEA; but for issues involving large numbers of students at an LEA, a sample of ten would be inadequate to determine meaningfully the extent to which noncompliance contributed to, or was responsible for, an LEA's failure to meet a target.

Targeted Monitoring:  Educational Benefit Review

- An educational benefit review is not required in targeted monitoring.  But it is not clear why this review is not required for at least some of these LEAs, because some may have notably poor performance on some indicators, performance that this review could lead to improving (according to CDE).

Targeted Monitoring:  Parent Input

- With respect to parent input, it is unclear why targeted levels 1 and 2 LEAs are not required to gather such input even if some of these LEAs were selected for targeted monitoring based on a failure to meet the parent involvement target.
- It is unclear why level 3 LEAs are not required to report the parent input results to CDE.
- The documents submitted do not explain how the results of the parent survey are to be analyzed and used in the next steps of the CIM process.

Targeted Monitoring:  Root Cause Analysis

- Determining the root causes of compliance and performance problems is clearly important to a targeted monitoring improvement process.  The documents provided by CDE do not set forth the expectations, training, assistance, and instructions for these LEAs.  Targeted levels 1 and 2 LEAs perform this analysis independently and will need training and clear instructions to do so; targeted level 3 LEAs receive some assistance in this analysis, but CDE has not provided a description of this assistance or any training for the providers of it.
- Standards that would be applied by CDE to either the required descriptions of the root cause analyses of levels 1 and 2 LEAs, or to the analyses themselves for level 3 LEAs, were not provided by CDE; CDE does not state that any standards at all are applied.  In the absence of such documents, this report can only conclude that targeted monitoring LEAs are unlikely to implement the root cause analysis step of the CIM process effectively in the absence of clear expectations, training, assistance, and instructions.

Targeted Monitoring:  Prioritization

- In the absence of the criteria to be used by targeted level 3 LEAs to prioritize root causes, and in the absence of guidance and training documents for them on this step that they are to perform independently, a conclusion cannot be reached about the design of the prioritization step of the CIM process for targeted level 3 LEAs.  CDE has offered no reasons to believe these LEAs will be enabled to implement this step effectively.

Targeted Monitoring:  Theory of Action/Improvement Framework

- With respect to the theory of action/improvement framework step of the CIM process, it is reasonable to expect LEAs developing improvement plans to be able to articulate a "logical chain of reasoning," in CDE's phrase, to explain how the steps they will take will change practices and lead to improved outcomes for SWD.  For that reason, it is not clear why targeted monitoring LEAs, even targeted level 3 LEAs, are not required to engage in this step as all such LEAs are to develop improvement plans.

Intensive Monitoring:  Sorting LEAs

- Although its general method of selecting LEAs for intensive monitoring and sorting them into different levels is sound, clear conclusions regarding CDE's specific criteria for selection for intensive monitoring cannot be reached at this time due to ambiguous language in its submission that appears to differ from its 2020 submission and its 2021 SPP Indicator Guide, and differences between its submission and its website on the criteria used for sorting.

Intensive Monitoring:  CDE Supervision

- The submission is not clear enough regarding the level of CDE supervision for intensive levels 1, 2, and 3 LEAs.

Intensive Monitoring:  Data Drill Down

- CDE provides intensive monitoring LEAs with access to a wealth of information related to accessing, understanding, disaggregating, and using data for improvement purposes.  However, none of the submitted documents offer a step-by-step approach to performing a data drill down.  No evidence was found in the documents produced that a step-by-step approach is embedded in the assistance provided to level 1 LEAs or in the CDE direction provide to levels 2 and 3 LEAs.
- Because CDE did not produce procedures governing such assistance and direction or training documents for the personnel who are to provide it, the adequacy of the design of the data drill down process for intensive monitoring LEAs cannot currently be determined.  Hence, this report cannot conclude that intensive monitoring data drill down is likely to be implemented effectively.

Intensive Monitoring:  Assessment of Infrastructure

- An assessment of infrastructure can be an important tool for intensive monitoring LEAs to determine contributing factors to their poor performance. The instrument submitted by CDE is adequate to this task.

- But intensive monitoring LEAs receive an annual determination of "needs intervention" in CDE's system because they require active intervention.  In the absence of requested procedures, instructions, guidance, and training documents and based on the discussion in CDE's submission, the assistance or direction provided to intensive LEAs in the assessment of infrastructure is passive and after the fact.  Thus, one cannot currently conclude that the intensive monitoring assessment of infrastructure is likely to be implemented effectively.

Intensive Monitoring:  Policies, Practices and Procedures Review

- The policies, practices and procedures review can play an important role in intensive monitoring.  But whether it is designed to play such a role cannot currently be determined due to the absence of requested documents.
- CDE produced only its monitoring instrument for this review, and did not produce procedures, guidance documents, training documents, interview and observation protocols, or information about the student sample sizes used or how the sample is selected.  That may be because individual students are not monitored in this review; no evidence was submitted by CDE that students are reviewed in this part of intensive monitoring despite the word "practices" in the review's name.  Hence, there is no evidence that monitors review student files and documents such as IEPs, IEP meeting notes, behavioral emergency reports, or behavior intervention plans.
- There is no evidence that the monitoring instrument used in the review is adapted based on the specific issues that resulted in an LEA's selection for intensive monitoring.  The instrument does not include the additional guidance contained in CDE's Item Table which deprives CDE monitors of useful guidance.
- If all of the corrective actions from CDE's corrective action table relevant to a probe in the monitoring instrument are assigned when noncompliance is found, then the corrective actions resulting from this review would be designed to resolve noncompliance, if implemented effectively, with the exception of the child find requirement.  But there is currently no evidence that all relevant corrective actions are assigned.
- With respect to LEAs selected for intensive monitoring due to significant disproportionality in identification, none of the information provided by CDE for this review shows that CDE attempts to determine whether any individual student's identification as having a disability and needing special education was or was not appropriate.  This is a priority area for monitoring.

Intensive Monitoring:  Educational Benefit Review

- An educational benefit review of a sufficient sample of SWD chosen purposefully can be an important component of a monitoring and improvement process for LEAs that are performing poorly enough to be selected for intensive monitoring.  But CDE has not presented reasons to believe that intensive level 1 LEAs can

effectively perform the educational benefit review independently and without CDE validation of the results.

- For intensive level 2 LEAs, the information submitted by CDE does not show that findings of compliance in this review are validated by CDE or that the assistance provided these LEAs is sufficient to validate these findings.

- In the absence of some requested documents for this review (procedures governing the review; any instructions, guidance, and training documents for its staff conducting the review for level 3 LEAs; and procedures and training documents for technical assistance providers for level 2 LEAs), it is unclear what sample sizes are used for levels 1 and 2 LEAs, how samples are stratified for level 2 LEAs, and how samples are chosen for all intensive LEAs.

- For level 3 LEAs, a sample of ten SWD is likely adequate for issues affecting small numbers of SWD at an LEA, but inadequate for larger numbers of SWD at an LEA.

- The educational benefit review does not monitor child find or LRE.

- The instrument used contains inaccurate citations, does not probe whether students' assessments were sufficiently comprehensive to identify all of their educational needs, and leaves key concepts undefined.

- None of the documents submitted by CDE show that the sufficiency of program modifications, or their actual implementation, is probed.

- There is currently no evidence that interviews or observations are performed during this review.

- Although some of the information in the educational benefit review monitoring instrument is likely to be helpful to monitors, the evidence submitted by CDE does not show that the review gathers all of the information necessary to determine whether a student's program is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."

- It is not clear which corrective actions are assigned by CDE when noncompliance is found in this review.

- The corrective actions for one item on the monitoring instrument does not include reconvening the IEP team for the affected student.

- The corrective actions for another item on the instrument do not require CDE to perform additional educational benefit reviews to ensure that noncompliance has been corrected systemically; for the three items that do require "an" additional review, CDE has not presented reasons to believe that one additional review would be sufficient to indicate systemic correction, nor is it completely clear from CDE's wording that only one additional review is to be conducted.

<u>Intensive Monitoring:  Parent Input</u>

- The documents submitted by CDE do not make clear whether intensive level 1 LEAs perform this review independently or with a technical assistance provider.

- Little information is provided regarding the nature of CDE oversight of levels 2 and 3 LEAs in this review.
- It is not clear whether, and if so how, parents who are not fully literate and/or who lack computer or printer access will be included in the survey.
- Interviews with parents are not required for intensive LEAs, even if survey results indicate reasons to probe more deeply on some issues.
- The documents submitted by CDE do not explain how the parent input results are to be analyzed and used in the next steps of the CIM process.

Intensive Monitoring:  Root Cause Analysis

- The prior steps in the CIM process may have revealed a number of different compliance and performance problems in LEAs selected for intensive monitoring.  Determining the root causes of these problems is an important step in an improvement process.
- However, the tools currently being tested by CDE do not form a coherent whole or offer a clear step-by-step root cause analysis process.
- The documents are unclear regarding whether all of the problems discovered through the prior steps of the CIM process are to be reduced to a single problem, or used at all in this analysis.  If CDE believes that multiple problems are to be reduced to a single problem, the tools do not explain how to go about doing so.
- The root cause analysis documents suffer from some terminological and conceptual confusion.
- In the absence of procedures, guidance and training documents for technical assistance providers and CDE staff, it is not possible to determine the design of the assistance provided to intensive level 1 LEAs or the direction provided to intensive levels 2 and 3 LEAs in this analysis.
- The documents provided by CDE in their current form are unlikely to result in an effective root cause analysis for intensive monitoring LEAs.

Intensive Monitoring:  Prioritization

- It is important for intensive monitoring LEAs to prioritize the issues to be grappled with in their attempt to improve compliance and performance.
- In the absence of any procedures, instructions, guidance, training documents, tools, and instruments relevant to intensive monitoring prioritization, a conclusion cannot be reached about the design of the prioritization step of the CIM process for intensive monitoring LEAs.  CDE has offered no reasons to believe intensive monitoring LEAs will be enabled to implement this step effectively.

Intensive Monitoring:  Initiative Inventory

- The submission does not contain guidance or standards for when the "keep, stop, start" approach would be required for this potentially important activity.
- The tool submitted by CDE does not assist teams in assessing which plans or initiatives align with priority root causes and whether each initiative should be kept, stopped or started.
- The role of the apparently required focus groups and parent input sessions is not fully explained.
- Procedures, guidance, and training documents are necessary to determine the full design of the initiative inventory process for intensive monitoring LEAs, and what it will accomplish if implemented effectively.

Intensive Monitoring:  Theory of Action/Improvement Framework

- The design of the theory of action/improvement framework step of the CIM process cannot be described beyond the information in CDE's submission, or its adequacy determined, in the absence of procedures, instructions, guidance and training documents.
- It is not clear that CDE intends to develop materials to assist, guide, train, and instruct intensive monitoring LEAs in the development of a theory of action/improvement framework.

Targeted and Intensive Monitoring:  Parent Survey Instrument

- The instrument used can gather some valuable information for improvement planning.
- But none of the probes address the timeliness of the monitoring priority area of child find, and the LRE and one assessment probe could be more direct.
- There is no evidence the probes are modified based on the reasons for the LEA's selection for monitoring.

Targeted and Intensive Monitoring:  Development of Improvement Plans

- Due to the absence of relevant documents, conclusions cannot be reached regarding how LEAs are to develop improvement plans; the assistance, advice, and direction they receive to do so; and whether the process and oversight can enable the development of plans that will result in improved compliance, results, and outcomes.  Currently CDE has offered no reasons to believe that LEAs will be enabled to develop improvement plans effectively.

Targeted and Intensive Monitoring:  Improvement Plan Approval Process

- Although the importance of a plan approval process that uses clear standards is obvious, CDE currently does not have any standards at all.  Hence, the design of the approval process cannot be determined.  As a result, whether approved LEA improvement plans will reasonably enable the improvement of compliance and outcomes for SWD is currently unknown.
- CDE has not explained why targeted level 1 LEAs should not submit their plans for approval and has not demonstrated that this should not be required.

Targeted and Intensive Monitoring:  Monitoring Implementation of Improvement Plans

- Due to a lack of procedures, standards for poor performance on plan implementation, standards for when LEAs are required to update their plans, and guidance and training documents, this report must conclude that the current design of CDE's process for monitoring implementation of improvement plans cannot reasonably ensure the implementation of these plans.
- CDE has also not explained:  how the implementation of level 1 targeted monitoring LEAs' plans will be monitored, as these LEAs are not required to submit their plans;  what a "community of practice" is or its role in monitoring targeted monitoring plan implementation;  how and when special education local plan areas (SELPAs) would inform it of plan implementation problems for level 2 LEAs; the respective roles of SELPAs and CDE in monitoring plan implementation for targeted level 3 LEAs; and the specific circumstances in which CDE will work directly with targeted monitoring LEAs that are not meeting timelines and milestones, nor the nature of this direct work.

Cyclical Monitoring of Small LEAs

- Small LEAs are not selected for monitoring based on performance or compliance, but are monitored every three years (with the exception of the annual monitoring of timeline compliance) using a self-monitoring approach.  Much of this monitoring process is apparently not yet designed, and requested supporting documents related to it were not submitted.  For these reasons, what the design of CDE's small LEA cyclical monitoring process can and cannot do if implemented effectively cannot currently be described, and the process in its current form is unlikely to be implemented effectively.
- Among the unknowns are the compliance elements reviewed; student sample sizes used; nature of, and sample sizes for, the CDE random audit; policies and procedures reviewed, and CDE oversight of that review; standards applied in both the student and policies and procedures reviews; nature of the training for these LEAs to perform this self-review; sample size and composition for the educational benefit review; standards used to select LEAs with systemic concerns of noncompliance to engage in a modified CIM process; and the design of the

modified CIM process.  There is no evidence in CDE's submission of external oversight of LEA findings of compliance in the educational benefit review.

Monitoring of Nonpublic Schools

- As targeted and intensive monitoring appear to use relatively small sample sizes that will not include many of the SWD placed in these restrictive settings (as far as this can be determined), if CDE is to ensure FAPE in the LRE for students in these facilities, this cyclical monitoring process must play an important role.
- Much about this monitoring process cannot currently be determined due to lack of access to all relevant documents.
- What can be said is that the instrument used for onsite and follow-up reviews, if applied effectively, will measure basic compliance for the unknown number of students in the sample.
- It is not clear whether IEPs are reviewed in the follow-up review.
- But even if applied effectively, this instrument does not monitor whether individual SWD in these restrictive environments are receiving FAPE or are placed in the LRE.  Educational benefit reviews are not performed, and key LRE requirements are not monitored substantively.  FAPE and LRE are priority areas for monitoring.

Annual Determinations

- Determinations are tied to the tier of monitoring for which an LEA has been selected.  The design of CDE's process of making annual determinations is likely to be implemented effectively with the exceptions noted below.
- However, CDE has not 1) set forth its criteria for "needs substantial intervention" annual determinations, and 2) explained clearly and precisely how its process of making determinations is applied to small LEAs.

Enforcement

- CDE's approach to enforcement is clear about the standards for the application of many of its enforcement steps, which are tied to two of the three possible annual determination levels for LEAs that do not meet requirements.
- However, CDE has not 1) set forth its enforcement steps that are tied to a "needs substantial intervention" determination; 2) explained what designating an LEA as a high-risk grantee means; and 3) put forth its standards for applying seven of its significant sanctions.[6]

---

[6] Withholding funds, notification of the LEA superintendent regarding uncorrected noncompliance, a compliance agreement requiring corrective action within three years, ineligibility for IDEA funding, prohibiting the LEA from applying for discretionary funds from CDE, requesting an audit of the LEA's financial records, and directing the administration of the LEA's special education programs

## IV.  Outstanding Phase 2 Issues

The Court has not yet ruled on three Phase 2 issues—targets, restraint and seclusion, and IEP implementation.  CDE's report provides updates on two of these issues and submits the targets approved by the State Board of Education.

### A.  Targets

The Court in the past explained why adequate targets are important for a monitoring system:

> An adequate monitoring system requires adequate targets. If targets are too modest, states may fail to identify districts that are falling short on their obligation to provide an adequate education to disabled children.  (Dkt. No. 2520 at 15)

"[L]egally deficient" targets are those that "prevent the state from adequately monitoring school districts" (Dkt. No. 2520 at 17).

When this issue was last discussed in a monitoring report, there were three target areas that were relevant to the selection of LEAs for further monitoring:  school-age LRE, preschool LRE, and child find (See Dkt. No. 2555 at 13).   The Court has since ruled on CDE's child find target (Dkt. No. 2598 at 9-11).  Further, CDE adopted a cyclical approach to the monitoring of small LEAs, an approach that does not rely on targets for selection (Dkt. No. 2676 at 27-28).  Thus, the least restrictive environment targets are not relevant to the selection of small LEAs for monitoring.

CDE's submission reviews the history of the development of the LRE six-year targets, a process that culminated in State Board of Education approval in November 2021 and submission to the U. S. Department of Education in February 2022 (Dkt. No. 2676 at 32-33).  CDE includes the proposed targets as Attachment 3 to its submission (Dkt. No. 2676 at 44).  CDE's submission does not include a rationale for the selection of these proposed targets.  The targets are displayed and discussed below.

### 1.  School-Age LRE

The table below shows CDE's proposed targets:

| Indicator | 2020-21 | 2021-22 | 2022-23 | 2023-24 | 2024-25 | 2025-26 |
|---|---|---|---|---|---|---|
| ≥ 80% Regular Class | 58.0% | 60.0% | 62.0% | 64.0% | 67.0% | 70.0% |
| ≤ 40% Regular Class | 19.5% | 18.0% | 16.5% | 15.0% | 13.5% | 12.0% |
| Separate Setting | 3.4% | 3.2% | 3.0% | 2.8% | 2.6% | 2.4% |

The table below shows the most recent available California data for these indicators, whether the state met its targets for that year, and compares the state to the nation and the nation when the state's data are removed:

| Indicator | 2020-21 CA Rate | Met Target? | 2020-21 Nation Rate | Performed Better than Nation? | 2020-21 Nation minus CA |
|---|---|---|---|---|---|
| ≥ 80% Regular Class | 59.47% | Yes | 66.17% | No | 66.96% |
| ≤ 40% Regular Class | 18.22% | Yes | 12.54% | No | 11.87% |
| Separate Setting | 3.00% | Yes | 3.15% | Yes | 3.17% |

The state lags the national rate significantly in both measures of time spent in regular classes, but performs slightly better than the nation in its use of separate settings. The new targets for time spent in regular classes are rigorous and indicate that CDE wishes to provoke significant changes in special education placement practices in the state, a very positive development.

For separate settings, though, the state has already met its targets through the 2022-23 school year. However, in light of the fact that it currently performs better that the national rate, and the steep drop it hopes for in the final three target years, the proposed targets for separate schools are not legally deficient because they do not prevent the state from adequately monitoring school districts.

One should acknowledge the possible argument that the targets for time spent in regular classes are too ambitious because they risk overwhelming CDE's targeted monitoring resources, at least for levels 1 and 2 targeted monitoring, in the later target years.[7] But that possibility, in the Monitor's view, does not render these targets legally deficient: that judgment is for CDE to make.

2. Preschool LRE

The table below shows CDE's proposed targets:

| Indicator | 2020-21 | 2021-22 | 2022-23 | 2023-24 | 2024-25 | 2025-26 |
|---|---|---|---|---|---|---|
| Regular Early Childhood Program | 39.0% | 41.0% | 43.0% | 45.0% | 47.0% | 49.0% |
| Separate Setting | 33.0% | 31.0% | 29.0% | 27.0% | 25.0% | 23.0% |

The table below shows the most recent available California data for these indicators, whether the state met its targets for that year, and compares the state to the nation and the nation when the state's data are removed:

---

[7] But these ambitious targets will not impact CDE's intensive monitoring resources, and perhaps not its resources for targeted level 3 LEAs, because selection for intensive monitoring does not depend on missing targets. See below.

| Indicator | 2020-21 CA Rate | Met Target | 2020-21 Nation Rate | Performed Better than Nation | 2020-21 Nation minus CA |
|---|---|---|---|---|---|
| Regular Early Childhood Program | 29.26% | No | 39.78% | No | 41.26% |
| Separate Setting | 38.77% | No | 29.98% | No | 28.73% |

California missed meeting its 2020-21 preschool LRE targets by considerable margins.  It also significantly lags the national rate in current performance on these measures.  Yet its targets for the coming years are rigorous, so rigorous that one is tempted to call them farfetched:  it is difficult to imagine a set of activities that would cause current placement patterns to move so far so fast.[8]

CDE clearly wishes to provoke very significant changes with these targets, a laudable goal in light of its current performance.  However, the danger of overwhelming its targeted monitoring levels 1 and 2 resources due to the selection of many LEAs, and more in each subsequent year, is more acute for preschool LRE than it is for school-age LRE.

On the other hand, the reader will discover below that these two levels of targeted monitoring do not use a large amount of CDE's direct staff resources.  For that reason, in the Monitor's view these preschool LRE targets are not legally deficient.  CDE has proposed these targets and apparently believes that they are the best approach to resolving the significant concerns raised by its current performance on preschool LRE.

**Compliance Conclusion:  Compliant.**

B. Restraint and Seclusion

CDE's submission states that it has postponed the development of a restraint and seclusion data analysis and selection approach due to the disruptions caused by the Covid-19 pandemic.  CDE writes that it collected 2019-20 and 2020-21 data from LEAs; however, the pandemic and resulting school closures caused the former to be "truncated" and the latter to be "so affected" that the development of a data analysis model was precluded.

The submission states CDE's intention to consider LEA performance on restraint and seclusion in its annual determinations of LEAs and to use the same CIM process that is in use for targeted and intensive monitoring (Dkt. No. 2676 at 33-34).

**Compliance Conclusion:  Deferred.**

---

[8] The data over time shown in the Monitor's Phase 2 continued report in 2020 also support this conclusion (see Dkt. No. 2555 at 20).

C.  IEP Implementation

Due again to the pandemic, CDE writes, it does not yet have enough information to propose a data analysis and selection approach.  It is, however, proceeding with a pilot project to test its method of data collection, validation measures, and determine the metric it will use to gauge LEAs' IEP implementation.

Twelve LEAs of varying sizes containing approximately 11% of the state's SWD will participate in the pilot.  The pilot project concerns IEP implementation during the period from April 1st through May 31st of this year.  CDE was to provide the samples of students to LEAs on June 1st, and LEAs will report the results during the month of June.  In July CDE will begin the process of validating the data (Dkt. No. 2676 at 34-35).

**Compliance Conclusion:  Deferred.**

**V.  Framework of CDE's Monitoring and Support System for Non-Small LEAs**

A.  Philosophical Underpinnings

Citing the intent of the federal statute and academic studies, CDE highlights the connection between placements in the general education classroom and the academic growth of SWD.  CDE states its belief that the design of its monitoring system addresses systemic concerns in LEAs and, if LEAs improve systemically, then SWD will have increased access to general education and supports and, ultimately, improved results and outcomes.

CDE sets forth "four major pillars" on which improved student results and outcomes rest:

- The "right" placement for students, one that ensures that they are able to access general education curriculum and instruction to the greatest extent possible;
- The provision of the "right" supports to allow each student to fully engage in learning;
- Classrooms with high-quality instruction to ensure that all students fully benefit; and
- Ensuring equity and education free of racial and ethnic bias so that all students have an opportunity to succeed.

CDE's Figure 1 (Dkt. No. 2676 at 4) displays the short- and long-term changes it expects for SWD as a result of focusing its monitoring on these pillars.[9]  If it does so, CDE believes, then SWD will be in the right placement receiving the right supports, high-quality instruction, and an equitable education.  As a result, in the short term, behavior

---

[9] Another graphic illustrating this is displayed in Ex. 79 at 2.

problems will be reduced and students will learn more; in the long term, students will graduate and achieve success in their post-school years (Dkt. No. 2676 at 2-4).

The most central design elements of this monitoring system are:

- The CIM process, which CDE describes as the "core" of its monitoring framework (Dkt. No. 2676 at 6), and
- CDE's use of monitoring and support tiers.

To these elements this report now turns.

B. <u>CIM Process</u>

CIM is a multi-year four-step process designed to assist LEAs in identifying systemic issues that lead to poor student outcomes and results, creating an improvement plan that will positively impact SWD outcomes, and then implementing the plan (Dkt. No. 2676 at 15).   CDE explains:

> The CIM process is a series of steps and activities by which CDE identifies and assists LEAs to identify areas for correction and improvement, and developing an integrated plan to address those areas. CDE designed this process to ensure that LEAs, with differentiated levels of involvement and review, examine a wide-range of both compliance and performance data and identify the root causes of areas of concern to develop and implement an effective improvement plan.  (Dkt. No. 2676 at 7)

CIM is a multi-year process because "meaningful improvement likely does not occur in a short period of time" and calls for an LEA's "sustained focus" (Dkt. No. 2676 at 7).

All LEAs identified for targeted or intensive monitoring, with the exception of those slated for targeted compliance-only monitoring, are required to implement at least parts of the CIM process (Dkt. No. 2676 at 7, fn. 11; 8-9[10]).  However, CDE's sample annual determination letter, Ex. 80, states, "Please note:  only LEAs in Targeted Level 2 or Intensive Levels 1 through 3 will participate in the CIM process" (at 2).  *CDE should explain this apparent contradiction in its response to this report.*

Depending on the monitoring tier to which an LEA is assigned (see next section below), a specific CIM activity may be optional, required to be completed independently by the LEA, required to be completed with assistance, or required to be completed directed by CDE (Dkt. No. 2676 at 17).

The table below shows the four steps of the CIM process and the major activities in each step (Dkt. No. 2676 at 17-26):

---

[10] "CDE requires that LEAs with concerns related to performance and identified for targeted monitoring must participate in the CIM process and complete various activities within that process" (Dkt. No. 2676 at 8).

| Step 1:  Gather and Inquire | Step 2: Investigation | Step 3: Planning | Step 4: Implementation and Ongoing Monitoring |
|---|---|---|---|
| • Create team<br>• Data drill down<br>• Infrastructure Assessment<br>• Policies, practices and procedures review<br>• Educational benefit review<br>• Parent input | • Root cause analysis<br>• Prioritization<br>• Initiative inventory<br>• Theory of action/ Improvement framework | • Improvement plan<br>• Approval process | • LEA implements plan<br>• Monitoring of implementation |

In an introductory webinar for LEAs in intensive monitoring CDE expresses the purpose of:

- Step 1 as determining *what* is happening,
- Step 2 as *why* it is happening, and
- Step 3 as *how* the LEA can address the what and the why (Ex. 79 at 11).

The design of the substance of the CIM process, including oversight of implementation and standards used, will be discussed in Section VI below.  It is first necessary to lay out CDE's use of monitoring and support tiers as its vehicle for differentiating the monitoring and support LEAs receive.

**Conclusion:  A process such as CIM—one that determines accurately and comprehensively for all systemic issues affecting an LEA's performance and compliance what the issues are, why they are happening, and how they will be addressed—is an essential element of systemic improvement, assuming effective implementation and effective external assistance and oversight to the extent necessary.**

C.  Monitoring and Support Tiers

CDE employs three tiers of monitoring and support:  universal, targeted, and intensive.  In addition, there are four possible levels of targeted monitoring and three possible levels of intensive monitoring.[11]  Thus, in this differentiated system, LEAs are

---

[11] This is a change in terminology for CDE.  The tiers were formerly called levels, and what are now called levels did not exist.  CDE's State Performance Plan (SPP) Indicator Guide, updated in September 2021 and provided to the Monitor in May 2022, does not reflect this change (Ex. 61 at 61-62).

sorted into eight possible tiers/levels for monitoring and support, at least according to its submission (but see below).[12]

## 1. Universal Monitoring and Support

CDE's annual oversight and monitoring of every LEA in the state includes:

- analysis of compliance and performance data,
- review of fiscal information (including maintenance of effort, spending at least the same amount of funds on special education services as in the prior year), and
- review of assurances from the relevant SELPA.

It is also clear from its standards for "meets requirements" annual determinations that CDE judges:

- the timeliness and completeness (but not the accuracy) of LEAs' data submissions,
- the current status of corrective actions, and
- whether there were any nonpublic schools (NPS) "areas of concern" that were attributed to the LEA[13] (Dkt. No. 2676 at 40, Attachment 1).

LEAs that met compliance and performance targets, were not among the lowest performing, and have no negative findings in any of the other areas are not selected for targeted or intensive monitoring.

CDE points out that such LEAs have resources, tools, training, and self-guided activities available to them related to improvement, but use of those resources is not monitored by CDE (Dkt. No. 2676 at 7-8).

**Conclusion:  CDE's universal monitoring and support tier is well designed:  it conserves CDE's resources in order to devote them to LEAs in need of additional monitoring, support, and oversight.**

## 2. Targeted Monitoring and Support

The four possible levels of targeted monitoring are compliance-only, and levels 1, 2, and 3, according to CDE's submission (Dkt. No. 2676 at 8-11).

But CDE's sample annual determination letter, dated March of this year, a month prior to its submission, does not list compliance-only targeted monitoring or level 1 targeted monitoring.[14]  Instead this letter treats compliance timeline monitoring not as

---

[12] LEAs' annual determinations are the result of the tier of monitoring for which they are selected.  See Section IX below.
[13] It is not clear whether NPS "areas of concern" are findings of noncompliance.  See Section VIII below.
[14] "For the 2022 Monitoring Year, LEAs will be identified as Targeted Level 2, Targeted Level 3, Intensive Level 1, Intensive Level 2, Intensive Level 3, and Significant Disproportionality."

an aspect of targeted monitoring but as a separate process, and also states that there are "3 levels of compliance monitoring" (Ex. 80 at 2, 4-5).  The letter sets forth the following levels of compliance monitoring:

- Any Late IEPs/Initial Assessments: LEAs that have *any* overdue IEPs or assessments will need to review their local data systems to work to schedule the necessary IEPs, where applicable.
- Late IEPs/Initials **or** No Improvement: LEAs who have students waiting longer than 120 days past the deadline for IEPs and assessments *or* have not made progress to reduce the number of students waiting on IEPs or assessments since October 2021 will need to review their local data and access technical assistance resources provided by SELPAs to support LEAs.
- Late IEPs/Initials **and** No Improvement: LEAs who have students waiting longer than 120 days past the deadline for IEPs and assessments *and* have not made progress to reduce the number of students waiting on IEPs or assessments since October 2021 will need to review their local data and receive technical assistance provided by SELPAs to support LEAs.[15]

*In its response to this report, CDE should explain the omission of level 1 targeted monitoring from this sample letter, why this information was not included in its submission to this Court, and clarify this aspect of its monitoring system.*

Assuming this letter accurately reflects this aspect of CDE's monitoring system, the addition of a measure of very late IEPs is a positive change.  However, four months past the initial evaluation deadline means that students would be waiting half a year for an initial evaluation to be completed prior to this form of CDE intervention.  Further, the intervention is only the LEA reviewing its local data and either accessing technical assistance (TA) resources or receiving TA.

Moreover, neither CDE's submission nor its sample annual determination letter mention compensatory education for students subjected to lengthy delays in determining eligibility and/or the development of IEPs.

The table below shows the criteria used to sort LEAs into these levels according to CDE's submission (Dkt. No. 2676 at 9-11, Attachment 1 at 40):

| Level of Targeted Monitoring | Criteria |
| --- | --- |
| Compliance-Only | Violations in at least one of these six areas:<br>• initial evaluation within 60 days<br>• Part C to B transition by third birthday |

---

[15] The letter states that technical assistance for LEAs in the categories Late IEPs/Initials *or* No Improvement and Late IEPs/Initials *and* No Improvement can be found at https://caltan.info/resources/tag/high-quality-ieps (Ex. 80 at 4).  On June 14th that web address identified four SELPAs to provide this TA but stated: "Resources coming soon!"

| Level of Targeted Monitoring | Criteria |
|---|---|
| | • Secondary transition[16]<br>• IEP meeting at least once a year<br>• Reevaluation at least once every three years<br>• informal resolution meeting within 15 days of a request for due process hearing<br>And/or any of the below[17]:<br>Untimely/incomplete data<br>MOE/SELPA assurance concerns<br>Corrective actions from complaints or due process hearings<br>NPS areas of concern |
| **Level 1** | Does not meet one or two performance targets<br>And/or:<br>Not making progress on systemic causes of low performance or Uncorrected noncompliance[18] |
| **Level 2** | Does not meet three or more performance targets<br>And/or:<br>Year 1 of disproportionality |
| **Level 3** | Performing in bottom 11-20% of LEAs on indicators most closely associated with FAPE in the LRE, and data do not demonstrate improvement "such that" LEA at risk for selection for intensive monitoring<br>And/or:<br>Year 2 of disproportionality, and data do not demonstrate improvement "such that" LEA at risk of identification as significantly disproportionate in following year. |

The performance targets referenced above in the criteria for levels 1 and 2 targeted monitoring, and relevant to this litigation, can be in the following areas: child find, statewide assessment participation, statewide assessment proficiency, suspension rate, school-age LRE, preschool LRE, and/or parent involvement (Dkt. No. 2545 at 8-9).

For level 3 targeted monitoring, CDE's submission does not explain how it operationalizes concepts such as 1) "not making progress" on systemic causes of low performance for level 1 targeted monitoring, and 2) data not demonstrating

---

[16] CDE states that it measures "timelines" for these six areas, but this indicator concerns whether the IEPs of SWD 16 and older contain eight required elements (see Dkt. No. 2545 at 6). Further, this indicator concerns students older than preschool through eighth grade and, thus, is not relevant to the *Emma C.* litigation.

[17] Based on CDE's Attachment 1 these are also criteria for selection for compliance-only targeted monitoring (Dkt. No. 2676 at 40). But in the body of its submission CDE writes that it "may" identify LEAs for this monitoring process based on any of these criteria (Dkt. No. 2676 at 9). *CDE should clarify this in its response to this report.*

[18] Presumably "uncorrected noncompliance" here refers to noncompliance not corrected within one year.

improvement "such that" the LEA is at risk of selection for intensive monitoring or significant disproportionality.[19]  CDE may be referring here to the indicators measured by its Dashboard,[20] which includes measures of progress and regression, but the Dashboard is not used for all indicators.  *CDE should include the progress standards it uses in its response to this report.*

 Moreover, CDE's submission does not explain in its categorization of LEAs into level 3 what becomes of LEAs that are:

- performing in bottom 11-20% of LEAs on indicators most closely associated with FAPE in the LRE but *are* demonstrating improvement based on CDE's unstated standards, and/or
- in year 2 of disproportionality but *are* demonstrating improvement based on CDE's unstated standards.

*CDE should address this issue in its response to this report.*

 In addition, for level 3 targeted monitoring LEAs will be selected based on performance on indicators most closely associated with FAPE in the LRE, but CDE does not state which performance indicators these are.[21]  *CDE should do so in its response to this report.*

 Further, CDE's CIM website (which is Ex. 10), does not list the same standards for selection as those listed in CDE's submission.[22]  For level 2, the website only mentions year 1 of disproportionality, not the failure to meet three or more performance targets.[23]  For level 3, only year 2 of disproportionality is mentioned, with no mention of being in the bottom 11-20% of LEAs on the unspecified indicators.[24]  *CDE should explain these discrepancies in its response to this report.*

 Compliance-only targeted monitoring LEAs are not required to complete any aspect of the CIM process (although they have the option to complete portions of it), but are required to 1) correct the noncompliance, and 2) show 100% compliance in subsequent data (Prong 2 review) (Dkt. No. 2676 at 9).  With respect to timeline violations and incomplete transition plans CDE writes:

> There are instances in which CDE will require the LEA to correct the student-level noncompliance (late IEPs, late initial evaluations that are still not held by the data collection period, and incomplete transition plans). There are other instances where CDE will require the LEA to

---

[19] It is not clear why progress and improvement are not factors in sorting LEAs into level 2 targeted monitoring, but that is not mentioned in CDE's submission (Dkt. No. 2676 at 10).

[20] For a basic explanation of CDE's Dashboard see the Court's Phase 2 Order, Dkt. No. 2520 at 6-7.

[21] It is possible that CDE is referring to its intensive monitoring selection criteria here.

[22] https://www.cde.ca.gov/sp/se/qa/cimprocess.asp.  Compliance-only and level 1 targeted monitoring are not mentioned on this website.

[23] https://www.cde.ca.gov/sp/se/qa/targetedlevel2.asp.

[24] https://www.cde.ca.gov/sp/se/qa/targetedlevel3.asp.

make system-level changes to ensure that there are not future instances
of noncompliance.  (Dkt. No. 2676 at 15)

CDE's submission does not include any guidance or standards that are used to
distinguish the violations that require student-level correction from those that require
system-level changes.

CDE was requested to produce its standards for requiring student-level
correction versus those that require system-level changes for timeline noncompliance.
CDE responded that the materials are still in development, but referred the Monitor to
Ex. 87 in the interim (Unnumbered Index of Materials Provided at 9).

Ex. 87 is a spreadsheet of corrective actions with 5,127 rows.  In order to test
whether this document contained any guidance to distinguish instances of timeline
noncompliance that require student-level correction from those that require system-
level changes, the document was searched for "60" and "sixty," the required timeline in
days for an initial assessment.  The results did not provide any guidance on this issue.
*CDE should produce its standards for distinguishing timeline noncompliance that requires
student-level correction from timeline noncompliance that requires system-level changes in its
response to this report.*

Those LEAs that are found noncompliant with submitting timely and complete
data are required to determine the cause and make improvements to their data systems.
TA from CDE and CDE-funded TA providers is made available as needed (Dkt. No.
2676 at 13).

For the three other levels of targeted monitoring the table below shows the
aspects of the CIM process that are required; whether the LEAs implement those
aspects independently, with assistance, or as directed; and what entities provide the
assistance or direction (Dkt. No. 2676 at 9-11, Attachment 2 at 42):

| CIM Process Activity | Targeted Level 1 | Targeted Level 2 | Targeted Level 3 |
|---|---|---|---|
| **Step 1: Gather/Inquire** | | | |
| Data Drill Down | Required Independent | Required Independent | Required Assisted |
| Assessment of Infrastructure | Optional | Optional | Optional |
| Policies, Practices, Procedures Review | Required Independent | Required Independent | Required Independent |
| Educational Benefit Review | Optional | Optional | Optional |
| Parent Input | Optional | Optional | Required Independent |
| **Step 2: Investigate** | | | |
| Root Cause Analysis | Required Independent | Required Independent | Required Assisted |
| Prioritization | Optional | Optional | Required Independent |

| CIM Process Activity | Targeted Level 1 | Targeted Level 2 | Targeted Level 3 |
|---|---|---|---|
| Initiative Inventory | Optional | Optional | Optional |
| Theory of Action/ Improvement Framework | Optional | Optional | Optional |
| **Step 3: Planning** | | | |
| Improvement Plan | Required Independent | Required Independent | Required Assisted |
| Approval of Plan | None | SELPA | SELPA or COE and CDE |
| **Step 4: Monitoring Plan Implementation** | None; CDE to monitor "through existing data analysis processes of annual data collection" | SELPA[25]; CDE to monitor "through existing annual data collection and analysis processes" | SELPA or COE and CDE to monitor "implementation of activities and the LEA's progress based on timelines and milestones" identified in improvement plan |
| **Overall Support/Assistance During CIM Process** | SELPA "as needed"; CDE upon request | CDE-funded TA providers "as needed"; SELPA or county office of education (COE) | TA provider assigned by CDE; CDE and SELPA or COE support plan implementation[26] |

Level 1 targeted monitoring, as presented in the submission, is essentially an LEA self-monitoring process.  Level 2 targeted monitoring requires the same activities as Level 1 and is also essentially a self-monitoring process, although at level 2 external approval of the improvement plan is required.

It is not at all clear why a self-monitoring approach with little external oversight is appropriate for levels 1 and 2 targeted monitoring LEAs.  Recall that level 1 LEAs may have missed one or two targets, and Level 2 three or more targets; these standards, for non-Dashboard indicators, do not include a measure of how far from the target the LEA was.

For example, the 2020-21 target for school-age placements in regular classes at least 80% of the time is 58.0%, and the target for such placements less than 40% of the time is 19.5%.  A targeted level 1 LEA may have missed only these two targets, but missed them by wide margins, alerting CDE to a significant school-age LRE problem in that LEA.  For example, a non-small LEA may have placed 38% of its SWD in regular

---

[25] It is not clear that the SELPA role in Level 2 targeted monitoring is to monitor implementation of the plan.  CDE writes that the SELPA is required to "support…completion of required activities with support from TA providers, as needed…."

[26] CDE requires the "LEA's SELPA or COE to work closely with the LEA to ensure that the LEA meets those implementation timeline milestones."

classes at least 80% of the time, missing the target by 20%; and 35% of its SWD in regular placements less than 40% of the time, missing the target by 15.5%.  It is difficult to understand why an LEA self-monitoring process—one in which external approval of the improvement plan and external monitoring of the plan's timeless and activities are not required—would be regarded as sufficient in this circumstance.

With respect to the provision of TA during the CIM process, it appears that it includes both individual and group support and "ongoing coaching," at least for those LEAs in targeted levels 1 and 2 for any of the four areas of disproportionality.  These LEAs can schedule a coaching session as needed (Ex. 3 at 29-30; Ex. 4 at 31).

**Conclusion:  CDE's general framework of sorting targeted monitoring LEAs into different monitoring levels, with increasing amounts of assistance and oversight as the levels increase, is sound.**

**However, for some performance indicators this approach can cause results incompatible with its general supervisory responsibilities, such as LEAs that miss few targets but by wide margins being sorted into a largely self-monitoring process. Further, CDE's submitted documents do not call for the provision of compensatory education when SWD suffer lengthy delays in the adoption and implementation of IEPs.  The cutoff for a lengthy delay is too long, and the form of CDE intervention in these circumstances appears to be weak.**

**In addition, firm conclusions cannot be reached about aspects of its targeted monitoring LEA sorting process due to:**

- **important contradictions between some of its documents,**
- **lack of clarity regarding the indicators used to sort LEAs into level 3,**
- **the failure to include standards for key concepts such as "not making progress," and**
- **a lack of standards for distinguishing timeline noncompliance that requires student-level correction from that requiring system-level changes.  The latter were requested from CDE but not produced.**

3.  <u>Intensive Monitoring and Support</u>

The selection criteria used for school-age intensive monitoring, in addition to the other criteria set forth in the table below, are:

- English language arts proficiency,
- Math proficiency,
- Suspension rate,
- Chronic absenteeism rate,
- Rate of SWD in regular classes 80% or more of the day, and
- Rate of SWD in regular classes less than 40% of the day.

The selection criteria used for preschool intensive monitoring, in addition to the other criteria set forth in the table below, are:

- Average rate of child outcomes,
- Rates of suspension and expulsion,
- Rate of SWD in regular classes most of the time, and
- Rate of SWD in separate schools/placements most of the time.

The three possible levels of intensive monitoring are levels 1, 2, and 3. The table below shows the criteria used to sort LEAs into these levels (Dkt. No. 2676 at 11-13, Attachment 1 at 40):

| Level of Intensive Monitoring | Criteria |
|---|---|
| Level 1 | Performing in bottom 8-10% of LEAs on selection criteria on "both" school-age and preschool selection criteria[27] And/or: Outstanding corrective actions for more than one year And/or: In year 1 of significant disproportionality |
| Level 2 | Performing in bottom 4-7.99% of LEAs on selection criteria on "both" school-age and preschool selection criteria And/or: In year 2 of significant disproportionality |
| Level 3 | Performing in bottom 0-3.99% of LEAs on selection criteria on "both" school-age and preschool selection criteria And/or: Outstanding corrective actions for more than two years And/or: Significant disproportionality for three or more years |

These standards appear to state that an LEA must perform within the percentage ranges specified on the selection criteria for *both* school-age and preschool to be selected for intensive monitoring. If that is indeed the case it would be a significant change from CDE's presentation of its approach in its further Phase 2 submission in 2020. There CDE wrote:

> There are now three different selection criteria that may result in CDE identifying an LEA for intensive monitoring: (1) Intensive monitoring, due to outcomes for students ages 6 through 21; (2) Intensive

---

[27] CDE's exact language here is "are in the bottom 8-10 percent of LEAs in the intensive selection criteria, based on the examination of both school-age and preschool data" (Dkt. No. 2676 at 11).

monitoring, due to outcomes for children with disabilities ages 3 through 5; and (3) identification for Significant Disproportionality.[28]

CDE added with respect to preschool intensive monitoring:

> This review may be conducted as an adjunct to the intensive monitoring for ages 6 through 21 for LEAs selected to participate in that activity, or it may be conducted as a separate review for those LEAs not selected for intensive monitoring for ages 6 through 21. (Dkt. No. 2545 at 9)

CDE clearly planned separate school-age and preschool reviews in 2020, except when an LEA was selected for both school-age and preschool intensive monitoring.  *CDE should clarify this issue in its response to this report.*

In addition, CDE's website, submitted as Ex. 10, does not list the same standards for intensive monitoring selection as those listed in CDE's submission. For level 1, the website lists only the specified performance on the selection criteria, omitting year 1 of significant disproportionality and outstanding corrective actions for more than one year.[29]  For level 2, the website lists only the specified performance on the selection criteria, not year 2 of significant disproportionality.[30]  For level 3, the website lists only the specified performance on the selection criteria, not outstanding corrective actions for more than two years or significant disproportionality for three or more years.[31]  *CDE should explain the difference between its website and its submission on this issue and clarify its criteria.*

For the three levels of intensive monitoring all aspects of the CIM process are required.  The table below shows whether LEAs implement those aspects independently, with assistance, or as directed; and what entities provide the assistance or direction (Dkt. No. 2676 at 11-13, Attachment 2 at 42):

| CIM Process Activity | Intensive Level 1 | Intensive Level 2 | Intensive Level 3 |
|---|---|---|---|
| **Step 1:**<br>**Gather/Inquire** | | | |
| Data Drill Down | Required Assisted | Required Directed | Required Directed |
| Assessment of Infrastructure | Required Assisted | Required Directed | Required Directed |

---

[28] This same language appears in CDE's September 2021 SPP Indicator Guide (see Ex. 61 at 62).
[29] https://www.cde.ca.gov/sp/se/qa/intensivelevel1.asp.
[30] https://www.cde.ca.gov/sp/se/qa/intensivelevel2.asp.  However, it appears that CDE may have intended to list the other criterion given the presence of "(1)": "The CDE identifies for level 2 intensive monitoring and supports those LEAs that: (1) are in the bottom 4-7.99 percent of LEAs in outcomes for achievement, placement and school climate (suspension and attendance)."  The website does not include a second standard.
[31] https://www.cde.ca.gov/sp/se/qa/intensivelevel3.asp.

| CIM Process Activity | Intensive Level 1 | Intensive Level 2 | Intensive Level 3 |
|---|---|---|---|
| Policies, Practices, Procedures Review | Required Directed | Required Directed | Required Directed |
| Educational Benefit Review | Required Independent | Required Assisted | Required Directed |
| Parent Input | Required Independent | Required Directed | Required Directed |
| **Step 2: Investigate** | | | |
| Root Cause Analysis | Required Assisted | Required Directed | Required Directed |
| Prioritization | Required Assisted | Required Directed | Required Directed |
| Initiative Inventory | Required Independent | Required Assisted | Required Directed |
| Theory of Action/ Improvement Framework | Required Independent | Required Assisted | Required Directed |
| **Step 3: Planning** | | | |
| Plan | Required Directed | Required Directed | Required Directed |
| Approval | CDE | CDE | CDE |
| **Step 4: Monitoring Plan Implementation** | CDE | CDE | CDE |
| **Overall Support/Assistance During CIM Process** | TA provider[32]; CDE "close supervision" | TA provider supplied by CDE; CDE "close supervision" | CDE "direct supervision"; CDE-assigned TA providers "as needed" |

The submission does not explain whether there is a difference between "close supervision" (levels 1 and 2) by CDE and "direct supervision" (level 3) and, if so, what that difference is. *CDE should address this in its response to this report.*

**Conclusion: CDE's general method of sorting intensive monitoring LEAs into three different monitoring levels, with increasing amounts of assistance and oversight as the levels increase, is sound.**

**However, clear conclusions regarding CDE's specific criteria for selection for intensive monitoring cannot be reached at this time based on ambiguous language in its submission that appears to differ from its 2020 submission and its 2021 SPP Indicator Guide.**

**With respect to CDE's approach to sorting intensive monitoring LEAs into different levels, differences between CDE's submission and its website on the criteria used prevent clear conclusions.**

---

[32] LEAs can register to receive this TA at https://systemimprovement.org/info/technical-assistance (Ex. 51). It is not clear if intensive level 1 LEAs are required to do so.

Further, the submission is not clear enough regarding the level of CDE supervision of the CIM process for intensive levels 1, 2, and 3 LEAs.

## VI.  Substance of CDE's Monitoring and Support System for Non-Small LEAs

A.  CIM Process Step 1:  Gather and Inquire

The purpose of this step is to identify and analyze data in order to understand systemic issues and how those issues impact SWD subgroups.  It involves, CDE writes, identifying the issues the LEA needs to address, determining what current data say about the issues and why the issues exist, and determining what additional data are needed (Dkt. No. 2676 at 17-18).

1.  Team Creation

Although this step is not included in CDE's Attachment 2, it will be assumed that the creation of a team is mandatory for any LEA required to engage in any aspect of the CIM process.  Although a team is presumably required, CDE "suggests" that it consist of an administrator such as a superintendent or deputy superintendent, a special education administrator such as a special education director, a special education teacher, and a general education teacher.  CDE's submission also lists optional participants.  CDE states that it may require additional team members "as necessary," but its submission sheds no light on the circumstances that would result in CDE requiring additional members (Dkt. No. 2676 at 18).

TA is available for LEAs in targeted levels 2 and 3 for disproportionality that are having difficulty forming a team (Ex. 5 at 35).  It is not clear whether such assistance is available for LEAs in targeted levels 2 and 3 for other reasons.

For intensive monitoring levels 1 and 2 LEAs, CDE was requested to provide its guidance and training documents for LEAs and TA providers.  All of the documents produced are still being tested by CDE (Unnumbered Index of Materials Provided at 7).  One of the documents asks, for intensive level 3 LEAs, how the team will be representative of the community and how diverse perspectives will be ensured (Ex. 86 at 1).

Some of the other documents have to do with team functioning and facilitation of a team process.  Ex. 81, "Consultancy Protocol," concerns working through a coaching dilemma.  Ex. 83, "Four Corners Protocol," can be useful to build consensus in a group.[33]  Ex. 84, "Norm Setting Protocol," advocates a process through which a team creates norms of group functioning with respect to collaboration and communication.  Finally, Ex. 85, "Paseo Protocol," seeks to increase group members' awareness of how

---

[33] The protocol involves introducing a statement; labeling the four corners of the room as strongly agree, agree, disagree, and strongly disagree; having group members physically locate themselves in the corner that comes closest to their position; and having a discussion regarding why each group member chose the corner they did.  During the discussion participants can change corners if the discussion changes their perspectives.

aspects of their identities (backgrounds, beliefs, values and culture) may influence their views of the problems the group wishes to impact positively.[34]

**Conclusion:  A well-functioning team is necessary for effective change, improvement planning, and plan implementation.   Effective team building and facilitation should be a key component of the CIM process.**
**It is reasonably clear that for intensive monitoring LEAs, enough TA is available to make the smooth functioning of improvement teams likely.  For targeted monitoring LEAs this is less clear, particularly for levels 1 and 2 LEAs that go through this process largely on their own.  Some training in facilitation for leaders or chairpersons of targeted monitoring LEA teams may be necessary to ensure the effectiveness of their teams.**

2. <u>Data Drill Down</u>

This step is mandatory for all LEAs required to implement the CIM process in targeted or intensive monitoring.  Its goal is to "determine the issues that exist in the LEA and the areas that will require further analysis" using the LEA's current data. LEAs use CDE-provided tools, guides, instructions, and guided questions to disaggregate the data in a variety of ways (disability, race/ethnicity, etc.) and reach conclusions.  LEAs are required to describe to CDE the outcome of their analyses and, when applicable, the support they received from TA providers (Dkt. No. 2676 at 18-19).

a. <u>Data Drill Down:  Targeted</u>

CDE was requested to provide the data analysis tools, guides, and templates that are provided to targeted monitoring LEAs for data drill down in each potential target or review area.  The two documents provided by CDE concern only disproportionality, not the other potential review areas, and do not include tools or templates.  It is not clear who the audience is for these documents, although one can assume that it is targeted monitoring LEAs selected for disproportionality.
One document is a presentation from a TA provider (Ex. 13), and the other is described by CDE as a "copy of a Data Drill Down Activity" (Ex 14; Unnumbered Index of Materials Provided at 2).[35]  Both documents describe data drill down as starting with data from a big group, breaking it up into smaller groups, and narrowing your data to look at groups within (Ex. 13 at 10; Ex. 14 at 1).  It appears from the slides in Ex. 13 that at least one demonstration drill down may have been performed during this training, but the data associated with it are not included in the slides (at 11, 14-15).  The example

---

[34] It should be noted that, in the Monitor's view, this protocol should be used only by an experienced facilitator if it is used at all.  A process like this can easily go wrong in a number of ways and thereby undermine its objective, which is to build "connections within a team" (Ex. 85 at 1; see the note for facilitators at 2, which is too nonchalant regarding this potential).
[35] Ex. 2 makes clear that targeted monitoring level 2 and 3 LEAs, at least those selected for disproportionality, are required to attend a training session on data drill down (at 3).

provided in Ex. 14 also does not include the data.  It instructs those performing the activity to locate LEA data for suspension, identify the percentage of students suspended at least once, and compare it to the prior year.  It then calls for comparing the district data to the SWD subgroup.  It next instructs participants to plan their next drill down and instructs how to get to the school-level data and SWD at that school, but does not tell participants to compare the school rate with the LEA rate, or the SWD rate in that school to the LEA SWD rate, or to the rates in other LEA schools.  It then asks what data will be needed to "explore the next set of questions," but does not identify what those questions are (at 2-3).

The training presentation asks participants, in order to "complete this workshop," to finish a "participant guide" and email it to the TA provider; the provider will then "review and send you feedback and next steps" (Ex 13 at 23[36]).  Despite the request to provide the guides used, this guide was not provided by CDE.  As targeted monitoring level 3 LEAs are to receive TA from a TA provider assigned by CDE on data drill down, it is unknown if the feedback on the participant guide referenced above is that TA, or part of it.

Although CDE does not mention it, it appears that all of the documents discussed below for intensive monitoring drill down are also available for targeted monitoring LEAs.

**Conclusion:  Assuming the availability of Exs. 48-62 to targeted monitoring LEAs, these LEAs would have access to much data necessary to perform an effective drill down.  But while access to data is a necessary condition for an effective drill down, it is not a sufficient condition.  Targeted monitoring LEAs will need assistance to complete an effective drill down.**

**The documents submitted by CDE concern disproportionality only; none concerned the other possible issues for targeted monitoring drill down.**

**In addition, the requested data analysis tools, guides, and templates were not provided by CDE.  In the absence of these documents, guidance for LEAs concerning how to drill down data in the other possible areas of review, and guidance regarding how to draw conclusions from the drill down, this report cannot conclude that targeted monitoring data drill down is likely to be performed effectively.**

### b.  Data Drill Down:  Intensive

CDE was requested to provide its procedures, instructions, guidance, training documents, templates, tools, and instruments related to intensive monitoring data drill down.  CDE provided Exs. 48-62.[37]

For the most part these documents explain how to access data and create data reports.[38]  Ex. 48 is a flyer announcing data tools clinics and workshops; Ex. 59 is a flyer that concerns the Data Quality Toolkit, which appears to offer consultation, coaching,

---

[36] This guide is also referenced in the same manner in Ex. 21 at 22.

[37] Exs. 49 and 56 are the same document, and Exs. 50 and 57 are the same document.

[38] LEAs can manage user access (see Ex. 62).

training, and facilitation to improve data governance and use.[39]  The wording in both documents suggests that these activities are open to all LEAs.

Ex. 49 instructs LEAs how to access the "Drill Down Center," which is presumably part of a CDE-funded TA entity.  Through that entity LEAs can run data reports (Ex. 49 at 4).  Ex. 51 teaches LEAs how to upload data files from CDE's CALPADS database into this system, which generates what are called snapshot reports.  These reports can be disaggregated in a number of ways the document does not explain, and are available for LRE, discipline, preschool LRE, parent involvement, disproportionality, and timely initial eligibility (Ex. 51 at 6, 7).  Child find, statewide assessment participation, and statewide assessment proficiency are not mentioned, although Ex. 50 shows that the report can compare the percentage of students receiving special education in the LEA to the state, a measure of the results of child find (Ex. 50 at 5).  Ex. 50 explains how to interpret these snapshot reports and how to disaggregate.  Each report is capable of disaggregation by disability, race/ethnicity, grade level, gender, school, and socio-economic status.  Data can be displayed in bar charts, heat maps, and risk ratio graphs.  Finally, these reports include guiding questions, such as "What do you notice about the race and ethnicity of students with disabilities along the LRE continuum?"  (Ex. 50 at 5-9).  Such reports would be useful for data drill down.

A number of documents concern annual performance reports (APR):  one explains how to access these reports (Ex. 55), and the other how to interpret them (Ex. 54).  The latter does not explain how to use these reports in a drill down.  APR data also appears to be available through the data tools (Ex. 58).  Each of the APR indicators is explained in CDE's SPP Indicator Guide (Ex. 61); this guide is introduced and explained in a CDE presentation for an unknown audience (Ex. 60).

One document provides multiple sources of additional data "to help you create a more comprehensive picture of the problem and potential areas for improvement."  But "…each LEA must determine the data to study based on its own areas of strength and need" (Ex. 53 at 1, 3).  But the latter statement is not appropriate for intensive levels 2 and 3 LEAs, as these LEAs are to perform the drill down with direction from CDE.  These statements also presume that intensive monitoring LEAs know what "the problem" and its areas of need are, and none of these documents instruct LEAs how and where to start the drill down.

No evidence of a step-by-step approach to performing a data drill down in the specific areas that resulted in the LEA's selection for intensive monitoring was found in CDE's introductory webinar for intensive monitoring LEAs (see Ex. 79 at 13) or its sample CIM introductory meeting agenda for intensive level 3 LEAs (see Ex. 86 at 2[40]).[41]

---

[39] See also https://vimeo.com/592979085.

[40] This agenda allots 20 minutes of this meeting for creating a plan for data collection and analysis, deciding how the data improvement center will be accessed, who is responsible for data collection, what data will be collected, and when the data will be analyzed.

[41] Ex. 82, entitled "Data Observation Protocol," states that this protocol may be used in isolation or as part of a root cause analysis, not data drill down.  But it contains some guiding questions that could be a starting point for a drill down, such as: "What does the data indicate are areas of strength?  What does the data indicate are areas of need?  How has performance changed over time?  What patterns do you notice?  Are there any outliers in the data that may need further investigation?"

Procedures explaining and governing the type of direction to be provided by CDE to intensive levels 2 and 3 LEAs were not provided by CDE.  That is also the case for the assistance to be provided to intensive level 1 LEAs.  Further, training documents for CDE and TA staff who are to provide the direction or assistance were also not provided.

**Conclusion:  It is clear that CDE provides intensive monitoring LEAs with a wealth of information related to accessing, understanding, disaggregating, and using data for improvement purposes.**

**However, none of these documents offer a step-by-step approach to performing a data drill down in the areas that resulted in the LEA's selection for intensive monitoring.  That may be because intensive monitoring LEAs are to perform this activity with assistance (level 1) or as directed by CDE (levels 2 and 3), and a step-by-step approach could be embedded in that assistance or direction; however, no evidence of that was discovered in the documents submitted by CDE.**

**Because CDE did not produce procedures governing such assistance and direction, or training documents for the personnel who are to provide it, the adequacy of the design of the data drill down process for intensive monitoring LEAs cannot currently be determined.  Hence, this report cannot conclude that intensive monitoring data drill down is likely to be implemented effectively.**

3. Assessment of Infrastructure

This step is optional for LEAs in targeted monitoring and required of those in intensive monitoring.  Its purpose is to examine the strength of an LEA's infrastructure through "six basic, or foundational, components for the kind of infrastructure needed in order to have a well-functioning special education program" (Ex. 63 at 1).  The six components are:

- "meaningful and productive" collaboration and communication;
- "strategic allocation" of staffing and processes to monitor and address personnel needs;
- up-to-date, compliant policies and procedures and a "robust" prereferral system;
- accurate, accessible and monitored data systems;
- financial resource management and monitoring processes; and
- instructional practices, including professional development opportunities, that support access to the general education curriculum and quality IEPs (Dkt. No. 2676 at 19).

Ex. 63 is a reasonable approach to assessing the basic parts of a well-functioning special education system.[42]  The document cautions, however, that these components "are not *all* that is needed for a well-functioning system.  They do not replace other

---

[42] The tool through which this is accomplished can be found in Ex. 63 at 7-19.

essential conditions for effective systems, such as effective leadership and a supportive culture" Ex. 63 at 3; emphasis in original).

Intensive monitoring LEAs are to complete the tool, review the results with their TA provider or assigned CDE staff, and record their findings (Ex. 79 at 14). This discussion with the TA provider or CDE staff may be the assistance referred to for intensive level 1 LEAs, but intensive level 2 and 3 LEAs are supposed to perform this assessment with direction from CDE (Dkt. No. 2676, Attachment 2 at 42). A discussion with CDE staff after the tool has been applied and completed is not direction.

Some LEAs that are poorly performing, left to their own devices in this assessment, may not implement it with fidelity without participation and direction from CDE. That may also be true of some intensive level 1 LEAs, which may also require the participation of the TA provider in the assessment itself in order to ensure full and honest implementation.

Procedures, instructions, guidance, and training documents related to the assessment of infrastructure were requested from CDE. Ex. 63 was the only document provided. It does not address the provision of assistance or direction to intensive monitoring LEAs.

**Conclusion: An assessment of infrastructure, as this instrument defines it, can be an important tool for intensive monitoring LEAs to determine factors contributing to poor performance. The instrument is adequate to this task.**

**In the absence of the requested procedures, instructions, guidance, and training documents, based on the discussion in CDE's submission, the assistance or direction provided to intensive LEAs in the assessment of infrastructure is passive and after the fact. Intensive monitoring LEAs receive an annual determination of "needs intervention" in CDE's system for a reason: they require active intervention. Thus, this report cannot currently conclude that this part of the CIM process is likely to be implemented effectively by these LEAs.**

4. Policies, Practices and Procedures Review

This review is required of all LEAs in targeted or intensive monitoring. According to CDE's submission, the review examines procedural, rather than substantive, compliance, although it also states that the review is focused on requirements linked to improving SWD outcomes. CDE provides templates to guide the review.

This review is said to be "differentiated," but CDE's submission does not explain what that means in this context. The submission does not attach the instruments, templates, or standards used to determine compliance or noncompliance.

For LEAs in targeted monitoring that perform this review independently, CDE states that it conducts a "random verification" to ensure the LEA's review was accurate and consistent. No information is provided regarding the composition of the samples, sample sizes, methods, or standards used for this verification. For LEAs in intensive

monitoring CDE performs the policies, practices and procedures review itself, and does so remotely (Dkt. No. 2676 at 20-21).

### a. Policies, Practices and Procedures Review:  Targeted

CDE was requested to provide its procedures, monitoring standards, sample sizes/composition, instruments, guides and templates used by LEAs, SELPAs, and/or CDE-funded TA providers to conduct the policies, practices and procedures review and determine procedural compliance in each potential target or review area.  CDE provided six documents, none of which are the governing procedures.  The discussion below also draws upon other documents provided by CDE.  With one exception, all of the provided documents concern disproportionality; none concern the other potential review areas.[43]

The exception is CDE's Item Table (Ex. 15), a document that contains over 900 federal and state requirements, a standard for each one, and a column entitled "other guidance."  The document contains columns for categories (major category, category, and subcategory[44]), but it does not make clear which of these categories and associated specific requirements are monitored for each potential target or review area in a targeted monitoring policies, practices and procedures review.  This document will be drawn upon below in any review areas for which CDE specified the requirements to be monitored.

A CDE training for targeted monitoring level 2 LEAs selected for year 1 of disproportionality provides a basic introduction to disproportionality and the applicable aspects of the CIM process (Ex. 8 at 4-11, 13-14).  A CDE training for targeted monitoring level 3 LEAs selected for year 2 of disproportionality shows these LEAs how to use the electronic system for the policy and procedures and student reviews.  LEAs first designate which of the four disproportionality indicators is being reviewed, and then are required to upload relevant policy and procedure documents, providing a reference to a page or document to support any items the LEA finds compliant.  For findings of noncompliance, an LEA is required to indicate why it found itself noncompliant (Ex. 9 at 25-28; see also Ex. 47[45] at 36).

For the student record review, the sample is chosen by CDE and is ten students per indicator (Ex. 16 at 19; Ex. 9 at 19; Ex. 47 at 24),[46] and the same process is required for findings of compliance or noncompliance as noted above for the procedures (Ex. 9 at

---

[43] Again, the other potential targeted monitoring review areas are child find, statewide assessment participation, statewide assessment proficiency, suspension rate, LRE, preschool LRE, and parent involvement.

[44] For example, the compliance test for item 10-2-5 is "Does the IEP of students identified as English learners include activities which lead to the development of English language proficiency?"  The major category for this item is "Achievement," the category is "Academic Assessment," and the subcategory is "English Learners."

[45] Ex. 47 is a 2021 CDE training on the policies, practices and procedures review for disproportionality.

[46] Because the documents submitted by CDE all concerned the student record review for disproportionality, it is not clear that samples of ten are chosen for each of the other potential areas of review (child find, preschool LRE, etc.).

23-34; Ex. 47 at 43), according to these documents.  But another CDE document, a 2021 email to an LEA, states that the student record review involves five student records, not ten, for each area of disproportionality.  It also states that the "review will be conducted by the CDE…," not the LEA (Ex. 41 at 2).  Yet another CDE document, an email to another LEA, clearly instructs the LEA to "[c]omplete the student record review with the approved students" (Ex. 46 at 2).  *CDE should resolve these apparent inconsistencies in its response to this report.*

Before turning to the adequacy of the sample size, it must be noted that none of CDE's documents related to the targeted monitoring student record review discuss the composition of the sample of students, despite the request for these procedures, guidance, and instructions.  Thus, it is not currently possible to establish whether the student record review consists of an adequate sample of students capable of determining the extent to which, if any, noncompliance with relevant requirements was responsible for, or contributed to, the LEA's failure to meet the target(s) and/or stay below the risk ratio threshold for disproportionality that resulted in its selection for targeted monitoring.  In other words, the targeted group(s) of SWD to review should result from the reason(s) for selection.  Some examples are:

- if African American SWD are overidentified for Specific Learning Disabilities, then the sample should be African American students identified with a Specific Learning Disability;
- if the LEA was selected because it did not meet the target for the percent of SWD in the regular classroom at least 80% of the time, then the sample should be of SWD with disabilities NOT in the regular classroom at least 80% of the time; and
- if the LEA was selected because it did not meet the target for math proficiency, then the sample should be of SWD who did NOT score proficient in math.

Unfortunately, one cannot determine from CDE's submission and other documents whether it composes student samples strategically and purposefully.

Assuming the sample size selected by CDE for the LEA to review is ten students per area of review (disproportionality in discipline, child find, placements in separate schools, etc.), there are many possible sizes of targeted groups of SWD for whom this sample size would be inadequate to make a meaningful determination of the extent to which noncompliance contributed to or was responsible for the LEA's selection, and some for whom it would be adequate.

A sample size of ten would likely be adequate for issues that involve relatively small numbers of SWD.  For example, if an LEA has 60 total African American SWD identified with serious emotional disturbance and was flagged as disproportionate for potentially overidentifying such students, then a sample of ten of these students to determine whether there are procedural issues would be adequate: it would tell us something that would confidently reveal systemic issues.

But this sample size would be inadequate for issues involving larger numbers of SWD.  For example, if an LEA missed the target for math proficiency and had 250 SWD who did not score proficient, a sample of ten of these students might not be adequate.  If

the LEA missed the target for placements in the regular classroom at least 80% of the time and had 1,000 SWD who are not placed in the regular classroom at least 80% of the time, then a sample of ten would be insufficient to determine whether procedural violations were responsible for, or contributed to, this issue.  As CDE states in its submission that it wishes this review to "provide important information…about potential systemic issues" concerning IEPs (Dkt. No. 2676 at 20), CDE must use sample sizes capable of revealing systemic issues.  A blanket rule of ten students per area of review regardless of the size of the population at issue cannot confidently reveal systemic issues.

If noncompliance is found, a Prong 2 review of "up to" five students "per element" (an element is presumably the same as item or requirement) and continues until 100% compliance is found.  A CDE consultant performs the Prong 2 review (Ex. 9 at 43-44; Ex. 16 at 45; Ex. 45; Ex. 47 at 62-63).  Another document, a presentation by a TA provider for levels 2 and 3 targeted monitoring LEAs on the policy, practices and procedures review for disproportionality, contained no content about these reviews (Ex. 17).[47]

With respect to the CDE random verification, these trainings state that a CDE consultant will "review each item," which would be more than the random verification stated in its submission (Ex. 9 at 41; Ex. 16 at 42).  Another CDE training document also implies that each item would be reviewed by CDE (Ex. 47 at 53).  Since the submission sated that the review is a random verification, it is unclear whether CDE verifies "each item" or a random sample of some size.  CDE was requested to provide its procedures, including sample sizes, to verify that findings of compliance and noncompliance were made correctly.  CDE responded that the materials are "still in development," but in the interim provided Ex. 23.  However, this document concerns only corrective actions for noncompliance found in the disproportionality policy, practices and procedures review, not CDE's verification of whether the LEA made its findings of compliance and noncompliance in those reviews correctly.  Thus, the adequacy of CDE's process for verifying that findings of compliance and noncompliance were made correctly by targeted monitoring LEAs in their self-reviews of policy, practices and procedures in each potential target or review area cannot currently be determined.

Due to an absence of information, particularly the instruments used, little can be said about the content of the policy, practices and procedures reviews in the other potential targeted monitoring areas (child find, LRE, etc.).  With respect to disproportionality, LEAs can be selected for targeted monitoring for disproportionality in:

- Identification of students as SWD,
- Identification of students as SWD with particular impairments,
- Placement in restrictive settings, and/or

---

[47] This presentation did apparently include a demonstration on how to think critically during a student file review during which "two people push each other to go deeper on a file review topic."  Trainees are told to watch for moments when file reviewers challenge ideas respectfully and are open to reconsidering their points of view (Ex. 17 at 12).

- The incidence, duration, and type of disciplinary removals from placement, including suspension and expulsion (34 C.F.R. § 300.646(a)).

The first of these is a priority area for monitoring "to the extent the [disproportionate] representation is the result of inappropriate identification" (34 C.F.R. § 300.600(d)(3)).

CDE produced its protocols for the disproportionality policies and procedures (Ex. 18) and student record (Ex. 19) reviews. The former is a two-page, and the latter a one-page, document. Both protocols contain requirements that are monitored regardless of which type of disproportionality resulted in the LEA's selection, and both also monitor some requirements specific to each of the types of disproportionality.

Both documents include a "compliance test" column which specifies the item question that the reviewer needs to answer to determine whether the LEA is compliant or not on that particular item. The items match up with CDE's Item Table, Ex. 15, but neither of these two protocols include the "compliance standard" and "other guidance" columns from Ex. 15. These columns in Ex. 15 can assist monitors by adding information or suggesting other monitoring activities. For example, the student record protocol includes Item 3-4-2.1: "In making the determination of eligibility, did the IEP team draw upon a variety of sources of information, such as tests, teacher recommendations and parent input?" No other guidance is included in the protocol. But the Item Table also includes the following for this requirement:

| Compliance Standard | Other Guidance |
|---|---|
| Each LEA must draw upon information from a variety of sources including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the student's physical condition, social or cultural background, and adaptive behavior. | Interviews with staff may provide additional information to verify this item. Look for the documentation of the information from the sources used to make the determination of eligibility. |

None of the documents submitted by CDE for this review indicate that interviews are conducted as part of it.

The student record protocol also includes Item 5-1-5.2: "In selecting the LRE, is consideration given to any potential harmful effect of the placement on the child or on the quality of services that he or she needs?" The Item Table also includes:

| Compliance Standard | Other Guidance |
|---|---|
| The student record should contain information that discussions occurred about the potential harmful effects of placement, the quality of services and needed modifications. | Evidence of the required considerations may be addressed in assessment reports or may be addressed in IEP meeting notes. There may be check-offs on the IEP. The legal requirement for these considerations does not state where the evidence of the considerations must be documented, only that the considerations occur. |

This is helpful guidance for an LEA self-monitor, but is not included on the protocol.

Item 4-3-1 is included on the student record protocol and reads: "When a student with a disability has been removed from his or her current placement for 10 school days in the same school year, during any subsequent days of removal, did the public agency provide services?"  The Item Table's compliance test column adds clarification that such services should be provided "on the eleventh day of removal forward," and also includes:

| Compliance Standard | Other Guidance |
|---|---|
| Must be documented in student record. | Check the student record for evidence of notices or information provided to the student's parents regarding arrangements to continue services. Check the student's discipline file. |

No evidence was found in the targeted monitoring TA documents provided by CDE that LEA self-monitors are given access to the compliance standard and other guidance for the items in these protocols and are trained on those standards and guidance.

Moreover, as noted above one disproportionality area is also a priority area for monitoring—whether the racial or ethnic disproportionality in identification as a SWD is the result of "inappropriate" identification.  The student record protocol does not attempt to reach a substantive judgment regarding whether the student's identification as having a disability was appropriate.  It looks instead at the inputs for the decision that the student has a disability (such as whether the assessment was conducted in the primary language).  And some of the items that measure these inputs do so cursorily.  For example, Item 2-2-2.6 on the student record protocol is: "Is there evidence that the current assessment is comprehensive and that assessments were administered in all areas related to the suspected disability by trained and knowledgeable personnel using sound instruments?"   Even if it is assumed that LEA staff are given access to the Item Table and are trained on it, this is the standard offered there for this requirement:

| Compliance Standard | Other Guidance |
|---|---|
| Areas assessed reflect those indicated in the referral and/or the Assessment Plan. | [Nothing entered in this cell] |

Thus, LEA self-monitors are sent to the referral form and assessment plan, but not to the student's cumulative record in order to determine whether there were other concerns about the student prior to referral that should have been included in the assessment plan and, therefore, should have been assessed as part of a comprehensive assessment. What was *not* recorded in the referral and assessment plan may be the reason why a student was not assessed comprehensively in all areas of suspected disability.

Further, the federal requirement also commands an evaluation that is "sufficiently comprehensive" to identify all of the student's special education and related services needs, even if not usually linked to the suspected disability (34 C.F.R. §

42

300.304(c)(6)).[48]  The compliance test for this item does not include that aspect of the requirement for comprehensive assessments.  In addition, the compliance test demands that personnel be trained and knowledgeable and the instruments used be sound; the compliance standard does not attempt to measure these parts of the requirement.

It will be seen below whether *significant* disproportionality in this priority monitoring area is approached in a different manner by CDE in its intensive review process.

CDE was requested to provide a random sample of reports, letters of findings, or other documents that memorialize and convey the results of the policies, practices and procedures review and the review of procedural compliance.  CDE provided in response Exs. 24-46.  None of these documents convey to LEAs the specific results of these reviews.  But they do show that CDE has a well-developed electronic system and process for tracking Prong 1 and Prong 2 findings of noncompliance and the status and completion of corrective actions related to the results of the targeted monitoring disproportionality policies, practices and procedures review.

However, some of these documents contain some puzzling information.  For example, a report on initial review student noncompliance shows fewer than ten students initially reviewed (Prong 1) for a majority of the LEAs included in the report, and no students reviewed for several LEAs (Ex. 30).  A report of Prong 2 student noncompliance shows several LEAs for which no students were reviewed, including one large LEA (Ex. 34).  Finally, a report of indicators reviewed for LEAs that are disproportionate shows many LEAs that are in years 4, 5, or 6 of disproportionality; one LEA was in year 6 for three of the four disproportionality areas (Ex. 36).[49]  These LEAs should have been selected for intensive review due to significant disproportionality.  It is possible that this CDE report also included intensive review LEAs.  *CDE should address these ostensible issues in its response to this report.*

Turning to the corrective actions assigned by CDE when noncompliance is found in the targeted monitoring policies, practices and procedures review, Ex. 23 is a spreadsheet that shows the corrective action(s) for each possible violation found related to the four possible areas of disproportionality.  CDE did not produce corrective actions for any of the other target areas that could also result in an LEA's selection for targeted monitoring.

For policies and procedures noncompliance, the corrective actions in the spreadsheet typically demand evidence that compliant policies and procedures are now in place, and also require evidence that relevant staff have been trained on the now-compliant documents.  For individual student noncompliance, the corrective actions typically require redoing an assessment report and/or reconvening the IEP meeting for

---

[48] This requirement is not explicitly included in CDE's Item Table at all.  The compliance test for Item 2-2-2 cites this regulation, and reads, "Is there evidence that the assessment is comprehensive?"  But the compliance standard does not mention sufficiently comprehensive to identify all needs whether or not commonly linked to the disability category, which is precisely what § 300.304(c)(6) requires.  See Ex. 15 at Item 2-2-2.

[49] An LEA remaining disproportionate in three of the four areas for six years could be an indicator that CDE's monitoring of disproportionality is ineffective in practice.  But that is an issue for another day.

the student in order to correct the noncompliance.[50]  Ex. 23 does not mention steps to ensure that the same noncompliance did not and will not affect other individual students.

**Conclusion:  A targeted monitoring policies, practices and procedures review could be an important component of the CIM process.  But the documents submitted by CDE do not indicate that it is either well designed or likely to be implemented effectively.**

**All of the targeted monitoring policies, practices and procedures review documents produced by CDE concerned disproportionality.  Although requested, no documents had to do with the other possible review areas:  child find, statewide assessment participation, statewide assessment proficiency, suspension rate, LRE, preschool LRE, and/or parent involvement.  Thus, what those reviews are designed to accomplish cannot currently be determined.**

**Due to documents that were not produced such as procedures, and different information in different CDE documents, determinations cannot be reached on many issues.  It is not clear whether CDE or the LEA performs this review, nor is the size of the student sample completely clear.  Assuming the sample is ten students per indicator, that sample size would be adequate for issues involving small numbers of students; but for issues involving large numbers of students, a sample of ten would be inadequate to determine meaningfully the extent to which noncompliance contributed to, or was responsible for, the LEA's failure to meet the target.  Despite the Monitor's request, no information was included in the documents provided regarding how the student sample is chosen.  For that reason, whether student samples are focused, i.e., based on the issues that resulted in an LEA's selection, cannot currently be determined.**

**The documents are also unclear regarding whether CDE's verification of LEA findings of compliance and noncompliance (assuming it is the LEA conducting the review) is a random verification or whether each student is verified.  Thus, whether this verification is designed to be effective cannot be determined at this time.**

**It is also unclear whether LEA self-monitors or CDE monitors are given enough information to conduct the student review effectively and whether interviews are conducted when called for by CDE's Item Table.**

**For the disproportionality area that is a priority area for monitoring, whether the racial or ethnic disproportionality in identification as a SWD is the result of "inappropriate" identification, the student review is not designed to determine whether the identification of the student was or was not appropriate.**

**On the positive side, CDE's documents show that it has a method of tracking findings of noncompliance and corrective actions that is likely to be valuable, assuming it is implemented effectively.**

---

[50] For one requirement, Item 2-4-1, Ex. 23 contains both individual student corrections and policy and procedures correction in both the policies and procedures and the individual student sections of the document.  This may be an error.  *If not, CDE should explain why this requirement is treated differently from the others.*

b.  <u>Policies, Practices and Procedures Review:  Intensive</u>

CDE was requested to provide its procedures, instructions, guidance, training documents, templates, interview and observation protocols, tools, instruments, sample sizes/composition, and monitoring standards related to or governing the intensive monitoring policies, practices and procedures review.  CDE produced only one document in response, Ex. 64, which it describes as a "copy of a 2022 Policy, Practices and Procedures Review" (Unnumbered Index of Materials Provided at 6).

This eight-page monitoring instrument does not contain instructions for CDE monitors, governing procedures, guidance regarding the size and composition of samples of students, or documents used for training the CDE monitors who perform the review.  It also does not contain interview or observation protocols or tools which, one must assume from the instrument, indicates that interviews and observations are not conducted as part of this review of policies, procedures and *practices* for LEAs that are performing poorly enough to be selected for a form of monitoring said to be "intensive."

Moreover, the actual practices of the LEA in conducting assessments, crafting IEPs, and implementing IEPs are not measured by this instrument:  every probe included in Ex. 64 concerns only the presence or absence of compliant policies and procedures.[51]  This may explain why the document does not contain guidance regarding the size and composition of samples of students:  individual students are not reviewed, at least as far as one can tell from this document.  But LEAs can adopt compliant policies and procedures and not implement them, or not do so consistently for every SWD.

In addition, keeping in mind that LEAs can be selected for intensive monitoring based on its number of years of significant disproportionality in at least one of four areas, and/or performance on the selection criteria, and/or having overdue corrective actions (levels 1 and 3), there is no indication that the document is fine-tuned in order to ensure that the review focuses on the issues that resulted in an LEA's selection.

Finally, the instrument includes only the compliance test column from CDE's Ex. 15, not the compliance standard and other guidance contained in the latter document.  Further, the compliance test is sometimes worded differently from the Item Table so that it applies to policies and procedures rather than individual students.[52]  In the absence of the procedures governing this review, there is no evidence that CDE monitors are to use Ex. 64 in conjunction with Ex. 15.  The table below shows the compliance test as shown on Ex. 64 (reworded by CDE from that shown on Ex. 15) and monitoring activities called for by Ex. 15, in addition to reviewing policies and procedures:

---

[51] The instrument includes a column for the LEA to note the location of each policy or procedure.

[52] Compare, for example, Item 2-5-8 on this instrument (Ex. 64 at 5) and that same requirement in Ex. 15, the Item Table:  in Ex. 64 the compliance test asks whether policies and procedures include a provision related to the content of behavioral emergency reports; in Ex. 15 the test looks at whether these reports actually include the required content.

| Item | Compliance Test (Ex. 64) | Other Guidance (Ex. 15) |
|------|--------------------------|-------------------------|
| 2-5-9 | Does the LEA have policies and procedures that ensure if a student does not have a behavioral intervention plan, the administrator schedules an individualized education program (IEP) team meeting within two days of the behavioral emergency to review the emergency report, to determine the necessity for a functional behavioral assessment, and to determine the necessity for an interim (behavioral) plan? | Review documentation from IEP meeting. Look for documentation of the meeting notice or calls to schedule the meeting. |
| 1-1-1 | Does the LEA have policies and procedures to ensure the LEA identifies, locates, and assesses all students aged birth through 21, in need of special education and related services residing in its jurisdiction, including a) students in private, including religious, schools; (b) highly mobile individuals with exceptional needs, such as students who are migrant or homeless; (c) students who are advancing from grade to grade even though they are suspected of being an individual with exceptional needs and in need of special education and related services; (d) students who are wards of the State? | Interviews: Can staff describe how they identify, locate and evaluate students in private schools? Students that are homeless?  Migrant students? |
| 10-2-7 | Do LEA policies and procedures include a provision that teachers who provide instruction to English learners with disabilities have appropriate special education credentials as well as supplementary authorization to provide English language development and primary language support (e.g., Crosscultural, Language, and Academic Development Certificate; Bilingual Crosscultural, Language, and Academic Development Certificate, or equivalent)? | Review qualifications of staff serving children with disabilities. |
| 2-5-8 | Do LEA policies and procedures include a provision that the behavioral emergency report shall include the following: the name and age of the individual; the setting | Review the BER(s) for the student. |

| Item | Compliance Test (Ex. 64) | Other Guidance (Ex. 15) |
|---|---|---|
| | and location of the incident; the name of the staff or other persons involved; a description of the incident and the emergency intervention used; whether the individual is currently engaged in any systemic behavioral intervention plan; and the details of any injuries sustained by the individuals or others including staff, as a result of the incident. | |
| 3-5-7 | For a student whose behavior impedes his or her learning or that of others, does the LEA have policies and procedures that ensure the IEP team considers the provision of positive behavior interventions and strategies and/or supports to address the behavior? | Review the student's BIP. Review the student's IEP. |
| 4-1-3 | Does the LEA have policies and procedures that ensure the LEA provides special education instruction and related services in accordance with the student's IEP?[53] | Check to make sure that all services are provided as described in the IEP (e.g., frequency, intensity, duration, location). If the IEP describes day treatment, wraparound or residential services, these must be unbundled into each discrete service provided and include the required elements. Verify the provision of the unbundled services.<br>Can staff confirm that students receive the special education and related services as stated on the IEP?<br>Can staff describe methods that document how they ensure that student's receive services as stated on the IEP?<br>Can staff and administration describe how they ensure that special education and related services are provided to |

---

[53] For the importance of IEP implementation see the Court's Phase 1 order (Dkt. No. 2428 at 13-18)

| Item | Compliance Test (Ex. 64) | Other Guidance (Ex. 15) |
|------|--------------------------|--------------------------|
| | | children with disabilities according to their IEPs? Can staff and administration describe how they determine which children are currently receiving special education and related services as stated on the IEP? and Can staff and administration describe how they determine which children are not receiving special education and related services as stated on the IEP? |
| 10-2-1 | Does the LEA have policies and procedures that ensure all students whose home language survey indicates a language other than English are assessed using the English Language Proficiency Assessment for California, or an alternate to determine English language proficiency? | Review files of students with disabilities whose home language is other than English to see if their English language proficiency has been assessed. Interview administrators and staff. |

The instrument and evidence submitted by CDE does not demonstrate that it undertakes the monitoring activities shown in this table from Ex. 15 as part of the intensive monitoring policies, practices and procedures review.  These activities include reviewing student files, IEPs, IEP meeting notes, behavioral emergency reports, and behavior intervention plans and verifying staff qualifications.

CDE was requested to provide a random sample of reports, letters of findings, or other documents that memorialize and convey the results of the intensive monitoring policies, practices and procedures review.  CDE responded that these documents are still in development (Unnumbered Index of Materials Provided at 7).

CDE was also requested to provide a random sample of corrective action steps required as a result of noncompliance found through the intensive monitoring policies, practices and procedures review.  CDE provided Ex. 87, its corrective action table.  Each of the examples from Ex. 64 listed in the table above was located in Ex. 87.  All of these items had multiple possible corrective actions, as shown in the table below[54]:

---

[54] Column D of the spreadsheet was headed with "ca_type"; this column contained entries of 1, 2, 3, 4, 5, or 6 in each row.  No key was included, so it was not possible to determine definitively what the numbers signified.  However, the general pattern appeared to be:  1:  LEA must provide evidence that it has compliant policies and procedures; 2:  LEA must provide evidence that it has notified administrators and staff of the policies and procedures; 3:  LEA must provide evidence that it has conducted inservice training for staff and administrators; 4:  LEA staff will ensure that all student records are compliant; 5:

| Item | Compliance Test (Ex. 64) | Corrective Actions (paraphrased) (Ex. 87) |
|------|--------------------------|--------------------------------------------|
| 2-5-9 | Does the LEA have policies and procedures that ensure if a student does not have a behavioral intervention plan, the administrator schedules an individualized education program (IEP) team meeting within two days of the behavioral emergency to review the emergency report, to determine the necessity for a functional behavioral assessment, and to determine the necessity for an interim (behavioral) plan? | 1) develop compliant policies and procedures (row 4256)<br>2) notify administrators and staff of the policies and procedures (row 4270)<br>3) inservice training on policies and procedures (row 4303)<br>4) ensure all student records compliant; CDE will sample half of the records from most recent six months, up to ten (row 4322)<br>5) provide evidence that requirement followed (row 4337)<br>6) "No corrective action available, please overwrite and enter a corrective action" (row 4866) |
| 1-1-1 | Does the LEA have policies and procedures to ensure the LEA identifies, locates, and assesses all students aged birth through 21, in need of special education and related services residing in its jurisdiction, including a) students in private, including religious, schools; (b) highly mobile individuals with exceptional needs, such as students who are migrant or homeless; (c) students who are advancing from grade to grade even though they are suspected of being an individual with exceptional needs and in need of special education and related services; (d) students who are wards of the State? | 1) provide evidence of compliant policies and procedures (row 2)<br>2) notify administrators and staff of policies and procedures (row 810)<br>3) inservice training on policies and procedures (row 1621)<br>4) provide evidence that LEA ensures "other LEAs serving LEA residents comply" with requirements (row 3010)<br>5) "No corrective action available, please overwrite and enter a corrective action" (row 4433) |
| 10-2-7 | Do LEA policies and procedures include a provision that teachers who provide instruction to English learners with disabilities | 1) mechanism in place to review credentials for relevant staff (row 732)<br>2) notify administrators and staff of policies and procedures (row 1573) |

LEA must provide CDE with evidence OR no corrective action available; and 6: a miscellany, but many are student specific.

| Item | Compliance Test (Ex. 64) | Corrective Actions (paraphrased) (Ex. 87) |
|---|---|---|
| | have appropriate special education credentials as well as supplementary authorization to provide English language development and primary language support (e.g., Crosscultural, Language, and Academic Development Certificate; Bilingual Crosscultural, Language, and Academic Development Certificate, or equivalent)? | 3) provide evidence that LEA ensures "other LEAs serving LEA residents" have compliant policies and procedures (row 3774)<br>4) mechanism in place to review credentials for relevant staff (row 4283)<br>5) "No corrective action available, please overwrite and enter a corrective action" (row 4775) |
| 2-5-8 | Do LEA policies and procedures include a provision that the behavioral emergency report shall include the following: the name and age of the individual; the setting and location of the incident; the name of the staff or other persons involved; a description of the incident and the emergency intervention used; whether the individual is currently engaged in any systemic behavioral intervention plan; and the details of any injuries sustained by the individuals or others including staff, as a result of the incident. | 1) develop compliant policies and procedures (row 4254)<br>2) notify staff and administrators (row 4268)<br>3) inservice training on policies and procedures (row 4301)<br>4) ensure all student records compliant; CDE will sample half of the records from most recent six months, up to ten (row 4320)<br>5) provide evidence report includes required content (row 4335)<br>6) "No corrective action available, please overwrite and enter a corrective action" (row 4864) |
| 3-5-7 | For a student whose behavior impedes his or her learning or that of others, does the LEA have policies and procedures that ensure the IEP team considers the provision of positive behavior interventions and strategies and/or supports to address the behavior? | 1) evidence of compliant policies and procedures (row 175)<br>2) notify staff and administrators (row 982)<br>3) inservice training on policies and procedures (row 1794)<br>4) ensure all student records compliant; CDE will sample half of the records from most recent six months, up to ten (row 2545)<br>5) provide evidence that LEA ensures "other LEAs serving LEA residents comply" with requirements (row 3183) |

| Item | Compliance Test (Ex. 64) | Corrective Actions (paraphrased) (Ex. 87) |
|------|--------------------------|--------------------------------------------|
| | | 6) reconvene IEP team or complete amendment to ensure consideration of positive behavior interventions (row 3918) |
| 4-1-3 | Does the LEA have policies and procedures that ensure the LEA provides special education instruction and related services in accordance with the student's IEP? | 1) evidence of compliant policies and procedures (row 204) <br> 2) notify staff and administrators (row 1011) <br> 3) ensure all "student records" compliant; CDE will sample half of the records from most recent six months, up to ten (row 2567) <br> 4) provide evidence that LEA ensures "other LEAs serving LEA residents comply" with requirements (row 3212) <br> 5) reconvene IEP team or complete amendment to determine compensatory services, schedule for services; provide evidence of service delivery for both IEP services and compensatory (row 3939) <br> 6) inservice training for staff and administrators (row 4275) |
| 10-2-1 | Does the LEA have policies and procedures that ensure all students whose home language survey indicates a language other than English are assessed using the English Language Proficiency Assessment for California, or an alternate to determine English language proficiency? | 1) provide evidence of compliant policies and procedures (row 726) <br> 2) notify staff and administrators (row 1567) <br> 3) ensure all "student records" compliant; CDE will sample half of the records from most recent six months, up to ten (row 2966) <br> 4) provide evidence that LEA ensures "other LEAs serving LEA residents" have compliant policies and procedures (row 3768) <br> 5) provide evidence that "the student" assessed with ELPAC or alternate (row 4169) <br> 6) inservice training for staff and administrators (row 4272) |

It is not clear from Ex. 87 whether CDE assigns all, some, or one of these possible corrective actions when a policy and procedure area is found noncompliant in the intensive monitoring policies, practices and procedures review.  *CDE should clarify this in its response to this report.*

Assuming all of the corrective actions associated with an item from Ex. 64 are assigned, CDE's approach to correcting policy and procedure noncompliance is to ensure development of compliant documents, notify appropriate staff of them, train staff, and then ensure that the LEA has complied with the new procedures by reviewing a recent sample of students.  That, if it is indeed the case, would be a solid design, one likely to fully correct policy and procedure noncompliance.  But there is no evidence currently that all of the possible corrective actions are assigned for these policy and procedure violations.

If they are all assigned, there is one exception to that approach in the examples above:  the child find requirement (Item 1-1-1).  For that policy and procedure violation, CDE's corrective actions do not include any steps to determine whether there are students in the LEA who could be reasonably suspected of having disabilities and thereby needing special education.  It is not clear why this requirement is an exception, as child find is a priority area for monitoring.

Finally, with respect to the disproportionality priority area for monitoring—whether the racial or ethnic disproportionality in identification as a SWD was the result of "inappropriate" identification—the targeted monitoring section above concluded, based on the documents provided by CDE, that the targeted monitoring approach to this issue was cursory, incomplete, and not substantive.  For intensive monitoring, although some of the policies and procedures items are related to this issue,[55] the documents provided by CDE do not show that individual students are monitored at all.  Hence, currently there is no evidence that CDE's monitoring system is capable of determining whether or not an LEA that is significantly disproportionate in identification has identified students as having disabilities appropriately.

**Conclusion:  This review can play an important role in intensive monitoring.  But whether it is designed to play such a role cannot currently be determined due the absence of requested documents.**

**CDE only produced its monitoring instrument, and did not produce procedures, guidance documents, training documents, interview and observation protocols, or information about the student sample sizes used or how the sample is selected.  That may be because individual students are not monitored in this review; no evidence was submitted by CDE that students are reviewed in this part of intensive monitoring despite the word "practices" in the review's name.  Hence, there is no evidence that monitors review student files, IEPs, IEP meeting notes, behavioral emergency reports, or behavior intervention plans.**

**There is no evidence that the monitoring instrument is adapted based on the specific issues that resulted in an LEA's selection for intensive monitoring.  The instrument does not include the additional guidance contained in CDE's Item Table, which deprives CDE monitors of useful guidance.**

**If all of the corrective actions from Ex. 87 relevant to a probe in the instrument are assigned when noncompliance is found, then the corrective actions resulting from**

---

[55] For example, items 6-6-1.1, 1-1-3, 2-2-2.5, 2-4-1, and 10-2-1 look for complaint policies and procedures in related areas.

this review would be designed to resolve noncompliance if implemented effectively. An exception is the child find requirement for the reasons stated above.  But there is currently no evidence that all relevant corrective actions are assigned.

With respect to LEAs selected for intensive monitoring due to significant disproportionality in identification, none of the information provided by CDE for this review shows that CDE attempts to determine whether any individual student's identification as having a disability and needing special education was or was not appropriate.  This is a priority area for monitoring.

    5.  Educational Benefit Review

The educational benefit review is optional for LEAs in targeted monitoring and required of those in intensive monitoring.  The submission does not explain why this review is optional for targeted monitoring LEAs.  As LEAs selected for level 1 targeted monitoring may have missed one to two performance targets, those selected for level 2 may have missed three or more performance targets,[56] and those for level 3 may have scored in the bottom 11-20% on performance indicators,[57] this requires some explanation from CDE.  It is not obvious why an educational benefit review should not be required for any level of targeted monitoring.

The purpose of educational benefit review is to "determine whether a student's program has been reasonably planned to result in educational benefit."  The review covers a three-year period for each student reviewed, and works with IEPs, assessments, and progress information to "chart" each year's individualized program. CDE asserts that this review analyzes the relation between the student's needs and IEP goals, whether the student's assessment was comprehensive, and whether sufficient supportive services to enable the student to meet IEP goals were present in the IEP; and then compares the student's program through the three years to determine how the program was adjusted in light of student progress.  The submission does not include the instruments, instructions, or standards used to conduct this review.

According to CDE's submission, intensive monitoring level 1 LEAs are to complete the review independently. CDE provides tools for the LEA to use.  CDE does not verify or validate the results of the review, but it does require assurances that the LEA used the trainings provided, conducted the review, and included a discussion of the results in its summary of this step of the CIM process.  No information is provided in the submission regarding the size and composition of the sample of students, nor whether the LEA or another entity chooses the sample.  CDE and TA providers are available for support if requested.

As intensive monitoring level 1 LEAs may have scored in the bottom 8-10% of LEAs on the intensive monitoring selection criteria, it is not at all clear why these LEAs

---

[56] For non-Dashboard indicators, targets may have been missed by a large margin.
[57] This sentence uses "may have" because, as shown above, an LEA can also be selected for level 1 targeted monitoring due to not making progress on corrective actions, level 2 due to year 1 of disproportionality, and level 3 due to year 2 of disproportionality.

are performing this review independently with what appears to be no external oversight or after-the-fact validation of the results.

For intensive level 2, CDE requires the LEA's participation in a "live" training. LEAs are required to review a "stratified" sample of an unspecified number of students and report the results to CDE.  If noncompliance is reported by the LEA, CDE verifies it. The submission does not discuss whether, and if so how, it verifies findings of compliance.  No information is provided regarding the size and composition of the sample of students, nor regarding what stratification means in this context.[58]  These LEAs presumably have the assistance of a TA provider assigned by CDE in conducting this review.

For intensive level 3, a CDE staff member is the lead reviewer.  The sample size is ten SWD, presumably regardless of the size of an LEA's population of SWD.  CDE requires that each review begin with an initial or triennial assessment, which may imply that this is not the case for the reviews conducted at lower levels of intensive monitoring.  Reporting of the concerns that emerge from the review is overseen by CDE staff, but it is not clear from the submission if these "concerns" are findings of noncompliance (Dkt. No. 2676 at 21-22).

It must be noted that CDE's introductory webinar for intensive monitoring levels 1, 2, and 3 LEAs does not fully comport with CDE's submission.  There CDE states that intensive LEAs "will conduct the educational benefit review with your CDE staff" (Ex. 79 at 15).  No exceptions are noted in the presentation.  *CDE should clarify this issue in its response to this report.*

## a.  Educational Benefit Review:  Targeted

CDE was requested to provide procedures, guidance, and training documents for LEAs, SELPAs, and/or CDE-funded TA providers for targeted monitoring.  Procedures and guidance documents were not produced by CDE, but several training documents were.  Keeping in mind that this review is optional for targeted monitoring LEAs, a CDE presentation for targeted monitoring level 2 LEAs makes clear that training on the educational benefit review is recommended but not required (Ex. 8 at 20).  A CDE presentation for targeted level 3 LEAs does not mention an educational benefit review (Ex. 9).

One document is described by CDE as educational benefit presentation slides from a CDE TA provider (Unnumbered Index of Materials Provided at 1).  This document solely concerns educational benefit; three slides in this presentation repeat what this TA provider regards as the "essential question" of this review, "How do we connect each step of the IEP process so it leads to academic, behavioral and social progress?" (Ex. 6 at 1, 9, 11). But this presentation contains no information regarding how LEAs should conduct this optional review.

---

[58] One can stratify a sample in many different ways—e.g., by disability, school, grade, placement, and/or race/ethnicity.  The purpose of stratified samples is to ensure that each subgroup of interest is represented in the sample.  Thus, it is important to know how many strata are chosen and what the overall sample size is in order to judge the adequacy of a stratification sampling methodology.

A training session conducted by CDE staff entitled "Targeted Monitoring: Introduction to Educational Benefit" was provided by CDE (Ex. 7).  This presentation defines this review as an "examination of a student's initial/triennial and two subsequent annual IEPs to determine whether the IEPs are designed to meet the needs of the student and are reasonably calculated to result in educational progress" (at 3).  It cites the Supreme Court's 2017 decision in the *Endrew F.* case for the proposition that LEAs must offer a program to SWD that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances" (at 6).  Two slides sketch out the six steps of this review very briefly (at 13-14).  While some aspects of CDE's brief presentation of the steps in the educational benefit review merit further probing, this document is only an introduction to an optional process rather than the governing procedures or standards used.  This CDE presentation does not indicate that this review attempts to monitor LRE for the students reviewed.

One slide offers targeted monitoring LEAs some persuasive reasons to perform this currently optional review:  improving student outcomes, improving LEA practices, training staff, identifying weaknesses, and engaging many staff to work together in performing this review (Ex. 7 at 8).

**Conclusion:  An accurate educational benefit review can be an important component of a CIM-type process for targeted monitoring LEAs.  For that reason, and because some of these LEAs may have notably poor performance on some indicators, performance that this review could lead to improving (according to CDE's Ex. 7), it is not clear why this review is not required of at least some of these LEAs.**

b. Educational Benefit Review:  Intensive

CDE was requested to produce its procedures, instructions, guidance, training documents, templates, interview and observation protocols, tools, instruments, sample sizes/composition, and monitoring standards related to or governing its intensive monitoring educational benefit review.  CDE provided three documents, none of which were governing procedures:  a CDE presentation for intensive monitoring LEAs (Ex. 65), a one-page educational benefit flowchart (Ex. 66), and a one-page review form that contains the compliance test, compliance standard, and other guidance (Ex. 67).  Ex. 66 refers to completing an "educational benefit summary form"; that form was not provided by CDE.

None of these documents explain how the sample of ten students for intensive level 3 LEAs is selected or by whom; and none state the size of the sample for the other intensive monitoring LEAs or how, and by whom, the sample is selected.  Turning first to the composition of the intensive monitoring educational benefit review sample of SWD, and keeping in mind the standards for LEA selection for intensive monitoring,[59] a

_____

[59] Again, the selection criteria for school-age, in addition to outstanding corrective actions and significant disproportionality, are:  English language arts proficiency, math proficiency, suspension rate, chronic absenteeism rate, rate of SWD in regular classes 80% or more of the day, and rate of SWD in regular classes less than 40% of the day.  For preschool, in addition to outstanding corrective actions and

sample of students who exhibit some or all of the characteristics that resulted in the LEA's selection would be called for in these poorly performing LEAs (for example, a school-age student who performed poorly on both state assessments, was suspended more than once in the prior year and/or was chronically absent, and/or placed in regular classes less than 40% of the day).  One cannot determine from CDE's documents whether samples are selected in this manner or some other.

As to the sample of ten students for intensive level 3 LEAs, a sample size of ten would likely be adequate for issues that involve relatively small numbers of SWD.  For example, if an LEA was selected based on the selection criteria and has 150 total school-age SWD, one could likely create a sample of ten SWD who met all or most of the criteria on which the LEA performed poorly.  For example, assume that this fictitious intensive level 3 LEA of 150 SWD scored in the bottom 0-3.99% of the state due to having:

- low proficiency scores,
- high suspension rates,
- high chronic absenteeism rates, and
- high rates of students being placed in the regular classroom less than 40% of the time.

A sample of ten SWD who met all four of these criteria could be selected (if a sample of ten such SWD exists), or a sample of ten SWD could be selected who met one or more of these four criteria.  Assuming a substantive educational benefit review capable of fulfilling CDE's stated goal of "assess[ing] the provision of FAPE in the LRE" (Dkt. No. 2676 at 21), a sample of ten could tell us something important about the provision of FAPE in the LRE that may also affect the larger population of the particular subset of 150 SWD who share most or all of these characteristics with an acceptable level of confidence.

But this sample size would be inadequate for larger LEAs.  For example, a large LEA with 5,000 SWD selected based on the four criteria mentioned above would likely have a large number of SWD who have at least one of these characteristics, and many SWD with more than one.  One could not have confidence that results indicating that, for example, half of the sample of ten did not have IEPs reasonably calculated to result in educational benefit could be characteristic of the larger population of SWD who share these traits.  A sample of ten in an LEA this size may tell us that some SWD are not receiving FAPE, but will not tell us with a reasonable level of confidence the extent to which this may be true of the entire population of students with the same characteristics.

---

significant disproportionality, the criteria are average rate of child outcomes, rates of suspension and expulsion, rate of SWD in regular classes most of the time, and rate of SWD in separate schools/placements most of the time.  Intensive level 3 LEAs scored in the bottom 0-3.99% of LEAs, and all intensive monitoring LEAs scored in the bottom decile of all LEAs in the state, unless they were selected based on the other criteria.

In short, both the size and the composition of an educational benefit sample matter greatly if the goal of this review is to determine the extent to which a failure to provide FAPE is the reason for, or contributes to, an LEA's poor performance.  It bears repeating that the provision of FAPE is a priority area for monitoring.

Turning to the substance of the review, Ex. 65 is strikingly similar to Ex. 7, CDE's presentation on educational benefit for targeted monitoring LEAs.  This document, citing an unspecified 2017 U.S. Department of Education document, defines educational benefit as:

> …the effectiveness of an IEP to provide a student meaningful opportunities to benefit from special education and related services, "for appropriate academic and functional advancement and to enable the child to make progress" **that would be equivalent with the opportunities provided to other children.**

In addition, IEPs must:

> [e]nsure that the student's program is reasonably calculated, and result in educational progress which is appropriately ambitious in light of the student's circumstances, and demonstrate that adequate progress means exceeding "merely more than de minimis."  (Ex. 65 at 3; emphasis in original)

As was the case with the targeted monitoring presentation, CDE cites the Supreme Court's 2017 decision in the *Endrew F.* case for the proposition that LEAs must offer a program to SWD that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances" (Ex. 65 at 6).

The presentation states that for a student primarily placed in the general education classroom, one can "in part" measure whether an IEP is reasonably calculated to result in benefit by ascertaining whether the student is receiving passing grades, advancing from grade to grade, making "appropriate" progress toward meeting IEP goals, improving on state and LEA assessments, and graduating with a diploma (Ex. 65 at 9).  The presentation does not provide similar guidance for a student not primarily placed in the general education classroom.

Ex. 65 calls for a six step process:

> Review and chart the last three years of information about the student's program, beginning with the initial or triennial IEP.

> **Step One: Assessments**
> Review assessments based on assessment plan(s)
> **Step Two: Present Levels**
> Identify present levels of academic achievement and functional performance

**Step Three: Needs**
Identify needs based on assessments and present levels
**Step Four: Goals**
Identify goals to address all of student's identified needs
**Step Five: Services**
Identify services to support goal achievement
**Step Six: Progress**
Verify services resulted in appropriate progress

Determine FAPE legal compliance through an examination of documented evidence in the student record (Ex. 65 at 12-13; formatting omitted)

According to the flowchart, for each of the three years covered by the inquiry the reviewer:

- first records from the IEP and other records the student's present performance, needs, goals/objectives, services, and progress;
- then analyzes whether there is a "clear relationship" between needs, goals, and services; and
- then compares to the prior year in order to determine whether the next year's goals and services were "consistent" with the progress made.

The reviewer then completes the summary form (not provided by CDE to the Monitor) and ascertains whether there any patterns and trends to the IEP planned for the student. The final question to be answered in this inquiry is: "Was the student's program reasonably planned to result in educational benefit?" (Ex. 66; emphasis omitted).

Findings of compliance or noncompliance result from the application of the tests and standards in the educational benefit review form for four requirements (Ex. 67). The first is:

| Item | Compliance Test | Compliance Standard | Other Guidance |
|------|-----------------|---------------------|----------------|
| 3-2-3 | Does the IEP include a direct relationship between the present levels of performance, goals and the specific educational services to be provided? | The IEP shall show a direct relationship between the student's present levels of performance, the goals and objectives, and the specific educational services to be provided. | There must be a logical consistency between the assessment report, the student's present levels of performance, annual goals and benchmarks, and services that will be provided. |

There is no indication in this item that, for students whose initial evaluation occurred in the first of the three years studied, the educational benefit review looks at whether the student was timely referred for special education based on his or her prior academic

and behavioral performance.  Thus, this review does not attempt to monitor the timeliness of child find.

Moreover, the review takes the assessment as a given:  it does not probe whether it was sufficiently comprehensive to identify all of the student's educational needs, including those not usually connected with the disability category (34 C.F.R. § 300.304(b)(1), (c)(2), (4), (6) and (7)).  Mental health needs, for example, can sometimes be overlooked in a referral, and therefore in an assessment, if not typically connected with the suspected disability.  If the assessment was not sufficiently comprehensive and did not identify all of the educational needs, then the review's ability to analyze the relation between needs, goals, and services is fatally impaired.

Further, key concepts such as "direct relationship" and "logical consistency" are not defined so that different monitors will review this item in a uniform manner.  This would be important even if CDE staff were performing all of these reviews for intensive monitoring LEAs, and is particularly important because intensive level 1 LEAs are engaging in this review independently and level 2 LEAs with some form of TA which may or may not amount to oversight.[60]

The second test is:

| Item | Compliance Test | Compliance Standard | Other Guidance |
|------|-----------------|---------------------|----------------|
| 3-2-5 | Does the IEP include descriptions of program modifications that will be provided to enable the student to:<br>1) Advance toward attaining annual goals?<br>2) Be involved and make progress in the general education curriculum and participate in extra-curricular activities?<br>3) Be educated and participate with other students with disabilities and with nondisabled students? | The IEP should include a statement of the program modifications or supports for school personnel that will be provided to enable the student to advance toward attaining annual goals, be involved and make progress in the general education curriculum and participate in extracurricular activities, and to be educated and participate with other students with disabilities and with nondisabled students. | Must be documented in the IEP. |

It is clear that this item looks for documentation of the program modifications the student is to receive on the IEP, which is a basic compliance requirement.  But it is not at all clear that the monitors substantively attempt to determine whether those modifications are *sufficient* to enable advancement toward attaining goals, involvement and progress in the general curriculum and participation in extracurricular activities, and education and participation with students with and without disabilities.

[60] The documents produced by CDE do not shed light on whether the assistance amounts to oversight of this process for intensive level 2 LEAs.

In addition, the item does not indicate that the review determines the extent to which the modifications on the IEP are actually implemented, and implemented consistently, using monitoring methods such as observations and interviews. Even thoughtful and appropriate modifications will not enable a student to make progress if they are not implemented fully and with fidelity.

The third test is:

| Item | Compliance Test | Compliance Standard | Other Guidance |
|------|-----------------|---------------------|----------------|
| 4-1-1 | Does the LEA make a free appropriate public education available to the student? | Records, documentation, and interviews must indicate that all children with a disability have a free appropriate public education available to them. | Review the components of FAPE in 34 CFR 300.13 and in 34 CFR 300.300-313. Generally, does the LEA serve all eligible children? Are they served at no cost to the parents? Are services provided under public supervision? Does it include a regular preschool, elementary and secondary education? And are the services provided in conformity with an IEP? |

It must first be noted that the regulations cited in the other guidance column of this instrument do not contain the components of FAPE.[61]  The first regulation cited defines "elementary school," § 300.300 concerns parental consent, § 300.301-300.311 concern evaluations and eligibility determinations, and there are no regulations § 300.312 or § 300.313.  Inaccurate citations cannot assist LEA self-monitors and CDE monitors attempting to apply this guidance.  *CDE should identify the regulation(s) it intended to cite here in its response to this report.*

The questions that follow the citations are not likely to be very helpful for an inquiry into FAPE for an individual student, with the exception of the last.  The provision of services in conformance with the IEP could be answered through interviews, observations, and staff timelogs.

"Records, documentation, and interviews" are listed in the compliance standard column, but none of the other documents produced by CDE indicate that interviews are conducted for the educational benefit review, and it is not clear whether records and documents such as staff timelogs would be routinely reviewed by LEAs (levels 1 and 2) or CDE (level 3) during this review.  Governing procedures would shed light on this issue, but procedures were not produced.  Observations of the student are not listed in that column, so one must assume they are not conducted as part of the review.

The fourth test is:

---

[61] The same regulations are cited in this column of the Item Table for item 4-1-1 as well (Ex. 15).

| Item | Compliance Test | Compliance Standard | Other Guidance |
|---|---|---|---|
| 4-1-5 | Does the LEA assist the student to achieve the goals listed in the IEP? Also, for a student eligible for statewide testing using the California Alternate Assessment (CAA), does the LEA assist the student to achieve the benchmarks listed in the IEP? | A review of records, other documentation and interviews must demonstrate that the LEA ensured that the annual IEP goals and if appropriate, benchmarks, were measurable and designed to meet the student's needs that result from the student's disability. | Consider whether the goals and objectives are appropriate, whether they have been adjusted over time. Consider whether the goals, objectives and services are reasonably calculated to enable the child to benefit from special education and related services. Consider whether the District has provided consistent related and support services to the child (consistent staffing). Consider whether the locations, facilities, equipment and materials are comparable to those provided for all other students. |

Assuming effective implementation, the considerations listed in the other guidance column are likely to be helpful in answering the ultimate question from CDE's Ex. 66, "Was the student's program reasonably planned to result in educational benefit?"

However, it is not clear that that question is equivalent to the key CDE takeaway from the *Endrew F.* decision as expressed in Ex. 65: whether the student's program is "reasonably calculated to enable a child to make *progress appropriate in light of the child's circumstances*" (emphasis added). As set forth above, it is also unclear if this review gathers enough of the right kind of information necessary to answer that question.

CDE was also requested to provide a random sample of reports, letters of findings, or other documents that memorialize and convey the results of intensive monitoring educational benefit reviews. CDE responded that that these materials are still in development (Unnumbered Index of Materials Provided at 7).

In response to a request for a random sample of corrective action steps resulting from educational benefit findings of noncompliance, CDE pointed to Ex. 87, its corrective action table. The table below shows the compliance test from Ex. 67 and the corrective actions from Ex. 87:

| Item | Compliance Test (Ex. 67) | Corrective Actions (paraphrased) (Ex. 87) |
|---|---|---|
| 3-2-3 | Does the IEP include a direct relationship between the present levels of performance, goals and the specific | 1) evidence of compliant policies and procedures (row 92)<br>2) notify administrators and staff of policies and procedures (row 900)<br>3) inservice training for staff and administrators (row 1711) |

| Item | Compliance Test (Ex. 67) | Corrective Actions (paraphrased) (Ex. 87) |
|------|--------------------------|-------------------------------------------|
|  | educational services to be provided? | 4) ensure all "student records" compliant; CDE will sample half of the records from most recent six months, up to five, and conduct "an" educational benefit review (row 2473)<br>5) LEA provides evidence that it ensures other LEAs serving LEA residents comply with requirements (row 3100)<br>6) reconvene IEP team or complete amendment to ensure IEP includes direct relationship (row 3861) |
| 3-2-5 | Does the IEP include descriptions of program modifications that will be provided to enable the student to:<br>1) Advance toward attaining annual goals?<br>2) Be involved and make progress in the general education curriculum and participate in extra-curricular activities?<br>3) Be educated and participate with other students with disabilities and with nondisabled students? | 1) evidence of compliant policies and procedures (row 94)<br>2) notify administrators and staff of policies and procedures (row 902)<br>3) inservice training for staff and administrators (row 1713)<br>4) ensure all "student records" compliant; CDE will sample half of the records from most recent six months, up to 20 (row 2475)<br>5) LEA provides evidence that it ensures other LEAs serving LEA residents comply with requirements (row 3102)<br>6) reconvene IEP team or complete amendment to ensure IEP includes required content (row 3863) |
| 4-1-1 | Does the LEA make a free appropriate public education available to the student? | 1) evidence of compliant policies and procedures (row 202)<br>2) notify administrators and staff of policies and procedures (row 1009)<br>3) ensure all "student records" compliant; CDE will sample half of the "student referrals" from most recent six months, up to five, and conduct "an" educational benefit review (row 2565)<br>4) LEA provides evidence that it ensures other LEAs serving LEA residents comply with requirements (row 3210) |

| Item | Compliance Test (Ex. 67) | Corrective Actions (paraphrased) (Ex. 87) |
|------|--------------------------|--------------------------------------------|
| | | 5) LEA to provide evidence that it makes FAPE available to all SWD (row 4215)<br>6) inservice training for staff and administrators (row 4271) |
| 4-1-5 | Does the LEA assist the student to achieve the goals listed in the IEP? Also, for a student eligible for statewide testing using the California Alternate Assessment (CAA), does the LEA assist the student to achieve the benchmarks listed in the IEP? | 1) evidence of compliant policies and procedures (row 206)<br>2) notify administrators and staff of policies and procedures (row 1013)<br>3) inservice training for staff and administrators (row 1822)<br>4) ensure all "student records" compliant; CDE will sample half of the "student referrals" from most recent six months, up to five, and conduct "an" educational benefit review, (for "students with severe handicapping conditions") (row 2569)<br>5) LEA provides evidence that it ensures other LEAs serving LEA residents comply with requirements (row 3214)<br>6) reconvene IEP team to review educational benefit findings and revise student's program to address concerns (row 3941) |

As was the case for corrective actions resulting from the review of policies and procedures, it is not clear whether CDE assigns all, some, or one of these potential corrective actions when noncompliance with any of these four requirements is found through an educational benefit review. *CDE should address this issue in its response to this report.*

The corrective actions for the program modifications requirement (3-2-5) do not include steps related to the actual provision of the modifications listed on the IEP. That would appear to confirm that the educational benefit review for that item does not measure implementation of needed modifications: if it did one would expect to see some corrective action steps related to implementation. That may also be the case for item 4-1-1: the other guidance for this item included determining whether the services are provided in conformity with an IEP, but it is not obvious that any of the potential corrective actions concern actual service delivery.

In addition, while items 3-2-3, 3-2-5, and 4-1-5 each has a corrective action item that requires reconvening the IEP team for the student, item 4-1-1 does not. It is not clear why the team should not reconvene in response to noncompliance with this item.

The corrective actions for two of these items refer to "student referrals," a term that often refers to referrals for special education assessment. But the associated items concern students already eligible for special education. *As "referrals" is puzzling in this context, it would helpful if CDE would explain its meaning in these two items.*

The corrective actions for three of these four items require CDE to conduct "an" educational benefit review; one, item 3-2-5, does not. *CDE should explain why that is the case in its response to this report.*

Moreover, while not entirely clear from the wording, the word "an" may indicate that only one additional educational benefit review will be conducted by CDE in order to determine whether noncompliance found through the initial review has been corrected systemically. If so, it is difficult to understand how a review of a sample of one student would speak to this concern in a meaningful way.

**Conclusion: If implemented effectively and designed well, an educational benefit review of a sufficient sample of SWD chosen purposefully can be an important component of a CIM-like process for LEAs that are performing poorly enough to be selected for intensive monitoring. For the reasons stated above and summarized below, there are reasons to question whether the review is well designed and whether it will be implemented effectively.**

**CDE has not presented reasons to believe that intensive level 1 LEAs can effectively perform this review independently and without CDE validation of the results. For level 2 LEAs, the information submitted by CDE does not show that findings of compliance are validated by CDE or that the assistance provided these LEAs is sufficient to validate these findings.**

**In the absence of some requested documents (the procedures governing the review; any instructions, guidance, and training documents for its staff conducting the review for level 3 LEAs; procedures and training documents for TA providers for level 2 LEAs; any interview and observation protocols it uses; and the educational benefit summary form), it is unclear what sample sizes are used for levels 1 and 2 LEAs, how samples are stratified for level 2 LEAs, and how samples are chosen for all intensive LEAs. For level 3 LEAs, a sample of ten SWD is likely adequate for issues affecting small numbers of SWD, but inadequate for issues affecting large numbers of SWD.**

**The review does not monitor child find or LRE. The instrument used contains inaccurate citations, does not probe whether students' assessments were sufficiently comprehensive to identify all of their educational needs, and leaves key concepts undefined. None of the documents submitted by CDE show that the sufficiency of program modifications, or their actual implementation, is probed. There is currently no evidence that interviews or observations are performed during this review.**

**Although some of the information in the instrument is likely to be helpful to monitors, the evidence submitted by CDE does not show that the review gathers the information necessary to determine whether a student's program is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."**

**It is not clear which corrective actions are assigned by CDE when noncompliance is found. One item's corrective actions do not include reconvening the IEP team for the affected student. Another item's corrective actions do not require CDE to perform an additional educational benefit review to ensure that**

**noncompliance has been corrected systemically; for the three items that do require "an" additional review, CDE has not presented reasons to believe that one additional review would be sufficient to indicate systemic correction, assuming this is the correct reading of CDE's wording.**

6. <u>Parent Input</u>

The parent input review is not required for levels 1 and 2 targeted monitoring LEAs, but is required for level 3 targeted and Levels 1, 2, and 3 intensive monitoring LEAs. CDE's submission includes a link to the parent survey,[62] which was later submitted as Ex. 68. The submission does not explain why a parent input review is not required for levels 1 and 2 targeted monitoring LEAs. This is odd, as some of these LEAs may have been selected for monitoring because they did not meet the target for the parent involvement indicator.

The level 3 targeted and level 1 intensive LEAs are to conduct the review independently. But these LEAs are also at the overall "assisted" level of engagement according to CDE's Attachment 2 (Dkt. No. 2676 at 42). CDE may be referring to the overall level of engagement when it writes, "For those LEAs at the assisted level of engagement, CDE will require the LEA to work with a TA provider to conduct the training and conduct the analysis of the parent input that will be included in CIM process Step 1." *As it is not clear whether level 3 targeted and level 1 intensive LEAs engage in this review independently or with a TA provider, CDE should clarify this in its response to this report.*

Such LEAs are required to participate in a training via webinar. The submission does not include a link to this webinar training. LEAs may also use additional means to gather parent input. CDE states that it provides access to a "reflective activity" so that LEAs can set forth their conclusions. The submission does not attach the reflective activity, nor does it state how many parents are to be surveyed and the composition of the sample.

Levels 2 and 3 intensive LEAs conduct the review with CDE oversight. CDE requires that a link to the survey be sent to every parent of a SWD in the LEA, and conducts analysis meetings to assist in drawing conclusions from the results (Dkt. No. 2676 at 22).

a. <u>Parent Input:  Parent Survey Instrument</u>

The parent survey instrument was reviewed. It consists of 23 probes with five possible responses ranging from "strongly agree" to "strongly disagree" ("strongly agree" is the first option listed). Eighteen probes apply to all parents, one to parents of students with behavioral issues, two to parents of students 16 and older, and two to parents of English learners.

---

[62] https://www.seedsofpartnership.org/monitoringsurvey/.

None of the probes concern the timeliness of the child find or the referral activities that led to the student's identification as a SWD. One probe concerns LRE, but does not ask the parent his or her view of whether the student could be educated in a less restrictive setting with the use of supports and services.[63] Two probes focus on IEP implementation. Three probes concern the assessment process: whether the reports were reviewed and explained at the IEP meeting, and whether the results were used to plan IEP goals and services. The other assessment-related probe does not ask whether the assessments identified all of the student's educational needs, and instead probes whether the assessments were "helpful" in identifying all of the needs.[64] It is unclear how a parent would respond if the assessments were helpful but did not identify all of the student's needs.

   **Conclusion: The parent input instrument can gather some valuable information for improvement planning. But none of the probes address the timeliness of the monitoring priority area of child find, and the LRE probe and one assessment probe could be more direct. There is no evidence that the instrument is modified based on the reasons for the LEA's selection for monitoring.**

   b. Parent Input: Targeted

   CDE was requested to provide its parent input procedures for targeted level 3 LEAs. It provided a training conducted by a TA provider (Ex. 21) and what it described as a parent input activity from the same TA provider (Ex. 22). Procedures were not provided. Both concern "empathy interviews" and both are for LEAs selected for targeted monitoring based on disproportionality. Neither states whether empathy interviews are conducted prior to or after the parent survey is administered and its results tabulated, or whether these interviews are required as part of the parent input process. But Ex. 69, submitted for intensive monitoring parent input, states that intensive LEAs have the option to do interviews and focus groups (at 1). Because interviews are optional for intensive LEAs, one can safely assume that they are not required for targeted level 3 LEAs.

   Exs. 21 and 22 advise asking parents three types of questions—specific, broad, and probing—and both offer examples of each (Ex. 21 at 14, 16-17; Ex. 22 at 2). One offers interview tips, such as not correcting interviewees and not sharing their own opinions (Ex. 21 at 18). Both documents advise trainees to pick a process that involves parents related to the specific area of disproportionality that resulted in selection for monitoring and ask questions about it, for example meetings about behavioral referrals or IEP meetings (Ex. 21 at 20; Ex. 22 at 1-2). The parent input activity document advises identifying themes from three or more interviews and then including them in an

---

[63] "15. My child is in the appropriate placement for their educational needs (such as the general education class, special education class, learning center/ resource support, etc.). "

[64] "10. The special education assessments my child received were helpful in identifying all of their academic, developmental, and functional needs."

unspecified "communication," and including in presentations quotes from interviewees who have granted permission to do so.

It is not clear from either document whether level 3 targeted LEAs are required to report the results of the survey to CDE, but Ex. 69 states that only intensive monitoring LEAs are required to report (at 1).  One document closes by asking trainees to offer ideas regarding how to incorporate the identified parental themes into the monitoring process (Ex. 22 at 2-3).

**Conclusion:  It is important to gather input from parents to inform an improvement planning process.  It is therefore unclear why targeted levels 1 and 2 LEAs are not required to gather such input even if they were selected based on a failure to meet the parent involvement indicator, and also unclear why level 3 LEAs are not required to report the results to CDE.**

**Interviews with parents are not required for level 3 LEAs, even if the survey results indicate reasons to dig more deeply into some issues.  The documents submitted do not explain how the results of the survey are to be analyzed and used in the next steps of the CIM process.  It is possible that documents that were not provided by CDE, the webinar training and reflective activity, could shed light on these issues.**

### c.  Parent Input:  Intensive

CDE was requested to provide its procedures, instructions, guidance and training documents, instruments, and sample sizes/composition related to or governing the intensive monitoring parent input process.  As noted above, CDE provided its parent survey instrument (Ex. 68) and a frequently asked questions document (Ex. 69).

Ex. 69 makes clear that all intensive monitoring LEAs must report the parent survey results and have the option of using additional sources of parent input such as focus groups or interviews (at 1).  A link to the survey is disseminated by all intensive monitoring LEAs to all parents of SWD; parents of students who do not currently have IEPs are not surveyed regarding any experiences they may have had with the child find process.  Parents can respond to the survey on line or mail a printed copy.  Whether, and if so, how parents who are not fully literate and/or who lack computer or printer access are to be included in the survey is not addressed in this document.  The goal is for a 20% response rate.  If an LEA has difficulty reaching that response rate it "should" contact the CDE consultant for that region for "additional strategies."  The additional strategies to be used in these circumstances are not included in the document (at 2).

The document closes with a brief discussion of how the data will be used.  But no guidance for analyzing and using the results is offered there.  Instead, it simply states that the data will be used in "determining root cause(s)" and "further support" toward the improvement plan (at 2-3).

None of the submitted documents explain how conclusions are to be drawn from the survey, how results are to be used at later stages of the CIM process, or the nature of

CDE oversight for intensive levels 2 and 3 LEAs.  The introductory webinar for intensive LEAs does not mention any form of oversight for these LEAs, and also says that LEAs will analyze the data themselves "as well as other data to be discussed with their TA provider," and notes that the primary TA provider for intensive level 3 LEAs is CDE (Ex. 79 at 17, 21).  CDE's sample meeting agenda for intensive level 3 LEAs refers to the availability of parent input reports based on the survey, but CDE did not provide examples of these reports (Ex. 86 at 3).

**Conclusion:  It is important to gather input from parents to inform an improvement planning process in poorly performing LEAs.  The documents submitted by CDE do not make clear whether intensive level 1 LEAs perform this review independently or with a TA provider.  Little information is provided regarding the nature of CDE oversight of levels 2 and 3 LEAs.**

**It is not clear whether, and if so how, parents who are not fully literate and/or who lack computer or printer access will be included in the survey.  Interviews with parents are not required for intensive LEAs, even if survey results indicate reasons to probe more deeply on some issues.  Moreover, the documents submitted by CDE do not explain how the results are to be analyzed and used in the next steps of the CIM process.  It is unknown if there are additional documents not submitted by CDE that would shed light on these issues.**

B.  CIM Process Step 2:  Investigation

The purpose of this step is to look more closely at the identified issues, determine their root causes, and determine which one to three of them should be focused on.

1.  Root Cause Analysis

With the exception of compliance-only targeted monitoring LEAs, this analysis is required of all other LEAs in targeted or intensive monitoring.  Targeted levels 1 and 2 LEAs perform the analysis independently; targeted level 3 and intensive level 1 LEAs with assistance; and intensive levels 2 and 3 LEAs with direction from CDE (Dkt. No. 2676, Attachment 2 at 42).

CDE writes:

> Root causes are typically few in number, often three or less. Additional root causes would likely indicate that deeper analysis is required. Root causes are also not a person or group of people. They often point to a process, a set of assumptions or beliefs behind a process, or a break in the system that might need some level of support. A root cause should reveal where to focus the LEA's attention, not where to assign blame. Addressing this process with a growth mindset is essential to finding

real solutions. Points of resistance may reveal additional information and a place for needed support.  (Dkt. No. 2676 at 23)

Although CDE does not offer support for some of its assertions in this paragraph,[65] they appear reasonable.

CDE states its belief that a "true data-based, vetted root cause" will begin the process of positive change necessary for improved SWD outcomes.  The submission asserts that there are many tools that can assist a team in this analysis, but does not attach these tools.

Those LEAs that perform the analysis independently (targeted levels 1 and 2) are invited to a webinar training, provided the necessary tools by CDE, and must describe their analyses in their summaries of this step of the CIM process.  The submission did not include the webinar.

Targeted level 3 and intensive level 1 LEAs are required to work with a TA provider on the analysis and are required to include the analysis in their summaries of CIM step 2.  CDE oversees intensive levels 2 and 3 LEAs' implementation of the analysis and "conduct[s]" the meetings itself (Dkt. No. 2676 at 23-24).

a.  <u>Root Cause Analysis:  Targeted</u>

The Monitor requested a copy of the webinar training to which targeted levels 1 and 2 LEAs were apparently invited, and any other trainings on root cause analysis for targeted monitoring LEAs.  CDE responded that "the State does not any have further materials to provide" (Gill email to Mlawer, 5/20/22).  Targeted levels 1 and 2 LEAs are to perform this analysis independently; one would expect that they would need significant training to do so.  Targeted level 3 LEAs are to engage in this analysis with assistance, but CDE's submitted documents do not lay out what this assistance consists of.

CDE stated in this same email that Exs. 70-77 (see below) "can also be used" for root cause analysis by targeted monitoring LEAs, but the email did not say that these documents have been provided to these LEAs, nor whether targeted monitoring LEAs have been trained in the use of these documents.[66]  As noted above, targeted levels 1 and 2 LEAs must describe their root cause analyses in their summaries of this step of the CIM process.  But CDE does not state whether any standards are applied to that summary in order to ensure that the analysis was performed with fidelity.

CDE was also asked to provide a random sample of root cause analyses from targeted monitoring LEAs.  CDE responded that these materials are still in development (Unnumbered Index of Materials Provided at 4).

---

[65] For example, why are root causes typically few in number?  Why can they not be a person or group of people?

[66] As will be seen below, a significant amount of training and better instructions will be necessary if these documents are to be used fruitfully by targeted levels 1 and 2 LEAs that conduct root cause analyses independently.

**Conclusion:  Determining the root causes of noncompliance and poor performance is important in a CIM-like process for targeted monitoring LEAs.**

**However, CDE has not provided documents setting forth the expectations, training, assistance, and instructions for these LEAs.  Targeted levels 1 and 2 LEAs perform this analysis independently and will need training and clear instructions to do so.  Targeted level 3 LEAs receive some assistance in this analysis, according to CDE, but CDE has not provided a description of that assistance or any training for the providers of it.  In addition, CDE has not provided any standards that would be applied to either the descriptions of the root cause analyses of levels 1 and 2 LEAs, or to the analyses themselves to be included in the CIM step 2 summaries for level 3 LEAs, and indeed has not stated that any standards at all are applied.**

**In the absence of such documents, this report can only conclude that targeted monitoring LEAs are unlikely to implement the root cause analysis step of the CIM process effectively.**

### b.  Root Cause Analysis:  Intensive

CDE was requested to provide its procedures, instructions, guidance, training documents, templates, and tools related to or governing intensive monitoring root cause analysis.  CDE provided Exs. 70-77.[67]  It states that these are "tools CDE is currently testing in anticipation of selecting appropriate protocol(s)" (Unnumbered Index of Materials Provided at 6).  None of the documents explain the order in which they are to be used or how they fit together.[68]  Ex. 76, a root cause analysis summarizing tool, shows two steps to the process:  1) problem(s) identified through data analysis, and 2) investigation methods, results, and root causes (see below for discussion of this tool).

Ex. 71, "Fishbone Diagram," assists in identifying potential causes of a problem, categorizing them and, the document asserts, "helps teams focus on causes rather than symptoms."  It calls for first defining the problem, brainstorming potential causes, grouping the potential causes into categories, and labeling the categories (at 1).  In the fishbone diagram the head of the fish is the problem, and along the spine the categories of causes appear with potential causes arrayed below each category (at 2).  The document is a potentially useful tool, although no aspect of the document helps distinguish causes from symptoms.

But the fishbone analysis assumes participants all know and agree on what "the problem" is.  By this point in the CIM process intensive monitoring LEAs:

- presumably know the reasons they were selected for monitoring;
- completed a data drill down;

---

[67] Ex. 82, "Data Observation Protocol," states that it can also be used "as part of a deeper root cause analysis investigation."  But, as noted in the intensive data drill down section above, the guided questions appear to be more appropriate to data drill down than to root cause analysis.

[68] Ex. 75, a sample root cause analysis meeting agenda, includes a space to record the step in the process the meeting is attempting to implement.

- assessed their infrastructure;
- monitored policies, practices, and procedures for compliance;
- reviewed educational benefit; and
- conducted a parent survey.

As will be seen below, Ex. 72 is another potential source of problems.

These activities may have revealed a host of problems in these low-performing LEAs.  None of the documents submitted by CDE show whether, and if so how, LEAs are to achieve a focus on a problem or several problems.[69]  It is also possible that CDE wishes LEAs to perform a fishbone analysis for each of the problems found, but that it is impossible to determine from the submitted documents.

Ex. 77 also concerns potential root causes and symptoms.  Entitled "Root Cause Analysis Tool," its stated purpose is:

> to support teams in brainstorming a list of potential symptoms and root causes for problems they are facing. It supports analysis of the problem and helps teams develop a shared understanding of the problem. This tool may be used in isolation or as part of a deeper root cause analysis investigation.  (at 1)

After introducing the "suspected or known" problem area, participants "brainstorm a list of related problems," fill in a tree diagram, achieve consensus, and then develop an action plan to investigate the suspected causes (at 1).[70]  The tree diagram, however, does not include places to list these "related problems"; these are now apparently treated in the diagram as symptoms of the problem.  But a problem related to another problem may not be a symptom of the latter, and may be worthy of being treated itself as a primary problem; no guidance is offered in the document for how to distinguish one from the other or either from a symptom.

In the tree diagram the problem is the trunk, causes of the problem are the roots, and potential symptoms are the branches (at 2).  "Related problems" does not appear in the diagram.  The tool ends with a place to enter an action plan to "investigate the problem" (at 2).  Thus, it is not clear in this document whether it is potential causes or the problems that are being further investigated.  It is also not clear whether this tool should be used in conjunction with Ex. 71, the fishbone analysis, or whether LEAs are to use one or the other.

In addition to the prior steps in the CIM process listed above, Ex. 72, named "Historical Data Protocol," is yet another potential source of information about the problem(s).  This tool concerns performance on the SPP indicators over three years. Users of this instrument are to look for trends in performance for each indicator, and categorize trends as increasing, stable, decreasing, or inconsistent, and are also to note

---

[69] Ex. 74 implies that multiple problems will be identified ("Problem statement. What PROBLEMS did you identify?") (emphasis in original).  See below for discussion of this document.
[70] Ex. 74 also calls for an investigation plan as part of the root cause analysis.  There it appears that it is the problem(s) being further investigated, not the suspected causes, but that it not entirely clear.  See below.

whether the target for each was met.  The lines in the form for state assessment proficiency, discipline rate by ethnicity, and disproportionate representation by disability also have text boxes to note "student group performance" (at 1-3), presumably the performance of student subgroups.  It is unknown why such text boxes are not included for other indicators, since different subgroups may also have different rates of placement in different settings, different rates of achieving preschool outcomes, etc.

Moreover, the form does not include a line for CDE's non-SPP child find indicator, the percentage of students identified with disabilities.  Child find is a priority area for monitoring (see Dkt. No. 2520 at 16).

Users are to fill out a summary table on the last page of the tool through which performance on each indicator is placed in one of three columns:  missed target three plus years, stable three plus years, or met target, or inconsistent (at 4).  That row is entitled "What do you KNOW about current performance? *Historical data analysis." This information is apparently used in Ex. 74.[71]

Ex. 74 would appear to be the next tool one would use in this process.  Titled "Root Cause Analysis Investigation Plan," this one-page document in table format contains two sections.  The first asks what is known to the participants about "the system."  Under that header the user enters what is known about current performance, apparently taken from Ex. 72 (since the language used is the same[72]).  Users are then prompted to enter a problem statement (singular), but are immediately asked what problems were identified (plural).

The second section is headed by the question, "Dig Deeper: What do you want to know about the system?"  Below the header are columns for priority investigation questions, method to investigate, predictions of what will be learned, by whom and by when the question will be investigated, and what was ultimately learned from the investigation.  The form does not include a place to list the potential root causes identified through Ex. 71 and/or Ex. 77.  But it is not clear from this document what exactly is being investigated in this part of the root cause analysis:  is it the problem or problems?  Potential root causes?  The "system"?  All of these?

Ex. 76, the "Root Cause Analysis Summarizing Protocol," is a document in table format.  It calls for the facilitation of a group process to complete the table, using  the "Affinity Protocol," Ex. 70, to do so.[73]  The table is structured in this manner (Ex. 76 at 2):

---

[71] CDE should consider whether a tool like Ex. 72 fits better as an aspect of data drill down rather than root cause analysis.  A thorough drill down will also consider performance over time.  It should also be noted that the identification of APR targets not met and areas in need of improvement appear on the sample agenda for the introductory CIM meeting for intensive level 3 LEAs (Ex. 86 at 2).

[72] "What do you KNOW about current performance? *Historical data analysis."

[73] Ex. 70 is a generic facilitation tool the goal of which is to develop and cluster like ideas together through a group process.

| Root Cause Analysis Step | Root Cause Analysis Activity | Summary |
|---|---|---|
| **1** | Problems identified in data analysis.<br>* Summary of strengths and weaknesses | |
| **2** | Dig Deeper: Investigative methods | |
| | Dig Deeper: Key takeaways | |
| | Problem and 1-2 root causes to address through improvement activities | |

By some unknown process of transformation "problems" in the plural at step 1 turn into a "problem" in the singular at step 2. Assuming this is not a typographical error (unlikely since this same issue has been present in some of the other documents), the instructions for the form do not set forth a method to boil multiple problems down to one (at 1).

In addition, the problems identified are limited to those identified through data analysis, which may mean the results of the data drill down, the results of Ex. 72 (the historical data protocol), or both. The results of other CIM activities (infrastructure assessment, policies, practices and procedures review, educational benefit review, and parent survey) are not mentioned even though these may also have revealed significant problems.

Ex. 73, "Improvement Planning Tool," is "intended to be utilized at the end of the root cause analysis process" (at 1). The instructions call for documenting "the problem," two to three root causes and their supporting evidence, and one to two high-leverage improvement activities. The first table has space for one problem and up to three root causes and their evidence (at 2). The second table calls for the development of two improvement activities, their expected outcomes in measurable terms, the person or people responsible for implementation of the activity, by whom improvement will be monitored and how often, a timeline for implementation, and the data to be used to measure improvement (at 3-4).

Thus, the goal of this tool is the development of improvement activities for the improvement plan. It is unclear why an LEA is to develop such activities before prioritizing the root causes (the next step in the process); the submission and other documents submitted by CDE do not shed light on this.

CDE was requested to provide a random sample of root cause analyses from intensive monitoring LEAs. CDE responded that these materials are still in development (Unnumbered Index of Materials Provided at 8).

**Conclusion: The prior steps in the CIM process may have revealed a number of different compliance and performance problems in LEAs selected for intensive monitoring. Determining the root causes of these problems is an important step in the CIM process.**

**However, the tools currently being tested by CDE taken together do not form a coherent whole or offer a clear step-by-step root cause analysis process. The**

**documents are unclear regarding whether all of the problems discovered through the prior steps of the CIM process are to be reduced to a single problem, or used at all in this analysis.  If CDE believes that multiple problems are to be reduced to a single problem, the tools do not explain how to go about doing so.  The documents also suffer from some terminological and conceptual confusion.**

**In the absence of procedures, guidance and training documents for TA providers and CDE staff, it is not possible to determine CDE's design of the assistance provided to intensive level 1 LEAs or the direction provided to intensive levels 2 and 3 LEAs in root cause analysis.**

**The documents provided by CDE in their current form are unlikely to result in an effective root cause analysis for intensive monitoring LEAs.**

2. Prioritization

This activity is optional for targeted levels 1 and 2 LEAs, required of targeted level 3 LEAs to perform independently, and required of all LEAs in intensive monitoring (level 1 with assistance and directed by CDE for levels 2 and 3).  Its purpose is to achieve focus on "improvement activities that can be scaled up and widely implemented in the LEA with fidelity."  It is clear that CDE intends a review of all the root causes the LEA adduced during the root cause analysis and placing them in priority order.[74]

The criteria to be used to prioritize root causes are not specified in the submission, and no guidance or other such documents related to this activity are included (Dkt. No. 2676 at 24, Attachment 2 at 42).

a. Prioritization:  Targeted

As noted above, targeted monitoring level 3 LEAs are required to engage in this step and do so independently.  CDE was requested to provide its procedures, guidance, and training documents for targeted monitoring LEAs.  CDE submitted Exs. 1-12 in response, but none of those documents address the prioritization of root causes.  Ex. 9, a CDE introductory presentation specifically for targeted monitoring level 3 LEAs, does not mention this required step of the CIM process.

**Conclusion:  Establishing priorities is an important step in an improvement process.**

**In the absence of the criteria to be used by targeted level 3 LEAs to prioritize root causes, and guidance and training documents for them on this CIM step that such LEAs are to perform independently, a conclusion cannot be reached about the design of the prioritization step of the CIM process for targeted level 3 LEAs.  This**

---

[74] "CDE will require the LEA to review all of the root causes and determines (sic) the priority in which they should be addressed" (Dkt. No. 2676 at 24).

report cannot conclude that these LEAs will be enabled to implement this step effectively.

### b.  Prioritization:  Intensive

CDE was requested to provide its procedures, instructions, guidance, training documents, tools, and instruments related to or governing the intensive monitoring prioritization process.  No documents were produced and CDE did not state in its response that these materials were still in development.

**Conclusion:  It is important for intensive monitoring LEAs to prioritize the issues to be grappled with in their attempt to improve compliance and performance. In the absence of any procedures, instructions, guidance, training documents, tools, and instruments relevant to intensive monitoring prioritization, a conclusion cannot be reached about the design of the prioritization step of the CIM process for intensive monitoring LEAs.  This report cannot conclude that intensive monitoring LEAs will be enabled to implement this step effectively.**

### 3.  Initiative Inventory

This activity is optional for all targeted monitoring LEAs, and required of all LEAs in intensive monitoring (independently at level 1, with assistance at level 2, and directed at level 3).  This activity involves a review of all of the LEA's general and special education initiatives 1) to decide which initiatives address the identified root causes, and 2) align with the "need"[75] identified as highest priority.  CDE explains:

> Often LEAs will engage in several "improvement initiatives" simultaneously without considering the resources needed to implement them fully and completely. When this occurs, an LEA's staff are unable to adequately identify which initiative has impact, and cannot devote energy or resources appropriately. As a result, an LEA is not able to improve outcomes because an LEA fails to fully and completely implement any initiative.  (Dkt. No. 2676 at 24)

Some initiatives may align with the priority root causes and could be expanded; others may not be so aligned and could be delayed or eliminated.  LEAs therefore decide through this activity which of their initiatives should be "kept, started, or stopped." One guiding notion here is to target the allocation of resources toward the activities that are highest priority and can eliminate root causes.  This is sensible and explained well by CDE's submission.

---

[75] CDE may be referring here to the root cause identified as highest priority, since the prior step in the CIM process is the prioritization of root causes.

The submission states that CDE "may" require the "keep, stop, start" approach, but does not explain the circumstances in which it would or would not require it and why; it only says this decision is "based on what is revealed through the data and root cause analysis."  CDE states that it requires LEAs to hold focus groups or parent input sessions to help decide which initiatives are and are not working.  The submission does not include any guidance documents or instruments associated with this activity (Dkt. No. 2676 at 24-25, Attachment 2 at 42).

CDE was requested to provide its procedures, instructions, guidance, training documents, templates, tools, and instruments related to or governing the initiative inventory process for intensive monitoring LEAs.  CDE provided one document in response, Ex. 78, and stated that it is currently being tested.

Ex. 78 is a one-page document entitled "Initiative Crosswalk."  Its purpose is "to support a review of past and current initiatives, including plans, to identify strategies that have been successful, and challenges, while considering existing mandates and resource commitments."  Users are told to consider only the most important initiatives and plans.

The document is in table format and includes columns for the name of the plan/initiative, start and end dates, its leader and key members of the team, relation to the LEA, target student group, financial commitment, measurable expected outcomes and any evidence of outcomes to date from the plan or initiative.  After filling out the table, users are told to summarize "themes related to strengths and challenges."  However, the form does not include a column for the challenges faced by each initiative or plan, nor one for whether the plan/initiative was implemented with fidelity.

This instrument may be helpful as far as it goes, but no aspect of it assists teams in determining which plans or initiatives align with the problems identified and their priority root causes; indeed, the problems identified and root causes are not mentioned in it at all.

The document also does not shed light on the focus groups and parent input sessions that CDE stated were required, does not explain the circumstances in which it would or would not require the "keep, stop, start" method, and does not include a column to note whether the initiative or plan should be kept, started, or stopped or any standards to be used to make that decision.

**Conclusion:  It is easy to understand the potential importance of this step of the CIM process.**

**The submission does not contain guidance or standards for when the "keep, stop, start" approach would be required.  The tool submitted by CDE does not assist teams in assessing which plans or initiatives align with priority root causes and whether each initiative should be kept, stopped or started.  The role of the apparently required focus groups and parent input sessions is not fully explained.**

**In the absence of procedures, guidance, and training documents related to the initiative inventory process for intensive monitoring LEAs, the design of this CIM step cannot be further described or its adequacy determined.**

4.  Theory of Action/Improvement Framework

This activity is optional for all targeted monitoring LEAs, and required of all LEAs in intensive monitoring (independently at level 1, with assistance at level 2, and directed at level 3).  It is geared toward helping LEAs "narrow in" on its "core beliefs" and creating a rationale for selecting some activities over others.  CDE's expectation here is that LEAs will

> clearly state a logical chain of reasoning to describe how the change the LEA will employ will lead to improved practices and how, in turn those practices, if sustained, will lead to improved outcomes for SWD.

The submission does not include any instruction documents, guidance documents, or standards associated with this activity (Dkt. No. 2676 at 25, Attachment 2 at 42).  The submission does not explain why this step is not required of any targeted monitoring LEAs.

CDE was requested to provide its procedures, instructions, guidance, training documents, tools, and instruments related to or governing the development of the theory of action/improvement framework for intensive monitoring LEAs.  CDE did not produce any documents in response to this request, and did not state in its index of materials provided that these materials were still in development.  CDE was also requested to provide a random sample of theories of action/improvement frameworks.  CDE responded that these materials are still in development (Unnumbered Index of Materials Provided at 8).

**Conclusion:  It is reasonable to expect LEAs developing improvement plans to be able to articulate a chain of reasoning to explain how the steps they will take will change practices and lead to improved outcomes for SWD.**

**For that reason, it is not clear why targeted monitoring LEAs, even targeted level 3 LEAs, are not required to engage in this step as all such LEAs are to develop improvement plans.**

**For intensive monitoring LEAs, in the absence of procedures, instructions, guidance and training documents, the design of this step in the CIM process cannot be further described or its adequacy determined.  It is not clear that CDE intends to develop materials to assist, guide, train, and instruct intensive monitoring LEAs in the development of a theory of action/improvement framework.**

C.  CIM Process Step 3:  Planning

1.  Improvement Plan

With the exception of compliance-only targeted monitoring LEAs, development of an improvement plan is required of all other LEAs in targeted or intensive monitoring.  Targeted levels 1 and 2 LEAs develop the plan independently (level 1 with

support from the SELPA, and level 2 with support from the SELPA or COE); targeted level 3 with assistance (from a TA provider assigned by CDE); and intensive levels 1, 2 and 3 LEAs with direction from CDE[76] (Dkt. No. 2676 at 9-10, Attachment 2 at 42).

The improvement plan is required to include activities, timelines, and milestones to be used in ongoing monitoring.  The one paragraph in the submission devoted to these plans does not provide additional specifics, and the submission does not include any guidance documents, templates, or training documents regarding the development of these plans (Dkt. No. 2676 at 25).

### a. Improvement Plan:  Targeted

CDE was requested to provide its guidance, procedures, templates, and training documents for the development of improvement plans by targeted monitoring LEAs.  It responded that these materials are still in development (Unnumbered Index of Materials Provided at 3).  For level 2 targeted monitoring LEAs, CDE was also requested to provide its procedures, guidance, and training documents for LEAs, SELPAs, COEs, and/or CDE-funded TA providers to support LEAs in the process of developing improvement plans.  CDE referred the Monitor to Exs. 1-12 and 16-20, but these documents concern some of the steps leading up to the creation of plans, not the actual development of improvement plans.

**Conclusion:  The improvement plan is the engine that drives compliance and performance improvement in CDE's CIM process for targeted monitoring LEAs.**
**Due to the absence of relevant documents, this report cannot reach conclusions about how targeted monitoring LEAs are to develop these plans, the assistance and advice they receive to do so, and whether the process used and assistance and advice received can enable the development of plans that will result in improved compliance, results, and outcomes.  This report cannot conclude that targeted monitoring LEAs will be enabled to develop improvement plans effectively.**

### b. Improvement Plan:  Intensive

CDE was requested to provide its procedures, instructions, guidance, training documents, templates, tools, and instruments related to or governing the development of improvement plans by intensive monitoring LEAs.  CDE did not produce any documents in response to this request, and did not state in its index of materials provided that these materials were still in development.

**Conclusion:  The improvement plan is designed to be the engine that drives compliance and performance improvement in CDE's CIM process for intensive monitoring LEAs.**

---

[76] It appears that a TA provider or CDE staff may be involved in this as well for intensive monitoring LEAs (Ex. 79 at 19).

Due to the absence of relevant documents, this report cannot reach conclusions about how intensive monitoring LEAs are to develop these plans, the direction and assistance they receive to do so from CDE, and whether the process used and direction received can enable the development of plans that will result in improved compliance, results, and outcomes for these low-performing LEAs. This report cannot conclude that intensive monitoring LEAs will be enabled to develop improvement plans effectively.

2. Approval Process

Level 1 targeted monitoring LEAs are not required to submit their plans for approval. Level 2 targeted monitoring LEAs submit their plans to the SELPA for approval, and level 3 targeted LEAs to the SELPA and CDE for approval. All LEAs in intensive monitoring submit the plans to CDE for approval, and are also required to submit all of the "outputs" of the CIM process to CDE for approval.

The submission does not include the standards used to approve or disapprove improvement plans, nor those applied to the other outputs of the process. It also does not explain why targeted level 1 LEAs are not required to submit their plans for approval (Dkt. No. 2676 at 25, Attachment 2 at 42).

a. Approval Process: Targeted

For level 2 targeted monitoring LEAs, CDE was requested to provide the standards used by SELPAs and/or COEs to approve or disapprove improvement plans; and for level 3 LEAs the standards used by CDE, SELPAs and/or COEs to approve or disapprove improvement plans. CDE responded that these materials are still in development. CDE was also requested to provide a random sample of approved improvement plans from targeted levels 1, 2, and 3 LEAs. CDE responded that these materials are also still in development (Unnumbered Index of Materials Provided at 3, 4).

Conclusion: An approval process for improvement plans that uses clear standards is necessary to ensure the adoption of improvement plans that will impact compliance and outcomes positively for targeted monitoring LEAs.

CDE has not explained why targeted level 1 LEAs should not submit their plans for approval and has not demonstrated that this should not be required.

For targeted levels 2 and 3 LEAs, CDE did not produce the standards that are used to approve or disapprove these plans or a sample of approved improvement plans. It is not currently possible to determine the design of the approval process, and therefore whether approved plans from targeted monitoring LEAs will reasonably enable those LEAs to improve compliance and outcomes for SWD.

b.  Approval Process:  Intensive

CDE was requested to produce the standards it uses to approve or disapprove intensive monitoring LEA improvement plans.  It responded that such standards are still in development.  The Monitor also requested a random sample of approved improvement plans from intensive levels 1, 2, and 3 LEAs.  CDE again responded that those materials are still in development (Unnumbered Index of Materials Provided at 7-8).

**Conclusion:  An approval process for improvement plans that uses clear standards is necessary to ensure the adoption of improvement plans that will impact compliance and outcomes positively for intensive monitoring LEAs.**
**CDE did not produce the standards that are used to approve or disapprove these plans or a sample of approved improvement plans.  It is not currently possible to determine the design of the approval process, and therefore whether approved plans from intensive monitoring LEAs will reasonably enable those LEAs to improve compliance and outcomes for SWD.**

D.  CIM Process Step 4:  Implementation and Ongoing Monitoring

CDE asserts that it monitors the implementation of improvement plans, specifying the "milestones and timelines" in the plan, and does this through "either direct monitoring or communities of practice."  The submission says nothing more about these "communities of practice" that are apparently assigned a monitoring role.
As level 1 targeted monitoring LEAs are not required to submit their plans, it is difficult to understand how CDE or any other entity could monitor their plans' timelines and milestones.  CDE's Attachment 2 does not indicate any monitoring of improvement plan implementation for those LEAs.
The attachment shows that SELPAs monitor plan implementation for level 2 targeted monitoring LEAs, SELPAs and CDE monitor for level 3 targeted monitoring LEAs, and CDE for all intensive monitoring LEAs.  No mention is made in the attachment of "communities of practice."
The submission states that "those LEAs" not meeting improvement plan timelines and milestones must "work directly" with CDE to tackle implementation barriers.  It is unclear how CDE would know that level 1 targeted monitoring LEAs are not meeting their timelines and milestones; as to level 2 targeted monitoring LEAs, CDE's submission does not specify how and when SELPAs would inform it of plan implementation problems.
CDE also reviews LEA data annually; if "poor" performance continues, CDE "may" require the LEA to "revisit" CIM steps 1-2 and update its plan.  The submission does not include standards for "poor" performance, nor for the circumstances under which it would or would not require LEAs to update their plans.  Further, the submission does not include CDE's procedures, standards, guidance and training

documents for monitoring implementation of improvement plans (Dkt. No. 2676 at 25-26, Attachment 2 at 42).

1. Implementation and Ongoing Monitoring:  Targeted

CDE was requested to provide its procedures, standards, guidance, and training documents for SELPA and CDE monitoring of the implementation of targeted monitoring improvement plans.  CDE responded that these materials are still in development (Unnumbered Index of Materials Provided at 3).

**Conclusion:  Given the role in its improvement efforts assigned to targeted monitoring improvement plans, it is of obvious importance that these plans be implemented and implementation monitored.**
**However, CDE has not:**

- **explained how the implementation of level 1 targeted monitoring LEAs' plans will be monitored, as these LEAs are not required to submit their plans;**
- **explained what a community of practice is or what its role is in monitoring plan implementation;**
- **explained how and when SELPAs would inform it of plan implementation problems for level 2 LEAs;**
- **detailed the respective roles of SELPAs and CDE in monitoring plan implementation for level 3 LEAs;**
- **set forth the specific circumstances under which it will work directly with targeted monitoring LEAs that are not meeting timelines and milestones, nor the nature of this direct work; and**
- **set forth its standards for requiring targeted monitoring LEAs to update their plans.**

**Due to the lack of information in CDE's submission and the absence of CDE's procedures, standards, guidance, and training documents for SELPA and CDE monitoring of the implementation of improvement plans, this report must conclude that the current design of CDE's process for monitoring implementation of targeted monitoring improvement plans cannot reasonably ensure the implementation of these plans.**

2. Implementation and Ongoing Monitoring:  Intensive

CDE was requested to provide its procedures, standards, guidance, and training documents for monitoring the implementation of intensive monitoring improvement plans.  CDE pointed to Ex. 87, its corrective action table, and Ex. 15, its Item Table, in response.  But there is no obvious relation between these documents and monitoring the timelines and milestones in improvement plans.  In addition, these documents do

not address the circumstances under which CDE would require LEAs to "revisit" CIM steps 1-2 and update their plans, and do not include standards for "poor" performance.

**Conclusion:  Given the important role in its improvement efforts assigned to intensive monitoring improvement plans, it is clearly essential that these plans be implemented and implementation monitored.**

**Due to the absence of its procedures, standards for poor performance and updating plans, guidance, and training documents for the CDE staff who are to monitor implementation of intensive monitoring improvement plans, this report must conclude that the current design of CDE's process for monitoring implementation of intensive monitoring improvement plans cannot reasonably ensure the implementation of these plans.**

## VII.  Cyclical Monitoring of Small LEAs

CDE selects one-third of its small LEAs annually for this monitoring process which, it writes in its submission, consists of three activities:

- procedural compliance review and policies and procedures review,
- timeline compliance review, and
- educational benefit review.

LEAs are randomly selected for this review and cannot have been selected in the prior two years.  But one of the three activities, timeline compliance review, is not triennial, as it is part of CDE's annual universal monitoring for all LEAs in the state.  The other two are LEA self-monitoring activities.

In the compliance review the LEA looks at unspecified "compliance elements" in "up to" 25 student files.  The submission does not include the sample sizes for small LEAs of different sizes, although one can assume that LEAs with 100 SWD are self-reviewing 25 files.  The submission refers to "attached items that are most closely aligned with FAPE in the LRE," but the submission does not attach these items, nor does it include the standards used to monitor them.

A policy and procedures review is also performed by the LEA, but CDE's submission does not say which policies and procedures are reviewed or what standards are used to review them.  A training is provided to the LEA regarding how to conduct the review.  This training is not included in CDE's submission.

The submission does not mention any form of CDE oversight of the accuracy of the policy and procedures review.  With respect to the LEA's file review, the submission states that CDE performs a "random audit," but does not say how many file review results are audited through this process.

Turning to the education benefit review, LEAs are required to take part in a live training.  No further information regarding this training is included in the submission. LEA staff then review a "subset" of student files to "assess the provision of FAPE in the LRE."  The size of this subset and how this sample is created are not specified in the

submission, and any guidance documents, instruments, and standards to be used by the LEA are not provided by the submission.

The submission states that CDE "verifies" findings of noncompliance made by the LEA in its self-review of educational benefit, but does not mention any verification or oversight of findings of compliance.

CDE asserts that it examines the results of these monitoring activities, and then selects those LEAs with "systemic concerns of noncompliance" to engage in a "modified" CIM process.  The standards used to select such LEAs, and the content of this modified CIM process, are not set forth in CDE's submission (Dkt. No. 2676 at 27-28).

For small LEA cyclical monitoring CDE was requested to provide procedures, instructions, guidance, training documents, templates, tools, instruments, sample sizes, and standards related to the LEA's compliance self-review and educational benefit review; CDE's procedures, including sample sizes, to verify that findings of compliance and noncompliance were made correctly by LEA in its compliance self-review and educational benefit review (random audit); a random sample of reports, letters of findings, or other documents that memorialize and convey the results of the LEA's compliance self-review and educational benefit review; and a random sample of corrective action steps required as a result of findings of noncompliance.
CDE responded that these documents are still in development (Unnumbered Index of Materials Provided at 11).

**Conclusion:  Small LEAs are not selected for monitoring based on performance indicators, but are monitored every three years, with the exception of timeline compliance which is monitored annually.  Thus, the cyclical monitoring is responsible for ensuring compliance with the requirements most closely associated with FAPE in the LRE and child find.**

**However, in the absence of the requested documents the following are all unknown:**

- **the compliance elements reviewed;**
- **sample sizes used;**
- **nature of, and sample sizes for, the CDE random audit;**
- **policies and procedures reviewed, and CDE oversight of that review;**
- **standards applied in both reviews;**
- **nature of the training for these LEAs to perform this self-review;**
- **sample size and composition for the educational benefit review;**
- **standards used to select LEAs with "systemic concerns of noncompliance" to engage in a "modified" CIM process; and**
- **the nature of this modified CIM process.**

**In addition, there is no evidence in the submission of CDE oversight of LEA findings of compliance in the educational benefit review.**

**Hence, what the design of CDE's small LEA cyclical monitoring process can do, and cannot do, if implemented effectively cannot currently be described. The lack of pertinent information currently compels the conclusion that CDE's cyclical monitoring of small LEAs is unlikely to be implemented effectively.**

## VIII.  Monitoring of Nonpublic Schools

CDE first notes that SWD in NPS placements are included in the same way as other SWD in its monitoring process.  NPS are required to submit data to the LEAs that have contracted with it so that the data can be reported to CDE, and these data are included in CDE's data analysis to determine the selection of LEAs for further monitoring (Dkt. No. 2676 at 28).

CDE uses a three-year monitoring cycle for NPS.[77]  Each year one-third of NPS in the state perform a self-review, one-third receive a CDE onsite review, and one-third a CDE follow-up visit.  Thus, CDE is visiting two-thirds of these facilities each year.   In addition to these processes CDE carries out compliance investigations if there is "substantial reason" to believe that a student's health, safety, or welfare is in "immediate danger"; if it receives evidence of a "significant deficiency" in the quality of educational services; or if it receives evidence of noncompliance with the Health and Safety Code.

A. <u>Self-Review</u>

The purpose of the self-review is for the "NPS to monitor its facilities, educational environment, and the quality of its educational and behavioral program" (Dkt. No. 2676 at 30).  CDE was requested to produce the procedures, instructions, guidance, training documents, and instruments related to NPS self-review and a random sample of reports and corrective actions resulting from this self-review process. CDE provided the self-monitoring protocol, which included instructions (Ex. 89), and one report (Ex. 93).

NPS are instructed to submit only the completed protocol with no attachments. For each item in the protocol, the NPS is to find itself compliant or noncompliant:  if compliant, it is to explain how it meets the standard; if noncompliant, the steps it will take to reach compliance (Ex. 89 at 1).  The protocol contains 43 items, some pertaining to certification and some to the program.  Some concern issues such as whether the facility provides at least the minimum number of instructional minutes per year for each grade, staff qualifications, reporting requirements for suspected abuse, fire warning systems, whether it has an individual services agreement for each student, and whether it has a written policy regarding sexual harassment.

Many items concern discipline, student behaviors, and emergency behavioral interventions.  These include, but are not limited to, whether the facility:

---

[77] CDE's submission also includes a description of the initial certification process for NPS facilities.  See Dkt. No. 2676 at 29-30.

- has and abides by a lawful written policy for pupil discipline (Item 11);
- has a principal who is aware of responsibilities and duties relating to suspension (Item 12);
- has and abides by a written plan for behavior management that includes positive behavior interventions and supports, emergency interventions, and prohibitions (Item 13);
- has evidence that behavior training took place and was verified by contracting LEAs (Item 14);
- provides incentives for positive behavioral interventions and supports (Item 35);
- uses behavioral interventions in consideration of the pupil's physical freedom and social interaction, are administered in a manner that respects human dignity and personal privacy, and ensure a pupil's right to placement in the LRE (Item 36);
- has programs of support for students with significant behaviors (Item 37);
- implements state law regarding emergency interventions (Item 38); and
- prepares behavioral emergency reports (BERs) immediately and maintains reports in student files (Item 39).

For each item, the types of evidence to be reviewed and interviews to be conducted are capable of answering each prompt, assuming effective implementation of the protocol by the NPS. The NPS can check off the types of evidence it reviewed and who was interviewed for each item.

The one completed NPS self-review report produced by CDE was reviewed (Ex. 93). This facility found itself compliant with each item. The comments supporting each conclusion of compliant are thorough and address the prompt, with one minor exception.[78]

## B. CDE Onsite Review

The purpose of the NPS onsite review, CDE states, is to monitor the facilities, environment, and educational and behavioral program including staff credentials, curriculum and instructional materials. In addition, the review seeks to determine whether LEAs and SELPAs are providing appropriate supervision and monitoring. During the review, CDE writes, it reviews the facility's documentation, programs and procedures, and an unspecified sample of student IEPs and records. It also "observes" whether students have access to the same core curriculum as that of the LEAs that

---

[78] Only one of the responses was questionable based on the comments. Item 23 asks whether the NPS has a "current and fully executed" individual services agreement for each student. This NPS found itself compliant, but found the contracting LEAs noncompliant, for three of its newer students because the contracting LEAs had not yet executed and returned the document. This comment was properly included in the completed protocol, but the standard—that each student's document was current and fully executed—would call for a conclusion of noncompliant, regardless of which entity's fault it was.

contracted with the NPS.  CDE produces a written report within 60 days to the facility and any LEAs that contract with it (Dkt. No. 2676 at 30-31).

CDE was requested to produce the procedures, instructions, guidance, training documents, templates, tools, instruments, sample sizes, and standards related to the onsite review; the procedures governing the follow-up visit; and a random sample of reports and corrective actions resulting from these activities.  CDE produced a blank copy of the monitoring protocol which is used for both onsite and follow-up reviews (Ex. 90), one onsite review report (Ex. 92), and one follow-up review report (Ex. 91).

The monitoring protocol does not address sample sizes or composition.  It contains 62 items, many of which are also included on the self-review protocol.  One section of this protocol does not appear on the self-review:  titled "IEP Implementation," it contains prompts which concern basic compliance with IEP content and process requirements for individual students, but not the implementation of those IEPs.[79]  None of these items specifically call for the observation of classrooms or related services settings.  An educational benefit type of review, one that could in theory get at whether a student is receiving FAPE, is not included in the onsite review.

Because NPS are restrictive settings, particular attention was paid to any items that concerned LRE-related requirements.  Two of these concerned students placed outside the state.[80]  Three other items are also related to LRE-related IEP content:

- Each IEP contains an explanation of the extent, if any, to which the pupil will not participate with non-disabled students in regular classes and activities (Item 51);
- Each IEP contains an explanation showing that in selecting the least restrictive environment, consideration is given to any potential harmful effect of the placement on the student or on the quality of services that the student needs (Item 52); and
- Each IEP contains a provision for the transition into the regular class program in a public school during any part of the school day, if appropriate (Item 53, Ex. 90).

These items look for statements on IEP documents, but do not attempt to monitor compliance with the substantive LRE requirements for these students in restrictive placements, such as:

- whether these students are educated with nondisabled students to the "maximum extent appropriate," and

---

[79] Some examples:  "Each IEP contains a statement of the special education, related services, supplementary aids and services, and/or program modifications or supports for school personnel to be provided to or on behalf of the student" (Item 49); "Each IEP includes a statement of any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance of the child on State and districtwide assessments" (Item 54).

[80] "The placing LEA has documented its efforts to utilize a public school or locate an appropriate NPS within the state prior to contracting with an NPS located outside of California" (Item 61); and "The LEA indicates the anticipated date for the return of the pupil to an NPS located in California and documents efforts made during the previous placement year to return the pupil to California" (Item 62).

- whether the IEPs of these students could be implemented satisfactorily in a setting less restrictive than an NPS with the use of supplementary aids and services (34 C.F.R. § 300.114(a)(2)).[81]

As some students in NPS have behavior problems, the protocol was also reviewed for related prompts.  In the certification section of the document, CDE looks for a written plan for behavior management and related training (Items 14a, b, and c).  In the program section, CDE looks at whether the facility:

- provides incentives for positive behavior (Item 35);
- provides interventions in a manner that respects the students' dignity, freedom, and rights to a placement in the LRE (Item 36);
- has "programs of support" for students with significant behaviors (Item 37);
- implements state law regarding when emergency interventions are used (Item 38);
- prepares BERs immediately and keeps them in student files (Item 39);
- notifies the parent and LEA within one day of the use of an emergency intervention (Item 40);
- produces BERs with all required components (Item 41);
- after a BER is produced for a student without a behavior plan, an IEP meeting takes place within two days (Item 42); and
- reconvenes the IEP team if a BER concerns a new behavior or follows the implementation of an ineffective intervention from the behavior plan (Item 43).

Some of these items call for observations.  One item in the IEP implementation section looks at whether the IEP "contains considerations" for positive behavioral interventions (Item 56), but it is not clear that this item judges whether the IEP actually contains such interventions and supports.

These items taken together can paint an adequate picture of how the facility programs for students with challenging behaviors, assuming effective implementation and systematic observations.  But it is not at all clear that the latter take place in the absence of the governing procedures for this monitoring process.[82]

Turning to the one onsite review report produced by CDE (Ex. 92), this review was conducted virtually in 2022, presumably due to the pandemic although that is not clear.  Of the 29 SWD served by this facility, CDE reviewed three IEPs (at 2, 3).  CDE found that three IEPs had not been updated annually (Item 44), one IEP did not have a direct relationship between the present levels of performance and the annual goals (Item 48), and one IEP did not contain a provision for transition into a regular class

---

[81] SEAs are also required to carry out activities to ensure that § 300.114 is implemented (34 C.F.R. 300.120).

[82] One of these items calls for "Observation during Tour of NPS," which does not sound like a systematic approach to observations (Item 35).  Systematic observations would attempt to determine the extent to which IEPs are being implemented and the quality of instruction.  High-quality instruction is one of CDE's four pillars on which improved student outcomes are based (Dkt. No. 2676 at 3-4).

program for any part of the school day (Item 53).  There is no indication in the report that, in response to the three IEPs that had not been updated annually, CDE monitors reviewed additional IEPs for this item in order to determine whether this basic compliance issue affected additional students.

This NPS was not required to engage in any corrective actions, according to the report.  The contracting LEAs for the students whose IEPs contained the noted problems were also not found noncompliant; instead, these issues were labeled "areas of concern" for reasons that cannot be discerned from the report.  As CDE did not produce the requested procedures, instructions, guidance and training documents for the onsite review, the reason why these were not findings of noncompliance cannot currently be determined.

## C.  CDE Follow-Up Review

CDE conducts a follow-up visit the year after the onsite visit.  It again reviews staff credentials and reviews the behavioral programs, and follows up on findings of noncompliance and areas of concern (Dkt. No. 2676 at 31).

The follow-up report was reviewed (Ex. 91).  The content of the report does not make clear what findings or areas of concern were being followed up and, as CDE did not produce the onsite review report for this facility, this cannot be determined based on the information provided by CDE.

The report states that no IEPs were reviewed during the follow-up review (at 3).  Each of the IEP-related items contains this statement in the comments section:  "IEPs are not reviewed as part of the Follow-up Review" (see Items 44-62).  That may be a general procedure CDE follows during follow-ups, or may be simply because CDE did not find any noncompliance or areas of concern regarding IEPs during the onsite review.  Without the governing procedures that cannot be determined.

**Conclusion:  As shown above, CDE's targeted and intensive monitoring appear to use relatively small sample sizes (to the extent this can be determined based on CDE's submission).  If so, that indicates that SWD placed in NPS facilities are not very likely to be included in LEA student samples.  Thus, if CDE is to ensure FAPE in the LRE for students in NPS, cyclical monitoring of these facilities must play an important role.**

**As shown above, much cannot be determined due to lack of access to all relevant procedures, instructions, training documents, and guidance regarding sampling.  What can currently be said is that the instrument used for onsite and follow-up reviews, if applied effectively, will measure basic compliance for the unknown number of students in the sample.  However, it is unclear whether IEPs are reviewed in the follow-up review.**

**Even if applied effectively, the instrument does not monitor whether students in these highly restrictive environments are receiving FAPE or are placed in the LRE. Educational benefit reviews are not performed, and key LRE requirements are not monitored substantively.  Both FAPE and LRE are priority areas for monitoring.**

## IX.  Annual Determinations

As noted above, in CDE's system, the annual determinations required by the statute depend upon the tier of monitoring for which LEAs are selected.  LEAs with data submissions that are timely and complete, no fiscal findings, no procedural noncompliance, no disproportionality, that met targets and are not among the lowest performing on the targets, have no outstanding corrective actions, and no NPS areas of concern are labeled "meets requirements."  LEAs selected for any level of targeted monitoring are labeled "needs assistance," and those selected for intensive monitoring "needs intervention" (Dkt. No. 2676 at 40, Attachment 1).  This is fairly straightforward, but there are two issues that require further explanation and information.

First, the statute contains four possible determination levels, not three.  The determination level not mentioned by CDE is "needs substantial intervention" (34 C.F.R. § 300.603(b)(1)(iv)).  *In its response to this report CDE should set forth its criteria for "needs substantial intervention" annual determinations.*

Second, CDE should explain clearly how these standards for annual determinations apply to small LEAs.  CDE states that small LEAs, whether or not selected for cyclical monitoring in a particular year, will continue to be monitored annually for timeline and complaint noncompliance and may also be selected for targeted or intensive monitoring (Dkt. No. 2676 at 7).  This suggests that noncompliance with timelines or found through complaints would be one way for a small LEA to be selected for targeted or intensive monitoring.

But it is not clear whether, and if so how, very small LEAs would have the disproportionality and meeting-of-targets standards for targeted and intensive monitoring applied to them given their low numbers of SWD.

Moreover, the submission states that CDE will "examine" the results of the cyclical monitoring of a small LEA and dispute resolution data and "determine which LEAs may need a higher level of monitoring, including participation in a modified CIM process."  Only those small LEAs with "systemic concerns of noncompliance" will be selected for the modified CIM process (Dkt. No. 2676 at 28).  *As higher levels of monitoring affect an LEA's determination, CDE should set forth with precision its standards for the annual determinations of small LEAs.*

**Conclusion:  For the most part, the design of CDE's process of making annual determinations is solid and sensible.**

**However, CDE has not set forth its criteria for "needs substantial intervention" annual determinations and has not explained clearly and precisely how its process of making these determinations is applied to small LEAs.**

## X.  Enforcement

CDE's submission lists five enforcement actions it "can" take when LEAs are not determined to meet the requirements of the statute.  The actions are:

- making TA available,
- providing direct TA,
- placing "special conditions" on an LEA's funding,
- creating a corrective action or improvement plan through the CIM process, and
- withholding funds.

We have seen above how the two TA-related actions and corrective action and improvement plans play out in CDE's monitoring system.  But CDE's submission does not put forth its criteria for placing "special conditions" on an LEA's funding and withholding funds.

      With respect to longstanding uncorrected noncompliance, we have also seen that a failure to make progress on corrective actions results in selection for level 1 targeted monitoring; noncompliance not corrected within one year results in the LEA's selection for level 1 intensive monitoring; and noncompliance not corrected within two or more years results in the LEA's selection for level 3 intensive monitoring (Dkt. No. 2676, Attachment 1 at 40).  As discussed above, selection for these monitoring processes affects an LEA's annual determination.

      The submission also lists other possible sanctions that can result from a failure to correct noncompliance.  These are said to be "graduated sanctions," and include:

- more frequent reporting on progress toward correction,
- notification of the LEA superintendent regarding uncorrected noncompliance,
- a compliance agreement requiring corrective action within three years,
- special conditions on LEA funding,
- ineligibility for IDEA funding,
- withholding a portion of funds,
- redirecting funds for specific activities,
- prohibiting the LEA from applying for discretionary funds from CDE,
- requesting an audit of the LEA's financial records, and
- directing the administration of the LEA's special education programs.

No criteria are set forth for the application of these graduated sanctions in CDE's submission (Dkt. No. 2676 at 26).

      CDE was requested to provide its standards and criteria that govern its use of sanctions for LEAs not meeting requirements.  CDE responded that these materials are still in development (Unnumbered Index of Materials Provided at 10), but referenced a table of its enforcement mechanisms mapped to its monitoring tiers and annual determinations (Ex. 88).

      The table is useful in understanding CDE's deployment of many of the sanctions mentioned in its submission.  The table below shows the sanctions employed based on selection for each tier and level of monitoring, with the applicable annual determination in parentheses:

| Tier/Level of Monitoring (Annual Determination) | Enforcement Mechanisms Used |
|---|---|
| Targeted compliance only (needs assistance) | Corrective action plan (as needed) |
| Targeted level 1 (needs assistance) | The above, plus inform of TA |
| Targeted level 2 (needs assistance) | Both of the above, plus "report use"[83] |
| Targeted level 3 (needs assistance) | All of the above, plus assist in identifying TA |
| Intensive level 1 (needs intervention) | All of the above, plus direct use of funds |
| Intensive level 2 (needs intervention) | All of the above, plus high-risk grantee |
| Intensive level 3 (needs intervention) | All of the above, plus special conditions on grant |
| Unknown (needs substantial intervention) | Not included in Ex. 88 |

This exhibit helps clarify CDE's use of some enforcement mechanisms.  *However, CDE should explain concretely what it means to be a high-risk grantee in its response to this report.*

In addition, the sanction of withholding funds (presumably in whole or in part) is listed on CDE's exhibit but is not tied to a tier or level of monitoring.  Further, CDE's submission lists some possible enforcement steps that are not included in the exhibit:

- notification of the LEA superintendent regarding uncorrected noncompliance,
- a compliance agreement requiring corrective action within three years,
- ineligibility for IDEA funding,
- prohibiting the LEA from applying for discretionary funds from CDE,
- requesting an audit of the LEA's financial records, and
- directing the administration of the LEA's special education programs.

*CDE should submit its criteria for the use of these possible enforcement steps in its response to this report.*

**Conclusion:  Clear standards and criteria for the application of enforcement actions are necessary in a well-designed monitoring system.**

**CDE's approach to enforcement is clear about the standards for the application of many of its enforcement steps, which are tied to two of the three annual determination levels for LEAs that do not meet requirements.**

**However, CDE:**

- **has not set forth its enforcement steps that are tied to a "needs substantial intervention" determination;**
- **has not explained what designating an LEA as a high-risk grantee means; and**
- **has not put forth its standards for applying the following sanctions: 1) notification of the LEA superintendent regarding uncorrected noncompliance,**

---

[83] Presumably "report use" means more frequent reporting on progress toward correction.  *If this is incorrect CDE should explain its meaning in its response to this report.*

2) a compliance agreement requiring corrective action within three years, 3) ineligibility for IDEA funding, 4) prohibiting the LEA from applying for discretionary funds from CDE, 5) requesting an audit of the LEA's financial records, 6) directing the administration of the LEA's special education programs, and 7) withholding funds.