William S. Koski, Esq., SBN 166061
Abigail Trillin, Esq., SBN 179052
STANFORD LAW SCHOOL
YOUTH & EDUCATION LAW PROJECT
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone: (650) 724-3718
Fax: (650) 723-4426
Email: bkoski@stanford.edu
         atrillin@law.stanford.edu

Brenda Shum, Esq., SBN 961146
(admitted *pro hac vice*)
Freya Pitts, Esq., SBN 295878
NATIONAL CENTER FOR YOUTH LAW
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Fax: (510) 835-8099
Email: bshum@youthlaw.org
         fpitts@youthlaw.org

*Attorneys for Plaintiffs Emma C., et al.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| EMMA C., et al., | Case No.: 3:96-cv-4179 (VC) |
| *Plaintiffs*, | **PLAINTIFFS' RESPONSE TO THE STATE DEFENDANTS' PHASE 3 DESIGN SUB-PHASE SUBMISSION, THE COURT MONITOR'S REVIEW OF THE SUBMISSION, AND THE STATE DEFENDANTS' RESPONSE TO MONITOR'S REVIEW OF THE SUBMISSION** |
| v. | |
| TONY THURMOND, et al., | |
| *Defendants*. | Hon. Vince Chhabria |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

I.   THE CDE HAS NOT DEMONSTRATED THAT THE DESIGN OF ITS
     MONITORING AND ENFORCEMENT SYSTEM COMPLIES WITH THE
     8/11/21 ORDER, THE CONSENT DECREE, OR THE IDEA ................................... 3

     A.   The CDE's design of its monitoring and enforcement system does not
          comply with the IDEA because it is incomplete and lacks sufficient detail
          to be evaluated ....................................................................................................... 4

     B.   The State provides little or not meaningful explanation or argument to
          demonstrate that its monitoring and enforcement activities will ensure
          that LEAs comply with the law, provide FAPE in the LRE, and improve
          the performance and outcomes of children with disabilities ................................. 5

     C.   The CDE's Targeted Monitoring system provides insufficient CDE
          oversight of LEAs and technical assistance providers ........................................... 7

     D.   CDE's monitoring and enforcement system focuses too heavily on paper
          compliance at the expense of site visits, classroom observations, and
          interviews—the most effective methods for improving service delivery
          to students with disabilities ................................................................................ 10

     E.   CDE's Submission does not provide any analysis of the staffing,
          resources, and budget necessary to implement its monitoring and
          enforcement system ............................................................................................. 11

II.  CDE FAILS TO ADDRESS THE DEFICIENCIES IN ITS MONITORING
     AND ENFORCEMENT SYSTEM IDENTIFIED BY THE COURT
     MONITOR ............................................................................................................... 12

III. CONCLUSION ........................................................................................................ 43

EXHIBIT A, Plaintiffs' Memorandum to Court Monitor, May 10, 2013

# INTRODUCTION

Pursuant to the Court's August 11, 2021 Order Regarding Evidentiary Hearings on Phase 3 Design Sub-Phase, ECF No. 2658 ("8/11/21 Order"), Plaintiffs submit this Response to the State Defendants' Phase 3 Design Sub-Phase Submission, ECF No. 2676 (the "CDE's Submission"),[1] the Court Monitor's Review of the California Department of Education's Submission Regarding the Design of Its Monitoring Activities (Phase 3 Design Sub-Phase), ECF No. 2679 (the "Court Monitor's Report"), and the State Defendants' Response to Monitor's Review of Phase 3 Design Sub-Phase Submission. ECF No. 2684 (the "CDE's Response").

In this Phase 3 of the evaluation of the State's compliance with its obligations under the 8/11/21 Court Order, the Consent Decree, and the Individuals with Disabilities Education Act ("IDEA"), the focus is on whether the design of the CDE's monitoring and enforcement system will allow it to effectively fulfill its monitoring and enforcement duties under Section 13.0 of the Consent Decree and the IDEA.

To get to the point: although the CDE's Submission provides a description of the bare-bones outlines of a logical monitoring and enforcement system, the CDE fails to demonstrate compliance with the 8/11/21 Order, the IDEA, and Section 13 of the First Amended Consent Decree's requirement that the "the state-level system in place is capable of ensuring continued compliance with the law and the provision of [a free appropriate public education] to children with disabilities in Ravenswood" because the proposed monitoring and enforcement system:

    (1) is admittedly a work-in-progress and lacks sufficient detail to permit meaningful evaluation by this Court;

---

[1] Although the Phase 3 Design Sub-Phase Submission was submitted on behalf of all State Defendants—the California Superintendent of Public Instruction ("SPI"), the California Department of Education ("CDE"), and the California State Board of Education ("SBE")—the Court Monitor refers to the State Defendants collectively as "the CDE." For consistency, Plaintiffs will also refer to the State Defendants as "the CDE."

(2) is not supported by meaningful explanation, argument, or evidence to demonstrate that it will ensure that local education agencies ("LEAs") comply with the law, provide a free appropriate public education ("FAPE") in the least restrictive environment ("LRE"), and improve the performance and outcomes of children with disabilities;

(3) provides insufficient CDE oversight over LEAs, Special Education Local Plan Areas ("SELPAs"), and technical assistance providers;

(4) focuses too heavily on paper compliance at the expense of site visits, classroom observations, and interviews—the most effective methods to assist in improving service delivery to students with disabilities; and

(5) does not include any analysis of the staffing, resources, and budget necessary to implement and sustain the monitoring and enforcement system.

For each of these reasons alone, the Court should not place its imprimatur on the CDE's monitoring and enforcement system. In addition, the Court Monitor has identified dozens of specific deficiencies in the system that render it out-of-compliance with the IDEA and the Consent Decree.

The remainder of Plaintiffs' Response proceeds as follows. In Section I, Plaintiffs further elaborate the five reasons why the Court should reject CDE's system. Section II then pivots to the Monitor's Report and analyzes the CDE's response to each of the areas of deficiency identified by the Monitor. In tabular format, Plaintiffs summarize each area of deficiency identified by the Monitor, provide CDE's response, if any, to each of the Monitor's concerns, and set forth Plaintiffs' analysis of the CDE's responses, as well as several specific concerns that the Monitor did not identify in his report.

# I.

## THE CDE HAS NOT DEMONSTRATED THAT THE DESIGN OF ITS MONITORING AND ENFORCEMENT SYSTEM COMPLIES WITH THE 8/11/21 ORDER, THE CONSENT DECREE, OR THE IDEA.

Under the Consent Decree, the CDE bears the burden of demonstrating that its state-level monitoring system ensures district-level compliance with the law and FAPE in the LRE for students with disabilities.

Under the IDEA, the priority areas for monitoring are:

(3) Monitoring priorities

The Secretary shall monitor the States, and shall require each State to monitor the local educational agencies located in the State (except the State exercise of general supervisory responsibility), using quantifiable indicators in each of the following priority areas, and using such qualitative indicators as are needed to adequately measure performance in the following priority areas:

> (A) Provision of a free appropriate public education in the least restrictive environment.

> (B) State exercise of general supervisory authority, including child find, effective monitoring, the use of resolution sessions, mediation, voluntary binding arbitration, and a system of transition services as defined in sections 1401(34) and 1437(a)(9) of this title.

> (C) Disproportionate representation of racial and ethnic groups in special education and related services, to the extent the representation is the result of inappropriate identification.

20 U.S.C. §1416(a)(3). Relatedly, the focus of CDE monitoring activities shall be on:

> (A) improving educational results and functional outcomes for all children with disabilities; and

> (B) ensuring that States meet the program requirements under this subchapter, with a particular emphasis on those requirements that are most closely related to improving educational results for children with disabilities.

20 U.S.C. §1416(a)(2). Those priority areas for monitoring are also described in the IDEA's implementing regulations. 34 C.F.R. §300.600(b)&(d).

3

**A. The CDE's design of its monitoring and enforcement system does not comply with the IDEA because it is incomplete and lacks sufficient detail to be evaluated.**

At the most general level, the outline of CDE's monitoring and enforcement system is logical. The tiered system with universal monitoring of compliance and performance indicators for all local education agencies ("LEAs"), "targeted monitoring and support to LEAs whose data indicate areas of concern related to performance, compliance, and/or disproportionality that may impact [students with disabilities] performance," ECF No. 2684 at 29, and "intensive monitoring and support to those LEAs whose data on outcomes for [students with disabilities] indicate systemic issues," *id.* at 32, ensures that the LEAs that perform more poorly on indicators most closely related to FAPE in the LRE receive greater scrutiny and support. Not only will LEAs be given the opportunity to improve and be held accountable for improvement based on their needs, the CDE can better deploy its resources. Similarly, the four-step Compliance and Improvement Monitoring ("CIM") process is a reasonable approach to identifying the root causes of noncompliance and systemic failure and designing and implementing reforms that should result in improvement.

But the CDE's submission does not provide sufficient detail regarding the components of these monitoring and improvement processes to allow the Court to determine whether they stand a chance of being efficacious. Recognizing that glaring deficiency in the CDE's Submission, the Monitor requested that the CDE provide the necessary documents that might put some flesh on the framework of CDE's abstract system. Specifically, the Monitor requested procedures, guidance, and training documents for participants in the monitoring process; tools, guides, templates, instruments, and protocols to be used in the process; and standards to be applied in evaluating performance. *See* ECF No. 2683 at 38-40. In response, CDE provided on May 6, 2022 some materials that responded to some of the Monitor's request, but admitted that it "is continuing to develop many of the procedures, guidance, tools, and trainings." *Id.* at 42. CDE then provided some additional materials on July 29, 2022. Yet, as the CDE repeatedly concedes

in its July 29, 2022, Response, many of those materials that would provide the necessary detail for meaningful evaluation have not yet been developed.

This is not acceptable. CDE knew since the Case Management Conference on August 4, 2021, and the Court's 8/11/21 Order that it needed to demonstrate that the design of its entire system complied with the Consent Decree and the IDEA. Indeed, CDE chose a date, April 15, 2022, eight months later by which it would provide the necessary description of and argument for its system. The description provided by the CDE is partial and far too vague for the Court to pass judgment on the system. For that reason alone the Court should not deem the CDE's monitoring and enforcement system compliant with the IDEA.

**B.  The State provides little or no meaningful explanation or argument to demonstrate that its monitoring and enforcement activities will ensure that LEAs comply with the law, provide FAPE in the LRE, and improve the performance and outcomes of children with disabilities.**

The CDE has provided the Court with a broad and incomplete *description* of its monitoring and enforcement system along with some requested documents. What the CDE failed to provide is any serious *explanation or argument* as to why it thinks this system will work.

Again, at the most general level, the outlines of CDE's system are sound and CDE makes a case for the general design:

> By way of background, CDE developed its differentiated monitoring methodology by first identifying monitoring activities that are designed to support LEAs in gathering additional information on performance and compliance issues, investigating why poor performance is present, and developing an integrated plan to support LEAs in their efforts to improve the educational results and functional outcomes of their students with disabilities (SWD). CDE then determined which level of direct engagement and support LEAs will reasonably require based on the LEA's performance. CDE proposes three levels of LEA engagement for required activities: 1) independent, meaning the LEA conducts the activity alone; 2) with assistance, meaning the LEA conducts the activity with the support of a TA Provider; and, 3) with direct support by CDE consultants. This recognizes that some LEAs require less intervention than others and differentiation ensures CDE appropriately allocates available resources to the LEAs with the greatest need.

ECF No. 2684 at 7.

CDE's overall tiered approach to monitoring makes sense, particularly if the only two concerns are (1) conserving CDE's resources and (2) providing more intervention and support for LEAs that perform more poorly. Those are relevant concerns. But they are not the only concerns that a functional monitoring system must address, and they are not reflective of what is required by the IDEA. CDE did not bear its burden of demonstrating that its monitoring activities are designed to "improve[e] educational results and functional outcomes for all children with disabilities" and "ensur[e] that States meet the program requirements under [the law], with a particular emphasis on those requirements that are most closely related to improving educational results for children with disabilities." 20 U.S.C. §1416(a)(2). Nor does the CDE demonstrate that its monitoring and enforcement activities will appropriately address the IDEA's priority areas: "Provision of a free appropriate public education in the least restrictive environment," "State exercise of general supervisory authority, including child find, effective monitoring, the use of resolution sessions, mediation, voluntary binding arbitration, and a system of transition services . . .," and "Disproportionate representation of racial and ethnic groups in special education and related services, to the extent the representation is the result of inappropriate identification." 20 U.S.C. §1416(a)(3).

Plaintiffs do not object to the broad outline of the system, but CDE must go beyond the outline and provide an explanation for why the *specific* information gathering, investigation, and planning activities will result in improved LEA performance. In Phases 1 and 2, the Court evaluated the CDE's system for collecting and analyzing data to ensure that poor performing LEAs are selected for greater scrutiny and receive greater support. In Phase 3, however, the CDE needs to show how its actual monitoring, intervention, support, and enforcement activities will result in improvement. CDE did not do that.

What could it have done? Beyond the broad outlines of the CIM process, CDE could have described the logic model that informs each of the monitoring interventions that would ensure improved performance of LEAs. CDE could have provided evidence from other

jurisdictions or professional/scholarly research that similar activities improve performance. CDE could even have reflected on its own past practices to explain and justify its own determination of what works and what doesn't work in terms of monitoring and enforcement. What it cannot be allowed to do is simply say, "trust us, this will work."  Indeed, as Plaintiffs argue below, because CDE's work-in-progress monitoring and enforcement system lacks sufficient oversight over LEAs and focuses too heavily on paper compliance at the expense of site visits, classroom observations, and interviews, its system is unlikely to meet the requirements of the IDEA.

**C. The CDE's Targeted Monitoring system provides insufficient CDE oversight of LEAs and technical assistance providers.**

CDE's Targeted monitoring system relies too heavily on activities that LEAs conduct independently with no assistance, oversight, or verification by CDE. For Targeted Levels 1 and 2, all but one (CIM Plan approval) of the activities are undertaken with no required oversight by CDE or even a technical assistance provider.  ECF No. 2684 at 117. For Targeted Level 3, support is provided for several of the activities, but that support is provided by a (presumably) independent technical assistance provider. *Id.* For Intensive Level 1 assistance to LEAs is split between technical assistance providers and the CDE, while Intensive Levels 2 an 3 require direct CDE assistance and oversight for all activities. *Id.* The CDE does not describe how it oversees the work of the technical assistance providers.

CDE defends the lack of oversight for Targeted Monitoring by arguing that the tiered approach conserves CDE's resources and baldly asserting that "CDE reasonably believes that these LEAs are able to complete the required monitoring activities independently and without CDE's individualized assistance." ECF No. 2684 at 7-8. CDE further claims, without evidence, that its "levels of engagement and support and required activities, as proposed, are reasonably designed to support LEAs with the CIM Process and support the LEAs in their path towards improved outcomes." ECF No. 2684 at 8. But a "reasonable belief" is not a substitute for argument and evidence. As the Monitor notes, ECF 2679 at 7, some of the LEAs in Targeted

Monitoring may have missed their performance targets by wide margins. CDE needs to provide evidence that such poor performers can improve on their own.

Perhaps more troubling, past experience actually confirms the opposite. The shortcomings of CDE's own, and now discarded, monitoring system demonstrate that such self-monitoring is ineffective. The monitoring activities undertaken by LEAs in Targeted Monitoring are much like the self-directed activities that LEAs undertook when required to do a "Special Education Self Review" ("SESR") under CDE's prior monitoring system. Under SESR, LEAs would conduct "policies and procedures" reviews and "educational benefit" reviews, gather parent input, and undertake activities designed to root out systemic deficiencies. Ravenswood City School District, then a Defendant in this case, was required to conduct such a SESR and, pursuant to the Court's directive in 2013, Plaintiffs comprehensively reviewed Ravenswood's implementation of the SESR. That review, summarized in a memorandum to the Court Monitor and attached hereto as Exhibit A, aimed to "determine whether the system is capable of ensuring the provision of FAPE to children with disabilities in Ravenswood. Consistent with the standard outlined by Judge Henderson, Plaintiffs sought to determine whether (1) the SESR was implemented adequately in the District; (2) Ravenswood and the CDE appropriately identified both compliance and noncompliance; and (3) Ravenswood and the CDE identified and implemented appropriate corrective actions and corrected identified noncompliance." Exh. A. at 1.

The results of Plaintiffs' review were clear: "Plaintiffs' review not only revealed that Ravenswood faced several implementation challenges but also that the CDE failed to effectively monitor the SESR process and suggest appropriate corrective actions for the District." *Id.* "Although the District generally followed the CDE's guidelines stated in the Special Education Self-Review Manual, there were numerous problems with implementation as the result of lack of conformity to IDEA requirements, training, support, monitoring, and clarity by the CDE." *Id.* at 3. More specifically, Plaintiffs found that:

(1) The CDE failed to exercise meaningful oversight and transparency in the creation of Ravenswood's Monitoring Plan, which was developed based on limited data.

(2) The Student Records Review portion of the SESR overly burdened District staff, lacked sufficient CDE oversight, was inconsistent, and merely determined "paper compliance," not appropriateness of services and interventions or quality of those services or interventions.

(3) The District inadequately performed the Implementation Review portion of the SESR, and the CDE failed to exercise sufficient oversight.

(4) The CDE failed to adequately guide Ravenswood in conducting the Educational Benefits portion of the SESR. As a result, Ravenswood's Educational Benefits Reviews lacked consistency. Moreover, this portion of the SESR lacked appropriate quantifiable measures of student performance.

(5) The Fiscal Review portion of the SESR was not transparent and allowed for a great degree of subjectivity by reviewers.

(6) There was no transparency as to how another district within the SELPA conducted the SELPA Governance Review.

(7) The CDE failed to verify and adequately oversee the Policies and Procedure Review, given that Ravenswood did not review IEPs and conduct interviews as directed by the SESR guidelines for evaluating the SESR items. It is also not clear which policies or procedure documents were reviewed by the District.

(8) It is not clear how the CDE made district-level findings and the CDE failed to suggest appropriate district-level findings of non-compliance and corrective actions. Though CDE did propose district-level findings of non-compliance and corrective actions, they were not sufficient to generate meaningful improvement of student services.

(9) The CDE consistently lacked transparency in its verification and review of the SESR process. Moreover, its monitoring of the SESR does not appear to go beyond paper review.

*Id.* at 3-4. Many of these criticisms should sound familiar, as they are nearly identical to concerns raised by the Monitor and Plaintiffs regarding CDE's proposed self-directed Targeted Monitoring activities. CDE should not be permitted to make the same mistakes again.

**D.  CDE's monitoring and enforcement system focuses too heavily on paper compliance at the expense of site visits, classroom observations, and interviews—the most effective methods for improving service delivery to students with disabilities.**

Although CDE claims that it aims to get at the "root cause" of noncompliance and poor performance and to develop improvement plans that will remedy such poor performance, CDE's Targeted and Intensive Monitoring systems will fall short for a very straightforward reason: CDE's monitoring processes, most notably its CIM process and Educational Benefits Review, fail to gather any information from classroom observations, systematic interviews with educators and service providers, and other qualitative sources. Reviewing performance data and reading IEPs can go a long way toward flagging aggregate performance problems and identifying non-compliance, but it tells us very little about the true "root causes" of those performance problems and noncompliance. To get to the root cause, CDE must evaluate actual service delivery—how student assessments are conducted, how student behaviors are addressed in the classroom, the way that related services are provided to students, and the quality of instruction. The only way to meaningfully do that is to observe classrooms and service delivery, and to systematically interview administrators, teachers, providers, and parents.

This type of monitoring for improved performance is nothing new. Quality Service Review, as it's known by child welfare agencies, has a proven track record of helping service providers, such as social workers, identify performance problems, identify and understand the source of those problems, and continuously improve performance.[2] QSR is an interactive learning process allowing social workers, mental health providers, administrators, and families to discover what is working and not working in practice, and why. QSR dives deep into an individual child's service delivery with a combination of information gathered from interviews, child welfare records, observations, and deductions made from fact patterns and interpreted by

---

[2] *See* Kathleen G. Noonan, Charles F. Sabel, and William Simon, Legal Accountability in the service-Based Welfare State: Lessons from Child Welfare Reform, 34 *Law & Soc. Inquiry* 523 (2009).

reviewers regarding children and families receiving supportive services. Interviews are conducted with the children, family members, and important people in each child's life, including the social worker, mental health service providers, parents, caregivers, medical professionals, teachers, attorneys, coaches, clergy, and anyone else the family considers to be an important person in their life. Case summaries are completed to report back what is working for families in terms of practice and areas of opportunities where practice can move forward. QSR is a necessary and integral part of a comprehensive child welfare monitoring system that also includes data collection and analysis, technical assistance, and, when necessary, enforcement.

While Plaintiffs are not necessarily suggesting that CDE adopt QSR itself or substitute QSR for CDE's Universal, Targeted and Intensive Monitoring systems, Plaintiffs contend that the CDE's proposed monitoring activities will not be sufficient to identify root causes of poor performance or assist rank-and-file teachers and service providers in improving their practices because the CDE's monitoring system virtually ignores their practice and what matters most: what goes on in the classroom.

### E. CDE's Submission does not provide any analysis of the staffing, resources, and budget necessary to implement its monitoring and enforcement system.

It is impossible to evaluate the design of CDE's system without a clear understanding of the staffing, resources, and budget necessary for the CDE to implement the system. How many independent technical assistance providers will be necessary to fully implement CIM? How many data analysts will CDE need to flag noncompliance and performance problems? What materials and other resources need to be developed to assist LEAs in Targeted Monitoring? Inadequate budget and staffing will further exacerbate the problems identified above—a lack of sufficient oversight by CDE and  an over reliance on paper monitoring. While Plaintiffs understand that such projections will be estimates, the Court should not approve any monitoring system that cannot realistically be implemented on a statewide basis due to budgetary and resource constraints. This is a design necessity.

## II.

## CDE FAILS TO ADDRESS THE DEFICIENCIES IN ITS MONITORING AND ENFORCEMENT SYSTEM IDENTIFIED BY THE COURT MONITOR.

Pivoting now to the Monitor's analysis, the following table summarizes each of the Monitor's items of concern with CDE's monitoring and enforcement system, provides CDE's response, if any, to each of the Monitor's concerns, and sets forth Plaintiffs' analysis of the CDE's responses, as well as several specific concerns that the Monitor did not identify in his report. The table relies on the Monitor's organizational approach.

| Monitor Item of Concern | CDE Response | Plaintiffs' Analysis |
|---|---|---|
| **I. Outstanding Phase 2 Issues** | | |
| **A. Targets** | | |
| School-age LRE: Compliant | N/A | Plaintiffs agree with the Monitor's conclusion. |
| Preschool LRE: Compliant | N/A | Plaintiffs agree with the Monitor's conclusion. |
| **B. Restraint & Seclusion** | | |
| Restraint & Seclusion: Deferred | N/A | Plaintiffs agree with the Monitor's conclusion. |
| **C. IEP Implementation** | | |
| IEP Implementation: Deferred | N/A | Plaintiffs agree with the Monitor's conclusion. |
| **II. Framework for CDE's Monitoring and Support System for Non-Small LEAs** | | |
| **A. Philosophical Underpinnings** | | |
| **B. CIM Process** | | |
| CDE should clarify apparent contradiction between the Sample Annual Determination Letter (CDE Ex. 80) and the description of the CIM process. ECF No. 2679 at 20. | CDE explains that it had to continue monitoring LEAs during the pandemic, but those activities were modified due to the pandemic and were not necessarily those described in CDE's submission. Thus, there were some discrepancies between some of the monitoring documents CDE provided and the description in the CDE submission. CDE further explained that it will implement monitoring | With the understanding that CDE's proposed system is as described in its Submission and Response, Plaintiffs accept CDE's explanation for the discrepancy between the Submission and certain documents provided by CDE. |

12

| | | |
|---|---|---|
| | activities described in its submission after court approval during the 2023 monitoring period. ECF No. 2684 at 5-6. | |

| **B. Monitoring and Support Tiers** | | |
|---|---|---|
| 1. Universal Monitoring and Support | | |
| | | As part of its Universal Monitoring, the CDE conducts a "review of fiscal information including Maintenance of Effort?" ECF No. 2676 at 10. *Plaintiffs request that the CDE provide an explanation of this fiscal review, including the information LEAs provide, the people who conduct the review, and the standards used to approve the LEAs fiscal health.* |
| | | As part of its Universal Monitoring, CDE conducts a "review of the local Special Education Local Plan Area ("SELPA") assurances. ECF No. 2676 at 10." *Plaintiffs request that the CDE provide further description of the SELPA assurances and its process for reviewing those assurances.* |
| "CDE's universal monitoring and support tier is well designed: it conserves CDE's resources in order to devote them to LEAs in need of additional monitoring, | N/A | No additional comment. |

13

| | | |
|---|---|---|
| support, and oversight." ECF No. 2679 at 7 and 22. | | |
| 2. Targeted Monitoring and Support | | |
| a. Targeted Monitoring: Sorting LEAs | | |
| "In its response to this report, CDE should explain the omission of level 1 targeted monitoring from this sample letter, why this information was not included in its submission to this Court, and clarify this aspect of its monitoring system." ECF No. 2679 at 24. | The monitor accurately describes the criteria CDE proposes to use to sort and support LEA's in the Compliance-Only monitoring level. 2684 at 12 | No additional comment. |
| "For level 3 targeted monitoring, CDE's submission does not explain how it operationalizes concepts such as . . . 'not making progress" on systemic causes of low performance for level 1 targeted monitoring . . . .'" ECF No. 2679 at 25. | With respect to those LEAs whose data demonstrates that its performance is staying the same or getting worse on any indicator over three years, CDE considers such LEAs to be "not making progress." ECF No. 2684 at 12-13. | CDE's explanation appears reasonable. That said, CDE must provide LEAs with clear and specific metrics and yardsticks for measuring improved performance. Is modest improvement enough? How much improvement is enough? |
| For level 3 targeted monitoring, there is a lack of clarity as to "the data do not demonstrate improvement such that the LEA is at risk of being identified as Significantly Disproportionate in the following year." ECF No. 2679 at 25-26. | CDE's explanation is unclear on this point. It may be saying that this is the same as "performance is staying the same or getting worse." | CDE should clarify this point. |
| CDE does not explain how it categorizes LEAs that are (1) performing in the bottom 11-20% of LEAs on indicators most closely associated with FAPE in the LRE but *are* demonstrating improvement based on CDE's unstated standards, and/or (2) in year 2 of disproportionality but *are* demonstrating improvement | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide an explanation. |

14

| based on CDE's unstated standards. *CDE should address this issue in its response to this report.* ECF No. 2679 at 26. | | |
|---|---|---|
| For level 3 targeted monitoring, the CDE does not identify which of the indicators are most closely associated with FAPE in the LRE. ECF No. 2679 at 26. | "CDE proposes using the same data and ranking methodology approved by the Court (Dkt. 2598, p 5-6) as the criteria to identify LEAs for Targeted Tier, Level 3 monitoring." ECF No. 2684 at 12-13. | CDE's proposal appears reasonable. |
| There are discrepancies between the CDE's submission and its website regarding standards for Targeted Monitoring selection. ECF No. 2679 at 26. | See the explanation above regarding discrepancies between CDE's Submission and monitoring documents it provided. | CDE's explanation appears reasonable. |
| Some LEAs that miss few targets but by wide margins are sorted into a largely self-monitoring process. ECF No. 2679 at 7. | "CDE acknowledges the Monitor's concern as to a situation in which an LEA misses a performance target by a wide margin but is sorted into a largely self-monitoring level. CDE agrees that additionally requiring the LEA to engage in investigative and explorative activities at a higher level of engagement may better support LEAs whose data demonstrate they are performing poorly on any key "FAPE in the LRE" indicator. In response, CDE proposes an adjustment to the monitoring processes described in its Phase 3 Sub-Phase Design Report. For LEAs whose data indicate they are the bottom 10 percent on any key "FAPE in the LRE" indicator, the LEA will graduate from | CDE's response appears reasonable. |

| | | |
|---|---|---|
| | Targeted Tier, Level 1 or 2 to Targeted Tier, Level 3, as reflected in Attachment 5, the revised sorting chart." ECF No. 2684 at 13-14.<br><br>CDE's Exhibit 6 further describes the selection criteria, general activities, and oversight for each of the tiers/levels of intervention. | |
| CDE's submission does not include any guidance or standards that are used to distinguish the violations that require student-level correction from those that require system-level changes. ECF No. 2679 at 27. | "Because CDE is still developing final standards, does not have further information to provide at this time." ECF No. 2684 at 13. | CDE's response is unacceptable. |
| **b. Targeted Monitoring: General** | | |
| The information submitted by CDE for each activity in targeted monitoring concerned only disproportionality. None had to do with the other possible targeted monitoring review areas: child find, statewide assessment participation, statewide assessment proficiency, suspension rate, LRE, preschool LRE, and parent involvement. Thus, what each activity is designed to accomplish in the other areas of review cannot currently be determined. ECF No. 2679 at 7. | Although CDE provided some training materials for a few of the self-monitoring activities, Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| **c. Targeted Monitoring: Timeline Noncompliance** | | |
| CDE's submitted documents do not call for the provision of compensatory education when SWD suffer lengthy delays in the adoption and | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |

| implementation of IEPs. The cutoff for a lengthy delay is too long, and the form of CDE intervention in these circumstances appears to be weak. MR at 28 | | |
|---|---|---|
| 3. Intensive Monitoring and Support: LEA Sorting | | |
| "[C]lear conclusions regarding CDE's specific criteria for selection for intensive monitoring cannot be reached at this time due to ambiguous language in its submission that appears to differ from its 2020 submission and its 2021 SPP Indicator Guide, and differences between its submission and its website on the criteria used for sorting." ECF No. 2679 at 10. | "In response to the Monitor's request for confirmation, CDE refers the Monitor to the previous section entitled Clarification of April 15, 2022 Phase 3 Design Sub-Phase Report and Additional Materials Provided on May 6, 2022, as well as Attachment 5." ECF No. 2684 at 15. | CDE's response appears reasonable. |
| CDE's Submission "does not explain whether there is a difference between "close supervision" (levels 1 and 2) by CDE and "direct supervision" (level 3) and, if so, what that difference is. CDE should address this in its response to this report." ECF No. 2679 at 32. | "The Monitor requests that CDE confirm the difference between "close supervision" and "direct supervision" as it pertains to LEAs sorted into the three levels of monitoring under the Intensive Tier. A fuller clarification is set forth in Attachment 4, the CIM Guide, as well as clarification of the roles for each activity. In summary, CDE provides the following distinctions between "close supervision" for LEAs in Intensive Tier, Levels 1 and 2, and "direct supervision" for LEAs in Intensive Tier, Level 3: • "Close supervision" means LEAs are supported by their SELPA, appropriate TA Provider(s) and CDE monitoring staff. | CDE's response appears reasonable. |

17

| | • "Direct supervision" means LEAs are supported by their SELPA and appropriate TA Provider(s), but with CDE monitoring staff as the lead support and providing direct oversight of activity completion." ECF No. 2684 at 15 | |
|---|---|---|
| **III. Substance of CDE's Monitoring and Support System for Non-Small LEAs** | | |
| **A. CIM Process Step 1: Gather and Inquire** | | |
| 1. Team Creation | | |
| "It is reasonably clear that for intensive monitoring LEAs, enough TA is available to make the smooth functioning of improvement teams likely. For targeted monitoring LEAs this is less clear, particularly for levels 1 and 2 LEAs that go through this process largely on their own. Some training in facilitation for leaders or chairpersons of targeted monitoring LEA teams may be necessary to ensure the effectiveness of their teams." ECF No. 2679 at 34. | "The Monitor identifies a helpful addition to the list of required activities that will support LEAs in the CIM Process. As reflected in Attachment 6, CDE has amended its list of required activities in CIM Process, Step 1, to include "Team Creation." ECF No. 2684 at 15. | CDE's response appears reasonable. |
| 2. Data Drill Down | | |
| a. Data Drill Down: Targeted | | |
| LEAs will need assistance to perform the data drill down. ECF No. 2679 at 8 and 34. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| The document submitted by CDE discusses only disproportionality, not other areas subject to targeted monitoring. ECF No. 2679 at 8 and 34. | Although CDE provided some training materials for a few of the self-monitoring activities, Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| Very little information on how to conduct data drill downs; interpret the data; | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |

| | | |
|---|---|---|
| draw conclusions. ECF No. 2679 at 35 | | |
| b. Data Drill Down: Intensive | | |
| CDE does not offer "a step-by-step approach to performing a data drill down in the areas that resulted in the LEA's selection for intensive monitoring. That may be because intensive monitoring LEAs are to perform this activity with assistance (level 1) or as directed by CDE (levels 2 and 3), and a step-by-step approach could be embedded in that assistance or direction; however, no evidence of that was discovered in the documents submitted by CDE." ECF No. 2679 at 9 and 36 | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| Because CDE did not produce procedures governing such assistance and direction, or training documents for the personnel who are to provide it, the adequacy of the design of the data drill down process for intensive monitoring LEAs cannot currently be determined. Hence, this report cannot conclude that intensive monitoring data drill down is likely to be implemented effectively. ECF No. 2679 at 9 and 36. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| | | Plaintiffs request that CDE provide an explanation of the "set of guided questions that will help [the LEA] arrive at conclusions based on the synthesis of this data |

19

| | | disaggregation." ECF No. 2676 at 20. |
|---|---|---|
| 3. Assessment of Infrastructure | | |
| An assessment of infrastructure can be an important tool for intensive monitoring LEAs to determine contributing factors to their poor performance. The instrument submitted by CDE is adequate to this task. ECF No. 2679 at 10 and 38. | N/A | No Additional comment. |
| But intensive monitoring LEAs receive an annual determination of "needs intervention" in CDE's system because they require active intervention. In the absence of requested procedures, instructions, guidance, and training documents and based on the discussion in CDE's submission, the assistance or direction provided to intensive LEAs in the assessment of infrastructure is passive and after the fact. Thus, one cannot currently conclude that the intensive monitoring assessment of infrastructure is likely to be implemented effectively. ECF No. 2679 at 11 and 38. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| 4. Policies Procedures and Practices Review | | |
| a. Policies Procedures and Practices Review: Targeted | | |
| Due to a lack of responsive documents and different information in different CDE documents, conclusions regarding some aspects of this review cannot be | CDE disagrees. CDE's continued development of sampling methodologies for areas other than Disproportionality, including the composition of students to be sampled, the number of | CDE's failure to provide a full response to the Monitor's concern deprives the Court of its ability and authority to determine whether the design of CDE's system, specifically the design of the policies, |

reached. For example, the size of the student sample is not completely clear, nor is it clear how the student sample is chosen. Whether student samples are focused on the issues that resulted in an LEA's selection cannot therefore be currently determined. ECF No. 2679 at 8 and 45.

students to be sampled, and the compliance items to be reviewed, does not mean that its Policies, Practices, and Procedures Review as currently designed is an inadequate tool to uncover an LEA's performance issues or that it is inadequate to meet the requirements of federal law. ECF No. 2684 at 8.

Moreover, requiring a large sample of student files for review during the Policies, Practices, and Procedures Review—as the Monitor appears to propose--would not necessarily provide additional value to help determine an LEA's systemic issues. Working in tandem with the outcomes of a Policies, Practices, and Procedures Review, an outcome of the Data Drill Down provides the LEA the information available for each area, for all students. As such, requiring an LEA to review a large sample of individual student files during the Policies, Practices, and Procedures Review is of limited value. ECF No. 2684 at 9

CDE agrees with the Monitor that the sample and review should align to the area(s) under review, and is developing guidance for LEAs to review student files connected to the issue(s) the LEA is trying to address. But

practices, and procedures review, is likely to be effective. While a sampling of students/files may be an effective tool for monitoring, sampling can only be effective if designed appropriately, i.e., sufficient sample size and appropriate stratification of the sample.

21

|  | CDE disagrees that a large sample size is necessary to support the LEA in arriving at reasonable conclusions during the Root Cause Analysis. ECF No. 2684 at 10 |  |
|---|---|---|
| The methodology CDE uses to verify whether findings of compliance and noncompliance were made appropriately by LEA self-monitors is unclear (random verification of students or whether each student is verified). If a random verification is used, the size of the samples is not clear. Thus, whether this verification is designed to be effective cannot be determined at this time. ECF No. 2679 at 8 and 45. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| It is also unclear whether LEA self-monitors or CDE monitors are given enough information to conduct the student review effectively and whether interviews are conducted. ECF No. 2679 at 8 and 45. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| For the disproportionality issue that is a priority area for monitoring—whether the racial or ethnic disproportionality in identification as a SWD is the result of "inappropriate" identification—the student review is not designed to determine whether the identification of the student was or was not appropriate. ECF No. 2679 at 8 and 45. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| For one requirement, Item 2-4-1, Ex. 23 contains both | "The Monitor requests that the CDE confirm the required | CDE's response appears reasonable. |

| | | |
|---|---|---|
| individual student corrections and policy and procedures correction in both the policies and procedures and the individual student sections of the document. This may be an error. *If not, CDE should explain why this requirement is treated differently from the others.* ECF No. 2679 at 45, n. 50 | corrective actions for Compliance Item 2-4-1. (Dkt. 2679, p. 44, fn. 50). CDE confirms that Compliance Item 2- 4-1 does contain both student-level and policy and procedure corrective actions. The corrective actions for this item are as follows:<br><br>**Student-level**: Unless the parent and the LEA agreed that a reevaluation was unnecessary, the District must provide evidence that it has conducted reevaluations: a) not more frequently than once a year; b) at least every three years; c) when the LEA determines that the educational or related service needs (including improved academic achievement and functional performance) warrants an evaluation; d) at the student's parents' or teacher's request.<br><br>**Policy and Procedure-level**: The District must provide evidence that it (1) has policies and procedures that are compliant with state and federal law related to preparing and conducting three-year reevaluations and subsequent IEP meetings; (2) notified staff and administrators of the District's policies and procedures related to preparing and conducting three-year reevaluations and subsequent IEP meetings; and (3) conducted in-service training for staff and administrators related to | |

23

| | preparing and conducting three-year reevaluations and subsequent IEP meetings." ECF No. 2684 at 16-17. | |
|---|---|---|
| b. Policies Procedures and Practices Review: Intensive | | |
| The policies, practices and procedures review can play an important role in intensive monitoring. But whether it is designed to play such a role cannot currently be determined due to the absence of requested documents. ECF No. 2679 at 11. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| CDE produced only its monitoring instrument for this review, and did not produce procedures, guidance documents, training documents, interview and observation protocols, or information about the student sample sizes used or how the sample is selected. That may be because individual students are not monitored in this review; no evidence was submitted by CDE that students are reviewed in this part of intensive monitoring despite the word "practices" in the review's name. Hence, there is no evidence that monitors review student files and documents such as IEPs, IEP meeting notes, behavioral emergency reports, or behavior intervention plans. ECF No. 2679 at 11. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| There is no evidence that the monitoring instrument used in the review is adapted based on the specific issues that | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |

24

| | | |
|---|---|---|
| resulted in an LEA's selection for intensive monitoring. The instrument does not include the additional guidance contained in CDE's Item Table which deprives CDE monitors of useful guidance. ECF No. 2679 at 11. | | |
| If all of the corrective actions from CDE's corrective action table relevant to a probe in the monitoring instrument are assigned when noncompliance is found, then the corrective actions resulting from this review would be designed to resolve noncompliance, if implemented effectively, with the exception of the child find requirement. But there is currently no evidence that all relevant corrective actions are assigned. ECF No. 2679 at 11. | CDE clarifies that when an LEA is found noncompliant for policy and procedures, the LEA must demonstrate that it has the required compliant policy before the corrective action can be cleared. In situations where the LEA is found noncompliant for policies and procedures, the LEA either had a compliant policy and failed to submit it as evidence, or the LEA would need to create a new compliant policy and submit that as evidence. Once the LEA has demonstrated it has a compliant policy, CDE requires at least one corrective action: the LEA must provide evidence that it has compliant policies and procedures to address the noncompliance. CDE may assign additional corrective actions if it finds an LEA noncompliant in a Policies and Procedures review. ECF No. 2684 at 17. | CDE's response is inadequate. To appropriately remedy noncompliance in this area, all corrective actions must be applied. |
| With respect to LEAs selected for intensive monitoring due to significant disproportionality in identification, none of the information provided by CDE for this review shows that | CDE argues that federal law does not require SEAs to monitor whether any individual student's disability identification was appropriate. | CDE misses the point. CDE and LEAs cannot determine the cause of disproportionality without an understanding of whether the LEA is appropriately identifying students with |

| | | |
|---|---|---|
| CDE attempts to determine whether any individual student's identification as having a disability and needing special education was or was not appropriate. This is a priority area for monitoring. ECF No. 2679 at 11. | | disabilities. There may be disproportionality, but that disproportionality cannot be understood without an exploration of the eligibility decisions made for individual students. CDE's argument that neither the CDE nor LEAs can "upend a parent's consent to IEP eligibility," ECF No. 2684 at 11, is a distraction. Neither the Monitor or Plaintiffs suggest this.  But there needs to be monitoring of whether the district is making appropriate eligibility determinations. CDE and LEAs must consider, among other things: Were appropriate assessments conducted? How were the data interpreted? How can the CDE "identify the overall reasons why [the disproportionality] rate appears to be high," *id.,* if it doesn't understand why students are being identified at disproportionate rates? |
| There is no evidence of interview or observation protocols or tools which, one must assume from the instrument, indicates that interviews and observations are not conducted as part of this review of policies, procedures, and *practices* for LEAs . . . ." ECF No. 2679 at 45 | Plaintiffs could not identify CDE's response to this specific concern. | See Plaintiffs' concern regarding the absence of meaningful classroom observation and interview data-gathering in the monitoring process. |
| 5. Educational Benefit Review | | |
| a. Educational Benefit Review: Targeted | | |
| An educational benefit review is not required in targeted monitoring. But it is | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |

| | | |
|---|---|---|
| not clear why this review is not required for at least some of these LEAs, because some may have notably poor performance on some indicators, performance that this review could lead to improving (according to CDE). ECF No. 2679 at 9. | | |
| b. Educational Benefit Review: Intensive | | |
| CDE has not presented reasons to believe that intensive level 1 LEAs can effectively perform the educational benefit review independently and without CDE validation of the results. ECF No. 2679 at 10-11. | "CDE refers the Monitor to the previous section entitled Clarification of April 15, 2022 Phase 3 Design Sub-Phase Report and Additional Materials Provided on May 6, 2022 as well as **Attachment 6**." ECF No. 2684 at 17. | This response is inadequate and does not address the Monitor's concerns. |
| For intensive level 2 LEAs, the information submitted by CDE does not show that findings of compliance in this review are validated by CDE or that the assistance provided these LEAs is sufficient to validate these findings. ECF No. 2679 at 11. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| In the absence of some requested documents for this review (procedures governing the review; any instructions, guidance, and training documents for its staff conducting the review for level 3 LEAs; and procedures and training documents for technical assistance providers for level 2 LEAs), it is unclear what sample sizes are used for levels 1 and 2 LEAs, how samples are stratified for level 2 LEAs, and how samples are chosen for all | Plaintiffs could not identify CDE's response to this specific concern, although Plaintiffs note the CDE's general refusal to provide specific sampling methodologies. | Monitor lays out a sampling method based on students who met characteristics associated with the selection criteria for intensive monitoring on which the LEA performed poorly. That method would be reasonable. CDE should address this concern. |

| | | |
|---|---|---|
| intensive LEAs . ECF No. 2679 at 11. | | |
| For level 3 LEAs, a sample of ten SWD is likely adequate for issues affecting small numbers of SWD at an LEA, but inadequate for larger numbers of SWD at an LEA. ECF No. 2679 at 11. | Plaintiffs could not identify CDE's response to this specific concern, although Plaintiffs note the CDE's general refusal to provide specific sampling methodologies. | CDE should address this concern. |
| The educational benefit review does not monitor child find or LRE. ECF 2679 at 11. | Plaintiffs could not identify CDE's response to this specific concern, though there is discussion of LRE concepts in Ex. 67. | CDE should specifically address this concern. |
| The instrument used contains inaccurate citations, does not probe whether students' assessments were sufficiently comprehensive to identify all of their educational needs, and leaves key concepts undefined. ECF No. 2679 at 11. | The Monitor identified an issue with the regulations cited and used during the Educational Benefit Review. (Dkt. 2679, p. 60). CDE has updated the four items used in Educational Benefit Review since submission of its Phase 3 Design Sub-Phase Report. Item numbers have been changed to better distinguish these items from similar items  used during a Policies, Practices, and Procedures Review. CDE has slightly modified  the wording of the compliance items and updated the citations to better reflect FAPE in the LRE. ECF No. 2684 at 17-18. | The CDE only addressed the citations issue. It did not address the issues of the appropriateness of student assessments and identification of student needs. CDE should address those issues. |
| None of the documents submitted by CDE show that the sufficiency of program modifications, or their actual implementation, is probed. ECF No. 2679 at 11. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| There is currently no evidence that interviews or observations are performed | Plaintiffs could not identify CDE's response to this specific concern. | This is particularly important because lack of IEP implementation or low-quality service delivery may |

| | | |
|---|---|---|
| during this review. ECF No. 2679 at 11. | | be the reason the student is not receiving educational benefit. |
| The evidence submitted by CDE does not show that the review gathers all of the information necessary to determine whether a student's program is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." ECF No. 2679 at 11. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| It is not clear which corrective actions are assigned by CDE when noncompliance is found in this review. ECF No. 2679 at 11. | As clarified above, there are four specific items examined in an Educational Benefit Review. ECF No. 2684 at 19-20. | CDE's response appears reasonable. |
| The corrective actions for one item on the monitoring instrument does not include reconvening the IEP team for the affected student. ECF No. 2679 at 11. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| The corrective actions for another item on the instrument do not require CDE to perform additional educational benefit reviews to ensure that noncompliance has been corrected systemically; for the three items that do require "an" additional review, CDE has not presented reasons to believe that one additional review would be sufficient to indicate systemic correction, nor is it completely clear from CDE's wording that only one additional review is to be conducted. ECF No. 2679 at 11. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |

29

| | | |
|---|---|---|
| The corrective actions for two of these items refer to "student referrals," a term that often refers to referrals for special education assessment. But the associated items concern students already eligible for special education. *As "referrals" is puzzling in this context, it would helpful if CDE would explain its meaning in these two items.* ECF No. 2679 at 64. | "CDE acknowledges that "referrals" was used incorrectly in the Phase 3 Design Sub-Phase Report. Along with the changes noted above, language for the specific corrective actions for Items 14-1-3 and 14-1-4 has been changed to address this issue as follows: "CDE staff will ensure that all student records are compliant with the required standard. California Department of Education staff will sample half of the student ***IEPs*** for the most recent six months." ECF No. 2684 at 22 (Emphasis added). | CDE response appears reasonable. |
| | | CDE s does not discuss whether/how it monitors behavioral needs and interventions during the Educational Benefit Review process. CDE should specifically address those items, including the development of behavioral goals and consideration of behavioral intervention plans. |
| 6. Parent Input | | |
| a. Parent Input: Parent Survey Instrument | | |
| None of the probes address the timeliness of the monitoring priority area of child find, and the LRE probe and one assessment probe could be more direct. ECF No. 2679 at 66 | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| There is no evidence that the instrument is modified based on the reasons for the LEA's selection for monitoring. ECF No. 2679 at 66. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |

| b. Parent Input: Targeted | | |
|---|---|---|
| With respect to parent input, it is unclear why targeted levels 1 and 2 LEAs are not required to gather such input even if some of these LEAs were selected for targeted monitoring based on a failure to meet the parent involvement target. ECF No. 2679 at 8. | CDE acknowledges this concern, and has modified the required activities for LEAs in Targeted Tier, Levels 1 and 2. Thus, if the LEA does not meet the Parent Input indicator target, the LEA is required to conduct the Parent Input activity at the required, independent support level. ECF No. 2684 at 23 | CDE's response appears reasonable. |
| It is unclear why level 3 LEAs are not required to report the parent input results to CDE. MR at 8. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| The documents submitted do not explain how the results of the parent survey are to be analyzed and used in the next steps of the CIM process. ECF No. 2679 at 8. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| c. Parent Input: Intensive | | |
| The documents submitted by CDE do not make clear whether intensive level 1 LEAs perform this review independently or with a technical assistance provider. ECF No. 2679 at 11. | CDE confirms that when an LEA is directed to complete the Parent Input activity as "Required, Independent," the LEA is required to complete the activity independently. As noted above, CDE will provide the training and tools to complete the CIM activity, but it will only provide individualized assistance to the LEA upon request. 2684 at 23. | CDE provided a response, but it is not clear that LEAs in intensive level 1 should be permitted to conduct this activity independently. |
| Little information is provided regarding the nature of CDE oversight of levels 2 and 3 LEAs in this review. ECF No. 2679 at 12. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| It is not clear whether, and if so how, parents who are not fully literate and/or | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |

| | | |
|---|---|---|
| who lack computer or printer access will be included in the survey. ECF No. 2679 at 12. | | |
| Interviews with parents are not required for intensive LEAs, even if survey results indicate reasons to probe more deeply on some issues. ECF No. 2679 at 12. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| The documents submitted by CDE do not explain how the parent input results are to be analyzed and used in the next steps of the CIM process. ECF No. 2679 at 12. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| **B. CIM Process Step 2: Investigation** | | |
| 1. Root Cause Analysis | | |
| a. Root Cause Analysis: Targeted | | |
| The documents provided by CDE do not set forth the expectations, training, assistance, and instructions for these LEAs. Targeted levels 1 and 2 LEAs perform this analysis independently and will need training and clear instructions to do so; targeted level 3 LEAs receive some assistance in this analysis, but CDE has not provided a description of this assistance or any training for the providers of it. ECF No. 2679 at 8. | The Monitor requests clarification on how a particular activity is completed, including clarification to describe how the LEA will walk through the activity and how CDE will assess the reported results, when applicable. CDE refers the Monitor to **Attachment 4**, as its contents provide further clarification for CIM Steps 2 and 3. Because CDE is still developing CIM Step 4, Implementation and Ongoing Monitoring, it cannot provide further clarification at this time. ECF No. 2684 at 24. | This response does not make the case for how CDE's CIM Steps 2 and 3 are sufficient to ensure LEA compliance and FAPE in the LRE for students. While Attachment 4 provides greater descriptive details for Steps 1, 2, and 3 of the CIM process, CDE does not carry its burden of showing that those activities are designed to meet required outcomes.

Furthermore, CDE cannot be found compliant for CIM Step 4 activities because it has not sufficiently described those activities. |
| Standards that would be applied by CDE to either the required descriptions of the root cause analyses of levels 1 and 2 LEAs, or to the analyses themselves for | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |

| level 3 LEAs, were not provided by CDE; CDE does not state that any standards at all are applied. In the absence of such documents, this report can only conclude that targeted monitoring LEAs are unlikely to implement the root cause analysis step of the CIM process effectively in the absence of clear expectations, training, assistance, and instructions. ECF No. 2679 at 8. | | |
|---|---|---|
| **b. Root Cause Analysis: Intensive** | | |
| The tools currently being tested by CDE do not form a coherent whole or offer a clear step-by-step root cause analysis process. ECF No. 2679 at 12. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| The documents are unclear regarding whether all of the problems discovered through the prior steps of the CIM process are to be reduced to a single problem, or used at all in this analysis. If CDE believes that multiple problems are to be reduced to a single problem, the tools do not explain how to go about doing so. MR at 12. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| The root cause analysis documents suffer from some terminological and conceptual confusion. ECF No. 2679 at 12. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| In the absence of procedures, guidance and training documents for technical assistance providers and CDE staff, it is not possible to determine the design of | Although CDE provided certain training materials, including materials for conducting root cause analysis, Plaintiffs could not | CDE should provide a response and explanation for all of the guidance and training materials for each monitoring activity. |

33

| | | |
|---|---|---|
| the assistance provided to intensive level 1 LEAs or the direction provided to intensive levels 2 and 3 LEAs in this analysis. ECF No. 2679 at 12. | identify CDE's response to this specific concern. | |
| The documents provided by CDE in their current form are unlikely to result in an effective root cause analysis for intensive monitoring LEAs. ECF No. 2679 at 12. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| 2. Prioritization | | |
| a. Prioritization: Targeted | | |
| In the absence of the criteria to be used by targeted level 3 LEAs to prioritize root causes, and in the absence of guidance and training documents for them on this step that they are to perform independently, a conclusion cannot be reached about the design of the prioritization step of the CIM process for targeted level 3 LEAs. CDE has offered no reasons to believe these LEAs will be enabled to implement this step effectively. ECF No. 2679 at 8. | Plaintiffs could not identify CDE's response to this specific concern. | There are no trainings, protocols, instructions, procedures, guidance, templates, or tools for this activity. CDE should provide a response. |
| b. Prioritization: Intensive | | |
| In the absence of any procedures, instructions, guidance, training documents, tools, and instruments relevant to intensive monitoring prioritization, a conclusion cannot be reached about the design of the prioritization step of the CIM process for intensive monitoring LEAs. CDE has offered no reasons to | Plaintiffs could not identify CDE's response to this specific concern. | There are no trainings, protocols, instructions, procedures, guidance, templates, or tools for this activity. CDE should provide a response. |

| | | |
|---|---|---|
| believe intensive monitoring LEAs will be enabled to implement this step effectively. ECF No. 2679 at 12 | | |
| **3. Initiative Inventory** | | |
| The submission does not contain guidance or standards for when the "keep, stop, start" approach would be required for this potentially important activity. ECF No. 2679 at 13 | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| The tool submitted by CDE does not assist teams in assessing which plans or initiatives align with priority root causes and whether each initiative should be kept, stopped or started. ECF No. 2679 at 13 | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| The role of the apparently required focus groups and parent input sessions is not fully explained. ECF No. 2679 at 13 | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| **4. Theory of Action/Improvement Framework** | | |
| With respect to the theory of action/improvement framework step of the CIM process, it is reasonable to expect LEAs developing improvement plans to be able to articulate a "logical chain of reasoning," in CDE's phrase, to explain how the steps they will take will change practices and lead to improved outcomes for SWD. For that reason, it is not clear why targeted monitoring LEAs, even targeted level 3 LEAs, are not required to engage in this step as all such LEAs are | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |

| | | |
|---|---|---|
| to develop improvement plans. ECF No. 2679 at 9 | | |
| The design of the theory of action/improvement framework step of the CIM process cannot be described beyond the information in CDE's submission, or its adequacy determined, in the absence of procedures, instructions, guidance and training documents. ECF No. 2679 at 13. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| It is not clear that CDE intends to develop materials to assist, guide, train, and instruct intensive monitoring LEAs in the development of a theory of action/improvement framework. ECF No. 2679 at 13 | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| **C. CIM Process Step 3: Planning** | | |
| 1. Improvement Plan: Targeted and Intensive | | |
| Due to the absence of relevant documents, conclusions cannot be reached regarding how LEAs are to develop improvement plans; the assistance, advice, and direction they receive to do so; and whether the process and oversight can enable the development of plans that will result in improved compliance, results, and outcomes. Currently CDE has offered no reasons to believe that LEAs will be enabled to develop improvement plans effectively. ECF No. 2679 at 13 | Plaintiffs could not identify CDE's response to this specific concern. | CDE provided a document titled "High Leverage Practices" which provides suggestions for reforms and practices that might address noncompliance issues in the various targeted areas. This document does not adequately address the Monitor's concern. |
| 2. Approval Process: Targeted and Intensive | | |

| | | |
|---|---|---|
| CDE has not explained why targeted level 1 LEAs should not submit their plans for approval and has not demonstrated that this should not be required. ECF No. 2679 at 14. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| CDE currently does not have any standards for approval of the improvement plan at all. Hence, the design of the approval process cannot be determined. As a result, whether approved LEA improvement plans will reasonably enable the improvement of compliance and outcomes for SWD is currently unknown. ECF No. 2679 at 14. | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| | | CDE should explain how it will provide training in approving improvement plans to the SELPAs that are charged with approving LEAs' plans. |
| **D. CIM Process Step 4: Implementation and Ongoing Monitoring: Targeted and Intensive** | | |
| CDE has also not explained: how the implementation of level 1 targeted monitoring LEAs' plans will be monitored, as these LEAs are not required to submit their plans; what a "community of practice" is or its role in monitoring targeted monitoring plan implementation; how and when special education local plan areas (SELPAs) would inform it of plan implementation problems for | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |

37

| | | |
|---|---|---|
| level 2 LEAs; the respective roles of SELPAs and CDE in monitoring plan implementation for targeted level 3 LEAs; and the specific circumstances in which CDE will work directly with targeted monitoring LEAs that are not meeting timelines and milestones, nor the nature of this direct work. ECF No. 2679 at 14 | | |
| Due to a lack of procedures, standards for poor performance on plan implementation, standards for when LEAs are required to update their plans, and guidance and training documents, this report must conclude that the current design of CDE's process for monitoring implementation of improvement plans cannot reasonably ensure the implementation of these plans. ECF No. 2679 at 14 | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| **IV. Cyclical Monitoring of Small LEAs** | | |
| In the absence of requested documents the following are all unknown:<br>• the compliance elements reviewed;<br>• sample sizes used;<br>• nature of, and sample sizes for, the CDE random audit;<br>• policies and procedures reviewed, and CDE oversight of that review;<br>• standards applied in both reviews;<br>• nature of the training for these LEAs to perform this self-review; | CDE submits Attachment 4, which provides additional description of "Small LEA Cyclical Monitoring."<br><br>CDE does confirm the following:<br><br>Policies, practices and procedures review is required at the "required, independent level," including | CDE does not provide a crosswalk between any of the Monitor's specific concerns. Many of the concerns are not addressed at all. And there is no effort to demonstrate the sufficiency of the activities. CDE acknowledges that "[s]pecific cutoffs and criterion [sic] to identify and direct a small LEA to participate in a modified CIM process is under development." ECF No. 2684 at 110. |

38

| | | |
|---|---|---|
| • sample size and composition for the educational benefit review; <br><br> • standards used to select LEAs with "systemic concerns of noncompliance" to engage in a "modified" CIM process; and <br><br> • the nature of this modified CIM process. ECF No. 2679 at 83 | • Attend training activities presented by CDE <br><br> • Commence and complete the Student File Review (Practices) <br><br> • Commence and complete the Policy and Procedure Review protocol <br><br> • Review corrective actions associated with any findings from the Policies, Practices and Procedures Review <br><br> • Complete the corrective actions and provide evidence of correction <br><br> • Consult with your CDE consultant on the process of the Prong II, if applicable <br><br> Educational Benefit is a required activity. The LEA is required to complete this activity at the Required, independent level, with additional support provided by the CDE: <br><br> • View a recording of the Educational Benefit Review training or attend a regional in-person training offered by CDE consultants | Finally, the activities—LEA tasks and consultant's role—contained in the tables CDE provided, ECF No. 2684 at 110-113, provide almost no additional detail that would allow the Court to determine the sufficiency of the activities. |

| | • Receive and review the required reporting form(s)<br><br>• Receive and review the initial student list for Educational Benefit Review sent by the CDE consultant<br><br>• Commence and complete the Educational Benefit Review<br><br>• Review corrective actions associated with any findings from the Educational Benefit Review<br><br>• Complete the corrective actions and provide evidence of correction | |
|---|---|---|
| There is no evidence in the submission of CDE oversight of LEA findings of compliance in the educational benefit review. ECF No. 2679 at 83 | CDE's table re "consultant role" suggests that the consultant will review educational benefit review documentation, review student files against EBR documents to verify LEA work, and ensure that corrective actions are taken, if necessary. | CDE should clarify its response to the Monitor's concern. |
| **V. Monitoring of Nonpublic Schools** | | |
| Much about this monitoring process cannot currently be determined due to lack of access to all relevant documents. ECF No. 2679 at 15 | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| It is not clear whether IEPs are reviewed in the follow-up review. ECF No. 2679 at 15 | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |
| But even if applied effectively, this instrument does not monitor whether | Plaintiffs could not identify CDE's response to this specific concern. | CDE should provide a response. |

| | | |
|---|---|---|
| individual SWD in these restrictive environments are receiving FAPE or are placed in the LRE. Educational benefit reviews are not performed, and key LRE requirements are not monitored substantively. FAPE and LRE are priority areas for monitoring. MR at 15 | | |
| **VI. Annual Determinations** | | |
| CDE has not 1) set forth its criteria for "needs substantial intervention" annual determinations, and 2) explained clearly and precisely how its process of making determinations is applied to small LEAs. ECF No. 2679 at 15 | CDE is still developing the criteria with respect to this determination and is unable to provide an explanation at this time. ECF No. 2684 at 24<br><br>CDE collects data for small LEAs annually to determine timeline compliance and Disproportionality. Results of these analyses may identify a small LEA for further monitoring. When a small LEA is identified once every three years for cyclical monitoring, the LEA is required to conduct a self-study, comprised of a Policies, Practices, and Procedures Review and an Educational Benefit Review. CDE analyzes data collected from Policies, Practices and Procedures and Educational Benefit Reviews alongside the LEA's annually reported data to determine timeline compliance and disproportionality.<br><br>Because CDE's proposed cutoffs for identification into | CDE's response is inadequate. |

41

|  | the appropriate monitoring tiers and levels, as well as CDE's criteria to determine the small LEA's annual determination, are still in development, it cannot provide further clarification at this time. |  |
|---|---|---|
| **VII. Enforcement** | | |
| Presumably "report use" means more frequent reporting on progress toward correction. *If this is incorrect CDE should explain its meaning in its response to this report.* ECF No. 2679 at 92, n.83. | CDE requires that the LEA report any and all technical assistance that it used to address the areas of noncompliance or poor performance. This requires the LEA to identify the technical assistance the LEA accessed, the technical assistance services that were provided to the LEA, and how the technical assistance was used to support the LEA. The LEA must also report on the impact of technical assistance on performance using survey data, local quantitative data, and state reported outcome data. 2684 at 25 | CDE's response appears reasonable. |
| CDE has not 1) set forth its enforcement steps that are tied to a "needs substantial intervention" determination; 2) explained what designating an LEA as a high-risk grantee means; and 3) put forth its standards for applying seven of its significant sanctions: 1) notification of the LEA superintendent regarding uncorrected noncompliance, 2) a compliance agreement requiring corrective action within three years, 3) | Because CDE is still continuing to develop these criteria, it cannot provide a further explanation at this time. ECF No. 2684 at 25. | CDE's response is inadequate. |

42

| ineligibility for IDEA funding, 4) prohibiting the LEA from applying for discretionary funds from CDE, 5) requesting an audit of the LEA's financial records, 6) directing the administration of the LEA's special education programs, and 7) withholding funds. ECF No. 2679 at 15, 91-92 | | |
|---|---|---|

## III.

## CONCLUSION

CDE's proposed monitoring and enforcement system does not comply with the Consent Decree and the IDEA for each of the following reasons: (1) it is incomplete and lacks sufficient detail to be evaluated by this Court; (2) it is not supported by meaningful explanation or argument to demonstrate that it will ensure LEA compliance with the law and FAPE in the LRE; (3) it provides insufficient CDE oversight over LEAs, SELPAs and technical assistance providers; (4) it focuses too heavily on paper compliance at the expense of site visits, classroom observations, and interviews—the monitoring methods that are most effective in improving service delivery; of improving service delivery to students with disabilities; and (5) it does not include any analysis of the staffing, resources, and budget necessary to implement the monitoring and enforcement system. In addition to those fatal flaws, dozens of specific flaws identified by the Court Monitor render the CDE's monitoring and enforcement system out-of-compliance with the IDEA and the Consent Decree.

Dated: September 15, 2022        Respectfully submitted,

YOUTH AND EDUCATION LAW PROJECT
STANFORD LAW SCHOOL
MILLS LEGAL CLINIC

By: _____/s/_____
William S. Koski
*Attorneys for Plaintiffs Emma C., et al.*

NATIONAL CENTER FOR YOUTH LAW

By:_____/s/_____
Brenda Shum

*Attorneys for Plaintiffs Emma C., et al.*

44