UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EMMA C., et al.,

          Plaintiffs,

    v.

TONY THURMOND, et al.,

        Defendants.

Case No.  96-cv-04179-VC

**ORDER RE STATE'S COMPLIANCE AT PHASE 3A**

In this long-running case, the California Department of Education is working to demonstrate that it has come into compliance with the federal Individuals with Disabilities Education Act ("IDEA"). The Court has set up a multi-phase, multi-year process by which the state may eventually show that it is adequately fulfilling its obligations. If the state does so, the consent decree will be lifted, and this Court's supervision will end.

The current phase—Phase 3A—is about the state's plan for helping struggling school districts improve. As discussed in this ruling, the plan is almost certainly sufficient. The real test will be at Phase 3B, which will examine whether the state is actually implementing the plan in a manner that satisfies its obligations under the IDEA.

## I

The IDEA requires that states receiving federal education funds provide an appropriate education to students with disabilities. While local school districts are primarily responsible for providing such an education, the law tasks states with overseeing them and intervening when the

districts fall short.[1] The law broadly requires that states' monitoring programs focus on "improving educational results and functional outcomes for all children with disabilities" with "a particular emphasis on those requirements that are most closely related to improving educational results for children with disabilities." 20 U.S.C. § 1416(a)(2). States must use "quantifiable indicators" and "such qualitative indicators as are needed" to determine whether districts are providing "a free appropriate public education in the least restrictive environment" and are appropriately engaging in "child find, effective monitoring, the use of resolution sessions, mediation, voluntary binding arbitration, and a system of transition services." § 1416(a)(3). The state must also monitor whether districts are disproportionately identifying disabilities among students who belong to racial and ethnic minorities. § 1416(a)(3)(C). Federal regulations add that states must enforce the law by providing technical assistance to districts, conditioning or withholding state education funds, and requiring corrective action or improvement plans as appropriate. 34 C.F.R. § 300.600(a)(3).

How to carry out these responsibilities is left up to each state. For purposes of the consent decree in this case, California is in compliance with the IDEA so long as its efforts are adequate. Neither excellence nor perfection is necessary.

## II

In Phases 1 and 2, the state demonstrated that its data collection and analysis procedures were largely in compliance with the IDEA. *Emma C. v. Torlakson*, No. 96-cv-4179, 2018 WL 3956310 (N.D. Cal. Aug. 17, 2018) (holding the state in compliance at Phase 1 except for data collection related to individual education programs); *Emma C. v. Thurmond*, 393 F. Supp. 3d 885 (N.D. Cal. 2019) (initially holding the state out of compliance at Phase 2); *Emma C. v. Thurmond*, 472 F. Supp. 3d 641 (N.D. Cal. 2020) (holding the state in compliance at Phase 2 except for its performance targets). The outstanding issues will be revisited in Phase 4. For those

---

[1] In the interest of accessibility and readability, this order uses the term "school district" where the IDEA uses the term "local educational agency," or LEA. An LEA is almost always the same as a school district, though not always. For example, a standalone charter school is an LEA, but would not be thought of as a school district.

first two phases, the state had to show that is procedures were not "so deficient [as to] significantly hinder its ability to monitor school districts." *Emma C.*, 393 F. Supp. 3d at 893.

In Phase 3, the state must show that it does an adequate job monitoring and intervening with the poorly performing districts identified through the procedures set out in the prior phases. Once the state collects appropriate data and analyzes that data to find struggling and noncompliant districts, it must take reasonable steps to improve things. Given the onset of the pandemic and the scope of this phase, it was split into two parts. In Phase 3A, the current phase, the state must demonstrate that its plan for monitoring school districts is reasonably calculated to address the deficiencies identified by its data. In Phase 3B, the state will have to demonstrate that it is following through on its plan.

The Court held three days of Phase 3A hearings in November 2022 to discuss an initial round of submissions. Dkt. Nos. 2676 (state's filing), 2679 (court monitor's filing), 2684 (state's response to monitor), 2688 (plaintiffs' filing). A further hearing was set for March 2023 so that the state could complete and present its internal manual for monitoring. Dkt. No. 2707. The court monitor and the plaintiffs filed responses flagging their concerns. Dkt. Nos. 2708, 2709. At the hearings, which were conducted by Zoom, state officials explained their monitoring process and answered questions from the plaintiffs, the monitor, and the Court.

### III

Every year, the state sends each school district an annual determination letter with its monitoring tier. Districts that are fully compliant with their IDEA obligations are assigned to what California calls "universal monitoring." The state simply offers those districts resources for voluntary improvement programs. Districts with timeliness issues, but not performance issues, are assigned to "compliance-only targeted monitoring." Those districts must fix their issues within one year, but do not have to engage in a more structured process.

All the other districts have either one or more performance issues on the state's indicators, have disproportionality problems relating to race or ethnicity, or have outstanding tasks from past years. Those districts must participate in what the state calls its Compliance and

Improvement Monitoring ("CIM") process. At a high level, the CIM process always has the same four steps. At the first step, the district gets its bearings by assembling an appropriate team and performing both a "data drill down" and a "policies, practices, and procedures review." At the second step, the district analyzes its data to identify the root causes of its problems. At the third step, the district formulates a plan to make progress on the issues that triggered monitoring. That plan must be approved by either a regional special education body or the California Department of Education itself. The fourth and final step is ongoing monitoring of the district's work implementing its plan, which occurs in years two and three of monitoring. (The state rightly recognizes that it will take time for a district to see meaningful progress.) The state provides checklists, guidance, and other resources, and verifies that the district is doing its homework.

The CIM process is structured to require more effort from districts that are in worse shape, and it allocates more resources to help them. Within the four steps, more tasks are assigned to districts with more significant problems. Such districts are also subjected to closer oversight by either third-party technical assistance providers or the state itself. Districts flagged for monitoring because of more limited problems are assigned to "targeted monitoring," in which they undertake the core steps of the CIM process largely independently. Dkt. No. 2707 at 17. Districts that fail to meet one or two performance indicators are assigned to targeted level 1. Districts failing three indicators are assigned to targeted level 2, as are districts in the first year of racial or ethnic disproportionality. Districts that are in the bottom 11–20% on a combination of the state's intensive performance indicators, or in the bottom 10% of any one indicator, are in targeted level 3, as are districts in a second year of disproportionality.[2]

Districts with data indicating more systemic problems are assigned to "intensive

---

[2] The indicators for intensive monitoring for K–12 schools are English proficiency, math proficiency, suspension rate, chronic absenteeism rate, rate of students in regular classes more than 80% of the day, and rate of students in separate classrooms more than 40% of the day. The preschool indicators are average rate of child outcomes, rate of suspension and expulsion, rate of children in regular classes most of the time, and rate of children in separate schools or placements most of the time. *Emma C.*, 472 F. Supp. 3d at 646 n.2.

monitoring," which requires a more thorough CIM process and closer oversight. Dkt. No. 2707 at 44. Districts in the bottom 10% statewide on the intensive performance indicators are divided among three levels. Districts that have failed to complete assigned corrective actions and districts found to have significant disproportionality problems are also assigned to intensive monitoring.

## IV

The state's filings are confusing. They are repetitive and jargon-heavy, and they leave the reader struggling to articulate what a district actually does as it moves through the CIM process. Partly this is the nature of reviewing a plan in the abstract. And partly it is because the CIM manual is an internal document, not the instructions that are actually given to school districts. But the next phase will provide a better picture of how this all works in practice. For now, at the design phase, the state has the legitimately difficult task of deciding in advance how to allocate its resources and graduate the intensity of its interventions. The state needs a plan that is specific enough to put into practice, but general enough to be useful for any given district.

Two basic features of the CIM process show that the state has taken a reasonable approach to that challenge. First, the tasks assigned in each tier are reasonably tailored to the severity of the problems. Districts with less significant problems are required to come up with a rational plan to fix those problems, but they complete a less onerous process. For instance, in targeted levels 1 and 2, districts don't have to conduct an "initiative inventory." That makes sense, as they are not trying to fix as many problems at once as are districts in higher tiers. Those worse-performing districts need to formally review their special education initiatives, because districts that are really struggling often launch too many new projects at once and then fail to make meaningful progress on any front. In assigning this and other tasks to some districts but not others, the state has made reasonable decisions.

Second, the state conducts closer supervision of districts with more significant problems. At targeted level 1—the lowest level of monitoring that involves the CIM process—a district does pretty much everything independently. At the highest level of monitoring, intensive level 3, the state is directly involved at every step. For the levels in between, there is closer supervision

at the more important steps, and sometimes the supervision is provided by a third-party technical assistance provider rather than the state itself. One question at the hearings was why the state conceives of such oversight as a middle ground between independent work and direct state oversight. One might think that outside specialists would be appropriate for the worst-performing districts, not those somewhere in the middle. The state's explanation, that the third-party consultants are like medical specialists while the state is like a general practitioner, makes some sense (although it is not wholly satisfying). Other good questions raised about the technical assistance providers, such as how they are supervised by the state, were answered in part at the hearings and, in any event, are better considered during Phase 3B if there appears to be a problem with the state's plan in practice. For now, the delegation of supervision for the districts in mid-level monitoring does not rise to—or even necessarily suggest—noncompliance with the state's obligations under the IDEA.

The plaintiffs and court monitor identified a handful of more specific concerns with the state's written plan. To the extent those concerns were not resolved by the discussions at the hearings, they do not amount to noncompliance at this phase, where the state need only put forth an adequate plan. For example, the court monitor raised a concern that the CIM process lacks a specific method to ensure districts comply with the IDEA's "child find" requirements. At the hearing, the monitor explained that poor performance on the child find indicator suggests that a district is failing to identify students with disabilities, but does not necessarily prove it. This may not be a problem at all. The law focuses on structural problems, and everyone agrees that state staff aren't expected to be out searching for individual students. But if there is an issue, it is more a question of implementation than design. Furthermore, if Phase 3B reveals that the state is following its process exactly as described, but also shows that its work is not attentive to the requirements of the statute or not reasonably calculated to make progress on actual problems, then the state may be held out of compliance at that point. Put another way, a problem that surfaces in Phase 3B will not be waved away merely because it could be characterized as a "design" problem. For now, the state's plan is sufficient to move forward.

Phase 3B is likely to be the most intensive and difficult phase yet. It's one thing to have a good plan; it's another thing to follow through on that plan. The parties will confer on how to randomly select districts at each monitoring level. For each step in the CIM process, the state will submit the documents produced for that district and provide a narrative of how the monitoring played out. The court monitor and the plaintiffs will each submit responses, limited to 15 pages each. Those filings need not explain their concerns in detail, but rather should serve to put the state on notice so that it can respond at the hearing.

**IT IS SO ORDERED.**

Dated: April 4, 2023

_____

VINCE CHHABRIA
United States District Judge