**Pages 1 - 180**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

```
EMMA C., et al.,               )
                               )
            Plaintiffs,        )
                               )
   VS.                         )    NO. C 96-04179 VC
                               )
TONY THURMOND, et al.,         )
                               )
            Defendants.        )
_____)
```

San Francisco, California
Tuesday, October 17, 2023

<u>**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:  (via videoconference)

For Plaintiffs:

STANFORD LAW SCHOOL
Youth & Education Law Project
559 Nathan Abbott Way
Stanford, California  94305
**BY:  WILLIAM S. KOSKI, ATTORNEY AT LAW**

NATIONAL CENTER FOR YOUTH LAW
1212 Broadway - Suite 600
Oakland, California  94612
**BY:  BRENDA SHUM, ATTORNEY AT LAW**
**FREYA E.K. PITTS, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter

```
1    APPEARANCES:   (via videoconference, cont'd)

2    For Defendants:
                         CALIFORNIA DEPARTMENT OF EDUCATION
3                        1430 N Street - Suite 5319
                         Sacramento, California  95814
4               BY:  SHIYLOH DUNCAN-BECERRIL, ATTORNEY AT LAW
                     JACK BRIMHALL, ATTORNEY AT LAW
5

6                        OFFICE OF THE ATTORNEY GENERAL
                         CIVIL, HEALTH, EDUCATION & WELFARE SECTION
7                        1300 I Street - Suite 125
                         Sacramento, California  94244
8               BY:  DARRELL W. SPENCE, ATTORNEY AT LAW

9    Also Present:       MARK MLAWER, SPECIAL MASTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   Tuesday - October 17, 2023                    9:34 a.m.

 2                    P R O C E E D I N G S

 3                        ---o0o---

 4         THE CLERK:  Now calling civil case 96-4179, Emma C.,

 5   et al. versus Thurmond, et al.

 6      Will Counsel please state your appearances for the record

 7   starting with the Plaintiff.

 8         MS. SHUM:  Good morning, Brenda Shum, National Center

 9   For Youth Law for Plaintiffs, along with my co-counsel Freya

10   Pitts, also with NCYL, and Bill Koski with Stanford's Youth &

11   Education Law Project.

12         THE COURT:  Welcome, Ms. Shum.  Is this your first

13   appearance?

14         MS. SHUM:  I have appeared before but not presented,

15   Your Honor.

16         THE COURT:  Okay.

17         MR. SPENCE:  Good morning Darrell Spence on behalf of

18   State Defendants.

19         THE COURT:  Good morning.  And hello, Mark.  How are

20   you?

21         MR. MLAWER:  Fine, Judge.  How are you?

22         THE COURT:  A little bit annoyed.  I don't like

23   keeping people waiting, so I do apologize for that.

24      So, anyway, let's get started.  I think the first thing we

25   ought to discuss is the sealing issue.  So right now the
```

**PROCEEDINGS**

1   proceeding is not sealed.

2                    (Video freeze interruption.)

3          **THE COURT:**  I want to go over with you how we --

4   should the entire hearing be under seal and then we sort of go

5   through the transcript and unredact -- hold on.

6       Now, I'm getting a message that my internet connection is

7   unstable.  Is everybody able to hear me okay?

8          **MS. DUNCAN-BECERRIL:**  You were frozen for a little

9   bit, Your Honor, but now you are fine.

10         **THE COURT:**  Okay.  Let me start over just in case.

11  So, right now we are not under seal --

12                   (Video freeze interruption.)

13         **THE COURT:**  I know that we have some confidential

14  stuff that --

15                   (Video freeze interruption.)

16         **OFFICIAL COURT REPORTER:**  Is it just my connection or

17  is everyone --

18         **MR. MLAWER:**  No.

19                      (Pause in the proceedings.)

20         **THE COURT:**  What about now?  Okay so far?

21         **MR. SPENCE:**  Yes.

22         **THE COURT:**  Please feel free to interrupt if -- feel

23  free to interrupt if you see a problem.

24      Okay.  So as I was saying --

25                      (Pause in proceedings.)

1          **THE COURT:**  Okay.  Press the re-set button.

2      So the first thing we should talk about is sealing.  I was

3  tentatively thinking that the hearing -- we should just do the

4  entire hearing under seal and have you-all go through the

5  transcript and unredact anything that can be unredacted, but

6  I'm happy to think about another way to do it that is -- that

7  allows the public in real-time to have access to a portion of

8  the hearing.

9      I mean, I -- I know that there are some sort of

10  confidential matters that we will be discussing that should

11  not -- you know, should not be disclosed to the public, but a

12  lot of the hearing should be publicly accessible either in

13  real-time or, you know, after the fact by unredacting portions

14  of the hearing transcript.

15      So, how do you-all think we should proceed?

16          **MR. SPENCE:**  This is Darrell Spence on behalf of State

17  Defendants.

18      I think your suggestion, if I understand it correctly, I

19  would agree to it.  So, if I understand it correctly, we are

20  sealing the -- this video transmission.  And then afterwards,

21  the parties will get together and figure out what needs to be

22  redacted in terms of the transcript.

23      If that's what I'm hearing, then the State Defendants

24  would agree to that.

25          **THE COURT:**  Well, that's -- that was one -- that was

**PROCEEDINGS**

1    sort of my tentative inclination for how we should do it, but

2    I'm also very open to suggestions for doing it in a different

3    way that might allow, you know, the public to continue to have

4    access to a portion of this hearing in real-time.

5         I just don't know if that's realistic.  I don't know if we

6    are going to be able to, you know, sort of segregate out, you

7    know, discussion of specific school districts or specific

8    student files or something like that, you know, in a meaningful

9    way that would, you know, prevent us from having to go back and

10   forth to sealed versus unsealed too frequently.

11        What do the Plaintiffs think about that?

12        **MS. SHUM:**  So, we appreciate the importance of having

13   the hearing open to the public, and I think that we agreed to

14   refer to the specific LEAs by their -- by designated number in

15   an effort to preserve that confidentiality; and we would do our

16   best to be disciplined about doing so throughout the hearing.

17        One option is to, perhaps, leave the hearing open until it

18   becomes necessary to address confidential information, and then

19   we could pivot and close the hearing.  And I appreciate the

20   fact that that can create some logistical challenges.

21        So, if the Court is inclined to proceed as it tentatively

22   proposed, we would cooperate with Defendants to sort of review

23   the transcript and designate the portions that needed to be

24   sealed as opposed to those that are appropriate for public

25   participation.

1       **THE COURT:**  Okay.  Well, I mean, I would certainly

2   prefer not to seal the entire hearing if we don't have to.

3       I have not memorized -- I haven't correlated the numbers

4   to the districts.  And so, I mean, is there a list somewhere

5   that would allow me to do that quickly?

6       **MR. SPENCE:**  Yeah, Your Honor.  I can e-mail you a

7   list of the specific LEAs and the correlated number right now.

8       **THE COURT:**  Okay.  Why don't you do that.

9       **MS. DUNCAN-BECERRIL:**  Your Honor, if I can just add, I

10  think if there are global issues for us to talk about that are

11  significant and for all LEAs, I think those portions can remain

12  open.

13      I think Jack and myself can keep the confidentiality.  I

14  would say when we start to bring in our staff, that presents an

15  additional challenge, you know, it can be a little bit nerve

16  wracking to come in front of a federal court judge for the

17  first time.

18      And so maybe wanting to preserve it at that point when we

19  are talking about specific issues with LEAs.  So that may be

20  when the trigger occurs.

21      **THE COURT:**  Well, that might make sense.  I will say

22  that being nervous is not a reason to have it under seal,

23  but --

24      **MS. DUNCAN-BECERRIL:**  Correct.

25      **THE COURT:**  -- to the extent that you are concerned

1  that it will be difficult for staff to meaningfully respond to

2  questions, you know, present the issues, you know, without

3  referring to particular districts or district, students or, you

4  know, something like that, I -- you know, I hear what you are

5  saying.

6      **MS. DUNCAN-BECERRIL:**  Yeah.  I apologize.  That was

7  my -- that was my intent was to say we wouldn't want them to

8  accidently say the name of the district or the name of the

9  staff or the students, you know, while they are trying to

10 convey the information.

11     **THE COURT:**  Okay.  Okay.  Well, I think that might

12 be -- that might make sense.  Let's sort of try to proceed in

13 open court for as long as we can and see how it goes.  Okay.

14     In terms of how to begin, I was actually thinking -- I

15 mean, I think a lot of times we begin with kind of the State

16 making a presentation and going through some of the objections

17 that are made and concerns that are expressed by the Plaintiffs

18 and by the Monitor.

19     I think this time what I want to say is that I -- you

20 know, maybe starting with the Plaintiffs -- since they, after

21 all are the Plaintiffs -- I, you know, share a lot of the

22 concerns that the Plaintiffs express in their filing.

23     And, you know, it's not about -- it's not about whether

24 the State is doing an adequate job at this phase.  It's about

25 whether the State has given us enough to determine whether it's

1    doing an adequate job at this phase; right.

2        But I do share a lot of the concerns expressed by the

3    Plaintiffs.  And so I wonder if, you know, it would be worth

4    beginning with a summary from the Plaintiffs of the concerns

5    that they have expressed in their filing.

6        And after we get that summary, maybe Mark -- you know, if

7    Mark thinks there is anything important to add that wasn't

8    covered, he could add it.  And then we could hear from the

9    State.

10                       (No response.)

11       **THE COURT:**  You are mute, Ms. Shum.

12       **MS. SHUM:**  Thank you, Your Honor.  I actually think

13   that's an -- a really effective strategy for today's hearing

14   because what we tried to do was really take a step back and

15   think critically and strategically about CDE's responsibility

16   at this phase and this step of Phase 3B.

17       We would ask the Court to defer approval of Step 1 of

18   CDE's CIM process until the conclusion of Phase 3B when the

19   Court has had a much more meaningful opportunity to confirm

20   that the State has successfully corrected the deficiencies that

21   the Plaintiffs identified in their briefing.

22       **THE COURT:**  And what -- can you remind me what the

23   timeline is for that, like when -- we were going to do three

24   steps I think.  When is the final of the three steps?

25       **MS. SHUM:**  Let me ask my colleague to help me pull

**PROCEEDINGS**

1    up --

2          THE COURT:  Mark, you look like you were going to

3    answer that.

4          MR. MLAWER:  The last scheduled hearing is scheduled

5    for April.

6          THE COURT:  Okay.  Got it.  All right.

7          MS. SHUM:  Thank you -- thank you, Mark.  We certainly

8    appreciate the complexity involved in the design and

9    implementation of a comprehensive monitoring and improvement

10   process for a State of this size and complexity serving, I

11   think at this point, nearly 20,000 students with an identified

12   disability.

13       And as we noted at the last court hearing, the Plaintiffs

14   believe that the differentiated monitoring system proposed by

15   the State actually offers a great deal of potential.

16       And the CDE's submission and all of the massive amount of

17   supporting materials and the documents on a whole really, I

18   think, demonstrate a quite thoughtful and accessible process

19   that is intended to assist the LEA in identifying and

20   addressing the root cause of their IDE noncompliance.

21       But even so, the Plaintiffs would assert that CDE's

22   submission still lacks some pretty essential information

23   necessary to ensure that it fulfills its monitoring and

24   enforcement responsibilities as required by the consent decree

25   and the IDEA.

1          And more importantly, I think that even at this step, the

2    submission does not yet comply with the IDEA in that it

3    continues to prioritize or emphasize paper compliance over

4    substantive compliance; and it is not yet sufficiently tailored

5    to target the specific areas of noncompliance that are

6    identified in Step 1 here.

7          And I think of great concern to Plaintiffs, it also

8    lacks -- at least from what we can review in the submission, it

9    still lacks clear measures of accountability.

10          And so, you know, ultimately in a differentiated

11    monitoring system, so much depends on the State's ability to

12    demonstrate sort of a tight fit between the root cause of the

13    noncompliance and the interventions that it requires the LEAs

14    to participate in.

15          It is really important that, um, this be, um, refined in

16    such a way that it really directs the appropriate interventions

17    and resources necessary to address the specific areas of

18    concern.

19          So as an initial matter, um, we believe that the CDE

20    submission is still missing some pretty essential information.

21          And the reason that this matters is because without it,

22    the Court is not yet in a position to fully evaluate the extent

23    to which this process, even as it's designed, allows CDE to

24    effectively monitor and enforce compliance at the LEA level.

25          What I think is really essential at this juncture is some

1    kind of assurance that the CDE's activities, the technical

2    assistance it's providing, the accountability that it is teeing

3    up for the next phase and the next steps of this process are

4    really going to course correct -- allow the LEAs to course

5    correct in a meaningful way.

6        So, we identified a couple of different things that we

7    think the Court and the parties and the Monitor should

8    collectively consider.

9        Important information in context regarding CDE's oversight

10   and management over the monitoring process as a whole is

11   missing or lacking context in the submission that we reviewed

12   for today's hearing.

13       Just as a concrete example, Your Honor, the focus

14   monitoring technical consultants, at this point it's not yet

15   clear from the submissions the number of LEAs that are --

16   apologies -- that are in each monitoring tier, the number of

17   LEAs by each monitoring tier by region, the number of LEAs that

18   are assigned to the consultants in each tier or even how those

19   consultants are assigned, the extent to which there's an effort

20   to not just assign those consultants regionally or

21   geographically but in a way that --

22       **THE COURT:**  Can I interrupt for a second?  I mean, you

23   know, the concerns about, you know, the -- the amount of

24   participation by the consultants and the CDE people and the

25   quality of their participation, I get all that.

1    I mean, one thing that kind -- that -- one thing that

2    caught my ear in what you were saying was the concern about not

3    knowing, you know, how many LEAs are subject to this type of

4    monitoring and how many LEAs are subject to that type of

5    monitoring, I mean, isn't that something that we went through

6    in the previous phase?

7         MS. SHUM:  I think that information is available.

8    It's obviously available to CDE.  I think that placing the

9    submission in the context of that larger framework would give

10   us some sense of what the overall monitoring load looks like

11   and --

12        THE COURT:  Yeah.  And I don't remember what -- you

13   know, I don't remember exactly what the -- you know, what the

14   numbers were, but I thought we went through that in painstaking

15   detail last -- in the last phase; like, roughly how many

16   districts were going to be in intensive monitoring; roughly,

17   how many districts were going to be in targeted monitoring.

18   And we would like to -- obviously we would like to do more;

19   but, you know, the resources are limited and all that stuff.  I

20   mean, I thought we went through all of that.

21        MS. SHUM:  My recollection -- my recollection of our

22   last hearing and CDE's, I think -- and we welcome them to

23   correct this as needed -- but my recollection is that we had a

24   pretty extensive conversation about the way -- the different

25   levels and the way in which districts would be sorted into the

 1    different tiers.

 2         But we, I think, continue to believe that it's still

 3    important to understand the allocation of work and the caseload

 4    for the various consultants to really understand --

 5              THE COURT:  Sure.

 6              MS. SHUM:  -- if CDE has adequate resources that will

 7    cover --

 8              THE COURT:  Okay.  I agree with that.  Okay.

 9              MS. SHUM:  Okay.  Thank you, Your Honor.

10         In addition to sort of a little bit more detail in context

11    regarding the FMTA consultants, I think that it would also be

12    useful for the Court to have available a little bit more

13    information regarding the technical assistance providers, the

14    selection and assignment of the different providers, and how

15    they are being matched with the different LEAs and the

16    different tiers; again, sort of what the caseloads look like

17    and how the allocation of technical support looks across the

18    system and for the various LEAs.

19         And again, I think it's important to understand that the

20    Plaintiffs are not interested in this information simply to

21    micromanage what the State Department of Education is doing but

22    to really get some -- a little bit more visibility into whether

23    as designed, what the CDE has proposed as their monitoring

24    framework has the potential to be successful in allocating the

25    appropriate level of resources and the appropriate expertise to

1   the LEAs given the different monitoring needs and compliance

2   issues that the data demonstrates.

3       Another thing that the Plaintiffs observed from this most

4   recent submission is that it would be -- it would be equally

5   helpful to have some additional supporting documentation that

6   is available because it was clearly referenced in the

7   submission and in some of the documents but not necessarily

8   accessible to us so that we could take a look at what CDE

9   reviewed when it was monitoring the LEAs and also what the

10  CDE's response was.

11      So without that supporting documentation, Your Honor, I

12  think that it is impossible for the Plaintiffs or for the Court

13  or the Monitor to actually verify that the LEA is completing

14  the CIM process correctly and that the CDE is intervening when

15  the LEA is deficient.

16      And I think just as a concrete example -- one concrete

17  example would be the fact that we had -- we could tell from the

18  submissions that policies and procedures were provided for

19  review, but we weren't in a position to actually access those

20  specific policies and procedures.

21      Another example might be the fact that a number of the

22  LEAs obviously conducted the student record review and were

23  trying to assess compliance at the student level, and we were

24  unable to access the information that would confirm for us

25  that -- that that process was allowing the CDE to confirm that

1    the -- that the LEA or the district was in compliance or

2    noncompliance.

3         Then just, you know, another observation we did have when

4    we were reviewing all of the materials is that it wasn't always

5    apparent from what we could access who was participating on the

6    CIM team even though there are some pretty clear and consistent

7    requirements and expectations for how -- who is actually

8    serving in that role.

9         And I would also note for the Court that one of the

10   challenges that we experienced when we were reviewing all of

11   the materials that CDE provided is that without some of the

12   correspondence and the communication -- access to a little bit

13   more of the communication between the LEAs, the CDE, the

14   technical consultants and also the SELPAs, the Plaintiffs were

15   not in a position to really evaluate or assess the level of

16   assistance and oversight that the LEAs received from CDE.

17        There were a number of references to questions that were

18   posed by the LEA or some of the CIM teams, and it was also

19   noted, I think, in the materials that there was a response by a

20   consultant or a CDE; but it was really quite challenging to

21   determine from the available materials whether the response of

22   the -- of the State Department of Education was actually

23   sufficient to allow meaningful compliance with the steps, the

24   CIM process outlined by the CIM program.

25        And there were just a couple of problems -- a couple of

1  specific examples, Your Honor, that we could identify just for

2  your benefit.

3        For LEA 6, for example, there was a specific

4  acknowledgment that the general education teachers were

5  reluctant to -- to teach students with disabilities and --

6  which is a pretty significant, I think, concern.  And if there

7  was a response, it was not quite clear from the materials that

8  we reviewed what that response was.

9        Another specific example of where or why this is

10  potentially problematic is that when LEA 5 was identified as

11  having this, you know, issues with disproportionality that was

12  traced all the way back to the elementary LEA, it was

13  impossible to determine what the CDE's specific response or

14  intervention was to address that -- to address that sort of

15  root cause without a little bit more context that would have

16  been apparent, I think, from some of the correspondence and

17  communications between the CDE, LEAs and the technical

18  assistance providers.

19        The other thing that we wanted to raise for this Court's

20  consideration is that it would also be helpful from our

21  perspective for the Court and the parties and the Monitor to

22  have a little bit more information and insight regarding the

23  selection of the 11 LEAs and when they were identified and how

24  they were connected to the technical assistance providers.

25        And one of the things that we think could be helpful is

1   for us today to discuss the opportunity to figure out if we can

2   capture some of the LEAs that are not represented by the 11

3   districts that were part of this sample; for example, a larger

4   district, a district that, perhaps, has maybe over 20,000

5   students or charter schools.  I think that would --

6           **THE COURT:**  I have a question about that.

7           **MS. SHUM:**  Yeah.

8           **THE COURT:**  I mean, I guess -- I thought there were a

9   number of important concerns expressed in your submission.  For

10  that one, I guess I was -- I was a little surprised when I saw

11  it because I thought that I gave pretty clear direction to

12  everybody that you-all should have some input on -- and that

13  you were welcome to provide input on the selection of the

14  school districts that we would be taking a closer look at.

15       And to the extent that you are now concerned -- I have a

16  feeling that no matter what 11 school districts we chose,

17  there -- one could express some concerns about whether it's a

18  representative sample, but now that the -- now that the 11

19  districts have been chosen and there's been a presentation made

20  on them and now that you -- you know, and that you had every

21  opportunity to provide input and cooperate with them on the

22  selection of the districts that we would be looking at, I'm not

23  really sure it's fair to raise concerns about -- you know,

24  raise a concern that the 11 districts are not a representative

25  sample.

PROCEEDINGS

1          **MS. SHUM:**  Sure.  I want to acknowledge right up front

2    that the Plaintiffs fully -- did have a very full opportunity

3    to engage with Defendants around the criteria for the selection

4    of the 11 exemplar districts.

5          I think that one of the things we're acknowledging now is

6    that I think that in order for the exemplars to be informative

7    of how the CDE's CIM process is functioning overall, it's -- it

8    is perhaps a missed opportunity for us to be completely lacking

9    in information regarding, I think, the wide -- the range of

10   districts that the CDE serves.

11         So a larger -- a much larger district which might have --

12   which might present a very different vantage point in terms of

13   its interaction with CDE on these compliance issues, and I

14   think in particular it would be really helpful to have access

15   to some visibility into how a charter district might actually

16   be -- what their experience in participating in this process

17   might be.

18         **THE COURT:**  Okay.  Well, I will just say that I -- you

19   know, I understand what you are saying.  And to the extent that

20   the State is able to provide us with some report on sort of

21   whether they've looked to see if there's any meaningful

22   difference in the way monitoring is going in a large district

23   or a charter school, you know, it would be helpful to hear

24   that; but we are not going to do nearly the kind of deep dive

25   into one of those schools that we have done with these 11.  I

1    mean, it is just too late for that.

2         Again, that sort of gets back to the theme that we are not

3    seeking perfection here.  We're, you know -- we are -- you

4    know, we are not micromanaging everything that the State does,

5    and we are not going to look behind everything that the State

6    does with respect to every district.

7         You know, this was an opportunity to come up with a sample

8    that would help us get a general sense of whether the

9    district -- whether the State is doing an adequate job in

10   monitoring, so...

11            MS. SHUM:  Understood.

12            THE COURT:  So you can -- what else?

13            MS. SHUM:  So, we also elevated to the Court's

14   attention our concern that Step 1 does not comply with IDEA in

15   some pretty substantive ways as designed.

16        Plaintiffs have an insufficient level of confidence that

17   the CIM process will actually lead to substantive compliance

18   with the IDEA for a couple of different reasons.

19        I think that both our submission and also the Monitor's

20   submission note that the process at this step continues to

21   prioritize paper compliance with CIM over substantive

22   compliance.

23        And, perhaps, one concrete example might be the lack of

24   meaningful parent input.  Another example might be the fact

25   that only one in-person meeting and one scheduled site visit

1  were contemplated for the 11 LEAs that were highlighted for

2  this particular submission.

3      I think what's significant, Your Honor, about that is the

4  extent to which -- that that is true even for the LEAs that are

5  actually in the intensive monitoring and at the upper level,

6  upper tiers of the intensive monitoring process.

7      And this is another point that Plaintiffs raised at the

8  last court hearing that we would like to reiterate today, which

9  is that there continues to be a lack of qualitative data

10 provided, at least in this submission, except for the LEAs that

11 were flagged for disproportionality.

12     The other thing that I think is really apparent from this

13 submission is that it's still unclear whether this

14 differentiated monitoring process successfully tailors the

15 intervention to the LEAs' identified area of noncompliance.

16     One of the ways in which this was apparent is the fact

17 that there was a lack of differentiation, for example, in the

18 policies and practices and procedures review.

19     For example, for LEA 11, which was identified for

20 school-age children, there was a lack of -- the policies and

21 procedures that were submitted and reviewed did not necessarily

22 track, and the same was true for LEA 8, which was, I think

23 flagged for preschool aged children.

24     The other thing that I think is a little bit more

25 important for the Court to contemplate is that there was a lack

1    of specific attention to the identified areas of noncompliance

2    such as a showing of deficiency and discipline for LEA 11, and

3    then also for that same LEA a showing of a lack of attention to

4    that discipline and a lack of clarity as to how

5    disproportionate LEAs' performance indicators factor into the

6    CIM process if they were, for example, flagged for

7    disproportionality as well as for performance indicators and

8    kind of how monitoring of those two rather important issues

9    intersect.

10        We would also note for the Court that from what we were

11   able to review, it is not apparent that the CIM process had

12   clear measures of accountability available to the LEAs, a lack

13   of, I think, documentation around what constitutes success for

14   a specific LEA or what the consequences might be for failure to

15   comply with specific CIM tasks.

16        There were a couple of districts, for example, that -- at

17   least according to the submissions -- missed required

18   trainings.

19        It wasn't apparent whether they made those up later or

20   what type of conversation, communication, or intervention the

21   CDE offered to hold the districts accountable.  That was true

22   for LEA 10 and LEA 7.

23        And then there were a few LEAs that appeared to fail to

24   complete some of the specific LEA tasks.  LEA number 4 had a

25   late submission for the educational benefit review and the

1    student record review.  There might have been a consequence or

2    intervention associated that.  It wasn't apparent from the

3    materials that we reviewed.

4         For LEA 5 the submission of Step 1 -- their Step 1 summary

5    and their progress report were also missing or incomplete.

6    And, again, it was impossible to tell, at least from these

7    materials, what type of accountability the CDE enforced in

8    order to course correct or help those districts course correct

9    in a timely fashion.

10        And so those are some of the more significant things that

11   we wanted to bring to this Court's attention, and I'm happy to

12   answer any further questions that you might have or we are also

13   looking forward to CDE's comments and response.

14        **THE COURT:**  Thanks.  I mean, I think, you know, you

15   have raised some procedural issues and some substantive issues.

16   My sense is that the procedural questions are going to be

17   relatively easy for the State to answer, but I do think they do

18   need to be answered; right.

19        I mean, it is, I think, important to have a better

20   understanding of the quality -- the amount of participation by,

21   you know, CDE folks and the consultants, the quality of that

22   participation, you know, how thin are these people stretched,

23   that -- you know, that is going to be, you know -- I think it

24   is easy to answer, but it will be important to get an answer on

25   that.

1        You know, to the extent additional supporting

2   documentation is needed, I assume that's not -- you know,

3   that's not too difficult to address.

4        And then, you know, on the question of, you know, again, I

5   mean, we are not -- it is sort of too late to go back and do a

6   deep dive into some district other than these 11 districts that

7   we have looked at, but it is probably worth addressing the

8   question of whether it's -- you know, there is any significant

9   problem with the selection of these 11 as far as giving us a

10  window into how it's going overall.

11       And I also thought it was interesting, you know, the

12  question of whether, you know, when did people know that this

13  was a district -- you know, when did the folks at the district,

14  when did the consultants learn that this was going to be one of

15  the 11 districts, that it was going to be subject to the kind

16  of scrutiny that we are giving them here?  I think that

17  probably is an important thing to know.

18       On the substantive stuff, you know, the first substantive

19  concern that the -- that the Plaintiffs identified is kind

20  of -- maybe a different way of articulating the concern that I

21  have been expressing all along which is, you know, you can

22  create documents which say, you know, this is what we are doing

23  or this is our plan for what we are going to do but how do we

24  really know that that is what's happening on the ground?

25       You know, how do we verify that something close to what's

1    articulated in the plan is what is happening on the ground?

2         I mean, that's always -- I think you have heard me say

3    that for years now that that's always been my big concern about

4    this case and this phase in particular.

5         The -- you know, the issue of the, you know, the CIM

6    process seeming a little generic or cookie cutter, I think is

7    worth -- you know, is worth addressing.  That does seem like a

8    concern to me.

9         Perhaps it's something -- it's a concern that should have

10   been raised when we were looking at the manual.  You know, I

11   can't remember how much detail we got about the CIM process

12   back then.

13        And then the question of how districts will be held

14   accountable, I think that's important too.

15        I want to kind of add a couple of more specific concerns

16   that probably -- I guess they probably -- if you were to put my

17   specific concerns in any category identified by the Plaintiffs

18   in their submission, it might be the category of CIM process

19   seeming a little too cookie cutter.  I'm not sure or maybe they

20   are separate concerns.  I'm not sure, but one is just a

21   question which is trying to go back and think about sort of the

22   core purposes of the statute, right, one of them is IEPs and

23   IEP implementation and we discussed that at Phase 1.

24        So I just wanted to get a reminder of kind of where we are

25   these days on IEP implementation and is IEP implementation

**PROCEEDINGS**

1   adequately addressed when the -- you know, the CDE and its

2   consultants are helping the school districts sort of look at

3   their problems and fix their problems.

4       So that's -- that's one question I want to make sure we

5   discuss in this hearing at some point.

6       The other is again sort of going back to, you know, the

7   core purposes of the statute is the least restrictive

8   environment.

9       So are we -- you know, the process that the State

10  described, you know, is it looking hard enough at least

11  restrictive environment and in particular when a district has

12  been flagged for disproportionality issues; right.

13      If you have got, you know -- if there is a concern that

14  too many Latino kids are being, you know, sort of classified --

15  you know, are being sort of set to the side, is there an

16  additional concern that those -- you know, kids who are being

17  classified as Special Ed are also not being -- an insufficient

18  effort is being made to put them in the least restrictive

19  environment.

20      So like, for example, District 9 or District 3 -- I'm

21  looking.  I have Darrell's list here -- you know, are they --

22  you know, are -- is a hard enough look being taken at those

23  districts, for example, at least restrictive environment?

24      So those are two additional more specific questions I

25  wanted to flag.  And I think probably, Mark, do you want to

1  chime in with anything before we let the folks at the State

2  respond to all of this?

3       **MR. MLAWER:**  Well, I think there is a lot of overlap

4  between the points I made and what Plaintiffs have said.

5       I would specifically note on the issue of access to

6  documents that for three districts, data drilldown documents

7  were not included in the submission and have not been filed

8  since that time.  So that was particularly frustrating on that

9  subject.

10      But the bottom line for me was this:  That targeted

11 monitoring is not -- does not appear to be targeted enough to

12 the issues that resulted in selection.

13      In addition, for intensive monitoring, when a district has

14 failed to meet targets outside of the selection formula, that

15 appears to drop off the table in the intensive monitoring

16 process.  And the same is true --

17      **THE COURT:**  Can you say that one more time and --

18      **MR. MLAWER:**  Yes, Judge.

19      **THE COURT:**  I want to make sure that I understand

20 that.

21      **MR. MLAWER:**  When districts are selected for intensive

22 monitoring but in addition to that have failed to meet some

23 targets that are not included in the intensive monitoring

24 selection formula, those issues do not seem to be included in

25 the monitoring process.

**PROCEEDINGS**

1    The same, I believe, is true for disproportionality

2    districts, at least as far as one can determine that from the

3    submitted documents.  And that is, I think, some examples we

4    will just offer and if we have a chance to talk about those

5    more specifically.

6        But as far as I could tell for disproportionate districts

7    no attention was paid whatsoever -- almost whatsoever to the

8    additional failure to meet specific targets that themselves

9    would have resulted in selection for targeted monitoring.

10        **THE COURT:**  Okay.

11        **MR. MLAWER:**  And that's it in a nutshell.

12        **THE COURT:**  All right.  Thanks.

13        **MS. SHUM:**  Your Honor, before we move on, I do want to

14    just thank you for raising the two points related to IEP

15    implementation and seclusion and restraint, which were sort of

16    deferred a bit from earlier phases.

17        My co-counsel -- we didn't specifically address that in

18    our briefing, but we collectively did agree that those are two

19    things that it would be really helpful just to get some updates

20    on related to where the Defendants are with their data

21    collection and their analysis of those issues for the LEAs.

22        The other thing we wanted to note though is that for

23    something like least restrictive environment, that is an issue

24    where qualitative data collection feels pretty essential.

25        It would be very helpful to understand how decisions are

**PROCEEDINGS**

1    being made about placement, and that is frequently not captured

2    by the data which really documents -- which really kind of

3    tends to document the recommended placements.

4        And I think there is a lot of helpful information that we

5    can get about compliance and root causes through observation or

6    interviews or, you know, additional information from collateral

7    staff, teachers, support people, about what types of

8    accommodations or modifications might allow a greater level of

9    participation in a general education setting.

10       **THE COURT:**  Okay.  Shiyloh and company, you want to

11   take it away?

12       **MS. DUNCAN-BECERRIL:**  Thank you, Your Honor.  Shiyloh

13   Duncan-Becerril for the California Department of Education,

14   currently the interim director for special education here at

15   the department.  We are no longer --

16       **THE COURT:**  Wait a minute.

17       **MS. DUNCAN-BECERRIL:**  We no longer have a director.

18       **THE COURT:**  You are interim director?

19       **MS. DUNCAN-BECERRIL:**  For now.

20       **THE COURT:**  Why don't they make you director?

21       **MS. DUNCAN-BECERRIL:**  Well, my normal job is

22   implementing this monitoring system.  I don't know if I'm ready

23   to pass it off to somebody else yet.

24       We are hiring a new director.  Heather Calomese left us in

25   July to pursue other State opportunities, and so we are

**PROCEEDINGS**

1    currently looking for a new director.  We expect by our next

2    hearing we will have a new director in place, and I will return

3    to my associate director position.

4        I'm joined today by Jack Brimhall, who is currently the

5    interim associate director.  And we will obviously have staff

6    come and join us.

7            **MR. SPENCE:**  Why is Bill smiling?  Is he going to

8    apply for the position or something?

9            **MS. DUNCAN-BECERRIL:**  Bill, you want the job?  If Bill

10   wants the job, like, we are hiring.

11       So just a couple of very clear points I wanted to address

12   before we sort of get into the meat of the issues and

13   potentially bring staff in to kind of talk about the work that

14   they did with LEAs.

15       We agree with the Plaintiffs' suggestion that we would

16   prefer to defer any decisions about the CIM process until after

17   April or even after that point --

18           **THE COURT:**  I think that --

19           **MS. DUNCAN-BECERRIL:**  -- in part because --

20           **THE COURT:**  I'm sorry to interrupt.  Sorry, go ahead

21   and finish what you were going to say.  I was about to say I

22   think that does make sense that we should look at it kind of

23   holistically and maybe some of the questions we are left with

24   now will be answered later although it is worth raising the

25   concerns now.

PROCEEDINGS

1          I think I agree with you, but I apologize for

2     interrupting.  Go ahead.

3          **MS. DUNCAN-BECERRIL:**  No problem, Your Honor.

4          I think we -- what I wanted to say is that we see the CIM

5     process as just that, a process that exists through, in

6     essence, three years; but really the bulk of what we are

7     talking about here is a year-long process.

8          And so while the Court now has what I would consider,

9     like, a keyhole view into the process that is almost point in

10    time, a short period of time, we are hoping that a lot of the

11    questions that have been raised by both the Plaintiffs and the

12    Monitor will be addressed by additional submissions, additional

13    testimony, more documentation that will help really tell the

14    story of what we are doing.

15         This is not a one time thing.  We don't see our monitoring

16    as one and done.  In the past it was very similar to that in

17    that we would go; we would do a single compliance activity or a

18    single file review, and then issue corrective actions, and then

19    wait a year to do work with the LEA again.  That is not our

20    process anymore.

21         This process is really working with LEAs over a period of

22    time to address a lot of concerns but starting with what we

23    consider the most serious issues.

24         So I just kind of wanted to start with that right off the

25    bat.

**PROCEEDINGS**

1    I did want to correct just a small issue that was brought

2  up.   There are over 800,000 students with disabilities in

3  California that are covered over 2,200 LEAs.

4    So I think the Plaintiffs' attorney gave a number of

5  20,000, so I just wanted to make sure we are talking about a

6  much higher number than that.

7    So, I want to just start with a technical issue that I

8  think is going to address the concerns that were already

9  brought out.

10    So one of the issues was that it doesn't seem like our

11  policies, practices and procedures review was differentiated.

12    I know when I spoke in the spring we talked a lot about

13  how our intent was to sort of create switches within our

14  compliance monitoring.

15    And when we talk about compliance monitoring, there's a

16  section within the 34 Code of Federal Regulations 300.600 that

17  talks about how our monitoring should be focused on functional

18  outcomes and also procedural issues.

19    So when we are talking about compliance, we are really

20  talking about procedural issues that reference to that, but we

21  are also looking at performance as an issue.

22    So I know that the Plaintiffs often talk about compliance

23  with IDEA as a whole, which includes that section.  When we

24  think about compliance, we talk -- we are thinking about those

25  procedural issues.

1        **THE COURT:**  What is the code section again?

2        **MS. DUNCAN-BECERRIL:**  I believe it is 34 C.F.R.

3   300.600.  Mark, might know better but I think it is B.  Mark,

4   do you know?

5        **MR. MLAWER:**  It is B.

6        **MS. DUNCAN-BECERRIL:**  Yeah, it is B.

7        And so, I know when I talked in the spring, I had said our

8   compliance monitoring work looking at procedures and practices,

9   looking at student file review had intended to be

10  differentiated.  That is still our intent.

11       In the spring of 2023, we brought on board our file

12  monitoring system, and we experienced a number of technical

13  difficulties getting it up and running.

14       One of the challenges that we had with that system was the

15  ability to switch on and off specific indicator areas so our

16  intent was that if we had an LEA who was experiencing, say

17  graduation, as an indicator that was a problem, we would have

18  specific items that would be addressed to that, almost like a

19  switch.  So we could turn on that switch, and that LEA would

20  have those compliance items to review.

21       **MR. SPENCE:**  You are talking about software.

22       **MS. DUNCAN-BECERRIL:**  Yes, software.  So this is

23  technical software.  An LEA is going to log into a system.

24  They are going to see that they have to do a file review.  They

25  are going to get a list of students, and those students, they

1   will have to identify with a significant -- with a number of

2   items.

3        We experienced an extraordinary amount of technical

4   difficulties up and past the time when we submitted our

5   documentation and unfortunately could not get that

6   differentiation to occur within the software alone.

7        And so one of the things that we ended up doing was

8   eventually taking the entire system offline to work on it.

9        In the meantime what we were able to do was make sure that

10  all LEAs reviewed for what we considered FAPE and the LRE

11  items, so what we considered core items that were important for

12  everyone to review.

13       So in the past one of the things we may have done -- and I

14  remember this very clearly with preschool review -- is we may

15  not have done any review because we couldn't do what we said we

16  were going to do.

17       We did not want to do that.  What we wanted to do was

18  conduct a compliance review, a file review, that would

19  enlighten core issues within the LEA -- systemic issues within

20  the LEA that may lead to other problems.

21       And so we believed that if we took those core items along

22  with other data analysis and an intensive other types of

23  activities and parent input, we could pull together that the

24  LEAs would be able to identify the issues.

25       I will remind the Court that this step is not about

1  identifying why the LEA is having this issue.  It is not a root

2  cause analysis.  It is not identifying what are the

3  interventions that are going to occur.

4      This stage is about illuminating the problems and

5  identifying what we believe are the significant issues that

6  exist in the LEA.

7      And so it was our experience and belief that we could use

8  our core items as those items and address the technical issues.

9      We are going to be addressing the technical issues, and we

10 are confident that we will have a differentiated system -- a

11 system in the spring that will be able to turn those switches

12 on and off but it was just becoming such a pain point with the

13 LEAs and our staff that it was either we do something or we do

14 nothing.

15     And so we made the relatively tough decision to do

16 something that was not exactly what we wanted to do.

17                 (Pause in proceedings.)

18         **THE COURT:**  All right.

19         **MS. DUNCAN-BECERRIL:**  So I don't know if there is any

20 additional questions on that but in that differentiated

21 piece --

22                 (Pause in proceedings.)

23         **MS. DUNCAN-BECERRIL:**  So the next -- I think the next

24 question was around the number of LEAs selected, and I'm happy

25 to file with the Court the number of LEAs selected.

**PROCEEDINGS**

1    We have 47 LEAs in intensive level 1, 45 LEAs in intensive

2    level 2, 89 LEAs in intensive level 3, 420 LEAs in small

3    monitoring, 65 LEAs in a targeted level 1, 306 LEAs in targeted

4    level 2, and 254 LEAs in targeted level 3.  And there is also

5    an additional 7 LEAs that are only looking at targeted

6    compliance, meaning they had no performance issues but they

7    were -- had some compliance issues and one LEA in universal

8    monitoring.

9        So, that's a total of 1,234 LEAs that are part of this

10   monitoring cycle this year.

11       And I bring that up because -- as a reminder that LEAs who

12   are small are going through a cyclical monitoring process.

13       We also had made a couple of substantial changes around

14   cyclical monitoring for smalls.  I don't know if you want to

15   bring it up now or if we want to talk about it later.

16       **THE COURT:**  Since we are on the topic and since I

17   don't remember exactly where we came out on the -- on

18   monitoring of the small districts, it would be good to get a

19   reminder.

20       **MS. DUNCAN-BECERRIL:**  So let's start there and then we

21   can talk a little bit more about some of these other

22   substantive issues.

23       So small LEAs are in a cyclical monitoring process, 500

24   per cycle approximately.  We had 420 this time.  And part of

25   that is because if the LEAs became targeted for another reason,

**PROCEEDINGS**

1  then they would be pulled into that monitoring like

2  disproportionality.

3         **THE COURT:**  Did you-all decide -- forgive me.  I can't

4  remember.  This was Phase 2, I guess, was it?

5         **MS. DUNCAN-BECERRIL:**  Yes.

6         **THE COURT:**  Did -- so is it -- was it, like, a random

7  selection of around 500 districts -- small districts each year?

8         **MS. DUNCAN-BECERRIL:**  Yeah.

9         **THE COURT:**  Okay.

10        **MS. DUNCAN-BECERRIL:**  And so when we went through --

11 remember, I think when we talked about this, one of the

12 significant issues is that their data is really difficult for

13 us to determine whether or not they are struggling in

14 performance and procedural compliance.

15     So we decided to look at a number of factors in collecting

16 data that would help us identify systemic issues.

17     So they go through an educational benefit review, which we

18 talked about a little bit in the spring, which is a three-year

19 review of an -- of a file.

20     They also do a performance or a compliance review of a

21 student file, and they also do a policy and procedures review.

22     So we are treating that data collection along with other

23 types of data like complaint data and data on timely submission

24 or timely IEPs and triennials together to determine which LEAs

25 have significant issues.

**PROCEEDINGS**

1      Our initial intent was the cycle would be three years,

2   meaning we would go through the data collection one year, and

3   then the second year they would be moving into CIM while we get

4   a second cohort.

5      One of the things that we found is that small LEAs needed

6   a significant level of help in completing their review.  I

7   think you-all saw that in the submission for, I want to say

8   correctly, LEA 4, which is the small LEA.  Thank you for that.

9      And so it is -- is that they struggle a lot.  Of these

10   small LEAs, this one specifically is a very good example.

11   Their -- the principal of their school is the superintendent.

12   The special education director is also the bus driver.

13      And so doing these kinds of compliance reviews was very

14   new to them, and they struggled significantly both with

15   manpower and getting it worked on.  And so we have been

16   consulting on some other options for the monitoring of smalls.

17      And in July of this year, the U.S. Department of Education

18   came out with some guidance around monitoring and general

19   supervision -- and I think it was referenced in Mark's

20   submission -- and in that they sort of laid out the requirement

21   that every LEA must be monitored once every six years.

22      And so our intent at this point is to move LEAs into kind

23   of a two-year, six-year cycle, if you will; meaning, LEAs who

24   had their data collected this year, they will move into some

25   level of CIM next year.

PROCEEDINGS

 1       And then at the end of this -- of that next year cycle we

 2   will pick another cohort of LEAs.  And so at the end of six

 3   years, every small LEA will have been monitored in both the

 4   data collection and in the CIM process.

 5                     (Pause in proceedings.)

 6           THE COURT:  Okay.

 7           MR. SPENCE:  Real quick -- let me interject real

 8   quick, Your Honor, and parties.  We have a number of witnesses

 9   that we have in the next room that if the parties and the Court

10   want to hear from specific consultants whose declarations we

11   have submitted, we have them here.

12       One of them has to leave by 2:00 p.m.  And so -- and that

13   was the consultant who worked with LEA number 5.  She has to

14   leave at 2:00 p.m.; but, you know, if there is some need to

15   hear from these witnesses, they are prepared to testify.

16       If there's some need to hear from them, if you can let us

17   know kind of sooner rather than later if you have a sense of

18   what order you want to hear from, who you want to hear from.  I

19   don't know if we are going to be able to get through all nine

20   today; but if we could get kind of a sense of that right now

21   maybe -- I don't know if this is the proper time, I guess it's

22   as good as any -- that would be helpful.

23           THE COURT:  Sure.  I mean, sure.  It is helpful to

24   hear Shiyloh's general comments and response to the concerns

25   addressed -- concerns flagged by the Plaintiffs and by Mark,

PROCEEDINGS

1   and I don't know if she would -- I didn't get the sense that

2   she was done with that yet.  Maybe she could complete that, and

3   then I think it would be useful to hear from the folks that you

4   have brought, and I don't really care what order they present

5   in.

6        I sort of defer to you on that, and I assume they have

7   some prepared remarks and then we can ask them questions.  And

8   I think that would be -- I think that would be very helpful.

9        **MR. SPENCE:**  So real quick, so Shiyloh is not done,

10  first of all.  She made that clear.  But, yeah, that makes

11  sense to us.

12       And we were also hoping that kind of in this more

13  conversational style we have that even if a particular witness

14  is testifying, if a certain question has certain aspects to it

15  that, perhaps, Shiyloh and Jack -- without stepping on the

16  witness -- could also kind of respond more to the larger system

17  with respect to that specific question.

18       **THE COURT:**  Of course.  Of course.  That's not a

19  problem at all.

20       **MR. SPENCE:**  Okay.  Go ahead, Shiyloh.  Sorry.

21       **THE COURT:**  Thank you, Your Honor.

22       A couple of other things I just kind of wanted to note

23  around how LEAs are assigned to monitoring, who -- what the

24  case loads kind of look like, I can speak -- for the most part

25  when we start the process, LEAs are assigned by region; and

1   there are 11 regions within the State of California.

2        They are called CCSESA regions -- I can't remember.  It's

3   the County Superintendent Offices, how they sort of group the

4   counties.

5        And so there are 11 regions, and so we typically will

6   split them up geographically to start that process; but there's

7   always some individual determinations made about how much need

8   an LEA has, what it looks like for a specific staff, if the

9   staff member is new and they need to be partnered with another

10  more experienced consultant as they move through the process.

11  They may not take the lead on as many LEAs so that they can be

12  paired with more experienced consultants.

13       Also, if staff are struggling with their LEAs, the

14  managers will typically step in.

15       I will tell you that generally the caseloads for -- for

16  staff in targeted are larger than the caseloads for staff in

17  intensive.  And that is on purpose.

18       We want LEAs who are in intensive to have more -- staff

19  have more access to them and more time with them.

20       Remember, LEAs in the targeted level of monitoring are

21  conducting a lot of their review independently, and so that's

22  based on their need.  But if an LEA needs more, their

23  consultant is available for more, and we did find targeted LEAs

24  had lots of questions to ask this cycle especially since it was

25  new.  And so I think you will hear from our targeted staff that

 1   they did answer lots of questions and work with --

 2        **THE COURT:**  Sorry to interrupt.  When you say "our

 3   targeted staff," are you referring to your consultants now or

 4   actual CDE staff?

 5        **MS. DUNCAN-BECERRIL:**  Okay, so that's kind of the

 6   thing that's a little bit weird about our staffing is that we

 7   call our staff -- the actual classification name of their

 8   position is called consultant.

 9        And so I don't know why that is, and so it is very weird

10   because we often call contracted staff consultants.

11        But for these purposes, our staff are called consultants,

12   and that is the classification -- a journey level

13   classification that works independently.  Staff who are hired

14   into that position must have either a master's degree or a

15   credential.  And to be a consultant they must have an

16   administrative credential along with years of experience.

17        The classification right below that is known as education

18   programs assistant, and those are individuals that must have a

19   master's degree or a credential in a teaching position and

20   additional years of experience; and they may become consultants

21   once they have had levels of experience within the department.

22        So you will see some of our staff are listed as education

23   program consultants.  Some of them are listed as education

24   program assistants.

25        They have varying level of experience; meaning, some of

1  them were teachers, some of them were principals, some of them

2  worked in State positions and gained experience that way and

3  then moved into positions within the Department; but they all

4  have to have --

5        THE COURT:  Sorry.  In your submission when you are

6  referring to "consultants" and the consultants who exchange

7  e-mails with folks at the district or consultants --

8        MS. DUNCAN-BECERRIL:  Yeah.

9        THE COURT:  -- who meet -- Zoom meetings or whatever

10  with folks at the district, you are always there referring to

11  actual CDE staff?

12        MS. DUNCAN-BECERRIL:  Correct.

13        THE COURT:  Okay.

14        MS. DUNCAN-BECERRIL:  When we --

15        THE COURT:  So what about the -- what about the

16  contractors who you hire to help the districts?  Have they

17  played any role in the -- in the process that you described in

18  your submission so far?

19        MS. DUNCAN-BECERRIL:  Yes.  They have played a role

20  and our staff can talk about their role, I think, more deeply;

21  but they -- we typically refer to them as TA providers within

22  our submissions.

23      So when we talk about TA providers, then that is what we

24  are talking about, consultants.  So I hope that did not cause

25  any confusion although I think --

 1              THE COURT:  No.  I assumed when you said "TA provider"

 2     that you were talking about the -- you know, the contracted --

 3              MS. DUNCAN-BECERRIL:  Yeah.

 4              THE COURT:  -- entities.

 5              MS. DUNCAN-BECERRIL:  Yeah, yeah, but our consultants

 6     are our State level staff.

 7              THE COURT:  Okay.

 8              MS. DUNCAN-BECERRIL:  And they -- and so we are

 9     monitoring their caseload.  Targeted staff or staff in targeted

10     units will carry a larger caseload, and intensive staff will

11     carry a smaller caseload.  That's around the level of

12     engagement that they will have with an LEA.

13          The small staff, the small unit staff -- they are not

14     small themselves -- are -- we have fewer staff in that unit,

15     and so they will carry a larger caseload; but keep in mind what

16     they are doing now is data collection.  And once we begin

17     differentiating into the CIM process, their caseloads will also

18     change.

19          So, and they can talk -- as they come in to talk, you can

20     ask them about what their caseload is and how they feel about

21     their caseload.

22          LEAs are often in different spaces too.  So I think one

23     thing to keep in mind is LEAs are -- some of them are in level

24     or Step 4, meaning they are implementing and they may require a

25     little bit less one-on-one engagement.  Some of them are in

1   steps 1, 2 and 3, which may require more engagement.  Some LEAs

2   function really well in this process and may need a little bit

3   less and some of them may need more.

4        So I think the differentiation concerns that are brought

5   up by the Plaintiffs are really individualized based on the

6   LEAs, and I can't understand that without sort of the

7   back-and-forth and the discussion -- I think our staff will be

8   able to illuminate their process -- that these -- that our

9   staff really engaged a lot with LEAs.  And especially if they

10  needed more engagement, we really worked to give them more

11  engagement.

12       As far as how they are assigned to caseloads, I know Jack

13  can maybe speak a little bit to how he has assigned caseloads

14  in the past, his experience.  He has probably got our deepest

15  level of experience as a manager who has done caseloads for

16  almost ten years.  You can talk a little bit about that.

17       **MR. BRIMHALL:**  Yeah.  So, as Shiyloh said, there's 11

18  regions, so each consultant has a region.  So that's the

19  starting point.  That doesn't always make the work equitable

20  when you start looking at the numbers.

21       **THE COURT:**  So you are saying there is one consultant

22  per region?

23       **MR. BRIMHALL:**  Typically, yeah.  With LA there is more

24  than one but for the most part it's one consultant per region.

25  And the region might extend a variety of counties.  For

1   example, Northern California is less populated, so there's a

2   bunch of counties for one region.  Southern California is a

3   little bit different.

4           **MS. DUNCAN-BECERRIL:**  And we are happy to submit a map

5   that shows the counties and their breakup, and I know that we

6   probably at some point can even submit that to you directly,

7   Your Honor.

8           **THE COURT:**  Yeah, why don't you do that.

9           **MR. BRIMHALL:**  So that's -- it's a good way to get a

10  starting point for numbers, but then we break it up.  I want to

11  see how many consultants -- how many LEA level 3s a consultant

12  has, how many level 2s, how many level 1s.  For the current

13  plan, how many that are in continuing because all of those are

14  very different.

15          So, for example, for 3s we know we are going to be on-site

16  for a variety of things.  For the 2s and 1s, they may be

17  on-site depending on how the LEA is doing.

18          And so when we start breaking it down looking at this

19  consultant has this many 3s, this has this many 2s, this

20  consultant has this many 1s, and then you have to think about,

21  as I mentioned, the ones that are in Step 4 which are

22  implementing.

23          So you will typically see one or two consultants have a

24  lot more.  It's kind of cyclical.  Sometimes it is in a certain

25  area.  It just depends.  And a few consultants may have pretty

1    low numbers.  What we will do then is try to even them up.

2        We try to keep consultants -- we do it logically.  So if

3    there is a SELPA, we try to keep all the LEAs in that SELPA

4    with one consultant to not break it up individually within that

5    SELPA or even a county, we will try to do that; try to do it in

6    a way that makes sense logically, but we do have to shift and

7    move numbers so that it's more equal across the board so that

8    one consultant is not way overloaded and one is way

9    underloaded.

10       Ideally, it's nice to have consultants in that region --

11   in their own region because they get to know the LEAs.  They

12   get to know the SELPAs.  They build relationships, but it just

13   doesn't always work out perfectly like that.

14           **THE COURT:**  Can I ask a question?  You know, thinking

15   about the small districts, if I remember correctly -- I'm

16   thinking about these -- the consultants -- and I'm going to try

17   to call them staff to distinguish from the TA consultants,

18   which are the contracted folks -- but so when you are thinking

19   about small LEAs, small districts, and you are thinking about

20   staff and you have said that there's one staffer per region

21   generally speaking, right, now, has there been -- as far as

22   staff goes, has there been an increase in the number of

23   staffers that you have doing this monitoring work or a decrease

24   or has it roughly stayed the same over, let's say, the last ten

25   years?

1    **MS. DUNCAN-BECERRIL:**  I would say there has been an

2  increase.  We requested five positions after the determination

3  that we would include smalls in a cyclical cycle and was

4  provided those five positions in the budget.  I believe that

5  was in 2020 or 2021.

6    **THE COURT:**  That's exactly the question I was going to

7  ask because, you know, looking at what -- you know, how things

8  have been going with the district number 4 on your list, right,

9  I mean, that actually may -- even though it's a small district,

10  it may require a little more attention from the staff.

11    And if we are talking about 500 additional districts that

12  are being monitored by staff, you know, is five additional

13  staffers enough to, you know, to meaningfully cover the 500

14  additional districts that are being monitored?

15    **MS. DUNCAN-BECERRIL:**  So at this point we have not

16  found that there's a concern in there, and we are happy to have

17  that staff member come in and speak about her experience.

18    I will say we are consistently monitoring that.  And if we

19  do find that that does not work, we have -- we are going to

20  request from the budget.  We are not always granted that from

21  the budget, but we try to request if we have a sense that we

22  are not going to be able to meet our obligations in this court

23  case.

24    So far we have not experienced that.  The concerns around

25  the support of LEA 4 are really within the LEA itself.  It

1 | wasn't necessarily that the staff couldn't provide the support.

2 | I think the staff is very engaged with that LEA and all of her

3 | LEAs.  I think it is really around the staff -- the LEA felt

4 | they couldn't get the work done.

5 |     So --

6 |         THE COURT:  Right, but, I mean -- but that --

7 | presumably that LEA requires greater staff attention.  And to

8 | the extent that you have 500 of those sort of statewide, right,

9 | but you only have 11 staffers, you know, that's why I was

10 | asking, you know, how much did you increase staff once you

11 | started monitoring small school districts?  Because it seems

12 | like --

13 |         MS. DUNCAN-BECERRIL:  Yeah, so --

14 |         THE COURT:  -- from a staff time -- from the

15 | perspective of staff time, it seems like it could potentially

16 | be a significant increase.

17 |         MS. DUNCAN-BECERRIL:  It could and as we move into

18 | also doing CIM with them, we are monitoring that as well; and

19 | we will request additional staff if we feel like we are not

20 | going to meet our proposal and our expectations.  At this time

21 | we have not found that to be the issue.

22 |         THE COURT:  Okay.

23 |         MS. DUNCAN-BECERRIL:  But -- the other thing I also

24 | wanted to address was around whether or not LEAs knew they were

25 | being monitored and whether or not our technical assistance

**PROCEEDINGS**

1  providers knew the staff -- they do not.  The LEAs do not know

2  that they are part of this court case.

3       They know they are being monitored, but they do not know

4  that their submissions are being -- are part of this case.  And

5  also the technical assistance providers do not know which LEAs

6  they are supporting are part of this case.

7       Our staff knew pretty much right after they were selected.

8  The LEAs were selected pretty randomly.  You know, we kind of

9  made the criteria.  We need one from smalls and one from -- so

10  we kind of put all those into different buckets and then

11  randomly pulled them out.

12       But we let the staff know right away because we wanted to

13  make sure that they could put their documents and things like

14  that in -- into a place.

15       So but the LEAs to this day do not know and the TA

16  providers also do not know.  And that's one of the requests

17  that we have really made around the -- trying to keep things as

18  confidential as possible in part because that really changes

19  the relationship if they find out that they are -- there's an

20  extra level of scrutiny.  And we don't want that.  We want it

21  to try and feel authentic.

22       The other thing is, as far as documents, additional

23  documents, and I think we need to have -- I think once we hear

24  from staff if you feel, like, there is additional e-mail

25  exchanges or things you may want to see, we can definitely

1    provide those.

2        I mean, it was a challenge for us.  I think this is -- the

3    first submission was very illuminating for us about -- and then

4    all the feedback that we have received from both the Monitor

5    and the Plaintiffs and now Your Honor is that like what -- what

6    is the fine line between sort of burying the Court in documents

7    and providing a clear picture.

8        It has been sort of a threading the needle piece.  I do

9    feel like we will get better at providing direct and clear

10   communication with you-all.  But we are happy to provide

11   additional documents if the Court feels like that's necessary.

12       And then the thing that I -- I guess there are two more

13   issues that I wanted to cover before we kind of start to talk

14   about the individual cases.

15       One is about accountability.  And I want to talk a little

16   bit about how we worked in the past and how I think our system

17   is actually more accountable than it was in the past, and it

18   will continue to be more accountable.

19       So in the past we would tell an LEA:  You are

20   non-compliant or you need to create a plan.  Go -- they would

21   do those things, and it was far -- you know, when I think of

22   paper compliance, I think about what we used to do, which was,

23   like, you did a noncompliance, here is the corrective action,

24   go, bye, we will not see you again.

25       And we would say:  Yes, you have done a plan or you have

**PROCEEDINGS**

1    done a corrective action we will see you in a year or more, and

2    we will look at your data in a year.

3        One, I think, of the things that is really helpful with

4    this system that we have created now is that we can engage with

5    LEAs much sooner than in the past, and I think you would see

6    that when we are talking about -- I think it is LEA -- no --

7                    (Pause in proceedings.)

8        **MS. DUNCAN-BECERRIL:**  LEA 10, yes, LEA 10.  You know,

9    so in the past when they weren't engaging, it would almost be

10   the whole year before we would identify that because we would

11   wait on submissions or we would wait on data to come in.

12       Now, the LEA -- we identify those things right away, and

13   the staff can work closely with them to try and get them to

14   comply.

15       There is no woodshed unfortunately that we can take LEA

16   staff to when they are not doing those things.

17       There are heightened levels of sanctions and enforcement

18   we can do; but, you know, our staff member identified that the

19   LEA was not engaging in the process right away, within a month

20   or two, and was calling on the LEA working with them.  And I'm

21   sure they will talk a little bit more about their engagement

22   and getting the LEA to work with them closely.

23       And what I think you will see from the challenges that you

24   might have seen in Step 1 to Step 2 is that we are bringing

25   LEAs more on board.

1        LEA 10 is an LEA that is far more engaged in this process.

2    They are more -- they want to make it work better in part

3    because of their relationship they have now built with their

4    consultant and the work that -- I'm sorry -- that our staff

5    member has done and the work that our staff has done to really

6    engage them.  But in the past, we wouldn't know for several

7    months or longer that the LEA wasn't making progress.

8        Now, we know right away.  So, that, I think, for us

9    identifies a level of accountability and view that we haven't

10   had in the past.

11       Now, I'm not sure what other types of accountability we

12   are going to work on.  We want districts to be able to engage.

13       There are sanctions within the code that we tried to

14   engage them with.  I think we talked about them before.  34

15   Code of Federal Regulations 300.604 goes through levels of

16   enforcement that we can go through, the most significant being

17   withholding their federal funds.

18       We don't like to do that because that creates a very

19   strained relationship for one.  And, for two, we don't find it

20   very effective.  A lot of the issues LEAs have when they are

21   not engaging with us doesn't have to do with -- some of it is

22   resource constraints, some of it is funding.  So withholding

23   the funding doesn't often get us the spaces that we do.

24       So we are, I think, exploring that.  And I think LEA 10 is

25   probably -- as we continue along this process -- a very good

1    example of how we can identify early issues with LEAs and how

2    we can engage them more significantly.

3        And then the final update I wanted to provide was around

4    IEP implementation.  We did collect IEP implementation for the

5    first time this year, and we will be including it in our

6    selection for monitoring this year.

7        So we are trying to figure out what that looks like in

8    that process.  We don't have an activity that is currently --

9    and I don't think we put it in the manual.  I think we may be

10   open to it if there is a place where we feel like it would

11   fit -- our CIM process that looks specifically at IEP

12   implementation.

13       The educational benefit review does have a portion that

14   looks at that, and that might be a part that we can expand if

15   the Court feels strongly that that's a piece that should be

16   included in the higher levels of monitoring.

17       And then LEAs who are experiencing issues with IEP

18   implementation at the -- at the targeted level, we would

19   definitely want them to review that more significantly.

20       Um, I kind of wanted to also just piggyback on something

21   that Mark said in that the idea that LEAs might have other

22   issues that are identified in our monitoring and that we just

23   kind of dropped that, I would challenge we don't drop it.

24       We help LEAs look at that data, but it may not be the

25   problem or practice that they -- that we identify as being most

1    significant.

2        One of the things that we have done in the past that we

3    have not felt was very effective was to create a plan that

4    addresses every indicator that the LEA is not meeting targets

5    on, and that resulted in a ten-point plan for every LEA; and

6    they would work on that plan at 10 percent per target and would

7    never get anywhere.

8        And so our perspective now -- and I think I talked about

9    this in the spring -- is that we wanted LEAs to focus on a

10   single problem of practice and a high-leverage activity.

11       And so I have given the example this is kind of like a --

12   you know, when you have a lot of high-interest credit cards,

13   you start by paying off the one with the most significant

14   interest.  You are still paying some of the minimum balances on

15   the other ones, but you are trying to get the one that is most

16   significant.  I have also used my healthcare analogy to also

17   describe this.

18       If we have an LEA who has -- you know, this stage is about

19   identifying the symptoms that the LEA has.  So if they come to

20   you and they say:  You know, I think I might have -- do you

21   have cancer and tennis elbow, which one are we going to be

22   focusing on potentially?  Unless the tennis elbow is causing

23   part of the cancer, we want to be focusing really on that

24   piece.

25       So it is a bit of triage but that's because we want the

1    LEA to be focused on making improvement and not trying to fix

2    little things or fix one or two things.

3         We did find that LEAs struggled this year with the data

4    analysis piece.  I have been working in data for 15 years with

5    LEAs, and I think the data collection has gotten really good

6    and even our ability to analyze the data and provide that to

7    LEAs, I think LEAs really struggle around moving away from

8    observing data to really asking why.

9         And so one of the things we have really pushed our staff

10   to think through when they are working with LEAs -- and we are

11   going to continue to build out our tools -- is why are you

12   seeing this?  What does this mean to you?  What do we need to

13   look at more?

14        And we have already seen that.  Step 2 was kind of already

15   done for a lot of these LEAs, and we have been pushing them to

16   look at more qualitative data, to look at more information, to

17   dig deeper into some of these spaces.

18        And we are also looking at the spring monitoring -- so the

19   monitoring of 2024 -- and updating our tools for data because

20   we did find that, you know, they didn't look as deeply as we

21   wanted them to.  And we would prod them and push them, and it

22   was a real space of where they hit a wall.  Like, why do we

23   need to keep looking at this data?

24        I was just looking at our survey from LEAs around Step 1

25   and it was, like, "Why do we have to keep looking at data over

1  and over again?"  It was, like, "because you are not looking

2  deeply enough."

3      And so really helping LEAs get to that practice.  It might

4  take a little bit of time, but that is something that we have

5  identified as an area that we are going to be addressing.

6      I think that was that.  Sorry, I didn't talk quite as long

7  as the seven hours that I talked previously.

8      **THE COURT:**  Does anybody have any questions for

9  Shiyloh on the general stuff before we turn to the staff?

10     **MS. SHUM:**  Your Honor, if I might, I just want to

11  express a lot of appreciation for some of the global comments

12  that you made especially the difficulty in trying to understand

13  how much information is going to be useful.  I think Plaintiffs

14  struggle with that as well.  We certainly don't want you to

15  dump individual student, you know, records on us; but I think

16  that what we are really hoping for is something that really

17  gives the Plaintiffs an opportunity to kind of place the CDE

18  activities and the technical assistance in some context in

19  terms of the larger CIM program.

20     I am wondering -- since you spent a few moments discussing

21  the smalls -- and that was very informative -- I am wondering

22  whether it might be possible to get in writing the modified

23  approach to monitoring.

24     The smalls, I think that to some extent it might actually

25  differ from -- what you describe may differ from what we

1   reviewed before.  And so to the extent that that's already

2   available in an updated version of the manual, that might be

3   helpful for the parties and the Court to review and the Monitor

4   to take a look at.

5       I also was wondering if it would be possible for you to

6   add a bit more detail to some of your comments related to the

7   moments or the occasions when a small LEA might be pulled into

8   the regular CIM process.

9       You had flagged that, for example, it might be possible

10  for a small to be referred for more intensive monitoring if

11  they got flagged for disproportionality, but is it possible for

12  them to be referred to another level of monitoring for

13  compliance issues on another -- on -- related to another issue?

14       **MS. DUNCAN-BECERRIL:**  So, by far the most common is

15  through disproportionality.  There is -- so the U.S. Department

16  of Education has provided us directives around how we select

17  LEAs for disproportionality.  That occurred in 2016, and that's

18  when they published for comment.

19       We provided some relatively strong comments at that time

20  that said this is going to inappropriately identify small LEAs

21  they did not make any changes to the calculations.

22       So what happens is if an LEA is small but not really

23  small, like, if they are ten or fewer, then they are not

24  selected; but if they have, say, 30 students with disabilities,

25  then what happens is we use something called the alternate risk

 1   ratio.

 2        I'm not going to bore everyone because I know it's almost

 3   lunch.  What it does is it compares the student ratios to the

 4   State ratios because there is not a comparison group, and it

 5   does identify some small LEAs for disproportionality and

 6   potentially significant disproportionality.

 7        And that's mostly when they would get pulled into the

 8   higher levels.  So they could be in targeted or intensive

 9   depending on how long they are disproportionate.

10        Pretty rarely -- it has not happened this year -- but I

11   could see if we would have a significant, say, critical

12   incident review or a significant issue in another space that we

13   would bring in through complaints or something like that that

14   we might say this LEA needs to be in another type of

15   monitoring.

16        When our CIM comes online for smalls, the CIM for smalls

17   is going to probably be able to address those issues.  Right

18   now the CIM for smalls -- and we talked about this in the

19   spring -- might look a little bit different.  It is still going

20   to have steps 1, 2 and 3; but some of the work that they have

21   already done is already going to exist in -- for Step 1, like

22   the policies, practices and procedures review and the

23   educational benefit review.

24        For data we are going to have them look at much more

25   qualitative sets of data because the quantitative data isn't

PROCEEDINGS

1   really impactful at those numbers.

2       So once that sort of comes online, then that system will

3   be able to identify those critical incident cases; but that

4   would be the instances where that would occur.

5           **MS. SHUM:**  That was extremely helpful.  Thank you so

6   much.  I'm also wondering -- you did mention that it might be

7   possible to file the additional details regarding the numbers,

8   workload, case assignments, et cetera, for your CDE staff

9   consultants.

10      I think it might also be helpful and informative if we

11  could see similar information regarding the contracted

12  technical assistance providers.

13      And one question that I sort of still had as you were

14  sharing a little bit more information about how those staff

15  were assigned out is beyond the sort of understandable regional

16  focus that many have, are there, in fact, occasions when the

17  substantive expertise of a CDE staff consultant or technical

18  provider is actually used to -- to make some of those

19  assignments?

20      I recall you sort of describing the process at the last

21  court hearing as trying to target sort of specialists and

22  patients who have a specific need.  And I was wondering at what

23  stage that might occur.

24          **MS. DUNCAN-BECERRIL:**  So, kind of just to piggyback a

25  little bit on that, so we do kind of see the CIM almost like an

1   integrated healthcare model for LEAs in some ways.  And so

2   we -- our staff for the most part -- our CDE staff are like

3   your general care providers, your primary care.  And so they

4   are identifying the issues, and they are trying to run tests

5   and help the LEA identify what the problems of practice is, why

6   that's occurring and develop a treatment plan; and that ends up

7   being the CIM plan.

8        Then, we will refer them out to specialists.  And so we do

9   refer -- for example, we have a technical assistance provider

10  that is specific to significant disproportionality.

11       And if an LEA is significantly disproportionate, they will

12  work with that technical assistance provider.

13       In addition, we have technical assistance providers that

14  focus on inclusive practices.  We have technical assistance

15  providers who will focus on universal design for learning.

16       And so if the LEA has identified that as a problem of

17  practice or an area in which they are implementing, at the

18  intensive level we match them to that technical assistance

19  provider and we tell them you are now working with this

20  technical assistance provider.

21       At the targeted level because of their needs assistance

22  and have to seek out technical assistance, we provide them --

23  we have a website that identifies all of our technical

24  assistance providers -- we provide them a list of the technical

25  assistance providers and tell them they need to seek out

 1   assistance and provide us information about who they will seek

 2   out and who they worked with.

 3       And that's part of sort of Step 4.  Um, they also may seek

 4   out technical assistance.  Again, that's part of the

 5   requirements -- I believe that's under 300.604 -- that says

 6   what the LEAs sort of do at that level.

 7       Um, they can seek out technical assistance and pay for it

 8   separately.  If they know of a contractor that they like to

 9   work with, they still have to report that they worked with

10   technical assistance provider.

11       We do try to provide as much of the technical assistance

12   as possible especially at the early steps from CDE, but at the

13   intensive level they are matched.

14       **MS. SHUM:**  That's very helpful.  Thank you.

15       And then, you -- I also just want to acknowledge and

16   appreciate the extent to which you have described this as a

17   process and that it's being -- that it's sort of being

18   sequenced and rolled out over time.

19       I'm wondering if you might be in a position to just share

20   a little bit more information about where the manual is in

21   terms of Steps 3 and 4 since we were touching on the manual.

22   And at the last hearing a lot of that was still understandably

23   sort of being sketched out.

24       **MS. DUNCAN-BECERRIL:**  So we, I think, fully tested our

25   process this year for Step 3 and Step 4.  And so I believe we

1   will be able -- we are working to update the manual this is

2   actually pretty good timing.  I mean, I was encouraged by the

3   Judge's statement that we are not expecting perfection because

4   that always worries me.

5        It is not quite perfect yet, but the -- that -- this is

6   really great timing because we are preparing and updating our

7   documents around monitoring for 2024.

8        We just surveyed all of the LEAs who went through Steps 1

9   and 2, and we are going to use some of that.  We are going to

10  use some of the feedback we received from the Court and also

11  some of the things that we observed to make updates.

12       So I do believe we will have an updated manual.  It is

13  probably going to be closer to February or March before we

14  would have it fully updated with Steps 3 and 4 and the smalls,

15  but I would see it for our step -- okay, I have to remember.

16  It is Phase 3A -- no, 3B.3 -- whatever that is.  We have made

17  this very complicated, I apologize.

18       But the last submission that we are going to have in this

19  part I see we could file an updated manual with Steps 3, 4 and

20  a fully fleshed out smalls process.

21            **MS. SHUM:**  Thank you so much.

22            **THE COURT:**  Um, let me suggest since you mentioned --

23  Darrell, did you mention that -- was it the person who is

24  looking at District 9 who has to go?

25            **MR. SPENCE:**  No.  LEA 5.

PROCEEDINGS

```
1            THE COURT:  LEA 5.  Might I suggest that we do -- do
2      like a five-minute break.  Then we hear from that person, and
3      then we do a lunch break?  Is that okay with everybody?
4            MS. DUNCAN-BECERRIL:  Yeah.
5            MR. SPENCE:  That sounds good to the State Defendant.
6            THE COURT:  All right.  So why don't we resume at
7      12:20 and maybe we will try to only take, you know, 20 or 30
8      minutes of this person's time and, you know, try to limit each
9      person's appearance to 20 to 30 minutes.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

PROCEEDINGS

1  ████████████████████████████████████████████████████

2  ██████████████████████

3              (Recess taken at 12:15 p.m.)

4         (Proceedings resumed at 12:21 p.m.)

5         **THE COURT:**  All right.  Should we be -- I can my -- my

6  slip-up a second ago is a good example of why we should just

7  have the proceedings under seal for when we are talking to the

8  staffers.

9      So should we -- does everybody agree with that?

10         **MR. SPENCE:**  The State Defendants do.

11         **MS. SHUM:**  That's fine, Your Honor.

12         **THE COURT:**  Am I freezing again?  It looks like Bhavna

13  is frozen.  Can everybody hear me okay?

14         **OFFICIAL COURT REPORTER:**  Judge, your video has quite

15  a bit of lag.

16         **THE COURT:**  Let me switch again.  Sorry about that.

17                  (Pause in proceedings.)

18         **THE COURT:**  So does everybody agree that now that we

19  are hearing from staff members who are dealing with monitoring

20  specific school districts, that we should just have the rest of

21  this under seal.  And then we will go through a process where

22  you-all can identify which portions of the transcript should

23  remain redacted and redact the rest?

24         **MR. SPENCE:**  Yes, Your Honor.

25         **MS. SHUM:**  That's fine, Your Honor.

PROCEEDINGS

```
 1            THE COURT:  Okay.  So we will do that.  So the
 2   remainder of today's proceedings will be under seal.  And so,
 3   Bhavna, what do you need to do to -- I assume, by the way, that
 4   staffers for the other districts are -- it's perfectly
 5   appropriate for them to continue to watch and to be in the
 6   virtual courtroom.  It is just members of the public that we
 7   are keeping out; right?
 8            MR. SPENCE:  Yes.
 9            THE COURT:  Okay.  So there is any -- Bhavna, what do
10   you need to do to close the courtroom?
11            THE CLERK:  I just need to verify that the attendees
12   are the ones that can remain.  And then I will lock it.
13            THE COURT:  Okay.  So, we see Abigail Trillin.  We
14   know that she's okay.  Abrar Omeish?
15            MS. SHUM:  He is with NCYL.  So, yes, he needs to
16   remain.
17            THE COURT:  Okay, Carmen Barnhart.
18            MS. DUNCAN-BECERRIL:  Yes, Your Honor.
19            THE COURT:  There is someone called FMTA.
20            MS. DUNCAN-BECERRIL:  Focus monitoring and technical
21   assistance.
22            THE COURT:  Okay.
23            MS. DUNCAN-BECERRIL:  I don't know exactly who that
24   would be.  Oh, it's our staff next door.  Yes, we can -- they
25   can stay.
```

PROCEEDINGS

1          THE COURT:  Kamala Buchanan-Williams.

2          MS. SHUM:  She is with NCYL, so she can remain,

3    Your Honor.

4          THE COURT:  Okay.  Rony Sagy.

5          MR. MLAWER:  From Morgan Hill.

6          MR. SPENCE:  Yeah, she cannot remain.

7          THE COURT:  Sorry.  Who is that?

8          MR. MLAWER:  Counsel on the Morgan Hill case,

9    Your Honor.

10          THE COURT:  Okay.  So she should be excluded but

11    Ms. Sagy will be able to review a transcript of most of these

12    proceedings just redacting whatever information that would

13    identify a particular school district or a particular student.

14       Okay.  And S. Bancroft?

15          MR. SPENCE:  That's Sarah Bancroft.  She should be

16    permitted.

17          THE COURT:  Okay.  All right.  So that's it.

18       This is sealed portion.

19          THE COURT:  Okay.  So Rony Sagy has been removed.  And

20    you are locking the courtroom now, Bhavna?

21          THE CLERK:  Yes, the webinar has been locked.

22       (The following pages 68 through 180 were originally

23        placed under seal and now unsealed by Order of the

24        Court.)

25

PROCEEDINGS

1      **THE COURT:**  Okay.  Then -- so, this proceeding and the

2  remainder of this hearing will be under seal.  That does not

3  mean that everything that is said will remain confidential.

4      What it means is just that anything that is said that

5  could be used to identify a particular school district or a

6  particular student or anything -- anything else that is highly

7  confidential or sensitive will be redacted but the remainder of

8  the hearing will be unredacted and a transcript will eventually

9  be made available for the public.

10     And I will ask -- the parties will order a transcript.

11 And whenever the transcript arrives -- you-all can order a

12 transcript.  And whenever the transcript arrives, I will give

13 you 14 days from the arrival of the transcript to submit

14 proposed redactions to us.  And both sides should be working

15 together on that.  Okay.

16                     (No response.)

17     **THE COURT:**  All right.  Okay.  Go ahead.  It looks

18 like we have a new participant.

19     **MR. SPENCE:**  Yes.  So in the interest of brevity, we

20 will just cut short the introduction a bit.  So, first of all,

21 introduce yourself to the Court.

22     **LIBBEY DURKEE:**  My name is Libbey Durkee.

23     **MR. SPENCE:**  Ms. Durkee, you are currently employed

24 with the Department of Education; correct?

25     **LIBBEY DURKEE:**  I am.

PROCEEDINGS

1        **MR. SPENCE:**  What is your official title?

2        **LIBBEY DURKEE:**  I'm an Education Programs Consultant.

3        **MR. SPENCE:**  And in that role, how long have you been

4    working with LEA number 5?

5        **LIBBEY DURKEE:**  Since about March of this year.

6        **MR. SPENCE:**  Okay.  And you submitted a declaration

7    with regard to this Phase 3B submission?

8        **LIBBEY DURKEE:**  Yes.

9        **MR. SPENCE:**  Okay.  With that, we will open it up to

10   the parties and Court for questions and knowing that Shiyloh

11   and Jack may also add in and jump in on questions.

12       **THE COURT:**  Great.  First of all, remind me your name

13   one more time.

14       **LIBBEY DURKEE:**  Libbey Durkee, L-I-B-B-E-Y,

15   D-U-R-K-E-E.

16       **THE COURT:**  B-U-R-K-E-E, [sic] all right.

17   Ms. Burkee [sic], did you have anything you wanted to add

18   to your declaration or would you rather folks just ask you

19   questions and you can answer them as you see fit?

20       **LIBBEY DURKEE:**  Just have folks ask me questions.  And

21   I want to correct, my last name is Durkee, like with dog,

22   with D.

23       **THE COURT:**  Sorry about that.

24       **LIBBEY DURKEE:**  That's okay.

25       **THE COURT:**  All right.  Do the Plaintiffs wish to

1   start?

2        **MS. SHUM:**  Sure.  Ms. Durkee, I just have a couple of

3   clarifying questions to follow up on your declaration.

4        Could you please help us understand what has been done or

5   is currently being done to address the disproportionality

6   issues that were flagged in the elementary LEA?

7        **LIBBEY DURKEE:**  Um, yeah, so they -- LEA 5 said that

8   the elementary was a challenge and that was one of the things

9   that they were going to be working on in their previous plan

10  and in their progress report.  So that is something that they

11  will work on continuously.

12       Also they are doing a revision, and I believe that that

13  will be an -- one of the items that they will mention and speak

14  to and work on as one of their activities going forward.

15       **MR. SPENCE:**  So, Ms. Durkee, LEA number 5 is a high

16  school; right?

17       **LIBBEY DURKEE:**  Yes, that's correct.

18       **MS. DUNCAN-BECERRIL:**  And just to clarify, LEAs can

19  update their plan at any point in time.  So if an LEA feels

20  like this is a space where we need to do a little bit more

21  work -- and I think the -- this is not an uncommon thing that

22  we see is that you have a high school district who has

23  identified issues and -- as being disproportionate.  And they

24  say:  Well, wait a second.  We are not identifying these

25  students.  They come to us already identified.

1        What is the coordinated early intervening services that we

2   would provide?  We are not going to make them leave special

3   education.  We want to support them and give them what they

4   need.  At the same time how do we address that with LEAs?

5        And so one of the things that LEAs has done that has been

6   very successful -- and I would expect this LEA would explore as

7   well -- are things like reviewing or being a part of IEP team

8   meetings with students who are at the elementary school level,

9   working very closely and doing technical assistance or doing

10  training with staff at that level to help.

11       They have also done -- other LEAs have done memorandums of

12  understanding.

13       **THE COURT:**  Shiyloh, can I interrupt you for a second?

14  Let me just ask -- I want to ask Ms. Durkee, the stuff that

15  Shiyloh is talking about, I mean, how much are you dialoguing

16  with the district about this stuff at this point in your

17  interactions with them?

18       Because with all due respect to Shiyloh, it is one thing

19  for the high-level person to articulate what ought to be done;

20  but I want to hear from you about the interactions that you are

21  having with these people about sort of how to tackle the

22  disproportionality concern.

23       **LIBBEY DURKEE:**  Yeah.  So, for this, the challenge

24  that they mentioned in their progress report, I will -- I have

25  definitely looked at their progress report.  We have had

**PROCEEDINGS**

1    discussions about it.  I have accepted their progress report.

2        Going forward, they are revising from the last year.  So

3    there's going to be additional conversations to be had on this,

4    and so there will be those conversations.  They have not

5    happened yet because they aren't in that period of time yet.

6        **THE COURT:**  When you say you have accepted their

7    progress report, can you tell me a little bit more about that?

8    What goes into -- you know, what are you looking for when you

9    review the progress report and what caused you to accept it?

10       **LIBBEY DURKEE:**  Yeah.  There are certain pieces to it.

11   So they have to document, like, what activities they have done

12   so far, what challenges they have seen, what was something good

13   that came out of it.

14       So we are kind of looking to see where they were

15   previously and where they are now.

16       So with that, I'm -- you know, I'm looking at the

17   narratives that they have submitted.  I'm making sure that they

18   have kind of entered all of the information that is required

19   for those narratives and then -- but I feel like there was

20   actually progress being made and that they actually were doing

21   the pieces that they said that they were going to do.

22       **THE COURT:**  And how do you figure out whether progress

23   is actually being made and they have actually done the pieces

24   they said they were going to do?

25       **LIBBEY DURKEE:**  There is quantifiable data piece to it

1    that they put in their original report and then they follow up

2    on it in their progress report.

3        So this could be -- well, one thing that really showed me

4    was their risk ratio, it decreased.  They were at, like, 4.98

5    previously on their indicator 10.  And now they are at, like,

6    3.72.

7        So there was definitely a decrease to the numbers of that

8    risk ratio for their Hispanic LSD.

9        **THE COURT:**  Can you tell me more about that, the risk

10   ratio and indicator 10?  I'm not as deeply ensconced in all of

11   this as you guys are so --

12       **LIBBEY DURKEE:**  Indicator 10 is looking at their

13   overall disability and ethnicity.  So for this particular

14   district, they were out on Hispanic specific learning

15   disability.  And so the risk ratio was making it about 4.98

16   times as likely to identify Hispanic students with specific

17   learning disability.

18       So that was the previous year.  And then this year they

19   were reidentified as an annual thing.  And for Hispanics

20   specific learning disability it was 3.72.

21       So there was a decrease in that number alone.  They also

22   look at other things, like, how many --

23       **THE COURT:**  Sorry to interrupt.  Let me ask you a

24   follow-up question about that.

25       What -- how did they -- how did that happen?  What did

 1  they do to sort of address the concern reflected in the 4.98

 2  risk ratio or whatever it was?

 3       **THE WITNESS:**  Yeah.  One of the things they had was a

 4  training.  So they do trainings for their staff.  A lot of it

 5  is around their, like, assessment process.  So they look at

 6  referrals and assessments.  They completed training around

 7  those things as well.

 8       And so I can look at the quantifiable numbers that they

 9  had at those trainings.  They show how many people attend, how

10  many didn't.  They look at the number of pre-referrals.  They

11  look at their assessments.

12       So there's a lot of quantifiable pieces there that go into

13  that.  We can see it with that annual determination as well.

14       **THE COURT:**  Okay.  And then I interrupted you.  You

15  were going to give me another example.

16       **LIBBEY DURKEE:**  That's what I was going to talk about

17  actually was the assessment and the pre-referral numbers, those

18  were some of the things that they were looking at in the

19  trainings, yeah.

20       **THE COURT:**  Any other follow-up questions?

21       **MS. SHUM:**  Sorry, just a couple to try to get a little

22  bit of clarity around the identification of the feeder

23  elementary LEA as one of the contributors or maybe root causes

24  of the disproportionality issues that we were seeing at the

25  high school level.

1      I'm wondering if you could provide a little bit of

2  clarification about the role of yourself or other technical

3  assistance providers in terms of the identification of that or

4  whether that was self identified by the -- by the high school

5  LEA.

6      **LIBBEY DURKEE:**  The high school LEA identified that

7  themselves, and it wasn't necessarily a root cause that they

8  identified.  They just said that it was one of the challenges

9  that they faced in terms of -- there are other issues, like

10  with assessments and referrals.  So they identified that as a

11  challenge to try to work with that leader district.

12      **MS. SHUM:**  Thank you for that helpful clarification.

13  I'm wondering if in that instance when it gets identified that

14  the elementary sort of disproportionality issues and

15  identification issues is flagged, does that lead to the

16  elementary district also being identified or flagged or

17  monitored for disproportionality?

18      **THE WITNESS:**  So that district I don't believe has

19  been flagged, but it's often the case in disproportionality.

20  So --

21      **MS. DUNCAN-BECERRIL:**  Ms. Durkee has a long experience

22  with districts in disproportionality.  She has been working on

23  them for a number of years, and I think she can definitely

24  speak to what she has seen in sort of that is a common element.

25      But to keep in mind when you have smaller districts that

1  are feeding into larger -- some elementary school districts

2  feeding into larger districts, sometimes those things aren't

3  quite as apparent as when you get them sort of grouped

4  together.

5           **MS. SHUM:**  Thank you.

6                    (Pause in proceedings.)

7           **THE COURT:**  Anyone have any other questions for

8  Ms. Durkee?

9           **MR. MLAWER:**  I just have a couple, Your Honor.

10      Ms. Durkee, as I read the plan that this district

11  developed -- the high-leverage practices and activities that

12  are at 2729, page 147 -- none of them touch the practices in

13  the elementary LEA; correct?

14          **LIBBEY DURKEE:**  Correct.

15          **MR. MLAWER:**  As far as you know, has the State done

16  any direct work with that elementary LEA on this issue to

17  assist this LEA?

18          **LIBBEY DURKEE:**  With the elementary?  I'm sorry, I

19  don't know.

20          **MR. MLAWER:**  Okay.  One other question.  There seem to

21  be some confusion regarding whether this LEA did a fresh parent

22  input activity.  I noticed that in your declaration.

23      The answer appeared to be yes they did, but I didn't see

24  any materials in -- that were submitted that indicated that

25  that was done and what the results was.  Did they do a fresh

**PROCEEDINGS**

1   parent activity?

2       **LIBBEY DURKEE:**  Not a fresh parent input activity, no.

3   They completed a parent input activity in the previous cycle on

4   their last CIM plan.

5       **MR. MLAWER:**  So the State ultimately determined that

6   they did not need to do a new parent input activity?  Because I

7   thought the documents were pretty clear that they did.

8       **LIBBEY DURKEE:**  As a continuing LEA, they can use all

9   the information that they already have and either go forward

10  with implementing it or they can choose to make revisions.

11      This LEA has decided to make some revisions, but they did

12  not choose to complete a parent input part of it.

13      **MR. MLAWER:**  So ultimately it turned out that the LEA

14  had an option to do a new one or not?

15      **LIBBEY DURKEE:**  Yes.

16      **MS. DUNCAN-BECERRIL:**  Parent input was a required

17  activity in Step 1 if you remember.

18      One of the things that we are learning -- and I'm not

19  trying to like speak too globally here.  I know I have already

20  spoken quite a bit -- is that parent input continues to be a

21  challenge.

22      So we are kind of revising that for Step 4 in terms of

23  ensuring that LEAs are having more continuous input from

24  parents and families, and we think that -- because we think

25  that's an important and valuable activity.

1          We only presented it as occurring in Step 1, but I think

2     one of the things that we have learned is that it needs to

3     continue to occur even through Step 4.

4          **THE COURT:**  On the other hand, I mean, one sense that

5     I got from reading your submission -- the State's submission is

6     that, you know -- I guess all the submissions, is that, you

7     know, it is often very hard to collect meaningful input from

8     parents.

9          And, you know, at some point you are going to be wasting

10    resources; like, you know, working hard to get your parent

11    response rate up from 12 percent to 14 percent, you know, as

12    opposed to spending those resources do other things that might

13    help you get into better compliance with the IDEA.

14         And so I guess I was curious -- you know, whether it is

15    Ms. Durkee or Shiyloh -- Ms. Durkee, let me start with you.  I

16    mean, do you have a comment about that?  I mean, do you know

17    anything about why this LEA did not, you know, sort of re-up on

18    the parent survey this go-around?  I mean, is it some of the

19    stuff that I'm talking about or what's been your -- your

20    experience with that?

21         **LIBBEY DURKEE:**  Yeah, I think a little bit to that,

22    but for this LEA in particular I feel like they got a lot of

23    good information the first year.  So they really liked the

24    feedback that they got.  They felt like it was very helpful in

25    determining a lot of their problems.

1       So they just wanted to keep going with that.  They didn't

2   feel like it was necessary to ask for it again when they have

3   already got really great feedback and responses.

4       **THE COURT:**  And when you say "great feedback and

5   responses," what do you know about the feedback and responses

6   that they got?

7       Are you -- are you -- are you just kind of deferring to

8   the LEAs conclusion about -- that they are satisfied with the

9   responses they got or are you looking behind that to see if, in

10  fact, the LEA did get useful information back from the parent

11  survey?

12      **LIBBEY DURKEE:**  Well, they definitely spoke to how the

13  parents felt to the IEP and assessment process.  That was well

14  documented.  And then you can see that going forward in their

15  activities that there is kind of a connection all the way

16  through their plan.

17      So it wasn't problematic in that for me.  I felt like they

18  had said something honestly, and I could see that if the parent

19  said those things that they would be able to address those

20  through the activities that they created.

21      **MS. DUNCAN-BECERRIL:**  And I think Libbey brings up a

22  really good point -- and Jack can maybe speak to it a little

23  bit more.  He has a lot more experience with the parent input

24  piece among lots of LEAs -- is that, you know, we have -- we

25  have focused on the number.  Like, did you get 12 percent?  Did

PROCEEDINGS

1    you get 15 percent versus the quality of the parent input.

2         So oftentimes that tells us a lot more about, you know,

3    whether or not they are able to get parent input.  It might be

4    an issue that the districts have identified.  I don't know.  Do

5    you want to talk a little bit --

6         **MR. BRIMHALL:**  We also learned -- it was really

7    interesting with the parent input.  Some LEAs would get a

8    bunch.  They would have up to 20 percent or more.  Some LEAs

9    could only get 1 or 2 percent.

10        So even those LEAs that could only get 1 or 2 percent,

11   that told us a lot, and that's potentially telling that CIM

12   team, you either have a communication breakdown in your

13   infrastructure to be able to reach out to parents, which -- and

14   we have that infrastructure assessment as part of Step 1.  That

15   could be it or you didn't work hard enough to do it which is a

16   problem in itself.

17        The LEAs that got a lot of feedback had a good

18   organization parent structure to get communication out, whether

19   it was in PTA, those kind of things, compared to the others.

20        So even the ones that had really poor rates, that was

21   valuable information to take into Step 2.

22        **MS. DUNCAN-BECERRIL:**  And LEAs can also use Step 2 as

23   a way -- I know we are not talking here to this LEA about

24   Step 2 -- I know parent input is a concern to the Plaintiffs.

25   And so in this idea that Step 2 is an opportunity for us to

1   say:  Hey, you only got 1 percent.  You only got 1 or 2.  Have

2   we looked at other ways we can look at parent input?

3      Are we holding -- I know some of our other staff might be

4   able to speak to their experiences about have they held, you

5   know, information sessions, listening sessions; have they done

6   focus groups; have they done other kinds of qualitative work

7   that could get at parent input?

8      I mean, I do think there's going to be at some point a

9   diminished benefit in terms of getting parent input sometimes,

10  in terms of providing the resources.

11     If we are able to get quality input, do we need to get a

12  lot more?  The answer was probably no.  If we are not able to

13  get any input, then I think the LEA -- we need to continue and

14  the LEA needs to continue to get that input.  So it may not be

15  about quantity so much as quality.

16     **THE COURT:**  Ms. Durkee, how many LEAs are you sort of

17  interfacing with these days?

18     **LIBBEY DURKEE:**  I have 36 LEAs.

19     **THE COURT:**  And how -- in your mind do you have a

20  rough breakdown of how many are small versus medium versus

21  large?

22     **LIBBEY DURKEE:**  Um, I think it is kind of well divided

23  for me.  I have several smalls.  I have several larger

24  districts and a couple medium sized.  So it is pretty well

25  across all of the different levels.

1      **THE COURT:**  And so those LEAs are all LEAs that are in

2   monitoring -- that are in monitoring, right, is it all targeted

3   monitoring or is it a combo of intensive and targeted?

4      **LIBBEY DURKEE:**  It is all targeted monitoring.

5      **THE COURT:**  All targeted, okay.  And so how often --

6   you know, how often are you interfacing with these -- with

7   these LEAs?

8      Like, do you have a single point of contact or are you

9   speaking with multiple people at the LEA?  And if so, how often

10  are you meeting with them?

11     **LIBBEY DURKEE:**  Yeah.  I generally speak to the

12  special education directors and then the SELPA directors.

13  Those are my main point of contact.  And so for this LEA,

14  that's true as well.

15     The special education director, I would say at least

16  monthly, but sometimes more if we have a deadline coming up or

17  something that they are working on, questions.  But definitely

18  quite often and generally through e-mail.  They will send me a

19  message.  I will send them a reminder or something.  So, you

20  know, there's that back-and-forth.

21     **THE COURT:**  Okay.  And what about, are any of your

22  LEAs using TA consultants also?

23     **LIBBEY DURKEE:**  We have one TA provider but not a

24  consultant that they do a couple activities with.  This

25  particular LEA has watched a training from one of those TA

 1   providers.

 2          **THE COURT:**  Okay.  But not -- not -- no direct

 3   interface between a TA consultant and them?  It's just you that

 4   they are interfacing with it sounds like?

 5          **LIBBEY DURKEE:**  Correct, yes.

 6          **THE COURT:**  Okay.  All right.

 7                      (Pause in proceedings.)

 8          **THE COURT:**  Anything else for Ms. Durkee?  I know she

 9   had -- you-all said she had to leave around 2:00 or something

10   like that.  Any other follow-up questions for her?

11          **MR. MLAWER:**  Not from me.

12          **MS. SHUM:**  Just really quickly.  Because we were

13   talking about parent engagement, I was wondering if you

14   could -- you could share a little bit more about how you

15   support your district's ability.  So beyond this specific LEA,

16   what CDE does to support their ability to get higher levels of

17   engagement.

18          I certainly agree that there is quantity and quality, but

19   I think they both have some benefit; and I'm wondering what

20   types of tools the districts tend to rely on in order to

21   communicate with parents, engage parents, and what

22   opportunities there are to just capture information from

23   parents where they are already appearing such as IEP meetings

24   or in other settings.

25          **MR. SPENCE:**  Do you understand the question?

1          **LIBBEY DURKEE:**  Yeah.

2          **MR. SPENCE:**  Do you need it broken down?

3          **LIBBEY DURKEE:**  No.  I think I understand.  The LEAs

4     generally start with asking people that they know, and I

5     usually tell them that that's a great start but what else are

6     you doing.

7          So they have worked with SEEDs to send out surveys.

8     That's generally one of the larger options that they do.

9          Sometimes if they don't get a great response rate on that,

10    they will come back and say:  "What else can we do?  We only

11    got 8 percent.  We really want to get more feedback."

12         And so then --

13         **MR. SPENCE:**  So SEEDs is a technical assistance

14    provider?

15         **LIBBEY DURKEE:**  Yes.  Yeah, they do surveys.  So they

16    will help the LEA with the survey response that they can send

17    out with questions.

18         So SEEDs is very helpful in that.  A lot of my LEAs have

19    chosen to work with them on that particular piece.

20         The other thing that they might do is, like you said,

21    during IEP meetings -- especially if the timeline works

22    correctly -- we have mentioned that that's a great opportunity

23    to get some answers from parents there.  So I recommended that

24    as well.

25         And then they have tried different versions, like mailing

1 or e-mail electronic surveys.  So there's different options

2 there as well.

3          **MS. SHUM:**  And usually in multiple languages or no?

4          **LIBBEY DURKEE:**  Yeah.  They usually do their top three

5 languages.

6          **MS. DUNCAN-BECERRIL:**  And the SEEDs survey is

7 available in multiple languages.

8          **MS. SHUM:**  Great.  Thank you.  I think I noticed that

9 from the submission.  For the number of LEAs that you are

10 specifically supporting, I'm just wondering if there happen to

11 be any site visits contemplated or scheduled for any of them?

12          **LIBBEY DURKEE:**  No.

13          **MS. SHUM:**  Thank you.

14          **THE COURT:**  I thought of a couple other questions.

15 Sorry.

16     You mentioned that -- when you were talking about parent

17 feedback, you mentioned that this LEA or maybe all LEAs tend to

18 get good information about the IEP process.

19     And I was -- it made me think of the -- reminded me of the

20 point I made earlier -- I don't know if you were listening --

21 but, you know, the IEP is the center piece of the IDEA; right.

22     And, you know, it's very important to kind of verify -- to

23 make sure that the IEP is not just a paper promise, but it's

24 actually being implemented properly.

25     And I was curious on the parent feedback, is that some of

1   the feedback that you get, whether the IEP is being implemented

2   faithfully on the ground?

3        **LIBBEY DURKEE:**  Yes.  And so I think a large part of

4   it is how well the parent understands what the IEP entails as

5   well.

6        **THE COURT:**  Do you -- in the review -- in the work

7   that you have done with this LEA, do you -- are you able to get

8   a sense of whether, you know, IEPs are being -- are being

9   properly implemented or is that kind of beyond the scope of

10  what -- of the review that you do with this LEA?

11       **LIBBEY DURKEE:**  I think it is a little bit beyond it

12  only because their focus is on the Hispanic specific learning

13  disability and so particularly the pre-referral and assessment

14  process with that.

15       The implementation of it, I think most -- when we talk

16  about disproportionality, a lot of times you are looking more

17  at the general education side.  Like, what supports are being

18  provided so they aren't identified, so there's less of an

19  implementation look at that particular type of LEA.

20       **THE COURT:**  In other words, what supports can be

21  provided to this population so that they are less likely to be

22  shoehorned into the category of Special Ed?

23       **LIBBEY DURKEE:**  Yes, yes, exactly.

24       **THE COURT:**  Okay.  And then I have a similar question

25  about least restrictive environment, like making sure -- you

1  know, trying to make sure that they are in the general

2  classroom as much as possible.

3      In the review that you have done -- you know, in the work

4  that you have done with this LEA, have you been able to get a

5  sense of whether they have a problem in -- in terms of -- in

6  terms of keep -- not -- not doing a good enough job of making

7  sure that these Hispanic students who are classified as

8  disabled are, you know, in the general classroom enough?  Do

9  you understand my question?  I don't think I asked it very

10  well.

11          **LIBBEY DURKEE:**  If there's an LRE issue with --

12          **THE COURT:**  Yeah, like, okay, we have got these people

13  who are classified as disabled and maybe they shouldn't be but

14  they are classified as disabled.  What is -- what is -- what is

15  the consequence of their being classified as disabled?

16      Are they being kept out of -- even assuming they are

17  disabled, are they being kept out of the general classroom too

18  much?  Do you -- in the work that you are doing with this

19  district, are you able to assess that question?

20          **LIBBEY DURKEE:**  I would say yes just because our data

21  does not show that there is an LRE issue.

22      You know, there is definitely opportunities once they are

23  identified; but for this, the focus is really about what are

24  you doing to prevent identification if it is done so

25  incorrectly and what are you going to do to fix that.

**PROCEEDINGS**

1    So there isn't so much like, hey, this student shouldn't

2   have this service or something like they shouldn't be in this

3   placement.  It is more about what are you doing to make sure

4   that they are identified correctly in the first place.

5          THE COURT:  Okay.

6          MS. DUNCAN-BECERRIL:  I do think, Your Honor, there

7   will be opportunities for you to ask that same question of our

8   other staff members who do look more closely at LRE or the

9   overarch between LRE and potential disproportionality.

10    I think this LEA didn't necessarily have that concern in

11   this space and Libbey didn't work closely with them in Step 1.

12   And so it is something that we would continue to review, I

13   think, as we look at their data.

14          THE COURT:  Okay.  Anything else?

15                    (No response.)

16          THE COURT:  Okay.  Thank you, Ms. Durkee.

17          LIBBEY DURKEE:  Thank you.

18          MR. SPENCE:  Okay.

19          THE COURT:  Would you guys like -- it is almost

20   1:00 o'clock.  Would you guys like to break -- I guess we

21   should break for lunch now.  Why don't we break for lunch until

22   1:30 and then resume.

23          MR. SPENCE:  Thank you.

24          THE COURT:  And I sort of defer to the State in terms

25   of who to put up next.

1      **MR. SPENCE:**  Yeah, I think we will just go in order,

2   just numerical order.

3      **MS. DUNCAN-BECERRIL:**  Do we want to continue having

4   the questions around targeted and then move on to intensive?

5   That might help.

6      **THE COURT:**  I don't know.  I think it might be better,

7   like, if -- I think it could be better to -- if there's

8   somebody -- you know, because we might not be able to get to

9   everybody today, I think, you know, we should ask Mark and

10  Brenda and whoever else, you know, who do you most -- who are

11  you most interested in hearing from and we can order it that

12  way.

13     **MR. MLAWER:**  I organized my report with intensive

14  first and targeted next and the small after that in case it

15  ended up being a template for the hearing to make sure that we

16  had sufficient time for the intensive districts since they are

17  intensive.

18     That would be my only comment; that, you know, I would

19  like, if we can get through the intensives first.

20     On the other hand, the targeted issues, as I have

21  mentioned, have some important issues in there; but that's my

22  inclination.  Do intensive first.

23     **THE COURT:**  Okay.

24     **MR. SPENCE:**  Sorry.  I am speaking to the Plaintiffs

25  and the Monitor.  Who do you-all -- can you give me just, like,

**PROCEEDINGS**

```
 1   three who you absolutely need to hear from right now just in

 2   case we don't make it through everyone?

 3            MS. SHUM:  If I can just have one second to consult.

 4            MR. SPENCE:  Yeah.

 5                      (Pause in proceedings.)

 6            MS. SHUM:  Thank you.  I couldn't get my cursor to

 7   move to unmute.

 8        We would prefer LEA 11, LEA 10, LEA 3, LEA 8, and LEA 4

 9   and -- if we want to sequence in the interest of time.

10            THE COURT:  All right.  Let's focus on those at first.

11            MR. SPENCE:  Okay.

12            THE COURT:  All right.  Thank you.  We will see you at

13   1:30.

14            MR. SPENCE:  Thank you.

15            THE CLERK:  Court is in recess.

16            (Luncheon recess was taken at 12:59 p.m.)

17   AFTERNOON SESSION                                    1:30 p.m.

18            THE COURT:  Okay.

19            THE CLERK:  Court is back in session.  Come to order.

20                      (Pause in proceedings.)

21            THE COURT:  Okay.  Who do we have next?

22            MR. SPENCE:  We have Jill Whitehair.  So should we

23   wait for Shiyloh to get back because she may be answering some

24   of these questions.  I can try to track her down real quick.

25            THE COURT:  Sure.
```

PROCEEDINGS

```
 1                    (Pause in proceedings.)

 2          MR. SPENCE:  Thank you.

 3          THE COURT:  We can wait a minute.

 4                    (Pause in proceedings.)

 5          THE COURT:  Meanwhile, Ms. White, which LEA are you

 6   attached to?

 7          MS. WHITEHAIR:  I'm LEA 11 and my last name is

 8   Whitehair.

 9          THE COURT:  Oh, Whitehair, sorry about that.

10          MS. WHITEHAIR:  That's okay.

11          THE COURT:  LEA 11.

12          MR. SPENCE:  So Shiyloh is back.

13          MS. DUNCAN-BECERRIL:  My apologies, Your Honor.

14          THE COURT:  No worries.  All right.  So,

15   Ms. Whitehair, I will ask the same -- I will ask you the same

16   question that I asked Ms. Durkee.

17      Do you have anything that you want to sort of say or

18   summarize or add to your declaration or do you just want to

19   start getting peppered with questions?

20          MS. WHITEHAIR:  You can pepper me with questions.

21          THE COURT:  All right.  Go ahead.  Ms. Shum, do you

22   want to start?

23          MS. SHUM:  Sure, I'm happy to.  I just have a couple

24   of clarifying questions.  I'm wondering if it's possible for

25   you to share (video freeze interruption) --
```

1          **THE COURT:**  Sorry, Ms. Shum, I'm having a little

2     difficulty -- you were cutting in and out a little bit.  I

3     think it was because you were looking down.

4          **MS. SHUM:**  Can you hear me now?

5          **THE COURT:**  Yes.

6          **MS. SHUM:**  Let me reconfigure my notebook so I'm

7     facing the microphone.

8        Could you please describe how the process works to make

9     sure that concerns that are identified in Step 1 or early on in

10    the monitoring process are addressed later or throughout the

11    next phase of the monitoring process?  Here, perhaps, you can

12    talk specifically about discipline, English language and

13    absenteeism.

14         **MS. WHITEHAIR:**  So looking at the data, that's a

15    continual process.  So in Step 2 they continued to dive into

16    that as they started to focus on what some of the root causes

17    might be for some of the things that they are concerned about.

18         **THE COURT:**  Well, could I -- could we step back for a

19    second because I have not looked at the specific documents

20    submitted by the State as closely as the lawyers have.

21       So can you -- could you just maybe start by giving me a

22    summary of why an LEA is in intensive monitoring and kind of

23    what it is that you are working on with them.

24         **MS. WHITEHAIR:**  Sure.  I can go ahead and so we looked

25    at, for intensive monitoring, they are in for school age

 1  monitoring -- for intensive and we looked at graduation,

 2  English language arts and math proficiency.  We looked at least

 3  restrictive environment, chronic absenteeism and preschool --

 4  preschool.

 5          THE COURT:  Okay.  And when did you start working with

 6  them?

 7          MS. WHITEHAIR:  In March.

 8          THE COURT:  In March, okay.  And could you maybe -- I

 9  mean, I'm sorry.  I think this is a little bit of a repeat of

10  your declaration, but can you kind of just in general terms

11  summarize your work with them between March and now?

12          MS. WHITEHAIR:  So, this LEA is an intensive level 1,

13  and so they are working with the TA provider, and then I work

14  in partnership with the TA provider.

15      We have met to go over data, historical data.  We did look

16  at all targets that were missed and then narrowed down to what

17  they felt was their most important area to look at for that

18  LEA.

19      We have done a student record review.  They did a --

20          THE COURT:  And what were --

21          MS. WHITEHAIR:  Oh, go ahead.

22          THE COURT:  Sorry, what were they -- what did they

23  narrow down to be their most important areas to focus on?

24          MS. WHITEHAIR:  They looked at least restrictive

25  environment.  They have also looked at math proficiency; ELA,

1    they have looked at somewhat but not as intensely as math.

2        But the least restrictive environment they felt has been

3    their -- historically they have not made those targets and that

4    was one of their greatest needs.

5            THE COURT:  And how -- can you describe to me a little

6    more the process of figuring out where -- what their greatest

7    needs are?  Like, it sounds like it is a determination that

8    they made.  So could you describe to me sort of how they came

9    about -- how they got to that determination?

10           MS. WHITEHAIR:  Sure.  They did a data dive with their

11   technical assistance provider.  And at that, they looked at all

12   their targets.  And then when they looked at the historical

13   data, what they chose to focus on was any target they hadn't

14   met for three plus years.  And then they looked at is there one

15   area that might make the biggest change.

16       So they chose least restrictive environment with the idea

17   that, you know, if they look at least restrictive environment

18   and kids are in their General Ed classroom more, then some of

19   those other areas would be improved.

20           THE COURT:  Okay.  And how much -- so is it -- in

21   terms of who is primarily working with them, is it primarily

22   the TA provider or is it primarily you or is -- and who are you

23   communicating with during this process?

24           MS. WHITEHAIR:  I communicate with both the TA

25   provider, and I have worked in partnership with them.  She has

1    led them through the data dives.  I have been involved in them

2    but she has led those.

3        And then if there's questions, you know, if there's

4    information I want more information about, then we would

5    discuss those in meetings.

6        And we met from about the end of April until June 30th

7    when the submission was due.  Almost weekly we met via Zoom.

8    And "we" meaning the CIM team, myself and the TA provider.

9        **MS. DUNCAN-BECERRIL:**  So the LEA CIM team.

10       **MS. WHITEHAIR:**  Yeah, LEA CIM team.  I'm sorry.

11       **THE COURT:**  Who is on the CIM team?

12       **MS. WHITEHAIR:**  I will have to look.  I will just go

13   off the top of my head.

14       **THE COURT:**  Yeah, that's fine.

15       **MS. WHITEHAIR:**  There are general education

16   representatives.  The assistant superintendent has been

17   involved; the Special Ed director.  There is the general

18   education, I believe, it is the curriculum.  I would have to

19   look at my notes, exactly their position.

20       There's school psychologists.  There is a principal, and

21   then they have had some Special Ed teachers.  They also had the

22   County Office of Education, they had support from them as well

23   to be a part of the process.

24       **THE COURT:**  Okay.  And you are saying that all of

25   those people that you just described or most of the people you

1  just described were meeting on a weekly basis from April

2  through June?

3        **MS. WHITEHAIR:**  The majority of them but not all of

4  them came to every meeting.

5        **THE COURT:**  Sure.

6        **MS. WHITEHAIR:**  Which is a subsequent conversation

7  that we have had; that it is important especially for general

8  education to be involved in those conversations and so then --

9  to have them involved in the meetings.

10       **THE COURT:**  Okay.  Sorry, Ms. Shum.  I think I sort of

11 interrupted Ms. Whitehair as she was in the middle of answering

12 one your questions and I apologize for that.

13       **MS. SHUM:**  Not at all, Your Honor.  I think that

14 context is actually very helpful, and I appreciate you sharing

15 some additional information about your work with this LEA.

16     With respect to the meetings of the CIM team that you were

17 describing, was the team itself meeting in person and then you

18 would participate by Zoom or did all of those meetings occur

19 virtually for all participants?

20       **MS. WHITEHAIR:**  It was mixed.  The LEA has different

21 campuses so some of them were together.  Some of them were via

22 Zoom, and then myself and the TA provider were via Zoom.

23       **MS. SHUM:**  I just have a couple of sort of clarifying

24 questions before we get to the question I already asked you.

25     I was wondering if you could talk a little bit about some

1  of the missing supporting documentation that seemed to be

2  flagged in the materials that CDE submitted for this hearing.

3      What, if anything, did CDE do regarding policies and

4  student record reviews that were missing or unavailable?

5          **MS. WHITEHAIR:**  So, the -- they did have some policies

6  and procedures that were missing.  They had thought that they

7  had submitted them all.  And so then, since then, though --

8  since our September -- not September 30th -- since our

9  June 30th submission, they have since provided me with that

10 documentation.

11         **MS. SHUM:**  So for all of the policies and the --

12         **MS. WHITEHAIR:**  Yes.

13     **MS. SHUM:**  Okay, thank you.  Can you describe your

14 experience working with this LEA around parent engagement and

15 the process that they used to try to gather information about

16 the parent experience in that LEA?

17         **MS. WHITEHAIR:**  Sure.  So, this LEA did -- we did

18 notice that they were struggling to get some parent input using

19 that SEED surveys.

20     We discussed that they could, you know, pass out hard

21 copies.  They could give them -- you know, hand them out with

22 at IEP meetings.  They could mail them home.  We discussed that

23 in future they could do interviews.  They could go to parent

24 meetings for their Special Ed parents.

25     So and then we also gave them an extension.  They still

1  did not meet that 20 percent.

2      As we have gone onto Step 2, they have continued to

3  discuss that parent input and also how that could be a factor

4  in some of the concerns they might have and is that part of a

5  root cause and part of a greater issue that they do need to

6  address.

7          MS. SHUM:  And what were the conclusions that the LEA

8  came to by participating in those conversations with CDE and

9  the technical assistance providers?

10         MS. WHITEHAIR:  So it would bring us into Step 2 that

11 we have had those continuing conversations.  They did reach out

12 to additional parents.  They did a few interviews.  It has been

13 an ongoing struggle and has become a part of their root cause.

14         MS. SHUM:  I see.  Thank you.  To what extent did the

15 LEA discuss the fact that only one of the parent responses was

16 in Spanish?  And did they identify any specific interventions

17 that they wanted to try to engage non-native English speaking

18 parents?

19         MS. WHITEHAIR:  I will be honest, I don't recall any

20 specific conversation around that; but, again, they have

21 addressed that parent input is part of their struggle.  And so

22 that's something that we have continued to discuss and not

23 specifically any one ethnicity or group of parents but in

24 general.

25         MS. SHUM:  Thank you.

1    This is a district that had a number of non-compliant

2  performance indicators.  You reviewed a number of them and

3  flagged that LRE in particular was identified by the district

4  as a priority because I think you said it was -- it was

5  non-compliant for three years -- at least three years in a row.

6  Is that what you were sharing before?

7        MS. WHITEHAIR:  Yes.  Their historical data shows that

8  that has been a missed target.

9        MS. SHUM:  Okay.  Do you happen to recall to what

10  extent discipline or performance indicators related to

11  suspension were also historically an issue for this particular

12  LEA?

13        MS. WHITEHAIR:  During their historical data dive,

14  they did look at discipline.  They even disaggregated it by

15  race and ethnicity.

16    And so -- but, again, after -- I know for multiracial

17  ethnicity, it was targeted -- it was two years that they hadn't

18  met it, and then there wasn't data for the next year.

19        MS. SHUM:  Sorry.  There was no data for the next year

20  because of the pandemic or for another reason?

21        MS. WHITEHAIR:  They are not sure.  I mean, it is the

22  pandemic year, so why that wasn't, they weren't sure.

23    And so, you know, until we get more data, they weren't

24  able to make clear decisions on that, but they did look at it.

25  They did disaggregate it, and it was that one group of students

1  that they focused on but didn't have the continuing data at

2  this time.

3       MS. SHUM:  Okay.  So to what extent is discipline or

4  suspension a part of the improvement plan for this district

5  moving forward?

6       MS. WHITEHAIR:  Well, moving forward, they are

7  focusing on the least restrictive environment as their main

8  focus with the idea that if students are in their general

9  education classroom, some of these other targets then will be

10 met as well.

11      MS. SHUM:  It looked like there were maybe four areas

12 of noncompliance that were flagged in the student record

13 reviews according to the materials that we had access to.

14      Are you able to specify what the four areas of

15 noncompliance were?

16      MS. WHITEHAIR:  I don't have that in front of me,

17 sorry.

18      MS. SHUM:  Yeah.  I know -- I don't if it was

19 available but we couldn't tell from the materials that you

20 submitted.

21      Back to my initial question, just sort of trying to

22 understand the role that CDE plays in supporting an LEA at this

23 level of monitoring, I'm wondering what steps you or the

24 technical assistance providers specifically take to ensure that

25 sort of all of those issues that were flagged as non-compliant

**PROCEEDINGS**

```
 1   are continued to be addressed or will be addressed in the

 2   monitoring process at a later stage.

 3         MS. WHITEHAIR:  So they will receive correct -- well,

 4   they received corrective actions, and then they will need to

 5   submit the documentation that they have addressed those.

 6         MS. DUNCAN-BECERRIL:  Just to clarify because -- I

 7   just want to clarify because I think sometimes when the

 8   Plaintiffs' attorneys talk about noncompliance, they are

 9   talking about noncompliance under IDEA as a whole or are they

10   talking about the policies, practices and procedures review

11   that resulted in procedural noncompliance that would require

12   corrective action?

13         MS. SHUM:  Apologies.  I think I was referring to the

14   noncompliance performance -- the noncompliance performance

15   indicators, all of the things that were identified earlier.

16         MS. DUNCAN-BECERRIL:  Okay.  So I think -- we have

17   talked a little bit about this before.  Part of the work of the

18   CIM is not to create a plan for every indicator the LEA is not

19   meeting.

20         It is to identify the problems or practice that we believe

21   are inner connected and have the greatest -- the highest

22   leverage for success.

23         So this LEA looked at all of those different pieces of

24   data.  They looked at suspension.  They looked at LRE.  They

25   looked at graduation.  And I think, as Ms. Whitehair has spoken
```

1    to that and she has -- if you want more, we can provide more

2    information on that -- but where they sort of began to really

3    identify the issue and what their belief -- part of this is

4    when they are looking at the data and looking at all of this

5    information is this belief, if they have students in the LRE,

6    the least restrictive environment, the right placements for the

7    students, that these other issues -- so access to education,

8    more supports in the general educational classroom -- will

9    reduce behavior instances, increase graduation, increase

10   assessment scores.

11        So that's really been the focus of the problem of

12   practice.  I'm not speaking for her.  I'm just saying this is

13   sort of what we would tend to see.

14        Our intent with this process, because we have done it in

15   previous years, is not to create an improvement plan for every

16   indicator.  We want them to look at those indicators and find

17   the inner connectivity between them and see if one is

18   identifying as being part of that root cause.

19        And they may look at that in the future.  I can't speak to

20   that exactly, right, this second but -- and I would refer to

21   Ms. Whitehair -- but that is sort of the intent of work

22   generally.

23        MS. SHUM:  Thank you.  That's a helpful point of

24   clarification and a reminder.

25        I'm wondering then to what extent at what point do you

1  confirm that targeting sort of the root cause such as LRE

2  actually is having the effect of bringing the LEA closer into

3  compliance for some of the other performance indicators.

4      **MS. DUNCAN-BECERRIL:**  So I think we would look at

5  those in Step 4, right, so as the district -- and I say this,

6  typically what we would have done is waited until a whole other

7  year of data.  In Step 4 the intent -- and I think we had

8  Libbey kind of speak to that -- is looking at their data, more

9  their local data.

10    So they might look at office referrals.  They might look

11 at local suspension data before we get it.  They may look at

12 interim assessments, so those -- not the summative assessments

13 but the formative assessments that they might take at the

14 district level to determine if students are actually being able

15 to meet that.

16    So those are some of the things we would look at as they

17 are moving into Step 4.  So we would start to look at that data

18 much -- at that point.  So that's when we would start to look

19 at that.

20    And if we don't see those changes, then the questions we

21 begin to ask are:  Is this the right path to go down?  So we

22 don't have them implement for a year or two years before we are

23 beginning to ask those questions.  This LEA is probably not at

24 that point.

25     **MS. SHUM:**  Thank you.  Thanks so much.

1     **THE COURT:**  Ms. Whitehair, I'm -- as you can probably

2   tell from some of the questions that I have asked already, I'm

3   concerned about IEP implementation.

4     And, you know, as -- you know, as Ms. Durkee mentioned,

5   you know, when we were talking about parent involvement, she

6   indicated that one of the problems sometimes is that parents

7   don't really understand what's in the IEP and that -- that

8   suggested to me, you know, possibly a concern that -- you know,

9   that a parent survey might not get at the question of whether

10   IEPs are being properly implemented.

11     So I guess my question to you is:  Do you feel like in

12   your work with this LEA, you have been able to develop a sense

13   of whether IEPs are being properly implemented?

14     And if so, how have you developed that sense.  And if not,

15   how would you develop that sense?  Do you understand my

16   question?  It was a little long.

17     **MS. WHITEHAIR:**  I think so.  So, with this LEA, they

18   looked at an educational benefit review, and then I also did a

19   student record review, so that was -- that would be part of

20   that process.

21     As they moved into Step 2, they chose to interview some

22   students and a couple of parents.  They also looked at their

23   staff.  They have done some process maps to determine some of

24   those steps and if the IEPs are being implemented as they were

25   designed.

PROCEEDINGS

```
 1          THE COURT:  So, how -- okay, so let's sort of go
 2   through it.
 3       You talked about educational benefits review.  How does
 4   that help us determine whether the IEPs are being implemented?
 5          MS. WHITEHAIR:  So the educational benefit review
 6   would look over three years of IEPs.  It's going to start
 7   usually with an assessment year and then the two subsequent
 8   years to determine if -- like, where the student was assessed,
 9   where they became eligible, if those services have been
10   provided, if they are moving through those IEP systems the way
11   that they were designed to do.
12          THE COURT:  And how do you determine whether the
13   services were provided?
14          MS. WHITEHAIR:  Um, sometimes they are listed on the
15   IEP and sometimes they are not.  And so when a service is
16   dropped off of an IEP for some reason but there is no
17   documentation, that then would say okay, what's going on with
18   this student.  We can ask additional questions.
19          THE COURT:  Well, what about when a service is on an
20   IEP?  Like, how do you determine --
21          MS. WHITEHAIR:  Even then during an educational
22   benefit review, there is -- you can still ask questions about
23   it, like is it an appropriate service?  You know, do we know
24   that it was being done in the manner it was written?  Those are
25   all conversations that we had.
```

**PROCEEDINGS**

1    **THE COURT:**  How would -- what I'm trying to get at is

2    how would you verify it?  Like, you see a service on there.

3    **MS. WHITEHAIR:**  Well, I guess I'm not there in person,

4    so I wouldn't verify -- I can't go there -- I didn't go there

5    to verify in person, I guess.  So it is based on what I'm being

6    told.

7    **MS. DUNCAN-BECERRIL:**  And --

8    **THE COURT:**  It's based on -- oh, sorry, one follow-up

9    question -- based on what you are being told, but how would

10   they do it?  Like, how would they -- you know, how would the

11   folks at the LEA go about verifying that a service that is

12   called for in an IEP is actually being provided in the

13   classrooms?

14   **MS. WHITEHAIR:**  I guess I'm not quite sure what you

15   are looking for.  I mean, I don't -- I'm not quite sure what

16   your question is.

17   **THE COURT:**  Yeah, I mean --

18   **MS. DUNCAN-BECERRIL:**  I think -- I could -- myself and

19   Jack can probably address some of that.  IEP implementation is

20   not currently part of our process.  I know we have inputted in

21   part of the process, and I think we are up to have it for

22   discussion if it is an activity that we feel like is important

23   but --

24   **THE COURT:**  The reason I'm asking is --

25   **MS. DUNCAN-BECERRIL:**  -- a secondary activity to

**PROCEEDINGS**

 1 | educational benefit review.  So she would not have looked at

 2 | IEP implementation as part of --

 3 |      THE COURT:  Right, but that's what I'm trying to

 4 | understand is the process that exists today, how effective or

 5 | ineffective is it at verifying whether a service that's

 6 | promised in an IEP is actually provided; right.  That's why I'm

 7 | asking the questions.

 8 |      MS. DUNCAN-BECERRIL:  My apologies.  Yeah, we don't

 9 | have that as part of our proposed process.  Now, one of the

10 | things we could be looking at and what we intend to look at as

11 | part of the IEP implementation is we are collecting from all of

12 | the LEAs a sample of their IEP implementation to determine if

13 | there is a systemic issue where IEPs are not being

14 | implemented --

15 |      THE COURT:  Well, what does --

16 |      MS. DUNCAN-BECERRIL:  -- across the LEA.

17 |      THE COURT:  What does that mean to collect a sample

18 | and LEA's IEP implementation?  What does that mean?

19 |      MS. DUNCAN-BECERRIL:  We would -- the way that we have

20 | proposed it, I think -- I thought we filed this but I could

21 | be --

22 |      MR. SPENCE:  Service logs.

23 |      MS. DUNCAN-BECERRIL:  Well, I thought we filed it.

24 | Our apologies if I'm stepping out of -- there have been a lot

25 | of filings in this case.

**PROCEEDINGS**

1    So, the way that we proposed it and we sort of conferred

2  with Plaintiffs and the Monitor on this was to take a sample of

3  up to -- of 10 percent or up to 500 students in an LEA, and we

4  would give the LEA the names they would identify if there was a

5  percentage of students -- like, what percentage of the IEP was

6  provided.  So was it a hundred percent?  Was it 80 percent?

7  Was it 70 percent?  Was it 40 percent?  And then they would

8  provide us the number of students in their -- in the groupings.

9  So, you know --

10        **THE COURT:**  But how do they determine that?

11        **MS. DUNCAN-BECERRIL:**  They look at -- there is a

12  couple ways they can look at that.  They can look at the

13  service logs -- so the written service logs -- that would

14  identify that.  So they would say:  The student needs one hour

15  of speech.

16    The service provider would log that in a paper log.  That

17  doesn't happen that much anymore.  Most districts will use an

18  electronic service log, and they will look at that electronic

19  service log and they will say:  The student was supposed to

20  receive 500 minutes of service, and they received 300 minutes

21  of services in which the services -- so that's located at the

22  LEAs.  I don't know, Jack, you sort of --

23        **MR. BRIMHALL:**  Sometimes it is a schedule.  So if a

24  student is to get an hour of RSP --

25        **MS. DUNCAN-BECERRIL:**  RSP is what?

1      **MR. BRIMHALL:**  Resource specialist.  If they get an

2  hour of that, you can look at the actual calendar and see that

3  there is an hour scheduled in their calendar.

4     So some of that is just natural.  If it is, like, a push

5  in service, you would need to look at like the push in schedule

6  that typically the building principal would create where the

7  different aides would go with what students.

8     So there is a variety of different ways.  Logs, schedule,

9  are probably your two biggest ways to do it.

10      **MR. SPENCE:**  What is a push in?

11      **MR. BRIMHALL:**  Push in support is where the student

12  gets whatever service in the general education classroom, so

13  with an aide or a teacher.

14            (Pause in proceedings.)

15      **THE COURT:**  Okay.

16      **MR. BRIMHALL:**  One thing with educational benefit,

17  even though it is not looking specific at IEP implementation,

18  you are looking at IEP effectiveness.

19     So when you look at those three years, you will see

20  potentially a service changing or being replaced or modified,

21  and you will see why.  You will see the discussion around those

22  things, and you will look at the goals and the progress on

23  goals.

24     So while you don't specifically see, like, boots on the

25  ground that the service was provided, you do get at the

1  effectiveness of what the services are and how those goals were

2  either met or not met and the changes made around that over

3  time, at least over that three years.  So it's really -- it's a

4  really neat process that will elicit that.

5          **THE COURT:**  Okay.

6          **MS. SHUM:**  Your Honor, if I might, just a quick

7  follow-up question specifically to the logs.

8          **THE COURT:**  Of course.

9          **MS. SHUM:**  I was wondering if CDE could clarify what

10  districts need to do in order to verify that services are, in

11  fact, being provided for the sample students.

12          **MS. DUNCAN-BECERRIL:**  Sure.  So we would give them the

13  list of students, and then they would identify the total number

14  of minutes that the student is supposed to receive.

15          So if student A -- we give them the names so they can't --

16  and it is after the period of time.  So what I think is

17  important is so the period of measurement I think this year was

18  March 1st to April 30th -- I would have to look, somewhere

19  around like an eight-week period -- and at the end -- on

20  May 1st we gave them the 500 names.  And we told them tell us

21  where the students falls and the percentages.

22          So, they would look at, you know, at the student; and if

23  that student needed 300 minutes of service, then they would go

24  to the logs and see how many minutes of service they received.

25          And, you know, if it was -- and then they would calculate

1   the percentage based on that, and then we would receive the

2   percentages of all the students.

3        And our intent is to look and see across LEAs, almost kind

4   of like on a bell curve or like a cut-off -- we haven't got to

5   the cut-off point yet -- is to look and see are there districts

6   for whom there seems to be significant numbers of students who

7   are not receiving all of their services.

8        Now, there's a lot of reasons students may not receive

9   services in a given time, like, if they are, like, sick or if

10  something happened.

11       One of the biggest concerns that we had is that we didn't

12  want to make this such a compliance heavy activity.  We

13  recognize it's important, but we didn't want to make it such a

14  compliance heavy activity that LEAs would be -- feel that they

15  could not allow students with disabilities to participate in

16  education as all other students would.

17       What we would hear is:  Well, we can't let this student go

18  on the field trip because they are going to miss their

19  services.  And if we are not a hundred percent, we are going to

20  get dinged on it and -- or we can't get the student ride the

21  bus because they are not going to get their service or they are

22  not going to get this or we can't let the student participate

23  in PE or field day or those kind of things, all of the stuff

24  that their peers would participate in.

25       And so sort of trying to balance those pieces was -- is

1  challenging obviously.  And so we are trying to identify what

2  is the space where we can identify where there are significant

3  concerns around IEP implementation without it feeling

4  extraordinarily punitive to the normal process of students

5  being students.

6       **MS. SHUM:**  Sure.  That makes a lot of sense.  Just in

7  terms of CDE's ability to kind of monitor what the LEAs are

8  tracking, though, is it then -- it's your understanding that

9  all the districts are, in fact, maintaining -- keeping and

10 maintaining those logs, either hard copy or electronically?

11      **MS. DUNCAN-BECERRIL:**  Yes, that was our expectation

12 that we laid out when we started this process.

13      **MS. SHUM:**  Thank you.

14      **THE COURT:**  Mark, did you have anything?

15      **MR. MLAWER:**  Just a couple of questions, Judge.

16    Ms. Whitehair, as you know, in addition to being selected

17 to intensive monitoring, this district also didn't meet two of

18 the three -- (video freeze interruption).

19      **OFFICIAL COURT REPORTER:**  I'm sorry, Mr. Mlawer, I

20 can't hear you.

21      **MR. MLAWER:**  Oh, I'm sorry.  In addition to being

22 selected for intensive, this district also didn't meet two of

23 the three LRE preschool indicators.

24     Now, on the student record review, the summary sheet seems

25 to be showing zero preschool kids reviewed.  Did I understand

1   that correctly?

2        **MS. WHITEHAIR:**  Yes.  This LEA is an intensive

3   monitoring for school-aged students, and that was the student

4   for the student record review.

5        **MS. DUNCAN-BECERRIL:**  And that kind of goes back to

6   our discussion previously about our technical limitations in

7   this space that didn't allow us to differentiate in the way

8   that we wanted to, but we intend to do that in this upcoming

9   year.

10        **MR. MLAWER:**  Okay.

11        **MS. DUNCAN-BECERRIL:**  The students selected were

12   selected randomly.  We weren't able to differentiate the

13   different pieces, and so -- but all of the students in the

14   grouping that could be selected for review were age 3 to 22.

15        **MR. MLAWER:**  So, in other words, preschool students

16   could have been selected?  Did I understand that right?

17        **MS. DUNCAN-BECERRIL:**  Yes.  They were not for this

18   review, and that was a technical problem on our side.

19        **MR. MLAWER:**  I see.  Okay.  Thank you.

20        **MS. DUNCAN-BECERRIL:**  You are welcome.

21        **MR. MLAWER:**  One other question:  In the ed benefit

22   review, absences when noted as a potential problem, when it

23   came time for the consolidation step at the end of Step 1, the

24   absenteeism was not listed as a focus.  Do you know why?

25        **MS. WHITEHAIR:**  I don't know why they didn't, but they

**PROCEEDINGS**

1  did get feedback on that about looking into chronic

2  absenteeism, which they have in Step 2 where they have

3  continued to look at data.

4          **MR. MLAWER:**  I see.

5          **MS. WHITEHAIR:**  That's one of the areas that they

6  looked at.

7          **MR. MLAWER:**  So we may see more about that issue at

8  Step 2?

9          **MS. WHITEHAIR:**  You may.  You may not.  I'm not

10 totally certain how detailed that would be because this is

11 talking about Step 1, so -- but they did continue the

12 conversation.

13         **MR. MLAWER:**  I see.

14         **MR. BRIMHALL:**  Step 2 does have a prioritization

15 activity where they will take all those different issues.

16 There is a priority matrix where they look at where you are

17 going to get the biggest bang for your buck, for one or two

18 high-leverage activities.  So that should be typically looked

19 at in the prioritization protocol but that's in Step 2.

20         **MR. MLAWER:**  Okay.  Last question:  This district

21 listed LEA performance in the consolidation step as a trend,

22 but this district didn't meet the target for ELA performance,

23 and I noticed here that this was not returned to the district.

24      Do you -- were they talking as a strength that ELA

25 performance for kids with disabilities or is it possible they

**PROCEEDINGS**

1  were referring to kids without disabilities there?  Because

2  that struck me as really odd that an area in which you didn't

3  meet a target would be regarded as a strength for this purpose.

4  Do you have any insight into that?

5       **MS. WHITEHAIR:**  Yes.  When we looked at historical

6  data, the ELA performance had historically -- up until COVID

7  year -- been a strength for them.  And then after COVID, that's

8  when it was identified that they did not meet that target.

9       So in looking at the historical, it had been a relative

10  strength for them until COVID.

11       **MS. DUNCAN-BECERRIL:**  And they only had one year of

12  post-COVID --

13       **MS. WHITEHAIR:**  Right, they only had one year of

14  post-COVID data.

15       **MR. MLAWER:**  I see.  Thank you.  No further questions,

16  Judge.

17       **THE COURT:**  Anything else for Ms. Whitehair?

18            (No response.)

19       **THE COURT:**  Okay.  Great.  Thank you very much.  Who

20  is next?

21       **MR. SPENCE:**  So I believe Kishaun Thorntona will be

22  next.  It will take me a minute or two to get the witness.

23            (Pause in proceedings.)

24       **THE COURT:**  All right.

25       **MS. SHUM:**  Your Honor, if I might just really briefly

PROCEEDINGS

1    while we wait for the next witness, Ms. Buchanan-Williams, our

2    colleague, was accidently kicked out of the webinar; and I'm

3    wondering if it is possible to facilitate her reentry to the

4    closed session.

5                 **THE COURT:**  I think that would be fine.

6                      (Pause in proceedings.)

7                 **THE CLERK:**  I will be unlocking it now so she can

8    join.

9                 **MS. SHUM:**  Thank you so much.  Apologies for that

10   inconvenience.

11                     (Pause in proceedings.)

12                **MR. MLAWER:**  Shiyloh, if you know which LEA number is

13   the next witness associated with?

14                **MS. DUNCAN-BECERRIL:**  10.  I think we went in order

15   that the Plaintiffs' Counsel requested.

16                **THE COURT:**  I'm actually going to step away for just

17   30 seconds.  I will be right back.

18                     (Pause in proceedings.)

19                **THE COURT:**  Okay.  Sorry about that okay.  Is it

20   Ms. Thornton?

21                **MR. SPENCE:**  It is Ms. Thorntona.

22                **THE COURT:**  Okay.

23                **MR. SPENCE:**  So, Ms. Thorntona, please introduce

24   yourself to the Court and Counsel.

25                **MS. THORNTONA:**  Hello, I'm a focus monitoring and

**PROCEEDINGS**

1   technical assistance unit 1 education programs consultant, and

2   my name is Kishaun, K-I-S-H-A-U-N, Thorntona,

3   T-H-O-R-N-T-O-N-A.

4            **MR. SPENCE:**  How long have you been employed in that

5   role?

6            **MS. THORNTONA:**  Since about 2017.

7            **MR. SPENCE:**  How long have you worked with LEA number

8   10?

9            **MS. THORNTONA:**  Since May of this year.

10           **MR. SPENCE:**  With that, we will open it up to

11  questions.

12           **THE COURT:**  Okay.  Ms. Shum.

13      **MS. SHUM:**  Thank you.  Ms. Thorntona, I just have a

14  couple of clarifying questions to follow up on your

15  declaration.

16      It appears from the submission that -- you cited the fact

17  that this particular LRE missed performance indicators.  The

18  CIM process actually focused on disproportionality, and it was

19  unclear what efforts CDE engaged in to address some of the

20  other performance indicators.  I'm wondering if you could speak

21  a little bit to that question.

22           **MS. THORNTONA:**  So this LEA, number 10, is identified

23  as significantly disproportionate for specific learning

24  disability Hispanic and has been identified back in, I believe,

25  2020 and has been in continuing significantly disproportionate

**PROCEEDINGS**

 1   since.

 2           **MS. DUNCAN-BECERRIL:**  If I could just add quickly,

 3   so --

 4           **THE COURT:**  Can I -- Shiyloh, before you jump in.

 5           **MS. DUNCAN-BECERRIL:**  Sure.

 6           **THE COURT:**  Maybe, Ms. Shum, I mean, I'm not sure that

 7   totally answered the question.  So maybe we can have -- we can

 8   get some follow-up on that.

 9           **MS. SHUM:**  Sure.  In addition to sort of the ongoing

10   issue with significant disproportionality, it does appear that

11   there were some issues related to LRE both with respect to the

12   regular classroom setting, also LRE in separate schools.

13       I'm trying to understand to what extent CDE's monitoring

14   and compliance work with this LEA focused on some of those

15   other concerns.

16           **MS. DUNCAN-BECERRIL:**  So I just want to confirm, this

17   is for LEA 10; correct?

18           **MS. SHUM:**  Correct.

19           **MS. DUNCAN-BECERRIL:**  Okay.  So LEA 10 is in

20   continuing and -- and so they -- so they did not go under this

21   process last year in the CIM process.  We have now braided them

22   into the process.

23       That's what I was trying to say to respond to Ms. Shum's

24   question is that we haven't been able to look at it because

25   they were in significant disproportionality, which is our

**PROCEEDINGS**

1   highest level.

2       So when I talk about looking at, you know, this -- if this

3   is a patient, this is a patient basically in the ICU.  They

4   have significant racial and -- racial ethnic disproportionality

5   for their students for more than three years before 2020, so

6   potentially since 2017, and now they are still in that role.

7       And so they have been meeting the requirements under 34

8   Code of Federal Regulations 300.646 and 647, which is a very

9   clear process about how we have to treat them.  We set aside

10  15 percent of their IDEA funds.

11      And so at this point we are solely examining and trying to

12  treat the -- the disproportionality issue because that -- we

13  believe that is the most prolific issue and is of the highest

14  concern under this LEA.

15      They had a plan under the coordinated early intervening

16  services process as required under 300.646 and 647.  Instead of

17  starting over and delaying their implementation, we have

18  basically braided their old SEED's based plan into the new

19  process.

20      So it is a very long way -- apologies -- for saying we

21  don't look at that right now.  It's not right now for this LEA.

22      **MS. SHUM:**  That's super helpful.  So, again, I saw

23  references to braiding.  I don't think I -- I'm not even going

24  to claim that additional information helps me fully understand

25  the extent to which those processes merge.

PROCEEDINGS

1        I am wondering maybe if I could just then go ahead and

2   back up and ask a slightly different question before I try to

3   understand the sequencing that braiding contemplates.

4        Ms. Thorntona, what -- how does this CIM process actually

5   support or address the concerns for an LEA like LEA 10 where

6   there has been sort of ongoing lack of improvement around

7   significant disproportionality?

8        **MS. THORNTONA:**  Well, I think definitely this process

9   does help address the areas of need because once this LEA gets

10  into developing in accordance with the process, it will look

11  deeper than what was required when we were just initially

12  creating the SEED's based plan.  And part of this process is

13  developing that stage 4 or Step 4, which is the implementation

14  piece.

15       So, as Ms. Becerril was mentioning, we have braided it and

16  so now we are really looking at implementation.  How do we look

17  at this LEA and how they are implementing their plan?

18       The first few years it's really been about creating that

19  foundation to address the contributing factors to significant

20  disproportionality, ensuring that they had strong tier 1 and

21  tier 2 systems of support as well as addressing bias with their

22  staff through professional development and also just creating a

23  system where the district can follow some foundational -- you

24  know, have a system in place.

25       And so now that they have created that, now, we are really

**PROCEEDINGS**

1   looking at what services are available that you are going to

2   provide, interventions, if you will, for the students.

3       So now that you have done this beautiful -- you know,

4   created a foundation, now where does the rubber hit the road?

5   Is that professional development working for these students?

6       So I think that's where we are now with this LEA in moving

7   forward.

8           **THE COURT:**  Can I ask a follow-up about that?

9   I guess, sort of going to Ms. Shum's original question, I

10  understand that that significant disproportionality is the

11  focus and that we're sort of -- we are putting a lot of time

12  and resources and energy and conversation into addressing the

13  significant disproportionality problem, but I would think that

14  in that process, in the process of engaging on -- I mean, this

15  is a key IDEA issue; right -- and I would think that in the

16  process of engaging with them on that, it would be only natural

17  to sort of start working with them on some other stuff too.

18      I mean, you are kind of looking at their systems and you

19  are looking at how they are performing in this area; and I

20  would think it would be -- I think -- I would think you would

21  notice some obvious deficiencies in some other areas, you know,

22  LRE, for example, or something like that.  And, you know, it

23  would be odd not to engage with them on that as well.

24      So I guess maybe one question is:  What are your marching

25  orders?  Are your marching orders to just, like, not bug them

1    about other stuff?

2        Like even if you see, you know, some sort of significant

3    deficiency in their system for, you know, LRE or whatever --

4    you know, whatever other issue they may be deficient on, you

5    are supposed to, like, not mention that and just focus

6    singularly on significant disproportionality?

7        **MS. THORNTONA:**  Well, I think significant

8    disproportionality definitely highlights whether or not a

9    district is ensuring that students are receiving LRE -- or are

10   in the least restrictive environment because one of the -- you

11   know, things that we do when we are evaluating or doing the

12   data dive is we are looking across the board in Gen Ed and

13   students with disabilities.  We are not just looking at

14   students with disabilities.

15       So we are looking at some of those contributing factors as

16   well that might lead into that Gen Ed.  It's all the

17   pre-referrals, so seeing whether or not students are engaged in

18   their learning.  So that's through, you know, teaching.

19       Are they being referred to interventions first -- those

20   tier 1 and tier 2 interventions before even being referred

21   ensuring that students with disabilities also receive these

22   interventions and receiving that access to curriculum in the

23   Gen Ed setting.

24       So this absolutely addresses that least restrictive

25   environment piece.  And, you know, you can have good numbers --

PROCEEDINGS

1  least restrictive numbers across the board, but doing this

2  process, you are able to really -- we really disaggregate the

3  data so that you could see whether all students are

4  receiving -- are in the least restrictive environment.

5       Are we seeing more Hispanic students in -- placed in more

6  restrictive environments because of their identification?

7       So those are some of the things we look at, and then we

8  see how do we get our students back into that General Ed

9  setting.  So that's definitely looked at.

10       **MS. SHUM:**  So if I might follow up on your question,

11  Your Honor, that is -- that is helpful; and I appreciate the

12  Court's question because I think this is what I'm trying to

13  understand in terms of what it means to braid sort of this

14  newer flagged issues with sort of ongoing more systemic

15  noncompliance that an LEA might be struggling with.

16       So, I am trying to understand from CDE's perspective sort

17  of what type of monitoring and support and technical assistance

18  is being provided to assist with prioritizing sort of the

19  triage issues like significant disproportionality while making

20  sure we don't just park for the moment some of the other

21  noncompliance issues that -- that may -- that may be related

22  sometimes very closely and sometimes maybe in a more disparate

23  way.

24       **MS. THORNTONA:**  Well, we definitely have conversations

25  with the district around their data.

1    So we look at all of the indicators.  We see where they
2  have not met those indicator targets.  It may not be a part of
3  what's in writing here in their plan, but it is something that
4  we address.

5    There are some issues with assessments.  There are issues
6  with whether -- you know, achievement, which is also addressed
7  with that -- the larger significant disproportionality process.

8    But, you know, all the areas that they have not met, we do
9  have a conversation about them; and we talk about ways of
10  addressing it and ensuring that they don't drop the ball on
11  those things.

12    But as far as the plan goes itself, it's really looking at
13  the significant disproportionality, the contributing factors,
14  because a part of this is the 15 -- they are required to set
15  aside 15 percent of their IDEA funds to focus on that
16  pre-referral work to address it.

17    So it is something that we have to look at.  We do look at
18  that definitely, but there are conversations that we
19  continuously have around their data.

20    So even if they are continuing -- like this district is --
21  we do look at their data.  We do talk about it.  We do talk
22  about, you know, what are some things that you are doing, offer
23  suggestions and even offer resources where necessary.

24    **THE COURT:**  Um, this -- Ms. Thorntona, this might be a
25  question for you.  It might be a question for Shiyloh or both

**PROCEEDINGS**

1  of you, but is there -- this is a -- the question I have now is

2  about sort of staff training and the direction staff receives

3  from CDE on how to deal with these LEAs.

4      Is there anything that says:  Hey, when you are going into

5  an LEA and you are doing -- there is significant

6  disproportionality and you are focusing on that, like, make

7  sure -- I mean, maybe it is not going to be -- you know, maybe

8  the other stuff is not going to be part of the report, but make

9  sure you take, like, a holistic view of what they are doing and

10  offer yourself up as a resource to the LEA to sort of -- to

11  help consult with them on some of these other indicators that

12  they are lagging on.

13      **MS. DUNCAN-BECERRIL:**  So in the manual we have

14  pretty -- we worked pretty clearly to try and say "you are

15  going to look at all these indicators."

16      The process for our data analysis looks at all of those

17  indicators.  The infrastructure analysis looks at multiple

18  levels of issues.

19      The prioritization that occurs in Step 2 won't look just

20  at one thing.  You know, significant disproportionality has to

21  be handled but it is around the inner connectivity.

22      We can definitely -- I mean, if we look at the manual and

23  if the Court feels like there needs to be additional

24  directives, we have been pretty clear -- and I think Jack can

25  speak to the work he has done with the staff -- to make that

 1   directive clear.

 2        I mean, there are some issues that will be parked, not the

 3   most significant ones, but some issues will be parked because

 4   districts don't -- are not successful at doing that.  They are

 5   not successful as doing ten things at 10 percent.

 6        And so we have to figure out a way, is it two things at

 7   50 percent?  Is it three things at 33 percent?  I don't know

 8   exactly what it is for each LEA, but it has to be at a place

 9   where they can actually make a change.

10        And if we don't -- if we don't park some things, then we

11   are never going to get them off of the first -- you know, they

12   are never going to pass go.  It's always going to be stuck.

13        And I know, Jack, and some of the directives you have

14   provided around significant disproportionality looking at all

15   the data gave to your staff.

16        **MR. BRIMHALL:**  Yeah.  And so that data tool is amazing

17   because not only can you use it to drill down your data in the

18   Step 1, but you can upload your CALPADS data and use it in

19   Step 2, Step 3, all the way through implementation.  And it's

20   real-time data.

21        So in the previous version of what we did, if districts

22   wanted data on their State performance plan indicators, they

23   would have to wait until March.  Now they upload their CALPADS

24   data and not only that, the tool helps them disaggregate.  You

25   can disaggregate by school site if you wanted to.

 1         So if LRE is an issue, you can monitor that by individual

 2    schools, which is really cool.

 3         **MS. DUNCAN-BECERRIL:**  And part of the updates we are

 4    making to the manual for Step 4 is to have districts look at

 5    that data again.

 6         So data is not one thing we are looking at one time.  It's

 7    something -- and parent input is also going to be a part of

 8    that too.  It's like you need to continually be taking the

 9    temperature.  You need to be continually checking in to see how

10    things are going and our staff holding the LEAs to that

11    process.  So that's part of that piece.

12         **MS. SHUM:**  Thank you so much.  I actually just have a

13    couple of questions.  Ms. Thorntona, I think LEA 10 is one of

14    the few districts identified in this set of exemplars that is

15    scheduled for a site visit.

16         I'm wondering what guidance or criteria CDE uses in order

17    to determine when a site visit is appropriate.

18         **MS. THORNTONA:**  Well, we are starting to really build

19    out that implementation piece, and part of that is for our

20    level 3 LEAs doing site visits.

21         And so that's -- that's part -- that's mainly the main

22    criteria at this point until we continue to see, you know, the

23    need.

24         And looking at the -- you know, one thing with the site

25    visits that's really helpful is that we are able to fill the

1  plan -- see the plan come off the paper, so we have a good

2  understanding of what's actually happening, what needs to

3  happen, how do we address issues that we are seeing, and how do

4  we know what additional supports that we should be giving the

5  districts around the plan and the work that they are doing

6  around the plan.

7       **MR. BRIMHALL:**  We meet weekly in the intensive units,

8  so we know we go on site for all the 3s in Step 1.  We are

9  going to go on site during the implementation.

10      What we also do weekly when we meet is we discuss who is

11  struggling, who is not struggling; and that's a good way --

12  that's a good way to determine not only what level they are in

13  but what is the need.  So if they really need a site visit,

14  that's what we will do.  We will continually discuss it and we

15  will send folks if the district is struggling.

16      **MS. SHUM:**  That's very helpful.  I don't think that

17  was super obvious from the submission, and it may have been in

18  there.  I just don't think I fully appreciated that, so thank

19  you.

20      So then, Ms. Thorntona, I'm wondering if you can just

21  quickly try to give me a sense of what your caseload looks --

22  what your caseload looks like, sort of how many LEAs you have

23  and whether they are all sort of intensive or whether you have

24  a mix of targeted and intensive LEAs that you support.

25      **MS. THORNTONA:**  All of my LEAs are intensive.  I have

**PROCEEDINGS**

1   about 19 LEAs that I'm monitoring right now.  About 14 of them

2   have the identification of significant disproportionality and

3   five for the data.

4        **MS. SHUM:**  Thank you.  So does CDE ever conduct site

5   visits for LEAs that fall below intensive level 3?

6        **MS. DUNCAN-BECERRIL:**  Our intent is to do that.  We --

7   I don't know if we have enough information yet.  Most of those

8   districts are going through -- only like a hundred of them went

9   through Step 1 last year.  And so this year is the first year

10  all almost 500 are going through the CIM Step 1, and I think we

11  are waiting to see, like, where are districts struggling; but,

12  yes, they could go on a site visit if they need support.

13       Definitely in implementation we might see site visits

14  occur as well.  If we saw a district that wasn't doing what

15  they were supposed to do, we would definitely -- I mean,

16  recalcitrant districts who want to do a site visit.  I just

17  don't know if we are quite there yet.  They are just now

18  finishing up Step 2.  So they are probably at the point where

19  we are starting to ask those questions.

20       I also wanted to point out, Kishaun is very good example

21  of how we differentiate our caseloads.  So she has probably our

22  most -- our deepest experience in significant

23  disproportionality.  And so, as you can tell from her caseload,

24  14 of the 19 LEAs are significant disproportionality.

25       She often works with our districts who struggle the most

PROCEEDINGS

1    in significant disproportionality because she is so deeply --

2    has such a deep experience in that space.  So that's one of the

3    reasons you might see -- you know, other staff members might

4    have a more even caseload, like half and half.  She will

5    typically take our toughest ones.

6         MS. SHUM:  I appreciate that because we did ask

7    questions about how you take advantage of specific substantive

8    expertise.  So that was super helpful.

9         I think I'm still trying to appreciate the fact that

10   you -- that CDE works with the LEAs to prioritize and identify

11   what to prioritize in terms of their various challenges,

12   compliance issues, root causes, et cetera.

13        What type of guidance, what type of sort of generic or

14   consistent uniform guidance does CDE provide to the LEAs in

15   terms of which types of performance indicators should be

16   prioritized over others?

17        MS. DUNCAN-BECERRIL:  So we definitely --

18        MS. SHUM:  Sorry, I'm talking -- because we have been

19   talking so much about significant disproportionality, I'm

20   wondering does that always trump sort of the -- and we are very

21   concerned about that, so I'm not saying it shouldn't be -- I'm

22   just trying to understand CDE's process.  Does that always sort

23   of take precedence over other types of performance or

24   compliance requirements?

25        MS. DUNCAN-BECERRIL:  Well, I think we consider

**PROCEEDINGS**

1  significant disproportionality one of our highest level areas;

2  right.  So if it's districts in significant disproportionality,

3  also because of the requirements to set aside so much funds to

4  work specifically on that, that sort of raises it up.

5      We do -- the LRE -- sort of the -- the key FAPE and the

6  LRE indicators that we identified in Phase 2 I think would be

7  some of the ones that we believe are also very impactful, so,

8  you know, achievement scores, LRE participation, and then

9  suspension/expulsion, and to some extent chronic absenteeism.

10     And so really sort of looking at those being -- because we

11 have a belief that we communicate to everyone that if you have

12 the right -- the students in the right placements with the

13 right supports, access to general education and the general

14 education teachers, they are going to do better on their

15 assessment scores, they are going to have fewer suspension

16 events, behavior events; they are going to want to be in school

17 because they like school better.  You won't see as much as

18 chronic absenteeism.  And by default, you know, the graduation

19 rates will go up.  You know, the dropout rates will go down.

20 Post-school outcomes will go up.

21     So all of these things are sort of inner connected.  I

22 think we kind of see it like -- as equity is a huge focus, so

23 if we don't have that, then that's really hard to get all the

24 other stuff off the ground and then the FAPE and LRE pieces,

25 and LRE being one of the biggest ones.

1          **MS. SHUM:**  Thank you so much.  I don't have anything

2    further.

3          **THE COURT:**  Sorry.  Go ahead, Mark.

4          **MR. MLAWER:**  I have a couple of questions.  I noted

5    that this district was first identified as significant

6    disproportionate in 2020.  Its risk ratio is actually higher

7    now than when it was first identified.

8          In that light, the declaration from Ms. Thorntona stated

9    that this district missed three training events between March

10   and June, and you also expressed concerns about a lack of data

11   to evaluate its activities.  Have the data issues been resolved

12   at this point?

13         **MS. THORNTONA:**  We are in the process of resolving

14   them.  Because of the timeframe that this report went in or

15   this declaration went in, it was at the tail end of summer and

16   a lot of districts are out over the summer.

17         So really working with the district in determining what

18   those data points should be so that in future progress reports

19   those are addressed.  And as they are creating their plan to --

20   for additional activities, that's something that is definitely

21   looked at in that beginning process.

22         **MR. MLAWER:**  With respect to the missed training

23   events in this district just noting the lack of progress thus

24   far on lowering the risk ratio, have there been any

25   consequences for this intensive level 3 LEA as a result of

1    missing those training events?

2         MS. THORNTONA:  Well, this district is a continuing

3    district.  So the information that's at the beginning of the --

4    every -- after every annual determination letter, there is

5    these beginning kind of introductory type trainings that are

6    done.  This is a continuing LEA, so they are familiar with that

7    beginning piece.

8         I do meet with -- I did meet with the LEA and everything

9    that was discussed in those -- that they have met -- that they

10   did not participate in, they did get that information from me.

11        And then there's a webinar that we offer all LEAs and that

12   is not a required webinar.  It's something, you know, to

13   provide additional information for them so that they could

14   hopefully consider it moving forward but not a requirement.

15        MS. DUNCAN-BECERRIL:  So I think -- just to kind of

16   clarify that piece, I think it is a really good example of

17   the -- the accountability that the Plaintiffs' attorney was

18   discussing.

19        You know, so obviously we have no woodshed, but we would

20   say -- so one of the things that Kishaun did when we realized

21   that they were not attending those trainings is that she got on

22   the call with them and said:  Okay, we are going to go over

23   those trainings so that you have that information and you can

24   make that available.

25        And then I think she also talked about the site visit

1  planning as part of a way to engage them again, so --

2       THE COURT:  I mean, this -- this is -- it's good I

3  think that the -- that the districts are not aware that, you

4  know, they are the subject of this judicial scrutiny and it

5  allows me to ask questions like this of Ms. Thorntona:  What do

6  you think the problem is with them?

7       I mean, do you think -- is it -- are these people -- is it

8  that the district is dramatically under resourced?  Is it that

9  they have got bad people, you know, people with competence

10 issues, people with laziness issues?  I mean, what do you think

11 it is?

12      MS. THORNTONA:  Well, they have been very responsive

13 to me.  So when I have reached out to them to -- whether by

14 e-mail or to actually hold a meeting, they have been very

15 responsive and those have -- you know, they have responded to

16 my e-mails or we have quickly scheduled meetings to meet.

17      So I don't think -- you know, unresponsiveness is not an

18 issue.  I think one of the things that we see is that when they

19 are identified, it is later in the year.  They have a lot of

20 stuff going on.  You know, springtime, a lot of assessments

21 happen.  So, you know, special education staff is really slim.

22      Then you have spring break and then you have summer.  So

23 as, you know, a lot of these districts, are contracted where

24 they end at the last day of the school year.

25      So, you know there's constraints.  And when we could do

**PROCEEDINGS**

1   certain things with the districts, but I think the

2   responsiveness is there with them.  And, you know, coming back

3   into the school year, we met; got back -- you know, got back on

4   track.  There's a lot of turnover that happens, a lot of

5   turnover.  That really affects districts in moving forward in

6   their plans or just with any work really because sometimes they

7   have to start from scratch.

8       That's what makes a lot of professional development

9   challenging because they will, you know, do the professional

10  development.  And then by the end of the school year, they have

11  to do it all over again because they have new staff.  Not an

12  excuse but it's reality.

13          **THE COURT:**  Has -- in terms of accountability,

14  consequences for, you know, not being sufficiently

15  responsive -- and I don't know whether that's the case with

16  this district or not, but I'm just asking more generally -- I

17  mean, superintendents are elected; right?

18          **MS. DUNCAN-BECERRIL:**  Some.

19          **THE COURT:**  Depends on the district?

20          **MS. DUNCAN-BECERRIL:**  Yeah, it depends on the

21  district.

22          **THE COURT:**  So for those who are not elected, how do

23  they get -- how do they become superintendent?

24          **MS. DUNCAN-BECERRIL:**  The school board will hire them.

25  My local school district recently just hired a superintendent.

1          **THE COURT:**  Okay.

2          **MS. DUNCAN-BECERRIL:**  Or even the district might go

3    through a process of hiring if they are smaller; but, yeah,

4    they are not always elected.  The county office superintendents

5    are often elected but the district level superintendents, it

6    really depends on the district themselves.

7          **THE COURT:**  Okay.

8          **MS. DUNCAN-BECERRIL:**  And we --

9          **THE COURT:**  Have you-all thought about -- I mean,

10   whether a superintendent is elected or appointed by, you know,

11   the school board, I mean, a -- a report, you know, from the

12   State of California trashing them for the job that they have

13   done in -- you know, their failure to turn things around on a

14   particular -- on, you know, a particular significant

15   disproportionality or whatever it is, I would think would be a

16   pretty good -- that's your woodshed, right, or that's a version

17   of a woodshed.

18         **MS. DUNCAN-BECERRIL:**  We have done that.  I mean,

19   Jack, do you want to talk about some of the times that we have

20   done that before?

21         **MR. BRIMHALL:**  Yeah.  We have sent that exact letter

22   saying that you are not responsive.  We have sent it to the

23   superintendent.  We have even included some of the school board

24   members.

25        We have set up meetings where the superintendent is there

1   along with the Special Ed director and laid out very clearly

2   this deadline was missed, this deadline was missed.

3       So those two things that -- the latter part that you have

4   mentioned, we have done.  We have even sent letters saying that

5   we will potentially withhold funds; but, again, that's --

6   that's not going to be that effective, but it will wake people

7   up.

8       Like, if we are having a hard time getting ahold of the

9   superintendent, which can happen, those types of letters

10  will -- the superintendent will then reach out to us; and

11  that's how we can schedule those meetings.

12      So, the -- part of the issue is -- and is that, building a

13  good relationship.  That's really the key.

14          THE COURT:  Understand, yeah.

15          MR. BRIMHALL:  And our staff have done a really --

16  have worked really hard to build that relationship.  And

17  once -- and at first when we first start meeting with them, the

18  LEAs do not want to be part of any kind of meeting with the

19  State.

20      But as they get to know those consultants -- and Kishaun

21  is a good example.  She is passionate about equity and she is

22  passionate about helping districts with significant

23  disproportionality -- they will see that.  They see she's not

24  there to just hammer them.  She is there to truly help.  And so

25  the --

1          THE COURT:  Can I -- I get all that.

2          MR. BRIMHALL:  The best way to --

3          THE COURT:  I mean, I think one can assume that in the

4    vast, vast majority of circumstances, you know, districts will

5    be responsive and they will be happy to receive the help and,

6    you know, they will be cooperative and all that.

7          But in the rare instances for whatever reason they are

8    not -- maybe there's just too -- too few resources or there are

9    serious competent issues or whatever -- you know, the question

10   is how do you -- you know --

11         MS. DUNCAN-BECERRIL:  So I can give you an example.

12         THE COURT:  You know -- oh, sorry, I was just going to

13   say, I always think of these civil grand jury reports that get

14   issued; right.  And you see in the paper, you know, civil grand

15   jury issues a report that, you know, this government entity is

16   corrupt or this, whatever.

17         And it usually, you know, it often results in something.

18   It creates kind of a ruckus and then follow-up media inquiries

19   and stuff like that, and it affects elections sometimes.  And

20   so it seems like sometimes that's -- you know, you do have to

21   take people to the woodshed and --

22         MS. DUNCAN-BECERRIL:  So we have --

23         THE COURT:  Go ahead.

24         MS. DUNCAN-BECERRIL:  There are instances where the

25   district is kind of just recalcitrant.  Like, we don't want to

1  do what the State says.  Like, what?

2       You know, and that has happened on occasion or we -- the

3  relationship is just deteriorated to the point where it is

4  really difficult to work with them, and we have required as

5  corrective action in the past them to make a presentation to

6  their State board about why they are still significantly

7  disproportionate, why they are not making progress.

8       And so I do believe that is part going to be part of the

9  work going forward when we see districts just not implementing.

10  You know, the challenge for us is that we didn't really -- we

11  weren't involved in implementation before now.  We just -- they

12  just didn't do, and we didn't know why they didn't do.  They

13  just weren't getting better.

14       They would do a plan and we would come back a year later

15  and go "Why are you still awful?"  And so now we are going to

16  know and we are going to know and be able to identify LEAs that

17  are -- like, is it funding issues?  Is it poor management?  Is

18  it poor communication or is it just that they don't want to do

19  what we tell them to do?  I mean, there are different

20  strategies for each one of those.

21       THE COURT:  Two comments:  Number one, this is sort of

22  a parenthetical comment but, you know, your statement "we were

23  not involved in implementation before," I think one thing

24  that's going to be important for me for this phase of the case

25  is standing -- having a pretty detailed description of what was

1  happening or what was not happening before, how it was working

2  before during the first 500 years of this consent decree, and

3  then how it's -- you know, sort of how it's beginning to work

4  now just to give me some perspective; right.  Because I have

5  only been involved in this for a hundred years of the 500

6  years.  And so reminding me of what it was like in the first

7  four hundred years will be helpful.

8          **MS. DUNCAN-BECERRIL:**  Absolutely.

9          **THE COURT:**  And then second comment is, you know, you

10  are talking about making a presentation to the State board

11  about why we are still significantly disproportional after all

12  these years, you know, angry letter to the school board or to

13  the superintendent or both or whatever.

14      Are those options -- I mean, one of the things that the

15  Plaintiffs have complained about is, you know, the State hasn't

16  explained what the consequences are going to be, you know, what

17  the level of accountability is.

18      I mean, is there a way to kind of flesh that out a little

19  bit somewhere of, you know, under what circumstances what might

20  we take them to the woodshed?

21      I know it's tricky, right, because you don't want to be --

22  you don't want to be -- obviously you don't want that in your

23  initial letter to the school district letting them know that

24  they are significantly disproportionate, right, but is there a

25  way to kind of -- you know, sort of for posteriority, you know,

1    like, memorialize sort of some general guidance about when it's

2    time to take a district to the woodshed.

3          **MS. DUNCAN-BECERRIL:**  I do -- I think -- you know, I

4    think we have used in the past the requirements in -- there is

5    a set of requirements in, like, in statute, in the --

6          **THE COURT:**  I remember you teaching me about that.

7          **MS. DUNCAN-BECERRIL:**  Yeah, 604, so there are things

8    like you can withhold some of the funds.  You can refer them to

9    the office of civil rights.  You can do -- I don't have it

10   right in front of me.  I can go through them -- I think there's

11   others.

12       There's a step between just saying you are bad and

13   withholding their funds that we are trying to find the trigger

14   for, and I think we are there; right.

15       So there's a place where is it an angry letter?  And if

16   they ignore the angry letter, is there a direct meeting with

17   superintendent?  If that's not successful, it's a meeting in

18   front of the school board.

19       And so then is it withholding funds or threatening to

20   withhold funds?  I mean, I think there's steps there.  I think

21   we wanted to be really clear about when that trigger would be

22   when we knew more about why districts weren't getting better.

23       I mean, the first 400 years of this process was really

24   like, oh, you guys are awful; do a plan; okay, thanks for your

25   plan and then we will see you in a year or two years.

1       And we can give you more description than that but that's

2   the very easy description of it.  Bill is nodding his head,

3   like, yeah, that was it.  And so -- with the expectation they

4   would do the plan.  And then we would come back and say:

5   "District, why are you still so awful?  What's going on?"

6       And they would pull the drawer out and they would dust off

7   their old plan and say:  "Oh, yeah, we have this plan."

8       And so now the implementation, I think, gives us an idea,

9   like, it's the resources, which they can present to the school

10  board.  Hey, we don't have enough teachers.  We don't have

11  enough aides.  We don't have these things that are keeping us

12  from implementing this plan.  We don't have the consistent

13  leadership.

14      And so I think we are there.  I know that the Plaintiffs

15  have been asking for it for more than a year and we have been

16  like, yeah, we are figuring it out; but, yes, there is a place

17  for that.

18      That's not -- you know, in statute there is something very

19  clear, but I think there is a space in between.

20      **THE COURT:**  Right.  And it strikes me that it could be

21  helpful to -- you know, to be directing staff.  You know, here

22  is when you might want to start thinking about the nasty-gram

23  to the board or to the superintendent or whatever.

24      You know, I don't know.  I don't have any specific

25  guidance or suggestions or anything, but it does seem like

1   there -- it is worthy of memorialization somewhere.  It is

2   worth sort of including in your discussions or your directives

3   or your manual for staff.

4        Okay.  Anything else for Ms. Thorntona?

5             **MR. MLAWER:**  No, Your Honor.

6                       (No response.)

7        **THE COURT:**  Okay.  Thank you very much.  Do you all --

8   I can't remember how many more there are on the list given to

9   you by the Plaintiffs.

10        **MS. DUNCAN-BECERRIL:**  On the Plaintiffs' list,

11   I believe, there is the one coming in and then two more after

12   that.  So three total.

13        **THE COURT:**  Why don't we do one more and then we will

14   take a short break.  You know, I wonder -- maybe we can have

15   this discussion.  Should that be it for this step in the

16   process, hearing from these two or three additional folks?  Or

17   do you want to try and schedule something later in the week to

18   hear from, you know, from everybody?

19        It's not obvious to me that hearing from everybody will

20   advance the ball all that much, but I do defer to the

21   Plaintiffs on that because if you think it's important to hear

22   from everybody, we will figure out --

23             **MS. SHUM:**  That's a legitimate question.  I apologize.

24   I didn't mean to interrupt you.  We have been trying to consult

25   amongst ourselves as well.

**PROCEEDINGS**

1          With the benefit of Shiyloh sort of earlier framing some

2     of her additional context and information and some of these

3     issues are overlapping, so I don't know that there's an

4     absolute need from Plaintiffs' perspective to hear from every

5     single LEA.

6          I think we have prioritized the ones that we thought would

7     be most useful to get additional information from and from the

8     declarants -- I --

9               MS. DUNCAN-BECERRIL:  If it is helpful, Your Honor,

10    the individual coming in to testify is the individual who

11    oversees LEAs 1, 2 and 3.

12              THE COURT:  One, 2 and 3?

13              MS. DUNCAN-BECERRIL:  Yes.  So it's really at that

14    point just three additional staff that would not be interviewed

15    at this time.  We can definitely prioritize them --

16              THE COURT:  And then who else -- did the Plaintiffs

17    identify anybody else?

18              MS. DUNCAN-BECERRIL:  Yes, they identified --

19              MR. SPENCE:  LEA number 8.

20              MS. DUNCAN-BECERRIL:  And 4.

21              MR. SPENCE:  And 4, yeah.

22              MS. DUNCAN-BECERRIL:  Eight and 4.  So that leaves us,

23    I believe, three staff members who would not come in if we were

24    to end at that point.  We can definitely prioritize them for

25    the next hearing.

1        **THE COURT:**  Well, I mean, my recommendation would be

2    let's leave it at those three staff members for now, for this

3    step.  For the next one, let's all think in advance about

4    whether we should hear from everybody or whether we want to

5    hear from a subset and maybe we can identify the subset in

6    advance that we want to hear from or maybe we will decide we

7    want to hear from everybody.  I don't know.

8        **MS. SHUM:**  Yeah.

9        **THE COURT:**  Let's think about that a little bit in

10   advance, but I think probably -- probably for purposes of this

11   step that we are at right now, these three folks will probably

12   suffice.  Ms. Shum, what do you think about that?

13       **MS. SHUM:**  I think Plaintiffs would agree, Your Honor.

14   I think the only thing I think would be helpful to address

15   before we end today's hearing is some of the additional

16   supplemental documents and materials that would be, perhaps,

17   more useful than hearing from three additional declarants; and

18   we can address this at another point, but I think that there's

19   a way for us to, perhaps, meet and confer with the Monitor and

20   with Defendants and really just come up with a short list of

21   what we think is most relevant, useful, available, et cetera

22   and the timeline within which it makes sense to share that

23   information.

24       **THE COURT:**  Okay.  That sounds fine.  All right.  Who

25   do we have now?

PROCEEDINGS

```
 1            MR. SPENCE:  Introduce yourself to the Court, please.
 2            MS. McMILLAN:  My name is Tamara McMillan,
 3   T-A-M-A-R-A, M-C-M-I-L-L-A-N.
 4            MR. SPENCE:  You are employed with the California
 5   Department of Education in what role?
 6            MS. McMILLAN:  I am an education program consultant
 7   and focused in monitoring technical assisting unit 2.
 8            MR. SPENCE:  How long have you been working in that
 9   role?
10            MS. McMILLAN:  Since 1999.
11            THE COURT:  And you have -- oh, I'm sorry.  I was just
12   going to ask:  So you have LEA 1, 2 and 3?
13            MS. McMILLAN:  Correct.
14            THE COURT:  Looks like they are far away from each
15   other.  You have one in Northern California and two in
16   Southern.  Are your -- are you concentrated in a particular
17   area?
18            MS. McMILLAN:  My main focus is in the Los Angeles
19   County.
20            THE COURT:  Okay.
21            MS. McMILLAN:  The majority of my LEAs are in Los
22   Angeles County.
23            THE COURT:  So how did you end up with ██████████?
24            MS. McMILLAN:  I was assigned ████████ by my
25   administrator.
```

PROCEEDINGS

1          THE COURT:  Okay.

2          MR. SPENCE:  LEA number 3.

3          MS. McMILLAN:  Sorry, LEA number 3.

4          THE COURT:  It's okay.  It is under seal.  I

5     apologize.  I have made the mistake too.  It is under seal and

6     we will redact it from the transcript.

7          MS. McMILLAN:  Thank you.  I'm sorry.

8          THE COURT:  Sorry, I lured you into that mistake.

9                         (Laughter)

10         THE COURT:  Ms. Shum, do you want to proceed with

11    Ms. McMillan.

12         MS. SHUM:  Ms. McMillan, I just have a couple of

13    clarifying questions to follow up on your declaration.  I am --

14    most of my questions for the moment are going to really kind of

15    focus specifically on LEA 3 even though you have 1, 2 and 3.

16         It is my understanding that based on the submission, there

17    was -- there were some missing supporting documentations

18    related to both the policies and procedures review and then

19    also, perhaps, the records review.  I'm wondering what CDE's

20    response was to the missing documentation.

21         MS. McMILLAN:  Sure.  So when they -- when they first

22    submitted their documentation, I noticed that they were missing

23    one policy and procedure, which is pretty common for LEAs to

24    have.

25         So I did call the Special Education director and asked her

**PROCEEDINGS**

1  to just double check that they were actually missing that, and

2  they were able to find the documentations in their policies and

3  procedures.  And so that one was cleared.

4      There were a couple issues with their student record

5  reviews in which they were still out of compliance after

6  talking with the Special Ed director.  And so they were marked

7  out of compliance in those areas.

8          MS. SHUM:  And what was CDE's response when that

9  noncompliance was not found with that initial (video freeze

10 interruption).

11         MS. McMILLAN:  So, just to clarify, Ms. Shum -- I just

12 want to make sure I'm hearing you correctly -- you are asking

13 what happened after they were found non-compliant.  Is that

14 what you are asking?

15         MS. SHUM:  Yes.

16         MS. McMILLAN:  Okay.  So those findings just went out

17 to the LEAs, and so they have 45 days to correct those areas of

18 noncompliance and show me that they have been corrected.

19         MS. SHUM:  And so what types of support or monitoring

20 does CDE engage in in between sort of issuing the noncompliance

21 and then waiting for the next submission?  Any?

22         MS. McMILLAN:  So, many of my LEAs have reached out

23 regarding their areas of noncompliance asking what

24 documentation are we looking for, what do they need to do,

25 those types of things.

1          And so I have been offering technical assistance in those

2     areas.  LEA 3 is one of those.  When we talked about it before,

3     the -- so she kind of had an idea but she just wanted to

4     clarify exactly what documentation was needed.  And so that

5     conversation has been had, and now the LEA is working on

6     holding those IEP meetings to amend those IEPs to meet the

7     corrective actions.

8          **MS. SHUM:**  Thank you.

9          I'm wondering sort of to what extent the next step might

10    contemplate a conversation with the LEA about how the student

11    records review might actually be indicative of more widespread

12    issues or really just focused on individual deficiencies for

13    the individual students.

14         **MS. McMILLAN:**  So I think --

15         **MR. SPENCE:**  Do you understand the question?

16         **MS. McMILLAN:**  The systemic question, so most of the

17    areas that LEA 3 was marked out on are systemic areas.  And so

18    what they have done is they found that -- you know, after

19    talking with them in June, they noticed that these were

20    systemic issue.  So they have had trainings to work with their

21    teachers that are coming back to address those so that those

22    are covered.  Does that answer your question, Ms. Shum?

23         **MS. SHUM:**  I think so.  Thank you so much.

24         Um, just really briefly turning for a moment to LEA 2, I

25    am wondering what happens if the randomly selected student

1  record not actually relates to an LEA's flagged area of

2  noncompliance.

3        **MS. DUNCAN-BECERRIL:**  I'm sorry.  I had a hard time

4  hearing the question.

5        **MS. SHUM:**  So sorry.  Let me just repeat it.

6     I'm wondering if you could address what happens from the

7  CDE perspective, what do you do if the randomly selected

8  student records don't actually relate to the LEA area of

9  noncompliance.

10        **MS. DUNCAN-BECERRIL:**  Oh, so you are talking about the

11  differentiation -- like, oh, so --

12        **MS. SHUM:**  It goes back to your other response about

13  the technical problem.

14        **MS. DUNCAN-BECERRIL:**  The technical issue, yeah.  I

15  think at this point our intent is to sort of identify the

16  systemic sort of foundational issues with the LEA.

17     It is an issue that we recognize and that we couldn't

18  differentiate, especially for level 2 LEAs -- level 1 and

19  level 2 LEAs where we believe that that with the data piece, we

20  will look at the data that's specific to that area will

21  illuminate those areas of need for them to develop in their

22  plan.

23     They do work closely with their SELPA.  So level 1 and

24  level 2 LEAs work most closely with their SELPAs.  And so Tammy

25  can speak a little more about these individual LEAs.  I cannot

**PROCEEDINGS**

1    speak to that, but the SELPA also provides support in those

2    specific areas as well.

3        So I think as they are developing the plan and the SELPA

4    reviews the plans and provides them feedback, that also helps

5    us to provide them clarification on those specific areas of

6    improvement.

7        I don't know if there's anything you wanted to add to

8    those LEAs specifically.

9            MS. McMILLAN:  No.  I think that that definitely

10   addressed Ms. Shum's question.

11           MS. SHUM:  Thank you.  I was also wondering sort of

12   what some of the allocation of responsibilities was for the

13   SELPAs.  So that's actually really helpful additional

14   information.  So they are focusing on, like, the tier 1 and

15   tier 2.

16           MS. McMILLAN:  Uh-huh.

17           MS. SHUM:  Thank you.  I don't have any further

18   questions, Your Honor.

19           THE COURT:  Mark, anything from you?

20           MR. MLAWER:  Yes.  For LEAs 1, 2 and 3, no documents

21   associated with the data drill downs were included in the

22   submission.  Did these always do data drill downs?

23           MS. McMILLAN:  Yes.  They did do a data drilldown.

24   They work with their SELPA.  So their SELPA is supposed to work

25   with them, and the LEA keeps that documentation with them for

 1   levels 1 and 2.

 2         **MR. MLAWER:**  So those documents were not submitted to

 3   the State?

 4         **MS. McMILLAN:**  No.

 5         **MS. DUNCAN-BECERRIL:**  We can -- we view them whether

 6   or not they uploaded their data, whether or not -- so we know

 7   that these LEAs uploaded their data, and we do the -- we ensure

 8   that they do the compliance review so for this level.

 9         And at the end of the -- because the SELPA will do the

10   plan approval -- and that -- that was sort of identified,

11   I believe, in one of the submissions.  The one I have in front

12   of me is 2707 -- that the SELPA would be doing the approvals,

13   they will provide us the assurances that they follow the

14   requirements that we have given them.

15         We provide them training of what to look for and how to

16   review that in the process.

17         **MR. MLAWER:**  So we have no access to the process of or

18   the results of these three data drill downs; is that right?

19         "We" meaning us here?

20         **MR. BRIMHALL:**  I mean, we can ask for them.

21         **MS. DUNCAN-BECERRIL:**  We can ask for them but that's

22   not part of our normal process.  So we followed what was

23   considered our normal process.  In our normal process we would

24   not have received those for levels 1 and 2, and that's as we

25   had proposed.

PROCEEDINGS

1                    (Pause in proceedings.)

2          **MR. MLAWER:**  I guess I don't have any further

3     questions, Judge.

4          **MS. SHUM:**  Sorry.

5          **THE COURT:**  I mean, the question is -- I mean, one

6     question is whether it's okay not to receive those documents as

7     a general matter and having the SELPA do it, and it sounds like

8     that probably is okay as a general matter.

9          But since we have these 11 districts that we are taking a

10    close look at, I mean, I'm wondering if it would be -- make

11    sense to ask for the documents, you know, to have -- to enable

12    everybody to kind of check to make sure there is not some

13    problem in the way that they are doing it?

14         I mean, I don't know -- you don't want to do it in a way

15    that signals to them they are subject to judicial review

16    obviously.

17         **MS. DUNCAN-BECERRIL:**  Um, yes.  I mean, we definitely

18    can ask them if they have those pieces.  We can request them of

19    the SELPA.  We will try not to tip them off; but, again, in our

20    normal process if we are sort of -- like, we were trying to

21    give, like, a ride-along view of what CDE does, in our normal

22    process we would not.

23         **THE COURT:**  I mean, I don't have particularly strong

24    feelings about it.  It sounds like, you know, the concern is

25    probably mostly how things are going with the, you know,

1    districts that are in intensive monitoring; but, I mean, would

2    it be useful -- let me ask the Plaintiffs:  Would it be useful

3    to get those documents and take a look?

4              MS. SHUM:  I think it would be useful.  Can I also

5    just ask a really quick point of clarification.  You

6    reiterated, Shiyloh, a number of times that that's not the

7    normal procedure for tier 1 and 2.  I think LEA 3 -- I could be

8    wrong -- my understanding was they were tier 3.  Am I wrong?

9              MS. DUNCAN-BECERRIL:  They are targeted level 2,

10   I believe.

11             MS. SHUM:  Is it -- is that also true for level 3?

12             MS. DUNCAN-BECERRIL:  No.  For level 3, we -- they

13   submit to us in our digital system the summary of what they

14   did.  We confirm with that information so we get all of that

15   like -- like, all of our CIM summaries.

16             MS. SHUM:  Okay.  That's very helpful.  Thank you.

17                    (Pause in proceedings.)

18             THE COURT:  Okay.  All right.  Thank you,

19   Ms. McMillan.  Appreciate it.

20             MS. McMILLAN:  Thank you.

21             THE COURT:  You-all want to take a break until 3:15.

22             MS. DUNCAN-BECERRIL:  Sorry, Darrell missed his chair.

23             THE COURT:  I am disappointed because I missed that.

24             MS. DUNCAN-BECERRIL:  It is recording.

25             THE COURT:  Oh, yeah, that's right, another benefit of

**PROCEEDINGS**

1  recording Zoom hearings.   Okay.   So why don't we take a break

2  until 3:15.

3            **MS. DUNCAN-BECERRIL:**   Thank you.

4                      (Recess taken at 3:09 p.m.)

5                 (Proceedings resumed at 3:20 p.m.)

6            **THE COURT:**  All right.   Who is next?

7            **MR. SPENCE:**   So we have Josh Rucker.   Introduce

8  yourself -- well, actually, I already kind of did.   What is

9  your title?

10           **MR. RUCKER:**   I'm an education program consultant in

11 FMTA 1.

12           **MR. SPENCE:**   What does FMTA mean?

13           **MR. RUCKER:**   Focus monitoring and technical

14 assistance.   And it is annoying acronym but we run with it.

15           **MR. SPENCE:**   How long have you been in that role?

16           **MR. RUCKER:**   A little over four years now.

17           **MR. SPENCE:**   And you submitted a declaration with

18 regards to the 3B submission for the State Defendants?

19           **MR. RUCKER:**   Yes, regarding LEA number 8.

20           **THE COURT:**  All right.   Go ahead, Ms. Shum.

21           **MS. SHUM:**  My apologies.   Could you just give us your

22 name, please.

23           **MR. RUCKER:**   Yeah, Josh, J-O-S-H; last name is Rucker,

24 R-U-C-K-E-R.

25           **MS. SHUM:**  Thank you.   Mr. Rucker, I just have a

**PROCEEDINGS**

1  couple of clarifying questions to follow up on your

2  declaration.

3      I am wondering if you could describe the support that you

4  provided to LEA 8 around the missing documentation, more

5  specifically the policies and procedures and student records

6  that they had not submitted in a timely fashion?

7          **MR. RUCKER:**  I believe you must be getting them mixed

8  up with a different LEA.

9          **MS. SHUM:**  Okay.

10         **MR. RUCKER:**  Mine were all timely submissions.

11         **MS. SHUM:**  Yours were all timely submissions?

12         **MR. RUCKER:**  Yes.

13         **MS. SHUM:**  I apologize.

14         **MR. RUCKER:**  Not a problem.  Long day.

15         **MS. SHUM:**  Yes.  Could you talk a little bit -- was

16  this LEA also identified as having school-age concerns?

17         **MR. RUCKER:**  There were certain issues that were on

18  the table, least restrictive environment being a piece that

19  carried into preschool a little bit and some of the academic

20  outcomes as well, yeah.

21         **MS. SHUM:**  Okay.  So, to what extent does the

22  improvement plan for this particular LEA focus on preschool

23  concerns and as opposed to school-age concerns?

24         **MR. RUCKER:**  They are primarily qualified under the

25  preschool indicator.  That is the one that we've placed the

1   most focus on.

2       The uniqueness of this particular LEA is that during our

3   data dive we were able to identify that through looking at some

4   of the data within their preschools, that the issue actually

5   was housed for their kindergarten students which we classified

6   under preschool age.  However, the issues for discipline were

7   taking place in their school age setting in the kindergarten

8   classroom.

9       So it kind of allowed us to be flexible in this plan which

10  is one of the nice unique pieces to what we are doing with

11  these.  We are able to take the data and really work toward

12  what the LEA needs to do to improve their numbers.

13      **MS. SHUM:**  Okay.  I don't think I have any additional

14  specific questions related to LEA 8, Your Honor, based on some

15  of the other testimony that was already taken.

16      **THE COURT:**  So I think I might -- can you just give me

17  a second.  I want to flip through the State's submission.

18              (Pause in proceedings.)

19      **THE COURT:**  So this is LEA number 8.  What exhibit --

20  hold on.  Let me just -- I'm flipping through the submission

21  here.

22              (Pause in proceedings.)

23      **THE COURT:**  Where is LEA number 8 discussed in the

24  submission, in the State's submission?

25      **MS. DUNCAN-BECERRIL:**  Let me find it.

```
 1                    (Pause in proceedings.)

 2           MS. DUNCAN-BECERRIL:  They are targeted -- they are

 3   intensive level 2 new, so --

 4           MR. SPENCE:  So it would be page 22 of the submission,

 5   top of the page.

 6           MS. DUNCAN-BECERRIL:  Intensive level 2, preschool

 7   performance.

 8           THE COURT:  Okay.  Okay.  I don't have any other

 9   questions.  Mark, do you have anything?

10           MR. MLAWER:  Yes, Judge.  This district -- (video

11   freeze interruption).

12           THE COURT:  Mark -- it's hard to hear you, Mark.

13           MR. MLAWER:  This district was selected intensive

14   preschool and also missed five school-aged indicators.

15       For the student record review, if I'm reading this

16   document correctly, it appears that no preschool students were

17   reviewed for the student record; is that correct?

18           MR. RUCKER:  That is correct and was referenced

19   previously with regards to us being able -- unable to

20   differentiate within our system.

21           MR. MLAWER:  Right, but this particular district was

22   selected for preschool.

23           MR. RUCKER:  This is correct.  We did have some

24   preschool file review that took place within our educational

25   benefit review where we span over three years from preschool
```

1    into school aged.

2          And, again, when we found out through our data dive that a

3    lot of our issues were taking place actually within the

4    kindergarten level, we were able to focus and hone in on some

5    of the students in the kindergarten level with our student

6    record review.

7          **MR. MLAWER:**  I see.  Okay.  So do you know in the ed

8    benefit review how many preschoolers were reviewed there?

9          **MR. RUCKER:**  I would be able to look that up for you,

10   but specifically off the top of my head, I could not give you

11   that number.

12         **MR. MLAWER:**  Okay.

13         **MR. RUCKER:**  I can tell you, though, with a matter of

14   fact if a student record was reviewed in preschool, it

15   continues through a three-year process.  So none of those

16   students' current IEP would have been in a preschool setting.

17   It would have been prior to, so it is a three-year trajectory.

18         **MR. MLAWER:**  Got it.  Thank you.  I noticed in the

19   documents that a SELPA policy concerning limitations on

20   preschool services appear to be relevant at least to the LEA;

21   that those services in that particular SELPA are limited to

22   three hours a day, four days a week, which struck the LEA -- if

23   I understood it correctly -- as potentially problematic.

24         So my question is:  Has the State taken any steps to

25   ensure that students in that SELPA who are in preschool and --

1    in order to receive FAPE and need additional hours per day or

2    additional days per week, that that programming option would

3    reflect that; in other words, that those kids would be offered

4    hours of service that would provide them FAPE?

5          MR. RUCKER:  Yes.  As part of the data dive and some

6    of the discussions we've had in Step 1, that comment did

7    surface and is in discussion with regards to moving forward

8    into Step 2 and further as a possible issued remedy to include

9    more time in those county programs.  So, yes, definitely a part

10   of the discussion.

11         MR. MLAWER:  So we may see more about that at Step 2

12   and 3; is that correct?

13         MR. RUCKER:  I would imagine so, yes.

14         MR. MLAWER:  Okay.  I don't have any other questions,

15   Judge.

16         MS. SHUM:  Sorry.  Just a quick follow-up.  I

17   apologize.  Just kind of taking a step back, Mr. Rucker, I'm

18   wondering if you can describe is there any difference between

19   the support the technical assistance that CDE provides to

20   preschool LEAs when compared to other elementary or high school

21   LEAs?

22         MR. RUCKER:  I would say that our technical assistance

23   in any capacity is really geared towards the needs of the LEA.

24   If the LEA has a need in the area of preschool, we are going to

25   reach out to preschool resources and contractor to provide them

**PROCEEDINGS**

1    that sort of resource.  If it is a high school issue, we would

2    find the proper technical assistance in that area.  So, yeah,

3    we do vary.  It is not one-size-fits-all.

4           **MS. DUNCAN-BECERRIL:**  We also have a technical

5    assistance center that we have contracted with, The California

6    Early Childhood Special Education Technical Assistance Center

7    that is basically our technical assistance center hub for early

8    childhood issues within California.

9           **MS. SHUM:**  Thank you so much.  On your particular

10   caseload, do you have other LEAs that actually represent

11   preschool LEAs?

12          **MR. RUCKER:**  Currently at this time, no, none that are

13   addressing that specific indicator.

14          **MS. SHUM:**  Are you able to describe just very briefly

15   sort of the composition of your current caseload, how many LEAs

16   you are supporting and at what level they are eligible for

17   continuous -- sorry -- the compliance monitoring?

18          **MR. RUCKER:**  So I'm working with about 19 LEAs at this

19   time, ten of which are significant disproportionality.  The

20   remainder being in the CIM process.  All of mine are intensive

21   and part of the intensive unit.  So all of mine are intensive

22   level LEAs.

23          **MS. SHUM:**  I don't think I have any other questions.

24   Thank you so much.

25          **THE COURT:**  Great.  Thank you, Mr. Rucker.

PROCEEDINGS

1          **MR. RUCKER:**  Thank you.

2          **THE COURT:**  We have one more person; is that right?

3          **MS. DUNCAN-BECERRIL:**  Yeah.  So, we have -- just to

4    confirm, we have three staff members who do intensive and

5    targeted.  LEA 4 is our staff member over small LEAs.

6      So if there's other questions about intensive or targeted

7    from our staff members, we can bring them in if we needed to

8    towards the end.

9          **THE COURT:**  Take it away.

10          **MR. SPENCE:**  Okay.  Can you please introduce yourself

11   to the Court and Counsel.

12          **MS. LAGASCA:**  Hi, I'm Carissa Lagasca.  That's

13   C-A-R-I-S-S-A; Lagasca, L-A-G-A-S-C-A.

14          **MR. SPENCE:**  What is your title in terms of your

15   employment with the California Department of Education?

16          **MS. LAGASCA:**  I'm an education programs program

17   assistant for the focus monitoring and technical assistance

18   smalls unit.  I have been with the smalls unit for just over a

19   year now.

20          **MR. SPENCE:**  Okay.  We will open it up for questions.

21          **THE COURT:**  Go ahead, Ms. Shum.

22          **MS. SHUM:**  Thank you.  Ms. Lagasca, you mentioned that

23   you have been supporting the smalls group for a little bit over

24   a year.  Have you ever supported any of the other LEAs prior to

25   your assignment for this particular unit?

1          MS. LAGASCA:  No.  This is my first position here with

2     CDE.

3          MS. SHUM:  Understood.  So, I'm trying to understand

4     the extent to which the monitoring and compliance experience

5     from the perspective of a small LEA is similar or different

6     than the experience of other LEAs at the intensive or targeted

7     levels.  Do you have the ability to comment on them?

8          MS. LAGASCA:  I can comment on what the process has

9     been like so far with the LEA 4 that I have been working with.

10         At this -- we call it cycle A, so at this stage of

11    cycle A, we have been doing a lot of data collection.  So it

12    has been a self review with three activities that LEAs have

13    completed.

14         As consultants, we have guided them through those

15    activities and received their submissions.  So for this first

16    part of the cycle, it has just been a lot of data gathering.

17    So that's, you know, we are different than the other monitoring

18    units in that we are still in that cycle of our process.

19         MS. SHUM:  And what kind of -- what kind of support

20    have you had to provide to LEA 4 in terms of understanding how

21    to comply with the data gathering expectations at this stage?

22         MS. LAGASCA:  So for LEA 4 specifically I have had

23    Zoom sessions with the superintendent.  We have had, as a unit,

24    offered weekly office hours for any LEA to kind of casually hop

25    on and ask questions that they may have.

 1          Other offers -- or other ways that I have supported LEA 4

 2    has been through recorded webinars with information, training

 3    videos that we have sent, kind of check-in e-mails that I have

 4    had with them.  And, again, I believe I have done two Zoom

 5    sessions with the superintendent of LEA 4.

 6          **MS. SHUM:**  Thank you.

 7      How many other small LEAs are you currently supporting?

 8          **MS. LAGASCA:**  So currently on my caseload I have 122

 9    LEAs.  Now, mid cycle from our data gathering, we have a

10    consultant that had to leave and go to another unit.  So I did

11    take on some of hers.  Typically I would have had just over a

12    hundred LEAs in my caseload.

13          **MS. SHUM:**  Thank you.

14      Do you believe that the other LEAs that you are currently

15    supporting experience similar confusion as LEA 4 has expressed

16    regarding how to comply with this process?

17          **MS. LAGASCA:**  No.  Most LEAs were able to submit their

18    activities on time and with accuracy.  LEA 4 needed just some

19    clarification and technical assistance mentioning that they

20    were stretched thin on-site due to staffing issues and just

21    didn't have the time commitment that they needed to kind of

22    really submit the activities on time.

23          But the majority of LEAs that I have worked with were able

24    to submit accurately and on time; and, in fact, some didn't

25    need any technical assistance at all.  They were able to figure

**PROCEEDINGS**

1    out what to do just from the training that was provided.

2         **MS. SHUM:**  Thank you.

3         How would you -- let me take a step back.  How are the

4    small LEAs held accountable for untimely or non-compliant

5    completion of --

6         **MS. LAGASCA:**  So LEA 4, my contact with the

7    superintendent -- once the deadline for one of the activities

8    had passed, I checked in to see if there was anything -- any

9    way I could assist or kind of what the problem was.

10        Again, they cited just need for more time.  And as a unit,

11   this is our first cycle in working with small LEAs and the

12   first time they have been monitored.

13        So we are able to grant kind of extra time and extensions,

14   definitely not unlimited time.  I did check in with him shortly

15   after that and kind of urge him to go ahead and submit his

16   activity.

17        **MS. SHUM:**  Thank you.  That's very helpful.  Do any of

18   the small LEAs actually have access to some of the contracted

19   technical assistance providers or does CDE -- do CDE staff

20   handle all of the small LEAs and manage that part in-house?

21        **MS. LAGASCA:**  So at this part of my cycle -- this is

22   the data gathering and the self review activities -- we,

23   consultants, manage all of those activities and have provided

24   all of the technical assistance needed.

25        So we have not had needed -- there was no necessity -- I'm

**PROCEEDINGS**

1    sorry -- for the use of TA providers.

2         **MS. DUNCAN-BECERRIL:**  When the small LEAs move into

3    the CIM process, they will have access to all of the technical

4    assistance available.

5         And, in fact, we are looking at options for potentially

6    developing a small technical assistance -- some of that's going

7    to be depending a little bit on funding -- but to create a

8    small technical assistance center for small LEAs to support

9    their individual needs.

10        **MS. SHUM:**  So specific to the smalls.

11        **MS. DUNCAN-BECERRIL:**  Correct.

12        **MS. SHUM:**  Okay, that's super helpful.  I feel like we

13   might have discussed this at a different point in the hearing.

14        I'm wondering if you can help clarify for the record

15   whether a small LEA could actually be selected and referred to

16   the CIM process for disproportionality or significant

17   disproportionality.

18        **MS. DUNCAN-BECERRIL:**  They can and they often are.

19   And so -- that is an annual review process, and so we do have

20   LEAs who were identified for the small cycle, and then we

21   identified them for disproportionality; and we sort of stop

22   their work in that process and move them into the CIM process.

23   And I think -- did you have LEAs on your caseload that that

24   occurred?

25        **MS. LAGASCA:**  To go into -- yes.

1          **MS. DUNCAN-BECERRIL:**  We sort of transition them from

2     one to the other.

3          **MS. SHUM:**  But they would remain on your caseload

4     because they are a small, is that correct, or --

5          **MS. DUNCAN-BECERRIL:**  No.  They don't remain on the

6     caseload.

7          **MS. SHUM:**  Sorry, okay, got it.  I misunderstood.

8     Thank you.  What role, if any, do the SELPAs play in terms of

9     them monitoring in smalls?

10         **MS. LAGASCA:**  We do work closely with our SELPAs and

11    our manager does a lot of meeting with them to kind of fill

12    them in on the details of what the activities will look like

13    and how we best think they can support their LEAs.

14        I think because our LEAs are smaller, they are used to

15    working with their SELPAs a lot more closely and they have --

16    you know, I have seen a lot of help from -- particularly the

17    larger SELPAs are able to help their LEAs.  So we do rely on

18    their support as well.

19         **MS. SHUM:**  Thank you.  I'm wondering if any of the

20    small that are part of your caseload are charter school LEAs.

21         **MS. LAGASCA:**  Oh, many of them.  Perhaps the majority.

22    I mean, I don't know -- I don't have the numbers in front of

23    me, but the majority of the small LEAs that we have are

24    charters.

25         **MS. SHUM:**  Would you -- would you say that there are

1  any differences in supporting a charter LEA as compared to a --

2  just a regular small LEA?

3       MS. LAGASCA:  I haven't noticed any difference between

4  type of school that I have been supporting and the type of

5  support they need.

6       MS. SHUM:  In your role supporting charter smalls, are

7  you engaging at all with charter management organizations or

8  separate charter boards?

9       MS. LAGASCA:  I have not -- in my support of my LEAs,

10  I have not.

11       MS. DUNCAN-BECERRIL:  Districts in CIM may have.  What

12  we often find is that LEAs who have multiple -- charter

13  management organizations that have multiple LEAs are often very

14  involved in the process.

15     For example, a charter LEA or a charter management

16  organization may have one compliance officer for all of their

17  charters within them, and so we would work with them once we

18  sort of get to that point.  We just haven't gotten there yet

19  with this level of work.

20       MS. SHUM:  Understood.  Thank you.  I don't have any

21  further questions.  That was helpful.

22                    (Pause in proceedings.)

23       THE COURT:  Mark, anything?

24       MR. MLAWER:  No questions, Judge.

25       THE COURT:  Okay.  Thank you very much.  I don't have

1    any questions either.  So, appreciate your time.  Thanks.

2        All right.  So what do we need to talk about now?  I do

3    think -- I mean, it sounds like all of us are on the same page

4    on the fact that, you know, I just need to wait until we get --

5    until springtime and kind of issue a ruling on compliance at

6    this phase once we get there.

7        I think it doesn't make sense for me to make any

8    determinations in the wake of this hearing.

9        So what else should we be discussing at this point?

10       **MR. SPENCE:**  So I have a specific question.  I know

11   there was some discussion about materials -- supplemental

12   materials that the parties might need, the Court or the

13   parties.

14       I just want to kind of confirm for sure exactly what

15   people want and when they want it before we move on, please,

16   or, excuse me, before this hearing concludes, please.

17       **MS. SHUM:**  Sure.  I think what I had sort of initially

18   proposed is that we might agree to meet and confer, the parties

19   with the Monitor, and try to narrow the universe and identify

20   in a very concrete and specific way what additional information

21   would be useful at this juncture and when that information

22   might be shared because I think much of it already exists in

23   some form or another.

24       One of the things that I think we specifically discussed

25   during today's court hearing is to sort of -- some general CIM

 1    process information.  Like, the CDE consultant assignments, I

 2    think that Shiyloh mentioned that there is a map.

 3          THE COURT:  Well, can I -- can I make a suggestion

 4    sort of in the interest of time?

 5          MS. SHUM:  Sure.

 6          THE COURT:  Why don't I say that the -- that the

 7    Plaintiffs are responsible for putting together a list of

 8    documents that should be filed on the docket as a supplement to

 9    the State's filing before -- that was made before this hearing.

10    Please consult with the Monitor to make sure that anything that

11    he's interested in is included in your list.

12          And then before you submit the list, meet and confer with

13    Mr. Spence to make sure that it's not unreasonable and that

14    it's manageable.  And so I'm -- but I'm going to require the

15    list to be created and provided to the State by Friday.

16          MS. SHUM:  Okay.

17          THE COURT:  And then I'm going to require the State to

18    file the documents as part of a supplemental filing, the

19    following Friday.  Is that doable?

20          MS. SHUM:  Yes, Your Honor.

21          THE COURT:  Okay.

22                          (Pause in proceedings.)

23          MR. SPENCE:  In terms of whether the State -- I didn't

24    mean to cut you off, Your Honor.

25          THE COURT:  No.  Go ahead.

1          **MR. SPENCE:**  In terms of whether the State can get

2     these materials on file by next Friday, obviously we have an

3     idea of some of the materials but --

4          **THE COURT:**  If for whatever reason, you need to chase

5     them down from a SELPA or whatever, I understand it will take

6     more time.  I'm just going to go ahead and impose that

7     deadline.  And if you need additional time, you can request it.

8          **MR. SPENCE:**  Okay.

9          **THE COURT:**  Okay.  Anything else?

10         **MR. SPENCE:**  I have one more question.  So I know that

11    we laid out the process and we have some other hearings coming

12    up with submissions and responses.

13         And then part of this was because this was our first

14    go-around with this particular format, but maybe after --

15    within a certain amount of time -- and I don't know if we need

16    a formal court order for this -- maybe after a certain amount

17    of time if Mark and the Plaintiffs feel like they need certain

18    documentation, they can just send me an e-mail and we can kind

19    of hash that out on the front end before the hearing.

20         I apologize.  Some of the materials you did -- you guys

21    did flag for us in terms of in your response itself, but I was

22    almost thinking pre-response, like before you actually sit down

23    and draft your response, if you could just let us know some

24    materials you have.

25         So that way in the response if we didn't provide you the

 1  materials you asked for, you can say:  Hey, we asked for these

 2  and we didn't get them or you can actually speak on the

 3  substance of the materials.

 4      So maybe just after -- maybe a week after our submission

 5  for this next mini subphase, if you-all could informally reach

 6  out to me and ask me for what you want -- again, I don't think

 7  we need an order for it -- and we can work it out.

 8      **THE COURT:**  That's fine.  I mean, but one thing is,

 9  you know, in the -- in Mark's submission and in the State's

10  submission, they were raising concerns about certain documents

11  needing to be included.

12      I mean, you should have -- when you saw that, you should

13  have started gathering those documents and submitted them to

14  them or included them in the supplemental filing.

15      And, you know, that way everybody can sort of digest the

16  missing documents in advance.  And, you know, maybe some of

17  their questions will be answered, and it will -- it will

18  require your clients to spend less time on these hearings,

19  but -- so that's number one.

20      But I agree also that it would be helpful, you know, as

21  the Plaintiffs and Mark are discovering that there are not --

22  you know, documents aren't included that they think should be,

23  they should e-mail you.

24      **MR. SPENCE:**  Yeah, and -- yeah, going forward even if

25  I don't get an e-mail, if I see they call out certain lack of

**PROCEEDINGS**

 1   information, I will take the initiative and put it on the

 2   docket.

 3           **THE COURT:**  Great.  Is there anything else we need to

 4   discuss right now?

 5           **MS. DUNCAN-BECERRIL:**  There was a request for a

 6   supplemental filing around two things.  One about the modified

 7   approach to smalls and the other one was around a -- what

 8   happened 400 years ago.

 9                              (Laughter)

10           **MS. DUNCAN-BECERRIL:**  Just wanting to sort of get an

11   idea around that.

12           **THE COURT:**  What was the first one?

13           **MS. DUNCAN-BECERRIL:**  They wanted an -- in writing

14   changes to the smalls monitoring, the modified approach to

15   smalls.

16           **THE COURT:**  Okay.  I think that would probably be -- I

17   think if you make a note to just include that in your next

18   filing, that would probably be fine.

19           **MS. DUNCAN-BECERRIL:**  Okay.

20           **THE COURT:**  And then on the sort of what it was like

21   400 years ago compared to now, I guess same thing.  It could be

22   in your next filing.  It could be in your third filing.  I

23   think actually that might be -- so you are -- so, let's --

24   remind me what our schedule is.  We have -- when is our next

25   hearing?

PROCEEDINGS

1          **MR. MLAWER:**  I think January 12th if I remember right.

2          **MS. DUNCAN-BECERRIL:**  February 2nd is our next

3  hearing.

4          **THE COURT:**  Okay.  And we set up a similar schedule

5  for the State to make its submission and for the Monitor and

6  for the Plaintiffs to respond?

7          **MR. SPENCE:**  Yes.

8          **THE COURT:**  Similar page limits.

9          **MS. DUNCAN-BECERRIL:**  Yes, that is correct.

10         **THE COURT:**  Okay.  I think that's good for -- that's

11  good for the next step for -- you know, for January.  I think

12  that all makes sense.  And then our next meeting after that is

13  when?

14         **MR. SPENCE:**  April 19th.

15         **THE COURT:**  April 19th.  So I think we can discuss

16  this at the next -- at the January hearing.  But April 19th,

17  that will be a hearing where -- I mean, obviously we are going

18  to talk about what's happened between, you know, between

19  January and April, but it's also going to be about whether the

20  State should be held in -- should be found in compliance or not

21  for this stuff, right, for this -- for this set of -- and so

22  for that, you may -- you can just remind me to talk to you

23  about this next time.

24      You may want to have longer -- somewhat longer page

25  limits -- hopefully not too much longer -- and I think that

1  would be the place, Shiyloh, to include -- sort of put all of

2  this in perspective; right.

3      You know, what is -- you know, what is -- you know, what

4  is -- sort of summarizing everything that has happened in this

5  phase and kind of reminding us what it looks like now compared

6  to what it looked like 400 years ago.  I think that would be

7  the place for that.

8      By the way, also sort of remind us, either in your filing

9  for January or your filing for April, sort of the role of the

10 SELPA in all of this.

11     I mean, we talked a little bit about that with respect to

12 the small school districts; but when the SELPAs came up, we

13 sort of jolted up and I was like, oh, yeah, the SELPAs I think

14 are the primary -- you know, they are the -- you know, they are

15 a creation of the IDEA; right?

16     **MS. DUNCAN-BECERRIL:**  No, they are not.  They are a

17 creation of the State of California.

18     **THE COURT:**  Oh, they are a creation of the State.  So

19 remind me of kind of where the SELPAs sort of fit into all of

20 this monitoring.  I think I used to have a better understanding

21 of that than I do now.

22     **MS. DUNCAN-BECERRIL:**  Okay.  And then I think -- I

23 think -- I felt like we came to agreement, but I just want to

24 make sure that I'm clear around is there a desire to have any

25 additional LEA information at -- like, additional LEAs outside

1    of the ones?  I think there was, like, a no but --

2         **THE COURT:**  I think that it would be worth sort of --

3    I mean, look, we are not going to do the kind of -- we are not

4    going to do additional audits, but I think if you can maybe in

5    your next filing or in the -- in the January filing or in the

6    April filing, if you can try to address as best you can the

7    concerns the Plaintiff -- the questions the Plaintiffs have

8    raised about whether this, you know, whether this is a good --

9    whether this captures it pretty well, you know, statewide and

10   if why or why not or are there -- you know, is this concern

11   about the large -- you know, the really large districts the

12   real concern or, you know, whatever.  You know, try your best

13   to address the concerns that Plaintiffs have expressed.

14        **MS. SHUM:**  Since we are talking about scheduling and

15   submissions, I am -- I might be the only person who is not

16   clear on this point.

17        But I think that the hearings and the submissions are

18   addressing CIMs steps 1, 2 and 3.  I'm just trying to get

19   clarity around any kind of information related to Step 4 that

20   is going to be available by April and whether that sort of

21   folds in and is included in that April set of papers or are we

22   anticipating an additional hearing?

23        **MS. DUNCAN-BECERRIL:**  I mean, I think we had -- I had

24   said that the -- that we had intended to have an updated manual

25   that had more description around Step 4.

 1        We are going to continue having information about LEAs in

 2   Step 4 that are part of this -- that are part of the LEA

 3   selected.

 4        But I think our intent, if the Court is amenable, is to

 5   file on the docket an updated manual with that April submission

 6   or that prior to April submission.  So I think it is like a

 7   March deadline or -- February 23rd oh, we will do our best.

 8        **THE COURT:**  I mean, if you need to tweak the deadlines

 9   to make it work with the manual and anything else that's

10   happening, we -- you know, let us know and we will figure it

11   out.  You know, work with the Plaintiffs to -- you know, if you

12   need to tweak the schedule, we will figure it out.

13                    (Pause in proceedings.)

14        **THE COURT:**  Okay.  And then what -- do you-all agree

15   that it would -- it's useful to have available the CDE staffers

16   who are involved in these LEAs?  Do you want to keep doing

17   that?

18        **MS. SHUM:**  I think Plaintiffs found that extremely

19   helpful, and I think understanding that this is an imposition

20   on their time and that we are talking about a large number of

21   LEAs, I think we could do our best just to try to prioritize

22   and identify in advance the declarants that we are actually

23   most interested in meeting.

24        **THE COURT:**  That would be good.  On the other hand, I

25   mean, even for those who did not have an opportunity to speak

**PROCEEDINGS**

1   today, I assume that this is sort of useful for them to -- you

2   know, attending these hearings.

3       What about the TA providers, the ones -- particularly the

4   ones who were involved in helping the districts that are in

5   intensive monitoring?

6       **MS. SHUM:**  Yeah, especially as we are -- I think -- I

7   do believe that a lot of the technical assistance provided by

8   the contracted LEAs is going to be increasingly relevant in the

9   next couple of steps, and I think it would be extremely helpful

10  to have -- to have them available as well.

11      **THE COURT:**  At least -- I mean, I guess what I

12  would -- my gut is at least for the ones that are in intensive

13  monitoring.

14      **MS. DUNCAN-BECERRIL:**  Just to clarify, would you want

15  the ones who are involved in the sample of LEAs?  So those LEAs

16  and their technical assistance providers -- like, the technical

17  assistance provider for those LEAs; correct?

18      **THE COURT:**  That's what I was thinking of.

19      **MS. DUNCAN-BECERRIL:**  Could -- if you wanted -- would

20  you prefer them to make declarations or would you want them to

21  be present or both?  And by present --

22      **THE COURT:**  I always find presence more helpful than

23  declarations.  I do understand that you would probably have to

24  pay them for their time.

25      **MS. DUNCAN-BECERRIL:**  I mean, I'm not so much

1  concerned about that.  They are not all located in Sacramento.

2  So we would have to sort of figure out if we are going to be

3  virtual for that or if we are going to be in San Francisco

4  depending on the -- sort of that.  I mean, virtual, I think, is

5  more cost effective for us.  Then they would need -- they could

6  come in virtually.  That would probably be the easiest way for

7  us to have access to them.

8          THE COURT:  Yeah, it's always -- for me it's hard.  I

9  mean, I have such a strong preference for in person for

10  hearings generally, you know, and I just feel like it's -- you

11  know, it's that much easier to engage and whatnot.

12      But I understand.  I mean, you know, we are now talking

13  about, like, you know, eight CDE staffers in addition to the

14  interim director and the interim or acting director or whatever

15  and acting assistant director and then we have -- now we are

16  talking about the TA providers and we have got a Monitor in

17  Washington.

18      So I guess my -- I guess I think that, you know, it's

19  probably better to just keep doing this by Zoom as long as

20  nobody has an objection to that.

21                  (No response.)

22          MS. DUNCAN-BECERRIL:  If that's the case, I think it

23  would be fine to have the TA providers potentially present,

24  again, for the April session, because at that point their

25  engagement with the LEAs is pretty much done.

PROCEEDINGS

1        **THE COURT:**  So you think it would be better to have

2   them for the April session?

3        **MS. DUNCAN-BECERRIL:**  Yeah.  They don't know that

4   those LEAs are selected either, so --

5        **THE COURT:**  Okay.  That sounds good.  All right.

6   Let's plan on that.  Okay.  Thanks very much.  Have a good day.

7        **MR. SPENCE:**  Thank you, Your Honor.

8        **MS. DUNCAN-BECERRIL:**  Thank you.

9              (Proceedings adjourned at 3:59 p.m.)

10                     ---oOo---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   October 26, 2023

8

9

10

11    _____

12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
            United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25