**United States District Court**
**Office of the Court Monitor**
*Emma C., et al., v. Tony Thurmond, et al.* **(No. C96-4179 VC)**

**mmlawer@rcn.com**

**Mark A. Mlawer**
**Court Monitor**

# California Department of Education Special Education Monitoring System, Phase 3B CIM Step 2: Court Monitor Response to State Submission

January 12, 2024

# I.  Introduction

This response concerns the CIM Step 2 documents related to the sample of eleven LEAs selected for CDE's targeted, intensive, or small LEA monitoring processes.

The documents reviewed show many of the LEAs in the sample taking the CIM process seriously.  The quality of CDE oversight of the process in the sample LEAs is mixed:  the submitted documents show meaningful CDE oversight of one targeted LEA (LEA 7) and one intensive LEA (LEA 11, although two important issues were ultimately not addressed).  It is also clear that CDE reviewed LEA submissions carefully for two additional intensive LEAs, LEAs 8 and 9; however, in the former it ignored what is arguably the most important issue (see next paragraph), and in the latter its oversight of the relationship between the LEA and its original TA provider was questionable.  For LEA 6, CDE's oversight of the LEA's progress reports was problematic.  Moreover, as LEA 6's plan does not include baseline data or a measurable outcome, it is difficult to understand how progress can be judged.

Two LEAs, one intensive (LEA 8) and one targeted (LEA 5), display what is emerging as a significant limitation of CDE's monitoring system—its inability as currently structured to reach other entities such as county offices of education or other LEAs when necessary to resolve identified data-based issues.  Because Phase 3B concerns a small sample of LEAs, the extent to which this is a systemic problem in CDE's monitoring system is not clear.

As noted at Step 1, the trend of intensive significantly disproportionate LEAs overlooking missed targets in the CIM process continues (LEAs 9 and 10).  In addition,

CDE approved an abbreviated plan for LEA 10 substantially similar to the LEA's prior plans, plans that have not resolved its significant disproportionality after years of CDE intervention.

For the three targeted level 1 and 2 LEAs (LEAs 1, 2, and 3), little additional can be said at this time due to the lack of data-drill-down and root cause analysis documents.[1]  Moreover, as CDE itself does not apparently receive and review these documents routinely, it is not clear that it can ensure the quality of the monitoring process for targeted levels 1 and 2 LEAs.

## II.  Intensive LEAs

LEA 11 (Intensive Level 1 for school-age performance[2]):  The Monitor's Step 1 response noted that the student record review appeared to only include school-age students, there was no evidence that performance and placement data were drilled down by race/ethnicity, two of the weaknesses uncovered by the infrastructure analysis could be related to the LEA's known data-based issues, the parent survey response rate was low, there was no indication of the collection of qualitative data,[3] and the absenteeism issue noted in the EBR was not carried forward to the consolidation portion of Step 1.[4]  LEA 11's final approved Step 1 documents, included with CDE's Step 2 submission, show that CDE raised some of these issues for the LEA to consider at

---

[1] These documents are expected to be filed with CDE's Step 3 submission.
[2] In addition to the selection formula, LEA 11 did not meet the school-age LRE separate schools, preschool LRE regular class, preschool LRE home, higher education, and competitive employment targets.
[3] The CDE consultant testified in October that some parent and student interviews were conducted after Step 1.
[4] Dkt. No. 2732 at 2-4.

Step 2 (absenteeism, parent input, and patterns discovered through the drill down).[5]

The LEA's first Step 2 submission was rejected by CDE due to the failure to include parents in the root causes; CDE also commented on the appearance that LEA 11 "has a lack of collaboration with parents."[6]  LEA 11's second submission was also rejected, due to lack of detail and examples related to the parent interviews.[7]  LEA 11's approved Step 2 submission reveals that it only interviewed one parent.

LEA 11 is focusing its CIM on LRE.  Two of the three root causes it puts forward are on point for LRE (limited collaboration between special and general education and tier 1 instructional differentiation); the third is difficult to understand, but appears to concern clarity in the IEP process.  The theory of action is sensible, although the LRE expected outcome is arguably unrealistically ambitious.  If implemented through meaningful action steps, LEA 11's approach could improve student performance as well as LRE.  However, student behavior (the LEA was rated as very low on suspension) and absenteeism are not addressed in the LEA's Step 2 documents.[8]

LEA 6 (Intensive Level 1 for school-age performance[9]):  The Monitor's Step 1 response pointed out that there was no evidence that data were actually drilled down, the CDE infrastructure tool applied, or EBRs conducted.  This lack of information made it difficult to evaluate CIM steps 2 and 3, although the root causes and action steps appeared reasonable based on the information that was included.  LEA 6 did not

---

[5] Dkt. No. 2763-1 at 178-179.
[6] Dkt. No. 2763-1 at 197.
[7] Dkt. No. 2763-1 at 207-208.
[8] Dkt. No. 2763-1 at 210-213.  See 210 for interviewing only one parent and 222 for suspension.
[9] In addition to the indicators in the formula, LEA 6 did not meet the targets for higher education and competitive employment.  The LEA is in year 2 of the CIM process.

respond to half of the prompts on the form in its April-June 2023 progress report.[10]

The resubmitted April-June report still does not address whether the collected data would provoke any changes to its activities and why. LEA 6's July-September progress report also does not respond to that part of the prompt.[11] Adjusting activities when necessary based on data is an important aspect of an improvement process. Moreover, CDE's progress report form does not ask for the data that the LEA believes would "determine the effectiveness" of its activities even for a report covering the end of a school year of CIM plan implementation.

The LEA's CIM plan indicates that its problem of practice is that students' time in special education was increasing. Oddly, its first root cause uses the same language, although it appears that the cause the LEA actually has in mind is the use of a six-period school day. The other root causes were lack of understanding and training on tier 1 supports and lack of co-teaching and push-in services.[12]

The first two root causes have associated activities in the CIM plan; the third is instead folded into the strategy and activities under the first two. The activities appear reasonable, although that is difficult to judge in the absence of 1) baseline data, which the CDE form does not ask for and the LEA did not provide; and 2) the expected measurable outcomes of its activities, which the form does request but LEA 6 left

---

[10] Dkt. No. 2732 at 4-6. CDE's current submission states that the CDE consultant "noticed" the missing responses and the LEA resubmitted the progress report. But the 10/5 email from the consultant to the LEA states that "My admin is wanting some information" on the missing parts of the report and requests that those parts be added; CDE apparently received the original report in July but did not take this action until October (Dkt. Nos. 2763 at 17, 2763-1 at 275).
[11] Dkt. Nos. 2763-1 at 252, 2753 at 30.
[12] Dkt. No. 2763-1 at 255-256.

blank.[13]  There is no indication that CDE rejected this plan or queried its lack of a measurable outcome.

The lack of a baseline, measurable outcomes, and progress data make it difficult to understand how CDE can judge whether LEA 6 is making sufficient progress.

LEA 9 (Intensive Level 1 for significant disproportionality[14]):  With respect to the missed LRE targets, the Monitor's Step 1 response noted that there was no evidence that LRE was a factor in any of LEA 9's Step 1 activities; in fact, at the consolidation step the LEA identified placing students in the LRE as a strength despite its missed targets.

As to significant disproportionality, at Step 1 the policies and procedures review, student case study, parent input, and infrastructure analysis uncovered potentially relevant issues.  The drill down was particularly on point for the LEA's overidentification issue, and the key findings section included a success gap statement pointing to Hispanic students' reading comprehension issues that cause referrals to special education.[15]

In late August the CDE consultant was informed by LEA 9's TA provider that he or she was no longer working with LEA 9.  CDE's submission states that the LEA believed it needed more support than it received from the original TA provider; what the LEA felt it needed was a more "hands-on approach" to the support.[16]  This turn of events apparently surprised CDE, and it is unclear whether CDE agrees with the concerns expressed by the LEA about its original TA provider.  A 9/13 email

---

[13] Dkt. No. 2763-1 at 257-258.
[14] LEA 9 also did not meet any of the three school-age LRE targets.
[15] Dkt. No. 2732 at 6-8.
[16] Dkt. Nos. 2763-1 at 291, 2763 at 18, 2763-2 at 25, 30.

apparently from the new TA provider contains what could be read as a critique of the results of LEA 9's work with its prior provider. [17]

According to CDE's submission, as of 11/29 LEA 9 had made two Step 2 submissions and neither was accepted by CDE.  Thus, an approved Step 2 submission is not included in CDE's submission.[18]  The second rejected submission is included.

It is clear from the feedback from the CDE consultant's supervisor that CDE engaged in a close reading of LEA 9's second submission and had ample basis for its rejection, including:  disconnect between the data and root causes, English-language development (ELD) is included in the theory of action but not included in the root cause analysis discussion, the focus of the root cause shifted from academic to behavioral support without explanation, lack of connection between behavioral data and the overidentified population, and ambiguity about the target population of the CIM activities.[19]  The LRE issues are not mentioned.

The root causes advanced by the LEA's rejected Step 2 submission are student behavior leading to the assumption of a disability, cultural dissonance and bias affecting communication and relationships with families and students, and lack of authentic communication and partnership with non-English-speaking families.[20]  It is difficult to distinguish between the second and third root causes, and whether the problem the LEA is trying to impact is academic (reading comprehension issues that

---

[17] Dkt. No. 2763-2 at 29-30.
[18] Dkt. No. 2763 at 19.  LEA 9 received CDE's feedback on the second rejected submission on 11/6 and 11/7.  On 11/17 the TA provider indicated an imminent submission of the revised Step 2, but it was apparently not submitted by 11/29 (Dkt. Nos. 2763-1 at 293, 2732-2 at 47, 49).
[19] Dkt. No. 2763-2 at 47.
[20] Dkt. No. 2763-2 at 13-15.

cause referrals, the Step 1 success gap statement) or behavioral is not obvious.  The theory of action, however, posits that both will change positively and referrals will decline, if 1) Multi-Tiered Systems of Support (MTSS) is implemented with fidelity, 2) ELD curriculum and the discipline matrix are used effectively, and 3) staff are coached on these practices and on family engagement.[21]

This ambitious theory does not mention LRE, which is perhaps unsurprising in an LEA that regarded that area as a strength despite its missed targets.  One can imagine, however, LRE improvements taking place regardless if the discipline matrix and ELD curriculum are implemented effectively.  But because LRE has been dodged in Steps 1 and 2, we do not know the characteristics of the students not placed in the LRE and the reasons for those placements.

With respect to CDE's oversight of this intensive LEA, it does not appear that it was overseeing the relationship between the LEA and its prior TA provider closely.  On the other hand, CDE's review of the rejected submission shows attention to detail as well as to the big picture of the precise issue this LEA is attempting to impact.

LEA 8 (Intensive Level 2 for preschool performance[22]):  The Monitor's Step 1 response noted that no preschool children were reviewed in the student record review (confirmed by CDE at the hearing), but the EBR did include preschoolers; the infrastructure analysis produced ideas relevant to the LEA's known issues; the drill down attended to preschool data, although there was no evidence that the data were

---

[21] Dkt. No. 2763-2 at 17.
[22] In addition to the selection formula, LEA 8 did not meet the targets for school-age ELA performance, math performance, suspension, LRE regular class less than 40%, and LRE separate schools.

drilled down by race/ethnicity or disability; the drill down revealed that some preschool issues result from decisions made at the regional level; the drill down did not devote enough attention to the LEA's significant school-age concerns; and the Step 1 areas of weakness are reasonable based on the results of its activities.[23]

CDE rejected LEA 8's first Step 2 submission largely due to a failure to 1) support the root causes, problem areas (preschool discipline and LRE), and theory of action with data; 2) list and prioritize the problem areas; and 3) provide enough detail.[24]  It is clear that CDE reviewed the LEA's first submission carefully, but it ignored what appears to be the most important issue.

LEA 8's accepted Step 2 submission corrects the issues raised by CDE.  However, its prioritization of preschool discipline over LRE is problematic:  not only did the LEA miss all three preschool LRE targets, it was not close to meeting any of them.[25]  LEA 8 is frank in its submission about why it did not select LRE:  the "sphere of influence of the CIM team"; "the current structure"; a "majority" of preschoolers with disabilities receive services in a county program, and the LEA "does not have control over this programming with regard to which placement options are available to students"; while inclusive options have increased, "the available placements were limited"; "...the district does not operate a preschool program, nor have preschool classrooms" on its campuses; and the LEA's current initiatives do not include preschoolers because LEA 8

---

[23] Dkt. No. 2732 at 8-9.
[24] Dkt. No. 2763-2 at 84, 87-88.  CDE also notes in its rejection that the two problem areas were "not clearly highlighted" at Step 1.  Both of those issues were mentioned as areas of weakness at the consolidation step.  See Dkt. No. 2729-1 at 76.
[25] Dkt. No. 2729-1 at 28.

"does not run the preschool program."[26]

Hence, it is apparently the LEA's view that any CIM plan it adopted would not affect its preschool LRE data.[27] But those data are a major reason LEA 8 was selected for intensive preschool monitoring. In its review of both the rejected and accepted submissions, CDE apparently found this issue, and LEA 8's discussion of it, unworthy of comment.[28]

Instead, preschool discipline was chosen by the LEA, focusing on four- and five-year-old children in TK and K served in the LEA's elementary schools. Discipline was chosen because there was a "slight increase" in the suspensions of these children from the prior year; it appears that there were four students who accumulated 14 days of suspension between them, and 5.4% of these children received at least one day of suspension versus 1% of the overall TK/K population. "[S]ome" of these children were suspended prior to being identified with disabilities, and those students were counted as having disabilities because the suspensions took place in the same school year.[29]

Two of the three root causes focus on variation in teachers' skills and knowledge related to behaviors, and the third concerns the transition process from county, Head Start, and state preschools to the LEA. Qualitative data was collected from LEA staff via interviews as part of this process.[30] The theory of action hypothesizes that

---

[26] Dkt. No. 2763-2 at 91, 93.
[27] Of course, the LEA's CIM plan could target educating preschool children with disabilities in the LEA rather than the county program, a possibility not considered by the LEA's CIM team or suggested by CDE.
[28] The issue is also not mentioned in the emails related to this LEA (Dkt. No. 2763-2 at 98-265).
[29] Dkt. No. 2763-2 at 91, 164.
[30] Dkt. No. 2763-2 at 91-92.

impacting the MTSS process, collaboration between special educators, general educators and administrators, and the transition process will decrease suspensions of these students.[31]  It is difficult to grasp the connection between the transition process and TK/K suspensions; the LEA did not explain it, and CDE did not question it.

LEA 10 (Intensive Level 3 for significant disproportionality, continuing[32]):  The Monitor's Step 1 response noted that LEA 10 has been in intensive monitoring for significant disproportionality since 2020 (presumably after three years of being labeled disproportionate) but had a higher risk ratio in 2023 than in 2020.  LEA 10 missed three training events in the spring of 2023.  The CDE consultant expressed concerns about a lack of evaluative data and later testified that those concerns had not yet been resolved, but that LEA 10 has been responsive to her.  A site visit for October was scheduled in June.  In general, the Step 1 documents did not leave an impression of intensive LEA implementation or CDE oversight of this intensive level 3 LEA, and lacked evidence that the LEA's missed LRE targets were part of its CIM process.[33]

CDE's submission states that the site visit scheduled for October was rescheduled to "January or February" due to illness.  This rescheduling is not mentioned in the consultant's declaration or in the email correspondence.[34]  There are no emails after 9/20 included in CDE's submission.

The measurable outcome of LEA 10's prior CCEIS plan was to reduce SST referrals of English learners (ELs) for special education assessment by 10% by

_____

[31] Dkt. No. 2763-2 at 94-95.
[32] In addition, LEA 10 did not meet two preschool LRE targets.
[33] Dkt. No. 2732 at 9-10.
[34] Dkt. Nos. 2763 at 22, 2763-3 at 3-4, 131-134.

September 2023.  The LEA's final report on that plan, covering July-September 2023, states that this outcome was not achieved: instead, SST referrals for assessment increased in the 2022-23 school year; the report does not address the extent to which this increase involved ELs.  The number of ELs needing special education remained the same.[35]

The measurable outcome of LEA's current abbreviated plan, approved by CDE in November, calls for a decrease in referrals of ELs for assessment by 15% by September 2025 (despite the CDE consultant's concerns that "[r]educing referrals can be in conflict with Child Find").  The plan's activities are adding six meetings of its EL committee to support teachers' implementation of ELD standards, funding a teacher on special assignment, and training and follow-up coaching.[36]  These activities are quite similar to those in the LEA's 2021 and 2022 plans.  But LEA 10 stated in its July-September 2023 report that "[d]ue to funding" it was not able to provide coaching.[37] There is no indication in these documents that CDE raised this fiscal aspect of the coaching issue before approving the current plan.

In light of the similarity of the strategies in the plans, the results thus far, and the discouraging 2022 survey results (although improved from 2020), it is difficult to be optimistic about LEA 10's chances of exiting significant disproportionality.[38]  In addition, the preschool LRE issues remain unaddressed in these documents.

---

[35] Dkt. No. 2763-3 at 26.
[36] Dkt. No. 2763-3 at 124-126, 129, 133.
[37] Dkt. No. 2763-3 at 27.
[38] See Dkt. No. 2763-3 at 68-74 for the survey results.

### III.  Targeted and Small LEAs

LEA 2 (Targeted Level 1 for performance—preschool LRE separate schools):  The Monitor's Step 1 response noted that none of the policy and procedure areas reviewed by this LEA concerned preschool or LRE, some of the records reviewed were of school-age students, the record review instrument did not measure compliance with the IDEA standard for removal from general education, it was unclear if any preschool children in separate schools were reviewed, and data-drill-down documents were not submitted.[39]

CDE's Step 2 submission does not include any documents associated with LEA 2's root cause analysis.[40]  For that reason little more can be said about this LEA at this time.  It is assumed that CDE will submit these documents and the LEA's data-drill-down documents with its Step 3 submission in February.

LEA 1 (Targeted Level 2 for performance—child find, preschool LRE regular class, competitive employment):  The Monitor's Step 1 response pointed out that LEA 1 did not review policies and procedures related to LRE, it was unclear whether any preschool children were reviewed, the record review instrument did not measure compliance with the standard for removal from general education, there was no evidence of the "robust" child find monitoring called for by USDOE, and data-drill-down documents were not submitted.[41]

CDE's Step 2 submission does not include any documents concerning LEA 1's root cause analysis.  Thus, nothing more can be said about this LEA's CIM process at

---

[39] Dkt. No. 2732 at 10-11.
[40] The submission includes an email from the LEA inquiring about corrective actions concerning violations unrelated to preschool LRE (Dkt. No. 2763-1 at 8).
[41] Dkt. No. 2732 at 11-12.  See fn. 39 at 12 for USDOE and child find.

this time.  It is assumed that CDE will submit these documents and the LEA's data-drill-down documents with its Step 3 submission in February.

LEA 3 (Targeted Level 2 for disproportionality[42]):  The Monitor's Step 1 response noted that LEA 3's policies and procedures review focused only on disproportionality and not on its four missed LRE targets, the same was true of its record reviews, and data-drill-down documents were not included in the submission.[43]

CDE's Step 2 submission does not include any documents about LEA 3's root cause analysis.  At this time, therefore, nothing more can be said about this LEA's Step 2 process.  It is assumed that CDE will submit these documents and the LEA's data-drill-down documents in its Step 3 submission.

LEA 7 (Targeted Level 3 for school-age performance based on selection formula[44]):  Issues noted in the Monitor's Step 1 response included a policies and procedures review not clearly targeted at this LEA's performance; no evidence of the gathering of qualitative information, including through parent interviews to augment the poor survey response; and a lack of evidence indicating that placement and performance data were drilled down to ascertain differences between the placement and performance of students with different disabilities, races, ethnicities, grades, etc.[45]

 With respect to the latter issue, the documents in CDE's current submission show the use of some drill-down data (by disability and grade) in the LEA's Step 2

---

[42] In addition, LEA 3 did not meet four LRE targets (school-age separate school, and preschool regular class, separate schools, and home).
[43] Dkt. No. 2732 at 12-13.
[44] In addition, LEA 7 did not meet targets for preschool LRE regular class and separate school.
[45] Dkt. No. 2732 at 13-14.

submission, albeit with a significant amount of CDE oversight and after disapproval of prior submissions.[46]  Empathy interviews are referenced in the LEA's submission, showing the collection of some qualitative information, although it is not clear who was interviewed.  LRE was chosen as the priority problem area; the two root causes are reasonable, although it is not possible to determine at this remove whether those two are indeed the root causes of LEA 7's LRE issues.[47]

The second-priority problem area from the LEA's prior submissions, the MTSS process, was omitted in the LEA's final submission at CDE's encouragement.  This could make improvement in performance and behavior less likely, although that cannot be concluded based on the information in CDE's submission.[48]

LEA 5 (Targeted Level 3 for disproportionality):  The Monitor's Step 1 response noted this small LEA's impressive CIM documents and improvement plan from the prior year, its improved risk ratio, its concern that identification of students often takes place at elementary schools that are not part of this LEA, and its progress report showing evidence of the collection and use of relevant data.[49]

The LEA's first Step 2 submission was not accepted by CDE because the root causes lacked quantitative data.[50]  The approved submission sets forth four root causes for the overidentification issue.  The first three concern the LEA itself (SLD assessments not considering second-language acquisition, lack of a system for targeted

---

[46] Dkt. No. 2763-1 at 72; for CDE oversight see 58, 64, 86-87, 102, 114, 118, 122-123.
[47] Dkt. No. 2763-1 at 71-72.
[48] Dkt. No. 2763-1 at 55, 60, 94, 102, 108.  Note LEA 7's discussion of performance data and its conclusion that SWD do not currently have "adequate access to research-based instructional strategies" at 122-123.
[49] Dkt. No. 2732 at 15.
[50] Dkt. No. 2763-1 at 146, 159.

interventions, and inconsistent English-language development teachers).  But the fourth root cause gets to the source of the problem:  according to the LEA, *all* current SLD students were identified by its feeder K-8 schools, schools over which LEA 5 lacks any oversight, not by LEA 5.[51]

LEA 5 hopes that it can exit some students from special education.  If it does, the steps it will take in response to the second and third root causes may assist in supporting these students in general education.  But grappling with and resolving the source of the issue, the feeder LEAs, is not within the authority of LEA 5.[52]

LEA 4 (Small):  The Monitor's Step 1 response noted that the LEA's EBR was submitted three months late due to staffing issues, three findings of noncompliant were changed by CDE to compliant based on the LEA's assertion that the violations had been corrected by the third-year IEPs, and further noted CDE's statement that the self-review findings would be verified in early fall.[53]

CDE's Step 2 narrative, its consultant's declaration, and the supporting documents do not mention verification of the LEA's Step 1 results.  Whether findings of noncompliance have been corrected is also not addressed, although that is likely due to the December due dates for corrective actions.[54]

---

[51] Dkt. No. 2763-1 at 150-151.  See also the discussion at 149 under root cause #1.
[52] The LEA's Step 2 submission briefly mentions "replacing the archaic SLD testing mechanism" across all the LEAs, a process apparently being driven by the county office of education (Dkt. No. 2763-1 at 149). But it is not clear that the feeder LEAs fail to consider second-language acquisition in SLD assessments and, if that is the case, whether that is a root cause of the overidentification.
[53] Dkt. No. 2732 at 16.  See Dkt. No. 2729 at 30 for verification in the fall.
[54] Dkt. No. 2763-3 at 142, 144.