William S. Koski, Esq., SBN 166061
Abigail Trillin, Esq., SBN 179052
STANFORD LAW SCHOOL
YOUTH & EDUCATION LAW PROJECT
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone: (650) 724-3718
Fax: (650) 723-4426
Email: bkoski@stanford.edu
        atrillin@law.stanford.edu

Freya Pitts, Esq., SBN 295878
NATIONAL CENTER FOR YOUTH LAW
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Fax: (510) 835-8099
Email: fpitts@youthlaw.org

*Attorneys for Plaintiffs Emma C., et al.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| EMMA C., et al.,<br><br>                    *Plaintiffs*,<br><br><br>          v.<br><br>TONY THURMOND, et al.,<br><br>                    *Defendants*. | Case No.: 3:96-cv-4179 (VC)<br><br>**PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' PHASE 4 COMPLIANCE REPORT**<br><br>**Date:**  October 25, 2024<br>**Time:**  10:00 a.m.<br>**Courtroom:** 4<br>**Before:** Hon. Vince Chhabria |

**TABLE OF CONTENTS**

                                                                              **Page**

TABLE OF AUTHORITIES ........................................................................................ ii

I.      INTRODUCTION ...........................................................................................1

II.     QUESTIONS AND CONCERNS REGARDING THE STATE'S PLAN FOR
        INCLUSION OF IEP IMPLEMENTATION DATA IN THE CIM PROCESS....................4

        A.      IEP Implementation Data Collection ..............................................4

        B.      IEP Implementation Data Validation and Transparency .................7

        C.      IEP Implementation Data Use in CIM Selection and Processes....................9

III.    QUESTIONS AND CONCERNS REGARDING THE STATE'S PLAN FOR
        INCLUSION OF RESTRAINT AND SECLUSION DATA IN THE CIM PROCESS
        ........................................................................................................10

        A.      Restraint and Seclusion Data Analysis .........................................10

        B.      The Use of Restraint and Seclusion Data in the CIM Selection and Processes............12

IV.     QUESTIONS AND CONCERNS REGARDING THE STATE'S PLAN FOR
        SELECTION OF SMALL LEAs FOR THE CIM-S PROCESS AND THE
        ACTIVITIES THAT SMALL LEAs MUST COMPLETE FOR THAT PROCESS............13

V.      CONCLUSION ..............................................................................................14

CERTIFICATE OF SERVICE / ECF ATTESTATION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Endrew F. v. Douglas Cty. School Dist.*,
    137 S. Ct. 988 (2017)................................................................................................3

*Honig v. Doe*,
    484 U.S. 6305 (1988)...............................................................................................3

**Statutes**

Individuals With Disabilities Education Act (IDEA), Pub.L. 101-476, 104 Stat.
    1142, codified at 20 U.S.C. § 1400 *et seq*...............................................1, 3, 4, 6, 14

    20 U.S.C. § 1412(a)(5) ............................................................................................6

Cal. Educ. Code § 46392 ..............................................................................................5

Cal. Educ. Code § 56349(a)(9) .....................................................................................5

**Regulations**

34 C.F.R. § 300.42.........................................................................................................6

34 C.F.R. § 300.114(a)(2) .............................................................................................6

**Other Authorities**

Black's Law Dictionary (12th ed. 2024).......................................................................9

Merriam Webster Dictionary (11th ed. 2019)...............................................................9

U.S. Department of Education, Policy Documents, *Part B Implementation of IDEA*
    *Provision of Services in the Current COVID-19 Environment Q&A Document*
    (Sept. 28, 2020), https://sites.ed.gov/idea/idea-files/part-b-implementation-idea-
    provision-services-current-covid-19-environment-qa-document-sept-28-2020......5

# I.

## INTRODUCTION

Pursuant to the Court's Order re State's Obligations Under Consent Decree, Dkt. No. 2387, as amended by the Joint Statement Regarding Phase 4, Dkt. No. 2841, and the Court's Order re State's Compliance at Phase 3B, Dkt. No. 2847, Plaintiffs submit this Response to State Defendants' Phase 4 Compliance Report, Dkt. No. 2851. In this Phase 4 of the State's demonstration of compliance with its obligations under the Consent Decree and the Individuals with Disabilities Education Act ("IDEA"), the focus is on three remaining subjects: "(1) the State's plan for the inclusion of IEP [individualized education program] implementation data in selection for, and the process of, CIM [Compliance and Improvement Monitoring]; (2) the State's plan for the inclusion of restraint and seclusion data in selection for, and the process of, CIM; and (3) information regarding small LEAs' [local education agencies] selection for monitoring and the updated rubrics for small LEAs." Dkt. No. 2847 at 12.

Generally speaking, the State's Report provides a clear explanation of how it intends to use IEP implementation and restraint and seclusion data in selecting LEAs for the CIM process and the activities those selected LEAs must undertake during that process. The Report also provides a comprehensive explanation of how small LEAs will be selected for further monitoring activities, the activities those small LEAs must undertake during the CIM process, and those activities that are modified for small LEAs.

That said, the State's report and accompanying materials raise a number of questions and substantive concerns that should be addressed before this Phase 4 inquiry can be completed. As with Plaintiffs' past responses to the State's submissions, Plaintiffs identify below each of those

questions and concerns in the hope that the State will provide additional information and explanation to address them. Four specific concerns are worth highlighting at the outset:

(1) Plaintiffs request that the State provide guidance to LEAs to ensure that—for IEP implementation data collection and reporting purposes—LEAs are not incentivized to place students in more restrictive (particularly "pull-out") settings.

(2) Plaintiffs request that the State develop an IEP implementation data validation method that is effective in ensuring accurate data reporting. The State's proposed method, which is primarily reliant on a "follow-up survey" that it administers to a sample of LEAs, will not ensure accurate data reporting.

(3) Plaintiffs request that the State develop a method for "flagging" LEAs for further restraint and seclusion monitoring that will capture (a) those LEAs that have a high rate of restraint and seclusion incidents relative to the overall number of students with disabilities and (b) those LEAs that have a high number of students with disabilities who have been restrained or secluded relative to the overall number of students with disabilities. The State's proposed method appears to capture only those LEAs that have restrained or secluded the same students more than two times on average.

(4) Plaintiffs request that the State explain how it arrived at its thresholds for inclusion of small LEAs in Targeted Monitoring (5-7 "flags") and Intensive Monitoring (8-11 "flags") and whether the State has calculated how many small LEAs would be included in each of these CIM processes under this methodology.

Although the scope of Phase 4 is much narrower than past phases, the items at issue could not be more important. First, this Court has emphasized the "centrality of the IEP to ensuring that districts provide children an appropriate education," Dkt. No. 2428 at 16, and

concluded "that the state's failure to collect statewide data on IEP implementation prevents it from effectively monitoring school districts, putting the state out of compliance with its obligations under federal law (and therefore out of compliance with this consent decree)," *id.* at 15. Although the Court has since approved of the State's data collection methodology for IEP implementation, Dkt. No. 2644 at 2, this Phase 4 inquiry must ensure that the State's IEP implementation data are valid and reliable and that the data are appropriately used in the CIM selection and monitoring processes. As the Court has recognized, "[t]he IEP is the 'centerpiece' of the IDEA," Dkt No. 2428 at 14 (citing and quoting *Endrew F. v. Douglas Cty. School Dist.*, 137 S. Ct. 988, 994 (2017) (quoting *Honig v. Doe,* 484 U.S. 6305, 311 (1988)), and the State must be able to demonstrate that it has an effective system in place to identify and resolve systemic IEP implementation issues.

Second, as noted by the Court, "[t]he state's policymakers do not dispute the importance of collecting data on restraint and seclusion," Dkt. No. 2428 at 27, and "there is significant evidence that schools misuse restraint and seclusion to control the behavior of children with disabilities, often leading to grave consequences," *id.* at 26. While the Court did not find the State out of compliance at Phase 1 for failure to collect restraint and seclusion data (in part because the State legislature had recently passed a bill requiring such data collection), *id.* at 28, as is the case with the IEP implementation data, the State must show that its restraint and seclusion data are valid and reliable and that they are appropriately used in the CIM selection and monitoring processes.

Finally, in Phase 2 of these proceedings, the Court found that "[b]ecause . . . small districts are not being assessed on many metrics, they are functionally exempt from many targeted and intensive monitoring activities," Dkt. No. 2520 at 11, and concluded that the "state's

3

failure to include [small districts] is a failure to comply with its monitoring obligations under the IDEA," *id.* at 12. Since the Phase 2 proceedings, the State has developed and refined its approach to small LEA monitoring, but the State had yet to demonstrate that it is appropriately selecting small LEAs for (targeted and intensive) CIM monitoring activities and that those activities are appropriately modified to ensure small LEA compliance and improved performance.

Given the importance of these Phase 4 issues, the State should not be released from its consent decree obligations unless and until it has appropriately and comprehensively addressed all three issues.

## II.
## QUESTIONS AND CONCERNS REGARDING THE STATE'S PLAN FOR INCLUSION OF IEP IMPLEMENTATION DATA IN THE CIM PROCESS

In this Section, Plaintiffs specify each of their questions and concerns regarding the State's collection of IEP implementation data; the validation of IEP implementation data; and the use of IEP implementation data in the selection for and implementation of the CIM process.

### A.   IEP Implementation Data Collection

Plaintiffs recognize that the Court has already approved the State's general plan for collecting IEP implementation data. Dkt. No. 2644. Nevertheless, the State's Phase 4 Compliance Report and accompanying materials detail, for the first time, its specific data collection protocols and guidance it provides to LEAs. The Report and materials raise the following questions and concerns about IEP implementation data collection for CIM selection and implementation and the Plaintiffs request that those questions be addressed by the CDE:

1. *How are student absences addressed when calculating service minutes?*

The State has developed a "Frequently Asked Questions" (FAQ) document to assist LEAs in IEP implementation data collection. Exh. 4, Dkt. No. 2851-4. The State has anticipated

4

LEA concerns regarding student absences in the calculation of service minutes and notes that while "IEP implementation percentages should be based upon actual service minutes," *id.* at 2, the "[f]requency and longevity of absences and their effect on IEP implementation percentage may be evaluated on an individual basis if randomly selected for auditing by FMTA consultants during monitoring assistance," *id*. For extended student absences, "[i]f there are shortcomings in the rate of implementation this will be sorted out through technical assistance by FMTA consultants in the monitoring process." *Id.* Thus, it appears that the State, on a case-by-case basis, will provide relief in the monitoring process for those LEAs that had problematic IEP implementation rates due to student absences. Plaintiffs appreciate the potential need to provide such relief, but request that the State more thoroughly describe when and how that relief will be provided.

2. *Must LEAs provide services during extended school closures due to "emergency conditions," such as natural disasters and public health emergencies, and how are service minutes addressed during such closures*?

The U.S. Department of Education has issued guidance recognizing that LEAs are not relieved of their responsibility to provide a free appropriate public education (FAPE) during a public health crisis. Part B Implementation of IDEA Provision of Services in the Current COVID-19 Environment Q&A Document (Sept. 28, 2020), https://sites.ed.gov/idea/idea-files/part-b-implementation-idea-provision-services-current-covid-19-environment-qa-document-sept-28-2020/. Similarly, the California Education Code ensures that students with disabilities continue to receive services during school closures in the event of "emergency conditions" (such as a flood, fire, or epidemic). Cal. Educ. Code §§ 46392, 56349(a)(9). Given that LEAs are not relieved of their FAPE and service-delivery obligations

during emergency conditions, Plaintiffs request that the State describe how service minutes are calculated during such events.

3.   *How are compensatory education hours counted in the service minutes calculation*?

Some students may receive "compensatory" education services during the time window for calculating service minutes. The State has provided guidance on whether and how compensatory hours should be calculated: "The sum total of service minutes provided should fall within the prescribed evaluation period for the IEP Implementation data collection. . . . If an LEA is providing compensatory time, the hours to be made up would need to fall within the evaluation period." Exh. 4, Dkt. No. 2851-4 at 2-3. Plaintiffs seek clarification of how this guidance will be operationalized and request that the State provide a further explanation of how compensatory education services are handled in calculating service minutes within an evaluation period.

4.   *What IEP services and interventions are counted in the service minutes calculation*?

The "Frequently Asked Questions" document addresses how to calculate service minutes for related services and states that "[c]alculations for services should only be services directly prescribed in the IEP." *Id.* at 9. Plaintiffs request that the State clarify what IEP-prescribed services count, including whether paraprofessional (1:1 aide) and "collaborative consultation" minutes are included in the calculation, and what types of services would be excluded, if any.

5.   *What has the State done (or can the State do) to ensure that IEP implementation data collection protocols do not incentivize more restrictive placements and services*?

Pursuant to the IDEA's "least restrictive environment" (LRE) principle, students with disabilities are entitled to be educated with their non-disabled peers "to the maximum extent appropriate." 20 U.S.C. § 1412(a)(5); *see also* 34 C.F.R. § 300.114(a)(2); 34 C.F.R. § 300.42.

Many LEAs and families choose to implement the LRE principle by including students with disabilities in general education classrooms with supplementary aids and services, including "push in" specialized academic instruction, team teaching, and other group instruction models. Plaintiffs recognize that calculating service minutes may be more challenging in those integrated, group-based instruction settings and are concerned that LEAs will be incentivized to provide special education services and instruction in a segregated pull-out model rather than an integrated push-in model to ensure more accurate service minute calculations.

Such an unintended consequence of counting service-minute delivery would be unfortunate. Accordingly, Plaintiffs request that the State explain what guidance it has provided or can provide to ensure both that service minutes are accurately counted and that students with disabilities are served in the least restrictive setting. Clear guidance to LEAs will be critical to ensuring that IEP implementation data collection does not have the significant perverse consequence of incentivizing more restrictive placements.

**B.  IEP Implementation Data Validation and Transparency**

1.  *The State should report IEP implementation data to the public.*

The State asserts that "CDE's intention with this [IEP implementation] data collection is to identify those LEAs whose data suggests a systemic issue in service delivery. It does not intend to 'punish' an LEA for reporting to the state that a part of the LEA's sample did not receive 100 percent of all service minutes for the two-month time frame, but rather identify systemic root causes and provide resources to address issues so that all students with disabilities are receiving their services." Dkt. No. 2851 at 11. The "IEP Implementation Data: Frequently Asked Questions Document" states:

> Q:   Will this information be reported on the CA school dashboard or any
>       other public sources?

> A:    No, this data collection is a unique reporting activity specific to IEP
>        Implementation effectiveness at the LEA level.

Dkt. No. 2851-4 at 6. Plaintiffs request that the State clarify this response, *i.e.*, will LEA-specific

IEP implementation data be made available to the public, even if school-specific data is not?

Naturally, Plaintiffs do not believe in "punishing" an LEA for reporting data, but public

reporting and transparency are part of the process for ensuring that students are properly served,

much like the public reporting the State requires on its "dashboard" for all LEAs. Given the

importance of IEP implementation to ensuring that students with disabilities are appropriately

served, it seems particularly important that there be some public reporting of that data. To the

extent that CDE is concerned about the accuracy of the data given that it is a new process, CDE

should, at the least, provide a clear timeline for when the data will be made publicly available.

 2.    *The State's IEP implementation data validation process should ensure that reported
        data are accurate.*

The State has stipulated: "To assess the validity and reliability of data submitted in

response to the State's annual statewide data collection regarding an LEA's implementation of

IEP services, for those LEAs who submit such data, the State will randomly select 10% of those

LEAs *and audit the data submitted by those LEAs regarding the LEA's implementation of*

*services*." Dkt. No. 2644 at 3 (emphasis added). In its Report, the State offers a data validation

method that selects a stratified sample of 10 percent of LEAs in each stratum which then respond

to a "four-question follow-up survey to assist in determining the integrity of LEAs' processes

used to determine the IEP implementation rates submitted for the students in the sample." Dkt.

No. 2851 at 4-5. The State does not independently verify the accuracy of the service-minute data

reported. The State's validation survey is not an *audit* of the LEA's reported data and cannot

reliably confirm the accuracy of the data.[1] The State should ensure that reported data are accurate. Plaintiffs request that the State develop a more robust system to audit IEP implementation data that, at a minimum, includes reviewing LEA documents and systems used for tracking IEP implementation for the LEAs being audited.

### C.  IEP Implementation Data Use in CIM Selection and Processes

The State's proposal for the use of IEP implementation data in selecting LEAs for the CIM process and using those data for monitoring is designed "to identify LEAs with systemic issues in service delivery, not just issues related to a few students." Dkt. No. 2851 at 9. Plaintiffs' understanding is that IEP implementation (and restraint and seclusion) data will not be included among the criteria for selection for intensive monitoring. Plaintiffs are unclear whether the IEP implementation (and restraint and seclusion) data will be considered among the performance targets that are used for selection for Targeted Monitoring and Support (Levels 1-3).  Finally, Plaintiffs understand that those LEAs that are otherwise not selected for or in the process of Targeted or Intensive Monitoring, but are nonetheless flagged for IEP implementation (or restraint and seclusion), will be sorted into the Targeted-Compliance Only tier of monitoring. According to the amended CIM Manual, Exh. 1, Dkt. No. 2851-1 at 14, those LEAs in Targeted-Compliance Only will be issued corrective actions. Similarly, the CIM Manual describes

---

[1] The *Merriam-Webster Dictionary* defines "audit" as "a methodical examination and review," Merriam Webster Dictionary at https://www.merriam-webster.com/dictionary/audit, while *Black's Law Dictionary* defines "audit" as "[a] formal examination of an individual's or organization's accounting records, financial situation, or compliance with some other set of standards." AUDIT, Black's Law Dictionary (12th ed. 2024). CDE's proposed IEP implementation data verification method is neither a "methodical examination and review" of the reported data nor is it a "formal examination" of an LEA's "compliance with some other set of standards" for IEP implementation data accuracy.

Targeted-Compliance Only monitoring as requiring only corrective actions. *Id.* at 5.

Confusingly, Exhibit 18 would require those in Targeted-Compliance Only to complete

corrective actions *and* complete the Data Quality Toolkit and Data Drill Down. Dkt. No. 2851-

18. With these understandings, Plaintiffs request that the State address the following questions or

concerns:

1. *Will IEP implementation (and restraint and seclusion) be included among the performance targets used for Targeted Monitoring (Tiers 1-3) and, if not, why not*?

2. *Why has the State chosen not to include IEP implementation (and restraint and seclusion) among the criteria used for selection for Intensive Monitoring (Tiers 1-3)*?

3. *For those LEAs sorted into Targeted-Compliance Only for IEP implementation, how will the State ensure that systemic issues of non-compliance are identified and addressed, either through the corrective action process or otherwise*?

### III.
### QUESTIONS AND CONCERNS REGARDING THE STATE'S PLAN FOR INCLUSION OF RESTRAINT AND SECLUSION DATA IN THE CIM PROCESS

In this Section, Plaintiffs specify each of their questions and concerns regarding the

State's analysis of restraint and seclusion data and the use of those data in the selection for and

implementation of the CIM process.

#### A. Restraint and Seclusion Data Analysis

The State's proposed method to flag LEAs for further monitoring under the CIM process

is to calculate the ratio of the total count of restraint and seclusion incidents (*i.e.*, the sum of all

incidents of seclusion and incidents of physical and mechanical restraint) to the total

unduplicated count of students with disabilities reported as having been restrained or secluded.

Dkt. No. 2851 at 14. LEAs will be flagged for further monitoring if the resulting incident-to-

10

student ratio is higher than 2:1. *Id.* Plaintiffs are puzzled by this methodology and what it is designed to address. As Plaintiffs understand it, this methodology captures only whether an LEA has high rates of restraint and seclusion among those students with disabilities who have been restrained or secluded. The methodology does not capture those LEAs that have high rates of restraint and seclusion incidents among all of their students with disabilities nor those LEAs that have high rates of unduplicated students with disabilities who are restrained or secluded. This runs the risk of missing districts with extremely problematic practices. For example, a district that restrained more than half of its students with disabilities, but only restrained them each one time, would not be flagged at all.

The State argues that "it is challenging to quantitatively know which reported restraints and seclusions are legally permissible, and which are not" and that the State "will flag an LEA for monitoring in the event that its LEA-level data *hints* at the LEA potentially overutilizing the practice of restraint and seclusion." *Id.* at 15. But it is not at all clear how the State's proposed ratio does anything more than flag those LEAs that restrain or seclude the same students with disabilities repeatedly. While problematic, this is not the only concern associated with restraint and seclusion. This calculation does not tell us anything about how frequently an LEA employs restraint and seclusion of students with disabilities relative to the overall number of students with disabilities nor the proportion of students with disabilities who are restrained and secluded.

Accordingly, *Plaintiffs request that the State develop a method for "flagging" LEAs for further restraint and seclusion monitoring that will capture (a) LEAs that have a high rate of restraint and seclusion incidents relative to the overall number of students with disabilities and (b) those LEAs that that have a high number of students with disabilities who have been*

*restrained or secluded relative to the overall number of students with disabilities. At a minimum*
*the State must more clearly explain why it chose its methodology.*

**B.  The Use of Restraint and Seclusion Data in the CIM Selection and Processes**

Similar to the State's use of IEP implementation data, Plaintiffs' understanding is that
restraint and seclusion data will not be included among the criteria for selection for intensive
monitoring. Plaintiffs are unclear whether restraint and seclusion data will be considered among
the performance targets that are used for selection for Targeted Monitoring and Support (Levels
1-3).  Finally, Plaintiffs understand that those LEAs that are otherwise not selected for or in the
process of Targeted or Intensive Monitoring, but are nonetheless flagged for restraint and
seclusion, will be sorted into the Targeted-Compliance Only tier of monitoring. According to the
amended CIM Process Revised Activity Chart, Exh. 18, Dkt. No. 2851-18, LEAs in Targeted-
Compliance Only will be issued corrective actions only, though LEAs that are flagged for
restraint and seclusion data quality will be required to complete the "Data Quality Toolkit" and a
"Data Drill Down." Plaintiffs also note that the State has developed a lengthy set of restraint and
seclusion compliance questions with corrective actions required for the LEAs' "Student Record
Review," but it is not clear how those activities will be used to identify systemic problems with
restraint and seclusion.

With these understandings, Plaintiffs request that the State address the following
questions or concerns:

1.  *Will restraint and seclusion be included among the performance targets used for*
    *Targeted Monitoring (Tiers 1-3) and, if not, why not?*

2.  *Why has the State chosen not to include restraint and seclusion among the criteria*
    *used for selection for Intensive Monitoring (Tiers 1-3)?*

3.  *For those LEAs sorted into Targeted-Compliance Only for restraint and seclusion, how will the State ensure that systemic issues of non-compliance are identified and addressed through the corrective action process or otherwise, especially for LEAs flagged for concerning rates of restraint and seclusion, rather than data quality issues*?

4.  *Because any incidents of restraint and seclusion at a non-public school (NPS) are reported to the State by the LEA who placed the student at the NPS (not by the NPS), does the State have any ability to identify those NPSs that have high rates of restraint and seclusion*? Plaintiffs note that certified NPSs are monitored by the State on a cyclical basis, *see* Dkt. No. 2518 at 94–98; Dkt. No. 2520 at 32, but do not know whether restraint and seclusion is part of that monitoring process.

## IV.

## QUESTIONS AND CONCERNS REGARDING THE STATE'S PLAN FOR SELECTION OF SMALL LEAs FOR THE CIM-S PROCESS AND THE ACTIVITIES THAT SMALL LEAs MUST COMPLETE FOR THAT PROCESS

Plaintiffs appreciate the State's revised approach to selecting small LEAs for the CIM-S process, its description of the monitoring activities that small LEAs must undertake for Targeted and Intensive Monitoring, and its identification of those CIM activities that have been modified for small LEAs. Of particular note is the State's proposal for "tiering" small LEAs for the CIM-S process. Dkt. No. 2851 at 23-27. The State has identified 11 criteria that it will use to flag small LEAs for the CIM process. If an LEA receives five-to-seven flags it will be identified for CIM-S at the Targeted level. If an LEA receives eight or more flags it will be identified for CIM-S at the Intensive level. Plaintiffs do not object to this method in the abstract, *but request that the State explain how it arrived at its thresholds for inclusion of small LEAs in Targeted and Intensive*

*Monitoring and whether the State has calculated how many small LEAs would be included in each of these CIM processes under this methodology.*

As a final item, Plaintiffs note that they could not find the accountability matrix for non-small LEAs in the revised manual. *Plaintiffs request that the matrix be included in the manual.*

## V.
## CONCLUSION

Plaintiffs would like to acknowledge the work of CDE staff and leadership in developing, as the Court put it, an IDEA monitoring system that, while not "perfect, it is a world away from what the state was doing before working with the Court, the plaintiffs, and the monitor to get into compliance with the IDEA." Dkt. 2847 at 12. Now in this final Phase 4, Plaintiffs request that the State address their questions and concerns with the remaining three items, by doing the following:

1) Developing a more robust system to audit IEP implementation data that includes reviewing LEA documents for the LEAs being audited.

2) Developing IEP implementation data collection guidance for LEAs to ensure that LEAs do not reduce inclusion of students with disabilities in an attempt to make data collection easier.

3) Developing a system to flag LEAs for restraint and seclusion issues that captures LEAs that have a high rate of restraint and seclusion incidents relative to the LEA's population of students with disabilities and LEAs that restrain a high number of students with disabilities relative to the population of students with disabilities in the LEA.

4) Providing clarification on the additional questions raised in this filing.

Plaintiffs respectfully request that this Court evaluate whether the State has adequately addressed these questions and concerns before finding the State in compliance with its Phase 4 obligations.

Dated: September 13, 2024   Respectfully submitted,

         YOUTH AND EDUCATION LAW PROJECT
         STANFORD LAW SCHOOL
         MILLS LEGAL CLINIC

     BY: */s/ William S. Koski*
         William S. Koski

         *Attorneys for Plaintiffs Emma C., et al.*

         NATIONAL CENTER FOR YOUTH LAW

     BY: */s/ Freya Pitts*
         Freya Pitts

         *Attorneys for Plaintiffs Emma C., et al.*

**CERTIFICATE OF SERVICE / ECF ATTESTATION**

I hereby certify that on September 13, 2024, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**PLAINTIFFS' RESPONSE TO STATE DEFENDANTS'
PHASE 4 COMPLIANCE REPORT**

I further certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on September 13, 2024, at Stanford, California.


DATED: September 13, 2024

                                   _/s/ William S. Koski_
                                   William S. Koski