**United States District Court**
Office of the Court Monitor
*Emma C., et al., v. Tony Thurmond, et al.* **(No. C96-4179 VC)**

**mmlawer@rcn.com**　　　　　　　　　　　　　　　　　　　　　　　**Mark A. Mlawer**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**Court Monitor**

# California Department of Education Special Education Monitoring System, Phase 4: Court Monitor Response to State Submission

September 13, 2024

## I. Introduction

This response concerns the adequacy of a) CDE's plan for the inclusion of IEP implementation data in selection for, and the process of, Compliance and Improvement Monitoring (CIM); b) CDE's plan for the inclusion of restraint and seclusion data in selection for, and the process of, CIM; and c) CDE's proposed modified CIM selection process for small LEAs (CIM-S) (Dkt. No. 2847 at 1, 12).

This response raises some potential concerns about CDE's proposed approaches to each of these issues. It is likely that many of these concerns will be addressed through additional details from CDE. To assist CDE, issues on which additional clarity and details are needed have been italicized below.

The most important of the issues raised below has to do with the monitoring of IEP implementation. The Court's Phase 1 Order was clear about the significance of IEP implementation in the IDEA. But unlike much of the other data used to determine an LEA's monitoring tier and level, IEP implementation can only affect the tier and level under one limited circumstance. That approach may not comport with the importance of this issue.

## II. IEP Implementation

The stated focus of CDE's approach to monitoring the implementation of IEPs is to identify those LEAs with systemic issues in providing IEP services. Each non-small LEA is sorted into one of three categories based on the collected data—delivery of 95-100% of services, 90-94.9% of services, or fewer than 90% of services. CDE then selects

10% of the LEAs in each of these categories for validation; the LEAs selected for validation are to complete a survey which is then reviewed by the CDE consultant (Dkt. No. 2851 at 5-7; survey at Dkt. No. 2851-6).

CDE states that the purpose of the validation survey is to assist in determining the "integrity" of an LEA's processes to collect IEP implementation data.  But the state provides no information regarding 1) the criteria it will use to evaluate survey responses, and 2) the steps it will take when it determines, based on the surveys, that the processes used by an LEA to collect these data lacked sufficient integrity.  *CDE should provide this information in its response.*

A number of CDE exhibits use the word "audit" in connection with the validation, but it is not entirely clear if this refers to an activity that will attempt to ascertain the accuracy of the data for the selected LEAs, although CDE does state that this activity will "[a]ssess the validity and reliability" of the data (Dkt. Nos. 2851-2 at 22, 2851-3 at 3, 2851-4 at 4).  *In its response CDE should lay out the steps it will take during the audit.*

The state intends to flag for additional intervention any LEA reporting that more than one-half of its sample of students received fewer than 90% of their services.  Notably, its approach to flagging these LEAs departs from its CIM structure of tiers and levels.  In other words, IEP implementation data will not affect an LEA's monitoring tier or level, with one exception:  if the LEA would otherwise have been labeled "meets requirements," failing to meet CDE's IEP implementation standard will result in a monitoring designation of "Targeted-Compliance Only" and an annual determination

of "needs assistance" (Dkt. Nos. 2851 at 8, 11-12, 2851-7 at 2).

Thus, CDE intends to treat IEP implementation data differently from the other data it uses to determine an LEA's monitoring status, as the former data will not contribute to an LEA's monitoring status except in the limited situation noted above. This is arguably at odds with the Court's discussion of the importance of IEP implementation: the Phase 1 order describes the implementation of IEPs as an LEA's "most fundamental obligation under the statute."[1] The most fundamental obligation of the statute should be capable of affecting the monitoring tier and level of LEAs.[2]

Although not entirely clear from its submission, it appears that CDE will require a drill down of IEP implementation data for all flagged LEAs regardless of whether they are implementing CIM steps 1-3, step 4, or are compliance-only for this indicator (Dkt. No. 2851 at 12). *It would be helpful if CDE clarified exactly what flagged LEAs will be required to do in its response.*

CDE's submission does not address whether an LEA in which more than 50% of students received fewer than 90% of their services will result in findings of noncompliance for the affected students. Findings of noncompliance are subject to federal requirements that they be corrected for the individual students and

---

[1] Dkt. No. 2428 at 14; full discussion at 13-18.

[2] CDE concedes in a footnote that its choice to deprive IEP implementation (and restraint and seclusion) of a role in tiering LEAs may seem "contradictory on the surface," but notes that it did so in order to ensure that LEAs with no other known compliance or performance problems are flagged for further monitoring (Dkt. No. 2851 at 11, fn. 5). But that laudable objective could also be achieved while allowing IEP implementation to affect the monitoring status of all LEAs.
 CDE also casts doubt on whether poor performance on this indicator would always signal "a true, systemic issue" rather than poor document management, for example (Dkt. No. 2851 at 12). But the CIM process is equipped to handle such possibilities. For example, at Phase 3B LEA 1 asserted that no substantive issues accounted for its three missed indicators (see Dkt. No. 2827 at 11).

systemically, with the latter monitored via the Prong II review. In addition, they must be reported on the federal SPP/APR. *CDE should discuss this issue in its response.*

### III. Restraint and Seclusion

As CDE points out, unlike IEP implementation CDE was not found out of compliance on the collection of restraint and seclusion data at Phase 1. These data were first reported to the state in 2020. Nonpublic schools are required to report their data through the LEAs with which they contract. LEAs certify the accuracy of the data they report to the state (Dkt. No. 2851 at 15-16).

Despite LEAs' certification of accuracy, CDE has what appears to be well-grounded concerns about the accuracy of the data. In an April 2024 memo to LEAs and county offices of education, CDE stated that, because many LEAs reported zero instances of restraint and seclusion for all students, "it is likely that these data represent significant underreporting rather than a lack of incidents."[3] The memo sets forth possible causes of the underreporting for both SWD and students without IEPs, and acknowledges that there may be other causes as well. For SWD, the two possible causes mentioned are LEAs failing to ensure that incidents of restraint and seclusion reported on behavioral emergency reports (BERs) are entered into the student information system, and master contracts between LEAs and NPS facilities not clearly stating that the facilities must report such incidents to the LEA so that the LEA can report them to CDE.

---

[3] https://www.cde.ca.gov/ds/sp/cl/ressec20240412.asp.  This link is provided in Ex. 10 (Dkt. No. 2851-10).

CDE intends to flag for data quality concerns:

- non-small LEAs that do not report restraint and seclusion data or do not certify the data submission;

- LEAs that report zero instances for SWD at NPS placements and have more than ten SWD placed at NPS;

- LEAs that report zero incidents for SWD and have more than 50% of their SWD placed at separate schools or residential facilities;

- LEAs that report zero incidents for SWD and have high suspension/expulsion rates; and

- non-small LEAs that report zero incidents for general and special education.

Flagging these types of LEAs for data quality is a reasonable approach.

LEAs flagged only for data quality must complete the Data Quality Toolkit and, according to Ex. 18, are designated "Targeted-Compliance Only" and "needs assistance." LEAs that are in the CIM process for other reasons and are flagged for data quality must also complete the Toolkit (Dkt. Nos. 2851 at 17, 19-20; 2851-18 at 2).[4]

A review of CDE's relevant exhibits (11-15) indicates that the Toolkit has to do with data practices in general, not specifically the collection of restraint and seclusion data. Technical assistance (TA) is available from CDE's TA provider, but this self-assessment process does not appear to include any CDE supervision or oversight. The Toolkit process is to result in an action plan.

---

[4] In addition, Ex. 18 appears to state that LEAs flagged for data quality must also complete a data drill down, but that could be an error in the table. *CDE should clarify this in its response.*

It is not clear that completing the Toolkit will be either necessary or sufficient to uncover and resolve underreporting of restraint and seclusion data. It may be unnecessary because the Toolkit calls for a general review of data practices rather than clearly targeting this precise issue; and it may be insufficient because it can miss the detailed nature of issues such as failing to transfer information from BERs to the LEA data system and the NPS master contract concern. A more targeted and efficient use of LEA resources may be for CDE to take what it has learned thus far about the causes of underreporting and ensure that LEAs focus on those potential issues. *A response from CDE regarding this concern may be helpful.*

Turning to the inclusion of restraint and seclusion in the CIM process, CDE proposes to flag (not tier) for monitoring any LEA that exceeds a 2:1 ratio of incidents of restraint and seclusion per total SWD who were restrained or secluded (total incident count for SWD divided by total unduplicated count of SWD restrained or secluded). CDE regards this as a "low threshold," one that "hints at" potential overuse of these interventions (Dkt. No. 2851 at 16-18).

LEAs flagged for exceeding this ratio are designated "Targeted-Compliance Only" and "needs assistance," and are required to perform a student record review. It is noteworthy and positive that the students to be reviewed are those who were restrained or secluded. The sample size is "up to" ten SWD, a sample size that may not be adequate in the largest LEAs in the state. The purpose of this review is to "shed light on" the use of restraint or seclusion inappropriately, i.e., "as a method of behavior intervention beyond emergency situations"; such interventions are to be used "only to

control behavior that poses a clear and present danger of serious physical harm to the pupil or others that cannot be immediately prevented by a response that is less restrictive" (Dkt. Nos. 2851-7 at 2, 2851 at 21).

Ex. 16, the review instrument and corrective actions, was examined. Several of the probes call for interviews and/or the review of policies and procedures. Regarding the former, it is unclear whether CDE will require these interviews and how it will ensure that they take place. Without interviews it may be difficult to determine whether, for example, staff members observed a student being restrained or secluded as required (Items 2-5-11 and 2-5-12, Dkt. No. 2851-16 at 6).

With respect to reviewing policies and procedures, it is unclear how such documents would shed light on, for example, whether an emergency intervention for a student was used as a substitute for a systematic behavior intervention plan, or whether the intervention was employed for longer than necessary to contain the behavior (Items 2-5-10 and 2-5-10.1, Dkt. No. 2851-16 at 4).

Consideration should be given to separating the review of practices for individual students from a review of policy and procedural documents. This would assist CDE in determining precisely what was noncompliant and in assigning corrective actions that will resolve the problem (see, for example, the multiple possible corrective actions for Items 2-5-10 and 2-5-10.1, Dkt. No. 2851-16 at 10). *It would be helpful if CDE explained in its response how it will decide which of these corrective actions to assign.*

### IV.  Small LEAs

Small LEAs will be monitored annually on compliance with timelines, disproportionality, restraint and seclusion, and correction of noncompliance.  The monitoring of restraint and seclusion is structured in the same way as it is for non-small LEAs—LEAs can be flagged for data quality and/or exceeding the 2:1 ratio.  The Toolkit is required for the former LEAs and the student record review for the latter (Dkt. Nos. 2851-1 at 88, 2851 at 28-29).  Restraint and seclusion data will also serve as a potential flag for CIM-S (see below).

The cyclical aspect of small LEA monitoring proceeds on a six-year cycle for random selection of each cohort of small LEAs, with the monitoring activities unfolding over a two-year period.  CDE has added two new activities to cyclical monitoring, assessment of infrastructure and IEP implementation.

CDE states that small LEAs often have inadequate infrastructure due to lack of resources and size.  Using the tool provided by CDE, LEAs are to assess their infrastructure and report the results.  Infrastructure issues are not included as a flag for CIM-S (Dkt. Nos. 2851-1 at 90, 2851 at 23).

As the size of the LEA will not be affected by the results of the analysis, unless CDE will provide additional resources to these LEAs it is unclear what steps CDE will take based on the results of the assessment.  As there may be small LEAs with infrastructure concerns that are not selected for CIM-S, it is also unclear if, and if so how, CDE will take any necessary steps on these concerns.  *CDE should address this issue in its response.*

As part of the cyclical process, between 20-100% of the IEPs in each small LEA will be reviewed for implementation by the LEA; the percentage of IEPs to be reviewed is based on the LEA's number of SWD. This issue is included as a potential flag for CIM-S (see below).

Unlike its process with non-small LEAs, it does not appear that CDE will divide small LEAs into categories based on the results (delivery of 95-100% of services, 90-94.9%, or fewer than 90%). Small LEAs are required to submit the survey mentioned above regarding the integrity of the LEA's processes of collecting these data, and CDE again does not set forth the standards it will use to review the survey responses, or what it will do when it determines that the processes used by an LEA lacked sufficient integrity. (Dkt. No. 2851-1 at 90, 93, 94). It appears that small LEAs flagged for IEP implementation, even if not selected for CIM-S, will be required to complete a data drill down (Dkt. No. 2851 at 28). Although not entirely clear from the submission, it is likely that such small LEAs will be designated "Targeted-Compliance Only" and "needs assistance" as is the case with non-small LEAs.

In the winter of the second year of cyclical monitoring selection for CIM-S takes place and, if an LEA is selected, the CIM process takes three years. CDE proposes eleven flags for CIM-S selection. LEAs meeting five to seven of these flags are to be selected for Targeted CIM-S, and those meeting eight or more for Intensive CIM-S. The criteria are:

- Noncompliance: 15 or more findings of noncompliance from policies and procedures, student records, and timelines. This presumably includes findings

from the restraint and seclusion student record review.

- IEP implementation:  More than 50% of students receiving fewer than 90% of services.

- Restraint/seclusion:  Greater than 2:1 ratio of incidents to students.

- Dashboard:  Identification as Differentiated Assistance for SWD subgroup.

- LRE:  Restrictive placements.  However, *CDE does not explain how this flag will be calculated, and should do so in its response.*

- Overdue corrective actions:  Any findings not corrected within one year.

- Suspension:  An LEA is automatically flagged if it has any suspensions of preschool children with disabilities.  LEAs with "high numbers" of suspensions will meet this criterion on a "case-by-case basis."  *CDE should unpack this standard and explain what it means in its response.*

- Disproportionality:  Year 2 and 3 LEAs will meet this criterion.

- Academic achievement:  LEAs with decreases in both Math and ELA achievement on the Dashboard will be flagged.

- Chronic absenteeism:  This criterion will be met if an LEA scores Red with no improvement, or Orange if chronic absenteeism is getting worse.

- CDE consultant recommendations:  The LEA will be flagged if the consultant recommends further monitoring.

This selection approach weighs each of these eleven criteria equally (Dkt. No. 2851 at 26-27).  That choice provokes some questions.

First, as discussed above, the implementation of IEPs is a fundamental obligation

10

of LEAs. While LEAs flagged for this requirement are required to engage in a data drill down, that appears to take place as part of a "Compliance-Only" designation and outside of the CIM-S process unless the LEA meets at least four other criteria.[5] That does not seem adequate to a requirement so central to the statute. As matters now stand, a small LEA could be flagged for IEP implementation, LRE, suspension, and academic achievement, for example, and not be selected for CIM-S. *In its response CDE should lay out precisely what LEAs that meet the IEP implementation flag but are not selected for CIM-S will be expected to accomplish in the drill down, how CDE will ensure that it is conducted with fidelity, and the steps that will be taken to ensure that services are delivered in the future.*

Second, setting aside IEP implementation, we can imagine a small LEA that is in year 3 of disproportionality,[6] and is also flagged for LRE, managing student behavior without relying on suspensions, and in which student outcomes are poor. That sort of LEA may show the limitations of weighing all flags equally, as it would not currently be selected for CIM-S. While CDE is surely correct in noting that "[n]ot every issue at a small LEA warrants participation in this labor- and time- consuming process" (Dkt. No. 2851 at 29), there are some combinations of four issues in a small LEA that do merit

---

[5] In other words, a CIM plan would presumably not result from this activity for these "Compliance-Only" small LEAs. But that the drill down will take place outside the CIM-S process is not entirely clear. CDE writes: "For small LEAs identified for further monitoring under the CIM-S Process, *and for those who were flagged for IEP implementation*, the small LEA will be required to complete the Data Drill Down activity *during the CIM-S Process*" (Dkt. No. 2851 at 28, emphases added). *CDE should clarify this in its response.*

[6] One additional year of disproportionality for year 3 LEAs will result in a designation of significant disproportionality. Year 3 disproportionate small LEAs are required to complete a qualitative case study (Dkt. No. 2851-1 at 88). It is not clear whether year 3 disproportionate small LEAs will also be designated "Targeted-Compliance Only" and "needs assistance." *CDE should clarify this issue in its response.*

11

meaningful CDE intervention in some form.

Third, the recommendation of the assigned CDE consultant functions in CDE's scheme as one of eleven potential flags for CIM-S. The consultant's judgment that "the LEA requires further monitoring" is to be based on "interactions, observations, reports, or other information" gained through cyclical monitoring. These are important sources of information for the CDE staff member who, as a result, presumably knows the LEA best. It is not obvious why a recommendation from the consultant that the LEA needs further monitoring should not be weighed more heavily in selection for CIM-S. Further, it is also not clear how else information learned through the infrastructure analysis will be considered during the CIM-S selection process if not through the consultant's recommendation, as infrastructure concerns are not a flag for selection.

Turning to the CIM-S process, SELPAs are tasked with providing support and assistance to Targeted-S LEAs, and CDE with assistance and direction to Intensive-S LEAs. Currently there are no additional TA providers for small LEAs, with the exception of some support from a TA provider for the data drill down. CDE states that it is learning from the current cohort of CIM-S LEAs and will consider contracting with a TA provider for small LEAs in the future (Dkt. Nos. 2851 at 30, 2851-1 at 99-100), a reasonable position. But the assignment of TA providers is mentioned with some frequency in CDE's accountability table for small LEAs. For example, in response to a root cause analysis that does not connect to data and the problem of practice, CDE is to assign the LEA additional TA providers (Dkt. No. 2851-1 at 125). *CDE should explain whether it has sufficient providers available for these circumstances.*

The CIM process itself has been consolidated for small LEAs into two steps, "Gather, Inquire, and Investigate" and "Planning and Implementation." Documents such as the CIM plan and resources have been pared down and modified. CIM activities will not have separate due dates, and this may make it more difficult for CDE to ensure that Targeted-S LEAs are timely engaging with the activities. (Due to the direct role CDE consultants are to play with Intensive-S LEAs this should not be an issue with those LEAs.) SELPAs are to provide assistance to Targeted-S LEAs in the root cause analysis, an important CIM activity, but CDE does not explain how they will be trained to do so.[7]

CDE sets forth accountability steps for small LEAs in the cyclical and CIM-S processes (Dkt. No. 2851-1 at 121-125). During CIM plan implementation semi-annual progress reports are required, directly to CDE for Intensive LEAs and to SELPAs for Targeted LEAs. For Targeted LEAs SELPAs "will submit" these progress reports to CDE, a positive oversight step. However, on the prior page of the manual SELPAs are to forward these reports to CDE "if needed" (Dkt. No. 2851-1 at 117, 116).[8] *CDE should resolve this apparent contradiction in its response.*

As to the annual determinations of CIM-S LEAs, Targeted-S LEAs will be designated "needs assistance" and Intensive-S LEAs "needs intervention" (Dkt. No.

---

[7] See the description of the root cause analysis procedure, Dkt. No. 2851-1 at 110-111. Targeted-S LEAs may require a significant amount of support to complete this activity with fidelity.

[8] CDE's activity chart states that plan implementation monitoring is the responsibility of "SELPA + CDE" (Dkt. No. 2851-1 at 100). CDE would need to review progress reports to make its share of monitoring implementation possible.

2851-1 at 100). Presumably these determinations will remain stable through the three years of the CIM process. It does not appear to be the case that, if a Targeted-S LEA's annual data indicate that student outcomes are getting worse, its determination would change to "needs intervention," even after two years of deteriorating data."[9] *A response from CDE to this issue may be helpful.*

One potentially troubling issue concerns the annual determinations for small LEAs, specifically "meets requirements." Setting aside meeting the flags for IEP implementation and restraint and seclusion, it appears that an LEA flagged, for example, for suspension, LRE, academic achievement, and chronic absenteeism, or any other four flags, would qualify for a "meets requirements" determination as these LEAs would not be selected for CIM-S. *A clear explanation from CDE of how the determination of "meets requirements" is calculated for small LEAs would be helpful.*

---

[9] See the CDE actions column in the accountability steps for this possibility (Dkt. No. 2851 at 124).