1   Rob Bonta
    Attorney General of California
2   DARRELL W. SPENCE
    Supervising Deputy Attorney General
3   STACEY L. LEASK
    Deputy Attorney General
4   State Bar No. 233281
      455 Golden Gate Avenue, Suite 11000
5     San Francisco, CA  94102-7004
      Telephone:  (415) 510-3524
6     Fax:  (415) 703-5480
      E-mail:  Stacey.Leask@doj.ca.gov
7   *Attorneys for Defendants*
    *California Department of Education, Tony*
8   *Thurmond, in his official capacity as the State*
    *Superintendent of Public Instruction, and State*
9   *Board of Education*

10                  IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

14  | | |
    |---|---|
    | **EMMA C., et al.,** | 3:96-cv-04179-VC |
    | Plaintiffs, | **STATE DEFENDANTS' REPLY IN SUPPORT OF PHASE 4 COMPLIANCE REPORT** |
    | v. | |
    | **THURMOND, et al.,** | Date:        October 25, 2024 |
    | | Time:        10:00 a.m. |
    | Defendants. | Courtroom: 4 |
    | | Judge:       The Honorable Vince Chhabria |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Responses to Plaintiffs' and the Monitor's Concerns .................................................... 1

    I.      Concerns Regarding IEP Implementation ............................................... 1

            A.     The Use of IEP Implementation Data ........................................ 2

            B.     IEP Implementation Data Validation ........................................ 3

            C.     Specific Responses to Concerns Regarding IEP Implementation Data ......................................................................................... 4

                    1.    How are student absences addressed when calculating student service minutes? ...................................... 5

                    2.    Must LEAs provide services during extended school closures due to "emergency conditions," such as natural disasters and public health emergencies, and how are service minutes addressed during such closures? ................................... 5

                    3.    How are compensatory education hours counted in the service minutes calculation? ....................................... 6

                      4.    What IEP services and interventions are counted in the service minutes calculation? ....................................... 6

                      5.    What has the State done (or can the State do) to ensure that IEP implementation data collection protocols do not incentivize more restrictive placements and services? ................... 6

            D.     Concerns Regarding IEP Implementation Data Validation Transparency ............................................................................. 7

            E.     Concerns Regarding IEP Implementation Data Use in CIM Selection and CIM Process .......................................................... 7

    II.     Concerns Regarding Restraint and Seclusion Data Analysis ................................. 7

    III.    Responses to Concerns Regarding Monitoring Small LEAs ............................... 10

Conclusion .............................................................................................................. 13

# TABLE OF AUTHORITIES

**Page**

CASES

*Emma C. v. Thurmond*
    668 F.Supp.3d 902 (N.D. Cal. 2023) ........................................................................ 1

STATUTES

California Education Code
    § 46392 ............................................................................................................................ 6
    § 49005(c) ....................................................................................................................... 9
    § 56345(a)(9) ................................................................................................................... 6
    § 56345(a)(9)(A) ............................................................................................................. 5

OTHER AUTHORITIES

34 C.F.R.
    300.600(a)(2) ................................................................................................................. 13
    300.601(b) ....................................................................................................................... 4

https://www.cde.ca.gov/ls/he/hn/specialedcovid19guidance.asp ................................................. 6

1    Defendants California Department of Education (CDE), Tony Thurmond, in his official

2    capacity as the State Superintendent of Public Instruction, and State Board of Education (SBE)

3    (collectively, State Defendants or the State) hereby submit their Reply to Plaintiffs' and the

4    Monitor's Responses to State Defendants' Phase 4 Compliance Report.  The Reply provides

5    further clarification regarding (1) the State's plan for the inclusion of IEP implementation data in

6    selection for, and the process of, CIM; (2) the State's plan for the inclusion of restraint and

7    seclusion data in selection for, and the process of, CIM; and (3) information regarding small

8    LEA's selection for monitoring and the updated rubrics for small LEAs.  To the extent that any

9    concerns are not fully addressed by this Reply, State Defendants' witnesses will provide further

10   clarification at the upcoming Phase 4 evidentiary hearing.  With this additional clarification, the

11   State will demonstrate that it has an adequate and meaningful system for monitoring school

12   districts/LEAs and enforcing the requirements of the Individuals with Disabilities Education Act

13   (IDEA).

14                **RESPONSES TO PLAINTIFFS' AND THE MONITOR'S CONCERNS**

15   As set forth in the First Amended Consent Decree (FACD), the State must demonstrate that

16   it has a monitoring and enforcement system adequate to ensure that local educational agencies

17   (LEAs) are providing an education to students with disabilities that complies with the

18   requirements of the Individuals with Disabilities Education Act (IDEA).  Dkt. 833.  In making

19   this showing, "neither excellence nor perfection is necessary."  *Emma C. v. Thurmond*, 668

20   F.Supp.3d 902, 904 (N.D. Cal. 2023); Dkt. 2847.  Instead, the State must show that it's "efforts

21   are adequate."  *Id*.

22   Throughout these proceedings, CDE has revised and adjusted its monitoring processes and

23   remained flexible in order to address items identified by this Court and the parties.  Against this

24   backdrop, CDE now provides the following clarifications and additional information to assist the

25   Court in evaluating the topics to be addressed in this Phase 4.

26   **I.    CONCERNS REGARDING IEP IMPLEMENTATION**

27   Plaintiffs and the Monitor seek clarification surrounding CDE's method for "flagging"

28   LEAs for IEP implementation.  In June 2021, the Court found the CDE in compliance with its

                                          1

obligations under federal law and the FACD with respect to statewide data collection to identify LEAs that are not providing the services promised in IEPs.  Dkt. 2644.  Thus, the Court already has determined and ordered that CDE has an adequate statewide data collection method to identify LEAs for further monitoring.  Accordingly, the issue of data collection regarding IEPs need not be further addressed.

### A.    The Use of IEP Implementation Data

With respect to how IEP implementation data will be used by CDE, CDE has proposed to flag an LEA whose data indicate that more than one-half of the sample of students reported receiving fewer than 90 percent of the services during a two-month time frame.  From the onset, CDE's intent with IEP implementation data is to identify those LEAs with systemic issues in providing the services listed in their students' IEPs for further monitoring.  CDE also notes that IEP implementation data is in addition to the other performance and compliance data CDE uses to identify LEAs for further monitoring.  The value of this combined data collection and its use in the CDE monitoring system is highlighted by the connection of the services provided to the student in relation to their academic and functional outcomes.  Focusing on the systemic issues relating to IEP implementation data with other outcome data, versus looking at each IEP service that is provided, is a more reasonable use of state resources.

Consider the following example: an LEA is identified for intensive monitoring for its school age performance.  The LEA's data indicates that their students with disabilities are chronically absent and are not obtaining English Language Arts and Math proficiency.  The LEA has also been flagged based on its IEP implementation data.  Upon receipt of the information from CDE, the LEA is directed to begin the Compliance and Improvement Monitoring (CIM) Process.  The LEA completes the required activities to gather and analyze data to understand and determine the root causes of the issues collectively, and to develop strategies and efforts to improve the issues, including to determine the correlation (if any) between its poor performance in chronic absenteeism, academic achievement, and IEP implementation.  In other words, the data is interconnected, meaning that one root cause is likely connected to multiple outcomes.  For this reason, focusing on systemic, rather than individual IEPs, is more useful in the overall CIM

1   Process and more targeted to identifying root causes and solutions to improve student outcomes

2   overall.

3        Take another example: an LEA was flagged for targeted monitoring for Disproportionality

4   last year.  The LEA was required to complete the required activities during CIM Steps 1 through

5   3, and already has an improvement plan that it is implementing.  CDE notifies the LEA it has

6   been flagged for IEP implementation.  With its improvement plan in hand, the LEA is required to

7   complete a data drill down to understand the reported implementation rates.  What occurred

8   during that timeframe to explain why more than one-half of the students sampled received fewer

9   than 90 percent of their service minutes?  Were students absent?  Were staff absent?  Was the

10  student required to participate in statewide testing?  What—if anything—does the LEA need to

11  do to adjust their improvement plan?  Conducting this data drill down inclusive of the IEP

12  implementation data in step 1 of the CIM assists the LEA identifying the root cause and high

13  leverage activity for their plan.

14       LEAs are expected to implement IEPs in accordance with the law.  CDE monitors LEAs

15  under its monitoring structure, by directing LEAs to assess their local systems and practices to

16  determine the root of the poor performance and take steps to improve.  Flagging LEAs annually

17  for IEP implementation (as well as restrain and seclusion) enables CDE to meet its federal

18  obligation to monitor LEAs with a focus to improving educational results and functional

19  outcomes for all children with disabilities, and ensures that public agencies meet the program

20  requirements under Part B of the Act, with a particular emphasis on those requirements that are

21  most closely related to improving educational results for students with disabilities.

22       **B.    IEP Implementation Data Validation**

23       With respect to Plaintiffs' and the Monitor's concerns regarding CDE's method to validate

24  IEP implementation data, CDE again notes that this Court already approved the State's data

25  collection methods, and in that sense, has already found the outputs of that data to be of sufficient

26  quality for the purposes of the State's monitoring system.

27       Notwithstanding, CDE offers the following clarification to assist the parties in

28  understanding how the process works.  Once LEAs have analyzed their data and submitted the

3

annual report to the State, CDE identifies LEAs for validation.  LEAs identified for validation are required to complete a follow-up survey to assist in determining the integrity of their processes used to determine the IEP implementation rates submitted for the students in the sample.  Survey results are submitted to the LEAs' assigned CDE monitoring consultant for review.

Similar to other data collections presented to this Court, the IEP implementation data collection employs existing validation processes to ensure data are valid and reliable.  CDE described its methodology for ensuring the LEAs submit valid and reliable data required in 34 C.F.R. 300.601(b) at Phase 1.  The validation process employed for other data collections, (and reviewed by this Court) is also employed for the IEP Implementation data collection.  Specific to this data, CDE developed and disseminated data element definitions, data collection manuals and provides training to LEAs on how to submit accurate data to CDE.  There are automatic validations in the reporting platform for data type (for example, built-in validation ensures the LEA enters expected data types such as a number instead of a date).  CDE provides the LEA the list of students included in the sample, and the LEA must also ensure those students were enrolled during the review period.  Lastly, CDE requires the LEA's Superintendent (or designee) to certify the data prior to submission to the State.  The validation survey is an additional step to the normative data validation process.

CDE believes its existing validation process is sufficient to ensure this data is valid and reliable.  CDE will continue to review its additional data validation protocols with respect to IEP implementation and determine if any refinements are required as this data collection continues.

### C.    Specific Responses to Concerns Regarding IEP Implementation Data

Plaintiffs and the Monitor each have raised some concerns regarding IEP implementation data and in its proposed use in selection for, and the process of, CIM.  Plaintiffs request that CDE develop and issue guidance for IEP implementation reporting and answer several specific scenarios they find unclear.  Plaintiffs additionally share a concern that without such guidance, LEAs may be incentivized to place students in more restrictive settings.  Dkt. 2853, p.7.

CDE believes its current technical assistance guide and related FAQ are sufficient to support LEAs in reporting IEP implementation data.[1]  However, CDE provides the following responses to each of the questions concerning the data collection of IEP implementation.

**1.    How are student absences addressed when calculating student service minutes?**

Based on their review of the FAQ on how LEAs should address student absences when calculations, Plaintiffs conclude "that the State, on a case-by-case basis, will provide relief in the monitoring process for those LEAs that had problematic IEP implementation rates due to student absences" and request that the State more thoroughly describe when and how "relief" would be provided.  Dkt. 2853, p. 5.

As indicated, the intent of the IEP implementation data collection is to flag LEAs with systemic issues in implementing their IEPs.  CDE provides reporting guidance to LEAs on how to report instances of extended absences and the existing reporting guidance is clear: IEP implementation percentages should be based upon actual service minutes provided during the evaluation period.  Plaintiffs' conclusion that CDE provides "relief" is not correct, nor is it applicable here.  If the LEA is randomly identified for validation of reported data, the validation is to ensure the data is accurate as reported so that CDE may appropriately flag the LEA for IEP implementation.  CDE believes its current FAQ is sufficient in directing how LEAs should address student absences when calculating service minutes.

**2.    Must LEAs provide services during extended school closures due to "emergency conditions," such as natural disasters and public health emergencies, and how are service minutes addressed during such closures?**

Plaintiffs request the State describe how LEAs are to calculate and report service minutes during extended school closures due to "emergency conditions."  California Education Code section 56345(a)(9)(A) states that the IEP must include "[a] description of the means by which the individualized education program will be provided under emergency conditions, as described

---

[1] See the IEP Implementation Data Collection Technical Assistance Guide 2023–24 Version 3 (Dkt. 2851-3) and IEP Implementation Data Collection Frequently Asked Questions (FAQ) (Dkt. 2851-4).

1    in Section 46392, in which instruction or services, or both, cannot be provided to the pupil either

2    at the school or in person for more than 10 school days."

3       Further, California Education Code section 56345(a)(9) states: "[p]ublic health orders shall

4    be taken into account in implementing subparagraph (A).

5       CDE has already issued guidance specific to emergency situations, such as the COVID-19

6    public health emergency.  This guidance is accessible on the following CDE site,

7    https://www.cde.ca.gov/ls/he/hn/specialedcovid19guidance.asp.

8
9
**3.  How are compensatory education hours counted in the service minutes calculation?**

10       Plaintiffs seek clarification of how the State's guidance on compensatory education hours

11    will be operationalized and requests that CDE provide a further explanation of how compensatory

12    education services are handled in calculating service minutes within an evaluation period.  LEAs

13    are to report the service minutes delivered out of the service minutes required in the prescribed

14    IEP for the evaluation period.  In the scenario described by Plaintiffs, if the student was

15    prescribed compensatory education during the evaluation window, those delivered service

16    minutes should be included in the numerator (*e.g.*, service minutes delivered within the evaluation

17    period).

18
**4.  What IEP services and interventions are counted in the service minutes calculation?**

19       Plaintiffs request that the State clarify what IEP-prescribed services count, including

20    whether paraprofessional (1:1 aide) and "collaborative consultation" minutes are included in the

21    calculation, and what types of services would be excluded, if any.  Dkt. 2853, p. 6.

22       The current FAQ resource is adequate to assist LEAs in reporting.  Specific services listed

23    in IEPs have frequency and duration and can be calculated as service minutes for reporting to the

24    CDE.  LEAs are to report whether the services prescribed in the IEP are delivered.

25
26
**5.  What has the State done (or can the State do) to ensure that IEP implementation data collection protocols do not incentivize more restrictive placements and services?**

27       IEPs are to be implemented as written.  To speak directly to the Plaintiffs' concern, the IEP

28    indicates the specific setting in which each service shall occur.  The IEP implementation data

collection and analysis is focused on minutes, not setting.  CDE does not believe its collection, data analysis and flagging of LEAs for IEP implementation incentivizes LEAs to offer students with disabilities more restrictive placements or services.

**D.  Concerns Regarding IEP Implementation Data Validation Transparency**

Plaintiffs assert that IEP implementation data should be publicly posted.  Dkt. 2853, p. 7. CDE disagrees, and notes there is no requirement under law to do so.

In addition, CDE reminds that the data collection takes a "snapshot" of an LEA's service delivery for a sample of their students with disabilities for a finite timeframe.  The intent of the IEP implementation data collection is to identify LEAs with systemic issues in service delivery and for CDE, through its analysis, to identify LEAs to further monitor.  Additionally, this data is disconnected from other relevant data on student outcomes that puts IEP implementation data into context and provides a clearer picture of the symbiotic nature of services relative to student outcomes.  These factors support CDE's decision not to publicly post the IEP data, particularly out of concern that it will confuse the public or lead individuals to think that it pertains to a specific IEP.

CDE also questions whether Plaintiffs' request to publicly post IEP implementation data would then inadvertently result in the very concern Plaintiffs share in their response: that LEAs would be incentivized to offer students with disabilities more restrictive placements or services (so as not to be flagged by the state for monitoring in this area).  On balance, CDE has opted to not publicly post IEP implementation data at this time; however, CDE remains open to further considering this issue and refining its approach.

**E.  Concerns Regarding IEP Implementation Data Use in CIM Selection and CIM Process**

State Defendants will be prepared to provide further clarification in the area at the upcoming hearing.

**II.  CONCERNS REGARDING RESTRAINT AND SECLUSION DATA ANALYSIS**

Here, Plaintiffs request that CDE "develop a method for "flagging" LEAs for further restraint and seclusion monitoring that will capture (a) LEAs that have a high rate of restraint and

7

1    inclusion incidents relative to the overall number of students with disabilities and (b) those LEAs

2    that have a high number of students with disabilities who have been restrained or secluded

3    relative to the overall number of students with disabilities." Dkt. 2853, p. 11-12. Essentially,

4    Plaintiffs are asking that CDE change their analyses and selection methodology to flag LEAs for

5    restraint and seclusion.

6          CDE's proposed methodology is informed by its concerns of data quality, specifically

7    underreporting. For this reason, CDE set forth in its proposal that it will analyze LEAs annually

8    for the quality of the data they report and their use of restraint and seclusion for students with

9    disabilities. The Monitor highlights that "CDE has what appears to be well-grounded concerns

10   about the accuracy of the data" and that CDE's proposed methodology to flag certain types for

11   data quality "is a reasonable approach." Dkt. 2854, pp. 4-5.

12         Plaintiffs include a poignant quote from the Phase 1 Order—"[t]he state's policymakers do

13   not dispute the importance of collecting data on restraint and seclusion" (Dkt. 2428, p. 27) and

14   "there is significant evidence that schools *misuse restraint and seclusion to control the behavior*

15   *of children with disabilities*, often leading to grave consequences." Dkt. 2428, p. 26, emphasis

16   added. Indeed, CDE's proposed methodology to flag LEAs and monitor such LEAs speaks

17   directly to the Court's concern. If CDE were to adopt Plaintiffs' methodology, fewer LEAs

18   would be flagged since LEAs' computed restraint and seclusion rates may appear lower due to the

19   size of the student population and any reporting variants.

20         Additionally, CDE is unclear on the thresholds Plaintiffs have in mind when they state a

21   "high rate" of restraint and seclusion incidents relative to the overall number of students with

22   disabilities and LEAs that have a "high number" of students with disabilities who have been

23   restrained or secluded relative to the overall number of students with disabilities. Dkt. 2853, p. 2.

24         Notwithstanding, CDE appreciates the comments from Plaintiffs and the Monitor regarding

25   restraint and inclusion methodologies for monitoring, and CDE is considering whether to refine

26   its method of identifying LEAs for monitoring as the quality of the data increases in the future.

27   But for now, CDE retains its proposed methodologies to analyze and flag LEAs for monitoring in

28   restraint and seclusion, as it believes that it will identify those LEAs who misuse restraint or

8

seclusion as means of behavior modification as opposed to "a safety measure of last resort."  Cal. Ed. Code, § 49005(c).

Related to this topic, the Monitor indicates that CDE's approach to flag LEAs for data quality concerns "is reasonable," but at the same time, the Monitor seeks clarification as to CDE's proposal to require LEAs to complete the Data Quality Toolkit as a required activity if flagged for restraint and seclusion data quality concerns.  LEAs identified for targeted monitoring and those flagged as having data quality issues with restraint and seclusion and/or are Disproportionate Year 1 are required to complete the Data Quality Toolkit activity.  The Data Quality Toolkit supports LEAs with data use and data governance to help improve data quality.

Further, the Monitor notes it would be helpful if CDE explains how it will decide which corrective actions will be assigned when reviewing restraint and seclusion.  CDE's proposal requires LEAs flagged for restraint and seclusion to complete a student record review and provided the proposed compliance questions and corrective actions for the Court's and parties' review.  See Dkt. 2851-16.

For further clarification, an LEA-level corrective action is required if a student-level noncompliance is uncovered.  For example, compliance question 2-5-10.1 asks: "For a student that has had an emergency intervention, was the emergency intervention employed for not longer than necessary to contain the behavior?"  In order to determine compliance, the LEA (or CDE monitoring consultant if conducting the review on behalf of the LEA) is required to review student-level documentation, such as the student's behavior intervention plan or behavior emergency report.  If determined noncompliant, (*e.g.*, for compliance 2-5-10.1 that the emergency intervention was employed longer than necessary to contain the behavior), three corrective actions are issued:

(1) The LEA must develop policies and procedures regarding emergency interventions, specifically that the emergency intervention must not be employed for longer than necessary to contain the behavior if policies and procedures do not exist, or do not specify the compliance standard.

9

1

2   (2) The LEA must provide evidence that in-service training has been completed for

3   administrators and staff on the policies and procedures related to emergency

    interventions.

4   (3) The LEA staff will ensure that all student records are compliant with the required

5   standard. CDE staff will conduct a Prong II review to review another set of applicable

6   student records to determine 100 percent compliance.

7   Accordingly, CDE believes its monitoring system as to restraint and inclusion data is not only

8   adequate, but reasonable under the circumstances.

9   **III.    RESPONSES TO CONCERNS REGARDING MONITORING SMALL LEAS**

10          Both Plaintiffs and the Monitor request additional clarification in relation to CDE's

11   monitoring of Small LEAs. CDE provides such further clarification below as follows.

12          First, the Monitor notes that Assessment of Infrastructure Analysis is a required Cyclical

13   Monitoring activity, yet the results of this activity are not included as a flag to select small LEAs

14   for CIM-S and requests what steps, if any, the CDE will take with LEAs reporting infrastructure

15   analysis concerns uncovered during the course of the small LEA's Cyclical Monitoring

16   participation.  Dkt. 2854, p. 11.

17          To clarify, a primary purpose of the Assessment of Infrastructure Analysis is to assist in

18   determining small LEA participation for CIM-S.  CDE monitoring staff leverage the results of

19   this analysis when analyzing the other tiering data.  For those LEAs completing this activity but

20   are ultimately not identified to participate in the CIM-S, CDE does not require the LEA do

21   anything further for this particular activity.  However, results of this analysis may in fact support

22   the LEA in other improvement efforts, and nothing prevents the LEA from taking action based on

23   its findings.

24          Regardless of the use of an additional monitoring activity that would be used to identify

25   small LEAs for CIM-S, CDE continues to assert that Cyclical Monitoring is monitoring.  Smalls

26   LEAs participation in Cyclical Monitoring (and other types of Annual Monitoring such as

27   timeline noncompliance and disproportionality monitoring) exceeds the standard set by the U.S.

28

1    Department of Education that requires States monitor every LEA once every six years (OSEP

2    Memo 23-01, Question A-11).

3         Second, the Monitor states that it does not appear that small LEAs will be divided into three

4    categories for IEP implementation (delivery of 95-100% of services 90-94.9% or fewer than

5    90%).  Dkt. 2854, p. 9.  This is not accurate.  CDE will require that small LEAs follow the same

6    data collection processes for IEP implementation as non-small LEAs.  The process deviates from

7    large LEAs in that small LEAs are required to report these data to the CDE only when identified

8    for and monitored under Cyclical Monitoring.

9         Third, Plaintiffs and the Monitor request CDE clarification on the tiering data CDE puts

10   forth to identify small LEAs for the CIM-S Process and for which tier, Targeted or Intensive.

11   Plaintiffs request CDE explain its reasoning on the thresholds and whether CDE has calculated

12   how many would be selected in each level based on its proposed methodology.  The Monitor

13   requests clarification on specific flags and CDE's justification to weigh each criteria equally.

14        In response to Plaintiffs, CDE believes it is reasonable to identify LEAs flagged for more

15   than half the selection criteria to be eligible for CIM-S participation.  CDE-proposed tiering data

16   identifies multiple flags across multiple areas to quantitively and qualitatively assess small LEAs

17   for compliance and performance under IDEA.  It is reasonable to select those small LEAs that

18   have at least areas flag to suggest the LEA is experiencing more systemic issues.  CDE proposes

19   reviewing the tiering data and other qualitative information, such as the results of the assessment

20   of infrastructure, complaints, and Office of Administrative Hearing decisions, and the CDE

21   monitoring consultants will analyze each LEAs results and will leverage their expertise to select

22   small LEAs in most need of CIM-S participation.

23        CDE is prepared to provide estimated counts of small LEAs selected for Targeted and

24   Intensive monitoring tiers at the next evidentiary hearing.  CDE wishes to reiterate that under its

25   revised monitoring processes, even if a small LEA is not identified to participate in the CIM-S

26   process that all small LEAs are now monitored both annually and cyclically.

27        In response to the Monitor, CDE clarifies that small LEAs will be flagged for the least

28   restrictive environment (LRE) criterion if more than one-half of the students with disabilities are

served in restrictive placements (indicator 5b, regular class less than 40 percent of the day; indicator 5c, separate schools and/or served by a nonpublic school).  CDE proposes that small LEAs will be flagged for the Suspension criterion in a similar manner as LRE: if more than one-half of their students with disabilities are suspended.

Fourth, the Monitor questions why CDE gives equal measure to tiering criteria and questions why the CDE monitoring consultant's recommendation is not weighed more heavily in CIM-S selection.

CDE has elected to assess multiple areas to flag small LEAs for the CIM-S Process.  As described in past testimony and submissions, small LEAs are different than large LEAs.  The identified tiering criteria allow CDE to review the small LEA using multiple factors to ensure that CDE is identifying small LEAs with systemic issues.  Future iterations of the selection process may weight some criteria if there is evidence CDE should do so.

Fifth, Plaintiffs were unable to find the small LEA accountability matrices and the Court Monitor requested clarification on technical assistance providers for certain circumstances to hold small LEAs accountable, and clarification on progress reports for small LEAs selected for intervention under the Targeted tier.  The small LEA accountability matrices may be found in CDE's revised CIM Manual, pages 120 to 124, Dkt. 2851-1.

In response to the Monitor's question as to how small LEAs will be supported absent a small LEA-specific Technical Assistance Provider, CDE reiterates LEAs will have sufficient technical assistance.  CDE monitoring staff and the LEAs' Special Education Local Plan Area (SELPAs) provide technical assistance throughout Annual Monitoring and during the Cyclical Monitoring activities.  When selected for the CIM-S process, SELPAs continue their support for small LEAs in Targeted and CDE monitoring staff for small LEAs at the Intensive level.

Sixth, the Monitor believes it would be helpful for the CDE to clarify whether an apparent contradiction exists in the CDE's revised CIM Manual, and its proposed monitoring of small LEAs identified for the CIM-S process at the Targeted level.  To confirm, CDE proposes that improvement plan implementation will be directly monitored by the SELPA with CDE coordination and oversight for LEAs identified for Targeted.  Targeted LEAs will report their

12

1    progress by submitting progress reports to their SELPA, and SELPAs will submit Targeted-S

2    Progress Reports to the CDE.  CDE will work with SELPAs to calibrate progress monitoring

3    approvals and address any concerns identified in progress report submissions.

4         Seventh, the Monitor states a clear explanation from CDE of how the determination of

5    "meets requirements" is calculated for small LEAs would be helpful.  To be clear, CDE makes–

6    and will continue to make–annual determinations as required under 34 C.F.R. 300.600(a)(2).  In

7    order for a small LEAs to receive a "Meets Requirements" annual determination under the IDEA,

8    the small LEA will have no disproportionality, no noncompliance associated with policies and

9    procedures review, no timeline noncompliance, no systemic performance flags and no individual

10   student-level noncompliance.

11                                  **CONCLUSION**

12        State Defendants appreciate the thoughtfulness and insights provided by Plaintiffs and the

13   Monitor in relation to the CIM Process and the phases as established by this Court.  State

14   Defendants believe that the updated monitoring system in relation to IEP implementation,

15   restraint and inclusion data, and small LEAs, is both adequate and in compliance with the IDEA

16   and the Consent Decree.  To the extent that the Court or the parties have any remaining questions,

17   State Defendants will address them at the upcoming evidentiary hearing.

18

19   Dated:  September 27, 2024                    Respectfully submitted,

20                                                 ROB BONTA
                                                   Attorney General of California
21                                                 DARRELL W. SPENCE
                                                   Supervising Deputy Attorney General
22

23

24                                                 */s/ STACEY L. LEASK*
                                                   STACEY L. LEASK
25                                                 Deputy Attorney General
                                                   *Attorneys for Defendants California*
26                                                 *Department of Education, the*
                                                   *Superintendent of Public Instruction, and*
27   SA2005104070                                  *the State Board of Education*

28

---

                                        13

# CERTIFICATE OF SERVICE

Case Name:   **Emma C., et al. v. Thurmond,**        No.   **3:96-cv-04179-VC**
                   **et al.**

I hereby certify that on <u>September 27, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

    **STATE DEFENDANTS' REPLY IN SUPPORT OF PHASE 4 COMPLIANCE REPORT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>September 27, 2024</u>, at San Francisco, California.

|  |  |
|:---:|:---:|
| G. Guardado | */s/ G. Guardado* |
| Declarant | Signature |

SA2005104070
44340118.docx